CAUSE NO. 537721

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY | § | IN THE PROBATE COURT |
| AS TRUSTEE OF THE HOLLI ANN | § | |
| HARDIN TRUST NUMBER ONE | § | |
| *Plaintiff*, | § | |
| | § | NUMBER ONE (1) |
| v. | § | |
| | § | |
| DAKOTA FONTENOT | § | |
| *Defendant*. | § | HARRIS COUNTY, TEXAS |

**PLAINTIFF'S FIRST AMENDED PETITION AND APPLICATION FOR
ADDITIONAL TEMPORARY AND PERMANENT INJUNCTIVE RELIEF**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff LINDA GOEHRS ("Plaintiff"), in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, and files this her First Amended Petition and Application for Additional Temporary and Permanent Injunctive Relief against Defendant DAKOTA FONTENOT ("Defendant"), and in support thereof would respectfully show unto the Court the following:

**I.
DISCOVERY CONTROL PLAN**

1.    Plaintiff intends to conduct discovery under Level 3 of Rule 190.4 of the Texas Rules of Civil Procedure.

**II.
CLAIM FOR RELIEF**

2.    Pursuant to Rule 47 of the Texas Rules of Civil Procedure, Plaintiff seeks monetary relief of more than $1,000,000.00 and non-monetary relief.

### III.
### PARTIES

3.      Plaintiff LINDA GOEHRS ("Plaintiff") is an individual residing in Harris County, Texas and currently serving as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One (the "Hardin Trust"). Plaintiff may be served through the undersigned attorneys of record.

4.      Defendant DAKOTA FONTENOT ("Defendant") has appeared through counsel in the matter before the Court and may be served through his attorneys of record, Jeffrey D. Watters, Jr., John P. Avant III, James Madison Ardoin III, and Paul S. Beik.

5.      Intervenor MICHELLE FONTENOT ("Michelle") has appeared through counsel in the matter before the Court and may be served through her attorneys of record, Ryan O. Cantrell and Mariah J. Karigan.

6.      Intervenor DALLAS JOSEPH FONTENOT III ("Joe") has appeared through counsel in the matter before the Court and may be served through her attorneys of record, Ryan O. Cantrell and Mariah J. Karigan.

7.      Intervenor MADISON E. FONTENOT ("Madison"), as next friend of minor children S.F. and W.F., has appeared through counsel in the matter before the Court and may be served through her attorney of record, Paul S. Beik.

### IV.
### JURISDICTION AND VENUE

8.      Personal jurisdiction exists over Defendant because Defendant is an individual domiciled in Harris County, Texas, and this lawsuit arises from actions within the State of Texas.

9.      This Court has subject matter jurisdiction over the lawsuit because the amount in controversy exceeds the Court's minimum jurisdictional requirements. This Court further has

subject matter jurisdiction pursuant to Texas Estates Code § 32.006 because it is an action by or against a trustee and an action involving an inter vivos trust.

10. Venue is proper in Harris County, Texas pursuant to Texas Property Code § 115.001 because Defendant, the purported Trustee of the Dakota Trust, is an individual resident of Harris County and upon information and belief, the situs of the administration of the Dakota Trust is in Harris County. Venue is further proper in Harris County, Texas pursuant to Texas Civil Practice & Remedies Code § 15.002 because Harris County is the county in which all or a substantial portion of the events giving rise to Plaintiff's claims occurred.

## V.
## FACTS

11. The Hardin Trust was created on or about June 5, 1991, by Holli Ann Hardin Fontenot ("Holli"). *See* **Exhibit "A"**, *Trust Agreement*. At the time, Holli was married to Dallas Joseph Fontenot, Jr. ("Dallas"). Defendant is the child of Holli and Dallas.

12. Dallas had two children from a previous marriage, Joe and Michelle. Defendant, Holli, Joe, and Michelle were each initial beneficiaries of the Hardin Trust. During his lifetime, Dallas owned numerous properties and businesses centered around the Colorado Bar & Grill (the "Colorado Club"), a gentleman's club located in Houston, Texas. Dallas accumulated millions of dollars of assets which at the time of his death were spread between his estate, the Hardin Trust, and a separate trust known as the Dakota Trust, which was created on November 9, 1994, by Holli as settlor. *See* **Exhibit "B"**, *Dakota Trust Agreement*.

13. Dallas died on September 3, 2021, and his estate was probated in Fort Bend County Court at Law Number Four (4) under Cause No. 21-CPR-036521. Litigation pertaining to Dallas's estate and the two above-mentioned trusts (collectively the "Trusts") was resolved through a

settlement agreement dated January 7, 2022 (the "Settlement Agreement"). *See* **Exhibit "C"**, *Binding Mediated Settlement Agreement*.

14. As part of the Settlement Agreement, the parties ultimately agreed that Holli would be bought out as a beneficiary of the Trusts, with certain assets to be paid to Holli in consideration of her disclaimer of further interest in the Trusts. Specifically, the Settlement Agreement dictated that Holli's interest in both Trusts "will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One." *Id.* at p. 5–6. Subsequently, Defendant, acting as President of HFR Enterprises, Inc. entered into a 2.8 million dollar loan agreement, in part to provide the necessary consideration for Holli's interest in both Trusts. *See* **Exhibit "D",** *Amended and Restated Promissory Note*. The Hardin Trust then paid Holli $2,823,464 for her interest in both Trusts, representing 85% of the total value of the Dakota Trust assets and 20% of the total value of the Hardin Trust assets. *See* **Exhibit "E"**, *Assignment of Interest and Disclaimer of Further Interest*.

*Running of the Colorado Club Entities.*

15. As agreed upon by Defendant, Joe and Michelle, following the entry of the Settlement Agreement, Defendant took over and began to manage/run all of the entities held by the Trust. Additionally, as part of the Settlement Agreement, Defendant also was given full ownership of Entertainment Marketing & Management, LTD ("EMM").

16. Following the execution of the Settlement Agreement, Defendant was named the President and sole Director of HFR Enterprises, Inc., ICE Embassy Inc., and the Colorado Bar & Grill, Corporation.

17. On or before May 19, 2023, Defendant was appointed as sole Director, as well as President and Secretary for the Colorado Bar & Grill Corporation, a corporation which is wholly

owned by the Hardin Trust.  **Exhibit "F".** On or before May 19, 2023, Defendant was appointed as sole Director, as well as President and Secretary for HFR Enterprises Inc, a corporation which is wholly owned by the Hardin Trust.  **Exhibit "G"**. On or before May 19, 2023, Defendant was appointed as sole Director, as well as President and Secretary for ICE Embassy, Inc, a corporation which is wholly owned by the Hardin Trust.  **Exhibit "H".** Defendant served in these positions (as well as sole shareholder/officer/director of EMM) until the sale of the Colorado Bar & Grill, Corporation.

18.	After taking over full management of the entities (following the longtime manager Frank Kent retiring), Defendant caused waste to assets held in the Hardin Trust and engaged in extensive self-dealing. Defendant mismanaged the Colorado Club for personal benefit to the detriment of the Hardin Trust, including, but not limited to, the following:

  a. Hiring his wife, who had little to no experience, to manage the Colorado Club;

  b. Paying his personal credit cards out of the company;

  c. Taking vacations and claiming them as a business expense;

  d. Paying personal expenses from the company;

  e. Making unnecessary and unreasonable improvements, many of which were never completed;

  f. Firing multiple consultants and paying them hundreds of thousands of dollars with no apparent benefits provided;

  g. Changing the system of the Colorado Club to have less oversight and allowing money to be taken or taking money from the club;

h. Taking a loan from his wife's stepfather for $150,000 and within a month repaying the loan with $50,000 in interest, which was wired directly to an offshore account

i. Obligating the entities held by the Hardin Trust to enter into an unnecessary Management Agreements and Administrative Agreements with an entity he owns, on top of taking a salary from the club; and

j. Using funds earmarked for repayment of the loan used to buy Holli's interest for his own personal benefit, allowing the company to default on the loan for months and causing a fire sale of the land and stock.

19.    Defendant entered the Management Agreement between Ice Embassy, Inc. d/b/a the Colorado Bar & Grill, as President of both entities. **Exhibit "I".** Defendant used this Management Agreement to take sums that violated the terms of the Settlement Agreement.

**The Sale of the Entities**

20.    Defendant notified the Trustee of the necessity to find a buyer for the entities because if they did not sell, they would be foreclosed upon and lose everything. The Trustee would come to find out that Defendant was months behind on the loan payments, as well as failing to pay other necessary business expenses. His actions and/or inactions put the entities in a position that it appeared that a quick sale would be necessitated to avoid foreclosure.

21.    In his work to sell the Entities, Defendant, without notice to Trustee, entered into two consulting agreements (each for $100,000 to be paid at the sale of the Entities) to assist him in the sale of HFR and Ice's Stock, the real property and improvements HFR owns located at 6710 Southwest Freeway, and/or assets of the foregoing through one or more purchase agreements. Defendant, as President for both ICE and HFR, entered into consulting agreements with Gray

Entertainment Inc., (**Exhibit "J"**) and Tim Wilson (**Exhibit "K"**). There was no mention of EMM in any of these consulting agreements.

22. HFR was sold to CLE Group SKZ Real Estate, LLC, a company that was formed on June 9, 2025, and managed by JZT Investments, LLC and Nightlife Investments II, LLC.[1] The Purchase and Sale Agreement was signed by Trustee and Zack Truesdell, as President of CLE Group SKZ Real Estate, LLC.

23. ICE was purchased by Colorado Rose, LLC, a company that was formed in April of 2025, managed by Salim Dehkordi. The ICE Stock Purchase Agreement ("Stock Purchase Agreement") was signed by Trustee, Defendant, in his individual capacity and as director and president of ICE and Justin Truesdell, as Manager of Colorado Rose, LLC. **Exhibit "L"**.

24. Although undisclosed until recently, a few months after the sale of the other entities in June of 2025, EMM was purchased by Colorado Rose, LLC, the same company that purchased ICE. This Partnership Interest Purchase Agreement ("Partnership Interest Purchase Agreement") was executed by Defendant, individually, as sole member of BFD GP, LLC, BFD LP, LLC, and as BFD GP, LLC, as sole member of general partner, and Justin Truesdell, as Manager for Colorado Rose, LLC. **Exhibit "M"**.

25. Because of information provided to Plaintiff related to the running of the entities by the Defendant, Plaintiff was forced to file suit on August 21, 2025. On September 25, 2025, a Temporary Injunction was entered against Defendant enjoining him from the sale of the real property located at 3414 Old Richmond Road, Rosenberg, Texas 77471, owned by Viva Las Vegas Properties, Inc. *See* **Exhibit "N"**, *Temporary Injunction*. With discovery currently ongoing, more wrongful actions of Defendant have been uncovered since the inception of this suit.

---

[1] In its articles of Incorporation, this entity also included JZT Investment II, LLC, as a manager, but it was removed within 30 days of its formation.

26.     Specifically, on October 24, 2025, at the hearing on Defendant's Motion to Compel Mediation, over the objection of counsel for Defendant, Defendant admitted to receiving $2,750,000 for the sale of Entertainment Marketing & Management, Ltd. ("EMM"). This occurred when the entities and assets comprising the Colorado Club netted approximately $1,300,000 with Defendant urging such sale on the false premise that it was necessary to mitigate a failing financial situation.  Defendant failed to disclose the fact that he was simultaneously selling EMM to the same buyer (or related entity) and although, upon information and belief, EMM had little to no value, Defendant secured a purchase price that netted him more than twice what was received by the Trust.

27.     As of December 31, 2024, EMM's only asset was a bank account with approximately $50,000. Upon information and belief, at the time of its sale in July of 2025, EMM was insolvent, had no contractual rights to future income, and that any purchase price allocation to this entity would lack economic foundation. EMM was a management company for the Colorado Club with no ownership over assets aside from such bank account, making the purchase of EMM for $2,750,000 to be without justification. Defendant appears to have orchestrated an allocation of the Colorado Club's sale proceeds that was grossly disproportionate, diverting substantial funds from the trusts to an entity under his exclusive control. This maneuver effectively stripped the Hardin Trust of millions in value. While the Hardin Trust was intended to benefit Defendant and his two siblings, the structure of the EMM sale ensured that Defendant alone reaped the financial advantage.

28.     For these reasons, Plaintiff is left with no alternative but to assert additional claims against Defendant and seek further injunctive relief to prevent ongoing harm in the interim.

**The Dakota Trust**

29.    Defendant purports to be the Trustee of the Dakota Trust. However, upon information and belief, Defendant was not validly appointed as Trustee of the Dakota Trust. Defendant is not a named successor trustee in the Dakota Trust Agreement. *See* **Exhibit "B"**. On May 1, 2013, Decedent, as Trustee of the Dakota Trust, designated Defendant as a successor Trustee, but he later revoked this designation on October 14, 2017. *See* **Exhibit "O"**, *5/1/13 Designation of Successor Trustee*; *See* **Exhibit "P"**, *10/14/17 Designation of Successor Trustee.* Decedent similarly removed Defendant from all officer and director positions for any entities owned by the Dakota Trust, including Viva Las Vegas Properties, Inc. on the same day. *See* **Exhibit "Q",** *Viva Las Vegas Resolution.* After Decedent's death, however, without the authority to do so, Defendant started acting as Trustee of the Dakota Trust and officer and director of Viva Las Vegas Properties, Inc. As purported Trustee of the Dakota Trust, Defendant has not repaid the Hardin Trust for any of the Hardin Trust assets used to buy out Holli's interest in the Dakota Trust.

30.    It has also been discovered that Defendant is not the only beneficiary of the Dakota Trust and that his two siblings, Joe and Michele, are equal beneficiaries of this Trust. **Exhibit "B".** As such, the necessity to have the Hardin Trust to reimburse the Trust for prior transactions is less important because the beneficiaries of the trusts are similar. That said, Defendant has sold assets and withdrawn large sums of money from the Dakota Trust without making any distributions to Joe and Michele.

**VI.**
**ARGUMENT AND AUTHORITIES**

A.    <u>DECLARATORY JUDGMENT</u>

31.    A person interested in or through a trustee or other fiduciary in the administration of a trust may have a declaration of rights or legal relations in respect to the trust to determine any

question arising in the administration of the trust. TEX. CIV. PRAC. & REM. CODE § 37.005. The two prerequisites for a declaratory judgment action are: (1) there must be a real controversy between the parties and (2) the controversy must be one that will actually be determined by the judicial declaration sought. *Houston Chronicle Publ'g Co. v. Thomas*, 196 S.W.3d 396, 401 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

32.    The matter at issue involves two trusts and the mismanagement of entities and assets associated with the trusts by Defendant. A declaration determining the rights of the parties will straightforwardly determine the controversy between Plaintiff and Defendant. Accordingly, Plaintiff's request for declaratory judgment is appropriate.

33.    Holli was a beneficiary of the two trusts at issue before being bought out pursuant to the Settlement Agreement. Plaintiff, Joe, and Michelle never agreed and the Settlement Agreement did not dictate that Defendant would benefit as if he were the sole beneficiary of the Dakota Trust while the Hardin Trust covers all costs pertaining to Holli's buyout without receiving adequate consideration from the Dakota Trust. As of the date of this filing, Dakota has failed or otherwise declined to reimburse the Hardin Trust for amounts paid to Holli for the buyout, wrongfully depriving the Hardin Trust and resulting in an ultimately illicit benefit received by Defendant.

34.    Accordingly, there exists a controversy between Plaintiff and Defendant pertaining to the stipulations of the Settlement Agreement and Defendant's failure to abide thereby. Such controversy can by resolved through a declaration by the Court ordering that Defendant repay to the Hardin Trust the amounts received by Holli under the Settlement Agreement.

35.    Despite no authority to do so, Defendant has wrongfully acted when convenient for his self-dealing as the trustee of the Dakota Trust and/or officer/director of the entities comprising

the Colorado Club in which Plaintiff holds an interest. Plaintiff is resultingly entitled to a declaration from the Court stipulating that, pursuant to the Settlement Agreement, Defendant is liable to Plaintiff for 50% of the amounts received by Holli under the Settlement Agreement buyout and that Defendant is not trustee of the Dakota Trust or an officer/director of any entity within the Colorado Club in which Plaintiff holds an interest.

B.    BREACH OF FIDUCIARY DUTY

36.    To prevail on a breach of fiduciary duty claim, a plaintiff must prove that (1) there is a fiduciary relationship between the plaintiff and defendant, (2) the defendant breached their fiduciary duty to the plaintiff, and (3) the breach resulted in an injury to the plaintiff or benefit to the defendant. *Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). The existence of a fiduciary duty is dependent upon the facts of a specific case, and may arise where one person trusts in and relies on another. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 176–77 (Tex. 1997). The breach here arise before and at the moment of consent, not merely as a downstream corporate harm.

37.    In 2022, Defendant assumed management and control of the Colorado Club, which is comprised of numerous entities held in the Hardin Trust, all of which Defendant served as an officer and director. By controlling the multi-million-dollar business responsible for the value and funding of the Hardin Trust, Defendant assumed a position carrying fiduciary duties toward Plaintiff as Trustee of the Hardin Trust. Defendant further acted as trustee of the Dakota Trust throughout this period without the lawful authority to do so. By his own actions, Defendant assumed formal and/or informal fiduciary duties toward both trusts and their beneficiaries.

38.    Despite this, Defendant blatantly disregarded his responsibilities and duties toward the Hardin Trust as beneficial owner of the Colorado Club. Defendant fraudulently diverted

First Amended Petition: Goehrs-Fontenot

hundreds of thousands of dollars from the operations of the Colorado Club, causing the operation to substantially decline in value. Because of this, Defendant has wrongfully benefitted to the detriment of the Hardin Trust.

39.     Upon Defendant's insistence, the Colorado Club was sold, with the Hardin Trust receiving $1,300,000, though it has since been discovered that $2,750,000 of the total purchase price was instead allocated to EMM, which held no assets and was fully controlled by Defendant. As a result, Defendant again benefitted to the detriment of the Hardin Trust, and Plaintiff is entitled to recover against Defendant upon her breach of fiduciary duty claim.

C.     NEGLIGENT MISREPRESENTATION

40.     Defendant, as officer and director, provided false and/or misinformation and/or half-truths to Plaintiff about the sales transaction involving the Colorado Club and EMM. Defendant made a representation to the Plaintiff in the course of the Defendant's business, profession, or employment, or in a transaction in which the Defendant had a pecuniary interest; the Defendant supplied false information for the guidance of Plaintiff in their business transactions; the Defendant failed to exercise reasonable care or competence in obtaining or communicating the information; Plaintiff justifiably relied on the representation; and Defendant's negligent misrepresentation proximately caused the Plaintiff to suffer pecuniary loss or injury.

D.     FRAUDULENT INDUCEMENT

41.     A fraudulent inducement claim is similar to common law fraud and arises only in the context of a contract. *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018); *Int'l Bus. Machs. Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 228 (Tex. 2019). Such a claim requires proof that: (1) the defendant made a material misrepresentation; (2) the defendant knew at the time that the representation was false or lacked knowledge of its truth; (3) the defendant intended that the

plaintiff should rely or act on the misrepresentation; (4) the plaintiff relied on the misrepresentation; and (5) the plaintiff's reliance on the misrepresentation caused injury. *Id.*

42. In the matter at issue, Defendant represented to Plaintiff that the Colorado Club was insolvent and sale was the only option to remediate the situation. This came at a time when Defendant had wrongfully assumed a position of authority within the Colorado Club and extensively defrauded the Hardin Trust of assets to which it was entitled. Upon information provided by Defendant, the Colorado Club was sold and resulted in a net receipt of $1,300,000 by the Hardin Trust. Defendant purposefully declined to disclose that $2,750,000 was paid to EMM, an entity of relatively nominal actual value under Defendant's control, for the sale.

43. As a result of Defendant's intent to defraud and Plaintiff's reliance on Defendant's misrepresentation, Plaintiff was damaged and Defendant impermissibly benefitted. Plaintiff is resultingly entitled to recovery against Defendant upon her fraudulent inducement cause of action.

E. <u>FRAUD BY NONDISCLOSURE</u>

44. The elements of fraud by non-disclosure are: (1) a party fails to disclose a material fact within the knowledge of that party, (2) the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth, (3) the party intends to induce the other party to take some action by failing to disclose that fact, and (4) the other party suffers injury as a result of acting without knowledge of the undisclosed fact.

45. In the matter at issue, Defendant failed to disclose to Plaintiff that he was selling EMM, an entity that appears to have no value, to the same buyer for $2,750,000, funds that, upon information and belief, should have been paid to the Trust. Defendant, as an officer and director, handled all of the transactions in question, including the sale of the Colorado Club for $1,300,000 by the Hardin Trust. Defendant purposefully declined to disclose that $2,750,000 was paid to

EMM, an entity of relatively nominal actual value under Defendant's control and full ownership, for the sale. Trustee would not have approved or would have renegotiated the sale had the EMM allocation been disclosed.

46.     Plaintiff was induced to enter the transaction by Defendant as a result of Defendant's nondisclosure and Plaintiff was damaged and Defendant impermissibly benefitted. Plaintiff is resultingly entitled to recovery against Defendant upon her fraud by non-disclosure cause of action.

F.     TEXAS THEFT LIABILITY ACT (TTLA)

47.     "A person who commits theft is liable for the damages resulting from the theft." TEX. CIV. PRAC. & REM. CODE § 134.003(a). Theft is defined as unlawfully appropriating property or unlawfully obtaining services in violation of the Texas Penal Code. *Coe v. DNOW LP*, 718 S.W.3d 338, 363–64 (Tex. App.—Houston [14th Dist.] 2025, pet. filed Oct. 10, 2025).

48.     As detailed above, in the years following Dallas's death while wrongfully acting in numerous capacities relating to the Colorado Club, Defendant purposefully misdirected assets away from the Colorado Club and the trusts to himself or entities within his control. Defendant's theft violates the Texas Penal Code and has caused damages to Plaintiff, and Plaintiff is accordingly entitled to judgment against Defendant pursuant to the TTLA.  Defendant knew he had no lawful entitlement to EMM consideration attributable to the Colorado club entities value.

G.     UNJUST ENRICHMENT

49.     In certain circumstances where a party profits from the inequities borne by another, a cause of action for unjust enrichment is appropriate. *HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 891 (Tex. 1998). Unjust enrichment occurs when a person has wrongfully secured a benefit which

it would be unconscionable to retain. *Eun Bok Lee v. Ho Change Lee*, 411 S.W.3d 95, 111 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

50. Despite no authority, on numerous occasions, Defendant has received an unwarranted benefit to the detriment of Plaintiff, the trusts, and the entities comprising the Colorado Club. Defendant utilized the Colorado Club as a means of funding his lifestyle, misallocating funds away from Plaintiff for his personal benefit. This includes the recent revelation of $2,750,000 being paid to a valueless entity under Defendant's control for the sale of the Colorado Club, as admitted to by Defendant in open court.

51. For these reasons, despite the Trusts existing to continue the business built by Dallas for the benefit of his family, Defendant has robbed the Hardin Trusts of substantial assets which should have fulfilled such purpose. Defendant has caused himself to be unjustly enriched while the Hardin Trust has suffered, entitling Plaintiff to recovery on her unjust enrichment claim against Defendant.

H.   MONEY HAD AND RECEIVED

52. Defendant is liable for money had and received as the Defendant: (1) received money, and (2) that in equity and good conscience, the money belongs to the Plaintiff as Trustee. Money had and received is not premised on wrongdoing but looks to the justice of the case and inquires whether the defendant has received money which rightfully belongs to another. The money received form the sale of EMM belongs to the Plaintiff as Trustee as EMM had little to no value.

## VII.
## DAMAGES

53. As a result of Defendant's actions, Plaintiff has been damaged in an amount far in excess of the minimum jurisdictional limits of the Court. With discovery ongoing, the full extent

of Plaintiff's damages are not currently known, and the full extent may be difficult to calculate. However, Plaintiff's damages currently include $2,750,000 wrongfully received by Defendant for the sale of the Colorado Club and extensive amounts directed from Defendant away from the Colorado Club under his direction and authority.

54.     Additionally, Defendant's fraudulent and malicious actions were taken with the purposeful intent to cause substantial injury or harm to Plaintiff. TEX. CIV. PRAC. & REM. CODE § 41.007(7). Because of this, Plaintiff is entitled to an award of exemplary damages against Defendant. TEX. CIV. PRAC. & REM. CODE § 41.003.

55.     Plaintiff also seeks equitable fee forfeiture and disgorgement of all applicable fees received by Defendant and/or his representatives.

## VIII.
## APPLICATION FOR INJUNCTIVE RELIEF

56.     Based on the foregoing, there is a substantial likelihood that Plaintiff will prevail on the merits of the claims against Defendant. *See Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993). The matters at issue are extensively documented through financial records in Plaintiff's possession and those yet to be discovered.

57.     In addition, Plaintiff has no adequate remedy at law for Defendant's wrongful actions causing unknown damages unlikely to be fully traceable. *See Sharma v. Vinman Int'l, Ltd.*, 231 S.W.3d 405, 426–27 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Specifically, Defendant has established and demonstrated a propensity to hide money through illicit transactions, utilizing shell companies and directing money in a way that will be difficult to trace. Even though he received over one million from his sale of EMM, he stated that he did not have access to funds that would be necessary to refund the sale of another property for $300,000. As the damages complained of herein total in the millions, it is highly likely that Defendant will face insolvency

or become judgment proof upon an award of the damages incurred by Plaintiff. *Axis Energy Mktg., LLC v. Apricus Enters., LLC*, No. 01-23-00660-CV, 2025 WL 2470572 at *8 (Tex. App.—Houston [1st Dist.] Aug. 28, 2025, no pet. h.). Plaintiff has suffered and will continue to suffer irreparable harm from Defendant's conduct. Even if Defendant was able to respond in payment of money damages, which he most likely is not able or willing to do, Plaintiff has been irreparably harmed with years of lost profits through management of the Colorado Club which would have continued through the present and into the future and cannot be easily calculated.

58.     The harm to Plaintiff is ongoing and further harm is imminent, and if the Court does not issue injunctive relief, Plaintiff will be irreparably injured. Failure to enjoin Defendant is extremely likely to lead to further depletion of property belonging to the Hardin Trust which Defendant has methodically withheld through fraudulent means. This includes the active threat of Defendant leaving the country, depriving Plaintiff of the possibility of recovery.

59.     Plaintiff has no adequate remedy at law because Defendant has absconded with funds that are very unlikely to be fully traceable. Defendant has additionally liquidated and misappropriated assets belonging to the Hardin Trust which are unlikely to ever be found. Further, the possibility to manage and profit from the Colorado Club has been taken from Plaintiff as a result of Defendant's wrongful actions, to which no value can be assuredly attributed.

60.     Greater injury will be inflicted upon Plaintiff by the denial of the requested injunctive relief than would be inflicted upon Defendant by granting such relief. Granting the injunctive relief herein would simply preserve the status quo by requiring Defendant to abide by his legal obligations and cease his purposeful harming of Plaintiff.

61.     The issuance of injunctive relief will not disserve the public interest. Balancing the equities and other factors, the significant potential of irreparable harm to Plaintiff without the

injunctive relief and the lack of harm due to the entry of injunctive relief demonstrate that the requested relief will not disserve the public interest.

62.     In order to preserve the status quo during the pendency of this action, Plaintiff seeks a Temporary Restraining Order and Temporary Injunction against Defendant. Plaintiff requests a Temporary Restraining Order that Defendant, his agents, and other persons or entities in active concert or participation who receive actual notice of the Court's Order, by personal service or otherwise, be enjoined as follows:

    a.  Defendant is restrained from access, using, moving and/or touching any of the funds that were received from the sale of EMM;

    b.  Defendant is restrained from destroying any and all documents, records, or other information pertaining to the Colorado Club, EMM, ICE, HFR, the Holli Ann Hardin Trust Number One, Dakota Trust, or other records and assets received from Dallas Joseph Fontenot, Jr. or his estate. This includes, but shall not be limited to, all financial records, business records, information from banking or other financial institutions, and information pertaining to Defendant's personal bank accounts and other financial institutions accounts;

    c.  All accounts in Defendant's care, custody, or control pertaining to or otherwise holding assets received from the sale of EMM; and

63.     Plaintiff further seeks a temporary injunction and, upon final hearing or trial hereof, a permanent injunction for the relief requested above.

64.     Plaintiff is willing to post the necessary reasonable bond to facilitate the injunctive relief requested.

**IX.**
**REQUEST FOR APPOINTMENT OF SUCCESSOR TRUSTEE**

65.     As detailed above, despite Defendant's wrongful actions under the guise of the capacity of trustee, there currently exists no trustee of the Dakota Trust. The trust agreement of the Dakota Trust dictates that First Interstate Bank of Texas, N.A. shall serve as successor trustee following Dallas, who is deceased, and Holli, who no longer holds any interest in the Dakota Trust.

*See* **Exhibit "B"**, *Dakota Trust Agreement*, at p. 5–7. First Interstate Bank of Texas, N.A. has not accepted appointment or otherwise acted as successor trustee in the more than four years since Dallas's death.

66.    Pursuant to Texas Property Code § 113.083(a), upon the vacancy of the position of trustee or failure to select a party for such role and upon petition of an interested party, a court may appoint a successor trustee. Because of the current lack of a trustee of the Dakota Trust, coupled with the extensive fraudulent actions of Defendant, Plaintiff requests that the Court appoint a neutral third-party as successor trustee of the Dakota Trust.

## X.
## JUDICIAL DISCHARGE

67.    Defendant has taken the position that Trustee's temporary administration of the Trust has or should have terminated. If the Court determines that Trustee's temporary administration has or should be terminated, then Plaintiff seeks to resign and to obtain a judicial discharge by this Court for the actions taken as Trustee of the Trust in accordance with the Texas Trust Code.

## XI.
## CONSTRUCTIVE TRUST

68.    Plaintiff seeks to have this Court place a constructive Trust on all funds received from the purported sale of EMM.  Plaintiff will prove that there was: (1) breach of a special trust, fiduciary relationship, or actual fraud; (2) unjust enrichment of the wrongdoer; and (3) tracing to an identifiable res. Defendant breached his fiduciary duty to Plaintiff and committed fraud, he was unjustly enriched from this breach and/or fraud and the funds are those directly traceable to the purported sale of EMM, an entity with little to no value.

## XII.
## CONDITIONS PRECEDENT

69.    All conditions precedent to Plaintiff's claims for relief have been performed or have occurred.

## XIII.
## JURY DEMAND

70.    Plaintiff requests a trial by jury on all claims included in this Amended Petition.

## XIV.
## ATTORNEY'S FEES

71.    Plaintiff has been required to employ counsel to bring this suit and requests an award of all reasonable and necessary attorney's fees for the services provided in representation and pursuit of this action. Plaintiff seeks an award of fees under the Texas Trust Code and Texas Common law.  Plaintiff also seeks the award of attorney fees under the Texas Civil Practice & Remedies Code Section 38,001.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, for the reasons detailed herein, Plaintiff LINDA GOEHRS, in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, respectfully requests that the Court set her Application for Temporary Restraining Order for hearing, that a Temporary Restraining Order be issued against Defendant DAKOTA FONTENOT as detailed herein, that the Court set Plaintiff's Application for Temporary Injunction for hearing and upon hearing issue a Temporary Injunction against Defendant, that upon final hearing or trial hereof the Court enter judgment against Defendant for the relief prayed for herein, and for all such other and further relief, general or special, at law or in equity, to which Plaintiff may show herself to be justly entitled.

Respectfully submitted,



RUDOLPH M. CULP
State Bar No. 24043014
rudy@texsprobateattorney.com
COLLIN J. BULLARD
State Bar No. 24129570
collin@texasprobateattorney.com
***EFILE EMAIL:*** *efile@texasprobateattorney.com*
**HOUSTON OFFICE:**
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
O: (713) 297-0700
F: (682) 428-8137
**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was forwarded to all counsel of record in accordance with the Texas Rules of Civil Procedure on this 15th day of January 2026.

RUDOLPH M. CULP

CAUSE NO. 537,721

| | | |
|---|---|---|
| **LINDA GOEHRS, IN HER CAPACITY AS** | § | **IN PROBATE COURT** |
| **TRUSTEE OF THE HOLLI ANN** | § | |
| **HARDIN TRUST NUMBER ONE** | § | |
| *Plaintiff*, | § | |
| | § | **NUMBER ONE OF** |
| **v.** | § | |
| | § | |
| | § | |
| **DAKOTA FONTENOT** | § | |
| *Defendant.* | § | **HARRIS COUNTY, TEXAS** |

### INTERVENORS' THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, CROSS-CLAIMS, AND APPLICATION FOR TEMPORARY INJUNCTIVE RELIEF

Michelle Fontenot ("Michelle") and Dallas Joseph Fontenot III ("Joe"), individually, as beneficiaries of the Holli Ann Hardin Trust Number One and Dakota Trust, file this Third Amended Answer, Affirmative Defenses, and Cross-Claims and Application for Temporary Injunctive Relief and respectfully show the Court as follows:

### GENERAL DENIAL

1.      Michelle and Joe generally deny the allegations contained in Defendant Dakota Fontenot's First Amended Counterclaim and Cross-Claim as permitted by Rule 92 of the Texas Rules of Civil Procedure and require that Dakota prove his causes of action by a preponderance of the credible evidence.

### AFFIRMATIVE DEFENSES

2.      Michelle and Joe plead the following affirmative defenses:

a.   Dakota lacks authority as Trustee of the Dakota Trust and any entities held by the Dakota Trust.

b.   Dakota's claims are barred by the doctrines of waiver, estoppel, laches, and release.

c.   Dakota's claims are barred by the doctrine of unclean hands.

1

35034788.v1

d.  Dakota's claims are barred by the statute of limitations.

e.  Dakota's claims are barred by the doctrines of res judicata or collateral estoppel.

### ATTORNEYS' FEES

3.  Michelle and Joe seek their reasonable and necessary attorneys' fees under all applicable authority, including Section 37.009 of the Texas Civil Practice and Remedies Code and Section 114.064 of the Texas Property Code.

### AMENDED CROSSCLAIMS

4.  Intervenors Michelle Fontenot and Joe Fontenot file these First Amended Crossclaims against Dakota Fontenot, and respectfully show the Court the following:

### DISCOVERY CONTROL PLAN

5.  This is a Level 2 case under Texas Rule of Civil Procedure 190.3.

### PARTIES

6.  Michelle Fontenot, individually as a beneficiary of the Dakota Trust and the Holli Ann Hardin Trust Number One, is an individual residing in Fort Bend County, Texas. Michelle has made an appearance in this matter through her counsel of record.

7.  Joe Fontenot, individually as a beneficiary of the Dakota Trust and the Holli Ann Hardin Trust Number One, is an individual residing in Fort Bend County, Texas. Joe has made an appearance in this matter through his counsel of record.

8.  Dakota Fontenot, individually and as purported Trustee of the Dakota Trust and purported officer and director of Viva Las Vegas Properties, Inc., and is an individual residing in Harris County, Texas. Dakota has made an appearance in this matter through his counsel of record.

2

35034788.v1

9.      Linda Goehrs, as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, is an individual residing in Harris County, Texas. Ms. Goehrs has made an appearance in this matter through her counsel of record.

10.      Madison Fontenot, individually and as Next Friend of S.F. and W.F., is an individual. She has made an appearance in this matter as Next Friend through her counsel of record, Paul Beik.

JURISDICTION AND VENUE

11.      This Court has jurisdiction under Texas Estates Code § 32.006. Venue is proper in Harris County under Texas Property Code § 115.002(b).

RULE 47 STATEMENT

12.      Michelle and Joe seek monetary relief over $1,000,000 and non-monetary relief. The damages sought are within the jurisdictional limits of this court.

RELEVANT FACTS

*The Dakota Trust*

13.      Holli Ann Hardin, as Settlor, created the Dakota Trust, an irrevocable inter vivos trust, on November 9, 1994. The Dakota Trust was never amended and could not be amended except by a court of competent jurisdiction. Holli Ann Hardin served as the original named Trustee of the Dakota Trust. *See* Exhibit 1, Dakota Trust Declaration, Article V, Section A. The Trust Agreement named the following successor Trustees, in order: Dallas, Joe, Michelle, and finally First Interstate Bank of Texas. *See* Exhibit 1, Dakota Trust Declaration, Article V, Sections B and C.

14.      On September 8, 1996, Holli resigned as Trustee by serving written notice of her resignation on Dallas. *See* Exhibit 2, 9/8/1996 Trustee Resignation; *see also* Exhibit 1, Dakota

3

Trust Declaration, Section V.F. ("Any appointee serving or entitled to serve as Trustee may resign at any time and without cause.").

15.     After Holli's resignation, Dallas, as the named first successor Trustee, served as Trustee for the Dakota Trust until his death on September 3, 2021. During his tenure as Trustee, Dallas exercised the authority under Article V, Section C. of the Trust Agreement to designate successor trustees. On May 1, 2013, Dallas executed a Designation of Successor Trustee, naming Dakota as his successor, followed by Frost Bank. *See* Exhibit 3, 5/1/13 Designation of Successor Trustee. On October 14, 2017, Dallas then revoked the designation of Dakota as successor Trustee, designating Frost Bank as his successor in a formal Designation of Successor Trustee:

> Pursuant to Article V, Section C of the Trust Declaration, Dallas Joseph Fontenot, Jr. removes all prior appointments of appoints Dakota James Fontenot as successor Trustee and, instead, appoints Frost Bank to serve as successor Trustee upon the death, disability, resignation, or disqualification of Dallas Joseph Fontenot, Jr.

*See* Exhibit 4, 10/14/17 Designation of Successor Trustee.

16.     At the same time, Dallas removed Dakota as officer of Viva Las Vegas Properties, Inc., among other entities. *See* Exhibit 5, 10/14/17 Resolutions Adopted by Consent of the Shareholder and Director of Viva Las Vegas Properties, Inc. The Dakota Trust owns 100% of the stock of Viva Las Vegas Properties, Inc. (*see* Exhibit 6) and accordingly the Trustee of the Dakota Trust is the sole shareholder for Viva Las Vegas Properties, Inc.

> ESOLVED that Dakota Fontenot is hereby removed from all offices and all positions as a Director of Viva Las Vegas Properties, Inc. from and after October 14, 2017.

*See* Exhibit 5, 10/14/17 Resolutions Adopted by Consent of the Shareholder and Director of Viva Las Vegas Properties, Inc.

35034788.v1

17.     Dakota is not a named successor trustee in the Trust Agreement for the Dakota Trust, and the only document that purports to give him any claim to the trustee position was revoked in October 2017. Upon Dallas's death in 2021, a vacancy in the trustee position was created, and Frost Bank was the named successor trustee in the 2017 Designation of Successor Trustee. Neither Dallas, nor Frost Bank, ever executed any other document that would appoint Dakota as successor trustee.

18.     Despite the lack of authority, Dakota currently purports to serve as Trustee of the Dakota Trust and director/officer of Viva Las Vegas Properties, Inc. To support his claimed status as Trustee, Dakota now asserts that the October 14, 2017 Designation of Successor Trustee is "invalid as a forgery and/or revoked document." *See* Dakota's Amended Answer and Counterclaim, ¶ 12. Dakota has not, and cannot, produce any document that would validly appoint him as successor trustee of the Dakota Trust. As Dakota's purported authority to act on behalf of Viva Las Vegas Properties, Inc. stems from actions he invalidly took as purported trustee, he likewise has no authority to act on behalf of Viva Las Vegas Properties, Inc.[1]

19.     Dakota, however, not only claims to be the Trustee of the Dakota Trust and the officer and director of Viva Las Vegas Properties, Inc., but Dakota claims that he is the "only current beneficiary of the Dakota Trust." *See* Dakota's First Amended Answer and Counterclaim, ¶ 14. However, the terms of the Dakota Trust dictate that Joe and Michelle are 2/3 beneficiaries of the Dakota Trust. After Dallas's death in 2021, Dakota sought to probate Dallas's 2013 Will, and Holli sought to probate Dallas's 2013 Will and 2017 Codicil. Dakota claimed that the 2017 Codicil was a forgery or was the product of undue influence. Dakota also initiated litigation regarding the

---

[1] After hearing on an Application for Temporary Injunction filed by the Holli Ann Hardin Trust Trustee, and partially joined by Joe and Michelle, the Court granted a Temporary Injunction enjoining Dakota from selling the real property held by Viva Las Vegas Properties, Inc.

5

Holli Ann Hardin Trust Number One, seeking a declaratory judgment and appointment of a successor trustee of the Holli Ann Hardin Trust Number One. The parties settled both the Estate and Trust litigation on January 7, 2022. Dallas's 2013 Will and 2017 Codicil were admitted to probate, and Holli was appointed Independent Executor of Dallas's Estate. *See* Exhibit 7, Order Admitting Will and Codicil to Probate.

20.    As part of the Settlement Agreement, Holli's interest in both the Holli Ann Hardin Trust Number One and the Dakota Trust Number One were bought out, and Holli disclaimed her interest in these Trusts. *See* Exhibit 8, Assignment of Interest and Disclaimer of Further Interest ("Holli Ann Fontenot disclaims any right to further interest in the Dakota Trust.").

21.    Pursuant to the terms of the Dakota Trust, upon Holli's death, absent Dallas's exercise of a power of appointment, the Trust property passes to the descendants of Holli Hardin Fontenot and to the descendants of Dallas Joseph Fontenot, Jr., *per stirpes*:

3.    Dallas Joseph Fontenot, Jr., by a clause in his Will in which he specifically exercises this power of appointment, shall have the power to appoint the trust assets remaining upon the death of Holli Hardin Fontenot to or for the benefit of any one or more of the descendants of Dallas Joseph Fontenot, Jr. or the descendants of Holli Hardin Fontenot, in such shares, proportions, or amounts, upon such trusts and for such estates as he alone may determine. If Dallas Joseph Fontenot, Jr. fails to exercise this special power of appointment to the fullest extent, then, subject to the other provisions of this Trust, upon his death, the unappointed trust assets shall be delivered to the living descendants of Holli Hardin Fontenot and to the living descendants of Dallas Joseph Fontenot, Jr., per stirpes.

*See* Exhibit 1, Article VI, Section D.3. *See also* Article IV, Section E ("For example, if a distribution were to be made to the descendants, *per stirpes*, of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot, assuming the recitations in Article I, the property to be distributed would

6

be divided into three equal shares, one for each of Dallas Joseph Fontenot, III, Michelle Anne Fontenot, and Dakota James Fontenot.").

22.    As he testified at the injunction hearing, Dakota, purportedly believing himself to be the acting Trustee and sole beneficiary of the Dakota Trust, has recently sold property located belonging to Viva Las Vegas Properties, Inc. and deposited all of the proceeds into a personal bank account, and subsequently depleted the proceeds for his own personal obligations. He did not notify Michelle or Joe about the sale of the property, and inappropriately accepted all of the proceeds for himself, sharing none with the other beneficiaries.

23.    As a result of Dakota's actions and baseless claims, and Joe and Michelle bring this action for damages, declaratory judgments, and to prevent further breaches of trust.

***The Holli Ann Hardin Trust Number One***

24.    The Holli Ann Hardin Trust Number One was created on June 5, 1991. *See* Exhibit 12, Holli Ann Hardin Trust Number One Trust Declaration. Disputes arose after the death of Dallas Fontenot, Junior, relating to his Estate and the Holli Ann Hardin Trust Number One. As discussed *supra*, the parties entered into a Binding Mediated Settlement Agreement on January 7, 2022 to resolve these disputes. *See* Exhibit 13, Binding Mediated Settlement Agreement.

25.    As part of the Settlement Agreement, the parties agreed that Dakota would receive "[a]ll interest, including all associated bank accounts, in Entertainment Marketing and Management, LP," which had a value of $10,000 according to the Temporary Administrator, Gus Tamborello's Inventory. *Id.* at ¶ 4; Exhibit 14, 11/23/21 Inventory and List of Claims; Exhibit 15, 1/25/22 Order Approving Inventory and List of Claims.

26.    Trusting that Dakota would treat them fairly and had their best interests at heart, Joe and Michelle also agreed to have Dakota appointed as Officer and/or Director of Ice Embassy,

7

Inc. and HFR Enterprises, Inc., the entities owned by the Holli Ann Hardin Trust Number One. *See* Exhibit 13, Binding Mediated Settlement Agreement, ¶ 9.

27.    The Binding Mediated Settlement Agreement also provides that Dakota would remain employed by "the businesses owned by the Holli Ann Hardin Trust Number One," but "[t]he compensation amount that Dakota [] ha[s] been receiving shall remain unchanged." *See id.* at ¶ 9.

28.    As discussed in Plaintiff Linda Goehrs' Original Petition, during the years in which Dakota was responsible for managing Ice Embassy and HFR Enterprises, the entities appeared to experience a significant loss in value, while Dakota ensured that he received significant compensation increases. For example, Dakota entered into a Management Agreement on behalf of Ice Embassy with EMM, an entity that he owned, whereby EMM would receive $17,500 per month, with a true-up at the end of each year to 10% of the gross revenue for the Club. *See* Exhibit 16, 1/1/24 Management Agreement. Dakota also entered into an Administrative Services Agreement on behalf of HFR, whereby EMM would receive less than a thousand dollars per month for 2021 and 2022, but then in 2023 and beyond would receive $1,850 per month. *See* Exhibit 17, 1/1/24 Administrative Services Agreement.

29.    In May of 2025, after repeated requests for information regarding the Holli Ann Hardin Trust Number One assets, Michelle and Joe learned for the first time that Dakota had allowed the entities to fall behind on payments under the note used to buy out Holli's interest for *seven months*. The note was guaranteed by the Holli Ann Hardin Trust Number One assets, and the lender threatened to foreclose on the note if a sale of the assets was not made.

30.    Unbeknownst to Michelle and Joe, Dakota had been negotiating a sale of Ice Embassy and the real property owned by HFR to remedy the note default that he allowed for seven

8

months while he continued receiving a substantial salary. Dakota and the Trustee closed on the sale of Ice Embassy and the real property owned by HFR in June of 2025. The initial sales price for the stock of Ice Embassy was $250,000 and $4,750,000 for the HFR real property. However, due to additional Ice Embassy debts that Dakota had allowed to accrue that exceeded the Ice Embassy stock sales price, the HFR real property sales price was reduced to $4,689,424.72. *See* Exhibit 18, 6/27/25 Amendment to Real Estate Purchase Agreement.

31.     After the closing of the Ice Embassy and HFR real property transactions, Michelle and Joe were once again blindsided by Dakota's wrongdoing. Dakota had apparently reached a side agreement with the purchasers of the Ice Embassy stock and HFR real property for the purchase of the EMM partnership interests. *See* Exhibit 19, Partnership Interest Purchase Agreement. EMM, an entity with no real assets (as acknowledged by the buyers' counsel), was sold for $2,750,000. *Id.*; *see also* Exhibit 20, 5/8/25 Email from Buyers' Counsel ("the only assets of any consequence in the Partnership (as I understand it) are the Administrative Services Agreement ("ASA") and any goodwill associated with the Partnership's management business activities."). EMM's financial records reflect that it was insolvent as of December 31, 2024, the entity was insolvent, and its only contractual rights to future income could be terminated by Ice or HFR for any reason with thirty days' notice. *See* Exhibit 16, at 3.01(a), Exhibit 17, at 8.2; Exhibit 21, 12/31/24 Balance Sheet; Exhibit 22, 4/30/25 Balance Sheet. Inexplicably, Dakota sold EMM— a shell company—for $2,750,000 ***payable to him personally!*** in connection with the sale of the Ice Embassy stock and HFR real property, demonstrating a clear diversion of Trust assets away from the Holli Ann Hardin Trust Number One, Michelle, and Joe. To make matters worse, Dakota obligated both assets belonging to Ice Embassy (any monetary award from Ice Embassy credit card fee class action litigation) and the escrow amount from the HFR real property sale for any of

9

the buyers' losses *before* the sellers could withhold payments owed to Dakota under the EMM agreement, such that Ice Embassy assets and the escrow amount that should ultimately belong to the Holli Ann Hardin Trust Number One will bear the cost of any of 1) EMM's obligations incurred before the closing, 2) any fraud, intentional misrepresentation, willful misconduct, criminal act, bad faith, or gross negligence of Dakota in connection with the EMM agreement, 3) any breach of or inaccuracy in any representation or warranty made by Dakota in the EMM agreement, and 4) any breach or non-fulfillment of any covenant or agreement of Dakota in the EMM agreement. *See* Exhibit 19, at 8.2 and 8.3.

32.    Moreover, Dakota also included Ice Embassy assets as "Excluded Assets" for the EMM partnership Interest Purchase Agreement in an attempt to divert more Trust property to himself personally. *See* Exhibit 19.

33.    Recently, Dakota has revealed that after wrongfully diverting millions of dollars to himself through the EMM Agreement, he and his wife, Madison, then created an entity in the U.S. Virgin Islands called Emerald Island Holdings, LLC and used the entity to purchase a home for approximately $2.4 million with the wrongfully acquired proceeds pursuant to the EMM Agreement. Dakota and Madison then transferred the entity to Madison's parents, Amir Shenaq and Sheila Shenaq, allegedly in exchange for a cancellation of an unidentified debt. All the while, Dakota and Madison continued to treat the $2.4 million U.S. Virgin Islands home as their own, storing their furniture and personal effects in the home and assisting with remodeling the home.

34.    Unfortunately, Dakota's brazen fraudulent behavior didn't stop there. During the second day of the Temporary Injunction hearing, Dakota revealed that *the day before* the Temporary Injunction hearing was set to take place seeking to secure the remaining installment payments to avoid any further dissipation by Dakota, he signed a release of any rights to future

10

installment payments (a value of approximately $937,500) in exchange for a reduced lump sum payment of $575,000—giving up $362,500 in an attempt to avoid an injunction that would prevent him from receiving any further payments. Dakota received a wire for the $575,000 lump sum payment *during the Temporary Injunction hearing on March 6, 2026*, and wired the money to an account in Madison's name the same day. Madison then apparently began transferring the money, including to her parents or an entity they control for an alleged "lease" of the $2.4 million U.S. Virgin Islands home.

35. As a result of Dakota's shocking and undisclosed diversion of funds and assets to himself through the EMM Agreement, and Dakota and Madison's fraudulent transfers of these assets, Michelle and Joe bring this action for damages and equitable relief.

### CAUSES OF ACTION

**AMENDED APPLICATION FOR RELIEF UNDER TEXAS PROPERTY CODE § 114.008**

36. Michelle and Joe incorporate by reference paragraphs 12 through 22 as though fully set forth herein.

37. Texas Property Code § 114.008 gives the Court broad authority to remedy a breach of trust that has occurred or might occur. As explained *supra*, Dakota has no authority to act on behalf of the Dakota Trust. Numerous breaches of trust have occurred and will continue to occur if Dakota continues to act without proper authority.

38. As Dakota's designation as successor trustee was revoked in 2017, Dakota is not validly serving as Trustee of the Dakota Trust. Any actions he has taken as purported Trustee of the Dakota Trust are invalid and ineffective.

39. Importantly, Dakota cannot become the Trustee of the Dakota Trust by some equitable doctrine of waiver or consent. *See Alpert v. Riley*, 274 S.W.3d 277 (Tex. App.—Houston

11

[1st Dist.] 2008, pet. denied) ("We have not located, and Riley does not identify, any authority that recognizes a trustee by estoppel in the presence of express trust language outlining the procedure for appointment of a successor trustee...Texas law prohibits the equitable rule proposed by Riley for other reasons as well. The Texas Trust Code requires adherence to the trustee selection method prescribed in the trust instrument, which necessarily forecloses the exercise of equitable discretion unless that method fails.") (citing TEX. PROP. CODE § 113.083).

40.     The Texas Property Code authorizes the Court to issue an injunction to remedy a breach of trust that has occurred or might occur. TEX. PROP. CODE § 114.008; *see also Matter of Bumstead Family Irrevocable Trust*, 2022 WL 710159 (Tex. App.—Corpus Christi-Edinburg March 10, 2022, pet. denied) (affirming trial court temporary injunction that enjoined an individual from acting as trustee and appointed a receiver when the validity of the purported trustee's appointment was at issue). Dakota taking any action on behalf of the Dakota Trust would be a further breach of trust, as he has no authority to act under the terms of the Trust agreement and subsequent designations of successor trustees.

41.     Similarly, Dakota has no authority to act on behalf of Viva Las Vegas Properties, Inc. Dallas removed Dakota as an officer and/or director of Viva Las Vegas Properties, Inc. on October 14, 2017. *See* Exhibit 5, 10/14/17 Resolutions Adopted by Written Consent of Shareholder.

42.     The only documents Dakota has produced that would purport to give him authority to act on behalf of Viva Las Vegas Properties, Inc. are documents that he executed as purported trustee in May of 2023. *See* Exhibit 9, 5/19/23 Purported Unanimous Joint Written Consent of Viva Las Vegas Properties, Inc. However, as discussed *supra*, Dakota is not validly serving as the trustee of the Dakota Trust. Therefore, he had no authority to execute these Viva Las Vegas Properties,

12

Inc. corporate governance documents that he relies upon for authority to act on behalf of Viva Las Vegas Properties, Inc. As a result, Dakota was not validly appointed officer and director of Viva Las Vegas Properties, Inc. and he has no authority to take action on its behalf, including selling real property and accessing funds belonging to Viva Las Vegas Properties, Inc. To the extent necessary, Joe and Michelle request that the Court void the execution of the May 19, 2023 Purported Unanimous Joint Written Consent of Viva Las Vegas Properties, Inc. under Texas Property Code § 114.008(a)(9).

43.    Accordingly, Joe and Michelle request that the Court order the following relief under Texas Property Code § 114.008:

a.  enjoin Dakota from acting as trustee on behalf of the Dakota Trust (TEX. PROP. CODE § 114.008(a)(2));

b.  compel Dakota to redress a breach of trust, including ordering Dakota to pay the proceeds of the sale of Trust property to the Trust (TEX. PROP. CODE § 114.008(a)(3));

c.  appoint a receiver to take possession of the trust property and administer the trust (TEX. PROP. CODE § 114.008(a)(5));

d.  suspend or remove Dakota as trustee, to the extent necessary (TEX. PROP. CODE § 114.008(a)(6)–(7));

e.  void the execution of the May 19, 2023 Purported Unanimous Joint Written Consent of Viva Las Vegas Properties, Inc. (TEX. PROP. CODE § 114.008(a)(9)); and/or

13

f.   impose a lien and/or constructive trust on any property Dakota received that belonged to the Dakota Trust, including but not limited to the sales proceeds from the sale of 3400 Old Richmond Road (TEX. PROP. CODE § 114.008(a)(9)).

**DECLARATORY JUDGMENT – JOE AND MICHELLE ARE EACH 1/3 BENEFICIARIES OF THE DAKOTA TRUST**

44.   Michelle and Joe incorporate by reference paragraphs 12 through 22 as though fully set forth herein.

45.   An interested person in the administration of a trust may bring suit for a "declaration of rights or legal relations in respect to the trust…to determine any question arising in the administration of the trust, including questions of construction of wills and other writings." TEX. CIV. PRAC. & REM. CODE § 37.005.

46.   As discussed *supra*, as Holli no longer has any interest in the Dakota Trust. *See* Exhibit 7, Assignment of Interest and Disclaimer of Further Interest. As Holli no longer has any interest in the Dakota Trust and has released nay and all interest effective January 2023, Michelle and Joe are at least the two-thirds beneficiaries of the Dakota Trust.

47.   Dakota disputes Michelle and Joe's status as beneficiaries of the Dakota Trust, and instead claims he is the sole beneficiary of the Dakota Trust. Dakota, believes, however, without any authority, that he is the sole beneficiary of the Dakota Trust, despite the lack of any document that would alter Michelle and Joe's status as beneficiaries. Dakota has relied upon Section 3.2 of Dallas's Last Will and Testament for his claim to be the sole beneficiary; however, Section 3.2 of Dallas's Last Will and Testament was revoked by Dallas's First Codicil, which was admitted to probate. *See* Exhibit 10, Last Will and Testament; Exhibit 11, First Codicil; Exhibit 7, Order Admitting Will and Codicil to Probate.

14

48.     Accordingly, Michelle and Joe request that the Court issue a declaratory judgment that Michelle and Joe are each 1/3 beneficiaries of the Dakota Trust.

**DECLARATORY JUDGMENT – JOE IS SUCCESSOR TRUSTEE OF THE DAKOTA TRUST**

49.     Michelle and Joe incorporate by reference paragraphs 12 through 22 as though fully set forth herein.

50.     An interested person in the administration of a trust may bring suit for a "declaration of rights or legal relations in respect to the trust…to determine any question arising in the administration of the trust, including questions of construction of wills and other writings." TEX. CIV. PRAC. & REM. CODE § 37.005.

51.     On October 14, 2017, Dallas Fontenot designated Frost Bank as his successor trustee. *See* Exhibit 4, 10/14/17 Designation of Successor Trustee. Frost Bank has failed to serve, and has executed a formal declination to serve as trustee of the Dakota Trust. Under the trustee succession provisions contained in the original Trust Agreement, Joe is the next named successor trustee and is prepared to serve as such. However, given the controversy created by Dakota claiming to be the Trustee and sole beneficiary, Joe and Michelle seek a declaration that Joe is the successor trustee of the Dakota Trust.

**APPLICATION TO FILL TRUSTEE VACANCY UNDER TEXAS PROPERTY CODE § 113.083**

52.     Michelle and Joe incorporate by reference paragraphs 12 through 22 as though fully set forth herein.

53.     As the trust instrument confirms, Joe is the successor trustee of the Dakota Trust, Michelle and Joe ask the Court to fill the trustee vacancy under Texas Property Code § 113.083. Upon information and belief, Frost is not serving as successor trustee and does not intend to serve as successor trustee.

15

35034788.v1

54.     Under Texas Property Code § 113.083, on the death, resignation, incapacity, or removal of a sole or surviving trustee, a successor trustee shall be selected according to the method, if any, prescribed in the trust instrument. TEX. PROP. CODE § 113.083(a). "If for any reason a successor is not selected under the terms of the trust instrument, a court may and on petition of any interested person shall appoint a successor in whom the trust shall vest." *Id.*

55.     As described *supra*, Dakota is not the Trustee of the Dakota Trust, and Michelle and Joe believe that the Trust Agreement provides that Joe is the successor trustee. As there is a vacancy in the trustee position, Michelle and Joe therefore request the Court fill the vacancy and appoint Joe to serve as successor Trustee.

**MISAPPROPRIATION OF TRUST ASSETS**

56.     Michelle and Joe incorporate by reference paragraphs 12 through 22 as though fully set forth herein.

57.     Dakota sold property held in an entity of which the Dakota Trust is the 100% owner, without any authority. Under Texas Property Code § 114.031, a beneficiary is liable for loss to the trust if the beneficiary has misappropriated or otherwise wrongfully dealt with the trust property or failed to repay a distribution or disbursement from the trust in excess of that to which the beneficiary is entitled. *See* TEX. PROP. CODE § 114.031(a)(1), (4). Dakota has misappropriated trust assets and accordingly, the trustee may offset his liability to the trust estate against his interest in the trust estate. Michelle and Joe bring this claim for misappropriation of trust assets as beneficiaries of the Dakota Trust derivatively on behalf of the Dakota Trust.

**UNJUST ENRICHMENT**

58.     Michelle and Joe incorporate by reference paragraphs 12 through 22 as though fully set forth herein.

16

35034788.v1

59.     Dakota received all of the sales proceeds of property belonging to an entity held by the Dakota Trust, of which he is only a 1/3 beneficiary. As a result, he has been unjustly enriched by receiving a benefit that would be unconscionable to retain. Accordingly, Michelle and Joe bring this claim for unjust enrichment derivatively on behalf of the Dakota Trust. Any future distributions to Dakota from the Dakota Trust should be offset by the amounts he has already received. *See* TEX. PROP. CODE § 114.031(b).

**MONEY HAD AND RECEIVED**

60.     Michelle and Joe incorporate by reference paragraphs 12 through 22 as though fully set forth herein.

61.     As a result of the sale of the property located at 3400 Old Richmond Road, Dakota holds funds which, in equity and good conscience, belong to the Dakota Trust. The Dakota Trust has suffered damages as a result of Dakota's inequitable conduct. Accordingly, Michelle and Joe bring this claim for money had and received derivatively on behalf of the Dakota Trust. Any future distributions to Dakota from the Dakota Trust should be offset by the amounts he has already received. *See* TEX. PROP. CODE § 114.031(b).

**BREACH OF FIDUCIARY DUTY**

62.     Michelle and Joe incorporate by reference paragraphs 23 through 35 as though fully set forth herein.

63.     To prevail on a breach of fiduciary duty claim, a plaintiff must prove that (1) there is a fiduciary relationship between the plaintiff and defendant, (2) the defendant breached their fiduciary duty to the plaintiff, and (3) the breach resulted in an injury to the plaintiff or benefit to the defendant. *Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.] 2008, pet. denied).

17

64.     In addition to a formal fiduciary relationship, an informal fiduciary duty can also arise based on a moral, social, domestic, or purely personal relationship of trust and confidence. *See Tex. Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 507–08 (Tex. 1980) (recognizing the existence of an informal fiduciary relationship in those cases "in which influence has been acquired and abused, in which confidence has been reposed and betrayed."); *Siddiqui v. Fancy Bites, LLC*, 504 S.W.3d 349, 365 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). When one family member "is accustomed to being guided by the judgment or advice of another or is justified in believing one will act in the best interest of another because of a family relationship, a confidential relationship may arise." *Garcia v. Vera*, 342 S.W.3d 721, 724 (Tex. App.—El Paso 2011, no pet.). Factors considered in determining when an informal fiduciary relationship exists include whether the plaintiff relied on the defendant for support, the plaintiff's age and health, and evidence of the plaintiff's trust. *Young v. Fawcett*, 376 S.W.3d 209, 215 (Tex. App.—Beaumont 2012, no pet.).

65.     Here, an informal fiduciary relationship existed between Michelle, Joe, and Dakota. Michelle and Joe relied on Dakota and trusted that he would act in their best interests when agreeing to his appointment as officer and director of the Holli Ann Hardin Trust Number One entities. As a fiduciary, Dakota owed Michelle and Joe the duty of loyalty and utmost good faith, the duty of candor, the duty to refrain from self-dealing, which extends to dealings with a fiduciary's spouse, agents, employees, and other persons whose interests are closely identified with those of the fiduciary, the duty to act with integrity of the strictest kind, the duty of fair, honest dealing, and the duty of full disclosure. *See Miller v. Lucas*, No. 02-13-00298-CV, 2015 WL 2437887 (Tex. App.—Fort Worth May 21, 2015, pet. denied). Dakota breached these fiduciary duties with his countless actions to benefit himself at the expense of Michelle, Joe, and the Holli Ann Hardin Trust Number One.

18

35034788.v1

66.     Accordingly, Michelle and Joe seek relief for Dakota's breach of his fiduciary duties, including monetary damages, a constructive trust over any assets or funds received in connection with the sale of EMM, and disgorgement of any fees.

**UNJUST ENRICHMENT: SALE OF EMM**

67.     Michelle and Joe incorporate by reference paragraphs 23 through 35 as though fully set forth herein.

68.     As a result of Dakota's diversion of proceeds to himself, he has been unjustly enriched by receiving a benefit that would be unconscionable to retain. Accordingly, Michelle and Joe bring this claim for unjust enrichment.

**MONEY HAD AND RECEIVED: SALE OF EMM**

69.     Michelle and Joe incorporate by reference paragraphs 23 through 35 as though fully set forth herein.

70.     As a result of Dakota's wrongdoing and misappropriation of assets, Dakota holds funds and assets which, in good conscience, belong to Michelle, Joe, and/or the Holli Ann Hardin Trust Number One. Michelle, Joe, and/or the Holli Ann Hardin Trust Number One have suffered damages as a result of Dakota's inequitable conduct. Accordingly, Michelle and Joe bring this claim for money had and received.

**FRAUDULENT TRANSFERS AND CONVEYANCES: TEXAS UNIFORM FRAUDULENT TRANSFER ACT §§ 24.005 AND 24.006**

71.     Michelle and Joe incorporate by reference paragraphs 23 through 35 as though fully set forth herein.

72.     The Texas Uniform Fraudulent Transfer Acts' ("TUFTA") overriding goal is to protect creditors, such as Michelle, Joe, and the Holli Ann Hardin Trust Number One, from being defrauded or left without recourse due to a debtor's unscrupulous actions. TUFTA also allows

19

creditors to sue third parties who received a fraudulent transfer to void the transaction and recover its losses.

73.    Dakota is a debtor because he is a person who is liable on a claim.

74.    Michelle and Joe are creditors because they have a claim, which TUFTA broadly defines as a right to payment or property, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.

75.    A transfer is fraudulent if, among other things, it was made with actual intent to hinder, delay, or defraud any of the debtor's creditors. Badges of fraud shed light on whether a debtor made a transfer with the requisite fraudulent intent.

76.    Transfers can also be constructively fraudulent if the debtor made a transfer without receiving a reasonably equivalent value.

77.    Dakota and Madison's transfers to insiders—their own family members or entities controlled by their family members—qualify as fraudulent and impermissible transfers under TUFTA. Dakota and Madison's transfers were made with actual intent to hinder, delay, and/or defraud Michelle and Joe. This intent is amply demonstrated by the evidence and circumstances surrounding the transfers, including, without limitation, the following:

a.    The transfers were to insiders;

b.    Dakota and Madison retained possession or control of the property transferred after the transfer;

c.    Dakota and Madison concealed the circumstances and nature of the transfers;

d.    The transfers were made during the pendency of this litigation, and on the eve of a Temporary Injunction hearing regarding the assets transferred; and

20

e.   The transfers were of substantially all of their assets, and Dakota was insolvent.

When there is a concurrence of badges, as here, they make a strong case of fraud. Dakota and Madison's above-referenced actions violated section 24.005(a)(1).

78.   Under section 24.005(a)(2), a transfer made by a debtor is fraudulent as to a creditor, if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due. Dakota and Madison made transfers to insiders without receiving reasonably equivalent value in exchange for the transfers, at a time when Dakota has admitted he was incurring debts beyond his ability to pay as they became due.

79.   Further, Dakota and Madison's transfers were fraudulent under section 24.006, as they were made without receiving reasonably equivalent value in exchange for the transfer and Dakota was insolvent or became insolvent as a result of the transfer; and/or the transfers were made to an insider for an antecedent debt, Dakota was insolvent at the time of the transfer, and the insider had reasonable cause to believe that Dakota was insolvent.

80.   Michelle and Joe therefore seek all remedies available to them for Dakota and Madison's fraudulent transfers, including avoidance of the transfers and obligations, attachment against the assets transferred, and judgment against Dakota and Madison for the value of the assets transferred or in an amount necessary to satisfy Michelle and Joe's claims. Michelle and Joe also request that the Court award it exemplary damages, costs, and reasonable attorneys' fees.

**CONSPIRACY**

81.   Michelle and Joe incorporate by reference paragraphs 23 through 35 as though fully set forth herein.

21

82. As part of Dakota's diversion of funds to himself and misappropriation of assets, Dakota and Madison also engaged in a conspiracy to conceal assets defraud Michelle and Joe.

83. Dakota and Madison conspired to accomplish and unlawful purpose, had a meeting of the minds on the object or course of action, and Dakota and/or Madison committed an unlawful, overt act to further the object or course of action. Michelle, Joe, and/or the Holli Ann Hardin Trust have suffered damages as a result, and accordingly Michelle and Joe bring this action for conspiracy against Dakota and Madison.

## ATTORNEYS' FEES

84. Michelle and Joe seek their reasonable and necessary attorneys' fees under all applicable authority, including Section 37.009 of the Texas Civil Practice and Remedies Code, Section 114.064 of the Texas Property Code, and Section 24.013 of the Texas Business and Commerce Code.

## APPLICATION FOR TEMPORARY INJUNCTIVE RELIEF

85. Michelle and Joe incorporate the preceding paragraphs as though fully set forth herein.

86. Pursuant to Texas Rule of Civil Procedure 680, to prevent irreparable harm in the interim, Michelle and Joe request that the Court issue immediate injunctive relief.

87. The issuance of temporary injunctions are intended "to maintain the status quo between the parties." *Cannan v. Green Oaks Apts., Ltd.*, 758 S.W.2d 753, 755 (Tex. 1988); *see also Clint Indep. Sch. Dist. v. Marquez*, 487 S.W.3d 538, 556 n.12 (Tex. 2026). As a general matter, in order to obtain a temporary injunction, the applicant "must plead and prove that it (1) has a cause of action against the opposing party; (2) has a probable right of relief on final trial to the relief sought; and (3) faces probable, imminent, and irreparable injury in the interim." *Clark v.*

22

35034788.v1

*Hastings Equity Partners, LLC*, 651 S.W.3d 359, 366 (Tex. App.—Houston [1st Dist.] 2022, no

pet.). At this stage, the applicant "is not required to establish that the applicant will prevail on final

trial." *Clark v. Clark*, 638 S.W.3d 829, 840 (Tex. App.—Houston [14th Dist.] 2021, no pet.). "The

decision to grant or deny a temporary injunction lies in the sound discretion of the trial court, and

the court's grant or denial is subject to reversal only for a clear abuse of that discretion." *Pidgeon

v. Turner*, 625 S.W.3d 583, 606 (Tex. App.—Houston [14th Dist.] 2021). The court's discretion

is not abused where the Court "applies the law correctly and some evidence reasonably supports

its ruling." *Id.*

88.     Additionally, in an action involving fraudulent transfer claims under the Texas

Uniform Fraudulent Transfer Act, a creditor may obtain "an injunction against further disposition

by the debtor or a transferee, or both, of the asset transferred or of other property, appointment of

a receiver to take charge of the asset transferred or of other property of the transferee, or any other

relief the circumstances may require." TEX. BUS. & COM. CODE § 24.008.

### A. Michelle and Joe have causes of action against Dakota for breach of fiduciary duty, money had and received, and unjust enrichment.

89.     As shown through the allegations above, Michelle and Joe have several viable

causes of action against Dakota individually and as an informal fiduciary to Michelle and Joe

relating to his actions in diverting funds to himself through the sale of EMM. Michelle and Joe

plead causes of action for breach of fiduciary duty, unjust enrichment, money had and received,

fraudulent transfer, and conspiracy. Therefore, Michelle and Joe have satisfied this element of their

entitlement to injunctive relief.

### B. Michelle and Joe are likely to succeed on the merits of their cause of action.

90.     The applicant "must establish a likelihood of success on the merits of the party's

claims in order to obtain injunctive relief." *Courtright v. Allied Custom Homes, Inc.*, 647 S.W.3d

504, 519 (Tex. App.—Houston [1st Dist.] 2022, pet. denied). This element is satisfied where an applicant "produce[s] some evidence supporting every element of at least one valid legal theory." *31 Holdings I, LLC v. Argonaut Ins. Co.*, 640 S.W.3d 915, 923 (Tex. App.—Dallas 2022, no pet.); *see also Cameron Intern. Corp. v. Guillory*, 445 S.W.3d 840, 846 (Tex. App.—Houston [1st Dist.] 2014, no pet.). In other words, "[a] probable right of recovery is shown by alleging a cause of action and presenting evidence tending to sustain it." *Draper v. City of Arlington*, 629 S.W.3d 777, 784 (Tex. App.—Fort Worth 2021, pet. denied).

91.    As discussed *supra*, Dakota has received or will receive millions of dollars at the expense of Michelle and Joe. As an informal fiduciary, Dakota owed Michelle and Joe the highest duty of good faith, fair dealing, honest performance, and strict accountability. Dakota breached these duties and inequitably received benefits at Michelle and Joe's expense. The evidence attached to this pleading as Exhibits 12 through 22 support a finding that Michelle and Joe are likely to succeed on the merits.

## C.  Michelle and Joe face probable, imminent, and irreparable injury in the interim.

92.    Courts have held an injury is irreparable when, as here, "the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 024 (Tex. 2002). Michelle and Joe have no adequate remedy at law for Dakota's wrongful actions. *See Sharma v. Vinman Int'l, Ltd.*, 231 S.W.3d 405, 426–27 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Specifically, Dakota has established and demonstrated a propensity to hide money through illicit transaction, utilizing shell companies and directing money in a way that will be difficult to trace. Further, upon information and belief, Dakota may be insolvent or become judgment proof upon an award of the damages incurred by Michelle and Joe. As Dakota has previously testified, he used the funds from

24

the sale of the Dakota Trust real property to pay off certain "obligations," and would be unable to return those funds—an amount significantly less than the millions of dollars currently at issue, and within six months of receiving close to two million dollars between the sale of the Dakota Trust real property and sale of EMM. Michelle and Joe will be irreparably harmed if Dakota retains his control over and unlimited access to the proceeds from the sale of EMM, some of which are still forthcoming. *See Hartwell v. Lone Star, PCA*, 528 S.W.3d 750 (Tex. App.—Texarkana 2017, pet dism'd) (where borrower in default and evidence showed he could not repay loan, irreparable injury found); *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 611 (Tex. App.—Houston [1st Dist.] 2002, no pet.); *Blackthorne v. Bellush*, 61 S.W.3d 439, 444 (Tex. App.—San Antonio 2001, no pet.) (plaintiff does not have adequate remedy at law if defendant is insolvent).

### D. Requested Injunctive Relief

93.    Michelle and Joe have satisfied the elements necessary to establish their right to injunctive relief. Michelle and Joe respectfully request that the Court issue a Temporary Injunction and maintain the Temporary Injunction in place until a final trial on the merits. Michelle and Joe request an order by this Court restraining Dakota as follows:

a. Within fifteen days of the date of the Court's order, Dakota Fontenot and his officers, agents, servants, employees, attorneys, and any person in active concert or participation with him who receives actual notice of the Order, are ordered to deposit $2,174,500 (all proceeds received under the EMM Agreement) in the registry of the Court;

b. Dakota Fontenot and Madison Fontenot, their officers, agents, servants, employees, attorneys, and any person in active concert with them who receive actual notice of this order by personal service or otherwise, are prohibited from spending, transferring, distributing, encumbering, pledging, or assigning any proceeds or assets held in any bank account in either of their names at any financial institution;

c. Dakota Fontenot, his officers, agents, servants, employees, attorneys, and any person in active concert or participation with him who receives actual notice of this

25

order by personal service or otherwise, are restrained from spending, transferring, distributing, encumbering, pledging, or assigning any proceeds or assets traceable to any payments for the sale of BFD GP, LLC, BFD LP, LLC, Emerald Islands, LLC, and Entertainment Marketing & Management, Ltd., as well as any subsidiaries, successor entities, assigns, or transferees, including any payments made pursuant to the Partnership Interest Purchase Agreement;

d. Dakota Fontenot, Colorado Rose, LLC, Cle Group SKZ Real Estate, LLC, including each of their agents, officers, members, affiliates, and assignees, shall be required to deposit any payments received under the Partnership Interest Purchase Agreement and any amendments or supplements thereto, and any future amounts payable to Dakota Fontenot under the Partnership Interest Purchase Agreement and any amendments or supplements thereto, into the registry of the Court, including payments pursuant to Section 1.2(a)(ii) and 1.2(a)(iii) of the Partnership Interest Purchase Agreement;

e. Dakota Fontenot is restrained from spending, transferring, distributing, or assigning any proceeds or assets traceable to proceeds from the sale of Entertainment Marketing & Management, Ltd.;

f. All accounts in Dakota's care, custody, or control pertaining to or otherwise holding assets or proceeds received from the sale of Entertainment Marketing & Management, Ltd. shall be frozen; and

g. Dakota Fontenot is ordered to account for all proceeds received from the sale of Entertainment Marketing & Management, Ltd.

94. Michelle and Joe will suffer irreparable injury, loss, or damage if injunctive relief is not immediately granted. A temporary injunction should issue, and Michelle and Joe should only be required to post a minimal bond, if any, to preserve the status quo. Michelle and Joe ask the Court to promptly set an evidentiary hearing to consider the issuance of a temporary injunction against Dakota.

**PRAYER**

Michelle Fontenot and Dallas Joseph Fontenot III, request that Dakota Fontenot be cited to appear and answer herein, and after proper consideration by the Court, they be subject to orders and judgment of the Court as follows:

a. Equitable relief under Texas Property Code § 114.008 as specified above;

26

35034788.v1

b. Equitable relief in the form of a temporary injunction as specified above;

c. Declaratory judgments that:

   a. Joe and Michelle are each 1/3 beneficiaries of the Dakota Trust; and

   b. Joe is the Trustee of the Dakota Trust;

d. Fill and vacancy in the trustee position and appoint Joe as successor trustee;

e. Monetary damages, including offset against Dakota's interest in the Dakota Trust; and

f. Attorneys' fees and costs of court.

Michelle and Joe request that the Court award them all other relief to which they may be justly entitled.

Respectfully submitted,

**CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY, P.C.**

By:    /s/ Ryan O. Cantrell
Ryan O. Cantrell
Texas Bar No. 24055259
ryan.cantrell@chamberlainlaw.com
Mariah J. Karigan
Texas Bar No. 24123088
mariah.karigan@chamberlainlaw.com
1200 Smith Street, Suite 1400
Houston, Texas 77002
Telephone:    (713) 658-1818
Facsimile:    (713) 658-2553
**COUNSEL FOR MICHELLE FONTENOT AND DALLAS JOSEPH FONTENOT III**

27

35034788.v1

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing instrument was served on this the 12th day of March, 2026, to the following:

Rudy Culp
Collin Bullard
TEXAS PROBATE ATTORNEY PLLC
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
*Counsel for Linda Goehrs*

Jeffrey D. Watters, Jr.
John P. ("Trey") Avant III
Andrew B. McCarty
GRAY REED & MCGRAW LLP
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
*Counsel for Dakota Fontenot*

James Madison ("Jimmy") Ardoin III
4900 Fournace Place, Suite 414
Bellaire, Texas 77401
*Counsel for Dakota Fontenot*

Paul S. Beik
440 Louisiana Street, Suite 1800
Houston, Texas 77002
*Counsel for Dakota Fontenot*

*/s/ Ryan O. Cantrell*
Ryan O. Cantrell

28

35034788.v1

CAUSE NO. 537,721

| | | |
|---|---|---|
| LINDA GOEHRS | § | IN THE PROBATE COURT |
| Plaintiff | § | |
| , | § | |
| | § | |
| , | § | NUMBER ONE (1) OF |
| v. | § | |
| DAKOTA FONTENOT & | § | |
| MADISON FONTENOT | § | |
| Defendants. | § | HARRIS COUNTY, TEXAS |

## ORIGINAL ANSWER AND JURY DEMAND
## OF DEFENDANT MADISON FONTENOT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Defendant Madison Fontenot who has been sued in her individual capacity files this Original Answer and Jury Demand and would show the Court as follows:

### GENERAL DENIAL

Defendant Madison Fontenot asserts a general denial as authorized by Rule 92 of the Texas Rules of Civil Procedure and demands that Plaintiff be required to prove each and every charge and allegation asserted against Defendant under the appropriate burden of proof as required by the Constitution and laws of the State of Texas.

### JURY DEMAND

Defendant Madison Fontenot makes this request for a trial by jury.

### AFFIRMATIVE DEFENSES

Defendant Madison Fontenot asserts the following affirmative defenses under Rule 94:

1. Release

2. Waiver

3. Statute of frauds

4. Failure of consideration

5. Estoppel

6. Fraud

7. Payment

8. Res judicata/collateral estoppel

9. Defendant contests the capacity of the Plaintiff to sue her. Linda Goehrs, in her capacity as trustee of the Holli Ann Hardin Trust, lacks the capacity to sue Defendant Madison Fontenot.

10. The Plaintiff does not have the legal capacity to sue.

11. Plaintiff is not entitled to recover in the capacity in which she sues.

12. The instrument upon which Plaintiff is suing is without consideration or the consideration has failed in whole or part.

## PRAYER

For the foregoing reasons, Defendant respectfully requests that Plaintiff take nothing by reason of its claims against Defendant and that Defendant be awarded attorney's fees and for any such other relief, whether at law or in equity to which Defendant may be justly entitled.

Respectfully submitted,

/s/ Lloyd E. Kelley
LLOYD E. KELLEY
State Bar No. 11203180
2726 Bissonnet Ste 240 PMB 12
Houston, Texas 77005
Telephone: 281-492-7766
kelley@lloydekelley.com
Attorney for Defendant Madison Fontenot

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been served upon all parties of record in this Cause, in accordance with the Texas Rules of Civil Procedure on April 7, 2026  via e-service.

/s/ Lloyd E. Kelley
Lloyd E. Kelley