FILED
8/21/2025 1:36 PM
Teneshia Hudspeth
County Clerk
Harris County - County Probate Court No. 1
Accepted By: TW

**EXHIBIT**

**1**

CAUSE NO. _____

| | |
|---|---|
| LINDA GOEHRS, IN HER CAPACITY AS TRUSTEE OF THE HOLLI ANN HARDIN TRUST NUMBER ONE<br> *Plaintiff,* | IN THE PROBATE COURT |
| v. | NO. <u>ONE</u> (<u>1</u>) OF |
| DAKOTA FONTENOT<br> *Defendant.* | HARRIS COUNTY, TEXAS<br>1 PERS BY PP 8/22/2025 |

<u>PLAINTIFF'S ORIGINAL PETITION</u>

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff LINDA GOEHRS ("Plaintiff"), in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, and files this her Original Petition and Application for Temporary and Permanent Injunctive Relief against Defendant DAKOTA FONTENOT ("Defendant"), and in support thereof would respectfully show unto the Court the following:

**I.**
**DISCOVERY CONTROL PLAN**

1.  Plaintiff intends to conduct discovery under Level 3 of Rule 190.4 of the Texas Rules of Civil Procedure.

**II.**
**CLAIM FOR RELIEF**

2.  Pursuant to Rule 47 of the Texas Rules of Civil Procedure, Plaintiff seeks monetary relief of more than $1,000,000.00 and non-monetary relief.

Page 1 of **15**

Hardin Trust

### III.
### PARTIES

3.      Plaintiff LINDA GOEHRS ("Plaintiff") is an individual residing in Harris County, Texas and currently serving as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One (the "Hardin Trust").

4.      Defendant DAKOTA FONTENOT ("Defendant") is an individual domiciled in Harris County, Texas. DAKOTA FONTENOT may be served with process at 2926 Fontana Drive, Houston, Texas 77043, or any other location where he may be found. Defendant was the President and Director of Ice Embassy, Inc., was the President and Director of HFR Enterprises, Inc. and claims to be the purported trustee of the Dakota Trust and President of Viva Las Vegas Properties, Inc., and is being named in these capacities in addition to his individual capacity.

### IV.
### JURISDICTION AND VENUE

5.      Personal jurisdiction exists over Defendant because Defendant is an individual domiciled in Harris County; the State of Texas and this lawsuit arises from actions within Texas.

6.      This Court has subject matter jurisdiction over the lawsuit because the amount in controversy exceeds the Court's minimum jurisdictional requirements.

7.      Venue is proper in Harris County, Texas pursuant to Texas Property Code § 115.001 because Defendant, the purported Trustee of the Dakota Trust, is an individual resident of Harris County and upon information and belief, the situs of the administration of the Dakota Trust is in Harris County. Venue is further proper in Harris County, Texas pursuant to Texas Civil Practice & Remedies Code § 15.002 because Harris County is the county in which all or a substantial portion of the events giving rise to Plaintiff's claims occurred.

Page **2** of **15**

Hardin Trust

UNOFFICIAL COPY

8. A Harris County Statutory Probate Court has jurisdiction over this matter because it is an action by or against a trustee and an action involving and inter vivos trust. TEX. EST. CODE § 32.006

## V.
## FACTS

9. The Hardin Trust was created on or about June 5, 1991, by Holli Ann Hardin Fontenot ("Holli"). *See* **Exhibit "A"**, *Trust Agreement*. At the time, Holli was married to Dallas Joseph Fontenot, Jr. ("Dallas"). Defendant is the child of Holli and Dallas.

10. Dallas had two children from a previous marriage, Dallas Joseph Fontenot III ("Joe") and Michelle Ann Fontenot ("Michelle"). Defendant, Holli, Joe, and Michelle were each initial beneficiaries of the Hardin Trust. During his lifetime, Dallas owned numerous properties and businesses centered around the Colorado Bar & Grill (the "Colorado Club"), a gentleman's club located in Houston, Texas. Dallas accumulated millions of dollars of assets which at the time of his death were spread between his estate, the Hardin Trust, and a separate trust known as the Dakota Trust, which was created on November 9, 1994 by Holli as settlor. *See* **Exhibit "B"**, *Dakota Trust Agreement*.

11. Until recently, the Hardin Trust owned 100% of the stock of Ice Embassy, Inc., which operated the Colorado Club. The Hardin Trust also owned 100% of the stock of HFR Enterprises, Inc., which, until recently, owned the real property on which the Colorado Club was operated.

12. Dallas died on September 3, 2021, and his estate was probated in Fort Bend County Court at Law Number Four (4) under Cause No. 21-CPR-036521. Litigation pertaining to Dallas's estate and the two above-mentioned trusts (collectively the "Trusts") was resolved through a

Hardin Trust

UNOFFICIAL COPY

settlement agreement dated January 7, 2022 (the "Settlement Agreement"). *See* **Exhibit "C"**, *Binding Mediated Settlement Agreement.*

13.     As part of the Settlement Agreement, the parties ultimately agreed that Holli would be bought out as a beneficiary of the Trusts, with certain assets to be paid to Holli in consideration of her disclaimer of further interest in the Trusts. Specifically, the Settlement Agreement dictated that Holli's interest in both Trusts "will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One." *Id.* at p. 5–6. Subsequently, Defendant, as President of HFR Enterprises, Inc. entered into a 2.8 million dollar loan agreement, in part to provide the necessary consideration for Holli's interest in both Trusts. *See* **Exhibit "D"**, *Amended and Restated Promissory Note.* The Hardin Trust then paid Holli $2,823,464 for her interest in both Trusts, representing 85% of the total value of the Dakota Trust assets and 20% of the total value of the Hardin Trust assets. *See* **Exhibit "E"**, *Assignment of Interest and Disclaimer of Further Interest.* The Hardin Trust effectively became the owner of Holli's 85% interest in the Dakota Trust. However, the payment has ultimately wrongfully benefitted Defendant as the now sole beneficiary of the Dakota Trust, to the detriment of the Hardin Trust and its beneficiaries.

14.     Defendant purports to be the Trustee of the Dakota Trust. However, upon information and belief, Defendant was not validly appointed as Trustee of the Dakota Trust. Defendant is not a named successor trustee in the Dakota Trust Agreement. *See* **Exhibit "B"**. On May 1, 2013, Decedent, as Trustee of the Dakota Trust, designated Defendant as a successor Trustee, but he later revoked this designation on October 14, 2017. *See* **Exhibit "F"**, *5/1/13 Designation of Successor Trustee*; *See* **Exhibit "G"**, *10/14/17 Designation of Successor Trustee.* Decedent similarly removed Defendant from all officer and director positions for any entities owned by the Dakota Trust, including Viva Las Vegas Properties, Inc. on the same day. *See* **Exhibit**

Hardin Trust

**"H"**, *Viva Las Vegas Resolution.* After Decedent's death, however, without the authority to do so, Defendant started acting as Trustee of the Dakota Trust and officer and director of Viva Las Vegas Properties, Inc. As purported Trustee of the Dakota Trust, Defendant has not repaid the Hardin Trust for any of the Hardin Trust assets used to buy out Holli's interest in the Dakota Trust.

15.     Defendant's wrongdoing at the expense of the Hardin Trust and its beneficiaries did not stop there. After the Settlement Agreement was signed, Defendant caused waste to assets held in the Hardin Trust. Defendant mismanaged the Colorado Club for personal benefit, including, but not limited to the following:

a.   hiring his wife, who had little to no experience, to manage the Colorado Club;

b.   paying his personal credit cards out of the company;

c.   taking vacations and claiming they were a business expense;

d.   paying personal expenses from the company;

e.   making unnecessary and unreasonable improvements, many of which were never completed;

f.   hiring multiple consultants and paying them hundreds of thousands of dollars with no apparent benefits provided;

g.   Changing the system at the Colorado Club to have less oversight and allowing money to be taken or taking money from the club;

h.   Taking a loan from his wife's stepfather for $150,000 and within a month, repaid the loan and $50,000 in interest, which was wired directly to an offshore account;

i.  Obligating the entities held by the Hardin Trust to lucrative an unnecessary Management Agreements and Administrative Agreements with an entity he owns, on top of taking a salary for the Club; and

j.  Using funds earmarked for repayment of the loan used to buy Holli's interest for his own personal benefit, allowing the company to default on the loan for months and causing a fire sale of the land and stock.

16.  Because of Defendant's actions, the Colorado Club declined in value significantly, ultimately harming the Hardin Trust.

17.  Upon information and belief, Defendant is seeking to liquidate as many assets as possible, including those held by entities owned by the Dakota Trust, and move to the Virgin Islands. Because of Defendant's wrongful actions, Plaintiff is left with no alternative but to petition this Court for relief.

**VI.**
**ARGUMENT AND AUTHORITIES**

A.  DECLARATORY JUDGMENT

18.  A person affected by a written contract or other writings constituting a contract may obtain a declaration of rights thereunder. TEX. CIV. PRAC. & REM. CODE § 37.004(a). The two prerequisites for a declaratory judgment action are: (1) there must be a real controversy between the parties and (2) the controversy must be one that will actually be determined by the judicial declaration sought. *Houston Chronicle Publ'g Co. v. Thomas*, 196 S.W.3d 396, 401 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

19.  In the matter at issue, Holli was a beneficiary of the two trusts at issue before being bought out pursuant to the Settlement Agreement. The assets used in consideration for Holli's relinquishment of further rights as a beneficiary of either of the Trusts came solely from those held

Hardin Trust

in the Hardin Trust. Because of this, Defendant has been wrongfully benefitted to the detriment of the Hardin Trust.

20.    Plaintiff, Joe, and Michelle never agreed and the Settlement Agreement did not dictate that Defendant would receive such benefit as the lone beneficiary of the Dakota Trust while the Hardin Trust cover all costs pertaining to Holli's buyout without receiving adequate consideration from the Dakota Trust. Instead, pursuant to the Settlement Agreement, Plaintiff became 85% beneficiary of the Dakota Trust. As of the date of this filing, Dakota has failed or otherwise declined to reimburse the Hardin Trust for amounts paid to Holli for the buyout, wrongfully depriving the Hardin Trust and resulting in an ultimately illicit benefit received by Defendant.

21.    Accordingly, there exists a controversy between Plaintiff and Defendant pertaining to the stipulations of the Settlement Agreement and Defendant's failure to abide thereby. Such controversy can be resolved through a declaration by the Court ordering that Defendant repay to the Hardin Trust the amounts received by Holli under the Settlement Agreement buyout and declaring that pursuant to the Settlement Agreement Plaintiff is 85% beneficiary of the Dakota Trust.

22.    Despite no authority to do so, Defendant has wrongfully acted when convenient for his self-dealing as the trustee of the Dakota Trust and/or officer/director of the entities comprising the Colorado Club in which Plaintiff holds an interest. Plaintiff is resultingly entitled to a declaration from the Court stipulating that, pursuant to the Settlement Agreement, Defendant is liable to Plaintiff for 50% of the amounts received by Holli under the Settlement Agreement buyout, Defendant is not trustee of the Dakota Trust or an officer/direct or any entity within the Colorado Club, and Plaintiff is 85% beneficiary of the Dakota Trust.

Hardin Trust

B.    UNJUST ENRICHMENT

23.    In certain circumstances where a party profits from the inequities borne by another, a cause of action for unjust enrichment is appropriate. *HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 891 (Tex. 1998). Unjust enrichment occurs when a person has wrongfully secured a benefit which it would be unconscionable to retain. *Eun Bok Lee v. Ho Change Lee*, 411 S.W.3d 95, 111 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

24.    As detailed above, despite no authority in the Settlement Agreement, Defendant has received an unwarranted benefit because none of the assets held in the Dakota Trust were used to fund the buyout of Holli as beneficiary of each of the Trusts. By ignoring Plaintiff's status as 85% beneficiary of the Dakota Trust pursuant to the Settlement Agreement, Defendant has wrongfully benefited to the detriment of the Hardin Trust. Summarily, while each of the Trusts should have equally borne the costs of Holli's buyout, Defendant has received a disproportionate advantage.

25.    Further, since assuming control of the Colorado Club, Defendant has utilized the business as a means of funding his lifestyle by misappropriating funds rightfully belonging to the Trusts. As a result of Defendant's actions, the Colorado Club and other assets held by the Hardin Trust substantially decreased in value, causing further damage to the Hardin Trust.

26.    For these reasons, despite the Trusts existing to continue the business built by Dallas for the benefit of his family, Defendant has robbed the Hardin Trusts of substantial assets which should have fulfilled such purpose. Defendant has caused himself to be unjustly enriched while the Hardin Trust has suffered, entitling Plaintiff to recovery on its unjust enrichment claim against Defendant.

C.    BREACH OF FIDUCIARY DUTY

Hardin Trust

27.    To prevail on a breach of fiduciary duty claim, a plaintiff must prove that (1) there is a fiduciary relationship between the plaintiff and defendant, (2) the defendant breached their fiduciary duty to the plaintiff, and (3) the breach resulted in an injury to the plaintiff or benefit to the defendant. *Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). The existence of a fiduciary duty is dependent upon the facts of a specific case, and may arise where one person trusts in and relies on another. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 176–77 (Tex. 1997).

28.    In 2022, Defendant assumed management and control of the Colorado Club, which comprised of numerous entities held in the Hardin Trust. By controlling the multi-million dollar business responsible for the value and funding of the Hardin Trust, Defendant assumed a position carrying fiduciary duties toward the Hardin Trust. Further, despite no authority to do so, Defendant has wrongfully acted as trustee of the Dakota Trust, to which Plaintiff is 85% beneficiary.

29.    Despite this, Defendant blatantly disregarded his responsibilities and duties toward the Hardin Trust as beneficial owner of the Colorado Club and 85% beneficiary of the Dakota Trust. Defendant fraudulently diverted hundreds of thousands of dollars from the operations of the Colorado Club and caused the operation to substantially decline in value. Because of this, Defendant was wrongfully benefited to the detriment of the Hardin Trust.

30.    For these reasons, Plaintiff is entitled to recover against Defendant upon its breach of fiduciary duty claim.

## VII.
## DAMAGES

31.    As a result of Defendant's actions, Plaintiff has been damaged in an amount far in excess of the minimum jurisdictional limits of the Court. However, because of the purposeful concealment of Defendant's wrongdoing, such amount of damages is currently unknown and likely

Hardin Trust

difficult to calculate. Plaintiff accordingly requests an award of all actual damages resulting from or proximately caused by Defendant's actions as described herein.

32.    Additionally, Defendant's fraudulent and malicious actions were taken with the purposeful intent to cause substantial injury or harm to Plaintiff. TEX. CIV. PRAC. & REM. CODE § 41.007(7). Because of this, Plaintiff is entitled to an award of exemplary damages against Defendant. TEX. CIV. PRAC. & REM. CODE § 41.003.

## VIII.
## APPLICATION FOR INJUNCTIVE RELIEF

33.    Based on the foregoing, there is a substantial likelihood that Plaintiff will prevail on the merits of the claims against Defendant. *See Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993). In addition, Plaintiff has no adequate remedy at law for Defendant's wrongful actions causing unknown damages unlikely to be fully traceable. *See Sharma v. Vinman Int'l, Ltd.*, 231 S.W.3d 405, 426–27 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Further, because of information and belief of Defendant's impending intent to liquidate any assets possible, including the real property located at 3414 Old Richmond Road, held by Viva Las Vegas Properties, Inc., and flee the country, unless Defendant is enjoined, Plaintiff will suffer clear, immediate, and irreparable injury.

34.    Upon information and belief, Defendant intends to close on the sale of real property located at 3414 Old Richmond Road by the end of August, and move to the Virgin Islands shortly thereafter.

35.    As detailed herein, Plaintiff has suffered and will continue to suffer irreparable harm from Defendant's conduct. Property rightfully belonging to the Hardin Trust is in jeopardy of its continued existence as a result of Defendant's past actions and continuing intention of

Hardin Trust

escaping justice. No amount of money can be reasonably calculated to fully compensate Plaintiff for these losses, even if Defendant was able to respond in payment of money damages.

36.     The harm to Plaintiff is ongoing and further harm is imminent, and if the Court does not issue injunctive relief, Plaintiff will be irreparably injured. Failure to enjoin Defendant is extremely likely to lead to the further depletion of property belonging to the Hardin Trust which Defendant has methodically withheld through fraudulent means. This includes, but is not limited to, Defendant's intentions of liquidating assets and leaving the country.

37.     Plaintiff has no adequate remedy at law because Defendant has absconded with funds that are very unlikely to be fully traceable. Defendant has additionally liquidated and misappropriated assets belonging to the Hardin Trust which are unlikely to ever be found. Further, greater injury will be inflicted upon Plaintiff by the denial of the requested injunctive relief than would be inflicted upon Defendant by granting such relief. Granting the injunctive relief herein would simply require Defendant to abide by his legal obligations and cease his purposeful harming of Plaintiff.

38.     The issuance of injunctive relief will not disserve the public interest. Balancing the equities and other factors, the significant potential of irreparable harm to Plaintiff without the injunctive relief and the lack of harm due to the entry of injunctive relief demonstrate that the requested relief will not disserve the public interest.

39.     In order to preserve the status quo during the pendency of this action, Plaintiff seeks a Temporary Restraining Order and Temporary Injunction against Defendant. Plaintiff requests a Temporary Restraining Order that Defendant, his agents, and other persons or entities in active concert or participation who receive actual notice of the Court's Order, by personal service or otherwise, be enjoined as follows:

Hardin Trust

a. Defendant is restrained from directly or indirectly selling or liquidating assets belonging to the Holli Ann Hardin Trust Number One, Dakota Trust, or entities owned by the Holli Ann Hardin Trust Number One or Dakota Trust;

b. Defendant is restrained from directly or indirectly causing assets or monies belonging to the Holli Ann Hardin Trust Number One, Dakota Trust, or entities owned by the Holli Ann Hardin Trust Number One or Dakota Trust to be sold, liquidated, or transferred;

c. Defendant must preserve all documents, records, or other information pertaining to the Colorado Club, the Holli Ann Hardin Trust Number One, Dakota Trust, or other assets received from Dallas Joseph Fontenot, Jr. or his estate. This includes, but shall not be limited to, all financial records, business records, information from banking or other financial institutions, and information pertaining to Defendant's personal bank accounts and other financial institutions accounts;

d. Defendant is restrained for directly or indirectly acting as trustee of the Dakota Trust or as an officer or director of any entity owned or controlled by the Holli Ann Hardin Trust Number One, Dakota Trust, Dallas Joseph Fontenot, Jr., or his estate; and

e. Defendant shall allow Plaintiff an opportunity to inspect, examine, and copy all information detailed above pertaining to the Holli Ann Hardin Trust Number One, Dakota Trust, Dallas Joseph Fontenot, Jr., or his estate.

40.    Plaintiff asks the Court to enter an ex-parte temporary restraining order to ensure that improper sale of real property does not occur.

41.    Plaintiff further seeks a temporary injunction and, upon final hearing or trial hereof, a permanent injunction for the relief requested above.

42.    Plaintiff is willing to post the necessary reasonable bond to facilitate the injunctive relief requested.

43.    Because of the urgency of this matter and potential inability to serve notice of this Application on Defendant before holding a hearing, proceeding *ex parte* may be necessary.

## IX.
## REQUEST FOR APPOINTMENT OF SUCCESSOR TRUSTEE

Hardin Trust

UNOFFICIAL COPY

44.     As detailed above, despite Defendant's wrongful actions under the guise of the capacity of trustee, there currently exists no trustee of the Dakota Trust. The trust agreement of the Dakota Trust dictates that First Interstate Bank of Texas, N.A. shall serve as successor trustee following Dallas, who is deceased, and Holli, who no longer holds any interest in the Dakota Trust. *See* **Exhibit "B"**, *Dakota Trust Agreement*, at p. 5–7. First Interstate Bank of Texas, N.A. has not accepted appointment or otherwise acted as successor trustee in the more than four years since Dallas's death.

45.     Pursuant to Texas Property Code § 113.083(a), upon the vacancy of the position of trustee or failure to select a party for such role and upon petition of an interested party, a court may appoint a successor trustee. Because of the current lack of a trustee of the Dakota Trust, coupled with the extensive fraudulent actions of Defendant, Plaintiff requests that the Court appoint a neutral third-party as successor trustee of the Dakota Trust.

Hardin Trust

## X.
## CONDITIONS PRECEDENT

46.     All conditions precedent to Plaintiff's claims for relief have been performed or have occurred.

## XI.
## JURY DEMAND

47.     Plaintiff requests a trial by jury on all claims included in this Original Petition.

## XII.
## ATTORNEY'S FEES

48.     Plaintiff has been required to employ counsel to bring this suit and requests an award of all reasonable and necessary attorney's fees for the services provided in representation and pursuit of this action.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, for the reasons detailed herein, Plaintiff LINDA GOEHRS, in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, prays that Defendant DAKOTA FONTENOT be cited to appear and answer herein, and that the Court award a judgment against Defendant for the following:

a. Temporary Restraining Order;
b. Temporary Injunction;
c. Permanent Injunction;
d. Actual Damages;
e. Exemplary Damages;
f. Attorney's Fees;
g. Costs of Court; and
h. All other relief to which Plaintiff may be justly entitled.

Hardin Trust

Respectfully submitted,





RUDOLPH M. CULP
State Bar No. 24043014
rudy@texsprobateattorney.com
COLLIN J. BULLARD
State Bar No. 24129570
collin@texasprobateattorney.com
***EFILE EMAIL: efile@texasprobateattorney.com***
**HOUSTON OFFICE:**
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
O: (713) 297-0700
F: (817) 383-5110
**ATTORNEYS FOR PLAINTIFF**

Page **15** of **15**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Robin Edwards on behalf of Rudy Culp
Bar No. 24043014
robin@texasprobateattorney.com
Envelope ID: 104679620
Filing Code Description: Petition
Filing Description: Plaintiff's Original Petition
Status as of 8/22/2025 2:49 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Robin Edwards | | robin@texasprobateattorney.com | 8/21/2025 1:36:04 PM | NOT SENT |
| Rudy Culp | | rudy@texasprobateattorney.com | 8/21/2025 1:36:04 PM | NOT SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 8/21/2025 1:36:04 PM | NOT SENT |
| Texas Probate Attorney, PLLC | | efile@texasprobateattorney.com | 8/21/2025 1:36:04 PM | NOT SENT |



EXHIBIT

A

# TRUST DECLARATION FOR
# THE HOLLI ANN HARDIN TRUST NUMBER ONE

THIS TRUST DECLARATION is made this day by declaration of HOLLI HARDIN FONTENOT, a resident of Harris County, Texas ("Trustor"). The Effective Date of this Trust Declaration is June 5, 1991.

1. **Trust Estate.**

   1.1 **Creation of Trust.** The Trustor hereby establishes, declares, and creates this Trust for the purposes hereinafter set forth, and the Trustee agrees to serve as the initial trustee and to hold the Trust Estate (as hereinafter defined) in trust upon the following provisions.

   1.2 **Transfer in Trust.** On or about the Effective Date, the Trustor has transferred and delivered to the Trustee the cash sum of One Thousand and No/100 Dollars ($1,000.00). Such property shall constitute the initial property of the Trust Estate.

   1.3 **Beneficiaries.** The Beneficiaries of this Trust shall be HOLLI HARDIN FONTENOT, DALLAS JOSEPH FONTENOT, JR., ANNE S. FONTENOT, DALLAS JOSEPH FONTENOT, III, MICHELLE ANNE FONTENOT, and any children of the marriage of HOLLI HARDIN FONTENOT and DALLAS JOSEPH FONTENOT, JR., including any children adopted by HOLLI HARDIN FONTENOT and DALLAS JOSEPH FONTENOT, JR. after the Effective Date (collectively, "Primary Beneficiaries"). Also Beneficiaries of this Trust are the children and other issue of each of the Primary Beneficiaries. The term "Beneficiary" will also mean any and all persons, organizations, trusts, and entities who may have or may acquire a beneficial interest in this Trust, whether vested or contingent in nature, resulting from the exercise of a power of appointment by a Beneficiary or otherwise.

   1.4 **Release of All Rights in Property.** The Trustor hereby releases for the benefit of this Trust any and all rights which the Trustor may have in her individual capacity in the property constituting the Trust Estate.

   1.5 **Acceptance of the Trust.** By acceptance hereof the Trustee, on her behalf and on behalf of her successors in trust, does by the execution hereof acknowledge receipt of the Trust Estate. The Trustee shall own, hold, and possess the Trust Estate (including any additional property which may

Page 1 of 18 Pages

81142_81.01

003185

at any time hereafter be transferred to the Trustee) in trust solely in the capacity of Trustee. The Trustee and her successors in trust shall hold, manage, sell, exchange, invest, and reinvest the Trust Estate; collect all income therefrom; and, after deducting such expenses as are properly payable from income, accumulate and distribute the Trust Estate as herein provided.

1.6 Additions to Trust Estate. The Trustor and any other person shall have the right at any time to add property to the Trust created herein. Such property, when received and accepted by the Trustee, shall become part of the Trust Estate.

1.7 Name of Trust. This Trust shall be known as THE HOLLI ANN HARDIN TRUST NUMBER ONE.

2. Irrevocability of Trust. The Trust herein created shall be irrevocable and shall not be altered, amended, revoked, or terminated by the Trustor or any other person except as specifically permitted by law.

3. Definitions. As used herein, the following terms shall have the following meanings.

3.1 Children. Issue. The term "child" or "children" shall refer only to any and all children born in lawful wedlock or lawfully adopted, whether born or adopted before or after the date of execution of this Trust Declaration. The term "issue" shall refer to the lawful blood descendants in the first, second, or any other degree of the ancestor designated.

3.2 Heirs at Law. Whenever a trustee or a legal advisor to the Trustee is called upon to determine the heirs at law of the Trustor or any other person beneficially interested in this Trust, the determination will be made to identify those individual, other than creditors, who would receive the personal property of a decedent upon his or her death as determined in accordance with the laws of intestate succession of the State of Texas, and further determined as if the Trustor of this Trust shall have predeceased the person or persons so named or described.

3.3 Minor Beneficiary. The term "Minor Beneficiary" identifies a Beneficiary who is less than twenty one years of age.

3.4 Disability. A Beneficiary will be considered "disabled" if he or she is incapacitated to an extent to make it impossible or impractical to give prompt and intelligent

Page 2 of 18 Pages

R1142_81.01

003186

consideration to business matters. The Trustee may act upon such evidence as the Trustee reasonably deems appropriate and reliable without liability by reason thereof.

3.5 Power of Appointment, Qualified Beneficiary Designation. Whenever this Trust gives a Beneficiary the power or authority to appoint a beneficiary of the Trust, the designation must be in writing and be acknowledged in the form required of acknowledgements by Texas law or exercised by a will executed with the formalities required by law of the Beneficiary's residence; it must clearly evidence the intent of the Beneficiary to exercise a power of appointment; and the written beneficiary designation must have been delivered to the Trustee prior to the Beneficiary's death or, if exercised by will, the will must have been filed for probate within three months from the date of the Beneficiary's date of death and must subsequently be admitted to probate no matter the time interval. The term of this Trust may be extended if the Qualified Beneficiary Designation requires that a Beneficiary's interest remain in Trust, or may be divided and be held as a separate trust which is governed by the terms of this Trust.

3.6 Trust Estate. The term "Trust Estate" shall mean any and all of the property delivered to the Trustee to be held, managed, and distributed under the terms of this Trust.

3.7 Trustee. For convenience, the term "Trustee," used in the singular, will mean and identify singular and multiple Trustees serving and acting pursuant to the directions of this Trust Declaration. The term "corporate Trustee" will identify a banking or trust corporation with trust powers.

4. Appointment of Trustee.

4.1 Original Appointment. The Trustor appoints HOLLI HARDIN FONTENOT as Trustee of this Trust. In the event HOLLI HARDIN FONTENOT should fail to qualify, or having qualified, should die, resign, or become incapacitated or unable to act as Trustee of this Trust, or having qualified should subsequently become divorced from DALLAS JOSEPH FONTENOT, JR., then the Trustor appoints DALLAS JOSEPH FONTENOT, JR. as Trustee of this Trust. The parties acknowledge and agree that the rights and obligations of HOLLI HARDIN FONTENOT to serve as Trustee and to resign as Trustee in accordance with the foregoing have been and are the subject of separate consideration,

003187

receipt of which is hereby acknowledged in full, and such rights and obligations are in the best interest of the administration of the Trust for its Beneficiaries.  HOLLI HARDIN FONTENOT specifically waives any rights which she may have to rescind or revoke her obligation to resign as Trustee upon divorce from DALLAS JOSEPH FONTENOT, JR.

4.2   Succession.   At any time on or after his appointment as Trustee of this Trust, DALLAS JOSEPH FONTENOT, JR. will have the right to appoint a successor or successors to serve as Trustee in the event that DALLAS JOSEPH FONTENOT, JR. chooses not to serve as Trustee or ceases to serve as Trustee for any reason, and DALLAS JOSEPH FONTENOT, JR. may specify any conditions upon succession and service as may be permitted by law.

For example, a successor may be required to furnish a fiduciary bond as a prerequisite or a successor's service may be condition upon the death, resignation, or inability to serve of another appointee.

At any time on or after his appointment as Trustee of this Trust, DALLAS JOSEPH FONTENOT, JR. may also provide that one or more designated successors will have the authority to appoint his, her, or its successor as Trustee.  An appointment of successor Trustee must be in writing and must be acknowledged to be effective.

In the absence of an appointment, or in the event all successors appointed by a Trustee shall fail or cease to serve for any reason, DALLAS JOSEPH FONTENOT, III is to be the successor as Trustee.

Trustor specifically provides that upon assumption of actual service as Trustee, DALLAS JOSEPH FONTENOT, III will have the right to appoint his successor as Trustee and to vest in a successor Trustee, upon assumption of that person's service, the right and authority to designate succession as Trustee.

In the event all of the Trustees named above, including duly appointed successors, fail or cease to serve for any reason, then FIRST INTERSTATE BANK OF TEXAS, N.A. is to be the successor Trustee.  The appointment of FIRST INTERSTATE BANK OF TEXAS, N.A. as Trustee will include any successor to FIRST INTERSTATE BANK OF TEXAS, N.A. by reason of its merger, reorganization, or sale to another banking corporation with trust powers or a trust company with trust powers.

Page 4 of 18 Pages

E1142_S1.01

003188

5. <u>Distribution of Income and Trust Corpus, Living and Port-Mortem</u>. The Trustee shall hold in trust or dispose of the Trust Estate as follows.

   5.1 <u>Distribution of Income and Principal</u>. The Trustee will have the discretionary authority to distribute to any or all of the Primary Beneficiaries or to apply for the Primary Beneficiaries' use and benefit such amounts of the Trust income and principal of the Trust Estate, even to the exhaustion thereof, as the Trustee shall desire, in the absolute discretion of the Trustee. The Trustee will have the discretionary authority to apportion or accumulate income to or for one or more of the Primary Beneficiaries in such amounts as the Trustee shall desire, in the absolute discretion of the Trustee; and the Trustee may distribute such amounts in equal or unequal shares, in the Trustee's absolute discretion. The Trustee may elect not to distribute any sums to any one or more of the Primary Beneficiaries. Accumulated income shall be added to the principal of the Trust.

   5.2 <u>Term of the Trust</u>. The term of this Trust shall be for so long as any of HOLLI HARDIN FONTENOT, DALLAS JOSEPH FONTENOT, JR., and ANNE S. FONTENOT shall live. Upon the last to die of all of the foregoing, this Trust shall terminate; provided, however, that the Trust will continue for a reasonable term thereafter for the purpose of liquidation and settlement.

   5.3 <u>Distributions for Death Taxes</u>. If the testamentary estate of the Trustor or any other Primary Beneficiary shall include any property of the Trust Estate because of the provisions of Sections 2036, 2037, and 2038 of the Internal Revenue Code of 1986 or any other provisions of the Internal Revenue Code of 1986, as amended, or under any corresponding statute hereafter in effect (dealing with inclusion of the Trust assets in the testamentary estate because of retained powers or otherwise), any death taxes (including but not limited to any estate tax) owing as a result of such inclusion shall be paid by this Trust. This provision shall control notwithstanding any other provision contained in this Trust. As used in this Trust Agreement, the term "death taxes" refers to all estate, inheritance, transfer, succession, legacy, or other death taxes of any kind and interest or penalty on such taxes, if any.

   5.4 <u>Distributions Upon Termination of the Trust</u>. Upon termination of this Trust, the undistributed principal and income after the distributions, if any, allowed under Section 5.3 above, shall be divided in equal shares, one for each of DALLAS

Page 5 of 18 Pages

H1142_81.01

003189

JOSEPH FONTENOT, III, MICHELLE ANNE FONTENOT, and each of the children of the marriage of HOLLI HARDIN FONTENOT and DALLAS JOSEPH FONTENOT, JR., including any children adopted by HOLLI HARDIN FONTENOT and DALLAS JOSEPH FONTENOT, JR. after the Effective Date ("Trust Share"). Each of the foregoing, using a Qualified Beneficiary Designation, shall have the right to appoint the Beneficiary or Beneficiaries of the Trust Estate upon his or her death and the manner in which an appointee is to receive his, her, or its Trust Share. If such Beneficiary does not exercise his power of appointment with a Qualified Beneficiary Designation, the Beneficiary's Trust Share of the remaining property of the Trust, net of settlement costs, will pass upon the termination of the Trust *per stirpes*, outright and free of Trust, to his issue living at the time of his death or, if none, *per stirpes* to the Trustor's issue then living.

5.5   Distribution In Accordance With Texas Intestate Laws. In the event all Primary Beneficiaries and all of the issue of the Primary Beneficiaries have died, upon termination of this Trust the Trustee shall distribute the Trust Estate among the heirs at law of DALLAS JOSEPH FONTENOT, JR. in accordance with the Texas rules for intestate distribution as if the Primary Beneficiaries and all of the children and other issue of the Primary Beneficiaries had predeceased the Trustor.

5.6   Method of Distribution. During such time as the Trustee is so expending sums from the Trust Estate for the benefit of any Beneficiary or otherwise as provided herein, the Trustee is authorized to make payments or delivery of the portion or portions of the Trust Estate, either to the Beneficiary directly or to the person having the care and custody of the Beneficiary, all without the necessity of the appointment of any guardian. Without limitation on the foregoing, it is acknowledged and agreed that this Trust constitutes a grantor trust within the meaning of Sections 671, et seq. of the Internal Revenue Code of 1986, as amended and that the income therefrom will be taxed to the Trustor for so long as the Trustor shall live. It is further understood and agreed that the Trustee shall distribute to the Trustor (or to any other person who is deemed to be a grantor of this Trust and taxable on the income of the Trust within the meaning of Section 671, et seq. of the Internal Revenue Code of 1986, as amended) the incremental income taxes arising in connection with the taxable income of the Trust Estate or, at the election of the Trustee, the Trustee may make

Page 6 of 18 Pages

H1142_81.01

such distribution directly to the Internal Revenue Service for the benefit of such person.

5.7    **Partial and Final Distributions**.    The Trustee, in making or preparing to make a partial or final distribution, may prepare an accounting and may require any or all of the following as a condition to payment:  a written and acknowledged statement from each distributee that the accounting has been thoroughly examined and accepted as correct; a discharge of the Trustee; a release from any loss, liability, claim, or question concerning the exercise of due care, skill, and prudence of the Trustee in the management, investment, retention, and distribution of property during the Trustee's term of service (except for any undisclosed error or omission having basis in fraud or bad faith); and/or an indemnity for the benefit of the Trustee, to include the payment of attorney's fees, from any asserted claim of any taxing agency, governmental authority, or other claimant.  Any Beneficiary having a question or potential claim may require an audit of the Trust as an expense of administration.  Failure to require the audit prior to acceptance of the Trustee's report or the acceptance of payment will operate as a final release and discharge of the Trustee except as to any error or omission having basis in fraud or bad faith.

5.8    **Contingent Trust for Certain Beneficiaries**.    The interest of any Beneficiary who has not attained the age of thirty (30) years (the "Required Age") or who may be otherwise legally disabled and whose interest is not otherwise covered by the provisions of this Trust Declaration may, in the sole and absolute discretion of the Trustee, be continued in Trust or be held as a separate trust, for the use and benefit of that person until such person shall attain the Required Age or until such person is no longer disabled.  For so long as the Trustee holds the Trust for a Beneficiary pursuant to these terms, the Beneficiary, using the Qualified Beneficiary Designation, shall have the right to appoint the Beneficiaries of his or her interest in the Trust entitled to his or her interest upon the death of the Beneficiary.  If the Beneficiary dies prior to a final distribution of his or her interest from the Trust without having made a Qualified Beneficiary Designation, that person's interest in the Trust will pass *per stirpes* to his or her issue then living, or if none, *per stirpes* to the issue of the Trustor then living.

Page 7 of 18 Pages
81142_81.01

003191

6. Powers of the Trustee. In order to carry out the purposes of this Trust Declaration, the Trustee, in addition to all other powers granted by law, shall have the following powers and discretions.

6.1 Retain Assets. The Trustee shall have the power to continue to hold any and all property received by the Trustee or subsequently added to the Trust Estate or acquired pursuant to proper authority if and as long as the Trustee, in exercising reasonable prudence, discretion, and intelligence, considers that the retention is in the best interest of the Trust.

6.2 Investments. The Trustee shall have the power to invest and reinvest in every kind of property, real, personal, or mixed, and every kind of investment, specifically including, but not by way of limitation, corporate obligations of every kind, and stocks, preferred or common, without regard to risk of loss or decline in value.

6.3 Management of Securities. The Trustee shall have the power to exercise, respecting securities held in the Trust Estate, all the rights, powers, and privileges of owners, including, but not limited to the power to vote, give proxies, and to pay assessments and other sums deemed by the Trustee necessary for the protection of the Trust Estate; to participate in voting trusts, pooling agreements, foreclosures, reorganizations, consolidations, mergers, and liquidations, and in connection therewith to deposit securities with and transfer title to any protective or other committee under such terms as the Trustee may deem advisable; to exercise or sell stock subscription or conversion rights; to accept and retain as an investment any securities or other property received through the exercise of any of the foregoing powers, regardless of any limitations elsewhere in this instrument relative to investments by the Trustee.

6.4 Form of Ownership of Trust Property. The Trustee shall have the power to hold securities or other Trust property in the name of the Trustee as Trustee under this Trust Declaration or in the Trustee's own name or in the name of a nominee or in such conditions where ownership will pass by delivery.

6.5 Business Interests. The Trustee shall have the power to continue and operate, to sell or to liquidate, as the Trustee deems advisable at the risk of the Trust Estate,

Page 8 of 18 Pages

E1142_81.01

003192

any business or partnership interests received by the Trust Estate.

6.6    Sell and Exchange.    The Trustee shall have the power to sell for cash or on deferred payments and on such terms and conditions as are deemed appropriate by the Trustee, whether at public or private sale, to exchange, and to convey any property of the Trust Estate.

6.7    Abandonment of Trust Assets.    The Trustee shall have the power to abandon any Trust asset or interest therein in the discretion of the Trustee.

6.8    Option.    The Trustee shall have the power to grant an option involving disposition of a Trust asset and to take an option for the acquisition of any asset by the Trust Estate.

6.9    Lease.    The Trustee shall have the power to lease any real or personal property of the Trust Estate for any purpose for terms within or extending beyond the duration of the Trust.

6.10    Property Management.    The Trustee shall have the power to manage, control, improve, and repair real and personal property belonging to the Trust Estate.

6.11    Development of Property.    The Trustee shall have the power to partition, divide, subdivide, assign, develop, and improve any Trust property; to make or obtain the vacation of plats and adjust boundaries or to adjust difference in valuation on exchange or partition by giving or receiving consideration; and to dedicate land or easements to public use with or without consideration.

6.12    Repair, Alter, Demolish, and Effect.    The Trustee shall have the power to make ordinary and extraordinary repairs and alterations in buildings or other trust property, to demolish any improvements, to raze party walls or buildings, and to erect new party walls or buildings as the Trustee deems advisable.

6.13    Borrowing and Encumbering.    The Trustee shall have the power to borrow money for any Trust purpose from any person, firm, or corporation on the terms and conditions deemed appropriate by the Trustee and to obligate the Trust Estate for repayment, upon such terms and conditions (including a term extending beyond the duration of the Trust) as the Trustee deems advisable; to encumber the Trust Estate or any of its property by mortgage, deed of

Page 9 of 18 Pages

B1142_81.01

003193

trust, pledge, or otherwise, using whatever procedures to consummate the transaction deemed advisable by the Trustee; and to replace, renew, and extend any encumbrance and to pay loans or other obligations of the Trust Estate deemed advisable by the Trustee.

6.14    **Natural Resources**.    The Trustee shall have the power to enter into oil, gas, liquid or gaseous hydrocarbon, sulphur, metal and any and all other natural resource leases on terms deemed advisable by the Trustee, and to enter into any pooling, unitization, repressurization, community, and other types of agreements relating to the exploration, development, operation, and conservation of properties containing minerals or other natural resources; to drill, mine, and otherwise operate for the development of oil, gas, and other minerals; to contract for the installation and operation of absorption and repressurizing plants; and to install and maintain pipelines.

6.15    **Insurance**.    The Trustee shall have the power to procure and carry at the expense of the Trust Estate insurance of the kinds, forms, and amounts deemed advisable by the Trustee to protect the Trust Estate and the Trustee against any hazard.

6.16    **Enforcement of Hypothecations**.    The Trustee shall have the power to enforce any deed of trust, mortgage, or pledge held by the Trust Estate and to purchase at any sale thereunder any property subject to any such hypothecation.

6.17    **Extending Time of Payment of Obligations**.    The Trustee shall have the power to extend the time of payment of any note or other obligation held in the Trust Estate, including accrued or future interests, in the discretion of the Trustee.

6.18    **Adjustment of Claim**.    The Trustee shall have the power to compromise, submit to arbitration, release with or without consideration, or otherwise adjust claims in favor of or against the Trust Estate.

6.19    **Litigation**.    The Trustee shall have the power to commence or defend at the expense of the Trust Estate any litigation affecting the Trust or any property of the Trust Estate deemed advisable by the Trustee.

6.20    **Administration Expenses**.    The Trustee shall have the power to pay all taxes, assessments, compensation of the Trustee, and all other expenses incurred in the collection, care, administration, and protection of the Trust Estate.

Page 10 of 18 Pages

B1142_81.01

003194

6.21  <u>Employment of Attorneys, Advisers, and Other Agents</u>.  The Trustee shall have the power to employ any attorney, investment adviser, accountant, broker, tax specialist, or any other agent deemed necessary in the discretion of the Trustee and to pay from the Trust Estate reasonable compensation for all services performed by any of them.

6.22  <u>Termination by Trustee of Small Trust</u>.  The Trustee shall have the power to terminate, in the discretion of the Trustee, the Trust held for the Beneficiaries if the fair market value of the Trust at any time becomes less than $25,000.00 and, regardless of the age of the Beneficiaries to distribute the principal and any accrued or undistributed income to the Beneficiaries, or to their respective guardians, conservators, or other fiduciaries.

6.23  <u>Distribution</u>.  The Trustee shall have the power on any partial or final distribution of the income or principal of the Trust Estate, to apportion and allocate the assets of the Trust Estate in cash or in kind, or partly in cash and partly in kind, or in undivided interests in the manner deemed advisable in the discretion of the Trustee and to sell any property deemed necessary by the Trustee to make the distribution.

6.24  <u>Merger</u>.  The Trustee shall have the power to merge this Trust with any trust established for the benefit of substantially the same beneficiaries as the Beneficiaries of this Trust and to manage and administer the respective Trusts and Trust Estate as one Trust and Trust Estate subject to the terms and conditions of the Trust Declaration governing each of said Trusts.

6.25  <u>General</u>.  The Trustee shall have the power to do all the acts, to take all the proceeds, and to exercise all the rights, powers, and privileges which an absolute owner of the property would have.  The enumeration of certain powers in this Trust Declaration shall not limit the general or implied powers of the Trustee.  The Trustee shall have all additional powers that may now or hereafter be conferred by law or that may be necessary to enable the Trustee to administer the Trust in accordance with the provisions of this Trust Declaration, subject to any limitations specified in this Trust Declaration.  The Trustee shall further have the discretion to maintain reserves for depreciation and/or depletion.

Page 11 of 18 Pages

B1142_81.01

7. **Duties and Compensation of the Trustee.**

    7.1   **Allocation of Income and Principal.** The Trustee shall determine what is income and what is principal of the Trust created under this Trust Declaration and what expenses, costs, taxes, and charges of any kind whatsoever shall be charged against income and what shall be charged against principal in accordance with the applicable statutes of the State of Texas as they now exist and may from time to time be enacted, amended, or repealed.

    7.2   **Relations With Trustee.** No one dealing with the Trustee need inquire concerning the validity of anything the Trustee purports to do, or need see to the application of any money paid or any property transferred to or upon the order of the Trustee.

    7.3   **Compensation.** Unless such fee is waived or unless specific provision is otherwise made in the appointment of any Trustee, each Trustee shall be entitled to reasonable compensation for services as Trustee in accordance with the usual and customary charges in the community where and when such services are rendered. The fee schedules of area trust departments prescribing fees for the same or similar services may be used to establish reasonable compensation. A Trustee will be entitled to full reimbursement for expenses, costs, or other obligations incurred as the result of service, including attorney's, accountant's, and other professional's fees.

    7.4   **Exculpation From Liability of Trustee.** The Trustee shall not be liable for any error or judgment or for any act done or omitted by the Trustee in good faith or for anything which the Trustee may in good faith do or refrain from doing in connection with this Trust. Accordingly, the Trustee shall not incur any liability with respect to any action taken or omitted in good faith upon the advice of counsel given in respect to any questions relating to the duties and responsibilities of the Trustee under this Trust Declaration or any action taken or omitted in reliance upon any instrument, including the written advice provided for herein, not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and accuracy of any information contained therein, which the Trustee shall in good faith believe to be genuine, to have been signed and presented by a proper person or persons, and to have conformed with the provisions of this Trust Declaration. The parties acknowledge and agree that the Trustee has no obligations to the Trust or any Beneficiary to offer to the Trust any investment opportunities presented to

Page 12 of 18 Pages

H1142_81.01

003196

Trustee individually during the term of the Trust Declaration.

7.5    Indemnity.    The Trustor shall at all times release and indemnify any successor Trustee and hold such successor Trustee harmless against any and all claims, suits, actions, debts, damages, costs, charges, and expenses, including court costs and attorney's fees, and against all liabilities, losses, or damages of any nature whatsoever that the Trustee shall at any time sustain or suffer in connection with acceptance or appointment as Trustee under this Agreement or as a result or arising out of the acquisition of any assets contributing to the Trust Estate, except to the extent of any such matter arising by reason or in consequence of the fraud or bad faith of the Trustee.

7.6    Bond.    No bond shall be required of the original Trustee hereunder.    Unless any instrument appointing a successor may provide otherwise, no bond shall be required of any successor Trustee; or if a bond is required by law, no surety shall be required on such bond.

7.7    Resignation.    Any Trustee of this Trust may at any time resign with respect to such Trust, with or without cause, effective ninety (90) days after delivery of notice of resignation thereof in writing to each current Beneficiary of this Trust.    If such Beneficiary is a minor, such delivery may be made to any guardian of such minor Beneficiary or to any adult with whom such minor Beneficiary resides.

7.8    Removal of a Trustee.    The Beneficiaries who are then entitled to receive distributions of income from the Trust or distributions of income from any separate trust created by this Trust Declaration may remove any corporate Trustee then serving, the notice of removal to be delivered in writing to the corporate Trustee.    Unless this Trust Declaration or any instrument appointing a successor provides otherwise, the selection of a successor to the corporate Trustee will be made by a court of competent jurisdiction.    In the event there is more than one Beneficiary entitled to the income from the Trust, all income Beneficiaries must join in the written notice of removal.    The consent of any person who is deceased or legally disabled will not be required in meeting the unanimous consent requirements for removal.

7.9    Liability of Trustee.    The Trustee in carrying out the Trustee's powers and performing the Trustee's duties may act in the

Page 13 of 18 Pages

81142_81.01

UNOFFICIAL COPY

003197

Trustee's discretion and shall be personally or individually liable only for fraud or acts or omissions in bad faith. No Trustee shall be liable individually or personally for any act or omission of any agent or employee of Trustee unless the Trustee shall have acted in bad faith in the selection and retention of such agent or employee.

7.10 <u>Accounts</u>. The Trustee shall each year render an account of the administration of the Trust hereunder to each living Primary Beneficiary. If a Federal Fiduciary Income Tax Return is then required for this Trust, such accounting may be made by submission of a copy of such return filed for the Trust. If no objection to an accounting has been made in writing by such Primary Beneficiary within sixty (60) days after the date of mailing of such accounting by the Trustee, it shall be deemed approved. Such approval of such account shall, as to all matters and transactions stated therein or shown thereby be final and binding upon all persons (whether in being or not) who are then or may thereafter become interested in, or entitled to share in, either the income or the principal of such Trust, provided always, however, that nothing contained in this Section 7.10 shall be deemed to give such person (or the guardian or representative) acting in conjunction with the Trustee the power to alter, amend, revoke, or terminate the Trust.

7.11 <u>Multiple Trustees</u>. In the event that there are two or more Trustees serving the Trust, all Trustees must sign any instrument transferring real property from the Trust. If the Trustees agree to do so, one Trustee acting alone may be given the primary responsibility of administration and accounting, and one Trustee alone may be authorized to deposit, transfer, and withdraw funds from any depository account held by the Trust. The authority vested in two Trustees may be exercised only by both of the Trustees; and, subject to the foregoing provisions, the authority vested in three or more trustees may be exercised by a majority of the Trustees. In the event of an action or decision by a majority, the non-consenting Trustee will not be responsible for the act of the majority.

8. <u>Spendthrift Provision</u>. The interests of each of the Beneficiaries in the principal or income of the Trust created hereunder shall not be subject to the claims of his or her creditors or creditors of others, including creditors of a spouse of a married Beneficiary, nor to legal process, and may not be voluntarily or involuntarily alienated or encumbered until actually distributed to such Beneficiary.

Page 14 of 18 Pages

EI I4Z_8).01

003198

9. <u>Perpetuities Savings Clause</u>.  Unless sooner terminated as otherwise provided in this Trust Declaration, the Trust created herein shall fully cease and terminate twenty-one (21) years after the date of the last survivor of the Trustor, the Primary Beneficiaries, and the children of each of the Primary Beneficiaries in existence as of the date of this Trust.  Upon such termination, the entire principal of the Trust Estate of the Trust, together with any undistributed income therefrom, shall vest in and be distributed to the persons entitled to take under the provisions of the Trust.

10. <u>In Terrorem Provision</u>.  If any person entitled to receive any interest from this Trust shall contest the validity of this Trust or any provision thereof or shall institute or join in (except as a party defendant) any proceeding to contest the validity of this Trust or to prevent any provision thereof from being carried out in accordance with its terms (regardless of whether or not such proceedings are instituted in good faith and with probable cause), then all benefits provided to such person in this Trust shall be revoked, and such benefits shall pass as if such person were not then living.

11. <u>Construction of Trust</u>.

11.1  <u>Governing Law</u>.  This Trust Declaration shall be governed by the laws of the State of Texas.

11.2  <u>Severability</u>.  If any part, clause, provision, or condition of this Trust Declaration is held to be void, invalid, or inoperative, such voidness, invalidity, or inoperativeness shall not affect any other clause, provision, or condition hereof; but the remainder of this Trust Declaration shall be effective as though such clause, provision, or condition had not been contained herein.

11.3  <u>Interpretative Clause</u>.  As used in this Trust Declaration, the masculine, feminine, or neuter gender, and the singular or plural number shall each be deemed to include the others whenever the context so indicates.

11.4  <u>Notices</u>.  All communications required to be given to the Trustor, the initial Trustee hereunder, or the Primary Beneficiaries (including notice of change of address) shall be in writing and shall be deemed to be duly given if and when personally delivered, or, if mailed via certified mail, return receipt requested, when tendered into the care and custody of the United States postal service properly addressed to as follows:

Page 15 of 18 Pages

B1142_81.01

003199

If to Trustor or Trustee:

HOLLI HARDIN FONTENOT
6002 Burning Tree Drive
Houston, Texas   77036


If to Primary Beneficiaries:

Dallas Joseph Fontenot, Jr.
6002 Burning Tree Drive
Houston, Texas   77036

Anne S. Fontenot
8526 Leader
Houston, Texas   77036

Dallas Joseph Fontenot, III
8526 Leader
Houston, Texas   77036

Michelle Anne Fontenot
8526 Leader
Houston, Texas   77036

11.5   Copies.  To the same extent as if it were the original,
anyone may rely on a copy of this Trust Declaration
certified by a notary public to be a true copy of this
Trust Declaration.  Anyone may rely on any statement of
fact certified by anyone who appears from the original
Trust Declaration or a certified copy thereof to be a
Trustee hereunder.

IN WITNESS WHEREOF, I, the undersigned, HOLLI HARDIN
FONTENOT, attest that I have executed this Declaration of Trust
and that the terms thereof will bind me and my successors and
assigns, my heirs and personal representatives, and any Trustee
of this Trust.  This Trust Declaration has been signed by the
Trustor on the Effective Date.

HOLLI HARDIN FONTENOT

Page 16 of 18 Pages
BJ142_81.01

003200

THE STATE OF TEXAS     §

                       §

COUNTY OF HARRIS     §

         This instrument was acknowledged before me on this the 5th day of June, 1991, by HOLLI HARDIN FONTENOT.



_____
Notary Public in and for
The State of T E X A S

_____
(Printed or Typed Name of Notary)

_____
(Commission Expiration Date)

## ACCEPTANCE BY TRUSTEE

I acknowledged that I have been appointed as a Trustee of THE HOLLI ANN HARDIN TRUST NUMBER ONE, and I hereby evidence my acceptance of the office of Trustee and will hold and administer the Trust according to the provisions thereof as required by law.

Date: _____ June 5, 1991

_____
HOLLI HARDIN FONTENOT

Page 17 of 18 Pages

B1142_81.01

UNOFFICIAL COPY

THE STATE OF TEXAS     §
                       §
COUNTY  OF  HARRIS     §

      This instrument was acknowledged before me on this the 5th day of June, 1991, by HOLLI HARDIN FONTENOT, TRUSTEE.



Notary Public in and for
The State of T E X A S
_____
(Printed or Typed Name of Notary)
_____
(Commission Expiration Date)

Page 18 of 18 Pages
81142_81.01

003202

TO WHOM IT MAY CONCERN:

I, Holli Ann Hardin Fontenot, hereby voluntarily resign as trustee of the Holli Ann Hardin Fontenot Trust Number One and the Dakota Trust. This resignation as trustee shall be effective immediately upon acceptance by Dallas J. Fontenot, Jr.

Very truly yours,

Holli Ann Hardin Fontenot

Agreed and accepted this ___8___ day of ___Sept___, 1996.

Dallas J. Fontenot, Jr.

LDK238:19

003203

EXHIBIT

B

---

## TRUST DECLARATION
## DAKOTA TRUST

---

THIS TRUST DECLARATION is made this day by declaration of Holli Hardin Fontenot ("Settlor"), who presently resides in Fort Bend County, Texas.

### ARTICLE I.
### TRUST BENEFICIARY

This Trust is created for the use and benefit of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot. The term "Trust Beneficiary" or "beneficiary" will also mean any and all persons, organizations, trusts, and entities who may have or may acquire a beneficial interest in this Trust, whether vested or contingent in nature, including a transfer of an interest in the Trust during the life of either Dallas Joseph Fontenot, Jr. or Holli Hardin Fontenot, or both, or from the exercise of a power of appointment by a Trust Beneficiary or otherwise.

For reference, the only child of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot is Dakota James Fontenot, who was born on June 22, 1994. Holli Hardin Fontenot has no other children born to her or adopted by her on the date of this Trust Declaration.

For reference, the only other children of Dallas Joseph Fontenot, Jr. are: Dallas Joseph Fontenot, III (who was born on March 29, 1969) and Michelle Anne Fontenot (who was born on March 12, 1970). Dallas Joseph Fontenot, Jr. has no other children born to him or adopted by him on the date of this Trust Declaration.

### ARTICLE II.
### INITIAL TRUST CORPUS AND RIGHT TO ADD TO THE TRUST

A.    **INITIAL TRUST CORPUS.** Settlor does hereby declare that from and after the date of this Trust Declaration, Settlor holds in trust the assets described in Schedule A attached to this Declaration, which assets are the initial corpus of this Trust and as Trustee acknowledges receipts of those assets. Settlor or any other person, trust, or entity may add property of any

003271

character to this Trust by a Last Will and Testament, from another trust (whether inter vivos or testamentary), or by deed or other transfer, subject only to the acceptance thereof by the Trustee.

B.    **ADDITIONS TO TRUST CORPUS.**  Additional contributions may be made to the corpus of the Trust, including testamentary contributions.

C.    **SEPARATE PROPERTY.**  The assets of this trust are the separate property of Holli Hardin Fontenot.  No inter vivos transfer of property will be made to this Trust unless the property constitutes the separate property of Holli Hardin Fontenot.  Holli Hardin Fontenot may make a testamentary contribution of property to this Trust, and such contribution may constitute the separate property of Holli Hardin Fontenot and Holli Hardin Fontenot's interest in community property.

## ARTICLE III.
### NO REVOCATION OR AMENDMENT

A.    **TRUST IS IRREVOCABLE.**  This Trust is an irrevocable Trust.

B.    **THIS TRUST MAY NOT BE AMENDED.**  This Trust Declaration may not be amended, except by a Court of competent jurisdiction under the doctrine of *cy pres*.

C.    **INCOME TAX MATTERS.**  For so long as the Settlor or Dallas Joseph Fontenot, Jr. is a Trustee of the Trust, the Trust will be treated for income tax reporting purposes as a Grantor Trust under Treasury Regulation § 1.671-4(b).  Thereafter, the Trust is to be treated for income tax purposes as required by the applicable provisions of Subchapter J of the Internal Revenue Code.

## ARTICLE IV.
### DEFINITIONS

A.    **DESCENDANTS.**  The term "Descendants" means the legitimate children of the person designated and the legitimate lineal descendants of such children.  The term includes any person adopted before attaining age eighteen (18) and the adopted person's legitimate lineal descendants.  A posthumous child shall be considered as living at the death of his parent.

Page 2 of 23 Pages

COPY UNOFFICIAL

003272

B.    **HEIRS AT LAW.** Whenever a trustee, or a legal advisor to the Trustee is called upon to determine the heirs at law of Settlor, or any other person beneficially interested in this Trust, the determination will be made to identify those individuals, other than creditors, who would receive the personal property of a decedent upon his or her death as determined in accordance with the laws of intestate succession of the State of Texas, United States of America, determined as if the decedent had then died single, intestate, and domiciled in Texas and further determined as if the Settlor of this Trust had predeceased the person or persons so named or described.

C.    **INCOMPETENT, DISABILITY.** A beneficiary will be considered "incompetent" or "disabled" if he or she is incapacitated to an extent to make it impossible or impractical to give prompt and intelligent consideration to business matters. The Trustee may act upon such evidence as the Trustee reasonably deems appropriate and reliable without liability by reason thereof.

D.    **MINOR BENEFICIARY.** The term "Minor Beneficiary" or "Minor" identifies a beneficiary who is less than 21 years of age.

E.    **PER STIRPES.** Whenever a distribution is directed to be made to the descendants, *per stirpes*, of any person or persons, including the descendants of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot, the property to be distributed shall be divided into as many equal shares as there are then living children of each of those persons and deceased children of each those persons who have descendants then living. Each then living child of such person shall take one share, and the share for the descendants of each deceased child shall be divided among the deceased child's then living descendants on a *per stirpes* basis.

For example, if a distribution were to be made to the descendants, *per stirpes*, of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot, assuming the recitations in Article I, the property to be distributed would be divided into three equal shares, one for each of Dallas Joseph Fontenot, III, Michelle Anne Fontenot, and Dakota James Fontenot.

F.    **RELATIVE OR RELATIVES.** Reference to a "Relative" or "Relatives" will identify any person or persons related to Settlor by blood or lawful adoption in any degree.

003273

G.   POWER OF APPOINTMENT, QUALIFIED BENEFICIARY DESIGNATION. Whenever this Trust Declaration gives a Trust Beneficiary the power or authority to appoint a beneficiary of the Trust, the designation must be in writing and be acknowledged in the form required of acknowledgements by Texas law or exercised by a will executed with the formalities required by law of the Trust Beneficiary's residence; it must clearly evidence the intent of the Trust Beneficiary to exercise a power of appointment; and the written beneficiary designation must have been delivered to the Trustee prior to the Trust Beneficiary's death or, if exercised by will, the will must have been filed for probate within three months from the date of the Trust Beneficiary's date of death and must subsequently be admitted to probate no matter the time interval.  The term of this Trust may be extended if the qualified beneficiary designation requires that a Beneficiary's interest remain in Trust, or may be divided and be held as a separate trust which is governed by the terms of this Trust Declaration.

H.   SURVIVE.  For the purpose of vesting in the event two or more persons who have an interest in the trust die within a short time of one another, one must have survived the other for a period of at least 90 days as a condition to vesting.

I.   TESTAMENTARY CONTRIBUTIONS.  The term "testamentary contributions" will mean any contribution to the Trust made by reason of the death of a person, including transfers made under the direction of a will, a beneficiary designation in a life insurance policy or other contract, by reason of survivorship language contained in a depository contract, or transfers from another Trust which designates this Trust as a beneficiary.

J.   TRUST.  "Trust" means the Trust created by this Trust Declaration

K.   TRUST DECLARATION.  The term "Trust Declaration" and the term "Trust Agreement" each refer to this Trust Declaration.

L.   TRUST FUND.  The term "Trust Fund" or "Trust Property" means all property comprising:  the initial contribution of corpus to the Trust; all property paid or transferred to, or otherwise vested in, the Trustee as additions to the corpus of this Trust; accumulated income, if any, whether or not added to the corpus of this Trust; and the investments and reinvestment of the Trust property, including the increase and decrease in the values thereof as determined from time to

Page 4 of 23 Pages

003274

time.    The terms "corpus" and "principal" are used interchangeably.

M.    **TRUSTEE.**   For convenience, the term "Trustee," used in the singular, will mean and identify multiple Trustees serving and acting pursuant to the directions of this Trust Declaration. The term "corporate Trustee" will identify a banking or trust corporation with trust powers.

N.    **GENDER, PLURAL USAGE.**   The use of personal pronouns, such as he, she, or it, are to be construed in context.   The term "person" will include a non-person, such as a corporation, trust, partnership or other entity as is appropriate in context.   The identification of person in the plural will include the singular and *vice versa*, as is appropriate in context.

<div align="center">

ARTICLE V.

**APPOINTMENT OF TRUSTEE**

</div>

A.    **ORIGINAL APPOINTMENT.**   Holli Hardin Fontenot shall serve as initial Trustee of this Trust.

B.    **FIRST SUCCESSOR.**   In the event that Holli Hardin Fontenot should die, resign, or become incapacitated or unable to act as Trustee of this Trust, or in the event that Holli Hardin Fontenot should subsequently become divorced from Dallas Joseph Fontenot, Jr., then Dallas Joseph Fontenot, Jr. shall serve as successor Trustee of this Trust.   In the event that Dallas Joseph Fontenot, Jr. should elect not to serve as Trustee of this Trust, Dallas Joseph Fontenot, Jr. will have the right to appoint a successor or successors to serve as Trustee, as set forth in Section V.C below, and he may specify any conditions upon succession and service as may be permitted by law.

Holli Hardin Fontenot acknowledges and agrees that the rights and obligations of Holli Hardin Fontenot to serve as Trustee and to resign as Trustee in accordance with the foregoing have been and are the subject of separate consideration, receipt of which is hereby acknowledged in full; and such rights and obligations are in the best interest of the administration of the Trust for its Beneficiaries.   Holli Hardin Fontenot specifically waives any rights which she may have to rescind

<div align="center">

Page 5 of 23 Pages

</div>

UNOFFICIAL COPY

003275

or revoke her obligation to resign as Trustee upon divorce from Dallas Joseph Fontenot, Jr.

C.    **SUCCESSION.**    Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment will have the right to appoint a successor or successors to serve as Trustee in the event that person ceases to serve for any reason, and each Trustee may specify any conditions upon succession and service as may be permitted by law.  For example, a successor may be required to furnish a fiduciary bond as a prerequisite or a successor's service may be conditioned upon another appointee's death, resignation, or inability to serve.  Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment may also provide that one or more designated successors as Trustee will have the authority to appoint his, her, or its successor as Trustee.  An appointment of successor Trustee must be in writing and must be acknowledged to be effective.  Unless other specified by a Trustee in a written designation of succession, succession is to be determined as follows.

If a Trustee by original appointment does not appoint a successor, the remaining Trustee or Trustees then serving will continue service alone.  If all Trustees by original appointment fail or cease to serve for any reason without having appointed a successor or successors, the successor or successors as Trustee will be as named below and in the order of succession herein prescribed.

FIRST:    Dallas Joseph Fontenot, III

BUT:    Settlor specifically provides that upon assumption of actual service as Trustee, Dallas Joseph Fontenot, III will have the right to appoint Dallas Joseph Fontenot, III's successor as Trustee, and to vest in a successor Trustee, upon assumption of that person's service, the right and authority to designate succession as Trustee. To the extent this is done, the appointment of succession will supersede the appointments which follow the designation of Dallas Joseph Fontenot, III as Trustee.

NEXT:    Michelle Anne Fontenot

BUT:    Settlor specifically provides that upon assumption of actual service as Trustee, Michelle Anne Fontenot will have the right to appoint Michelle Anne Fontenot's successor as Trustee, and to vest in a successor Trustee, upon assumption of that person's service, the right and

003276

authority to designate succession as Trustee. To the extent this is done, the appointment of succession will supersede the appointments which follow the designation of Michelle Anne Fontenot as Trustee.

FINALLY: First Interstate Bank of Texas, N.A., in the event all of the above, including duly appointed successors, fail or cease to serve for any reason. The appointment of First Interstate Bank of Texas, N.A. as Trustee will include any successor to First Interstate Bank of Texas, N.A. by reason of its merger, reorganization, or sale to another banking corporation with trust powers or a trust company with trust powers.

D.    **AUTHORITY OF SUCCESSOR TRUSTEE.** A successor will have the authority vested in a Trustee by original appointment under this Trust Declaration, subject to any lawful limitations or qualifications upon the service of a successor imposed by one Trustee in a written document appointing a successor. A successor Trustee will not be obliged to examine the accounts, records, or acts of the previous Trustee or Trustees; nor will a successor Trustee in any way or manner be responsible for any act or omission to act on the part of any previous Trustee. Reference to "Trustee" in the singular will include the plural.

E.    BOND. No one serving as Trustee will be required to furnish a fiduciary bond as a prerequisite to service.

F.    **RESIGNATION OR REMOVAL OF A TRUSTEE.** Any appointee serving or entitled to serve as Trustee may resign at any time and without cause, and the instructions in this Trust Declaration will determine who the successor will be (including successors appointed by a Trustee as herein provided). The trust beneficiary or beneficiaries who are then entitled to receive distributions of income from the trust, or distributions of income from any separate trust created by this document, may remove any corporate Trustee then serving, the notice of removal to be delivered in writing to the corporate Trustee. Unless this Trust Declaration or any instrument appointing a successor provides otherwise, the selection of a successor to the corporate Trustee will be made by a Court of competent jurisdiction. In the event there is more than one beneficiary entitled to the income from the trust, all income beneficiaries must join in the written notice of removal. The consent of any person who is deceased or legally disabled will not be required in meeting the unanimous consent requirements for removal.

Page 7 of 23 Pages

003277

G.     **AFFIDAVIT OF AUTHORITY.**  Any person or entity dealing with the Trust may rely upon the affidavit of a Trustee or Trustees of the Trust:

*On my [our] oath, and under the penalties of perjury, I [we] swear that I [we] am [are] the duly appointed and authorized Trustee[s] of DAKOTA TRUST.  I [we] certify that I [we] have not been removed as Trustee[s] and have the authority to act for, and bind, DAKOTA TRUST in the transaction of the business for which this affidavit is given as affirmation of my [our] authority.*

_____
*Signature Line*

*Sworn and subscribed before me, the undersigned authority, by _____ this _____ day of _____, 19___.*

_____
*Notary Public - State of Texas*

H.     **DOCUMENTING SUCCESSION.**  The successor to any Trustee may document succession with an affidavit setting forth that the preceding Trustee has failed or ceased to serve and the successor has assumed the duties of Trustee.  The affidavit may be filed in the deed records of Fort Bend County, Texas and in each county in which real property held in Trust is located or in the county in which the principal assets and records of the Trust are located.  The public and all persons interested in and dealing with the Trust and the Trustee may rely upon a certified copy of the recorded affidavit as conclusive evidence of a successor's authority to serve and act as the Trustee of the Trust.

I.     **COMPENSATION.**  Any person who serves as Trustee may elect to receive a reasonable compensation, reasonable compensation to be measured by the time required in the administration of the Trust and the responsibility assumed in the discharge of the duties of office.  The fee schedules of area Trust departments prescribing fees for the same or similar services may be used to establish reasonable compensation.  A corporate Trustee will be entitled to receive as its compensation such fees as are then prescribed by its published schedule of charges for Trusts of a similar size and nature and additional compensation for extraordinary services performed by the corporate Trustee.  A Trustee will be entitled to full reimbursement for expenses, costs, or other obligations incurred as the result of service, including attorney's, accountant's, and other professional fees.

J.     **MULTIPLE TRUSTEES.**  In the event there are two Trustees serving the Trust, both must sign any instrument transferring real property from the Trust.  If the Trustees agree to do so, one Trustee acting alone may be given the primary

UNOFFICIAL COPY

003278

responsibility of administration and accounting, and one Trustee alone may be authorized to deposit, transfer and withdraw funds from any depository account held by the Trust. The authority vested in three or more trustees may be exercised by a majority of the trustees. In the event of an action or decision by a majority, the non-consenting Trustee will not be responsible for the act of the majority.

## ARTICLE VI.
## DISTRIBUTIONS FROM THE TRUST,
## LIVING AND POST-MORTEM

A. **FOR SO LONG AS HOLLI HARDIN FONTENOT AND DALLAS JOSEPH FONTENOT, JR. SHALL REMAIN MARRIED.** For so long as Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr. shall remain married, the Trustee may from time to time distribute to or pay for the benefit of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., or either of them, so much of the net income (and, if the net income of the Trust is not sufficient, the principal of the Trust) as the Trustee determines may be necessary for the support, maintenance, health, and general welfare of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., or either of them. Such determination shall be in the absolute discretion of the Trustee, whose decisions shall be binding.

B. **UPON THE TERMINATION BY DIVORCE OF THE MARITAL RELATIONSHIP OF HOLLI HARDIN FONTENOT AND DALLAS JOSEPH FONTENOT, JR.** Upon the termination by divorce of the marital relationship of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., the interest of Holli Hardin Fontenot in this Trust will terminate and this Trust is to be continued in trust for the benefit of Dallas Joseph Fontenot, Jr. as follows:

1. This trust will is to be continued in Trust for the sole use and benefit of Dallas Joseph Fontenot, Jr. for so long as he shall live. Dallas Joseph Fontenot, Jr. will, for the duration of the Trust, be entitled to the net income of the Trust, this amount to be paid in convenient installment payments to be not less than quarter-annually. Distributions of income to Dallas Joseph Fontenot, Jr. shall be made in the amount, form, and manner required by Section 2523(f) of the Internal Revenue Code. If the income known by the Trustee to be available to Dallas Joseph Fontenot, Jr. from other sources is insufficient to provide for his continued

Page 9 of 23 Pages

003279

support and maintenance in good health, the Trustee will have the authority to pay to Dallas Joseph Fontenot, Jr. or apply for his benefit, so much of the principal of the Trust, even to the exhaustion thereof, as is necessary to provide for his support and maintenance in the style and comfort to which he is accustomed and to provide for his medical needs and maintenance of good health. It is intended that the payment of principal be limited by the ascertainable standard provided above, that this provision comply fully with Treasury Regulation §20.2041-1(c)(2), and that this Trust is to be construed and limited to that end. Dallas Joseph Fontenot, Jr. may at any time require that property which does not produce an income or a sufficient income be sold and invested in income producing property.

2. Upon the death of Dallas Joseph Fontenot, Jr., Dallas Joseph Fontenot, Jr., by a clause in his Will in which he specifically exercises this power of appointment, shall have the power to appoint the then remaining trust assets to or for the benefit of any one or more of the descendants of Dallas Joseph Fontenot, Jr. or the descendants of Holli Hardin Fontenot, in such shares, proportions, or amounts, upon such trusts and for such estates as he alone may determine. If Dallas Joseph Fontenot, Jr. fails to exercise this special power of appointment to the fullest extent, then, subject to the other provisions of this Trust, upon his death, the unappointed trust assets shall be delivered to the living descendants of Holli Hardin Fontenot who were born prior to the date of divorce and to the living descendants of Dallas Joseph Fontenot, Jr., *per stirpes*.

C. **UPON THE DEATH OF HOLLI HARDIN FONTENOT WHILE MARRIED TO DALLAS JOSEPH FONTENOT, JR.** Upon the death of Holli Hardin Fontenot while married to Dallas Joseph Fontenot, Jr. this Trust is to be continued in Trust as follows:

1. This trust will is to be continued in Trust for the sole use and benefit of Dallas Joseph Fontenot, Jr. for so long as he shall live. Dallas Joseph Fontenot, Jr. will, for the duration of the Trust, be entitled to the net income of the Trust, this amount to be paid in convenient installment payments to be not less than quarter-annually. Distributions of income to Dallas Joseph Fontenot, Jr. shall be made in the amount, form, and manner required by Section 2056(b)(7)(B) of the Internal Revenue Code. If the income known by the Trustee to be

003280

available to Dallas Joseph Fontenot, Jr. from other sources is insufficient to provide for his continued support and maintenance in good health, the Trustee will have the authority to pay to Dallas Joseph Fontenot, Jr. or apply for his benefit, so much of the principal of the Trust, even to the exhaustion thereof, as is necessary to provide for his support and maintenance in the style and comfort to which he is accustomed and to provide for his medical needs and maintenance of good health. It is intended that the payment of principal be limited by the ascertainable standard provided above, that this provision comply fully with Treasury Regulation §20.2041-1(c)(2), and that this Trust is to be construed and limited to that end. Dallas Joseph Fontenot, Jr. may at any time require that property which does not produce an income or a sufficient income be sold and invested in income producing property.

2. Upon the death of Dallas Joseph Fontenot, Jr., Dallas Joseph Fontenot, Jr., by a clause in his Will in which he specifically exercises this power of appointment, shall have the power to appoint the then remaining trust assets to or for the benefit of any one or more of the descendants of Dallas Joseph Fontenot, Jr. or the descendants of Holli Hardin Fontenot, in such shares, proportions, or amounts, upon such trusts and for such estates as he alone may determine. If Dallas Joseph Fontenot, Jr. fails to exercise this special power of appointment to the fullest extent, then, subject to the other provisions of this Trust, upon his death, the unappointed trust assets shall be delivered to the living descendants of Holli Hardin Fontenot and to the living descendants of Dallas Joseph Fontenot, Jr., *per stirpes*.

D. **UPON THE DEATH OF DALLAS JOSEPH FONTENOT, JR. WHILE MARRIED TO HOLLI HARDIN FONTENOT.** Upon the death of Dallas Joseph Fontenot, Jr. while married to Holli Hardin Fontenot, this Trust is to be continued in Trust as follows:

1. This trust will is to be continued in Trust for the sole use and benefit of Holli Hardin Fontenot for so long as she shall live. Holli Hardin Fontenot will, for the duration of the Trust, be entitled to the net income of the Trust, this amount to be paid in convenient installment payments to be not less than quarter-annually. If the income known by the Trustee to be available to Holli Hardin Fontenot from other sources is insufficient to provide for her continued support and



Page 11 of 23 Pages

003281

maintenance in good health, the Trustee will have the authority to pay to Holli Hardin Fontenot or apply for her benefit, so much of the principal of the Trust, even to the exhaustion thereof, as is necessary to provide for her support and maintenance in the style and comfort to which she is accustomed and to provide for her medical needs and maintenance of good health. Holli Hardin Fontenot may at any time require that property which does not produce an income or a sufficient income be sold and invested in income producing property.

2. Upon the death of Holli Hardin Fontenot, unless Holli Hardin Fontenot shall issue a direction to the contrary, the Trustee will pay from the Trust assets the entire increment in the taxes payable by reason of her death to the extent that the total of such taxes is greater than would have been imposed if the trust assets had not been taken into account in determining such taxes.

3. Dallas Joseph Fontenot, Jr., by a clause in his Will in which he specifically exercises this power of appointment, shall have the power to appoint the trust assets remaining upon the death of Holli Hardin Fontenot to or for the benefit of any one or more of the descendants of Dallas Joseph Fontenot, Jr. or the descendants of Holli Hardin Fontenot, in such shares, proportions, or amounts, upon such trusts and for such estates as he alone may determine. If Dallas Joseph Fontenot, Jr. fails to exercise this special power of appointment to the fullest extent, then, subject to the other provisions of this Trust, upon his death, the unappointed trust assets shall be delivered to the living descendants of Holli Hardin Fontenot and to the living descendants of Dallas Joseph Fontenot, Jr., *per stirpes*.

E. **ELECTION, QUALIFIED TERMINABLE INTEREST PROPERTY.** It is important to emphasize that upon the death of Holli Hardin Fontenot, or the termination by divorce of the marital relationship of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., Dallas Joseph Fontenot, Jr. will have no more than a life interest in the Trust. Dallas Joseph Fontenot, Jr. will have no right or power to revoke or amend this Trust. The Trustee may, without liability for doing so or the failure to do so, elect to treat all or a part of the Trust as Qualified Terminable Interest Property pursuant to the requirements of Section 2056(b)(7) or Section 2523(f) of the Internal Revenue Code, whichever is applicable. To the extent that an election is made, and unless Dallas Joseph Fontenot,

003282

Jr. shall issue a direction to the contrary, the Trustee will pay from the Trust assets the entire increment in the taxes payable by reason of his death to the extent that the total of such taxes is greater than would have been imposed if the property treated as qualified terminable interest property had not been taken into account in determining such taxes. To the extent a partial election is made, and to the extent and in the manner then permitted by law, the Trustee will have the authority (1) to divide the Trust into separate trusts to reflect the partial election, or (2) to continue the Trust as a whole, with the fraction or percentage of the whole representing the elective share to be administered and maintained in a manner to reflect its proportionate share of the increment or decline in the whole of the property for the purposes of applying Sections 2044 and 2519 of the Internal Revenue Code. If the Trust is divided into separate parts, the Trustee will make the division according to the fair market value at the time the division is made. It is Settlor's intent and purpose to comply with state and federal law so that the least amount of federal estate tax will be payable upon the deaths of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., and this Trust Declaration is to be applied and construed to accomplish this objective.

F.  DIVISION INTO SEPARATE TRUSTS. If, following the death of Holli Hardin Fontenot or the termination by divorce of the marital relationship between Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot, the Trust is divided into separate trusts, the appreciation or depreciation in the value of each such trust or account will measure the value thereof for the purpose of disposition and taxation. For example, if the Trustee elects to treat all but $600,000 of the Trust assets as qualified terminable interest property for the federal estate tax marital deduction, and, if the Trustee segregates the $600,000 amount into a separate trust, the amount distributable therefrom upon the death of Dallas Joseph Fontenot, Jr. will be the value of that account upon the death of Dallas Joseph Fontenot, Jr. If, however, the $600,000 amount represents 25 percent of the total trust estate, and is continued and maintained as a fractional percentage of the whole, the value of the fractional interest upon the death of Dallas Joseph Fontenot, Jr. is to be determined with regard to its proportional share of any increase or decrease in the value of the whole.

G.  ITEMS OF TANGIBLE PERSONAL PROPERTY IN TRUST. Holli Hardin Fontenot may have certain items of tangible personal property which are her separate property and which have been

003283

transferred to the Trust or otherwise subject to the Trustee's control. The term "personal belongings" or "tangible personal property" will mean and identify personal wearing apparel, jewelry, household furnishings and equipment, books, albums, art work, entertainment and sports equipment, and all items of decoration or adornment. Holli Hardin Fontenot may at any time and from time to time deliver to the Trustee written instructions as to any living or post mortem gifts of such personal belongings, and the Trustee shall be authorized and bound to make disposition of these items as Holli Hardin Fontenot has reasonably directed.

H.  **PARTIAL AND FINAL DISTRIBUTIONS.** The Trustee, in making or preparing to make a partial or final distribution, may prepare an accounting and may require, as a condition to payment, a written and acknowledged statement from each distributee that the accounting has been thoroughly examined and accepted as correct; a discharge of the Trustee; a release from any loss, liability, claim or question concerning the exercise of due care, skill, and prudence of the Trustee in the management, investment, retention, and distribution of property during the Trustee's term of service, except for any undisclosed error or omission having basis in fraud or bad faith; and an indemnity of the Trustee, to include the payment of attorney's fees, from any asserted claim of any taxing agency, governmental authority, or other claimant. Any remainder beneficiary having a question or potential claim may require an audit of the Trust as an expense of administration. Failure to require the audit prior to acceptance of the Trustee's report, or the acceptance of payment, will operate as a final release and discharge of the Trustee except as to any error or omission having basis in fraud or bad faith.

The Trustee, in making or preparing to make a partial or final distribution will have the authority to: (1) partition any asset or class of assets and deliver divided and segregated interests to the beneficiaries; (2) sell any asset or class of assets (whether or not susceptible to partition in kind), and deliver to a beneficiary or beneficiaries a divided interest in the proceeds of sale and/or divided or undivided interests in any note and security arrangement taken as part of the purchase price; and/or (3) deliver undivided interests in an asset or class of assets to the beneficiaries subject to any indebtedness which may be secured by the property.

I.  **CONTINUATION OF THE TRUST DURING DISSOLUTION.** The Trust may continue beyond its termination for a time reasonably necessary to conclude the administration of the Trust, pay

003284

expenses of termination and to distribute to the Trust property to those entitled thereto.

J.    **CONTINGENT TRUST FOR CERTAIN BENEFICIARIES.**  The interest of any Trust Beneficiary who has not attained the age of thirty-five (35) years (the "required age"), or who may be otherwise legally disabled, and whose interest is not otherwise covered by the provisions of this Trust Declaration or another Trust, may, in the sole and absolute discretion of the Trustee, be continued in Trust, or be held as a separate trust, for the use and benefit of that person until such person shall attain the required age or until such person is no longer disabled. For so long as the trust shall exist, the Trustee shall hold, manage, and make distributions of income and principal to provide for his or her health, education, support and maintenance.  The Trustee may make an entire distribution of principal to a Trust Beneficiary prior to the required age if, in the Trustee's determination alone, the beneficiary has demonstrated an ability to conserve his or her resources or if it is no longer feasible for the trust to continue considering the size of the trust and the time and cost to maintain the trust.  The Trust Beneficiary, with consent of the Trustee, may also extend the term of the trust.

For so long as the Trust is held for a beneficiary pursuant to these terms, the Trust Beneficiary, using a qualified beneficiary designation, will have the right to appoint the beneficiaries of his or her interest in the Trust entitled to his or her interest upon the Trust Beneficiary's death.  If the Trust Beneficiary dies prior to a final distribution of his or her interest from the Trust, without having made a qualified beneficiary designation, that person's interest will pass *per stirpes* to his or her descendants then living, or if none, *per stirpes* to Settlor's descendants then living.

K.    **PERPETUITIES.**  In no event will the term of this Trust continue for a term greater than twenty-one (21) years after the death of the last survivor of Settlor and all relatives of Settlor living on the effective date of this Trust Declaration.  Any continuation of the Trust by the qualified exercise of a power of appointment will be construed as the creation of a separate trust and an extension of the Rule Against Perpetuities to the extent permitted by law.  A court of competent jurisdiction is to liberally construe and apply this provision to validate an interest consistent with Settlor's intent and may reform or construe an interest according to the doctrine of *cy pres*.

003285

## ARTICLE VII.
### PAYMENT OF DEBTS, TAXES, AND
### SETTLEMENT COSTS
### EXERCISE OF ELECTIONS

The following directions concern the payment of debts, taxes, estate and trust settlement costs, and the exercise of any election permitted by Texas law or by the Internal Revenue Code:

A.   **PAYMENT OF INDEBTEDNESS AND SETTLEMENT COSTS.** The Trustee will have the discretionary authority to pay from the Trust Fund the costs reasonably and lawfully required to settle the estate of a deceased beneficiary. In the event there is more than one Trust Beneficiary immediately preceding the death of a beneficiary, distributions of Trust income and principal to pay settlement costs will not exceed that person's trust share or the fair market value of the beneficiary's interest in the Trust which is distributable by reason of his or her death.

B.   **SPECIAL BEQUESTS.** Unless otherwise provided in this Trust document, or in any amendment, or in a document exercising a power to appoint the beneficiaries of this Trust, if property given as a special bequest or gift is subject to a mortgage or other security interest, the designated recipient of the property will take the asset subject to the obligation and the recipient's assumption of the indebtedness upon distribution of the asset to the recipient. The obligation to be assumed shall be the principal balance of the indebtedness on date of death, and the Trust shall be entitled to reimbursement or offset for principal and interest payments paid by the Trust to date of distribution.

C.   **ESTATE, GENERATION SKIPPING, OR OTHER DEATH TAX.** Unless otherwise provided in this Trust document, or in a document exercising a power to appoint the beneficiaries of this Trust, estate, inheritance, succession, or other similar tax shall be charged to and apportioned to those whose gifts or distributive share generate a death tax liability by reason of Settlor's death or by reason of a taxable distribution from the Trust or a taxable termination of the Trust. To the extent Settlor may lawfully provide, a Trustee may pay and deduct from a beneficiary's distributive share (whether the distribution is to be paid outright or is to be continued in Trust) the increment in taxes payable by reason of a required distribution or termination of interest (i.e., estate, gift, inheritance, or generation skipping taxes) to the extent that the total of such taxes payable by reason of a distribution or

UNOFFICIAL COPY

003286

termination is greater than the tax which would have been imposed if the property of the Trust subject to the distribution or termination of interest had not been taken into account in determining the amount of such tax. To the extent a tax liability results from the distribution of property to a beneficiary other than under this Trust, the Trustee will have the authority to reduce any distribution to the beneficiary from this Trust by the amount of the tax liability apportioned to the beneficiary, or if the distribution is insufficient, the Trustee will have the authority to proceed against the beneficiary for his, her, or its share of the tax liability. In making an allocation, the Trustee may consider all property included in the gross estate of the Settlor for federal estate tax purposes, including all property subject to probate, all amounts paid or payable to another as the result of death, including life insurance proceeds, proceeds from a qualified retirement plan or account, proceeds from a joint and survivorship account with a financial institution or brokerage company, proceeds from a buy-sell or redemption contract, and/or any other plan or policy which provides for a payment of death benefits. This provision further contemplates and includes any tax which results from the inclusion of a prior transfer in the federal gross estate of Settlor even though possession of the property previously transferred is vested in someone other than the Trustee. This provision does not include a reduction in the unified credit by reason of taxable gifts previously made by Settlor. If the Trustee determines that the collection of an apportioned tax liability against another is not economically feasible or probable, the tax liability will be paid by the Trust and will reduce the amount distributable to the residuary beneficiaries. The Trustee's judgment with regard to the feasibility of collection is to be conclusive.

D.  **SPECIAL ELECTION FOR QUALIFIED TERMINABLE INTEREST PROPERTY.** For the purpose of identifying the "transferror" in allocating a GST exemption, the estate of Holli Hardin Fontenot or the Trustee of this Trust may elect to treat all of the property which passes in Trust to Dallas Joseph Fontenot, Jr. for which a marital deduction is allowed, by reason of Section 2056(b)(7) or Section 2523(f) of the Internal Revenue Code, as if the election to be treated as Qualified Terminable Interest Property had not been made. Reference to the "Special Election For Qualified Terminable Interest Property" will mean and identify the election provided by Section 2652(a)(2) of the Internal Revenue Code. The term "GST Exemption" or "GST Exemption Amount" is the dollar amount of property which may pass as generation skipping transfers under Subtitle B,

003287

Chapter 13, of the Internal Revenue Code of 1986 which is exempt from the generation-skipping tax.

E.   **ELECTIVE DEDUCTIONS.**  A Trustee will have the discretionary authority to claim any obligation, expense, cost, or loss as a deduction against either estate tax or income tax, or to make any election provided by Texas law, the Internal Revenue Code, or other applicable law, and the Trustee's decision will be conclusive and binding upon all interested parties and shall be effective without obligation to make an equitable adjustment or apportionment between or among the beneficiaries of this Trust or the estate of deceased beneficiary.

## ARTICLE VIII.
### SERVICE OF THE TRUSTEE
#### OTHER MATTERS

A.   **GENERAL AUTHORITY.**  A Trustee is to serve without Court supervision.  The service of a Trustee is to be governed first by the terms, conditions, and authority prescribed by this Trust Declaration, and then as prescribed by the trust laws of the State of Texas.

B.   **RETENTION OF ASSETS.**  A Trustee will have the authority to retain, without liability, any and all property in the form in which it is received by the Trustee without regard to its productivity or the proportion that any one asset or class of assets may bear to the whole.  A Trustee will not have liability nor responsibility for loss of income from or depreciation in the value of property which was retained in the form which the Trustee received it.

C.   **UNDIVIDED INTERESTS.**  A Trustee will have the authority to hold, acquire, and dispose of undivided interests in property.

D.   **LENDING, INVESTING.**  A Trustee will have the authority to lend, borrow, lease, sell, and purchase property, including undivided fractional interests in property, upon such terms and conditions as are reasonably prudent under the facts and circumstances then existing.  A Trustee may transact business, including lending, borrowing, leasing, and sale, between two or more related trusts or persons upon such terms and conditions as are reasonably prudent under the facts and circumstances then existing.  Without limiting the general authority above given, a Trustee will have the authority to hold, acquire and sell:

UNOFFICIAL COPY

003288

- Publicly traded securities, including stocks, bonds, warrants, futures, mutual funds, partnerships, real estate investment trusts, diversified asset funds.
- Interests in a closely held corporation, partnership, or trust, whether registered or not registered for public sale.
- Obligations of the United States Government or any other government.
- Cash deposits, money market funds, brokerage company accounts, certificates of deposit, savings accounts, and checking accounts, without limitation as to the location of the account or depository.
- Promissory notes, secured and unsecured, including mortgage notes purchased at a discount.
- Land, improved and unimproved, whether presently income producing or held for appreciation in value.
- Land, building and equipment leases.
- Minerals, mineral rights and working interests in mineral producing property or property held for future development.
- Equipment, implements, stock in trade, leasehold improvements, and livestock.
- Insurance policies.



E. **LIMITATION UPON A TRUSTEE'S LIABILITY.** A Trustee, other than a banking corporation serving as a Trustee, will not have personal liability for service in a fiduciary capacity other than for acts or omissions to act which, as determined by a court of law, constitute gross negligence or fraud.

F. **PROTECTION OF THE INTERESTS OF BENEFICIARIES.** No beneficiary will have the power to anticipate, encumber or transfer any interest in the Trust. No part of the Trust will be liable for or charged with any debts, contracts, liabilities or torts of a beneficiary or subject to seizure or other process by any creditor of a beneficiary.

G. **RELATIONSHIP WITH BENEFICIARIES WHO ARE MINORS OR INCOMPETENTS.** Distributions to an incompetent or disabled beneficiary, or a Minor Beneficiary may be made in such of the following ways as in the Trustee's opinion will be most beneficial to the interests of the beneficiary: (a) directly to such beneficiary; (b) to his or her parent, guardian or legal representative; (c) to a custodian for said beneficiary under any Uniform Gifts to Minors Act and/or Gifts of Securities to Minors Act in the jurisdiction of residence of such beneficiary; (d) to any person with whom he or she is residing; (e) to some near relative or close friend; or (f) by

003289

the Trustee using such payment directly for the benefit of such beneficiary, including payments made to or for the benefit of any person or persons whom said beneficiary has a legal obligation to support. The Trustee may in the Trustee's sole discretion instead hold such income or corpus for the account of such beneficiary as custodian. A receipt from a beneficiary or from his parent, guardian, legal representative, relative, close friend, or other person described above shall be a sufficient discharge to the Trustee from any liability for making said payments.

The Trustee is likewise authorized to consult with and act upon the advice of the parent, guardian, custodian, or legal representative of any beneficiary who is either an incompetent or a Minor with respect to any and all matters which may arise under this Declaration and as concerns the rights or interests of said beneficiary. All statements, accounts, documents, releases, notices, or other written instruments, including but not limited to written instruments concerning the resignation or replacement of any Trustee or Trustees, required to be delivered to or executed by such beneficiary may be delivered to or executed by the parent, guardian, custodian, or legal representative of said incompetent or Minor Beneficiary, and when so delivered or executed shall be binding upon said incompetent or Minor Beneficiary, and shall be of the same force and effect as though delivered to or executed by a beneficiary acting under no legal disability.

## ARTICLE IX.
## UNPRODUCTIVE OR UNDERPRODUCTIVE PROPERTY

A beneficiary who is then entitled to the income of the Trust, or the income of any other Trust established or continued pursuant to this trust declaration, will have the authority to issue a written directive to the Trustee to convert Trust Property which does not produce an income, or which is underproductive, into property which is income producing or which will provide a greater income to the trust. Upon actual receipt of an income beneficiary's written directive, the Trustee will reasonably and prudently proceed to convert unproductive or underproductive property into property which will produce a reasonable and safe rate of return. The Trustee may do so by selling the unproductive or underproductive asset upon such terms and conditions as is prudent and reasonable under all circumstances which may then exist (including the acceptance of an income or interest bearing obligation as the whole or a part of the sales price), and investing the proceeds of sale in income producing instruments or obligations. Notwithstanding

Page 20 of 23 Pages

003290

these requirements, a Trust Beneficiary cannot direct the Trustee to invest or reinvest trust property in a trust investment which is speculative in nature or which, in result, would violate the spendthrift provisions of this Trust Declaration.

## ARTICLE X.
### NO-CONTEST REQUIREMENTS

Settlor vests in the Trustee the authority to construe this Trust instrument and to resolve all matters pertaining to disputed issues or controverted claims. Settlor does not want to burden this Trust with the cost of a litigated proceeding to resolve questions of law or fact unless the proceeding is originated by the Trustee or with the Trustee's written permission. Any other person, agency, or organization who shall originate (or who shall cause to be instituted) a judicial proceeding to construe or contest this Trust instrument, or any will which requires distribution of property to this Trust, or to resolve any claim or controversy in the nature of reimbursement, or seeking to impress a constructive or resulting Trust, or alleging any other theory which, if assumed as true, would enlarge (or originate) a claimant's interest in this Trust or in Settlor's estate, without the Trustee's written permission, shall forfeit any amount to which that person, agency, or organization is or may be entitled and the interest of any such litigant or contestant shall pass as if he or she or it had predeceased us. These directions shall apply even though the person, agency or organization shall be found by a court of law to have originated the judicial proceeding in good faith and with probable cause and even though the proceedings may seek nothing more than to construe the application of this no-contest provision. This requirement is to be limited, even to the exclusion thereof, in the event it operates to deny the benefits of the federal estate tax or federal gift tax marital deduction.

## ARTICLE XI.
### JURISDICTION

The jurisdiction of this Trust will be the State of Texas. Any issue of law or fact pertaining to the creation, continuation, administration, and termination of the Trust, or any other matter incident to this Trust, is to be determined with reference to the specific directions in the Trust Declaration and then under the laws of the State of Texas. If a Article or Subsection of this Trust Declaration is in conflict with a prohibition of state law or federal law, the Article or Subsection, or the Trust Declaration as a whole, is to be construed in a manner which will cause it to be

003291

in compliance with state and federal law and in a manner which will result in the least amount of taxes and estate settlement costs.

ARTICLE XII.
ACCEPTANCE BY TRUSTEE

Holli Hardin Fontenot acknowledges that she is the initial Trustee of the DAKOTA TRUST.  By execution of this Trust Declaration, Holli Hardin Fontenot accepts the office of Trustee and agrees to hold and administer the Trust according to the provisions thereof and as required by law.

CONCLUSION AND ATTESTATION

Holli Hardin Fontenot attests that she has executed this Trust Declaration on the date set forth below, and the terms thereof will bind her, her successors and assigns, and her heirs and personal representatives.  This instrument is to be effective upon the date recorded immediately below.

Dated:    November 9, 1994

original signed by Holli Hardin Fontenot

Holli Hardin Fontenot, individually and as Trustee

Page 22 of 23 Pages

003292

STATE OF TEXAS     §
                   §
COUNTY OF HARRIS   §

On this __9th__ day of ___November___ in the year 199_4_ before me, a Notary Public of said State, personally appeared Holli Hardin Fontenot, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument, and acknowledged that she executed the same in the capacities expressed therein.

WITNESS MY HAND and official seal.

_____
Notary Public, State of Texas

[SEAL]

UNOFFICIAL COPY

Page 23 of 23 Pages

003293



## SCHEDULE A TO
## TRUST DECLARATION
## DAKOTA TRUST

The Sum of SIXTY FOUR THOUSAND AND NO/100 DOLLARS ($64,000.00) from the Holli Ann Hardin Sole and Separate Property Account, which sum constitutes the separate property of the Settlor

003294

This trust may need a demand power after Holli's death so that we can take advantages of $10,000 per year exclusion for gifts of present interest.



UNOFFICIAL COPY

Page 23 of 23 Pages

003295

④

TO WHOM IT MAY CONCERN:

I, Holli Ann Hardin Fontenot, hereby voluntarily resign as trustee of the Holli Ann Hardin Fontenot Trust Number One and the Dakota Trust. This resignation as trustee shall be effective immediately upon acceptance by Dallas J. Fontenot, Jr.

Very truly yours,

Holli Ann Hardin Fontenot

Agreed and accepted this _8_ day of _SEPT._, 1996.

Dallas J. Fontenot, Jr.

LDK238:19

UNOFFICIAL COPY

TOTAL P.02

003296



EXHIBIT

C

## NO. 21-CPR-036521

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN THE COUNTY COURT AT LAW |
| | § | |
| DALLAS JOSEPH FONTENOT, JR., | § | NUMBER FOUR (4) OF |
| | § | |
| DECEASED | § | FORT BEND COUNTY, TEXAS |

## NO. 21-DCV-288736

| | | |
|---|---|---|
| IN RE: | § | IN THE 240th DISTRICT COURT |
| | § | |
| | § | OF |
| HOLLI ANN HARDIN TRUST | § | |
| NUMBER ONE | § | FORT BEND COUNTY, TEXAS |

## BINDING MEDIATED SETTLEMENT AGREEMENT

The Parties – Dakota Fontenot, individually, in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in his capacity as next friend and virtual representative for S.F., a minor, Holli Ann Fontenot, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, Dallas Joseph Fontenot, III, individually, and in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One, Michelle Ann Fontenot, individually, in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in her capacity as next friend and virtual representative for A.E., a minor, and Ashley Fontenot Estrada, individually and in her capacity as a beneficiary of the Hollis Ann Hardin Trust Number One – hereto agree that all causes of action pending in cause number 21-CPR-036521 and cause number 21-DVC-288736, both of which are pending in Fort Bend County, Texas, and all related claims and/or controversies between them, whether asserted or not, known or unknown, actual or contingent, are hereby settled, in accordance with the terms of this Binding Mediated Settlement Agreement (hereinafter referred to as the "Settlement Agreement").

## A. DEFINITIONS

1.      Whenever used in this Settlement Agreement, the following terms shall have and be construed to have the following meanings:

i.      "Settlement Agreement" shall mean and refer to this Binding Mediated Settlement Agreement.

ii.      "Dakota" shall mean and refer to Dakota Fontenot, individually, in his capacity as beneficiary of the Holli Ann Hardin Trust Number One, and in his capacity as next friend and virtual representative of S.F., a minor.

1

iii.    "Holli" shall mean and refer to Holli Ann Fontenot, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

iv.    "Joe" shall mean and refer Dallas Joseph Fontenot, III, individually and in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

v.    "Michelle" shall mean and refer to Michelle Ann Fontenot, individually, in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in her capacity as next friend and virtual representative of A.E., a minor.

vi.    "Ashley" shall mean and refer to Ashley Fontenot Estrada, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

vii.    "Trust" shall mean and refer to the Holli Ann Hardin Trust Number One.

viii.    "Estate" shall mean and refer to the Estate of Dallas Joseph Fontenot, Jr., whose administration is pending in cause number 21-CPR-036521, in the County Court at Law Number Four (4) of Fort Bend County, Texas.

ix.    "Parties" shall mean and refer to Dakota, Holli, Joe, Michelle, and Ashley, collectively, as described in paragraphs two (ii) through six (vi) above.

x.    "Claims" shall mean and include any and all causes of action, demands, debts, obligations, duties, liens, liabilities, and theories of liabilities of whatsoever kind and nature, whether based in contract or tort, whether arising in equity or under the common law, whether by statute or regulation, whether known or unknown, whether past or present, whether contingent or matured, whether for damages relief, injunctive relief, declaratory relief, equitable relief, or any other type of relief, whether for actual damages, personal injury damages, mental anguish, liquidated damages, punitive damages, exemplary damages, compensatory damages, consequential damages, incidental damages, pecuniary damages, costs, expenses, attorneys' fees, penalties, or fines that are (is), were (was), could be, or could have been asserted as of the Effective Date, regardless of whether actually asserted, whether by claim, counterclaim, cross-claim, motion, third-party claim regarding the Estate and Trust, including but not limited to, claims, whether asserted or not, known or unknown, actual or contingent.

xi.    "Effective Date" shall mean and refer to the date that the last Party to this Settlement Agreement executes the same.

xii.    In respect to any defined term herein, the singular shall include the plural, and the plural shall include the singular.

2

UNOFFICIAL COPY

B. TERMS, CONDITIONS, AND MUTUAL CONSIDERATION

1.      The Parties acknowledge that bona fide disputes and controversies exist between them, both as to liability and the amount thereof in damages, if any, and by reason of such disputes and controversies they desire to compromise and settle all Claims and causes of action of any kind whatsoever which the Parties have or may have arising out of the transactions or occurrences which have been brought or could have been brought regarding the Trust.

2.      **THE PARTIES AGREE AND ACKNOWLEDGE THAT UPON THE EXECUTION OF THIS SETTLEMENT AGREEMENT, THIS SETTLEMENT AGREEMENT SHALL BECOME BINDING AND IRREVOCABLE.**

3.      The Parties agree that the 2013 Last Will and Testament and 2017 First Codicil to the Last Will and Testament will be admitted to probate.  The Parties agree that Holli will be appointed as the Independent Executor of the Estate and agree not to object to the same.

4.      All of the Estate's assets, including all associated bank accounts, shall be distributed to Holli, save and expect the following items:

- The following items are going to be distributed to Dakota:

   o   The 2017 F150 Truck
   o   The 2013 Toyota Sequoia
   o   All interest, including all associated bank accounts, in Entertainment Marketing and Management, LP
   o   The coin collection and gold located in the backpack at the Rosenburg Office

- The following items are going to be distributed to Joe:

   o   The 2008 Honda Ridgeline
   o   One-half (1/2) of the Decedent's Tiki Mug Collection

The Parties agree to execute all documents necessary to effectuate the conveyance of all property described above the individual recipients stated in paragraph four (4).

5.      From the Rosenburg office, Holli shall be entitled to obtain:

- The remaining $150,000 in non-earmarked cash located in the backpack;
- Any and all Playboy Magazines

6.      The Parties agree that all personal property belonging to Dakota, Joe, and/or Michelle that is currently located at 10402 W. Hidden Lake Lane, Richmond, Texas 77406 shall be distributed to Dakota, Joe, and/or Michelle as appropriate.  Dakota, Joe and/or Michelle shall

3

be afforded the opportunity, within thirty (30) days of the Effective Date of this Settlement Agreement, to conduct a supervised walkthrough of their personal property located at 10402 W. Hidden Lake Lane, Richmond, Texas 77406. During that time, Dakota, Joe, and/or Michelle will take photographs of their personal property which they would like to obtain. A list and accompanying photographs will be delivered to counsel for Holli of those items within fourteen (14) days of the walkthrough being completed. Holli will have fourteen (14) days to object to the items which Dakota, Joe, and/or Michelle would like to obtain. If the parties cannot reach a resolution regarding the same, Russ Jones will mediate, at an hourly rate, the division of the disputed personal property. Upon the completion and approval of a final list of items, Dakota, Joe, and/or Michelle, at their expense, shall obtain and remove the items on the approved final list of items at a mutually agreeable date and time within fourteen (14) days of the approval of the final list of items.

7.      The attorney's fees for Holli, Dakota, Joe, Michelle, and/or Ashley may be paid from the assets of the Holli Ann Hardin Trust Number One in an amount no more than $200,000.00 per side. The Parties will present their fees to Linda Goehrs, in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, for payment. The Parties agree that they will not object to the payment of the fees of any other party.

8.      The real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183 shall be distributed to Holli. Dakota, Michelle, and Joe, with Dakota as authorized representative, shall retain a right of first refusal in the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183. If Holli decides to sell or otherwise transfer the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183, Holli shall notify Dakota, Michelle, and Joe in writing and provide an appraisal completed by a certified and licensed real estate appraiser. From the date of receipt of that notice, Dakota, Michelle, and/or Joe shall have 30 days to exercise their right to purchase the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183. If exercised, Dakota, Michelle, and/or Joe shall enter into a real estate contract to purchase the property with a proposed closing date sixty (60) days from the date of receipt of the notice of sale or transfer triggering the right of first refusal. Holli is not required to sell at the appraised value if she receives offers in excess of the appraised value. If Holli receives an offer greater than the appraised value, the right of first refusal will be triggered upon delivery of the great offer to Dakota as authorized representative. The right of refusal will not renew if it is not exercised against the greatest value delivered by Holli.

9.      With regard to the further administration of the Holli Ann Hardin Trust Number One:

    ●  The Parties agree that the assets of the Holli Ann Hardin Trust Number One shall be appraised by certified and licensed business or real estate appraisers, as is appropriate for the particular asset. Russ Jones shall select the appraisers to complete the real estate and business appraisals. The costs of the appraisals shall be borne by the Holli Ann Hardin Trust Number One.

4

UNOFFICIAL COPY

- The Parties agree that, once the values on the appraisals are obtained for all Holli Ann Hardin Trust Number One assets, Holli's interest will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One in an amount equal to the twenty percent (20%) of the total value of the assets. Such purchase will occur within ninety days (90) of the completion of the valuation of the assets of the Holli Ann Hardin Trust Number One.

- The Parties agree that during the appraisal period described above, Linda Goehrs, in her capacity as Temporary Successor Trustee and/or Dakota, shall execute the necessary documents to install Dakota as an Officer and/or Director of Ice Embassy, Inc., HRF Enterprises, Inc., and Entertainment Marketing and Management, LP.

- The Parties agree that Linda Goehrs shall remain Temporary Successor Trustee of the Holli Ann Hardin Trust Number One until the closing of a sale on Holli's interest in the Holli Ann Hardin Trust Number One. At the time that Holli's interest is purchased, Linda Goehrs will resign as Temporary Successor Trustee, and Dakota, Joe, Michelle, and Ashley shall select a Successor Trustee of the Trust.

- Holli agrees to execute an assignment of interest and disclaimer of further interest in the Holli Ann Hardin Trust Number One at the time that her interest is purchased in accordance with this Settlement Agreement.

- The Parties agree that Dakota and Holli shall remain employees of Entertainment Marketing and Management, LP, and/or the business, or businesses owned by the Holli Ann Hardin Trust Number One. Holli shall be removed from the payroll on the date that her interest is purchased pursuant to this Agreement. The compensation amount that Dakota and Holli have been receiving shall remain unchanged.

- The Parties agree that Dakota and Holli shall remain on the insurance paid for by Entertainment Marketing and Management, LP, and/or the business or businesses owned by the Holli Ann Hardin Trust Number One. Holli shall be removed from the insurance plan on the date that her interest is purchased pursuant to this Agreement.

- To the extent owned by the Trust, Linda Goehrs as Temporary Successor Trustee, shall gift the horses known as Coco and Rusty to Holli.

10.    With regard to the further administration of the Dakota Trust:

- The Parties agree that the assets of the Dakota Trust shall be appraised by certified and licensed real estate appraisers. Russ Jones shall select the appraisers to complete the real estate appraisal. The cost of the appraisal shall be borne by the Dakota Trust.

5

- Upon completion of the appraisal, the total value of the assets will be compiled and Holli's interest will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One in an amount equal to eighty-five percent (85%) of the total value of the assets. Such purchase will occur within ninety days (90) of the completion of the valuation of the assets of the Dakota Trust.

- Holli agrees to execute an assignment of interest and disclaimer of further interest in the Dakota Trust at the time that her interest in purchased in accordance with this Settlement Agreement.

11.    Within seven (7) days of the Effective Date of this agreement, Dakota, Joe, Michelle, and/or Ashley agree to dismiss all pending pleas, pleadings, and/or motions, with prejudice regarding the Estate and/or Trust pending in cause number 21-CPR-036521 and cause number 21-DVC-288736, both of which are pending in Fort Bend County, Texas.

12.    Neither the Trust nor any entity owned, held, or possessed by the Holli Ann Hardin Trust Number One, the Dakota Trust, and/or the Estate have any claims against any of the Parties.

13.    The Parties agree to release Linda Goehrs, in her capacity as Temporary Successor Trustee, for making distributions according to this Settlement Agreement which contradict the terms of the Trust Agreement for the Holli Ann Hardin Trust Number One or the Dakota Trust.

## C. RELEASES AND DISCHARGE

1.    **Release of Claims by Dakota.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Dakota, on behalf of himself and all his heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Holli, Joe, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Dakota hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Dakota expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Holli, Joe, Michelle, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Dakota does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

2.    **Release of Claims by Holli.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Holli, on behalf of herself and all her heirs, successors,

6

UNOFFICIAL COPY

executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Joe, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Holli hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Holli expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Michelle, Joe, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Holli does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

3.     **Release of Claims by Joe**.  For and in consideration of the mutual promises, covenants, and agreements stated herein, Joe, on behalf of himself and all his heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Joe hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Joe expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Michelle, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Joe does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

4.     **Release of Claims by Michelle**.  For and in consideration of the mutual promises, covenants, and agreements stated herein, Michelle, on behalf of herself and all her heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Joe, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Michelle hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Michelle expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind

7

known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Joe, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Michelle does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

5.      **Release of Claims by Ashley**.  For and in consideration of the mutual promises, covenants, and agreements stated herein, Ashley, on behalf of herself and all her heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Joe, Michelle, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Ashley hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Ashley expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Joe, and Michelle. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Ashley does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

## D. REPRESENTATIONS AND WARRANTIES

1.      **Representations and Warranties**. Each of the Parties hereto represents and warrants to the other that:

a.      They are adequately represented by competent counsel in connection with the execution and delivery of this Settlement Agreement and/or had an opportunity to retain counsel in connection with this Settlement Agreement;

b.      In executing this Settlement Agreement, they relied upon the Party's own judgment and any advice it received from its own attorneys;

c.      They were not induced to sign or execute this Settlement Agreement by promises, omissions, agreements, or representations not expressly stated in this Settlement Agreement;

d.      They freely and willingly executed this Settlement Agreement and expressly disclaims reliance upon any facts, promises, statements made or not made, undertakings, or representations made by any person or entity

8

prior to the Effective Date of this Settlement Agreement except as specifically enumerated herein;

e.     They consent that this Settlement Agreement was not procured, obtained, or induced by improper conduct or undue influence;

f.     After an opportunity to consult with an attorney concerning the matters made subject of this Settlement Agreement, and after reviewing this Settlement Agreement, they agree this Settlement Agreement is fair, reasonable, and supported by good, valuable, and adequate consideration; and

g.     They understand and agree to the terms and conditions of this Settlement Agreement, which contains the entire agreement between the Parties relating to the matters made the subject of this Settlement Agreement.

2.     **Capacity and Authority**. Each of the Parties hereto represents and warrants to the other that the person signing this Settlement Agreement in a representative capacity has the requisite authority and consent to execute this Settlement Agreement on behalf of the Party for whom he or she has executed this Settlement Agreement, and that this Settlement Agreement is binding upon the Party for whom he or she has executed this Settlement Agreement and upon such Party's successors and assigns.

3.     **Assignment of Claims**. Each of the Parties hereto represents and warrants to the other that it has not transferred, assigned, or otherwise conveyed, excepting any interest held by counsel, in whole or in part, its respective interest in the Claims at issue and that it is the owner and holder thereof. Each of the Parties further represents and warrants that, aside from any interest held by counsel, it is the only holder of the Claims being released and that no other person or entity owns, or has any interest in, any of the Claims being released. Despite any interest held by counsel, this Settlement Agreement applies to the entirety of each of the Parties' Claims.

4.     **Cooperation in Execution of Further Documents**. Each of the Parties expressly agrees to execute any other documents reasonably necessary to effectuate the terms, purpose, and intent of this Settlement Agreement.

### E. MISCELLANEOUS PROVISIONS

1.     **Invalidity**. In the event any one or more of the provisions of this Settlement Agreement shall, for any reason, be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Settlement Agreement.

2.     **Entire Agreement**. This Settlement Agreement reflects the final and complete agreement between the parties concerning the matters made subject of this Settlement Agreement and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the Parties. There are no unwritten oral agreements between the Parties. The Parties expressly

9

acknowledge that any rights, duties, or obligations, whether contractual or otherwise, owed by or between the Parties prior to the effective date of this Settlement Agreement are terminated as of the Effective Date of this Settlement Agreement and the only rights, duties, or obligations owed by or between the Parties from this point forward shall be those set forth in this Settlement Agreement.

3. **Governing Law and Venue**. The validity, effect, and construction of this Settlement Agreement shall be governed by the laws of the State of Texas. Venue for any cause of action, controversy, or dispute regarding this Settlement Agreement or the subject matter hereof shall be proper only in the state courts of Fort Bend County, Texas.

4. **Amendment**. This Settlement Agreement may not be amended, modified, waived, or terminated unless such is done in a writing signed by all the Parties.

5. **Construction of Agreement**. This Settlement Agreement shall not be construed in favor of or against any Party on the basis that the Party did or did not author this Settlement Agreement or any attachment related to it. It is intended that this Settlement Agreement shall be comprehensive in nature and shall be construed liberally to affect its purposes.

6. **Titles or Headings**. All titles or headings used in this Settlement Agreement are used only for the convenience of the Parties and shall not be construed to have any effect or meaning with respect to the other content of the Settlement Agreement, such other content being controlling as to the Settlement Agreement of the Parties.

7. **Costs and Attorneys' Fees**. Each party shall bear its own costs and attorneys' fees in relation to the claims and the negotiation and preparation of this Settlement Agreement, subject to the attorney's fees provisions within this Settlement Agreement.

8. **Waiver**. The failure of any of the Parties to enforce, at any time, any provision of this Settlement Agreement shall not be construed to be a waiver of such provision, nor in any way affect the validity of this Settlement Agreement or any part thereof or any right of any Party thereafter to enforce each and every provision. No waiver of any breach of this Settlement Agreement shall be held to constitute a waiver of any other breach.

9. **Binding Agreement**. This Settlement Agreement is binding on the Parties hereto and not subject to revocation, repudiation, or withdrawal of consent, even if one or more of them shall become debtors in a bankruptcy proceeding. This binding effect is an integral part of this Agreement.

10. **Execution of Agreement**. This Settlement Agreement may be executed in a number of identical counterparts, each of which shall be deemed an original for all purposes. A fax signature or a copy of an original signature shall constitute an original signature for purposes of this Settlement Agreement. This Settlement Agreement shall be valid only if fully executed by all Parties and/or their representatives as agreed to herein. If not fully executed by all Parties, this Settlement Agreement shall be null and void and of no effect.

10

11.    **Future Disputes.** In the event that there are future disputes, disagreements, and/or conflicts regarding the terms and/or implementation of any terms of this Settlement Agreement, the Parties agree to return to Russ Jones for mediation regarding the dispute. The Parties agree to return to mediation prior to filing any litigation regarding a breach of this settlement agreement or these terms. If a Party refuses to return to mediation, the remaining parties are permitted to file litigation without returning to mediation. Should further litigation be filed regarding a breach of the agreement, the prevailing party shall be entitled to an award of attorney's fees as determined by a jury or judge.

12.    **Indemnity.** Each party shall indemnify the other parties for all claims made by, through, or under the indemnifying party.

AGREED TO BY ALL PARTIES AS EVIDENCED BY THEIR SIGNATURE BELOW ON THIS THE 7th DAY OF JANUARY, 2022.

_____
Dakota Fontenot, in all capacities

_____
Holli Ann Fontenot, in all capacities

_____
Dallas Joseph Fontenot, III, in all capacities

_____
Michelle Ann Fontenot, in all capacities

_____
Ashley Fontenot Estrada, in all capacities

_____
Christopher Burt
*Counsel for Dakota Fontenot*

11

11.    **Future Disputes.** In the event that there are future disputes, disagreements, and/or conflicts regarding the terms and/or implementation of any terms of this Settlement Agreement, the Parties agree to return to Russ Jones for mediation regarding the dispute. The Parties agree to return to mediation prior to filing any litigation regarding a breach of this settlement agreement or these terms. If a Party refuses to return to mediation, the remaining parties are permitted to file litigation without returning to mediation. Should further litigation be filed regarding a breach of the agreement, the prevailing party shall be entitled to an award of attorney's fees as determined by a jury or judge.

12.    **Indemnity.** Each party shall indemnify the other parties for all claims made by, through, or under the indemnifying party.

AGREED TO BY ALL PARTIES AS EVIDENCED BY THEIR SIGNATURE BELOW ON THIS THE 7th DAY OF JANUARY, 2022.

_____
Dakota Fontenot, in all capacities


_____
Holli Ann Fontenot, in all capacities

# Dallas Joseph Fontenot III
_____
Dallas Joseph Fontenot, III, in all capacities

# Michelle Ann Fontenot
_____
Michelle Ann Fontenot, in all capacities

# Ashley Fontenot Estrada
_____
Ashley Fontenot Estrada, in all capacities


_____
Christopher Burt
*Counsel for Dakota Fontenot*

11

_____

Steven Mendel

*Counsel for Holli Ann Fontenot*


_____

Kenneth Sumner

*Counsel for Dallas Joseph Fontenot, III,*
*Michelle Ann Fontenot, and Ashley Estrada*

UNOFFICIAL COPY

12

Steven Mendel
*Counsel for Holli Ann Fontenot*

# Kenneth E. Sumner, Jr.

Kenneth Sumner
*Counsel for Dallas Joseph Fontenot, III,*
*Michelle Ann Fontenot, and Ashley Estrada*

Signature: *Dallas Joseph Fontenot III*
Dallas Joseph Fontenot III (Jan 7, 2022 19:33 CST)

Email: djoef3@hotmail.com

Signature: Michelle Fontenot (Jan 7, 2022 19:36 CST)

Email: mannefontenot@gmail.com

Signature: Ashley Fontenot Estrada (Jan 7, 2022 19:38 CST)

Email: ashleyafontenot@gmail.com

Signature: *Kenneth C. Sumner, Jr*

Email: ksumner@romanosumner.com

12

EXHIBIT

D

## AMENDED AND RESTATED PROMISSORY NOTE

$2,825,000.00                              Houston, Texas                              May 22, 2023

FOR VALUE RECEIVED, the undersigned, **HFR ENTERPRISES, INC.**, a Texas corporation (the "Maker"), hereby promises to pay to the order of **LHS HOMES, L.L.C.**, a Texas limited liability company ("Lender"), at its offices at 5920 Hillcroft Street, Suite A, Houston, Texas 77036, in lawful money of the United States of America, the principal sum of up to TWO MILLION, EIGHT HUNDRED TWENTY-FIVE THOUSAND AND 00/100 DOLLARS ($2,825,000.00) or so much thereof as may be advanced and outstanding hereunder, together with interest.

This amended and restated promissory note (this "Note") is given in substitution of that certain promissory note executed by Maker in favor of Lender dated January 6, 2023 in the amount of ONE MILLION, EIGHT HUNDRED TWENTY-FIVE THOUSAND AND 00/100 DOLLARS ($1,825,000.00), which fully funded on or about January 6, 2023, (the "Original Note") and to evidence current and future advances in the aggregate amount of ONE MILLION AND 00/100 DOLLARS ($1,000,000.00) (the "New Funds") in accordance with the terms hereof. The Original Note shall, in its entirety, be superseded, amended, and restated by this Note and payment of the indebtedness thereunder shall be governed by this Note as if the aggregate unpaid indebtedness due under the Original Note had been advanced hereunder by Lender. Maker hereby renews and extends its covenant and agreement to pay the indebtedness evidenced by the Original Note, as amended and restated pursuant to this Note, and Maker hereby renews and extends its covenant and agreement to perform, comply with, and be bound by each and every term and provisions of the Original Note, as amended and restated by the terms of this Note. Maker confirms and agrees that this Note is, and shall continue to be, secured by the Deed of Trust recorded on January 9, 2023 under Instrument No. RP-2023-7823 in the Official Public Records of Harris County, Texas (the "Deed of Trust"), and in no way acts as a release or relinquishment of the liens created by the Deed of Trust. All of the provisions of the Deed of Trust now or heretofore executed by Maker as heretofore or contemporaneously herewith modified are hereby ratified and affirmed in all respects. The liens securing payment of the Original Note are hereby modified, extended, renewed, carried forward, and confirmed by Maker in all respects and shall remain in full force and effect until the principal and all accrued interest under this Note shall be fully and finally paid. As of the date hereof, all principal and interest payments due and owing under the Old Note have been paid in full when due and the outstanding unpaid principal balance of the Old Note is $1,809,300.24 (the "Old Note Balance").

This Note is further secured by certain Conditional Guaranty Agreements of even date herewith executed by Viva Las Vegas Properties, Inc., a Texas corporation and an affiliate of Maker ("VLV Guarantor"), Dakota Fontenot, an individual resident of Fort Bend County ("DF Guarantor"), and Ice Embassy, Inc., a Texas corporation (collectively referred to as "Guarantors"), respectively, in favor of Lender.

It is understood and agreed by and between Maker and Lender that (i) the entire principal of the Old Note has been advanced to Maker pursuant to the Old Note and that (ii) the entire principal of the New Funds under this Note is not being advanced in full to Maker upon the execution hereof, but subsequent and periodic advancements in various increments of the New Funds will be made to Maker, upon request to Lender, up to, but not to exceed, the amount of the New Funds pursuant to

1

the terms hereof. Interest on this Note shall accrue only on the principal amount of the New Funds advanced from the time it is so advanced, at the Contract Rate.

Lender shall advance the New Funds by wire transfer to an account designated by Maker as follows:

(i)     An amount equal to $250,000.00 (the "First New Advance") shall be funded immediately upon execution of this Note.

(ii)    Advances of the remaining New Funds, in amounts up to and not exceeding $750,000.00 in the aggregate, shall be advanced incrementally (such incremental advances being referred to individually and collectively as the "Future Advances") within five (5) Business Days after Lender receives a written request for advance ("Request for Advance") from Maker. Each Request for Advance shall be accompanied by a percentage of completion and cost schedule (a "Schedule of Values") describing the construction, maintenance, repair and/or renovation work completed at Maker's property located at 6710 Southwest Freeway, Houston, Harris County, Texas 77074 (the "Project") as of the date of the applicable Request for Advance, including backup documentation as may be reasonably requested by Lender. Additionally, Lender shall not be required to advance any Future Advances unless: (a) Lender's first lien deed of trust and security interest in the property identified in the Deed of Trust remains in a first lien position without tax liens, mechanics liens or any other monetary encumbrances against such Property other than normal permitted exceptions for current property taxes; (b) The VLV Guarantor's Fort Bend Property securing such Guaranty must have received a mortgagee title policy reflecting a first lien in favor of Lender other than normal permitted exceptions for current property taxes and assessments and nonmonetary encumbrances; (c) Maker and the VLV Guarantor must not otherwise be in any breach of any of its agreements, representation or warranties as set forth in this Note. If Lender refuses to advance the amount requested in any applicable Request for Advance, Lender shall within such 5 Business Day period provide written notice to Maker specifying the reason for such refusal, whereupon Maker and Lender shall endeavor in good faith to reach agreement on the amount to be advanced within ten (10) days after Maker receives notice of Lender's refusal to fund the amount initially requested. If the parties are unable to agree on the funding amount for the applicable Future Advance within such 10-day period, then either party may submit the matter to mediation. The final Future Advance of New Funds shall be made after completion of the Project in such amount that the sum of all Future Advances by Lender shall not exceed $750,000.00.

The unpaid principal balance of this Note shall bear interest prior to maturity at an annual rate equal to the lesser of (a) the Maximum Lawful Rate or (b) eight percent (8.0%) (the "Contract Rate"). Interest on this Note shall be calculated on a per annum basis of 360 days and for the actual number of days elapsed (including the first day but excluding the last day) unless such calculation would result in a rate that exceeds the Maximum Lawful Rate, in which case, interest shall be calculated on a per annum basis of 365 or 366 days, as the case may be. Maker hereby expressly promises to pay to the order of Lender or any other holder hereof the principal amount of this Note and all accrued but unpaid interest now or hereafter to become due and payable under this Note in the

2

manner provided herein.  Notwithstanding anything herein to the contrary, the final installment payment under this Note shall include all of the then outstanding principal, accrued but unpaid interest and all other costs, expenses and fees arising out of this Note.  All sums paid hereon (whether regularly scheduled payment or prepayment) shall be applied first to the satisfaction of accrued unpaid interest and the remainder, if any, to the reduction of the principal balance hereof.

Subject to prior acceleration as provided in this Note, this Note shall be paid as follows:

Principal and interest under this Note shall be due and payable monthly as follows ("Monthly Payments"):

(i)     Principal and interest on an amount equal to the sum of the Old Note Balance and the First New Advance (or $2,059,300.24) shall be due and payable in sixty (60) equal monthly installments, based on a 20-year amortization, of $17,225.00, with the first such payment being due on June 15, 2023, and continuing on the same day of each month thereafter until May 15, 2028 (the "Maturity Date"), on which date a final payment in the amount of $1,802,414.35 shall be due and payable in full.

(ii)    Interest only on Future Advances shall be due and payable monthly beginning on the 15th day of the calendar month after the month in which the first Future Advance is made and shall continue regularly on the same day of each succeeding calendar month thereafter until and including the Maturity Date, on which date a final payment, which shall include all then outstanding principal and accrued and unpaid interest due on Future Advances, shall be due and payable in full.

For purposes of this Note, the following terms have the meanings assigned to such terms as provided below:

"Applicable Laws" means the laws of the State of Texas and laws of the United States of America in effect from time to time and applicable to this Note.

"Business Day" means a day that is not a Saturday, Sunday, or federal or state holiday.

"Default Rate" means the Maximum Lawful Rate.

"Event of Default" means the failure to pay when due the principal and interest under this Note, or any part thereof, and such failure continues for more than thirty (30) days after Maker receives written notice from Lender specifying the amount of the delinquent payment. Event of Default shall also include Maker shall (a) become insolvent within the meaning of the Bankruptcy Code of the United States, as amended; (b) admit in writing its inability to pay or otherwise fail to pay its/his debts generally as they become due; (c) voluntarily seek consent to, or acquiesce in the benefit or benefits of any Debtor Relief Law; or (d) be made the subject of any proceeding provided for by any Debtor Relief Law that could suspend or otherwise affect any of the rights of Lender or any other holder hereof and such proceeding shall continue for sixty (60) days without dismissal or discharge; or (e) any default by Maker under that certain Deed of Trust securing this Note, executed by Maker in favor of Lender. As used herein, "Debtor Relief Laws" means the Bankruptcy Code of the United States, as amended and all other applicable liquidation, conservatorship, bankruptcy,

3

CONFIDENTIAL DOCUMENTS

HAH001242

moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws from time to time in effect affecting the rights of creditors generally.

"Indebtedness" means the obligations of Maker under this Note.

"Maximum Lawful Rate" means, at any time, the maximum rate of interest which may be charged, contracted for, taken, received or reserved by the Lender in accordance with Applicable Laws. Each change in any interest rate provided for herein based upon the Maximum Lawful Rate resulting from a change in the Maximum Lawful Rate shall take effect with written notice to the Maker before such change in the Maximum Lawful Rate.

All payments due under this Note shall be made by Maker without offset or other reduction of any kind. Any outstanding principal that is not paid in full when due shall bear interest at the Default Rate for the period from and including the due date thereof to but excluding the date the same is paid in full.

If any payment of principal or interest on this Note shall become due on a day which is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computing of interest in connection with such payment. In the event an installment, or the maturity date as set forth herein, is due on the 29th, 30th, or 31st day of the month, for each month which does not have a 29th, 30th, or 31st day, such installment, or the final payment, as applicable, shall be due on the last day of such month. Payments received on weekends or bank holidays will be credited as of the next Business Day. Any check, draft, money order or other instrument given in payment of all or any portion of this Note may be accepted by Lender and handled in collection in the customary manner, but the same shall not constitute payment or diminish any rights of Lender except to the extent that actual cash proceeds of such instrument are unconditionally received by Lender.

Unless otherwise agreed in writing, or otherwise required by Applicable Laws, interest on this Note will be calculated on the unpaid principal balance to the date each installment is paid and payments received will be applied in the following order of priority: (i) the payment or reimbursement of any expenses, costs, or obligations (other than the outstanding principal balance hereof and interest hereon) for which either Maker shall be obligated or Lender shall be entitled pursuant to the provisions of this Note, (ii) the payment of accrued but unpaid interest hereon, and (iii) the payment of principal. However, any Monthly Payments timely made by Maker shall be credited as of the date such Monthly Payment is due, and Lender shall not be required to ledger and compute reductions in interest for Monthly Payments made before such Monthly Payment is due.

Maker shall have the privilege to prepay at any time, and from time to time, all or any part of the principal amount of this Note, without notice, penalty or fee. Except as expressly provided herein to the contrary, all prepayments on this Note shall be applied in the following order of priority: (i) the payment of accrued but unpaid interest hereon, and (ii) the payment of all or any portion of the principal balance hereof then outstanding hereunder, in the inverse order of maturity.

Time is of the essence in the performance of this Note. Maker agrees that all past-due principal and past-due accrued interest under this Note shall bear interest from the date it is due until paid at the Maximum Lawful Rate.

4

Upon the occurrence of an Event of Default, Lender may, at its option, after the expiration of the notice and right to cure period provided herein, (i) declare the outstanding principal balance of and accrued but unpaid interest on this Note at once due and payable, or (ii) foreclose all liens securing payment hereof. Upon the occurrence of an Event of Default, if this Note is placed in the hands of an attorney for collection (whether or not suit is filed), or if this Note is collected by suit or legal proceedings or through the probate court or bankruptcy proceedings, Maker agrees to pay an additional amount as attorney's fees as may be reasonable.

Except as otherwise provided herein, Maker waives presentment for payment, demand, protest, notice thereof and dishonor, notice of intent to accelerate, notice of acceleration, and diligence in collecting and consents that the time of payment may be extended from time to time without notice and without releasing Maker.

Until such time as all New Funds have been advanced hereunder, Lender shall not assign this Note without the prior written consent of Maker, which consent shall not be unreasonably withheld. Following the final advance of New Funds after completion of the Project, Lender shall have the right to assign this Note without necessity of Maker's consent. In such event, the term "Lender" shall mean any permitted assignee of this Note.

This Note and its validity, enforcement and interpretation, shall be construed in accordance with Applicable Laws, without regard to any conflict of law rules or principles except as otherwise expressly set forth herein. It is expressly stipulated and agreed to be the intent of the Maker and the Lender at all times to comply strictly with Applicable Laws governing the maximum rate or amount of interest payable on the indebtedness evidenced by this Note. If Applicable Law is ever judicially interpreted so as to render usurious any amount (i) contracted for, charged, taken, reserved or received pursuant to this Note, (ii) contracted for, charged, taken, reserved or received by reason of the Lender's exercise of the option to accelerate the maturity of the Indebtedness, or (iii) the Maker will have paid or the Lender will have received by reason of any voluntary prepayment by the Maker of the Indebtedness, then it is the Maker's and the Lender's express intent that all amounts charged in excess of the Maximum Lawful Rate shall be automatically canceled, *ab initio*, and all amounts in excess of the Maximum Lawful Rate theretofore collected by the Lender shall be credited on the principal balance of the Indebtedness (or, if the Indebtedness have been or would thereby be paid in full, refunded to the Maker), and the provisions of this Note shall immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder and thereunder; provided, however, if this Note has been paid in full before the end of the stated term of this Note, then the Maker and the Lender agree that the Lender shall, with reasonable promptness after the Lender discovers or is advised by the Maker that interest was received in an amount in excess of the Maximum Lawful Rate, either refund such excess interest to the Maker and/or credit such excess interest against the Indebtedness then owing by the Maker to the Lender. The Maker hereby agrees that as a condition precedent to any claim seeking usury penalties against the Lender, the Maker will provide written notice to the Lender, advising the Lender in reasonable detail of the nature and amount of the violation, and the Lender shall have thirty (30) days after receipt of such notice in which to correct such usury violation, if any, by either refunding such excess interest to the Maker or crediting such excess interest against the Indebtedness then owing by the Maker to the Lender. All sums contracted for, charged, taken, reserved or received by the Lender for the use, forbearance or detention of any Indebtedness shall, to the extent permitted by applicable law, be amortized or spread, using the

5

HAH001244

actuarial method, throughout the stated term of this Note (including any and all renewal and extension periods) until payment in full so that the rate or amount of interest on account of this Note does not exceed the Maximum Lawful Rate from time to time in effect and applicable to this for so long as any Indebtedness is outstanding. In no event shall the provisions of Chapter 346 of the Texas Finance Code (which regulates certain revolving credit loan accounts and revolving triparty accounts) apply to this Note. Notwithstanding anything to the contrary contained herein, it is not the intention of the Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

To the extent that Lender is relying on Chapter 303 of the Texas Finance Code to determine the Maximum Lawful Rate payable on any Indebtedness, the Lender will utilize the weekly ceiling from time to time in effect as provided in such Chapter 303, as amended. Additionally, to the extent permitted by Applicable Laws now or hereafter in effect, the Lender may, at its option and from time to time, utilize any other method of establishing the Maximum Lawful Rate under such Chapter 303 or under other Applicable Law by giving notice, if required, to the Maker as provided by Applicable Law now or hereafter in effect.

In case any one or more of the provisions contained in this Note shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Note, and this Note shall be construed as if such invalid, illegal, or unenforceable provision had never been included in this Note.

No amendment, modification, or alteration of the terms of this Note shall be binding unless the same is in writing, dated subsequent to the date of this Note, and duly executed by the parties to this Note.

All notices sent to Maker shall be sent by hand delivery or by certified mail, return receipt requested to HFR Enterprises, Inc., Attn: Dakota Fontenot, 3414 Old Richmond Road, Rosenberg, Texas 77471 (with a copy to BoyarMiller, Attn: Christopher Barteau and Tiffany Melchers, 2925 Richmond Avenue, 14th Floor, Houston, Texas 77098), unless directed otherwise by Maker after notice to the Lender (or any other holder hereof) at the address set forth on Page 1 herein, or at such other address of the Lender (or any other holder hereof) specified by notice to Maker as described herein.  Any notice required herein shall be sufficient if it provides at least 10 days of notice after mailing, unless otherwise required by law.

[Remainder of page intentionally left blank.]

6

HAH001245

IN WITNESS WHEREOF, Maker has duly executed this Note as of the day and year first above written.

**MAKER:**

**HFR ENTERPRISES, INC.,**
a Texas corporation

By: _____
Name: Dakota Fontenot
Title: President

Address:
6710 Southwest Freeway
Houston, Texas 77074
Attention: Dakota Fontenot

THE STATE OF TEXAS          §
                            §
COUNTY OF HARRIS            §

This instrument was acknowledged before me on May 22, 2023, by Dakota Fontenot, President of HFR Enterprises, Inc., a Texas nonprofit corporation, for and on behalf of such corporation.

_____
NOTARY PUBLIC, STATE OF TEXAS

TINA BARAJAS
NOTARY PUBLIC
STATE OF TEXAS
ID# 10076954
EXPIRES 2-2-2027

SIGNATURE PAGE TO
NOTE

CONFIDENTIAL DOCUMENTS                    HAH001246

EXHIBIT

E

C.A. 21-CPR-036521

| | | |
|---|---|---|
| ESTATE OF | § | IN COUNTY COURT AT LAW |
| DALLAS JOSEPH FONTENOT, JR., | § | |
| DECEASED | § | NO. FOUR (4) OF |
| | § | |
| | § | FORT BEND COUNTY, TEXAS |

No. 21-DCV-288736

| | | |
|---|---|---|
| IN RE | § | IN THE 240TH DISTRICT COURT |
| HOLLI ANN HARDIN TRUST | § | |
| NUMBER ONE | § | OF |
| | § | |
| | § | FORT BEND COUNTY, TEXAS |

## Assignment of Interest & Disclaimer of Further Interest

Pursuant to the Binding Mediation Settlement Agreement reached in the above-captioned cases, and which is attached hereto as Exhibit "A":

1. Holli Ann Fontenot acknowledges receipt of check number 1005 payable to Holli Ann Fontenot in the amount of $2,823,464.00, and which sum represents full satisfaction of eighty five percent (85%) of the total value of The Dakota Trust assets ($1,899,514.00) and twenty percent (20%) of the total value of the Holli Ann Hardin Trust No. 1 assets ($923,950.00).

2. Holli Ann Fontenot hereby assigns any and all beneficial interest she has in the Holli Ann Hardin Trust No. 1 to the Trustee for further administration and distribution by the Trustee.

3. Holli Ann Fontenot assigns any and all beneficial interest she has in The Dakota Trust to the Trustee for further administration and distribution by the Trustee.

4. Holli Ann Fontenot disclaims any right to any further interest in the Holli Ann Hardin Trust No. 1. Holli Ann Fontenot previously resigned as the Trustee of said Trust.

5. Holli Ann Fontenot disclaims any right to any further interest in The Dakota Trust. Holli Ann Fontenot hereby resigns as a fiduciary of said Trust.

[SIGNATURE ON THE FOLLOWING PAGE]

SIGNED AND EXECUTED ON __18__ DAY OF JANUARY 2023.

HOLLI ANN FONTENOT

STATE OF TEXAS       §
                             §

COUNTY OF HARRIS       §

This instrument was acknowledged before me on this the _18_ day of January 2023 by Holli Ann Fontenot.

Notary Public in and for
The State of Texas

## NO. 21-CPR-036521

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN THE COUNTY COURT AT LAW |
| | § | |
| DALLAS JOSEPH FONTENOT, JR., | § | NUMBER FOUR (4) OF |
| | § | |
| DECEASED | § | FORT BEND COUNTY, TEXAS |

## NO. 21-DCV-288736

| | | |
|---|---|---|
| IN RE: | § | IN THE 240th DISTRICT COURT |
| | § | |
| | § | OF |
| HOLLI ANN HARDIN TRUST | § | |
| NUMBER ONE | § | FORT BEND COUNTY, TEXAS |

### BINDING MEDIATED SETTLEMENT AGREEMENT

The Parties – Dakota Fontenot, individually, in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in his capacity as next friend and virtual representative for S.F., a minor, Holli Ann Fontenot, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, Dallas Joseph Fontenot, III, individually, and in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One, Michelle Ann Fontenot, individually, in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in her capacity as next friend and virtual representative for A.E., a minor, and Ashley Fontenot Estrada, individually and in her capacity as a beneficiary of the Hollis Ann Hardin Trust Number One – hereto agree that all causes of action pending in cause number 21-CPR-036521 and cause number 21-DVC-288736, both of which are pending in Fort Bend County, Texas, and all related claims and/or controversies between them, whether asserted or not, known or unknown, actual or contingent, are hereby settled, in accordance with the terms of this Binding Mediated Settlement Agreement (hereinafter referred to as the "Settlement Agreement").

### A. DEFINITIONS

1.     Whenever used in this Settlement Agreement, the following terms shall have and be construed to have the following meanings:

i.     "Settlement Agreement" shall mean and refer to this Binding Mediated Settlement Agreement.

ii.     "Dakota" shall mean and refer to Dakota Fontenot, individually, in his capacity as beneficiary of the Holli Ann Hardin Trust Number One, and in his capacity as next friend and virtual representative of S.F., a minor.

1

iii.    "Holli" shall mean and refer to Holli Ann Fontenot, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

iv.    "Joe" shall mean and refer Dallas Joseph Fontenot, III, individually and in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

v.    "Michelle" shall mean and refer to Michelle Ann Fontenot, individually, in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in her capacity as next friend and virtual representative of A.E., a minor.

vi.    "Ashley" shall mean and refer to Ashley Fontenot Estrada, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

vii.    "Trust" shall mean and refer to the Holli Ann Hardin Trust Number One.

viii.    "Estate" shall mean and refer to the Estate of Dallas Joseph Fontenot, Jr., whose administration is pending in cause number 21-CPR-036521, in the County Court at Law Number Four (4) of Fort Bend County, Texas.

ix.    "Parties" shall mean and refer to Dakota, Holli, Joe, Michelle, and Ashley, collectively, as described in paragraphs two (ii) through six (vi) above.

x.    "Claims" shall mean and include any and all causes of action, demands, debts, obligations, duties, liens, liabilities, and theories of liabilities of whatsoever kind and nature, whether based in contract or tort, whether arising in equity or under the common law, whether by statute or regulation, whether known or unknown, whether past or present, whether contingent or matured, whether for damages relief, injunctive relief, declaratory relief, equitable relief, or any other type of relief, whether for actual damages, personal injury damages, mental anguish, liquidated damages, punitive damages, exemplary damages, compensatory damages, consequential damages, incidental damages, pecuniary damages, costs, expenses, attorneys' fees, penalties, or fines that are (is), were (was), could be, or could have been asserted as of the Effective Date, regardless of whether actually asserted, whether by claim, counterclaim, cross-claim, motion, third-party claim regarding the Estate and Trust, including but not limited to, claims, whether asserted or not, known or unknown, actual or contingent.

xi.    "Effective Date" shall mean and refer to the date that the last Party to this Settlement Agreement executes the same.

xii.    In respect to any defined term herein, the singular shall include the plural, and the plural shall include the singular.

UNOFFICIAL COPY

2

### B. TERMS, CONDITIONS, AND MUTUAL CONSIDERATION

1.    The Parties acknowledge that bona fide disputes and controversies exist between them, both as to liability and the amount thereof in damages, if any, and by reason of such disputes and controversies they desire to compromise and settle all Claims and causes of action of any kind whatsoever which the Parties have or may have arising out of the transactions or occurrences which have been brought or could have been brought regarding the Trust.

2.    **THE PARTIES AGREE AND ACKNOWLEDGE THAT UPON THE EXECUTION OF THIS SETTLEMENT AGREEMENT, THIS SETTLEMENT AGREEMENT SHALL BECOME BINDING AND IRREVOCABLE.**

3.    The Parties agree that the 2013 Last Will and Testament and 2017 First Codicil to the Last Will and Testament will be admitted to probate.  The Parties agree that Holli will be appointed as the Independent Executor of the Estate and agree not to object to the same.

4.    All of the Estate's assets, including all associated bank accounts, shall be distributed to Holli, save and expect the following items:

- The following items are going to be distributed to Dakota:

  o  The 2017 F150 Truck
  o  The 2013 Toyota Sequoia
  o  All interest, including all associated bank accounts, in Entertainment Marketing and Management, LP
  o  The coin collection and gold located in the backpack at the Rosenburg Office

- The following items are going to be distributed to Joe:

  o  The 2008 Honda Ridgeline
  o  One-half (1/2) of the Decedent's Tiki Mug Collection

The Parties agree to execute all documents necessary to effectuate the conveyance of all property described above the individual recipients stated in paragraph four (4).

5.    From the Rosenburg office, Holli shall be entitled to obtain:

- The remaining $150,000 in non-earmarked cash located in the backpack;
- Any and all Playboy Magazines

6.    The Parties agree that all personal property belonging to Dakota, Joe, and/or Michelle that is currently located at 10402 W. Hidden Lake Lane, Richmond, Texas 77406 shall be distributed to Dakota, Joe, and/or Michelle as appropriate.  Dakota, Joe and/or Michelle shall

3

be afforded the opportunity, within thirty (30) days of the Effective Date of this Settlement Agreement, to conduct a supervised walkthrough of their personal property located at 10402 W. Hidden Lake Lane, Richmond, Texas 77406. During that time, Dakota, Joe, and/or Michelle will take photographs of their personal property which they would like to obtain. A list and accompanying photographs will be delivered to counsel for Holli of those items within fourteen (14) days of the walkthrough being completed. Holli will have fourteen (14) days to object to the items which Dakota, Joe, and/or Michelle would like to obtain. If the parties cannot reach a resolution regarding the same, Russ Jones will mediate, at an hourly rate, the division of the disputed personal property. Upon the completion and approval of a final list of items, Dakota, Joe, and/or Michelle, at their expense, shall obtain and remove the items on the approved final list of items at a mutually agreeable date and time within fourteen (14) days of the approval of the final list of items.

7.      The attorney's fees for Holli, Dakota, Joe, Michelle, and/or Ashley may be paid from the assets of the Holli Ann Hardin Trust Number One in an amount no more than $200,000.00 per side. The Parties will present their fees to Linda Goehrs, in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, for payment. The Parties agree that they will not object to the payment of the fees of any other party.

8.      The real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183 shall be distributed to Holli. Dakota, Michelle, and Joe, with Dakota as authorized representative, shall retain a right of first refusal in the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183. If Holli decides to sell or otherwise transfer the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183, Holli shall notify Dakota, Michelle, and Joe in writing and provide an appraisal completed by a certified and licensed real estate appraiser. From the date of receipt of that notice, Dakota, Michelle, and/or Joe shall have 30 days to exercise their right to purchase the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183. If exercised, Dakota, Michelle, and/or Joe shall enter into a real estate contract to purchase the property with a proposed closing date sixty (60) days from the date of receipt of the notice of sale or transfer triggering the right of first refusal. Holli is not required to sell at the appraised value if she receives offers in excess of the appraised value. If Holli receives an offer greater than the appraised value, the right of first refusal will be triggered upon delivery of the great offer to Dakota as authorized representative. The right of refusal will not renew if it is not exercised against the greatest value delivered by Holli.

9.      With regard to the further administration of the Holli Ann Hardin Trust Number One:

- The Parties agree that the assets of the Holli Ann Hardin Trust Number One shall be appraised by certified and licensed business or real estate appraisers, as is appropriate for the particular asset. Russ Jones shall select the appraisers to complete the real estate and business appraisals. The costs of the appraisals shall be borne by the Holli Ann Hardin Trust Number One.

4

- The Parties agree that, once the values on the appraisals are obtained for all Holli Ann Hardin Trust Number One assets, Holli's interest will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One in an amount equal to the twenty percent (20%) of the total value of the assets. Such purchase will occur within ninety days (90) of the completion of the valuation of the assets of the Holli Ann Hardin Trust Number One.

- The Parties agree that during the appraisal period described above, Linda Goehrs, in her capacity as Temporary Successor Trustee and/or Dakota, shall execute the necessary documents to install Dakota as an Officer and/or Director of Ice Embassy, Inc., HRF Enterprises, Inc., and Entertainment Marketing and Management, LP.

- The Parties agree that Linda Goehrs shall remain Temporary Successor Trustee of the Holli Ann Hardin Trust Number One until the closing of a sale on Holli's interest in the Holli Ann Hardin Trust Number One. At the time that Holli's interest is purchased, Linda Goehrs will resign as Temporary Successor Trustee, and Dakota, Joe, Michelle, and Ashley shall select a Successor Trustee of the Trust.

- Holli agrees to execute an assignment of interest and disclaimer of further interest in the Holli Ann Hardin Trust Number One at the time that her interest is purchased in accordance with this Settlement Agreement.

- The Parties agree that Dakota and Holli shall remain employees of Entertainment Marketing and Management, LP, and/or the business, or businesses owned by the Holli Ann Hardin Trust Number One. Holli shall be removed from the payroll on the date that her interest is purchased pursuant to this Agreement. The compensation amount that Dakota and Holli have been receiving shall remain unchanged.

- The Parties agree that Dakota and Holli shall remain on the insurance paid for by Entertainment Marketing and Management, LP, and/or the business or businesses owned by the Holli Ann Hardin Trust Number One. Holli shall be removed from the insurance plan on the date that her interest is purchased pursuant to this Agreement.

- To the extent owned by the Trust, Linda Goehrs as Temporary Successor Trustee, shall gift the horses known as Coco and Rusty to Holli.

10. With regard to the further administration of the Dakota Trust:

- The Parties agree that the assets of the Dakota Trust shall be appraised by certified and licensed real estate appraisers. Russ Jones shall select the appraisers to complete the real estate appraisal. The cost of the appraisal shall be borne by the Dakota Trust.

5

- Upon completion of the appraisal, the total value of the assets will be compiled and Holli's interest will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One in an amount equal to eighty-five percent (85%) of the total value of the assets. Such purchase will occur within ninety days (90) of the completion of the valuation of the assets of the Dakota Trust.

- Holli agrees to execute an assignment of interest and disclaimer of further interest in the Dakota Trust at the time that her interest in purchased in accordance with this Settlement Agreement.

11. Within seven (7) days of the Effective Date of this agreement, Dakota, Joe, Michelle, and/or Ashley agree to dismiss all pending pleas, pleadings, and/or motions, with prejudice regarding the Estate and/or Trust pending in cause number 21-CPR-036521 and cause number 21-DVC-288736, both of which are pending in Fort Bend County, Texas.

12. Neither the Trust nor any entity owned, held, or possessed by the Holli Ann Hardin Trust Number One, the Dakota Trust, and/or the Estate have any claims against any of the Parties.

13. The Parties agree to release Linda Goehrs, in her capacity as Temporary Successor Trustee, for making distributions according to this Settlement Agreement which contradict the terms of the Trust Agreement for the Holli Ann Hardin Trust Number One or the Dakota Trust.

## C. RELEASES AND DISCHARGE

1. **Release of Claims by Dakota.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Dakota, on behalf of himself and all his heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Holli, Joe, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Dakota hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Dakota expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Holli, Joe, Michelle, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Dakota does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

2. **Release of Claims by Holli.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Holli, on behalf of herself and all her heirs, successors,

6

UNOFFICIAL COPY

executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Joe, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Holli hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Holli expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Michelle, Joe, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Holli does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

3.   **Release of Claims by Joe.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Joe, on behalf of himself and all his heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Joe hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Joe expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Michelle, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Joe does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

4.   **Release of Claims by Michelle.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Michelle, on behalf of herself and all her heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Joe, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Michelle hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Michelle expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind

7

known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Joe, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Michelle does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

5.    **Release of Claims by Ashley.**  For and in consideration of the mutual promises, covenants, and agreements stated herein, Ashley, on behalf of herself and all her heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Joe, Michelle, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Ashley hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Ashley expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Joe, and Michelle. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Ashley does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

## D. REPRESENTATIONS AND WARRANTIES

1.    **Representations and Warranties.**  Each of the Parties hereto represents and warrants to the other that:

a.    They are adequately represented by competent counsel in connection with the execution and delivery of this Settlement Agreement and/or had an opportunity to retain counsel in connection with this Settlement Agreement;

b.    In executing this Settlement Agreement, they relied upon the Party's own judgment and any advice it received from its own attorneys;

c.    They were not induced to sign or execute this Settlement Agreement by promises, omissions, agreements, or representations not expressly stated in this Settlement Agreement;

d.    They freely and willingly executed this Settlement Agreement and expressly disclaims reliance upon any facts, promises, statements made or not made, undertakings, or representations made by any person or entity

8

prior to the Effective Date of this Settlement Agreement except as specifically enumerated herein;

e. They consent that this Settlement Agreement was not procured, obtained, or induced by improper conduct or undue influence;

f. After an opportunity to consult with an attorney concerning the matters made subject of this Settlement Agreement, and after reviewing this Settlement Agreement, they agree this Settlement Agreement is fair, reasonable, and supported by good, valuable, and adequate consideration; and

g. They understand and agree to the terms and conditions of this Settlement Agreement, which contains the entire agreement between the Parties relating to the matters made the subject of this Settlement Agreement.

2.    **Capacity and Authority.** Each of the Parties hereto represents and warrants to the other that the person signing this Settlement Agreement in a representative capacity has the requisite authority and consent to execute this Settlement Agreement on behalf of the Party for whom he or she has executed this Settlement Agreement, and that this Settlement Agreement is binding upon the Party for whom he or she has executed this Settlement Agreement and upon such Party's successors and assigns.

3.    **Assignment of Claims.** Each of the Parties hereto represents and warrants to the other that it has not transferred, assigned, or otherwise conveyed, excepting any interest held by counsel, in whole or in part, its respective interest in the Claims at issue and that it is the owner and holder thereof. Each of the Parties further represents and warrants that, aside from any interest held by counsel, it is the only holder of the Claims being released and that no other person or entity owns, or has any interest in, any of the Claims being released. Despite any interest held by counsel, this Settlement Agreement applies to the entirety of each of the Parties' Claims.

4.    **Cooperation in Execution of Further Documents.** Each of the Parties expressly agrees to execute any other documents reasonably necessary to effectuate the terms, purpose, and intent of this Settlement Agreement.

## E. MISCELLANEOUS PROVISIONS

1.    **Invalidity.** In the event any one or more of the provisions of this Settlement Agreement shall, for any reason, be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Settlement Agreement.

2.    **Entire Agreement.** This Settlement Agreement reflects the final and complete agreement between the parties concerning the matters made subject of this Settlement Agreement and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the Parties. There are no unwritten oral agreements between the Parties. The Parties expressly

9

acknowledge that any rights, duties, or obligations, whether contractual or otherwise, owed by or between the Parties prior to the effective date of this Settlement Agreement are terminated as of the Effective Date of this Settlement Agreement and the only rights, duties, or obligations owed by or between the Parties from this point forward shall be those set forth in this Settlement Agreement.

3.    **Governing Law and Venue.** The validity, effect, and construction of this Settlement Agreement shall be governed by the laws of the State of Texas. Venue for any cause of action, controversy, or dispute regarding this Settlement Agreement or the subject matter hereof shall be proper only in the state courts of Fort Bend County, Texas.

4.    **Amendment.** This Settlement Agreement may not be amended, modified, waived, or terminated unless such is done in a writing signed by all the Parties.

5.    **Construction of Agreement.** This Settlement Agreement shall not be construed in favor of or against any Party on the basis that the Party did or did not author this Settlement Agreement or any attachment related to it. It is intended that this Settlement Agreement shall be comprehensive in nature and shall be construed liberally to affect its purposes.

6.    **Titles or Headings.** All titles or headings used in this Settlement Agreement are used only for the convenience of the Parties and shall not be construed to have any effect or meaning with respect to the other content of the Settlement Agreement, such other content being controlling as to the Settlement Agreement of the Parties.

7.    **Costs and Attorneys' Fees.** Each party shall bear its own costs and attorneys' fees in relation to the claims and the negotiation and preparation of this Settlement Agreement, subject to the attorney's fees provisions within this Settlement Agreement.

8.    **Waiver.** The failure of any of the Parties to enforce, at any time, any provision of this Settlement Agreement shall not be construed to be a waiver of such provision, nor in any way affect the validity of this Settlement Agreement or any part thereof or any right of any Party thereafter to enforce each and every provision. No waiver of any breach of this Settlement Agreement shall be held to constitute a waiver of any other breach.

9.    **Binding Agreement.** This Settlement Agreement is binding on the Parties hereto and not subject to revocation, repudiation, or withdrawal of consent, even if one or more of them shall become debtors in a bankruptcy proceeding. This binding effect is an integral part of this Agreement.

10.    **Execution of Agreement.** This Settlement Agreement may be executed in a number of identical counterparts, each of which shall be deemed an original for all purposes. A fax signature or a copy of an original signature shall constitute an original signature for purposes of this Settlement Agreement. This Settlement Agreement shall be valid only if fully executed by all Parties and/or their representatives as agreed to herein. If not fully executed by all Parties, this Settlement Agreement shall be null and void and of no effect.

11.    **Future Disputes.** In the event that there are future disputes, disagreements, and/or conflicts regarding the terms and/or implementation of any terms of this Settlement Agreement, the Parties agree to return to Russ Jones for mediation regarding the dispute. The Parties agree to return to mediation prior to filing any litigation regarding a breach of this settlement agreement or these terms. If a Party refuses to return to mediation, the remaining parties are permitted to file litigation without returning to mediation. Should further litigation be filed regarding a breach of the agreement, the prevailing party shall be entitled to an award of attorney's fees as determined by a jury or judge.

12.    **Indemnity.** Each party shall indemnify the other parties for all claims made by, through, or under the indemnifying party.

AGREED TO BY ALL PARTIES AS EVIDENCED BY THEIR SIGNATURE BELOW ON THIS THE 7th DAY OF JANUARY, 2022.

_____
Dakota Fontenot, in all capacities

_____
Holli Ann Fontenot, in all capacities

_____
Dallas Joseph Fontenot, III, in all capacities

_____
Michelle Ann Fontenot, in all capacities

_____
Ashley Fontenot Estrada, in all capacities

_____
Christopher Burt
*Counsel for Dakota Fontenot*

11

11.    **Future Disputes.** In the event that there are future disputes, disagreements, and/or conflicts regarding the terms and/or implementation of any terms of this Settlement Agreement, the Parties agree to return to Russ Jones for mediation regarding the dispute. The Parties agree to return to mediation prior to filing any litigation regarding a breach of this settlement agreement or these terms. If a Party refuses to return to mediation, the remaining parties are permitted to file litigation without returning to mediation. Should further litigation be filed regarding a breach of the agreement, the prevailing party shall be entitled to an award of attorney's fees as determined by a jury or judge.

12.    **Indemnity.** Each party shall indemnify the other parties for all claims made by, through, or under the indemnifying party.

AGREED TO BY ALL PARTIES AS EVIDENCED BY THEIR SIGNATURE BELOW ON THIS THE 7th DAY OF JANUARY, 2022.

_____
Dakota Fontenot, in all capacities

_____
Holli Ann Fontenot, in all capacities

**Dallas Joseph Fontenot III**
_____
Dallas Joseph Fontenot, III, in all capacities

**Michelle Ann Fontenot**
_____
Michelle Ann Fontenot, in all capacities

**Ashley Fontenot Estrada**
_____
Ashley Fontenot Estrada, in all capacities

_____
Christopher Burt
*Counsel for Dakota Fontenot*

11

Steven Mendel
*Counsel for Holli Ann Fontenot*

Kenneth Sumner
*Counsel for Dallas Joseph Fontenot, III,
Michelle Ann Fontenot, and Ashley Estrada*

UNOFFICIAL COPY

12

Steven Mendel
*Counsel for Holli Ann Fontenot*


# Kenneth E. Sumner, Jr.

Kenneth Sumner
*Counsel for Dallas Joseph Fontenot, III,*
*Michelle Ann Fontenot, and Ashley Estrada*

Signature: *Dallas Joseph Fontenot III*
Dallas Joseph Fontenot III (Jan 7, 2022 19:33 CST)
Email:  djoef3@hotmail.com

Signature: _____
Michelle Fontenot (Jan 7, 2022 19:36 CST)
Email:  mannefontenot@gmail.com

Signature: _____
Ashley Fontenot Estrada (Jan 7, 2022 19:38 CST)
Email:  ashleyafontenot@gmail.com

Signature: *Kenneth C. Sumner, Jr.*
Email:  ksumner@romanosumner.com

UNOFFICIAL COPY

12



EXHIBIT

F

## DESIGNATION OF SUCCESSOR TRUSTEE
### Dakota Trust

The undersigned Dallas Joseph Fontenot, Jr., Successor Trustee of Dakota Trust, a trust established by Trust Declaration of Holli Ann Fontenot dated November 9, 1994 ("Trust Declaration") does hereby declare as follows:

Article V, Section C of the Trust Declaration provides in part that:

> SUCCESSION.  Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment will have the right to appoint a successor or successors to serve as Trustee in the event that person ceases to serve for any reason, and each Trustee may specify any conditions upon succession and service as may be permitted by law.  For example, a successor may be required to furnish a fiduciary bond as a prerequisite or a successor's service may be conditioned upon another appointee's death, resignation, or inability to serve.  Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment may also provide that one or more designated successors as Trustee will have the authority to appoint his, her, or its successor as Trustee. An appointment of successor Trustee must be in writing and must be acknowledged to be effective.

Pursuant to Article V, Section C of the Trust Declaration, Dallas Joseph Fontenot, Jr. appoints Dakota James Fontenot as successor Trustee, to serve immediately upon the death, disability, resignation, or disqualification of Dallas Joseph Fontenot, Jr.

Dallas Joseph Fontenot, Jr. appoints Frost Bank to serve as successor Trustee upon the death, disability, resignation, or disqualification of Dakota James Fontenot.

Each Trustee will have the right to appoint a successor or successors to serve as trustee of the Trust in the event that he ceases to serve for any reason, and such Trustee may specify any conditions upon succession and service as may be permitted by law.

The incapacity or disability of a trustee hereunder shall be (i) determined by a duly licensed physician representing that he or she is certified by a recognized medical board and is not related by blood or marriage to any trustee or beneficiary hereunder; and (ii) evidenced by a writing which is executed, witnessed, and acknowledged certifying that such a physician is familiar with the physical and mental condition of a person and has concluded that, by reason of accident, physical, or mental deterioration, or other similar cause, such person was, as of the date thereof, unable to give prudent, prompt, and intelligent consideration to financial matters.  No judicial determination of incapacity

000355

or disability shall be necessary.  Any physician's certificate described above may be revoked by a similar certificate to the effect that such person is no longer incapacitated, which certificate must be executed either (i) by the originally certifying physician or (ii) by two other licensed, unrelated physicians.  In the case of a revocation of a certificate of incapacity or disability of a trustee hereunder, such revocation shall cause such trustee to regain his or her appointment as trustee, and the then serving successor trustee shall be relieved of his or her duties.

This Designation of Successor Trustee shall be effective as of May 1, 2013 and shall revoke and replace all prior Designations of Successor Trustee.

_____
Dallas Joseph Fontenot, Jr., Trustee

STATE OF NEVADA
COUNTY OF ___Clark___
This document was acknowledged before me on the _7TH_ day of May, 2013 by Dallas Joseph Fontenot, Jr., Trustee.

_____
Notary Public, State of Nevada

MICHAEL J. MOORE
Notary Public State of Nevada
No. 08-7991-1
My Appt. Exp. September 11, 2016

000356

EXHIBIT

G

## DESIGNATION OF SUCCESSOR TRUSTEE
### Dakota Trust

The undersigned Dallas Joseph Fontenot, Jr., Successor Trustee of Dakota Trust, a trust established by Trust Declaration of Holli Ann Fontenot dated November 9, 1994 ("Trust Declaration") does hereby declare as follows:

Article V, Section C of the Trust Declaration provides in part that:

SUCCESSION.  Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment will have the right to appoint a successor or successors to serve as Trustee in the event that person ceases to serve for any reason, and each Trustee may specify any conditions upon succession and service as may be permitted by law.  For example, a successor may be required to furnish a fiduciary bond as a prerequisite or a successor's service may be conditioned upon another appointee's death, resignation, or inability to serve.  Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment may also provide that one or more designated successors as Trustee will have the authority to appoint his, her, or its successor as Trustee. An appointment of successor Trustee must be in writing and must be acknowledged to be effective.

Pursuant to Article V, Section C of the Trust Declaration, Dallas Joseph Fontenot, Jr. removes all prior appointments of appoints Dakota James Fontenot as successor Trustee and, instead, appoints Frost Bank to serve as successor Trustee upon the death, disability, resignation, or disqualification of Dallas Joseph Fontenot, Jr.

Each Successor Trustee will have the right to appoint a successor or successors to serve as trustee of the Trust in the event that he ceases to serve for any reason, and such Trustee may specify any conditions upon succession and service as may be permitted by law.

The incapacity or disability of a trustee hereunder shall be (i) determined by a duly licensed physician representing that he or she is certified by a recognized medical board and is not related by blood or marriage to any trustee or beneficiary hereunder; and (ii) evidenced by a writing which is executed, witnessed, and acknowledged certifying that such a physician is familiar with the physical and mental condition of a person and has concluded that, by reason of accident, physical, or mental deterioration, or other similar cause, such person was, as of the date thereof, unable to give prudent, prompt, and intelligent consideration to financial matters.  No judicial determination of incapacity or disability shall be necessary.  Any physician's certificate described above may be

000456

revoked by a similar certificate to the effect that such person is no longer incapacitated, which certificate must be executed either (i) by the originally certifying physician or (ii) by two other licensed, unrelated physicians. In the case of a revocation of a certificate of incapacity or disability of a trustee hereunder, such revocation shall cause such trustee to regain his or her appointment as trustee, and the then serving successor trustee shall be relieved of his or her duties.

This Designation of Successor Trustee shall be effective as of October 14, 2017 and shall revoke and replace all prior Designations of Successor Trustee.

_____
Dallas Joseph Fontenot, Jr., Trustee

STATE OF TEXAS
COUNTY OF Harris

This document was acknowledged before me on the 14th day of October, 2017 by Dallas Joseph Fontenot, Jr., Trustee.

_____
Notary Public, State of Texas

DIANNE N SKINNER
Notary ID # 126280969
My Commission Expires
November 11, 2019

000457

EXHIBIT

H



## RESOLUTIONS ADOPTED BY
## WRITTEN CONSENT OF SHAREHOLDER AND DIRECTOR OF
## VIVA LAS VEGAS PROPERTIES, INC.
### (OCTOBER 14, 2017)

The undersigned, being the sole shareholder of Viva Las Vegas Properties, Inc., a corporation organized and existing under the laws of Texas, does by this writing consent to take the following actions and adopt the following resolutions:

RESOLVED that the following persons person is elected as the sole Director of Viva Las Vegas Properties, Inc., to serve at the discretion of the Shareholder from October 14, 2017 until such time as his successors are elected by the Shareholder and qualify:

Dallas Fontenot

The undersigned direct that this consent be filed with the minutes of the proceeding of the Shareholders of Viva Las Vegas Properties, Inc.

The undersigned, now being the sole director of Viva Las Vegas Properties, Inc., does by this writing consent to take the following actions and adopt the following resolutions:

RESOLVED that the following person is elected to the offices of Viva Las Vegas Properties, Inc. set forth below, to serve at the discretion of the director from October 14, 2017 until such time as his successors are elected by the Shareholder and qualify:

Dallas Fontenot     President
Dallas Fontenot     Secretary

ESOLVED that Dakota Fontenot is hereby removed from all offices and all positions as a Director of Viva Las Vegas Properties, Inc. from and after October 14, 2017.

The undersigned direct that this consent be filed with the minutes of the proceeding of the Directors of Viva Las Vegas Properties, Inc.

This consent is executed pursuant to the laws of Texas and the Bylaws of Viva Las Vegas Properties, Inc., which authorize the taking of action by the Shareholders and Directors by unanimous written consent without a meeting. This consent is intended to substitute for a special meeting of the Shareholders and Directors of Viva Las Vegas Properties, Inc. Only those persons named above shall serve as Directors until a subsequent election or appointment by the

000437

Shareholder of Viva Las Vegas Properties, Inc. Only those persons named above shall serve as an officer until a subsequent election or appointment by the Director of Viva Las Vegas Properties, Inc.

Dated to be effective as of October 14, 2017.

Viva Las Vegas Properties, Inc., Shareholder

by: _____
Dallas Fontenot, President

_____
Dallas Fontenot, Director

000438



FILED
8/26/2025 3:28 PM
Teneshia Hudspeth
County Clerk
Harris County - County Probate Court No. 1
Accepted By: JD

**CAUSE NO. 537,721**

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY AS TRUSTEE OF THE HOLLI ANN HARDIN TRUST NUMBER ONE<br>*Plaintiff,*<br><br>v.<br><br>DAKOTA FONTENOT<br>*Defendant.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | IN PROBATE COURT<br><br><br>NUMBER ONE (1) OF<br><br><br>HARRIS COUNTY, TEXAS |

TRO
w/s

## MOTION FOR EX-PARTE TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff LINDA GOEHRS ("Plaintiff"), in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, and files this her Motion for Ex Parte Temporary Restraining Order against Defendant DAKOTA FONTENOT ("Defendant"), and in support thereof would respectfully show unto the Court the following:

**RELIEF REQUESTED:**

1. Defendant be enjoined from selling the Richmond Property and/or any other property held by the Dakota Trust.

2. Defendant be enjoined from taking any action as Trustee of the Dakota Trust, until such time as a Trustee is properly appointed to administer the Dakota Trust.

3. Defendant be enjoined from taking any action as an officer/director of Viva Las Vegas Properties, Inc.

UNOFFICIAL COPY

Page **1** of 14

Hardin Trust TRO/TI

# I.
# PARTIES

1.　　Plaintiff LINDA GOEHRS ("Plaintiff") is an individual residing in Harris County, Texas and currently serving as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One (the "Hardin Trust").

2.　　Defendant DAKOTA FONTENOT ("Defendant") is an individual domiciled in Harris County, Texas. DAKOTA FONTENOT may be served with process at 2926 Fontana Drive, Houston, Texas 77043, or any other location where he may be found. Defendant was the President and Director of Ice Embassy, Inc., was the President and Director of HFR Enterprises, Inc. and claims to be the purported trustee of the Dakota Trust and President of Viva Las Vegas Properties, Inc., and is being named in these capacities in addition to his individual capacity.

# II.
# EXHIBITS

Exhibit A – Trust Agreement of the Holli Ann Hardin Trust Number One

Exhibit B – Trust Agreement of the Dakota Trust

Exhibit C – Binding Mediated Settlement Agreement

Exhibit D – Amended and Restated Promissory Note

Exhibit E – Assignment of Interest and Disclaimer of Further Interest

Exhibit F – May 1, 2013 Designation of Successor Trustee

Exhibit G – October 14, 2017 Designation of Successor Trustee

Exhibit H – Viva Las Vegas Resolution

Exhibit I – Viva Las Vegas Written Consent

Exhibit J – Affidavit of Linda Goehrs

Exhibit K – Settlement Statement (Sale of Trust Entities)

Hardin Trust TRO/TI

Exhibit L – Listing for Old Richmond Road showing Under Contract.

### III.
### BACKGROUND

3.      The Hardin Trust was created on or about June 5, 1991, by Holli Ann Hardin Fontenot ("Holli"). See Exhibit "A", Trust Agreement. At the time, Holli was married to Dallas Joseph Fontenot, Jr. ("Dallas"). Defendant is the child of Holli and Dallas.

4.      Dallas had two children from a previous marriage, Dallas Joseph Fontenot III ("Joe") and Michelle Ann Fontenot ("Michelle"). Defendant, Holli, Joe, and Michelle were each initial beneficiaries of the Hardin Trust. During his lifetime, Dallas owned numerous properties and businesses centered around the Colorado Bar & Grill (the "Colorado Club"), a gentleman's club located in Houston, Texas. Dallas accumulated millions of dollars of assets which at the time of his death were spread between his estate, the Hardin Trust, and a separate trust known as the Dakota Trust, which was created on November 9, 1994 by Holli as settlor. *See* **Exhibit "B"**, *Dakota Trust Agreement.*

5.      Until recently, the Hardin Trust owned 100% of the stock of Ice Embassy, Inc., which operated the Colorado Club. The Hardin Trust also owned 100% of the stock of HFR Enterprises, Inc., which, until recently, owned the real property on which the Colorado Club was operated.

6.      Dallas died on September 3, 2021, and his estate was probated in Fort Bend County Court at Law Number Four (4) under Cause No. 21-CPR-036521. Litigation pertaining to Dallas's estate and the two above-mentioned trusts (collectively the "Trusts") was resolved through a settlement agreement dated January 7, 2022 (the "Settlement Agreement"). *See* **Exhibit "C"**, *Binding Mediated Settlement Agreement.*

UNOFFICIAL COPY

Page **3** of **14**

Hardin Trust TRO/TI

7.      As part of the Settlement Agreement, the parties ultimately agreed that Holli would be bought out as a beneficiary of the Trusts, with certain assets to be paid to Holli in consideration of her disclaimer of further interest in the Trusts. Specifically, the Settlement Agreement dictated that Holli's interest in both Trusts "will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One." *Id.* at p. 5–6. Subsequently, Defendant, as President of HFR Enterprises, Inc. entered into a 2.8 million dollar loan agreement, in part to provide the necessary consideration for Holli's interest in both Trusts. *See* **Exhibit "D"**, *Amended and Restated Promissory Note*. The Hardin Trust then paid Holli $2,823,464 for her interest in both Trusts, representing 85% of the total value of the Dakota Trust assets and 20% of the total value of the Hardin Trust assets. *See* **Exhibit "E"**, *Assignment of Interest and Disclaimer of Further Interest*. The Hardin Trust effectively became the owner of Holli's 85% interest in the Dakota Trust. However, the payment has ultimately wrongfully benefitted Defendant as the now sole beneficiary of the Dakota Trust, to the detriment of the Hardin Trust and its beneficiaries.

8.      Defendant purports to be the Trustee of the Dakota Trust. However, upon information and belief, Defendant was not validly appointed as Trustee of the Dakota Trust. Defendant is not a named successor trustee in the Dakota Trust Agreement. *See* **Exhibit "B"**. On May 1, 2013, Decedent, as Trustee of the Dakota Trust, designated Defendant as a successor Trustee, but he later revoked this designation on October 14, 2017. *See* **Exhibit "F"**, *5/1/13 Designation of Successor Trustee*; *See* **Exhibit "G"**, *10/14/17 Designation of Successor Trustee*. Decedent similarly removed Defendant from all officer and director positions for any entities owned by the Dakota Trust, including Viva Las Vegas Properties, Inc. on the same day. *See* **Exhibit "H"**, *Viva Las Vegas Resolution*. After Decedent's death, however, without the authority to do so, Defendant started acting as Trustee of the Dakota Trust and officer and director of Viva Las Vegas

REDACTED COPY — UNOFFICIAL

Hardin Trust TRO/TI

Properties, Inc. As purported Trustee of the Dakota Trust, Defendant has not repaid the Hardin Trust for any of the Hardin Trust assets used to buy out Holli's interest in the Dakota Trust.

9.    Defendant's wrongdoing at the expense of the Hardin Trust and its beneficiaries did not stop there. After the Settlement Agreement was signed, Defendant caused waste to assets held in the Hardin Trust. Defendant mismanaged the Colorado Club for personal benefit, including, but not limited to the following:

a.  hiring his wife, who had little to no experience, to manage the Colorado Club;

b.  paying his personal credit cards out of the company;

c.  taking vacations and claiming they were a business expense;

d.  paying personal expenses from the company;

e.  making unnecessary and unreasonable improvements, many of which were never completed;

f.  hiring multiple consultants and paying them hundreds of thousands of dollars with no apparent benefits provided;

g.  Changing the system at the Colorado Club to have less oversight and allowing money to be taken or taking money from the club;

h.  Taking a loan from his wife's stepfather for $150,000 and within a month, repaid the loan and $50,000 in interest, which was wired directly to an offshore account;

i.  Obligating the entities held by the Hardin Trust to lucrative an unnecessary Management Agreements and Administrative Agreements with an entity he owns, on top of taking a salary for the Club; and

j.  Using funds earmarked for repayment of the loan used to buy Holli's interest for his own personal benefit, allowing the company to default on the loan for months and causing a fire sale of the land and stock.

10.    Because of Defendant's actions, the Colorado Club declined in value significantly, ultimately harming the Hardin Trust. The entities held by the Trust were valued at approximately $8 million in 2022, but when reappraised in 2024, had declined to $4.75 million. The entities were

ultimately sold for $4,689,424.72, but because of the massive debt and unpaid expenses incurred during Defendant's time running the entities, the Trust netted only $1,239,139.78. *See* **Exhibit "K"**.

11.    Upon information and belief, Defendant is seeking to liquidate as many assets as possible, including those held by entities owned by the Dakota Trust, and move to the Virgin Islands. Because of Defendant's wrongful actions, Plaintiff is left with no alternative but to petition this Court for relief.

## IV.
## FACTS SPECIFIC FOR INJUNCTIVE RELIEF

12.    Defendant denuded the Hardin Trust of millions of dollars of assets and is now actively attempting to further liquidate any assets he can access before absconding to the Virgin Islands, where the Hardin Trust would be unable to recover any assets from him. The injunctive relief being requested is to stop or delay the sale of real property (or prevent the proceeds of the sale from being lost) that should be part of the Hardin Trust until the Hardin Trust's interest can be determined.

13.    As explained above, because the Hardin Trust purchased Holli's 85% interest in the Dakota Trust pursuant to the Settlement Agreement, the Hardin Trust owns Holli's 85% interest in the Dakota Trust. The only known asset of the Dakota Trust is Viva Las Vegas Properties, Inc. ("Viva Las Vegas"), which holds real property, including 3414 Old Richmond Road, Rosenberg Texas, 77471 ("Richmond Property"). The Richmond Property served as the business offices for the entities comprising the Colorado Club and belonging to the Trusts prior to their sale. Although Defendant claims to be both Trustee of the Dakota Trust and president of Viva Las Vegas, as provided above, the paperwork does not support these appointments, and according to the paperwork received by Plaintiff, there is currently no validly appointed trustee for the Dakota Trust

Page **6** of **14**

Hardin Trust TRO/TI

nor a validly elected president (or any officer) for Viva Las Vegas. *See* **Exhibits "F", "G"** and **"H"**.

14.    Defendant is aware of the threat of impending litigation because the parties, including the two other beneficiaries of the Hardin Trust, attended a mediation with Russ Jones, which was unsuccessful. It appears that Defendant has no intention of rightfully resolving the issue or subjecting himself to litigation and the authority of the Court, as Defendant has stated that he intends to sell assets to which he has access.  This includes the active attempt to sell the Richmond Property.

15.    The Richmond Property is listed on HAR and shows that it is under contract. Plaintiff has been informed that she needs to remove the entity paperwork for the impending sale. *See* **Exhibit "L"**.  The listed price is $700,000, with the Hardin Trust having an interest 85% interest (or $595,000) in the proceeds from that sale.  Defendant was overheard talking to his realtor about selling the Richmond Property and his own homestead and moving to the Virgin Islands.[1]

16.    Additionally, Plaintiff is seeking to enjoin Defendant from taking any action as Trustee of the Dakota Trust and/or as President (or officer/director) of Viva Last Vegas, because the documentation does not support that he was ever validly appointed and/or elected to serve in those positions.

17.    As detailed and evidenced in Plaintiff's Original Petition and Application for Temporary and Permanent Injunctive Relief, the Hardin Trust has and continues to suffer immediate, irreparable harm which may become entirely unrecoverable should Defendant succeed

---

[1] It is important to note that the repayment of the purported $150,000 loan from Defendant's wife's stepfather, with $50,000 in interest, was repaid by the entities by wiring the $200,000 to an offshore account, further supporting the high probability that Defendant intends to liquidate and move out of the jurisdiction to avoid litigation.

Hardin Trust TRO/TI

in leaving the country with extensive assets belonging to the Hardin Trust and/or is allowed to act as Trustee of the Dakota Trust and/or President of Viva Las Vegas. Because of the urgency of the matter before the Court, Plaintiff requests that the hearing on the application for a temporary restraining order against Defendant be heard ex parte, based on the authority detailed below.

## V.
## TEMPORARY RESTRAINING ORDER/TEMPORARY INJUNCTION

18.     In order to obtain a temporary injunction, Movants have the burden of pleading and proving three specific elements: (1) a cause of action against Defendant; (2) a probable right to relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002).

### A. CAUSE OF ACTION AGAINST DEFENDANT

19.     In their Original Petition against Defendant, Plaintiff brings a multitude of claims against Defendant, including a request for declaratory relief, unjust enrichment, Breach of Fiduciary Duty and a Permanent Injunction. The relief that is most relevant to this temporary injunction is:

    a.  Declaration that Plaintiff owns an 85% interest in the Dokata Trust as provided for in the Settlement Agreement and associated documents. *See* **Exhibits "C", "D", and "E",**

    b.  Declaration that Defendant is not the Trustee of the Dakota Trust and/or President, officer and/or director of Viva Las Vegas.

    c.  Permanent injunction preventing Defendant from selling and absconding with the assets of the Dakota Trust and/or taking action as Trustee of the Dakota Trust and/or President, officer and/or director of Viva Las Vegas.

Hardin Trust TRO/TI

UNOFFICIAL COPY

20.     These are all valid causes of action that are fully supported by the documentation attached to this motion.

## B. PROBABLE RIGHT TO RELIEF SOUGHT

21.     To establish a probable right to recover, an applicant need not prove that she will ultimately prevail in the litigation, rather, the applicant must show she has a cause of action for which relief may be granted. *Sun Oil Co. v. Whitaker*, 424 S. W.2d 216, 218 (Tex. 1968). Plaintiff has not only outlined the causes of action that Plaintiff has against the Defendant for which relief may be granted, Plaintiff has provided substantial and uncontroverted evidence of its right to relief. The evidence provided goes well beyond anything that would be necessary to show that they would have a probable right to relief.

## C. A PROBABLE, IMMINENT AND IRREPARABLE INJURY IN THE INTERIM

22.     In order to show a probable, imminent, and irreparable injury, Movants must show the Court that if the action is not restrained, the recovery they would be entitled to is unlikely to occur or be obtained. A party proves irreparable harm by showing that they will have no adequate remedy at law or otherwise for the harm or damage that will occur or a recovery which could not be obtained without the injunction. *Universal Health Servs. v. Thompson*, 24 S.W.3d 570, 576 (Tex.App.—Austin 2000, no pet.).

23.     First, when the court weighs the elements of (1) probable right to relief and (2) probable, imminent, and irreparable injury, the court applies a "sliding scale" under which clear evidence establishing one of the elements will result in a less stringent requirement of proof of the other element. *See Ebony Lake Healthcare Ctr. v. Tex. Dep't of Human Servs.*, 62 S.W.3d 867, 87 (Tex. App.—Austin 2001, no pet.); *Topheavy Studios, Inc. v. Doe*, No. 03-05-00022-CV, 2005 Tex. App. LEXIS 6462, at *8 (Tex. App.—Austin Aug. 11, 2005). "Where the pleadings and the

UNOFFICIAL COPY

Hardin Trust TRO/TI

evidence present a case of probable right and probable injury, the trial court is clothed with broad discretion in determining whether to issue the writ, and its order will be reversed only on a showing of a clear abuse of discretion." *Transport Co. of Texas v. Robertson Transports*, 261 S.W.2d 549 552 (Tex. 1953). The Texas Supreme Court has indicated that when the first two elements are overwhelming, as they are in this case, evidence of the third element becomes irrelevant.

24.    In the matter before the Court, the evidence is overwhelming in support of Plaintiff's contention that it has an 85% interest in the Dakota Trust, that Dakota is not the validly appointed Trustee of the Dakota Trust and Dakota is not validly serving as President, officer and/or director of Viva Las Vegas. Therefore, the proof necessary to show that there is a probable, imminent, and irreparable injury is to be relaxed, if not to be considered irrelevant, in the Court's decision to enter a temporary injunction.

25.    Additionally, as part of this third element, the court looks to whether the applicant has an adequate remedy at law for damages. *Surko Enters., Inc. v. Borg-Warner Acceptance Corp.*, 782 S.W.2d 223, 225 (Tex. App.—Houston [1st Dist.] 1989). The test for determining whether an existing remedy is adequate is whether such remedy is as complete and as practical and efficient to the ends of justice and its prompt administration as is equitable relief. *Greater Houston Bank v. Conte*, 641 S.W.2d 407 (Tex. App.—Houston [14th Dist.] 1982, no writ); *Bank of Sw. N.A. v. Harlingen Nat'l Bank*, 662 S.W.2d 113, 116 (Tex. App.—Corpus Christi 1983). "For the purposes of injunctive relief, no adequate remedy at law exists if damages are incapable of calculation or if defendant is incapable of responding in damages." *Harlingen Nat'l Bank, 662 S.W.2d at 116; Surko Enters., Inc.*, 782 S.W.2d at 225 (stating that no adequate remedy exists if a defendant is unable to pay a judgment and/or is insolvent).[2]

---

[2] This is further supported by the Texas Supreme Court when it stated that "if an otherwise complete and adequate remedy at law will lead to a multiplicity of suits, that very fact prevents it from being complete and

Hardin Trust TRO/TI

26.    If Defendant is not restrained from accessing these funds, Defendant will take action to remove these funds from the country and likely outside the jurisdiction of this Court, and therefore, Plaintiff will lose the opportunity to recover any portion of the hundreds of thousands of dollars interest the Plaintiff has in the asset and/or the funds Defendant has stolen from Plaintiff. The evidence demonstrates that a failure to enjoin the Defendant from taking specific action and/or acting as Trustee off the Dokota Trust and/or President, officer and/or director of Viva Las Vegas, will result in imminent, irreparable harm and that if Defendant is not enjoined, Plaintiff will have no adequate remedy at law.

## VI.
## REQUEST FOR EX PARTE HEARING ON TEMPORARY RESTRAINING ORDER

27.    A temporary restraining order is an equitable remedy appropriate only if the movant shows: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunctive relief is denied; (3) the threatened injury outweighs any damage that the injunctive relief might cause the defendant; and (4) the injunctive relief would not disserve the public interest. *Sacal-Micha v. Longoria*, 449 F. Supp.3d 656, 661–62 (S.D. Tex. 2020) (applying Texas law). The purpose of such is to preserve the status quo until an evidentiary hearing on an application for a temporary injunction may be heard, at which further injunctive relief may be granted only upon an appropriate showing. *Clint Indep. Sch. Dist. v. Marquez*, 487 S.W.3d 538, 555 (Tex. 2016). Because of this, a temporary restraining order is only a precursor to a temporary injunction, and constitutes no ruling on the merits.

---

adequate." *Campbell v. Wilder*, 487 S.W.3d 146, 152 (Tex. 2016). In the matter before the Court, a judgement against Defendant who is believed to be selling off all accessible assets to move out of the country will simply lead to additional lawsuits in multiple jurisdiction and Plaintiff will likely be prevented from ever recovering if Defendant is permitted to take these assets out of the country.

Hardin Trust TRO/TI

28.     Because temporary injunctions are a form of emergency injunctive relief pertaining to the immediate necessity of court intervention to preserve the status quo, a hearing may be granted on the application should it be impossible for citation to issue before such hearing is available to be conducted. *In re St. Mark's Sch. of Tex.*, No. 05-23-000369-CV, 2023 WL 3220937 at *2–3 (Tex. App.—Dallas May 3, 2023, no pet.). In such scenario, the Court must explain why the temporary restraining order was issued without notice to the defendant. *Id.* Accordingly, for an ex parte hearing to be conducted, Plaintiff must "show by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before notice can be served and a hearing had thereon." *In re Spiritas Ranch Enters., L.L.P.*, 218 S.W.3d 887, 895 (Tex. App.—Fort Worth 2007, no pet.).

29.     In the matter at issue, Plaintiff asserts more than a blanket assertion that there is not enough time to serve notice on Defendant and hold a hearing as the reason for requesting that the Application be heard ex parte. Instead, the Court is faced with a scenario where the next available time for hearing is needed because of Defendant's intent to avoid the judicial process to the detriment of the Hardin Trust.

30.     Defendant is currently attempting to finalize the liquidate of any assets remaining in his possession which Defendant knows belong at least in part to the Hardin Trust, including the Richmond Property. Defendant hopes to cash out on whatever amounts possible and leave for the Virgin Islands to avoid potential consequences for his actions. Defendant is actively attempting to close on the sale of the above-detailed real property in which the Hardin Trust possesses an interest. As detailed in Plaintiff's Original Petition, Defendant has and continues to wrongfully act under the supposed authority of the position of officer in entities possessed by the Hardin Trust. *See* **Exhibit "H"**, *Viva Las Vegas Resolution*; *See* **Exhibit "I"**, *Viva Las Vegas Written Consent*.

Hardin Trust TRO/TI

31.     Because Defendant hopes to finalize this liquidation as soon as possible, there is no time for service on Defendant and a hearing must be heard ex parte. Waiting for citation to be served before scheduling a hearing on the requested temporary restraining order would further subject Plaintiff to continued harm, the full extent of which is unknown, and potential lack of ability to recover against Defendant for his fraudulent actions.

32.     Finally, the requested temporary restraining order does nothing more than obligate Defendant to act in accordance with the bounds of the authority of the Hardin Trust, the related entities within its control, and Texas law. At the very worst, should Defendant successfully argue against the implementation of a temporary injunction hereafter, the requested temporary restraining order would in no way negatively impact Defendant's rights. The interests of justice, in conjunction with Plaintiff's well-supported showing of Defendant's wrongful actions, necessitate the immediate setting of a temporary restraining order hearing ex parte.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, for the reasons detailed herein, Plaintiff LINDA GOEHRS, in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, respectfully requests that the Court: (i) set her application for a temporary restraining order for the soonest available hearing, conduct said hearing ex parte without service of citation upon Defendant DAKOTA FONTENOT, enter an ex-parte temporary restraining order, to continue in force until the day set for hearing on the Motion for Temporary Injunction, or until further Order of this Court, enjoining DAKOTA FONTENOT from selling the Richmond Property, taking any action as Trustee of the Dakota Trust and/or taking any action as President, officer and/or director of Viva Las Vegas, (ii) set a date and time for a hearing on notice of this Motion for Temporary Injunction and that DAKOTA FONTENOT be cited and notified to appear on that day and answer

Page **13** of **14**

Hardin Trust TRO/TI

in this action; (iii) on this hearing, grant a Temporary Injunction, enjoining DAKOTA FONTENOT from selling the Richmond Property, taking any action as Trustee of the Dakota Trust and/or taking any action as President, officer and/or director of Viva Las Vegas; (iv) Order that Plaintiff recover all court costs and attorneys' fees; and (v) for all such other and further relief, general or special, at law or in equity, to which Plaintiff may show herself to be justly entitled.

Respectfully submitted,

★
EST. 2001
TEXAS PROBATE
ATTORNEY PLLC

RUDOLPH M. CULP
State Bar No. 24043014
rudy@texsprobateattorney.com
COLLIN J. BULLARD
State Bar No. 24129570
collin@texasprobateattorney.com
*EFILE EMAIL: efile@texasprobateattorney.com*
**HOUSTON OFFICE:**
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
O: (713) 297-0700
F: (817) 383-5110
**ATTORNEYS FOR PLAINTIFF**

UNOFFICIAL COPY

Hardin Trust TRO/TI

**STATE OF TEXAS**     §

                            §

**COUNTY OF HARRIS**    §

BEFORE ME, the undersigned authority, on this day personally appeared Linda C. Goehrs, Successor Temporary Trustee of the Holli Hardin Trust, who, being by me duly sworn, stated on oath:

"My name is Linda C. Goehrs, Successor Temporary Trustee of the Holli Hardin Trust. I am the Plaintiff in the foregoing Application for Temporary Restraining Order. I have read the application, and the factual statements contained therein are within my personal knowledge and are true and correct."

_____
Signature of Applicant

SUBSCRIBED AND SWORN TO before me on this ___21st___ day of August **2025**.

_____
Notary Public, State of Texas

ROBIN C. EDWARDS
MY COMMISSION EXPIRES
MARCH 8, 2029
NOTARY ID: 12060314

UNOFFICIAL COPY

Page **15** of **15**

Hardin Trust TRO/TI

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Robin Edwards on behalf of Rudy Culp
Bar No. 24043014
robin@texasprobateattorney.com
Envelope ID: 104873252
Filing Code Description: Application for Temporary Injunction
Filing Description: Motion for Ex-Parte TRO and TI against Dakota Fontenot
Status as of 8/27/2025 12:33 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Robin Edwards | | robin@texasprobateattorney.com | 8/26/2025 3:28:51 PM | SENT |
| Rudy Culp | | rudy@texasprobateattorney.com | 8/26/2025 3:28:51 PM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 8/26/2025 3:28:51 PM | SENT |

UNOFFICIAL COPY

EXHIBIT

A

exhibitsticker.com

COPY

## TRUST DECLARATION FOR
## THE HOLLI ANN HARDIN TRUST NUMBER ONE

THIS TRUST DECLARATION is made this day by declaration of HOLLI HARDIN FONTENOT, a resident of Harris County, Texas ("Trustor"). The Effective Date of this Trust Declaration is June 5, 1991.

1. **Trust Estate.**

   1.1 **Creation of Trust.** The Trustor hereby establishes, declares, and creates this Trust for the purposes hereinafter set forth, and the Trustee agrees to serve as the initial trustee and to hold the Trust Estate (as hereinafter defined) in trust upon the following provisions.

   1.2 **Transfer in Trust.** On or about the Effective Date, the Trustor has transferred and delivered to the Trustee the cash sum of One Thousand and No/100 Dollars ($1,000.00). Such property shall constitute the initial property of the Trust Estate.

   1.3 **Beneficiaries.** The Beneficiaries of this Trust shall be HOLLI HARDIN FONTENOT, DALLAS JOSEPH FONTENOT, JR., ANNE S. FONTENOT, DALLAS JOSEPH FONTENOT, III, MICHELLE ANNE FONTENOT, and any children of the marriage of HOLLI HARDIN FONTENOT and DALLAS JOSEPH FONTENOT, JR., including any children adopted by HOLLI HARDIN FONTENOT and DALLAS JOSEPH FONTENOT, JR. after the Effective Date (collectively, "Primary Beneficiaries"). Also Beneficiaries of this Trust are the children and other issue of each of the Primary Beneficiaries. The term "Beneficiary" will also mean any and all persons, organizations, trusts, and entities who may have or may acquire a beneficial interest in this Trust, whether vested or contingent in nature, resulting from the exercise of a power of appointment by a Beneficiary or otherwise.

   1.4 **Release of All Rights in Property.** The Trustor hereby releases for the benefit of this Trust any and all rights which the Trustor may have in her individual capacity in the property constituting the Trust Estate.

   1.5 **Acceptance of the Trust.** By acceptance hereof the Trustee, on her behalf and on behalf of her successors in trust, does by the execution hereof acknowledge receipt of the Trust Estate. The Trustee shall own, hold, and possess the Trust Estate (including any additional property which may

Page 1 of 18 Pages

81142_81.01

at any time hereafter be transferred to the Trustee) in trust solely in the capacity of Trustee. The Trustee and her successors in trust shall hold, manage, sell, exchange, invest, and reinvest the Trust Estate; collect all income therefrom; and, after deducting such expenses as are properly payable from income, accumulate and distribute the Trust Estate as herein provided.

1.6    Additions to Trust Estate. The Trustor and any other person shall have the right at any time to add property to the Trust created herein. Such property, when received and accepted by the Trustee, shall become part of the Trust Estate.

1.7    Name of Trust. This Trust shall be known as THE HOLLI ANN HARDIN TRUST NUMBER ONE.

2.    Irrevocability of Trust. The Trust herein created shall be irrevocable and shall not be altered, amended, revoked, or terminated by the Trustor or any other person except as specifically permitted by law.

3.    Definitions. As used herein, the following terms shall have the following meanings.

3.1    Children, Issue. The term "child" or "children" shall refer only to any and all children born in lawful wedlock or lawfully adopted, whether born or adopted before or after the date of execution of this Trust Declaration. The term "issue" shall refer to the lawful blood descendants in the first, second, or any other degree of the ancestor designated.

3.2    Heirs at Law. Whenever a trustee or a legal advisor to the Trustee is called upon to determine the heirs at law of the Trustor or any other person beneficially interested in this Trust, the determination will be made to identify those individual, other than creditors, who would receive the personal property of a decedent upon his or her death as determined in accordance with the laws of intestate succession of the State of Texas, and further determined as if the Trustor of this Trust shall have predeceased the person or persons so named or described.

3.3    Minor Beneficiary. The term "Minor Beneficiary" identifies a Beneficiary who is less than twenty one years of age.

3.4    Disability. A Beneficiary will be considered "disabled" if he or she is incapacitated to an extent to make it impossible or impractical to give prompt and intelligent

Page 2 of 18 Pages

H1142_S1.01

003186

consideration to business matters.   The Trustee may act upon such evidence as the Trustee reasonably deems appropriate and reliable without liability by reason thereof.

3.5   Power of Appointment, Qualified Beneficiary Designation.   Whenever this Trust gives a Beneficiary the power or authority to appoint a beneficiary of the Trust, the designation must be in writing and be acknowledged in the form required of acknowledgements by Texas law or exercised by a will executed with the formalities required by law of the Beneficiary's residence;   it must clearly evidence the intent of the Beneficiary to exercise a power of appointment; and the written beneficiary designation must have been delivered to the Trustee prior to the Beneficiary's death or, if exercised by will, the will must have been filed for probate within three months from the date of the Beneficiary's date of death and must subsequently be admitted to probate no matter the time interval.   The term of this Trust may be extended if the Qualified Beneficiary Designation requires that a Beneficiary's interest remain in Trust, or may be divided and be held as a separate trust which is governed by the terms of this Trust.

3.6   Trust Estate.   The term "Trust Estate" shall mean any and all of the property delivered to the Trustee to be held, managed, and distributed under the terms of this Trust.

3.7   Trustee.   For convenience, the term "Trustee," used in the singular, will mean and identify singular and multiple Trustees serving and acting pursuant to the directions of this Trust Declaration.   The term "corporate Trustee" will identify a banking or trust corporation with trust powers.

4.   Appointment of Trustee.

4.1   Original Appointment.   The Trustor appoints HOLLI HARDIN FONTENOT as Trustee of this Trust.   In the event HOLLI HARDIN FONTENOT should fail to qualify, or having qualified, should die, resign, or become incapacitated or unable to act as Trustee of this Trust, or having qualified should subsequently become divorced from DALLAS JOSEPH FONTENOT, JR., then the Trustor appoints DALLAS JOSEPH FONTENOT, JR. as Trustee of this Trust.   The parties acknowledge and agree that the rights and obligations of HOLLI HARDIN FONTENOT to serve as Trustee and to resign as Trustee in accordance with the foregoing have been and are the subject of separate consideration,

Page 3 of 18 Pages
H1142_81.01

003187

receipt of which is hereby acknowledged in full, and such rights and obligations are in the best interest of the administration of the Trust for its Beneficiaries. HOLLI HARDIN FONTENOT specifically waives any rights which she may have to rescind or revoke her obligation to resign as Trustee upon divorce from DALLAS JOSEPH FONTENOT, JR.

4.2   Succession.   At any time on or after his appointment as Trustee of this Trust, DALLAS JOSEPH FONTENOT, JR. will have the right to appoint a successor or successors to serve as Trustee in the event that DALLAS JOSEPH FONTENOT, JR. chooses not to serve as Trustee or ceases to serve as Trustee for any reason, and DALLAS JOSEPH FONTENOT, JR. may specify any conditions upon succession and service as may be permitted by law.

For example, a successor may be required to furnish a fiduciary bond as a prerequisite or a successor's service may be condition upon the death, resignation, or inability to serve of another appointee.

At any time on or after his appointment as Trustee of this Trust, DALLAS JOSEPH FONTENOT, JR. may also provide that one or more designated successors will have the authority to appoint his, her, or its successor as Trustee.  An appointment of successor Trustee must be in writing and must be acknowledged to be effective.

In the absence of an appointment, or in the event all successors appointed by a Trustee shall fail or cease to serve for any reason, DALLAS JOSEPH FONTENOT, III is to be the successor as Trustee.

Trustor specifically provides that upon assumption of actual service as Trustee, DALLAS JOSEPH FONTENOT, III will have the right to appoint his successor as Trustee and to vest in a successor Trustee, upon assumption of that person's service, the right and authority to designate succession as Trustee.

In the event all of the Trustees named above, including duly appointed successors, fail or cease to serve for any reason, then FIRST INTERSTATE BANK OF TEXAS, N.A. is to be the successor Trustee.  The appointment of FIRST INTERSTATE BANK OF TEXAS, N.A. as Trustee will include any successor to FIRST INTERSTATE BANK OF TEXAS, N.A. by reason of its merger, reorganization, or sale to another banking corporation with trust powers or a trust company with trust powers.

Page 4 of 18 Pages

E1142_S1.01

003188

5. **Distribution of Income and Trust Corpus, Living and Port-Mortem.** The Trustee shall hold in trust or dispose of the Trust Estate as follows.

5.1 **Distribution of Income and Principal.** The Trustee will have the discretionary authority to distribute to any or all of the Primary Beneficiaries or to apply for the Primary Beneficiaries' use and benefit such amounts of the Trust income and principal of the Trust Estate, even to the exhaustion thereof, as the Trustee shall desire, in the absolute discretion of the Trustee. The Trustee will have the discretionary authority to apportion or accumulate income to or for one or more of the Primary Beneficiaries in such amounts as the Trustee shall desire, in the absolute discretion of the Trustee; and the Trustee may distribute such amounts in equal or unequal shares, in the Trustee's absolute discretion. The Trustee may elect not to distribute any sums to any one or more of the Primary Beneficiaries. Accumulated income shall be added to the principal of the Trust.

5.2 **Term of the Trust.** The term of this Trust shall be for so long as any of HOLLI HARDIN FONTENOT, DALLAS JOSEPH FONTENOT, JR., and ANNE S. FONTENOT shall live. Upon the last to die of all of the foregoing, this Trust shall terminate; provided, however, that the Trust will continue for a reasonable term thereafter for the purpose of liquidation and settlement.

5.3 **Distributions for Death Taxes.** If the testamentary estate of the Trustor or any other Primary Beneficiary shall include any property of the Trust Estate because of the provisions of Sections 2036, 2037, and 2038 of the Internal Revenue Code of 1986 or any other provisions of the Internal Revenue Code of 1986, as amended, or under any corresponding statute hereafter in effect (dealing with inclusion of the Trust assets in the testamentary estate because of retained powers or otherwise), any death taxes (including but not limited to any estate tax) owing as a result of such inclusion shall be paid by this Trust. This provision shall control notwithstanding any other provision contained in this Trust. As used in this Trust Agreement, the term "death taxes" refers to all estate, inheritance, transfer, succession, legacy, or other death taxes of any kind and interest or penalty on such taxes, if any.

5.4 **Distributions Upon Termination of the Trust.** Upon termination of this Trust, the undistributed principal and income after the distributions, if any, allowed under Section 5.3 above, shall be divided in equal shares, one for each of DALLAS

Page 5 of 18 Pages

H1142_81.01

003189

JOSEPH FONTENOT, III, MICHELLE ANNE FONTENOT, and each of the children of the marriage of HOLLI HARDIN FONTENOT and DALLAS JOSEPH FONTENOT, JR., including any children adopted by HOLLI HARDIN FONTENOT and DALLAS JOSEPH FONTENOT, JR. after the Effective Date ("Trust Share"). Each of the foregoing, using a Qualified Beneficiary Designation, shall have the right to appoint the Beneficiary or Beneficiaries of the Trust Estate upon his or her death and the manner in which an appointee is to receive his, her, or its Trust Share. If such Beneficiary does not exercise his power of appointment with a Qualified Beneficiary Designation, the Beneficiary's Trust Share of the remaining property of the Trust, net of settlement costs, will pass upon the termination of the Trust *per stirpes*, outright and free of Trust, to his issue living at the time of his death or, if none, *per stirpes* to the Trustor's issue then living.

5.5   Distribution In Accordance With Texas Intestate Laws. In the event all Primary Beneficiaries and all of the issue of the Primary Beneficiaries have died, upon termination of this Trust the Trustee shall distribute the Trust Estate among the heirs at law of DALLAS JOSEPH FONTENOT, JR. in accordance with the Texas rules for intestate distribution as if the Primary Beneficiaries and all of the children and other issue of the Primary Beneficiaries had predeceased the Trustor.

5.6   Method of Distribution. During such time as the Trustee is so expending sums from the Trust Estate for the benefit of any Beneficiary or otherwise as provided herein, the Trustee is authorized to make payments or delivery of the portion or portions of the Trust Estate, either to the Beneficiary directly or to the person having the care and custody of the Beneficiary, all without the necessity of the appointment of any guardian. Without limitation on the foregoing, it is acknowledged and agreed that this Trust constitutes a grantor trust within the meaning of Sections 671, et seq. of the Internal Revenue Code of 1986, as amended and that the income therefrom will be taxed to the Trustor for so long as the Trustor shall live. It is further understood and agreed that the Trustee shall distribute to the Trustor (or to any other person who is deemed to be a grantor of this Trust and taxable on the income of the Trust within the meaning of Section 671, et seq. of the Internal Revenue Code of 1986, as amended) the incremental income taxes arising in connection with the taxable income of the Trust Estate or, at the election of the Trustee, the Trustee may make

Page 6 of 18 Pages
H1142_81.01

003190

such distribution directly to the Internal Revenue Service for the benefit of such person.

5.7   Partial and Final Distributions.  The Trustee, in making or preparing to make a partial or final distribution, may prepare an accounting and may require any or all of the following as a condition to payment:  a written and acknowledged statement from each distributee that the accounting has been thoroughly examined and accepted as correct; a discharge of the Trustee; a release from any loss, liability, claim, or question concerning the exercise of due care, skill, and prudence of the Trustee in the management, investment, retention, and distribution of property during the Trustee's term of service (except for any undisclosed error or omission having basis in fraud or bad faith); and/or an indemnity for the benefit of the Trustee, to include the payment of attorney's fees, from any asserted claim of any taxing agency, governmental authority, or other claimant.  Any Beneficiary having a question or potential claim may require an audit of the Trust as an expense of administration.  Failure to require the audit prior to acceptance of the Trustee's report or the acceptance of payment will operate as a final release and discharge of the Trustee except as to any error or omission having basis in fraud or bad faith.

5.8   Contingent Trust for Certain Beneficiaries.  The interest of any Beneficiary who has not attained the age of thirty (30) years (the "Required Age") or who may be otherwise legally disabled and whose interest is not otherwise covered by the provisions of this Trust Declaration may, in the sole and absolute discretion of the Trustee, be continued in Trust or be held as a separate trust, for the use and benefit of that person until such person shall attain the Required Age or until such person is no longer disabled.  For so long as the Trustee holds the Trust for a Beneficiary pursuant to these terms, the Beneficiary, using the Qualified Beneficiary Designation, shall have the right to appoint the Beneficiaries of his or her interest in the Trust entitled to his or her interest upon the death of the Beneficiary.  If the Beneficiary dies prior to a final distribution of his or her interest from the Trust without having made a Qualified Beneficiary Designation, that person's interest in the Trust will pass *per stirpes* to his or her issue then living, or if none, *per stirpes* to the issue of the Trustor then living.

Page 7 of 18 Pages
B114Z_81.01

6.    Powers of the Trustee.    In order to carry out the purposes of this Trust Declaration, the Trustee, in addition to all other powers granted by law, shall have the following powers and discretions.

   6.1    Retain Assets.    The Trustee shall have the power to continue to hold any and all property received by the Trustee or subsequently added to the Trust Estate or acquired pursuant to proper authority if and as long as the Trustee, in exercising reasonable prudence, discretion, and intelligence, considers that the retention is in the best interest of the Trust.

   6.2    Investments.    The Trustee shall have the power to invest and reinvest in every kind of property, real, personal, or mixed, and every kind of investment, specifically including, but not by way of limitation, corporate obligations of every kind, and stocks, preferred or common, without regard to risk of loss or decline in value.

   6.3    Management of Securities.    The Trustee shall have the power to exercise, respecting securities held in the Trust Estate, all the rights, powers, and privileges of owners, including, but not limited to the power to vote, give proxies, and to pay assessments and other sums deemed by the Trustee necessary for the protection of the Trust Estate; to participate in voting trusts, pooling agreements, foreclosures, reorganizations, consolidations, mergers, and liquidations, and in connection therewith to deposit securities with and transfer title to any protective or other committee under such terms as the Trustee may deem advisable; to exercise or sell stock subscription or conversion rights; to accept and retain as an investment any securities or other property received through the exercise of any of the foregoing powers, regardless of any limitations elsewhere in this instrument relative to investments by the Trustee.

   6.4    Form of Ownership of Trust Property.    The Trustee shall have the power to hold securities or other Trust property in the name of the Trustee as Trustee under this Trust Declaration or in the Trustee's own name or in the name of a nominee or in such conditions where ownership will pass by delivery.

   6.5    Business Interests.    The Trustee shall have the power to continue and operate, to sell or to liquidate, as the Trustee deems advisable at the risk of the Trust Estate,

Page 8 of 18 Pages
E1142_81.01

any business or partnership interests received by the Trust Estate.

6.6   Sell and Exchange.   The Trustee shall have the power to sell for cash or on deferred payments and on such terms and conditions as are deemed appropriate by the Trustee, whether at public or private sale, to exchange, and to convey any property of the Trust Estate.

6.7   Abandonment of Trust Assets.   The Trustee shall have the power to abandon any Trust asset or interest therein in the discretion of the Trustee.

6.8   Option.   The Trustee shall have the power to grant an option involving disposition of a Trust asset and to take an option for the acquisition of any asset by the Trust Estate.

6.9   Lease.   The Trustee shall have the power to lease any real or personal property of the Trust Estate for any purpose for terms within or extending beyond the duration of the Trust.

6.10   Property Management.   The Trustee shall have the power to manage, control, improve, and repair real and personal property belonging to the Trust Estate.

6.11   Development of Property.   The Trustee shall have the power to partition, divide, subdivide, assign, develop, and improve any Trust property; to make or obtain the vacation of plats and adjust boundaries or to adjust difference in valuation on exchange or partition by giving or receiving consideration; and to dedicate land or easements to public use with or without consideration.

6.12   Repair, Alter, Demolish, and Effect.   The Trustee shall have the power to make ordinary and extraordinary repairs and alterations in buildings or other trust property, to demolish any improvements, to raze party walls or buildings, and to erect new party walls or buildings as the Trustee deems advisable.

6.13   Borrowing and Encumbering.   The Trustee shall have the power to borrow money for any Trust purpose from any person, firm, or corporation on the terms and conditions deemed appropriate by the Trustee and to obligate the Trust Estate for repayment, upon such terms and conditions (including a term extending beyond the duration of the Trust) as the Trustee deems advisable; to encumber the Trust Estate or any of its property by mortgage, deed of

Page 9 of 18 Pages

81142_81.01

UNOFFICIAL COPY

003193

trust, pledge, or otherwise, using whatever procedures to consummate the transaction deemed advisable by the Trustee; and to replace, renew, and extend any encumbrance and to pay loans or other obligations of the Trust Estate deemed advisable by the Trustee.

6.14 Natural Resources.  The Trustee shall have the power to enter into oil, gas, liquid or gaseous hydrocarbon, sulphur, metal and any and all other natural resource leases on terms deemed advisable by the Trustee, and to enter into any pooling, unitization, repressurization, community, and other types of agreements relating to the exploration, development, operation, and conservation of properties containing minerals or other natural resources; to drill, mine, and otherwise operate for the development of oil, gas, and other minerals; to contract for the installation and operation of absorption and repressurizing plants; and to install and maintain pipelines.

6.15 Insurance.  The Trustee shall have the power to procure and carry at the expense of the Trust Estate insurance of the kinds, forms, and amounts deemed advisable by the Trustee to protect the Trust Estate and the Trustee against any hazard.

6.16 Enforcement of Hypothecations.  The Trustee shall have the power to enforce any deed of trust, mortgage, or pledge held by the Trust Estate and to purchase at any sale thereunder any property subject to any such hypothecation.

6.17 Extending Time of Payment of Obligations.  The Trustee shall have the power to extend the time of payment of any note or other obligation held in the Trust Estate, including accrued or future interests, in the discretion of the Trustee.

6.18 Adjustment of Claim.  The Trustee shall have the power to compromise, submit to arbitration, release with or without consideration, or otherwise adjust claims in favor of or against the Trust Estate.

6.19 Litigation.  The Trustee shall have the power to commence or defend at the expense of the Trust Estate any litigation affecting the Trust or any property of the Trust Estate deemed advisable by the Trustee.

6.20 Administration Expenses.  The Trustee shall have the power to pay all taxes, assessments, compensation of the Trustee, and all other expenses incurred in the collection, care, administration, and protection of the Trust Estate.

Page 10 of 18 Pages

B1142_81.01

003194

6.21  <u>Employment of Attorneys, Advisers, and Other Agents</u>.  The Trustee shall have the power to employ any attorney, investment adviser, accountant, broker, tax specialist, or any other agent deemed necessary in the discretion of the Trustee and to pay from the Trust Estate reasonable compensation for all services performed by any of them.

6.22  <u>Termination by Trustee of Small Trust</u>.  The Trustee shall have the power to terminate, in the discretion of the Trustee, the Trust held for the Beneficiaries if the fair market value of the Trust at any time becomes less than $25,000.00 and, regardless of the age of the Beneficiaries to distribute the principal and any accrued or undistributed income to the Beneficiaries, or to their respective guardians, conservators, or other fiduciaries.

6.23  <u>Distribution</u>.  The Trustee shall have the power on any partial or final distribution of the income or principal of the Trust Estate, to apportion and allocate the assets of the Trust Estate in cash or in kind, or partly in cash and partly in kind, or in undivided interests in the manner deemed advisable in the discretion of the Trustee and to sell any property deemed necessary by the Trustee to make the distribution.

6.24  <u>Merger</u>.  The Trustee shall have the power to merge this Trust with any trust established for the benefit of substantially the same beneficiaries as the Beneficiaries of this Trust and to manage and administer the respective Trusts and Trust Estate as one Trust and Trust Estate subject to the terms and conditions of the Trust Declaration governing each of said Trusts.

6.25  <u>General</u>.  The Trustee shall have the power to do all the acts, to take all the proceeds, and to exercise all the rights, powers, and privileges which an absolute owner of the property would have.  The enumeration of certain powers in this Trust Declaration shall not limit the general or implied powers of the Trustee.  The Trustee shall have all additional powers that may now or hereafter be conferred by law or that may be necessary to enable the Trustee to administer the Trust in accordance with the provisions of this Trust Declaration, subject to any limitations specified in this Trust Declaration.  The Trustee shall further have the discretion to maintain reserves for depreciation and/or depletion.

Page 11 of 18 Pages
81142_81.01

7.  **Duties and Compensation of the Trustee.**

7.1  **Allocation of Income and Principal.**  The Trustee shall determine what is income and what is principal of the Trust created under this Trust Declaration and what expenses, costs, taxes, and charges of any kind whatsoever shall be charged against income and what shall be charged against principal in accordance with the applicable statutes of the State of Texas as they now exist and may from time to time be enacted, amended, or repealed.

7.2  **Relations With Trustee.**  No one dealing with the Trustee need inquire concerning the validity of anything the Trustee purports to do, or need see to the application of any money paid or any property transferred to or upon the order of the Trustee.

7.3  **Compensation.**  Unless such fee is waived or unless specific provision is otherwise made in the appointment of any Trustee, each Trustee shall be entitled to reasonable compensation for services as Trustee in accordance with the usual and customary charges in the community where and when such services are rendered.  The fee schedules of area trust departments prescribing fees for the same or similar services may be used to establish reasonable compensation.  A Trustee will be entitled to full reimbursement for expenses, costs, or other obligations incurred as the result of service, including attorney's, accountant's, and other professional's fees.

7.4  **Exculpation From Liability of Trustee.**  The Trustee shall not be liable for any error or judgment or for any act done or omitted by the Trustee in good faith or for anything which the Trustee may in good faith do or refrain from doing in connection with this Trust.  Accordingly, the Trustee shall not incur any liability with respect to any action taken or omitted in good faith upon the advice of counsel given in respect to any questions relating to the duties and responsibilities of the Trustee under this Trust Declaration or any action taken or omitted in reliance upon any instrument, including the written advice provided for herein, not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and accuracy of any information contained therein, which the Trustee shall in good faith believe to be genuine, to have been signed and presented by a proper person or persons, and to have conformed with the provisions of this Trust Declaration. The parties acknowledge and agree that the Trustee has no obligations to the Trust or any Beneficiary to offer to the Trust any investment opportunities presented to

Page 12 of 18 Pages

H1142_81.01

UNOFFICIAL COPY

003196

Trustee individually during the term of the Trust Declaration.

7.5  Indemnity.  The Trustor shall at all times release and indemnify any successor Trustee and hold such successor Trustee harmless against any and all claims, suits, actions, debts, damages, costs, charges, and expenses, including court costs and attorney's fees, and against all liabilities, losses, or damages of any nature whatsoever that the Trustee shall at any time sustain or suffer in connection with acceptance or appointment as Trustee under this Agreement or as a result or arising out of the acquisition of any assets contributing to the Trust Estate, except to the extent of any such matter arising by reason or in consequence of the fraud or bad faith of the Trustee.

7.6  Bond.  No bond shall be required of the original Trustee hereunder.  Unless any instrument appointing a successor may provide otherwise, no bond shall be required of any successor Trustee; or if a bond is required by law, no surety shall be required on such bond.

7.7  Resignation.  Any Trustee of this Trust may at any time resign with respect to such Trust, with or without cause, effective ninety (90) days after delivery of notice of resignation thereof in writing to each current Beneficiary of this Trust.  If such Beneficiary is a minor, such delivery may be made to any guardian of such minor Beneficiary or to any adult with whom such minor Beneficiary resides.

7.8  Removal of a Trustee.  The Beneficiaries who are then entitled to receive distributions of income from the Trust or distributions of income from any separate trust created by this Trust Declaration may remove any corporate Trustee then serving, the notice of removal to be delivered in writing to the corporate Trustee.  Unless this Trust Declaration or any instrument appointing a successor provides otherwise, the selection of a successor to the corporate Trustee will be made by a court of competent jurisdiction.  In the event there is more than one Beneficiary entitled to the income from the Trust, all income Beneficiaries must join in the written notice of removal.  The consent of any person who is deceased or legally disabled will not be required in meeting the unanimous consent requirements for removal.

7.9  Liability of Trustee.  The Trustee in carrying out the Trustee's powers and performing the Trustee's duties may act in the

Page 13 of 18 Pages
H1142_81.01

003197

Trustee's discretion and shall be personally or individually liable only for fraud or acts or omissions in bad faith.  No Trustee shall be liable individually or personally for any act or omission of any agent or employee of Trustee unless the Trustee shall have acted in bad faith in the selection and retention of such agent or employee.

7.10  Accounts.  The Trustee shall each year render an account of the administration of the Trust hereunder to each living Primary Beneficiary.  If a Federal Fiduciary Income Tax Return is then required for this Trust, such accounting may be made by submission of a copy of such return filed for the Trust.  If no objection to an accounting has been made in writing by such Primary Beneficiary within sixty (60) days after the date of mailing of such accounting by the Trustee, it shall be deemed approved.  Such approval of such account shall, as to all matters and transactions stated therein or shown thereby be final and binding upon all persons (whether in being or not) who are then or may thereafter become interested in, or entitled to share in, either the income or the principal of such Trust, provided always, however, that nothing contained in this Section 7.10 shall be deemed to give such person (or the guardian or representative) acting in conjunction with the Trustee the power to alter, amend, revoke, or terminate the Trust.

7.11  Multiple Trustees.  In the event that there are two or more Trustees serving the Trust, all Trustees must sign any instrument transferring real property from the Trust.  If the Trustees agree to do so, one Trustee acting alone may be given the primary responsibility of administration and accounting, and one Trustee alone may be authorized to deposit, transfer, and withdraw funds from any depository account held by the Trust.  The authority vested in two Trustees may be exercised only by both of the Trustees; and, subject to the foregoing provisions, the authority vested in three or more trustees may be exercised by a majority of the Trustees.  In the event of an action or decision by a majority, the non-consenting Trustee will not be responsible for the act of the majority.

8.  Spendthrift Provision.  The interests of each of the Beneficiaries in the principal or income of the Trust created hereunder shall not be subject to the claims of his or her creditors or creditors of others, including creditors of a spouse of a married Beneficiary, nor to legal process, and may not be voluntarily or involuntarily alienated or encumbered until actually distributed to such Beneficiary.

Page 14 of 18 Pages

EI142_8).01

003198

9. **Perpetuities Savings Clause.** Unless sooner terminated as otherwise provided in this Trust Declaration, the Trust created herein shall fully cease and terminate twenty-one (21) years after the date of the last survivor of the Trustor, the Primary Beneficiaries, and the children of each of the Primary Beneficiaries in existence as of the date of this Trust. Upon such termination, the entire principal of the Trust Estate of the Trust, together with any undistributed income therefrom, shall vest in and be distributed to the persons entitled to take under the provisions of the Trust.

10. **In Terrorem Provision.** If any person entitled to receive any interest from this Trust shall contest the validity of this Trust or any provision thereof or shall institute or join in (except as a party defendant) any proceeding to contest the validity of this Trust or to prevent any provision thereof from being carried out in accordance with its terms (regardless of whether or not such proceedings are instituted in good faith and with probable cause), then all benefits provided to such person in this Trust shall be revoked, and such benefits shall pass as if such person were not then living.

11. **Construction of Trust.**

11.1 **Governing Law.** This Trust Declaration shall be governed by the laws of the State of Texas.

11.2 **Severability.** If any part, clause, provision, or condition of this Trust Declaration is held to be void, invalid, or inoperative, such voidness, invalidity, or inoperativeness shall not affect any other clause, provision, or condition hereof; but the remainder of this Trust Declaration shall be effective as though such clause, provision, or condition had not been contained herein.

11.3 **Interpretative Clause.** As used in this Trust Declaration, the masculine, feminine, or neuter gender, and the singular or plural number shall each be deemed to include the others whenever the context so indicates.

11.4 **Notices.** All communications required to be given to the Trustor, the initial Trustee hereunder, or the Primary Beneficiaries (including notice of change of address) shall be in writing and shall be deemed to be duly given if and when personally delivered, or, if mailed via certified mail, return receipt requested, when tendered into the care and custody of the United States postal service properly addressed to as follows:

Page 15 of 18 Pages

B1142_81.01

003199

If to Trustor or Trustee:

HOLLI HARDIN FONTENOT
6002 Burning Tree Drive
Houston, Texas   77036


If to Primary Beneficiaries:

Dallas Joseph Fontenot, Jr.
6002 Burning Tree Drive
Houston, Texas   77036

Anne S. Fontenot
8526 Leader
Houston, Texas   77036

Dallas Joseph Fontenot, III
8526 Leader
Houston, Texas   77036

Michelle Anne Fontenot
8526 Leader
Houston, Texas   77036

11.5  Copies.  To the same extent as if it were the original, anyone may rely on a copy of this Trust Declaration certified by a notary public to be a true copy of this Trust Declaration.  Anyone may rely on any statement of fact certified by anyone who appears from the original Trust Declaration or a certified copy thereof to be a Trustee hereunder.

IN WITNESS WHEREOF, I, the undersigned, HOLLI HARDIN FONTENOT, attest that I have executed this Declaration of Trust and that the terms thereof will bind me and my successors and assigns, my heirs and personal representatives, and any Trustee of this Trust.  This Trust Declaration has been signed by the Trustor on the Effective Date.

HOLLI HARDIN FONTENOT

Page 16 of 18 Pages

HJ142_81.01

003200

THE STATE OF TEXAS      §
                        §
COUNTY  OF  HARRIS      §

       This instrument was acknowledged before me on this the 5th day of June, 1991, by HOLLI HARDIN FONTENOT.



Notary Public in and for
The State of T E X A S

(Printed or Typed Name of Notary)

(Commission Expiration Date)

## ACCEPTANCE BY TRUSTEE

I acknowledged that I have been appointed as a Trustee of THE HOLLI ANN HARDIN TRUST NUMBER ONE, and I hereby evidence my acceptance of the office of Trustee and will hold and administer the Trust according to the provisions thereof as required by law.

Date: _____ June 5, 1991

_____
HOLLI HARDIN FONTENOT

Page 17 of 18 Pages
81142_81.01

UNOFFICIAL COPY

003201

THE STATE OF TEXAS    §

COUNTY OF HARRIS    §

     This instrument was acknowledged before me on this the 5th day of June, 1991, by HOLLI HARDIN FONTENOT, TRUSTEE.

Notary Public in and for
The State of T E X A S

(Printed or Typed Name of Notary)

(Commission Expiration Date)

Page 18 of 18 Pages

H1142_81.01

003202

TO WHOM IT MAY CONCERN:

I, Holli Ann Hardin Fontenot, hereby voluntarily resign as trustee of the Holli Ann Hardin Fontenot Trust Number One and the Dakota Trust. This resignation as trustee shall be effective immediately upon acceptance by Dallas J. Fontenot, Jr.

Very truly yours,

Holli Ann Hardin Fontenot

UNOFFICIAL COPY

Agreed and accepted this __8__ day of __Sept__, 1996.

Dallas J. Fontenot, Jr.

LDK238:19

003203

EXHIBIT

B

---

# TRUST DECLARATION
# DAKOTA TRUST

---

THIS TRUST DECLARATION is made this day by declaration of Holli Hardin Fontenot ("Settlor"), who presently resides in Fort Bend County, Texas.

## ARTICLE I.
## TRUST BENEFICIARY

This Trust is created for the use and benefit of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot. The term "Trust Beneficiary" or "beneficiary" will also mean any and all persons, organizations, trusts, and entities who may have or may acquire a beneficial interest in this Trust, whether vested or contingent in nature, including a transfer of an interest in the Trust during the life of either Dallas Joseph Fontenot, Jr. or Holli Hardin Fontenot, or both, or from the exercise of a power of appointment by a Trust Beneficiary or otherwise.

For reference, the only child of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot is Dakota James Fontenot, who was born on June 22, 1994. Holli Hardin Fontenot has no other children born to her or adopted by her on the date of this Trust Declaration.

For reference, the only other children of Dallas Joseph Fontenot, Jr. are: Dallas Joseph Fontenot, III (who was born on March 29, 1969) and Michelle Anne Fontenot (who was born on March 12, 1970). Dallas Joseph Fontenot, Jr. has no other children born to him or adopted by him on the date of this Trust Declaration.

## ARTICLE II.
## INITIAL TRUST CORPUS AND RIGHT TO ADD TO THE TRUST

A.    **INITIAL TRUST CORPUS.** Settlor does hereby declare that from and after the date of this Trust Declaration, Settlor holds in trust the assets described in Schedule A attached to this Declaration, which assets are the initial corpus of this Trust and as Trustee acknowledges receipts of those assets. Settlor or any other person, trust, or entity may add property of any

003271

character to this Trust by a Last Will and Testament, from another trust (whether inter vivos or testamentary), or by deed or other transfer, subject only to the acceptance thereof by the Trustee.

B.    **ADDITIONS TO TRUST CORPUS.**  Additional contributions may be made to the corpus of the Trust, including testamentary contributions.

C.    **SEPARATE PROPERTY.**  The assets of this trust are the separate property of Holli Hardin Fontenot.  No inter vivos transfer of property will be made to this Trust unless the property constitutes the separate property of Holli Hardin Fontenot. Holli Hardin Fontenot may make a testamentary contribution of property to this Trust, and such contribution may constitute the separate property of Holli Hardin Fontenot and Holli Hardin Fontenot's interest in community property.

## ARTICLE III.
### NO REVOCATION OR AMENDMENT

A.    **TRUST IS IRREVOCABLE.**  This Trust is an irrevocable Trust.

B.    **THIS TRUST MAY NOT BE AMENDED.**  This Trust Declaration may not be amended, except by a Court of competent jurisdiction under the doctrine of *cy pres*.

C.    **INCOME TAX MATTERS.**  For so long as the Settlor or Dallas Joseph Fontenot, Jr. is a Trustee of the Trust, the Trust will be treated for income tax reporting purposes as a Grantor Trust under Treasury Regulation § 1.671-4(b).  Thereafter, the Trust is to be treated for income tax purposes as required by the applicable provisions of Subchapter J of the Internal Revenue Code.

## ARTICLE IV.
### DEFINITIONS

A.    **DESCENDANTS.**  The term "Descendants" means the legitimate children of the person designated and the legitimate lineal descendants of such children.  The term includes any person adopted before attaining age eighteen (18) and the adopted person's legitimate lineal descendants.  A posthumous child shall be considered as living at the death of his parent.

Page 2 of 23 Pages

B.  **HEIRS AT LAW.**  Whenever a trustee, or a legal advisor to the Trustee is called upon to determine the heirs at law of Settlor, or any other person beneficially interested in this Trust, the determination will be made to identify those individuals, other than creditors, who would receive the personal property of a decedent upon his or her death as determined in accordance with the laws of intestate succession of the State of Texas, United States of America, determined as if the decedent had then died single, intestate, and domiciled in Texas and further determined as if the Settlor of this Trust had predeceased the person or persons so named or described.

C.  **INCOMPETENT, DISABILITY.**  A beneficiary will be considered "incompetent" or "disabled" if he or she is incapacitated to an extent to make it impossible or impractical to give prompt and intelligent consideration to business matters.  The Trustee may act upon such evidence as the Trustee reasonably deems appropriate and reliable without liability by reason thereof.

D.  **MINOR BENEFICIARY.**  The term "Minor Beneficiary" or "Minor" identifies a beneficiary who is less than 21 years of age.

E.  **PER STIRPES.**  Whenever a distribution is directed to be made to the descendants, *per stirpes*, of any person or persons, including the descendants of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot, the property to be distributed shall be divided into as many equal shares as there are then living children of each of those persons and deceased children of each those persons who have descendants then living.  Each then living child of such person shall take one share, and the share for the descendants of each deceased child shall be divided among the deceased child's then living descendants on a *per stirpes* basis.

For example, if a distribution were to be made to the descendants, *per stirpes*, of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot, assuming the recitations in Article I, the property to be distributed would be divided into three equal shares, one for each of Dallas Joseph Fontenot, III, Michelle Anne Fontenot, and Dakota James Fontenot.

F.  **RELATIVE OR RELATIVES.**  Reference to a "Relative" or "Relatives" will identify any person or persons related to Settlor by blood or lawful adoption in any degree.

Page 3 of 23 Pages

G.    **POWER OF APPOINTMENT, QUALIFIED BENEFICIARY DESIGNATION.** Whenever this Trust Declaration gives a Trust Beneficiary the power or authority to appoint a beneficiary of the Trust, the designation must be in writing and be acknowledged in the form required of acknowledgements by Texas law or exercised by a will executed with the formalities required by law of the Trust Beneficiary's residence; it must clearly evidence the intent of the Trust Beneficiary to exercise a power of appointment; and the written beneficiary designation must have been delivered to the Trustee prior to the Trust Beneficiary's death or, if exercised by will, the will must have been filed for probate within three months from the date of the Trust Beneficiary's date of death and must subsequently be admitted to probate no matter the time interval.  The term of this Trust may be extended if the qualified beneficiary designation requires that a Beneficiary's interest remain in Trust, or may be divided and be held as a separate trust which is governed by the terms of this Trust Declaration.

H.    **SURVIVE.** For the purpose of vesting in the event two or more persons who have an interest in the trust die within a short time of one another, one must have survived the other for a period of at least 90 days as a condition to vesting.

I.    **TESTAMENTARY CONTRIBUTIONS.** The term "testamentary contributions" will mean any contribution to the Trust made by reason of the death of a person, including transfers made under the direction of a will, a beneficiary designation in a life insurance policy or other contract, by reason of survivorship language contained in a depository contract, or transfers from another Trust which designates this Trust as a beneficiary.

J.    **TRUST.** "Trust" means the Trust created by this Trust Declaration

K.    **TRUST DECLARATION.** The term "Trust Declaration" and the term "Trust Agreement" each refer to this Trust Declaration.

L.    **TRUST FUND.** The term "Trust Fund" or "Trust Property" means all property comprising: the initial contribution of corpus to the Trust; all property paid or transferred to, or otherwise vested in, the Trustee as additions to the corpus of this Trust; accumulated income, if any, whether or not added to the corpus of this Trust; and the investments and reinvestment of the Trust property, including the increase and decrease in the values thereof as determined from time to

003274

time.    The terms "corpus" and "principal" are used interchangeably.

M.   **TRUSTEE.**  For convenience, the term "Trustee," used in the singular, will mean and identify multiple Trustees serving and acting pursuant to the directions of this Trust Declaration. The term "corporate Trustee" will identify a banking or trust corporation with trust powers.

N.   **GENDER, PLURAL USAGE.**  The use of personal pronouns, such as he, she, or it, are to be construed in context.  The term "person" will include a non-person, such as a corporation, trust, partnership or other entity as is appropriate in context.    The identification of person in the plural will include the singular and *vice versa*, as is appropriate in context.

<div align="center">

ARTICLE V.

**APPOINTMENT OF TRUSTEE**

</div>

A.   **ORIGINAL APPOINTMENT.**  Holli Hardin Fontenot shall serve as initial Trustee of this Trust.

B.   **FIRST SUCCESSOR.**  In the event that Holli Hardin Fontenot should die, resign, or become incapacitated or unable to act as Trustee of this Trust, or in the event that Holli Hardin Fontenot should subsequently become divorced from Dallas Joseph Fontenot, Jr., then Dallas Joseph Fontenot, Jr. shall serve as successor Trustee of this Trust.  In the event that Dallas Joseph Fontenot, Jr. should elect not to serve as Trustee of this Trust, Dallas Joseph Fontenot, Jr. will have the right to appoint a successor or successors to serve as Trustee, as set forth in Section V.C below, and he may specify any conditions upon succession and service as may be permitted by law.

Holli Hardin Fontenot acknowledges and agrees that the rights and obligations of Holli Hardin Fontenot to serve as Trustee and to resign as Trustee in accordance with the foregoing have been and are the subject of separate consideration, receipt of which is hereby acknowledged in full; and such rights and obligations are in the best interest of the administration of the Trust for its Beneficiaries.  Holli Hardin Fontenot specifically waives any rights which she may have to rescind

UNOFFICIAL COPY

003275

or revoke her obligation to resign as Trustee upon divorce from Dallas Joseph Fontenot, Jr.

C. **SUCCESSION.** Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment will have the right to appoint a successor or successors to serve as Trustee in the event that person ceases to serve for any reason, and each Trustee may specify any conditions upon succession and service as may be permitted by law. For example, a successor may be required to furnish a fiduciary bond as a prerequisite or a successor's service may be conditioned upon another appointee's death, resignation, or inability to serve. Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment may also provide that one or more designated successors as Trustee will have the authority to appoint his, her, or its successor as Trustee. An appointment of successor Trustee must be in writing and must be acknowledged to be effective. Unless other specified by a Trustee in a written designation of succession, succession is to be determined as follows.

If a Trustee by original appointment does not appoint a successor, the remaining Trustee or Trustees then serving will continue service alone. If all Trustees by original appointment fail or cease to serve for any reason without having appointed a successor or successors, the successor or successors as Trustee will be as named below and in the order of succession herein prescribed.

FIRST:    Dallas Joseph Fontenot, III

BUT:    Settlor specifically provides that upon assumption of actual service as Trustee, Dallas Joseph Fontenot, III will have the right to appoint Dallas Joseph Fontenot, III's successor as Trustee, and to vest in a successor Trustee, upon assumption of that person's service, the right and authority to designate succession as Trustee. To the extent this is done, the appointment of succession will supersede the appointments which follow the designation of Dallas Joseph Fontenot, III as Trustee.

NEXT:    Michelle Anne Fontenot

BUT:    Settlor specifically provides that upon assumption of actual service as Trustee, Michelle Anne Fontenot will have the right to appoint Michelle Anne Fontenot's successor as Trustee, and to vest in a successor Trustee, upon assumption of that person's service, the right and

Page 6 of 23 Pages

003276

authority to designate succession as Trustee. To the extent this is done, the appointment of succession will supersede the appointments which follow the designation of Michelle Anne Fontenot as Trustee.

FINALLY: First Interstate Bank of Texas, N.A., in the event all of the above, including duly appointed successors, fail or cease to serve for any reason. The appointment of First Interstate Bank of Texas, N.A. as Trustee will include any successor to First Interstate Bank of Texas, N.A. by reason of its merger, reorganization, or sale to another banking corporation with trust powers or a trust company with trust powers.

D.    **AUTHORITY OF SUCCESSOR TRUSTEE.** A successor will have the authority vested in a Trustee by original appointment under this Trust Declaration, subject to any lawful limitations or qualifications upon the service of a successor imposed by one Trustee in a written document appointing a successor. A successor Trustee will not be obliged to examine the accounts, records, or acts of the previous Trustee or Trustees; nor will a successor Trustee in any way or manner be responsible for any act or omission to act on the part of any previous Trustee. Reference to "Trustee" in the singular will include the plural.

E.    **BOND.** No one serving as Trustee will be required to furnish a fiduciary bond as a prerequisite to service.

F.    **RESIGNATION OR REMOVAL OF A TRUSTEE.** Any appointee serving or entitled to serve as Trustee may resign at any time and without cause, and the instructions in this Trust Declaration will determine who the successor will be (including successors appointed by a Trustee as herein provided). The trust beneficiary or beneficiaries who are then entitled to receive distributions of income from the trust, or distributions of income from any separate trust created by this document, may remove any corporate Trustee then serving, the notice of removal to be delivered in writing to the corporate Trustee. Unless this Trust Declaration or any instrument appointing a successor provides otherwise, the selection of a successor to the corporate Trustee will be made by a Court of competent jurisdiction. In the event there is more than one beneficiary entitled to the income from the trust, all income beneficiaries must join in the written notice of removal. The consent of any person who is deceased or legally disabled will not be required in meeting the unanimous consent requirements for removal.

Page 7 of 23 Pages

003277

G.   **AFFIDAVIT OF AUTHORITY.**  Any person or entity dealing with the Trust may rely upon the affidavit of a Trustee or Trustees of the Trust:

*On my [our] oath, and under the penalties of perjury, I [we] swear that I [we] am [are] the duly appointed and authorized Trustee[s] of DAKOTA TRUST. I [we] certify that I [we] have not been removed as Trustee[s] and have the authority to act for, and bind, DAKOTA TRUST in the transaction of the business for which this affidavit is given as affirmation of my [our] authority.*

_____
*Signature Line*

*Sworn and subscribed before me, the undersigned authority, by _____ this _____ day of _____, 19___ .*

_____
*Notary Public - State of Texas*

H.   **DOCUMENTING SUCCESSION.**  The successor to any Trustee may document succession with an affidavit setting forth that the preceding Trustee has failed or ceased to serve and the successor has assumed the duties of Trustee.  The affidavit may be filed in the deed records of Fort Bend County, Texas and in each county in which real property held in Trust is located or in the county in which the principal assets and records of the Trust are located.  The public and all persons interested in and dealing with the Trust and the Trustee may rely upon a certified copy of the recorded affidavit as conclusive evidence of a successor's authority to serve and act as the Trustee of the Trust.

I.   **COMPENSATION.**  Any person who serves as Trustee may elect to receive a reasonable compensation, reasonable compensation to be measured by the time required in the administration of the Trust and the responsibility assumed in the discharge of the duties of office.  The fee schedules of area Trust departments prescribing fees for the same or similar services may be used to establish reasonable compensation.  A corporate Trustee will be entitled to receive as its compensation such fees as are then prescribed by its published schedule of charges for Trusts of a similar size and nature and additional compensation for extraordinary services performed by the corporate Trustee.  A Trustee will be entitled to full reimbursement for expenses, costs, or other obligations incurred as the result of service, including attorney's, accountant's, and other professional fees.

J.   **MULTIPLE TRUSTEES.**  In the event there are two Trustees serving the Trust, both must sign any instrument transferring real property from the Trust.  If the Trustees agree to do so, one Trustee acting alone may be given the primary

<center>Page 9 of 23 Pages</center>

003278

responsibility of administration and accounting, and one Trustee alone may be authorized to deposit, transfer and withdraw funds from any depository account held by the Trust. The authority vested in three or more trustees may be exercised by a majority of the trustees. In the event of an action or decision by a majority, the non-consenting Trustee will not be responsible for the act of the majority.

## ARTICLE VI.
### DISTRIBUTIONS FROM THE TRUST,
### LIVING AND POST-MORTEM

A. **FOR SO LONG AS HOLLI HARDIN FONTENOT AND DALLAS JOSEPH FONTENOT, JR. SHALL REMAIN MARRIED.** For so long as Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr. shall remain married, the Trustee may from time to time distribute to or pay for the benefit of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., or either of them, so much of the net income (and, if the net income of the Trust is not sufficient, the principal of the Trust) as the Trustee determines may be necessary for the support, maintenance, health, and general welfare of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., or either of them. Such determination shall be in the absolute discretion of the Trustee, whose decisions shall be binding.

B. **UPON THE TERMINATION BY DIVORCE OF THE MARITAL RELATIONSHIP OF HOLLI HARDIN FONTENOT AND DALLAS JOSEPH FONTENOT, JR.** Upon the termination by divorce of the marital relationship of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., the interest of Holli Hardin Fontenot in this Trust will terminate and this Trust is to be continued in trust for the benefit of Dallas Joseph Fontenot, Jr. as follows:

1. This trust will is to be continued in Trust for the sole use and benefit of Dallas Joseph Fontenot, Jr. for so long as he shall live. Dallas Joseph Fontenot, Jr. will, for the duration of the Trust, be entitled to the net income of the Trust, this amount to be paid in convenient installment payments to be not less than quarter-annually. Distributions of income to Dallas Joseph Fontenot, Jr. shall be made in the amount, form, and manner required by Section 2523(f) of the Internal Revenue Code. If the income known by the Trustee to be available to Dallas Joseph Fontenot, Jr. from other sources is insufficient to provide for his continued

Page 9 of 23 Pages

003279

support and maintenance in good health, the Trustee will have the authority to pay to Dallas Joseph Fontenot, Jr. or apply for his benefit, so much of the principal of the Trust, even to the exhaustion thereof, as is necessary to provide for his support and maintenance in the style and comfort to which he is accustomed and to provide for his medical needs and maintenance of good health. It is intended that the payment of principal be limited by the ascertainable standard provided above, that this provision comply fully with Treasury Regulation §20.2041-1(c)(2), and that this Trust is to be construed and limited to that end. Dallas Joseph Fontenot, Jr. may at any time require that property which does not produce an income or a sufficient income be sold and invested in income producing property.

2. Upon the death of Dallas Joseph Fontenot, Jr., Dallas Joseph Fontenot, Jr., by a clause in his Will in which he specifically exercises this power of appointment, shall have the power to appoint the then remaining trust assets to or for the benefit of any one or more of the descendants of Dallas Joseph Fontenot, Jr. or the descendants of Holli Hardin Fontenot, in such shares, proportions, or amounts, upon such trusts and for such estates as he alone may determine. If Dallas Joseph Fontenot, Jr. fails to exercise this special power of appointment to the fullest extent, then, subject to the other provisions of this Trust, upon his death, the unappointed trust assets shall be delivered to the living descendants of Holli Hardin Fontenot who were born prior to the date of divorce and to the living descendants of Dallas Joseph Fontenot, Jr., per stirpes.

C. **UPON THE DEATH OF HOLLI HARDIN FONTENOT WHILE MARRIED TO DALLAS JOSEPH FONTENOT, JR.** Upon the death of Holli Hardin Fontenot while married to Dallas Joseph Fontenot, Jr. this Trust is to be continued in Trust as follows:

1. This trust will is to be continued in Trust for the sole use and benefit of Dallas Joseph Fontenot, Jr. for so long as he shall live. Dallas Joseph Fontenot, Jr. will, for the duration of the Trust, be entitled to the net income of the Trust, this amount to be paid in convenient installment payments to be not less than quarter-annually. Distributions of income to Dallas Joseph Fontenot, Jr. shall be made in the amount, form, and manner required by Section 2056(b)(7)(B) of the Internal Revenue Code. If the income known by the Trustee to be

003280

available to Dallas Joseph Fontenot, Jr. from other sources is insufficient to provide for his continued support and maintenance in good health, the Trustee will have the authority to pay to Dallas Joseph Fontenot, Jr. or apply for his benefit, so much of the principal of the Trust, even to the exhaustion thereof, as is necessary to provide for his support and maintenance in the style and comfort to which he is accustomed and to provide for his medical needs and maintenance of good health.    It is intended that the payment of principal be limited by the ascertainable standard provided above, that this provision comply fully with Treasury Regulation §20.2041-1(c)(2), and that this Trust is to be construed and limited to that end.  Dallas Joseph Fontenot, Jr. may at any time require that property which does not produce an income or a sufficient income be sold and invested in income producing property.

2.    Upon the death of Dallas Joseph Fontenot, Jr., Dallas Joseph Fontenot, Jr., by a clause in his Will in which he specifically exercises this power of appointment, shall have the power to appoint the then remaining trust assets to or for the benefit of any one or more of the descendants of Dallas Joseph Fontenot, Jr. or the descendants of Holli Hardin Fontenot, in such shares, proportions, or amounts, upon such trusts and for such estates as he alone may determine.    If Dallas Joseph Fontenot, Jr. fails to exercise this special power of appointment to the fullest extent, then, subject to the other provisions of this Trust, upon his death, the unappointed trust assets shall be delivered to the living descendants of Holli Hardin Fontenot and to the living descendants of Dallas Joseph Fontenot, Jr., per stirpes.

D.    **UPON THE DEATH OF DALLAS JOSEPH FONTENOT, JR. WHILE MARRIED TO HOLLI HARDIN FONTENOT.**    Upon the death of Dallas Joseph Fontenot, Jr. while married to Holli Hardin Fontenot, this Trust is to be continued in Trust as follows:

1.    This trust will is to be continued in Trust for the sole use and benefit of Holli Hardin Fontenot for so long as she shall live.    Holli Hardin Fontenot will, for the duration of the Trust, be entitled to the net income of the Trust, this amount to be paid in convenient installment payments to be not less than quarter-annually.    If the income known by the Trustee to be available to Holli Hardin Fontenot from other sources is insufficient to provide for her continued support and

Page 11 of 23 Pages

003281

maintenance in good health, the Trustee will have the authority to pay to Holli Hardin Fontenot or apply for her benefit, so much of the principal of the Trust, even to the exhaustion thereof, as is necessary to provide for her support and maintenance in the style and comfort to which she is accustomed and to provide for her medical needs and maintenance of good health. Holli Hardin Fontenot may at any time require that property which does not produce an income or a sufficient income be sold and invested in income producing property.

2.   Upon the death of Holli Hardin Fontenot, unless Holli Hardin Fontenot shall issue a direction to the contrary, the Trustee will pay from the Trust assets the entire increment in the taxes payable by reason of her death to the extent that the total of such taxes is greater than would have been imposed if the trust assets had not been taken into account in determining such taxes.

3.   Dallas Joseph Fontenot, Jr., by a clause in his Will in which he specifically exercises this power of appointment, shall have the power to appoint the trust assets remaining upon the death of Holli Hardin Fontenot to or for the benefit of any one or more of the descendants of Dallas Joseph Fontenot, Jr. or the descendants of Holli Hardin Fontenot, in such shares, proportions, or amounts, upon such trusts and for such estates as he alone may determine. If Dallas Joseph Fontenot, Jr. fails to exercise this special power of appointment to the fullest extent, then, subject to the other provisions of this Trust, upon his death, the unappointed trust assets shall be delivered to the living descendants of Holli Hardin Fontenot and to the living descendants of Dallas Joseph Fontenot, Jr., *per stirpes*.

E.   **ELECTION, QUALIFIED TERMINABLE INTEREST PROPERTY.** It is important to emphasize that upon the death of Holli Hardin Fontenot, or the termination by divorce of the marital relationship of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., Dallas Joseph Fontenot, Jr. will have no more than a life interest in the Trust. Dallas Joseph Fontenot, Jr. will have no right or power to revoke or amend this Trust. The Trustee may, without liability for doing so or the failure to do so, elect to treat all or a part of the Trust as Qualified Terminable Interest Property pursuant to the requirements of Section 2056(b)(7) or Section 2523(f) of the Internal Revenue Code, whichever is applicable. To the extent that an election is made, and unless Dallas Joseph Fontenot,

003282

Jr. shall issue a direction to the contrary, the Trustee will pay from the Trust assets the entire increment in the taxes payable by reason of his death to the extent that the total of such taxes is greater than would have been imposed if the property treated as qualified terminable interest property had not been taken into account in determining such taxes. To the extent a partial election is made, and to the extent and in the manner then permitted by law, the Trustee will have the authority (1) to divide the Trust into separate trusts to reflect the partial election, or (2) to continue the Trust as a whole, with the fraction or percentage of the whole representing the elective share to be administered and maintained in a manner to reflect its proportionate share of the increment or decline in the whole of the property for the purposes of applying Sections 2044 and 2519 of the Internal Revenue Code. If the Trust is divided into separate parts, the Trustee will make the division according to the fair market value at the time the division is made. It is Settlor's intent and purpose to comply with state and federal law so that the least amount of federal estate tax will be payable upon the deaths of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., and this Trust Declaration is to be applied and construed to accomplish this objective.

F.    **DIVISION INTO SEPARATE TRUSTS.** If, following the death of Holli Hardin Fontenot or the termination by divorce of the marital relationship between Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot, the Trust is divided into separate trusts, the appreciation or depreciation in the value of each such trust or account will measure the value thereof for the purpose of disposition and taxation. For example, if the Trustee elects to treat all but $600,000 of the Trust assets as qualified terminable interest property for the federal estate tax marital deduction, and, if the Trustee segregates the $600,000 amount into a separate trust, the amount distributable therefrom upon the death of Dallas Joseph Fontenot, Jr. will be the value of that account upon the death of Dallas Joseph Fontenot, Jr. If, however, the $600,000 amount represents 25 percent of the total trust estate, and is continued and maintained as a fractional percentage of the whole, the value of the fractional interest upon the death of Dallas Joseph Fontenot, Jr. is to be determined with regard to its proportional share of any increase or decrease in the value of the whole.

G.    **ITEMS OF TANGIBLE PERSONAL PROPERTY IN TRUST.** Holli Hardin Fontenot may have certain items of tangible personal property which are her separate property and which have been

003283

transferred to the Trust or otherwise subject to the Trustee's control. The term "personal belongings" or "tangible personal property" will mean and identify personal wearing apparel, jewelry, household furnishings and equipment, books, albums, art work, entertainment and sports equipment, and all items of decoration or adornment. Holli Hardin Fontenot may at any time and from time to time deliver to the Trustee written instructions as to any living or post mortem gifts of such personal belongings, and the Trustee shall be authorized and bound to make disposition of these items as Holli Hardin Fontenot has reasonably directed.

H.  **PARTIAL AND FINAL DISTRIBUTIONS.** The Trustee, in making or preparing to make a partial or final distribution, may prepare an accounting and may require, as a condition to payment, a written and acknowledged statement from each distributee that the accounting has been thoroughly examined and accepted as correct; a discharge of the Trustee; a release from any loss, liability, claim or question concerning the exercise of due care, skill, and prudence of the Trustee in the management, investment, retention, and distribution of property during the Trustee's term of service, except for any undisclosed error or omission having basis in fraud or bad faith; and an indemnity of the Trustee, to include the payment of attorney's fees, from any asserted claim of any taxing agency, governmental authority, or other claimant. Any remainder beneficiary having a question or potential claim may require an audit of the Trust as an expense of administration. Failure to require the audit prior to acceptance of the Trustee's report, or the acceptance of payment, will operate as a final release and discharge of the Trustee except as to any error or omission having basis in fraud or bad faith.

The Trustee, in making or preparing to make a partial or final distribution will have the authority to: (1) partition any asset or class of assets and deliver divided and segregated interests to the beneficiaries; (2) sell any asset or class of assets (whether or not susceptible to partition in kind), and deliver to a beneficiary or beneficiaries a divided interest in the proceeds of sale and/or divided or undivided interests in any note and security arrangement taken as part of the purchase price; and/or (3) deliver undivided interests in an asset or class of assets to the beneficiaries subject to any indebtedness which may be secured by the property.

I.  **CONTINUATION OF THE TRUST DURING DISSOLUTION.** The Trust may continue beyond its termination for a time reasonably necessary to conclude the administration of the Trust, pay

003284

expenses of termination and to distribute to the Trust property to those entitled thereto.

J.  **CONTINGENT TRUST FOR CERTAIN BENEFICIARIES.**  The interest of any Trust Beneficiary who has not attained the age of thirty-five (35) years (the "required age"), or who may be otherwise legally disabled, and whose interest is not otherwise covered by the provisions of this Trust Declaration or another Trust, may, in the sole and absolute discretion of the Trustee, be continued in Trust, or be held as a separate trust, for the use and benefit of that person until such person shall attain the required age or until such person is no longer disabled. For so long as the trust shall exist, the Trustee shall hold, manage, and make distributions of income and principal to provide for his or her health, education, support and maintenance.  The Trustee may make an entire distribution of principal to a Trust Beneficiary prior to the required age if, in the Trustee's determination alone, the beneficiary has demonstrated an ability to conserve his or her resources or if it is no longer feasible for the trust to continue considering the size of the trust and the time and cost to maintain the trust.  The Trust Beneficiary, with consent of the Trustee, may also extend the term of the trust.

For so long as the Trust is held for a beneficiary pursuant to these terms, the Trust Beneficiary, using a qualified beneficiary designation, will have the right to appoint the beneficiaries of his or her interest in the Trust entitled to his or her interest upon the Trust Beneficiary's death.  If the Trust Beneficiary dies prior to a final distribution of his or her interest from the Trust, without having made a qualified beneficiary designation, that person's interest will pass *per stirpes* to his or her descendants then living, or if none, *per stirpes* to Settlor's descendants then living.

K.  **PERPETUITIES.**  In no event will the term of this Trust continue for a term greater than twenty-one (21) years after the death of the last survivor of Settlor and all relatives of Settlor living on the effective date of this Trust Declaration.  Any continuation of the Trust by the qualified exercise of a power of appointment will be construed as the creation of a separate trust and an extension of the Rule Against Perpetuities to the extent permitted by law.  A court of competent jurisdiction is to liberally construe and apply this provision to validate an interest consistent with Settlor's intent and may reform or construe an interest according to the doctrine of *cy pres*.

003285

ARTICLE VII.
PAYMENT OF DEBTS, TAXES, AND
SETTLEMENT COSTS
EXERCISE OF ELECTIONS

The following directions concern the payment of debts, taxes, estate and trust settlement costs, and the exercise of any election permitted by Texas law or by the Internal Revenue Code:

A.    **PAYMENT OF INDEBTEDNESS AND SETTLEMENT COSTS.** The Trustee will have the discretionary authority to pay from the Trust Fund the costs reasonably and lawfully required to settle the estate of a deceased beneficiary. In the event there is more than one Trust Beneficiary immediately preceding the death of a beneficiary, distributions of Trust income and principal to pay settlement costs will not exceed that person's trust share or the fair market value of the beneficiary's interest in the Trust which is distributable by reason of his or her death.

B.    **SPECIAL BEQUESTS.** Unless otherwise provided in this Trust document, or in any amendment, or in a document exercising a power to appoint the beneficiaries of this Trust, if property given as a special bequest or gift is subject to a mortgage or other security interest, the designated recipient of the property will take the asset subject to the obligation and the recipient's assumption of the indebtedness upon distribution of the asset to the recipient. The obligation to be assumed shall be the principal balance of the indebtedness on date of death, and the Trust shall be entitled to reimbursement or offset for principal and interest payments paid by the Trust to date of distribution.

C.    **ESTATE, GENERATION SKIPPING, OR OTHER DEATH TAX.** Unless otherwise provided in this Trust document, or in a document exercising a power to appoint the beneficiaries of this Trust, estate, inheritance, succession, or other similar tax shall be charged to and apportioned to those whose gifts or distributive share generate a death tax liability by reason of Settlor's death or by reason of a taxable distribution from the Trust or a taxable termination of the Trust. To the extent Settlor may lawfully provide, a Trustee may pay and deduct from a beneficiary's distributive share (whether the distribution is to be paid outright or is to be continued in Trust) the increment in taxes payable by reason of a required distribution or termination of interest (i.e., estate, gift, inheritance, or generation skipping taxes) to the extent that the total of such taxes payable by reason of a distribution or

Page 16 of 23 Pages

003286

termination is greater than the tax which would have been imposed if the property of the Trust subject to the distribution or termination of interest had not been taken into account in determining the amount of such tax. To the extent a tax liability results from the distribution of property to a beneficiary other than under this Trust, the Trustee will have the authority to reduce any distribution to the beneficiary from this Trust by the amount of the tax liability apportioned to the beneficiary, or if the distribution is insufficient, the Trustee will have the authority to proceed against the beneficiary for his, her, or its share of the tax liability. In making an allocation, the Trustee may consider all property included in the gross estate of the Settlor for federal estate tax purposes, including all property subject to probate, all amounts paid or payable to another as the result of death, including life insurance proceeds, proceeds from a qualified retirement plan or account, proceeds from a joint and survivorship account with a financial institution or brokerage company, proceeds from a buy-sell or redemption contract, and/or any other plan or policy which provides for a payment of death benefits. This provision further contemplates and includes any tax which results from the inclusion of a prior transfer in the federal gross estate of Settlor even though possession of the property previously transferred is vested in someone other than the Trustee. This provision does not include a reduction in the unified credit by reason of taxable gifts previously made by Settlor. If the Trustee determines that the collection of an apportioned tax liability against another is not economically feasible or probable, the tax liability will be paid by the Trust and will reduce the amount distributable to the residuary beneficiaries. The Trustee's judgment with regard to the feasibility of collection is to be conclusive.

D. **SPECIAL ELECTION FOR QUALIFIED TERMINABLE INTEREST PROPERTY.** For the purpose of identifying the "transferror" in allocating a GST exemption, the estate of Holli Hardin Fontenot or the Trustee of this Trust may elect to treat all of the property which passes in Trust to Dallas Joseph Fontenot, Jr. for which a marital deduction is allowed, by reason of Section 2056(b)(7) or Section 2523(f) of the Internal Revenue Code, as if the election to be treated as Qualified Terminable Interest Property had not been made. Reference to the "Special Election For Qualified Terminable Interest Property" will mean and identify the election provided by Section 2652(a)(2) of the Internal Revenue Code. The term "GST Exemption" or "GST Exemption Amount" is the dollar amount of property which may pass as generation skipping transfers under Subtitle B,

Page 17 of 23 Pages

003287

Chapter 13, of the Internal Revenue Code of 1986 which is exempt from the generation-skipping tax.

E.    **ELECTIVE DEDUCTIONS.**  A Trustee will have the discretionary authority to claim any obligation, expense, cost, or loss as a deduction against either estate tax or income tax, or to make any election provided by Texas law, the Internal Revenue Code, or other applicable law, and the Trustee's decision will be conclusive and binding upon all interested parties and shall be effective without obligation to make an equitable adjustment or apportionment between or among the beneficiaries of this Trust or the estate of deceased beneficiary.

### ARTICLE VIII.
### SERVICE OF THE TRUSTEE
### OTHER MATTERS

A.    **GENERAL AUTHORITY.**  A Trustee is to serve without Court supervision.  The service of a Trustee is to be governed first by the terms, conditions, and authority prescribed by this Trust Declaration, and then as prescribed by the trust laws of the State of Texas.

B.    **RETENTION OF ASSETS.**  A Trustee will have the authority to retain, without liability, any and all property in the form in which it is received by the Trustee without regard to its productivity or the proportion that any one asset or class of assets may bear to the whole.  A Trustee will not have liability nor responsibility for loss of income from or depreciation in the value of property which was retained in the form which the Trustee received it.

C.    **UNDIVIDED INTERESTS.**  A Trustee will have the authority to hold, acquire, and dispose of undivided interests in property.

D.    **LENDING, INVESTING.**  A Trustee will have the authority to lend, borrow, lease, sell, and purchase property, including undivided fractional interests in property, upon such terms and conditions as are reasonably prudent under the facts and circumstances then existing. A Trustee may transact business, including lending, borrowing, leasing, and sale, between two or more related trusts or persons upon such terms and conditions as are reasonably prudent under the facts and circumstances then existing.  Without limiting the general authority above given, a Trustee will have the authority to hold, acquire and sell:

UNOFFICIAL COPY

003288

- Publicly traded securities, including stocks, bonds, warrants, futures, mutual funds, partnerships, real estate investment trusts, diversified asset funds.
- Interests in a closely held corporation, partnership, or trust, whether registered or not registered for public sale.
- Obligations of the United States Government or any other government.
- Cash deposits, money market funds, brokerage company accounts, certificates of deposit, savings accounts, and checking accounts, without limitation as to the location of the account or depository.
- Promissory notes, secured and unsecured, including mortgage notes purchased at a discount.
- Land, improved and unimproved, whether presently income producing or held for appreciation in value.
- Land, building and equipment leases.
- Minerals, mineral rights and working interests in mineral producing property or property held for future development.
- Equipment, implements, stock in trade, leasehold improvements, and livestock.
- Insurance policies.

E.   **LIMITATION UPON A TRUSTEE'S LIABILITY.**  A Trustee, other than a banking corporation serving as a Trustee, will not have personal liability for service in a fiduciary capacity other than for acts or omissions to act which, as determined by a court of law, constitute gross negligence or fraud.

F.   **PROTECTION OF THE INTERESTS OF BENEFICIARIES.**  No beneficiary will have the power to anticipate, encumber or transfer any interest in the Trust.  No part of the Trust will be liable for or charged with any debts, contracts, liabilities or torts of a beneficiary or subject to seizure or other process by any creditor of a beneficiary.

G.   **RELATIONSHIP WITH BENEFICIARIES WHO ARE MINORS OR INCOMPETENTS.**  Distributions to an incompetent or disabled beneficiary, or a Minor Beneficiary may be made in such of the following ways as in the Trustee's opinion will be most beneficial to the interests of the beneficiary:  (a) directly to such beneficiary; (b) to his or her parent, guardian or legal representative; (c) to a custodian for said beneficiary under any Uniform Gifts to Minors Act and/or Gifts of Securities to Minors Act in the jurisdiction of residence of such beneficiary; (d) to any person with whom he or she is residing; (e) to some near relative or close friend; or (f) by

Page 19 of 23 Pages

003289

the Trustee using such payment directly for the benefit of such beneficiary, including payments made to or for the benefit of any person or persons whom said beneficiary has a legal obligation to support. The Trustee may in the Trustee's sole discretion instead hold such income or corpus for the account of such beneficiary as custodian. A receipt from a beneficiary or from his parent, guardian, legal representative, relative, close friend, or other person described above shall be a sufficient discharge to the Trustee from any liability for making said payments.

The Trustee is likewise authorized to consult with and act upon the advice of the parent, guardian, custodian, or legal representative of any beneficiary who is either an incompetent or a Minor with respect to any and all matters which may arise under this Declaration and as concerns the rights or interests of said beneficiary. All statements, accounts, documents, releases, notices, or other written instruments, including but not limited to written instruments concerning the resignation or replacement of any Trustee or Trustees, required to be delivered to or executed by such beneficiary may be delivered to or executed by the parent, guardian, custodian, or legal representative of said incompetent or Minor Beneficiary, and when so delivered or executed shall be binding upon said incompetent or Minor Beneficiary, and shall be of the same force and effect as though delivered to or executed by a beneficiary acting under no legal disability.

## ARTICLE IX.
## UNPRODUCTIVE OR UNDERPRODUCTIVE PROPERTY

A beneficiary who is then entitled to the income of the Trust, or the income of any other Trust established or continued pursuant to this trust declaration, will have the authority to issue a written directive to the Trustee to convert Trust Property which does not produce an income, or which is underproductive, into property which is income producing or which will provide a greater income to the trust. Upon actual receipt of an income beneficiary's written directive, the Trustee will reasonably and prudently proceed to convert unproductive or underproductive property into property which will produce a reasonable and safe rate of return. The Trustee may do so by selling the unproductive or underproductive asset upon such terms and conditions as is prudent and reasonable under all circumstances which may then exist (including the acceptance of an income or interest bearing obligation as the whole or a part of the sales price), and investing the proceeds of sale in income producing instruments or obligations. Notwithstanding

003290

these requirements, a Trust Beneficiary cannot direct the Trustee to invest or reinvest trust property in a trust investment which is speculative in nature or which, in result, would violate the spendthrift provisions of this Trust Declaration.

## ARTICLE X.
### NO-CONTEST REQUIREMENTS

Settlor vests in the Trustee the authority to construe this Trust instrument and to resolve all matters pertaining to disputed issues or controverted claims.  Settlor does not want to burden this Trust with the cost of a litigated proceeding to resolve questions of law or fact unless the proceeding is originated by the Trustee or with the Trustee's written permission.  Any other person, agency, or organization who shall originate (or who shall cause to be instituted) a judicial proceeding to construe or contest this Trust instrument, or any will which requires distribution of property to this Trust, or to resolve any claim or controversy in the nature of reimbursement, or seeking to impress a constructive or resulting Trust, or alleging any other theory which, if assumed as true, would enlarge (or originate) a claimant's interest in this Trust or in Settlor's estate, without the Trustee's written permission, shall forfeit any amount to which that person, agency, or organization is or may be entitled and the interest of any such litigant or contestant shall pass as if he or she or it had predeceased us.  These directions shall apply even though the person, agency or organization shall be found by a court of law to have originated the judicial proceeding in good faith and with probable cause and even though the proceedings may seek nothing more than to construe the application of this no-contest provision. This requirement is to be limited, even to the exclusion thereof, in the event it operates to deny the benefits of the federal estate tax or federal gift tax marital deduction.

## ARTICLE XI.
### JURISDICTION

The jurisdiction of this Trust will be the State of Texas.  Any issue of law or fact pertaining to the creation, continuation, administration, and termination of the Trust, or any other matter incident to this Trust, is to be determined with reference to the specific directions in the Trust Declaration and then under the laws of the State of Texas.  If a Article or Subsection of this Trust Declaration is in conflict with a prohibition of state law or federal law, the Article or Subsection, or the Trust Declaration as a whole, is to be construed in a manner which will cause it to be

003291

in compliance with state and federal law and in a manner which will
result in the least amount of taxes and estate settlement costs.

## ARTICLE XII.
### ACCEPTANCE BY TRUSTEE

Holli Hardin Fontenot acknowledges that she is the initial Trustee
of the DAKOTA TRUST.  By execution of this Trust Declaration, Holli
Hardin Fontenot accepts the office of Trustee and agrees to hold
and administer the Trust according to the provisions thereof and as
required by law.

### CONCLUSION AND ATTESTATION

Holli Hardin Fontenot attests that she has executed this Trust
Declaration on the date set forth below, and the terms thereof will
bind her, her successors and assigns, and her heirs and personal
representatives.  This instrument is to be effective upon the date
recorded immediately below.

Dated:    November 9, 1994

original signed by Holli Hardin Fontenot

Holli Hardin Fontenot, individually and
as Trustee

Page 22 of 23 Pages

003292

STATE OF TEXAS         §
                       §
COUNTY OF HARRIS       §

On this __9th__ day of ___November___ in the year 199_4_ before me, a Notary Public of said State, personally appeared Holli Hardin Fontenot, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument, and acknowledged that she executed the same in the capacities expressed therein.

WITNESS MY HAND and official seal.

_____
Notary Public, State of Texas

[SEAL]

Page 23 of 23 Pages

003293

## SCHEDULE A TO
## TRUST DECLARATION
## DAKOTA TRUST

The Sum of SIXTY FOUR THOUSAND AND NO/100 DOLLARS ($64,000.00) from the Holli Ann Hardin Sole and Separate Property Account, which sum constitutes the separate property of the Settlor

UNOFFICIAL COPY

003294

This trust may need a demand power after Holli's death so that we can take advantages of $10,000 per year exclusion for gifts of present interest.

UNOFFICIAL COPY

003295

(4)

TO WHOM IT MAY CONCERN:

I, Holli Ann Hardin Fontenot, hereby voluntarily resign as trustee of the Holli Ann Hardin Fontenot Trust Number One and the Dakota Trust. This resignation as trustee shall be effective immediately upon acceptance by Dallas J. Fontenot, Jr.

Very truly yours,

Holli Ann Hardin Fontenot

Agreed and accepted this __8__ day of __SEPT.__, 1996.

Dallas J. Fontenot, Jr.

LDK238:19

003296

EXHIBIT

C

NO. 21-CPR-036521

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN THE COUNTY COURT AT LAW |
| | § | |
| DALLAS JOSEPH FONTENOT, JR., | § | NUMBER FOUR (4) OF |
| | § | |
| DECEASED | § | FORT BEND COUNTY, TEXAS |

NO. 21-DCV-288736

| | | |
|---|---|---|
| IN RE: | § | IN THE 240th DISTRICT COURT |
| | § | |
| | § | OF |
| HOLLI ANN HARDIN TRUST | § | |
| NUMBER ONE | § | FORT BEND COUNTY, TEXAS |

## BINDING MEDIATED SETTLEMENT AGREEMENT

The Parties – Dakota Fontenot, individually, in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in his capacity as next friend and virtual representative for S.F., a minor, Holli Ann Fontenot, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, Dallas Joseph Fontenot, III, individually, and in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One, Michelle Ann Fontenot, individually, in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in her capacity as next friend and virtual representative for A.E., a minor, and Ashley Fontenot Estrada, individually and in her capacity as a beneficiary of the Hollis Ann Hardin Trust Number One – hereto agree that all causes of action pending in cause number 21-CPR-036521 and cause number 21-DVC-288736, both of which are pending in Fort Bend County, Texas, and all related claims and/or controversies between them, whether asserted or not, known or unknown, actual or contingent, are hereby settled, in accordance with the terms of this Binding Mediated Settlement Agreement (hereinafter referred to as the "Settlement Agreement").

## A. DEFINITIONS

1.    Whenever used in this Settlement Agreement, the following terms shall have and be construed to have the following meanings:

i.    "Settlement Agreement" shall mean and refer to this Binding Mediated Settlement Agreement.

ii.    "Dakota" shall mean and refer to Dakota Fontenot, individually, in his capacity as beneficiary of the Holli Ann Hardin Trust Number One, and in his capacity as next friend and virtual representative of S.F., a minor.

1

UNOFFICIAL COPY

iii.    "Holli" shall mean and refer to Holli Ann Fontenot, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

iv.    "Joe" shall mean and refer Dallas Joseph Fontenot, III, individually and in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

v.    "Michelle" shall mean and refer to Michelle Ann Fontenot, individually, in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in her capacity as next friend and virtual representative of A.E., a minor.

vi.    "Ashley" shall mean and refer to Ashley Fontenot Estrada, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

vii.    "Trust" shall mean and refer to the Holli Ann Hardin Trust Number One.

viii.    "Estate" shall mean and refer to the Estate of Dallas Joseph Fontenot, Jr., whose administration is pending in cause number 21-CPR-036521, in the County Court at Law Number Four (4) of Fort Bend County, Texas.

ix.    "Parties" shall mean and refer to Dakota, Holli, Joe, Michelle, and Ashley, collectively, as described in paragraphs two (ii) through six (vi) above.

x.    "Claims" shall mean and include any and all causes of action, demands, debts, obligations, duties, liens, liabilities, and theories of liabilities of whatsoever kind and nature, whether based in contract or tort, whether arising in equity or under the common law, whether by statute or regulation, whether known or unknown, whether past or present, whether contingent or matured, whether for damages relief, injunctive relief, declaratory relief, equitable relief, or any other type of relief, whether for actual damages, personal injury damages, mental anguish, liquidated damages, punitive damages, exemplary damages, compensatory damages, consequential damages, incidental damages, pecuniary damages, costs, expenses, attorneys' fees, penalties, or fines that are (is), were (was), could be, or could have been asserted as of the Effective Date, regardless of whether actually asserted, whether by claim, counterclaim, cross-claim, motion, third-party claim regarding the Estate and Trust, including but not limited to, claims, whether asserted or not, known or unknown, actual or contingent.

xi.    "Effective Date" shall mean and refer to the date that the last Party to this Settlement Agreement executes the same.

xii.    In respect to any defined term herein, the singular shall include the plural, and the plural shall include the singular.

2

B. TERMS, CONDITIONS, AND MUTUAL CONSIDERATION

1.      The Parties acknowledge that bona fide disputes and controversies exist between them, both as to liability and the amount thereof in damages, if any, and by reason of such disputes and controversies they desire to compromise and settle all Claims and causes of action of any kind whatsoever which the Parties have or may have arising out of the transactions or occurrences which have been brought or could have been brought regarding the Trust.

2.      **THE PARTIES AGREE AND ACKNOWLEDGE THAT UPON THE EXECUTION OF THIS SETTLEMENT AGREEMENT, THIS SETTLEMENT AGREEMENT SHALL BECOME BINDING AND IRREVOCABLE.**

3.      The Parties agree that the 2013 Last Will and Testament and 2017 First Codicil to the Last Will and Testament will be admitted to probate. The Parties agree that Holli will be appointed as the Independent Executor of the Estate and agree not to object to the same.

4.      All of the Estate's assets, including all associated bank accounts, shall be distributed to Holli, save and expect the following items:

- The following items are going to be distributed to Dakota:

  o   The 2017 F150 Truck
  o   The 2013 Toyota Sequoia
  o   All interest, including all associated bank accounts, in Entertainment Marketing and Management, LP
  o   The coin collection and gold located in the backpack at the Rosenburg Office

- The following items are going to be distributed to Joe:

  o   The 2008 Honda Ridgeline
  o   One-half (1/2) of the Decedent's Tiki Mug Collection

The Parties agree to execute all documents necessary to effectuate the conveyance of all property described above the individual recipients stated in paragraph four (4).

5.      From the Rosenburg office, Holli shall be entitled to obtain:

- The remaining $150,000 in non-earmarked cash located in the backpack;
- Any and all Playboy Magazines

6.      The Parties agree that all personal property belonging to Dakota, Joe, and/or Michelle that is currently located at 10402 W. Hidden Lake Lane, Richmond, Texas 77406 shall be distributed to Dakota, Joe, and/or Michelle as appropriate. Dakota, Joe and/or Michelle shall

3

be afforded the opportunity, within thirty (30) days of the Effective Date of this Settlement Agreement, to conduct a supervised walkthrough of their personal property located at 10402 W. Hidden Lake Lane, Richmond, Texas 77406. During that time, Dakota, Joe, and/or Michelle will take photographs of their personal property which they would like to obtain. A list and accompanying photographs will be delivered to counsel for Holli of those items within fourteen (14) days of the walkthrough being completed. Holli will have fourteen (14) days to object to the items which Dakota, Joe, and/or Michelle would like to obtain. If the parties cannot reach a resolution regarding the same, Russ Jones will mediate, at an hourly rate, the division of the disputed personal property. Upon the completion and approval of a final list of items, Dakota, Joe, and/or Michelle, at their expense, shall obtain and remove the items on the approved final list of items at a mutually agreeable date and time within fourteen (14) days of the approval of the final list of items.

7.    The attorney's fees for Holli, Dakota, Joe, Michelle, and/or Ashley may be paid from the assets of the Holli Ann Hardin Trust Number One in an amount no more than $200,000.00 per side. The Parties will present their fees to Linda Goehrs, in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, for payment. The Parties agree that they will not object to the payment of the fees of any other party.

8.    The real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183 shall be distributed to Holli. Dakota, Michelle, and Joe, with Dakota as authorized representative, shall retain a right of first refusal in the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183. If Holli decides to sell or otherwise transfer the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183, Holli shall notify Dakota, Michelle, and Joe in writing and provide an appraisal completed by a certified and licensed real estate appraiser. From the date of receipt of that notice, Dakota, Michelle, and/or Joe shall have 30 days to exercise their right to purchase the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183. If exercised, Dakota, Michelle, and/or Joe shall enter into a real estate contract to purchase the property with a proposed closing date sixty (60) days from the date of receipt of the notice of sale or transfer triggering the right of first refusal. Holli is not required to sell at the appraised value if she receives offers in excess of the appraised value. If Holli receives an offer greater than the appraised value, the right of first refusal will be triggered upon delivery of the great offer to Dakota as authorized representative. The right of refusal will not renew if it is not exercised against the greatest value delivered by Holli.

9.    With regard to the further administration of the Holli Ann Hardin Trust Number One:

- The Parties agree that the assets of the Holli Ann Hardin Trust Number One shall be appraised by certified and licensed business or real estate appraisers, as is appropriate for the particular asset. Russ Jones shall select the appraisers to complete the real estate and business appraisals. The costs of the appraisals shall be borne by the Holli Ann Hardin Trust Number One.

4

- The Parties agree that, once the values on the appraisals are obtained for all Holli Ann Hardin Trust Number One assets, Holli's interest will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One in an amount equal to the twenty percent (20%) of the total value of the assets. Such purchase will occur within ninety days (90) of the completion of the valuation of the assets of the Holli Ann Hardin Trust Number One.

- The Parties agree that during the appraisal period described above, Linda Goehrs, in her capacity as Temporary Successor Trustee and/or Dakota, shall execute the necessary documents to install Dakota as an Officer and/or Director of Ice Embassy, Inc., HRF Enterprises, Inc., and Entertainment Marketing and Management, LP.

- The Parties agree that Linda Goehrs shall remain Temporary Successor Trustee of the Holli Ann Hardin Trust Number One until the closing of a sale on Holli's interest in the Holli Ann Hardin Trust Number One. At the time that Holli's interest is purchased, Linda Goehrs will resign as Temporary Successor Trustee, and Dakota, Joe, Michelle, and Ashley shall select a Successor Trustee of the Trust.

- Holli agrees to execute an assignment of interest and disclaimer of further interest in the Holli Ann Hardin Trust Number One at the time that her interest is purchased in accordance with this Settlement Agreement.

- The Parties agree that Dakota and Holli shall remain employees of Entertainment Marketing and Management, LP, and/or the business, or businesses owned by the Holli Ann Hardin Trust Number One. Holli shall be removed from the payroll on the date that her interest is purchased pursuant to this Agreement. The compensation amount that Dakota and Holli have been receiving shall remain unchanged.

- The Parties agree that Dakota and Holli shall remain on the insurance paid for by Entertainment Marketing and Management, LP, and/or the business or businesses owned by the Holli Ann Hardin Trust Number One. Holli shall be removed from the insurance plan on the date that her interest is purchased pursuant to this Agreement.

- To the extent owned by the Trust, Linda Goehrs as Temporary Successor Trustee, shall gift the horses known as Coco and Rusty to Holli.

10.   With regard to the further administration of the Dakota Trust:

- The Parties agree that the assets of the Dakota Trust shall be appraised by certified and licensed real estate appraisers. Russ Jones shall select the appraisers to complete the real estate appraisal. The cost of the appraisal shall be borne by the Dakota Trust.

- Upon completion of the appraisal, the total value of the assets will be compiled and Holli's interest will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One in an amount equal to eighty-five percent (85%) of the total value of the assets. Such purchase will occur within ninety days (90) of the completion of the valuation of the assets of the Dakota Trust.

- Holli agrees to execute an assignment of interest and disclaimer of further interest in the Dakota Trust at the time that her interest in purchased in accordance with this Settlement Agreement.

11. Within seven (7) days of the Effective Date of this agreement, Dakota, Joe, Michelle, and/or Ashley agree to dismiss all pending pleas, pleadings, and/or motions, with prejudice regarding the Estate and/or Trust pending in cause number 21-CPR-036521 and cause number 21-DVC-288736, both of which are pending in Fort Bend County, Texas.

12. Neither the Trust nor any entity owned, held, or possessed by the Holli Ann Hardin Trust Number One, the Dakota Trust, and/or the Estate have any claims against any of the Parties.

13. The Parties agree to release Linda Goehrs, in her capacity as Temporary Successor Trustee, for making distributions according to this Settlement Agreement which contradict the terms of the Trust Agreement for the Holli Ann Hardin Trust Number One or the Dakota Trust.

## C. RELEASES AND DISCHARGE

1. **Release of Claims by Dakota.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Dakota, on behalf of himself and all his heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Holli, Joe, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Dakota hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Dakota expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Holli, Joe, Michelle, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Dakota does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

2. **Release of Claims by Holli.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Holli, on behalf of herself and all her heirs, successors,

6

executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Joe, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Holli hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Holli expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Michelle, Joe, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Holli does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

3.    **Release of Claims by Joe**. For and in consideration of the mutual promises, covenants, and agreements stated herein, Joe, on behalf of himself and all his heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Joe hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Joe expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Michelle, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Joe does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

4.    **Release of Claims by Michelle**. For and in consideration of the mutual promises, covenants, and agreements stated herein, Michelle, on behalf of herself and all her heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Joe, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Michelle hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Michelle expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind

7

known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Joe, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Michelle does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

5. **Release of Claims by Ashley**. For and in consideration of the mutual promises, covenants, and agreements stated herein, Ashley, on behalf of herself and all her heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Joe, Michelle, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Ashley hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Ashley expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Joe, and Michelle. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Ashley does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

## D. REPRESENTATIONS AND WARRANTIES

1. **Representations and Warranties**. Each of the Parties hereto represents and warrants to the other that:

a. They are adequately represented by competent counsel in connection with the execution and delivery of this Settlement Agreement and/or had an opportunity to retain counsel in connection with this Settlement Agreement;

b. In executing this Settlement Agreement, they relied upon the Party's own judgment and any advice it received from its own attorneys;

c. They were not induced to sign or execute this Settlement Agreement by promises, omissions, agreements, or representations not expressly stated in this Settlement Agreement;

d. They freely and willingly executed this Settlement Agreement and expressly disclaims reliance upon any facts, promises, statements made or not made, undertakings, or representations made by any person or entity

8

prior to the Effective Date of this Settlement Agreement except as specifically enumerated herein;

e.  They consent that this Settlement Agreement was not procured, obtained, or induced by improper conduct or undue influence;

f.  After an opportunity to consult with an attorney concerning the matters made subject of this Settlement Agreement, and after reviewing this Settlement Agreement, they agree this Settlement Agreement is fair, reasonable, and supported by good, valuable, and adequate consideration; and

g.  They understand and agree to the terms and conditions of this Settlement Agreement, which contains the entire agreement between the Parties relating to the matters made the subject of this Settlement Agreement.

2.  **Capacity and Authority.** Each of the Parties hereto represents and warrants to the other that the person signing this Settlement Agreement in a representative capacity has the requisite authority and consent to execute this Settlement Agreement on behalf of the Party for whom he or she has executed this Settlement Agreement, and that this Settlement Agreement is binding upon the Party for whom he or she has executed this Settlement Agreement and upon such Party's successors and assigns.

3.  **Assignment of Claims.** Each of the Parties hereto represents and warrants to the other that it has not transferred, assigned, or otherwise conveyed, excepting any interest held by counsel, in whole or in part, its respective interest in the Claims at issue and that it is the owner and holder thereof. Each of the Parties further represents and warrants that, aside from any interest held by counsel, it is the only holder of the Claims being released and that no other person or entity owns, or has any interest in, any of the Claims being released. Despite any interest held by counsel, this Settlement Agreement applies to the entirety of each of the Parties' Claims.

4.  **Cooperation in Execution of Further Documents.** Each of the Parties expressly agrees to execute any other documents reasonably necessary to effectuate the terms, purpose, and intent of this Settlement Agreement.

### E. MISCELLANEOUS PROVISIONS

1.  **Invalidity.** In the event any one or more of the provisions of this Settlement Agreement shall, for any reason, be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Settlement Agreement.

2.  **Entire Agreement.** This Settlement Agreement reflects the final and complete agreement between the parties concerning the matters made subject of this Settlement Agreement and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the Parties. There are no unwritten oral agreements between the Parties. The Parties expressly

9

acknowledge that any rights, duties, or obligations, whether contractual or otherwise, owed by or between the Parties prior to the effective date of this Settlement Agreement are terminated as of the Effective Date of this Settlement Agreement and the only rights, duties, or obligations owed by or between the Parties from this point forward shall be those set forth in this Settlement Agreement.

3.    **Governing Law and Venue.** The validity, effect, and construction of this Settlement Agreement shall be governed by the laws of the State of Texas. Venue for any cause of action, controversy, or dispute regarding this Settlement Agreement or the subject matter hereof shall be proper only in the state courts of Fort Bend County, Texas.

4.    **Amendment.** This Settlement Agreement may not be amended, modified, waived, or terminated unless such is done in a writing signed by all the Parties.

5.    **Construction of Agreement.** This Settlement Agreement shall not be construed in favor of or against any Party on the basis that the Party did or did not author this Settlement Agreement or any attachment related to it. It is intended that this Settlement Agreement shall be comprehensive in nature and shall be construed liberally to affect its purposes.

6.    **Titles or Headings.** All titles or headings used in this Settlement Agreement are used only for the convenience of the Parties and shall not be construed to have any effect or meaning with respect to the other content of the Settlement Agreement, such other content being controlling as to the Settlement Agreement of the Parties.

7.    **Costs and Attorneys' Fees.** Each party shall bear its own costs and attorneys' fees in relation to the claims and the negotiation and preparation of this Settlement Agreement, subject to the attorney's fees provisions within this Settlement Agreement.

8.    **Waiver.** The failure of any of the Parties to enforce, at any time, any provision of this Settlement Agreement shall not be construed to be a waiver of such provision, nor in any way affect the validity of this Settlement Agreement or any part thereof or any right of any Party thereafter to enforce each and every provision. No waiver of any breach of this Settlement Agreement shall be held to constitute a waiver of any other breach.

9.    **Binding Agreement.** This Settlement Agreement is binding on the Parties hereto and not subject to revocation, repudiation, or withdrawal of consent, even if one or more of them shall become debtors in a bankruptcy proceeding. This binding effect is an integral part of this Agreement.

10.    **Execution of Agreement.** This Settlement Agreement may be executed in a number of identical counterparts, each of which shall be deemed an original for all purposes. A fax signature or a copy of an original signature shall constitute an original signature for purposes of this Settlement Agreement. This Settlement Agreement shall be valid only if fully executed by all Parties and/or their representatives as agreed to herein. If not fully executed by all Parties, this Settlement Agreement shall be null and void and of no effect.

11.    **Future Disputes.** In the event that there are future disputes, disagreements, and/or conflicts regarding the terms and/or implementation of any terms of this Settlement Agreement, the Parties agree to return to Russ Jones for mediation regarding the dispute. The Parties agree to return to mediation prior to filing any litigation regarding a breach of this settlement agreement or these terms. If a Party refuses to return to mediation, the remaining parties are permitted to file litigation without returning to mediation. Should further litigation be filed regarding a breach of the agreement, the prevailing party shall be entitled to an award of attorney's fees as determined by a jury or judge.

12.    **Indemnity.** Each party shall indemnify the other parties for all claims made by, through, or under the indemnifying party.

AGREED TO BY ALL PARTIES AS EVIDENCED BY THEIR SIGNATURE BELOW ON THIS THE 7th DAY OF JANUARY, 2022.

_____
Dakota Fontenot, in all capacities

_____
Holli Ann Fontenot, in all capacities

_____
Dallas Joseph Fontenot, III, in all capacities

_____
Michelle Ann Fontenot, in all capacities

_____
Ashley Fontenot Estrada, in all capacities

_____
Christopher Burt
*Counsel for Dakota Fontenot*

11

11.     **Future Disputes.** In the event that there are future disputes, disagreements, and/or conflicts regarding the terms and/or implementation of any terms of this Settlement Agreement, the Parties agree to return to Russ Jones for mediation regarding the dispute. The Parties agree to return to mediation prior to filing any litigation regarding a breach of this settlement agreement or these terms. If a Party refuses to return to mediation, the remaining parties are permitted to file litigation without returning to mediation. Should further litigation be filed regarding a breach of the agreement, the prevailing party shall be entitled to an award of attorney's fees as determined by a jury or judge.

12.     **Indemnity.** Each party shall indemnify the other parties for all claims made by, through, or under the indemnifying party.

AGREED TO BY ALL PARTIES AS EVIDENCED BY THEIR SIGNATURE BELOW ON THIS THE 7th DAY OF JANUARY, 2022.

_____

Dakota Fontenot, in all capacities

Holli Ann Fontenot, in all capacities

## Dallas Joseph Fontenot III

Dallas Joseph Fontenot, III, in all capacities

## Michelle Ann Fontenot

Michelle Ann Fontenot, in all capacities

## Ashley Fontenot Estrada

Ashley Fontenot Estrada, in all capacities

_____

Christopher Burt
*Counsel for Dakota Fontenot*

11

Steven Mendel
*Counsel for Holli Ann Fontenot*


Kenneth Sumner
*Counsel for Dallas Joseph Fontenot, III,
Michelle Ann Fontenot, and Ashley Estrada*

12

Steven Mendel
*Counsel for Holli Ann Fontenot*

# Kenneth E. Sumner, Jr.

Kenneth Sumner
*Counsel for Dallas Joseph Fontenot, III,*
*Michelle Ann Fontenot, and Ashley Estrada*

**Signature:** *Dallas Joseph Fontenot III*
Dallas Joseph Fontenot III (Jan 7, 2022 19:33 CST)

**Email:** djoef3@hotmail.com

**Signature:** Michelle Fontenot (Jan 7, 2022 19:36 CST)

**Email:** mannefontenot@gmail.com

**Signature:**
Ashley Fontenot Estrada (Jan 7, 2022 19:38 CST)

**Email:** ashleyafontenot@gmail.com

**Signature:** *Kenneth C. Sumner, Jr*

**Email:** ksumner@romanosumner.com

UNOFFICIAL COPY

12

EXHIBIT

D

# AMENDED AND RESTATED PROMISSORY NOTE

$2,825,000.00                     Houston, Texas                     May 22, 2023

FOR VALUE RECEIVED, the undersigned, **HFR ENTERPRISES, INC.**, a Texas corporation (the "Maker"), hereby promises to pay to the order of **LHS HOMES, L.L.C.**, a Texas limited liability company ("Lender"), at its offices at 5920 Hillcroft Street, Suite A, Houston, Texas 77036, in lawful money of the United States of America, the principal sum of up to TWO MILLION, EIGHT HUNDRED TWENTY-FIVE THOUSAND AND 00/100 DOLLARS ($2,825,000.00) or so much thereof as may be advanced and outstanding hereunder, together with interest.

This amended and restated promissory note (this "Note") is given in substitution of that certain promissory note executed by Maker in favor of Lender dated January 6, 2023 in the amount of ONE MILLION, EIGHT HUNDRED TWENTY-FIVE THOUSAND AND 00/100 DOLLARS ($1,825,000.00), which fully funded on or about January 6, 2023, (the "Original Note") and to evidence current and future advances in the aggregate amount of ONE MILLION AND 00/100 DOLLARS ($1,000,000.00) (the "New Funds") in accordance with the terms hereof. The Original Note shall, in its entirety, be superseded, amended, and restated by this Note and payment of the indebtedness thereunder shall be governed by this Note as if the aggregate unpaid indebtedness due under the Original Note had been advanced hereunder by Lender. Maker hereby renews and extends its covenant and agreement to pay the indebtedness evidenced by the Original Note, as amended and restated pursuant to this Note, and Maker hereby renews and extends its covenant and agreement to perform, comply with, and be bound by each and every term and provisions of the Original Note, as amended and restated by the terms of this Note. Maker confirms and agrees that this Note is, and shall continue to be, secured by the Deed of Trust recorded on January 9, 2023 under Instrument No. RP-2023-7823 in the Official Public Records of Harris County, Texas (the "Deed of Trust"), and in no way acts as a release or relinquishment of the liens created by the Deed of Trust. All of the provisions of the Deed of Trust now or heretofore executed by Maker as heretofore or contemporaneously herewith modified are hereby ratified and affirmed in all respects. The liens securing payment of the Original Note are hereby modified, extended, renewed, carried forward, and confirmed by Maker in all respects and shall remain in full force and effect until the principal and all accrued interest under this Note shall be fully and finally paid. As of the date hereof, all principal and interest payments due and owing under the Old Note have been paid in full when due and the outstanding unpaid principal balance of the Old Note is $1,809,300.24 (the "Old Note Balance").

This Note is further secured by certain Conditional Guaranty Agreements of even date herewith executed by Viva Las Vegas Properties, Inc., a Texas corporation and an affiliate of Maker ("VLV Guarantor"), Dakota Fontenot, an individual resident of Fort Bend County ("DF Guarantor"), and Ice Embassy, Inc., a Texas corporation (collectively referred to as "Guarantors"), respectively, in favor of Lender.

It is understood and agreed by and between Maker and Lender that (i) the entire principal of the Old Note has been advanced to Maker pursuant to the Old Note and that (ii) the entire principal of the New Funds under this Note is not being advanced in full to Maker upon the execution hereof, but subsequent and periodic advancements in various increments of the New Funds will be made to Maker, upon request to Lender, up to, but not to exceed, the amount of the New Funds pursuant to

1

the terms hereof. Interest on this Note shall accrue only on the principal amount of the New Funds advanced from the time it is so advanced, at the Contract Rate.

Lender shall advance the New Funds by wire transfer to an account designated by Maker as follows:

(i)    An amount equal to $250,000.00 (the "First New Advance") shall be funded immediately upon execution of this Note.

(ii)   Advances of the remaining New Funds, in amounts up to and not exceeding $750,000.00 in the aggregate, shall be advanced incrementally (such incremental advances being referred to individually and collectively as the "Future Advances") within five (5) Business Days after Lender receives a written request for advance ("Request for Advance") from Maker. Each Request for Advance shall be accompanied by a percentage of completion and cost schedule (a "Schedule of Values") describing the construction, maintenance, repair and/or renovation work completed at Maker's property located at 6710 Southwest Freeway, Houston, Harris County, Texas 77074 (the "Project") as of the date of the applicable Request for Advance, including backup documentation as may be reasonably requested by Lender. Additionally, Lender shall not be required to advance any Future Advances unless: (a) Lender's first lien deed of trust and security interest in the property identified in the Deed of Trust remains in a first lien position without tax liens, mechanics liens or any other monetary encumbrances against such Property other than normal permitted exceptions for current property taxes; (b) The VLV Guarantor's Fort Bend Property securing such Guaranty must have received a mortgagee title policy reflecting a first lien in favor of Lender other than normal permitted exceptions for current property taxes and assessments and nonmonetary encumbrances; (c) Maker and the VLV Guarantor must not otherwise be in any breach of any of its agreements, representation or warranties as set forth in this Note. If Lender refuses to advance the amount requested in any applicable Request for Advance, Lender shall within such 5 Business Day period provide written notice to Maker specifying the reason for such refusal, whereupon Maker and Lender shall endeavor in good faith to reach agreement on the amount to be advanced within ten (10) days after Maker receives notice of Lender's refusal to fund the amount initially requested. If the parties are unable to agree on the funding amount for the applicable Future Advance within such 10-day period, then either party may submit the matter to mediation. The final Future Advance of New Funds shall be made after completion of the Project in such amount that the sum of all Future Advances by Lender shall not exceed $750,000.00.

The unpaid principal balance of this Note shall bear interest prior to maturity at an annual rate equal to the lesser of (a) the Maximum Lawful Rate or (b) eight percent (8.0%) (the "Contract Rate"). Interest on this Note shall be calculated on a per annum basis of 360 days and for the actual number of days elapsed (including the first day but excluding the last day) unless such calculation would result in a rate that exceeds the Maximum Lawful Rate, in which case, interest shall be calculated on a per annum basis of 365 or 366 days, as the case may be. Maker hereby expressly promises to pay to the order of Lender or any other holder hereof the principal amount of this Note and all accrued but unpaid interest now or hereafter to become due and payable under this Note in the

2

manner provided herein. Notwithstanding anything herein to the contrary, the final installment payment under this Note shall include all of the then outstanding principal, accrued but unpaid interest and all other costs, expenses and fees arising out of this Note. All sums paid hereon (whether regularly scheduled payment or prepayment) shall be applied first to the satisfaction of accrued unpaid interest and the remainder, if any, to the reduction of the principal balance hereof.

Subject to prior acceleration as provided in this Note, this Note shall be paid as follows:

Principal and interest under this Note shall be due and payable monthly as follows ("Monthly Payments"):

(i)     Principal and interest on an amount equal to the sum of the Old Note Balance and the First New Advance (or $2,059,300.24) shall be due and payable in sixty (60) equal monthly installments, based on a 20-year amortization, of $17,225.00, with the first such payment being due on June 15, 2023, and continuing on the same day of each month thereafter until May 15, 2028 (the "Maturity Date"), on which date a final payment in the amount of $1,802,414.35 shall be due and payable in full.

(ii)    Interest only on Future Advances shall be due and payable monthly beginning on the 15th day of the calendar month after the month in which the first Future Advance is made and shall continue regularly on the same day of each succeeding calendar month thereafter until and including the Maturity Date, on which date a final payment, which shall include all then outstanding principal and accrued and unpaid interest due on Future Advances, shall be due and payable in full.

For purposes of this Note, the following terms have the meanings assigned to such terms as provided below:

"Applicable Laws" means the laws of the State of Texas and laws of the United States of America in effect from time to time and applicable to this Note.

"Business Day" means a day that is not a Saturday, Sunday, or federal or state holiday.

"Default Rate" means the Maximum Lawful Rate.

"Event of Default" means the failure to pay when due the principal and interest under this Note, or any part thereof, and such failure continues for more than thirty (30) days after Maker receives written notice from Lender specifying the amount of the delinquent payment. Event of Default shall also include Maker shall (a) become insolvent within the meaning of the Bankruptcy Code of the United States, as amended; (b) admit in writing its inability to pay or otherwise fail to pay its/his debts generally as they become due; (c) voluntarily seek consent to, or acquiesce in the benefit or benefits of any Debtor Relief Law; or (d) be made the subject of any proceeding provided for by any Debtor Relief Law that could suspend or otherwise affect any of the rights of Lender or any other holder hereof and such proceeding shall continue for sixty (60) days without dismissal or discharge; or (e) any default by Maker under that certain Deed of Trust securing this Note, executed by Maker in favor of Lender. As used herein, "Debtor Relief Laws" means the Bankruptcy Code of the United States, as amended and all other applicable liquidation, conservatorship, bankruptcy,

3

moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws from time to time in effect affecting the rights of creditors generally.

"Indebtedness" means the obligations of Maker under this Note.

"Maximum Lawful Rate" means, at any time, the maximum rate of interest which may be charged, contracted for, taken, received or reserved by the Lender in accordance with Applicable Laws. Each change in any interest rate provided for herein based upon the Maximum Lawful Rate resulting from a change in the Maximum Lawful Rate shall take effect with written notice to the Maker before such change in the Maximum Lawful Rate.

All payments due under this Note shall be made by Maker without offset or other reduction of any kind. Any outstanding principal that is not paid in full when due shall bear interest at the Default Rate for the period from and including the due date thereof to but excluding the date the same is paid in full.

If any payment of principal or interest on this Note shall become due on a day which is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computing of interest in connection with such payment. In the event an installment, or the maturity date as set forth herein, is due on the 29th, 30th, or 31st day of the month, for each month which does not have a 29th, 30th, or 31st day, such installment, or the final payment, as applicable, shall be due on the last day of such month. Payments received on weekends or bank holidays will be credited as of the next Business Day. Any check, draft, money order or other instrument given in payment of all or any portion of this Note may be accepted by Lender and handled in collection in the customary manner, but the same shall not constitute payment or diminish any rights of Lender except to the extent that actual cash proceeds of such instrument are unconditionally received by Lender.

Unless otherwise agreed in writing, or otherwise required by Applicable Laws, interest on this Note will be calculated on the unpaid principal balance to the date each installment is paid and payments received will be applied in the following order of priority: (i) the payment or reimbursement of any expenses, costs, or obligations (other than the outstanding principal balance hereof and interest hereon) for which either Maker shall be obligated or Lender shall be entitled pursuant to the provisions of this Note, (ii) the payment of accrued but unpaid interest hereon, and (iii) the payment of principal. However, any Monthly Payments timely made by Maker shall be credited as of the date such Monthly Payment is due, and Lender shall not be required to ledger and compute reductions in interest for Monthly Payments made before such Monthly Payment is due.

Maker shall have the privilege to prepay at any time, and from time to time, all or any part of the principal amount of this Note, without notice, penalty or fee. Except as expressly provided herein to the contrary, all prepayments on this Note shall be applied in the following order of priority: (i) the payment of accrued but unpaid interest hereon, and (ii) the payment of all or any portion of the principal balance hereof then outstanding hereunder, in the inverse order of maturity.

Time is of the essence in the performance of this Note. Maker agrees that all past-due principal and past-due accrued interest under this Note shall bear interest from the date it is due until paid at the Maximum Lawful Rate.

4

Upon the occurrence of an Event of Default, Lender may, at its option, after the expiration of the notice and right to cure period provided herein, (i) declare the outstanding principal balance of and accrued but unpaid interest on this Note at once due and payable, or (ii) foreclose all liens securing payment hereof. Upon the occurrence of an Event of Default, if this Note is placed in the hands of an attorney for collection (whether or not suit is filed), or if this Note is collected by suit or legal proceedings or through the probate court or bankruptcy proceedings, Maker agrees to pay an additional amount as attorney's fees as may be reasonable.

Except as otherwise provided herein, Maker waives presentment for payment, demand, protest, notice thereof and dishonor, notice of intent to accelerate, notice of acceleration, and diligence in collecting and consents that the time of payment may be extended from time to time without notice and without releasing Maker.

Until such time as all New Funds have been advanced hereunder, Lender shall not assign this Note without the prior written consent of Maker, which consent shall not be unreasonably withheld. Following the final advance of New Funds after completion of the Project, Lender shall have the right to assign this Note without necessity of Maker's consent. In such event, the term "Lender" shall mean any permitted assignee of this Note.

This Note and its validity, enforcement and interpretation, shall be construed in accordance with Applicable Laws, without regard to any conflict of law rules or principles except as otherwise expressly set forth herein. It is expressly stipulated and agreed to be the intent of the Maker and the Lender at all times to comply strictly with Applicable Laws governing the maximum rate or amount of interest payable on the indebtedness evidenced by this Note. If Applicable Law is ever judicially interpreted so as to render usurious any amount (i) contracted for, charged, taken, reserved or received pursuant to this Note, (ii) contracted for, charged, taken, reserved or received by reason of the Lender's exercise of the option to accelerate the maturity of the Indebtedness, or (iii) the Maker will have paid or the Lender will have received by reason of any voluntary prepayment by the Maker of the Indebtedness, then it is the Maker's and the Lender's express intent that all amounts charged in excess of the Maximum Lawful Rate shall be automatically canceled, *ab initio*, and all amounts in excess of the Maximum Lawful Rate theretofore collected by the Lender shall be credited on the principal balance of the Indebtedness (or, if the Indebtedness have been or would thereby be paid in full, refunded to the Maker), and the provisions of this Note shall immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder and thereunder; provided, however, if this Note has been paid in full before the end of the stated term of this Note, then the Maker and the Lender agree that the Lender shall, with reasonable promptness after the Lender discovers or is advised by the Maker that interest was received in an amount in excess of the Maximum Lawful Rate, either refund such excess interest to the Maker and/or credit such excess interest against the Indebtedness then owing by the Maker to the Lender. The Maker hereby agrees that as a condition precedent to any claim seeking usury penalties against the Lender, the Maker will provide written notice to the Lender, advising the Lender in reasonable detail of the nature and amount of the violation, and the Lender shall have thirty (30) days after receipt of such notice in which to correct such usury violation, if any, by either refunding such excess interest to the Maker or crediting such excess interest against the Indebtedness then owing by the Maker to the Lender. All sums contracted for, charged, taken, reserved or received by the Lender for the use, forbearance or detention of any Indebtedness shall, to the extent permitted by applicable law, be amortized or spread, using the

5

CONFIDENTIAL DOCUMENTS                                                      HAH001244

actuarial method, throughout the stated term of this Note (including any and all renewal and extension periods) until payment in full so that the rate or amount of interest on account of this Note does not exceed the Maximum Lawful Rate from time to time in effect and applicable to this for so long as any Indebtedness is outstanding. In no event shall the provisions of Chapter 346 of the Texas Finance Code (which regulates certain revolving credit loan accounts and revolving triparty accounts) apply to this Note. Notwithstanding anything to the contrary contained herein, it is not the intention of the Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

To the extent that Lender is relying on Chapter 303 of the Texas Finance Code to determine the Maximum Lawful Rate payable on any Indebtedness, the Lender will utilize the weekly ceiling from time to time in effect as provided in such Chapter 303, as amended. Additionally, to the extent permitted by Applicable Laws now or hereafter in effect, the Lender may, at its option and from time to time, utilize any other method of establishing the Maximum Lawful Rate under such Chapter 303 or under other Applicable Law by giving notice, if required, to the Maker as provided by Applicable Law now or hereafter in effect.

In case any one or more of the provisions contained in this Note shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Note, and this Note shall be construed as if such invalid, illegal, or unenforceable provision had never been included in this Note.

No amendment, modification, or alteration of the terms of this Note shall be binding unless the same is in writing, dated subsequent to the date of this Note, and duly executed by the parties to this Note.

All notices sent to Maker shall be sent by hand delivery or by certified mail, return receipt requested to HFR Enterprises, Inc., Attn: Dakota Fontenot, 3414 Old Richmond Road, Rosenberg, Texas 77471 (with a copy to BoyarMiller, Attn: Christopher Barteau and Tiffany Melchers, 2925 Richmond Avenue, 14th Floor, Houston, Texas 77098), unless directed otherwise by Maker after notice to the Lender (or any other holder hereof) at the address set forth on Page 1 herein, or at such other address of the Lender (or any other holder hereof) specified by notice to Maker as described herein. Any notice required herein shall be sufficient if it provides at least 10 days of notice after mailing, unless otherwise required by law.

[Remainder of page intentionally left blank.]

6

CONFIDENTIAL DOCUMENTS                    HAH001245

IN WITNESS WHEREOF, Maker has duly executed this Note as of the day and year first above written.

**MAKER:**

**HFR ENTERPRISES, INC.,**
a Texas corporation

By: _____
Name: Dakota Fontenot
Title: President

Address:
6710 Southwest Freeway
Houston, Texas 77074
Attention: Dakota Fontenot

THE STATE OF TEXAS          §
                            §
COUNTY OF HARRIS            §

This instrument was acknowledged before me on May 22, 2023, by Dakota Fontenot, President of HFR Enterprises, Inc., a Texas nonprofit corporation, for and on behalf of such corporation.

_____
NOTARY PUBLIC, STATE OF TEXAS

[Notary Seal: TINA BARAJAS, NOTARY PUBLIC, STATE OF TEXAS, ID# 10076954, EXPIRES 2-2-2027]

SIGNATURE PAGE TO
NOTE

CONFIDENTIAL DOCUMENTS                    HAH001246



EXHIBIT

E

C.A. 21-CPR-036521

| | | |
|---|---|---|
| ESTATE OF | § | IN COUNTY COURT AT LAW |
| DALLAS JOSEPH FONTENOT, JR., | § | |
| DECEASED | § | NO. FOUR (4) OF |
| | § | |
| | § | FORT BEND COUNTY, TEXAS |

No. 21-DCV-288736

| | | |
|---|---|---|
| IN RE | § | IN THE 240TH DISTRICT COURT |
| HOLLI ANN HARDIN TRUST | § | |
| NUMBER ONE | § | OF |
| | § | |
| | § | FORT BEND COUNTY, TEXAS |

## Assignment of Interest &
## Disclaimer of Further Interest

Pursuant to the Binding Mediation Settlement Agreement reached in the above-captioned cases, and which is attached hereto as Exhibit "A":

1. Holli Ann Fontenot acknowledges receipt of check number 1005 payable to Holli Ann Fontenot in the amount of $2,823,464.00, and which sum represents full satisfaction of eighty five percent (85%) of the total value of The Dakota Trust assets ($1,899,514.00) and twenty percent (20%) of the total value of the Holli Ann Hardin Trust No. 1 assets ($923,950.00).

2. Holli Ann Fontenot hereby assigns any and all beneficial interest she has in the Holli Ann Hardin Trust No. 1 to the Trustee for further administration and distribution by the Trustee.

3. Holli Ann Fontenot assigns any and all beneficial interest she has in The Dakota Trust to the Trustee for further administration and distribution by the Trustee.

4. Holli Ann Fontenot disclaims any right to any further interest in the Holli Ann Hardin Trust No. 1. Holli Ann Fontenot previously resigned as the Trustee of said Trust.

5. Holli Ann Fontenot disclaims any right to any further interest in The Dakota Trust. Holli Ann Fontenot hereby resigns as a fiduciary of said Trust.

[SIGNATURE ON THE FOLLOWING PAGE]

UNOFFICIAL COPY

SIGNED AND EXECUTED ON __18__ DAY OF JANUARY 2023.

HOLLI ANN FONTENOT

STATE OF TEXAS          §
                       §
COUNTY OF HARRIS       §

This instrument was acknowledged before me on this the __18__ day of January 2023 by Holli Ann Fontenot.

Notary Public in and for
The State of Texas

NO. 21-CPR-036521

| | | |
|---|---|---|
| IN THE ESTATE OF | § § | IN THE COUNTY COURT AT LAW |
| DALLAS JOSEPH FONTENOT, JR., | § § | NUMBER FOUR (4) OF |
| DECEASED | § | FORT BEND COUNTY, TEXAS |

NO. 21-DCV-288736

| | | |
|---|---|---|
| IN RE: | § § | IN THE 240th DISTRICT COURT |
| | § | OF |
| HOLLI ANN HARDIN TRUST NUMBER ONE | § § | FORT BEND COUNTY, TEXAS |

## BINDING MEDIATED SETTLEMENT AGREEMENT

The Parties – Dakota Fontenot, individually, in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in his capacity as next friend and virtual representative for S.F., a minor, Holli Ann Fontenot, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, Dallas Joseph Fontenot, III, individually, and in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One, Michelle Ann Fontenot, individually, in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in her capacity as next friend and virtual representative for A.E., a minor, and Ashley Fontenot Estrada, individually and in her capacity as a beneficiary of the Hollis Ann Hardin Trust Number One – hereto agree that all causes of action pending in cause number 21-CPR-036521 and cause number 21-DVC-288736, both of which are pending in Fort Bend County, Texas, and all related claims and/or controversies between them, whether asserted or not, known or unknown, actual or contingent, are hereby settled, in accordance with the terms of this Binding Mediated Settlement Agreement (hereinafter referred to as the "Settlement Agreement").

### A. DEFINITIONS

1.      Whenever used in this Settlement Agreement, the following terms shall have and be construed to have the following meanings:

i.      "Settlement Agreement" shall mean and refer to this Binding Mediated Settlement Agreement.

ii.      "Dakota" shall mean and refer to Dakota Fontenot, individually, in his capacity as beneficiary of the Holli Ann Hardin Trust Number One, and in his capacity as next friend and virtual representative of S.F., a minor.

1

iii.   "Holli" shall mean and refer to Holli Ann Fontenot, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

iv.   "Joe" shall mean and refer Dallas Joseph Fontenot, III, individually and in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

v.   "Michelle" shall mean and refer to Michelle Ann Fontenot, individually, in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in her capacity as next friend and virtual representative of A.E., a minor.

vi.   "Ashley" shall mean and refer to Ashley Fontenot Estrada, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

vii.   "Trust" shall mean and refer to the Holli Ann Hardin Trust Number One.

viii.   "Estate" shall mean and refer to the Estate of Dallas Joseph Fontenot, Jr., whose administration is pending in cause number 21-CPR-036521, in the County Court at Law Number Four (4) of Fort Bend County, Texas.

ix.   "Parties" shall mean and refer to Dakota, Holli, Joe, Michelle, and Ashley, collectively, as described in paragraphs two (ii) through six (vi) above.

x.   "Claims" shall mean and include any and all causes of action, demands, debts, obligations, duties, liens, liabilities, and theories of liabilities of whatsoever kind and nature, whether based in contract or tort, whether arising in equity or under the common law, whether by statute or regulation, whether known or unknown, whether past or present, whether contingent or matured, whether for damages relief, injunctive relief, declaratory relief, equitable relief, or any other type of relief, whether for actual damages, personal injury damages, mental anguish, liquidated damages, punitive damages, exemplary damages, compensatory damages, consequential damages, incidental damages, pecuniary damages, costs, expenses, attorneys' fees, penalties, or fines that are (is), were (was), could be, or could have been asserted as of the Effective Date, regardless of whether actually asserted, whether by claim, counterclaim, cross-claim, motion, third-party claim regarding the Estate and Trust, including but not limited to, claims, whether asserted or not, known or unknown, actual or contingent.

xi.   "Effective Date" shall mean and refer to the date that the last Party to this Settlement Agreement executes the same.

xii.   In respect to any defined term herein, the singular shall include the plural, and the plural shall include the singular.

2

### B. TERMS, CONDITIONS, AND MUTUAL CONSIDERATION

1.     The Parties acknowledge that bona fide disputes and controversies exist between them, both as to liability and the amount thereof in damages, if any, and by reason of such disputes and controversies they desire to compromise and settle all Claims and causes of action of any kind whatsoever which the Parties have or may have arising out of the transactions or occurrences which have been brought or could have been brought regarding the Trust.

2.     **THE PARTIES AGREE AND ACKNOWLEDGE THAT UPON THE EXECUTION OF THIS SETTLEMENT AGREEMENT, THIS SETTLEMENT AGREEMENT SHALL BECOME BINDING AND IRREVOCABLE.**

3.     The Parties agree that the 2013 Last Will and Testament and 2017 First Codicil to the Last Will and Testament will be admitted to probate. The Parties agree that Holli will be appointed as the Independent Executor of the Estate and agree not to object to the same.

4.     All of the Estate's assets, including all associated bank accounts, shall be distributed to Holli, save and expect the following items:

- The following items are going to be distributed to Dakota:
  - The 2017 F150 Truck
  - The 2013 Toyota Sequoia
  - All interest, including all associated bank accounts, in Entertainment Marketing and Management, LP
  - The coin collection and gold located in the backpack at the Rosenburg Office

- The following items are going to be distributed to Joe:
  - The 2008 Honda Ridgeline
  - One-half (1/2) of the Decedent's Tiki Mug Collection

The Parties agree to execute all documents necessary to effectuate the conveyance of all property described above the individual recipients stated in paragraph four (4).

5.     From the Rosenburg office, Holli shall be entitled to obtain:

- The remaining $150,000 in non-earmarked cash located in the backpack;
- Any and all Playboy Magazines

6.     The Parties agree that all personal property belonging to Dakota, Joe, and/or Michelle that is currently located at 10402 W. Hidden Lake Lane, Richmond, Texas 77406 shall be distributed to Dakota, Joe, and/or Michelle as appropriate. Dakota, Joe and/or Michelle shall

3

be afforded the opportunity, within thirty (30) days of the Effective Date of this Settlement Agreement, to conduct a supervised walkthrough of their personal property located at 10402 W. Hidden Lake Lane, Richmond, Texas 77406. During that time, Dakota, Joe, and/or Michelle will take photographs of their personal property which they would like to obtain. A list and accompanying photographs will be delivered to counsel for Holli of those items within fourteen (14) days of the walkthrough being completed. Holli will have fourteen (14) days to object to the items which Dakota, Joe, and/or Michelle would like to obtain. If the parties cannot reach a resolution regarding the same, Russ Jones will mediate, at an hourly rate, the division of the disputed personal property. Upon the completion and approval of a final list of items, Dakota, Joe, and/or Michelle, at their expense, shall obtain and remove the items on the approved final list of items at a mutually agreeable date and time within fourteen (14) days of the approval of the final list of items.

7.    The attorney's fees for Holli, Dakota, Joe, Michelle, and/or Ashley may be paid from the assets of the Holli Ann Hardin Trust Number One in an amount no more than $200,000.00 per side. The Parties will present their fees to Linda Goehrs, in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, for payment. The Parties agree that they will not object to the payment of the fees of any other party.

8.    The real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183 shall be distributed to Holli. Dakota, Michelle, and Joe, with Dakota as authorized representative, shall retain a right of first refusal in the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183. If Holli decides to sell or otherwise transfer the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183, Holli shall notify Dakota, Michelle, and Joe in writing and provide an appraisal completed by a certified and licensed real estate appraiser. From the date of receipt of that notice, Dakota, Michelle, and/or Joe shall have 30 days to exercise their right to purchase the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183. If exercised, Dakota, Michelle, and/or Joe shall enter into a real estate contract to purchase the property with a proposed closing date sixty (60) days from the date of receipt of the notice of sale or transfer triggering the right of first refusal. Holli is not required to sell at the appraised value if she receives offers in excess of the appraised value. If Holli receives an offer greater than the appraised value, the right of first refusal will be triggered upon delivery of the great offer to Dakota as authorized representative. The right of refusal will not renew if it is not exercised against the greatest value delivered by Holli.

9.    With regard to the further administration of the Holli Ann Hardin Trust Number One:

- The Parties agree that the assets of the Holli Ann Hardin Trust Number One shall be appraised by certified and licensed business or real estate appraisers, as is appropriate for the particular asset. Russ Jones shall select the appraisers to complete the real estate and business appraisals. The costs of the appraisals shall be borne by the Holli Ann Hardin Trust Number One.

4

- The Parties agree that, once the values on the appraisals are obtained for all Holli Ann Hardin Trust Number One assets, Holli's interest will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One in an amount equal to the twenty percent (20%) of the total value of the assets. Such purchase will occur within ninety days (90) of the completion of the valuation of the assets of the Holli Ann Hardin Trust Number One.

- The Parties agree that during the appraisal period described above, Linda Goehrs, in her capacity as Temporary Successor Trustee and/or Dakota, shall execute the necessary documents to install Dakota as an Officer and/or Director of Ice Embassy, Inc., HRF Enterprises, Inc., and Entertainment Marketing and Management, LP.

- The Parties agree that Linda Goehrs shall remain Temporary Successor Trustee of the Holli Ann Hardin Trust Number One until the closing of a sale on Holli's interest in the Holli Ann Hardin Trust Number One. At the time that Holli's interest is purchased, Linda Goehrs will resign as Temporary Successor Trustee, and Dakota, Joe, Michelle, and Ashley shall select a Successor Trustee of the Trust.

- Holli agrees to execute an assignment of interest and disclaimer of further interest in the Holli Ann Hardin Trust Number One at the time that her interest is purchased in accordance with this Settlement Agreement.

- The Parties agree that Dakota and Holli shall remain employees of Entertainment Marketing and Management, LP, and/or the business, or businesses owned by the Holli Ann Hardin Trust Number One. Holli shall be removed from the payroll on the date that her interest is purchased pursuant to this Agreement. The compensation amount that Dakota and Holli have been receiving shall remain unchanged.

- The Parties agree that Dakota and Holli shall remain on the insurance paid for by Entertainment Marketing and Management, LP, and/or the business or businesses owned by the Holli Ann Hardin Trust Number One. Holli shall be removed from the insurance plan on the date that her interest is purchased pursuant to this Agreement.

- To the extent owned by the Trust, Linda Goehrs as Temporary Successor Trustee, shall gift the horses known as Coco and Rusty to Holli.

10.   With regard to the further administration of the Dakota Trust:

- The Parties agree that the assets of the Dakota Trust shall be appraised by certified and licensed real estate appraisers. Russ Jones shall select the appraisers to complete the real estate appraisal. The cost of the appraisal shall be borne by the Dakota Trust.

5

- Upon completion of the appraisal, the total value of the assets will be compiled and Holli's interest will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One in an amount equal to eighty-five percent (85%) of the total value of the assets. Such purchase will occur within ninety days (90) of the completion of the valuation of the assets of the Dakota Trust.

- Holli agrees to execute an assignment of interest and disclaimer of further interest in the Dakota Trust at the time that her interest in purchased in accordance with this Settlement Agreement.

11. Within seven (7) days of the Effective Date of this agreement, Dakota, Joe, Michelle, and/or Ashley agree to dismiss all pending pleas, pleadings, and/or motions, with prejudice regarding the Estate and/or Trust pending in cause number 21-CPR-036521 and cause number 21-DVC-288736, both of which are pending in Fort Bend County, Texas.

12. Neither the Trust nor any entity owned, held, or possessed by the Holli Ann Hardin Trust Number One, the Dakota Trust, and/or the Estate have any claims against any of the Parties.

13. The Parties agree to release Linda Goehrs, in her capacity as Temporary Successor Trustee, for making distributions according to this Settlement Agreement which contradict the terms of the Trust Agreement for the Holli Ann Hardin Trust Number One or the Dakota Trust.

## C. RELEASES AND DISCHARGE

1. **Release of Claims by Dakota.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Dakota, on behalf of himself and all his heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Holli, Joe, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Dakota hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Dakota expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Holli, Joe, Michelle, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Dakota does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

2. **Release of Claims by Holli.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Holli, on behalf of herself and all her heirs, successors,

6

executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Joe, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Holli hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Holli expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Michelle, Joe, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Holli does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

3.    **Release of Claims by Joe.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Joe, on behalf of himself and all his heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Joe hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Joe expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Michelle, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Joe does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

4.    **Release of Claims by Michelle.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Michelle, on behalf of herself and all her heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Joe, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Michelle hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Michelle expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind

7

known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Joe, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Michelle does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

5.    **Release of Claims by Ashley.**  For and in consideration of the mutual promises, covenants, and agreements stated herein, Ashley, on behalf of herself and all her heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Joe, Michelle, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Ashley hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Ashley expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Joe, and Michelle. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Ashley does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

## D. REPRESENTATIONS AND WARRANTIES

1.    **Representations and Warranties.** Each of the Parties hereto represents and warrants to the other that:

    a.    They are adequately represented by competent counsel in connection with the execution and delivery of this Settlement Agreement and/or had an opportunity to retain counsel in connection with this Settlement Agreement;

    b.    In executing this Settlement Agreement, they relied upon the Party's own judgment and any advice it received from its own attorneys;

    c.    They were not induced to sign or execute this Settlement Agreement by promises, omissions, agreements, or representations not expressly stated in this Settlement Agreement;

    d.    They freely and willingly executed this Settlement Agreement and expressly disclaims reliance upon any facts, promises, statements made or not made, undertakings, or representations made by any person or entity

8

prior to the Effective Date of this Settlement Agreement except as specifically enumerated herein;

e.. They consent that this Settlement Agreement was not procured, obtained, or induced by improper conduct or undue influence;

f. After an opportunity to consult with an attorney concerning the matters made subject of this Settlement Agreement, and after reviewing this Settlement Agreement, they agree this Settlement Agreement is fair, reasonable, and supported by good, valuable, and adequate consideration; and

g. They understand and agree to the terms and conditions of this Settlement Agreement, which contains the entire agreement between the Parties relating to the matters made the subject of this Settlement Agreement.

2. **Capacity and Authority.** Each of the Parties hereto represents and warrants to the other that the person signing this Settlement Agreement in a representative capacity has the requisite authority and consent to execute this Settlement Agreement on behalf of the Party for whom he or she has executed this Settlement Agreement, and that this Settlement Agreement is binding upon the Party for whom he or she has executed this Settlement Agreement and upon such Party's successors and assigns.

3. **Assignment of Claims.** Each of the Parties hereto represents and warrants to the other that it has not transferred, assigned, or otherwise conveyed, excepting any interest held by counsel, in whole or in part, its respective interest in the Claims at issue and that it is the owner and holder thereof. Each of the Parties further represents and warrants that, aside from any interest held by counsel, it is the only holder of the Claims being released and that no other person or entity owns, or has any interest in, any of the Claims being released. Despite any interest held by counsel, this Settlement Agreement applies to the entirety of each of the Parties' Claims.

4. **Cooperation in Execution of Further Documents.** Each of the Parties expressly agrees to execute any other documents reasonably necessary to effectuate the terms, purpose, and intent of this Settlement Agreement.

### E. MISCELLANEOUS PROVISIONS

1. **Invalidity.** In the event any one or more of the provisions of this Settlement Agreement shall, for any reason, be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Settlement Agreement.

2. **Entire Agreement.** This Settlement Agreement reflects the final and complete agreement between the parties concerning the matters made subject of this Settlement Agreement and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the Parties. There are no unwritten oral agreements between the Parties. The Parties expressly

UNOFFICIAL COPY

9

acknowledge that any rights, duties, or obligations, whether contractual or otherwise, owed by or between the Parties prior to the effective date of this Settlement Agreement are terminated as of the Effective Date of this Settlement Agreement and the only rights, duties, or obligations owed by or between the Parties from this point forward shall be those set forth in this Settlement Agreement.

3.    **Governing Law and Venue.** The validity, effect, and construction of this Settlement Agreement shall be governed by the laws of the State of Texas. Venue for any cause of action, controversy, or dispute regarding this Settlement Agreement or the subject matter hereof shall be proper only in the state courts of Fort Bend County, Texas.

4.    **Amendment.** This Settlement Agreement may not be amended, modified, waived, or terminated unless such is done in a writing signed by all the Parties.

5.    **Construction of Agreement.** This Settlement Agreement shall not be construed in favor of or against any Party on the basis that the Party did or did not author this Settlement Agreement or any attachment related to it. It is intended that this Settlement Agreement shall be comprehensive in nature and shall be construed liberally to affect its purposes.

6.    **Titles or Headings.** All titles or headings used in this Settlement Agreement are used only for the convenience of the Parties and shall not be construed to have any effect or meaning with respect to the other content of the Settlement Agreement, such other content being controlling as to the Settlement Agreement of the Parties.

7.    **Costs and Attorneys' Fees.** Each party shall bear its own costs and attorneys' fees in relation to the claims and the negotiation and preparation of this Settlement Agreement, subject to the attorney's fees provisions within this Settlement Agreement.

8.    **Waiver.** The failure of any of the Parties to enforce, at any time, any provision of this Settlement Agreement shall not be construed to be a waiver of such provision, nor in any way affect the validity of this Settlement Agreement or any part thereof or any right of any Party thereafter to enforce each and every provision. No waiver of any breach of this Settlement Agreement shall be held to constitute a waiver of any other breach.

9.    **Binding Agreement.** This Settlement Agreement is binding on the Parties hereto and not subject to revocation, repudiation, or withdrawal of consent, even if one or more of them shall become debtors in a bankruptcy proceeding. This binding effect is an integral part of this Agreement.

10.    **Execution of Agreement.** This Settlement Agreement may be executed in a number of identical counterparts, each of which shall be deemed an original for all purposes. A fax signature or a copy of an original signature shall constitute an original signature for purposes of this Settlement Agreement. This Settlement Agreement shall be valid only if fully executed by all Parties and/or their representatives as agreed to herein. If not fully executed by all Parties, this Settlement Agreement shall be null and void and of no effect.

10

11. **Future Disputes.** In the event that there are future disputes, disagreements, and/or conflicts regarding the terms and/or implementation of any terms of this Settlement Agreement, the Parties agree to return to Russ Jones for mediation regarding the dispute. The Parties agree to return to mediation prior to filing any litigation regarding a breach of this settlement agreement or these terms. If a Party refuses to return to mediation, the remaining parties are permitted to file litigation without returning to mediation. Should further litigation be filed regarding a breach of the agreement, the prevailing party shall be entitled to an award of attorney's fees as determined by a jury or judge.

12. **Indemnity.** Each party shall indemnify the other parties for all claims made by, through, or under the indemnifying party.

AGREED TO BY ALL PARTIES AS EVIDENCED BY THEIR SIGNATURE BELOW ON THIS THE 7th DAY OF JANUARY, 2022.

Dakota Fontenot, in all capacities

Holli Ann Fontenot, in all capacities

Dallas Joseph Fontenot, III, in all capacities

Michelle Ann Fontenot, in all capacities

Ashley Fontenot Estrada, in all capacities

Christopher Burt
*Counsel for Dakota Fontenot*

11

UNOFFICIAL COPY

11.    **Future Disputes.** In the event that there are future disputes, disagreements, and/or conflicts regarding the terms and/or implementation of any terms of this Settlement Agreement, the Parties agree to return to Russ Jones for mediation regarding the dispute. The Parties agree to return to mediation prior to filing any litigation regarding a breach of this settlement agreement or these terms. If a Party refuses to return to mediation, the remaining parties are permitted to file litigation without returning to mediation. Should further litigation be filed regarding a breach of the agreement, the prevailing party shall be entitled to an award of attorney's fees as determined by a jury or judge.

12.    **Indemnity.** Each party shall indemnify the other parties for all claims made by, through, or under the indemnifying party.

AGREED TO BY ALL PARTIES AS EVIDENCED BY THEIR SIGNATURE BELOW ON THIS THE 7th DAY OF JANUARY, 2022.

_____
Dakota Fontenot, in all capacities


_____
Holli Ann Fontenot, in all capacities


## Dallas Joseph Fontenot III
_____
Dallas Joseph Fontenot, III, in all capacities


## Michelle Ann Fontenot
_____
Michelle Ann Fontenot, in all capacities


## Ashley Fontenot Estrada
_____
Ashley Fontenot Estrada, in all capacities


_____
Christopher Burt
*Counsel for Dakota Fontenot*

11

_____

Steven Mendel
*Counsel for Holli Ann Fontenot*


_____

Kenneth Sumner
*Counsel for Dallas Joseph Fontenot, III,*
*Michelle Ann Fontenot, and Ashley Estrada*

12

Steven Mendel
*Counsel for Holli Ann Fontenot*

## Kenneth E. Sumner, Jr.

Kenneth Sumner
*Counsel for Dallas Joseph Fontenot, III,*
*Michelle Ann Fontenot, and Ashley Estrada*

Signature: *Dallas Joseph Fontenot III*
Dallas Joseph Fontenot III (Jan 7, 2022 19:33 CST)
Email: djoef3@hotmail.com

Signature: Michelle Fontenot (Jan 7, 2022 19:36 CST)
Email: mannefontenot@gmail.com

Signature: Ashley Fontenot Estrada (Jan 7, 2022 19:38 CST)
Email: ashleyafontenot@gmail.com

Signature: *Kenneth C. Sumner, Jr.*
Email: ksumner@romanosumner.com

UNOFFICIAL COPY

12



EXHIBIT

F

## DESIGNATION OF SUCCESSOR TRUSTEE
### Dakota Trust

The undersigned Dallas Joseph Fontenot, Jr., Successor Trustee of Dakota Trust, a trust established by Trust Declaration of Holli Ann Fontenot dated November 9, 1994 ("Trust Declaration") does hereby declare as follows:

Article V, Section C of the Trust Declaration provides in part that:

> SUCCESSION. Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment will have the right to appoint a successor or successors to serve as Trustee in the event that person ceases to serve for any reason, and each Trustee may specify any conditions upon succession and service as may be permitted by law. For example, a successor may be required to furnish a fiduciary bond as a prerequisite or a successor's service may be conditioned upon another appointee's death, resignation, or inability to serve. Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment may also provide that one or more designated successors as Trustee will have the authority to appoint his, her, or its successor as Trustee. An appointment of successor Trustee must be in writing and must be acknowledged to be effective.

Pursuant to Article V, Section C of the Trust Declaration, Dallas Joseph Fontenot, Jr. appoints Dakota James Fontenot as successor Trustee, to serve immediately upon the death, disability, resignation, or disqualification of Dallas Joseph Fontenot, Jr.

Dallas Joseph Fontenot, Jr. appoints Frost Bank to serve as successor Trustee upon the death, disability, resignation, or disqualification of Dakota James Fontenot.

Each Trustee will have the right to appoint a successor or successors to serve as trustee of the Trust in the event that he ceases to serve for any reason, and such Trustee may specify any conditions upon succession and service as may be permitted by law.

The incapacity or disability of a trustee hereunder shall be (i) determined by a duly licensed physician representing that he or she is certified by a recognized medical board and is not related by blood or marriage to any trustee or beneficiary hereunder; and (ii) evidenced by a writing which is executed, witnessed, and acknowledged certifying that such a physician is familiar with the physical and mental condition of a person and has concluded that, by reason of accident, physical, or mental deterioration, or other similar cause, such person was, as of the date thereof, unable to give prudent, prompt, and intelligent consideration to financial matters. No judicial determination of incapacity

UNOFFICIAL COPY

or disability shall be necessary. Any physician's certificate described above may be revoked by a similar certificate to the effect that such person is no longer incapacitated, which certificate must be executed either (i) by the originally certifying physician or (ii) by two other licensed, unrelated physicians. In the case of a revocation of a certificate of incapacity or disability of a trustee hereunder, such revocation shall cause such trustee to regain his or her appointment as trustee, and the then serving successor trustee shall be relieved of his or her duties.

This Designation of Successor Trustee shall be effective as of May 1, 2013 and shall revoke and replace all prior Designations of Successor Trustee.

_____
Dallas Joseph Fontenot, Jr., Trustee

STATE OF NEVADA
COUNTY OF _Clark_
This document was acknowledged before me on the _7TH_ day of May, 2013 by Dallas Joseph Fontenot, Jr., Trustee.

MICHAEL J. MOORE
Notary Public State of Nevada
No. 08-7991-1
My Appt. Exp. September 11, 2016

_____
Notary Public, State of Nevada

000356

EXHIBIT

G
_____

## DESIGNATION OF SUCCESSOR TRUSTEE
### Dakota Trust

The undersigned Dallas Joseph Fontenot, Jr., Successor Trustee of Dakota Trust, a trust established by Trust Declaration of Holli Ann Fontenot dated November 9, 1994 ("Trust Declaration") does hereby declare as follows:

Article V, Section C of the Trust Declaration provides in part that:

> SUCCESSION. Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment will have the right to appoint a successor or successors to serve as Trustee in the event that person ceases to serve for any reason, and each Trustee may specify any conditions upon succession and service as may be permitted by law. For example, a successor may be required to furnish a fiduciary bond as a prerequisite or a successor's service may be conditioned upon another appointee's death, resignation, or inability to serve. Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment may also provide that one or more designated successors as Trustee will have the authority to appoint his, her, or its successor as Trustee. An appointment of successor Trustee must be in writing and must be acknowledged to be effective.

Pursuant to Article V, Section C of the Trust Declaration, Dallas Joseph Fontenot, Jr. removes all prior appointments of appoints Dakota James Fontenot as successor Trustee and, instead, appoints Frost Bank to serve as successor Trustee upon the death, disability, resignation, or disqualification of Dallas Joseph Fontenot, Jr.

Each Successor Trustee will have the right to appoint a successor or successors to serve as trustee of the Trust in the event that he ceases to serve for any reason, and such Trustee may specify any conditions upon succession and service as may be permitted by law.

The incapacity or disability of a trustee hereunder shall be (i) determined by a duly licensed physician representing that he or she is certified by a recognized medical board and is not related by blood or marriage to any trustee or beneficiary hereunder; and (ii) evidenced by a writing which is executed, witnessed, and acknowledged certifying that such a physician is familiar with the physical and mental condition of a person and has concluded that, by reason of accident, physical, or mental deterioration, or other similar cause, such person was, as of the date thereof, unable to give prudent, prompt, and intelligent consideration to financial matters. No judicial determination of incapacity or disability shall be necessary. Any physician's certificate described above may be

000456

revoked by a similar certificate to the effect that such person is no longer incapacitated, which certificate must be executed either (i) by the originally certifying physician or (ii) by two other licensed, unrelated physicians. In the case of a revocation of a certificate of incapacity or disability of a trustee hereunder, such revocation shall cause such trustee to regain his or her appointment as trustee, and the then serving successor trustee shall be relieved of his or her duties.

This Designation of Successor Trustee shall be effective as of October 14, 2017 and shall revoke and replace all prior Designations of Successor Trustee.

_____
Dallas Joseph Fontenot, Jr., Trustee

STATE OF TEXAS
COUNTY OF Harris

This document was acknowledged before me on the 14th day of October, 2017 by Dallas Joseph Fontenot, Jr., Trustee.

_____
Notary Public, State of Texas

DIANNE N SKINNER
Notary ID # 126280969
My Commission Expires
November 11, 2019

000457



EXHIBIT

H

## RESOLUTIONS ADOPTED BY
## WRITTEN CONSENT OF SHAREHOLDER AND DIRECTOR OF
## VIVA LAS VEGAS PROPERTIES, INC.
### (OCTOBER 14, 2017)

The undersigned, being the sole shareholder of Viva Las Vegas Properties, Inc., a corporation organized and existing under the laws of Texas, does by this writing consent to take the following actions and adopt the following resolutions:

> RESOLVED that the following persons person is elected as the sole Director of Viva Las Vegas Properties, Inc., to serve at the discretion of the Shareholder from October 14, 2017 until such time as his successors are elected by the Shareholder and qualify:

> Dallas Fontenot

The undersigned direct that this consent be filed with the minutes of the proceeding of the Shareholders of Viva Las Vegas Properties, Inc.

The undersigned, now being the sole director of Viva Las Vegas Properties, Inc., does by this writing consent to take the following actions and adopt the following resolutions:

> RESOLVED that the following person is elected to the offices of Viva Las Vegas Properties, Inc. set forth below, to serve at the discretion of the director from October 14, 2017 until such time as his successors are elected by the Shareholder and qualify:

> Dallas Fontenot     President
> Dallas Fontenot     Secretary

> ESOLVED that Dakota Fontenot is hereby removed from all offices and all positions as a Director of Viva Las Vegas Properties, Inc. from and after October 14, 2017.

The undersigned direct that this consent be filed with the minutes of the proceeding of the Directors of Viva Las Vegas Properties, Inc.

This consent is executed pursuant to the laws of Texas and the Bylaws of Viva Las Vegas Properties, Inc., which authorize the taking of action by the Shareholders and Directors by unanimous written consent without a meeting. This consent is intended to substitute for a special meeting of the Shareholders and Directors of Viva Las Vegas Properties, Inc. Only those persons named above shall serve as Directors until a subsequent election or appointment by the

000437

Shareholder of Viva Las Vegas Properties, Inc. Only those persons named above shall serve as an officer until a subsequent election or appointment by the Director of Viva Las Vegas Properties, Inc.

Dated to be effective as of October 14, 2017.

Viva Las Vegas Properties, Inc., Shareholder

by: _____
Dallas Fontenot, President

_____
Dallas Fontenot, Director

000438

DocuSign Envelope ID: A147B6D8-8079-4BCD-868D-83F1A7F21409



**EXHIBIT**

I

## VIVA LAS VEGAS PROPERTIES, INC.
## UNANIMOUS JOINT WRITTEN CONSENT OF THE
## SOLE SHAREHOLDER AND SOLE DIRECTOR
## IN LIEU OF A SPECIAL MEETING

August 24, 2023

Pursuant to the provisions of the Texas Business Organizations Code, the undersigned, being the sole shareholder (*"Sole Shareholder"*) and the sole director (the *"Sole Director"*) of VIVA LAS VEGAS PROPERTIES, a Texas corporation (the *"Corporation"*), in lieu of holding a special meeting of the Sole Shareholder and Board, the call and notice of which is hereby expressly waived, do hereby consent to the following resolutions:

**Appointment of a New Director to the Board of Directors**

**WHEREAS**, Dakota Fontenot is currently the Sole Director of the Corporation; and

**WHEREAS**, the Sole Shareholder desires to number of directors on the board of directors of the Corporation by adding one (1) additional director.

**RESOLVED**, that the following named person be, and hereby is, elected to serve as a director of the Board, and to serve in such capacity until her respective successor has been duly elected and qualified, or until her earlier death, resignation or removal:

Madison Fontenot

**Election of a New Secretary**

**RESOLVED**, that effective immediately after the adoption of the resolution set forth above appointing the new director to the Board, that the following named person be, and hereby is, elected to the office set forth opposite her name, to serve in such capacity until her successor is duly elected and qualified or until her earlier death, resignation or removal:

Madison Fontenot                     Secretary and Treasurer

**FURTHER RESOLVED**, that this officer is empowered to carry out the day-to-day business of the Corporation, subject to the direction and control of the Board.

**General Authority**

1

DocuSign Envelope ID: A147B6D8-8079-4BCD-868D-83F1A7F21409

**RESOLVED,** that the execution by the President or any other officer of the Corporation of any document authorized by the foregoing resolutions, or any document executed in the accomplishment of any action or actions so authorized, is (or shall become upon delivery) the enforceable and binding act and obligation of the Corporation without the necessity of the signature or attestation of any other officer of the Corporation or the affixing of the corporate seal.

**RESOLVED FURTHER,** that all acts, transactions, or agreements undertaken by the President or any other officer of the Corporation, in the name of and on the behalf of the Corporation, in connection with the foregoing matters prior to the adoption of these resolutions are hereby ratified, confirmed and adopted by the Corporation.

**RESOLVED FURTHER,** that the President or any other officer of the Corporation be, and each of them hereby is, authorized and empowered to certify these resolutions.

*(Signature Page Follows)*

2

DocuSign Envelope ID: A147B6D8-8079-4BCD-868D-83F1A7F21409

**EXECUTED** by the undersigned to be effective as of the first date written above.

**SOLE SHAREHOLDER:**

**DAKOTA TRUST**

By: _____ _Dakota James Fontenot_
7272523D83F9429

Name: Dakota Fontenot
Title: Trustee

**SOLE DIRECTOR:**

_Dakota James Fontenot_
7272523D83F9429

**DAKOTA FONTENOT**

Signature Page
Unanimous Joint Written Consent of the Sole Shareholder
and the Sole Director in Lieu of a Special Meeting
(VIVA LAS VEGAS PROPERTIES, INC.)

EXHIBIT

J

STATE OF TEXAS          §
                       §
COUNTY OF HARRIS        §


BEFORE ME, the undersigned authority, on this day personally appeared Linda C. Goehrs, Successor Temporary Trustee of the Holli Hardin Trust, who, being by me duly sworn, stated on oath:

"My name is Linda C. Goehrs, Successor Temporary Trustee of the Holli Hardin Trust. I am the Plaintiff in the foregoing Application for Temporary Restraining Order. I have read the application, and the factual statements contained therein are within my personal knowledge and are true and correct."

_____
Signature of Applicant

SUBSCRIBED AND SWORN TO before me on this 22nd day of August 2025.


_____
Notary Public, State of Texas

ROBIN C. EDWARDS
MY COMMISSION EXPIRES
MARCH 8, 2029
NOTARY ID: 12050914

UNOFFICIAL COPY

Hardin Trust TRO/TI

K

## A. Settlement Statement

**U.S. Department of Housing and Urban Development**

OMB No. 2502-0265

### B. Type of Loan

| | | |
|---|---|---|
| 1. ☐ FHA  2. ☐ FmHA  3. ☐ Conv Unins | 6. File Number | 7. Loan Number |
| 4. ☐ VA  5. ☐ Conv Ins.  6. ☐ Seller Finance | **25-100182-01** | 8. Mortgage Ins Case Number |
| 7. ☐ Cash Sale. | | |

**C. Note:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D. Name & Address of Borrower | E. Name & Address of Seller | F. Name & Address of Lender |
|---|---|---|
| **CLE Group SKZ Real Estate, LLC**<br><br>, | **HFR Enterprises Inc.**<br><br>, | <br>, |

| G. Property Location | H. Settlement Agent Name |
|---|---|
| **6710 Southwest Freeway**<br>**Houston, TX  77074** | **Post Oak Title**<br>**4543 Post Oak Place, Suite 222**<br>**Houston, TX  77027   Tax ID: 4●●●●005**<br>**Underwritten By: Stewart** |

| Place of Settlement | I. Settlement Date |
|---|---|
| **Post Oak Title**<br>**4543 Post Oak Place, Suite 222**<br>**Houston, TX  77027** | **6/30/2025**<br>Fund: **6/30/2025** |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due from Borrower** | | **400. Gross Amount Due to Seller** | |
| 101.  Contract Sales Price | | 401.  Contract Sales Price | $4,689,424.72 |
| 102.  Personal Property | | 402.  Personal Property | |
| 103.  Settlement Charges to borrower | | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| **Adjustments for items paid by seller in advance** | | **Adjustments for items paid by seller in advance** | |
| 106.  City property taxes | | 406.  City property taxes | |
| 107.  County property taxes | | 407.  County property taxes | |
| 108.  Assessment Taxes | | 408.  Assessment Taxes | |
| 109.  School property taxes | | 409.  School property taxes | |
| 110.  MUD taxes | | 410.  MUD taxes | |
| 111.  HOA Dues | | 411.  HOA Dues | |
| 112.  Assignment Fee | | 412. | |
| 113. | | 413. | |
| 114. | | 414. | |
| 115. | | 415. | |
| 116. | | 416. | |
| **120. Gross Amount Due From Borrower** | | **420.  Gross Amount Due to Seller** | $4,689,424.72 |
| **200. Amounts Paid By Or in Behalf Of Borrower** | | **500. Reductions in Amount Due to Seller** | |
| 201.  Deposit or earnest money | | 501.  Excess Deposit | |
| 202.  Principal amount of new loan(s) | | 502.  Settlement Charges to Seller (line 1400) | $969,766.49 |
| 203.  Existing Loan(s) Taken Subject to | | 503.  Existing Loan(s) Taken Subject to | $2,737,357.00 |
| 204.  Loan Amount 2nd Lien | | 504.  Payoff of first mortgage loan     to **LHS Homes, LLC** | $217,917.89 |
| 205. | | 505.  Payoff of second mortgage loan    to | |
| 206.  Home Warranty Credit | | 506.  Home Warranty Credit | |
| 207.  Seller Credit | | 507.  Seller Credit | |
| 208.  Option Fee | | 508.  Option Fee | |
| 209. | | 509. | |
| **Adjustments for items unpaid by seller** | | **Adjustments for items unpaid by seller** | |
| 210.  City property taxes | | 510.  City property taxes | |
| 211.  County property taxes     01/01/25 thru 06/30/25 | | 511.  County property taxes     01/01/25 thru 06/30/25 | $25,243.56 |
| 212.  Assessment Taxes | | 512.  Assessment Taxes | |
| 213.  School property taxes | | 513.  School property taxes | |
| 214.  MUD taxes | | 514.  MUD taxes | |
| 215.  HOA Dues | | 515.  HOA Dues | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid By/For Borrower** | | **520. Total Reduction Amount Due Seller** | $3,950,284.94 |
| **300. Cash At Settlement From/To Borrower** | | **600. Cash At Settlement To/From Seller** | |
| 301. Gross Amount due from borrower (line 120) | | 601. Gross Amount due to seller (line 420) | $4,689,424.72 |
| 302. Less amounts paid by/for borrower (line 220) | | 602. Less reductions in amt. due seller (line 520) | $3,950,284.94 |
| **303. Cash From Borrower** | | **603. Cash To Seller** | $739,139.78 |

Section 5 of the Real Estate Settlement Procedures Act (RESPA) requires the following:  • HUD must develop a Special Information Booklet to help persons borrowing money to finance the purchase of residential real estate to better understand the nature and costs of real estate settlement services;
• Each lender must provide the booklet to all applicants from whom it receives or for whom it prepares a written application to borrow money to finance the purchase of residential real estate;  • Lenders must prepare and distribute with the Booklet a Good Faith Estimate of the settlement costs that the borrower is likely to incur in connection with the settlement. These disclosures are mandatory.

Section 4(a) of RESPA mandates that HUD develop and prescribe this standard form to be used at the time of loan settlement to provide full disclosure of all charges imposed upon the borrower and seller. These are third party disclosures that are designed to provide the borrower with pertinent information during the settlement process in order to be a better shopper.
The Public Reporting Burden for this collection of information is estimated to average one hour per response, including the time for reviewing instructions searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.
This agency may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB control number.
The information requested does not lend itself to confidentiality.

CONFIDENTIAL DOCUMENTS                    HAH0119512

## L. Settlement Charges

| | | | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|---|---|
| **700.** | **Total Sales/Broker's Commission based on price** | @ % = | | | |
| | Division of Commission (line 700) as follows: | | | | |
| 701. | to | | | | |
| 702. | to | | | | |
| 703. | | | | | |
| **800.** | **Items Payable in Connection with Loan** | | | | |
| 801. | Loan Origination Fee     % | to | | | |
| 802. | Loan Discount     % | to | | | |
| 803. | Appraisal Fee | to | | | |
| 804. | Credit Report | to | | | |
| 805. | Lender's Inspection Fee | to | | | |
| 806. | Mortgage Insurance Application | to | | | |
| 807. | Assumption Fee | to | | | |
| 808. | Document Preparation | to | | | |
| 809. | Administration Fee | to | | | |
| 810. | Processing Fee | to | | | |
| 811. | Tax Service Fee | to | | | |
| 812. | Underwriting Fee | to | | | |
| 813. | Wire Transfer Fee | to | | | |
| 814. | Flood Certification Fee | to | | | |
| **900.** | **Items Required by Lender To Be Paid in Advance** | | | | |
| 901. | Interest from   6/30/2025   to   7/1/2025 @ $0/day | | | | |
| 902. | Mortgage Insurance Premium for  months | to | | | |
| 903. | Hazard Insurance Premium for  years | to | | | |
| **1000.** | **Reserves Deposited With Lender** | | | | |
| 1001. | Hazard insurance | months @        per month | | | |
| 1002. | Mortgage insurance | months @        per month | | | |
| 1003. | City property taxes | months @        per month | | | |
| 1004. | County property taxes | months @        per month | | | |
| 1005. | Assessment Taxes | months @        per month | | | |
| 1006. | School property taxes | months @        per month | | | |
| 1007. | MUD taxes | months @        per month | | | |
| 1008. | HOA Dues | months @        per month | | | |
| 1011. | Aggregate Adjustment | | | | |
| **1100.** | **Title Charges** | | | | |
| 1101. | Settlement or closing fee | to   Post Oak Title | | | $595.00 |
| 1102. | Abstract or title search | to | | | |
| 1103. | Title examination | to | | | |
| 1104. | Title insurance binder | to | | | |
| 1105. | Document preparation | to | | | |
| 1106. | Notary fees | to   Calico Notary Services Inc. | | | |
| 1107. | Attorney's fees - Document Prep - Deed | to   The Law Office of David Ayala, PLLC | | | |
| | (includes above items numbers:                                    ) | | | | |
| 1108. | Title insurance | to   Post Oak Title | | | $21,550.00 |
| | (includes above items numbers:                                    ) | | | | |
| 1109. | Lender's coverage | $0.00/$0.00 | | | |
| 1110. | Owner's coverage | $4,689,424.72/$21,550.00 | | | |
| 1111. | Escrow fee | to   Post Oak Title | | | |
| 1112. | Attorney's fees - Document Prep - ROL | to | | | |
| 1113. | Title - State of Texas Policy Guaranty F | to   Texas Title Insurance Guaranty Association | | | $0.00 |
| **1200.** | **Government Recording and Transfer Charges** | | | | |
| 1201. | Recording Fees   Deed $24.00 ; Mortgage $102.00 ; Rel          to Post Oak Title | | | | |
| 1202. | City/county tax/stamps   Deed  ; Mortgage          to | | | | |
| 1203. | State tax/stamps   Deed  ; Mortgage          to | | | | |
| 1204. | Tax certificates | to   Nations Tax Solutions, Inc. | | | $109.00 |
| 1205. | Courier/Messenger Fee | to   Post Oak Title | | | $95.00 |
| 1206. | Wire Fee | to   Post Oak Title | | | $55.00 |
| 1207. | E-Recording | to   Post Oak Title | | | |
| **1300.** | **Additional Settlement Charges** | | | | |
| 1301. | Closing Cooridnation | to   SIZE | | | $1,250.00 |
| 1302. | Pest Inspection | to | | | |
| 1303. | HOA - Outstanding Balance | to | | | |
| 1304. | HOA - Statement Of Account | to | | | |
| 1305. | Attorney Fee | to   Nance & Simpson, LLP | | | |
| 1306. | Outsstanding Tax - ACT#:091-509-000-0028 | to   Harris County | | | $10,731.05 |
| 1307. | Outsstanding Tax - ACT#:104-849-000-0001 | to   Harris County | | | $56,373.69 |
| 1308. | Attorney Fee | to   Pagel, Davis & Hill, P.C. | | | $22,778.00 |
| 1309. | Consulting Fee | to   Gray Entertainement Inc | | | $150,000.00 |
| 1310. | Attorney Fee | to   The Greenwood Law Firm, PLLC | | | $31,229.75 |
| 1311. | Consulting Fee | to   Tim Wilson | | | $175,000.00 |
| 1312. | Escrow Indemnity | to   Argent Institutional Trust Company | | | $500,000.00 |
| **1400.** | **Total Settlement Charges (enter on lines 103, Section J and 502, Section K)** | | | | $969,766.49 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a completed copy of pages 1, 2 and 3 of this HUD-1 Settlement Statement.

CONFIDENTIAL DOCUMENTS   HAH011513

HFR Enterprises Inc.

SETTLEMENT AGENT CERTIFICATION
The HUD-1 Settlement Statement which I have prepared is a true and accurate
account of this transaction.  I have caused the funds to be disbursed in
accordance with this statement.

By *Linda Goehrs*

_____    _____
Settlement Agent                                    Date

**Warning:** It is a crime to knowingly make false statements to the United
States on this or any other similar form.  Penalties upon conviction can
include a fine and imprisonment.  For details see: Title 18 U.S. Code Section
1001 and Section 1010.

Previous Editions are Obsolete                    Page 2                    form **HUD-1** (3/86)
                                                                            Handbook 4305.2

UNOFFICIAL COPY

CONFIDENTIAL DOCUMENTS                                    HAH011514

Case 4:26-cv-02743 Document 16-1 Filed 04/29/26 in TXSD Page 216 of 1053

EXHIBIT

L

Want to Schedule a Tour?

Texas > Fort Bend > Rosenberg > 77471 > Details

# 3414 Old Richmond Rd

Rosenberg, TX 77471   Get Directions

EN ▼

For Sale | Under Contract = P

**$700,000**

Est. Mortgage 3,569/month

Currency converter

‹                                                                                    ›

8 photos

**1.95** Lot Acres                                    **Lots**                    13 Day(s) on Market

## Audio narrative 🔊

▶  00:00 ○━━━━━━━━━━━━━━━━━━━━━━━━━

Choose from 12 Languages ▼     ⤷ Share

## About this property

| Large lot | Flex space | Warehouse | Office | 5,557 sqft | 1.94 acres | Spacious | Versatile | Commercial | Mixed-use |

1.94 acres of land with 5,557 sqft Flex space. 3200 sqft of Warehouse and the remainder is office.

Measurement in Ft-in ▼

**Tara Oliver**
*Platinum*
Oliver Commercial Real ...

Contact

Take a tour →

**MLS#**
96762974

**List Price**
$700,000

**Listing Status**
Under Contract – P

**Address**
3414 Old Richmond Rd

**City**
Rosenberg

**State**
TX

**Zip Code**
77471

**County**
Fort Bend County

**Subdivision**
J W Moore

**Legal Description**
0061 J W MOORE, TRACT 64, ACRES 1.9488, RESERVE "A" BGM DIVI

**Property Type**
Lots

**Lot Size**
1.95 Lot Acres/Survey

**Key Map©**
605J

**Market Area**
Fort Bend South/Richmond

This listing features a dedicated property website. Check it out!

Property website

---

# Locate on the map



| Street view | Get directions | Drive Time |

---

# Exterior

**Lot Description**
Corner

**Controlled Access**
Automatic Gate

**Cable**
Available

**Water Sewer**
Public Water

**Phone**
Available

**Electric**
Electric Available

**Gas**
Availability Unknown

**Road Surface**
Concrete

---

# See the lot information

**Lot Size**
1.95 Lot Acres /Survey


**Tara Oliver**
Platinum
Oliver Commercial Real ...

Take a tour →



**Disclaimer:** Lot configuration and dimensions are estimates, not based on personal knowledge and come from a third party (Digital Map Products); therefore, you should not rely on the estimates and perform independent confirmation as to their accuracy

# Extra details you may need to know

**HOA Mandatory**
No

**List Type**
Exclusive Right to Sell/Lease

# Financial information

**Other Fees**
No

**Maintenance Fee**
No

**Taxes w/o Exemp**
$5,136/2024

**Tax Rate**
1.8889

**Report problem**

# View neighborhood information

MARKET AREA        ZIP CODE        CITY

UNOFFICIAL COPY

▶ Watch Video

Tara Oliver
Platinum
Oliver Commercial Real ...

Take a tour →



## Fort Bend South/Richmond

☆ ☆ ☆ ☆ ☆  3 Review(s)

Fort Bend South/Richmond homes for sale and rent. Find details, real estate for sale, real estate for rent and more near Fort Bend South/Richmond. Search 917 homes for sale in Fort Bend South/Richmond and 309 homes for rent in Fort Bend South/Richmond

See More

# Get insights from analytics

Create HAR Account to obtain access to the analytics for this listing and view the number of times the property has been viewed, as well as the current number of users who have bookmarked it as a favorite.

Sign in to view the analytic report

Don't have an account? Sign up

# Check out your estimated electricity cost

Wondering if you're overpaying for electricity at your current home? Check now!

**Your Zip Code**

Your Zip Code

**Due Date**

08/20/2025

**Amount Due**

$  Amount Due

**Total Usage**

Total Usage

**Electric Heat**

No

⚡ Power Check

**Tara Oliver**

[Platinum]

Oliver Commercial Real …

Take a tour →



UNOFFICIAL COPY

# Know the property tax history and market value



Chart | List



**MARKET VALUE PER APPRAISAL DISTRICT**

202K, 207K, 175K, 189K, 248K, 248K, 272K

# Estimate your mortgage payments

Create and estimate your monthly mortgage payment and property taxes based on past rates.

### List Price

700,000

### Down Payment

| Amount ($) | Percentage (%) |
|---|---|
| 140,000 | 20 |

### Loan Term

| Months | Years |
|---|---|
| 360 | 30 |

Annual Interest Rate (%)

6.58

---

Tara Oliver

[Platinum]

Oliver Commercial Real ...

Take a tour →

View Amortization Table

## $3,569

**Estimated Monthly Property Tax**

1,102

**More Options** ⌄

[Calculate]    [Full Page]



Principal & Interest    Taxes

23.6%

$4,671/m

76.4%

## Ready to sell your home?

If you like this property and are also considering selling your current home now, you may find out how. Request your home selling analysis report featuring Recently Sold, Market Analysis, Home Valuations, and Market Update.

[Start selling your home]



SELLING?

## Explore school information

Check out assigned and nearby schools along with their detailed ratings and essential information to help you make informed decisions.

**Assigned schools**

Elementary School

**JACKSON Elementary School**

LAMAR CISD

☆☆☆☆☆


**Tara Oliver**
[Platinum]
Oliver Commercial Real ...

Take a tour →



## Middle School

**GEORGE Junior High School**

LAMAR CISD

★ ★ ☆ ☆ ☆

 **D** Below Average

Details | Compare School

## High School

**B F TERRY High School**

LAMAR CISD

★ ★ ★ ☆ ☆

**C** Average

Details | Compare School

## View nearby schools ⌄

**Notice & Disclaimer**

School information is computer generated and may not be accurate or current. Buyer must independently verify and confirm enrollment. Please contact the school district to determine the schools to which this property is zoned.

# Listing broker



**Oliver Commercial Real Estate, LLC**

📞 Click to view phone

✉ Email Broker

Office profile

Office listings

Office transaction

# Information source



**Houston Association of REALTORS**

Source last updated Aug 20, 2025 at 10:18 AM

Listing last updated Aug 18, 2025 at 10:27 AM

# View nearby similar homes for sale

 **Tara Oliver**

**Platinum**

Oliver Commercial Real ...

---- ----

---- ----

Take a tour →



---

## View nearby similar homes for rent



## View nearby recently sold homes



**Tara Oliver**

Platinum

3414 Old Richmond Rd, Oliver Commercial Real Rosenberg, TX 77471. View photos, map, tax, nearby homes for sale, home values, school info...

**Take a tour →**

Case 4:26-cv-02743     Document 6-1     Filed 04/29/26 in TXSD     Page 224 of 1053

View all **homes on Old Richmond**

# More tools and resources

Print Flyer ▾

Calculator

Currency Converter

Measurement in Ft-in ▾

Homes for Sale 77471 TX

Homes for Rent 77471 TX

Homes for Sale Rosenberg, TX

Homes for Rent Rosenberg, TX

Fort Bend County, TX Homes for Sale

Fort Bend County, TX Homes for Rent

All Homes on Old Richmond



## Schedule a Tour



| | Fri **22** AUG | Sat **23** AUG | Sun **24** AUG | Mon **25** AUG | Tue **26** AUG | |
|---|---|---|---|---|---|---|
| ‹ | | | | | | › |

Continue to Schedule



**Tara Oliver**
[Platinum]
Oliver Commercial Real ...

Take a tour →

**INFORMATION SERVICE, INC.**
**All Rights Reserved.**

    

Equal Housing Opportunity = Disclaimer: All
information on this site is subject to change and
should be independently verified.
Code Of Ethics

**COMPANY**

About Us

Newsroom

Help Center

Contact Us

**REAL ESTATE**

Texas Real Estate

Counties

Cities

Neighborhoods

Zip Codes

**RESOURCES**

RealInsight

Ask a Pro

Knowledge Base

Knowledge Videos

Service Providers

Other Resources

**PRODUCT**

HAR Mobile App

HAR Rentals

Find a Pro

Open Houses

MLS Platinum

 

HAR Mobile Apps

Accessibility Privacy Policy ☑☒ Your Privacy Choices Terms of Use Contact Us



**Tara Oliver**
*Platinum*
Oliver Commercial Real ...

Take a tour →



**EXHIBIT**

**3**

FILED
8/26/2025 9:16 AM
Teneshia Hudspeth
County Clerk
Harris County - County Probate Court No. 1
Accepted By: MR

## CAUSE NO. 537,721

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY AS TRUSTEE OF THE HOLLI ANN HARDIN TRUST NUMBER ONE<br>*Plaintiff,* | §<br>§<br>§<br>§<br>§ | IN THE PROBATE COURT |
| v. | §<br>§<br>§ | NUMBER ONE (1) OF |
| DAKOTA FONTENOT<br>*Defendant.* | §<br>§<br>§ | HARRIS COUNTY, TEXAS |

### SUPPLEMENT TO MOTION FOR EX-PARTE
### TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION

Please find the Verification, Exhibit "A", that was inadvertently left off of the initial filing.

Respectfully submitted,



★

EST. 2001

**TEXAS PROBATE ATTORNEY**ᴾᴸᴸᶜ

RUDOLPH M. CULP
State Bar No. 24043014
rudy@texsprobateattorney.com
COLLIN J. BULLARD
State Bar No. 24129570
collin@texasprobateattorney.com
*EFILE EMAIL: efile@texasprobateattorney.com*
HOUSTON OFFICE:
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
O: (713) 297-0700
F: (817) 383-5110
**ATTORNEYS FOR PLAINTIFF**

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Robin Edwards on behalf of Rudy Culp
Bar No. 24043014
robin@texasprobateattorney.com
Envelope ID: 104838658
Filing Code Description: Amended Filing
Filing Description: Supplement to Motion for Ex-Parte Temporary Restraining Order and Temporary Injunction
Status as of 8/26/2025 4:40 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Rudy Culp | | rudy@texasprobateattorney.com | 8/26/2025 9:16:34 AM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 8/26/2025 9:16:34 AM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 8/26/2025 9:16:34 AM | SENT |

UNOFFICIAL COPY

| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME, the undersigned authority, on this day personally appeared Linda C. Goehrs, Successor Temporary Trustee of the Holli Hardin Trust, who, being by me duly sworn, stated on oath:

"My name is Linda C. Goehrs, Successor Temporary Trustee of the Holli Hardin Trust. I am the Plaintiff in the foregoing Application for Temporary Restraining Order. I have read the application, and the factual statements contained therein are within my personal knowledge and are true and correct."

_____
Signature of Applicant

SUBSCRIBED AND SWORN TO before me on this ___21st___ day of August **2025**.

_____
Notary Public, State of Texas

ROBIN C. EDWARDS
MY COMMISSION EXPIRES
MARCH 8, 2029
NOTARY ID: 12050314

Hardin Trust TRO/TI

Page **15** of **15**



### Teneshia Hudspeth
COUNTY CLERK, HARRIS COUNTY, TEXAS
PROBATE COURTS DEPARTMENT



EXHIBIT

4

PROBATE COURT 1

| | | |
|---|---|---|
| The State of Texas | § | Docket No.537721 |
| County of Harris | § | |
| County Probate Court No. 1 | § | Linda Goehrs, in her capacity as Trustee of the Holli Ann Hardin Trust Number One, Plaintiff |
| | | vs. |
| | | Dakota Fontenot, Defendant |

CLERK'S

### CERTIFICATE OF CASH DEPOSIT IN LIEU OF TEMPORARY RESTRAINING ORDER BOND

This is to certify that I, Teneshia Hudspeth, County Clerk of Harris County and Clerk of the above designated Court, and in accordance with Rule 146 and 684, Texas Rules of Court, as amended, have received, and do hereby receipt for, a cash deposit, in the sum of **$1,000.00**, Dollars, which sum is equal to the amount set out in Court Order, dated **8/29/2025**. Said cash deposit was received from Linda Goehrs, in lieu of a Bond in said cause; and this Certificate, filed shall have the force and effect of a Temporary Restraining Order Bond pursuant to said Rule 146, as amended.

WITNESS MY HAND AND SEAL OF OFFICE on this the 29th day of August, 2025.



Teneshia Hudspeth, County Clerk
and Clerk of Probate Courts
Harris County, Texas

Melanie Rosa, Deputy

P.O. Box 1525 ● Houston, TX 77251-1525 ● (713) 274-8585

www.cclerk.hctx.net

Form No. I-02-015 (Rev. 12/17/2020)                                    Page 1 of 1



FILED
08/29/2025 11:47:45 AM
Teneshia Hudspeth
County Clerk
Harris County, Texas
richard.alvarado

CAUSE NO. 537,721

| | | |
|---|---|---|
| **LINDA GOEHRS, IN HER CAPACITY AS** | § | **IN THE PROBATE COURT** |
| **TRUSTEE OF THE HOLLI ANN** | § | |
| **HARDIN TRUST NUMBER ONE** | § | |
| *Plaintiff,* | § | |
| | § | **NUMBER ONE (1) OF** |
| **v.** | § | |
| | § | |
| **DAKOTA FONTENOT** | § | |
| *Defendant.* | § | **HARRIS COUNTY, TEXAS** |

## EX-PARTE TEMPORARY RESTRAINING ORDER

On this day, the Court heard Plaintiff LINDA GOEHRS' Motion for Ex-Parte Temporary Restraining Order (the "Motion") filed in her capacity as Successor Temporary Trustee of the Holli Ann Hardin Trust Number One ("Trustee") against Defendant DAKOTA FONTENOT ("Defendant"). The Court, having considering Plaintiff's Motion, the evidence, and arguments of counsel, if any, finds that the Motion is well taken and should be in all things GRANTED.

Trustee has provided sufficient evidence to the Court to support Trustee's' contention that unless a Temporary Restraining Order is granted against Defendant that Trustee, and thus the beneficiaries of the Trust, will suffer probable, imminent, and irreparable harm including but not limited to the loss of assets belonging to the Holli Ann Hardin Trust Number One, loss of information pertaining to such assets, and inability to recover such assets and information with the contention that Defendant is seeking to leave this jurisdiction with the assets and be outside the jurisdiction of this Court preventing the recovery of the assets and enforcement of any judgments against the Defendant.

The Court finds that Trustee has submitted sufficient evidence to support the finding that an ex parte order is necessary because there was not enough time to give notice to Defendant, hold

Ex-Parte TRO

a hearing, and issue a Temporary Restraining Order before the irreparable injury, loss, or damage would occur.

It is therefore ORDERED that Defendant DAKOTA FONTENOT, his agents, and all other persons or entities in active participation with him who receive actual notice of this Order by personal service or otherwise, by and are hereby enjoined as follows:

a. Defendant is restrained from directly or indirectly selling or liquidating assets belonging to Dakota Trust and/or Viva Las Vegas Properties, Inc.; and

b. Defendant is restrained from taking action as Trustee of the Dakota Trust; and

c. Defendant is restrained from taking action as President, officer and/or director of Viva Las Vegas Properties, Inc.;

d. Defendant is restrained from selling the real property located at 3414 Old Richmond Road, Rosenberg, Texas 77471, held by Viva Las Vegas Properties, Inc.

IT IS FURTHER ORDERED that the Clerk shall issue an ex-parte Temporary Restraining Order in conformity with the law upon the Individuals and Entities listed herein upon Plaintiff filing bond in the amount of $1,000.00_____ as set by this Court as required by Rule 684 of the Texas Rules of Civil Procedure

IT IS FURTHER ORDERED that this Temporary Restraining Order shall continue in force until September 12, 2025 at 11:59 p.m.

SB

IT IS FURTHER ORDERED that the clerk issue notice to Defendant that the hearing on Plaintiff's Applicatoin for Temporary Injunction is set for September 8, 2025 at 10:30 a.m. SB The purpose of the hearing will be to determine whether this Temporary Restraining Order shall be made a Temporary Injunction pending a full trial on the merits.

Signed: 08/29/2025
11:29:11 AM

_____
JUDGE PRESIDING

REC/ _____ 08/29/2025

Ex-Parte TRO



FILED
9/8/2025 2:16 PM
Teneshia Hudspeth
County Clerk
Harris County - County Probate Court No. 1
Accepted By: MR

**CAUSE NO. 537,721**

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY AS | § | IN THE PROBATE COURT |
| TRUSTEE OF THE HOLLI ANN | § | |
| HARDIN TRUST NUMBER ONE | § | |
|     *Plaintiff,* | § | |
| | § | |
| | § | **NUMBER ONE (1) OF** |
| v. | § | |
| | § | |
| DAKOTA FONTENOT | § | |
|     *Defendant.* | § | HARRIS COUNTY, TEXAS |

## MOTION TO EXTEND TEMPORARY RESTRAINING ORDER

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, Plaintiff LINDA GOEHRS, in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One ("Movant"), Plaintiff in the above-entitled and numbered cause, asking that the court extend the Temporary Restraining Order. In support of this Motion, Movant provides the following:

**I.**

1.       The Court entered the Temporary Restraining Order on August 29, 2025, setting the hearing on the temporary injunction for September 8, 2025, at 10:30 a.m., seven (7) days after it was signed. After diligently attempting to serve Dakota Fontenot ("Defendant"), the Movant has been unable to perfect service upon the Defendant.

2.       A copy of the attempted service is attached hereto as Exhibit A. See Also Motion for Alternative Service on file with the clerk.

3.       Movant filed a Motion for Alternative Service upon the Defendant on September 4, 2025.

4.       Movant would ask the Court to extend the Temporary Restraining Order and set a new date for the hearing in accordance with Rule 680 of the Texas Rules of Civil Procedure. The Movant's diligence in attempting to serve the Defendant is good cause to allow the Court to extend the Temporary Restraining Order for up to an additional fourteen (14) days.

1 | P a g e

Motion Extend TRO

WHEREFORE, PREMISES CONSIDERED, LINDA GOEHRS, IN HER CAPACITY AS TEMPORARY SUCCESSOR TRUSTEE OF THE HOLLI ANN HARDIN TRUST NUMBER ONE, ("Movant") requests: the Court to reset the hearing on the Temporary Injunction and allow the Temporary Restraining Order issued in this case to be continued in full force and effect until that time; and Movant have all other and further relief to which he may be entitled.

Respectfully submitted,

★
EST. 2001
**TEXAS PROBATE ATTORNEY**<sup>PLLC</sup>

RUDOLPH M. CULP
State Bar No. 24043014
rudy@texsprobateattorney.com
COLLIN J. BULLARD
State Bar No. 24129570
collin@texasprobateattorney.com
***EFILE EMAIL: efile@texasprobateattorney.com***
**HOUSTON OFFICE:**
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
O: (713) 297-0700
F: (817) 383-5110
**ATTORNEYS FOR PLAINTIFF**

Motion Extend TRO

## CERTIFICATE OF SERVICE

This is to certify that the foregoing instrument has been duly served, by delivery of a true and correct copy by hand delivery, by certified mail, return receipt requested, e-file service, or by electronic or telephonic document transfer, upon the attorneys of record on this 8th day of September 2025, as follows:

                                       ___ /s/ Rudolph M. Culp
                                          Rudolph M. Culp

Motion Extend TRO

EXHIBIT A

**CAUSE NO. 537721**

LINDA GOEHRS, IN HER CAPACITY AS
TRUSTEE OF THE HOLLIL ANN HARDIN
TRUST NUMBER ONE
**PLAINTIFF**

VS.

DAKOTA FONTENOT
**DEFENDANT**

§
§
§
§
§
§
§
§
§
§
§
§

IN THE COUNTY PROBATE COURT NO. 1

HARRIS COUNTY, TX

**DECLARATION OF BRANDEN JOSHUA JASPER
IN SUPPORT OF MOTION FOR ALTERNATE SERVICE**

**On Wednesday, August 27, 2025 AT 10:02 AM**, CITATION, PLAINTIFF'S ORIGINAL PETITION, EXHIBIT A, EXHIBIT B, EXHIBIT C, EXHIBIT D, EXHIBIT E, EXHIBIT F, EXHIBIT G, EXHIBIT H for service on DAKOTA FONTENOT came to hand.

**On Wednesday, August 27, 2025 at 8:46 PM**, at 2926 FONTANA DRIVE, HOUSTON, HARRIS COUNTY, TX 77043, No answer. No one appeared to be home.

**On Saturday, August 30, 2025 at 12:26 PM**, at 2926 FONTANA DRIVE, HOUSTON, HARRIS COUNTY, TX 77043, No answer. No one appeared to be home.

**On Tuesday, September 2, 2025 at 2:38 PM**, at 2926 FONTANA DRIVE, HOUSTON, HARRIS COUNTY, TX 77043, I arrived to the residence at 2 PM. At around 2:30 PM Dakota Fonteno's wife Madison pulled into the driveway. I told her that I had documents to drop off for Dakota. She said that he was not in at the moment. She did not have a specific time for when he would be available but Indicated that he would be available sometime in the evening hours.

**On Tuesday, September 2, 2025 at 7:47 PM**, at 2926 FONTANA DRIVE, HOUSTON, HARRIS COUNTY, TX 77043, I went to the address and no one appeared to be home. There were two garbage cans that have been emptied still sitting in the front driveway. I waited for an hour and no one ever came home.

**On Wednesday, September 3, 2025 at 7:45 AM**, at 2926 FONTANA DRIVE, HOUSTON, HARRIS COUNTY, TX 77043, I went to the address and no one appeared to be home. The garbage cans from the prior attempt were still in the front driveway blocking access. It appears no one has been home since the previous night. I waited for an hour and no one ever came outside.

**On Wednesday, September 3, 2025 at 6:42 PM**, at 2926 FONTANA DRIVE, HOUSTON, HARRIS COUNTY, TX 77043, No answer. No one appeared to be home. Trashcans were still in front. Appears that no one has been home in days.

**On Thursday, September 4, 2025 at 8:17 PM**, at 2926 FONTANA DRIVE, HOUSTON, HARRIS COUNTY, TX 77043, No answer. No one appeared to be home. All lights are off inside the house.

**On Friday, September 5, 2025 at 8:48 AM**, at 2926 FONTANA DRIVE, HOUSTON, HARRIS

Client Reference#: 00478

Doc ID: 339940_1

UNOFFICIAL COPY

COUNTY, TX 77043, Arrive to the house at 8:30 AM. There was a little girl sitting on the couch and she said that she would get somebody. She never came back to the door. No one ever answered.

**On Friday, September 5, 2025 at 5:30 PM**, at 2926 FONTANA DRIVE, HOUSTON, HARRIS COUNTY, TX 77043, I went to the address and waited an hour. I knocked on the door and what appeared to be the nanny answered. She already knew who I was looking for before I asked for Dakota Fontenot and she said he was not there. I asked Her how she knew who I was asking for and she replied "well who do you need to speak with" I then replied with Dakota Fontenot and she replied "like I said, he's not here". I asked her when he would be returning and she said she had no idea.

**On Saturday, September 6, 2025 at 10:32 AM**, at 2926 FONTANA DRIVE, HOUSTON, HARRIS COUNTY, TX 77043, I arrive to the address at 8:30 AM. I waited for two hours and no one ever came inside or outside of the home. I then proceeded to knock on the door and no one answered. Two vehicles were parked in the driveway. The one I could visibly see was a Ford bronco with the license plate XBT4504. People did appear to be home.

**On Saturday, September 6, 2025 at 8:20 PM**, at 2926 FONTANA DRIVE, HOUSTON, HARRIS COUNTY, TX 77043, I went to the address and the same bronco was parked in the driveway. I waited outside 20 minutes and I never saw any activity. I drove by the house and the lights were completely off inside.

For the reasons set forth above, it is impractical to secure personal service on DAKOTA FONTENOT and I will be unable to do so despite due diligence. In the course of my attempts to serve said documents listed above, I've determined that 2926 FONTANA DRIVE, HOUSTON, HARRIS COUNTY, TX 77043 is DAKOTA FONTENOT's usual place of business, usual place of abode, or other place where the Respondent can probably be found. I believe DAKOTA FONTENOT will receive effective notice of this suit by leaving true and correct copies of the CITATION, PLAINTIFF'S ORIGINAL PETITION, EXHIBIT A, EXHIBIT B, EXHIBIT C, EXHIBIT D, EXHIBIT E, EXHIBIT F, EXHIBIT G, EXHIBIT H with anyone over the age of sixteen (16) years or by placing it inside the premises through a door mail chute, or by securely affixing copies of the citation and attached petition, to either the front door, side door, back door, gate and/or fence of the residence and/or business.

My name is Branden Joshua Jasper.  My e-mail address is info@easy-serve.com. I am over the age of 18. I am in all ways competent to make this declaration, which is based on personal knowledge. I am not a party to this case, and have no interest in its outcome.  I declare under penalty of perjury that the foregoing is true and correct.

Executed in Harris County, TX on Monday, September 8, 2025.

*Branden Joshua Jasper*

BRANDEN JOSHUA JASPER
1201 Louisiana St Ste 370
Houston, TX 77002

JBCC Registration# PSC-3529 expires June 30, 2026.

Client Reference#: 00478

Doc ID: 339940_1

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Selina Bostock on behalf of Rudy Culp
Bar No. 24043014
selina@texasprobateattorney.com
Envelope ID: 105333594
Filing Code Description: Application for Extension
Filing Description: To Extend Temporary Restraining Order
Status as of 9/9/2025 9:53 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Rudy Culp | | rudy@texasprobateattorney.com | 9/8/2025 2:16:25 PM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 9/8/2025 2:16:25 PM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 9/8/2025 2:16:25 PM | SENT |
| Ryan Cantrell | | ryan.cantrell@chamberlainlaw.com | 9/8/2025 2:16:25 PM | SENT |
| Mariah Karigan | | mariah.karigan@chamberlainlaw.com | 9/8/2025 2:16:25 PM | SENT |
| Elizabeth Garcia | | elizabeth.garcia@chamberlainlaw.com | 9/8/2025 2:16:25 PM | SENT |





FILED
09/11/2025 3:39:50 PM
Teneshia Hudspeth
County Clerk
Harris County, Texas
richard.alvarado

CAUSE NO. 537,721

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY AS TRUSTEE OF THE HOLLI ANN HARDIN TRUST NUMBER ONE<br>*Plaintiff,*<br><br>v.<br><br>DAKOTA FONTENOT<br>*Defendant.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | IN THE PROBATE COURT<br><br><br>NUMBER ONE (1) OF<br><br><br>HARRIS COUNTY, TEXAS |

## ORDER EXTENDING EX-PARTE TEMPORARY RESTRAINING ORDER

On this day, came on to be heard the Motion of LINDA GOEHRS, IN HER CAPACITY AS TEMPORARY SUCCESSOR TRUSTEE OF THE HOLLI ANN HARDIN TRUST NUMBER ONE, ("Movant"), for An Order Extending Ex-Parte Temporary Restraining Order against Defendant DAKOTA FONTENOT. The Court, having considered Original Plaintiff's Application for Ex-Parte Temporary Restraining Order, this Motion to Extend Ex-Parte Temporary Restraining Order, the evidence, and arguments of counsel, finds that the Motion is well taken and should be in all things GRANTED.

It appears from the evidence set forth in Plaintiff's Original Application that unless a Temporary Restraining Order is granted against Defendant that Plaintiff will suffer probable, imminent, and irreparable harm including but not limited to the loss of assets belonging to the Holli Ann Hardin Trust Number One, loss of information pertaining to such assets, and inability to recover such assets and information should Defendant attempt to flee the country in avoidance of potential liability.

It appears from the evidence set forth in the Motion to Extend Ex-Parte Temporary Restraining Order, that Plaintiff has made a diligent attempt to serve Defendant and has been unable to do so and that alternative

An ex-parte order is necessary because there was not enough time to give notice to

Defendant, hold a hearing, and issue a Temporary Restraining Order before the irreparable injury, loss, or damage would occur.

It is therefore ORDERED that Defendant DAKOTA FONTENOT, his agents, and all other persons or entities in active participation with him who receive actual notice of this Order by personal service or otherwise, by and are hereby enjoined as follows:

    a.  Defendant is restrained from directly or indirectly selling or liquidating assets belonging to Dakota Trust and/or Viva Las Vegas Properties, Inc.; and

    b.  Defendant is restrained from taking action as Trustee of the Dakota Trust; and

    c.  Defendant is restrained from taking action as President, officer and/or director of Viva Las Vegas Properties, Inc.;

    d.  Defendant is restrained from selling the real property located at 3414 Old Richmond Road, Rosenberg, Texas 77471, held by Viva Las Vegas Properties, Inc.

IT IS FURTHER ORDERED that the Clerk shall issue an ex-parte Temporary Restraining Order in conformity with the law upon the Individuals and Entities listed herein upon Plaintiff maintaining bond in the amount of $1,000.00 as set by this Court in the initial order signed on August 29, 2025, and as required by Rule 684 of the Texas Rules of Civil Procedure.

IT IS FURTHER ORDERED that this Temporary Restraining Order shall continue in force until the 26th day of September 2025.

IT IS FURTHER ORDERED that the clerk issue notice to Defendant in that the hearing ton Plaintiff's Application for Temporary Injunction is set for September 24, 2025 at 11:00 am. , in the Probate Court Number One of Harris County, Texas, 201 Caroline Street, Houston, Texas 77002. The purpose of the hearing will be to determine whether this Temporary Restraining Order shall be made a Temporary Inunction pending a full trial on the merit.

UNOFFICIAL COPY

Motion Extend TRO

Signed: 09/11/2025
2:09:06 PM

_____
JUDGE PRESIDING

SB

APPROVED AS TO FORM:

★
EST. 2001
**TEXAS PROBATE
ATTORNEY** ᴾᴸᴸᶜ



RUDOLPH M. CULP
State Bar No. 24043014
rudy@texasprobateattorney.com
COLLIN J. BULLARD
State Bar No. 24129570
collin@texasprobateattorney.com
BAILEY D. BOWE
State Bar No. 24142201
bailey@texasprobateattorney.com
*EFILE EMAIL: efile@texasprobateattorney.com*
**HOUSTON OFFICE:**
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
O: (713) 297-0700
F: (817) 383-5110
**ATTORNEYS FOR PLAINTIFF**

UNOFFICIAL COPY

Motion Extend TRO

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Selina Bostock on behalf of Rudy Culp
Bar No. 24043014
selina@texasprobateattorney.com
Envelope ID: 105333594
Filing Code Description: Application for Extension
Filing Description: To Extend Temporary Restraining Order
Status as of 9/9/2025 9:53 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Rudy Culp | | rudy@texasprobateattorney.com | 9/8/2025 2:16:25 PM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 9/8/2025 2:16:25 PM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 9/8/2025 2:16:25 PM | SENT |
| Ryan Cantrell | | ryan.cantrell@chamberlainlaw.com | 9/8/2025 2:16:25 PM | SENT |
| Mariah Karigan | | mariah.karigan@chamberlainlaw.com | 9/8/2025 2:16:25 PM | SENT |
| Elizabeth Garcia | | elizabeth.garcia@chamberlainlaw.com | 9/8/2025 2:16:25 PM | SENT |

UNOFFICIAL COPY



FILED
9/15/2025 6:05 PM
Teneshia Hudspeth
County Clerk
Harris County - County Probate Court No. 1
Accepted By: KC

No. 537,721

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY AS | § | IN THE PROBATE COURT |
| TRUSTEE OF THE HOLLI ANN HARDIN | § | |
| TRUST NUMBER ONE | § | |
| *Plaintiff,* | § | |
| | § | NUMBER ONE (1) OF |
| v. | § | |
| | § | |
| DAKOTA FONTENOT, | § | |
| *Defendant.* | § | HARRIS COUNTY, TEXAS |

## AGREED MOTION TO VACATE TEMPORARY RESTRAINING ORDER

Come now, Defendant Dakota Fontenot ("Dakota" or "Defendant") and Plaintiff Linda Goehrs, in her capacity as Trustee of the Holli Ann Hardin Trust Number One ("Linda" or "Plaintiff"), and file this Agreed Motion to Vacate Temporary Restraining Order, and would respectfully show the Court as follows:

### BACKGROUND

1. On August 29, 2025, this Court signed an *ex parte* Temporary Restraining Order ("TRO") which enjoins Dakota from:

a. Directly or indirectly selling or liquidating assets belonging to a trust known as the "Dakota Trust" and/or Vivia Las Vegas Properties, Inc.;

b. Taking action as trustee of the Dakota Trust;

c. Taking action as President, officer and/or director of Viva Las Vegas Properties, Inc.; and

d. Selling the real property located at 3414 Old Richmond Road, Rosenburg, Texas 77471 ("Property"), held by Viva Las Vegas Properties, Inc.

2. The Court subsequently Ordered that the TRO is extended and shall remain in force until September 26, 2025. A temporary injunction hearing on the injunctive relief sought by

1

UNOFFICIAL COPY

4907-5667-5177.1

Plaintiff is now set to be heard by this Court on September 24, 2025.

### AGREEMENT TO VACATE TEMPORARY RESTRAINING ORDER

3.      Plaintiff and Defendant have reached a Rule 11 Agreement in this proceeding, which is attached hereto to this Motion.[1] The Rule 11 Agreement holds that Plaintiff and Defendant will submit an Agreed Order vacating the TRO, so that *inter alia*, the Property may be sold and the sales proceeds can be held in escrow pending the resolution of the temporary injunction hearing set on September 24, 2025, in this Court.

4.      Accordingly, pursuant to their Rule 11 Agreement, Plaintiff and Defendant request that the Court vacate the TRO which is otherwise set to expire on September 26, 2025.

### PRAYER

5.      Based on the foregoing, Defendant and Plaintiff pray that the Court: (1) vacate the TRO as requested herein, and (2) grant all other relief to which they may be justly entitled, both in law and in equity.

Respectfully submitted,

GRAY REED & McGRAW LLP

/s/ Trey Avant
JEFFREY D. WATTERS, JR.
Texas State Bar Number: 2406695
jwatters@grayreed.com
JOHN P. ("TREY") AVANT III
Texas State Bar Number: 24101471
tavant@grayreed.com

---

[1] *See* Rule 11 Agreement dated September 15, 2025, attached hereto as **Exhibit A,** and incorporated herein by reference.

2

ANDREW B. MCCARTY
Texas State Bar Number: 24126139
amccarty@grayreed.com
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000

**ATTORNEYS FOR DEFENDANT,
DAKOTA FONTENOT**

JAMES MADISON ("JIMMY") ARDOIN III
Texas State Bar Number: 24045420
jimmy@jimmyardoinlaw.com
4900 Fournace Place, Suite 414
Bellaire, Texas 77401
Telephone: (713) 574-8900

**ATTORNEY FOR DEFENDANT,
DAKOTA FONTENOT**

PAUL S. BEIK
Texas State Bar Number: 24054444
paul@beiklaw.com
440 Louisiana Street, Suite 1800
Houston, Texas 77002
Telephone: (713) 869-6975

**ATTORNEY FOR DEFENDANT,
DAKOTA FONTENOT**

3

4907-5667-5177.1

AGREED AS TO FORM AND SUBSTANCE:

*/s/ Rudolph M. Culp    (with permission)*
RUDOLPH M. CULP
State Bar No. 24043014
rudy@texasprobateattorney.com
COLLIN J. BULLARD
State Bar No. 24129570
collin@texasprobateattorney.com
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
Telephone: (713) 297-0700
Fax: (817) 383-5110

**ATTORNEYS FOR PLAINTIFF,
LINDA GOEHRS, IN HER CAPACITY AS
TRUSTEE OF THE HOLLI ANN HARDIN
TRUST NUMBER ONE**

4

4907-5667-5177.1

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been served upon all parties of record in this Cause, in accordance with the Texas Rules of Civil Procedure on September 15, 2025.

RUDOLPH M. CULP                    VIA E-SERVICE
State Bar No. 24043014
rudy@texasprobateattorney.com
COLLIN J. BULLARD
State Bar No. 24129570
collin@texasprobateattorney.com
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
Telephone: (713) 297-0700
Fax: (817) 383-5110

**ATTORNEYS FOR PLAINTIFF,
LINDA GOEHRS, IN HER CAPACITY AS
TRUSTEE OF THE HOLLI ANN HARDIN
TRUST NUMBER ONE**

_/s/ Trey Avant_
JOHN P. ("TREY") AVANT III

5

4907-5667-5177.1

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Edith Resendiz on behalf of Jeffrey Watters
Bar No. 24066695
eresendiz@grayreed.com
Envelope ID: 105612981
Filing Code Description: Motion (No Fee)
Filing Description: to Vacate Temporary Restraining Order
Status as of 9/16/2025 3:56 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Texas Probate Attorney, PLLC | | efile@texasprobateattorney.com | 9/15/2025 6:05:53 PM | SENT |
| Rudy Culp | | rudy@texasprobateattorney.com | 9/15/2025 6:05:53 PM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 9/15/2025 6:05:53 PM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 9/15/2025 6:05:53 PM | SENT |
| Ryan Cantrell | | ryan.cantrell@chamberlainlaw.com | 9/15/2025 6:05:53 PM | SENT |
| Mariah Karigan | | mariah.karigan@chamberlainlaw.com | 9/15/2025 6:05:53 PM | SENT |
| Elizabeth Garcia | | elizabeth.garcia@chamberlainlaw.com | 9/15/2025 6:05:53 PM | SENT |
| Debbie Gurley | | dgurley@grayreed.com | 9/15/2025 6:05:53 PM | SENT |
| Marcie Cardenas | | mcardenas@grayreed.com | 9/15/2025 6:05:53 PM | SENT |
| Andrew McCarty | | amccarty@grayreed.com | 9/15/2025 6:05:53 PM | SENT |
| John P. TreyAvant | | tavant@grayreed.com | 9/15/2025 6:05:53 PM | SENT |
| Jeffrey D.Watters | | jwatters@grayreed.com | 9/15/2025 6:05:53 PM | SENT |



537721



# GRAY REED.

JEFFREY D. WATTERS
DIRECT NO. 713.986.7113
JWATTERS@GRAYREED.COM

September 15, 2025

**Via Email**
Mr. Rudolph M. Culp
24 Greenway Plaza, Suite 1825
Houston, Texas 77046

> RE: *Goehrs v. Fontenot*; Cause No. 537,721; In the Probate Court Number One (1) of Harris County, Texas (the "Proceeding").

Rudy,

On behalf of my client, Dakota Fontenot ("Dakota"), I am proposing the following terms as a Rule 11 Agreement:

1. Linda Goehrs ("Linda") agrees to release her Notice of Lis Pendens recorded on or about August 25, 2025, in the real property records of Fort Bend County, Texas, concerning the real property located at 3414 Old Richmond Road, Rosenberg, Texas, 77471 ("Property")

2. The Parties shall submit an agreed order vacating the temporary restraining order on Monday, September 15, 2025 as required by the underwriter to let the closing of the Property go forward on Tuesday, September 16, 2025.

3. Linda and Dakota agree that the proceeds from the sale of the Property shall be held in escrow upon closing of the sale of the Property and such amount will be held pending the resolution of Linda's temporary injunction.

4. Linda and Dakota will go forward with the temporary injunction hearing set for September 24, 2025.

If you are in agreement with the above terms, please sign below and I will file with the Court.

Sincerely,

Jeffrey D. Watters

Agreed to by:

___/s/ Rudolph M. Culp_____
Rudolph Culp, Counsel for Linda Goehrs

**EXHIBIT**

**A**

UNOFFICIAL COPY



FILED
09/18/2025 2:22:31 PM
Teneshia Hudspeth
County Clerk
Harris County, Texas
mia.hernandez

No. 537,721

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY AS | § | IN THE PROBATE COURT |
| TRUSTEE OF THE HOLLI ANN HARDIN | § | |
| TRUST NUMBER ONE | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | NUMBER ONE (1) OF |
| v. | § | |
| | § | |
| DAKOTA FONTENOT, | § | |
| *Defendant.* | § | HARRIS COUNTY, TEXAS |

## AGREED ORDER VACATING TEMPORARY RESTRAINING ORDER

On this day, the Court considered Defendant Dakota Fontenot ("Dakota" or "Defendant") and Plaintiff Linda Goehrs', in her capacity as Trustee of the Holli Ann Hardin Trust Number One ("Linda" or "Plaintiff") Agreed Motion to Vacate Temporary Restraining Order ("Motion"). After considering the merits of the Motion, the Court is of the opinion that the Motion should be in all things granted. It is therefore ORDERED that the Motion is GRANTED.

It is further ORDERED that the Temporary Restraining Order signed by this Court on August 29, 2025, and subsequently extended by this Court to remain in force and effect through September 26, 2025 ("TRO") is hereby VACATED.

It is further ORDERED that the temporary injunction hearing in this proceeding set for September 24, 2025, at 11:00 am CST shall remain on the Court's hearing docket notwithstanding this Order to Vacate the TRO.

Signed: 09/18/2025
        1:22:34 PM

_____
JUDGE PRESIDING

SB

4925-7687-2809.1

ENTRY REQUESTED:

GRAY REED & McGRAW LLP

*/s/ Trey Avant*

_____

JOHN P. ("TREY") AVANT III
State Bar No.: 24101471
tavant@grayreed.com
JEFFREY D. WATTERS, JR.
State Bar No.: 24066695
jwatters@grayreed.com
ANDREW B. McCARTY
State Bar No.: 24126139
amccarty@grayreed.com
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000

**ATTORNEYS FOR DEFENDANT,
DAKOTA FONTENOT**

JAMES MADISON ("JIMMY") ARDOIN III
Texas State Bar Number: 24045420
jimmy@jimmyardoinlaw.com
4900 Fournace Place, Suite 414
Bellaire, Texas 77401
Telephone: (713) 574-8900

**ATTORNEY FOR DEFENDANT,
DAKOTA FONTENOT**

PAUL S. BEIK
Texas State Bar Number: 24054444
paul@beiklaw.com
440 Louisiana Street, Suite 1800
Houston, Texas 77002
Telephone: (713) 869-6975

**ATTORNEY FOR DEFENDANT,
DAKOTA FONTENOT**

4925-7687-2809.1

ENTRY REQUESTED:

*/s/ Rudolph M. Culp (with permission)*

_____

RUDOLPH M. CULP
State Bar No. 24043014
rudy@texasprobateattorney.com
COLLIN J. BULLARD
State Bar No. 24129570
collin@texasprobateattorney.com
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
Telephone: (713) 297-0700
Fax: (817) 383-5110

**ATTORNEYS FOR PLAINTIFF,
LINDA GOEHRS, IN HER CAPACITY AS
TRUSTEE OF THE HOLLI ANN HARDIN**

4925-7687-2809.1

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Edith Resendiz on behalf of Jeffrey Watters
Bar No. 24066695
eresendiz@grayreed.com
Envelope ID: 105612981
Filing Code Description: Motion (No Fee)
Filing Description: to Vacate Temporary Restraining Order
Status as of 9/16/2025 3:56 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Texas Probate Attorney, PLLC | | efile@texasprobateattorney.com | 9/15/2025 6:05:53 PM | SENT |
| Rudy Culp | | rudy@texasprobateattorney.com | 9/15/2025 6:05:53 PM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 9/15/2025 6:05:53 PM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 9/15/2025 6:05:53 PM | SENT |
| Ryan Cantrell | | ryan.cantrell@chamberlainlaw.com | 9/15/2025 6:05:53 PM | SENT |
| Mariah Karigan | | mariah.karigan@chamberlainlaw.com | 9/15/2025 6:05:53 PM | SENT |
| Elizabeth Garcia | | elizabeth.garcia@chamberlainlaw.com | 9/15/2025 6:05:53 PM | SENT |
| Debbie Gurley | | dgurley@grayreed.com | 9/15/2025 6:05:53 PM | SENT |
| Marcie Cardenas | | mcardenas@grayreed.com | 9/15/2025 6:05:53 PM | SENT |
| Andrew McCarty | | amccarty@grayreed.com | 9/15/2025 6:05:53 PM | SENT |
| John P. TreyAvant | | tavant@grayreed.com | 9/15/2025 6:05:53 PM | SENT |
| Jeffrey D.Watters | | jwatters@grayreed.com | 9/15/2025 6:05:53 PM | SENT |



EXHIBIT

10

exhibitsticker.com

FILED
9/19/2025 2:19 PM
Teneshia Hudspeth
County Clerk
Harris County - County Probate Court No. 1
Accepted By: EK

No. 537,721

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY AS TRUSTEE OF THE HOLLI ANN HARDIN TRUST NUMBER ONE | § § § | IN THE PROBATE COURT |
| *Plaintiff*, | § | |
| | § | |
| | § | NUMBER ONE (1) OF |
| v. | § | |
| | § | |
| DAKOTA FONTENOT, | § | |
| *Defendant*. | § | HARRIS COUNTY, TEXAS |

### DEFENDANT DAKOTA FONTENOT'S
### ORIGINAL ANSWER AND COUNTERCLAIM

Defendant Dakota Fontenot ("Dakota") files his Original Answer to the Original Petition ("Petition") of Linda Goehrs, in her capacity as "Temporary" Successor Trustee of the Holli Ann Hardin Trust Number One ("Plaintiff" and "Holli Trust") and Counterclaim as follows:

### I.    GENERAL DENIAL

1.    Pursuant to Rule 92 of the Texas Rules of Civil Procedure, Dakota denies each and every allegation contained in the Petition and demands strict proof thereof by a preponderance of the credible evidence as required by the Constitution and Laws of the State of Texas.

### II.    AFFIRMATIVE DEFENSES

2.    The "Temporary" Successor Trustee lacks capacity and/or standing to bring all of her claims. As explained in part III below, the "Temporary" Successor Trustee's authority to serve expired long ago and she has no independent interest in this litigation outside of that fiduciary capacity. Further, even if the "Temporary" Successor Trustee is validly acting, all of

4926-2021-6681.1                                    1

the spurious allegations against Dakota for actions he took in saving the businesses are not properly bought by the "Temporary" Successor Trustee. Any duties owed were to the various entities that Dakota was the officer/director of, not to the "Temporary" Successor Trustee. Finally, even if the "Temporary" Successor Trustee is validly acting, the "Temporary" Successor Trustee is not a beneficiary of the Dakota Trust and has no standing to bring an action regarding its trustee appointment.

3.     The "Temporary" Successor Trustee's claims are barred by waiver and/or estoppel. As the evidence will show, the "Temporary" Successor Trustee was aware of and approved the financing plan used to buy Holli Hardin Fontenot ("Holli") out of her interests in the Holli Trust and the Dakota Trust. Further, the "Temporary" Successor Trustee is aware of the lengths Dakota went to ensure that the business succeeded. As evidenced from the exhibits to her own Petition, on the loan needed to take care of a portion of the deferred maintenance issues Decedent left, Dakota personally guaranteed it and secured it using property of the Dakota Trust. Even though Dakota and the Dakota Trust did not have an ownership interest in the business. (Notably, the "Temporary" Successor Trustee did not have any issues when Dakota used his authority on behalf of the entities owned by the Dakota Trust for these transactions.) The "Temporary" Successor Trustee was involved in all of these decisions and cannot now bring suit because other beneficiaries of the Holli Trust are not happy with her actions.

4.     Any complaint about how Dakota ran the businesses is barred by the business judgment rule. The "Temporary" Successor Trustee knows how Dakota ran the business until it was sold. She was aware from the appraisal she herself commissioned that the business was cash

poor and a sinking ship. She further knows that Dakota left a lucrative career and put his name, reputation, and personal assets on the line to keep the business afloat. And it was only through Dakota's hard work and decisive actions that any value at all was salvaged for the beneficiaries of the Holli Trust. Her now second-guessing of decisions Dakota made in good faith is barred.

5.    As shown by all of the above, the "Temporary" Successor Trustee's equitable claims are barred by unclean hands.

6.    Finally, any amount owed from the Dakota Trust to the Holli Trust is offset by what entities owned by the Holli Trust owe entities owned by the Dakota Trust and/or Dakota personally.

### III.    REQUEST FOR SPECIFIC PERFORMANCE

7.    As described above, the "Temporary" Successor Trustee has been anything but. Originally appointed by order of a Fort Bend County District Court in 2021, the "Temporary" Successor Trustee's appointment was only supposed to last until the litigation regarding Dallas Fontenot's estate plan was resolved. That resolution occurred by Settlement Agreement in 2022. Yet the "Temporary" Successor Trustee stayed.

8.    In the Settlement Agreement, the "Temporary" Successor Trustee was to resign when the surviving spouse's interest was bought out of the Trusts. Yet, after the buyout was accomplished, the "Temporary" Successor Trustee stayed on.

9.    She still continues to serve over four years after her "temporary" appointment and shows no signs of resigning her office, even though the two documents that give her any authority dictate she should have left long ago. The Court should enforce the Settlement

Agreement and compel the "Temporary" Successor Trustee to resign and/or remove her under Texas Trust Code § 114.008.

## IV.    REQUEST FOR DECLARATORY JUDGMENT/MODIFICATION OF TRUST

10.    If the "Temporary" Successor Trustee is found to have standing and/or capacity to pursue claims regarding the Dakota Trust, Dakota brings this claim for declaratory judgment under Texas Civil Practice and Remedies Code § 37.005 for the Court to declare that the 2017 document purportedly removing Dakota as successor trustee of the Dakota Trust is invalid as a forgery and/or revoked document and that Dakota is the validly serving trustee of the Dakota Trust.

11.    As the "Temporary" Successor Trustee well knows, the validity of Dallas Fontenot's 2017 purported estate planning was at the heart of the previous litigation. All of Dallas' children (who are all the beneficiaries of the Holli Trust) asserted that Dallas' purported actions to remove Dakota from his estate plan ran counter to Dallas' wishes he expressed both before and after 2017 that Dakota be in charge of the business and the various family entities. It was the intent of all parties in the Settlement Agreement to honor those wishes.

12.    In the alternative, as the only current beneficiary of the Dakota Trust, if the Court finds that Dakota Trust has no validly serving trustee, Dakota requests that the Court appoint him as the trustee under Texas Trust Code §§ 112.054(a)(2) and (5).

### V. REQUEST FOR ATTORNEY'S FEES

13.    It has been necessary for Dakota to hire attorneys to defend himself and bring countersuit, so an award of reasonable and necessary attorney's fees to Dakota from Plaintiff

4926-2021-6681.1

4

and/or the Holli Trust would be equitable and just. Moreover, an award of reasonable and necessary attorney's fees to Dakota is authorized by Section 37.009 of the Texas Civil Practice and Section 114.064 of the Texas Property Code.

<div align="center">

**PRAYER**

</div>

Based on the foregoing, Defendant Dakota Fontenot prays that:

- Plaintiff take nothing;

- the Court enter an order compelling Plaintiff to resign as "Temporary" Successor Trustee;

- the Court enter an order finding that Dakota is validly serving as trustee of the Dakota Trust;

- Dakota recover his reasonable and necessary attorney's fees from Plaintiff and/or the Holli Trust; and

- the Court grant all other relief to which he may be justly entitled, both in law and in equity.

Respectfully submitted,

*/s/ Trey Avant*
JEFFREY D. WATTERS, JR.
Texas State Bar Number: 2406695
jwatters@grayreed.com
JOHN P. ("TREY") AVANT III
Texas State Bar Number: 24101471
tavant@grayreed.com
ANDREW B. MCCARTY
Texas State Bar Number: 24126139
amccarty@grayreed.com

4926-2021-6681.1                                                5

GRAY REED & McGRAW LLP
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000

JAMES MADISON ("JIMMY") ARDOIN III
Texas State Bar Number: 24045420
jimmy@jimmyardoinlaw.com
4900 Fournace Place, Suite 414
Bellaire, Texas 77401
Telephone: (713) 574-8900

PAUL S. BEIK
Texas State Bar Number: 24054444
paul@beiklaw.com
440 Louisiana Street, Suite 1800
Houston, Texas 77002
Telephone: (713) 869-6975

**ATTORNEYS FOR DEFENDANT,
DAKOTA FONTENOT**

CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been served upon all parties of record in this Cause, in accordance with the Texas Rules of Civil Procedure on September 19, 2025.

RUDOLPH M. CULP                                VIA E-SERVICE
State Bar No. 24043014
rudy@texasprobateattorney.com
COLLIN J. BULLARD
State Bar No. 24129570
collin@texasprobateattorney.com
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
Telephone: (713) 297-0700
Fax: (817) 383-5110

**ATTORNEYS FOR PLAINTIFF,**
**LINDA GOEHRS, IN HER CAPACITY AS**
**TRUSTEE OF THE HOLLI ANN HARDIN**
**TRUST NUMBER ONE**

UNOFFICIAL COPY

/s/ Trey Avant
JOHN P. ("TREY") AVANT III

## VERIFICATION

STATE OF TEXAS        §
                      §
COUNTY OF HARRIS      §

My name is Dakota Fontenot, my date of birth is _06/22/1994_, and my address is 2926 Fontana Drive, Houston, Texas 77043, and United States.   I declare under the penalty of perjury that the statements made in Defendant's Original Answer are true and correct based on my personal knowledge.

Dated: September 19, 2025

Dakota Fontenot

4926-2021-6681.1

8

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Marcie Cardenas on behalf of Trey Avant
Bar No. 24101471
mcardenas@grayreed.com
Envelope ID: 105842615
Filing Code Description: Answer/Response
Filing Description: Dakota Fontenot
Status as of 9/19/2025 3:13 PM CST

Associated Case Party: Linda Goehrs

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Texas Probate Attorney, PLLC | | efile@texasprobateattorney.com | 9/19/2025 2:19:15 PM | SENT |
| Rudy Culp | | rudy@texasprobateattorney.com | 9/19/2025 2:19:15 PM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 9/19/2025 2:19:15 PM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 9/19/2025 2:19:15 PM | SENT |

Associated Case Party: Dakota Fontenot

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| John P. TreyAvant | | tavant@grayreed.com | 9/19/2025 2:19:15 PM | SENT |
| Debbie Gurley | | dgurley@grayreed.com | 9/19/2025 2:19:15 PM | SENT |
| Andrew McCarty | | amccarty@grayreed.com | 9/19/2025 2:19:15 PM | SENT |
| Marcie Cardenas | | mcardenas@grayreed.com | 9/19/2025 2:19:15 PM | SENT |
| Jeffrey D.Watters | | jwatters@grayreed.com | 9/19/2025 2:19:15 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Ryan Cantrell | | ryan.cantrell@chamberlainlaw.com | 9/19/2025 2:19:15 PM | SENT |
| Mariah Karigan | | mariah.karigan@chamberlainlaw.com | 9/19/2025 2:19:15 PM | SENT |
| Elizabeth Garcia | | elizabeth.garcia@chamberlainlaw.com | 9/19/2025 2:19:15 PM | SENT |
| James Ardoin | 24045420 | jimmy@jimmyardoinlaw.com | 9/19/2025 2:19:15 PM | SENT |
| Paul Beik | 24054444 | paul@beiklaw.com | 9/19/2025 2:19:15 PM | SENT |

UNOFFICIAL COPY

**EXHIBIT**

**11**

FILED
9/23/2025 1:51 PM
Teneshia Hudspeth
County Clerk
Harris County - County Probate Court No. 1
Accepted By: EK

No. 537,721

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY AS TRUSTEE OF THE HOLLI ANN HARDIN TRUST NUMBER ONE<br>　　*Plaintiff*, | § § § § § § § § § § | IN THE PROBATE COURT<br><br>NUMBER ONE (1) OF<br><br>HARRIS COUNTY, TEXAS |
| v. | | |
| DAKOTA FONTENOT,<br>　　*Defendant*. | | |

## DEFENDANT DAKOTA FONTENOT'S
## FIRST AMENDED ANSWER AND COUNTERCLAIM

Defendant Dakota Fontenot ("Dakota") files his First Amended Answer to the Original Petition ("Petition") of Linda Goehrs, in her capacity as "Temporary" Successor Trustee of the Holli Ann Hardin Trust Number One ("Plaintiff" and "Holli Trust") and Counterclaim as follows:

### I.　GENERAL DENIAL

1.　Pursuant to Rule 92 of the Texas Rules of Civil Procedure, Dakota denies each and every allegation contained in the Petition and demands strict proof thereof by a preponderance of the credible evidence as required by the Constitution and Laws of the State of Texas.

### II.　AFFIRMATIVE DEFENSES

2.　The "Temporary" Successor Trustee lacks capacity and/or standing to bring all of her claims. As explained in part III below, the "Temporary" Successor Trustee's authority to serve expired long ago and she has no independent interest in this litigation outside of that

4926-2021-6681.2

1

fiduciary capacity. Further, even if the "Temporary" Successor Trustee is validly acting, all of the spurious allegations against Dakota for actions he took in saving the businesses are not properly bought by the "Temporary" Successor Trustee. Any duties owed were to the various entities that Dakota was the officer/director of, not to the "Temporary" Successor Trustee. Finally, even if the "Temporary" Successor Trustee is validly acting, the "Temporary" Successor Trustee is not a beneficiary of the Dakota Trust and has no standing to bring an action regarding its trustee appointment.

3.      The "Temporary" Successor Trustee's claims are barred by waiver, ratification, and/or estoppel. As the evidence will show, the "Temporary" Successor Trustee was aware of and approved the financing plan used to buy Holli Hardin Fontenot ("Holli") out of her interests in the Holli Trust and the Dakota Trust. Further, the "Temporary" Successor Trustee is aware of the lengths Dakota went to ensure that the business succeeded. As evidenced from the exhibits to her own Petition, on the loan needed to take care of a portion of the deferred maintenance issues Decedent left, Dakota personally guaranteed it and secured it using property of the Dakota Trust. Even though Dakota and the Dakota Trust did not have an ownership interest in the business. (Notably, the "Temporary" Successor Trustee did not have any issues when Dakota used his authority on behalf of the entities owned by the Dakota Trust for these transactions.) The "Temporary" Successor Trustee was involved in all of these decisions and cannot now bring suit because other beneficiaries of the Holli Trust are not happy with her actions.

4.      Any complaint about how Dakota ran the businesses is barred by the business judgment rule. The "Temporary" Successor Trustee knows how Dakota ran the business until it

was sold. She was aware from the appraisal she herself commissioned that the business was cash poor and a sinking ship. She further knows that Dakota left a lucrative career and put his name, reputation, and personal assets on the line to keep the business afloat. And it was only through Dakota's hard work and decisive actions that any value at all was salvaged for the beneficiaries of the Holli Trust. Her now second-guessing of decisions Dakota made in good faith is barred.

5.      The "Temporary" Successor Trustee's claims are barred by illegality.

6.      The "Temporary" Successor Trustee's claims are barred by the statute of limitations.

7.      As shown by all of the above, the "Temporary" Successor Trustee's equitable claims are barred by unclean hands.

8.      Finally, any amount owed from the Dakota Trust to the Holli Trust is offset by what entities owned by the Holli Trust owe entities owned by the Dakota Trust and/or Dakota personally.

## III.    REQUEST FOR SPECIFIC PERFORMANCE

9.      As described above, the "Temporary" Successor Trustee has been anything but. Originally appointed by order of a Fort Bend County District Court in 2021, the "Temporary" Successor Trustee's appointment was only supposed to last until the litigation regarding Dallas Fontenot's estate plan was resolved. That resolution occurred by Settlement Agreement in 2022. Yet the "Temporary" Successor Trustee stayed.

10.      In the Settlement Agreement, the "Temporary" Successor Trustee was to resign when the surviving spouse's interest was bought out of the Trusts. Yet, after the buyout was

4926-2021-6681.2                                         3

accomplished, the "Temporary" Successor Trustee stayed on.

11.    She still continues to serve over four years after her "temporary" appointment and shows no signs of resigning her office, even though the two documents that give her any authority dictate she should have left long ago.    The Court should enforce the Settlement Agreement and compel the "Temporary" Successor Trustee to resign and/or remove her under Texas Trust Code § 114.008.

## IV.    REQUEST FOR DECLARATORY JUDGMENT/MODIFICATION OF TRUST

12.    If the "Temporary" Successor Trustee is found to have standing and/or capacity to pursue claims regarding the Dakota Trust, Dakota brings this claim for declaratory judgment under Texas Civil Practice and Remedies Code § 37.005 for the Court to declare that the 2017 document purportedly removing Dakota as successor trustee of the Dakota Trust is invalid as a forgery and/or revoked document and that Dakota is the validly serving trustee of the Dakota Trust.

13.    As the "Temporary" Successor Trustee well knows, the validity of Dallas Fontenot's 2017 purported estate planning was at the heart of the previous litigation.    All of Dallas' children (who are all the beneficiaries of the Holli Trust) asserted that Dallas' purported actions to remove Dakota from his estate plan ran counter to Dallas' wishes he expressed both before and after 2017 that Dakota be in charge of the business and the various family entities.    It was the intent of all parties in the Settlement Agreement to honor those wishes.

14.    In the alternative, as the only current beneficiary of the Dakota Trust, if the Court finds that Dakota Trust has no validly serving trustee, Dakota requests that the Court appoint him

as the trustee under Texas Trust Code §§ 112.054(a)(2) and (5).

## V. REQUEST FOR ATTORNEY'S FEES

15.    It has been necessary for Dakota to hire attorneys to defend himself and bring countersuit, so an award of reasonable and necessary attorney's fees to Dakota from Plaintiff and/or the Holli Trust would be equitable and just.  Moreover, an award of reasonable and necessary attorney's fees to Dakota is authorized by Section 37.009 of the Texas Civil Practice and Section 114.064 of the Texas Property Code.

### PRAYER

Based on the foregoing, Defendant Dakota Fontenot prays that:

- Plaintiff take nothing;

- the Court enter an order compelling Plaintiff to resign as "Temporary" Successor Trustee;

- the Court enter an order finding that Dakota is validly serving as trustee of the Dakota Trust;

- Dakota recover his reasonable and necessary attorney's fees from Plaintiff and/or the Holli Trust; and

- the Court grant all other relief to which he may be justly entitled, both in law and in equity.

Respectfully submitted,

/s/ Trey Avant



JEFFREY D. WATTERS, JR.
Texas State Bar Number: 2406695
jwatters@grayreed.com
JOHN P. ("TREY") AVANT III
Texas State Bar Number: 24101471
tavant@grayreed.com
ANDREW B. MCCARTY
Texas State Bar Number: 24126139
amccarty@grayreed.com
GRAY REED & McGRAW LLP
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000

JAMES MADISON ("JIMMY") ARDOIN III
Texas State Bar Number: 24045420
jimmy@jimmyardoinlaw.com
4900 Fournace Place, Suite 414
Bellaire, Texas 77401
Telephone: (713) 574-8900

PAUL S. BEIK
Texas State Bar Number: 24054444
paul@beiklaw.com
440 Louisiana Street, Suite 1800
Houston, Texas 77002
Telephone: (713) 869-6975

**ATTORNEYS FOR DEFENDANT,
DAKOTA FONTENOT**

4926-2021-6681.2                                     6

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been served upon all parties of record in this Cause, in accordance with the Texas Rules of Civil Procedure on September 23, 2025.

RUDOLPH M. CULP                                    VIA E-SERVICE
State Bar No. 24043014
rudy@texasprobateattorney.com
COLLIN J. BULLARD
State Bar No. 24129570
collin@texasprobateattorney.com
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
Telephone: (713) 297-0700
Fax: (817) 383-5110

**ATTORNEYS FOR PLAINTIFF,
LINDA GOEHRS, IN HER CAPACITY AS
TRUSTEE OF THE HOLLI ANN HARDIN
TRUST NUMBER ONE**

                                    */s/ Trey Avant*
                                    JOHN P. ("TREY") AVANT III

4926-2021-6681.2                                    7

## VERIFICATION

STATE OF TEXAS        §
                               §
COUNTY OF HARRIS      §

My name is Dakota Fontenot, my date of birth is 06/22/1994, and my address is 2926 Fontana Drive, Houston, Texas 77043, and United States.   I declare under the penalty of perjury that the statements made in Defendant's Original Answer are true and correct based on my personal knowledge.

Dated: September 23, 2025

_____
Dakota Fontenot

8

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Debbie Gurley on behalf of Trey Avant
Bar No. 24101471
dgurley@grayreed.com
Envelope ID: 105968190
Filing Code Description: Answer/Response
Filing Description: 1st Amended; Answer and Counterclaim- Dakota Fontenot
Status as of 9/24/2025 10:48 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Paul Beik | 24054444 | paul@beiklaw.com | 9/23/2025 1:51:22 PM | SENT |
| James Ardoin | 24045420 | jimmy@jimmyardoinlaw.com | 9/23/2025 1:51:22 PM | SENT |
| John P. TreyAvant | | tavant@grayreed.com | 9/23/2025 1:51:22 PM | SENT |
| Debbie Gurley | | dgurley@grayreed.com | 9/23/2025 1:51:22 PM | SENT |
| Andrew McCarty | | amccarty@grayreed.com | 9/23/2025 1:51:22 PM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 9/23/2025 1:51:22 PM | SENT |
| Jeffrey D.Watters | | jwatters@grayreed.com | 9/23/2025 1:51:22 PM | SENT |
| Ryan Cantrell | | ryan.cantrell@chamberlainlaw.com | 9/23/2025 1:51:22 PM | SENT |
| Mariah Karigan | | mariah.karigan@chamberlainlaw.com | 9/23/2025 1:51:22 PM | SENT |
| Elizabeth Garcia | | elizabeth.garcia@chamberlainlaw.com | 9/23/2025 1:51:22 PM | SENT |
| Texas Probate Attorney, PLLC | | efile@texasprobateattorney.com | 9/23/2025 1:51:22 PM | SENT |
| Marcie Cardenas | | mcardenas@grayreed.com | 9/23/2025 1:51:22 PM | SENT |
| Rudy Culp | | rudy@texasprobateattorney.com | 9/23/2025 1:51:22 PM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 9/23/2025 1:51:22 PM | SENT |

UNOFFICIAL COPY

EXHIBIT

12

exhibitsticker.com

FILED
9/24/2025 7:20 AM
Teneshia Hudspeth
County Clerk
Harris County - County Probate Court No. 1
Accepted By: CS

No. 537,721

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY AS | § | IN THE PROBATE COURT |
| TRUSTEE OF THE HOLLI ANN HARDIN | § | |
| TRUST NUMBER ONE | § | |
| *Plaintiff,* | § | |
| | § | NUMBER ONE (1) OF |
| v. | § | |
| | § | |
| DAKOTA FONTENOT, | § | |
| *Defendant.* | § | HARRIS COUNTY, TEXAS |

## DEFENDANT DAKOTA FONTENOT'S BRIEF IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR TEMPORARY INJUNCTION

Defendant Dakota Fontenot ("Dakota") files his Brief in Opposition ("Brief") to the Application for Temporary Injunction filed by Plaintiff Linda Goehrs, in her capacity as "Temporary" Successor Trustee of the Holli Ann Hardin Trust Number One ("Plaintiff" and "Holli Trust"), and would respectfully show to the Court as follows:

### I. SUMMARY OF ARGUMENT

Plaintiff fails to establish any one of the three elements required for the issuance of a temporary injunction. Further, Plaintiff lacks standing to bring her claims and impermissibly attempts to change the status quo. For any one of those five (5) separate and independent reasons, the Court should deny Plaintiff's request for a temporary injunction.

### II. BACKGROUND

Dakota is the son of Holli Ann Hardin Fontenot ("Holli") and Dallas Joseph Fontenot, Jr. ("Dallas"). Dallas had two children from a previous marriage, Dallas Joseph Fontenot III ("Joe") and Michelle Fontenot ("Michelle"). Dallas died on September 3, 2021. Prior to his death, Dallas had ownership and interests in a variety of trusts and entities, which in part, owned a gentleman's club in Houston commonly known as the Colorado Club. When Dallas died, litigation ensued in

1

4929-9046-7946.2

Fort Bend County regarding Dallas' estate and the Holli Trust.

Plaintiff was appointed as a "Temporary Successor Trustee" of the Holli Trust by the County Court at Law #4 of Fort Bend County as a result of that litigation. This appointment was only intended to last until the end of the estate dispute.

***A Settlement Agreement is executed by the beneficiaries of the Hardin Trust to end the Fort Bend litigation.***

That litigation was ended by a mediated Settlement Agreement between Dakota, Holli, Joe, Michelle, and Ashley Fontenot (the beneficiaries of the Holli Trust) effective January 7, 2022 ("Settlement Agreement"). As part of the Settlement Agreement, the parties agreed that Holli would be bought out of her beneficial interests from the Holli Trust and another trust called the Dakota Trust. The buyout price was to be paid "by Dakota, Joe, Michelle, **and/or** the business entities owned by the Holli Ann Hardin Trust Number One...."[1]

Under the Settlement Agreement, an appraiser valued the assets of the Holli Trust (of which Holli was to receive 20% for the buyout) and the Dakota Trust (of which Holli was to receive 85% for the buyout). The Holli Trust (of which Linda acted as Temporary Successor Trustee) held Ice Embassy, Inc.; HRF Enterprises Inc. (both of which were part of the Colorado Club); and two parcels of land. The Dakota Trust (of which Dakota was trustee of after Dallas' passing) held Viva Las Vegas Properties Inc. (which owned the land where the Colorado Club's corporate office was located). Based on those valuations, Holli was to receive $2,823,464. To raise the money for that amount, Plaintiff and Dakota agreed to sell a parcel of land for $975,000 and take out a loan of $1.825 million in the name of HFR Enterprises Inc. As part of this transaction, Dakota also proposed taking out a $1.5 million line of credit secured by real estate owned by the Holli Trust to finance potential business opportunities. Plaintiff signed off on this integrated transaction

---

[1] *See* Binding Executed Settlement Agreement (attached as **Exhibit A**) at P.4-5 (emphasis added).

2

4929-9046-7946.2

(including executing the document necessary for the line of credit), took the proceeds, and paid Holli the entire buyout amount using a check from the Holli Trust on January 13, 2023.

### Dakota rehabilitates the Colorado Club.

The Settlement Agreement also provided that Plaintiff would execute the necessary documents to install Dakota as an Officer and or/director of Ice Embassy, Inc., HRF Enterprises Inc., and Entertainment Marketing Management, LP (the core entities that effectively owned and operated the Colorado Club).[2]

From the execution of the Settlement Agreement through the sale of the Colorado Club earlier this year, Dakota worked diligently to keep the Colorado Club afloat and salvage some measure of value for the family. As Plaintiff knows first-hand, the Colorado Club had major infrastructure issues, outdated interior design, faulty beverage equipment requiring an overhaul, along with a host of other issues (including a severe possum infestation) that required an infusion of capital to fix when Dakota took over. This was on top of the severe crosswinds affecting the industry of the hit it took during COVID and increased fees and taxes levied by the State of Texas.

As evidenced in this Brief, along with numerous emails and other documents that will be presented to the Court, Plaintiff was well aware of the issues Dakota faced. And Plaintiff was informed of and approved of the actions Dakota took on behalf of the Colorado Club.

### Plaintiff doesn't resign as trustee. Instead, she sues Dakota for actions she approved.

The Settlement Agreement also provided further that Plaintiff "will resign" as temporary trustee "at the time that Holli's interest is purchased."[3] Yet, after Plaintiff tendered the check to Holli, Plaintiff refused to tender her resignation. She refuses to do so until this day. Instead, only after Dakota successfully rehabilitated the Colorado Club enough to allow for a sale, Plaintiff filed

---

[2] *Id.*

[3] *Id.*

3

4929-9046-7946.2

her Original Petition ("Petition") and shortly thereafter obtained an *ex parte* temporary restraining order from the Court on the incredible basis that Dakota was about to abscond with the funds from his trust to the Caribbean.

As discussed more below, Plaintiff asserts causes of action (declaratory judgment and unjust enrichment) claiming that Dakota was unjustly enriched by funding Holli's buyout under the Settlement Agreement using only assets that belonged to the Holli Trust rather than the Dakota Trust. The Settlement Agreement, however, does not mandate that any one source must fund Holli's buyout (hence the use of **"and/or"** under the Settlement Agreement).[4] And in fact does not provide at all that the Dakota Trust or entities owned by the Dakota Trust would be responsible for the buyout.

Plaintiff further alleges that Dakota caused damage to the Colorado Club, thus damaging the Holli Trust. Plaintiff brings this allegation though she agreed that the Colorado Club was in poor condition due to Dallas' prior management and consented to the expenditures Dakota made to salvage its value.

Plaintiff finally seeks for the Court to order that Dakota is not the trustee of the Dakota Trust despite her express consent to his trusteeship for over three years. When the loan that financed Holli's buyout was refinanced and the line of credit wiped out in May of 2023, Dakota used his authority on behalf of the Dakota Trust and Viva Las Vegas to guarantee and secure the new loan.[5] Notably, Plaintiff did not question Dakota's authority then when it benefitted the Holli Trust.

Important for the issue before the Court, Plaintiff also seeks an injunction enjoining Dakota from: (1) selling assets belonging to Dakota Trust and/or Viva Las Vegas Properties, Inc. (which

---

[4] *See* **Exhibit A** at P.4-5 (emphasis added).
[5] See Amended and Restated Promissory Note dated May 22, 2023, attached as **Exhibit B**.

4929-9046-7946.2

owned the property containing the corporate offices of the Colorado Club); (2) taking action as trustee of the Dakota Trust; (3) taking action as president/officer of Viva Las Vegas Properties, Inc.; and (4) selling the real property located 3414 Old Richmond Road, Rosenburg, Texas held by Viva Las Vegas Properties, Inc. As shown below, no evidence or authority supports this request and it should be denied.

## III.    ARGUMENT & AUTHORITIES

A temporary injunction is an "extraordinary remedy" designed "to preserve the status quo of the litigation's subject matter pending a trial on the merits."[6]  Temporary injunctions do not issue as a matter of right, and their issuance should be carefully regulated.[7]  "To obtain a temporary injunction, an applicant must plead and prove: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim."[8]  As Plaintiff cannot establish these elements, the Court should deny Plaintiff's temporary injunction.

### A.    Plaintiff lacks standing to bring her causes of action against Dakota.

But before the elements are analyzed, Plaintiff must have standing to even request a temporary injunction.[9]  A lack of standing deprives the trial court of subject-matter jurisdiction, rendering any injunctive relief void.[10]

Plaintiff claims standing as the "Temporary" Successor Trustee of the Holli Trust. Yet, Plaintiff is not named a trustee in the Holli Trust instrument. Her authority is derived only from

---

[6] *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002).
[7] *Id.; see also City of Arlington v. City of Fort Worth*, 873 S.W.2d 765, 768 (Tex. App.—Fort Worth 1994, writ dism'd w.o.j.).
[8] *Id.*; *Tranter, Inc. v. Liss*, No. 02-13-00167-CV, 2014 WL 1257278, at *2 (Tex. App.—Fort Worth Mar. 27, 2014, no pet.).
[9] *Austin Nursing Ctr., Inc. v. Lovato,* 171 S.W.3d 845, 849 (Tex. 2005).
[10] *See Tuma v. Kerr Cnty.,* 336 S.W.3d 277, 280 (Tex. App.—San Antonio 2010, no pet.); *see also In re Mask,* 198 S.W.3d 231, 234 (Tex. App.—San Antonio 2006, orig. proceeding); *see also Taub v. Aquila Sw. Pipeline Corp.,* 93 S.W.3d 451, 455–56 (Tex. App.-Houston [14th Dist.] 2002, no pet.).

5

4929-9046-7946.2

the court order appointing her. And that authority was only supposed to last for the duration of the litigation regarding Dallas' estate plan. That litigation was resolved by the Settlement Agreement. Yet, the parties provided Plaintiff with a temporary reprieve by extending her tenure by agreement *only* to accomplish Holli's buyout. Pursuant to Paragraph 9 of the Settlement Agreement, Plaintiff "will resign" as "Temporary Successor Trustee" at "the time that Holli's interest is purchased."[11] That buyout was accomplished when Plaintiff signed a check to Holli on January 13, 2023.

Still, Plaintiff did not resign. And has not provided any justification for why she is still acting as "temporary" trustee of the Holli Trust four years after her appointment. Although not a signatory to the Settlement Agreement, Plaintiff is nonetheless bound to its terms.[12] As requested in Dakota's request for specific performance under Texas Trust Code § 114.008 that was noticed for this same hearing, the Court should uphold the Settlement Agreement and compel Plaintiff to resign. If it does, this case is over as Plaintiff otherwise lacks standing to pursue any claims related to the Holli Trust.

Therefore, for this first separate and independent ground, the Court should deny Plaintiff's request for a temporary injunction.

## B.    Plaintiff fails to show a probable right to relief of her causes of action against Dakota.

On the temporary injunction elements, Plaintiff first has the burden of pleading and proving a probable right to relief on her claims for declaratory judgment, breach of fiduciary duty, and unjust enrichment.[13] She fails at each one.

---

[11] *See* **Exhibit A** at P.4-5 (emphasis added).

[12] *Taylor Morrison of Tex., Inc. v. Ha*, 660 S.W.3d 529, 533 (Tex. 2023) ("a non-signatory plaintiff seeking the benefits of a contract is estopped from simultaneously attempting to avoid the contract's burdens"); *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 755 (Tex. 2001) ("[A] litigant who sues based on a contract subjects him or herself to the contract's terms.").

[13] *See* S*tate v. Zurawski*, 690 S.W.3d 644 (Tex. 2024).

6

4929-9046-7946.2

*(1)     Plaintiff fails to show a probable right to relief to her declaratory judgment actions.*

Here, Plaintiff cannot prove probable right of relief on her declaratory judgment actions on multiple grounds. Plaintiff seeks the following declaratory judgments pursuant to Texas Civil Practice and Remedies Code §37.004(a):

(1) An order directing Defendant repay to the Holli Trust the amounts received by Holli under the Settlement Agreement buyout;

(2) An order declaring Plaintiff is 85% beneficiary of the Dakota Trust.

(3) An order that "Pursuant to The Settlement Agreement, Defendant is liable to Plaintiff for 50% of the amounts received by Holli under the Settlement Agreement buyout"; and

(4) An order that "Defendant is not trustee of the Dakota Trust or an officer/director of any entity within the Colorado Club."[14]

Plaintiff has no basis for requested declarations #1 and #3 as the Settlement Agreement does not obligate either Dakota or the Dakota Trust for any amount of the buyout. No agreement does and these have no basis. To the extent Plaintiff is attempting to cloak her unjust enrichment claim in declaratory judgment garb, that is prohibited by Texas law. [15]

As for Declaration 3# relating to Plaintiff's claimed ownership in the Dakota Trust, Texas law is clear that assignments of beneficial interests in trusts are void when they are subject to a spendthrift provision in the trust.[16] The Dakota Trust instrument specifically precludes a beneficiary from the alienation, encumbrance, transfer, and/or assignment of their interest.[17] Consequently, the Holli Trust cannot own an 85% of interest in the Dakota Trust.

---

[14] *See* Plaintiff's Original Petition ¶¶ 21-22.

[15] *See Abor v. Black,* 695 S.W.2d 564, 566 (Tex. 1985) (holding a declaratory judgment action may not be used to determine potential tort liability); *see also Trantham v. Isaacks*, 218 S.W.3d 750, 753-754 (Tex. App.—Fort Worth 2007, pet. denied).

[16] *See* TEX PROP. CODE 112.05*; Bradley v. Shaffer*, 535 S.W.3d 242, 248 (Tex. App.—Eastland 2017, no pet.) (holding that the express terms of the trust precluded [beneficiary] from assigning his beneficial interest in the trust, and his conveyances to [purported purchaser] were invalid at the time they occurred.).

[17] *See* Article VIII, Section F of the Trust Declaration Dakota Trust, attached as **Exhibit C.**

7

Further, as Plaintiff's own Petition states repeatedly, the Settlement Agreement was a "buyout" meaning that Holli was being paid off in order to essentially end the litigation regarding Dallas' estate. Holli was paid the amount that was determined by neutral licensed appraisers, as agreed under the Settlement Agreement, and Plaintiff was well aware of the exact amounts she was being paid. Plaintiff cannot now prove a probable right to relief that the "buyout" under the Settlement Agreement gives her an ownership in the Dakota Trust.

Finally, on Declaration #4 that Dakota is not the Trustee of the Dakota Trust and request for appointment of a successor trustee, she only has standing as an interested person in the Dakota Trust and Viva Las Vegas through her claims declaratory judgment and unjust enrichment. Plaintiff has no other standing with respect to the Dakota Trust or its entities as she is not a trustee or beneficiary. But as those claims have no merit (as explained above and below), this claim likewise fails.

*(2)     Plaintiff fails to show a probable right to relief for her breach of fiduciary duty claim because Dakota owes her no fiduciary duty.*

Plaintiff must prove that Defendant owed her, as "temporary" trustee of the Holli Trust, a fiduciary duty. She cannot. Plaintiff alleges in her Petition that because Dakota was "controlling" the entities that operated the Colorado Club, Dakota "assumed a position carrying fiduciary duties toward the Holli Trust."

In this case, Plaintiff does not allege or identity the source of any formal fiduciary duty owed by Dakota to Plaintiff. (In fact, it is Plaintiff who owes Dakota a formal fiduciary duty.) Plaintiff argues that Dakota "assumed" a fiduciary duty. To the extent that can be construed as alleging an informal fiduciary duty, that position is simply incompatible with the stringent

requirements of an informal fiduciary duty under Texas law.[18]

Dakota owes fiduciary duties to the entities which he is an officer for, but they do not flow through to Plaintiff. Since Plaintiff cannot prove Dakota owes her a fiduciary duty, she cannot prove a probable right of relief on her breach of fiduciary duty claims.

*(3)     Even if Plaintiff were to prove a fiduciary duty was owed to her by Dakota, Plaintiff cannot show that Dakota breached his duties.*

Even if Dakota somehow owed Plaintiff a duty, the evidence will show that Dakota did not breach any alleged fiduciary duties.

Plaintiff's Petition includes a laundry list of actions that allegedly show Dakota mismanaged the Colorado Club to support her breach of fiduciary duty claim. The evidence will show that Plaintiff was well aware at all relevant times that the Colorado Club was in dire need of repairs—requiring an infusion of capital to accomplish. The evidence will show that when Dakota assumed management of the Colorado Club, there was a possum infestation, there were major infrastructure problems, the beverage equipment had to be overhauled, and the entire Colorado Club was severely outdated.

The evidence will further show that Plaintiff approved, in writing, Dakota's extensive efforts to improve the Colorado Club and the necessary expenditures that were made. As just a few examples, Plaintiff signed off on a construction loan agreement for the Colorado Club that she now complains of, and consistently approved of expenditures that she now is suing Dakota for.[19] Remarkably, Plaintiff even wrote to Dakota on March 22, 2023, approving funds to be spent by

---

[18] *Pitts v. Rivas,* 709 S.W.3d 517, 528-29 (Tex. 2025); *Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 288 (Tex. 1998).
[19] See January 2023, e-mail string attached as **Exhibit D**.

9

4929-9046-7946.2

Dakota for repairs of the Colorado Club, stating:

> For Plaintiff to acknowledge that Dakota received the Colorado Club in poor condition,

On Wed, Mar 22, 2023 at 6:06 PM, Linda Goehrs <linda@hgprobate.com> wrote:

> Approved. I really wish that Dallas had done repairs and replaced old equipment. It is costing a lot of money to get this place looking good and operating well!
>
>
> Linda C. Goehrs
> Horrigan Goehrs Edwards & Culp, L.L.P.
> 1401 Truxillo St.
> Houston, TX 77004
> (713) 659-4200
> (713) 659-3804 (facsimile)
> linda@hgprobate.com

only to complain more than two years later about the expenditures Dakota made to improve it (expenditures she approved of no less), is an outrageous misrepresentation of the facts. More importantly for the present proceeding, it demonstrates that Dakota did not breach any fiduciary duty to Plaintiff (assuming for the purposes of this analysis that he even owed one). Dakota took over a sinking ship, and the evidence will show that he worked very hard to keep it afloat.

Moreover, Plaintiff complains about a "$150,000.00 loan that Dakota took from his stepfather" in her Petition, despite the fact that she physically signed the Secured Promissory Note related to this loan, as "Temporary" Successor Trustee of the Holli Trust.[20] Plaintiff implies that Dakota acted nefariously by wiring the funds under the Secured Promissory Note "directly to an offshore account." As Plaintiff knows since she signed the Secured Promissory Note herself, the payee had a principal address in St. Thomas which is listed directly in the document that Plaintiff signed.

---

[20] *See* March 21, 2025, Secured Promissory Note, attached as **Exhibit E.**

10

4929-9046-7946.2

Plaintiff purports to be the acting "temporary trustee" during all times relevant to every single transaction that she complains Dakota took. Yet, Plaintiff seeks to blame Dakota for transactions that she purports to have had a duty to oversee as "temporary trustee." There are numerous additional examples that Dakota will show to the Court of Plaintiff acknowledging and approving the very actions that she now contends are at the root of her breach of fiduciary duty claims.

Further, Plaintiff's complaints about expenditures are exactly the kind of second-guessing that the business judgment rule has barred for almost 150 years. The business judgment rule protects corporate officers and directors, who owe fiduciary duties to the corporation, from liability for acts that are within the honest exercise of their business judgment and discretion.[21]

For either reason (no such duty was owed and any of those duties weren't breached), Plaintiff cannot prove a probable right of relief on her breach of fiduciary duty claims against Dakota.

*(4)      Plaintiff fails to show a probable right of relief on her unjust enrichment claim.*

Plaintiff argues in her Petition that Dakota was unjustly enriched because "none of the assets held in the Dakota Trust were used to fund the buyout of Holli as beneficiary of each Trust." Texas law holds that unjust enrichment "is not a proper remedy merely because it 'might appear expedient or generally fair that some recompense be afforded for an unfortunate loss . . . or because the benefits to the person sought to be charged amount to a windfall.'"[22] The doctrine of unjust enrichment thus does not operate to rescue a party from the consequences of a bad bargain, and the enrichment of one party at the expense of the other is not unjust where it is provided for under

---

[21] *See Cates v. Sparkman*, 11 S.W. 846, 848–49 (Tex. 1889).
[22] *HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 891 (Tex. 1998)

4929-9046-7946.2

the terms of an express contract.[23]  Further, unjust enrichment does not apply when the contractual duty at issue has been performed.[24]

Here, the Settlement Agreement states that Holli's interest will be bought out by Dakota, Joe, Michelle, **and/or** the business entities owned by the Holli Hardin Ann Trust…"  There was no requirement that the buyout costs be paid from any particular source as long as it complied with the above—hence the use of "and/or…"  Additionally, the terms of the Settlement Agreement do not even contemplate that the Dakota Trust or any entities owned by the Dakota Trust would be the source of the buyout, as they were excluded from the list of permissible sources.

To make matters worse for Plaintiff, she signed the very check that paid Holli the buyout amount entirely from the funds of the Holli Trust.  Plaintiff was also further aware of and signed off on the financing that raised the money to fund Holli's buyout.  Plaintiff is barred from now complaining about the source of the funds used for the buyout when: (1) the funding was explicitly allowed by the "and/or" provision of the Settlement Agreement, (2) the Dakota Trust was not identified as a source of the buyout funds in the Settlement Agreement; and (3) Plaintiff approved of it in writing.

Even further, Plaintiff signed the check paying Holli the entire buyout amount from the Holli Trust on January 13, 2023.  That is when any cause of action for unjust enrichment she may have accrued.  As there is a two-year statute of limitations on an unjust enrichment cause of action, Plaintiff would have had to file suit by January 13, 2025.[25]  As she waited until August 21, 2025, Plaintiff's cause of action is further barred by the statute of limitations.  Therefore, Plaintiff fails to show a probable right of relief for her unjust enrichment claim.

---

[23] *First Union Nat. Bank v. Richmont Capital Partners I, L.P.,* 168 S.W.3d 917, 931 (Tex. App.—Dallas 2005, no pet.).
[24] *Id.*
[25] *Elledge v. Friberg-Cooper Water Supply Corp.,* 240 S.W.3d 869, 869 (Tex. 2007).

4929-9046-7946.2

As Plaintiff cannot show a probable right of relief as to any of her claims, for this second separate and independent ground the Court should deny the temporary injunction.

**C.      Plaintiff fails to show imminent, and irreparable harm.**

To constitute irreparable harm, as required for injunctive relief, an injury must be certain, great, actual and not theoretical.[26]  Evidence of fear, apprehension, and possibilities is not sufficient to establish any injury, let alone irreparable injury necessary for granting a temporary injunction.[27]  If a movant has an adequate remedy at law other than the issuance of an injunction, the Court must find that there is not imminent and irreparable harm, and must deny the request for injunctive relief.[28]

*(1)      Plaintiff fails to meet her burden of proving that she has no adequate remedy at law.*

For purposes of injunctive relief, no adequate remedy at law exists if damages are incapable of calculation or if the defendant is incapable of responding in damages.[29]

Plaintiff seeks relief that is absolutely capable of calculation through an award of monetary damages. Even Plaintiff's declaratory judgment actions ask for a percentage of liability to be awarded to the Holli Trust. Plaintiff claims that the Holli Trust has been damaged by Plaintiff's alleged breaches of fiduciary duty through allegedly improper expenditures and the allegedly improper funding of Holli's buyout (which Plaintiff signed off on).  Plaintiff alleges that Dakota seeks to "move to the Virgin Islands" to be outside of the Court's jurisdiction and therefore Plaintiff has no adequate remedy at law other than an injunction. These arguments lack any merit.

Plaintiff offered no evidence that Dakota is insolvent or is attempting to hide from the

---

[26] *Duarte v. City of Lewisville, 136 F. Supp. 3d 752 (E.D. Tex. 2015), judgment aff'd*, 858 F.3d 348 (5th Cir. 2017), (applying Texas law).
[27] *Marketshare Telecom, L.L.C. v. Ericsson, Inc.*, 198 S.W.3d 908, 926 (Tex. App.—Dallas 2006, no pet.).
[28] *Clarendon Nat. Ins. Co. v. Thompson,* 199 S.W.3d 482, 494 (Tex. App.—Houston [1st Dist.] 2006, no pet.).
[29] *Haq v. America's Favorite Chicken Co.*, 921 S.W.2d 728, 730 (Tex. App.—Corpus Christi-Edinburg 1996, writ dismissed w.o.j.).

13

4929-9046-7946.2

Court's jurisdiction. To the contrary, Dakota will show through evidence that he owns several entities which currently operate, and will continue to operate in Texas throughout the course of this litigation. Dakota maintains a residency in Texas. Dakota has hired attorneys who have entered an appearance in this proceeding. Further, the US Virgin Islands are a territory belonging to the United States and if Dakota is at any time there, it will in no way deprive the Court of jurisdiction or create imminent and irreparable harm. Plaintiff is very well aware of these facts. Dakota is solvent, and Plaintiff's claims are, per her own Petition, reducible to calculable money judgments.

Accordingly, Plaintiff has an adequate remedy at law and for this third separate and independent reason the Court should deny her request for a temporary injunction.

*(2)    Plaintiff also fails to show the existence of imminent harm.*

Plaintiff seeks an injunction enjoining Dakota from: (1) selling assets belonging to Dakota Trust and/or Viva las Vegas Properties, Inc.; (2) taking action as trustee of the Dakota Trust; (3) taking action as president/officer of Viva Las Vegas Properties; and (4) selling the Property.

The evidence will show that Dakota has a lawful right to take each of these actions, and therefore should not be enjoined because of the nuisance that Plaintiff alleges will result. Through her own correspondence, documents that she signed, and through a variety of other ways, Plaintiff has time and time again acknowledged that Dakota is an officer of Viva Las Vegas Properties, as well as the trustee of the Dakota Trust. This acknowledgment and consent from Plaintiff spans from at least the execution of the Settlement Agreement in January of 2022. Plaintiff had no problem with Dakota acting in these capacities from 2022 until the time that she brought this suit.

Plaintiff cannot now claim that there is some "imminent" harm as a result of Dakota's actions which she has been aware of for years. Dakota already has a sales contract and approval

14

from a title company to close on the sale of the Property which further evidences his authority to act on behalf of Viva Las Vegas Properties. Dakota's position as the Sole Director of Viva Las Vegas Properties is further established in a Unanimous Joint Written Consent document, the Amended and Restated Bylaws, along with several other items that Plaintiff is well aware of.[30]

The bottom line is, Dakota cannot be restrained from taking lawful acts when Plaintiff has no valid interest in the Dakota Trust, and when she has been aware and approved of the actions for years which she now complains will lead to her imminent harm. As a result, for this fourth separate and independent reason, the Court should deny her request for a temporary injunction.

**D.      Plaintiff's request for injunctive relief would change the statute quo.**

Finally, the purpose of a temporary injunction is to preserve the status quo pending trial on the merits.[31] The status quo is the last, actual, peaceable, non contested status that preceded the pending controversy.[32] If one party takes action that alters relationship between the parties, status quo is the relationship that existed before such action.[33]

Here, the status quo is that Dakota is acting as the trustee of the Dakota Trust and the director/officer of Viva Las Vegas. He's been acting in these capacities for years, all with Plaintiff's knowledge and tacit consent. To enjoin him from acting as he has before Plaintiff filed her lawsuit would change the status quo. And that is not what Texas law provides injunctive relief should do. Thus, the Plaintiff's request for a temporary injunction should be denied for this fifth separate and independent reason.

---

[30] See Unanimous Joint Written Consent of Viva Las Vegas Properties, Inc., and Amended and Restated Bylaws of Viva Las Vegas Properties, Inc., attached as **Exhibit F** and **Exhibit G**.

[31] *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002).

[32] *In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004); *Janus Films, Inc. v. City of Fort Worth*, 358 S.W.2d 589, 580 (Tex. 1962).

[33] *See Lifeguard Benefit Servs., Inc. v. Direct Med. Network Solutions, Inc.*, 308 S.W.3d 102, 114 (Tex. App.—Fort Worth 2010, no pet.).

15

**PRAYER**

Based on the foregoing, Defendant Dakota Fontenot prays that:

- the Court enter an order denying Plaintiff's request for a temporary injunction; and

- the Court grant all other relief to which he may be justly entitled, both in law and in equity.

<div style="margin-left: 45%;">

Respectfully submitted,

/s/ Trey Avant
JEFFREY D. WATTERS, JR.
Texas State Bar Number: 2406695
jwatters@grayreed.com
JOHN P. ("TREY") AVANT III
Texas State Bar Number: 24101471
tavant@grayreed.com
ANDREW B. MCCARTY
Texas State Bar Number: 24126139
amccarty@grayreed.com
GRAY REED & McGRAW LLP
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000

JAMES MADISON ("JIMMY") ARDOIN III
Texas State Bar Number: 24045420
jimmy@jimmyardoinlaw.com
4900 Fournace Place, Suite 414
Bellaire, Texas 77401
Telephone: (713) 574-8900

PAUL S. BEIK
Texas State Bar Number: 24054444
paul@beiklaw.com
440 Louisiana Street, Suite 1800
Houston, Texas 77002
Telephone: (713) 869-6975

**ATTORNEYS FOR DEFENDANT,
DAKOTA FONTENOT**

</div>

16

CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been served upon all parties of record in this Cause, in accordance with the Texas Rules of Civil Procedure on September 24, 2025.

RUDOLPH M. CULP                          VIA E-SERVICE
State Bar No. 24043014
rudy@texasprobateattorney.com
COLLIN J. BULLARD
State Bar No. 24129570
collin@texasprobateattorney.com
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
Telephone: (713) 297-0700
Fax: (817) 383-5110

**ATTORNEYS FOR PLAINTIFF,
LINDA GOEHRS, IN HER CAPACITY AS
TRUSTEE OF THE HOLLI ANN HARDIN
TRUST NUMBER ONE**

_/s/ Trey Avant_
JOHN P. ("TREY") AVANT III

17

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Marcie Cardenas on behalf of Trey Avant
Bar No. 24101471
mcardenas@grayreed.com
Envelope ID: 105997049
Filing Code Description: Answer/Response
Filing Description: Defendant Dakota Fontenot's Brief in Opposition to Plaintiff's Application for Temporary Injunction
Status as of 9/24/2025 10:49 AM CST

Associated Case Party: Linda Goehrs

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Texas Probate Attorney, PLLC | | efile@texasprobateattorney.com | 9/24/2025 7:20:32 AM | SENT |
| Rudy Culp | | rudy@texasprobateattorney.com | 9/24/2025 7:20:32 AM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 9/24/2025 7:20:32 AM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 9/24/2025 7:20:32 AM | SENT |

Associated Case Party: Dakota Fontenot

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| John P. TreyAvant | | tavant@grayreed.com | 9/24/2025 7:20:32 AM | SENT |
| Debbie Gurley | | dgurley@grayreed.com | 9/24/2025 7:20:32 AM | SENT |
| Andrew McCarty | | amccarty@grayreed.com | 9/24/2025 7:20:32 AM | SENT |
| Marcie Cardenas | | mcardenas@grayreed.com | 9/24/2025 7:20:32 AM | SENT |
| Jeffrey D. Watters | | jwatters@grayreed.com | 9/24/2025 7:20:32 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Paul Beik | 24054444 | paul@beiklaw.com | 9/24/2025 7:20:32 AM | SENT |
| James Ardoin | 24045420 | jimmy@jimmyardoinlaw.com | 9/24/2025 7:20:32 AM | SENT |
| Ryan Cantrell | | ryan.cantrell@chamberlainlaw.com | 9/24/2025 7:20:32 AM | SENT |
| Mariah Karigan | | mariah.karigan@chamberlainlaw.com | 9/24/2025 7:20:32 AM | SENT |
| Elizabeth Garcia | | elizabeth.garcia@chamberlainlaw.com | 9/24/2025 7:20:32 AM | SENT |

EXHIBIT
A

537721

Probate Court No. 1

NO. 21-CPR-036521

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN THE COUNTY COURT AT LAW |
| | § | |
| DALLAS JOSEPH FONTENOT, JR., | § | NUMBER FOUR (4) OF |
| | § | |
| DECEASED | § | FORT BEND COUNTY, TEXAS |

NO. 21-DCV-288736

| | | |
|---|---|---|
| IN RE: | § | IN THE 240th DISTRICT COURT |
| | § | |
| | § | OF |
| HOLLI ANN HARDIN TRUST | § | |
| NUMBER ONE | § | FORT BEND COUNTY, TEXAS |

## BINDING MEDIATED SETTLEMENT AGREEMENT

The Parties – Dakota Fontenot, individually, in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in his capacity as next friend and virtual representative for S.F., a minor, Holli Ann Fontenot, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, Dallas Joseph Fontenot, III, individually, and in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One, Michelle Ann Fontenot, individually, in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in her capacity as next friend and virtual representative for A.E., a minor, and Ashley Fontenot Estrada, individually and in her capacity as a beneficiary of the Hollis Ann Hardin Trust Number One – hereto agree that all causes of action pending in cause number 21-CPR-036521 and cause number 21-DVC-288736, both of which are pending in Fort Bend County, Texas, and all related claims and/or controversies between them, whether asserted or not, known or unknown, actual or contingent, are hereby settled, in accordance with the terms of this Binding Mediated Settlement Agreement (hereinafter referred to as the "Settlement Agreement").

## A. DEFINITIONS

1.    Whenever used in this Settlement Agreement, the following terms shall have and be construed to have the following meanings:

i.    "Settlement Agreement" shall mean and refer to this Binding Mediated Settlement Agreement.

ii.    "Dakota" shall mean and refer to Dakota Fontenot, individually, in his capacity as beneficiary of the Holli Ann Hardin Trust Number One, and in his capacity as next friend and virtual representative of S.F., a minor.

1

iii.    "Holli" shall mean and refer to Holli Ann Fontenot, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

iv.    "Joe" shall mean and refer Dallas Joseph Fontenot, III, individually and in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

v.    "Michelle" shall mean and refer to Michelle Ann Fontenot, individually, in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in her capacity as next friend and virtual representative of A.E., a minor.

vi.    "Ashley" shall mean and refer to Ashley Fontenot Estrada, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

vii.    "Trust" shall mean and refer to the Holli Ann Hardin Trust Number One.

viii.    "Estate" shall mean and refer to the Estate of Dallas Joseph Fontenot, Jr., whose administration is pending in cause number 21-CPR-036521, in the County Court at Law Number Four (4) of Fort Bend County, Texas.

ix.    "Parties" shall mean and refer to Dakota, Holli, Joe, Michelle, and Ashley, collectively, as described in paragraphs two (ii) through six (vi) above.

x.    "Claims" shall mean and include any and all causes of action, demands, debts, obligations, duties, liens, liabilities, and theories of liabilities of whatsoever kind and nature, whether based in contract or tort, whether arising in equity or under the common law, whether by statute or regulation, whether known or unknown, whether past or present, whether contingent or matured, whether for damages relief, injunctive relief, declaratory relief, equitable relief, or any other type of relief, whether for actual damages, personal injury damages, mental anguish, liquidated damages, punitive damages, exemplary damages, compensatory damages, consequential damages, incidental damages, pecuniary damages, costs, expenses, attorneys' fees, penalties, or fines that are (is), were (was), could be, or could have been asserted as of the Effective Date, regardless of whether actually asserted, whether by claim, counterclaim, cross-claim, motion, third-party claim regarding the Estate and Trust, including but not limited to, claims, whether asserted or not, known or unknown, actual or contingent.

xi.    "Effective Date" shall mean and refer to the date that the last Party to this Settlement Agreement executes the same.

xii.    In respect to any defined term herein, the singular shall include the plural, and the plural shall include the singular.

2

### B. TERMS, CONDITIONS, AND MUTUAL CONSIDERATION

1.    The Parties acknowledge that bona fide disputes and controversies exist between them, both as to liability and the amount thereof in damages, if any, and by reason of such disputes and controversies they desire to compromise and settle all Claims and causes of action of any kind whatsoever which the Parties have or may have arising out of the transactions or occurrences which have been brought or could have been brought regarding the Trust.

**2.    THE PARTIES AGREE AND ACKNOWLEDGE THAT UPON THE EXECUTION OF THIS SETTLEMENT AGREEMENT, THIS SETTLEMENT AGREEMENT SHALL BECOME BINDING AND IRREVOCABLE.**

3.    The Parties agree that the 2013 Last Will and Testament and 2017 First Codicil to the Last Will and Testament will be admitted to probate.  The Parties agree that Holli will be appointed as the Independent Executor of the Estate and agree not to object to the same.

4.    All of the Estate's assets, including all associated bank accounts, shall be distributed to Holli, save and expect the following items:

- The following items are going to be distributed to Dakota:

  o   The 2017 F150 Truck
  o   The 2013 Toyota Sequoia
  o   All interest, including all associated bank accounts, in Entertainment Marketing and Management, LP
  o   The coin collection and gold located in the backpack at the Rosenburg Office

- The following items are going to be distributed to Joe:

  o   The 2008 Honda Ridgeline
  o   One-half (1/2) of the Decedent's Tiki Mug Collection

The Parties agree to execute all documents necessary to effectuate the conveyance of all property described above the individual recipients stated in paragraph four (4).

5.    From the Rosenburg office, Holli shall be entitled to obtain:

- The remaining $150,000 in non-earmarked cash located in the backpack;
- Any and all Playboy Magazines

6.    The Parties agree that all personal property belonging to Dakota, Joe, and/or Michelle that is currently located at 10402 W. Hidden Lake Lane, Richmond, Texas 77406 shall be distributed to Dakota, Joe, and/or Michelle as appropriate.  Dakota, Joe and/or Michelle shall

3

UNOFFICIAL COPY

be afforded the opportunity, within thirty (30) days of the Effective Date of this Settlement Agreement, to conduct a supervised walkthrough of their personal property located at 10402 W. Hidden Lake Lane, Richmond, Texas 77406. During that time, Dakota, Joe, and/or Michelle will take photographs of their personal property which they would like to obtain. A list and accompanying photographs will be delivered to counsel for Holli of those items within fourteen (14) days of the walkthrough being completed. Holli will have fourteen (14) days to object to the items which Dakota, Joe, and/or Michelle would like to obtain. If the parties cannot reach a resolution regarding the same, Russ Jones will mediate, at an hourly rate, the division of the disputed personal property. Upon the completion and approval of a final list of items, Dakota, Joe, and/or Michelle, at their expense, shall obtain and remove the items on the approved final list of items at a mutually agreeable date and time within fourteen (14) days of the approval of the final list of items.

7.    The attorney's fees for Holli, Dakota, Joe, Michelle, and/or Ashley may be paid from the assets of the Holli Ann Hardin Trust Number One in an amount no more than $200,000.00 per side. The Parties will present their fees to Linda Goehrs, in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, for payment. The Parties agree that they will not object to the payment of the fees of any other party.

8.    The real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183 shall be distributed to Holli. Dakota, Michelle, and Joe, with Dakota as authorized representative, shall retain a right of first refusal in the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183. If Holli decides to sell or otherwise transfer the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183, Holli shall notify Dakota, Michelle, and Joe in writing and provide an appraisal completed by a certified and licensed real estate appraiser. From the date of receipt of that notice, Dakota, Michelle, and/or Joe shall have 30 days to exercise their right to purchase the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183. If exercised, Dakota, Michelle, and/or Joe shall enter into a real estate contract to purchase the property with a proposed closing date sixty (60) days from the date of receipt of the notice of sale or transfer triggering the right of first refusal. Holli is not required to sell at the appraised value if she receives offers in excess of the appraised value. If Holli receives an offer greater than the appraised value, the right of first refusal will be triggered upon delivery of the great offer to Dakota as authorized representative. The right of refusal will not renew if it is not exercised against the greatest value delivered by Holli.

9.    With regard to the further administration of the Holli Ann Hardin Trust Number One:

- The Parties agree that the assets of the Holli Ann Hardin Trust Number One shall be appraised by certified and licensed business or real estate appraisers, as is appropriate for the particular asset. Russ Jones shall select the appraisers to complete the real estate and business appraisals. The costs of the appraisals shall be borne by the Holli Ann Hardin Trust Number One.

4

- The Parties agree that, once the values on the appraisals are obtained for all Holli Ann Hardin Trust Number One assets, Holli's interest will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One in an amount equal to the twenty percent (20%) of the total value of the assets. Such purchase will occur within ninety days (90) of the completion of the valuation of the assets of the Holli Ann Hardin Trust Number One.

- The Parties agree that during the appraisal period described above, Linda Goehrs, in her capacity as Temporary Successor Trustee and/or Dakota, shall execute the necessary documents to install Dakota as an Officer and/or Director of Ice Embassy, Inc., HRF Enterprises, Inc., and Entertainment Marketing and Management, LP.

- The Parties agree that Linda Goehrs shall remain Temporary Successor Trustee of the Holli Ann Hardin Trust Number One until the closing of a sale on Holli's interest in the Holli Ann Hardin Trust Number One. At the time that Holli's interest is purchased, Linda Goehrs will resign as Temporary Successor Trustee, and Dakota, Joe, Michelle, and Ashley shall select a Successor Trustee of the Trust.

- Holli agrees to execute an assignment of interest and disclaimer of further interest in the Holli Ann Hardin Trust Number One at the time that her interest is purchased in accordance with this Settlement Agreement.

- The Parties agree that Dakota and Holli shall remain employees of Entertainment Marketing and Management, LP, and/or the business, or businesses owned by the Holli Ann Hardin Trust Number One. Holli shall be removed from the payroll on the date that her interest is purchased pursuant to this Agreement. The compensation amount that Dakota and Holli have been receiving shall remain unchanged.

- The Parties agree that Dakota and Holli shall remain on the insurance paid for by Entertainment Marketing and Management, LP, and/or the business or businesses owned by the Holli Ann Hardin Trust Number One. Holli shall be removed from the insurance plan on the date that her interest is purchased pursuant to this Agreement.

- To the extent owned by the Trust, Linda Goehrs as Temporary Successor Trustee, shall gift the horses known as Coco and Rusty to Holli.

10.    With regard to the further administration of the Dakota Trust:

- The Parties agree that the assets of the Dakota Trust shall be appraised by certified and licensed real estate appraisers. Russ Jones shall select the appraisers to complete the real estate appraisal. The cost of the appraisal shall be borne by the Dakota Trust.

5

- Upon completion of the appraisal, the total value of the assets will be compiled and Holli's interest will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One in an amount equal to eighty-five percent (85%) of the total value of the assets. Such purchase will occur within ninety days (90) of the completion of the valuation of the assets of the Dakota Trust.

- Holli agrees to execute an assignment of interest and disclaimer of further interest in the Dakota Trust at the time that her interest in purchased in accordance with this Settlement Agreement.

11.    Within seven (7) days of the Effective Date of this agreement, Dakota, Joe, Michelle, and/or Ashley agree to dismiss all pending pleas, pleadings, and/or motions, with prejudice regarding the Estate and/or Trust pending in cause number 21-CPR-036521 and cause number 21-DVC-288736, both of which are pending in Fort Bend County, Texas.

12.    Neither the Trust nor any entity owned, held, or possessed by the Holli Ann Hardin Trust Number One, the Dakota Trust, and/or the Estate have any claims against any of the Parties.

13.    The Parties agree to release Linda Goehrs, in her capacity as Temporary Successor Trustee, for making distributions according to this Settlement Agreement which contradict the terms of the Trust Agreement for the Holli Ann Hardin Trust Number One or the Dakota Trust.

### C. RELEASES AND DISCHARGE

1.    **Release of Claims by Dakota.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Dakota, on behalf of himself and all his heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Holli, Joe, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Dakota hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Dakota expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Holli, Joe, Michelle, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Dakota does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

2.    **Release of Claims by Holli.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Holli, on behalf of herself and all her heirs, successors,

UNOFFICIAL COPY

6

executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Joe, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Holli hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Holli expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Michelle, Joe, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Holli does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

3.    **Release of Claims by Joe.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Joe, on behalf of himself and all his heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Joe hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Joe expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Michelle, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Joe does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

4.    **Release of Claims by Michelle.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Michelle, on behalf of herself and all her heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Joe, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Michelle hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Michelle expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind

7

known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Joe, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Michelle does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

5.    **Release of Claims by Ashley**.  For and in consideration of the mutual promises, covenants, and agreements stated herein, Ashley, on behalf of herself and all her heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Joe, Michelle, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Ashley hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Ashley expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Joe, and Michelle. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Ashley does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

## D. REPRESENTATIONS AND WARRANTIES

1.    **Representations and Warranties**. Each of the Parties hereto represents and warrants to the other that:

a.    They are adequately represented by competent counsel in connection with the execution and delivery of this Settlement Agreement and/or had an opportunity to retain counsel in connection with this Settlement Agreement;

b.    In executing this Settlement Agreement, they relied upon the Party's own judgment and any advice it received from its own attorneys;

c.    They were not induced to sign or execute this Settlement Agreement by promises, omissions, agreements, or representations not expressly stated in this Settlement Agreement;

d.    They freely and willingly executed this Settlement Agreement and expressly disclaims reliance upon any facts, promises, statements made or not made, undertakings, or representations made by any person or entity

8

prior to the Effective Date of this Settlement Agreement except as specifically enumerated herein;

e.   They consent that this Settlement Agreement was not procured, obtained, or induced by improper conduct or undue influence;

f.   After an opportunity to consult with an attorney concerning the matters made subject of this Settlement Agreement, and after reviewing this Settlement Agreement, they agree this Settlement Agreement is fair, reasonable, and supported by good, valuable, and adequate consideration; and

g.   They understand and agree to the terms and conditions of this Settlement Agreement, which contains the entire agreement between the Parties relating to the matters made the subject of this Settlement Agreement.

2.   **Capacity and Authority.** Each of the Parties hereto represents and warrants to the other that the person signing this Settlement Agreement in a representative capacity has the requisite authority and consent to execute this Settlement Agreement on behalf of the Party for whom he or she has executed this Settlement Agreement, and that this Settlement Agreement is binding upon the Party for whom he or she has executed this Settlement Agreement and upon such Party's successors and assigns.

3.   **Assignment of Claims.** Each of the Parties hereto represents and warrants to the other that it has not transferred, assigned, or otherwise conveyed, excepting any interest held by counsel, in whole or in part, its respective interest in the Claims at issue and that it is the owner and holder thereof. Each of the Parties further represents and warrants that, aside from any interest held by counsel, it is the only holder of the Claims being released and that no other person or entity owns, or has any interest in, any of the Claims being released. Despite any interest held by counsel, this Settlement Agreement applies to the entirety of each of the Parties' Claims.

4.   **Cooperation in Execution of Further Documents.** Each of the Parties expressly agrees to execute any other documents reasonably necessary to effectuate the terms, purpose, and intent of this Settlement Agreement.

### E. MISCELLANEOUS PROVISIONS

1.   **Invalidity.** In the event any one or more of the provisions of this Settlement Agreement shall, for any reason, be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Settlement Agreement.

2.   **Entire Agreement.** This Settlement Agreement reflects the final and complete agreement between the parties concerning the matters made subject of this Settlement Agreement and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the Parties. There are no unwritten oral agreements between the Parties. The Parties expressly

9

acknowledge that any rights, duties, or obligations, whether contractual or otherwise, owed by or between the Parties prior to the effective date of this Settlement Agreement are terminated as of the Effective Date of this Settlement Agreement and the only rights, duties, or obligations owed by or between the Parties from this point forward shall be those set forth in this Settlement Agreement.

3.    **Governing Law and Venue.** The validity, effect, and construction of this Settlement Agreement shall be governed by the laws of the State of Texas. Venue for any cause of action, controversy, or dispute regarding this Settlement Agreement or the subject matter hereof shall be proper only in the state courts of Fort Bend County, Texas.

4.    **Amendment.** This Settlement Agreement may not be amended, modified, waived, or terminated unless such is done in a writing signed by all the Parties.

5.    **Construction of Agreement.** This Settlement Agreement shall not be construed in favor of or against any Party on the basis that the Party did or did not author this Settlement Agreement or any attachment related to it. It is intended that this Settlement Agreement shall be comprehensive in nature and shall be construed liberally to affect its purposes.

6.    **Titles or Headings**. All titles or headings used in this Settlement Agreement are used only for the convenience of the Parties and shall not be construed to have any effect or meaning with respect to the other content of the Settlement Agreement, such other content being controlling as to the Settlement Agreement of the Parties.

7.    **Costs and Attorneys' Fees.** Each party shall bear its own costs and attorneys' fees in relation to the claims and the negotiation and preparation of this Settlement Agreement, subject to the attorney's fees provisions within this Settlement Agreement.

8.    **Waiver**. The failure of any of the Parties to enforce, at any time, any provision of this Settlement Agreement shall not be construed to be a waiver of such provision, nor in any way affect the validity of this Settlement Agreement or any part thereof or any right of any Party thereafter to enforce each and every provision. No waiver of any breach of this Settlement Agreement shall be held to constitute a waiver of any other breach.

9.    **Binding Agreement.** This Settlement Agreement is binding on the Parties hereto and not subject to revocation, repudiation, or withdrawal of consent, even if one or more of them shall become debtors in a bankruptcy proceeding. This binding effect is an integral part of this Agreement.

10.    **Execution of Agreement.** This Settlement Agreement may be executed in a number of identical counterparts, each of which shall be deemed an original for all purposes. A fax signature or a copy of an original signature shall constitute an original signature for purposes of this Settlement Agreement. This Settlement Agreement shall be valid only if fully executed by all Parties and/or their representatives as agreed to herein. If not fully executed by all Parties, this Settlement Agreement shall be null and void and of no effect.

11.     **Future Disputes.**  In the event that there are future disputes, disagreements, and/or conflicts regarding the terms and/or implementation of any terms of this Settlement Agreement, the Parties agree to return to Russ Jones for mediation regarding the dispute.  The Parties agree to return to mediation prior to filing any litigation regarding a breach of this settlement agreement or these terms.  If a Party refuses to return to mediation, the remaining parties are permitted to file litigation without returning to mediation. Should further litigation be filed regarding a breach of the agreement, the prevailing party shall be entitled to an award of attorney's fees as determined by a jury or judge.

12.     **Indemnity.**  Each party shall indemnify the other parties for all claims made by, through, or under the indemnifying party.

AGREED TO BY ALL PARTIES AS EVIDENCED BY THEIR SIGNATURE BELOW ON THIS THE 7th DAY OF JANUARY, 2022.

_____
Dakota Fontenot, in all capacities

_____
Holli Ann Fontenot, in all capacities

_____
Dallas Joseph Fontenot, III, in all capacities

_____
Michelle Ann Fontenot, in all capacities

_____
Ashley Fontenot Estrada, in all capacities

_____
Christopher Burt
*Counsel for Dakota Fontenot*

11

11.    **Future Disputes.** In the event that there are future disputes, disagreements, and/or conflicts regarding the terms and/or implementation of any terms of this Settlement Agreement, the Parties agree to return to Russ Jones for mediation regarding the dispute. The Parties agree to return to mediation prior to filing any litigation regarding a breach of this settlement agreement or these terms. If a Party refuses to return to mediation, the remaining parties are permitted to file litigation without returning to mediation. Should further litigation be filed regarding a breach of the agreement, the prevailing party shall be entitled to an award of attorney's fees as determined by a jury or judge.

12.    **Indemnity.** Each party shall indemnify the other parties for all claims made by, through, or under the indemnifying party.

AGREED TO BY ALL PARTIES AS EVIDENCED BY THEIR SIGNATURE BELOW ON THIS THE 7th DAY OF JANUARY, 2022.

_____
Dakota Fontenot, in all capacities


_____
Holli Ann Fontenot, in all capacities

## Dallas Joseph Fontenot III
_____
Dallas Joseph Fontenot, III, in all capacities

## Michelle Ann Fontenot
_____
Michelle Ann Fontenot, in all capacities

## Ashley Fontenot Estrada
_____
Ashley Fontenot Estrada, in all capacities


_____
Christopher Burt
*Counsel for Dakota Fontenot*

11

_____

Steven Mendel
*Counsel for Holli Ann Fontenot*


_____

Kenneth Sumner
*Counsel for Dallas Joseph Fontenot, III,
Michelle Ann Fontenot, and Ashley Estrada*

COPY

UNOFFICIAL

12

Steven Mendel
*Counsel for Holli Ann Fontenot*

# Kenneth E. Sumner, Jr.

Kenneth Sumner
*Counsel for Dallas Joseph Fontenot, III,*
*Michelle Ann Fontenot, and Ashley Estrada*

**Signature:** *Dallas Joseph Fontenot III*
Dallas Joseph Fontenot III (Jan 7, 2022 19:33 CST)

**Email:** djoef3@hotmail.com

**Signature:** Michelle Fontenot (Jan 7, 2022 19:36 CST)

**Email:** mannefontenot@gmail.com

**Signature:** 
Ashley Fontenot Estrada (Jan 7, 2022 19:38 CST)

**Email:** ashleyafontenot@gmail.com

**Signature:** *Kenneth E. Sumner, Jr*

**Email:** ksumner@romanosumner.com

12

LINDA GOEHRS, IN HER CAPACITY AS TRUSTEE OF THE HOLLI ANN HARDIN TRUST NUMBER ONE

Plaintiff,

v.

DAKOTA FONTENOT,

Defendant.

Case 4:26-cv-02743    Document 6-1    Filed 04/29/26 in TXSD    Page 303 of 1053

EXHIBIT
B

537721

Probate Court No. 1

# AMENDED AND RESTATED PROMISSORY NOTE

$2,825,000.00                      Houston, Texas                      May 22, 2023

FOR VALUE RECEIVED, the undersigned, **HFR ENTERPRISES, INC.**, a Texas corporation (the "Maker"), hereby promises to pay to the order of **LHS HOMES, L.L.C.**, a Texas limited liability company ("Lender"), at its offices at 5920 Hillcroft Street, Suite A, Houston, Texas 77036, in lawful money of the United States of America, the principal sum of up to TWO MILLION, EIGHT HUNDRED TWENTY-FIVE THOUSAND AND 00/100 DOLLARS ($2,825,000.00) or so much thereof as may be advanced and outstanding hereunder, together with interest.

This amended and restated promissory note (this "Note") is given in substitution of that certain promissory note executed by Maker in favor of Lender dated January 6, 2023 in the amount of ONE MILLION, EIGHT HUNDRED TWENTY-FIVE THOUSAND AND 00/100 DOLLARS ($1,825,000.00), which fully funded on or about January 6, 2023, (the "Original Note") and to evidence current and future advances in the aggregate amount of ONE MILLION AND 00/100 DOLLARS ($1,000,000.00) (the "New Funds") in accordance with the terms hereof. The Original Note shall, in its entirety, be superseded, amended, and restated by this Note and payment of the indebtedness thereunder shall be governed by this Note as if the aggregate unpaid indebtedness due under the Original Note had been advanced hereunder by Lender. Maker hereby renews and extends its covenant and agreement to pay the indebtedness evidenced by the Original Note, as amended and restated pursuant to this Note, and Maker hereby renews and extends its covenant and agreement to perform, comply with, and be bound by each and every term and provisions of the Original Note, as amended and restated by the terms of this Note. Maker confirms and agrees that this Note is, and shall continue to be, secured by the Deed of Trust recorded on January 9, 2023 under Instrument No. RP-2023-7823 in the Official Public Records of Harris County, Texas (the "Deed of Trust"), and in no way acts as a release or relinquishment of the liens created by the Deed of Trust. All of the provisions of the Deed of Trust now or heretofore executed by Maker as heretofore or contemporaneously herewith modified are hereby ratified and affirmed in all respects. The liens securing payment of the Original Note are hereby modified, extended, renewed, carried forward, and confirmed by Maker in all respects and shall remain in full force and effect until the principal and all accrued interest under this Note shall be fully and finally paid. As of the date hereof, all principal and interest payments due and owing under the Old Note have been paid in full when due and the outstanding unpaid principal balance of the Old Note is $1,809,300.24 (the "Old Note Balance").

This Note is further secured by certain Conditional Guaranty Agreements of even date herewith executed by Viva Las Vegas Properties, Inc., a Texas corporation and an affiliate of Maker ("VLV Guarantor"), Dakota Fontenot, an individual resident of Fort Bend County ("DF Guarantor"), and Ice Embassy, Inc., a Texas corporation (collectively referred to as "Guarantors"), respectively, in favor of Lender.

It is understood and agreed by and between Maker and Lender that (i) the entire principal of the Old Note has been advanced to Maker pursuant to the Old Note and that (ii) the entire principal of the New Funds under this Note is not being advanced in full to Maker upon the execution hereof, but subsequent and periodic advancements in various increments of the New Funds will be made to Maker, upon request to Lender, up to, but not to exceed, the amount of the New Funds pursuant to

1

UNOFFICIAL COPY

the terms hereof. Interest on this Note shall accrue only on the principal amount of the New Funds advanced from the time it is so advanced, at the Contract Rate.

Lender shall advance the New Funds by wire transfer to an account designated by Maker as follows:

(i)    An amount equal to $250,000.00 (the "First New Advance") shall be funded immediately upon execution of this Note.

(ii)    Advances of the remaining New Funds, in amounts up to and not exceeding $750,000.00 in the aggregate, shall be advanced incrementally (such incremental advances being referred to individually and collectively as the "Future Advances") within five (5) Business Days after Lender receives a written request for advance ("Request for Advance") from Maker. Each Request for Advance shall be accompanied by a percentage of completion and cost schedule (a "Schedule of Values") describing the construction, maintenance, repair and/or renovation work completed at Maker's property located at 6710 Southwest Freeway, Houston, Harris County, Texas 77074 (the "Project") as of the date of the applicable Request for Advance, including backup documentation as may be reasonably requested by Lender. Additionally, Lender shall not be required to advance any Future Advances unless: (a) Lender's first lien deed of trust and security interest in the property identified in the Deed of Trust remains in a first lien position without tax liens, mechanics liens or any other monetary encumbrances against such Property other than normal permitted exceptions for current property taxes; (b) The VLV Guarantor's Fort Bend Property securing such Guaranty must have received a mortgagee title policy reflecting a first lien in favor of Lender other than normal permitted exceptions for current property taxes and assessments and nonmonetary encumbrances; (c) Maker and the VLV Guarantor must not otherwise be in any breach of any of its agreements, representation or warranties as set forth in this Note. If Lender refuses to advance the amount requested in any applicable Request for Advance, Lender shall within such 5 Business Day period provide written notice to Maker specifying the reason for such refusal, whereupon Maker and Lender shall endeavor in good faith to reach agreement on the amount to be advanced within ten (10) days after Maker receives notice of Lender's refusal to fund the amount initially requested. If the parties are unable to agree on the funding amount for the applicable Future Advance within such 10-day period, then either party may submit the matter to mediation. The final Future Advance of New Funds shall be made after completion of the Project in such amount that the sum of all Future Advances by Lender shall not exceed $750,000.00.

The unpaid principal balance of this Note shall bear interest prior to maturity at an annual rate equal to the lesser of (a) the Maximum Lawful Rate or (b) eight percent (8.0%) (the "Contract Rate"). Interest on this Note shall be calculated on a per annum basis of 360 days and for the actual number of days elapsed (including the first day but excluding the last day) unless such calculation would result in a rate that exceeds the Maximum Lawful Rate, in which case, interest shall be calculated on a per annum basis of 365 or 366 days, as the case may be. Maker hereby expressly promises to pay to the order of Lender or any other holder hereof the principal amount of this Note and all accrued but unpaid interest now or hereafter to become due and payable under this Note in the

2

manner provided herein. Notwithstanding anything herein to the contrary, the final installment payment under this Note shall include all of the then outstanding principal, accrued but unpaid interest and all other costs, expenses and fees arising out of this Note. All sums paid hereon (whether regularly scheduled payment or prepayment) shall be applied first to the satisfaction of accrued unpaid interest and the remainder, if any, to the reduction of the principal balance hereof.

Subject to prior acceleration as provided in this Note, this Note shall be paid as follows:

Principal and interest under this Note shall be due and payable monthly as follows ("Monthly Payments"):

(i)     Principal and interest on an amount equal to the sum of the Old Note Balance and the First New Advance (or $2,059,300.24) shall be due and payable in sixty (60) equal monthly installments, based on a 20-year amortization, of $17,225.00, with the first such payment being due on June 15, 2023, and continuing on the same day of each month thereafter until May 15, 2028 (the "Maturity Date"), on which date a final payment in the amount of $1,802,414.35 shall be due and payable in full.

(ii)    Interest only on Future Advances shall be due and payable monthly beginning on the 15th day of the calendar month after the month in which the first Future Advance is made and shall continue regularly on the same day of each succeeding calendar month thereafter until and including the Maturity Date, on which date a final payment, which shall include all then outstanding principal and accrued and unpaid interest due on Future Advances, shall be due and payable in full.

For purposes of this Note, the following terms have the meanings assigned to such terms as provided below:

"Applicable Laws" means the laws of the State of Texas and laws of the United States of America in effect from time to time and applicable to this Note.

"Business Day" means a day that is not a Saturday, Sunday, or federal or state holiday.

"Default Rate" means the Maximum Lawful Rate.

"Event of Default" means the failure to pay when due the principal and interest under this Note, or any part thereof, and such failure continues for more than thirty (30) days after Maker receives written notice from Lender specifying the amount of the delinquent payment. Event of Default shall also include Maker shall (a) become insolvent within the meaning of the Bankruptcy Code of the United States, as amended; (b) admit in writing its inability to pay or otherwise fail to pay its/his debts generally as they become due; (c) voluntarily seek consent to, or acquiesce in the benefit or benefits of any Debtor Relief Law; or (d) be made the subject of any proceeding provided for by any Debtor Relief Law that could suspend or otherwise affect any of the rights of Lender or any other holder hereof and such proceeding shall continue for sixty (60) days without dismissal or discharge; or (e) any default by Maker under that certain Deed of Trust securing this Note, executed by Maker in favor of Lender. As used herein, "Debtor Relief Laws" means the Bankruptcy Code of the United States, as amended and all other applicable liquidation, conservatorship, bankruptcy,

3

moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws from time to time in effect affecting the rights of creditors generally.

"Indebtedness" means the obligations of Maker under this Note.

"Maximum Lawful Rate" means, at any time, the maximum rate of interest which may be charged, contracted for, taken, received or reserved by the Lender in accordance with Applicable Laws. Each change in any interest rate provided for herein based upon the Maximum Lawful Rate resulting from a change in the Maximum Lawful Rate shall take effect with written notice to the Maker before such change in the Maximum Lawful Rate.

All payments due under this Note shall be made by Maker without offset or other reduction of any kind. Any outstanding principal that is not paid in full when due shall bear interest at the Default Rate for the period from and including the due date thereof to but excluding the date the same is paid in full.

If any payment of principal or interest on this Note shall become due on a day which is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computing of interest in connection with such payment. In the event an installment, or the maturity date as set forth herein, is due on the 29th, 30th, or 31st day of the month, for each month which does not have a 29th, 30th, or 31st day, such installment, or the final payment, as applicable, shall be due on the last day of such month. Payments received on weekends or bank holidays will be credited as of the next Business Day. Any check, draft, money order or other instrument given in payment of all or any portion of this Note may be accepted by Lender and handled in collection in the customary manner, but the same shall not constitute payment or diminish any rights of Lender except to the extent that actual cash proceeds of such instrument are unconditionally received by Lender.

Unless otherwise agreed in writing, or otherwise required by Applicable Laws, interest on this Note will be calculated on the unpaid principal balance to the date each installment is paid and payments received will be applied in the following order of priority: (i) the payment or reimbursement of any expenses, costs, or obligations (other than the outstanding principal balance hereof and interest hereon) for which either Maker shall be obligated or Lender shall be entitled pursuant to the provisions of this Note, (ii) the payment of accrued but unpaid interest hereon, and (iii) the payment of principal. However, any Monthly Payments timely made by Maker shall be credited as of the date such Monthly Payment is due, and Lender shall not be required to ledger and compute reductions in interest for Monthly Payments made before such Monthly Payment is due.

Maker shall have the privilege to prepay at any time, and from time to time, all or any part of the principal amount of this Note, without notice, penalty or fee. Except as expressly provided herein to the contrary, all prepayments on this Note shall be applied in the following order of priority: (i) the payment of accrued but unpaid interest hereon, and (ii) the payment of all or any portion of the principal balance hereof then outstanding hereunder, in the inverse order of maturity.

Time is of the essence in the performance of this Note. Maker agrees that all past-due principal and past-due accrued interest under this Note shall bear interest from the date it is due until paid at the Maximum Lawful Rate.

4

Upon the occurrence of an Event of Default, Lender may, at its option, after the expiration of the notice and right to cure period provided herein, (i) declare the outstanding principal balance of and accrued but unpaid interest on this Note at once due and payable, or (ii) foreclose all liens securing payment hereof. Upon the occurrence of an Event of Default, if this Note is placed in the hands of an attorney for collection (whether or not suit is filed), or if this Note is collected by suit or legal proceedings or through the probate court or bankruptcy proceedings, Maker agrees to pay an additional amount as attorney's fees as may be reasonable.

Except as otherwise provided herein, Maker waives presentment for payment, demand, protest, notice thereof and dishonor, notice of intent to accelerate, notice of acceleration, and diligence in collecting and consents that the time of payment may be extended from time to time without notice and without releasing Maker.

Until such time as all New Funds have been advanced hereunder, Lender shall not assign this Note without the prior written consent of Maker, which consent shall not be unreasonably withheld. Following the final advance of New Funds after completion of the Project, Lender shall have the right to assign this Note without necessity of Maker's consent. In such event, the term "Lender" shall mean any permitted assignee of this Note.

This Note and its validity, enforcement and interpretation, shall be construed in accordance with Applicable Laws, without regard to any conflict of law rules or principles except as otherwise expressly set forth herein. It is expressly stipulated and agreed to be the intent of the Maker and the Lender at all times to comply strictly with Applicable Laws governing the maximum rate or amount of interest payable on the indebtedness evidenced by this Note. If Applicable Law is ever judicially interpreted so as to render usurious any amount (i) contracted for, charged, taken, reserved or received pursuant to this Note, (ii) contracted for, charged, taken, reserved or received by reason of the Lender's exercise of the option to accelerate the maturity of the Indebtedness, or (iii) the Maker will have paid or the Lender will have received by reason of any voluntary prepayment by the Maker of the Indebtedness, then it is the Maker's and the Lender's express intent that all amounts charged in excess of the Maximum Lawful Rate shall be automatically canceled, *ab initio*, and all amounts in excess of the Maximum Lawful Rate theretofore collected by the Lender shall be credited on the principal balance of the Indebtedness (or, if the Indebtedness have been or would thereby be paid in full, refunded to the Maker), and the provisions of this Note shall immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder and thereunder; provided, however, if this Note has been paid in full before the end of the stated term of this Note, then the Maker and the Lender agree that the Lender shall, with reasonable promptness after the Lender discovers or is advised by the Maker that interest was received in an amount in excess of the Maximum Lawful Rate, either refund such excess interest to the Maker and/or credit such excess interest against the Indebtedness then owing by the Maker to the Lender. The Maker hereby agrees that as a condition precedent to any claim seeking usury penalties against the Lender, the Maker will provide written notice to the Lender, advising the Lender in reasonable detail of the nature and amount of the violation, and the Lender shall have thirty (30) days after receipt of such notice in which to correct such usury violation, if any, by either refunding such excess interest to the Maker or crediting such excess interest against the Indebtedness then owing by the Maker to the Lender. All sums contracted for, charged, taken, reserved or received by the Lender for the use, forbearance or detention of any Indebtedness shall, to the extent permitted by applicable law, be amortized or spread, using the

5

HAH001244

actuarial method, throughout the stated term of this Note (including any and all renewal and extension periods) until payment in full so that the rate or amount of interest on account of this Note does not exceed the Maximum Lawful Rate from time to time in effect and applicable to this for so long as any Indebtedness is outstanding. In no event shall the provisions of Chapter 346 of the Texas Finance Code (which regulates certain revolving credit loan accounts and revolving triparty accounts) apply to this Note. Notwithstanding anything to the contrary contained herein, it is not the intention of the Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

To the extent that Lender is relying on Chapter 303 of the Texas Finance Code to determine the Maximum Lawful Rate payable on any Indebtedness, the Lender will utilize the weekly ceiling from time to time in effect as provided in such Chapter 303, as amended. Additionally, to the extent permitted by Applicable Laws now or hereafter in effect, the Lender may, at its option and from time to time, utilize any other method of establishing the Maximum Lawful Rate under such Chapter 303 or under other Applicable Law by giving notice, if required, to the Maker as provided by Applicable Law now or hereafter in effect.

In case any one or more of the provisions contained in this Note shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Note, and this Note shall be construed as if such invalid, illegal, or unenforceable provision had never been included in this Note.

No amendment, modification, or alteration of the terms of this Note shall be binding unless the same is in writing, dated subsequent to the date of this Note, and duly executed by the parties to this Note.

All notices sent to Maker shall be sent by hand delivery or by certified mail, return receipt requested to HFR Enterprises, Inc., Attn: Dakota Fontenot, 3414 Old Richmond Road, Rosenberg, Texas 77471 (with a copy to BoyarMiller, Attn: Christopher Barteau and Tiffany Melchers, 2925 Richmond Avenue, 14th Floor, Houston, Texas 77098), unless directed otherwise by Maker after notice to the Lender (or any other holder hereof) at the address set forth on Page 1 herein, or at such other address of the Lender (or any other holder hereof) specified by notice to Maker as described herein. Any notice required herein shall be sufficient if it provides at least 10 days of notice after mailing, unless otherwise required by law.

[Remainder of page intentionally left blank.]

6

CONFIDENTIAL DOCUMENTS                                        HAH001245

IN WITNESS WHEREOF, Maker has duly executed this Note as of the day and year first above written.

**MAKER:**

**HFR ENTERPRISES, INC.,**
a Texas corporation

By: _____
Name: Dakota Fontenot
Title: President

Address:
6710 Southwest Freeway
Houston, Texas 77074
Attention: Dakota Fontenot

THE STATE OF TEXAS     §
                            §

COUNTY OF HARRIS     §

This instrument was acknowledged before me on May 22, 2023, by Dakota Fontenot, President of HFR Enterprises, Inc., a Texas nonprofit corporation, for and on behalf of such corporation.

_____
NOTARY PUBLIC, STATE OF TEXAS

UNOFFICIAL COPY

TINA BARAJAS
NOTARY PUBLIC
STATE OF TEXAS
ID# 10076954
EXPIRES 2-2-2027

SIGNATURE PAGE TO
NOTE

CONFIDENTIAL DOCUMENTS           HAH001246

537721

EXHIBIT

C

Probate Court No. 1

LINDA GOEHRS, IN HER CAPACITY AS
TRUSTEE OF THE HOLLI ANN HARDIN
TRUST NUMBER ONE
Plaintiff,
v.
DAKOTA FONTENOT,
Defendant.

---

## TRUST DECLARATION
## DAKOTA TRUST

---

THIS TRUST DECLARATION is made this day by declaration of Holli Hardin Fontenot ("Settlor"), who presently resides in Fort Bend County, Texas.

### ARTICLE I.
### TRUST BENEFICIARY

This Trust is created for the use and benefit of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot. The term "Trust Beneficiary" or "beneficiary" will also mean any and all persons, organizations, trusts, and entities who may have or may acquire a beneficial interest in this Trust, whether vested or contingent in nature, including a transfer of an interest in the Trust during the life of either Dallas Joseph Fontenot, Jr. or Holli Hardin Fontenot, or both, or from the exercise of a power of appointment by a Trust Beneficiary or otherwise.

For reference, the only child of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot is Dakota James Fontenot, who was born on June 22, 1994. Holli Hardin Fontenot has no other children born to her or adopted by her on the date of this Trust Declaration.

For reference, the only other children of Dallas Joseph Fontenot, Jr. are: Dallas Joseph Fontenot, III (who was born on March 29, 1969) and Michelle Anne Fontenot (who was born on March 12, 1970). Dallas Joseph Fontenot, Jr. has no other children born to him or adopted by him on the date of this Trust Declaration.

### ARTICLE II.
### INITIAL TRUST CORPUS AND RIGHT TO ADD TO THE TRUST

A.    INITIAL TRUST CORPUS. Settlor does hereby declare that from and after the date of this Trust Declaration, Settlor holds in trust the assets described in Schedule A attached to this Declaration, which assets are the initial corpus of this Trust and as Trustee acknowledges receipts of those assets. Settlor or any other person, trust, or entity may add property of any

003271

character to this Trust by a Last Will and Testament, from another trust (whether inter vivos or testamentary), or by deed or other transfer, subject only to the acceptance thereof by the Trustee.

B. **ADDITIONS TO TRUST CORPUS.** Additional contributions may be made to the corpus of the Trust, including testamentary contributions.

C. **SEPARATE PROPERTY.** The assets of this trust are the separate property of Holli Hardin Fontenot. No inter vivos transfer of property will be made to this Trust unless the property constitutes the separate property of Holli Hardin Fontenot. Holli Hardin Fontenot may make a testamentary contribution of property to this Trust, and such contribution may constitute the separate property of Holli Hardin Fontenot and Holli Hardin Fontenot's interest in community property.

## ARTICLE III.
## NO REVOCATION OR AMENDMENT

A. **TRUST IS IRREVOCABLE.** This Trust is an irrevocable Trust.

B. **THIS TRUST MAY NOT BE AMENDED.** This Trust Declaration may not be amended, except by a Court of competent jurisdiction under the doctrine of *cy pres*.

C. **INCOME TAX MATTERS.** For so long as the Settlor or Dallas Joseph Fontenot, Jr. is a Trustee of the Trust, the Trust will be treated for income tax reporting purposes as a Grantor Trust under Treasury Regulation § 1.671-4(b). Thereafter, the Trust is to be treated for income tax purposes as required by the applicable provisions of Subchapter J of the Internal Revenue Code.

## ARTICLE IV.
## DEFINITIONS

A. **DESCENDANTS.** The term "Descendants" means the legitimate children of the person designated and the legitimate lineal descendants of such children. The term includes any person adopted before attaining age eighteen (18) and the adopted person's legitimate lineal descendants. A posthumous child shall be considered as living at the death of his parent.

003272

B.    **HEIRS AT LAW.**  Whenever a trustee, or a legal advisor to the Trustee is called upon to determine the heirs at law of Settlor, or any other person beneficially interested in this Trust, the determination will be made to identify those individuals, other than creditors, who would receive the personal property of a decedent upon his or her death as determined in accordance with the laws of intestate succession of the State of Texas, United States of America, determined as if the decedent had then died single, intestate, and domiciled in Texas and further determined as if the Settlor of this Trust had predeceased the person or persons so named or described.

C.    **INCOMPETENT, DISABILITY.**  A beneficiary will be considered "incompetent" or "disabled" if he or she is incapacitated to an extent to make it impossible or impractical to give prompt and intelligent consideration to business matters.    The Trustee may act upon such evidence as the Trustee reasonably deems appropriate and reliable without liability by reason thereof.

D.    **MINOR BENEFICIARY.**  The term "Minor Beneficiary" or "Minor" identifies a beneficiary who is less than 21 years of age.

E.    **PER STIRPES.**  Whenever a distribution is directed to be made to the descendants, *per stirpes*, of any person or persons, including the descendants of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot, the property to be distributed shall be divided into as many equal shares as there are then living children of each of those persons and deceased children of each those persons who have descendants then living.    Each then living child of such person shall take one share, and the share for the descendants of each deceased child shall be divided among the deceased child's then living descendants on a *per stirpes* basis.

For example, if a distribution were to be made to the descendants, *per stirpes*, of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot, assuming the recitations in Article I, the property to be distributed would be divided into three equal shares, one for each of Dallas Joseph Fontenot, III, Michelle Anne Fontenot, and Dakota James Fontenot.

F.    **RELATIVE OR RELATIVES.**    Reference to a "Relative" or "Relatives" will identify any person or persons related to Settlor by blood or lawful adoption in any degree.

003273

G. **POWER OF APPOINTMENT, QUALIFIED BENEFICIARY DESIGNATION.** Whenever this Trust Declaration gives a Trust Beneficiary the power or authority to appoint a beneficiary of the Trust, the designation must be in writing and be acknowledged in the form required of acknowledgements by Texas law or exercised by a will executed with the formalities required by law of the Trust Beneficiary's residence; it must clearly evidence the intent of the Trust Beneficiary to exercise a power of appointment; and the written beneficiary designation must have been delivered to the Trustee prior to the Trust Beneficiary's death or, if exercised by will, the will must have been filed for probate within three months from the date of the Trust Beneficiary's date of death and must subsequently be admitted to probate no matter the time interval. The term of this Trust may be extended if the qualified beneficiary designation requires that a Beneficiary's interest remain in Trust, or may be divided and be held as a separate trust which is governed by the terms of this Trust Declaration.

H. **SURVIVE.** For the purpose of vesting in the event two or more persons who have an interest in the trust die within a short time of one another, one must have survived the other for a period of at least 90 days as a condition to vesting.

I. **TESTAMENTARY CONTRIBUTIONS.** The term "testamentary contributions" will mean any contribution to the Trust made by reason of the death of a person, including transfers made under the direction of a will, a beneficiary designation in a life insurance policy or other contract, by reason of survivorship language contained in a depository contract, or transfers from another Trust which designates this Trust as a beneficiary.

J. **TRUST.** "Trust" means the Trust created by this Trust Declaration

K. **TRUST DECLARATION.** The term "Trust Declaration" and the term "Trust Agreement" each refer to this Trust Declaration.

L. **TRUST FUND.** The term "Trust Fund" or "Trust Property" means all property comprising: the initial contribution of corpus to the Trust; all property paid or transferred to, or otherwise vested in, the Trustee as additions to the corpus of this Trust; accumulated income, if any, whether or not added to the corpus of this Trust; and the investments and reinvestment of the Trust property, including the increase and decrease in the values thereof as determined from time to

003274

time.    The  terms  "corpus"  and  "principal"  are  used interchangeably.

M.    **TRUSTEE.**    For  convenience,  the  term  "Trustee,"  used  in  the singular,  will  mean  and  identify  multiple  Trustees  serving  and acting  pursuant  to  the  directions  of  this  Trust  Declaration. The  term  "corporate  Trustee"  will  identify  a  banking  or  trust corporation  with  trust  powers.

N.    **GENDER, PLURAL USAGE.**    The  use  of  personal  pronouns,  such  as he,  she,  or  it,  are  to  be  construed  in  context.    The  term "person"  will  include  a  non-person,  such  as  a  corporation, trust,  partnership  or  other  entity  as  is  appropriate  in context.    The  identification  of  person  in  the  plural  will include  the  singular  and  *vice  versa*,  as  is  appropriate  in context.

## ARTICLE V.
## APPOINTMENT OF TRUSTEE

A.    **ORIGINAL APPOINTMENT.**    Holli  Hardin  Fontenot  shall  serve  as initial  Trustee  of  this  Trust.

B.    **FIRST SUCCESSOR.**    In  the  event  that  Holli  Hardin  Fontenot should  die,  resign,  or  become  incapacitated  or  unable  to  act as  Trustee  of  this  Trust,  or  in  the  event  that  Holli  Hardin Fontenot  should  subsequently  become  divorced  from  Dallas Joseph  Fontenot,  Jr.,  then  Dallas  Joseph  Fontenot,  Jr.  shall serve  as  successor  Trustee  of  this  Trust.    In  the  event  that Dallas  Joseph  Fontenot,  Jr.  should  elect  not  to  serve  as Trustee  of  this  Trust,  Dallas  Joseph  Fontenot,  Jr.  will  have the  right  to  appoint  a  successor  or  successors  to  serve  as Trustee,  as  set  forth  in  Section  V.C  below,  and  he  may  specify any  conditions  upon  succession  and  service  as  may  be  permitted by  law.

Holli  Hardin  Fontenot  acknowledges  and  agrees  that  the  rights and  obligations  of  Holli  Hardin  Fontenot  to  serve  as  Trustee and  to  resign  as  Trustee  in  accordance  with  the  foregoing  have been  and  are  the  subject  of  separate  consideration,  receipt  of which  is  hereby  acknowledged  in  full;  and  such  rights  and obligations  are  in  the  best  interest  of  the  administration  of the  Trust  for  its  Beneficiaries.    Holli  Hardin  Fontenot specifically  waives  any  rights  which  she  may  have  to  rescind

003275

or revoke her obligation to resign as Trustee upon divorce from Dallas Joseph Fontenot, Jr.

C.   **SUCCESSION.**   Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment will have the right to appoint a successor or successors to serve as Trustee in the event that person ceases to serve for any reason, and each Trustee may specify any conditions upon succession and service as may be permitted by law.  For example, a successor may be required to furnish a fiduciary bond as a prerequisite or a successor's service may be conditioned upon another appointee's death, resignation, or inability to serve.  Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment may also provide that one or more designated successors as Trustee will have the authority to appoint his, her, or its successor as Trustee.  An appointment of successor Trustee must be in writing and must be acknowledged to be effective.  Unless other specified by a Trustee in a written designation of succession, succession is to be determined as follows.

If a Trustee by original appointment does not appoint a successor, the remaining Trustee or Trustees then serving will continue service alone.  If all Trustees by original appointment fail or cease to serve for any reason without having appointed a successor or successors, the successor or successors as Trustee will be as named below and in the order of succession herein prescribed.

FIRST:   Dallas Joseph Fontenot, III

BUT:   Settlor specifically provides that upon assumption of actual service as Trustee, Dallas Joseph Fontenot, III will have the right to appoint Dallas Joseph Fontenot, III's successor as Trustee, and to vest in a successor Trustee, upon assumption of that person's service, the right and authority to designate succession as Trustee. To the extent this is done, the appointment of succession will supersede the appointments which follow the designation of Dallas Joseph Fontenot, III as Trustee.

NEXT:   Michelle Anne Fontenot

BUT:   Settlor specifically provides that upon assumption of actual service as Trustee, Michelle Anne Fontenot will have the right to appoint Michelle Anne Fontenot's successor as Trustee, and to vest in a successor Trustee, upon assumption of that person's service, the right and

003276

authority to designate succession as Trustee. To the extent this is done, the appointment of succession will supersede the appointments which follow the designation of Michelle Anne Fontenot as Trustee.

FINALLY: First Interstate Bank of Texas, N.A., in the event all of the above, including duly appointed successors, fail or cease to serve for any reason. The appointment of First Interstate Bank of Texas, N.A. as Trustee will include any successor to First Interstate Bank of Texas, N.A. by reason of its merger, reorganization, or sale to another banking corporation with trust powers or a trust company with trust powers.

D.  **AUTHORITY OF SUCCESSOR TRUSTEE.** A successor will have the authority vested in a Trustee by original appointment under this Trust Declaration, subject to any lawful limitations or qualifications upon the service of a successor imposed by one Trustee in a written document appointing a successor. A successor Trustee will not be obliged to examine the accounts, records, or acts of the previous Trustee or Trustees; nor will a successor Trustee in any way or manner be responsible for any act or omission to act on the part of any previous Trustee. Reference to "Trustee" in the singular will include the plural.

E.  **BOND.** No one serving as Trustee will be required to furnish a fiduciary bond as a prerequisite to service.

F.  **RESIGNATION OR REMOVAL OF A TRUSTEE.** Any appointee serving or entitled to serve as Trustee may resign at any time and without cause, and the instructions in this Trust Declaration will determine who the successor will be (including successors appointed by a Trustee as herein provided). The trust beneficiary or beneficiaries who are then entitled to receive distributions of income from the trust, or distributions of income from any separate trust created by this document, may remove any corporate Trustee then serving, the notice of removal to be delivered in writing to the corporate Trustee. Unless this Trust Declaration or any instrument appointing a successor provides otherwise, the selection of a successor to the corporate Trustee will be made by a Court of competent jurisdiction. In the event there is more than one beneficiary entitled to the income from the trust, all income beneficiaries must join in the written notice of removal. The consent of any person who is deceased or legally disabled will not be required in meeting the unanimous consent requirements for removal.

UNOFFICIAL COPY

003277

G. **AFFIDAVIT OF AUTHORITY.** Any person or entity dealing with the Trust may rely upon the affidavit of a Trustee or Trustees of the Trust:

*On my [our] oath, and under the penalties of perjury, I [we] swear that I [we] am [are] the duly appointed and authorized Trustee[s] of DAKOTA TRUST. I [we] certify that I [we] have not been removed as Trustee[s] and have the authority to act for, and bind, DAKOTA TRUST in the transaction of the business for which this affidavit is given as affirmation of my [our] authority.*

_____
*Signature Line*

*Sworn and subscribed before me, the undersigned authority, by _____ this _____ day of _____, 19___ .*

_____
*Notary Public - State of Texas*

H. **DOCUMENTING SUCCESSION.** The successor to any Trustee may document succession with an affidavit setting forth that the preceding Trustee has failed or ceased to serve and the successor has assumed the duties of Trustee. The affidavit may be filed in the deed records of Fort Bend County, Texas and in each county in which real property held in Trust is located or in the county in which the principal assets and records of the Trust are located. The public and all persons interested in and dealing with the Trust and the Trustee may rely upon a certified copy of the recorded affidavit as conclusive evidence of a successor's authority to serve and act as the Trustee of the Trust.

I. **COMPENSATION.** Any person who serves as Trustee may elect to receive a reasonable compensation, reasonable compensation to be measured by the time required in the administration of the Trust and the responsibility assumed in the discharge of the duties of office. The fee schedules of area Trust departments prescribing fees for the same or similar services may be used to establish reasonable compensation. A corporate Trustee will be entitled to receive as its compensation such fees as are then prescribed by its published schedule of charges for Trusts of a similar size and nature and additional compensation for extraordinary services performed by the corporate Trustee. A Trustee will be entitled to full reimbursement for expenses, costs, or other obligations incurred as the result of service, including attorney's, accountant's, and other professional fees.

J. **MULTIPLE TRUSTEES.** In the event there are two Trustees serving the Trust, both must sign any instrument transferring real property from the Trust. If the Trustees agree to do so, one Trustee acting alone may be given the primary

UNOFFICIAL COPY

003278

responsibility of administration and accounting, and one Trustee alone may be authorized to deposit, transfer and withdraw funds from any depository account held by the Trust. The authority vested in three or more trustees may be exercised by a majority of the trustees. In the event of an action or decision by a majority, the non-consenting Trustee will not be responsible for the act of the majority.

## ARTICLE VI.
### DISTRIBUTIONS FROM THE TRUST,
### LIVING AND POST-MORTEM

A.  **FOR SO LONG AS HOLLI HARDIN FONTENOT AND DALLAS JOSEPH FONTENOT, JR. SHALL REMAIN MARRIED.** For so long as Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr. shall remain married, the Trustee may from time to time distribute to or pay for the benefit of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., or either of them, so much of the net income (and, if the net income of the Trust is not sufficient, the principal of the Trust) as the Trustee determines may be necessary for the support, maintenance, health, and general welfare of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., or either of them. Such determination shall be in the absolute discretion of the Trustee, whose decisions shall be binding.

B.  **UPON THE TERMINATION BY DIVORCE OF THE MARITAL RELATIONSHIP OF HOLLI HARDIN FONTENOT AND DALLAS JOSEPH FONTENOT, JR.** Upon the termination by divorce of the marital relationship of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., the interest of Holli Hardin Fontenot in this Trust will terminate and this Trust is to be continued in trust for the benefit of Dallas Joseph Fontenot, Jr. as follows:

1.  This trust will is to be continued in Trust for the sole use and benefit of Dallas Joseph Fontenot, Jr. for so long as he shall live. Dallas Joseph Fontenot, Jr. will, for the duration of the Trust, be entitled to the net income of the Trust, this amount to be paid in convenient installment payments to be not less than quarter-annually. Distributions of income to Dallas Joseph Fontenot, Jr. shall be made in the amount, form, and manner required by Section 2523(f) of the Internal Revenue Code. If the income known by the Trustee to be available to Dallas Joseph Fontenot, Jr. from other sources is insufficient to provide for his continued

UNOFFICIAL COPY

003279



support and maintenance in good health, the Trustee will have the authority to pay to Dallas Joseph Fontenot, Jr. or apply for his benefit, so much of the principal of the Trust, even to the exhaustion thereof, as is necessary to provide for his support and maintenance in the style and comfort to which he is accustomed and to provide for his medical needs and maintenance of good health. It is intended that the payment of principal be limited by the ascertainable standard provided above, that this provision comply fully with Treasury Regulation §20.2041-1(c)(2), and that this Trust is to be construed and limited to that end. Dallas Joseph Fontenot, Jr. may at any time require that property which does not produce an income or a sufficient income be sold and invested in income producing property.

2. Upon the death of Dallas Joseph Fontenot, Jr., Dallas Joseph Fontenot, Jr., by a clause in his Will in which he specifically exercises this power of appointment, shall have the power to appoint the then remaining trust assets to or for the benefit of any one or more of the descendants of Dallas Joseph Fontenot, Jr. or the descendants of Holli Hardin Fontenot, in such shares, proportions, or amounts, upon such trusts and for such estates as he alone may determine. If Dallas Joseph Fontenot, Jr. fails to exercise this special power of appointment to the fullest extent, then, subject to the other provisions of this Trust, upon his death, the unappointed trust assets shall be delivered to the living descendants of Holli Hardin Fontenot who were born prior to the date of divorce and to the living descendants of Dallas Joseph Fontenot, Jr., *per stirpes*.

C. **UPON THE DEATH OF HOLLI HARDIN FONTENOT WHILE MARRIED TO DALLAS JOSEPH FONTENOT, JR.** Upon the death of Holli Hardin Fontenot while married to Dallas Joseph Fontenot, Jr. this Trust is to be continued in Trust as follows:

1. This trust will is to be continued in Trust for the sole use and benefit of Dallas Joseph Fontenot, Jr. for so long as he shall live. Dallas Joseph Fontenot, Jr. will, for the duration of the Trust, be entitled to the net income of the Trust, this amount to be paid in convenient installment payments to be not less than quarter-annually. Distributions of income to Dallas Joseph Fontenot, Jr. shall be made in the amount, form, and manner required by Section 2056(b)(7)(B) of the Internal Revenue Code. If the income known by the Trustee to be

Page 10 of 23 Pages

003280

available to Dallas Joseph Fontenot, Jr. from other sources is insufficient to provide for his continued support and maintenance in good health, the Trustee will have the authority to pay to Dallas Joseph Fontenot, Jr. or apply for his benefit, so much of the principal of the Trust, even to the exhaustion thereof, as is necessary to provide for his support and maintenance in the style and comfort to which he is accustomed and to provide for his medical needs and maintenance of good health. It is intended that the payment of principal be limited by the ascertainable standard provided above, that this provision comply fully with Treasury Regulation §20.2041-1(c)(2), and that this Trust is to be construed and limited to that end. Dallas Joseph Fontenot, Jr. may at any time require that property which does not produce an income or a sufficient income be sold and invested in income producing property.

2.   Upon the death of Dallas Joseph Fontenot, Jr., Dallas Joseph Fontenot, Jr., by a clause in his Will in which he specifically exercises this power of appointment, shall have the power to appoint the then remaining trust assets to or for the benefit of any one or more of the descendants of Dallas Joseph Fontenot, Jr. or the descendants of Holli Hardin Fontenot, in such shares, proportions, or amounts, upon such trusts and for such estates as he alone may determine. If Dallas Joseph Fontenot, Jr. fails to exercise this special power of appointment to the fullest extent, then, subject to the other provisions of this Trust, upon his death, the unappointed trust assets shall be delivered to the living descendants of Holli Hardin Fontenot and to the living descendants of Dallas Joseph Fontenot, Jr., *per stirpes*.

D.   **UPON THE DEATH OF DALLAS JOSEPH FONTENOT, JR. WHILE MARRIED TO HOLLI HARDIN FONTENOT.**   Upon the death of Dallas Joseph Fontenot, Jr. while married to Holli Hardin Fontenot, this Trust is to be continued in Trust as follows:

1.   This trust will is to be continued in Trust for the sole use and benefit of Holli Hardin Fontenot for so long as she shall live. Holli Hardin Fontenot will, for the duration of the Trust, be entitled to the net income of the Trust, this amount to be paid in convenient installment payments to be not less than quarter-annually. If the income known by the Trustee to be available to Holli Hardin Fontenot from other sources is insufficient to provide for her continued support and

maintenance in good health, the Trustee will have the authority to pay to Holli Hardin Fontenot or apply for her benefit, so much of the principal of the Trust, even to the exhaustion thereof, as is necessary to provide for her support and maintenance in the style and comfort to which she is accustomed and to provide for her medical needs and maintenance of good health. Holli Hardin Fontenot may at any time require that property which does not produce an income or a sufficient income be sold and invested in income producing property.

2.  Upon the death of Holli Hardin Fontenot, unless Holli Hardin Fontenot shall issue a direction to the contrary, the Trustee will pay from the Trust assets the entire increment in the taxes payable by reason of her death to the extent that the total of such taxes is greater than would have been imposed if the trust assets had not been taken into account in determining such taxes.

3.  Dallas Joseph Fontenot, Jr., by a clause in his Will in which he specifically exercises this power of appointment, shall have the power to appoint the trust assets remaining upon the death of Holli Hardin Fontenot to or for the benefit of any one or more of the descendants of Dallas Joseph Fontenot, Jr. or the descendants of Holli Hardin Fontenot, in such shares, proportions, or amounts, upon such trusts and for such estates as he alone may determine. If Dallas Joseph Fontenot, Jr. fails to exercise this special power of appointment to the fullest extent, then, subject to the other provisions of this Trust, upon his death, the unappointed trust assets shall be delivered to the living descendants of Holli Hardin Fontenot and to the living descendants of Dallas Joseph Fontenot, Jr., *per stirpes*.

E.  **ELECTION, QUALIFIED TERMINABLE INTEREST PROPERTY.** It is important to emphasize that upon the death of Holli Hardin Fontenot, or the termination by divorce of the marital relationship of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., Dallas Joseph Fontenot, Jr. will have no more than a life interest in the Trust. Dallas Joseph Fontenot, Jr. will have no right or power to revoke or amend this Trust. The Trustee may, without liability for doing so or the failure to do so, elect to treat all or a part of the Trust as Qualified Terminable Interest Property pursuant to the requirements of Section 2056(b)(7) or Section 2523(f) of the Internal Revenue Code, whichever is applicable. To the extent that an election is made, and unless Dallas Joseph Fontenot,

003282

Jr. shall issue a direction to the contrary, the Trustee will pay from the Trust assets the entire increment in the taxes payable by reason of his death to the extent that the total of such taxes is greater than would have been imposed if the property treated as qualified terminable interest property had not been taken into account in determining such taxes. To the extent a partial election is made, and to the extent and in the manner then permitted by law, the Trustee will have the authority (1) to divide the Trust into separate trusts to reflect the partial election, or (2) to continue the Trust as a whole, with the fraction or percentage of the whole representing the elective share to be administered and maintained in a manner to reflect its proportionate share of the increment or decline in the whole of the property for the purposes of applying Sections 2044 and 2519 of the Internal Revenue Code. If the Trust is divided into separate parts, the Trustee will make the division according to the fair market value at the time the division is made. It is Settlor's intent and purpose to comply with state and federal law so that the least amount of federal estate tax will be payable upon the deaths of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., and this Trust Declaration is to be applied and construed to accomplish this objective.

F.  **DIVISION INTO SEPARATE TRUSTS.** If, following the death of Holli Hardin Fontenot or the termination by divorce of the marital relationship between Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot, the Trust is divided into separate trusts, the appreciation or depreciation in the value of each such trust or account will measure the value thereof for the purpose of disposition and taxation. For example, if the Trustee elects to treat all but $600,000 of the Trust assets as qualified terminable interest property for the federal estate tax marital deduction, and, if the Trustee segregates the $600,000 amount into a separate trust, the amount distributable therefrom upon the death of Dallas Joseph Fontenot, Jr. will be the value of that account upon the death of Dallas Joseph Fontenot, Jr. If, however, the $600,000 amount represents 25 percent of the total trust estate, and is continued and maintained as a fractional percentage of the whole, the value of the fractional interest upon the death of Dallas Joseph Fontenot, Jr. is to be determined with regard to its proportional share of any increase or decrease in the value of the whole.

G.  **ITEMS OF TANGIBLE PERSONAL PROPERTY IN TRUST.** Holli Hardin Fontenot may have certain items of tangible personal property which are her separate property and which have been

Page 13 of 23 Pages

003283

transferred to the Trust or otherwise subject to the Trustee's control. The term "personal belongings" or "tangible personal property" will mean and identify personal wearing apparel, jewelry, household furnishings and equipment, books, albums, art work, entertainment and sports equipment, and all items of decoration or adornment. Holli Hardin Fontenot may at any time and from time to time deliver to the Trustee written instructions as to any living or post mortem gifts of such personal belongings, and the Trustee shall be authorized and bound to make disposition of these items as Holli Hardin Fontenot has reasonably directed.

H.  **PARTIAL AND FINAL DISTRIBUTIONS.** The Trustee, in making or preparing to make a partial or final distribution, may prepare an accounting and may require, as a condition to payment, a written and acknowledged statement from each distributee that the accounting has been thoroughly examined and accepted as correct; a discharge of the Trustee; a release from any loss, liability, claim or question concerning the exercise of due care, skill, and prudence of the Trustee in the management, investment, retention, and distribution of property during the Trustee's term of service, except for any undisclosed error or omission having basis in fraud or bad faith; and an indemnity of the Trustee, to include the payment of attorney's fees, from any asserted claim of any taxing agency, governmental authority, or other claimant. Any remainder beneficiary having a question or potential claim may require an audit of the Trust as an expense of administration. Failure to require the audit prior to acceptance of the Trustee's report, or the acceptance of payment, will operate as a final release and discharge of the Trustee except as to any error or omission having basis in fraud or bad faith.

The Trustee, in making or preparing to make a partial or final distribution will have the authority to: (1) partition any asset or class of assets and deliver divided and segregated interests to the beneficiaries; (2) sell any asset or class of assets (whether or not susceptible to partition in kind), and deliver to a beneficiary or beneficiaries a divided interest in the proceeds of sale and/or divided or undivided interests in any note and security arrangement taken as part of the purchase price; and/or (3) deliver undivided interests in an asset or class of assets to the beneficiaries subject to any indebtedness which may be secured by the property.

I.  **CONTINUATION OF THE TRUST DURING DISSOLUTION.** The Trust may continue beyond its termination for a time reasonably necessary to conclude the administration of the Trust, pay

Page 14 of 23 Pages

003284

expenses of termination and to distribute to the Trust property to those entitled thereto.

J.    **CONTINGENT TRUST FOR CERTAIN BENEFICIARIES.**    The interest of any Trust Beneficiary who has not attained the age of thirty-five (35) years (the "required age"), or who may be otherwise legally disabled, and whose interest is not otherwise covered by the provisions of this Trust Declaration or another Trust, may, in the sole and absolute discretion of the Trustee, be continued in Trust, or be held as a separate trust, for the use and benefit of that person until such person shall attain the required age or until such person is no longer disabled. For so long as the trust shall exist, the Trustee shall hold, manage, and make distributions of income and principal to provide for his or her health, education, support and maintenance.    The Trustee may make an entire distribution of principal to a Trust Beneficiary prior to the required age if, in the Trustee's determination alone, the beneficiary has demonstrated an ability to conserve his or her resources or if it is no longer feasible for the trust to continue considering the size of the trust and the time and cost to maintain the trust.    The Trust Beneficiary, with consent of the Trustee, may also extend the term of the trust.

For so long as the Trust is held for a beneficiary pursuant to these terms, the Trust Beneficiary, using a qualified beneficiary designation, will have the right to appoint the beneficiaries of his or her interest in the Trust entitled to his or her interest upon the Trust Beneficiary's death.    If the Trust Beneficiary dies prior to a final distribution of his or her interest from the Trust, without having made a qualified beneficiary designation, that person's interest will pass *per stirpes* to his or her descendants then living, or if none, *per stirpes* to Settlor's descendants then living.

K.    **PERPETUITIES.**    In no event will the term of this Trust continue for a term greater than twenty-one (21) years after the death of the last survivor of Settlor and all relatives of Settlor living on the effective date of this Trust Declaration.    Any continuation of the Trust by the qualified exercise of a power of appointment will be construed as the creation of a separate trust and an extension of the Rule Against Perpetuities to the extent permitted by law.    A court of competent jurisdiction is to liberally construe and apply this provision to validate an interest consistent with Settlor's intent and may reform or construe an interest according to the doctrine of *cy pres*.

UNOFFICIAL COPY

ARTICLE VII.
PAYMENT OF DEBTS, TAXES, AND
SETTLEMENT COSTS
EXERCISE OF ELECTIONS

The following directions concern the payment of debts, taxes, estate and trust settlement costs, and the exercise of any election permitted by Texas law or by the Internal Revenue Code:

A.   **PAYMENT OF INDEBTEDNESS AND SETTLEMENT COSTS.**   The Trustee will have the discretionary authority to pay from the Trust Fund the costs reasonably and lawfully required to settle the estate of a deceased beneficiary.   In the event there is more than one Trust Beneficiary immediately preceding the death of a beneficiary, distributions of Trust income and principal to pay settlement costs will not exceed that person's trust share or the fair market value of the beneficiary's interest in the Trust which is distributable by reason of his or her death.

B.   **SPECIAL BEQUESTS.**   Unless otherwise provided in this Trust document, or in any amendment, or in a document exercising a power to appoint the beneficiaries of this Trust, if property given as a special bequest or gift is subject to a mortgage or other security interest, the designated recipient of the property will take the asset subject to the obligation and the recipient's assumption of the indebtedness upon distribution of the asset to the recipient.   The obligation to be assumed shall be the principal balance of the indebtedness on date of death, and the Trust shall be entitled to reimbursement or offset for principal and interest payments paid by the Trust to date of distribution.

C.   **ESTATE, GENERATION SKIPPING, OR OTHER DEATH TAX.**   Unless otherwise provided in this Trust document, or in a document exercising a power to appoint the beneficiaries of this Trust, estate, inheritance, succession, or other similar tax shall be charged   to   and   apportioned   to   those   whose   gifts   or distributive share generate a death tax liability by reason of Settlor's death or by reason of a taxable distribution from the Trust or a taxable termination of the Trust.   To the extent Settlor may lawfully provide, a Trustee may pay and deduct from a beneficiary's distributive share (whether the distribution is to be paid outright or is to be continued in Trust)·the increment in taxes payable by reason of a required distribution or termination of interest (i.e., estate, gift, inheritance, or generation skipping taxes) to the extent that the total of such taxes payable by reason of a distribution or

UNOFFICIAL COPY

003286

termination is greater than the tax which would have been imposed if the property of the Trust subject to the distribution or termination of interest had not been taken into account in determining the amount of such tax. To the extent a tax liability results from the distribution of property to a beneficiary other than under this Trust, the Trustee will have the authority to reduce any distribution to the beneficiary from this Trust by the amount of the tax liability apportioned to the beneficiary, or if the distribution is insufficient, the Trustee will have the authority to proceed against the beneficiary for his, her, or its share of the tax liability. In making an allocation, the Trustee may consider all property included in the gross estate of the Settlor for federal estate tax purposes, including all property subject to probate, all amounts paid or payable to another as the result of death, including life insurance proceeds, proceeds from a qualified retirement plan or account, proceeds from a joint and survivorship account with a financial institution or brokerage company, proceeds from a buy-sell or redemption contract, and/or any other plan or policy which provides for a payment of death benefits. This provision further contemplates and includes any tax which results from the inclusion of a prior transfer in the federal gross estate of Settlor even though possession of the property previously transferred is vested in someone other than the Trustee. This provision does not include a reduction in the unified credit by reason of taxable gifts previously made by Settlor. If the Trustee determines that the collection of an apportioned tax liability against another is not economically feasible or probable, the tax liability will be paid by the Trust and will reduce the amount distributable to the residuary beneficiaries. The Trustee's judgment with regard to the feasibility of collection is to be conclusive.

D.    **SPECIAL ELECTION FOR QUALIFIED TERMINABLE INTEREST PROPERTY.** For the purpose of identifying the "transferror" in allocating a GST exemption, the estate of Holli Hardin Fontenot or the Trustee of this Trust may elect to treat all of the property which passes in Trust to Dallas Joseph Fontenot, Jr. for which a marital deduction is allowed, by reason of Section 2056(b)(7) or Section 2523(f) of the Internal Revenue Code, as if the election to be treated as Qualified Terminable Interest Property had not been made. Reference to the "Special Election For Qualified Terminable Interest Property" will mean and identify the election provided by Section 2652(a)(2) of the Internal Revenue Code. The term "GST Exemption" or "GST Exemption Amount" is the dollar amount of property which may pass as generation skipping transfers under Subtitle B,

UNOFFICIAL COPY

003287

Chapter 13, of the Internal Revenue Code of 1986 which is exempt from the generation-skipping tax.

E.  **ELECTIVE DEDUCTIONS.**  A Trustee will have the discretionary authority to claim any obligation, expense, cost, or loss as a deduction against either estate tax or income tax, or to make any election provided by Texas law, the Internal Revenue Code, or other applicable law, and the Trustee's decision will be conclusive and binding upon all interested parties and shall be effective without obligation to make an equitable adjustment or apportionment between or among the beneficiaries of this Trust or the estate of deceased beneficiary.

ARTICLE VIII.
SERVICE OF THE TRUSTEE
OTHER MATTERS

A.  **GENERAL AUTHORITY.**  A Trustee is to serve without Court supervision.  The service of a Trustee is to be governed first by the terms, conditions, and authority prescribed by this Trust Declaration, and then as prescribed by the trust laws of the State of Texas.

B.  **RETENTION OF ASSETS.**  A Trustee will have the authority to retain, without liability, any and all property in the form in which it is received by the Trustee without regard to its productivity or the proportion that any one asset or class of assets may bear to the whole.  A Trustee will not have liability nor responsibility for loss of income from or depreciation in the value of property which was retained in the form which the Trustee received it.

C.  **UNDIVIDED INTERESTS.**  A Trustee will have the authority to hold, acquire, and dispose of undivided interests in property.

D.  **LENDING, INVESTING.**  A Trustee will have the authority to lend, borrow, lease, sell, and purchase property, including undivided fractional interests in property, upon such terms and conditions as are reasonably prudent under the facts and circumstances then existing. A Trustee may transact business, including lending, borrowing, leasing, and sale, between two or more related trusts or persons upon such terms and conditions as are reasonably prudent under the facts and circumstances then existing.  Without limiting the general authority above given, a Trustee will have the authority to hold, acquire and sell:

Page 18 of 23 Pages

003288

- Publicly traded securities, including stocks, bonds, warrants, futures, mutual funds, partnerships, real estate investment trusts, diversified asset funds.
- Interests in a closely held corporation, partnership, or trust, whether registered or not registered for public sale.
- Obligations of the United States Government or any other government.
- Cash deposits, money market funds, brokerage company accounts, certificates of deposit, savings accounts, and checking accounts, without limitation as to the location of the account or depository.
- Promissory notes, secured and unsecured, including mortgage notes purchased at a discount.
- Land, improved and unimproved, whether presently income producing or held for appreciation in value.
- Land, building and equipment leases.
- Minerals, mineral rights and working interests in mineral producing property or property held for future development.
- Equipment, implements, stock in trade, leasehold improvements, and livestock.
- Insurance policies.

E.   **LIMITATION UPON A TRUSTEE'S LIABILITY.**  A Trustee, other than a banking corporation serving as a Trustee, will not have personal liability for service in a fiduciary capacity other than for acts or omissions to act which, as determined by a court of law, constitute gross negligence or fraud.

F.   **PROTECTION OF THE INTERESTS OF BENEFICIARIES.**  No beneficiary will have the power to anticipate, encumber or transfer any interest in the Trust.  No part of the Trust will be liable for or charged with any debts, contracts, liabilities or torts of a beneficiary or subject to seizure or other process by any creditor of a beneficiary.

G.   **RELATIONSHIP WITH BENEFICIARIES WHO ARE MINORS OR INCOMPETENTS.**  Distributions to an incompetent or disabled beneficiary, or a Minor Beneficiary may be made in such of the following ways as in the Trustee's opinion will be most beneficial to the interests of the beneficiary:  (a) directly to such beneficiary; (b) to his or her parent, guardian or legal representative; (c) to a custodian for said beneficiary under any Uniform Gifts to Minors Act and/or Gifts of Securities to Minors Act in the jurisdiction of residence of such beneficiary; (d) to any person with whom he or she is residing; (e) to some near relative or close friend; or (f) by

003289

the Trustee using such payment directly for the benefit of such beneficiary, including payments made to or for the benefit of any person or persons whom said beneficiary has a legal obligation to support. The Trustee may in the Trustee's sole discretion instead hold such income or corpus for the account of such beneficiary as custodian. A receipt from a beneficiary or from his parent, guardian, legal representative, relative, close friend, or other person described above shall be a sufficient discharge to the Trustee from any liability for making said payments.

The Trustee is likewise authorized to consult with and act upon the advice of the parent, guardian, custodian, or legal representative of any beneficiary who is either an incompetent or a Minor with respect to any and all matters which may arise under this Declaration and as concerns the rights or interests of said beneficiary. All statements, accounts, documents, releases, notices, or other written instruments, including but not limited to written instruments concerning the resignation or replacement of any Trustee or Trustees, required to be delivered to or executed by such beneficiary may be delivered to or executed by the parent, guardian, custodian, or legal representative of said incompetent or Minor Beneficiary, and when so delivered or executed shall be binding upon said incompetent or Minor Beneficiary, and shall be of the same force and effect as though delivered to or executed by a beneficiary acting under no legal disability.

## ARTICLE IX.
### UNPRODUCTIVE OR UNDERPRODUCTIVE PROPERTY

A beneficiary who is then entitled to the income of the Trust, or the income of any other Trust established or continued pursuant to this trust declaration, will have the authority to issue a written directive to the Trustee to convert Trust Property which does not produce an income, or which is underproductive, into property which is income producing or which will provide a greater income to the trust. Upon actual receipt of an income beneficiary's written directive, the Trustee will reasonably and prudently proceed to convert unproductive or underproductive property into property which will produce a reasonable and safe rate of return. The Trustee may do so by selling the unproductive or underproductive asset upon such terms and conditions as is prudent and reasonable under all circumstances which may then exist (including the acceptance of an income or interest bearing obligation as the whole or a part of the sales price), and investing the proceeds of sale in income producing instruments or obligations. Notwithstanding

003290

these requirements, a Trust Beneficiary cannot direct the Trustee to invest or reinvest trust property in a trust investment which is speculative in nature or which, in result, would violate the spendthrift provisions of this Trust Declaration.

## ARTICLE X.
### NO-CONTEST REQUIREMENTS

Settlor vests in the Trustee the authority to construe this Trust instrument and to resolve all matters pertaining to disputed issues or controverted claims.  Settlor does not want to burden this Trust with the cost of a litigated proceeding to resolve questions of law or fact unless the proceeding is originated by the Trustee or with the Trustee's written permission.  Any other person, agency, or organization who shall originate (or who shall cause to be instituted) a judicial proceeding to construe or contest this Trust instrument, or any will which requires distribution of property to this Trust, or to resolve any claim or controversy in the nature of reimbursement, or seeking to impress a constructive or resulting Trust, or alleging any other theory which, if assumed as true, would enlarge (or originate) a claimant's interest in this Trust or in Settlor's estate, without the Trustee's written permission, shall forfeit any amount to which that person, agency, or organization is or may be entitled and the interest of any such litigant or contestant shall pass as if he or she or it had predeceased us.  These directions shall apply even though the person, agency or organization shall be found by a court of law to have originated the judicial proceeding in good faith and with probable cause and even though the proceedings may seek nothing more than to construe the application of this no-contest provision. This requirement is to be limited, even to the exclusion thereof, in the event it operates to deny the benefits of the federal estate tax or federal gift tax marital deduction.

## ARTICLE XI.
### JURISDICTION

The jurisdiction of this Trust will be the State of Texas.  Any issue of law or fact pertaining to the creation, continuation, administration, and termination of the Trust, or any other matter incident to this Trust, is to be determined with reference to the specific directions in the Trust Declaration and then under the laws of the State of Texas.  If a Article or Subsection of this Trust Declaration is in conflict with a prohibition of state law or federal law, the Article or Subsection, or the Trust Declaration as a whole, is to be construed in a manner which will cause it to be

UNOFFICIAL COPY

003291

in compliance with state and federal law and in a manner which will
result in the least amount of taxes and estate settlement costs.

ARTICLE XII.

ACCEPTANCE BY TRUSTEE

Holli Hardin Fontenot acknowledges that she is the initial Trustee
of the DAKOTA TRUST. By execution of this Trust Declaration, Holli
Hardin Fontenot accepts the office of Trustee and agrees to hold
and administer the Trust according to the provisions thereof and as
required by law.

CONCLUSION AND ATTESTATION

Holli Hardin Fontenot attests that she has executed this Trust
Declaration on the date set forth below, and the terms thereof will
bind her, her successors and assigns, and her heirs and personal
representatives. This instrument is to be effective upon the date
recorded immediately below.

Dated:____November 9, 1994_____


_____original signed by Holli Hardin Fontenot
_____
Holli Hardin Fontenot, individually and
as Trustee

UNOFFICIAL COPY

003292

STATE OF TEXAS      §
                    §
COUNTY OF HARRIS    §

On this __9th__ day of ___November___ in the year 199_4_ before me, a Notary Public of said State, personally appeared Holli Hardin Fontenot, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument, and acknowledged that she executed the same in the capacities expressed therein.

WITNESS MY HAND and official seal.

_____
Notary Public, State of Texas

[SEAL]

Page 23 of 23 Pages

003293

## SCHEDULE A TO
## TRUST DECLARATION
## DAKOTA TRUST

The Sum of SIXTY FOUR THOUSAND AND NO/100 DOLLARS ($64,000.00) from the Holli Ann Hardin Sole and Separate Property Account, which sum constitutes the separate property of the Settlor



Page 24 of 23 Pages

003294

This trust may need a demand power after Holli's death so that we can take advantages of $10,000 per year exclusion for gifts of present interest.

UNOFFICIAL COPY

003295

(4)

TO WHOM IT MAY CONCERN:

I, Holli Ann Hardin Fontenot, hereby voluntarily resign as trustee of the Holli Ann Hardin Fontenot Trust Number One and the Dakota Trust. This resignation as trustee shall be effective immediately upon acceptance by Dallas J. Fontenot, Jr.

Very truly yours,

Holli Ann Hardin Fontenot

Agreed and accepted this __8__ day of __SEPT.__, 1996.

Dallas J. Fontenot, Jr.

LDK238:19

TOTAL P.02

003296

EXHIBIT
D

LINDA GOEHRS, IN HER CAPACITY AS
TRUSTEE OF THE HOPH ANNIGRDN
TRUST NUMBER ONE
Plaintiff,
v.
DAKOTA FONTENOT,
Defendant.

537721

Date : 6/7/2022 6:54:13 PM
From : "Linda Goehrs" linda@hgprobate.com
To : "Frank Kent" cbg.frank@gmail.com, "Dakota Fontenot" dakotajamesfontenot@gmail.com
Subject : RE: Big sign repair

I agree with Dakota. We need a signed Receipt from the company. Can Joanna give you're the $10,000 out of the safe in the cage. Last I heard, she had about $120,000 in that safe and she was using that to pay bills. If not, I can't meet you until Friday.

I am in agreement about the ice machine. Please lease the one you found. It is worth spending $13,806.00 for it. We have to remember that Dallas did not spend money on anything and that we are having to spend money that he should have years ago.

Thanks for your help Frank.

Linda C. Goehrs
Horrigan Goehrs Edwards & Culp, L.L.P.
1401 Truxillo St.
Houston, TX 77004
(713) 659-4200
(713) 659-3804 (facsimile)
linda@hgprobate.com
Notice of Confidentiality:

The information contained in and transmitted with this email is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, or use of or reliance upon the information contained in and transmitted with this email by or to anyone other than the recipient designated above by the sender is unauthorized and strictly prohibited. If you have received this email in error, please notify Horrigan & Goehrs, L.L.P. by telephone at (713) 659-4200 immediately. Any email erroneously transmitted to you should be immediately returned to the sender by U.S. Mail, or if authorization is granted by the sender, destroyed.

-----Original Message-----
From: Frank Kent <cbg.frank@gmail.com>
Sent: Tuesday, June 7, 2022 4:32 PM
To: Linda Goehrs <linda@hgprobate.com>; Dakota Fontenot <dakotajamesfontenot@gmail.com>
Subject: Re: Big sign repair

Cash is acceptable. Do you need deposit receipt from bank or receipt of acceptance from his company? Also when should I meet you for the funds? On an unrelated matter we have been fighting an Ice Machine crisis with this old machine. Problem is we need large capacity machine and they are literally out of stock everywhere. I have secured a machine to lease for $475.00 per month and they will order us a new machine for delivery 18 weeks from signing the agreement. These machines last up to 20 years and cost is $13,806.00. I meet with the rep tomorrow and will forward you both the contract for review and approval if accepted.

Thank You,

Frank

> On Jun 7, 2022, at 4:14 PM, Linda Goehrs <linda@hgprobate.com> wrote:
>
>

Date : 6/20/2022 9:56:29 AM
From : "Linda Goehrs" linda@hgprobate.com
To : "Dakota Fontenot" dakotajamesfontenot@gmail.com, "Frank Kent" cbg.frank@gmail.com
Cc : "Frank Kent" cbg.frank@gmail.com
Subject : RE: FK responses to offer.

Frank,

Thank you for your past and continued service. I am leaving for vacation tomorrow and will not return until July 2. I am happy to meet you at the office when I return to pay your signing bonus. I could meet you on July 3 or 4. I have meetings and mediation on July 5 & 6 but would be able to meet on July 7 or 8. Please let me know what works for you.

Thanks again for keeping everything running smoothly.

Linda C. Goehrs
Horrigan Goehrs Edwards & Culp, L.L.P.
1401 Truxillo St.
Houston, TX 77004
(713) 659-4200
(713) 659-3804 (facsimile)
linda@hgprobate.com

Notice of Confidentiality:

The information contained in and transmitted with this email is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, or use of or reliance upon the information contained in and transmitted with this email by or to anyone other than the recipient designated above by the sender is unauthorized and strictly prohibited. If you have received this email in error, please notify Horrigan & Goehrs, L.L.P. by telephone at (713) 659-4200 immediately. Any email erroneously transmitted to you should be immediately returned to the sender by U.S. Mail, or if authorization is granted by the sender, destroyed.

From: Dakota Fontenot <dakotajamesfontenot@gmail.com>
Sent: Monday, June 20, 2022 7:47 AM
To: Frank Kent <cbg.frank@gmail.com>; Linda Goehrs <linda@hgprobate.com>
Cc: Frank Kent <cbg.frank@gmail.com>
Subject: Re: FK responses to offer.

Frank –

We appreciate your willingness to stay and help the company. I spoke with Linda and we are both agreeable to your offer below.

Best,

*Dakota Fontenot, Esq.*
Mobile: (713) 419-2966
E-mail: dakotajamesfontenot@gmail.com

From: Frank Kent <cbg.frank@gmail.com>
Date: Friday, June 17, 2022 at 5:21 PM

**To:** Linda Goehrs <LINDA@HGPROBATE.COM>, Dakota Fontenot <dakotajamesfontenot@gmail.com>
**Cc:** Frank Kent <cbg.frank@gmail.com>
**Subject:** FK responses to offer.

*Linda and Dakota,*

Thank you for considering me to continue my work with contract extension. I truly have mixed feelings in that regard. It would mean I would be putting my future hopes and endeavors on hold for the extended time. On the other hand it could be beneficial for us to continue to strengthen the company for a while longer. I still harbor some resentment of broken promises, unpaid bonuses, and general abuse by the hand of Dallas yet I carry on because I love the company and desire to keep it stabilized and growing until it's time to go. I appreciate both of you to allow me to operate as I see fit . I was micromanaged for far too long and will never allow that to happen again. Freedom is on the horizon but there is much left to accomplish here.

With all due respect to you both please consider my offer to stay on until the end of this year.

1. Increase my base pay from $78K to $100K effective immediately with the difference paid in cash.
2. Continue my 4 week vacation benefit with compensation for any unused time.
3. Continue my vehicle and fuel compensation
4. Return the commission share to managers by dropping the 2 shares that Dallas took from us as punishment for previous manager theft, which I resolved. Dallas said the shares would be returned after he recouped $60k as compensation for the theft. In reality he has been taking it from us for many years now receiving hundreds of thousands from our commission pool seriously diluting our commissions. I intend to utilize those 2 shares to include the 2 new managers into the commission pool.
5. Continue my commission override compensation
6. Continue my schedule flexibility working in the daytime and every other Friday off.
7. Signing bonus of $50k firm paid in full up front in cash.

I feel I have a good working relationship with you both and that is comforting. I have spent almost half my life working here and fully expect to leave when my current contract expires at the end of August 2022 to pursue other opportunities unless my offer is accepted. This is a very demanding business and needs someone like me to balance the ball. This offer is not unreasonable in my opinion, given what I bring for the good of the company.

Warmest Regards,

Frank Kent

Date : 1/17/2023 4:47:05 PM
From : "Dakota Fontenot" dakotajamesfontenot@gmail.com
To : "Frank Kent" cbg.frank@gmail.com
Cc : "Linda Goehrs" LINDA@hgprobate.com
Subject : Re: Frank Kent contract extension

Thank you Frank. You have been great to us and we appreciate everything you have done. We couldn't have done it without you!

Best,

*Dakota Fontenot, Esq.*
Mobile: (713) 419-2966
E-mail: dakotajamesfontenot@gmail.com

---

This communication (including attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, or distribution of this information is prohibited. If you are not the intended recipient, please contact the sender by reply message and destroy all copies of the message.

Sent via Superhuman


On Tue, Jan 17, 2023 at 4:44 PM, Frank Kent <cbg.frank@gmail.com> wrote:
Thank you all! I will continue to do my best for the company and teach Dakota everything I can. You guy's have been great and thanks for treating me so well.

Sincerely,

FK

> On Jan 17, 2023, at 1:17 PM, Dakota Fontenot <dakotajamesfontenot@gmail.com> wrote:
>
> Frank -
>
> I accept you proposal. Just got off the phone with Linda and she confirmed.
>
> Best,
>
> *Dakota Fontenot, Esq.*
> Mobile: (713) 419-2966
> E-mail: dakotajamesfontenot@gmail.com
>
> ---
>
> This communication (including attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, or distribution of this information is prohibited. If you are not the intended recipient, please contact the sender by reply message and destroy all copies of the message.
>
> Sent via Superhuman
>
>
> On Tue, Jan 17, 2023 at 12:57 PM, Frank Kent <cbg.frank@gmail.com> wrote:

UNOFFICIAL COPY

Dear Dakota and Linda,

Thank you for your support this past year. Definitely challenging but we got through it. Dakota and I spoke recently about contract renewal options for 2023. I am willing to sign on and continue working to the end of June this year. Dakota offered base increase to $120k per year and I appreciate that but would actually be $60k for January through June. Dakota offered $25k signing bonus for the year so I would agree to $12,500.00 signing bonus for the 6 months. All other perks and benefits would remain active as per our previous agreement. Also, I have 15 vacation days not redeemed for 2022 and would like to cash those in. That totals $4,500.00, with the grand total being $17k. If agreeable, I would like to start the base pay increase starting from the first pay period in January which is now. I will continue all my efforts in earnest and provide all support possible including the Spur 529 project. Please respond asap because payroll is due. Thank you again for your support and generosity and the forthcoming loan generation compensation. I was happy to get that through! Whew, what a relief!

Warmest Regards,

Frank Kent



Date : 3/23/2023 1:58:20 PM
From : "Dakota Fontenot" dakotajamesfontenot@gmail.com
To : "Linda Goehrs" linda@hgprobate.com
Cc : "Frank Kent" cbg.frank@gmail.com, "Ice Embassy" cbg.corpoffice@gmail.com
Subject : RE: Up Dated Quote for Chillers

Thanks Linda. Unfortunately, this is just a necessary expense to keep operations going. Can you please write a check out of the origin account for this?

Best,

*Dakota Fontenot, Esq.*
Mobile: (713) 419-2966
E-mail: dakotajamesfontenot@gmail.com

---

This communication (including attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, or distribution of this information is prohibited. If you are not the intended recipient, please contact the sender by reply message and destroy all copies of the message.

Sent via Superhuman

On Wed, Mar 22, 2023 at 6:06 PM, Linda Goehrs <linda@hgprobate.com> wrote:

Approved. I really wish that Dallas had done repairs and replaced old equipment. It is costing a lot of money to get this place looking good and operating well!

Linda C. Goehrs
Horrigan Goehrs Edwards & Culp, L.L.P.
1401 Truxillo St.
Houston, TX 77004
(713) 659-4200
(713) 659-3804 (facsimile)
linda@hgprobate.com

Notice of Confidentiality:

The information contained in and transmitted with this email is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, or use of or reliance upon the information contained in and transmitted with this email by or to anyone other than the recipient designated above by the sender is unauthorized and strictly prohibited. If you have received this email in error, please notify Horrigan & Goehrs, L.L.P. by telephone at (713) 659-4200 immediately. Any email erroneously transmitted to you should be immediately returned to the sender by U.S. Mail, or if authorization is granted by the sender, destroyed.

From: Frank Kent <cbg.frank@gmail.com>

**Sent:** Wednesday, March 22, 2023 5:07 PM
**To:** Dakota Fontenot <dakotajamesfontenot@gmail.com>; Linda Goehrs <linda@hgprobate.com>; Ice Embassy <cbg.corpoffice@gmail.com>
**Cc:** Frank Kent <cbg.frank@gmail.com>
**Subject:** Fwd: Up Dated Quote for Chillers

This the quote for Glycol chillers.  This a cure all for our draught beer system.  Please advise. Current system is running at 50% and soon to fail.

Thanks

FK

Begin forwarded message:

**From:** John Villars <beergasjohn@gmail.com>

**Subject: Up Dated Quote for Chillers**

**Date:** March 21, 2023 at 10:58:19 PM CDT

**To:** "cbg.frank@gmail.com" <cbg.frank@gmail.com>

**Cc:** John Villars <Beergasjohn@gmail.com>

Please see the up date chiller quote.

LET ME KNOW IF YOU HAVE ANY QUESTIONS.

Thank You, John

Texas Draught Werks

713 545 1621

**EXHIBIT E**

Date : 3/21/2025 1:48:23 PM
From : "Linda Goehrs" linda@hgprobate.com
To : "Dakota Fontenot" dakotajamesfontenot@gmail.com
Subject : RE: PLEASE REVIEW ASAP AND SIGN IF ALL GOOD
Attachment : 20250321140433063.pdf;20250321140459415.pdf;

**537721**

LINDA GOEHRS, IN HER CAPACITY AS
TRUSTEE OF THE HOLLI ANN HARDIN
TRUST NUMBER ONE
Plaintiff,

v.

DAKOTA FONTENOT,
Defendant.

Linda C. Goehrs
Horrigan Goehrs Edwards & Culp, L.L.P.
1401 Truxillo St.
Houston, TX 77004
(713) 659-4200
(713) 659-3804 (facsimile)
linda@hgprobate.com

Notice of Confidentiality:

The information contained in and transmitted with this email is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, or use of or reliance upon the information contained in and transmitted with this email by or to anyone other than the recipient designated above by the sender is unauthorized and strictly prohibited. If you have received this email in error, please notify Horrigan & Goehrs, L.L.P. by telephone at (713) 659-4200 immediately. Any email erroneously transmitted to you should be immediately returned to the sender by U.S. Mail, or if authorization is granted by the sender, destroyed.

---

**From:** Dakota Fontenot <dakotajamesfontenot@gmail.com>
**Sent:** Friday, March 21, 2025 1:22 PM
**To:** Linda Goehrs <linda@hgprobate.com>
**Subject:** PLEASE REVIEW ASAP AND SIGN IF ALL GOOD

Linda – please review these asap and sign if all good. Will need to get these back to Amir in next 30 mins if wire is going to go out today. Call me if you have any issues or questions about the language. Once you sign, please send back to me, I'll sign, and send over to Amir and send you final copies.

Best,

*Dakota Fontenot, Esq.*
Mobile: (713) 419-2966
E-mail: dakotajamesfontenot@gmail.com

# SECURED PROMISSORY NOTE

$150,000.00                                                                March 21, 2025

This Secured Promissory Note (the "Note") is made effective this the 21st day of March 2025, by and between Ice Embassy, Inc., a Texas corporation ("Ice"), Viva Las Vegas Properties, Inc. ("Viva"), Holli Ann Hardin Trust Number One (the "HH Trust") and Dakota Fontenot ("Fontenot") (Ice, Viva, HH Trust and Fontenot, collectively "Borrower") and PL Partners LLP, a US Virgin Islands limited liability partnership having a principal address of 36A2-37A Dronningens Gade St. Thomas, USVI 00802 (the "Payee") (collectively, Borrower and Payee are referred to as the "Parties"):

## 1.     PROMISE TO PAY

FOR VALUE RECEIVED, Borrower promises to pay to the Payee, at or at such other place as Payee may designate in writing from time to time, the principal amount of one hundred and fifty thousand dollars ($150,000.00 USD) (the "Principal Amount"), together with a fixed interest amount of fifty thousand dollars ($50,000.00 USD) (the "Interest Amount"). The Principal Amount and Interest Amount Borrower promises to pay to Payee is two hundred thousand dollars ($200,000.00 USD).

## 2.     PAYMENT TERMS

The Principal Amount and Interest Amount paid by Borrower to Payee in the amount of two hundred thousand dollars ($200,000.00 USD) shall be paid in one lump sum payment by wire transfer in immediately available funds and shall be due and payable upon the earliest to occur: (i) receipt of any settlement proceeds by Borrower or Borrower's counsel from the Litigation, (ii) the sale of the 3400 Old Richmond Property, (iii) the sale of the Spur 529 Property, or (iv) on May 22, 2025. Upon payment of this Note in full, Payee shall surrender this Note, file all UCC1 termination statements and Borrower shall be forever released from all its obligations and liabilities under this Note. If Borrower repays this Note from proceeds related to this Litigation, Borrower's counsel must pay Payee prior to distributing settlement proceeds to any other person or entity. If the sale of the Spur 529 Property or the 3400 Old Richmond Property occurs prior to the receipt of proceeds from the Litigation, then Borrower shall ensure that the title company issues payment to Payee from the proceeds of the sale of such property. Failure to do so shall constitute an event of default under this Note.

If Borrower defaults in the timely payment of the Principal Amount or Interest Amount in accordance with Section 1, then, until such defaulted amount shall have been paid in full, all amounts outstanding under this Note shall be subject to a late payment penalty, payable on demand, of twenty four percent (24%) per annum, accruing daily and compounding annually (the "Late Payment Penalty").

## 3.     SECURITY INTEREST

UNOFFICIAL COPY

In order to secure Borrower's obligations under this Note, Borrower grants Payee a first priority security interest in the following collateral until Payee receives in full the Principal Amount and Interest Amount and if applicable the Late Payment Penalty:

(1) All of Borrower's settlement proceeds from Civil Action Nos. 4:24-cv-01461 *Entertainment Marketing & Management, Ltd., Ice Embassy Inc., HFR Enterprises, Inc. and Linda C. Goehrs, Esq,, as Trustee for the Holli Ann Hardin Trust Number One vs. Holli H. Fontenot*; in the United States District Court in the Southern District of Texas, Houston Division and Cause No. 22-DCV-294515, *Entertainment Marketing & Management, Ltd. and Ice Embassy, Inc. v. Holli H. Fontenot, as Executrix of the Estate of Dallas Joseph Fontenot, Jr., Deceased,* In the 434th Judicial District Court of Fort Bend, County (the "Litigation");

(2) Viva Las Vegas Properties, Inc.'s real property located in Fort Bend County Texas at 3400 Old Richmond Rd, Rosenberg, Texas 77471 (the "3400 Old Richmond Property"); and

(3) Holli Ann Hardin Trust Number One's real property located in Fort Bend County Texas of 9.288 Acres, 2511 & 2543 Spur 529, Rosenberg, Texas 77471, more specifically described as 0485 C N Simpson, Block 12, Tract 5, Acres 2.457; 0485 C N Simpson, Block 12, Tract 4, Acres 6.831 (the "Spur 529 Property"). (The Litigation, the 3400 Old Richmond Property, and the Spur 529 Property, collectively "The Collateral")

## 4.    PREPAYMENT

The Borrower may prepay this Note, in whole or in part, any time before demand without penalty or premium.

## 5.    BORROWER REPRESENTATIONS

(a) Company is a Texas corporation and is duly formed, validly existing, and in good standing under the laws of the jurisdiction of its formation; is duly qualified to do business in and is in good standing in every jurisdiction where Company is operating its business; and has all powers and all governmental licenses, authorizations, consents, and approvals required to carry on its business as now conducted.

(b) Borrower is the sole legal and beneficial owners of and has good title to the proceeds in the Litigation free and clear of any (a) encumbrance, mortgage, pledge, lien, security interest, charge, hypothecation, security agreement, security arrangement or encumbrance, or other adverse claim against title of any kind; (b) purchase, option, call, or put agreement or arrangement; (c) subordination agreement or arrangement; (d) prior sale, transfer, assignment; or (e) agreement or arrangement to create or effect any of the foregoing.

(c) The HH Trust is the sole legal and beneficial owner of and has good title to the Spur 529 Property free and clear of any (a) encumbrance, mortgage, pledge, lien, security interest, charge, hypothecation, security agreement, security arrangement or encumbrance, or other adverse claim against title of any kind; (b) purchase, option, call,

2

or put agreement or arrangement; (c) subordination agreement or arrangement; (d) prior sale, transfer, assignment; or (e) agreement or arrangement to create or effect any of the foregoing. The Spur 529 property is under contract for sale with a closing date of July 17, 2025.

(d) Viva is the sole legal and beneficial owner of and has good title to the 3400 Old Richmond Property free and clear of any (a) encumbrance, mortgage, pledge, lien, security interest, charge, hypothecation, security agreement, security arrangement or encumbrance, or other adverse claim against title of any kind; (b) purchase, option, call, or put agreement or arrangement; (c) subordination agreement or arrangement; (d) prior sale, transfer, assignment; or (e) agreement or arrangement to create or effect any of the foregoing. The 3400 Old Richmond Property is under contract for sale with a closing date of April 30th, 2025.

(e) There are no suits, investigations, or proceedings pending or, to the knowledge of Borrower, threatened, against Borrower that would reasonably be expected to materially and adversely affect it, the Litigation, the Spur 529 Property or the 3400 Old Richmond Property.

(f) All information relating to the Litigation that Borrower has provided to Payee is true, correct, and complete in all material respects and that a mediator's proposal for settlement of the Litigation in the amount of $450,000 payable to Borrower has been agreed to by plaintiffs and defendant.

(g) Borrower is legally entitled to no less than sixty percent (60%) of the attorney's fees to be distributed amongst class counsel in the Litigation.

## 6. COVENANTS

(a) Borrower shall provide a copy of this Promissory Note to Borrower's counsel in the Litigation and inform Borrower's counsel of Payee's security interest in the Litigation and instruct Borrower Borrower's counsel to make payment directly to Payee from any settlement proceeds received from the Litigation. Borrower shall provide written confirmation to Payee that this covenant has been satisfied.

(b) Borrower shall keep Payee apprised of any material events related to the Litigation, or the sale of 3400 Old Richmond Property and the sale of the Spur 529 Property.

(c) Borrower shall notify Payee upon receipt of any proceeds related to the Litigation, the sale of 3400 Old Richmond Property and the sale of the Spur 529 Property and to the extent

## 7. EVENTS OF DEFAULT

Borrower will be deemed to be in default under this Note on the occurrence of any of the following events (each and "Event of Default"): (i) any written representation or warranty made in or in connection with the Note or the Security Agreement or any written representation, warranty, statement, or information contained in any report, certificate, financial statement, or other instrument furnished in connection with or pursuant to this transaction, shall prove to have been false or misleading in any material respect when made, deemed made, or furnished (ii)

UNOFFICIAL COPY

Borrower's failure to repay the Note pursuant to Section 2; (iii) on the filing regarding the Borrower of any voluntary or involuntary petition for relief under the United States Bankruptcy Code; (iv) on the execution by Ice, Viva, or the HH Trust of an assignment for the benefit of creditors or the appointment of a receiver, custodian, trustee, or similar party to take possession of any assets or property; (v) default shall be made in the due observance or performance of any covenant, condition, or agreement contained in this Note or the Security Agreement any Transaction Document (other than those specified in clauses (i) or (ii) above) and such default shall continue unremedied for a period of five (5) business days after notice thereof, or (vi) Borrower pledges the Collateral or without Payee's written consent, or any encumbrance of any kind or character attaches on the Collateral.

### 8.    SUCCESSORS AND ASSIGNS

All references in this Note to Company and Payee shall be deemed to include, as applicable, a reference to their respective successors and assigns.  The provisions of this Note shall be binding and inure to the benefit of the successors and assigns of the Borrower and Payee.

### 9.    NOTICE

All notice or other communication provided for herein or given hereunder to a party hereto shall be in writing and shall be given in person or by overnight courier to the respective party as follows:

If to Borrower:
Ice Embassy, Inc.
C/O Dakota Fontenot
3414 Old Richmond Road
Rosenberg, Texas 77471

Viva Las Vegas Properties, Inc.
C/O Dakota Fontenot
3414 Old Richmond Road
Rosenberg, Texas 77471

Holli Ann Hardin Trust Number One
C/O Successor Trustee, Linda Goehrs
1401 Truxillo St.
Houston, TX 77004-3957

With Copy to:

Beik Law Firm, PLLC
917 Franklin Street, STE 220
Houston, Texas 77002

If to Payee:

4

Name:  PL Partners LLP
36A2-37A Dronningens Gade
St. Thomas, VI 00802
ashenaq@gmail.com

## 10.    GOVERNING LAW

This Note shall be governed by and construed in accordance with the laws of the United States Virgin Islands (without regard to principles of conflicts of law) and the applicable laws of the United States of America. This Agreement has been entered into in St. Thomas, USVI, and it shall be performable for all purposes in St. Thomas, USVI.

## 11.    WAIVER OF JURY TRIAL / ARBITRATION

Any controversy or claim arising out of or relating to this Note or any other Transaction Document, or the breach thereof, whether in contract, tort or statute, shall be settled by confidential arbitration in St. Thomas, US Virgin Islands administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction. For the avoidance of doubt, Borrower and Payee agree that even claims for emergency equitable relief, such as a temporary restraining order, may be sought only in arbitration pursuant to this Section 9. The arbitrator will have the authority to: (a) compel adequate discovery for the resolution of the dispute, (b) award any and all remedies that any Party would be entitled to seek in a court of law, and (c) determine its own jurisdiction by interpreting the scope of this arbitration clause and whether a controversy or claim arises out of or relates to this Note. Notwithstanding the foregoing, this Section 9 shall not limit the right of Payee, as a secured party, to: (i) exercise self-help remedies, such as but not limited to, setoff; (ii) initiate judicial or non-judicial foreclosure against any real or personal property collateral; (iii) exercise any judicial or power of sale rights; or (iv) to act in a court of law to obtain an interim remedy, such as but not limited to, writ of possession or appointment of a receiver, or additional or supplementary remedies. By agreeing to binding arbitration, the Parties irrevocably and voluntarily waive any right they may have to a trial by jury in respect of any claim. Furthermore, without intending in any way to limit this agreement to arbitrate, to the extent any claim is not arbitrated, the Parties irrevocably and voluntarily waive any right they may have to a trial by jury in respect of such claim. WHETHER THE CLAIM IS DECIDED BY ARBITRATION OR BY TRIAL BY A JUDGE, THE PARTIES AGREE AND UNDERSTAND THAT THE EFFECT OF THIS AGREEMENT IS THAT THEY ARE GIVING UP THE RIGHT TO TRIAL BY JURY TO THE EXTENT PERMITTED BY LAW.

## 12.    ENTIRE AGREEMENT

This Note constitutes the final, complete, and exclusive statement of agreement of the Parties with respect to the subject matter hereof and supersedes any and all other prior and contemporaneous agreements and understandings, both written and oral, between the Parties.

5

## 13. USURY

If any interest paid on this Note is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note or refunded to the extent insufficient principal remains outstanding.

THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY SATE AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER SUCH ACT AND/OR APPLICABLE STATE SECURITIES LAWS, OR UNLESS COMPANY HAS RECEIVED AN OPINION OF COUNSEL OR OTER EVIDENCE, REASONABLEY SATISFACOTRY AS TO THE CORPORATION ANDITS COUNSEL, THAT SUCH REGISTRATION IS NOT REQUIRED. THIS NOTE IS SUBJECT TO TRANSFER RESTRICTIONS.

## 14. NO IMPLIED WAIVER

The Parties failure to exercise any right or remedy provided in this Note shall not be construed as a waiver of any future exercise of that right or exercise of any other right or remedy to which the Parties may be entitled.

## 15. COLLECTION COSTS AND ATTORNEY'S FEES

Company agrees to pay any and all costs incurred by the Payee in collecting sums payable under this Note, including reasonable attorney's fees and court costs in addition to other amounts due, without any protest of any kind.

## 16. SEVERABILITY

If one or more of the provisions of this Note shall be declared or held to be invalid, illegal, or unenforceable in any respect in any jurisdiction, the validity, legality, and enforceability of the remaining provisions hereof shall not in any way be affected or impaired thereby and such declaration or holding shall not invalidate or render unenforceable such provision in any jurisdiction.

## 17. HEADINGS

Headings used in this Note are provided for convenience only and shall not be used to construe meaning or intent.

SIGNATURE PAGE FOLLOW:

6

IN WITNESS WHEREOF, the Parties have executed this Note as of the Effective Date first written above.

BORROWER:                              ICE EMBASSY, INC.


By:_____

Print:_____

Title:_____


BORROWER:                              VIVA LAS VEGAS PROPERTIES, INC.


By:_____

Print:_____

Title:_____

UNOFFICIAL COPY

BORROWER:                              HOLLI ANN HARDIN TRUST NUMBER ONE

By: *Linda Gochas*

Print: Linda Gochas

Title: Temporary Successor Trustee of the Holli Ann Hardin Trust Number One


BORROWER:                              DAKOTA FONTENOT


By:_____

Print:_____

Title:_____


7

PAYEE:                                         PL PARTNERS LLP

                                               By:_____

                                               Print:_____

                                               Title:_____

8

## SECURITY AGREEMENT

This Security Agreement (as amended, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this "**Agreement**") is executed as of March 21, 2025, by and between Ice Embassy, Inc., a Texas corporation ("Ice"), Viva Las Vegas Properties, Inc. ("Viva"), Holli Ann Hardin Trust Number One (the "HH Trust") and Dakota Fontenot (Fontenot, Ice, Viva, HH Trust and Fontenot, collectively "Pledgor") in favor of PL Partners LLP, a Virgin Islands limited liability partnership (collectively, with its successors and assigns, the "**Secured Party**"). Capitalized terms used but not otherwise defined herein have the meaning given to them in that certain Promissory Note, dated as of the date of this Agreement, between Secured Party, as Payee, and Pledgor, as Borrower (as amended or otherwise modified from time to time, the "**Promissory Note**").

1.     THE SECURITY. Pledgor hereby assigns and grants to Secured Party a security interest in the following described property now owned or hereafter acquired by Pledgor (collectively, the "**Collateral**"):

(a)     All right, title and interest in and to any Proceeds; for purposes of this Agreement, the following terms shall have the following meanings:

(i) "**Proceeds**" means any and all proceeds, receivables, property, cash, and other consideration payable to, or on behalf of, Pledgor in connection with the Litigation (whether by suit, judgment, settlement, or otherwise), including (a) any recovered attorneys' fees and costs, (b) any consequential, actual, punitive, exemplary, or treble damages on account thereof, and (c) any interest awarded or later accruing on the foregoing. The Proceeds will be calculated and determined without taking into consideration and prior to deduction of (i) any taxes payable by Pledgor in connection with the Proceeds, (ii) setoffs of any kind, including setoffs in respect of any claim or counterclaim asserted against Pledgor by any entity, or (iii) fees and/or expenses incurred in connection with the Litigation or the collection of any Proceeds.

(ii) "**Litigation**" means civil action Nos. 4:24-cv-01461 *Entertainment Marketing & Management, Ltd., Ice Embassy Inc., HFR Enterprises, Inc. and Linda C. Goehrs, Esq., as Trustee for the Holli Ann Hardin Trust Number One vs. Holli H. Fontenot*; in the United States District Court in the Southern District of Texas, Houston Division and Cause No. 22-DCV-294515, Entertainment Marketing & Management, Ltd. and Ice Embassy, Inc. v. Holli H. Fontenot, as Executrix of the Estate of Dallas Joseph Fontenot, Jr., Deceased, In the 434th Judicial District Court of Fort Bend, County, including the same matters if transferred to any other jurisdictions or forums (arbitral, judicial, or otherwise), any related judicial proceedings against Holli H. Fontenot, or any of their respective affiliates, together with (a) any and all claims, suits, causes of action, proceedings, and other rights relating to, or arising from, such matters, (b) any and all appellate proceedings, proceedings on remand, and enforcement, ancillary, parallel, or alternate dispute resolution proceedings and processes arising out of or related to such matters, and (c) any additional cases, lawsuits, arbitration matters, or other proceedings filed or initiated by or on behalf of either Pledgor against Holli H. Fontenot, or any of their respective affiliates based upon the same or substantially similar claims.

- 1 -

(b)     the 9.288 acres of real property situated in Fort Bend County Texas known as 2511 and 2543 Spur 529 Rosenberg, TX 77471 more specifically described as 0485 C N Simpson, Block 12, Tract 5, Acres 2.457; 0485 C N Simpson, Block 12, Tract 4, Acres 6.831.

(c)     the real property located at 3400 Old Richmond Rd. Rosenberg, TX 77471.

(d)     All substitutes or replacements for any Collateral, all cash or non-cash proceeds, products, rents, and profits of any Collateral, all income, benefits, and property receivable on account of the Collateral, all rights under letters of credit, guaranties, or other supporting obligations covering the Collateral, and any causes of action relating to the Collateral.

(e)     All books, data, and records pertaining to any Collateral, whether in the form of a writing, photograph, microfilm, or electronic media, including but not limited to any computer-readable memory and any computer hardware or software necessary to process such memory (collectively, "**Books and Records**").

2.     THE SECURED OBLIGATIONS.  The Collateral secures and will secure all Secured Obligations of Pledgor to Secured Party. "**Secured Obligations**" means all debts, obligations, and liabilities now or hereafter existing, absolute or contingent, of Pledgor to Secured Party, whether voluntary or involuntary, whether due or not due, or whether incurred directly or indirectly or acquired by Secured Party by assignment or otherwise.  Secured Obligations shall include, without limitation, all obligations of Pledgor arising under the Promissory Note.

3.     PLEDGOR'S COVENANTS.  Pledgor represents, covenants, and warrants that unless compliance is waived by Secured Party in writing:

(a) Pledgor will properly preserve the Collateral; defend the Collateral against any adverse claims and demands, except as expressly permitted hereby; and keep accurate Books and Records.

(b) Pledgor's chief executive office and the place at which the Books and Records are maintained is located in the city identified in the address specified for notices to Pledgor under this Agreement, as set forth on its signature page to this Agreement.  Pledgor shall give Secured Party at least thirty (30) days prior written notice before Pledgor changes its chief executive office or state of formation.  Pledgor will notify Secured Party in writing prior to any change in the location of any Collateral, including the Books and Records.

(c) Pledgor will notify Secured Party in writing prior to any change in Pledgor's name or business structure.

(d) Pledgor has not granted any security interest which presently is in effect, nor will it grant any security interest, in any of the Collateral except to Secured Party and will keep the Collateral free of all liens, claims, security interests, and encumbrances of any kind or nature except the security interests of Secured Party.

(e) Pledgor will promptly notify Secured Party in writing of any event which materially and adversely affects the value of the Collateral, the ability of Pledgor or Secured Party to collect or dispose of the Collateral, or the rights and remedies of Secured Party in

-2-

relation thereto, including, but not limited to, the levy of any legal process against any Collateral and the adoption of any marketing order, arrangement, or procedure affecting the Collateral, whether governmental or otherwise.

(f)    Unless and until Secured Party exercises its rights to make collection thereof, Pledgor will diligently collect all Collateral.

(g) Pledgor shall cause all Proceeds to be paid in accordance with the terms of the Promissory Note to Secured Party on account of the Secured Obligations until the Secured Obligations are paid in full.

(h)    Pledgor will at its own expense protect and defend all rights in the Collateral against any material claims and demands of all persons and entities other than Secured Party.

4.  ADDITIONAL OPTIONAL REQUIREMENTS. Pledgor agrees that Secured Party may at its option at any time, upon reasonable notice, whether or not Pledgor is in default in respect of the Secured Obligations or under this Agreement:

(a)  Require Pledgor to deliver to Secured Party (i) copies of or extracts from the Books and Records, and (ii) information on any contracts or other matters affecting the Collateral.

(b)  Examine the Collateral, including the Books and Records, and make copies of or extracts from the Books and Records, and for such purposes enter at any reasonable time during normal business hours upon reasonable notice (in any event not less than 5 business days prior written notice if no Event of Default has occurred and is continuing) upon the property where any Collateral or any Books and Records are located.

(c)  Following the occurrence and continuance of an Event of Default, notify any account debtors, any buyers of the Collateral, or any other persons or entities of Secured Party's interest in the Collateral and direct such person(s) or entity(ies) to forward all payments and proceeds of such Collateral directly to Secured Party for application against the Secured Obligations.

5.  DEFAULTS.  Any Event of Default (as such term is defined in the Promissory Note) shall constitute a default hereunder.

6. SECURED PARTY'S REMEDIES AFTER DEFAULT. In the event of any default, Secured Party may do any one or more of the following, to the extent permitted by law:

(a)  Declare any Secured Obligations immediately due and payable, without notice or demand.

(b)  Enforce the security interests given hereunder pursuant to the Uniform Commercial Code and any other applicable law.

(c)  Require Pledgor to segregate all collections and proceeds of the Collateral so that they are capable of identification and deliver daily such collections and proceeds to Secured Party in kind for application against the Secured Obligations.

(d)  Require Pledgor to direct (or Secured Party itself may direct) all account debtors to forward all payments and proceeds of the Collateral directly to Secured Party for application against the Secured Obligations.

(e)  Require Pledgor to assemble the Collateral, including the Books and Records, and make them available to Secured Party at a place designated by Secured Party.

(f)  With reasonable notice, enter upon the property where any Collateral, including any Books and Records, is located and take possession of such Collateral and such Books and Records, if Secured Party deems such use necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral.

(g)  Demand and collect any payments on and proceeds of the Collateral. In connection therewith, Pledgor irrevocably authorizes Secured Party to endorse or sign Pledgor's name on all checks, drafts, collections, receipts, and other documents, and to take possession of and open the mail addressed to Pledgor and remove therefrom any payments and proceeds of the Collateral for application against the Secured Obligations.

(h)  Grant extensions and compromise or settle claims with respect to the Collateral for less than face value, all without prior notice to Pledgor.

(i)  Have a receiver appointed by any court of competent jurisdiction to take possession of the Collateral.  Pledgor hereby consents to the appointment of such a receiver and agrees not to oppose any such appointment.

(j)  Take such measures as Secured Party may deem necessary or advisable to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, and Pledgor hereby irrevocably constitutes and appoints Secured Party as Pledgor's attorney-in-fact to perform all acts and execute all documents in connection therewith.

(k)  Without notice or demand to Pledgor, set off and apply against any and all of the Secured Obligations any and all deposits (general or special, time or demand, provisional or final) and any other obligations, at any time held or owing by Secured Party or any of Secured Party's agents or affiliates to or for the credit or the account of Pledgor or any other person or entity obligated under any of the Secured Obligations.

(l)  Exercise any other remedies available to Secured Party at law or in equity.

7. DISPUTE RESOLUTION PROVISION.  This Section 7, including the subsections below, is referred to as the "**Dispute Resolution Provision**."  This Dispute Resolution Provision is a material inducement for the parties entering into this Agreement.

(a)  Any claims, whether arising in contract, tort, or by statute, including but not limited to controversies or claims that arise out of or relate to: (i) this Agreement (including any renewals, extensions, or modifications hereof) or (ii) any document related to this Agreement (a "**Claim**"), shall be resolved by binding confidential arbitration pursuant to Section 11 of the Promissory Note.

- 4 -

(b)  By agreeing to binding arbitration, the parties irrevocably and voluntarily waive any right they may have to a trial by jury in respect of any Claim.  Furthermore, without intending in any way to limit this agreement to arbitrate, to the extent any Claim is not arbitrated, the parties irrevocably and voluntarily waive any right they may have to a trial by jury in respect of such Claim.  WHETHER THE CLAIM IS DECIDED BY ARBITRATION OR BY TRIAL BY A JUDGE, THE PARTIES AGREE AND UNDERSTAND THAT THE EFFECT OF THIS AGREEMENT IS THAT THEY ARE GIVING UP THE RIGHT TO TRIAL BY JURY TO THE EXTENT PERMITTED BY LAW.

8.  CERTAIN WAIVERS.  To the extent permitted by applicable law, Pledgor agrees that it will not at any time insist upon or plead, or in any manner claim or take any advantage of, any stay, exemption, or extension law or any so-called "Moratorium Law" now or at any time hereafter in force providing for the valuation or appraisement of any Collateral, prior to any sale(s) thereof to be made pursuant to this Agreement or applicable law; or, after any such sale, claim or exercise any rights to redeem the property so sold, or any part thereof, or relating to the marshalling thereof, upon foreclosure sale or other enforcement of this Agreement or under applicable law.  To the extent permitted by applicable law and without limiting the foregoing, Pledgor expressly waives any and all rights of reinstatement and redemption, if any, and agrees that Pledgor will not hinder, delay, or impede the execution of any right, power, or remedy of Secured Party under this Agreement or applicable law.

9.  MISCELLANEOUS.

(a)  Any waiver, express or implied, of any provision of this Agreement and any delay or failure by Secured Party to enforce any provision hereof shall not preclude Secured Party from enforcing any such provision thereafter.

(b)  Pledgor shall, at the request of Secured Party, execute such other agreements, documents, instruments, or financing statements in connection with this Agreement as Secured Party may reasonably deem necessary to effect the terms of this Agreement. Pledgor hereby authorizes Secured Party to file all financing statements (including those which describe the Collateral generally as all receivables and similar rights to payment), amendments thereto, continuations thereof, or other documents in such jurisdictions as deemed necessary or desirable by Secured Party, or to take other action, in order to perfect the security interests granted by this Agreement. Upon the payment in full of the Secured Obligations, (i) this Agreement shall automatically terminate without further action by the parties and (ii) Secured Party shall execute and/or deliver (at Pledgor's expense) any and all termination statements, releases and other written instruments reasonably requested by Pledgor to give effect to such termination and to release the Collateral from the security interest herein granted to Secured Party.

(c)  This Agreement is governed by and shall be interpreted according to federal law and the laws of New York.  If state or local law and federal law are inconsistent, or if state or local law is preempted by federal law, federal law governs.  If Secured Party has greater rights or remedies under federal law, this subsection shall not be deemed to deprive Secured Party of such rights and remedies as may be available under federal law.  Jurisdiction and venue for any action or proceeding to enforce this Agreement shall be the forum appropriate for such action or proceeding against Pledgor, to which jurisdiction Pledgor irrevocably submits and to which venue Pledgor waives to the fullest extent permitted by law any defense asserting an inconvenient forum in connection therewith.

UNOFFICIAL COPY

- 5 -

(d)  All rights and remedies herein provided are cumulative and not exclusive of any rights or remedies otherwise provided by the Promissory Note or by law.  Any single or partial exercise of any right or remedy shall not preclude the further exercise thereof or the exercise of any other right or remedy.

(e)  Except with respect to those capitalized terms used herein that are defined in the Promissory Note, all terms not defined herein are used as set forth in the Uniform Commercial Code.

(f)  In the event of any action by Secured Party to enforce this Agreement or to protect the security interest of Secured Party in the Collateral, or to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, Pledgor agrees to pay immediately the costs and expenses thereof, together with reasonable attorneys' fees and allocated costs for in-house legal services to the extent permitted by law.

(g)  In the event Secured Party seeks to take possession of any or all of the Collateral by judicial process, Pledgor hereby irrevocably waives any bonds and any surety or security relating thereto that may be required by applicable law as an incident to such possession and waives any demand for possession prior to the commencement of any such suit or action.

(h)  This Agreement shall constitute a continuing agreement, applying to all future as well as existing transactions, whether or not of the character contemplated at the date of this Agreement, and if all transactions between Secured Party and Pledgor shall be closed at any time, shall be equally applicable to any new transactions thereafter.

(i)  Secured Party's rights hereunder shall inure to the benefit of its successors and permitted assigns as are permitted in the Promissory Note.  In the event of any assignment or transfer by Secured Party of any of the Secured Obligations or the Collateral, Secured Party thereafter shall be fully discharged from any responsibility with respect to the Secured Obligations or Collateral so assigned or transferred, but Secured Party shall retain all rights and powers hereby given with respect to any of the Secured Obligations or Collateral not so assigned or transferred.  All representations, warranties, and agreements of Pledgor shall be binding upon the successors and assigns of Pledgor.

(j)  None of the terms or provisions of this Agreement may be amended, modified, supplemented, terminated or waived, and no consent to any departure by Pledgor therefrom shall be effective unless the same shall be in writing and signed by Secured Party and Pledgor, and then such amendment, modification, supplement, waiver or consent shall be effective only in the specific instance and for the specific purpose for which made or given.

(k)  Pledgor agrees that the Collateral may be sold as provided for in this Agreement and expressly waives any rights of notice of sale, advertisement procedures, or related provisions granted under applicable law, including the New York Lien Law.

(m)  In the event of a conflict between the terms of this Agreement and the Promissory Note, the terms of the Promissory Note shall govern and control for all purposes.

10. <u>FINAL AGREEMENT</u>. BY SIGNING THIS DOCUMENT, EACH PARTY REPRESENTS AND AGREES THAT: (A) THIS DOCUMENT, TOGETHER WITH THE PROMISSORY NOTE AND ALL OTHER TRANSACTION DOCUMENTS, REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS DOCUMENT, TOGETHER WITH THE PROMISSORY NOTE AND ALL OTHER TRANSACTION DOCUMENTS, SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS DOCUMENT, TOGETHER WITH THE PROMISSORY NOTE AND ALL OTHER TRANSACTION DOCUMENTS, MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.

[Signature Page Follows]

- 7 -

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first written above.

SECURED PARTY:

PL PARTNERS LLP,
a Virgin Islands limited liability partnership


By: _____
Name: Amir Shenaq
Title:   Partner

**Address for Notices for Secured Party:**
PL Partners LLP
36A2-37A Dronningens Gade
St, Thomas, VI 00802
Attention:   Amir Shenaq
Telephone: (832) 867-2959
Email:        ashenaq@gmail.com

PLEDGOR:

ICE EMBASSY, INC.


By:_____

Print:_____

Title:_____


VIVA LAS VEGAS PROPERTIES, INC.


By:_____

Print:_____

Title:_____


HOLLI ANN HARDIN TRUST NUMBER ONE

UNOFFICIAL COPY

- 8 -

By: _Linda Gochus_

Print: _Linda Gochrs_

Title: _Temporary Successor Trustee of the Holli Ann Hardin Trust Number One_

DAKOTA FONTENOT

By:_____

Print:_____

Title:_____

- 9 -

LINDA GOEHRS, IN HER CAPACITY AS TRUSTEE OF THE HOLLI ANN HARDIN TRUST NUMBER ONE
Plaintiff,

v.

DAKOTA FONTENOT,
Defendant.

Case 4:26-cv-02743    Document 6    Filed 04/29/26 in TXSD    Page 361 of 1053

EXHIBIT

F

537721

Probate Court No. 1

## VIVA LAS VEGAS PROPERTIES, INC.

### UNANIMOUS JOINT WRITTEN CONSENT OF THE
### SOLE SHAREHOLDER AND SOLE DIRECTOR

### IN LIEU OF A SPECIAL MEETING

May 1⁷, 2023

The undersigned, being the sole shareholder (the "*Shareholder*") and the sole member of the Board of Directors (the "*Board*") of **VIVA LAS VEGAS PROPERTIES, INC.**, a Texas corporation (the "*Corporation*"), in lieu of holding a special meeting of the Shareholder and the Board, the call and notice of each of which are hereby expressly waived, do hereby consent to the following resolutions:

**Loss or Destruction of Corporate Records**

**WHEREAS**, the Corporation was formed as a Texas Corporation by filing of Articles of Incorporation (the "*Articles*") with the Texas Secretary of State on September 20, 1994 (the "*Formation*");

**WHEREAS**, subsequent to the Formation, all corporate records of the Corporation were maintained by or on the behalf of Dallas Joseph Fontenot, Jr. ("*Mr. Fontenot*");

**WHEREAS**, Mr. Fontenot died on September 3, 2021, and since such date, no corporate records of the Corporation have been located after a diligent search by his heirs and authorized affiliates; and

**WHEREAS**, the Shareholder and the Board desire to create new corporate records to govern the affairs of the Corporation, effective as of the date first set forth above to, among other things, replace the original records of the Corporation which have been lost or misplaced, elect the sole member of the Board, elect officers, adopt new Bylaws, and adopt and reflect the issuance of new share certificates (collectively, the "*New Records*").

**RESOLVED**, that New Records shall be obtained and adopted to replace any records of the Corporation which may be in existence, as of the date first written above.

**Election of Directors**

**WHEREAS**, the Shareholder desires to reconstitute the Board of the Corporation and remove any members of the Board which may have been previously elected.

008402\00002\3535058.1 - 5/17/2023 12:45:19 PM

1

**RESOLVED**, that the following named person be, and hereby is, elected to serve as a member of the Board, and to serve in such capacity until his respective successor has been duly elected and qualified, or until his earlier death, resignation or removal:

Dakota Fontenot

**FURTHER RESOLVED**, that any member of the Board not listed above is hereby removed from the Board.

## Election of Officers

**WHEREAS**, immediately following the reconstitution of the Board, the Board desires to reconstitute the officers of the Corporation and remove any officers which may have been previously elected.

**RESOLVED**, that the following named person be, and hereby is, elected to the offices set forth opposite his name, to serve in such capacity until his successor is duly elected and qualified or until his earlier death, resignation or removal:

Dakota Fontenot                    President and Secretary

**FURTHER RESOLVED**, that the officer is empowered to carry out the day-to-day business of the Corporation, subject to the direction and control of the Board.

**FURTHER RESOLVED**, that any officer of the Corporation not listed above is hereby removed from any such office they may have held with the Corporation.

## Corporate Records

**WHEREAS**, the corporate records of the Corporation, including its minute book cannot be located, and as such the Shareholder and the Board desire to create the New Records to replace the missing corporate records.

**RESOLVED**, that the Corporation shall recreate and maintain, as part of its corporate records, a minute book that shall include, but that shall not be limited to, records of the Corporation's Certificate of Formation and amendments thereto, its Bylaws and amendments thereto, minutes of all meetings of the Board, minutes of all meetings of the Shareholder, the time and the place of each such meeting, whether the meeting was regular or special, the manner in which the meeting was authorized, the notice given, the names of those present or represented at the meeting and the proceedings of each meeting; and

**FURTHER RESOLVED**, that the Secretary of the Corporation be, and hereby is, authorized and directed to procure such a replacement minute book and such other books and records as may be required by the Corporation.

2

## Articles of Incorporation

RESOLVED, that a copy of the filed Articles bearing the file stamp of the Secretary of State of Texas be inserted into the replacement minute book of the Corporation.

## Amended and Restated Bylaws

WHERAS, consistent with the adoption of New Records, and immediately following the reconstitution of the Board, the Board and Shareholder deem it advisable and in the best interests of the Corporation to enter into those certain Amended and Restated Bylaws dated as of even date herewith (the *"Amended and Restated Bylaws"*), by which any Bylaws, amendments thereto, or amendments and restatements thereof, of the Corporation shall be amended and restated in their entirety.

RESOLVED, that the form of Amended and Restated Bylaws presented to the Board and Shareholder for review be, and hereby are, approved and adopted as the Amended and Restated Bylaws of the Corporation; and

FURTHER RESOLVED, that the President of the Corporation is directed to certify a copy of the Amended and Restated Bylaws, insert them into the minute book of the Corporation, and maintain them in the principal office of the Corporation, open for inspection by the Shareholder of the Corporation at all reasonable times during office hours.

## Qualification in Other Jurisdictions

RESOLVED, that the Corporation qualify to engage in business in any state of the United States or any foreign country in which the Board determines it to be necessary or appropriate for the Corporation to qualify to do business;

FURTHER RESOLVED, that the proper officers of the Corporation be, and hereby are, authorized and directed on behalf of the Corporation to make and file such certificates, reports or other instruments as may be required by the laws of such jurisdiction to be filed for that purpose; and

FURTHER RESOLVED, that the officers of the Corporation be, and each acting separately hereby is, authorized and directed to pay all fees and expenses incident to and necessary for the qualification of the Corporation to do business in any state or foreign country.

## Licenses and Tax Permits

RESOLVED, that the officers of the Corporation be, and each acting separately hereby is, authorized and directed to obtain, in the name of the Corporation, such licenses and tax permits as may be required by any applicable federal, state, county or municipal governmental statute, ordinance or regulation for the conduct of the business of the Corporation within any jurisdiction in which the Corporation shall have qualified to do business.

## Banking Authority

**RESOLVED**, that the Secretary of the Corporation be, and hereby is, authorized and directed to select one or more financial institutions for the deposit of the Corporation's cash and securities, the deposit and collection of checks and drafts made payable to the order of the Corporation, issuance of letters of credit on behalf of the Corporation, extensions of credit, and other financial transactions on behalf of the Corporation, and to designate the names of the persons authorized to sign checks, drafts, borrowing requests and other instructions to such financial institutions on behalf of the Corporation;

**FURTHER RESOLVED**, that the Secretary of the Corporation be, and hereby is, authorized to open additional accounts with such additional financial institutions, close any accounts with financial institutions, change the names of the persons authorized to sign check, drafts, borrowing requests and other instructions on behalf of the Corporation as the Secretary deems to be necessary of convenient from time to time;

**FURTHER RESOLVED**, that the form of resolutions specified by any such financial institutions that are designated by the Secretary from time to time be, and hereby are, ratified and approved as the official resolutions of the Corporation and the persons designated from time to time by the Secretary as signatories on such accounts be, and hereby are, approved; and

**FURTHER RESOLVED**, that the Secretary of the Corporation be, and hereby is, authorized and directed to certify the adoption of the form of resolutions required by any such financial institutions from time to time designated by the Secretary and to certify the names and signatures of the persons designated by the Secretary from time to time as signatories on behalf of the Corporation.

## Adoption and Issuance of Share Certificates

**WHEREAS**, all certificates representing shares of stock in the Corporation have been lost or misplaced, and have not been recovered after a diligent search (collectively, the "*Lost Certificates*").

**WHEREAS**, the Corporation has received that certain Affidavit of Lost Stock Certificate of the Shareholder, and the Board and Shareholder believe it is in the best interest of the Corporation to reissue a certificate to the Shareholder, representing 1,000 shares of common stock (no par value) of the Corporation.

**RESOLVED**, that consistent with the adoption of the New Records, the form of share certificate attached hereto as **Exhibit A** be, and hereby is, approved and adopted as the form of share certificate representing the common stock (no par value per share) of the Corporation; and

**FURTHER RESOLVED**, that the certificates shall be consecutively numbered, beginning with the number 1; that the certificates shall bear all legends required by law to be placed on the Corporation's share certificates; and that the certificates shall only be issued in the manner and upon the conditions set forth in the Bylaws.

4

RESOLVED, that the Corporation issue shares of its Common Stock, no par value per share, to the following persons and prepare or cause to be prepared, issued, and executed a certificate representing such shares in exchange for the considerations set forth below, the receipt of which is hereby acknowledged on behalf of the Corporation, which shares, when so issued, shall be validly issued, fully paid and non-assessable, with no personal liability attaching to the ownership thereof:

| Shareholder | Shares | Consideration |
|---|---|---|
| Dakota Trust | 1,000 | $0.00 |

FURTHER RESOLVED, that the Corporation shall refuse to recognize any person other than the Shareholder as a shareholder of the Corporation, refuse to make any payment, transfer, registration, delivery or exchange called for by the Lost Certificates to any person other than the Shareholder, and refuse to take any other action pursuant to the request or demand of any person other than the Shareholder.

General Authority

RESOLVED, that the officers of the Corporation be, and each acting separately hereby is, authorized and directed to do any and all acts and things and to execute and deliver and accept delivery of, in the name of and on behalf of the Corporation, any and all instruments, agreements, consents, certificates and other documents as in their opinion, or in the opinion of counsel to the Corporation, may be necessary or appropriate in order to carry out the purposes and intent of any of the foregoing resolutions;

FURTHER RESOLVED, that any act or acts of any of the officers of the Corporation which acts would have been authorized by the foregoing resolutions, except that such acts were taken prior to the adoption of such resolutions, be, and they hereby are, severally ratified, confirmed, approved and adopted in all respects as acts in the name and on behalf of the Corporation and

FURTHER RESOLVED, that the Secretary of the Corporation be, and hereby is, authorized and directed to certify the adoption of these resolutions.

*[Balance of Page Intentionally Blank. Signature Page Follows]*

5

This Consent shall be effective as of the date hereof regardless of whether any signature occurs before, or after such date. All actions taken in this Consent shall be deemed to be taken simultaneously in the location of the Corporation's principal office on the date of this Consent.

**EXECUTED** by the undersigned to be effective as of the date first set forth above.

**SHAREHOLDER:**

**DAKOTA TRUST**

By: _____

Name: Dakota Fontenot

Title: Trustee

**DIRECTOR:**

By: _____

Name: Dakota Fontenot

UNOFFICIAL COPY

Signature Page
Unanimous Joint Written Consent of the Sole Shareholder and Sole Director
of
Viva Las Vegas Properties, Inc.

## EXHIBIT A

SPECIMEN SHARE CERTIFICATE

See attached.



LINDA GOEHRS, IN HER CAPACITY AS
TRUSTEE OF THE HOLLI ANN HARDIN
TRUST NUMBER ONE
Plaintiff,

v.

DAKOTA FONTENOT,
Defendant.

Probate Court No. 1

**EXHIBIT G**

537721

AMENDED AND RESTATED BYLAWS

OF

VIVA LAS VEGAS PROPERTIES, INC.
(the "*Corporation*")

May 19, 2023

008402\00002\3534997.1 - 5/17/2023 12:26:59 PM

## TABLE OF CONTENTS

**Page**

ARTICLE I. CAPITAL STOCK ...........................................................................................1
Section 1.01   Certificates Representing Shares ...................................................1
Section 1.02   Shareholders of Record ...............................................................1
Section 1.03   Shareholder's Change of Name or Address ..................................2
Section 1.04   Transfer of Shares........................................................................2
Section 1.05   Lost, Stolen, Mutilated or Destroyed Certificates .......................2
Section 1.06   Fractional Shares .........................................................................2

ARTICLE II. MEETINGS OF SHAREHOLDERS ...........................................................2
Section 2.01   Place of Meetings ........................................................................2
Section 2.02   Annual Meeting ...........................................................................2
Section 2.03   Special Meetings .........................................................................3
Section 2.04   Notice of Meeting........................................................................3
Section 2.05   Closing of Transfer Books and Fixing Record Date ....................3
Section 2.06   Voting List....................................................................................4
Section 2.07   Voting at Meetings ......................................................................4
Section 2.08   Quorum of Shareholders..............................................................4
Section 2.09   Officers ........................................................................................4
Section 2.10   Action by Written Consent ..........................................................4

ARTICLE III. DIRECTORS ...............................................................................................5
Section 3.01   Number and Initial Board of Directors.........................................5
Section 3.02   Term and Classification...............................................................5
Section 3.03   Removal........................................................................................5
Section 3.04   Vacancies.....................................................................................5
Section 3.05   Place of Meeting..........................................................................6
Section 3.06   Regular Meetings.........................................................................6
Section 3.07   Special Meetings .........................................................................6
Section 3.08   Quorum.........................................................................................6
Section 3.09   Compensation...............................................................................6
Section 3.10   Committees...................................................................................6
Section 3.11   Action by Written Consent...........................................................7

ARTICLE IV. OFFICERS ...................................................................................................7
Section 4.01   Officers ........................................................................................7
Section 4.02   Removal........................................................................................7
Section 4.03   Vacancies......................................................................................7
Section 4.04   Chairman of the Board .................................................................7
Section 4.05   Chief Executive Officer................................................................7
Section 4.06   President .......................................................................................8
Section 4.07   Vice President..............................................................................8
Section 4.08   Secretary.......................................................................................8
Section 4.09   Treasurer.......................................................................................9
Section 4.10   Delegation of Authority................................................................9

i

**ARTICLE V. INDEMNIFICATION AND INSURANCE** ........................................................ 9

  Section 5.01     Indemnification of Directors ........................................................ 9

  Section 5.02     Indemnification of Officers, Employees, Agents and Others ........ 12

  Section 5.03     Continuing Offer; Reliance; Effect of Amendment ..................... 12

  Section 5.04     Insurance .................................................................................... 13

  Section 5.05     Severability ................................................................................ 13

**ARTICLE VI. MISCELLANEOUS PROVISIONS** ................................................................ 13

  Section 6.01     Amendments ............................................................................... 13

  Section 6.02     Waiver ........................................................................................ 14

  Section 6.03     Telephone or Video Meetings ..................................................... 14

  Section 6.04     Offices ........................................................................................ 14

  Section 6.05     Resignations ............................................................................... 14

  Section 6.06     Seal ............................................................................................ 14

  Section 6.07     Fiscal Year ................................................................................. 14

  Section 6.08     Books and Records ..................................................................... 14

# AMENDED AND RESTATED BYLAWS
## OF
## VIVA LAS VEGAS PROPERTIES, INC.
(the "*Corporation*")

## ARTICLE I.
## CAPITAL STOCK

**Section 1.01  Certificates Representing Shares.**  The Corporation may issue uncertificated shares in accordance with the requirements of the Texas Business Organizations Code (the "*TBOC*") or may deliver certificates representing shares to which shareholders are entitled, as determined by the Board of Directors.  Any certificate representing shares of the Corporation shall be in such form as shall be approved by the Board of Directors and shall bear on its face the statement that the Corporation is organized in Texas, the name of the shareholder to whom the certificate is being issued, the name of the Corporation, the number, class and series of shares issued and the par value or a statement that the shares are without par value. Each certificate shall also contain, on its face or back, all recitations or references required by law or approved by the Board of Directors.  Certificates for shares of the Corporation shall be issued only when consideration for the shares has been fully paid.  Such certificates shall be signed by the Chief Executive Officer, President or a Vice President and the Secretary or any Assistant Secretary and may be sealed with the seal of the Corporation or a facsimile thereof.  Where any such certificate is countersigned by a transfer agent or registered by a registrar, either of which is other than the Corporation itself or an employee of the Corporation, the signatures of any such Chief Executive Officer, President or Vice President and Secretary or Assistant Secretary may be facsimiles or electronically transmitted.  In case any officer who has signed or whose facsimile or electronically transmitted signature has been placed upon such certificate shall have ceased to be such officer before such certificate is issued, it may be issued by the Corporation with the same effect as if such person were such officer at the date of its issuance.  The certificates shall be consecutively numbered and shall be entered in the books of the Corporation as they are issued.

**Section 1.02  Shareholders of Record.**  The Board of Directors of the Corporation may appoint one or more transfer agents or registrars of any class of stock of the Corporation.  Unless and until such appointment is made, the Secretary of the Corporation shall maintain, among other records, a stock certificate book, the stubs in which shall set forth the names and addresses of the holders of all issued shares of the Corporation, the number of shares held by each, the date of issue of such shares, whether or not such shares originate from original issues or from transfer, and if such shares are represented by a certificate, the certificate numbers representing such shares and the date on which such certificates were issued by the Corporation.  The names and addresses of shareholders and the number of shares held by each, as they appear on the stock transfer book shall be the official list of shareholders of record of the Corporation for all purposes.  The Corporation shall be entitled to treat the holder of record of any shares of the Corporation as the owner thereof for all purposes, and shall not be bound to recognize any equitable or other claim to, or interest in, such shares or any rights deriving from such shares, on the part of any other person, including (but without limitation) a purchaser, assignee or transferee, unless and until such other person becomes the holder of record of such shares, whether or not the Corporation shall have either actual or constructive notice of the interest of such other person.

Section 1.03  **Shareholder's Change of Name or Address.**  Each shareholder shall promptly notify the Secretary of the Corporation, at its principal business office, by written notice sent by certified mail, return receipt requested, of any change in name or address of the shareholder from that as it appears upon the official list of shareholders of record of the Corporation. The Secretary of the Corporation shall then enter such changes into all affected records of the Corporation, including, but not limited to, the official list of shareholders of record.

Section 1.04  **Transfer of Shares.**  The shares of the Corporation shall be transferable on the stock transfer book of the Corporation by the holder of record thereof, or the duly authorized attorney or legal representative of such holder of record, and, to the extent that the ownership interests of the Corporation are certificated, upon endorsement and surrender for cancellation of the certificates representing such shares. All certificates surrendered for transfer shall be cancelled and no new certificate shall be issued until a former certificate or certificates for a like number of shares shall have been surrendered and cancelled, except that in the case of a lost, stolen, mutilated or destroyed certificate, a new certificate may be issued therefor as set forth in Section 1.05 of these Bylaws.

Section 1.05  **Lost, Stolen, Mutilated or Destroyed Certificates.**  The Corporation may issue a new certificate for shares of stock in the place of any certificate theretofore issued and alleged to have been lost, stolen, mutilated or destroyed. The Board of Directors may require the holder of record of such lost, stolen, mutilated or destroyed certificate, or the legal representative of such holder of record, to furnish an affidavit as to such loss, theft, mutilation or destruction and to give a bond in such form and substance, and with such surety or sureties, with fixed or open penalty, as the Board of Directors may direct, in order to indemnify the Corporation and its transfer agents and registrars, if any, against any claim that may be made on account of any certificate alleged to be lost, stolen, mutilated or destroyed.

Section 1.06  **Fractional Shares.**  Only whole shares of the stock of the Corporation shall be issued. In case of any transaction by reason of which a fractional share might otherwise be issued, the officers of the Corporation in the exercise of powers delegated by the Board of Directors, shall take such measures consistent with the laws of the State of Texas, the Certificate of Formation and these Bylaws, including (for example, and not by way of limitation) the payment in cash of an amount equal to the fair value of any fractional share, as they may deem proper to avoid the issuance of any fractional share.

## ARTICLE II.
## MEETINGS OF SHAREHOLDERS

Section 2.01  **Place of Meetings.**  All meetings of shareholders shall be held at the principal place of business of the Corporation or at such other place within or without the State of Texas as shall be specified or fixed in the notices or waivers of notice thereof.

Section 2.02  **Annual Meeting.**  Annual meetings of the shareholders shall be held, commencing in 2024, on the first Tuesday of January each year at such hour as may be designated in the notice of the meeting, if such day is not a legal holiday, and if a holiday, then on the first following day that is not a legal holiday. If the annual meeting is not held on the date above specified, the Board of Directors shall cause a meeting in lieu thereof to be held as soon thereafter

2

008402\00002\3534997.1 - 5/17/2023 12:26:59 PM

as convenient, and any business transacted or election held at that meeting shall be as valid as if held at the annual meeting. Failure to hold the annual meeting at the designated time shall not work a termination or dissolution of the Corporation.

Section 2.03   **Special Meetings.**  Special meetings of the shareholders may be called at any time by the President or the Board of Directors. Special meetings of shareholders shall be called by the Secretary upon the written request of the holders of at least ten percent (10%) of the outstanding stock entitled to be voted at such meeting stating the purpose or purposes of such meeting and the matters proposed to be acted on thereat.

Section 2.04   **Notice of Meeting.**  Written notice of all meetings, stating the place, day and hour of the meeting and in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than ten (10) nor more than sixty (60) days before the meeting, either personally or by mail, by or at the direction of the President or, if the meeting is called by the Board of Directors or the holders of the requisite number of shares of the Corporation, by or at the direction of the Secretary, to each shareholder of record entitled to vote at such meeting. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail addressed to the shareholder at the address as it appears on the stock transfer book of the Corporation, with postage thereon prepaid. Notice for an adjourned meeting is not necessary unless the meeting is adjourned for thirty (30) days or more, in which case, notice of the adjourned meeting shall be given as in the case of any special meeting. Any notice required to be given to any shareholder under Chapter 21 of the TBOC, the Certificate of Formation or these Bylaws need not be given to the shareholder if (i) notice of two consecutive annual meetings and all notices of meetings held during the period between those annual meetings, if any, or (ii) all (but in no event less than two) payments (if sent by first class mail) of distributions on securities during a twelve (12) month period have been mailed to that person, addressed at such person's address as shown on the records of the Corporation, and have been returned undeliverable. Any action or meeting taken or held without notice to such a person shall have the same force and effect as if the notice had been duly given and, if the action taken by the Corporation is reflected in any certificate or document filed with the Texas Secretary of State, that certificate or that document may state that notice was duly given to all persons to whom notice was required to be given. If such a person delivers to the Corporation a written notice setting forth such person's then current address, the requirement that notice be given to that person shall be reinstated.

Section 2.05   **Closing of Transfer Books and Fixing Record Date.**  The Board of Directors may fix, in advance, a date as the record date for the purpose of determining shareholders entitled to notice of, or to vote at, any meeting of shareholders or any adjournment thereof, or shareholders entitled to receive any distribution, dividend or the allotment of any other rights, or in order to make a determination of shareholders for any other proper purpose. Such date, in any case, shall be not more than sixty (60) days, and in the case of a meeting of shareholders not less than ten (10) days, prior to the date on which the particular action requiring such determination of shareholders is to be taken. In lieu of fixing a record date, the Board of Directors may provide that the stock transfer book shall be closed for a stated period, but not to exceed, in any case, sixty (60) days. If the stock transfer book is closed for the purpose of determining shareholders entitled to notice of, or to vote at, a meeting of shareholders, such book shall be closed for at least ten (10) days immediately preceding such meeting.

3

**Section 2.06**  **Voting List.**  The officer or agent having charge of the stock transfer book of the Corporation shall make, at least ten (10) days before each meeting of shareholders, a complete list of the shareholders entitled to vote at such meeting or any adjournment thereof, arranged in alphabetical order, with the address of, and the number of shares held by, each shareholder, which list, for a period of ten (10) days prior to such meeting, shall be kept on file at the registered office of the Corporation and shall be subject to inspection by any shareholder at any time during usual business hours. Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any shareholder during the whole time of the meeting. The original stock transfer book shall be prima facie evidence as to the identity of the shareholders entitled to examine such list or transfer books or to vote at any meeting of shareholders. Failure to comply with any requirements of this Section 2.06 shall not affect the validity of any action taken at such meeting.

**Section 2.07**  **Voting at Meetings.**  Any holder of shares of the Corporation entitled to vote shall be entitled to one vote for each such share, either in person or by proxy executed in writing by such holder or by such holder's duly authorized attorney in fact. Voting on any resolution at the meeting shall be by voice, unless any shareholder demands a ballot vote before the voting begins. No proxy shall be valid after eleven months from the date of its execution unless otherwise provided in the proxy. Each proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest, including the appointment as proxy of (i) a pledgee, (ii) a person who purchased or agreed to purchase, or owns or holds an option to purchase, the shares, (iii) a creditor of the Corporation who extended its credit under terms requiring the appointment, (iv) an employee of the Corporation whose employment contract requires the appointment, or (v) a party to a voting agreement created under Chapter 21 of the TBOC. A revocable proxy shall be deemed to have been revoked if the Secretary of the Corporation shall have received at or before the meeting instructions or revocation or a proxy bearing a later date, which instructions or proxy shall have been duly executed and dated in writing by the shareholder.

**Section 2.08**  **Quorum of Shareholders.**  The holders of a majority of shares entitled to vote, represented in person or by proxy, shall constitute a quorum at a meeting of shareholders, but, if a quorum is not represented, the holders of a majority of shares entitled to vote then represented in person or proxy, though less than a quorum, may adjourn the meeting from time to time, without notice of adjournment other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting, at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally notified. The vote of the holders of a majority of the shares entitled to vote, and, thus represented, at a meeting at which a quorum is present, shall be the act of the shareholders' meeting, unless the vote of a greater number is required by law, the TBOC, the Certificate of Formation or these Bylaws.

**Section 2.09**  **Officers.**  The President shall preside at, and the Secretary shall keep the records of, each meeting of shareholders. In the absence of either such officer, his or her duties shall be performed by another director or officer of the Corporation appointed at the meeting.

**Section 2.10**  **Action by Written Consent.**  Any action that may be taken at a regular or special meeting of the shareholders may be taken without a meeting if a consent in writing, setting

4

forth the actions to be taken, shall be signed by the shareholders holding the number of shares entitled to vote at that meeting that would be required to approve such action at a meeting at which shareholders representing all issued and outstanding shares entitled to vote on such action are in attendance, and such consent shall have the same force and effect as a duly called meeting at which all shares entitled to vote on such action are represented in person or by proxy. No notice shall be required in connection with the use of a written consent pursuant to this Section, but a copy of each approved written consent shall be promptly provided in writing to each shareholder who would have been entitled to vote on such matter had a regular or special meeting been called.

## ARTICLE III.
## DIRECTORS

Section 3.01  **Number and Initial Board of Directors**. The business and affairs of the Corporation shall be managed by a Board of Directors, consisting of at least one (1) and not more than twelve (12) persons. The number of persons that make up the Board of Directors may be increased or decreased from time to time by resolution of the Board of Directors; *provided, however, that* no decrease shall have the effect of shortening the term of any incumbent director. The initial Board of Directors shall consist of the persons named in the Certificate of Formation.

Section 3.02  **Term and Classification**. Each director shall serve in such capacity until the next annual meeting of shareholders or until such director's earlier death, resignation or removal. If the Board of Directors at any time consists of more than five (5) persons, the Board of Directors may, by resolution of the Board of Directors, divided itself into two (2) or more classes that are as nearly equal in size as possible, with each class to serve for a term expiring on the first, second or third following annual meeting of shareholder, as set forth in such resolution. The Board of Directors may, by resolution of the Board of Directors, dissolve any class previously adopted by the Board of Directors and assign the members of any class to any other class whose term expires before the expiration of the term of the dissolved class.

Section 3.03  **Removal**. Any or all directors may be removed, for or without cause, at a special meeting of the shareholders called for such purposes. The removal of a director or directors shall require the affirmative vote of the shareholders holding a majority of the shares entitled to vote for the election such director or directors.

Section 3.04  **Vacancies**. Any vacancy occurring in the Board of Directors, whether occurring as a result the death, resignation or removal of a director, an increase in the size of the Board of Directors or otherwise, may be filled at an annual meeting of the shareholders or at a special meeting of the shareholders called for such purpose or, if the shareholders fail to fill any such vacancy within thirty (30) days, by the affirmative vote of the remaining directors though less than a quorum. If the number of candidates is less than or equal to the number of vacancies then existing on the Board of Directors, the election of a person to fill each such vacancy shall be by the affirmative vote of the shareholders holding a majority of the shares entitled to vote on the election of such director or directors. If there are more candidates for election than there are vacancies to be filled, the election of a persons to fill such vacancy or vacancies shall by the affirmative vote of the shareholders holding a plurality of the votes cast for such director or directors notwithstanding that such number is less than a majority of the shares entitled to vote on

5
008402\00002\3534997.1 - 5/17/2023 12:26:59 PM

such election of such directors. Cumulative voting shall not be allowed in connection with the election of any director.

Section 3.05    **Place of Meeting.** Meetings of the Board of Directors may be held either within or without the State of Texas, at whatever place is specified by the person calling the meeting.

Section 3.06    **Regular Meetings.** The Board of Directors shall meet each year immediately following the annual meeting of the shareholders, at the place of such meeting of the shareholders, for the election of directors whose term expired at such meeting and the transaction of such other business as may properly be brought before it. The Board of Directors may designate other times for the conduct of regular meetings of the Board of Directors. No notice of annual meetings or regular meetings for which the Board of Directors has designated a time need be given to members of the Board of Directors.

Section 3.07    **Special Meetings.** Special meetings of the Board of Directors may be held at any time upon the call of the President or any director of the Corporation. Notice shall be sent by mail, email or facsimile transmission to the last known physical address, email address or facsimile number of each director at least three (3) days before the meeting. Oral notice (including oral notice recorded by voicemail or other recording device under the control of any director) may be substituted for such written notice if given at least twenty-four (24) hours before the meeting. Notice of the time, place and purpose of such meeting may be waived in writing before or after such meeting and such waiver shall be equivalent to the giving and receipt of notice. Except with respect to the removal or election of directors, neither the business to be transacted at, nor the purpose of, any special meeting of the Board of Directors need be specified in the notice or waiver of notice of such meeting.

Section 3.08    **Quorum.** A majority of the number of directors then duly elected and serving (though less than the number of directors that make up the full Board of Directors) shall constitute a quorum for the transaction of business. The act of a majority of the directors present at any meeting at which a quorum is present shall be the act of the Board of Directors. Any regular or special directors' meeting may be adjourned from time to time by those present, whether a quorum is present or not.

Section 3.09    **Compensation.** Directors as such shall not receive any stated salary for their services, but, by resolution of the Board of Directors, a fixed sum and expenses of attendance, if any, may be allowed for attendance at each regular or special meeting of the Board of Directors; *provided, however, that* nothing contained herein shall be construed to preclude any director from serving the Corporation in any other capacity and receiving compensation therefor.

Section 3.10    **Committees.** The Board of Directors may, by resolution, designate an executive committee and one (1) or more other committees to conduct the business and affairs of the Corporation, to the extent authorized by the resolution and subject to the restrictions of the TBOC. The Board of Directors, by majority vote, shall have the power at any time to change the powers and members of any committee, to fill vacancies and to terminate the existence of any committee. Members of any committee shall receive such compensation as the Board of Directors may from time to time provide. The designation of any committee and the delegation thereto of

6

authority shall not operate to relieve the Board of Directors, or any member thereof, of any responsibility imposed by law. Every committee so designated shall keep regular minutes of the proceedings and regularly report the minutes to the Board of Directors.

**Section 3.11    Action by Written Consent.** Any action that may be taken at a regular or special meeting of the directors or committees may be taken without a meeting if a consent in writing, setting forth the actions to be taken, shall be signed by all of the persons then serving as a director or member of such committee and entitled to vote at that meeting, and such consent shall have the same force and effect as a duly called meeting at which such persons were in attendance. No notice shall be required in connection with the use of a written consent pursuant to this Section.

## ARTICLE IV.
## OFFICERS

**Section 4.01    Officers.** The officers of the Corporation shall be elected by the Board of Directors and shall, at a minimum, consist of a President and a Secretary. The Board of Directors may elect such other officers, including, without limitation, a Chairman of the Board, a Chief Executive Officer, one or more Vice Presidents, a Treasurer, and such Assistant Secretaries and Assistant Treasurers, and appoint such other agents, as the Board of Directors may deem necessary or desirable. All officers shall have such authority as is delegated by the Board of Directors to such officers and shall hold office until their successors are elected and qualified, or until their earlier death, resignation or removal. Any two or more offices may be held by the same person. The salaries of the officers shall be determined by the Board of Directors and may be altered by the Board of Directors from time to time, except as otherwise provided by contract. All officers shall be entitled to be paid or reimbursed for all costs and expenditures incurred in the Corporation's business.

**Section 4.02    Removal.** Any officer or agent elected or appointed by the Board of Directors may be removed by the Board of Directors whenever, in its judgment, the best interests of the Corporation will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed. Election or appointment of an officer or agent shall not of itself create contract rights.

**Section 4.03    Vacancies.** Whenever any vacancies shall occur in any office by death, resignation, increase in the number of officers of the Corporation, removal by the Board of Directors or otherwise, the same shall be filled by the Board of Directors, and the officer so elected shall hold such office until his successor is chosen and qualified or until his earlier death, resignation or removal by the Board of Directors.

**Section 4.04    Chairman of the Board.** The Chairman of the Board, if there shall be such an officer, shall be elected by the Board of Directors from its membership and, if present, shall preside at all meetings of the Board of Directors and exercise and perform such other powers and duties as may from time to time be assigned to the Chairman of the Board by the Board of Directors.

**Section 4.05    Chief Executive Officer.** The Chief Executive Officer, if there shall be such an officer, shall be the principal executive officer of the Corporation and, subject to the

control of the Board of Directors, shall supervise, direct and control all other officers of the Corporation other than a Chairman of the Board. The Chief Executive Officer, if there shall be such an officer, shall preside at all meetings of the shareholders and may sign, with the Secretary or any other proper officer of the Corporation thereunto authorized by the Board of Directors, certificates for shares of the Corporation; any deeds, mortgages, bonds, contracts or other instruments which the Board of Directors has authorized to be executed, except in cases where the signing and execution thereof shall be expressly delegated by the Board of Directors or by these Bylaws to some other officer or agent of the Corporation or shall be required by law to be otherwise signed and executed; and in general shall perform all other duties as may be prescribed by the Board of Directors from time to time.

Section 4.06  **President**. The President of the Corporation shall perform the usual and customary duties that pertain to such office (but no duties or powers conferred by these Bylaws or the Board of Directors upon a Chief Executive Officer, if there shall be such an officer), including, but not limited to, managing the day-to-day business operations of the Corporation and the implementation of the Corporation's strategic plans, as set forth by the Board of Directors. In addition, the President shall perform the duties and responsibilities of the Chief Executive Officer if the Board has not elected a Chief Executive Officer or in the absence of the Chief Executive Officer if one has been elected by the Board of Directors. The President shall report directly to and be subject to the control of the Chief Executive Officer, if there shall be such an officer, and otherwise shall report to and be subject to the control of the Board of Directors.

Section 4.07  **Vice President**. The Vice President or Vice Presidents, if there shall be such an officer or officers, may perform the usual and customary duties that pertain to such office (but no duties or powers conferred by these Bylaws or the Board of Directors upon a Chief Executive Officer, if there shall be such an officer, or the President), including, but not limited to, managing those functions or areas of the day-to-day business operations of the Corporation and implementation of the Corporation's strategic plans, as set forth by the Board of Directors. In addition, the Vice President shall perform the duties and responsibilities of the President in his absence. If there be more than one Vice President, such Vice Presidents shall perform the duties and responsibilities of the President in his absence in the order designated by the Board of Directors or, if no order is designated by the Board of Directors, in the order of seniority in office. The Vice Presidents shall report directly to and be subject to the control of the Chief Executive Officer, if there shall be such an officer, the President or other officer of the Corporation as directed by the Board of Directors.

Section 4.08  **Secretary**. The Secretary shall send all required notices of and attend all meetings of the shareholders and Board of Directors and record correctly the proceedings of such meetings in a book suitable for that purpose. It shall also be the duty of the Secretary to attest with his or her signature and the seal of the Corporation all stock certificates issued by the Corporation and to keep a stock transfer book in which shall be correctly recorded all transactions pertaining to the capital stock of the Corporation. The Secretary shall attest and keep at the registered office of the Corporation the original or a copy of these Bylaws, as they may be amended, and the original of the Certificate of Formation, as it may be amended. The Secretary shall also attest with his or her signature and the seal of the Corporation all deeds, conveyances or other instruments requiring the seal of the Corporation. The person holding the office of Secretary shall also perform, under the direction and subject to the control of the Board of Directors, such other duties as may be

8

assigned to the Secretary. The duties of the Secretary may also be performed by any Assistant Secretary designated by the Board of Directors.

Section 4.09  Treasurer. The Treasurer, if there shall be such an officer, shall keep such moneys of the Corporation as may be entrusted to his or her keeping and account for the same. The Treasurer shall be prepared at all times to give information as to the financial condition of the Corporation and shall make a detailed annual report of the entire business and financial condition of the Corporation. The person holding the office of Treasurer shall also perform, under the direction and subject to the control of the Board of Directors, such other duties as may be assigned to the Treasurer. The duties of the Treasurer may also be performed by any Assistant Treasurer designated by the Board of Directors.

Section 4.10  Delegation of Authority. In the case of any absence of any officer of the Corporation or for any other reason that the Board of Directors may deem sufficient, the Board of Directors may delegate some or all of the powers or duties of such officer to any other officer or to any director, employee, shareholder or agent for whatever period of time seems desirable.

## ARTICLE V.
## INDEMNIFICATION AND INSURANCE

Section 5.01  Indemnification of Directors.

(a)    Definitions. For purposes of this Article V:

(i)    "*Expenses*" include court costs and attorneys' fees.

(ii)    "*Official Capacity*" means (A) when used with respect to a director, the office of director in the Corporation; and (B) when used with respect to a person other than a director, the elective or appointive office in the Corporation held by the officer or the employment or agency relationship undertaken by the employee or agent on behalf of the Corporation; and (C) in both clauses (A) and (B) of this Section 5.01(a)(ii), such term does not include service for any other foreign or domestic corporation or any partnership, joint venture, sole proprietorship, trust, employee benefit plan, or other enterprise.

(iii)    "*Proceeding*" means any threatened, pending, or completed action, suit, or proceeding whether civil, criminal, administrative, arbitrative, or investigative, any appeal in such an action, suit, or proceeding, and any inquiry or investigation that could lead to such an action, suit, or proceeding.

(b)    Indemnification Where a Director Has Been Wholly Successful in Proceeding. The Corporation shall indemnify a director against all reasonable expenses incurred in connection with a Proceeding in which such director is named as a defendant or respondent, if such director has been wholly successful, on the merits or otherwise, in the defense of the Proceeding.

(c)    Indemnification Where a Director Has Not Been Wholly Successful in Proceeding.

9

(i)    The Corporation shall indemnify a person who was, is, or is threatened to be made a named defendant or respondent in a Proceeding because the person is or was a director of the Corporation, if it is determined, in accordance with the procedure set out in Section 5.01(c)(iv), that the person (A) conducted himself in good faith; (B) reasonably believed (1) in the case of conduct in his Official Capacity, that his conduct was in the Corporation's best interest; and (2) in all other cases, that his conduct was not opposed to the Corporation's best interests; and (C) in the case of any criminal Proceeding, had no reasonable cause to believe his conduct was unlawful.

(ii)    The termination of a Proceeding by judgment, order, settlement, or conviction, or on a plea of nolo contendere or its equivalent, is not of itself determinative that the person did not meet the requirements set forth in Section 5.01(c)(i). A person shall be deemed to have been found liable in respect of any claim, issue or matter only after the person shall have been so adjudged by a court of competent jurisdiction after exhaustion of all appeals therefrom.

(iii)    A person may be indemnified under Section 5.01(c)(i) against judgments, penalties (including excise and similar taxes), fines, settlements, and reasonable Expenses actually incurred by the person in connection with the Proceeding; but if the person is found liable to the Corporation or is found liable on the basis that personal benefit was improperly received by the person, the indemnification (A) is limited to reasonable Expenses actually incurred by the person in connection with the Proceeding and (B) shall not be made in respect of any Proceeding in which the person shall have been found liable for willful or intentional misconduct in the performance of his Official Capacity.

(iv)    Any indemnification under Section 5.01(c)(i) shall be made by the Corporation only upon a determination that indemnification of the director is proper in the circumstances because such director met the applicable standard of conduct. Such determination shall be made (A) by the Board of Directors by a majority vote of a quorum consisting of directors who, at the time of such vote, are not named defendants or respondents in the Proceeding; (B) if such a quorum cannot be obtained, then by a majority vote of a committee of the Board of Directors, duly designated to act in the matter by a majority vote of all directors (in which designation directors who are named defendants or respondents in the Proceeding may participate), such committee to consist solely of one (1) or more directors who, at the time of the committee vote, are not named defendants or respondents in the Proceeding; (C) by special legal counsel selected by the Board of Directors or a committee thereof by vote as set forth in clauses (A) or (B) of this Section 5.01(c)(iv), or, if the requisite quorum of all of the directors cannot be obtained therefor and such committee cannot be established, by a majority vote of all of the directors (in which directors who are named defendants or respondents in the Proceeding may participate); or (D) by the shareholders in a vote that excludes the shares held by directors who are named defendants or respondents in the Proceeding.

(v)    Determination as to reasonableness of Expenses shall be made in the same manner as the determination that indemnification is proper, except that if the determination that indemnification is proper is made by special legal counsel, determination as to reasonableness of Expenses must be made in the manner specified in clause (C) of Section 5.01(c)(iv) for the selection of special legal counsel. In the event a determination is made under Section 5.01(c)(iv)

10

that a director has met the applicable standard of conduct as to some matters but not as to others, amounts to be indemnified may be reasonably prorated.

(vi)    Except to the extent permitted by Section 5.01(c)(iii), a director may not be indemnified under Section 5.01(c)(i) in respect of a Proceeding (A) in which the director is found liable on the basis that personal benefit was improperly received by him, whether or not the benefit resulted from an action taken in the director's Official Capacity; or (B) in which the person is found liable to the Corporation.

(d)    Court-ordered Indemnification.    A director may apply to a court of competent jurisdiction for indemnification from the Corporation, whether or not he has met the requirements set forth in Section 5.01(c)(i) or has been adjudged liable in the circumstances described by Section 5.01(c)(vi).  If a director of the Corporation seeks to obtain court-ordered indemnification, the Corporation and its Board of Directors shall cooperate fully with such director in satisfying the procedural steps required therefor.

(e)    Advancement of Expenses.  Reasonable Expenses incurred by a director who was, is, or is threatened to be made a named defendant or respondent in a Proceeding shall be paid or reimbursed by the Corporation at reasonable intervals in advance of the final disposition of the Proceeding, and without making any of the determinations specified in Section 5.01(c)(iv), after receipt by the Corporation of:

(i)    a written affirmation by such director of his good faith belief that he has met the standard of conduct necessary for indemnification under this Article; and

(ii)    a written undertaking by or on behalf of such director to repay the amount paid or reimbursed by the Corporation if it shall ultimately be determined that he is not entitled to be indemnified by the Corporation as authorized in this Section 5.01.  Such written undertaking shall be an unlimited general obligation of the director but need not be secured and it may be accepted by the Corporation without reference to financial ability to make repayment.

(f)    Directors as Witnesses.  The Corporation shall pay or reimburse Expenses incurred by a director in connection with his appearance as a witness or other participation in a Proceeding at a time when he is not a named as a defendant or respondent in the Proceeding.

(g)    Notice to Shareholders.  Any indemnification of or advancement of expenses to a director in accordance with this Section 5.01 shall be reported in writing to the shareholders of the Corporation with or before the notice or waiver of notice of the next shareholders' meeting or with or before the next submission to shareholders of a consent to action without a meeting and, in any case, within the twelve (12) month period immediately following the date of the indemnification or advance.

(h)    Directors' Services to Benefit Plans.  For purposes of this Section 5.01, the Corporation is deemed to have requested a director to serve an employee benefit plan whenever the performance by him of his duties to the Corporation also imposes duties on or otherwise involves service by him to the plan or participants or beneficiaries of the plan.  Excise taxes assessed on a director with respect to any employee benefit plan pursuant to applicable law are deemed fines.  Action taken or omitted by him with respect to an employee benefit plan in the

11

performance of his duties for a purpose reasonably believed by him to be in the interest of the participants and beneficiaries of the plan is deemed to be for a purpose which is not opposed to the best interests of the Corporation.

Section 5.02 **Indemnification of Officers, Employees, Agents and Others**.

(a) In General. The Corporation shall indemnify and advance Expenses to an officer, employee, or agent of the Corporation in the same manner and to the same extent as is provided by Section 5.01 for a director. An officer is entitled to seek indemnification to the same extent as a director.

(b) Indemnification for Service to Other Enterprises. The Corporation may indemnify and advance expenses to persons who are not or were not officers, employees, or agents of the Corporation but who are or were serving at the request of the Corporation as a director, officer, partner, venturer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan, or other enterprise to the same extent that it may indemnify and advance expenses to directors under this Section 5.01.

(c) Additional Rights to Indemnification. The Corporation may, at the discretion of the Board of Directors in view of all relevant circumstances, indemnify and advance expenses to a person who is an officer, employee, or agent of the Corporation and who is not a director of the Corporation or a person identified Section 5.02(b) and who is not a director of the Corporation to such further extent, consistent with law, as may be provided by the Certificate of Formation, by general or specific actions of the Board of Directors, by contract, or as permitted or required by common law.

Section 5.03 **Continuing Offer; Reliance; Effect of Amendment**. The provisions of this Article V are for the benefit of, and may be enforced by, each director, officer, employee, agent or person identified in Section 5.02(b), the same as if set forth in their entirety in a written instrument duly executed and delivered by the Corporation and such person, and constitute a continuing offer to all present and future persons occupying any such position. The Corporation, by its adoption of these Bylaws, acknowledges and agrees that each such person has relied upon and will continue to rely upon the provisions of this Article V in agreeing to serve and serving in any of the capacities referred to above; waives reliance upon, and all notices of acceptance of, such provisions by each such person and acknowledges and agrees that no present or future person occupying any such position shall be prejudiced in his right to enforce the provisions of this Article V in accordance with their terms by any act or failure to act on the part of the Corporation. No amendment, modification or repeal of this Article V or any provision hereof shall in any manner terminate, reduce or impair the right of any past, present or future director, officer, employee, agent or person identified in Section 5.02(b) to be indemnified by the Corporation, nor the obligation of the Corporation to indemnify any such person, under and in accordance with the provisions of this Article V as in effect immediately prior to such amendment, modification or repeal with respect to claims arising from or relating to matters occurring, in whole or in part, prior to such amendment, modification or repeal, regardless of when such claims may arise or be asserted.

008402\00002\3534997.1 - 5/17/2023 12:26:59 PM

**Section 5.04  Insurance.** The Corporation may purchase and maintain insurance or another arrangement on behalf of any person who is or was a director, officer, employee or agent of the Corporation or who is or was serving at the request of the Corporation as a director, officer, partner, venturer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan, or other enterprise, against any liability asserted against him and incurred by him in such a capacity or arising out of his status as such a person, whether or not the Corporation would have the power to indemnify him against that liability under this Article V. Without limiting the power of the Corporation to procure or maintain any kind of insurance or other arrangement, the Corporation may, for the benefit of persons indemnified by the Corporation; (i) create a trust fund; (ii) establish any form of self-insurance; (iii) secure its indemnity obligation by grant of a security interest or other lien on the assets of the Corporation; or (iv) establish a letter of credit, guaranty, or surety arrangement. The insurance or other arrangement may be procured, maintained, or established within the Corporation or with any insurer or other person deemed appropriate by the Board of Directors regardless of whether all or part of the stock or other securities of the insurer or other person are owned in whole or part by the Corporation. In the absence of fraud, the judgment of the Board of Directors as to the terms and conditions of the insurance or other arrangement and the identity of the insurer or other person participating in an arrangement shall be conclusive and the insurance or arrangement shall not be voidable and shall not subject the directors approving the insurance or arrangement to liability, on any ground, regardless of whether directors participating in the approval are beneficiaries of the insurance or arrangement.

**Section 5.05  Severability.** The indemnification provided by this Article V shall be subject to all valid and applicable laws, including, without limitation, Chapter 8 of the TBOC. If this Article V or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Corporation shall nevertheless indemnify each director or officer, employee, agent, or person identified in Section 5.02(b), as to Expenses, judgments, fines and amounts paid in settlement with respect to any Proceeding, to the fullest extent permitted by any applicable portion of this Article V that shall not have been invalidated and to the fullest extent permitted by applicable law. If any provision hereof should be held by a court of competent jurisdiction to be invalid, it shall be limited only to the extent necessary to make such provision enforceable; it being the intent of this Article V to indemnify each individual who serves or who has served as a director, officer, employee, agent, or person identified in Section 5.02(b) to the maximum extent permitted by law.

## ARTICLE VI.
## MISCELLANEOUS PROVISIONS

**Section 6.01  Amendments.** The Board of Directors shall have the power to amend or repeal these Bylaws or adopt new Bylaws, unless the shareholders in amending, repealing, or adopting a new Bylaw expressly provide that the Board of Directors may not amend or repeal that Bylaw. Unless the Certificate of Formation or a bylaw adopted by the shareholders provide otherwise as to all or some portion of the Bylaws, the Corporation's shareholders may amend, repeal or adopt Bylaws even though the Bylaws may also be amended, repealed or adopted by the Board of Directors. The shareholders may amend, repeal or adopt new Bylaws at any annual meeting of the shareholders or at any special meeting of the shareholders at which a quorum is present or represented, by the affirmative vote of the shareholders holding a majority of the shares

13

entitled to vote at such meeting; *provided, however, that* notice of the proposed alteration or repeal is contained in the notice of any such special meeting. The directors shall not amend these Bylaws so as to effect a change in the time or place of the meeting for the election of directors within sixty (60) days next before the day on which such meeting is to be held; furthermore, in case of any change of said time or place, notice thereof shall be given to each shareholder in person or by letter mailed to his last known post office address at least ten (10) days before the meeting is held.

Section 6.02 **Waiver.** Whenever, under the provisions of any law, the Certificate of Formation or amendments thereto, or these Bylaws, any notice is required to be given to any shareholders, director or committee member, a waiver thereof in writing signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be equivalent to the giving of such notice. Attendance at any meeting by a shareholder or director shall constitute a waiver of notice of said meeting by such shareholder or director unless such individual attends the meeting for the specific purpose of objecting to the transaction of any business thereat on the ground that the meeting is not lawfully called or convened and does not vote on any business conducted at such meeting. Any such objection by a shareholder or director must be provided in writing to the Secretary before such meeting is called to order or announced at such meeting as a point of order before the vote on any matter is taken at such meeting.

Section 6.03 **Telephone or Video Meetings.** Meetings of shareholders, directors or any committee thereof, may be held by means of conference telephone, video conference or any other communications technology so long as all persons participating in the meeting can hear each other participant and any written material to be acted upon at such meeting has been distributed to such persons. Participation in a meeting pursuant to this Section shall constitute presence in person at such meeting.

Section 6.04 **Offices.** The principal office of the Corporation shall be located in such city, within or without the State of Texas, as shall be designated from time to time by the Board of Directors. The Corporation may also have offices at such other places as the Board of Directors may from time to time designate or as the business of the Corporation may require.

Section 6.05 **Resignations.** Any director or officer may resign at any time. Such resignations shall be made in writing and shall take effect at the time specified therein, or, if no time be specified, at the time of its receipt by the Secretary. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

Section 6.06 **Seal.** The seal of the Corporation shall be such as from time to time may be approved by the Board of Directors, but the use of a seal shall not be essential to the validity of any agreement entered into by the Corporation, unless otherwise provided by law.

Section 6.07 **Fiscal Year.** The fiscal year of the Corporation shall end on September 30 of each year.

Section 6.08 **Books and Records.** The Corporation shall maintain those books and records as provided by statute and as it may deem necessary or desirable. All books and records provided for by statute shall be open to inspection of the shareholders from time to time for a

14

proper corporate purpose and to the extent expressly provided by statute, and not otherwise.  The members of the Board of Directors may examine all such books and records at all reasonable times.

*[Signature Page Follows.]*



UNOFFICIAL COPY

15

The undersigned hereby confirms that these Amended and Restated Bylaws were approved and adopted by the Board of Directors as of the date first written above.

<u>**SOLE DIRECTOR:**</u>

**DAKOTA FONTENOT**

UNOFFICIAL COPY

Signature Page to
Amended and Restated Bylaws
(Viva Las Vegas Properties, Inc.)
008402\00002\3534997.1 - 5/17/2023 12:26:59 PM

**EXHIBIT**

**13**

exhibitsticker.com

FILED
9/24/2025 8:20 AM
Teneshia Hudspeth
County Clerk
Harris County - County Probate Court No. 1
Accepted By: CS

CAUSE NO. 537,721

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY AS TRUSTEE OF THE HOLLI ANN HARDIN TRUST NUMBER ONE *Plaintiff,* | § § § § § § § § § § § | IN PROBATE COURT NUMBER ONE OF |
| v. | | |
| DAKOTA FONTENOT *Defendant.* | | HARRIS COUNTY, TEXAS |

### INTERVENORS' ANSWER AND AFFIRMATIVE DEFENSES TO DEFENDANTS' COUNTERCLAIM

Michelle Fontenot ("Michelle") and Dallas Joseph Fontenot III ("Joe"), individually, as beneficiaries of the Holli Ann Hardin Trust Number One and Dakota Trust, file this intervention as necessary parties and respectfully show the Court as follows:

### GENERAL DENIAL

1.    Michelle and Joe generally deny the allegations contained in Defendant Dakota Fontenot's First Amended Counterclaim as permitted by Rule 92 of the Texas Rules of Civil Procedure and require that Dakota prove his causes of action by a preponderance of the credible evidence.

### AFFIRMATIVE DEFENSES

2.    Michelle and Joe plead the following affirmative defenses:

   a.    Dakota lacks authority as Trustee of the Dakota Trust and any entities held by the Dakota Trust.

   b.    Dakota's claims are barred by the doctrines of waiver, estoppel, laches, and release.

   c.    Dakota's claims are barred by the doctrine of unclean hands.

   d.    Dakota's claims are barred by the statute of limitations.

   e.    Dakota's claims are barred by the doctrines of res judicata or collateral estoppel.

1

32662041.v1

**PARTIAL JOINDER IN APPLICATION FOR TEMPORARY INJUNCTION**

3.       Michelle and Joe partially join in the Trustee's Application for Temporary Injunction. As beneficiaries of the Dakota Trust, Michelle and Joe request that the Court enjoin Dakota from taking any action on behalf of the Dakota Trust or the entities it owns, including Viva Las Vegas Properties, Inc. No document exists that would operate to either 1) appoint Dakota as the current Trustee of the Dakota Trust, or 2) give Dakota authority to act on behalf of Viva Las Vegas Properties, Inc. Accordingly, as Dakota does not have authority to act on behalf of the Trust or Viva Las Vegas Properties, Inc., the Court should enter a temporary injunction preventing him from taking such actions.

     **i.       Dakota has no authority to act as Trustee of the Dakota Trust or director and officer of Viva Las Vegas Properties, Inc.**

4.       Dakota purports to serve as Trustee of the Dakota Trust and director/officer of Viva Las Vegas Properties, Inc. Dakota has not, and cannot, produce any document that would validly appoint him as successor trustee of the Dakota Trust. As Dakota's purported authority to act on behalf of Viva Las Vegas Properties, Inc. stems from actions he invalidly took as purported trustee, he likewise has no authority to act on behalf of Viva Las Vegas Properties, Inc.

5.       Holli Ann Hardin, as Settlor, created an irrevocable inter vivos trust on November 9, 1994. The Dakota Trust was never amended and could not be amended except by a court of competent jurisdiction. Holli Ann Hardin served as the original named Trustee of the Dakota Trust. *See* Exhibit 1, Dakota Trust Declaration, Article V, Section A. The Trust Agreement named the following successor Trustees, in order: Dallas, Joe, Michelle, and finally First Interstate Bank of Texas. *See* Exhibit 1, Dakota Trust Declaration, Article V, Sections B and C. On September 8, 1996, Holli resigned as Trustee by serving written notice of her resignation on Dallas. *See* Exhibit

2

32662041.v1

2, 9/8/1996 Trustee Resignation; *see also* Exhibit 1, Dakota Trust Declaration, Section V.F. ("Any appointee serving or entitled to serve as Trustee may resign at any time and without cause.").

6.      After Holli's resignation, Dallas, as the named first successor Trustee, served as Trustee for the Dakota Trust until his death on September 3, 2021. During his tenure as Trustee, Dallas exercised the authority under Article V, Section C. of the Trust Agreement to designate successor trustees. On May 1, 2013, Dallas executed a Designation of Successor Trustee, naming Dakota as his successor, followed by Frost Bank. *See* Exhibit 3, 5/1/13 Designation of Successor Trustee. On October 14, 2017, Dallas then revoked the designation of Dakota as successor Trustee, designating Frost Bank as his successor.

> Pursuant to Article V, Section C of the Trust Declaration, Dallas Joseph Fontenot, Jr. removes all prior appointments of appoints Dakota James Fontenot as successor Trustee and, instead, appoints Frost Bank to serve as successor Trustee upon the death, disability, resignation, or disqualification of Dallas Joseph Fontenot, Jr.

*See* Exhibit 4, 10/14/17 Designation of Successor Trustee.

7.      At the same time, Dallas removed Dakota as officer of Viva Las Vegas Properties, Inc., among other entities. *See* Exhibit 5, 10/14/17 Resolutions Adopted by Consent of the Shareholder and Director of Viva Las Vegas Properties, Inc. The Dakota Trust owns 100% of the stock of Viva Las Vegas Properties, Inc. (*see* Exhibit 8) and accordingly the Trustee of the Dakota Trust is the sole shareholder for Viva Las Vegas Properties, Inc.

> ESOLVED that Dakota Fontenot is hereby removed from all offices and all positions as a Director of Viva Las Vegas Properties, Inc. from and after October 14, 2017.

8.      Dakota is not a named successor trustee in the Trust Agreement for the Dakota Trust, and the only document that purports to give him any claim to the trustee position was

UNOFFICIAL COPY

32662041.v1

revoked in October 2017. Upon Dallas's death in 2021, a vacancy in the trustee position was created, and Frost Bank was the named successor trustee in the Designation of Successor Trustee. Neither Dallas, nor Frost Bank, ever executed any other document that would appoint Dakota as successor trustee. To support his claimed status as Trustee, Dakota now asserts that the October 14, 2017 Designation of Successor Trustee is "invalid as a forgery and/or revoked document." *See* Dakota's Amended Answer and Counterclaim, ¶ 12. Dakota has not, and cannot, produce any other document that would validly appoint him as successor trustee of the Dakota Trust.

9.     Importantly, Dakota cannot become the Trustee of the Dakota Trust by some equitable doctrine of waiver or consent. *See Alpert v. Riley*, 274 S.W.3d 277 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) ("We have not located, and Riley does not identify, any authority that recognizes a trustee by estoppel in the presence of express trust language outlining the procedure for appointment of a successor trustee...Texas law prohibits the equitable rule proposed by Riley for other reasons as well. The Texas Trust Code requires adherence to the trustee selection method prescribed in the trust instrument, which necessarily forecloses the exercise of equitable discretion unless that method fails.") (citing Tex. Prop. Code § 113.083).

10.    As Dakota's designation as successor trustee was revoked in 2017, Dakota is not validly serving as Trustee of the Dakota Trust. Any actions he has taken as purported Trustee of the Dakota Trust are invalid and ineffective.

11.    The Texas Property Code authorizes the Court to issue an injunction to remedy a breach of trust that has occurred or might occur. Tex. Prop. Code § 114.008; *see also Matter of Bumstead Family Irrevocable Trust*, 2022 WL 710159 (Tex. App.—Corpus Christi-Edinburg March 10, 2022, pet. denied) (affirming trial court temporary injunction that enjoined an individual from acting as trustee and appointed a receiver when the validity of the purported trustee's

4

appointment was at issue). Dakota taking any action on behalf of the Dakota Trust would be a further breach of trust, as he has no authority to act under the terms of the Trust agreement and subsequent designations of successor trustees.

12.    Similarly, Dakota has no authority to act on behalf of Viva Las Vegas Properties, Inc. Dallas removed Dakota as an officer and/or director of Viva Las Vegas Properties, Inc. on October 14, 2017. *See* Exhibit 5, 10/14/17 Resolutions Adopted by Written Consent of Shareholder.

13.    The only documents Dakota has produced that would purport to give him authority to act on behalf of Viva Las Vegas Properties, Inc. are documents that he executed as purported trustee in May of 2023. *See* Exhibit 6, 5/19/23 Purported Unanimous Joint Written Consent of Viva Las Vegas Properties, Inc.. However, as discussed *supra*, Dakota is not validly serving as the trustee of the Dakota Trust. Therefore, he had no authority to execute these Viva Las Vegas Properties, Inc. corporate governance documents that he relies upon for authority to act on behalf of Viva Las Vegas Properties, Inc. As a result, Dakota was not validly appointed officer and director of Viva Las Vegas Properties, Inc. and he has no authority to take action on its behalf, including selling real property and accessing funds belonging to Viva Las Vegas Properties, Inc.

    **ii.    Michelle and Joe are beneficiaries of the Dakota Trust and object to Dakota taking any action on behalf of the Dakota Trust or entities held by the Dakota Trust.**

14.    Dakota claims that he is the "only current beneficiary of the Dakota Trust." *See* Dakota's First Amended Answer and Counterclaim, ¶ 14. However, the terms of the Dakota Trust dictate that Joe and Michelle are 2/3 beneficiaries of the Dakota Trust. After Dallas's death in 2021, Dakota sought to probate Dallas's 2013 Will, and Holli sought to probate Dallas's 2013 Will and 2017 Codicil. Dakota claimed that the 2017 Codicil was a forgery or was the product of undue

5

influence. Dakota also initiated litigation regarding the Holli Ann Hardin Trust Number One, seeking a declaratory judgment and appointment of a successor trustee of the Holli Ann Hardin Trust Number One. The parties settled both the Estate and Trust litigation on January 7, 2022. Dallas's 2013 Will and 2017 Codicil were admitted to probate, and Holli was appointed Independent Executor of Dallas's Estate.

15.    As part of the Settlement Agreement, Holli's interest in both the Holli Ann Hardin Trust Number One and the Dakota Trust Number One were bought out, and Holli disclaimed her interest in these Trusts. *See* Exhibit 7, Assignment of Interest and Disclaimer of Further Interest ("Holli Ann Fontenot disclaims any right to further interest in the Dakota Trust.").

16.    Pursuant to the terms of the Dakota Trust, upon Holli's death, absent Dallas's exercise of a power of appointment, the Trust property passes to the descendants of Holli Hardin Fontenot and to the descendants of Dallas Joseph Fontenot, Jr., *per stirpes*:

> 3.    Dallas Joseph Fontenot, Jr., by a clause in his Will in which he specifically exercises this power of appointment, shall have the power to appoint the trust assets remaining upon the death of Holli Hardin Fontenot to or for the benefit of any one or more of the descendants of Dallas Joseph Fontenot, Jr. or the descendants of Holli Hardin Fontenot, in such shares, proportions, or amounts, upon such trusts and for such estates as he alone may determine. If Dallas Joseph Fontenot, Jr. fails to exercise this special power of appointment to the fullest extent, then, subject to the other provisions of this Trust, upon his death, the unappointed trust assets shall be delivered to the living descendants of Holli Hardin Fontenot and to the living descendants of Dallas Joseph Fontenot, Jr., per stirpes.

*See* Exhibit 1, Article VI, Section D.3. *See also* Article IV, Section E ("For example, if a distribution were to be made to the descendants, *per stirpes*, of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot, assuming the recitations in Article I, the property to be distributed would

6

32662041.v1

be divided into three equal shares, one for each of Dallas Joseph Fontenot, III, Michelle Anne Fontenot, and Dakota James Fontenot.").

17.    Michelle and Joe are not aware of any document that would alter their status as beneficiaries, including a Trust amendment or family settlement agreement.

18.    As Holli no longer has any interest in the Dakota Trust and has released any and all interest effective January 2023, Michelle and Joe are at least the two-thirds beneficiaries of the Dakota Trust. *See also* Exhibit 1, Article VI, Section C.2. As there is currently no validly serving Trustee, Michelle and Joe are necessary parties to an action involving the Dakota Trust and any transaction that would dispose of any assets held by the Dakota Trust or any entities owned by the Dakota Trust.

19.    The Court should maintain the status quo and enjoin Dakota from selling real property held by Viva Las Vegas Properties, Inc., of which the Trust is the ultimate owner. *See N. Cypress Med. Ctr. Operating Co. v. St. Laurent*, 296 S.W.3d 171, 175 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (monetary damages may not adequately "compensate an injured party for the loss of property deemed to be legally 'unique' or irreplaceable.")

## CONCLUSION

For these reasons, Michelle Fontenot and Dallas Joseph Fontenot III respectfully request that the Court enjoin Dakota Fontenot from taking any actions on behalf of the Dakota Trust and entities held by the Dakota Trust, and award Michelle and Joe all such other and further relief as the Court may deem appropriate.

32662041.v1

Respectfully submitted,

**CHAMBERLAIN, HRDLICKA, WHITE,
WILLIAMS & AUGHTRY, P.C.**

By:    /s/ Ryan O. Cantrell
       Ryan O. Cantrell
       Texas Bar No. 24055259
       ryan.cantrell@chamberlainlaw.com
       Mariah J. Karigan
       Texas Bar No. 24123088
       mariah.karigan@chamberlainlaw.com
       1200 Smith Street, Suite 1400
       Houston, Texas 77002
       Telephone:    (713) 658-1818
       Facsimile:    (713) 658-2553
       **COUNSEL FOR MICHELLE FONTENOT AND
       DALLAS JOSEPH FONTENOT III**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing instrument was served on this the 24th day of September, 2025, to the following:

Rudy Culp
Collin Bullard
TEXAS PROBATE ATTORNEY PLLC
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
*Counsel for Linda Goehrs*

Jeffrey D. Watters, Jr.
John P. ("Trey") Avant III
Andrew B. McCarty
GRAY REED & McGRAW LLP
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
*Counsel for Dakota Fontenot*

James Madison ("Jimmy") Ardoin III
4900 Fournace Place, Suite 414
Bellaire, Texas 77401
*Counsel for Dakota Fontenot*

Paul S. Beik
440 Louisiana Street, Suite 1800
Houston, Texas 77002
*Counsel for Dakota Fontenot*

/s/ Ryan O. Cantrell
Ryan O. Cantrell

8

32662041.v1

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Lisa Adair on behalf of Ryan Cantrell
Bar No. 24055259
lisa.adair@chamberlainlaw.com
Envelope ID: 105998714
Filing Code Description: Answer/Response
Filing Description: Intervenors' Answer and Affirmative Defenses to Defendants' Counterclaim
Status as of 9/24/2025 10:50 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Paul Beik | 24054444 | paul@beiklaw.com | 9/24/2025 8:20:16 AM | SENT |
| James Ardoin | 24045420 | jimmy@jimmyardoinlaw.com | 9/24/2025 8:20:16 AM | SENT |
| John P. TreyAvant | | tavant@grayreed.com | 9/24/2025 8:20:16 AM | SENT |
| Debbie Gurley | | dgurley@grayreed.com | 9/24/2025 8:20:16 AM | SENT |
| Andrew McCarty | | amccarty@grayreed.com | 9/24/2025 8:20:16 AM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 9/24/2025 8:20:16 AM | SENT |
| Jeffrey D.Watters | | jwatters@grayreed.com | 9/24/2025 8:20:16 AM | SENT |
| Ryan Cantrell | | ryan.cantrell@chamberlainlaw.com | 9/24/2025 8:20:16 AM | SENT |
| Mariah Karigan | | mariah.karigan@chamberlainlaw.com | 9/24/2025 8:20:16 AM | SENT |
| Elizabeth Garcia | | elizabeth.garcia@chamberlainlaw.com | 9/24/2025 8:20:16 AM | SENT |
| Texas Probate Attorney, PLLC | | efile@texasprobateattorney.com | 9/24/2025 8:20:16 AM | SENT |
| Marcie Cardenas | | mcardenas@grayreed.com | 9/24/2025 8:20:16 AM | SENT |
| Rudy Culp | | rudy@texasprobateattorney.com | 9/24/2025 8:20:16 AM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 9/24/2025 8:20:16 AM | SENT |

LINDA GOEHRS, IN HER CAPACITY AS
TRUSTEE OF THE HOLLI ANN HARDIN
TRUST NUMBER ONE
Plaintiff,

v.

DAKOTA FONTENOT,
Defendant.

Case 4:26-cv-02743    Document 6-1    Filed 04/29/26 in TXSD    Page 396 of 1053

537721

Probate Court No. 1

---

# TRUST DECLARATION
# DAKOTA TRUST

---

THIS TRUST DECLARATION is made this day by declaration of Holli Hardin Fontenot ("Settlor"), who presently resides in Fort Bend County, Texas.

## ARTICLE I.
### TRUST BENEFICIARY

This Trust is created for the use and benefit of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot. The term "Trust Beneficiary" or "beneficiary" will also mean any and all persons, organizations, trusts, and entities who may have or may acquire a beneficial interest in this Trust, whether vested or contingent in nature, including a transfer of an interest in the Trust during the life of either Dallas Joseph Fontenot, Jr. or Holli Hardin Fontenot, or both, or from the exercise of a power of appointment by a Trust Beneficiary or otherwise.

For reference, the only child of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot is Dakota James Fontenot, who was born on June 22, 1994. Holli Hardin Fontenot has no other children born to her or adopted by her on the date of this Trust Declaration.

For reference, the only other children of Dallas Joseph Fontenot, Jr. are: Dallas Joseph Fontenot, III (who was born on March 29, 1969) and Michelle Anne Fontenot (who was born on March 12, 1970). Dallas Joseph Fontenot, Jr. has no other children born to him or adopted by him on the date of this Trust Declaration.

## ARTICLE II.
### INITIAL TRUST CORPUS AND RIGHT TO ADD TO THE TRUST

A.    INITIAL TRUST CORPUS. Settlor does hereby declare that from and after the date of this Trust Declaration, Settlor holds in trust the assets described in Schedule A attached to this Declaration, which assets are the initial corpus of this Trust and as Trustee acknowledges receipts of those assets. Settlor or any other person, trust, or entity may add property of any

Page 1 of 23 Pages

EXHIBIT

1

003271

character to this Trust by a Last Will and Testament, from another trust (whether inter vivos or testamentary), or by deed or other transfer, subject only to the acceptance thereof by the Trustee.

B.   **ADDITIONS TO TRUST CORPUS.**   Additional contributions may be made to the corpus of the Trust, including testamentary contributions.

C.   **SEPARATE PROPERTY.**   The assets of this trust are the separate property of Holli Hardin Fontenot. No inter vivos transfer of property will be made to this Trust unless the property constitutes the separate property of Holli Hardin Fontenot. Holli Hardin Fontenot may make a testamentary contribution of property to this Trust, and such contribution may constitute the separate property of Holli Hardin Fontenot and Holli Hardin Fontenot's interest in community property.

## ARTICLE III.
### NO REVOCATION OR AMENDMENT

A.   **TRUST IS IRREVOCABLE.**   This Trust is an irrevocable Trust.

B.   **THIS TRUST MAY NOT BE AMENDED.**   This Trust Declaration may not be amended, except by a Court of competent jurisdiction under the doctrine of *cy pres.*

C.   **INCOME TAX MATTERS.**   For so long as the Settlor or Dallas Joseph Fontenot, Jr. is a Trustee of the Trust, the Trust will be treated for income tax reporting purposes as a Grantor Trust under Treasury Regulation § 1.671-4(b). Thereafter, the Trust is to be treated for income tax purposes as required by the applicable provisions of Subchapter J of the Internal Revenue Code.

## ARTICLE IV.
### DEFINITIONS

A.   **DESCENDANTS.**   The term "Descendants" means the legitimate children of the person designated and the legitimate lineal descendants of such children. The term includes any person adopted before attaining age eighteen (18) and the adopted person's legitimate lineal descendants. A posthumous child shall be considered as living at the death of his parent.

Page 2 of 23 Pages

UNOFFICIAL COPY

B.  **HEIRS AT LAW.** Whenever a trustee, or a legal advisor to the Trustee is called upon to determine the heirs at law of Settlor, or any other person beneficially interested in this Trust, the determination will be made to identify those individuals, other than creditors, who would receive the personal property of a decedent upon his or her death as determined in accordance with the laws of intestate succession of the State of Texas, United States of America, determined as if the decedent had then died single, intestate, and domiciled in Texas and further determined as if the Settlor of this Trust had predeceased the person or persons so named or described.

C.  **INCOMPETENT, DISABILITY.** A beneficiary will be considered "incompetent" or "disabled" if he or she is incapacitated to an extent to make it impossible or impractical to give prompt and intelligent consideration to business matters. The Trustee may act upon such evidence as the Trustee reasonably deems appropriate and reliable without liability by reason thereof.

D.  **MINOR BENEFICIARY.** The term "Minor Beneficiary" or "Minor" identifies a beneficiary who is less than 21 years of age.

E.  **PER STIRPES.** Whenever a distribution is directed to be made to the descendants, *per stirpes*, of any person or persons, including the descendants of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot, the property to be distributed shall be divided into as many equal shares as there are then living children of each of those persons and deceased children of each those persons who have descendants then living. Each then living child of such person shall take one share, and the share for the descendants of each deceased child shall be divided among the deceased child's then living descendants on a *per stirpes* basis.

For example, if a distribution were to be made to the descendants, *per stirpes*, of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot, assuming the recitations in Article I, the property to be distributed would be divided into three equal shares, one for each of Dallas Joseph Fontenot, III, Michelle Anne Fontenot, and Dakota James Fontenot.

F.  **RELATIVE OR RELATIVES.** Reference to a "Relative" or "Relatives" will identify any person or persons related to Settlor by blood or lawful adoption in any degree.

003273

G.  **POWER OF APPOINTMENT, QUALIFIED BENEFICIARY DESIGNATION.** Whenever this Trust Declaration gives a Trust Beneficiary the power or authority to appoint a beneficiary of the Trust, the designation must be in writing and be acknowledged in the form required of acknowledgements by Texas law or exercised by a will executed with the formalities required by law of the Trust Beneficiary's residence; it must clearly evidence the intent of the Trust Beneficiary to exercise a power of appointment; and the written beneficiary designation must have been delivered to the Trustee prior to the Trust Beneficiary's death or, if exercised by will, the will must have been filed for probate within three months from the date of the Trust Beneficiary's date of death and must subsequently be admitted to probate no matter the time interval. The term of this Trust may be extended if the qualified beneficiary designation requires that a Beneficiary's interest remain in Trust, or may be divided and be held as a separate trust which is governed by the terms of this Trust Declaration.

H.  **SURVIVE.** For the purpose of vesting in the event two or more persons who have an interest in the trust die within a short time of one another, one must have survived the other for a period of at least 90 days as a condition to vesting.

I.  **TESTAMENTARY CONTRIBUTIONS.** The term "testamentary contributions" will mean any contribution to the Trust made by reason of the death of a person, including transfers made under the direction of a will, a beneficiary designation in a life insurance policy or other contract, by reason of survivorship language contained in a depository contract, or transfers from another Trust which designates this Trust as a beneficiary.

J.  **TRUST.** "Trust" means the Trust created by this Trust Declaration

K.  **TRUST DECLARATION.** The term "Trust Declaration" and the term "Trust Agreement" each refer to this Trust Declaration.

L.  **TRUST FUND.** The term "Trust Fund" or "Trust Property" means all property comprising: the initial contribution of corpus to the Trust; all property paid or transferred to, or otherwise vested in, the Trustee as additions to the corpus of this Trust; accumulated income, if any, whether or not added to the corpus of this Trust; and the investments and reinvestment of the Trust property, including the increase and decrease in the values thereof as determined from time to

Page 4 of 23 Pages

003274

time.    The terms "corpus" and "principal" are used interchangeably.

M.    **TRUSTEE.** For convenience, the term "Trustee," used in the singular, will mean and identify multiple Trustees serving and acting pursuant to the directions of this Trust Declaration. The term "corporate Trustee" will identify a banking or trust corporation with trust powers.

N.    **GENDER, PLURAL USAGE.** The use of personal pronouns, such as he, she, or it, are to be construed in context. The term "person" will include a non-person, such as a corporation, trust, partnership or other entity as is appropriate in context. The identification of person in the plural will include the singular and *vice versa*, as is appropriate in context.

## ARTICLE V.
## APPOINTMENT OF TRUSTEE

A.    **ORIGINAL APPOINTMENT.** Holli Hardin Fontenot shall serve as initial Trustee of this Trust.

B.    **FIRST SUCCESSOR.** In the event that Holli Hardin Fontenot should die, resign, or become incapacitated or unable to act as Trustee of this Trust, or in the event that Holli Hardin Fontenot should subsequently become divorced from Dallas Joseph Fontenot, Jr., then Dallas Joseph Fontenot, Jr. shall serve as successor Trustee of this Trust. In the event that Dallas Joseph Fontenot, Jr. should elect not to serve as Trustee of this Trust, Dallas Joseph Fontenot, Jr. will have the right to appoint a successor or successors to serve as Trustee, as set forth in Section V.C below, and he may specify any conditions upon succession and service as may be permitted by law.

Holli Hardin Fontenot acknowledges and agrees that the rights and obligations of Holli Hardin Fontenot to serve as Trustee and to resign as Trustee in accordance with the foregoing have been and are the subject of separate consideration, receipt of which is hereby acknowledged in full, and such rights and obligations are in the best interest of the administration of the Trust for its Beneficiaries. Holli Hardin Fontenot specifically waives any rights which she may have to rescind

003275

or revoke her obligation to resign as Trustee upon divorce from Dallas Joseph Fontenot, Jr.

C.    **SUCCESSION.**    Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment will have the right to appoint a successor or successors to serve as Trustee in the event that person ceases to serve for any reason, and each Trustee may specify any conditions upon succession and service as may be permitted by law. For example, a successor may be required to furnish a fiduciary bond as a prerequisite or a successor's service may be conditioned upon another appointee's death, resignation, or inability to serve. Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment may also provide that one or more designated successors as Trustee will have the authority to appoint his, her, or its successor as Trustee. An appointment of successor Trustee must be in writing and must be acknowledged to be effective. Unless other specified by a Trustee in a written designation of succession, succession is to be determined as follows.

If a Trustee by original appointment does not appoint a successor, the remaining Trustee or Trustees then serving will continue service alone. If all Trustees by original appointment fail or cease to serve for any reason without having appointed a successor or successors, the successor or successors as Trustee will be as named below and in the order of succession herein prescribed.

FIRST:    Dallas Joseph Fontenot, III

BUT:    Settlor specifically provides that upon assumption of actual service as Trustee, Dallas Joseph Fontenot, III will have the right to appoint Dallas Joseph Fontenot, III's successor as Trustee, and to vest in a successor Trustee, upon assumption of that person's service, the right and authority to designate succession as Trustee. To the extent this is done, the appointment of succession will supersede the appointments which follow the designation of Dallas Joseph Fontenot, III as Trustee.

NEXT:    Michelle Anne Fontenot

BUT:    Settlor specifically provides that upon assumption of actual service as Trustee, Michelle Anne Fontenot will have the right to appoint Michelle Anne Fontenot's successor as Trustee, and to vest in a successor Trustee, upon assumption of that person's service, the right and

Page 6 of 23 Pages

COPY UNOFFICIAL COPY

003276

authority to designate succession as Trustee. To the extent this is done, the appointment of succession will supersede the appointments which follow the designation of Michelle Anne Fontenot as Trustee.

FINALLY:   First Interstate Bank of Texas, N.A., in the event all of the above, including duly appointed successors, fail or cease to serve for any reason. The appointment of First Interstate Bank of Texas, N.A. as Trustee will include any successor to First Interstate Bank of Texas, N.A. by reason of its merger, reorganization, or sale to another banking corporation with trust powers or a trust company with trust powers.

D.   **AUTHORITY OF SUCCESSOR TRUSTEE.** A successor will have the authority vested in a Trustee by original appointment under this Trust Declaration, subject to any lawful limitations or qualifications upon the service of a successor imposed by one Trustee in a written document appointing a successor. A successor Trustee will not be obliged to examine the accounts, records, or acts of the previous Trustee or Trustees; nor will a successor Trustee in any way or manner be responsible for any act or omission to act on the part of any previous Trustee. Reference to "Trustee" in the singular will include the plural.

E.   **BOND.** No one serving as Trustee will be required to furnish a fiduciary bond as a prerequisite to service.

F.   **RESIGNATION OR REMOVAL OF A TRUSTEE.** Any appointee serving or entitled to serve as Trustee may resign at any time and without cause, and the instructions in this Trust Declaration will determine who the successor will be (including successors appointed by a Trustee as herein provided). The trust beneficiary or beneficiaries who are then entitled to receive distributions of income from the trust, or distributions of income from any separate trust created by this document, may remove any corporate Trustee then serving, the notice of removal to be delivered in writing to the corporate Trustee. Unless this Trust Declaration or any instrument appointing a successor provides otherwise, the selection of a successor to the corporate Trustee will be made by a Court of competent jurisdiction. In the event there is more than one beneficiary entitled to the income from the trust, all income beneficiaries must join in the written notice of removal. The consent of any person who is deceased or legally disabled will not be required in meeting the unanimous consent requirements for removal.

Page 7 of 23 Pages

UNOFFICIAL COPY

003277

G. **AFFIDAVIT OF AUTHORITY.** Any person or entity dealing with the Trust may rely upon the affidavit of a Trustee or Trustees of the Trust:

On my [our] oath, and under the penalties of perjury, I [we] swear that I [we] am [are] the duly appointed and authorized trustee[s] of DAKOTA TRUST. I [we] certify that I [we] have not been removed as Trustee[s] and have the authority to act for, and bind, DAKOTA TRUST in the transaction of the business for which this affidavit is given as affirmation of my [our] authority.

_____
Signature Line

Sworn and subscribed before me, the undersigned authority, by _____ this _____ day of
_____, 19___.

_____
Notary Public - State of Texas

H. **DOCUMENTING SUCCESSION.** The successor to any Trustee may document succession with an affidavit setting forth that the preceding Trustee has failed or ceased to serve and the successor has assumed the duties of Trustee. The affidavit may be filed in the deed records of Fort Bend County, Texas and in each county in which real property held in Trust is located or in the county in which the principal assets and records of the Trust are located. The public and all persons interested in and dealing with the Trust and the Trustee may rely upon a certified copy of the recorded affidavit as conclusive evidence of a successor's authority to serve and act as the Trustee of the Trust.

I. **COMPENSATION.** Any person who serves as Trustee may elect to receive a reasonable compensation, reasonable compensation to be measured by the time required in the administration of the Trust and the responsibility assumed in the discharge of the duties of office. The fee schedules of area Trust departments prescribing fees for the same or similar services may be used to establish reasonable compensation. A corporate Trustee will be entitled to receive as its compensation such fees as are then prescribed by its published schedule of charges for Trusts of a similar size and nature and additional compensation for extraordinary services performed by the corporate Trustee. A Trustee will be entitled to full reimbursement for expenses, costs, or other obligations incurred as the result of service, including attorney's, accountant's, and other professional fees.

J. **MULTIPLE TRUSTEES.** In the event there are two Trustees serving the Trust, both must sign any instrument transferring real property from the Trust. If the Trustees agree to do so, one Trustee acting alone may be given the primary

UNOFFICIAL COPY

003278

responsibility of administration and accounting, and one Trustee alone may be authorized to deposit, transfer and withdraw funds from any depository account held by the Trust. The authority vested in three or more trustees may be exercised by a majority of the trustees. In the event of an action or decision by a majority, the non-consenting Trustee will not be responsible for the act of the majority.

### ARTICLE VI.
### DISTRIBUTIONS FROM THE TRUST,
### LIVING AND POST-MORTEM

A.  **FOR SO LONG AS HOLLI HARDIN FONTENOT AND DALLAS JOSEPH FONTENOT, JR. SHALL REMAIN MARRIED.** For so long as Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr. shall remain married, the Trustee may from time to time distribute to or pay for the benefit of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., or either of them, so much of the net income (and, if the net income of the Trust is not sufficient, the principal of the Trust) as the Trustee determines may be necessary for the support, maintenance, health, and general welfare of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., or either of them. Such determination shall be in the absolute discretion of the Trustee, whose decisions shall be binding.

B.  **UPON THE TERMINATION BY DIVORCE OF THE MARITAL RELATIONSHIP OF HOLLI HARDIN FONTENOT AND DALLAS JOSEPH FONTENOT, JR.** Upon the termination by divorce of the marital relationship of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., the interest of Holli Hardin Fontenot in this Trust will terminate and this Trust is to be continued in trust for the benefit of Dallas Joseph Fontenot, Jr. as follows:

1.  This trust will is to be continued in Trust for the sole use and benefit of Dallas Joseph Fontenot, Jr. for so long as he shall live. Dallas Joseph Fontenot, Jr. will, for the duration of the Trust, be entitled to the net income of the Trust, this amount to be paid in convenient installment payments to be not less than quarter-annually. Distributions of income to Dallas Joseph Fontenot, Jr. shall be made in the amount, form, and manner required by Section 2523(f) of the Internal Revenue Code. If the income known by the Trustee to be available to Dallas Joseph Fontenot, Jr. from other sources is insufficient to provide for his continued

003279

support and maintenance in good health, the Trustee will have the authority to pay to Dallas Joseph Fontenot, Jr. or apply for his benefit, so much of the principal of the Trust, even to the exhaustion thereof, as is necessary to provide for his support and maintenance in the style and comfort to which he is accustomed and to provide for his medical needs and maintenance of good health.    It is intended that the payment of principal be limited by the ascertainable standard provided above, that this provision comply fully with Treasury Regulation §20.2041-1(c)(2), and that this Trust is to be construed and limited to that end.   Dallas Joseph Fontenot, Jr. may at any time require that property which does not produce an income or a sufficient income be sold and invested in income producing property.

2.     Upon the death of Dallas Joseph Fontenot, Jr., Dallas Joseph Fontenot, Jr., by a clause in his Will in which he specifically exercises this power of appointment, shall have the power to appoint the then remaining trust assets to or for the benefit of any one or more of the descendants of Dallas Joseph Fontenot, Jr. or the descendants of Holli Hardin Fontenot, in such shares, proportions, or amounts, upon such trusts and for such estates as he alone may determine.   If Dallas Joseph Fontenot, Jr. fails to exercise this special power of appointment to the fullest extent, then, subject to the other provisions of this Trust, upon his death, the unappointed trust assets shall be delivered to the living descendants of Holli Hardin Fontenot who were born prior to the date of divorce and to the living descendants of Dallas Joseph Fontenot, Jr., *per stirpes.*

C.   **UPON THE DEATH OF HOLLI HARDIN FONTENOT WHILE MARRIED TO DALLAS JOSEPH FONTENOT, JR.**  Upon the death of Holli Hardin Fontenot while married to Dallas Joseph Fontenot, Jr. this Trust is to be continued in Trust as follows:

1.     This trust will is to be continued in Trust for the sole use and benefit of Dallas Joseph Fontenot, Jr. for so long as he shall live.   Dallas Joseph Fontenot, Jr. will, for the duration of the Trust, be entitled to the net income of the Trust, this amount to be paid in convenient installment payments to be not less than quarter-annually.   Distributions of income to Dallas Joseph Fontenot, Jr. shall be made in the amount, form, and manner required by Section 2056(b)(7)(B) of the Internal Revenue Code.   If the income known by the Trustee to be

003280

available to Dallas Joseph Fontenot, Jr. from other sources is insufficient to provide for his continued support and maintenance in good health, the Trustee will have the authority to pay to Dallas Joseph Fontenot, Jr. or apply for his benefit, so much of the principal of the Trust, even to the exhaustion thereof, as is necessary to provide for his support and maintenance in the style and comfort to which he is accustomed and to provide for his medical needs and maintenance of good health. It is intended that the payment of principal be limited by the ascertainable standard provided above, that this provision comply fully with Treasury Regulation §20.2041-1(c)(2), and that this Trust is to be construed and limited to that end. Dallas Joseph Fontenot, Jr. may at any time require that property which does not produce an income or a sufficient income be sold and invested in income producing property.

2. Upon the death of Dallas Joseph Fontenot, Jr., Dallas Joseph Fontenot, Jr., by a clause in his Will in which he specifically exercises this power of appointment, shall have the power to appoint the then remaining trust assets to or for the benefit of any one or more of the descendants of Dallas Joseph Fontenot, Jr. or the descendants of Holli Hardin Fontenot, in such shares, proportions, or amounts, upon such trusts and for such estates as he alone may determine. If Dallas Joseph Fontenot, Jr. fails to exercise this special power of appointment to the fullest extent, then, subject to the other provisions of this Trust, upon his death, the unappointed trust assets shall be delivered to the living descendants of Holli Hardin Fontenot and to the living descendants of Dallas Joseph Fontenot, Jr., *per stirpes*.

D. **UPON THE DEATH OF DALLAS JOSEPH FONTENOT, JR. WHILE MARRIED TO HOLLI HARDIN FONTENOT.** Upon the death of Dallas Joseph Fontenot, Jr. while married to Holli Hardin Fontenot, this Trust is to be continued in Trust as follows:

1. This trust will is to be continued in Trust for the sole use and benefit of Holli Hardin Fontenot for so long as she shall live. Holli Hardin Fontenot will, for the duration of the Trust, be entitled to the net income of the Trust, this amount to be paid in convenient installment payments to be not less than quarter-annually. If the income known by the Trustee to be available to Holli Hardin Fontenot from other sources is insufficient to provide for her continued support and

<center>Page 11 of 23 Pages</center>

003281

maintenance in good health, the Trustee will have the authority to pay to Holli Hardin Fontenot or apply for her benefit, so much of the principal of the Trust, even to the exhaustion thereof, as is necessary to provide for her support and maintenance in the style and comfort to which she is accustomed and to provide for her medical needs and maintenance of good health.   Holli Hardin Fontenot may at any time require that property which does not produce an income or a sufficient income be sold and invested in income producing property.

2. Upon the death of Holli Hardin Fontenot, unless Holli Hardin Fontenot shall issue a direction to the contrary, the Trustee will pay from the Trust assets the entire increment in the taxes payable by reason of her death to the extent that the total of such taxes is greater than would have been imposed if the trust assets had not been taken into account in determining such taxes.

3. Dallas Joseph Fontenot, Jr., by a clause in his Will in which he specifically exercises this power of appointment, shall have the power to appoint the trust assets remaining upon the death of Holli Hardin Fontenot to or for the benefit of any one or more of the descendants of Dallas Joseph Fontenot, Jr. or the descendants of Holli Hardin Fontenot, in such shares, proportions, or amounts, upon such trusts and for such estates as he alone may determine.  If Dallas Joseph Fontenot, Jr. fails to exercise this special power of appointment to the fullest extent, then, subject to the other provisions of this Trust, upon his death, the unappointed trust assets shall be delivered to the living descendants of Holli Hardin Fontenot and to the living descendants of Dallas Joseph Fontenot, Jr., *per stirpes.*

E. **ELECTION, QUALIFIED TERMINABLE INTEREST PROPERTY.**  It is important to emphasize that upon the death of Holli Hardin Fontenot, or the termination by divorce of the marital relationship of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., Dallas Joseph Fontenot, Jr. will have no more than a life interest in the Trust.  Dallas Joseph Fontenot, Jr. will have no right or power to revoke or amend this Trust. The Trustee may, without liability for doing so or the failure to do so, elect to treat all or a part of the Trust as Qualified Terminable Interest Property pursuant to the requirements of Section 2056(b)(7) or Section 2523(f) of the Internal Revenue Code, whichever is applicable.  To the extent that an election is made, and unless Dallas Joseph Fontenot,

Page 12 of 23 Pages

COPY UNOFFICIAL

003282

Jr. shall issue a direction to the contrary, the Trustee will pay from the Trust assets the entire increment in the taxes payable by reason of his death to the extent that the total of such taxes is greater than would have been imposed if the property treated as qualified terminable interest property had not been taken into account in determining such taxes. To the extent a partial election is made, and to the extent and in the manner then permitted by law, the Trustee will have the authority (1) to divide the Trust into separate trusts to reflect the partial election, or (2) to continue the Trust as a whole, with the fraction or percentage of the whole representing the elective share to be administered and maintained in a manner to reflect its proportionate share of the increment or decline in the whole of the property for the purposes of applying Sections 2044 and 2519 of the Internal Revenue Code. If the Trust is divided into separate parts, the Trustee will make the division according to the fair market value at the time the division is made. It is Settlor's intent and purpose to comply with state and federal law so that the least amount of federal estate tax will be payable upon the deaths of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., and this Trust Declaration is to be applied and construed to accomplish this objective.

F.   **DIVISION INTO SEPARATE TRUSTS.** If, following the death of Holli Hardin Fontenot or the termination by divorce of the marital relationship between Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot, the Trust is divided into separate trusts, the appreciation or depreciation in the value of each such trust or account will measure the value thereof for the purpose of disposition and taxation. For example, if the Trustee elects to treat all but $600,000 of the Trust assets as qualified terminable interest property for the federal estate tax marital deduction, and, if the Trustee segregates the $600,000 amount into a separate trust, the amount distributable therefrom upon the death of Dallas Joseph Fontenot, Jr. will be the value of that account upon the death of Dallas Joseph Fontenot, Jr. If, however, the $600,000 amount represents 25 percent of the total trust estate, and is continued and maintained as a fractional percentage of the whole, the value of the fractional interest upon the death of Dallas Joseph Fontenot, Jr. is to be determined with regard to its proportional share of any increase or decrease in the value of the whole.

G.   **ITEMS OF TANGIBLE PERSONAL PROPERTY IN TRUST.** Holli Hardin Fontenot may have certain items of tangible personal property which are her separate property and which have been

003283

transferred to the Trust or otherwise subject to the Trustee's control. The term "personal belongings" or "tangible personal property" will mean and identify personal wearing apparel, jewelry, household furnishings and equipment, books, albums, art work, entertainment and sports equipment, and all items of decoration or adornment. Holli Hardin Fontenot may at any time and from time to time deliver to the Trustee written instructions as to any living or post mortem gifts of such personal belongings, and the Trustee shall be authorized and bound to make disposition of these items as Holli Hardin Fontenot has reasonably directed.

H.  **PARTIAL AND FINAL DISTRIBUTIONS.** The Trustee, in making or preparing to make a partial or final distribution, may prepare an accounting and may require, as a condition to payment, a written and acknowledged statement from each distributee that the accounting has been thoroughly examined and accepted as correct; a discharge of the Trustee; a release from any loss, liability, claim or question concerning the exercise of due care, skill, and prudence of the Trustee in the management, investment, retention, and distribution of property during the Trustee's term of service, except for any undisclosed error or omission having basis in fraud or bad faith; and an indemnity of the Trustee, to include the payment of attorney's fees, from any asserted claim of any taxing agency, governmental authority, or other claimant. Any remainder beneficiary having a question or potential claim may require an audit of the Trust as an expense of administration. Failure to require the audit prior to acceptance of the Trustee's report, or the acceptance of payment, will operate as a final release and discharge of the Trustee except as to any error or omission having basis in fraud or bad faith.

The Trustee, in making or preparing to make a partial or final distribution will have the authority to: (1) partition any asset or class of assets and deliver divided and segregated interests to the beneficiaries; (2) sell any asset or class of assets (whether or not susceptible to partition in kind), and deliver to a beneficiary or beneficiaries a divided interest in the proceeds of sale and/or divided or undivided interests in any note and security arrangement taken as part of the purchase price; and/or (3) deliver undivided interests in an asset or class of assets to the beneficiaries subject to any indebtedness which may be secured by the property.

I.  **CONTINUATION OF THE TRUST DURING DISSOLUTION.** The Trust may continue beyond its termination for a time reasonably necessary to conclude the administration of the Trust, pay

003284

expenses of termination and to distribute to the Trust property to those entitled thereto.

J.    **CONTINGENT TRUST FOR CERTAIN BENEFICIARIES.** The interest of any Trust Beneficiary who has not attained the age of thirty-five (35) years (the "required age"), or who may be otherwise legally disabled, and whose interest is not otherwise covered by the provisions of this Trust Declaration or another Trust, may, in the sole and absolute discretion of the Trustee, be continued in Trust, or be held as a separate trust, for the use and benefit of that person until such person shall attain the required age or until such person is no longer disabled. For so long as the trust shall exist, the Trustee shall hold, manage, and make distributions of income and principal to provide for his or her health, education, support and maintenance. The Trustee may make an entire distribution of principal to a Trust Beneficiary prior to the required age if, in the Trustee's determination alone, the beneficiary has demonstrated an ability to conserve his or her resources or if it is no longer feasible for the trust to continue considering the size of the trust and the time and cost to maintain the trust. The Trust Beneficiary, with consent of the Trustee, may also extend the term of the trust.

For so long as the Trust is held for a beneficiary pursuant to these terms, the Trust Beneficiary, using a qualified beneficiary designation, will have the right to appoint the beneficiaries of his or her interest in the Trust entitled to his or her interest upon the Trust Beneficiary's death. If the Trust Beneficiary dies prior to a final distribution of his or her interest from the Trust, without having made a qualified beneficiary designation, that person's interest will pass *per stirpes* to his or her descendants then living, or if none, *per stirpes* to Settlor's descendants then living.

K.    **PERPETUITIES.** In no event will the term of this Trust continue for a term greater than twenty-one (21) years after the death of the last survivor of Settlor and all relatives of Settlor living on the effective date of this Trust Declaration. Any continuation of the Trust by the qualified exercise of a power of appointment will be construed as the creation of a separate trust and an extension of the Rule Against Perpetuities to the extent permitted by law. A court of competent jurisdiction is to liberally construe and apply this provision to validate an interest consistent with Settlor's intent and may reform or construe an interest according to the doctrine of *cy pres*.

Page 15 of 23 Pages

003285

### ARTICLE VII.
### PAYMENT OF DEBTS, TAXES, AND
### SETTLEMENT COSTS
### EXERCISE OF ELECTIONS

The following directions concern the payment of debts, taxes, estate and trust settlement costs, and the exercise of any election permitted by Texas law or by the Internal Revenue Code:

A.  **PAYMENT OF INDEBTEDNESS AND SETTLEMENT COSTS.** The Trustee will have the discretionary authority to pay from the Trust Fund the costs reasonably and lawfully required to settle the estate of a deceased beneficiary. In the event there is more than one Trust Beneficiary immediately preceding the death of a beneficiary, distributions of Trust income and principal to pay settlement costs will not exceed that person's trust share or the fair market value of the beneficiary's interest in the Trust which is distributable by reason of his or her death.

B.  **SPECIAL BEQUESTS.** Unless otherwise provided in this Trust document, or in any amendment, or in a document exercising a power to appoint the beneficiaries of this Trust, if property given as a special bequest or gift is subject to a mortgage or other security interest, the designated recipient of the property will take the asset subject to the obligation and the recipient's assumption of the indebtedness upon distribution of the asset to the recipient. The obligation to be assumed shall be the principal balance of the indebtedness on date of death, and the Trust shall be entitled to reimbursement or offset for principal and interest payments paid by the Trust to date of distribution.

C.  **ESTATE, GENERATION SKIPPING, OR OTHER DEATH TAX.** Unless otherwise provided in this Trust document, or in a document exercising a power to appoint the beneficiaries of this Trust, estate, inheritance, succession, or other similar tax shall be charged to and apportioned to those whose gifts or distributive share generate a death tax liability by reason of Settlor's death or by reason of a taxable distribution from the Trust or a taxable termination of the Trust. To the extent Settlor may lawfully provide, a Trustee may pay and deduct from a beneficiary's distributive share (whether the distribution is to be paid outright or is to be continued in Trust)·the increment in taxes payable by reason of a required distribution or termination of interest (i.e., estate, gift, inheritance, or generation skipping taxes) to the extent that the total of such taxes payable by reason of a distribution or

003286

termination is greater than the tax which would have been imposed if the property of the Trust subject to the distribution or termination of interest had not been taken into account in determining the amount of such tax. To the extent a tax liability results from the distribution of property to a beneficiary other than under this Trust, the Trustee will have the authority to reduce any distribution to the beneficiary from this Trust by the amount of the tax liability apportioned to the beneficiary, or if the distribution is insufficient, the Trustee will have the authority to proceed against the beneficiary for his, her, or its share of the tax liability. In making an allocation, the Trustee may consider all property included in the gross estate of the Settlor for federal estate tax purposes, including all property subject to probate, all amounts paid or payable to another as the result of death, including life insurance proceeds, proceeds from a qualified retirement plan or account, proceeds from a joint and survivorship account with a financial institution or brokerage company, proceeds from a buy-sell or redemption contract, and/or any other plan or policy which provides for a payment of death benefits. This provision further contemplates and includes any tax which results from the inclusion of a prior transfer in the federal gross estate of Settlor even though possession of the property previously transferred is vested in someone other than the Trustee. This provision does not include a reduction in the unified credit by reason of taxable gifts previously made by Settlor. If the Trustee determines that the collection of an apportioned tax liability against another is not economically feasible or probable, the tax liability will be paid by the Trust and will reduce the amount distributable to the residuary beneficiaries. The Trustee's judgment with regard to the feasibility of collection is to be conclusive.

D.   **SPECIAL ELECTION FOR QUALIFIED TERMINABLE INTEREST PROPERTY.**
For the purpose of identifying the "transferror" in allocating a GST exemption, the estate of Holli Hardin Fontenot or the Trustee of this Trust may elect to treat all of the property which passes in Trust to Dallas Joseph Fontenot, Jr. for which a marital deduction is allowed, by reason of Section 2056(b)(7) or Section 2523(f) of the Internal Revenue Code, as if the election to be treated as Qualified Terminable Interest Property had not been made. Reference to the "Special Election For Qualified Terminable Interest Property" will mean and identify the election provided by Section 2652(a)(2) of the Internal Revenue Code. The term "GST Exemption" or "GST Exemption Amount" is the dollar amount of property which may pass as generation skipping transfers under Subtitle B,

003287

Chapter 13, of the Internal Revenue Code of 1986 which is exempt from the generation-skipping tax.

E.    **ELECTIVE DEDUCTIONS.**  A Trustee will have the discretionary authority to claim any obligation, expense, cost, or loss as a deduction against either estate tax or income tax, or to make any election provided by Texas law, the Internal Revenue Code, or other applicable law, and the Trustee's decision will be conclusive and binding upon all interested parties and shall be effective without obligation to make an equitable adjustment or apportionment between or among the beneficiaries of this Trust or the estate of deceased beneficiary.

## ARTICLE VIII.
## SERVICE OF THE TRUSTEE
## OTHER MATTERS

A.    **GENERAL AUTHORITY.**  A Trustee is to serve without Court supervision.  The service of a Trustee is to be governed first by the terms, conditions, and authority prescribed by this Trust Declaration, and then as prescribed by the trust laws of the State of Texas.

B.    **RETENTION OF ASSETS.**  A Trustee will have the authority to retain, without liability, any and all property in the form in which it is received by the Trustee without regard to its productivity or the proportion that any one asset or class of assets may bear to the whole.  A Trustee will not have liability nor responsibility for loss of income from or depreciation in the value of property which was retained in the form which the Trustee received it.

C.    **UNDIVIDED INTERESTS.**  A Trustee will have the authority to hold, acquire, and dispose of undivided interests in property.

D.    **LENDING, INVESTING.**  A Trustee will have the authority to lend, borrow, lease, sell, and purchase property, including undivided fractional interests in property, upon such terms and conditions as are reasonably prudent under the facts and circumstances then existing.  A Trustee may transact business, including lending, borrowing, leasing, and sale, between two or more related trusts or persons upon such terms and conditions as are reasonably prudent under the facts and circumstances then existing.  Without limiting the general authority above given, a Trustee will have the authority to hold, acquire and sell:

Page 18 of 23 Pages

003288

- Publicly traded securities, including stocks, bonds, warrants, futures, mutual funds, partnerships, real estate investment trusts, diversified asset funds.
- Interests in a closely held corporation, partnership, or trust, whether registered or not registered for public sale.
- Obligations of the United States Government or any other government.
- Cash deposits, money market funds, brokerage company accounts, certificates of deposit, savings accounts, and checking accounts, without limitation as to the location of the account or depository.
- Promissory notes, secured and unsecured, including mortgage notes purchased at a discount.
- Land, improved and unimproved, whether presently income producing or held for appreciation in value.
- Land, building and equipment leases.
- Minerals, mineral rights and working interests in mineral producing property or property held for future development.
- Equipment, implements, stock in trade, leasehold improvements, and livestock.
- Insurance policies.

E. **LIMITATION UPON A TRUSTEE'S LIABILITY.** A Trustee, other than a banking corporation serving as a Trustee, will not have personal liability for service in a fiduciary capacity other than for acts or omissions to act which, as determined by a court of law, constitute gross negligence or fraud.

F. **PROTECTION OF THE INTERESTS OF BENEFICIARIES.** No beneficiary will have the power to anticipate, encumber or transfer any interest in the Trust. No part of the Trust will be liable for or charged with any debts, contracts, liabilities or torts of a beneficiary or subject to seizure or other process by any creditor of a beneficiary.

G. **RELATIONSHIP WITH BENEFICIARIES WHO ARE MINORS OR INCOMPETENTS.** Distributions to an incompetent or disabled beneficiary, or a Minor Beneficiary may be made in such of the following ways as in the Trustee's opinion will be most beneficial to the interests of the beneficiary: (a) directly to such beneficiary; (b) to his or her parent, guardian or legal representative; (c) to a custodian for said beneficiary under any Uniform Gifts to Minors Act and/or Gifts of Securities to Minors Act in the jurisdiction of residence of such beneficiary; (d) to any person with whom he or she is residing; (e) to some near relative or close friend; or (f) by

Page 19 of 23 Pages

003289

the Trustee using such payment directly for the benefit of such beneficiary, including payments made to or for the benefit of any person or persons whom said beneficiary has a legal obligation to support. The Trustee may in the Trustee's sole discretion instead hold such income or corpus for the account of such beneficiary as custodian. A receipt from a beneficiary or from his parent, guardian, legal representative, relative, close friend, or other person described above shall be a sufficient discharge to the Trustee from any liability for making said payments.

The Trustee is likewise authorized to consult with and act upon the advice of the parent, guardian, custodian, or legal representative of any beneficiary who is either an incompetent or a Minor with respect to any and all matters which may arise under this Declaration and as concerns the rights or interests of said beneficiary. All statements, accounts, documents, releases, notices, or other written instruments, including but not limited to written instruments concerning the resignation or replacement of any Trustee or Trustees, required to be delivered to or executed by such beneficiary may be delivered to or executed by the parent, guardian, custodian, or legal representative of said incompetent or Minor Beneficiary, and when so delivered or executed shall be binding upon said incompetent or Minor Beneficiary, and shall be of the same force and effect as though delivered to or executed by a beneficiary acting under no legal disability.

## ARTICLE IX.
### UNPRODUCTIVE OR UNDERPRODUCTIVE PROPERTY

A beneficiary who is then entitled to the income of the Trust, or the income of any other Trust established or continued pursuant to this trust declaration, will have the authority to issue a written directive to the Trustee to convert Trust Property which does not produce an income, or which is underproductive, into property which is income producing or which will provide a greater income to the trust. Upon actual receipt of an income beneficiary's written directive, the Trustee will reasonably and prudently proceed to convert unproductive or underproductive property into property which will produce a reasonable and safe rate of return. The Trustee may do so by selling the unproductive or underproductive asset upon such terms and conditions as is prudent and reasonable under all circumstances which may then exist (including the acceptance of an income or interest bearing obligation as the whole or a part of the sales price), and investing the proceeds of sale in income producing instruments or obligations. Notwithstanding

Page 20 of 23 Pages

003290

these requirements, a Trust Beneficiary cannot direct the Trustee to invest or reinvest trust property in a trust investment which is speculative in nature or which, in result, would violate the spendthrift provisions of this Trust Declaration.

## ARTICLE X.
### NO-CONTEST REQUIREMENTS

Settlor vests in the Trustee the authority to construe this Trust instrument and to resolve all matters pertaining to disputed issues or controverted claims.  Settlor does not want to burden this Trust with the cost of a litigated proceeding to resolve questions of law or fact unless the proceeding is originated by the Trustee or with the Trustee's written permission.  Any other person, agency, or organization who shall originate (or who shall cause to be instituted) a judicial proceeding to construe or contest this Trust instrument, or any will which requires distribution of property to this Trust, or to resolve any claim or controversy in the nature of reimbursement, or seeking to impress a constructive or resulting Trust, or alleging any other theory which, if assumed as true, would enlarge (or originate) a claimant's interest in this Trust or in Settlor's estate, without the Trustee's written permission, shall forfeit any amount to which that person, agency, or organization is or may be entitled and the interest of any such litigant or contestant shall pass as if he or she or it had predeceased us.  These directions shall apply even though the person, agency or organization shall be found by a court of law to have originated the judicial proceeding in good faith and with probable cause and even though the proceedings may seek nothing more than to construe the application of this no-contest provision. This requirement is to be limited, even to the exclusion thereof, in the event it operates to deny the benefits of the federal estate tax or federal gift tax marital deduction.

## ARTICLE XI.
### JURISDICTION

The jurisdiction of this Trust will be the State of Texas.  Any issue of law or fact pertaining to the creation, continuation, administration, and termination of the Trust, or any other matter incident to this Trust, is to be determined with reference to the specific directions in the Trust Declaration and then under the laws of the State of Texas.  If a Article or Subsection of this Trust Declaration is in conflict with a prohibition of state law or federal law, the Article or Subsection, or the Trust Declaration as a whole, is to be construed in a manner which will cause it to be

Page 21 of 23 Pages

003291

in compliance with state and federal law and in a manner which will result in the least amount of taxes and estate settlement costs.

## ARTICLE XII.
### ACCEPTANCE BY TRUSTEE

Holli Hardin Fontenot acknowledges that she is the initial Trustee of the DAKOTA TRUST. By execution of this Trust Declaration, Holli Hardin Fontenot accepts the office of Trustee and agrees to hold and administer the Trust according to the provisions thereof and as required by law.

### CONCLUSION AND ATTESTATION

Holli Hardin Fontenot attests that she has executed this Trust Declaration on the date set forth below, and the terms thereof will bind her, her successors and assigns, and her heirs and personal representatives. This instrument is to be effective upon the date recorded immediately below.

Dated:    November 9, 1994


original signed by Holli Hardin Fontenot
_____
Holli Hardin Fontenot, individually and as Trustee

003292

STATE OF TEXAS        §
                             §

COUNTY OF HARRIS     §

On this __9th__ day of ___November___ in the year 199_4_ before me, a Notary Public of said State, personally appeared Holli Hardin Fontenot, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument, and acknowledged that she executed the same in the capacities expressed therein.

WITNESS MY HAND and official seal.

_____
Notary Public, State of Texas

[SEAL]

003293



## SCHEDULE A TO
## TRUST DECLARATION
## DAKOTA TRUST

The Sum of SIXTY FOUR THOUSAND AND NO/100 DOLLARS ($64,000.00) from the Holli Ann Hardin Sole and Separate Property Account, which sum constitutes the separate property of the Settlor

Page 24 of 23 Pages

003294

This trust may need a demand power after Holli's death so that we can take advantages of $10,000 per year exclusion for gifts of present interest.

Page 25 of 23 Pages

003295



TO WHOM IT MAY CONCERN:

I, Holli Ann Hardin Fontenot, hereby voluntarily resign as trustee of the Holli Ann Hardin Fontenot Trust Number One and the Dakota Trust. This resignation as trustee shall be effective immediately upon acceptance by Dallas J. Fontenot, Jr.

Very truly yours,

Holli Ann Hardin Fontenot

Agreed and accepted this  8  day of  SEP  , 1996.

Dallas J. Fontenot, Jr.

LDX233:19

TOTAL P.03

003296

LINDA GOEHRS IN HER CAPACITY
AS
TRUSTEE OF THE HOLLI ANN
HARDIN
TRUST NUMBER ONE
Plaintiff,
v.
DAKOTA FONTENOT,
Defendant.

537721

Probate Court No. 1

④

TO WHOM IT MAY CONCERN:

I, Holli Ann Hardin Fontenot, hereby voluntarily resign as trustee of the Holli Ann Hardin Fontenot Trust Number One and the Dakota Trust. This resignation as trustee shall be effective immediately upon acceptance by Dallas J. Fontenot, Jr.

Very truly yours,

Holli Ann Hardin Fontenot

Agreed and accepted this __8__ day of __SEPT__, 1996.

Dallas J. Fontenot, Jr.

LDK233:19

EXHIBIT

2

003296

LINDA GOEHRS, IN HER CAPACITY AS
TRUSTEE OF THE HOLLI ANN HARDIN
TRUST NUMBER ONE
Plaintiff,

v.

DAKOTA FONTENOT,
Defendant.

Probate Court No. 1

537721

# DESIGNATION OF SUCCESSOR TRUSTEE
## Dakota Trust

The undersigned Dallas Joseph Fontenot, Jr., Successor Trustee of Dakota Trust, a trust established by Trust Declaration of Holli Ann Fontenot dated November 9, 1994 ("Trust Declaration") does hereby declare as follows:

Article V, Section C of the Trust Declaration provides in part that:

> SUCCESSION. Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment will have the right to appoint a successor or successors to serve as Trustee in the event that person ceases to serve for any reason, and each Trustee may specify any conditions upon succession and service as may be permitted by law. For example, a successor may be required to furnish a fiduciary bond as a prerequisite or a successor's service may be conditioned upon another appointee's death, resignation, or inability to serve. Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment may also provide that one or more designated successors as Trustee will have the authority to appoint his, her, or its successor as Trustee. An appointment of successor Trustee must be in writing and must be acknowledged to be effective.

Pursuant to Article V, Section C of the Trust Declaration, Dallas Joseph Fontenot, Jr. appoints Dakota James Fontenot as successor Trustee, to serve immediately upon the death, disability, resignation, or disqualification of Dallas Joseph Fontenot, Jr.

Dallas Joseph Fontenot, Jr. appoints Frost Bank to serve as successor Trustee upon the death, disability, resignation, or disqualification of Dakota James Fontenot.

Each Trustee will have the right to appoint a successor or successors to serve as trustee of the Trust in the event that he ceases to serve for any reason, and such Trustee may specify any conditions upon succession and service as may be permitted by law.

The incapacity or disability of a trustee hereunder shall be (i) determined by a duly licensed physician representing that he or she is certified by a recognized medical board and is not related by blood or marriage to any trustee or beneficiary hereunder; and (ii) evidenced by a writing which is executed, witnessed, and acknowledged certifying that such a physician is familiar with the physical and mental condition of a person and has concluded that, by reason of accident, physical, or mental deterioration, or other similar cause, such person was, as of the date thereof, unable to give prudent, prompt, and intelligent consideration to financial matters. No judicial determination of incapacity

EXHIBIT

3

000355

or disability shall be necessary. Any physician's certificate described above may be revoked by a similar certificate to the effect that such person is no longer incapacitated, which certificate must be executed either (i) by the originally certifying physician or (ii) by two other licensed, unrelated physicians. In the case of a revocation of a certificate of incapacity or disability of a trustee hereunder, such revocation shall cause such trustee to regain his or her appointment as trustee, and the then serving successor trustee shall be relieved of his or her duties.

This Designation of Successor Trustee shall be effective as of May 1, 2013 and shall revoke and replace all prior Designations of Successor Trustee.

_____ "
Dallas Joseph Fontenot, Jr., Trustee

STATE OF NEVADA
COUNTY OF _Clark_

This document was acknowledged before me on the _7TH_ day of May, 2013 by Dallas Joseph Fontenot, Jr., Trustee.

MICHAEL J. MOORE
Notary Public State of Nevada
No. 08-7991-1
My Appt. Exp. September 11, 2016

_____
Notary Public, State of Nevada

UNOFFICIAL COPY

000356

LINDA GOEHRS, IN HER CAPACITY AS
TRUSTEE OF THE HOLLI ANN HARDIN
TRUST NUMBER ONE
Plaintiff,

v.

DAKOTA FONTENOT,
Defendant.

Probate Court No. 1

537721

## DESIGNATION OF SUCCESSOR TRUSTEE
### Dakota Trust

The undersigned Dallas Joseph Fontenot, Jr., Successor Trustee of Dakota Trust, a trust established by Trust Declaration of Holli Ann Fontenot dated November 9, 1994 ("Trust Declaration") does hereby declare as follows:

Article V, Section C of the Trust Declaration provides in part that:

SUCCESSION. Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment will have the right to appoint a successor or successors to serve as Trustee in the event that person ceases to serve for any reason, and each Trustee may specify any conditions upon succession and service as may be permitted by law. For example, a successor may be required to furnish a fiduciary bond as a prerequisite or a successor's service may be conditioned upon another appointee's death, resignation, or inability to serve. Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment may also provide that one or more designated successors as Trustee will have the authority to appoint his, her, or its successor as Trustee. An appointment of successor Trustee must be in writing and must be acknowledged to be effective.

Pursuant to Article V, Section C of the Trust Declaration, Dallas Joseph Fontenot, Jr. removes all prior appointments of appoints Dakota James Fontenot as successor Trustee and, instead, appoints Frost Bank to serve as successor Trustee upon the death, disability, resignation, or disqualification of Dallas Joseph Fontenot, Jr.

Each Successor Trustee will have the right to appoint a successor or successors to serve as trustee of the Trust in the event that he ceases to serve for any reason, and such Trustee may specify any conditions upon succession and service as may be permitted by law.

The incapacity or disability of a trustee hereunder shall be (i) determined by a duly licensed physician representing that he or she is certified by a recognized medical board and is not related by blood or marriage to any trustee or beneficiary hereunder; and (ii) evidenced by a writing which is executed, witnessed, and acknowledged certifying that such a physician is familiar with the physical and mental condition of a person and has concluded that, by reason of accident, physical, or mental deterioration, or other similar cause, such person was, as of the date thereof, unable to give prudent, prompt, and intelligent consideration to financial matters. No judicial determination of incapacity or disability shall be necessary. Any physician's certificate described above may be

UNOFFICIAL COPY

**EXHIBIT**

4

exhibitsticker.com

000456

revoked by a similar certificate to the effect that such person is no longer incapacitated, which certificate must be executed either (i) by the originally certifying physician or (ii) by two other licensed, unrelated physicians. In the case of a revocation of a certificate of incapacity or disability of a trustee hereunder, such revocation shall cause such trustee to regain his or her appointment as trustee, and the then serving successor trustee shall be relieved of his or her duties.

This Designation of Successor Trustee shall be effective as of October 14, 2017 and shall revoke and replace all prior Designations of Successor Trustee.

_____
Dallas Joseph Fontenot, Jr., Trustee

STATE OF TEXAS
COUNTY OF Harris

This document was acknowledged before me on the 14th day of October, 2017 by Dallas Joseph Fontenot, Jr., Trustee.

_____
Notary Public, State of Texas

DIANNE N SKINNER
Notary ID # 126280969
My Commission Expires
November 11, 2019

000457

LINDA GOEHRS, IN HER CAPACITY AS
TRUSTEE OF THE HOLLI ANN HARDIN
TRUST NUMBER ONE
Plaintiff,
v.
DAKOTA FONTENOT,
Defendant.

### RESOLUTIONS ADOPTED BY
### WRITTEN CONSENT OF SHAREHOLDER AND DIRECTOR OF
### VIVA LAS VEGAS PROPERTIES, INC.
(OCTOBER 14, 2017)

The undersigned, being the sole shareholder of Viva Las Vegas Properties, Inc., a corporation organized and existing under the laws of Texas, does by this writing consent to take the following actions and adopt the following resolutions:

> RESOLVED that the following persons person is elected as the sole Director of Viva Las Vegas Properties, Inc., to serve at the discretion of the Shareholder from October 14, 2017 until such time as his successors are elected by the Shareholder and qualify:

> Dallas Fontenot

The undersigned direct that this consent be filed with the minutes of the proceeding of the Shareholders of Viva Las Vegas Properties, Inc.

The undersigned, now being the sole director of Viva Las Vegas Properties, Inc., does by this writing consent to take the following actions and adopt the following resolutions:

> RESOLVED that the following person is elected to the offices of Viva Las Vegas Properties, Inc. set forth below, to serve at the discretion of the director from October 14, 2017 until such time as his successors are elected by the Shareholder and qualify:

> Dallas Fontenot        President
> Dallas Fontenot        Secretary

ESOLVED that Dakota Fontenot is hereby removed from all offices and all positions as a Director of Viva Las Vegas Properties, Inc. from and after October 14, 2017.

The undersigned direct that this consent be filed with the minutes of the proceeding of the Directors of Viva Las Vegas Properties, Inc.

This consent is executed pursuant to the laws of Texas and the Bylaws of Viva Las Vegas Properties, Inc., which authorize the taking of action by the Shareholders and Directors by unanimous written consent without a meeting. This consent is intended to substitute for a special meeting of the Shareholders and Directors of Viva Las Vegas Properties, Inc. Only those persons named above shall serve as Directors until a subsequent election or appointment by the

**EXHIBIT**

**5**

exhibitsticker.com

000437

Shareholder of Viva Las Vegas Properties, Inc. Only those persons named above shall serve as an officer until a subsequent election or appointment by the Director of Viva Las Vegas Properties, Inc.

Dated to be effective as of October 14, 2017.

Viva Las Vegas Properties, Inc., Shareholder

by: _____
Dallas Fontenot, President

_____
Dallas Fontenot, Director

000438

LINDA GOEHRS, IN HER CAPACITY AS
TRUSTEE OF THE HOLLI ANN HARDIN
TRUST NUMBER ONE
Plaintiff,
v.
DAKOTA FONTENOT,
Defendant.

Case 4:26-cv-02743  Document 6-1  Filed 04/29/26 in TXSD  Page 429 of 1053

537721

Probate Court No. 1

## VIVA LAS VEGAS PROPERTIES, INC.

### UNANIMOUS JOINT WRITTEN CONSENT OF THE SOLE SHAREHOLDER AND SOLE DIRECTOR

### IN LIEU OF A SPECIAL MEETING

May 1ˀ, 2023

The undersigned, being the sole shareholder (the "*Shareholder*") and the sole member of the Board of Directors (the "*Board*") of **VIVA LAS VEGAS PROPERTIES, INC.**, a Texas corporation (the "*Corporation*"), in lieu of holding a special meeting of the Shareholder and the Board, the call and notice of each of which are hereby expressly waived, do hereby consent to the following resolutions:

**Loss or Destruction of Corporate Records**

 **WHEREAS**, the Corporation was formed as a Texas Corporation by filing of Articles of Incorporation (the "*Articles*") with the Texas Secretary of State on September 20, 1994 (the "*Formation*");

 **WHEREAS**, subsequent to the Formation, all corporate records of the Corporation were maintained by or on the behalf of Dallas Joseph Fontenot, Jr. ("*Mr. Fontenot*");

 **WHEREAS**, Mr. Fontenot died on September 3, 2021, and since such date, no corporate records of the Corporation have been located after a diligent search by his heirs and authorized affiliates; and

 **WHEREAS**, the Shareholder and the Board desire to create new corporate records to govern the affairs of the Corporation, effective as of the date first set forth above to, among other things, replace the original records of the Corporation which have been lost or misplaced, elect the sole member of the Board, elect officers, adopt new Bylaws, and adopt and reflect the issuance of new share certificates (collectively, the "*New Records*").

 **RESOLVED**, that New Records shall be obtained and adopted to replace any records of the Corporation which may be in existence, as of the date first written above.

**Election of Directors**

 **WHEREAS**, the Shareholder desires to reconstitute the Board of the Corporation and remove any members of the Board which may have been previously elected.

008402\00002\3535058.1 - 5/17/2023 12:45:19 PM

1

EXHIBIT

6

**RESOLVED,** that the following named person be, and hereby is, elected to serve as a member of the Board, and to serve in such capacity until his respective successor has been duly elected and qualified, or until his earlier death, resignation or removal:

Dakota Fontenot

**FURTHER RESOLVED,** that any member of the Board not listed above is hereby removed from the Board.

## Election of Officers

**WHEREAS,** immediately following the reconstitution of the Board, the Board desires to reconstitute the officers of the Corporation and remove any officers which may have been previously elected.

**RESOLVED,** that the following named person be, and hereby is, elected to the offices set forth opposite his name, to serve in such capacity until his successor is duly elected and qualified or until his earlier death, resignation or removal:

Dakota Fontenot                    President and Secretary

**FURTHER RESOLVED,** that the officer is empowered to carry out the day-to-day business of the Corporation, subject to the direction and control of the Board.

**FURTHER RESOLVED,** that any officer of the Corporation not listed above is hereby removed from any such office they may have held with the Corporation.

## Corporate Records

**WHEREAS,** the corporate records of the Corporation, including its minute book cannot be located, and as such the Shareholder and the Board desire to create the New Records to replace the missing corporate records.

**RESOLVED,** that the Corporation shall recreate and maintain, as part of its corporate records, a minute book that shall include, but that shall not be limited to, records of the Corporation's Certificate of Formation and amendments thereto, its Bylaws and amendments thereto, minutes of all meetings of the Board, minutes of all meetings of the Shareholder, the time and the place of each such meeting, whether the meeting was regular or special, the manner in which the meeting was authorized, the notice given, the names of those present or represented at the meeting and the proceedings of each meeting; and

**FURTHER RESOLVED,** that the Secretary of the Corporation be, and hereby is, authorized and directed to procure such a replacement minute book and such other books and records as may be required by the Corporation.

## Articles of Incorporation

RESOLVED, that a copy of the filed Articles bearing the file stamp of the Secretary of State of Texas be inserted into the replacement minute book of the Corporation.

## Amended and Restated Bylaws

WHERAS, consistent with the adoption of New Records, and immediately following the reconstitution of the Board, the Board and Shareholder deem it advisable and in the best interests of the Corporation to enter into those certain Amended and Restated Bylaws dated as of even date herewith (the "*Amended and Restated Bylaws*"), by which any Bylaws, amendments thereto, or amendments and restatements thereof, of the Corporation shall be amended and restated in their entirety.

RESOLVED, that the form of Amended and Restated Bylaws presented to the Board and Shareholder for review be, and hereby are, approved and adopted as the Amended and Restated Bylaws of the Corporation; and

FURTHER RESOLVED, that the President of the Corporation is directed to certify a copy of the Amended and Restated Bylaws, insert them into the minute book of the Corporation, and maintain them in the principal office of the Corporation, open for inspection by the Shareholder of the Corporation at all reasonable times during office hours.

## Qualification in Other Jurisdictions

RESOLVED, that the Corporation qualify to engage in business in any state of the United States or any foreign country in which the Board determines it to be necessary or appropriate for the Corporation to qualify to do business;

FURTHER RESOLVED, that the proper officers of the Corporation be, and hereby are, authorized and directed on behalf of the Corporation to make and file such certificates, reports or other instruments as may be required by the laws of such jurisdiction to be filed for that purpose; and

FURTHER RESOLVED, that the officers of the Corporation be, and each acting separately hereby is, authorized and directed to pay all fees and expenses incident to and necessary for the qualification of the Corporation to do business in any state or foreign country.

## Licenses and Tax Permits

RESOLVED, that the officers of the Corporation be, and each acting separately hereby is, authorized and directed to obtain, in the name of the Corporation, such licenses and tax permits as may be required by any applicable federal, state, county or municipal governmental statute, ordinance or regulation for the conduct of the business of the Corporation within any jurisdiction in which the Corporation shall have qualified to do business.

3

## Banking Authority

**RESOLVED**, that the Secretary of the Corporation be, and hereby is, authorized and directed to select one or more financial institutions for the deposit of the Corporation's cash and securities, the deposit and collection of checks and drafts made payable to the order of the Corporation, issuance of letters of credit on behalf of the Corporation, extensions of credit, and other financial transactions on behalf of the Corporation, and to designate the names of the persons authorized to sign checks, drafts, borrowing requests and other instructions to such financial institutions on behalf of the Corporation;

**FURTHER RESOLVED**, that the Secretary of the Corporation be, and hereby is, authorized to open additional accounts with such additional financial institutions, close any accounts with financial institutions, change the names of the persons authorized to sign check, drafts, borrowing requests and other instructions on behalf of the Corporation as the Secretary deems to be necessary of convenient from time to time;

**FURTHER RESOLVED**, that the form of resolutions specified by any such financial institutions that are designated by the Secretary from time to time be, and hereby are, ratified and approved as the official resolutions of the Corporation and the persons designated from time to time by the Secretary as signatories on such accounts be, and hereby are, approved; and

**FURTHER RESOLVED**, that the Secretary of the Corporation be, and hereby is, authorized and directed to certify the adoption of the form of resolutions required by any such financial institutions from time to time designated by the Secretary and to certify the names and signatures of the persons designated by the Secretary from time to time as signatories on behalf of the Corporation.

## Adoption and Issuance of Share Certificates

**WHEREAS**, all certificates representing shares of stock in the Corporation have been lost or misplaced, and have not been recovered after a diligent search (collectively, the "*Lost Certificates*").

**WHEREAS**, the Corporation has received that certain Affidavit of Lost Stock Certificate of the Shareholder, and the Board and Shareholder believe it is in the best interest of the Corporation to reissue a certificate to the Shareholder, representing 1,000 shares of common stock (no par value) of the Corporation.

**RESOLVED**, that consistent with the adoption of the New Records, the form of share certificate attached hereto as **Exhibit A** be, and hereby is, approved and adopted as the form of share certificate representing the common stock (no par value per share) of the Corporation; and

**FURTHER RESOLVED**, that the certificates shall be consecutively numbered, beginning with the number 1; that the certificates shall bear all legends required by law to be placed on the Corporation's share certificates; and that the certificates shall only be issued in the manner and upon the conditions set forth in the Bylaws.

4

RESOLVED, that the Corporation issue shares of its Common Stock, no par value per share, to the following persons and prepare or cause to be prepared, issued, and executed a certificate representing such shares in exchange for the considerations set forth below, the receipt of which is hereby acknowledged on behalf of the Corporation, which shares, when so issued, shall be validly issued, fully paid and non-assessable, with no personal liability attaching to the ownership thereof:

| Shareholder | Shares | Consideration |
|---|---|---|
| Dakota Trust | 1,000 | $0.00 |

FURTHER RESOLVED, that the Corporation shall refuse to recognize any person other than the Shareholder as a shareholder of the Corporation, refuse to make any payment, transfer, registration, delivery or exchange called for by the Lost Certificates to any person other than the Shareholder, and refuse to take any other action pursuant to the request or demand of any person other than the Shareholder.

## General Authority

RESOLVED, that the officers of the Corporation be, and each acting separately hereby is, authorized and directed to do any and all acts and things and to execute and deliver and accept delivery of, in the name of and on behalf of the Corporation, any and all instruments, agreements, consents, certificates and other documents as in their opinion, or in the opinion of counsel to the Corporation, may be necessary or appropriate in order to carry out the purposes and intent of any of the foregoing resolutions;

FURTHER RESOLVED, that any act or acts of any of the officers of the Corporation which acts would have been authorized by the foregoing resolutions, except that such acts were taken prior to the adoption of such resolutions, be, and they hereby are, severally ratified, confirmed, approved and adopted in all respects as acts in the name and on behalf of the Corporation and

FURTHER RESOLVED, that the Secretary of the Corporation be, and hereby is, authorized and directed to certify the adoption of these resolutions.

*[Balance of Page Intentionally Blank. Signature Page Follows]*

5

This Consent shall be effective as of the date hereof regardless of whether any signature occurs before, or after such date.  All actions taken in this Consent shall be deemed to be taken simultaneously in the location of the Corporation's principal office on the date of this Consent.

EXECUTED by the undersigned to be effective as of the date first set forth above.

SHAREHOLDER:

DAKOTA TRUST

By: _____

Name: Dakota Fontenot

Title: Trustee

DIRECTOR:

By: _____

Name: Dakota Fontenot

Signature Page
Unanimous Joint Written Consent of the Sole Shareholder and Sole Director
of
Viva Las Vegas Properties, Inc.

## EXHIBIT A

SPECIMEN SHARE CERTIFICATE

See attached.



LINDA GOEHRS, IN HER CAPACITY AS TRUSTEE OF THE HOLLI ANN HARDIN TRUST NUMBER ONE
Plaintiff,
v.
DAKOTA FONTENOT,
Defendant.

Case 4:26-cv-02743    Document 6-13    Filed 04/29/26 in TXSD    Page 436 of 1053

537721

Probate Court No. 1

C.A. 21-CPR-036521

| | | |
|---|---|---|
| ESTATE OF | § | IN COUNTY COURT AT LAW |
| DALLAS JOSEPH FONTENOT, JR., | § | |
| DECEASED | § | NO. FOUR (4) OF |
| | § | |
| | § | FORT BEND COUNTY, TEXAS |

No. 21-DCV-288736

| | | |
|---|---|---|
| IN RE | § | IN THE 240TH DISTRICT COURT |
| HOLLI ANN HARDIN TRUST | § | |
| NUMBER ONE | § | OF |
| | § | |
| | § | FORT BEND COUNTY, TEXAS |

## Assignment of Interest & Disclaimer of Further Interest

Pursuant to the Binding Mediation Settlement Agreement reached in the above-captioned cases, and which is attached hereto as Exhibit "A":

1. Holli Ann Fontenot acknowledges receipt of check number 1005 payable to Holli Ann Fontenot in the amount of $2,823,464.00, and which sum represents full satisfaction of eighty five percent (85%) of the total value of The Dakota Trust assets ($1,899,514.00) and twenty percent (20%) of the total value of the Holli Ann Hardin Trust No. 1 assets ($923,950.00).

2. Holli Ann Fontenot hereby assigns any and all beneficial interest she has in the Holli Ann Hardin Trust No. 1 to the Trustee for further administration and distribution by the Trustee.

3. Holli Ann Fontenot assigns any and all beneficial interest she has in The Dakota Trust to the Trustee for further administration and distribution by the Trustee.

4. Holli Ann Fontenot disclaims any right to any further interest in the Holli Ann Hardin Trust No. 1. Holli Ann Fontenot previously resigned as the Trustee of said Trust.

5. Holli Ann Fontenot disclaims any right to any further interest in The Dakota Trust. Holli Ann Fontenot hereby resigns as a fiduciary of said Trust.

[SIGNATURE ON THE FOLLOWING PAGE]

UNOFFICIAL COPY

EXHIBIT

7

SIGNED AND EXECUTED ON __18__ DAY OF JANUARY 2023.

HOLLI ANN FONTENOT

STATE OF TEXAS            §
                         §
COUNTY OF HARRIS          §

This instrument was acknowledged before me on this the _18_ day of January 2023 by Holli Ann Fontenot.

Notary Public in and for
The State of Texas

KARI OLAH
NOTARY PUBLIC
STATE OF TEXAS
ID 131483116
EXP. 03-09-2026

UNOFFICIAL COPY

537721

## AFFIDAVIT OF LOST STOCK CERTIFICATE

STATE OF ___Texas___     §
                         §
COUNTY OF ___Harris___   §
                         §

**DAKOTA TRUST** (the "<u>Stockholder</u>"), deposes and says:

(1)     The Stockholder is entitled to the possession and is the true, lawful and sole beneficial owner of all stock certificates representing shares of issued and outstanding Common Stock, estimated to be 1,000 shares of Common Stock (collectively, the "<u>Original Certificates</u>"), issued by **VIVA LAS VEGAS PROPERTIES, INC.**, a corporation created under the laws of the State of Texas (the "<u>Corporation</u>"), in the name of the Stockholder.

(2)     The Original Certificates were originally acquired by the Stockholder directly from the Corporation, and have been lost, stolen or destroyed.

(3)     The Stockholder has not otherwise endorsed, or authorized anyone else to endorse, the Original Certificates.

(4)     The Stockholder has made or caused to be made a diligent search for the Original Certificates, and has been unable to find or recover them; the Stockholder has not sold, assigned, pledged, transferred, deposited under any agreement or hypothecated the Original Certificates or any interest therein, or signed any power of attorney or other authorization respecting the same which is now outstanding and in force, or otherwise disposed of the same; and no person, firm, corporation, agency or government other than the Stockholder has or has asserted any right, title, claim, equity or interest in, to or respecting the Original Certificates or the proceeds thereof.

(5)     The Stockholder hereby requests that the Corporation, and this Affidavit of Lost Stock Certificate is made for the purposes of inducing the Corporation to, (i) refuse to recognize any person other than the Stockholder as the owner of the Original Certificates; (ii) refuse to make any payment, transfer, registration, delivery or exchange called for by the Original Certificates to any person other than the Stockholder; (iii) refuse to take any other action pursuant to the request or demand of any person other than the Stockholder; and (iv) complete the return of the shares represented by the Original Certificates to the Corporation, and reissue a certificate to the Stockholder in replacement of the Original Certificates, representing 1,000 shares of Common Stock in the Corporation.

(6)     If the Stockholder should find or recover the Original Certificate, the Stockholder will immediately surrender it to the Corporation for cancellation without requiring any consideration therefor.

(7)     The Stockholder agrees in consideration of compliance with the foregoing requests by the Corporation to indemnify and protect the Corporation from any and all liabilities, loss, damage or expense to which the Corporation may be subjected by reason of the loss of the Original Certificates, including claims by any person claiming ownership of the Original Certificates or shares of Corporation's stock represented thereby.

*[SIGNATURE PAGE FOLLOWS]*

008402\00002\3534943.1 - 5/17/2023 12:29:14 PM

1

**EXHIBIT**

8

Signed and delivered by the Stockholder this ⎽19⎽ day of May, 2023.

**DAKOTA TRUST**

By: _____

Name: Dakota Fontenot

Title: Trustee

STATE OF ⎽Texas⎽ §

COUNTY OF ⎽Harris⎽ §
§

BEFORE ME, a notary public, on this day personally appeared Dakota Fontenot, known to me to be the person whose name is subscribed to the foregoing instrument and, being by me first duly sworn, declared that the statements therein contained are true and correct.

GIVEN UNDER MY HAND AND SEAL of office this ⎽19⎽ day of May, 2023.

THANH N DO
Notary ID #126241618
My Commission Expires
September 4, 2023

(Notary's Seal)

NOTARY PUBLIC IN AND FOR THE STATE OF ⎽Texas⎽

Signature Page to
Affidavit of Lost Stock Certificate
(Viva Las Vegas Properties, Inc.)
008402\00002\3534943.1 - 5/17/2023 12:29:14 PM

EXHIBIT

_____ 14 _____

exhibitsticker.com

FILED
09/26/2025 8:51:31 AM
Teneshia Hudspeth
County Clerk
Harris County, Texas
nelson.aguilar

CAUSE NO. 537721

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY AS | § | IN THE PROBATE COURT |
| TRUSTEE OF THE HOLLI ANN | § | |
| HARDIN TRUST NUMBER ONE | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | NUMBER ONE (1) |
| v. | § | |
| | § | |
| DAKOTA FONTENOT | § | |
| *Defendant.* | § | HARRIS COUNTY, TEXAS |

**TEMPORARY INJUNCTION**

On this day, came on for consideration the Application for Temporary Injunction filed by Plaintiff LINDA GOEHRS ("Plaintiff"), in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, against Defendant DAKOTA FONTENOT ("Defendant"). The Court, having considered the Application, evidence, and arguments of counsel, finds that the Application is well taken and should be in all things GRANTED.

It appears from the evidence that unless a Temporary Injunction is granted against Defendant that Plaintiff will suffer probable, imminent, and irreparable harm including but not limited to the loss of assets held in the Holli Ann Hardin Trust Number One, loss of information pertaining to such assets, and inability to recover such assets should Defendant attempt to avoid potential liability. Plaintiff has demonstrated a likelihood of success on the merits of this case and there is no adequate remedy at law for the damages threatened. Plaintiff has further demonstrated a probable right to the relief sought upon final hearing or trial hereof. A balancing of the equities strongly favors the granting of this Temporary Injunction to prevent the threatened harm, and the threatened injury to Plaintiff outweighs the threatened harm to Defendant by the



granting of this Temporary Injunction, which is limited in time and will not disserve the public interest.

The Court THEREFORE ORDERS as follows:

1. Defendant is enjoined from selling the real property located at 3414 Old Richmond Road, Rosenberg, Texas 77471;

IT IS FURTHER ORDERED, that this Temporary Injunction is binding upon Defendant and all officers, agents, services, employees, attorneys, and all other persons in active concert or participation with Defendant who receive notice of this Order.

IT IS FURTHER ORDERED, that the Clerk of the Court shall issue a Writ of Injunction pending final hearing and determination of this case enjoining all parties detailed in the preceding paragraph from the actions detailed herein.

IT IS FURTHER ORDERED, that prior to the issuance of the injunction, Plaintiff shall file with the Court a bond executed by Plaintiff in the sum of $5,000.00 payable to Defendant, approved and conditioned as required by law.

IT IS FURTHER ORDERED, that this Temporary Injunction shall be effective upon filing of the bond and shall remain intact and will not expire, until the conclusion of the trial on the merits.

All relief not expressly granted in is hereby DENIED.

Signed: 09/25/2025
3:56:23 PM

JUDGE PRESIDING

APPROVED AND ENTRY REQUESTED:



**TEXAS PROBATE
ATTORNEY** PLLC
EST. 2001

RUDOLPH M. CULP
State Bar No. 24043014
rudy@texsprobateattorney.com
COLLIN J. BULLARD
State Bar No. 24129570
collin@texasprobateattorney.com
BAILEY D. BOWE
State Bar No. 24142201
bailey@texasprobateattorney.com
*EFILE EMAIL: efile@texasprobateattorney.com*
**HOUSTON OFFICE:**
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
O: (713) 297-0700
F: (817) 383-5110
**ATTORNEYS FOR PLAINTIFF**

UNOFFICIAL COPY

537721

FILED
10/6/2025 3:06 PM
Teneshia Hudspeth
County Clerk
Harris County - County Probate Court No. 1
Accepted By: EK

**EXHIBIT**

**15**

# SureTec Insurance Company

## 2103 CityWest Blvd. #1300, Houston, Texas 77042

FILED
10/09/2025 11:21:20 AM
Teneshia Hudspeth
County Clerk
Harris County, Texas
nelson.aguilar

Linda Goehrs, In Her Capacity as Trustee of The Holli Ann Hardin Trust Number One

§
§
§
§
§
§
§
§
§
§
§
§
§
§

V.

Dakota Fontenot

_Harris_ COUNTY, _Texas_

In The Probate Court Number One (1)

Bond No. ___3538658___

## TEMPORARY INJUNCTION BOND

### Cause No. ___537,721___

KNOW ALL MEN BY THESE PRESENTS:

That we, ___Linda Goehrs___, as Principal and ___SureTec Insurance Company___, as Surety, acknowledge ourselves bound to pay to the said Defendant, in the above entitled and numbered suit, the sum of _Five Thousand Dollars & No/100_ , ($ _5,000.00_ ) conditioned that said Principal, as complainant in said suit, will abide by the decision which may be made therein, and will pay all sums of money and costs that may be adjudged against the undersigned Principal if the Temporary Injunction be dissolved in whole or in part.

SIGNED AND SEALED this ___6th___ day of ___October___, ___2025___

___Rudolph M. Culp___
Attorney of Record

___24 Greenway Plaza #1825___
Address
___Houston, Texas 77046___

Phone
___713-297-2700___

Linda Goehrs

Principal
By: _(signature)_ Linda Goehrs

SureTec Insurance Company

By: _(signature)_
John H. Compton Attorney in Fact

The above Bond and Oath approved
Signed on: 10/08/2025 2:58:25 PM

By: ___ _(signature)_ JUDGE
Probate Court One, Harris County TX

BH

POA# 4221206

# JOINT LIMITED POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS: That SureTec Insurance Company, a Corporation duly organized and existing under the laws of the State of Texas and having its principal office in the County of Harris, Texas and Markel Insurance Company (the "Company"), a corporation duly organized and existing under the laws of the state of Illinois, and having its principal administrative office in Glen Allen, Virginia, does by these presents make, constitute and appoint:

### John H. Compton, Higdon Oscar Compton, Jr.

Their true and lawful agent(s) and attorney(s)-in-fact, each in their separate capacity if more than one is named above, to make, execute, seal and deliver for and on their own behalf, individually as a surety or jointly, as co-sureties, and as their act and deed any and all bonds and other undertaking in suretyship provided, however, that the penal sum of any one such instrument executed hereunder shall not exceed the sum of:

### Five Million and 00/100 Dollars ($5,000,000.00)

This Power of Attorney is granted and is signed and sealed under and by the authority of the following Resolutions adopted by the Board of Directors of SureTec Insurance Company and Markel Insurance Company:

"RESOLVED, That the President, any Senior Vice President, Vice President, Assistant Vice President, Secretary, Assistant Secretary, Treasurer or Assistant Treasurer and each of them hereby is authorized to execute powers of attorney, and such authority can be executed by use of facsimile signature, which may be attested or acknowledged by any officer or attorney, of the company, qualifying the attorney or attorneys named in the given power of attorney, to execute in behalf of, and acknowledge as the act and deed of the SureTec Insurance Company and Markel Insurance Company, as the case may be, all bond undertakings and contracts of suretyship, and to affix the corporate seal thereto."

IN WITNESS WHEREOF, Markel Insurance Company and SureTec Insurance Company have caused their official seal to be hereunto affixed and these presents to be signed by their duly authorized officers on the 9th day of February , 2023 .

SureTec Insurance Company

By: _____
Michael C. Keimig, President

Markel Insurance Company

By: _____
Lindey Jennings, Vice President

State of Texas
County of Harris:

On this 9th day of February , 2023 A. D., before me, a Notary Public of the State of Texas, in and for the County of Harris, duly commissioned and qualified, came THE ABOVE OFFICERS OF THE COMPANIES, to me personally known to be the individuals and officers described in, who executed the preceding instrument, and they acknowledged the execution of same, and being by me duly sworn, disposed and said that they are the officers of the said companies aforesaid, and that the seals affixed to the proceeding instrument are the Corporate Seals of said Companies, and the said Corporate Seals and their signatures as officers were duly affixed and subscribed to the said instrument by the authority and direction of the said companies, and that Resolutions adopted by the Board of Directors of said Companies referred to in the preceding instrument is now in force.

IN TESTIMONY WHEREOF, I have hereunto set my hand, and affixed my Official Seal at the County of Harris, the day and year first above written.

JULIE E. MCCLARY
Notary Public State of Texas
Commission # 12947680-5
Commission Expires March 29, 2026

By: _____
Julie E. McClary, Notary Public
My commission expires 3/29/2026

We, the undersigned Officers of SureTec Insurance Company and Markel Insurance Company do herby certify that the original POWER OF ATTORNEY of which the foregoing is a full, true and correct copy is still in full force and effect and has not been revoked.

IN WITNESS WHEREOF, we have hereunto set our hands, and affixed the Seals of said Companies, on the 6th day of October , 2025 .

SureTec Insurance Company

By: _____
M. Brent Beaty, Assistant Secretary

Markel Insurance Company

By: _____
Andrew Marquis, Assistant Secretary

Any Instrument issued in excess of the penalty stated above is totally void and without any validity. 4221206
For verification of the authority of this Power you may call (713)812-0800 on any business day between 8:30 AM and 5:00 PM CST.

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Selina Bostock on behalf of Rudy Culp
Bar No. 24043014
selina@texasprobateattorney.com
Envelope ID: 106499188
Filing Code Description: Bond
Filing Description: $5,000
Status as of 10/7/2025 7:37 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Paul Beik | 24054444 | paul@beiklaw.com | 10/6/2025 3:06:07 PM | SENT |
| James Ardoin | 24045420 | jimmy@jimmyardoinlaw.com | 10/6/2025 3:06:07 PM | SENT |
| John P. TreyAvant | | tavant@grayreed.com | 10/6/2025 3:06:07 PM | SENT |
| Debbie Gurley | | dgurley@grayreed.com | 10/6/2025 3:06:07 PM | SENT |
| Andrew McCarty | | amccarty@grayreed.com | 10/6/2025 3:06:07 PM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 10/6/2025 3:06:07 PM | SENT |
| Jeffrey D.Watters | | jwatters@grayreed.com | 10/6/2025 3:06:07 PM | SENT |
| Ryan Cantrell | | ryan.cantrell@chamberlainlaw.com | 10/6/2025 3:06:07 PM | SENT |
| Mariah Karigan | | mariah.karigan@chamberlainlaw.com | 10/6/2025 3:06:07 PM | SENT |
| Elizabeth Garcia | | elizabeth.garcia@chamberlainlaw.com | 10/6/2025 3:06:07 PM | SENT |
| Texas Probate Attorney, PLLC | | efile@texasprobateattorney.com | 10/6/2025 3:06:07 PM | SENT |
| Marcie Cardenas | | mcardenas@grayreed.com | 10/6/2025 3:06:07 PM | SENT |
| Rudy Culp | | rudy@texasprobateattorney.com | 10/6/2025 3:06:07 PM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 10/6/2025 3:06:07 PM | SENT |
| Bailey Bowe | | bailey@texasprobateattorney.com | 10/6/2025 3:06:07 PM | SENT |

EXHIBIT

16

FILED
10/15/2025 1:24 PM
Teneshia Hudspeth
County Clerk
Harris County - County Probate Court No. 1
Accepted By: MR

No. 537,721

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY AS | § | IN THE PROBATE COURT |
| TRUSTEE OF THE HOLLI ANN HARDIN | § | |
| TRUST NUMBER ONE | § | |
| *Plaintiff*, | § | |
| | § | NUMBER ONE (1) OF |
| v. | § | |
| | § | |
| DAKOTA FONTENOT, | § | |
| *Defendant*. | § | HARRIS COUNTY, TEXAS |

## DEFENDANT DAKOTA FONTENOT'S FIRST AMENDED ANSWER, FIRST AMENDED COUNTERCLAIM AND CROSS-CLAIM

Defendant Dakota Fontenot ("Dakota") files his First Amended Answer to the Original Petition ("Petition") of Linda Goehrs, in her capacity as "Temporary" Successor Trustee of the Holli Ann Hardin Trust Number One ("Plaintiff" and "Holli Trust") and Counterclaim as follows:

## I.    GENERAL DENIAL

1.    Pursuant to Rule 92 of the Texas Rules of Civil Procedure, Dakota denies each and every allegation contained in the Petition and demands strict proof thereof by a preponderance of the credible evidence as required by the Constitution and Laws of the State of Texas.

## II.    AFFIRMATIVE DEFENSES

2.    The "Temporary" Successor Trustee lacks capacity and/or standing to bring all of her claims. As explained in part III below, the "Temporary" Successor Trustee's authority to serve expired long ago and she has no independent interest in this litigation outside of that

4907-0304-2163.1

1

fiduciary capacity. Further, even if the "Temporary" Successor Trustee is validly acting, all of the spurious allegations against Dakota for actions he took in saving the businesses are not properly bought by the "Temporary" Successor Trustee. Any duties owed were to the various entities that Dakota was the officer/director of, not to the "Temporary" Successor Trustee. Finally, even if the "Temporary" Successor Trustee is validly acting, the "Temporary" Successor Trustee is not a beneficiary of the Dakota Trust and has no standing to bring an action regarding its trustee appointment.

3.     The "Temporary" Successor Trustee's claims are barred by waiver, ratification, and/or estoppel. As the evidence will show, the "Temporary" Successor Trustee was aware of and approved the financing plan used to buy Holli Hardin Fontenot ("Holli") out of her interests in the Holli Trust and the Dakota Trust. Further, the "Temporary" Successor Trustee is aware of the lengths Dakota went to ensure that the business succeeded. As evidenced from the exhibits to her own Petition, on the loan needed to take care of a portion of the deferred maintenance issues Decedent left, Dakota personally guaranteed it and secured it using property of the Dakota Trust. Even though Dakota and the Dakota Trust did not have an ownership interest in the business. (Notably, the "Temporary" Successor Trustee did not have any issues when Dakota used his authority on behalf of the entities owned by the Dakota Trust for these transactions.) The "Temporary" Successor Trustee was involved in all of these decisions and cannot now bring suit because other beneficiaries of the Holli Trust are not happy with her actions.

4.     Any complaint about how Dakota ran the businesses is barred by the business judgment rule. The "Temporary" Successor Trustee knows how Dakota ran the business until it

was sold. She was aware from the appraisal she herself commissioned that the business was cash poor and a sinking ship. She further knows that Dakota left a lucrative career and put his name, reputation, and personal assets on the line to keep the business afloat. And it was only through Dakota's hard work and decisive actions that any value at all was salvaged for the beneficiaries of the Holli Trust. Her now second-guessing of decisions Dakota made in good faith is barred.

5.      The "Temporary" Successor Trustee's claims are barred by illegality.

6.      The "Temporary" Successor Trustee's claims are barred by the statute of limitations.

7.      As shown by all of the above, the "Temporary" Successor Trustee's equitable claims are barred by unclean hands.

8.      Finally, any amount owed from the Dakota Trust to the Holli Trust is offset by what entities owned by the Holli Trust owe entities owned by the Dakota Trust and/or Dakota personally.

## III.    REQUEST FOR DECLARATORY JUDGMENT/MODIFICATION OF TRUST

9.      As the "Temporary" Successor Trustee and Intervenors well know, the validity of Dallas Fontenot's 2017 purported estate planning was at the heart of the previous litigation. All of Dallas' children (who are all the beneficiaries of the Holli Trust) asserted that Dallas' purported actions to remove Dakota from his estate plan ran counter to Dallas' wishes he expressed both before and after 2017 that Dakota be in charge of the business and the various family entities. It was the intent of all parties in the Settlement Agreement to honor those wishes.

4907-0304-2163.1                                    3

10.     Dakota brings this claim for declaratory judgment under Texas Civil Practice and Remedies Code § 37.005 for the Court to declare that the 2017 document purportedly removing Dakota as successor trustee of the Dakota Trust is invalid as a forgery and/or revoked document and that Dakota is the validly serving trustee of the Dakota Trust.

11.     In the alternative, as the only current beneficiary of the Dakota Trust, if the Court finds that Dakota Trust has no validly serving trustee, Dakota requests that the Court appoint him as the trustee under Texas Trust Code §§ 112.054(a)(2) and (5).

12.     Further, Intervenors knew about the Dakota Trust and were put on notice that beneficiary status in the Dakota Trust was at issue.  They were represented by counsel who appeared in and participated in the litigation regarding Decedent's estate plan and the Holli Trust.  Rather than investigate the Dakota Trust and claims, Intervenors willingly entered into the Settlement Agreement to resolve the litigation regarding Decedent's estate, the Holli Trust, "and all related claims and/or controversies between them, whether asserted or not, known or unknown, actual or contingent . . . ."  Accordingly, Dakota also requests a declaration under Texas Civil Practice and Remedies Code § 37.005 that Intervenors waived and/or released any claim to be beneficiaries of the Dakota Trust in the Settlement Agreement.

13.     Finally, the Dakota Trust holds Viva Las Vegas Properties, Inc., which holds real estate.  After the sale of the business, the business stopped paying rent and the Dakota Trust had no cash flow.  As Dakota has operated as Trustee of the Dakota Trust and sole beneficiary, he paid untold expenses on behalf of the property held by the Dakota Trust, including lawncare and maintenance for the property, in the amount of $36,104.83.  Dakota requests a declaration under

Texas Civil Practice and Remedies Code § 37.005 that the Dakota Trust owes him $36,104.83 as expenses advanced on its behalf.

## IV.    REQUEST FOR SPECIFIC PERFORMANCE/REMOVAL

14.     As described above, the "Temporary" Successor Trustee has been anything but. Originally appointed by order of a Fort Bend County District Court in 2021, the "Temporary" Successor Trustee's appointment was only supposed to last until the litigation regarding Dallas Fontenot's estate plan was resolved.  That resolution occurred by Settlement Agreement in 2022. Yet the "Temporary" Successor Trustee stayed.

15.     In the Settlement Agreement, the "Temporary" Successor Trustee was to resign when the surviving spouse's interest was bought out of the Trusts.  Yet, after the buyout was accomplished, the "Temporary" Successor Trustee stayed on.

16.     She still continues to serve over four years after her "temporary" appointment and shows no signs of resigning her office, even though the two documents that give her any authority dictate she should have left long ago.  The Court should enforce the Settlement Agreement and compel the "Temporary" Successor Trustee to resign and/or remove her under Texas Trust Code § 114.008.

## V.    DEMAND FOR ACCOUNTING

17.     The "Temporary" Successor Trustee has served for almost four years now and has never provided Dakota with an itemization of what the Holli Trust has taken in and what it has expended.  Accordingly, Dakota demands under Texas Trust Code § 113.151 that the "Temporary" Successor Trustee provide an accounting.

4907-0304-2163.1

5

## VI. BREACH OF FIDUCIARY DUTY

18.     While the "Temporary" Successor Trustee has been less than forthcoming with disclosing information about the Holli Trust, what Dakota has learned raises serious concerns.

19.     The "Temporary Successor Trustee" was in charge of supervising the appraisers for the buyout.  In valuing Ice Embassy, Inc., one decision the "Temporary" Successor Trustee had to make was what to do with a receivable on the books from Decedent.  Dakota warned the "Temporary" Successor Trustee that the receivable presented a collection risk and should not be valued at its book value.  Yet the "Temporary" Successor Trustee insisted that the full book value be included in the valuation.  Not including a customary collection discount caused the price of the buyout to rise and benefitted Holli at the expenses of Dakota and the Intervenors.

20.     Exactly as Dakota warned, Holli as Independent Executor of Decedent's Estate refused to repay the loan.  It took a federal lawsuit and tens of thousands of dollars in attorney's fees to eventually only collect a fraction of the book value of the receivable.  Such a decision does not meet the standard of care required of a fiduciary and further breached her duty of impartiality as "Temporary" Successor Trustee's decision benefitted Holli at the expense of the other beneficiaries.

21.     Further, the "Temporary" Successor Trustee disclosed in the litigation that she charges the Holli Trust at a tenth of an hour increments her full rate for service as fiduciary.  She admitted does not provide these monthly billing statements to any of the beneficiaries for their review.  This level of fiduciary compensation is not authorized by either the Order that appointed her or the Holli Trust Declaration.  Indeed, the Holli Trust Declaration requires the "Temporary"

4907-0304-2163.1                                        6

Successor Trustee to charge compensation "in accordance with the usual and customary charges in the community where and when such services are rendered." Art. 7.3. Charging her hourly legal rate for work on the Holli Trust is not in accordance with the usual and customary charges in Harris County. Accordingly, Dakota asks that the Court force disgorgement of all fiduciary compensation (which amount the "Temporary" Successor Trustee has never disclosed) received by the "Temporary" Successor Trustee.

22.     The "Temporary" Successor Trustee was not always antagonistic to Dakota. Indeed, as shown above, the "Temporary" Successor Trustee worked hand in glove with Dakota to run the business and attempt to salvage some value for the beneficiaries of the Holli Trust.

23.     Sadly, once the business was sold and the "Temporary" Successor Trustee no longer needed Dakota, she allowed herself to be pushed by Intervenors into bringing this lawsuit. The "Temporary" Successor Trustee knew full well about the operation of the business and the payments under the Settlement Agreement. Yet she was afraid that Intervenors would blame her and sue her for her actions/inactions. So instead of owning up to her own actions, the "Temporary" Successor Trustee agreed to make Dakota the scapegoat and sued him for causes of action she already explained to Intervenors had no merit. In so doing, the "Temporary" Successor Trustee abdicated her fiduciary responsibility and favored Intervenors to the detriment of Dakota.

24.     Further, the "Temporary" Successor Trustee continues to act outside of any guardrails imposed by her fiduciary duty and the order appointing her. In addition to not providing any transparency as to her compensation, the "Temporary" Successor Trustee has not

provided any transparency as to the assets and expenditures of the Holli Trust. The "Temporary" Successor Trustee has instituted this lawsuit against her beneficiary, despite the order appointing her requiring agreement of all beneficiaries before she hired an attorney. The "Temporary" Successor Trustee did not discuss with the guardian of Dakota's children or with Michelle's children (who are all beneficiaries of the Holli Trust) on if they wanted her to institute this litigation and drain Holli Trust resources. The "Temporary" Successor Trustee has further attempted to freeze payments to Dakota that are unrelated to this litigation. She has breached her duty in numerous ways and caused her beneficiary damages.

## VII. INTERFERENCE WITH CONTRACTUAL RELATIONS

25. As part of the sale of the businesses, the "Temporary" Successor Trustee agreed to cover certain expenses incurred in the transition. The buyer presented receipts in the amount of $82,167.25 that the "Temporary" Successor Trustee is obligated to pay. Yet, the "Temporary" Successor Trustee refuses to pay those expenses. This has caused the buyer to withhold funds owed to Dakota from the sale of Entertainment Marketing and Management ("EMM").

26. Even beyond that, the "Temporary" Successor Trustee urged buyer to not make any contractually obligated payments to Dakota, citing this litigation as the rationale. As "Temporary" Successor Trustee well knows, EMM is not a subject of this litigation and no justification exists for her attempts to interfere with unrelated payments to Dakota. This interference has caused Dakota damages and must be stopped.

## VIII. REMOVAL

27. Based on the "Temporary" Successor Trustee's numerous breaches as outline

4907-0304-2163.1

8

above, she should also be removed under Texas Trust Code § 113.082.

## IX.  ASSISTING/ENCOURAGING AND
## KNOWING PARTICIPATION IN BREACH OF FIDUCIARY DUTY

28.    Based on Intervenors' actions in assisting/encouraging the "Temporary" Successor Trustee to file suit against Dakota in exchange for them not suing her, Intervenors have participated in the "Temporary" Successor Trustee's breaches of fiduciary duty and are jointly liable for them.

## X.  REQUEST FOR ATTORNEY'S FEES

29.    It has been necessary for Dakota to hire attorneys to defend himself and bring countersuit, so an award of reasonable and necessary attorney's fees to Dakota from Plaintiff, Intervenors, and/or the Holli Trust would be equitable and just.   Moreover, an award of reasonable and necessary attorney's fees to Dakota is authorized by Section 37.009 of the Texas Civil Practice and Remedies Code, Section 114.064 of the Texas Property Code, and paragraph 11 of the Settlement Agreement.

### PRAYER

Based on the foregoing, Defendant Dakota Fontenot prays that:

- Plaintiff take nothing;

- the Court enter an order compelling Plaintiff to resign as "Temporary" Successor Trustee;

- the Court enter an order finding that Dakota is validly serving as trustee of the Dakota Trust, that Intervenors waived any claim to be beneficiaries of the Dakota Trust, and that Dakota expended $36,104.83 in funds on behalf of the Dakota

Trust;

- Dakota recover his damages from Plaintiff and/or Intervenors;

- Dakota recover his reasonable and necessary attorney's fees from Plaintiff and/or the Holli Trust; and

- the Court grant all other relief to which he may be justly entitled, both in law and in equity.



Respectfully submitted,

/s/ Trey Avant
JEFFREY D. WATTERS, JR.
Texas State Bar Number: 2406695
jwatters@grayreed.com
JOHN P. ("TREY") AVANT III
Texas State Bar Number: 24101471
tavant@grayreed.com
ANDREW B. MCCARTY
Texas State Bar Number: 24126139
amccarty@grayreed.com
GRAY REED & McGRAW LLP
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000

JAMES MADISON ("JIMMY") ARDOIN III
Texas State Bar Number: 24045420
jimmy@jimmyardoinlaw.com
4900 Fournace Place, Suite 414
Bellaire, Texas 77401
Telephone: (713) 574-8900

PAUL S. BEIK
Texas State Bar Number: 24054444
paul@beiklaw.com
440 Louisiana Street, Suite 1800
Houston, Texas 77002

Telephone: (713) 869-6975

**ATTORNEYS FOR DEFENDANT,
DAKOTA FONTENOT**

11

CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been served upon all parties of record in this Cause, in accordance with the Texas Rules of Civil Procedure on October 15, 2025.

RUDOLPH M. CULP                          VIA E-SERVICE
State Bar No. 24043014
rudy@texasprobateattorney.com
COLLIN J. BULLARD
State Bar No. 24129570
collin@texasprobateattorney.com
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
Telephone: (713) 297-0700
Fax: (817) 383-5110

**ATTORNEYS FOR PLAINTIFF,
LINDA GOEHRS, IN HER CAPACITY AS
TRUSTEE OF THE HOLLI ANN HARDIN
TRUST NUMBER ONE**

/s/  Trey Avant
JOHN P. ("TREY") AVANT III

4907-0304-2163.1                          12

## <u>VERIFICATION</u>

STATE OF TEXAS           §
                         §
COUNTY OF HARRIS         §

My name is Dakota Fontenot, my date of birth is _06/22/1994_, and my address is 2926 Fontana Drive, Houston, Texas 77043, and United States.   I declare under the penalty of perjury that the statements made in Defendant's First Amended Answer are true and correct based on my personal knowledge.

Dated: October 15, 2025

Dakota Fontenot

UNOFFICIAL COPY

13

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Marcie Cardenas on behalf of Trey Avant
Bar No. 24101471
mcardenas@grayreed.com
Envelope ID: 106875958
Filing Code Description: Amended Filing
Filing Description: Defendant Dakota Fontenot's First Amended Answer, First Amended Counterclaim and Cross-Claim
Status as of 10/16/2025 9:45 AM CST

Associated Case Party: Linda Goehrs

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Texas Probate Attorney, PLLC | | efile@texasprobateattorney.com | 10/15/2025 1:24:59 PM | SENT |
| Rudy Culp | | rudy@texasprobateattorney.com | 10/15/2025 1:24:59 PM | SENT |
| Bailey Bowe | | bailey@texasprobateattorney.com | 10/15/2025 1:24:59 PM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 10/15/2025 1:24:59 PM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 10/15/2025 1:24:59 PM | SENT |

Associated Case Party: Dakota Fontenot

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| John P. TreyAvant | | tavant@grayreed.com | 10/15/2025 1:24:59 PM | SENT |
| Debbie Gurley | | dgurley@grayreed.com | 10/15/2025 1:24:59 PM | SENT |
| Andrew McCarty | | amccarty@grayreed.com | 10/15/2025 1:24:59 PM | SENT |
| Marcie Cardenas | | mcardenas@grayreed.com | 10/15/2025 1:24:59 PM | SENT |
| Jeffrey D.Watters | | jwatters@grayreed.com | 10/15/2025 1:24:59 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Paul Beik | 24054444 | paul@beiklaw.com | 10/15/2025 1:24:59 PM | SENT |
| James Ardoin | 24045420 | jimmy@jimmyardoinlaw.com | 10/15/2025 1:24:59 PM | SENT |
| Ryan Cantrell | | ryan.cantrell@chamberlainlaw.com | 10/15/2025 1:24:59 PM | SENT |
| Mariah Karigan | | mariah.karigan@chamberlainlaw.com | 10/15/2025 1:24:59 PM | SENT |
| Elizabeth Garcia | | elizabeth.garcia@chamberlainlaw.com | 10/15/2025 1:24:59 PM | SENT |

EXHIBIT

17

FILED
10/15/2025 4:09 PM
Teneshia Hudspeth
County Clerk
Harris County - County Probate Court No. 1
Accepted By: MR

No. 537,721

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY AS TRUSTEE OF THE HOLLI ANN HARDIN TRUST NUMBER ONE | § § § § | IN THE PROBATE COURT |
| *Plaintiff*, | § | |
| | § | NUMBER ONE (1) OF |
| v. | § | |
| | § | |
| DAKOTA FONTENOT, | § | |
| *Defendant*. | § | HARRIS COUNTY, TEXAS |

## DEFENDANT DAKOTA FONTENOT'S MOTION TO COMPEL MEDIATION

Defendant Dakota Fontenot ("Defendant") files this Motion to Compel Mediation ("Motion"), and respectfully shows the Court as follows:

Dakota is the son of Holli Ann Hardin Fontenot ("Holli") and Dallas Joseph Fontenot, Jr. ("Dallas"). Dallas had two children from a previous marriage, Dallas Joseph Fontenot III ("Joe") and Michelle Fontenot ("Michelle"). Dallas died on September 3, 2021. Prior to his death, Dallas had ownership and interests in a variety of trusts and entities, which in part, owned a gentleman's club in Houston commonly known as the Colorado Club. When Dallas died, litigation ensued in Fort Bend County regarding Dallas' estate and the Holli Trust.

That litigation was ended by a mediated Settlement Agreement between Dakota, Holli, Joe, Michelle, and Ashley Fontenot (the beneficiaries of the Holli Trust) effective January 7, 2022 ("Settlement Agreement"). As part of the Settlement Agreement, all parties agree that "[i]n the event that there are future disputes, disagreements, and/or conflicts regarding the terms and/or implementation of any terms of this Settlement Agreement, the Parties agree to return to Russ Jones for mediation regarding the dispute."

The issues in this litigation directly involve the terms and implementation of the Settlement Agreement, including how the buyout of Holli was to be structured and what rights Joe and

1

4938-9718-7185.1

Michelle released/waived as a result of signing the Settlement Agreement. As the parties agreed to/are suing on the Settlement Agreement (including the mediation provision), Dakota asks the Court to enforce the Settlement Agreement.

It is the policy of this state to encourage the peaceable resolution of disputes and the early settlement of pending litigation through voluntary settlement procedures. *See* TEX. CIV. PRAC. & REM. CODE § 154.002. Trial courts are encouraged to carry out this policy by compelling parties to "sit down with each other" to attempt a peaceful resolution at mediation. *See Decker v. Lindsay*, 824 S.W.2d 247, 250 (Tex. App.—Houston [1st Dist.] 1992, no writ).

Defendant believes that mediation will assist the parties in reaching an amicable resolution, conserve judicial resources, and avoid the necessity of trial. Thus, to prevent the further escalation of fees and expenses because of a trial, Defendant requests that the Court compel the parties to attend mediation with Russ Jones on or before a date certain, no later than 30 days from the date of the Order, as mandated by the Settlement Agreement.

### PRAYER

WHEREFORE, Defendant Dakota Fontenot respectfully requests that this Court (i) grant this Motion to Compel Mediation, (ii) order the parties to participate in mediation with Russ Jones, and (iii) grant such other and further relief as is just and proper.

Respectfully submitted,

*/s/ Trey Avant*

JEFFREY D. WATTERS, JR.
Texas State Bar Number: 2406695
jwatters@grayreed.com
JOHN P. ("TREY") AVANT III
Texas State Bar Number: 24101471
tavant@grayreed.com
ANDREW B. MCCARTY
Texas State Bar Number: 24126139
amccarty@grayreed.com

2

4938-9718-7185.1

GRAY REED & McGRAW LLP
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000

JAMES MADISON ("JIMMY") ARDOIN III
Texas State Bar Number: 24045420
jimmy@jimmyardoinlaw.com
4900 Fournace Place, Suite 414
Bellaire, Texas 77401
Telephone: (713) 574-8900

PAUL S. BEIK
Texas State Bar Number: 24054444
paul@beiklaw.com
440 Louisiana Street, Suite 1800
Houston, Texas 77002
Telephone: (713) 869-6975
**ATTORNEYS FOR DEFENDANT,
DAKOTA FONTENOT**

3

4938-9718-7185.1

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been served upon all parties of record in this Cause, in accordance with the Texas Rules of Civil Procedure on October 15, 2025.

RUDOLPH M. CULP                                        VIA E-SERVICE
Texas State Bar No. 24043014
rudy@texasprobateattorney.com
COLLIN J. BULLARD
Texas State Bar No. 24129570
collin@texasprobateattorney.com
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
Telephone: (713) 297-0700
Fax: (817) 383-5110

**ATTORNEYS FOR PLAINTIFF,
LINDA GOEHRS, IN HER CAPACITY AS
TRUSTEE OF THE HOLLI ANN HARDIN
TRUST NUMBER ONE**

Ryan O. Cantrell                                        VIA E-SERVICE
Texas Bar No. 24055259
ryan.cantrell@chamberlainlaw.com
Mariah J. Karigan
Texas Bar No. 24123088
mariah.karigan@chamberlainlaw.com
1200 Smith Street, Suite 1400
Houston, Texas 77002
Telephone: (713) 658-1818
Facsimile: (713) 658-2553

**COUNSEL FOR MICHELLE FONTENOT AND
DALLAS JOSEPH FONTENOT III**

/s/ Trey Avant
JOHN P. ("TREY") AVANT III

4

4938-9718-7185.1

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Marcie Cardenas on behalf of Trey Avant
Bar No. 24101471
mcardenas@grayreed.com
Envelope ID: 106892940
Filing Code Description: Application to Compel (Dep.)
Filing Description: Defendant Dakota Fontenot's Motion to Compel Mediation
Status as of 10/16/2025 3:03 PM CST

Associated Case Party: Linda Goehrs

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Texas Probate Attorney, PLLC | | efile@texasprobateattorney.com | 10/15/2025 4:09:17 PM | SENT |
| Rudy Culp | | rudy@texasprobateattorney.com | 10/15/2025 4:09:17 PM | SENT |
| Bailey Bowe | | bailey@texasprobateattorney.com | 10/15/2025 4:09:17 PM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 10/15/2025 4:09:17 PM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 10/15/2025 4:09:17 PM | SENT |

Associated Case Party: Dakota Fontenot

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| John P. TreyAvant | | tavant@grayreed.com | 10/15/2025 4:09:17 PM | SENT |
| Debbie Gurley | | dgurley@grayreed.com | 10/15/2025 4:09:17 PM | SENT |
| Andrew McCarty | | amccarty@grayreed.com | 10/15/2025 4:09:17 PM | SENT |
| Marcie Cardenas | | mcardenas@grayreed.com | 10/15/2025 4:09:17 PM | SENT |
| Jeffrey D.Watters | | jwatters@grayreed.com | 10/15/2025 4:09:17 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Paul Beik | 24054444 | paul@beiklaw.com | 10/15/2025 4:09:17 PM | SENT |
| James Ardoin | 24045420 | jimmy@jimmyardoinlaw.com | 10/15/2025 4:09:17 PM | SENT |
| Ryan Cantrell | | ryan.cantrell@chamberlainlaw.com | 10/15/2025 4:09:17 PM | SENT |
| Mariah Karigan | | mariah.karigan@chamberlainlaw.com | 10/15/2025 4:09:17 PM | SENT |
| Elizabeth Garcia | | elizabeth.garcia@chamberlainlaw.com | 10/15/2025 4:09:17 PM | SENT |



FILED
10/16/2025 9:42 AM
Teneshia Hudspeth
County Clerk
Harris County - County Probate Court No. 1
Accepted By: MR

**CAUSE NO. 537,721**

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY AS | § | IN PROBATE COURT |
| TRUSTEE OF THE HOLLI ANN | § | |
| HARDIN TRUST NUMBER ONE | § | |
|    *Plaintiff,* | § | |
| | § | **NUMBER ONE OF** |
| **v.** | § | |
| | § | |
| **DAKOTA FONTENOT** | § | |
|    *Defendant.* | § | HARRIS COUNTY, TEXAS |

### INTERVENORS' FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND CROSSCLAIMS

Michelle Fontenot ("Michelle") and Dallas Joseph Fontenot III ("Joe"), individually, as beneficiaries of the Holli Ann Hardin Trust Number One and Dakota Trust, file this amended answer, affirmative defenses, and cross-claims and respectfully show the Court as follows:

#### GENERAL DENIAL

1. Michelle and Joe generally deny the allegations contained in Defendant Dakota Fontenot's First Amended Counterclaim as permitted by Rule 92 of the Texas Rules of Civil Procedure and require that Dakota prove his causes of action by a preponderance of the credible evidence.

#### AFFIRMATIVE DEFENSES

2. Michelle and Joe plead the following affirmative defenses:

   a. Dakota lacks authority as Trustee of the Dakota Trust and any entities held by the Dakota Trust.

   b. Dakota's claims are barred by the doctrines of waiver, estoppel, laches, and release.

   c. Dakota's claims are barred by the doctrine of unclean hands.

   d. Dakota's claims are barred by the statute of limitations.

   e. Dakota's claims are barred by the doctrines of res judicata or collateral estoppel.

1

**ATTORNEYS' FEES**

3.      Michelle and Joe seek their reasonable and necessary attorneys' fees under all applicable authority, including Section 37.009 of the Texas Civil Practice and Remedies Code and Section 114.064 of the Texas Property Code.

**ORIGINAL CROSSCLAIMS**

4.      Intervenors Michelle Fontenot and Joe Fontenot file these Original Crossclaims against Dakota Fontenot, and respectfully show the Court the following:

**DISCOVERY CONTROL PLAN**

5.      This is a Level 2 case under Texas Rule of Civil Procedure 190.3.

**PARTIES**

6.      Michelle Fontenot, individually as a beneficiary of the Dakota Trust, is an individual residing in Fort Bend County, Texas. Michelle has made an appearance in this matter through her counsel of record.

7.      Joe Fontenot, individually as a beneficiary of the Dakota Trust, is an individual residing in Fort Bend County, Texas. Joe has made an appearance in this matter through his counsel of record.

8.      Dakota Fontenot, individually and as purported Trustee of the Dakota Trust and purported officer and director of Viva Las Vegas Properties, Inc., is an individual residing in Harris County, Texas. Dakota has made an appearance in this matter through his counsel of record.

**JURISDICTION AND VENUE**

9.      This Court has jurisdiction under Texas Estates Code § 32.006. Venue is proper in Harris County under Texas Property Code § 115.002(b).

2

32677652.v2

## RULE 47 STATEMENT

10.    Michelle and Joe seek monetary relief over $1,000,000 and non-monetary relief. The damages sought are within the jurisdictional limits of this court.

## RELEVANT FACTS

11.    Holli Ann Hardin, as Settlor, created the Dakota Trust, an irrevocable inter vivos trust, on November 9, 1994. The Dakota Trust was never amended and could not be amended except by a court of competent jurisdiction. Holli Ann Hardin served as the original named Trustee of the Dakota Trust. *See* Exhibit 1, Dakota Trust Declaration, Article V, Section A. The Trust Agreement named the following successor Trustees, in order: Dallas, Joe, Michelle, and finally First Interstate Bank of Texas. *See* Exhibit 1, Dakota Trust Declaration, Article V, Sections B and C.

12.    On September 8, 1996, Holli resigned as Trustee by serving written notice of her resignation on Dallas. *See* Exhibit 2, 9/8/1996 Trustee Resignation; *see also* Exhibit 1, Dakota Trust Declaration, Section V.F. ("Any appointee serving or entitled to serve as Trustee may resign at any time and without cause.").

13.    After Holli's resignation, Dallas, as the named first successor Trustee, served as Trustee for the Dakota Trust until his death on September 3, 2021. During his tenure as Trustee, Dallas exercised the authority under Article V, Section C. of the Trust Agreement to designate successor trustees. On May 1, 2013, Dallas executed a Designation of Successor Trustee, naming Dakota as his successor, followed by Frost Bank. *See* Exhibit 3, 5/1/13 Designation of Successor Trustee. On October 14, 2017, Dallas then revoked the designation of Dakota as successor Trustee, designating Frost Bank as his successor in a formal Designation of Successor Trustee:

3

32677652.v2

> Pursuant to Article V, Section C of the Trust Declaration, Dallas Joseph Fontenot, Jr. removes all prior appointments of appoints Dakota James Fontenot as successor Trustee and, instead, appoints Frost Bank to serve as successor Trustee upon the death, disability, resignation, or disqualification of Dallas Joseph Fontenot, Jr.

*See* Exhibit 4, 10/14/17 Designation of Successor Trustee.

14.    At the same time, Dallas removed Dakota as officer of Viva Las Vegas Properties, Inc., among other entities. *See* Exhibit 5, 10/14/17 Resolutions Adopted by Consent of the Shareholder and Director of Viva Las Vegas Properties, Inc. The Dakota Trust owns 100% of the stock of Viva Las Vegas Properties, Inc. (*see* Exhibit 6) and accordingly the Trustee of the Dakota Trust is the sole shareholder for Viva Las Vegas Properties, Inc.

> ESOLVED that Dakota Fontenot is hereby removed from all offices and all positions as a Director of Viva Las Vegas Properties, Inc. from and after October 14, 2017.

*See* Exhibit 5, 10/14/17 Resolutions Adopted by Consent of the Shareholder and Director of Viva Las Vegas Properties, Inc.

15.    Dakota is not a named successor trustee in the Trust Agreement for the Dakota Trust, and the only document that purports to give him any claim to the trustee position was revoked in October 2017. Upon Dallas's death in 2021, a vacancy in the trustee position was created, and Frost Bank was the named successor trustee in the 2017 Designation of Successor Trustee. Neither Dallas, nor Frost Bank, ever executed any other document that would appoint Dakota as successor trustee.

16.    Despite the lack of authority, Dakota currently purports to serve as Trustee of the Dakota Trust and director/officer of Viva Las Vegas Properties, Inc. To support his claimed status as Trustee, Dakota now asserts that the October 14, 2017 Designation of Successor Trustee is

4

32677652.v2

"invalid as a forgery and/or revoked document." *See* Dakota's Amended Answer and Counterclaim, ¶ 12. Dakota has not, and cannot, produce any document that would validly appoint him as successor trustee of the Dakota Trust. As Dakota's purported authority to act on behalf of Viva Las Vegas Properties, Inc. stems from actions he invalidly took as purported trustee, he likewise has no authority to act on behalf of Viva Las Vegas Properties, Inc.[1]

17. Dakota, however, not only claims to be the Trustee of the Dakota Trust and the officer and director of Viva Las Vegas Properties, Inc., but Dakota claims that he is the "only current beneficiary of the Dakota Trust." *See* Dakota's First Amended Answer and Counterclaim, ¶ 14. However, the terms of the Dakota Trust dictate that Joe and Michelle are 2/3 beneficiaries of the Dakota Trust. After Dallas's death in 2021, Dakota sought to probate Dallas's 2013 Will, and Holli sought to probate Dallas's 2013 Will and 2017 Codicil. Dakota claimed that the 2017 Codicil was a forgery or was the product of undue influence. Dakota also initiated litigation regarding the Holli Ann Hardin Trust Number One, seeking a declaratory judgment and appointment of a successor trustee of the Holli Ann Hardin Trust Number One. The parties settled both the Estate and Trust litigation on January 7, 2022. Dallas's 2013 Will and 2017 Codicil were admitted to probate, and Holli was appointed Independent Executor of Dallas's Estate. *See* Exhibit 7, Order Admitting Will and Codicil to Probate.

18. As part of the Settlement Agreement, Holli's interest in both the Holli Ann Hardin Trust Number One and the Dakota Trust Number One were bought out, and Holli disclaimed her interest in these Trusts. *See* Exhibit 8, Assignment of Interest and Disclaimer of Further Interest ("Holli Ann Fontenot disclaims any right to further interest in the Dakota Trust.").

---

[1] After hearing on an Application for Temporary Injunction filed by the Holli Ann Hardin Trust Trustee, and partially joined by Joe and Michelle, the Court granted a Temporary Injunction enjoining Dakota from selling the real property held by Viva Las Vegas Properties, Inc.

32677652.v2

19.     Pursuant to the terms of the Dakota Trust, upon Holli's death, absent Dallas's exercise of a power of appointment, the Trust property passes to the descendants of Holli Hardin Fontenot and to the descendants of Dallas Joseph Fontenot, Jr., *per stirpes*:

> 3.    Dallas Joseph Fontenot, Jr., by a clause in his Will in which he specifically exercises this power of appointment, shall have the power to appoint the trust assets remaining upon the death of Holli Hardin Fontenot to or for the benefit of any one or more of the descendants of Dallas Joseph Fontenot, Jr. or the descendants of Holli Hardin Fontenot, in such shares, proportions, or amounts, upon such trusts and for such estates as he alone may determine. If Dallas Joseph Fontenot, Jr. fails to exercise this special power of appointment to the fullest extent, then, subject to the other provisions of this Trust, upon his death, the unappointed trust assets shall be delivered to the living descendants of Holli Hardin Fontenot and to the living descendants of Dallas Joseph Fontenot, Jr., per stirpes.

See Exhibit 1, Article VI, Section D.3. *See also* Article IV, Section E ("For example, if a distribution were to be made to the descendants, *per stirpes*, of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot, assuming the recitations in Article I, the property to be distributed would be divided into three equal shares, one for each of Dallas Joseph Fontenot, III, Michelle Anne Fontenot, and Dakota James Fontenot.").

20.     As he testified at the injunction hearing, Dakota, purportedly believing himself to be the acting Trustee and sole beneficiary of the Dakota Trust, has recently sold property located belonging to Viva Las Vegas Properties, Inc. and deposited all of the proceeds into a personal bank account, and subsequently depleted the proceeds for his own personal obligations. He did not notify Michelle or Joe about the sale of the property, and inappropriately accepted all of the proceeds to himself, sharing none with the other beneficiaries.

21.     As a result of Dakota's actions and baseless claims, and Joe and Michelle bring this action for damages, declaratory judgments, and to prevent further breaches of trust.

32677652.v2

CAUSES OF ACTION

**AMENDED APPLICATION FOR RELIEF UNDER TEXAS PROPERTY CODE § 114.008**

22.    Michelle and Joe incorporate by reference paragraphs 10 through 21 as though fully set forth herein.

23.    Texas Property Code § 114.008 gives the Court broad authority to remedy a breach of trust that has occurred or might occur. As explained *supra*, Dakota has no authority to act on behalf of the Dakota Trust. Numerous breaches of trust have occurred and will continue to occur if Dakota continues to act without proper authority.

24.    As Dakota's designation as successor trustee was revoked in 2017, Dakota is not validly serving as Trustee of the Dakota Trust. Any actions he has taken as purported Trustee of the Dakota Trust are invalid and ineffective.

25.    Importantly, Dakota cannot become the Trustee of the Dakota Trust by some equitable doctrine of waiver or consent. *See Alpert v. Riley*, 274 S.W.3d 277 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) ("We have not located, and Riley does not identify, any authority that recognizes a trustee by estoppel in the presence of express trust language outlining the procedure for appointment of a successor trustee...Texas law prohibits the equitable rule proposed by Riley for other reasons as well. The Texas Trust Code requires adherence to the trustee selection method prescribed in the trust instrument, which necessarily forecloses the exercise of equitable discretion unless that method fails.") (citing TEX. PROP. CODE § 113.083).

26.    The Texas Property Code authorizes the Court to issue an injunction to remedy a breach of trust that has occurred or might occur. TEX. PROP. CODE § 114.008; *see also Matter of Bumstead Family Irrevocable Trust*, 2022 WL 710159 (Tex. App.—Corpus Christi-Edinburg March 10, 2022, pet. denied) (affirming trial court temporary injunction that enjoined an individual

7

32677652.v2

from acting as trustee and appointed a receiver when the validity of the purported trustee's appointment was at issue). Dakota taking any action on behalf of the Dakota Trust would be a further breach of trust, as he has no authority to act under the terms of the Trust agreement and subsequent designations of successor trustees.

27.     Similarly, Dakota has no authority to act on behalf of Viva Las Vegas Properties, Inc. Dallas removed Dakota as an officer and/or director of Viva Las Vegas Properties, Inc. on October 14, 2017. *See* Exhibit 5, 10/14/17 Resolutions Adopted by Written Consent of Shareholder.

28.     The only documents Dakota has produced that would purport to give him authority to act on behalf of Viva Las Vegas Properties, Inc. are documents that he executed as purported trustee in May of 2023. *See* Exhibit 9, 5/19/23 Purported Unanimous Joint Written Consent of Viva Las Vegas Properties, Inc. However, as discussed *supra*, Dakota is not validly serving as the trustee of the Dakota Trust. Therefore, he had no authority to execute these Viva Las Vegas Properties, Inc. corporate governance documents that he relies upon for authority to act on behalf of Viva Las Vegas Properties, Inc. As a result, Dakota was not validly appointed officer and director of Viva Las Vegas Properties, Inc. and he has no authority to take action on its behalf, including selling real property and accessing funds belonging to Viva Las Vegas Properties, Inc. To the extent necessary, Joe and Michelle request that the Court void the execution of the May 19, 2023 Purported Unanimous Joint Written Consent of Viva Las Vegas Properties, Inc. under Texas Property Code § 114.008(a)(9).

29.     Accordingly, Joe and Michelle request that the Court order the following relief under Texas Property Code § 114.008:

32677652.v2

a. enjoin Dakota from acting as trustee on behalf of the Dakota Trust (TEX. PROP. CODE § 114.008(a)(2));

b. compel Dakota to redress a breach of trust, including ordering Dakota to pay the proceeds of the sale of Trust property to the Trust (TEX. PROP. CODE § 114.008(a)(3));

c. appoint a receiver to take possession of the trust property and administer the trust (TEX. PROP. CODE § 114.008(a)(5));

d. suspend or remove Dakota as trustee, to the extent necessary (TEX. PROP. CODE § 114.008(a)(6)–(7));

e. void the execution of the May 19, 2023 Purported Unanimous Joint Written Consent of Viva Las Vegas Properties, Inc. (TEX. PROP. CODE § 114.008(a)(9)); and/or

f. impose a lien and/or constructive trust on any property Dakota received that belonged to the Dakota Trust, including but not limited to the sales proceeds from the sale of 3400 Old Richmond Road (TEX. PROP. CODE § 114.008(a)(9)).

**DECLARATORY JUDGMENT – JOE AND MICHELLE ARE EACH 1/3 BENEFICIARIES OF THE DAKOTA TRUST**

30. Michelle and Joe incorporate by reference paragraphs 10 through 21 as though fully set forth herein.

31. An interested person in the administration of a trust may bring suit for a "declaration of rights or legal relations in respect to the trust…to determine any question arising in the administration of the trust, including questions of construction of wills and other writings." TEX. CIV. PRAC. & REM. CODE § 37.005.

32677652.v2

32.    As discussed *supra*, as Holli no longer has any interest in the Dakota Trust. *See* Exhibit 7, Assignment of Interest and Disclaimer of Further Interest. As Holli no longer has any interest in the Dakota Trust and has released nay and all interest effective January 2023, Michelle and Joe are at least the two-thirds beneficiaries of the Dakota Trust.

33.    Dakota disputes Michelle and Joe's status as beneficiaries of the Dakota Trust, and instead claims he is the sole beneficiary of the Dakota Trust. Dakota, believes, however, without any authority, that he is the sole beneficiary of the Dakota Trust, despite the lack of any document that would alter Michelle and Joe's status as beneficiaries. Dakota has relied upon Section 3.2 of Dallas's Last Will and Testament for his claim to be the sole beneficiary; however, Section 3.2 of Dallas's Last Will and Testament was revoked by Dallas's First Codicil, which was admitted to probate. *See* Exhibit 10, Last Will and Testament; Exhibit 11, First Codicil; Exhibit 7, Order Admitting Will and Codicil to Probate.

34.    As a Accordingly, Michelle and Joe request that the Court issue a declaratory judgment that Michelle and Joe are each 1/3 beneficiaries of the Dakota Trust.

**DECLARATORY JUDGMENT – JOE IS SUCCESSOR TRUSTEE OF THE DAKOTA TRUST**

35.    Michelle and Joe incorporate by reference paragraphs 10 through 21 as though fully set forth herein.

36.    An interested person in the administration of a trust may bring suit for a "declaration of rights or legal relations in respect to the trust…to determine any question arising in the administration of the trust, including questions of construction of wills and other writings." TEX. CIV. PRAC. & REM. CODE § 37.005.

37.    On October 14, 2017, Dallas Fontenot designated Frost Bank as his successor trustee. *See* Exhibit 4, 10/14/17 Designation of Successor Trustee. Frost Bank has failed to serve,

10

and upon information and belief will execute a formal declination to serve as trustee of the Dakota Trust. Under the trustee succession provisions contained in the original Trust Agreement, Joe is the next named successor trustee and is prepared to serve as such. However, given the controversy created by Dakota claiming to be the Trustee and sole beneficiary, Joe and Michelle seek a declaration that Joe is the successor trustee of the Dakota Trust.

**APPLICATION TO FILL TRUSTEE VACANCY UNDER TEXAS PROPERTY CODE § 113.083**

38.     Michelle and Joe incorporate by reference paragraphs 10 through 21 as though fully set forth herein.

39.     As the trust instrument confirms, Joe is the successor trustee of the Dakota Trust, Michelle and Joe ask the Court to fill the trustee vacancy under Texas Property Code § 113.083. Upon information and belief, Frost is not serving as successor trustee and does not intend to serve as successor trustee.

40.     Under Texas Property Code § 113.083, on the death, resignation, incapacity, or removal of a sole or surviving trustee, a successor trustee shall be selected according to the method, if any, prescribed in the trust instrument. TEX. PROP. CODE § 113.083(a). "If for any reason a successor is not selected under the terms of the trust instrument, a court may and on petition of any interested person shall appoint a successor in whom the trust shall vest." *Id.*

41.     As described *supra*, Dakota is not the Trustee of the Dakota Trust, and Michelle and Joe believe that the Trust Agreement provides that Joe is the successor trustee. As there is a vacancy in the trustee position, Michelle and Joe therefore request the Court fill the vacancy and appoint Joe to serve as successor Trustee.

11

32677652.v2

**MISAPPROPRIATION OF TRUST ASSETS**

42.    Michelle and Joe incorporate by reference paragraphs 10 through 20 as though fully set forth herein.

43.    Dakota sold property held in an entity of which the Dakota Trust is the 100% owner, without any authority. Under Texas Property Code § 114.031, a beneficiary is liable for loss to the trust if the beneficiary has misappropriated or otherwise wrongfully dealt with the trust property or failed to repay a distribution or disbursement from the trust in excess of that to which the beneficiary is entitled. *See* TEX. PROP. CODE § 114.031(a)(1), (4). Dakota has misappropriated trust assets and accordingly, the trustee may offset his liability to the trust estate against his interest in the trust estate. Michelle and Joe bring this claim for misappropriation of trust assets as beneficiaries of the Dakota Trust derivatively on behalf of the Dakota Trust.

**UNJUST ENRICHMENT**

44.    Michelle and Joe incorporate by reference paragraphs 10 through 20 as though fully set forth herein.

45.    Dakota received all of the sales proceeds of property belonging to an entity held by the Dakota Trust, of which he is only a 1/3 beneficiary. As a result, he has been unjustly enriched by receiving a benefit that would be unconscionable to retain. Accordingly, Michelle and Joe bring this claim for unjust enrichment derivatively on behalf of the Dakota Trust. Any future distributions to Dakota from the Dakota Trust should be offset by the amounts he has already received. *See* TEX. PROP. CODE § 114.031(b).

**MONEY HAD AND RECEIVED**

46.    Michelle and Joe incorporate by reference paragraphs 10 through 20 as though fully set forth herein.

12

32677652.v2

47.     As a result of the sale of the property located at 3400 Old Richmond Road, Dakota holds funds which, in equity and good conscience, belong to the Dakota Trust. The Dakota Trust has suffered damages as a result of Dakota's inequitable conduct. Accordingly, Michelle and Joe bring this claim for money had and received derivatively on behalf of the Dakota Trust. Any future distributions to Dakota from the Dakota Trust should be offset by the amounts he has already received. *See* TEX. PROP. CODE § 114.031(b).

## ATTORNEYS' FEES

48.     Michelle and Joe seek their reasonable and necessary attorneys' fees under all applicable authority, including Section 37.009 of the Texas Civil Practice and Remedies Code and Section 114.064 of the Texas Property Code.

## PRAYER

Michelle Fontenot and Dallas Joseph Fontenot III, beneficiaries of the Dakota Trust, request that Dakota Fontenot be cited to appear and answer herein, and after proper consideration by the Court, they be subject to orders and judgment of the Court as follows:

a.  Equitable relief under Texas Property Code § 114.008 as specified above;

b.  Declaratory judgments that:

   a.  Joe and Michelle are each 1/3 beneficiaries of the Dakota Trust; and

   b.  Joe is the Trustee of the Dakota Trust;

c.  Fill and vacancy in the trustee position and appoint Joe as successor trustee;

d.  Monetary damages, including offset against Dakota's interest in the Dakota Trust; and

e.  Attorneys' fees and costs of court.

13

32677652.v2

Michelle and Joe request that the Court award them all other relief to which they may be justly entitled.

Respectfully submitted,

**CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY, P.C.**

By:  /s/ Ryan O. Cantrell
Ryan O. Cantrell
Texas Bar No. 24055259
ryan.cantrell@chamberlainlaw.com
Mariah J. Karigan
Texas Bar No. 24123088
mariah.karigan@chamberlainlaw.com
1200 Smith Street, Suite 1400
Houston, Texas 77002
Telephone:    (713) 658-1818
Facsimile:    (713) 658-2553
**COUNSEL FOR MICHELLE FONTENOT AND DALLAS JOSEPH FONTENOT III**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing instrument was served on this the 16th day of October, 2025, to the following:

Rudy Culp
Collin Bullard
TEXAS PROBATE ATTORNEY PLLC
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
*Counsel for Linda Goehrs*

Jeffrey D. Watters, Jr.
John P. ("Trey") Avant III
Andrew B. McCarty
GRAY REED & MCGRAW LLP
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
*Counsel for Dakota Fontenot*

James Madison ("Jimmy") Ardoin III
4900 Fournace Place, Suite 414
Bellaire, Texas 77401
*Counsel for Dakota Fontenot*

Paul S. Beik
440 Louisiana Street, Suite 1800
Houston, Texas 77002
*Counsel for Dakota Fontenot*

/s/ Ryan O. Cantrell
Ryan O. Cantrell

14

32677652.v2

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Mariah Karigan on behalf of Ryan Cantrell
Bar No. 24055259
mariah.karigan@chamberlainlaw.com
Envelope ID: 106962867
Filing Code Description: Application in an Existing Estate
Filing Description: Michelle and Joe Fontenot's First Amended Answer,
Affirmative Defenses, and Cross Claims
Status as of 10/17/2025 2:04 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Paul Beik | 24054444 | paul@beiklaw.com | 10/17/2025 8:23:16 AM | SENT |
| James Ardoin | 24045420 | jimmy@jimmyardoinlaw.com | 10/17/2025 8:23:16 AM | SENT |
| John P. TreyAvant | | tavant@grayreed.com | 10/17/2025 8:23:16 AM | SENT |
| Debbie Gurley | | dgurley@grayreed.com | 10/17/2025 8:23:16 AM | SENT |
| Andrew McCarty | | amccarty@grayreed.com | 10/17/2025 8:23:16 AM | SENT |
| Texas Probate Attorney, PLLC | | efile@texasprobateattorney.com | 10/17/2025 8:23:16 AM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 10/17/2025 8:23:16 AM | SENT |
| Jeffrey D.Watters | | jwatters@grayreed.com | 10/17/2025 8:23:16 AM | SENT |
| Ryan Cantrell | | ryan.cantrell@chamberlainlaw.com | 10/17/2025 8:23:16 AM | SENT |
| Mariah Karigan | | mariah.karigan@chamberlainlaw.com | 10/17/2025 8:23:16 AM | SENT |
| Elizabeth Garcia | | elizabeth.garcia@chamberlainlaw.com | 10/17/2025 8:23:16 AM | SENT |
| Marcie Cardenas | | mcardenas@grayreed.com | 10/17/2025 8:23:16 AM | SENT |
| Rudy Culp | | rudy@texasprobateattorney.com | 10/17/2025 8:23:16 AM | SENT |
| Bailey Bowe | | bailey@texasprobateattorney.com | 10/17/2025 8:23:16 AM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 10/17/2025 8:23:16 AM | SENT |

Linda Goehrs, in her capacity as Trustee of the Holli Ann Hardin Trust Number One, Plaintiffvs.Dakota Fontenot, [

## TRUST DECLARATION
## DAKOTA TRUST

THIS TRUST DECLARATION is made this day by declaration of Holli Hardin Fontenot ("Settlor"), who presently resides in Fort Bend County, Texas.

### ARTICLE I.
### TRUST BENEFICIARY

This Trust is created for the use and benefit of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot. The term "Trust Beneficiary" or "beneficiary" will also mean any and all persons, organizations, trusts, and entities who may have or may acquire a beneficial interest in this Trust, whether vested or contingent in nature, including a transfer of an interest in the Trust during the life of either Dallas Joseph Fontenot, Jr. or Holli Hardin Fontenot, or both, or from the exercise of a power of appointment by a Trust Beneficiary or otherwise.

For reference, the only child of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot is Dakota James Fontenot, who was born on June 22, 1994. Holli Hardin Fontenot has no other children born to her or adopted by her on the date of this Trust Declaration.

For reference, the only other children of Dallas Joseph Fontenot, Jr. are: Dallas Joseph Fontenot, III (who was born on March 29, 1969) and Michelle Anne Fontenot (who was born on March 12, 1970). Dallas Joseph Fontenot, Jr. has no other children born to him or adopted by him on the date of this Trust Declaration.

### ARTICLE II.
### INITIAL TRUST CORPUS AND RIGHT TO ADD TO THE TRUST

A.    INITIAL TRUST CORPUS. Settlor does hereby declare that from and after the date of this Trust Declaration, Settlor holds in trust the assets described in Schedule A attached to this Declaration, which assets are the initial corpus of this Trust and as Trustee acknowledges receipts of those assets. Settlor or any other person, trust, or entity may add property of any

Page 1 of 23 Pages

EXHIBIT

1

003271

character to this Trust by a Last Will and Testament, from another trust (whether inter vivos or testamentary), or by deed or other transfer, subject only to the acceptance thereof by the Trustee.

B.  **ADDITIONS TO TRUST CORPUS.** Additional contributions may be made to the corpus of the Trust, including testamentary contributions.

C.  **SEPARATE PROPERTY.** The assets of this trust are the separate property of Holli Hardin Fontenot. No inter vivos transfer of property will be made to this Trust unless the property constitutes the separate property of Holli Hardin Fontenot. Holli Hardin Fontenot may make a testamentary contribution of property to this Trust, and such contribution may constitute the separate property of Holli Hardin Fontenot and Holli Hardin Fontenot's interest in community property.

## ARTICLE III.
### NO REVOCATION OR AMENDMENT

A.  **TRUST IS IRREVOCABLE.** This Trust is an irrevocable Trust.

B.  **THIS TRUST MAY NOT BE AMENDED.** This Trust Declaration may not be amended, except by a Court of competent jurisdiction under the doctrine of *cy pres.*

C.  **INCOME TAX MATTERS.** For so long as the Settlor or Dallas Joseph Fontenot, Jr. is a Trustee of the Trust, the Trust will be treated for income tax reporting purposes as a Grantor Trust under Treasury Regulation § 1.671-4(b). Thereafter, the Trust is to be treated for income tax purposes as required by the applicable provisions of Subchapter J of the Internal Revenue Code.

## ARTICLE IV.
### DEFINITIONS

A.  **DESCENDANTS.** The term "Descendants" means the legitimate children of the person designated and the legitimate lineal descendants of such children. The term includes any person adopted before attaining age eighteen (18) and the adopted person's legitimate lineal descendants. A posthumous child shall be considered as living at the death of his parent.

Page 2 of 23 Pages

003272

B. **HEIRS AT LAW.** Whenever a trustee, or a legal advisor to the Trustee is called upon to determine the heirs at law of Settlor, or any other person beneficially interested in this Trust, the determination will be made to identify those individuals, other than creditors, who would receive the personal property of a decedent upon his or her death as determined in accordance with the laws of intestate succession of the State of Texas, United States of America, determined as if the decedent had then died single, intestate, and domiciled in Texas and further determined as if the Settlor of this Trust had predeceased the person or persons so named or described.

C. **INCOMPETENT, DISABILITY.** A beneficiary will be considered "incompetent" or "disabled" if he or she is incapacitated to an extent to make it impossible or impractical to give prompt and intelligent consideration to business matters. The Trustee may act upon such evidence as the Trustee reasonably deems appropriate and reliable without liability by reason thereof.

D. **MINOR BENEFICIARY.** The term "Minor Beneficiary" or "Minor" identifies a beneficiary who is less than 21 years of age.

E. **PER STIRPES.** Whenever a distribution is directed to be made to the descendants, *per stirpes*, of any person or persons, including the descendants of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot, the property to be distributed shall be divided into as many equal shares as there are then living children of each of those persons and deceased children of each those persons who have descendants then living. Each then living child of such person shall take one share, and the share for the descendants of each deceased child shall be divided among the deceased child's then living descendants on a *per stirpes* basis.

For example, if a distribution were to be made to the descendants, *per stirpes*, of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot, assuming the recitations in Article I, the property to be distributed would be divided into three equal shares, one for each of Dallas Joseph Fontenot, III, Michelle Anne Fontenot, and Dakota James Fontenot.

F. **RELATIVE OR RELATIVES.** Reference to a "Relative" or "Relatives" will identify any person or persons related to Settlor by blood or lawful adoption in any degree.

UNOFFICIAL COPY

Page 3 of 23 Pages

003273

G. **POWER OF APPOINTMENT, QUALIFIED BENEFICIARY DESIGNATION.** Whenever this Trust Declaration gives a Trust Beneficiary the power or authority to appoint a beneficiary of the Trust, the designation must be in writing and be acknowledged in the form required of acknowledgements by Texas law or exercised by a will executed with the formalities required by law of the Trust Beneficiary's residence; it must clearly evidence the intent of the Trust Beneficiary to exercise a power of appointment; and the written beneficiary designation must have been delivered to the Trustee prior to the Trust Beneficiary's death or, if exercised by will, the will must have been filed for probate within three months from the date of the Trust Beneficiary's date of death and must subsequently be admitted to probate no matter the time interval. The term of this Trust may be extended if the qualified beneficiary designation requires that a Beneficiary's interest remain in Trust, or may be divided and be held as a separate trust which is governed by the terms of this Trust Declaration.

H. **SURVIVE.** For the purpose of vesting in the event two or more persons who have an interest in the trust die within a short time of one another, one must have survived the other for a period of at least 90 days as a condition to vesting.

I. **TESTAMENTARY CONTRIBUTIONS.** The term "testamentary contributions" will mean any contribution to the Trust made by reason of the death of a person, including transfers made under the direction of a will, a beneficiary designation in a life insurance policy or other contract, by reason of survivorship language contained in a depository contract, or transfers from another Trust which designates this Trust as a beneficiary.

J. **TRUST.** "Trust" means the Trust created by this Trust Declaration

K. **TRUST DECLARATION.** The term "Trust Declaration" and the term "Trust Agreement" each refer to this Trust Declaration.

L. **TRUST FUND.** The term "Trust Fund" or "Trust Property" means all property comprising: the initial contribution of corpus to the Trust; all property paid or transferred to, or otherwise vested in, the Trustee as additions to the corpus of this Trust; accumulated income, if any, whether or not added to the corpus of this Trust; and the investments and reinvestment of the Trust property, including the increase and decrease in the values thereof as determined from time to

Page 4 of 23 Pages

003274

time.     The terms "corpus" and "principal" are used interchangeably.

M.    **TRUSTEE.** For convenience, the term "Trustee," used in the singular, will mean and identify multiple Trustees serving and acting pursuant to the directions of this Trust Declaration. The term "corporate Trustee" will identify a banking or trust corporation with trust powers.

N.    **GENDER, PLURAL USAGE.** The use of personal pronouns, such as he, she, or it, are to be construed in context. The term "person" will include a non-person, such as a corporation, trust, partnership or other entity as is appropriate in context. The identification of person in the plural will include the singular and *vice versa*, as is appropriate in context.

## ARTICLE V.
## APPOINTMENT OF TRUSTEE

A.    **ORIGINAL APPOINTMENT.** Holli Hardin Fontenot shall serve as initial Trustee of this Trust.

B.    **FIRST SUCCESSOR.** In the event that Holli Hardin Fontenot should die, resign, or become incapacitated or unable to act as Trustee of this Trust, or in the event that Holli Hardin Fontenot should subsequently become divorced from Dallas Joseph Fontenot, Jr., then Dallas Joseph Fontenot, Jr. shall serve as successor Trustee of this Trust. In the event that Dallas Joseph Fontenot, Jr. should elect not to serve as Trustee of this Trust, Dallas Joseph Fontenot, Jr. will have the right to appoint a successor or successors to serve as Trustee, as set forth in Section V.C below, and he may specify any conditions upon succession and service as may be permitted by law.

Holli Hardin Fontenot acknowledges and agrees that the rights and obligations of Holli Hardin Fontenot to serve as Trustee and to resign as Trustee in accordance with the foregoing have been and are the subject of separate consideration, receipt of which is hereby acknowledged in full; and such rights and obligations are in the best interest of the administration of the Trust for its Beneficiaries. Holli Hardin Fontenot specifically waives any rights which she may have to rescind

003275

or revoke her obligation to resign as Trustee upon divorce from Dallas Joseph Fontenot, Jr.

C.   **SUCCESSION.**   Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment will have the right to appoint a successor or successors to serve as Trustee in the event that person ceases to serve for any reason, and each Trustee may specify any conditions upon succession and service as may be permitted by law.  For example, a successor may be required to furnish a fiduciary bond as a prerequisite or a successor's service may be conditioned upon another appointee's death, resignation, or inability to serve.  Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment may also provide that one or more designated successors as Trustee will have the authority to appoint his, her, or its successor as Trustee.   An appointment of successor Trustee must be in writing and must be acknowledged to be effective.   Unless other specified by a Trustee in a written designation of succession, succession is to be determined as follows.

If a Trustee by original appointment does not appoint a successor, the remaining Trustee or Trustees then serving will continue service alone.   If all Trustees by original appointment fail or cease to serve for any reason without having appointed a successor or successors, the successor or successors as Trustee will be as named below and in the order of succession herein prescribed.

FIRST:      Dallas Joseph Fontenot, III

BUT:        Settlor specifically provides that upon assumption of actual service as Trustee, Dallas Joseph Fontenot, III will have the right to appoint Dallas Joseph Fontenot, III's successor as Trustee, and to vest in a successor Trustee, upon assumption of that person's service, the right and authority to designate succession as Trustee. To the extent this is done, the appointment of succession will supersede the appointments which follow the designation of Dallas Joseph Fontenot, III as Trustee.

NEXT:       Michelle Anne Fontenot

BUT:        Settlor specifically provides that upon assumption of actual service as Trustee, Michelle Anne Fontenot will have the right to appoint Michelle Anne Fontenot's successor as Trustee, and to vest in a successor Trustee, upon assumption of that person's service, the right and

Page 6 of 23 Pages

003276

authority to designate succession as Trustee.    To the extent this is done, the appointment of succession will supersede the appointments which follow the designation of Michelle Anne Fontenot as Trustee.

FINALLY:    First Interstate Bank of Texas, N.A., in the event all of the above, including duly appointed successors, fail or cease to serve for any reason.    The appointment of First Interstate Bank of Texas, N.A. as Trustee will include any successor to First Interstate Bank of Texas, N.A. by reason of its merger, reorganization, or sale to another banking corporation with trust powers or a trust company with trust powers.

D.    **AUTHORITY OF SUCCESSOR TRUSTEE.**    A successor will have the authority vested in a Trustee by original appointment under this Trust Declaration, subject to any lawful limitations or qualifications upon the service of a successor imposed by one Trustee in a written document appointing a successor.    A successor Trustee will not be obliged to examine the accounts, records, or acts of the previous Trustee or Trustees; nor will a successor Trustee in any way or manner be responsible for any act or omission to act on the part of any previous Trustee.    Reference to "Trustee" in the singular will include the plural.

E.    **BOND.**    No one serving as Trustee will be required to furnish a fiduciary bond as a prerequisite to service.

F.    **RESIGNATION OR REMOVAL OF A TRUSTEE.**    Any appointee serving or entitled to serve as Trustee may resign at any time and without cause, and the instructions in this Trust Declaration will determine who the successor will be (including successors appointed by a Trustee as herein provided).    The trust beneficiary or beneficiaries who are then entitled to receive distributions of income from the trust, or distributions of income from any separate trust created by this document, may remove any corporate Trustee then serving, the notice of removal to be delivered in writing to the corporate Trustee. Unless this Trust Declaration or any instrument appointing a successor provides otherwise, the selection of a successor to the corporate Trustee will be made by a Court of competent jurisdiction.    In the event there is more than one beneficiary entitled to the income from the trust, all income beneficiaries must join in the written notice of removal.    The consent of any person who is deceased or legally disabled will not be required in meeting the unanimous consent requirements for removal.

Page 7 of 23 Pages

003277

G.   **AFFIDAVIT OF AUTHORITY.**  Any person or entity dealing with the Trust may rely upon the affidavit of a Trustee or Trustees of the Trust:

On my [our] oath, and under the penalties of perjury, I [we] swear that I [we] am [are] the duly appointed and authorized trustee[s] of DAKOTA TRUST.  I [we] certify that I [we] have not been removed as Trustee[s] and have the authority to act for, and bind, DAKOTA TRUST in the transaction of the business for which this affidavit is given as affirmation of my [our] authority.

_____
Signature Line

Sworn and subscribed before me, the undersigned authority, by _____ this _____ day of _____, 19___.

_____
Notary Public - State of Texas

H.   **DOCUMENTING SUCCESSION.**  The successor to any Trustee may document succession with an affidavit setting forth that the preceding Trustee has failed or ceased to serve and the successor has assumed the duties of Trustee.  The affidavit may be filed in the deed records of Fort Bend County, Texas and in each county in which real property held in Trust is located or in the county in which the principal assets and records of the Trust are located.  The public and all persons interested in and dealing with the Trust and the Trustee may rely upon a certified copy of the recorded affidavit as conclusive evidence of a successor's authority to serve and act as the Trustee of the Trust.

I.   **COMPENSATION.**  Any person who serves as Trustee may elect to receive a reasonable compensation, reasonable compensation to be measured by the time required in the administration of the Trust and the responsibility assumed in the discharge of the duties of office.  The fee schedules of area Trust departments prescribing fees for the same or similar services may be used to establish reasonable compensation.  A corporate Trustee will be entitled to receive as its compensation such fees as are then prescribed by its published schedule of charges for Trusts of a similar size and nature and additional compensation for extraordinary services performed by the corporate Trustee.  A Trustee will be entitled to full reimbursement for expenses, costs, or other obligations incurred as the result of service, including attorney's, accountant's, and other professional fees.

J.   **MULTIPLE TRUSTEES.**  In the event there are two Trustees serving the Trust, both must sign any instrument transferring real property from the Trust.  If the Trustees agree to do so, one Trustee acting alone may be given the primary

Page 8 of 23 Pages

003278

responsibility of administration and accounting, and one Trustee alone may be authorized to deposit, transfer and withdraw funds from any depository account held by the Trust. The authority vested in three or more trustees may be exercised by a majority of the trustees. In the event of an action or decision by a majority, the non-consenting Trustee will not be responsible for the act of the majority.

## ARTICLE VI.
### DISTRIBUTIONS FROM THE TRUST,
### LIVING AND POST-MORTEM

A.  **FOR SO LONG AS HOLLI HARDIN FONTENOT AND DALLAS JOSEPH FONTENOT, JR. SHALL REMAIN MARRIED.** For so long as Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr. shall remain married, the Trustee may from time to time distribute to or pay for the benefit of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., or either of them, so much of the net income (and, if the net income of the Trust is not sufficient, the principal of the Trust) as the Trustee determines may be necessary for the support, maintenance, health, and general welfare of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., or either of them. Such determination shall be in the absolute discretion of the Trustee, whose decisions shall be binding.

B.  **UPON THE TERMINATION BY DIVORCE OF THE MARITAL RELATIONSHIP OF HOLLI HARDIN FONTENOT AND DALLAS JOSEPH FONTENOT, JR.** Upon the termination by divorce of the marital relationship of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., the interest of Holli Hardin Fontenot in this Trust will terminate and this Trust is to be continued in trust for the benefit of Dallas Joseph Fontenot, Jr. as follows:

1.  This trust will is to be continued in Trust for the sole use and benefit of Dallas Joseph Fontenot, Jr. for so long as he shall live. Dallas Joseph Fontenot, Jr. will, for the duration of the Trust, be entitled to the net income of the Trust, this amount to be paid in convenient installment payments to be not less than quarter-annually. Distributions of income to Dallas Joseph Fontenot, Jr. shall be made in the amount, form, and manner required by Section 2523(f) of the Internal Revenue Code. If the income known by the Trustee to be available to Dallas Joseph Fontenot, Jr. from other sources is insufficient to provide for his continued

003279

support and maintenance in good health, the Trustee will have the authority to pay to Dallas Joseph Fontenot, Jr. or apply for his benefit, so much of the principal of the Trust, even to the exhaustion thereof, as is necessary to provide for his support and maintenance in the style and comfort to which he is accustomed and to provide for his medical needs and maintenance of good health. It is intended that the payment of principal be limited by the ascertainable standard provided above, that this provision comply fully with Treasury Regulation §20.2041-1(c)(2), and that this Trust is to be construed and limited to that end. Dallas Joseph Fontenot, Jr. may at any time require that property which does not produce an income or a sufficient income be sold and invested in income producing property.

2.    Upon the death of Dallas Joseph Fontenot, Jr., Dallas Joseph Fontenot, Jr., by a clause in his Will in which he specifically exercises this power of appointment, shall have the power to appoint the then remaining trust assets to or for the benefit of any one or more of the descendants of Dallas Joseph Fontenot, Jr. or the descendants of Holli Hardin Fontenot, in such shares, proportions, or amounts, upon such trusts and for such estates as he alone may determine. If Dallas Joseph Fontenot, Jr. fails to exercise this special power of appointment to the fullest extent, then, subject to the other provisions of this Trust, upon his death, the unappointed trust assets shall be delivered to the living descendants of Holli Hardin Fontenot who were born prior to the date of divorce and to the living descendants of Dallas Joseph Fontenot, Jr., *per stirpes*.

C.    **UPON THE DEATH OF HOLLI HARDIN FONTENOT WHILE MARRIED TO DALLAS JOSEPH FONTENOT, JR.** Upon the death of Holli Hardin Fontenot while married to Dallas Joseph Fontenot, Jr. this Trust is to be continued in Trust as follows:

1.    This trust will is to be continued in Trust for the sole use and benefit of Dallas Joseph Fontenot, Jr. for so long as he shall live. Dallas Joseph Fontenot, Jr. will, for the duration of the Trust, be entitled to the net income of the Trust, this amount to be paid in convenient installment payments to be not less than quarter-annually. Distributions of income to Dallas Joseph Fontenot, Jr. shall be made in the amount, form, and manner required by Section 2056(b)(7)(B) of the Internal Revenue Code. If the income known by the Trustee to be



003280

available to Dallas Joseph Fontenot, Jr. from other sources is insufficient to provide for his continued support and maintenance in good health, the Trustee will have the authority to pay to Dallas Joseph Fontenot, Jr. or apply for his benefit, so much of the principal of the Trust, even to the exhaustion thereof, as is necessary to provide for his support and maintenance in the style and comfort to which he is accustomed and to provide for his medical needs and maintenance of good health. It is intended that the payment of principal be limited by the ascertainable standard provided above, that this provision comply fully with Treasury Regulation §20.2041-1(c)(2), and that this Trust is to be construed and limited to that end. Dallas Joseph Fontenot, Jr. may at any time require that property which does not produce an income or a sufficient income be sold and invested in income producing property.

2. Upon the death of Dallas Joseph Fontenot, Jr., Dallas Joseph Fontenot, Jr., by a clause in his Will in which he specifically exercises this power of appointment, shall have the power to appoint the then remaining trust assets to or for the benefit of any one or more of the descendants of Dallas Joseph Fontenot, Jr. or the descendants of Holli Hardin Fontenot, in such shares, proportions, or amounts, upon such trusts and for such estates as he alone may determine. If Dallas Joseph Fontenot, Jr. fails to exercise this special power of appointment to the fullest extent, then, subject to the other provisions of this Trust, upon his death, the unappointed trust assets shall be delivered to the living descendants of Holli Hardin Fontenot and to the living descendants of Dallas Joseph Fontenot, Jr., *per stirpes*.

D. **UPON THE DEATH OF DALLAS JOSEPH FONTENOT, JR. WHILE MARRIED TO HOLLI HARDIN FONTENOT.** Upon the death of Dallas Joseph Fontenot, Jr. while married to Holli Hardin Fontenot, this Trust is to be continued in Trust as follows:

1. This trust will is to be continued in Trust for the sole use and benefit of Holli Hardin Fontenot for so long as she shall live. Holli Hardin Fontenot will, for the duration of the Trust, be entitled to the net income of the Trust, this amount to be paid in convenient installment payments to be not less than quarter-annually. If the income known by the Trustee to be available to Holli Hardin Fontenot from other sources is insufficient to provide for her continued support and

Page 11 of 23 Pages

003281

maintenance in good health, the Trustee will have the authority to pay to Holli Hardin Fontenot or apply for her benefit, so much of the principal of the Trust, even to the exhaustion thereof, as is necessary to provide for her support and maintenance in the style and comfort to which she is accustomed and to provide for her medical needs and maintenance of good health. Holli Hardin Fontenot may at any time require that property which does not produce an income or a sufficient income be sold and invested in income producing property.

2.   Upon the death of Holli Hardin Fontenot, unless Holli Hardin Fontenot shall issue a direction to the contrary, the Trustee will pay from the Trust assets the entire increment in the taxes payable by reason of her death to the extent that the total of such taxes is greater than would have been imposed if the trust assets had not been taken into account in determining such taxes.

3.   Dallas Joseph Fontenot, Jr., by a clause in his Will in which he specifically exercises this power of appointment, shall have the power to appoint the trust assets remaining upon the death of Holli Hardin Fontenot to or for the benefit of any one or more of the descendants of Dallas Joseph Fontenot, Jr. or the descendants of Holli Hardin Fontenot, in such shares, proportions, or amounts, upon such trusts and for such estates as he alone may determine. If Dallas Joseph Fontenot, Jr. fails to exercise this special power of appointment to the fullest extent, then, subject to the other provisions of this Trust, upon his death, the unappointed trust assets shall be delivered to the living descendants of Holli Hardin Fontenot and to the living descendants of Dallas Joseph Fontenot, Jr., per stirpes.

E.   **ELECTION, QUALIFIED TERMINABLE INTEREST PROPERTY.** It is important to emphasize that upon the death of Holli Hardin Fontenot, or the termination by divorce of the marital relationship of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., Dallas Joseph Fontenot, Jr. will have no more than a life interest in the Trust. Dallas Joseph Fontenot, Jr. will have no right or power to revoke or amend this Trust. The Trustee may, without liability for doing so or the failure to do so, elect to treat all or a part of the Trust as Qualified Terminable Interest Property pursuant to the requirements of Section 2056(b)(7) or Section 2523(f) of the Internal Revenue Code, whichever is applicable. To the extent that an election is made, and unless Dallas Joseph Fontenot,

UNOFFICIAL COPY

003282

Jr. shall issue a direction to the contrary, the Trustee will pay from the Trust assets the entire increment in the taxes payable by reason of his death to the extent that the total of such taxes is greater than would have been imposed if the property treated as qualified terminable interest property had not been taken into account in determining such taxes. To the extent a partial election is made, and to the extent and in the manner then permitted by law, the Trustee will have the authority (1) to divide the Trust into separate trusts to reflect the partial election, or (2) to continue the Trust as a whole, with the fraction or percentage of the whole representing the elective share to be administered and maintained in a manner to reflect its proportionate share of the increment or decline in the whole of the property for the purposes of applying Sections 2044 and 2519 of the Internal Revenue Code. If the Trust is divided into separate parts, the Trustee will make the division according to the fair market value at the time the division is made. It is Settlor's intent and purpose to comply with state and federal law so that the least amount of federal estate tax will be payable upon the deaths of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., and this Trust Declaration is to be applied and construed to accomplish this objective.

F.   **DIVISION INTO SEPARATE TRUSTS.** If, following the death of Holli Hardin Fontenot or the termination by divorce of the marital relationship between Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot, the Trust is divided into separate trusts, the appreciation or depreciation in the value of each such trust or account will measure the value thereof for the purpose of disposition and taxation. For example, if the Trustee elects to treat all but $600,000 of the Trust assets as qualified terminable interest property for the federal estate tax marital deduction, and, if the Trustee segregates the $600,000 amount into a separate trust, the amount distributable therefrom upon the death of Dallas Joseph Fontenot, Jr. will be the value of that account upon the death of Dallas Joseph Fontenot, Jr. If, however, the $600,000 amount represents 25 percent of the total trust estate, and is continued and maintained as a fractional percentage of the whole, the value of the fractional interest upon the death of Dallas Joseph Fontenot, Jr. is to be determined with regard to its proportional share of any increase or decrease in the value of the whole.

G.   **ITEMS OF TANGIBLE PERSONAL PROPERTY IN TRUST.** Holli Hardin Fontenot may have certain items of tangible personal property which are her separate property and which have been

003283

transferred to the Trust or otherwise subject to the Trustee's control. The term "personal belongings" or "tangible personal property" will mean and identify personal wearing apparel, jewelry, household furnishings and equipment, books, albums, art work, entertainment and sports equipment, and all items of decoration or adornment. Holli Hardin Fontenot may at any time and from time to time deliver to the Trustee written instructions as to any living or post mortem gifts of such personal belongings, and the Trustee shall be authorized and bound to make disposition of these items as Holli Hardin Fontenot has reasonably directed.

H.  **PARTIAL AND FINAL DISTRIBUTIONS**. The Trustee, in making or preparing to make a partial or final distribution, may prepare an accounting and may require, as a condition to payment, a written and acknowledged statement from each distributee that the accounting has been thoroughly examined and accepted as correct; a discharge of the Trustee; a release from any loss, liability, claim or question concerning the exercise of due care, skill, and prudence of the Trustee in the management, investment, retention, and distribution of property during the Trustee's term of service, except for any undisclosed error or omission having basis in fraud or bad faith; and an indemnity of the Trustee, to include the payment of attorney's fees, from any asserted claim of any taxing agency, governmental authority, or other claimant. Any remainder beneficiary having a question or potential claim may require an audit of the Trust as an expense of administration. Failure to require the audit prior to acceptance of the Trustee's report, or the acceptance of payment, will operate as a final release and discharge of the Trustee except as to any error or omission having basis in fraud or bad faith.

The Trustee, in making or preparing to make a partial or final distribution will have the authority to: (1) partition any asset or class of assets and deliver divided and segregated interests to the beneficiaries; (2) sell any asset or class of assets (whether or not susceptible to partition in kind), and deliver to a beneficiary or beneficiaries a divided interest in the proceeds of sale and/or divided or undivided interests in any note and security arrangement taken as part of the purchase price; and/or (3) deliver undivided interests in an asset or class of assets to the beneficiaries subject to any indebtedness which may be secured by the property.

I.  **CONTINUATION OF THE TRUST DURING DISSOLUTION**. The Trust may continue beyond its termination for a time reasonably necessary to conclude the administration of the Trust, pay

003284

expenses of termination and to distribute to the Trust property to those entitled thereto.

J.   **CONTINGENT TRUST FOR CERTAIN BENEFICIARIES.**  The interest of any Trust Beneficiary who has not attained the age of thirty-five (35) years (the "required age"), or who may be otherwise legally disabled, and whose interest is not otherwise covered by the provisions of this Trust Declaration or another Trust, may, in the sole and absolute discretion of the Trustee, be continued in Trust, or be held as a separate trust, for the use and benefit of that person until such person shall attain the required age or until such person is no longer disabled. For so long as the trust shall exist, the Trustee shall hold, manage, and make distributions of income and principal to provide for his or her health, education, support and maintenance.  The Trustee may make an entire distribution of principal to a Trust Beneficiary prior to the required age if, in the Trustee's determination alone, the beneficiary has demonstrated an ability to conserve his or her resources or if it is no longer feasible for the trust to continue considering the size of the trust and the time and cost to maintain the trust.  The Trust Beneficiary, with consent of the Trustee, may also extend the term of the trust.

For so long as the Trust is held for a beneficiary pursuant to these terms, the Trust Beneficiary, using a qualified beneficiary designation, will have the right to appoint the beneficiaries of his or her interest in the Trust entitled to his or her interest upon the Trust Beneficiary's death.  If the Trust Beneficiary dies prior to a final distribution of his or her interest from the Trust, without having made a qualified beneficiary designation, that person's interest will pass *per stirpes* to his or her descendants then living, or if none, *per stirpes* to Settlor's descendants then living.

K.   **PERPETUITIES.**  In no event will the term of this Trust continue for a term greater than twenty-one (21) years after the death of the last survivor of Settlor and all relatives of Settlor living on the effective date of this Trust Declaration.  Any continuation of the Trust by the qualified exercise of a power of appointment will be construed as the creation of a separate trust and an extension of the Rule Against Perpetuities to the extent permitted by law.  A court of competent jurisdiction is to liberally construe and apply this provision to validate an interest consistent with Settlor's intent and may reform or construe an interest according to the doctrine of *cy pres*.

003285

ARTICLE VII.
PAYMENT OF DEBTS, TAXES, AND
SETTLEMENT COSTS
EXERCISE OF ELECTIONS

The following directions concern the payment of debts, taxes, estate and trust settlement costs, and the exercise of any election permitted by Texas law or by the Internal Revenue Code:

A.    **PAYMENT OF INDEBTEDNESS AND SETTLEMENT COSTS.** The Trustee will have the discretionary authority to pay from the Trust Fund the costs reasonably and lawfully required to settle the estate of a deceased beneficiary. In the event there is more than one Trust Beneficiary immediately preceding the death of a beneficiary, distributions of Trust income and principal to pay settlement costs will not exceed that person's trust share or the fair market value of the beneficiary's interest in the Trust which is distributable by reason of his or her death.

B.    **SPECIAL BEQUESTS.** Unless otherwise provided in this Trust document, or in any amendment, or in a document exercising a power to appoint the beneficiaries of this Trust, if property given as a special bequest or gift is subject to a mortgage or other security interest, the designated recipient of the property will take the asset subject to the obligation and the recipient's assumption of the indebtedness upon distribution of the asset to the recipient. The obligation to be assumed shall be the principal balance of the indebtedness on date of death, and the Trust shall be entitled to reimbursement or offset for principal and interest payments paid by the Trust to date of distribution.

C.    **ESTATE, GENERATION SKIPPING, OR OTHER DEATH TAX.** Unless otherwise provided in this Trust document, or in a document exercising a power to appoint the beneficiaries of this Trust, estate, inheritance, succession, or other similar tax shall be charged to and apportioned to those whose gifts or distributive share generate a death tax liability by reason of Settlor's death or by reason of a taxable distribution from the Trust or a taxable termination of the Trust. To the extent Settlor may lawfully provide, a Trustee may pay and deduct from a beneficiary's distributive share (whether the distribution is to be paid outright or is to be continued in Trust) the increment in taxes payable by reason of a required distribution or termination of interest (i.e., estate, gift, inheritance, or generation skipping taxes) to the extent that the total of such taxes payable by reason of a distribution or

Page 16 of 23 Pages

003286

termination is greater than the tax which would have been imposed if the property of the Trust subject to the distribution or termination of interest had not been taken into account in determining the amount of such tax. To the extent a tax liability results from the distribution of property to a beneficiary other than under this Trust, the Trustee will have the authority to reduce any distribution to the beneficiary from this Trust by the amount of the tax liability apportioned to the beneficiary, or if the distribution is insufficient, the Trustee will have the authority to proceed against the beneficiary for his, her, or its share of the tax liability. In making an allocation, the Trustee may consider all property included in the gross estate of the Settlor for federal estate tax purposes, including all property subject to probate, all amounts paid or payable to another as the result of death, including life insurance proceeds, proceeds from a qualified retirement plan or account, proceeds from a joint and survivorship account with a financial institution or brokerage company, proceeds from a buy-sell or redemption contract, and/or any other plan or policy which provides for a payment of death benefits. This provision further contemplates and includes any tax which results from the inclusion of a prior transfer in the federal gross estate of Settlor even though possession of the property previously transferred is vested in someone other than the Trustee. This provision does not include a reduction in the unified credit by reason of taxable gifts previously made by Settlor. If the Trustee determines that the collection of an apportioned tax liability against another is not economically feasible or probable, the tax liability will be paid by the Trust and will reduce the amount distributable to the residuary beneficiaries. The Trustee's judgment with regard to the feasibility of collection is to be conclusive.

D.    **SPECIAL ELECTION FOR QUALIFIED TERMINABLE INTEREST PROPERTY.** For the purpose of identifying the "transferror" in allocating a GST exemption, the estate of Holli Hardin Fontenot or the Trustee of this Trust may elect to treat all of the property which passes in Trust to Dallas Joseph Fontenot, Jr. for which a marital deduction is allowed, by reason of Section 2056(b)(7) or Section 2523(f) of the Internal Revenue Code, as if the election to be treated as Qualified Terminable Interest Property had not been made. Reference to the "Special Election For Qualified Terminable Interest Property" will mean and identify the election provided by Section 2652(a)(2) of the Internal Revenue Code. The term "GST Exemption" or "GST Exemption Amount" is the dollar amount of property which may pass as generation skipping transfers under Subtitle B,

UNOFFICIAL COPY

003287

Chapter 13, of the Internal Revenue Code of 1986 which is exempt from the generation-skipping tax.

E.    **ELECTIVE DEDUCTIONS.**    A Trustee will have the discretionary authority to claim any obligation, expense, cost, or loss as a deduction against either estate tax or income tax, or to make any election provided by Texas law, the Internal Revenue Code, or other applicable law, and the Trustee's decision will be conclusive and binding upon all interested parties and shall be effective without obligation to make an equitable adjustment or apportionment between or among the beneficiaries of this Trust or the estate of deceased beneficiary.

ARTICLE VIII.
SERVICE OF THE TRUSTEE
OTHER MATTERS

A.    **GENERAL AUTHORITY.**    A Trustee is to serve without Court supervision.  The service of a Trustee is to be governed first by the terms, conditions, and authority prescribed by this Trust Declaration, and then as prescribed by the trust laws of the State of Texas.

B.    **RETENTION OF ASSETS.**    A Trustee will have the authority to retain, without liability, any and all property in the form in which it is received by the Trustee without regard to its productivity or the proportion that any one asset or class of assets may bear to the whole.  A Trustee will not have liability nor responsibility for loss of income from or depreciation in the value of property which was retained in the form which the Trustee received it.

C.    **UNDIVIDED INTERESTS.**    A Trustee will have the authority to hold, acquire, and dispose of undivided interests in property.

D.    **LENDING, INVESTING.**    A Trustee will have the authority to lend, borrow, lease, sell, and purchase property, including undivided fractional interests in property, upon such terms and conditions as are reasonably prudent under the facts and circumstances then existing.  A Trustee may transact business, including lending, borrowing, leasing, and sale, between two or more related trusts or persons upon such terms and conditions as are reasonably prudent under the facts and circumstances then existing.  Without limiting the general authority above given, a Trustee will have the authority to hold, acquire and sell:

Page 18 of 23 Pages

003288

- Publicly traded securities, including stocks, bonds, warrants, futures, mutual funds, partnerships, real estate investment trusts, diversified asset funds.
- Interests in a closely held corporation, partnership, or trust, whether registered or not registered for public sale.
- Obligations of the United States Government or any other government.
- Cash deposits, money market funds, brokerage company accounts, certificates of deposit, savings accounts, and checking accounts, without limitation as to the location of the account or depository.
- Promissory notes, secured and unsecured, including mortgage notes purchased at a discount.
- Land, improved and unimproved, whether presently income producing or held for appreciation in value.
- Land, building and equipment leases.
- Minerals, mineral rights and working interests in mineral producing property or property held for future development.
- Equipment, implements, stock in trade, leasehold improvements, and livestock.
- Insurance policies.

E. **LIMITATION UPON A TRUSTEE'S LIABILITY.** A Trustee, other than a banking corporation serving as a Trustee, will not have personal liability for service in a fiduciary capacity other than for acts or omissions to act which, as determined by a court of law, constitute gross negligence or fraud.

F. **PROTECTION OF THE INTERESTS OF BENEFICIARIES.** No beneficiary will have the power to anticipate, encumber or transfer any interest in the Trust. No part of the Trust will be liable for or charged with any debts, contracts, liabilities or torts of a beneficiary or subject to seizure or other process by any creditor of a beneficiary.

G. **RELATIONSHIP WITH BENEFICIARIES WHO ARE MINORS OR INCOMPETENTS.** Distributions to an incompetent or disabled beneficiary, or a Minor Beneficiary may be made in such of the following ways as in the Trustee's opinion will be most beneficial to the interests of the beneficiary: (a) directly to such beneficiary; (b) to his or her parent, guardian or legal representative; (c) to a custodian for said beneficiary under any Uniform Gifts to Minors Act and/or Gifts of Securities to Minors Act in the jurisdiction of residence of such beneficiary; (d) to any person with whom he or she is residing; (e) to some near relative or close friend; or (f) by

Page 19 of 23 Pages

003289

the Trustee using such payment directly for the benefit of such beneficiary, including payments made to or for the benefit of any person or persons whom said beneficiary has a legal obligation to support. The Trustee may in the Trustee's sole discretion instead hold such income or corpus for the account of such beneficiary as custodian. A receipt from a beneficiary or from his parent, guardian, legal representative, relative, close friend, or other person described above shall be a sufficient discharge to the Trustee from any liability for making said payments.

The Trustee is likewise authorized to consult with and act upon the advice of the parent, guardian, custodian, or legal representative of any beneficiary who is either an incompetent or a Minor with respect to any and all matters which may arise under this Declaration and as concerns the rights or interests of said beneficiary. All statements, accounts, documents, releases, notices, or other written instruments, including but not limited to written instruments concerning the resignation or replacement of any Trustee or Trustees, required to be delivered to or executed by such beneficiary may be delivered to or executed by the parent, guardian, custodian, or legal representative of said incompetent or Minor Beneficiary, and when so delivered or executed shall be binding upon said incompetent or Minor Beneficiary, and shall be of the same force and effect as though delivered to or executed by a beneficiary acting under no legal disability.

## ARTICLE IX.
### UNPRODUCTIVE OR UNDERPRODUCTIVE PROPERTY

A beneficiary who is then entitled to the income of the Trust, or the income of any other Trust established or continued pursuant to this trust declaration, will have the authority to issue a written directive to the Trustee to convert Trust Property which does not produce an income, or which is underproductive, into property which is income producing or which will provide a greater income to the trust. Upon actual receipt of an income beneficiary's written directive, the Trustee will reasonably and prudently proceed to convert unproductive or underproductive property into property which will produce a reasonable and safe rate of return. The Trustee may do so by selling the unproductive or underproductive asset upon such terms and conditions as is prudent and reasonable under all circumstances which may then exist (including the acceptance of an income or interest bearing obligation as the whole or a part of the sales price), and investing the proceeds of sale in income producing instruments or obligations. Notwithstanding

Page 20 of 23 Pages

003290

these requirements, a Trust Beneficiary cannot direct the Trustee to invest or reinvest trust property in a trust investment which is speculative in nature or which, in result, would violate the spendthrift provisions of this Trust Declaration.

## ARTICLE X.
### NO-CONTEST REQUIREMENTS

Settlor vests in the Trustee the authority to construe this Trust instrument and to resolve all matters pertaining to disputed issues or controverted claims. Settlor does not want to burden this Trust with the cost of a litigated proceeding to resolve questions of law or fact unless the proceeding is originated by the Trustee or with the Trustee's written permission. Any other person, agency, or organization who shall originate (or who shall cause to be instituted) a judicial proceeding to construe or contest this Trust instrument, or any will which requires distribution of property to this Trust, or to resolve any claim or controversy in the nature of reimbursement, or seeking to impress a constructive or resulting Trust, or alleging any other theory which, if assumed as true, would enlarge (or originate) a claimant's interest in this Trust or in Settlor's estate, without the Trustee's written permission, shall forfeit any amount to which that person, agency, or organization is or may be entitled and the interest of any such litigant or contestant shall pass as if he or she or it had predeceased us. These directions shall apply even though the person, agency or organization shall be found by a court of law to have originated the judicial proceeding in good faith and with probable cause and even though the proceedings may seek nothing more than to construe the application of this no-contest provision. This requirement is to be limited, even to the exclusion thereof, in the event it operates to deny the benefits of the federal estate tax or federal gift tax marital deduction.

## ARTICLE XI.
### JURISDICTION

The jurisdiction of this Trust will be the State of Texas. Any issue of law or fact pertaining to the creation, continuation, administration, and termination of the Trust, or any other matter incident to this Trust, is to be determined with reference to the specific directions in the Trust Declaration and then under the laws of the State of Texas. If a Article or Subsection of this Trust Declaration is in conflict with a prohibition of state law or federal law, the Article or Subsection, or the Trust Declaration as a whole, is to be construed in a manner which will cause it to be

Page 21 of 23 Pages

003291

in compliance with state and federal law and in a manner which will result in the least amount of taxes and estate settlement costs.

## ARTICLE XII.
### ACCEPTANCE BY TRUSTEE

Holli Hardin Fontenot acknowledges that she is the initial Trustee of the DAKOTA TRUST. By execution of this Trust Declaration, Holli Hardin Fontenot accepts the office of Trustee and agrees to hold and administer the Trust according to the provisions thereof and as required by law.

### CONCLUSION AND ATTESTATION

Holli Hardin Fontenot attests that she has executed this Trust Declaration on the date set forth below, and the terms thereof will bind her, her successors and assigns, and her heirs and personal representatives. This instrument is to be effective upon the date recorded immediately below.

Dated: __November 9, 1994__

__original signed by Holli Hardin Fontenot__

_____
Holli Hardin Fontenot, individually and as Trustee

Page 22 of 23 Pages

003292

STATE OF TEXAS        §
                      §
COUNTY OF HARRIS      §

On this __9th__ day of ___November___ in the year 199_4_ before me, a Notary Public of said State, personally appeared Holli Hardin Fontenot, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument, and acknowledged that she executed the same in the capacities expressed therein.

WITNESS MY HAND and official seal.

_____
Notary Public, State of Texas

[SEAL]

Page 23 of 23 Pages

UNOFFICIAL COPY

003293

## SCHEDULE A TO
## TRUST DECLARATION
## DAKOTA TRUST

The Sum of SIXTY FOUR THOUSAND AND NO/100 DOLLARS ($64,000.00) from the Holli Ann Hardin Sole and Separate Property Account, which sum constitutes the separate property of the Settlor

UNOFFICIAL COPY

Page 24 of 23 Pages

003294

This trust may need a demand power after Holli's death so that we can take advantages of $10,000 per year exclusion for gifts of present interest.



UNOFFICIAL COPY

Page 25 of 23 Pages

003295



TO WHOM IT MAY CONCERN:

I, Holli Ann Hardin Fontenot, hereby voluntarily resign as trustee of the Holli Ann Hardin Fontenot Trust Number One and the Dakota Trust. This resignation as trustee shall be effective immediately upon acceptance by Dallas J. Fontenot, Jr.

Very truly yours,

Holli Ann Hardin Fontenot

Agreed and accepted this 8 day of SEPT., 1996.

Dallas J. Fontenot, Jr.

LDK233:19

UNOFFICIAL COPY

TOTAL P 02

003296

Linda Goehrs, in her capacity as Trustee of the Holli Ann Hardin Trust Number One, Plaintiffvs.Dakota Fontenot,

④

TO WHOM IT MAY CONCERN:

I, Holli Ann Hardin Fontenot, hereby voluntarily resign as trustee of the Holli Ann Hardin Fontenot Trust Number One and the Dakota Trust. This resignation as trustee shall be effective immediately upon acceptance by Dallas J. Fontenot, Jr.

Very truly yours,

Holli Ann Hardin Fontenot

Agreed and accepted this __8__ day of __SEPT.__, 1996.

Dallas J. Fontenot, Jr.

LDK233:19

UNOFFICIAL COPY

TOTAL P.02

**EXHIBIT**

**2**

003296

Linda Goehrs, in her capacity as Trustee of the Holli Ann Hardin Trust Number One, Plaintiffvs.Dakota Fontenot,

## DESIGNATION OF SUCCESSOR TRUSTEE
### Dakota Trust

The undersigned Dallas Joseph Fontenot, Jr., Successor Trustee of Dakota Trust, a trust established by Trust Declaration of Holli Ann Fontenot dated November 9, 1994 ("Trust Declaration") does hereby declare as follows:

Article V, Section C of the Trust Declaration provides in part that:

> SUCCESSION. Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment will have the right to appoint a successor or successors to serve as Trustee in the event that person ceases to serve for any reason, and each Trustee may specify any conditions upon succession and service as may be permitted by law. For example, a successor may be required to furnish a fiduciary bond as a prerequisite or a successor's service may be conditioned upon another appointee's death, resignation, or inability to serve. Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment may also provide that one or more designated successors as Trustee will have the authority to appoint his, her, or its successor as Trustee. An appointment of successor Trustee must be in writing and must be acknowledged to be effective.

Pursuant to Article V, Section C of the Trust Declaration, Dallas Joseph Fontenot, Jr. appoints Dakota James Fontenot as successor Trustee, to serve immediately upon the death, disability, resignation, or disqualification of Dallas Joseph Fontenot, Jr.

Dallas Joseph Fontenot, Jr. appoints Frost Bank to serve as successor Trustee upon the death, disability, resignation, or disqualification of Dakota James Fontenot.

Each Trustee will have the right to appoint a successor or successors to serve as trustee of the Trust in the event that he ceases to serve for any reason, and such Trustee may specify any conditions upon succession and service as may be permitted by law.

The incapacity or disability of a trustee hereunder shall be (i) determined by a duly licensed physician representing that he or she is certified by a recognized medical board and is not related by blood or marriage to any trustee or beneficiary hereunder; and (ii) evidenced by a writing which is executed, witnessed, and acknowledged certifying that such a physician is familiar with the physical and mental condition of a person and has concluded that, by reason of accident, physical, or mental deterioration, or other similar cause, such person was, as of the date thereof, unable to give prudent, prompt, and intelligent consideration to financial matters. No judicial determination of incapacity

UNOFFICIAL COPY

EXHIBIT

3

000355

or disability shall be necessary. Any physician's certificate described above may be revoked by a similar certificate to the effect that such person is no longer incapacitated, which certificate must be executed either (i) by the originally certifying physician or (ii) by two other licensed, unrelated physicians. In the case of a revocation of a certificate of incapacity or disability of a trustee hereunder, such revocation shall cause such trustee to regain his or her appointment as trustee, and the then serving successor trustee shall be relieved of his or her duties.

This Designation of Successor Trustee shall be effective as of May 1, 2013 and shall revoke and replace all prior Designations of Successor Trustee.

_____ "
Dallas Joseph Fontenot, Jr., Trustee

STATE OF NEVADA
COUNTY OF _____Clark_____
This document was acknowledged before me on the _7TH_ day of May, 2013 by Dallas Joseph Fontenot, Jr., Trustee.

_____
Notary Public, State of Nevada

MICHAEL J. MOORE
Notary Public State of Nevada
No. 08-7991-1
My Appt. Exp. September 11, 2016

UNOFFICIAL COPY

000356

Linda Goehrs, in her capacity as Trustee of the Holli Ann Hardin Trust Number One, Plaintiffvs.Dakota Fontenot, D

## DESIGNATION OF SUCCESSOR TRUSTEE
### Dakota Trust

The undersigned Dallas Joseph Fontenot, Jr., Successor Trustee of Dakota Trust, a trust established by Trust Declaration of Holli Ann Fontenot dated November 9, 1994 ("Trust Declaration") does hereby declare as follows:

Article V, Section C of the Trust Declaration provides in part that:

SUCCESSION. Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment will have the right to appoint a successor or successors to serve as Trustee in the event that person ceases to serve for any reason, and each Trustee may specify any conditions upon succession and service as may be permitted by law. For example, a successor may be required to furnish a fiduciary bond as a prerequisite or a successor's service may be conditioned upon another appointee's death, resignation, or inability to serve. Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment may also provide that one or more designated successors as Trustee will have the authority to appoint his, her, or its successor as Trustee. An appointment of successor Trustee must be in writing and must be acknowledged to be effective.

Pursuant to Article V, Section C of the Trust Declaration, Dallas Joseph Fontenot, Jr. removes all prior appointments of appoints Dakota James Fontenot as successor Trustee and, instead, appoints Frost Bank to serve as successor Trustee upon the death, disability, resignation, or disqualification of Dallas Joseph Fontenot, Jr.

Each Successor Trustee will have the right to appoint a successor or successors to serve as trustee of the Trust in the event that he ceases to serve for any reason, and such Trustee may specify any conditions upon succession and service as may be permitted by law.

The incapacity or disability of a trustee hereunder shall be (i) determined by a duly licensed physician representing that he or she is certified by a recognized medical board and is not related by blood or marriage to any trustee or beneficiary hereunder; and (ii) evidenced by a writing which is executed, witnessed, and acknowledged certifying that such a physician is familiar with the physical and mental condition of a person and has concluded that, by reason of accident, physical, or mental deterioration, or other similar cause, such person was, as of the date thereof, unable to give prudent, prompt, and intelligent consideration to financial matters. No judicial determination of incapacity or disability shall be necessary. Any physician's certificate described above may be

| EXHIBIT |
| --- |
| 4 |

000456

revoked by a similar certificate to the effect that such person is no longer incapacitated, which certificate must be executed either (i) by the originally certifying physician or (ii) by two other licensed, unrelated physicians.  In the case of a revocation of a certificate of incapacity or disability of a trustee hereunder, such revocation shall cause such trustee to regain his or her appointment as trustee, and the then serving successor trustee shall be relieved of his or her duties.

This Designation of Successor Trustee shall be effective as of October 14, 2017 and shall revoke and replace all prior Designations of Successor Trustee.

_____
Dallas Joseph Fontenot, Jr., Trustee

STATE OF TEXAS
COUNTY OF Harris

This document was acknowledged before me on the 14th day of October, 2017 by Dallas Joseph Fontenot, Jr., Trustee.

_____
Notary Public, State of Texas

DIANNE N SKINNER
Notary ID # 126280969
My Commission Expires
November 11, 2019

000457

Linda Goehrs, in her capacity as Trustee of the Holli Ann Hardin Trust Number One, Plaintiffvs.Dakota Fontenot, [

## RESOLUTIONS ADOPTED BY
## WRITTEN CONSENT OF SHAREHOLDER AND DIRECTOR OF
## VIVA LAS VEGAS PROPERTIES, INC.
### (OCTOBER 14, 2017)

The undersigned, being the sole shareholder of Viva Las Vegas Properties, Inc., a corporation organized and existing under the laws of Texas, does by this writing consent to take the following actions and adopt the following resolutions:

RESOLVED that the following persons person is elected as the sole Director of Viva Las Vegas Properties, Inc., to serve at the discretion of the Shareholder from October 14, 2017 until such time as his successors are elected by the Shareholder and qualify:

Dallas Fontenot

The undersigned direct that this consent be filed with the minutes of the proceeding of the Shareholders of Viva Las Vegas Properties, Inc.

The undersigned, now being the sole director of Viva Las Vegas Properties, Inc., does by this writing consent to take the following actions and adopt the following resolutions:

RESOLVED that the following person is elected to the offices of Viva Las Vegas Properties, Inc. set forth below, to serve at the discretion of the director from October 14, 2017 until such time as his successors are elected by the Shareholder and qualify:

Dallas Fontenot       President
Dallas Fontenot       Secretary

ESOLVED that Dakota Fontenot is hereby removed from all offices and all positions as a Director of Viva Las Vegas Properties, Inc. from and after October 14, 2017.

The undersigned direct that this consent be filed with the minutes of the proceeding of the Directors of Viva Las Vegas Properties, Inc.

This consent is executed pursuant to the laws of Texas and the Bylaws of Viva Las Vegas Properties, Inc., which authorize the taking of action by the Shareholders and Directors by unanimous written consent without a meeting. This consent is intended to substitute for a special meeting of the Shareholders and Directors of Viva Las Vegas Properties, Inc. Only those persons named above shall serve as Directors until a subsequent election or appointment by the

EXHIBIT

5

000437

Shareholder of Viva Las Vegas Properties, Inc. Only those persons named above shall serve as an officer until a subsequent election or appointment by the Director of Viva Las Vegas Properties, Inc.

Dated to be effective as of October 14, 2017.

Viva Las Vegas Properties, Inc., Shareholder

by: _____
Dallas Fontenot, President

_____
Dallas Fontenot, Director

UNOFFICIAL COPY

000438

537721  Harris County - County Probate Court No. 4

Linda Goehrs, in her capacity as Trustee of the Holli Ann Hardin Trust Number One, Plaintiffvs.Dakota Fonte

## AFFIDAVIT OF LOST STOCK CERTIFICATE

STATE OF _Texas_ §
§
COUNTY OF _Harris_ §

**DAKOTA TRUST** (the "Stockholder"), deposes and says:

(1)     The Stockholder is entitled to the possession and is the true, lawful and sole beneficial owner of all stock certificates representing shares of issued and outstanding Common Stock, estimated to be 1,000 shares of Common Stock (collectively, the "Original Certificates"), issued by **VIVA LAS VEGAS PROPERTIES, INC.**, a corporation created under the laws of the State of Texas (the "Corporation"), in the name of the Stockholder.

(2)     The Original Certificates were originally acquired by the Stockholder directly from the Corporation, and have been lost, stolen or destroyed.

(3)     The Stockholder has not otherwise endorsed, or authorized anyone else to endorse, the Original Certificates.

(4)     The Stockholder has made or caused to be made a diligent search for the Original Certificates, and has been unable to find or recover them; the Stockholder has not sold, assigned, pledged, transferred, deposited under any agreement or hypothecated the Original Certificates or any interest therein, or signed any power of attorney or other authorization respecting the same which is now outstanding and in force, or otherwise disposed of the same; and no person, firm, corporation, agency or government other than the Stockholder has or has asserted any right, title, claim, equity or interest in, to or respecting the Original Certificates or the proceeds thereof.

(5)     The Stockholder hereby requests that the Corporation, and this Affidavit of Lost Stock Certificate is made for the purposes of inducing the Corporation to, (i) refuse to recognize any person other than the Stockholder as the owner of the Original Certificates; (ii) refuse to make any payment, transfer, registration, delivery or exchange called for by the Original Certificates to any person other than the Stockholder; (iii) refuse to take any other action pursuant to the request or demand of any person other than the Stockholder; and (iv) complete the return of the shares represented by the Original Certificates to the Corporation, and reissue a certificate to the Stockholder in replacement of the Original Certificates, representing 1,000 shares of Common Stock in the Corporation.

(6)     If the Stockholder should find or recover the Original Certificate, the Stockholder will immediately surrender it to the Corporation for cancellation without requiring any consideration therefor.

(7)     The Stockholder agrees in consideration of compliance with the foregoing requests by the Corporation to indemnify and protect the Corporation from any and all liabilities, loss, damage or expense to which the Corporation may be subjected by reason of the loss of the Original Certificates, including claims by any person claiming ownership of the Original Certificates or shares of Corporation's stock represented thereby.

*[SIGNATURE PAGE FOLLOWS]*

008402\00002\3534943.1 - 5/17/2023 12:29:14 PM

1

**EXHIBIT**

**6**

Signed and delivered by the Stockholder this __19__ day of May, 2023.

<div align="center">

**DAKOTA TRUST**

By: _____

Name: Dakota Fontenot

Title: Trustee

</div>

STATE OF __Texas__     §

COUNTY OF __Harris__    §
                        §

    BEFORE ME, a notary public, on this day personally appeared Dakota Fontenot, known to me to be the person whose name is subscribed to the foregoing instrument and, being by me first duly sworn, declared that the statements therein contained are true and correct.

    GIVEN UNDER MY HAND AND SEAL of office this __19__ day of May, 2023.

> THANH N DO
> Notary ID #126241618
> My Commission Expires
> September 4, 2023

(Notary's Seal)

NOTARY PUBLIC IN AND FOR THE STATE OF __Texas__

<div align="center">

Signature Page to
Affidavit of Lost Stock Certificate
(Viva Las Vegas Properties, Inc.)

</div>

008402\00002\3534943.1 - 5/17/2023 12:29:14 PM

Electronically Filed
2/9/2022 4:45 PM
Laura Richard
County Clerk
Fort Bend County, Texas

Harris County - County Probate Court No. 1

Linda Goehrs, in her capacity as Trustee of the Holli Ann Hardin Trust Number One, Plaintiffvs.Dakota Fontenot, D

No. 21-CPR-036521

| | | |
|---|---|---|
| ESTATE OF | § | IN COUNTY COURT AT LAW |
| DALLAS JOSEPH FONTENOT, JR., | § | |
| DECEASED | § | NO. FOUR (4) |
| | § | |
| | § | FORT BEND COUNTY, TEXAS |

# Order Admitting Will to Probate & Authorizing Letters Testamentary

On this day the Court heard the Application for Probate of Will and Issuance of Letters Testamentary ("Application") filed by Holli H. Fontenot ("Applicant") in the Estate of Dallas Joseph Fontenot, Jr., Deceased ("Decedent").

The Court considered the evidence presented and reviewed the Will and the other documents filed herein and makes the following findings:

1.  The allegations contained in the Application are true.

2.  Notice and citation have been given in the manner and for the length of time required by law.

3.  Decedent died on September 3, 2021, and four (4) years have not elapsed since the date of Decedent's death.

4.  This Court has jurisdiction and venue of the Decedent's Estate.

5.  Decedent left a Will dated May 7, 2013 (the "Will"), executed with the formalities and solemnities and under the circumstances required by law to make it a valid Will.

6.  That on such date Decedent had attained the age of eighteen (18) years and was of sound mind.

7.  The Will was amended and republished by the First Codicil, dated October 31, 2017.

8.  No child or children were born to or adopted by the Decedent after the execution of the Will.

9.  At the time of Decedent's death, Decedent was married to Applicant, and Applicant survived Decedent.

10. Decedent's Will did not name either the State of Texas, a governmental agency of the State of Texas, or a charitable organization as devisee.

Page 1 of 3

EXHIBIT

7

11. No objection to or contest of the probate of the Will has been filed.

12. All of the necessary proof required for the probate of the Will has been made.

13. The Will is entitled to probate.

14. In the Will, Decedent named Dakota James Fontenot to serve as Independent Executor without bond. However, Decedent's First Codicil *revoked* the appointment of Dakota James Fontenot as Independent Executor, and instead named Applicant to serve as Independent Executor of the Estate without bond.

15. Applicant is duly qualified and not disqualified by law to act as Independent Executor and is entitled to receive Letters Testamentary.

16. A necessity exists for the administration of this Estate.

17. No interested person has applied for the appointment of appraisers and none are deemed necessary by the Court.

It is ORDERED that the Will is admitted to probate, and the Clerk of this Court is ORDERED to record the Will, together with the Application on the Judge's Probate Docket.

It is ORDERED that no bond or other security is required and that upon the taking and filing of the Oath required by law, Letters Testamentary shall issue to Holli H. Fontenot, who is appointed as Independent Executor of Decedent's Will and Estate, and no other action shall be had in this Court other than the return of an Inventory, Appraisement, & List of Claims or Affidavit in Lieu of Inventory, and the filing of the Certificate of Notice to Beneficiaries pursuant to TEX. EST. CODE § 308 as required by law.

It is further ORDERED that the appointment of an appraiser of said Estate is waived at this time; that upon the return of an Inventory, Appraisement, & List of Claims of said Estate or Affidavit in Lieu of Inventory, and the payment of costs of Court, this Estate shall be dropped from the Court's active docket.

[SIGNATURE ON FOLLOWING PAGE]

UNOFFICIAL COPY

SIGNED on this    **2/14/2022**

_____
Judge Presiding

APPROVED AS TO FORM ONLY:

// s // Emily J. Wyatt

_____
Stephen A. Mendel (13930650)
Emily J. Wyatt (24088685)
The Mendel Law Firm, L.P.
1155 Dairy Ashford, Ste. 104
Houston, TX 77079
Tel:  281-759-3213
Fax: 281-759-3214
Info@mendellawfirm.com

Attorneys for the Executor

Filed: 02/15/2022 12:52:20
Laura Richard
County Clerk
Fort Bend County, Texas
Padron, Velma

UNOFFICIAL COPY

Page 3 of 3

Linda Goehrs, in her capacity as Trustee of the Holli Ann Hardin Trust Number One, Plaintiffvs.Dakota Fontenot, D

C.A. 21-CPR-036521

| | | |
|---|---|---|
| ESTATE OF | § | IN COUNTY COURT AT LAW |
| DALLAS JOSEPH FONTENOT, JR., | § | |
| DECEASED | § | NO. FOUR (4) OF |
| | § | |
| | § | FORT BEND COUNTY, TEXAS |

No. 21-DCV-288736

| | | |
|---|---|---|
| IN RE | § | IN THE 240TH DISTRICT COURT |
| HOLLI ANN HARDIN TRUST | § | |
| NUMBER ONE | § | OF |
| | § | |
| | § | FORT BEND COUNTY, TEXAS |

## <u>Assignment of Interest &</u>
## <u>Disclaimer of Further Interest</u>

Pursuant to the Binding Mediation Settlement Agreement reached in the above-captioned cases, and which is attached hereto as Exhibit "A":

1.  Holli Ann Fontenot acknowledges receipt of check number 1005 payable to Holli Ann Fontenot in the amount of $2,823,464.00, and which sum represents full satisfaction of eighty five percent (85%) of the total value of The Dakota Trust assets ($1,899,514.00) and twenty percent (20%) of the total value of the Holli Ann Hardin Trust No. 1 assets ($923,950.00).

2.  Holli Ann Fontenot hereby assigns any and all beneficial interest she has in the Holli Ann Hardin Trust No. 1 to the Trustee for further administration and distribution by the Trustee.

3.  Holli Ann Fontenot assigns any and all beneficial interest she has in The Dakota Trust to the Trustee for further administration and distribution by the Trustee.

4.  Holli Ann Fontenot disclaims any right to any further interest in the Holli Ann Hardin Trust No. 1. Holli Ann Fontenot previously resigned as the Trustee of said Trust.

5.  Holli Ann Fontenot disclaims any right to any further interest in The Dakota Trust. Holli Ann Fontenot hereby resigns as a fiduciary of said Trust.

[SIGNATURE ON THE FOLLOWING PAGE]

**EXHIBIT**

8

exhibitsticker.com

SIGNED AND EXECUTED ON \_\_18\_\_ DAY OF JANUARY 2023.

HOLLI ANN FONTENOT

STATE OF TEXAS          §
                        §
COUNTY OF HARRIS        §

This instrument was acknowledged before me on this the 18 day of January 2023 by Holli Ann Fontenot.

Notary Public in and for
The State of Texas

Linda Goehrs, in her capacity as Trustee of the Holli Ann Hardin Trust Number One, Plaintiffvs.Dakota Fontenot, D

## VIVA LAS VEGAS PROPERTIES, INC.

## UNANIMOUS JOINT WRITTEN CONSENT OF THE
## SOLE SHAREHOLDER AND SOLE DIRECTOR

## IN LIEU OF A SPECIAL MEETING

May 1?, 2023

The undersigned, being the sole shareholder (the "*Shareholder*") and the sole member of

the Board of Directors (the "*Board*") of **VIVA LAS VEGAS PROPERTIES, INC.**, a Texas

corporation (the "*Corporation*"), in lieu of holding a special meeting of the Shareholder and the

Board, the call and notice of each of which are hereby expressly waived, do hereby consent to the

following resolutions:

### Loss or Destruction of Corporate Records

**WHEREAS**, the Corporation was formed as a Texas Corporation by filing of Articles of Incorporation (the "*Articles*") with the Texas Secretary of State on September 20, 1994 (the "*Formation*");

**WHEREAS**, subsequent to the Formation, all corporate records of the Corporation were maintained by or on the behalf of Dallas Joseph Fontenot, Jr. ("*Mr. Fontenot*");

**WHEREAS**, Mr. Fontenot died on September 3, 2021, and since such date, no corporate records of the Corporation have been located after a diligent search by his heirs and authorized affiliates; and

**WHEREAS**, the Shareholder and the Board desire to create new corporate records to govern the affairs of the Corporation, effective as of the date first set forth above to, among other things, replace the original records of the Corporation which have been lost or misplaced, elect the sole member of the Board, elect officers, adopt new Bylaws, and adopt and reflect the issuance of new share certificates (collectively, the "*New Records*").

**RESOLVED**, that New Records shall be obtained and adopted to replace any records of the Corporation which may be in existence, as of the date first written above.

### Election of Directors

**WHEREAS**, the Shareholder desires to reconstitute the Board of the Corporation and remove any members of the Board which may have been previously elected.

008402\00002\3535058.1 - 5/17/2023 12:45:19 PM

1

UNOFFICIAL COPY

**EXHIBIT**

**9**

**RESOLVED,** that the following named person be, and hereby is, elected to serve as a member of the Board, and to serve in such capacity until his respective successor has been duly elected and qualified, or until his earlier death, resignation or removal:

Dakota Fontenot

**FURTHER RESOLVED,** that any member of the Board not listed above is hereby removed from the Board.

## Election of Officers

**WHEREAS,** immediately following the reconstitution of the Board, the Board desires to reconstitute the officers of the Corporation and remove any officers which may have been previously elected.

**RESOLVED,** that the following named person be, and hereby is, elected to the offices set forth opposite his name, to serve in such capacity until his successor is duly elected and qualified or until his earlier death, resignation or removal:

Dakota Fontenot                    President and Secretary

**FURTHER RESOLVED,** that the officer is empowered to carry out the day-to-day business of the Corporation, subject to the direction and control of the Board.

**FURTHER RESOLVED,** that any officer of the Corporation not listed above is hereby removed from any such office they may have held with the Corporation.

## Corporate Records

**WHEREAS,** the corporate records of the Corporation, including its minute book cannot be located, and as such the Shareholder and the Board desire to create the New Records to replace the missing corporate records.

**RESOLVED,** that the Corporation shall recreate and maintain, as part of its corporate records, a minute book that shall include, but that shall not be limited to, records of the Corporation's Certificate of Formation and amendments thereto, its Bylaws and amendments thereto, minutes of all meetings of the Board, minutes of all meetings of the Shareholder, the time and the place of each such meeting, whether the meeting was regular or special, the manner in which the meeting was authorized, the notice given, the names of those present or represented at the meeting and the proceedings of each meeting; and

**FURTHER RESOLVED,** that the Secretary of the Corporation be, and hereby is, authorized and directed to procure such a replacement minute book and such other books and records as may be required by the Corporation.

2

## Articles of Incorporation

RESOLVED, that a copy of the filed Articles bearing the file stamp of the Secretary of State of Texas be inserted into the replacement minute book of the Corporation.

## Amended and Restated Bylaws

WHERAS, consistent with the adoption of New Records, and immediately following the reconstitution of the Board, the Board and Shareholder deem it advisable and in the best interests of the Corporation to enter into those certain Amended and Restated Bylaws dated as of even date herewith (the *"Amended and Restated Bylaws"*), by which any Bylaws, amendments thereto, or amendments and restatements thereof, of the Corporation shall be amended and restated in their entirety.

RESOLVED, that the form of Amended and Restated Bylaws presented to the Board and Shareholder for review be, and hereby are, approved and adopted as the Amended and Restated Bylaws of the Corporation; and

FURTHER RESOLVED, that the President of the Corporation is directed to certify a copy of the Amended and Restated Bylaws, insert them into the minute book of the Corporation, and maintain them in the principal office of the Corporation, open for inspection by the Shareholder of the Corporation at all reasonable times during office hours.

## Qualification in Other Jurisdictions

RESOLVED, that the Corporation qualify to engage in business in any state of the United States or any foreign country in which the Board determines it to be necessary or appropriate for the Corporation to qualify to do business;

FURTHER RESOLVED, that the proper officers of the Corporation be, and hereby are, authorized and directed on behalf of the Corporation to make and file such certificates, reports or other instruments as may be required by the laws of such jurisdiction to be filed for that purpose; and

FURTHER RESOLVED, that the officers of the Corporation be, and each acting separately hereby is, authorized and directed to pay all fees and expenses incident to and necessary for the qualification of the Corporation to do business in any state or foreign country.

## Licenses and Tax Permits

RESOLVED, that the officers of the Corporation be, and each acting separately hereby is, authorized and directed to obtain, in the name of the Corporation, such licenses and tax permits as may be required by any applicable federal, state, county or municipal governmental statute, ordinance or regulation for the conduct of the business of the Corporation within any jurisdiction in which the Corporation shall have qualified to do business.

3

## Banking Authority

**RESOLVED**, that the Secretary of the Corporation be, and hereby is, authorized and directed to select one or more financial institutions for the deposit of the Corporation's cash and securities, the deposit and collection of checks and drafts made payable to the order of the Corporation, issuance of letters of credit on behalf of the Corporation, extensions of credit, and other financial transactions on behalf of the Corporation, and to designate the names of the persons authorized to sign checks, drafts, borrowing requests and other instructions to such financial institutions on behalf of the Corporation;

**FURTHER RESOLVED**, that the Secretary of the Corporation be, and hereby is, authorized to open additional accounts with such additional financial institutions, close any accounts with financial institutions, change the names of the persons authorized to sign check, drafts, borrowing requests and other instructions on behalf of the Corporation as the Secretary deems to be necessary of convenient from time to time;

**FURTHER RESOLVED**, that the form of resolutions specified by any such financial institutions that are designated by the Secretary from time to time be, and hereby are, ratified and approved as the official resolutions of the Corporation and the persons designated from time to time by the Secretary as signatories on such accounts be, and hereby are, approved; and

**FURTHER RESOLVED**, that the Secretary of the Corporation be, and hereby is, authorized and directed to certify the adoption of the form of resolutions required by any such financial institutions from time to time designated by the Secretary and to certify the names and signatures of the persons designated by the Secretary from time to time as signatories on behalf of the Corporation.

## Adoption and Issuance of Share Certificates

**WHEREAS**, all certificates representing shares of stock in the Corporation have been lost or misplaced, and have not been recovered after a diligent search (collectively, the "*Lost Certificates*").

**WHEREAS**, the Corporation has received that certain Affidavit of Lost Stock Certificate of the Shareholder, and the Board and Shareholder believe it is in the best interest of the Corporation to reissue a certificate to the Shareholder, representing 1,000 shares of common stock (no par value) of the Corporation.

**RESOLVED**, that consistent with the adoption of the New Records, the form of share certificate attached hereto as **Exhibit A** be, and hereby is, approved and adopted as the form of share certificate representing the common stock (no par value per share) of the Corporation; and

**FURTHER RESOLVED**, that the certificates shall be consecutively numbered, beginning with the number 1; that the certificates shall bear all legends required by law to be placed on the Corporation's share certificates; and that the certificates shall only be issued in the manner and upon the conditions set forth in the Bylaws.

4

**RESOLVED,** that the Corporation issue shares of its Common Stock, no par value per share, to the following persons and prepare or cause to be prepared, issued, and executed a certificate representing such shares in exchange for the considerations set forth below, the receipt of which is hereby acknowledged on behalf of the Corporation, which shares, when so issued, shall be validly issued, fully paid and non-assessable, with no personal liability attaching to the ownership thereof:

| Shareholder | Shares | Consideration |
|---|---|---|
| Dakota Trust | 1,000 | $0.00 |

**FURTHER RESOLVED,** that the Corporation shall refuse to recognize any person other than the Shareholder as a shareholder of the Corporation, refuse to make any payment, transfer, registration, delivery or exchange called for by the Lost Certificates to any person other than the Shareholder, and refuse to take any other action pursuant to the request or demand of any person other than the Shareholder.

<u>General Authority</u>

**RESOLVED,** that the officers of the Corporation be, and each acting separately hereby is, authorized and directed to do any and all acts and things and to execute and deliver and accept delivery of, in the name of and on behalf of the Corporation, any and all instruments, agreements, consents, certificates and other documents as in their opinion, or in the opinion of counsel to the Corporation, may be necessary or appropriate in order to carry out the purposes and intent of any of the foregoing resolutions;

**FURTHER RESOLVED,** that any act or acts of any of the officers of the Corporation which acts would have been authorized by the foregoing resolutions, except that such acts were taken prior to the adoption of such resolutions, be, and they hereby are, severally ratified, confirmed, approved and adopted in all respects as acts in the name and on behalf of the Corporation and

**FURTHER RESOLVED,** that the Secretary of the Corporation be, and hereby is, authorized and directed to certify the adoption of these resolutions.

*[Balance of Page Intentionally Blank. Signature Page Follows]*

5

This Consent shall be effective as of the date hereof regardless of whether any signature occurs before, or after such date. All actions taken in this Consent shall be deemed to be taken simultaneously in the location of the Corporation's principal office on the date of this Consent.

**EXECUTED** by the undersigned to be effective as of the date first set forth above.

**SHAREHOLDER:**

**DAKOTA TRUST**

By: _____
Name: Dakota Fontenot
Title: Trustee

**DIRECTOR:**

By: _____
Name: Dakota Fontenot

UNOFFICIAL COPY

Signature Page
Unanimous Joint Written Consent of the Sole Shareholder and Sole Director
of
Viva Las Vegas Properties, Inc.

## EXHIBIT A

SPECIMEN SHARE CERTIFICATE

See attached.



Linda Goehrs, in her capacity as Trustee of the Holli Ann Hardin Trust Number One, Plaintiffvs.Dakota Fontenot, De

# LAST WILL AND TESTAMENT
## OF
## DALLAS JOSEPH FONTENOT, JR.

| | |
|---|---|
| The State of Texas | § |
| | § |
| County of Fort Bend | § |

I, Dallas Joseph Fontenot, Jr., now domiciled in Fort Bend County, Texas, being of sound and disposing mind, memory and understanding, do make and publish this, my Last Will and Testament, hereby revoking all Wills, codicils and other testamentary instruments heretofore made by me.

### ARTICLE 1
### INTRODUCTION, FAMILY HISTORY, AND INTENTION

1.1    My wife's name is Holli Ann Fontenot.  All references in this Will to my wife are to Holli Ann Fontenot.

1.2    At the time of execution of this Will, I have three (3) children:  Michelle Anne Fontenot , Dallas Joseph Fontenot, III, and Dakota James Fontenot.  I have no other children, either by birth or by adoption, and no deceased children.  All references in this Will to "my children" are to said named children and to any children hereafter born or adopted by me.

1.3    In this Will I intend to dispose of all property which I own at the time of my death, including all property payable to me or my Estate after my death.

1.4    In this Will I intend to dispose of all of my separate property, and only my proportionate interest in the community property of my wife and myself.  It is my intention to dispose of my community interest in all property which I own at the time of my death including all property payable to me or my Estate after my death.

1.5    This Will is not the result of any contract or agreement and may be revoked at any time.

Page 1 of 16 Pages

D.J.F.

UNOFFICIAL COPY

EXHIBIT

10

ARTICLE 2
EXECUTOR

2.1    I appoint Dakota James Fontenot as Independent Executor of this my Last Will and Testament and of my Estate.  In the event Dakota James Fontenot should fail to qualify, or having qualified, should die, resign, or become incapacitated or unable to act as such, then I appoint Frost Bank, NA to serve as Successor Independent Executor of this Will and my Estate.

2.2    Each and every act, decision or determination relating to the administration of my Estate shall be finally authorized, approved, or confirmed by my Executor.

2.3    Herein the term "Executor" shall refer to any duly appointed and qualified Executor then acting under the foregoing appointments.

2.4    I direct that no bond or other security be required of my Executor hereunder, and my Executor hereunder shall be independent of the supervision and direction of the Probate Court to the full extent permitted by law.  I further direct that no action shall be had in any court of probate jurisdiction in connection with this Will or in the administration or settlement of my Estate other than the probating of this Will and the return of the statutory inventory, appraisement, and list of claims.  The provisions hereof shall not be deemed to prohibit the closing of administration of my Estate in accordance with Sections 151 and 152 of the Texas Probate Code or the relevant provisions of the Texas Estates Code, as in effect at the date of the execution hereof.

2.5    I direct that my Executor pay all my valid and just debts and obligations and pay all funeral expenses, expenses of my last illness, and expenses of administration and other testamentary expenses imposed by or made payable under the laws of any state or country by reason of my death, out of my Estate as soon as practical after my death and without the unnecessary sacrifice of any of the properties of my Estate.  Should it be necessary to liquidate any portion of my Estate for the purpose of paying any of the aforesaid testamentary expenses or taxes, my Executor, in his sole discretion, shall determine which particular assets of my Estate shall be liquidated for such purposes.  Any of my debts which are payable in installments or are not due until at least one year from the date of my death need not be paid during the administration of my Estate but may, if the terms of such debts permit, be continued and paid according to their tenor.  My Executor shall elect to claim administrative expenses as deductions either on the income tax returns of my Estate or on the estate tax return, whichever will result in the least amount of total tax being paid by my Estate.  My Executor shall not make any adjustments in the interests of my beneficiaries

UNOFFICIAL COPY

Page 2 of 16 Pages

D.J.F.

as the result of this election, and my Executor shall incur no liability for making such election.

2.6    My Executor shall make final distribution of my Estate as soon after my death as he, in his discretion, shall deem practical. Prior to the final distribution of my Estate, my Executor may, in his discretion, make partial distributions. My Executor may make any distribution of my Estate subject to any indebtedness or liability of my Estate, and subject to all instruments evidencing same. Income from a portion of my Estate which has not been distributed shall accrue to the legatee or devisee provided for herein, as if final distribution thereof had been made at the time of my death. The income so accrued may be paid in whole or in part, and from time to time, to the respective legatee or devisee hereunder, or may be withheld, in the discretion of my Executor, until final distribution of my Estate is made.

2.7    My Executor shall not be responsible or liable for any loss or depreciation in value of the properties of my Estate unless such loss or depreciation is due to his gross negligence, bad faith, or fraud. My Executor shall not be accountable or held liable for any act or omission of any agent of my Executor if my Executor shall have exercised good faith and reasonable diligence in the selection of such person, and in such event any liability to my Estate shall be solely that of such selected person.

2.8    My Executor shall receive as compensation for services rendered in such capacity such fees as are then customary and usual for payment in Fort Bend County, Texas, for the services, unless my Executor shall waive payment for such services. My Executor shall be entitled to reimbursement from my Estate for all expenses paid personally by my Executor, including but not limited to compensation to agents and fees for professional services incurred in the administration hereof.

2.9    I direct that my Executor shall have the power and authority to sell, lease, mortgage, pledge, hypothecate, or otherwise encumber and dispose of real and personal property, and the authority to do any and all things as Executor that a trustee may do under the provisions of the Texas Trust Code, being Section 111.001, et seq., of the Property Code of Texas as such Code as amended reads at the date hereof.

2.10    After my Executor has distributed to the beneficiaries of my Estate all of the assets or property of my Estate that remain in his hands and after all of the debts of my Estate have been paid (except for a reasonable reserve of assets which my Executor may retain in a fiduciary capacity pending court approval of the final account), my Executor may file, but shall not be required to file, an action for declaratory judgment under Chapter 37, Civil Practice and Remedies Code, seeking to discharge my Executor from any liability involving matters relating to the past administration of my Estate. Unless the court orders otherwise, my Executor is entitled to pay from my Estate all

Page 3 of 16 Pages

D.J.F.

legal fees, expenses, and other costs of a proceeding incurred in relation to any final account required under Section 149E of the Texas Probate Code or the relevant provisions of the Texas Estates Code.

2.11　In determining the death taxes, estate, inheritance  and income tax liabilities related to my Estate, the decisions of my Executor as to all available tax elections shall be conclusive on all concerned.

2.12　If the Executor shall join with my wife in filing income tax returns, or consents for gift tax purposes to having gifts made by either of us during my life considered as made one-half by each of us, any resulting liability shall be borne by my Estate and my wife in such proportions as they may agree.

2.13　Unless otherwise specifically directed herein, my Executor shall pay all death taxes out of the residue of my estate without apportionment.

2.14　My Executor shall have complete discretion as to what assets of my residuary Estate shall be used or sold to pay death taxes and shall not be bound by any law requiring the use or sale of any type or category of property in priority to any other.

ARTICLE 3
DISPOSITION

3.1　I request that my Executor distribute certain tangible personal property in accordance with handwritten instructions which I may leave.  To comply with my instructions, my Executor shall have a special power of appointment over my tangible personal property.  This special power of appointment may be exercised only in favor of the persons I name in my handwritten instructions to receive such property.  If I leave instructions for my Executor to receive tangible personal property, my Executor may distribute this property to my Executor.  Otherwise, this power of appointment can not be exercised in favor of my Executor, the estate of my Executor, the creditors of my Executor, or the creditors of the estate of my Executor.  If I do not leave handwritten instructions for my Executor or if any person designated in my instructions to receive property does not accept any of such property, this gift shall lapse.

3.2　If Dakota James Fontenot survives me, I give the residuary of my Estate, including any assets over which I may have a power of appointment, to Dakota James Fontenot.  If Dakota James Fontenot does not survive me, but my wife, Holli Ann Fontenot, survives me, I give the residuary of my Estate, including any assets over which I may have a power of appointment, to Holli Ann Fontenot.

3.3    Nothing contained in this Will shall prevent any beneficiary from disclaiming, in whole or in part, any bequest or inheritance under this Will.

ARTICLE 4
POWERS AND RIGHTS OF EXECUTOR

4.1    In the administration of my Estate, my Executor shall act independently of control by any court, and shall be under all the duties and shall have all of the powers conferred upon trustees by the Texas Trust Code and by any amendments to the Texas Trust Code subsequent to the date hereof, except for any instance in which the Texas Trust Code may conflict with the express provisions of this Will, in which instance, the provisions hereof shall control.  Without intending to limit the powers hereinabove granted, but in addition thereto, my Executor shall be also specifically authorized as to my Estate as follows:

4.1.1    To exercise all powers now or hereafter granted to Independent Executors by the Texas Probate Code or the relevant provisions of the Texas Estates Code as now in force or hereafter amended, and by all other laws of Texas now in effect or hereafter enacted.

4.1.2    To exercise all of the powers now or hereafter granted to Trustees of express trusts by the Texas Trust Code as now in force or hereafter amended, and by all other laws of Texas now in effect or hereafter enacted.

4.1.3    To abandon, adjust, arbitrate, compromise, sue on or defend, and otherwise deal with and settle claims in favor of or against my Estate as to said Executor may seem most advantageous to my Estate, and whose discretion in such matters shall be final and binding upon all parties in interest.

4.1.4    To continue and operate, solely or in cooperation with others, any business or enterprise, in which I may have an interest at the time of my death whether as sole proprietor, partner, joint venturer, stockholder, or otherwise, and to do any and all things deemed appropriate by my Executor, without liability for any losses incurred in the continuance of the business except those arising from gross negligence or bad faith; to sell the business as a going concern or to close out and liquidate the business as and when it shall appear to my Executor to be advisable and upon such terms as shall appear to my Executor to be most advantageous to my Estate and

Page 5 of 16 Pages

the beneficiaries thereof.  In all such matters I grant complete discretion to my Executor and the Successor Title:__Executor2, as the case may be, in whose judgment I have full confidence.

4.1.5   To renew existing indebtedness, both secured and unsecured, and to perform, renew and extend all obligations relating to my business affairs which I may have entered into prior to my death, and to borrow money on the credit of my Estate for the purpose of paying all debts, estate and inheritance taxes and expenses of administration, and preserving and managing my Estate for the benefit of all beneficiaries; and in connection therewith to pledge, mortgage, or otherwise encumber any property held as a part of my Estate; and my Executor shall be authorized to lend money to my Estate upon such terms and conditions as my Executor shall deem advisable.

4.1.6   Upon distribution of any share or portion of my Estate to more than one distributee, to distribute in money or in kind or partly in money and partly in kind, and to partition real property, securities, chattels, and other personal property, and undivided interests in real and/or personal property, making necessary equalization in cash, at values to be determined by my Executor, whose judgment as to values shall be binding and conclusive upon all parties in interest.

4.1.7   To retain any of the original property constituting my Estate at my death, to acquire by purchase or otherwise, and to retain, temporarily or permanently, any kind of real, personal or mixed property, regardless of the income produced, and without any requirement as to diversification; to invest and reinvest said Estate as my Executor shall see fit in bonds, debentures, and other corporate obligations, and stocks, preferred or common, of any corporation, and private loans, secured or unsecured, oil, gas and mineral interests, or any other form of property, real or personal, which my Executor  shall deem proper; to use either income or corpus to purchase or pay the premiums on life insurance, retirement, income or annuity contracts on the lives of the beneficiaries or any person in which any beneficiary of the trust may have an insurable interest subject in all instances to the provisions of Section ?.

D.J.F.

4.1.8   To delegate administrative authority and to authorize any agent, employee, or attorney-in-fact to exercise any or all of the powers granted to the Executor herein; to register and hold title to any property in the name of any nominee, without in any way affecting the responsibility of the fiduciaries.

4.1.9   To exercise all options and elections that I could exercise, if living, as well as all options and elections available to executors and trustees under the laws of the United States of America and the several states thereof, with reference to (I) my Estate and all property and interest at any time constituting a part of my probate Estate and (ii) income, estate and inheritance and gift taxes levied under the laws of the United States of America and the several states thereof, and all other taxing jurisdictions having lawful authority to do so.

4.1.10   To determine whether any money or property coming into the hands of my Executor shall be treated as part of the corpus of the Estate or as part of the income therefrom and to apportion between such income, any gain, loss or expenditures in connection with the Estate as to him may seem just and equitable and his determination shall be conclusive, and to determine and maintain, if the Executor shall deem appropriate in his sole discretion, a reserve for depreciation and/or depletion.

4.1.11   To take possession of, hold, manage and control the Estate, and to collect all rents, income, dividends and profits thereof, as I might do if living except as herein restricted and without the restrictions provided by the Texas Probate Code or the relevant provisions of the Texas Estates Code as it now exists or as it may be amended in the future; provided, however, that the Executor shall have all of the powers, privileges and immunities conferred upon trustees by such laws insofar as such laws add to the powers of the Executor and do not detract from, limit or otherwise restrict or require certain acts of the Executor, and such sections and parts of sections of such laws as confer such powers and privileges shall be considered a part of this Will as though set forth herein.

D.J.H

4.1.12    To invest or reinvest surplus funds belonging to the Estate from time to time, in any property, real or personal, including securities of domestic and foreign corporations and investment trusts, bonds, preferred stocks, common stocks, mortgages, mortgage participations, even though such investment (by reason of its character, amount, proportion to the total Estate or otherwise) would not be considered appropriate for a fiduciary apart from this provision, and even though such investment causes a greater proportion of the total Estate to be invested in one company than would be considered appropriate for a fiduciary apart from this provision.

4.1.13    To litigate, compromise, adjust and settle all claims arising out of or in connection with my Estate.

4.1.14    At any time, either by public offering or private negotiations, and from time to time, and for such price and on such terms and with such security for deferred payment as to my Executor may seem reasonable, to sell, exchange, pledge, mortgage, assign, transfer or otherwise dispose of or alienate any part or all of the personal property or any part or all of any real property belonging to the Estate in order to fulfill the purposes hereunder.

4.1.15    To exchange the stock or other securities of any corporation held by my Executor for other stock or securities of the same corporation or of a successor corporation or of a corporation with which such corporation shall be merged or consolidated; to participate in mergers, re-organizations, consolidations, receiverships or dissolutions of any corporation in which the Executor may hold securities or other evidences of indebtedness or ownership; to vote in person or by proxy all stock or other securities held by the Executor, to exercise options and stock rights, if it is to the advantage of the Estate, even though the same results in the investment of funds of the Estate other than those to which the Executor shall be hereinabove restricted; to pay all assessments, taxes and other dues necessary for the protection of securities or other property held by the Executor; to renew and extend the maturity date of real

estate notes and mortgages held by the Executor and do any and all things necessary for the protection of the Estate.

4.1.16     To lease or partition any property which the Executor may hold at public or private sales and to execute any and all instruments necessary to discharge the authority hereby conferred; to make loans, secured or unsecured, in such amounts and upon such terms, for such rates of interest and to such persons, firms or corporations as the Executor shall deem proper; to borrow money, to execute promissory notes therefor and to secure said obligations by mortgage or pledge of any of the Estate; to conduct the operation or to continue the operation of any business in which I may be interested and to act as an officer or director of any corporation in which I may hold shares; to improve any real estate owned by the Estate, including the power to demolish any buildings; to foreclose, extend, assign, partially release, and discharge mortgages; to execute any and all leases for the development of any of my property for oil, gas and mineral developments; to enter into any pooling, unitization, repressurization, community, and other types of agreements relating to the exploration, development, operation, and conservation of properties containing minerals or other natural resources; to drill, mine, and otherwise operate for the development of oil, gas and other minerals; to install and maintain pipelines; to renew, re-arrange or extend any debts owing to or by the Estate, and the liens securing such debts; to employ such attorneys, brokers, banks, custodians and other agents and to delegate them such of the duties, rights and powers of the Executor for such periods as the Executor shall think proper; and, to pay taxes, maintain insurance, sue for the recovery of any debts and property, make repairs and do all things necessary for the proper management of the said Estate, and to incur reasonable expenses in managing, distributing and conveying any property in the said estate, commonly in a single investment for the benefit of any or all of such Estate, and in such proportions from such Estate as the Executor shall deem proper. Such investments shall be governed by the laws pertaining to common estate funds in the State of Texas.

Page 9 of 16 Pages

D.J.F.

4.1.17    To receive, preserve, manage, administer, dispose of, partition and distribute my Estate and the corpus and income thereof for the benefit of the beneficiaries of this Will, in the same manner as if my Executor were the owner in fee simple of all property comprising my Estate or any part thereof; and in the administration of my Estate, the recitals contained in any instrument executed by a duly qualified and acting Executor shall be prima facie evidence of the truth of the facts recited, and all persons dealing with such Executor may rely upon the truth of such recitals and shall not be obliged to make further inquiry.

4.2    My Executor shall have full power and discretion to select how the assets will be distributed and allocated among my beneficiaries. It is my desire that my Executor shall exercise discretion and attempt to allocate assets in a fair and equitable manner so that the potential income tax consequences to each beneficiary are considered. However, my Executor shall not be liable for any distribution made in good faith under the provisions of this Will.

4.3    Should my Estate contain property located in another state or a foreign jurisdiction and my Executor cannot or chooses not to serve under the laws of such state or foreign jurisdiction, my Executor shall have the power to appoint an ancillary Executor of such property. An ancillary Executor appointed pursuant to this section may be an individual or corporate fiduciary.

ARTICLE 5
NON-BINDING INSTRUCTIONS TO AND GOALS FOR PERSONAL REPRESENTATIVE

I have created a valuable estate of property, some of which I own outright and some of which I own indirectly as trustee. I have directed elsewhere in this Will that Dakota should be my Independent Executor, and I have directed in other instruments that Dakota should be the Trustee of each of the trusts. Without binding him to do so, it is my desire that Dakota or his successor, acting either as trustee or as Executor (herein, jointly, my "Personal Representative"), should use the assets of these estates, each subject to the terms of my Will and the respective Trust Declarations, to achieve the following broadly-stated goals. I have not suggested specific provisions for operation or maintenance, as I leave those decisions to Dakota, whom I trust explicitly, to make salient decisions about my estates after my death. I may supplement or amend these instructions from time to time by subsequent memoranda, which I may not execute with the formalities of a Will. These instructions and any subsequent supplements or amendments are only an expression of my desires and a distillation of my business

Page 10 of 16 Pages

D.J.F.

UNOFFICIAL COPY

experiences and my perception of my family's needs. They should not be read to direct or constrain my Executor or to amend any of the trusts. They should not be construed to create any beneficial interest except those expressed in other Articles of this Will or in the Trust Declarations for each trust.

Subject to the foregoing, I recommend the following to my Personal Representative:

5.1     Do not sell the land and property of the Colorado Bar & Grill because it is the source of my income. The Colorado Bar and Grill is the top source of income for the whole company. Don't ever sell this land and building. You can always run a retail business there and it's a place to rent to other people for income. The location is a great location and must stay in the trust for income. Your Mother, Frank, Nan, and lawyers will tell you this. Don't let this place go ever. Keep the place looking good and don't overspend money on it unless the place is making the cash to do the upgrades. There is a fine line on managing the place and losing the income. This place will need 24 hour attention at all times. Don't mess this up. Always consult with your Mother and lawyer. Mark Everett is the only lawyer that will not tell you wrong.

5.2     Take care of Holli Fontenot's medical and healthcare needs. Make sure she gets a regular paycheck. Dakota, you must have your Mother work for the company and work with Nan to help her and be part of the company team. She needs what I give her and her paycheck from the company. She needs help to take care of the 25 ½ acre ranch and income to support the place. You must help her in life and see that nothing happens to her. Look after her for me please. She will depend on you to keep the ranch. A place for you and her to always live if you choose to do so. You never will find a place like that again and it's worth lots of money and will go up in value over the years. Don't sell the place. Your Mom makes income of about $1,300.00 net every two weeks and $5,000.00 net from me a month. She can't pay all the bills with that for the ranch The big house needs funds also. Nan will tell you what I pay to keep up the other part of the ranch. Your Mom knows too. Work together with your Mom.

5.3     Continue to employ Nan Evanich and Frank Kent for operation of the club. Nan and Frank should stay with the company. Don't just run them off. Frank has been there 25 years and Nan has been with me for 35 years. You must try your best to keep them working. You and your Mother can work together on how to keep them in place. They are very good people and you need them to help run the company. You must talk to them every day. Work with them and try to do what they have done for years. Stay on top of their game and tell them what you and they would do if Dad were here.

5.4     Continue to support yourself until you have completed your education. Dakota, you need to work for the company to get a paycheck for school and living cost.

Page 11 of 16 Pages

You need to make part of what I am making.  Five thousand dollars a month to be director of the companies and ten thousand a month to be the trustee and manager of the company.  The company will pay for your car or truck and vacation days of 30 days a year pay and time off.  But there is very little time off.  You must stay in school and get your degrees.  This is going to be a very hard time in your life.  Your Mother can help, but "You" must be the person to work with all these people.  The above income is net income for you.  If there is more needed to pay bills then change it.

       5.5    Provide for  a modest stipend for Joseph Fontenot and Michelle Anne Fontenot.  Dakota, you will need to help Michelle and Joe out with income at some time.  They will get old and need some help.  You can have the trust pay some payments to them per month if they are in a bind.  Depends on what is in the bank each month.  Twenty-five thousand a year is a good amount to pay to them as a gift.  To each of them.  25k each a year gross payment.  Talk to Mark Everett, attorney, on this, but don't make them officers or directors of the company.  The amount can be less at first or more, you will decide what this can be.  Remember you are taking care of yourself, your Mother, Sister, and Brother, and Nan and Frank.  Plus paying the bills for the company.  Lots to take care of.  Don't pay any more money than people are making at this time, but you can change the pay at any time.  Just be careful of spending.

       5.6    Maintain the Texas ranch for investment; lease it if possible.  The ranch is a special place.  Your Mother and you can live there forever.  Your Mother would like to live there until she dies.  Please don't sell the ranch.  If you or your mother wants to move, then rent the place out.  Lease the ranch to a doctor or lawyer or wealthy person.  The ranch will be worth millions of dollars over the years.  It's paid for and that location is a gold mine.  Don't sell the ranch ever.  Keep it for your Mom and your family some day.  This is a place to keep for yourself and your Mom.  It is an income producing place for rent/lease money.  If you move and your Mother dies, then rent/lease the place.  Don't sell it.  Your Mother will own half of this place.  It's her's too.  Share this place with her.

       On the ranch property there are three homes, two barns, and lots of other storage and game room buildings. The whole ranch has a lot of equipment there too. Your mother owns half of this stuff and you will own the other half.  There are some things that belong to the Colorado club, all the club props and decoration from Rudolph's Place, sports stuff, old signs, lots of lights, and other things that you know go to the club.  All these things are stored there on the ranch.  My safes are full of things that are yours, such as guns, etc.

       5.7    Pay off the mortgage for the residence in Nevada and share use and occupancy with Holli.  Pay off the house in Las Vegas and keep the house for you and your Mom.  Sell the place only if you can get seven hundred thousand for it.  That will

<div align="center">Page 12 of 16 Pages</div>

D.J.F

be in 5 or 7 years.  Take care of the house and repair it.  Keep it in good shape.  <u>Your Mom owns half of this house</u>.

     5.8    Maintain and do not sell the tract on Highway 59 near Rosenberg, Texas.  The land on Hwy 59 south and FM 529 is about 9.6 acres.  Rudolph's Place was the club.  Never sell this place.  Lease it to a gas company or oil company for a retail business.  This is an income producer for the trust.  You can lease this place for a lot of money for years.  Some day the gas and oil companies will want this place.  Can lease for 99 years for big bucks.  Income to trust.  Also it's a great asset for the trust.  This place can rent for the right people.  Don't put any money in it.  Just upkeep.  New renters will need to put their money into the place.  That is why you give them a long lease.  Only a large company should get this place.  A company with money.  Like a gas station.  You will need a real estate law firm to help handle this with you.  Mark Everett, attorney, can help you with this.  This is a very important rental property.

     5.9    The Rosenberg property consists of 4 acres in Rosenberg, Texas.  The property is owned by a corporation, the shares of which are held in trust for you.  Use it for operation of the club.  Maintain and do not sell the Rosenberg property; the 4 acres and office is also a great place to have and not to sell.  Don't let your brother or sister or anyone get you to sell this land and building.  <u>Run your trust and business from there.</u>  If you do ever close down your trust and other companies, you need to lease the place out for income.  It's income producing property.  Always keep property that you can rent or lease.  The office is a place to keep your records and company records.  Also storage files and a place to run the trusts and other companies.  Keep the office in good standing,, looking good, and well taken care of.

     5.10   In conclusion, Dakota, your job as a trustee is to manage the trusts for yourself, taking into account your duties to your Mom, your brother (Joe Fontenot), and your sister (Michelle Fontenot).  Your job is to make the right decisions and not lose the money which you own outright, which you own in trust, or which is owned by the companies whose stock you own in trust.  Your job is to hold those assets and to manage the companies so that they produce income for the trust.  Your job for the trust assets is not for anyone else but the beneficiaries of the trusts.  Mark Everett will talk with you about your responsibilities as the trustee of the four trusts.  You need to hook up with Mark and get a classroom course about what trusts and trustees are all about.  This is a must; you must do this first.  Don't forget this: look after your Mom, brother, sister, and yourself.  Take good care of them and see that they are happy also.

     Dakota, when I'm gone people will try to ask for more income as soon as I am in the grave.  You will need to ask them to back off and tell them that you need to get your life on track with this new job of looking after the trusts, that you will study on this and get with your lawyer and others to see what to do about giving more income to

<div align="center">Page 13 of 16 Pages</div>

D.J.F.

others. People will make you feel that they will leave you and go elsewhere to work. If they do this, tell them good-bye. Good people will not put you under this type of pressure.

Also Nan and Frank have been with me for 25 to 35 years. Don't forget that they run your business and your need to look out for them too. Nan and Frank are very important to you and your success.

ARTICLE 6
DEFINITIONS

6.1    "Internal Revenue Code" shall mean the Internal Revenue Code of 1986, as amended, and applicable Treasury Regulations thereunder.

6.2    "Descendants" means the legitimate children of the person designated and the legitimate lineal descendants of such children, and includes any person adopted before attaining age eighteen (18) and the adopted person's legitimate lineal descendants. A posthumous child shall be considered as living at the death of his parent.

6.3    "Death taxes" refers to all federal estate, state and foreign estate, inheritance, transfer, succession, legacy, or other death taxes of any kind (including generation-skipping transfer taxes payable with respect to assets passing under this Will in a manner that constitutes a "direct skip," as defined in Section 2612(c) of the Internal Revenue Code, but not including any other generation-skipping transfer taxes) and interest or penalty on such taxes, imposed by reason of my death with respect to property required to be included in my gross Estate for purposes of such taxes, whether such property passes under this Will or otherwise, and payable to any federal, state, or foreign taxing authority, whether payable by my Estate or by any recipient of such property.

6.4    "Heirs" means those persons who would have inherited a decedent's personal property if the decedent had then died single, intestate, and domiciled in Texas.

6.5    Whenever a distribution is directed to be made to the descendants, per stirpes, of any person, the property to be distributed shall be divided into as many equal shares as there are then living children of that person and deceased children of that person who have descendants then living. Each then living child of such person shall take one share, and the share for the descendants of each deceased child shall be divided among the deceased child's then living descendants on a per stirpes basis.

ARTICLE 7
MISCELLANEOUS

7.1    If any legatee, devisee, or beneficiary hereunder should die within sixty (60) days of the date of my death, or should we die as a result of a common accident or calamity in such a manner that it cannot be determined in what order our deaths occurred, it shall be considered, for purposes of this Will, that such person predeceased me.

7.2    Unless my Executor shall elect otherwise, payments from an employee or self-employed benefit plan which are not includible in my gross Estate for federal estate tax purposes shall not be liable for or used for the payment of (or loaned for the purpose of paying) any taxes, liabilities, debts, or any other claims or charges against my Estate, including but not limited to death taxes, provided, however, that such proceeds and payments may be used for the payment of federal estate and state inheritance or estate taxes assessed with respect to such payments or proceeds.

7.3    If any provision of this Will shall be held invalid, illegal or inoperative under any circumstances, it is my intention that, so far as possible and reasonable, such provision under all other circumstances and all other provisions shall be effective and fully operative.  My Executor may seek and obtain Court instructions for the purpose of carrying out, as nearly as possible, the intention of this Will shown by the terms hereof, including the terms held invalid, illegal, and inoperative.

I, Dallas Joseph Fontenot, Jr., as testator, after being duly sworn, declare to the undersigned witnesses and to the undersigned authority that this instrument (which, including this page, is contained on 16 pages) is my will, that I have willingly made and executed it in the presence of the undersigned witnesses, all of whom were present at the same time, as my free act and deed, and that I have requested each of the undersigned witnesses to sign this will in my presence and in the presence of each other.  I now sign this will in the presence of the attesting witnesses and the undersigned authority on this _7_ day of May, 2013.

Dallas Joseph Fontenot, Jr.,
Testator

Page 15 of 16 Pages

COPY    NOT AN ORIGINAL    UNION

The undersigned, _Maria Mojica_ and _Gladys Velez_, each being above fourteen years of age, after being duly sworn, declare to the testator and to the undersigned authority that the testator declared to us that this instrument is the testator's will and that the testator requested us to act as witnesses to the testator's will and signature.  The testator then signed this will in our presence, all of us being present at the same time.  The testator is eighteen years of age or over (or being under such age, is or has been lawfully married, or is a member of the armed forces of the United States or of an auxiliary thereof or of the Maritime Service), and we believe the testator to be of sound mind.  We now sign our names as attesting witnesses in the presence of the testator, each other, and the undersigned authority on this ___ day of May, 2013.

_____
Witness

LAS VEGAS.
STATE OF NEVADA COUNTY OF CLARK
Address

_____
Witness

Los Vegas
STATE OF NEVADA County of Clark
Address

UNOFFICIAL COPY

The State of Nevada     §
                        §
County of ___Clark___   §

Subscribed and sworn to before me by the said Dallas Joseph Fontenot, Jr., Testator, and by the said _Maria Mojica_ and _Gladys Velez_, witnesses, this 7th day of May, 2013.

(SEAL)

MICHAEL J. MOORE
Notary Public State of Nevada
No. 08-7991-1
My Appt. Exp. September 11, 2016

_____
Notary Public, State of Nevada

Page 16 of 16 Pages

Linda Goehrs, in her capacity as Trustee of the Holli Ann Hardin Trust Number One, Plaintiffvs.Dakota Fontenot, De

## FIRST CODICIL TO LAST WILL AND TESTAMENT
## OF
## DALLAS JOSEPH FONTENOT, JR.

The State of Texas                         §
                                           §
County of Fort Bend                        §

I, Dallas Joseph Fontenot, Jr., now domiciled in Fort Bend County, Texas, being of sound and disposing mind, memory and understanding, do make and publish this, my First Codicil to my Last Will and Testament.

### ARTICLE 1
### INTRODUCTION AND INTENTION

1.1    On or about May 7, 2013, I executed my Last Will and Testament. I shall refer to this document as my Will. By executing this First Codicil, I intend to modify certain provisions of my Will as set forth below and, to the extent that I do not modify or revoke the provisions of my Will, to ratify the remaining provisions of my Will.

1.2    My wife's name is Holli Ann Fontenot. All references in this First Codicil to my wife are to Holli Ann Fontenot.

1.3    At the time of execution of this First Codicil, I have three (3) children: Michelle Anne Fontenot , Dallas Joseph Fontenot, III, and Dakota James Fontenot. I have no other children, either by birth or by adoption, and no deceased children. All references in this First Codicil to "my children" are to said named children and to any children hereafter born or adopted by me.

1.4    In this First Codicil I intend to dispose of all of my separate property, and only my proportionate interest in the community property of my wife and myself. It is my intention to dispose of my community interest in all property which I own at the time of my death including all property payable to me or my Estate after my death.

1.5    This First Codicil is not the result of any contract or agreement and may be revoked at any time.

Page 1 of 4 Pages

D.J.F.

UNOFFICIAL COPY

EXHIBIT

11

ARTICLE 2
EXECUTOR

2.1    I revoke the provisions of Section 2.1 of my Will, in which I have named the Executor of my Estate. In its place, I substitute the following:

I hereby appoint the following persons, in the order named, as Independent Executor of this my Last Will and Testament and of my Estate, with each successor to serve when the person named immediately before him or her shall fail to qualify, or having qualified, shall resign, become incapacitated, or otherwise fail or cease to act:

First, Holli Ann Fontenot
Second, Michelle Anne Fontenot
Third, Dallas Joseph Fontenot, III
And finally, Frost Bank, NA.

ARTICLE 3
DISPOSITION

3.1    I revoke the provisions of Section 3.2 of my Will, in which I have disposed of the residuary of my Estate. In its place, I substitute the following:

If Holli Ann Fontenot survives me, I give the residuary of my Estate, including any assets over which I may have a power of appointment, to Holli Ann Fontenot.  If Holli Ann Fontenot does not survive me, I give the residuary of my Estate, including any assets over which I may have a power of appointment, to Michelle Anne Fontenot and Dallas Joseph Fontenot, III or their descendants, *per stirpes* and not *per capita*.  I especially desire that neither Dakota James Fontenot nor any of his descendants shall be a beneficiary of my Estate.

ARTICLE 4
REPUBLICATION OF LAST WILL AND TESTAMENT

In every other respect I confirm and republish my Last Will and Testament dated May 7, 2013.

Page 2 of 4 Pages

D.J.F.

I, Dallas Joseph Fontenot, Jr., as testator, after being duly sworn, declare to the undersigned witnesses and to the undersigned authority that this instrument (which, including this page, is contained on 4 pages) is my First Codicil to my Last Will and Testament; that I have willingly made and executed it in the presence of the undersigned witnesses, all of whom were present at the same time, as my free act and deed, and that I have requested each of the undersigned witnesses to sign this in my presence and in the presence of each other. I now sign this in the presence of the attesting witnesses and the undersigned authority on this **3 1** day of _____ O C T O B E R _____, 2017.

_____
Dallas Joseph Fontenot, Jr.,
Testator

The undersigned, **FRANK KENT** and **Jose Luis HINOJOSA**, each being above fourteen years of age, after being duly sworn, declare to the testator and to the undersigned authority that the testator declared to us that this instrument is the testator's First Codicil to his Last Will and Testament dated May 13, 2017, and that the testator requested us to act as witnesses to the testator's First Codicil to his Last Will and Testament and signature. The testator then signed this his First Codicil to his Last Will and Testament in our presence, all of us being present at the same time. The testator is eighteen years of age or over (or being under such age, is or has been lawfully married, or is a member of the armed forces of the United States or of an auxiliary thereof or of the Maritime Service), and we believe the testator to be of sound mind. We now sign our names as attesting witnesses in the presence of the testator, each other, and the undersigned authority on this **3 1** day of _____ O C T O B E R _____, 2017.

_____
Witness

Address **Houston, TEXAS 77084**

_____
Witness

Address **HOUSTON TX 77082**

Page 3 of 4 Pages



**EXHIBIT**

**19**

FILED
10/21/2025 6:41 PM
Teneshia Hudspeth
County Clerk
Harris County - County Probate Court No. 1
Accepted By: CW

No. 537,721

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY AS TRUSTEE OF THE HOLLI ANN HARDIN TRUST NUMBER ONE<br>*Plaintiff,*<br><br>v.<br><br>DAKOTA FONTENOT,<br>*Defendant.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | IN THE PROBATE COURT<br><br><br>NUMBER ONE (1) OF<br><br><br>HARRIS COUNTY, TEXAS |



### DAKOTA FONTENOT'S MOTION FOR CONTINUANCE AND OBJECTION TO NOTICE

Defendant Dakota Fontenot ("Dakota") files this Motion for Continuance and Objection to Notice on Michelle Fontenot and Joe Fontenot's ("Intervenors") Amended Application for Relief under Texas Property Code §114.008 and Application to Fill Trustee Vacancy Under Texas Property Code §113.083 (collectively "Applications"), and would respectfully show to the Court as follows:

### I.    Background

1.    Intervenors first filed their Answer and Affirmative Defenses on September 24, 2025. On October 16, 2025, Intervenors filed their First Amended Answer, Affirmative Defenses, and Cross Claims. They proceeded to set a hearing for a week later and are asking the Court to grant them total and final relief on several of their claims. This breathtaking claim for relief comes before they have even filed their initial disclosures. As absolutely no discovery whatsoever has occurred, Dakota requests a continuance of at least ninety (90) days from the current setting, not for purposes of delay, but so that justice may be done.

4928-5908-0308.1

## II.    Argument & Authorities

**A.    The need for discovery prior to a hearing on the Applications warrants a continuance.**

2.    A trial court abuses its discretion when it denies discovery going to the heart of a party's case or when that denial severely compromises a party's ability to present a viable defense.[1] Here, written discovery and depositions are needed regarding several central issues to the relief sought by Intervenors' Applications.

3.    First, discovery needs to be conducted regarding the validity of revocation documents purportedly executed by Dallas Fontenot ("Dallas") during his lifetime on October 14, 2017.  Intervenors' Applications depend entirely on the validity of documents allegedly executed by Dallas that purport to remove Dakota as trustee of the Dakota Trust and remove Dakota as officer of Viva Las Vegas Properties, Inc.  However, the validity of these documents are contested. As part of his live pleading, Dakota seeks a declaratory judgment that the 2017 removal documents invalid.  Declaring a vacancy and filling it according to Intervenors' Application would have the effect of dismissing Dakota's claim before *any* discovery has occurred.

4.    Additionally, discovery needs to be conducted as to the scope of the mutual releases contained in the Mediated Settlement Agreement executed by Intervenors, Dakota, and others on January 7, 2022 ("Settlement Agreement").  The Settlement Agreement contains a broad mutual release between Intervenors and Dakota to resolve the litigation regarding Dallas's estate planning (including estate planning from 2017) and "all related claims and/or controversies between them, whether asserted or not, known or unknown, actual or contingent."  Dakota seeks a declaratory judgment that Intervenors released and waived the claims they now seek through their Applications by virtue of the Settlement Agreement.  The Settlement Agreement specifically refers to the

---

[1] *See Ford Motor Co. v. Castillo*, 279 S.W.3d 656 (Tex. 2009); *see also Sankaran v. VFS Services (USA) Inc.*, 693 S.W.3d 883 (Tex. App.—Houston [14th Dist.] 2024, pet. denied).

Dakota Trust, and Dakota should be able to question, through discovery, the Intervenors about their contention that the Settlement Agreement did not waive their current claims, conduct written discovery into what they knew about the Dakota Trust, and what claims were at known before they signed the Settlement Agreement.   Granting the Applications now would effectively moot Dakota's affirmative claims, which of course is why Intervenors are attempting to move forward now.

5.      Intervenors filed their claims against Dakota in this matter only on September 24, 2025.  Thus, the discovery period with the Intervenors and Dakota has not even begun under Texas Rule of Civil Procedure 190.3.  Dakota is entitled to conduct discovery and to a trial by a fact finder on his declaratory judgment request regarding the 2017 removal documents and the scope of the release in the Mediated Settlement Agreement.[2]  Therefore, the Court should continue the hearing on Intervenors' Applications so that discovery can be conducted.  Otherwise, Dakota's ability to present a viable defense as to his forgery and waiver/release claims will be severely compromised.

**B.      Dakota objects that Intervenors' Applications deprive him of the required 45 day notice to what amounts to a trial.**

6.      Pursuant to Texas Rule of Civil Procedure 245, the Court may set contested cases on written request of any party, or on the court's own motion, with reasonable notice of not less than forty-five days to the parties of a first setting for trial, or by agreement of the parties.[3]

7.      Here, Intervenors are asking this Court to order Dakota to repay certain amounts he previously received as trustee of the Dakota Trust, voiding the May 19, 2023, Unanimous Joint Written Consent of Viva Las Vegas Properties, Inc., declaring the trusteeship of the Dakota Trust

---

[2] *See See Allison v. Forney State Bank*, 502 S.W.2d 826 (Tex. App.—Dallas 1973, no writ); *see also Coleman v. Winn-Coleman, Inc.*, 110 S.W.3d 104 (Tex. App.—Houston [1st Dist.] 2003).
[3] *See* TEX. R. CIV. P. 245.

4928-5908-0308.1

vacant and installing Joe as trustee. Texas Rule of Civil Procedure 245 requires 45 days-notice of a setting of a contested case. Intervenors seek final relief on several of their claims that Dakota vigorously contests. Moving forward with Intervenors' claims without the proper notice would deprive Dakota of due process and violate the Texas Rules of Civil Procedure.

8.    While Texas Property Code 114.008 gives the Court broad discretion to order relief that would remedy a breach of trust, the Court must still exercise that discretion within the Texas Rules of Civil Procedure.[4] As Intervenors gave only eight (8) days advance notice, their notice is deficient, and Dakota's objection should be granted.

**C.    A continuance is warranted so that the parties can attend a mediation.**

9.    Pursuant to Dakota's Motion to Compel Mediation, currently on file with the Court, this matter should be mediated prior to further evidentiary hearings and/or trial. A continuance will allow for the parties to seek a resolution at mediation rendering the hearing on Intervenors' Applications unnecessary. Therefore, Dakota requests that the Court grant a continuance of the October 24, 2025, hearing on Intervenors' Applications no earlier than ninety (90) days after the current setting in the alternative on the basis of judicial economy.

<div align="center">PRAYER</div>

Based on the foregoing, Dakota requests that this Court: (i) grant his continuance as sought herein; (ii) sustain his objection; and (iii) grant such other and further relief entitled by equity or law.

---

[4] *See* TEX. PROP. CODE §. 115.012

4928-5908-0308.1

Respectfully submitted,

*/s/ Trey Avant*
JEFFREY D. WATTERS, JR.
Texas State Bar Number: 2406695
jwatters@grayreed.com
JOHN P. ("TREY") AVANT III
Texas State Bar Number: 24101471
tavant@grayreed.com
ANDREW B. MCCARTY
Texas State Bar Number: 24126139
amccarty@grayreed.com
GRAY REED & McGRAW LLP
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000

JAMES MADISON ("JIMMY") ARDOIN III
Texas State Bar Number: 24045420
jimmy@jimmyardoinlaw.com
4900 Fournace Place, Suite 414
Bellaire, Texas 77401
Telephone: (713) 574-8900

PAUL S. BEIK
Texas State Bar Number: 24054444
paul@beiklaw.com
440 Louisiana Street, Suite 1800
Houston, Texas 77002
Telephone: (713) 869-6975

**ATTORNEYS FOR DEFENDANT,
DAKOTA FONTENOT**



4928-5908-0308.1

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been served upon all parties of record in this Cause, in accordance with the Texas Rules of Civil Procedure on October 21, 2025.

RUDOLPH M. CULP                                    VIA E-SERVICE
Texas State Bar No. 24043014
rudy@texasprobateattorney.com
COLLIN J. BULLARD
Texas State Bar No. 24129570
collin@texasprobateattorney.com
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
Telephone: (713) 297-0700
Fax: (817) 383-5110

**ATTORNEYS FOR PLAINTIFF,
LINDA GOEHRS, IN HER CAPACITY AS
TRUSTEE OF THE HOLLI ANN HARDIN
TRUST NUMBER ONE**

Ryan O. Cantrell                                    VIA E-SERVICE
Texas Bar No. 24055259
ryan.cantrell@chamberlainlaw.com
Mariah J. Karigan
Texas Bar No. 24123088
mariah.karigan@chamberlainlaw.com
1200 Smith Street, Suite 1400
Houston, Texas 77002
Telephone: (713) 658-1818
Facsimile: (713) 658-2553

**COUNSEL FOR MICHELLE FONTENOT AND
DALLAS JOSEPH FONTENOT III**

/s/ Trey Avant
JOHN P. ("TREY") AVANT III

4928-5908-0308.1

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Marcie Cardenas on behalf of Trey Avant
Bar No. 24101471
mcardenas@grayreed.com
Envelope ID: 107123619
Filing Code Description: Application for Continuance
Filing Description: and Objection to Notice
Status as of 10/22/2025 8:09 AM CST

Associated Case Party: Linda Goehrs

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Texas Probate Attorney, PLLC | | efile@texasprobateattorney.com | 10/21/2025 6:41:57 PM | SENT |
| Rudy Culp | | rudy@texasprobateattorney.com | 10/21/2025 6:41:57 PM | SENT |
| Bailey Bowe | | bailey@texasprobateattorney.com | 10/21/2025 6:41:57 PM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 10/21/2025 6:41:57 PM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 10/21/2025 6:41:57 PM | SENT |

Associated Case Party: Dakota Fontenot

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| John P. TreyAvant | | tavant@grayreed.com | 10/21/2025 6:41:57 PM | SENT |
| Debbie Gurley | | dgurley@grayreed.com | 10/21/2025 6:41:57 PM | SENT |
| Andrew McCarty | | amccarty@grayreed.com | 10/21/2025 6:41:57 PM | SENT |
| Marcie Cardenas | | mcardenas@grayreed.com | 10/21/2025 6:41:57 PM | SENT |
| Jeffrey D.Watters | | jwatters@grayreed.com | 10/21/2025 6:41:57 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Paul Beik | 24054444 | paul@beiklaw.com | 10/21/2025 6:41:57 PM | SENT |
| James Ardoin | 24045420 | jimmy@jimmyardoinlaw.com | 10/21/2025 6:41:57 PM | SENT |
| Ryan Cantrell | | ryan.cantrell@chamberlainlaw.com | 10/21/2025 6:41:57 PM | SENT |
| Mariah Karigan | | mariah.karigan@chamberlainlaw.com | 10/21/2025 6:41:57 PM | SENT |
| Elizabeth Garcia | | elizabeth.garcia@chamberlainlaw.com | 10/21/2025 6:41:57 PM | SENT |

UNOFFICIAL COPY



FILED
10/22/2025 4:47 PM
Teneshia Hudspeth
County Clerk
Harris County - County Probate Court No. 1
Accepted By: EK

No. 537,721

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY AS | § | IN THE PROBATE COURT |
| TRUSTEE OF THE HOLLI ANN HARDIN | § | |
| TRUST NUMBER ONE | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | NUMBER ONE (1) OF |
| v. | § | |
| | § | |
| | § | |
| DAKOTA FONTENOT, | § | |
| *Defendant.* | § | HARRIS COUNTY, TEXAS |

### ANSWER AND COUNTERCLAIM OF MADISON E. FONTENOT AS NEXT FRIEND OF S.F. AND W.F., MINORS

Intervenor, Madison E. Fontenot, as next friend of her minor children, S.F. and W.F.,, files her Answer to the Original Petition ("Petition") of Linda Goehrs, in her capacity as "Temporary" Successor Trustee of the Holli Ann Hardin Trust Number One ("Plaintiff" and "Holli Trust") and Counterclaim, and respectfully show as follows:

### I.    STATEMENT OF INTEREST

1.     Under Section 1.3 of the Trust Declaration for the Holli Ann Hardin Trust Number One (the "Holli Hardin Trust"), the beneficiaries of the Holli Hardin Trust are Holli Hardin Fontenot, Dallas Joseph Fontenot, Jr., Anne Fontenot, Dallas Joseph Fontenot, III, Michelle Anne Fontenot, and any children of Holli and Dallas (all classified as Primary Beneficiaries).

2.     That section also states that "[a]lso Beneficiaries of this Trust are the children and other issue of each of the Primary Beneficiaries." Dakota Fontenot is a child of Holli and Dallas and thus is a Primary Beneficiary. As S.F. and W.F. are Dakota's children, they are also beneficiaries of the Holli Hardin Trust. And as beneficiaries of the Holli Hardin Trust, they are

1

persons interested in this proceeding.

## II.    GENERAL DENIAL

3.    Pursuant to Rule 92 of the Texas Rules of Civil Procedure, Madison denies each and every allegation contained in the Petition and demands strict proof thereof by a preponderance of the credible evidence as required by the Constitution and Laws of the State of Texas.

## III.    AFFIRMATIVE DEFENSES

4.    The "Temporary" Successor Trustee lacks capacity and/or standing to bring all of her claims. As explained in part III below, the "Temporary" Successor Trustee's authority to serve expired long ago and she has no independent interest in this litigation outside of that fiduciary capacity. Further, even if the "Temporary" Successor Trustee is validly acting, all of the spurious allegations against Dakota for actions he took in saving the businesses are not properly bought by the "Temporary" Successor Trustee. Any duties owed were to the various entities that Dakota was the officer/director of, not to the "Temporary" Successor Trustee.

5.    The "Temporary" Successor Trustee's claims are barred by waiver, ratification, and/or estoppel. As the evidence will show, the "Temporary" Successor Trustee was aware of and approved the financing plan used to buy Holli Hardin Fontenot ("Holli") out of her interests in the Holli Trust and the Dakota Trust. Further, the "Temporary" Successor Trustee is aware of the lengths Dakota went to ensure that the business succeeded. As evidenced from the exhibits to her own Petition, on the loan needed to take care of a portion of the deferred maintenance issues Decedent left, Dakota personally guaranteed it and secured it using property of the Dakota Trust. Even though Dakota and the Dakota Trust did not have an ownership interest in the business.

2

(Notably, the "Temporary" Successor Trustee did not have any issues when Dakota used his authority on behalf of the entities owned by the Dakota Trust for these transactions.) The "Temporary" Successor Trustee was involved in all of these decisions and cannot now bring suit because other beneficiaries of the Holli Trust are not happy with her actions.

6.    Any complaint about how Dakota, S.F. and W.F.'s father, ran the businesses is barred by the business judgment rule. The "Temporary" Successor Trustee knows how Dakota ran the business until it was sold. She was aware from the appraisal she herself commissioned that the business was cash poor and a sinking ship. She further knows that Dakota left a lucrative career and put his name, reputation, and personal assets on the line to keep the business afloat. And it was only through Dakota's hard work and decisive actions that any value at all was salvaged for the beneficiaries of the Holli Trust. Her now second-guessing of decisions Dakota made in good faith is barred.

7.    The "Temporary" Successor Trustee's claims are barred by illegality.

8.    The "Temporary" Successor Trustee's claims are barred by the statute of limitations.

9.    As shown by all of the above, the "Temporary" Successor Trustee's equitable claims are barred by unclean hands.

10.    Finally, any amount owed from the Dakota Trust to the Holli Trust is offset by what entities owned by the Holli Trust owe entities owned by the Dakota Trust and/or Dakota personally.

3

## IV.    REQUEST FOR SPECIFIC PERFORMANCE

11.    As described above, the "Temporary" Successor Trustee has been anything but. Originally appointed by order of a Fort Bend County District Court in 2021, the "Temporary" Successor Trustee's appointment was only supposed to last until the litigation regarding Dallas Fontenot's estate plan was resolved. That resolution occurred by Settlement Agreement in 2022. Yet the "Temporary" Successor Trustee stayed.

12.    In the Settlement Agreement, the "Temporary" Successor Trustee was to resign when the surviving spouse's interest was bought out of the Trusts. Yet, after the buyout was accomplished, the "Temporary" Successor Trustee stayed on.

13.    She still continues to serve over four years after her "temporary" appointment and shows no signs of resigning her office, even though the two documents that give her any authority dictate she should have left long ago. The Court should enforce the Settlement Agreement and compel the "Temporary" Successor Trustee to resign.

## V.    DEMAND FOR ACCOUNTING

14.    The "Temporary" Successor Trustee has served for almost four years now and has never provided S.F. or W.F. with an itemization of what the Holli Trust has taken in and what it has expended. Accordingly, Madison demands under Texas Trust Code § 113.151 that the "Temporary" Successor Trustee provide an accounting.

## VI. BREACH OF FIDUCIARY DUTY

15.    While the "Temporary" Successor Trustee has been less than forthcoming with disclosing information about the Holli Trust, what Madison has learned raises serious concerns.

4

16.     The "Temporary Successor Trustee" was in charge of supervising the appraisers for the buyout. In valuing Ice Embassy, Inc., one decision the "Temporary" Successor Trustee had to make was what to do with a receivable on the books from Decedent. Dakota, S.F. and W.F.'s father, warned the "Temporary" Successor Trustee that the receivable presented a collection risk and should not be valued at its book value. Yet the "Temporary" Successor Trustee insisted that the full book value be included in the valuation. Not including a customary collection discount caused the price of the buyout to rise and benefitted Holli at the expenses of Dakota, S.F., W.F., Joe, Michelle, and Michelle's two adult children (also beneficiaries of the Holli Trust).

17.     Exactly as Dakota warned, Holli as Independent Executor of Decedent's Estate refused to repay the loan. It took a federal lawsuit and tens of thousands of dollars in attorney's fees to eventually only collect a fraction of the book value of the receivable. Such a decision does not meet the standard of care required of a fiduciary and further breached her duty of impartiality as "Temporary" Successor Trustee's decision benefitted Holli at the expense of the other beneficiaries.

18.     Further, the "Temporary" Successor Trustee disclosed in the litigation that she charges the Holli Trust at a tenth of an hour increments her full rate for service as fiduciary. She admitted does not provide these monthly billing statements to any of the beneficiaries for their review. This level of fiduciary compensation is not authorized by either the Order that appointed her or the Holli Trust Declaration. Indeed, the Holli Trust Declaration requires the "Temporary" Successor Trustee to charge compensation "in accordance with the usual and customary charges in the community where and when such services are rendered." Art. 7.3.  Charging her hourly legal

UNOFFICIAL COPY

5

rate for work on the Holli Trust is not in accordance with the usual and customary charges in Harris County. Accordingly, Madison asks that the Court force disgorgement of all fiduciary compensation (which amount the "Temporary" Successor Trustee has never disclosed) received by the "Temporary" Successor Trustee.

19.    The "Temporary" Successor Trustee was not always antagonistic to Dakota (S.F. and W.F.'s father). Indeed, as shown above, the "Temporary" Successor Trustee worked hand in glove with Dakota to run the business and attempt to salvage some value for the beneficiaries of the Holli Trust.

20.    Sadly, once the business was sold and the "Temporary" Successor Trustee no longer needed Dakota, she allowed herself to be pushed by Intervenors Joe and Michelle into bringing this lawsuit under the threat of a lawsuit against her for her actions. The "Temporary" Successor Trustee knew full well about the operation of the business and the payments under the Settlement Agreement.  Yet she was afraid that Intervenors Joe and Michelle would blame her and sue her for her actions/inactions. So instead of owning up to her own actions, the "Temporary" Successor Trustee agreed to make Dakota, S.F. and W.F.'s father, the scapegoat and sued him for causes of action she already explained to Intervenors Joe and Michelle had no merit. In so doing, the "Temporary" Successor Trustee abdicated her fiduciary responsibility and favored Intervenors Joe and Michelle to the detriment of Dakota, S.F. and W.F. By her actions, the "Temporary" Successor Trustee also acted in her own benefit (avoiding a lawsuit against her personally) instead of honoring her fiduciary relationship to Dakota, S.F., and W.F.

21.    Further, the "Temporary" Successor Trustee continues to act outside of any

6

guardrails imposed by her fiduciary duty and the order appointing her. In addition to not providing any transparency as to her compensation, the "Temporary" Successor Trustee has not provided any transparency as to the assets and expenditures of the Holli Trust. The "Temporary" Successor Trustee has instituted this lawsuit against her beneficiary Dakota, S.F. and W.F.'s father, despite the order appointing her requiring agreement of all beneficiaries before she hired an attorney. The "Temporary" Successor Trustee did not discuss with Madison, the guardian of S.F. and W.F., or with Intervenor Michelle's children (who are all beneficiaries of the Holli Trust) on if they wanted her to institute this litigation and drain Holli Trust resources. The "Temporary" Successor Trustee has further attempted to freeze payments to Dakota, to the detriment of S.F. and W.F., that are unrelated to this litigation. She has breached her duty in a litany of ways and caused the beneficiaries damages. By her unlawful actions, she has specifically caused S.F. and W.F. significant damages by draining the Holli Trust's resources in order to avoid a lawsuit against her and instead institute a lawsuit against S.F. and W.F.'s father Dakota.

## VII. ASSISTING/ENCOURAGING AND KNOWING PARTICIPATION IN BREACH OF FIDUCIARY DUTY

22.    Based on Intervenors Joe and Michelle's actions in assisting/encouraging the "Temporary" Successor Trustee to file suit against Dakota in exchange for them not suing her, Intervenors Joe and Michelle have participated in the "Temporary" Successor Trustee's breaches of fiduciary duty and are jointly liable for them. Intervenors' actions were knowing, willful, reckless, and S.F. and W.F. are entitled to damages for their unlawful acts.

## VIII. REQUEST FOR ATTORNEY'S FEES

23.    It has been necessary for Madison to hire attorneys to intervene in this action and

7

bring countersuit, so an award of reasonable and necessary attorney's fees to Madison from Plaintiff, Intervenors Joe and Michelle, and/or the Holli Trust would be equitable and just. Moreover, an award of reasonable and necessary attorney's fees to Sara and William is authorized by Section 37.009 of the Texas Civil Practice and Remedies Code, Section 114.064 of the Texas Property Code, and paragraph 11 of the Settlement Agreement.

## PRAYER

Based on the foregoing, Intervenor Madison E. Fontenot, as next friend of S.F. and W.F., minors and beneficiaries of the Holli Ann Hardin Trust No. One, prays that:

- Plaintiff take nothing;

- the Court enter an order compelling Plaintiff to resign as "Temporary" Successor Trustee/remove the "Temporary" Successor Trustee;

- S.F. and W.F. recover their damages from Plaintiff and/or Intervenors Joe and Michelle;

- S.F. and W.F. recover their reasonable and necessary attorney's fees from Plaintiff, Intervenors Joe and Michelle and/or the Holli Trust; and

- the Court grant all other relief to which S.F. and W.F. may be justly entitled, both in law and in equity.

Respectfully submitted,

/s/ Paul S. Beik
PAUL S. BEIK
Texas State Bar Number: 24054444
paul@beiklaw.com
440 Louisiana Street, Suite 1800
Houston, Texas 77002

8

Telephone: (713) 869-6975

**ATTORNEYS FOR INTERVENOR MADISON E. FONTENOT, AS NEXT FRIEND OF S.F. AND W.F., BENEFICIARIES OF THE HOLLI ANN HARDIN TRUST NUMBER ONE**

9

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been served upon all parties of record in this Cause, in accordance with the Texas Rules of Civil Procedure on October 22, 2025.

RUDOLPH M. CULP                      VIA E-SERVICE
State Bar No. 24043014
rudy@texasprobateattorney.com
COLLIN J. BULLARD
State Bar No. 24129570
collin@texasprobateattorney.com
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
Telephone: (713) 297-0700
Fax: (817) 383-5110

**ATTORNEYS FOR PLAINTIFF,
LINDA GOEHRS, IN HER CAPACITY AS
TRUSTEE OF THE HOLLI ANN HARDIN
TRUST NUMBER ONE**

Ryan O. Cantrell                      VIA E-SERVICE
Texas Bar No. 24055259
ryan.cantrell@chamberlainlaw.com
Mariah J. Karigan
Texas Bar No. 24123088
mariah.karigan@chamberlainlaw.com
1200 Smith Street, Suite 1400
Houston, Texas 77002
Telephone: (713) 658-1818
Facsimile: (713) 658-2553

**COUNSEL FOR MICHELLE FONTENOT AND
DALLAS JOSEPH FONTENOT III**

/s/ Paul S. Beik
PAUL S. BEIK

10

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Paul  Beik on behalf of Paul Beik
Bar No. 24054444
paul@beiklaw.com
Envelope ID: 107180088
Filing Code Description: Application in an Existing Estate
Filing Description: Answer and Counterclaim of Madison E. Fontenot as
Next Friend of S.F. and W.F., Minors
Status as of 10/23/2025 4:33 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Paul Beik | 24054444 | paul@beiklaw.com | 10/22/2025 4:47:28 PM | SENT |
| James Ardoin | 24045420 | jimmy@jimmyardoinlaw.com | 10/22/2025 4:47:28 PM | SENT |
| Ryan Cantrell | | ryan.cantrell@chamberlainlaw.com | 10/22/2025 4:47:28 PM | SENT |
| Mariah Karigan | | mariah.karigan@chamberlainlaw.com | 10/22/2025 4:47:28 PM | SENT |
| Elizabeth Garcia | | elizabeth.garcia@chamberlainlaw.com | 10/22/2025 4:47:28 PM | SENT |

Associated Case Party: Dakota Fontenot

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| John P. TreyAvant | | tavant@grayreed.com | 10/22/2025 4:47:28 PM | SENT |
| Debbie Gurley | | dgurley@grayreed.com | 10/22/2025 4:47:28 PM | SENT |
| Andrew McCarty | | amccarty@grayreed.com | 10/22/2025 4:47:28 PM | SENT |
| Jeffrey D.Watters | | jwatters@grayreed.com | 10/22/2025 4:47:28 PM | SENT |
| Marcie Cardenas | | mcardenas@grayreed.com | 10/22/2025 4:47:28 PM | SENT |

Associated Case Party: Linda Goehrs

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Texas Probate Attorney, PLLC | | efile@texasprobateattorney.com | 10/22/2025 4:47:28 PM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 10/22/2025 4:47:28 PM | SENT |
| Rudy Culp | | rudy@texasprobateattorney.com | 10/22/2025 4:47:28 PM | SENT |
| Bailey Bowe | | bailey@texasprobateattorney.com | 10/22/2025 4:47:28 PM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 10/22/2025 4:47:28 PM | SENT |

UNOFFICIAL COPY

**EXHIBIT**

**21**

FILED
10/23/2025 4:10 PM
Teneshia Hudspeth
County Clerk
Harris County - County Probate Court No. 1
Accepted By: CS

No. 537,721

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY AS | § | IN THE PROBATE COURT |
| TRUSTEE OF THE HOLLI ANN HARDIN | § | |
| TRUST NUMBER ONE | § | |
|    *Plaintiff,* | § | |
| | § | |
| | § | NUMBER ONE (1) OF |
| v. | § | |
| | § | |
| DAKOTA FONTENOT, | § | |
|    *Defendant.* | § | HARRIS COUNTY, TEXAS |

## DEFENDANT DAKOTA FONTENOT'S JURY DEMAND

TO THE HONORABLE JUDGE OF SAID COURT:

In accordance with Texas Rule of Civil Procedure 216 and the Constitution of the State of Texas, Defendant Dakota Fontenot hereby submits this formal demand for jury trial. A jury fee is being paid in conjunction with the filing of this demand.

Respectfully submitted,

*/s/ Trey Avant*
JEFFREY D. WATTERS, JR.
Texas State Bar Number: 2406695
jwatters@grayreed.com
JOHN P. ("TREY") AVANT III
Texas State Bar Number: 24101471
tavant@grayreed.com
ANDREW B. MCCARTY
Texas State Bar Number: 24126139
amccarty@grayreed.com
GRAY REED & McGRAW LLP
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000

JAMES MADISON ("JIMMY") ARDOIN III
Texas State Bar Number: 24045420
jimmy@jimmyardoinlaw.com
4900 Fournace Place, Suite 414
Bellaire, Texas 77401
Telephone: (713) 574-8900

UNOFFICIAL COPY

4916-5187-2629.1

PAUL S. BEIK
Texas State Bar Number: 24054444
paul@beiklaw.com
440 Louisiana Street, Suite 1800
Houston, Texas 77002
Telephone: (713) 869-6975

**ATTORNEYS FOR DEFENDANT,
DAKOTA FONTENOT**

4916-5187-2629.1

**CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the foregoing instrument has been served upon all parties of record in this Cause, in accordance with the Texas Rules of Civil Procedure on October 23, 2025.

Rudolph M. Culp                                    VIA E-SERVICE
State Bar No. 24043014
rudy@texasprobateattorney.com
Collin J. Bullard
State Bar No. 24129570
collin@texasprobateattorney.com
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
Telephone: (713) 297-0700
Fax: (817) 383-5110

**ATTORNEYS FOR PLAINTIFF,**
**LINDA GOEHRS, IN HER CAPACITY**
**AS "TEMPORARY" SUCCESSOR**
**TRUSTEE OF THE HOLLI ANN**
**HARDIN TRUST NUMBER ONE**


Ryan O. Cantrell                                    VIA E-SERVICE
Texas Bar No. 24055259
ryan.cantrell@chamberlainlaw.com
Mariah J. Karigan
Texas Bar No. 24123088
mariah.karigan@chamberlainlaw.com
1200 Smith Street, Suite 1400
Houston, Texas 77002
Telephone: (713) 658-1818
Facsimile: (713) 658-2553

**COUNSEL FOR MICHELLE FONTENOT AND**
**DALLAS JOSEPH FONTENOT III**


                                    /s/ Trey Avant
                                    JOHN P. ("TREY") AVANT III


4916-5187-2629.1

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Marcie Cardenas on behalf of Trey Avant
Bar No. 24101471
mcardenas@grayreed.com
Envelope ID: 107228893
Filing Code Description: Demand for a Jury
Filing Description: Defendant Dakota Fontenot's Jury Demand
Status as of 10/24/2025 9:08 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Paul Beik | 24054444 | paul@beiklaw.com | 10/23/2025 4:10:29 PM | SENT |
| James Ardoin | 24045420 | jimmy@jimmyardoinlaw.com | 10/23/2025 4:10:29 PM | SENT |
| John P. TreyAvant | | tavant@grayreed.com | 10/23/2025 4:10:29 PM | SENT |
| Debbie Gurley | | dgurley@grayreed.com | 10/23/2025 4:10:29 PM | SENT |
| Andrew McCarty | | amccarty@grayreed.com | 10/23/2025 4:10:29 PM | SENT |
| Texas Probate Attorney, PLLC | | efile@texasprobateattorney.com | 10/23/2025 4:10:29 PM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 10/23/2025 4:10:29 PM | SENT |
| Jeffrey D.Watters | | jwatters@grayreed.com | 10/23/2025 4:10:29 PM | SENT |
| Ryan Cantrell | | ryan.cantrell@chamberlainlaw.com | 10/23/2025 4:10:29 PM | SENT |
| Mariah Karigan | | mariah.karigan@chamberlainlaw.com | 10/23/2025 4:10:29 PM | SENT |
| Elizabeth Garcia | | elizabeth.garcia@chamberlainlaw.com | 10/23/2025 4:10:29 PM | SENT |
| Marcie Cardenas | | mcardenas@grayreed.com | 10/23/2025 4:10:29 PM | SENT |
| Rudy Culp | | rudy@texasprobateattorney.com | 10/23/2025 4:10:29 PM | SENT |
| Bailey Bowe | | bailey@texasprobateattorney.com | 10/23/2025 4:10:29 PM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 10/23/2025 4:10:29 PM | SENT |

UNOFFICIAL COPY



FILED
10/23/2025 6:22 PM
Teneshia Hudspeth
County Clerk
Harris County - County Probate Court No. 1
Accepted By: CS

**CAUSE NO. 537,721**

| | | |
|---|---|---|
| **LINDA GOEHRS, IN HER CAPACITY AS** | § | **IN PROBATE COURT** |
| **TRUSTEE OF THE HOLLI ANN** | § | |
| **HARDIN TRUST NUMBER ONE** | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | **NUMBER ONE OF** |
| **v.** | § | |
| | § | |
| | § | |
| **DAKOTA FONTENOT** | § | |
| *Defendant.* | § | **HARRIS COUNTY, TEXAS** |

## MICHELLE FONTENOT AND JOE FONTENOT'S RESPONSE IN OPPOSITION TO MOTION FOR CONTINUANCE

Michelle Fontenot ("Michelle") and Dallas Joseph Fontenot III ("Joe"), individually, as beneficiaries of the Holli Ann Hardin Trust Number One and Dakota Trust, file this Response in Opposition to Dakota Fontenot's Motion for Continuance and in support thereof, would respectfully show the Court the following:

**I.    Dakota is not entitled to 45 days' notice of a hearing for interim relief under Texas Property Code § 114.008.**

1.      On September 24, 2025, this Court held a hearing on an Application for Temporary Injunction. At the conclusion of the hearing, the Court enjoined Dakota Fontenot from selling the real property located at 3414 Old Richmond Road, Rosenberg, Texas 77471. The Court further indicated that it would hear Michelle and Joe's request for relief under Texas Property Code § 114.008 at a later date. Consistent with this, Michelle and Joe set their request for relief for hearing at the soonest possible date provided by the Court, which was October 24, 2025. Dakota now claims that a continuance is necessary because he is entitled to 45-days' notice under Texas Rule of Civil Procedure 245.

2.      Texas Property Code § 114.008 authorizes interim relief in the form of an injunction to prevent a breach of trust that might occur or appoint a receiver to take possession of

1

the trust property and administer the trust, among other relief. *See* TEX. PROP. CODE § 114.008(a)(2), (5). The statute expressly gives the Court the authority to *prevent* a breach of trust before it occurs, without waiting for the breach to occur. *Id.* Relief under Texas Property Code § 114.008 is not a final adjudication on the merits such that Dakota would be entitled to 45 days' notice. *See In re Bumstead Family Irrevocable Trust,* No. 13-20-00350-CV, 2022 WL 710159 (Tex. App.—Corpus Christi-Edinburg Mar. 10, 2022, pet. denied). Texas Rule of Civil Procedure 245 does not require 45 days' notice for all contested hearings, and instead only applies to trial settings. Dakota has not cited, and Michelle and Joe are not aware of, any cases which have imposed a 45-day notice required for trials to an application for relief under Texas Property Code § 114.008. To the contrary, courts have confirmed that Section 114.008 authorizes temporary interim relief. In *In re Bumstead Family Irrevocable Trust,* the court rejected the very arguments Dakota now makes, finding that relief under Texas Property Code § 114.008 did not grant ultimate relief, did it deprive the purported trustee of due process, nor was there any entitlement to a jury trial. No. 13-20-00350-CV, 2022 WL 710159 (Tex. App.—Corpus Christi-Edinburg Mar. 10, 2022, pet. denied). *See also Estate of Benson,* No. 04–15–00087–CV2015, WL 5258702 (Tex.App—San Antonio Sept. 9, 2015, pet dism'd) (hearing for relief under Texas Property Code § 114.008 approximately two weeks after lawsuit filed complied with notice requirements); *Elliott v. Weatherman,* 396 S.W.3d 224, 229–30 (Tex. App.—Austin 2013, no writ) (indicating that 114.008 relief could have been "expeditiously" set to comply with 3-day notice requirement for appointment of a receiver); *see also Moody Nat'l Bank v. Moody,* No. 14-21-00096-CV, 2022 WL 14205534 (Tex. App.—Houston [14th Dist.] 2023, pet. denied). Accordingly, the 45-day notice provisions of Texas Rule of Civil Procedure 245 do not apply, and the Court should deny Dakota's requested continuance.

2

**II.    Dakota's claimed need for discovery does not justify a continuance of a hearing for temporary relief to prevent a breach of trust.**

3.    A court should not continue a hearing or trial so that a party may obtain additional discovery unless the party requesting the continuance (1) describes the discovery sought, (2) explains how the discovery is material, (3) shows that due diligence was used to obtain the discovery, (4) explains why the discovery was not obtained earlier, and (5) states that the continuance is not sought for delay but so that justice may be done. *See* Tex. R. Civ. P. 252; *see, e.g., State v. Wood Oil Distrib., Inc.*, 751 S.W.2d 863, 865 (Tex. 1988) (depositions); *In re Guardianship of Villarreal*, 330 S.W.3d 11, 27 (Tex. App.—Corpus Christi 2010, no pet.) (testimony); *Wal-Mart Stores Tex., LP v. Crosby*, 295 S.W.3d 346, 356 (Tex. App.—Dallas 2009, pet. denied) (additional discovery); *Tri-Steel Structures, Inc. v. Baptist Found.*, 166 S.W.3d 443, 447–48 (Tex. App.—Fort Worth 2005, pet. denied) (testimony); *Verkin v. Sw. Ctr. One, Ltd.*, 784 S.W.2d 92, 94–95 (Tex. App.—Houston [1st Dist.] 1989, writ denied) (additional discovery). As discussed *supra*, the requested relief under Texas Property Code § 114.008 is not a final determination on the merits. Rather, the relief sought will maintain the status quo during the pendency of these proceedings. Dakota's claims are defenses that he has the burden of proof on, and discovery is not necessary before the interim relief may be awarded to maintain the status quo.

**III.    Dakota's unilateral request for mediation does not justify a continuance.**

4.    Finally, Dakota claims that a continuance should be granted so the parties may attend a mediation. Michelle and Joe incorporate by reference their Response in Opposition to Dakota's Motion to Compel Mediation. Even if this Court were to compel mediation, the Court should still grant interim relief to prevent further breaches of trust that might occur while the parties mediate.

3

CONCLUSION

For the foregoing reasons, Michelle Fontenot and Dallas Joseph Fontenot III respectfully request that the Court deny Dakota Fontenot's Motion for Continuance. Michelle and Joe request all other further relief to which they may be entitled.

Respectfully submitted,

CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY, P.C.

By:     /s/ Ryan O. Cantrell
        Ryan O. Cantrell
        Texas Bar No. 24055259
        ryan.cantrell@chamberlainlaw.com
        Mariah J. Karigan
        Texas Bar No. 24123088
        mariah.karigan@chamberlainlaw.com
        1200 Smith Street, Suite 1400
        Houston, Texas 77002
        Telephone:     (713) 658-1818
        Facsimile:     (713) 658-2553
        COUNSEL FOR MICHELLE FONTENOT AND
        DALLAS JOSEPH FONTENOT III

UNOFFICIAL COPY

4

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing instrument was served on this the 23rd day of October, 2025, to the following:

Rudy Culp
Collin Bullard
TEXAS PROBATE ATTORNEY PLLC
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
*Counsel for Linda Goehrs*

James Madison ("Jimmy") Ardoin III
4900 Fournace Place, Suite 414
Bellaire, Texas 77401
*Counsel for Dakota Fontenot*

Jeffrey D. Watters, Jr.
John P. ("Trey") Avant III
Andrew B. McCarty
GRAY REED & MCGRAW LLP
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
*Counsel for Dakota Fontenot*

Paul S. Beik
440 Louisiana Street, Suite 1800
Houston, Texas 77002
*Counsel for Dakota Fontenot and Madison Fontenot*

/s/ Ryan O. Cantrell
Ryan O. Cantrell

5

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Mariah Karigan on behalf of Ryan Cantrell
Bar No. 24055259
mariah.karigan@chamberlainlaw.com
Envelope ID: 107236955
Filing Code Description: Answer/Response
Filing Description: Michelle and Joe's Response in Opposition to Motion for Continuance
Status as of 10/24/2025 9:04 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Paul Beik | 24054444 | paul@beiklaw.com | 10/23/2025 6:22:23 PM | SENT |
| James Ardoin | 24045420 | jimmy@jimmyardoinlaw.com | 10/23/2025 6:22:23 PM | SENT |
| John P. TreyAvant | | tavant@grayreed.com | 10/23/2025 6:22:23 PM | SENT |
| Debbie Gurley | | dgurley@grayreed.com | 10/23/2025 6:22:23 PM | SENT |
| Andrew McCarty | | amccarty@grayreed.com | 10/23/2025 6:22:23 PM | SENT |
| Texas Probate Attorney, PLLC | | efile@texasprobateattorney.com | 10/23/2025 6:22:23 PM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 10/23/2025 6:22:23 PM | SENT |
| Jeffrey D.Watters | | jwatters@grayreed.com | 10/23/2025 6:22:23 PM | SENT |
| Ryan Cantrell | | ryan.cantrell@chamberlainlaw.com | 10/23/2025 6:22:23 PM | SENT |
| Mariah Karigan | | mariah.karigan@chamberlainlaw.com | 10/23/2025 6:22:23 PM | SENT |
| Marcie Cardenas | | mcardenas@grayreed.com | 10/23/2025 6:22:23 PM | SENT |
| Rudy Culp | | rudy@texasprobateattorney.com | 10/23/2025 6:22:23 PM | SENT |
| Bailey Bowe | | bailey@texasprobateattorney.com | 10/23/2025 6:22:23 PM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 10/23/2025 6:22:23 PM | SENT |

UNOFFICIAL COPY

EXHIBIT

23

FILED
10/23/2025 5:10 PM
Teneshia Hudspeth
County Clerk
Harris County - County Probate Court No. 1
Accepted By: CS

CAUSE NO. 537,721

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY AS TRUSTEE OF THE HOLLI ANN HARDIN TRUST NUMBER ONE<br>*Plaintiff,*<br><br>v.<br><br>DAKOTA FONTENOT<br>*Defendant.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | IN PROBATE COURT<br><br><br>NUMBER ONE OF<br><br><br>HARRIS COUNTY, TEXAS |

### MICHELLE FONTENOT AND JOE FONTENOT'S RESPONSE IN OPPOSITION TO MOTION TO COMPEL MEDIATION

Michelle Fontenot ("Michelle") and Dallas Joseph Fontenot III ("Joe"), individually, as beneficiaries of the Holli Ann Hardin Trust Number One and Dakota Trust, file this Response in Opposition to Dakota Fontenot's Motion to Compel Mediation. As Michelle and Joe's claims are not covered by the Settlement Agreement, they should not be forced to mediate. To the extent any claims are covered by the mediation agreement in the Settlement Agreement, the parties already attended an unsuccessful mediation in May of this year, and Michelle and Joe do not believe a second mediation would be productive.

### ARGUMENT AND AUTHORITIES

1.     Michelle and Joe have asserted certain claims regarding the Dakota Trust, including claims for interim relief under Texas Property Code § 114.008 and an application to fill a trustee vacancy under Texas Property Code § 113.083. Dakota seeks to compel the parties to an early mediation under the terms of a Settlement Agreement that did not involve the present claims regarding the Dakota Trust.

2.     Dakota claims that Joe and Michelle released their present claims under the Settlement Agreement. However, a plain reading of the Settlement Agreement provides that the

1

32706456.v2

release provision does not extend to Joe and Michelle's currently claims regarding the Dakota Trust and should not serve as the basis to compel mediation.

3.      The Settlement Agreement release provisions that Dakota relies on only provide that the parties were releasing Claims "regarding the Estate and Trust…" *See* Exhibit 1, p. 2. The "Estate" is defined as "the Estate of Dallas Joseph Fontenot, Jr., whose administration is pending in cause number 21-CPR-036521, in the County Court at Law Number Four (4) of Fort Bend County, Texas" and the "Trust" is defined as "the Holli Ann Hardin Trust Number One." *Id.*

x.      **"Claims" shall mean and include any and all causes of action, demands, debts, obligations, duties, liens, liabilities, and theories of liabilities of whatsoever kind and nature, whether based in contract or tort, whether arising in equity or under the common law, whether by statute or regulation, whether known or unknown, whether past or present, whether contingent or matured, whether for damages relief, injunctive relief, declaratory relief, equitable relief, or any other type of relief, whether for actual damages, personal injury damages, mental anguish, liquidated damages, punitive damages, exemplary damages, compensatory damages, consequential damages, incidental damages, pecuniary damages, costs, expenses, attorneys' fees, penalties, or fines that are (is), were (was), could be, or could have been asserted as of the Effective Date, regardless of whether actually asserted, whether by claim, counterclaim, cross-claim, motion, third-party claim regarding the Estate and Trust, including but not limited to, claims, whether asserted or not, known or unknown, actual or contingent.**

vii.      **"Trust" shall mean and refer to the Holli Ann Hardin Trust Number One.**

viii.      **"Estate" shall mean and refer to the Estate of Dallas Joseph Fontenot, Jr., whose administration is pending in cause number 21-CPR-036521, in the County Court at Law Number Four (4) of Fort Bend County, Texas.**

4.      Further, Michelle and Joe are not named as parties to the Settlement Agreement in their capacities as beneficiaries or successor Trustees of the Dakota Trust. *See id.* p. 2 ("iv. 'Joe' shall mean and refer [to] Dallas Joseph Fontenot III, individually and in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One;" "v. 'Michelle' shall mean and refer to Michelle Ann Fontenot, individually, in her capacity as a beneficiary of the Holli Ann Hardin Trust

2

32706456.v2

Number One, and in her capacity as next friend and virtual representative of A.E., a minor."). Therefore, Dakota cannot enforce the mediation agreement against them as beneficiaries or successor Trustees of the Dakota Trust.

5.      Moreover, the parties already attended a mediation with Russ Jones in late May of 2025. The mediation was unsuccessful and there is no justification for an additional mediation so soon after the earlier failed mediation. Forcing the parties to attend yet another mediation will not advance judicial economy.

6.      To the extent the Court is inclined to compel mediation, the Court may and should still decide Michelle and Joe's Amended Application for Relief under Texas Property Code § 114.008 and Application to Fill Vacancy under Texas Property Code § 113.083.

## CONCLUSION

For the foregoing reasons, Michelle Fontenot and Dallas Joseph Fontenot III respectfully request that the Court deny Dakota Fontenot's Motion to Compel Mediation. Michelle and Joe request all other further relief to which they may be entitled.

Respectfully submitted,

CHAMBERLAIN, HRDLICKA, WHITE,
    WILLIAMS & AUGHTRY, P.C.

By:    /s/ Ryan O. Cantrell
       Ryan O. Cantrell
       Texas Bar No. 24055259
       ryan.cantrell@chamberlainlaw.com
       Mariah J. Karigan
       Texas Bar No. 24123088
       mariah.karigan@chamberlainlaw.com
       1200 Smith Street, Suite 1400
       Houston, Texas 77002
       Telephone:    (713) 658-1818
       Facsimile:    (713) 658-2553
       COUNSEL FOR MICHELLE FONTENOT AND
       DALLAS JOSEPH FONTENOT III

3

32706456.v2

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing instrument was served on this the 23rd day of October, 2025, to the following:

Rudy Culp
Collin Bullard
TEXAS PROBATE ATTORNEY PLLC
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
*Counsel for Linda Goehrs*

Jeffrey D. Watters, Jr.
John P. ("Trey") Avant III
Andrew B. McCarty
GRAY REED & MCGRAW LLP
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
*Counsel for Dakota Fontenot*

James Madison ("Jimmy") Ardoin III
4900 Fournace Place, Suite 414
Bellaire, Texas 77401
*Counsel for Dakota Fontenot*

Paul S. Beik
440 Louisiana Street, Suite 1800
Houston, Texas 77002
*Counsel for Dakota Fontenot and Madison Fontenot*

/s/ Ryan O. Cantrell
Ryan O. Cantrell

4

32706456.v2

NO. 21-CPR-036521

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN THE COUNTY COURT AT LAW |
| | § | |
| DALLAS JOSEPH FONTENOT, JR., | § | NUMBER FOUR (4) OF |
| | § | |
| DECEASED | § | FORT BEND COUNTY, TEXAS |

NO. 21-DCV-288736

| | | |
|---|---|---|
| IN RE: | § | IN THE 240th DISTRICT COURT |
| | § | |
| | § | OF |
| HOLLI ANN HARDIN TRUST | § | |
| NUMBER ONE | § | FORT BEND COUNTY, TEXAS |

## BINDING MEDIATED SETTLEMENT AGREEMENT

The Parties – Dakota Fontenot, individually, in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in his capacity as next friend and virtual representative for S.F., a minor, Holli Ann Fontenot, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, Dallas Joseph Fontenot, III, individually, and in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One, Michelle Ann Fontenot, individually, in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in her capacity as next friend and virtual representative for A.E., a minor, and Ashley Fontenot Estrada, individually and in her capacity as a beneficiary of the Hollis Ann Hardin Trust Number One – hereto agree that all causes of action pending in cause number 21-CPR-036521 and cause number 21-DVC-288736, both of which are pending in Fort Bend County, Texas, and all related claims and/or controversies between them, whether asserted or not, known or unknown, actual or contingent, are hereby settled, in accordance with the terms of this Binding Mediated Settlement Agreement (hereinafter referred to as the "Settlement Agreement").

## A. DEFINITIONS

1.     Whenever used in this Settlement Agreement, the following terms shall have and be construed to have the following meanings:

i.     "Settlement Agreement" shall mean and refer to this Binding Mediated Settlement Agreement.

ii.     "Dakota" shall mean and refer to Dakota Fontenot, individually, in his capacity as beneficiary of the Holli Ann Hardin Trust Number One, and in his capacity as next friend and virtual representative of S.F., a minor.

1

EXHIBIT
1

iii.   "Holli" shall mean and refer to Holli Ann Fontenot, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

iv.   "Joe" shall mean and refer Dallas Joseph Fontenot, III, individually and in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

v.   "Michelle" shall mean and refer to Michelle Ann Fontenot, individually, in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in her capacity as next friend and virtual representative of A.E., a minor.

vi.   "Ashley" shall mean and refer to Ashley Fontenot Estrada, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

vii.   "Trust" shall mean and refer to the Holli Ann Hardin Trust Number One.

viii.   "Estate" shall mean and refer to the Estate of Dallas Joseph Fontenot, Jr., whose administration is pending in cause number 21-CPR-036521, in the County Court at Law Number Four (4) of Fort Bend County, Texas.

ix.   "Parties" shall mean and refer to Dakota, Holli, Joe, Michelle, and Ashley, collectively, as described in paragraphs two (ii) through six (vi) above.

x.   "Claims" shall mean and include any and all causes of action, demands, debts, obligations, duties, liens, liabilities, and theories of liabilities of whatsoever kind and nature, whether based in contract or tort, whether arising in equity or under the common law, whether by statute or regulation, whether known or unknown, whether past or present, whether contingent or matured, whether for damages relief, injunctive relief, declaratory relief, equitable relief, or any other type of relief, whether for actual damages, personal injury damages, mental anguish, liquidated damages, punitive damages, exemplary damages, compensatory damages, consequential damages, incidental damages, pecuniary damages, costs, expenses, attorneys' fees, penalties, or fines that are (is), were (was), could be, or could have been asserted as of the Effective Date, regardless of whether actually asserted, whether by claim, counterclaim, cross-claim, motion, third-party claim regarding the Estate and Trust, including but not limited to, claims, whether asserted or not, known or unknown, actual or contingent.

xi.   "Effective Date" shall mean and refer to the date that the last Party to this Settlement Agreement executes the same.

xii.   In respect to any defined term herein, the singular shall include the plural, and the plural shall include the singular.

2

## B. TERMS, CONDITIONS, AND MUTUAL CONSIDERATION

1.      The Parties acknowledge that bona fide disputes and controversies exist between them, both as to liability and the amount thereof in damages, if any, and by reason of such disputes and controversies they desire to compromise and settle all Claims and causes of action of any kind whatsoever which the Parties have or may have arising out of the transactions or occurrences which have been brought or could have been brought regarding the Trust.

2.      **THE PARTIES AGREE AND ACKNOWLEDGE THAT UPON THE EXECUTION OF THIS SETTLEMENT AGREEMENT, THIS SETTLEMENT AGREEMENT SHALL BECOME BINDING AND IRREVOCABLE.**

3.      The Parties agree that the 2013 Last Will and Testament and 2017 First Codicil to the Last Will and Testament will be admitted to probate. The Parties agree that Holli will be appointed as the Independent Executor of the Estate and agree not to object to the same.

4.      All of the Estate's assets, including all associated bank accounts, shall be distributed to Holli, save and expect the following items:

- The following items are going to be distributed to Dakota:

    o   The 2017 F150 Truck
    o   The 2013 Toyota Sequoia
    o   All interest, including all associated bank accounts, in Entertainment Marketing and Management, LP
    o   The coin collection and gold located in the backpack at the Rosenburg Office

- The following items are going to be distributed to Joe:

    o   The 2008 Honda Ridgeline
    o   One-half (1/2) of the Decedent's Tiki Mug Collection

The Parties agree to execute all documents necessary to effectuate the conveyance of all property described above the individual recipients stated in paragraph four (4).

5.      From the Rosenburg office, Holli shall be entitled to obtain:

- The remaining $150,000 in non-earmarked cash located in the backpack;
- Any and all Playboy Magazines

6.      The Parties agree that all personal property belonging to Dakota, Joe, and/or Michelle that is currently located at 10402 W. Hidden Lake Lane, Richmond, Texas 77406 shall be distributed to Dakota, Joe, and/or Michelle as appropriate. Dakota, Joe and/or Michelle shall

3

be afforded the opportunity, within thirty (30) days of the Effective Date of this Settlement Agreement, to conduct a supervised walkthrough of their personal property located at 10402 W. Hidden Lake Lane, Richmond, Texas 77406. During that time, Dakota, Joe, and/or Michelle will take photographs of their personal property which they would like to obtain. A list and accompanying photographs will be delivered to counsel for Holli of those items within fourteen (14) days of the walkthrough being completed. Holli will have fourteen (14) days to object to the items which Dakota, Joe, and/or Michelle would like to obtain. If the parties cannot reach a resolution regarding the same, Russ Jones will mediate, at an hourly rate, the division of the disputed personal property. Upon the completion and approval of a final list of items, Dakota, Joe, and/or Michelle, at their expense, shall obtain and remove the items on the approved final list of items at a mutually agreeable date and time within fourteen (14) days of the approval of the final list of items.

7.      The attorney's fees for Holli, Dakota, Joe, Michelle, and/or Ashley may be paid from the assets of the Holli Ann Hardin Trust Number One in an amount no more than $200,000.00 per side. The Parties will present their fees to Linda Goehrs, in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, for payment. The Parties agree that they will not object to the payment of the fees of any other party.

8.      The real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183 shall be distributed to Holli. Dakota, Michelle, and Joe, with Dakota as authorized representative, shall retain a right of first refusal in the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183. If Holli decides to sell or otherwise transfer the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183, Holli shall notify Dakota, Michelle, and Joe in writing and provide an appraisal completed by a certified and licensed real estate appraiser. From the date of receipt of that notice, Dakota, Michelle, and/or Joe shall have 30 days to exercise their right to purchase the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183. If exercised, Dakota, Michelle, and/or Joe shall enter into a real estate contract to purchase the property with a proposed closing date sixty (60) days from the date of receipt of the notice of sale or transfer triggering the right of first refusal. Holli is not required to sell at the appraised value if she receives offers in excess of the appraised value. If Holli receives an offer greater than the appraised value, the right of first refusal will be triggered upon delivery of the great offer to Dakota as authorized representative. The right of refusal will not renew if it is not exercised against the greatest value delivered by Holli.

9.      With regard to the further administration of the Holli Ann Hardin Trust Number One:

- The Parties agree that the assets of the Holli Ann Hardin Trust Number One shall be appraised by certified and licensed business or real estate appraisers, as is appropriate for the particular asset. Russ Jones shall select the appraisers to complete the real estate and business appraisals. The costs of the appraisals shall be borne by the Holli Ann Hardin Trust Number One.

4

- The Parties agree that, once the values on the appraisals are obtained for all Holli Ann Hardin Trust Number One assets, Holli's interest will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One in an amount equal to the twenty percent (20%) of the total value of the assets. Such purchase will occur within ninety days (90) of the completion of the valuation of the assets of the Holli Ann Hardin Trust Number One.

- The Parties agree that during the appraisal period described above, Linda Goehrs, in her capacity as Temporary Successor Trustee and/or Dakota, shall execute the necessary documents to install Dakota as an Officer and/or Director of Ice Embassy, Inc., HRF Enterprises, Inc., and Entertainment Marketing and Management, LP.

- The Parties agree that Linda Goehrs shall remain Temporary Successor Trustee of the Holli Ann Hardin Trust Number One until the closing of a sale on Holli's interest in the Holli Ann Hardin Trust Number One. At the time that Holli's interest is purchased, Linda Goehrs will resign as Temporary Successor Trustee, and Dakota, Joe, Michelle, and Ashley shall select a Successor Trustee of the Trust.

- Holli agrees to execute an assignment of interest and disclaimer of further interest in the Holli Ann Hardin Trust Number One at the time that her interest is purchased in accordance with this Settlement Agreement.

- The Parties agree that Dakota and Holli shall remain employees of Entertainment Marketing and Management, LP, and/or the business, or businesses owned by the Holli Ann Hardin Trust Number One. Holli shall be removed from the payroll on the date that her interest is purchased pursuant to this Agreement. The compensation amount that Dakota and Holli have been receiving shall remain unchanged.

- The Parties agree that Dakota and Holli shall remain on the insurance paid for by Entertainment Marketing and Management, LP, and/or the business or businesses owned by the Holli Ann Hardin Trust Number One. Holli shall be removed from the insurance plan on the date that her interest is purchased pursuant to this Agreement.

- To the extent owned by the Trust, Linda Goehrs as Temporary Successor Trustee, shall gift the horses known as Coco and Rusty to Holli.

10. With regard to the further administration of the Dakota Trust:

- The Parties agree that the assets of the Dakota Trust shall be appraised by certified and licensed real estate appraisers. Russ Jones shall select the appraisers to complete the real estate appraisal. The cost of the appraisal shall be borne by the Dakota Trust.

5

- Upon completion of the appraisal, the total value of the assets will be compiled and Holli's interest will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One in an amount equal to eighty-five percent (85%) of the total value of the assets. Such purchase will occur within ninety days (90) of the completion of the valuation of the assets of the Dakota Trust.

- Holli agrees to execute an assignment of interest and disclaimer of further interest in the Dakota Trust at the time that her interest in purchased in accordance with this Settlement Agreement.

11.    Within seven (7) days of the Effective Date of this agreement, Dakota, Joe, Michelle, and/or Ashley agree to dismiss all pending pleas, pleadings, and/or motions, with prejudice regarding the Estate and/or Trust pending in cause number 21-CPR-036521 and cause number 21-DVC-288736, both of which are pending in Fort Bend County, Texas.

12.    Neither the Trust nor any entity owned, held, or possessed by the Holli Ann Hardin Trust Number One, the Dakota Trust, and/or the Estate have any claims against any of the Parties.

13.    The Parties agree to release Linda Goehrs, in her capacity as Temporary Successor Trustee, for making distributions according to this Settlement Agreement which contradict the terms of the Trust Agreement for the Holli Ann Hardin Trust Number One or the Dakota Trust.

## C. RELEASES AND DISCHARGE

1.    **Release of Claims by Dakota.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Dakota, on behalf of himself and all his heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Holli, Joe, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Dakota hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Dakota expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Holli, Joe, Michelle, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Dakota does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

2.    **Release of Claims by Holli.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Holli, on behalf of herself and all her heirs, successors,

6

executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Joe, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Holli hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Holli expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Michelle, Joe, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Holli does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

3.      **Release of Claims by Joe**. For and in consideration of the mutual promises, covenants, and agreements stated herein, Joe, on behalf of himself and all his heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Joe hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Joe expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Michelle, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Joe does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

4.      **Release of Claims by Michelle**. For and in consideration of the mutual promises, covenants, and agreements stated herein, Michelle, on behalf of herself and all her heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Joe, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Michelle hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Michelle expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind

7

known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Joe, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Michelle does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

5.      **Release of Claims by Ashley**. For and in consideration of the mutual promises, covenants, and agreements stated herein, Ashley, on behalf of herself and all her heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Joe, Michelle, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Ashley hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Ashley expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Joe, and Michelle. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Ashley does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

## D. REPRESENTATIONS AND WARRANTIES

1.      **Representations and Warranties**. Each of the Parties hereto represents and warrants to the other that:

a.      They are adequately represented by competent counsel in connection with the execution and delivery of this Settlement Agreement and/or had an opportunity to retain counsel in connection with this Settlement Agreement;

b.      In executing this Settlement Agreement, they relied upon the Party's own judgment and any advice it received from its own attorneys;

c.      They were not induced to sign or execute this Settlement Agreement by promises, omissions, agreements, or representations not expressly stated in this Settlement Agreement;

d.      They freely and willingly executed this Settlement Agreement and expressly disclaims reliance upon any facts, promises, statements made or not made, undertakings, or representations made by any person or entity

8

prior to the Effective Date of this Settlement Agreement except as specifically enumerated herein;

e.  They consent that this Settlement Agreement was not procured, obtained, or induced by improper conduct or undue influence;

f.  After an opportunity to consult with an attorney concerning the matters made subject of this Settlement Agreement, and after reviewing this Settlement Agreement, they agree this Settlement Agreement is fair, reasonable, and supported by good, valuable, and adequate consideration; and

g.  They understand and agree to the terms and conditions of this Settlement Agreement, which contains the entire agreement between the Parties relating to the matters made the subject of this Settlement Agreement.

2.  **Capacity and Authority**. Each of the Parties hereto represents and warrants to the other that the person signing this Settlement Agreement in a representative capacity has the requisite authority and consent to execute this Settlement Agreement on behalf of the Party for whom he or she has executed this Settlement Agreement, and that this Settlement Agreement is binding upon the Party for whom he or she has executed this Settlement Agreement and upon such Party's successors and assigns.

3.  **Assignment of Claims**. Each of the Parties hereto represents and warrants to the other that it has not transferred, assigned, or otherwise conveyed, excepting any interest held by counsel, in whole or in part, its respective interest in the Claims at issue and that it is the owner and holder thereof. Each of the Parties further represents and warrants that, aside from any interest held by counsel, it is the only holder of the Claims being released and that no other person or entity owns, or has any interest in, any of the Claims being released. Despite any interest held by counsel, this Settlement Agreement applies to the entirety of each of the Parties' Claims.

4.  **Cooperation in Execution of Further Documents**. Each of the Parties expressly agrees to execute any other documents reasonably necessary to effectuate the terms, purpose, and intent of this Settlement Agreement.

## E. MISCELLANEOUS PROVISIONS

1.  **Invalidity**. In the event any one or more of the provisions of this Settlement Agreement shall, for any reason, be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Settlement Agreement.

2.  **Entire Agreement**. This Settlement Agreement reflects the final and complete agreement between the parties concerning the matters made subject of this Settlement Agreement and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the Parties. There are no unwritten oral agreements between the Parties. The Parties expressly

9

acknowledge that any rights, duties, or obligations, whether contractual or otherwise, owed by or between the Parties prior to the effective date of this Settlement Agreement are terminated as of the Effective Date of this Settlement Agreement and the only rights, duties, or obligations owed by or between the Parties from this point forward shall be those set forth in this Settlement Agreement.

3.    **Governing Law and Venue**. The validity, effect, and construction of this Settlement Agreement shall be governed by the laws of the State of Texas. Venue for any cause of action, controversy, or dispute regarding this Settlement Agreement or the subject matter hereof shall be proper only in the state courts of Fort Bend County, Texas.

4.    **Amendment**. This Settlement Agreement may not be amended, modified, waived, or terminated unless such is done in a writing signed by all the Parties.

5.    **Construction of Agreement**. This Settlement Agreement shall not be construed in favor of or against any Party on the basis that the Party did or did not author this Settlement Agreement or any attachment related to it. It is intended that this Settlement Agreement shall be comprehensive in nature and shall be construed liberally to affect its purposes.

6.    **Titles or Headings**. All titles or headings used in this Settlement Agreement are used only for the convenience of the Parties and shall not be construed to have any effect or meaning with respect to the other content of the Settlement Agreement, such other content being controlling as to the Settlement Agreement of the Parties.

7.    **Costs and Attorneys' Fees**. Each party shall bear its own costs and attorneys' fees in relation to the claims and the negotiation and preparation of this Settlement Agreement, subject to the attorney's fees provisions within this Settlement Agreement.

8.    **Waiver**. The failure of any of the Parties to enforce, at any time, any provision of this Settlement Agreement shall not be construed to be a waiver of such provision, nor in any way affect the validity of this Settlement Agreement or any part thereof or any right of any Party thereafter to enforce each and every provision. No waiver of any breach of this Settlement Agreement shall be held to constitute a waiver of any other breach.

9.    **Binding Agreement**. This Settlement Agreement is binding on the Parties hereto and not subject to revocation, repudiation, or withdrawal of consent, even if one or more of them shall become debtors in a bankruptcy proceeding. This binding effect is an integral part of this Agreement.

10.    **Execution of Agreement**. This Settlement Agreement may be executed in a number of identical counterparts, each of which shall be deemed an original for all purposes. A fax signature or a copy of an original signature shall constitute an original signature for purposes of this Settlement Agreement. This Settlement Agreement shall be valid only if fully executed by all Parties and/or their representatives as agreed to herein. If not fully executed by all Parties, this Settlement Agreement shall be null and void and of no effect.

11.    **Future Disputes.** In the event that there are future disputes, disagreements, and/or conflicts regarding the terms and/or implementation of any terms of this Settlement Agreement, the Parties agree to return to Russ Jones for mediation regarding the dispute. The Parties agree to return to mediation prior to filing any litigation regarding a breach of this settlement agreement or these terms. If a Party refuses to return to mediation, the remaining parties are permitted to file litigation without returning to mediation. Should further litigation be filed regarding a breach of the agreement, the prevailing party shall be entitled to an award of attorney's fees as determined by a jury or judge.

12.    **Indemnity.** Each party shall indemnify the other parties for all claims made by, through, or under the indemnifying party.

AGREED TO BY ALL PARTIES AS EVIDENCED BY THEIR SIGNATURE BELOW ON THIS THE 7th DAY OF JANUARY, 2022.

_____
Dakota Fontenot, in all capacities

_____
Holli Ann Fontenot, in all capacities

_____
Dallas Joseph Fontenot, III, in all capacities

_____
Michelle Ann Fontenot, in all capacities

_____
Ashley Fontenot Estrada, in all capacities

_____
Christopher Burt
*Counsel for Dakota Fontenot*

UNOFFICIAL COPY

11

11.     **Future Disputes.** In the event that there are future disputes, disagreements, and/or conflicts regarding the terms and/or implementation of any terms of this Settlement Agreement, the Parties agree to return to Russ Jones for mediation regarding the dispute. The Parties agree to return to mediation prior to filing any litigation regarding a breach of this settlement agreement or these terms. If a Party refuses to return to mediation, the remaining parties are permitted to file litigation without returning to mediation. Should further litigation be filed regarding a breach of the agreement, the prevailing party shall be entitled to an award of attorney's fees as determined by a jury or judge.

12.     **Indemnity.** Each party shall indemnify the other parties for all claims made by, through, or under the indemnifying party.

AGREED TO BY ALL PARTIES AS EVIDENCED BY THEIR SIGNATURE BELOW ON THIS THE 7th DAY OF JANUARY, 2022.

_____

Dakota Fontenot, in all capacities

_____

Holli Ann Fontenot, in all capacities

# Dallas Joseph Fontenot III

_____

Dallas Joseph Fontenot, III, in all capacities

# Michelle Ann Fontenot

_____

Michelle Ann Fontenot, in all capacities

# Ashley Fontenot Estrada

_____

Ashley Fontenot Estrada, in all capacities

_____

Christopher Burt
*Counsel for Dakota Fontenot*

11

_____

Steven Mendel
*Counsel for Holli Ann Fontenot*

_____

Kenneth Sumner
*Counsel for Dallas Joseph Fontenot, III,*
*Michelle Ann Fontenot, and Ashley Estrada*

UNOFFICIAL COPY

12

Steven Mendel
*Counsel for Holli Ann Fontenot*

## Kenneth E. Sumner, Jr.

Kenneth Sumner
*Counsel for Dallas Joseph Fontenot, III,*
*Michelle Ann Fontenot, and Ashley Estrada*

Signature: _Dallas Joseph Fontenot III_
Dallas Joseph Fontenot III (Jan 7, 2022 19:33 CST)

Email: djoef3@hotmail.com

Signature: _Ashley Fontenot Estrada_
Ashley Fontenot Estrada (Jan 7, 2022 19:38 CST)

Email: ashleyafontenot@gmail.com

Signature: _Michelle Fontenot_
Michelle Fontenot (Jan 7, 2022 19:36 CST)

Email: mannefontenot@gmail.com

Signature: _Kenneth C. Sumner, Jr_

Email: ksumner@romanosumner.com

12

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Pennie Proctor on behalf of Ryan Cantrell
Bar No. 24055259
pennie.proctor@chamberlainlaw.com
Envelope ID: 107234469
Filing Code Description: Answer/Response
Filing Description: Michelle Fontenot and Dallas Joseph Fontenot III's Response in Opposition to Motion to Compel Mediation
Status as of 10/24/2025 9:05 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Paul Beik | 24054444 | paul@beiklaw.com | 10/23/2025 5:10:18 PM | SENT |
| James Ardoin | 24045420 | jimmy@jimmyardoinlaw.com | 10/23/2025 5:10:18 PM | SENT |
| John P. TreyAvant | | tavant@grayreed.com | 10/23/2025 5:10:18 PM | SENT |
| Debbie Gurley | | dgurley@grayreed.com | 10/23/2025 5:10:18 PM | SENT |
| Andrew McCarty | | amccarty@grayreed.com | 10/23/2025 5:10:18 PM | SENT |
| Texas Probate Attorney, PLLC | | efile@texasprobateattorney.com | 10/23/2025 5:10:18 PM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 10/23/2025 5:10:18 PM | SENT |
| Jeffrey D.Watters | | jwatters@grayreed.com | 10/23/2025 5:10:18 PM | SENT |
| Ryan Cantrell | | ryan.cantrell@chamberlainlaw.com | 10/23/2025 5:10:18 PM | SENT |
| Mariah Karigan | | mariah.karigan@chamberlainlaw.com | 10/23/2025 5:10:18 PM | SENT |
| Marcie Cardenas | | mcardenas@grayreed.com | 10/23/2025 5:10:18 PM | SENT |
| Rudy Culp | | rudy@texasprobateattorney.com | 10/23/2025 5:10:18 PM | SENT |
| Bailey Bowe | | bailey@texasprobateattorney.com | 10/23/2025 5:10:18 PM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 10/23/2025 5:10:18 PM | SENT |



FILED
10/23/2025 7:15 AM
Teneshia Hudspeth
County Clerk
Harris County - County Probate Court No. 1
Accepted By: CC

**EXHIBIT**

**24**

C

| | | |
|---|---|---|
| **LINDA GOEHRS, IN HER CAPACITY AS** | § | **IN PROBATE COURT** |
| **TRUSTEE OF THE HOLLI ANN** | § | |
| **HARDIN TRUST NUMBER ONE** | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | **NUMBER ONE OF** |
| **v.** | § | |
| | § | |
| | § | |
| **DAKOTA FONTENOT** | § | |
| *Defendant.* | § | **HARRIS COUNTY, TEXAS** |

## INTERVENORS' SUPPLEMENT TO AMENDED APPLICATION FOR RELIEF UNDER TEXAS PROPERTY CODE § 114.008 AND APPLICATION TO FILL VACANCY UNDER TEXAS PROPERTY CODE § 113.083

Michelle Fontenot ("Michelle") and Dallas Joseph Fontenot III ("Joe"), individually, as beneficiaries of the Holli Ann Hardin Trust Number One and Dakota Trust, file this Supplement to their Amended Application for Relief Under Texas Property Code § 114.008 and Application to Fill Vacancy under Texas Property Code § 113.083. Michelle and Joe supplement their Applications with the Declination to Serve as Successor Trustee of the Dakota Trust executed by an authorized representative of Frost Bank on October 16, 2025, attached as Exhibit 12.

1

Respectfully submitted,

**CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY, P.C.**

By:    /s/ Ryan O. Cantrell
Ryan O. Cantrell
Texas Bar No. 24055259
ryan.cantrell@chamberlainlaw.com
Mariah J. Karigan
Texas Bar No. 24123088
mariah.karigan@chamberlainlaw.com
1200 Smith Street, Suite 1400
Houston, Texas 77002
Telephone:    (713) 658-1818
Facsimile:    (713) 658-2553
**COUNSEL FOR MICHELLE FONTENOT AND DALLAS JOSEPH FONTENOT III**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing instrument was served on this the 23rd day of October, 2025, to the following:

Rudy Culp
Collin Bullard
TEXAS PROBATE ATTORNEY PLLC
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
*Counsel for Linda Goehrs*

Jeffrey D. Watters, Jr.
John P. ("Trey") Avant III
Andrew B. McCarty
GRAY REED & MCGRAW LLP
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
*Counsel for Dakota Fontenot*

James Madison ("Jimmy") Ardoin III
4900 Fournace Place, Suite 414
Bellaire, Texas 77401
*Counsel for Dakota Fontenot*

Paul S. Beik
440 Louisiana Street, Suite 1800
Houston, Texas 77002
*Counsel for Dakota Fontenot*

/s/ Ryan O. Cantrell
Ryan O. Cantrell

2

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Mariah Karigan on behalf of Ryan Cantrell
Bar No. 24055259
mariah.karigan@chamberlainlaw.com
Envelope ID: 107190734
Filing Code Description: Amended Filing
Filing Description: Michelle and Joe Fontenot's Supplement to Amended Application for Relief under Texas Property Code s 114.008 and Application to Fill Vacancy under Texas Property Code 113.083
Status as of 10/23/2025 7:19 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Paul Beik | 24054444 | paul@beiklaw.com | 10/23/2025 7:15:43 AM | SENT |
| James Ardoin | 24045420 | jimmy@jimmyardoinlaw.com | 10/23/2025 7:15:43 AM | SENT |
| John P. TreyAvant | | tavant@grayreed.com | 10/23/2025 7:15:43 AM | SENT |
| Debbie Gurley | | dgurley@grayreed.com | 10/23/2025 7:15:43 AM | SENT |
| Andrew McCarty | | amccarty@grayreed.com | 10/23/2025 7:15:43 AM | SENT |
| Texas Probate Attorney, PLLC | | efile@texasprobateattorney.com | 10/23/2025 7:15:43 AM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 10/23/2025 7:15:43 AM | SENT |
| Jeffrey D.Watters | | jwatters@grayreed.com | 10/23/2025 7:15:43 AM | SENT |
| Ryan Cantrell | | ryan.cantrell@chamberlainlaw.com | 10/23/2025 7:15:43 AM | SENT |
| Mariah Karigan | | mariah.karigan@chamberlainlaw.com | 10/23/2025 7:15:43 AM | SENT |
| Elizabeth Garcia | | elizabeth.garcia@chamberlainlaw.com | 10/23/2025 7:15:43 AM | SENT |
| Marcie Cardenas | | mcardenas@grayreed.com | 10/23/2025 7:15:43 AM | SENT |
| Rudy Culp | | rudy@texasprobateattorney.com | 10/23/2025 7:15:43 AM | SENT |
| Bailey Bowe | | bailey@texasprobateattorney.com | 10/23/2025 7:15:43 AM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 10/23/2025 7:15:43 AM | SENT |

# DECLINATION TO SERVE AS SUCCESSOR TRUSTEE
# OF THE DAKOTA TRUST

Frost Bank, ("Bank"), by and through its undersigned authorized agent, hereby DECLINES to serve as SUCCESSOR TRUSTEE of the DAKOTA TRUST (referred to as the "Trust" hereafter).

In connection with this Declination, the Bank states that it: (1) has never served as Trustee of the Trust; (2) has never accepted the appointment as Trustee the Trust; (3) has never had custody or control of the assets of the Trust; and (4) has had no knowledge or involvement whatsoever in the investments, management or administration of any assets of the Trust.

Signed this _16th_ day of _October_, 2025.

_____
Lorena Rodriguez, Administrative Officer

STATE OF TEXAS          §
COUNTY OF BEXAR         §

Before me the undersigned authority on this day appeared Lorena Rodriguez and upon her oath stated that she is an Administrative Officer of Frost Bank; that as such she is authorized to act on behalf of said bank and corporation; that she executed the above for the purposes and consideration stated therein as the act of said bank and corporation.

Signed and notarized this _16th_ day of _October_, 2025.

ALLISON KIDWELL
My Notary ID # 125540832
Expires September 29, 2026

_____
Notary Public in and for the State of Texas

EXHIBIT

12

EXHIBIT

25

FILED
11/26/2025 12:05 PM
Teneshia Hudspeth
County Clerk
Harris County - County Probate Court No. 1
Accepted By: CW

No. 537,721

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY AS TRUSTEE OF THE HOLLI ANN HARDIN TRUST NUMBER ONE | § § § | IN THE PROBATE COURT |
| *Plaintiff*, | § § | |
| | § | NUMBER ONE (1) OF |
| v. | § § | |
| DAKOTA FONTENOT, | § § | |
| *Defendant.* | § | HARRIS COUNTY, TEXAS |

## DAKOTA FONTENOT'S APPLICATION FOR
## INTERIM RELIEF UNDER TEXAS TRUST CODE § 114.008

Defendant Dakota Fontenot ("Dakota") makes this Application for Interim Relief Under Texas Trust Code against Linda Goehrs, in her capacity as "Temporary" Successor Trustee of the Holli Ann Hardin Trust Number One ("Holli Trust") as follows:

1.     The "Temporary" Successor Trustee instituted this litigation by filing suit against Dakota.  Dakota's siblings, Joe and Michelle, intervened in the case, joined the "Temporary" Successor Trustee's lawsuit, and have filed numerous other claims against Dakota.

2.     After two separate near day-long hearings, Dakota wondered how Joe and Michelle could continue their case against him when they left their previous attorney (at least partly) due to issues regarding payment.  Accordingly, Dakota's counsel sent a letter to the "Temporary" Successor Trustee asking if the Holli Trust was footing Joe and Michelle's legal bill and, if so, if the "Temporary" Successor Trustee would make an equalizing distribution so all beneficiaries of the Holli Trust were put on an equal footing.  *See* **Exhibit A**.

3.     Not only did the "Temporary" Successor Trustee proactively disclose that she was

4919-1050-5850.1                                                    1

funding Joe and Michelle's lawsuit using the Holli Trust (as was required by her fiduciary duty), she also refused to timely answer Dakota's simple inquiry. When Dakota's counsel followed up on a question that seconds to answer, the "Temporary" Successor Trustee's counsel brusquely stated he was too busy to answer. *See* **Exhibit B**.

4.      The "Temporary" Successor Trustee eventually admitted what Dakota had suspected all along, that she was paying for Joe and Michelle's lawsuit against Dakota.   To the tune of $63,247.48 and counting. *See* **Exhibit C**. Rather than admit her wrongdoing upon being caught, the Temporary Successor Trustee doubled down, claiming that an attorney's fees provision in the Settlement Agreement from four years ago gave her authority and would further fund Joe and Michelle with over an additional $100,000 in attorney's fees. *Id.*

5.      The provision in question is a standard term in a settlement agreement that covered the fees incurred for *that* litigation. *See* **Exhibit D**. It evidences no intent to set aside a slush fund for future use for litigation raising (partly) unrelated allegations.

7.      The attorney's fees for Holli, Dakota, Joe, Michelle, and/or Ashley may be paid from the assets of the Holli Ann Hardin Trust Number One in an amount no more than $200,000.00 per side.  The Parties will present their fees to Linda Goehrs, in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, for payment.  The Parties agree that they will not object to the payment of the fees of any other party.

6.      Even then, the "Temporary" Successor Trustee refused to make an equalizing distribution to Dakota, claiming that the Settlement Agreement limitations of $200,000 "per side" capped him out. *See* **Exhibit C**. Of course, Dakota is the one who led the fight against Holli's machinations and so had the most to be reimbursed.   Unexplained is how Joe and Michelle constituted a separate "side" in the previous litigation when they (1) never filed their

4919-1050-5850.1                                         2

own affirmative claim for relief and (2) admitted under oath in testimony in this case that they were aligned with Dakota.

7.    The "Temporary" Successor Trustee has therefore made unequal distributions from the Holli Trust.  As an unequal distribution is the exact same basis Joe and Michelle used to support their request for interim relief with respect to the Dakota Trust, what's good for the goose is good for the gander.  The Court should find that the "Temporary" Successor Trustee committed a breach of trust and enter a temporary injunction under Texas Trust Code § 114.008(a)(2) preventing the "Temporary" Successor Trustee from making distributions to (or on behalf of) Joe and Michelle for their legal fees.

8.    Dakota further requests that the Court order an equalizing distribution to him in the amount of $63,247.48 from the Holli Trust under Texas Trust Code §§ 114.008(a)(3), (10).

**PRAYER**

Based on the foregoing, Dakota Fontenot prays that:

- the Court enter an order enjoining the "Temporary" Successor Trustee from making distributions to Joe and Michelle for legal fees;

- the Court enter an order compelling the "Temporary" Successor Trustee to make an equalizing distribution of $63,247.48 to him; and

- the Court grant all other relief to which he may be justly entitled, both in law and in equity.

Respectfully submitted,

4919-1050-5850.1                                            3

*/s/ Trey Avant*
JEFFREY D. WATTERS, JR.
Texas State Bar Number: 2406695
jwatters@grayreed.com
JOHN P. ("TREY") AVANT III
Texas State Bar Number: 24101471
tavant@grayreed.com
ANDREW B. MCCARTY
Texas State Bar Number: 24126139
amccarty@grayreed.com
GRAY REED & McGRAW LLP
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000

JAMES MADISON ("JIMMY") ARDOIN III
Texas State Bar Number: 24045420
jimmy@jimmyardoinlaw.com
4900 Fournace Place, Suite 414
Bellaire, Texas 77401
Telephone: (713) 574-8900

PAUL S. BEIK
Texas State Bar Number: 24054444
paul@beiklaw.com
440 Louisiana Street, Suite 1800
Houston, Texas 77002
Telephone: (713) 869-6975

**ATTORNEYS FOR DEFENDANT,
DAKOTA FONTENOT**

4919-1050-5850.1                                   4

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been served upon all parties of record in this Cause, in accordance with the Texas Rules of Civil Procedure on November 26, 2025.

RUDOLPH M. CULP                    VIA E-SERVICE
State Bar No. 24043014
rudy@texasprobateattorney.com
COLLIN J. BULLARD
State Bar No. 24129570
collin@texasprobateattorney.com
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
Telephone: (713) 297-0700
Fax: (817) 383-5110

**ATTORNEYS FOR PLAINTIFF,
LINDA GOEHRS, IN HER CAPACITY AS
TRUSTEE OF THE HOLLI ANN HARDIN
TRUST NUMBER ONE**

/s/ Trey Avant
JOHN P. ("TREY") AVANT III

4919-1050-5850.1                    5

**VERIFICATION**

STATE OF TEXAS           §
                        §
COUNTY OF HARRIS        §

My name is Dakota Fontenot, my date of birth is 06/22/1994, and my address is 2926 Fontana Drive, Houston, Texas 77043, and United States.   I declare under the penalty of perjury that the statements made in Defendant's Original Answer are true and correct based on my personal knowledge.

Dated: November 25, 2025

_____
Dakota Fontenot

4919-1050-5850.1                                    6

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Marcie Cardenas on behalf of Trey Avant
Bar No. 24101471
mcardenas@grayreed.com
Envelope ID: 108500421
Filing Code Description: Application of Miscellaneous kind
Filing Description: for Interim Relief Under Texas Trust Code Section 114.008
Status as of 12/1/2025 10:42 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Paul Beik | 24054444 | paul@beiklaw.com | 11/26/2025 12:05:24 PM | SENT |
| James Ardoin | 24045420 | jimmy@jimmyardoinlaw.com | 11/26/2025 12:05:24 PM | SENT |
| John P. TreyAvant | | tavant@grayreed.com | 11/26/2025 12:05:24 PM | SENT |
| Debbie Gurley | | dgurley@grayreed.com | 11/26/2025 12:05:24 PM | SENT |
| Andrew McCarty | | amccarty@grayreed.com | 11/26/2025 12:05:24 PM | SENT |
| Texas Probate Attorney, PLLC | | efile@texasprobateattorney.com | 11/26/2025 12:05:24 PM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 11/26/2025 12:05:24 PM | SENT |
| Jeffrey D.Watters | | jwatters@grayreed.com | 11/26/2025 12:05:24 PM | SENT |
| Ryan Cantrell | | ryan.cantrell@chamberlainlaw.com | 11/26/2025 12:05:24 PM | SENT |
| Mariah Karigan | | mariah.karigan@chamberlainlaw.com | 11/26/2025 12:05:24 PM | SENT |
| Elizabeth Garcia | | elizabeth.garcia@chamberlainlaw.com | 11/26/2025 12:05:24 PM | SENT |
| Marcie Cardenas | | mcardenas@grayreed.com | 11/26/2025 12:05:24 PM | SENT |
| Rudy Culp | | rudy@texasprobateattorney.com | 11/26/2025 12:05:24 PM | SENT |
| Bailey Bowe | | bailey@texasprobateattorney.com | 11/26/2025 12:05:24 PM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 11/26/2025 12:05:24 PM | SENT |

Linda Goehrs, in her capacity as Trustee of the Holli Ann Hardin Trust Number One, Plaintiffvs.Dakota Fontenot, De



# GRAY REED.

JEFFREY D. WATTERS
DIRECT NO. 713.986.7113
JWATTERS@GRAYREED.COM

October 31, 2025

***Via E-Service***
Mr. Rudolph M. Culp
24 Greenway Plaza, Suite 1825
Houston, Texas 77046

RE:    *Goehrs v. Fontenot*; Cause No. 537,721; In the Probate Court Number One (1) of Harris County, Texas (the "Proceeding").

Rudy,

It has come to my attention that Linda Goehrs, as "Temporary" Successor Trustee of the Holli Ann Hardin Trust Number One (the "Trust"), may be paying Joe and Michelle Fontenot's attorney's fees leading up to and in this Proceeding.

Within one week of this letter, please confirm (1) if any such payments have been made, (2) the amount of any such payments, and (3) that your client will be making an equalizing distribution to Dakota Fontenot so that he is treated equally with his siblings in accordance with your client's fiduciary duty.

Sincerely,

Jeffrey D. Watters

1300 POST OAK BOULEVARD, SUITE 2000 | HOUSTON, TEXAS 77056 | P: 713.986.7000 | F: 713.986.7100 | GRAYREED.COM

4928-0646-8982.1

**EXHIBIT**

**B**

Harris County - County

537721

| | |
|---|---|
| **From:** | Rudy Culp |
| **To:** | Jeffrey Watters |
| **Cc:** | Trey Avant |
| **Subject:** | [EXTERNAL] RE: Fontenot |
| **Date:** | Tuesday, November 11, 2025 4:02:13 PM |
| **Attachments:** | image001.png |
| | image115979.png |
| | image472468.png |
| | image323270.png |
| | image927976.png |
| | image060412.png |
| | image483497.png |

I cannot respond right now, I will get you a full response by this Friday.

Thank you,

Rudy



★
EST. 2001
**TEXAS PROBATE**
**ATTORNEY** PLLC

**Rudy Culp**
Attorney

📞 (713) 297-0700 x113

📠 (682) 428-8137

📍 24 Greenway Plaza, Suite 1825, Houston, TX 77046

✉ rudy@texasprobateattorney.com

🌐 TexasProbateAttorney.com

The information contained in this message and all attachments is confidential and/or proprietary and may be protected by the attorney-client or other privileges. Any review, use, disclosure, or distribution by persons other than the intended recipient is prohibited and may be unlawful. If you believe this message has been sent to you in error, please notify the sender by replying to this transmission or calling Texas Probate Attorney, PLLC at (817) 383-5100 and delete this message in its entirety and any copy of it (in any form) without disclosing it. Unless expressly stated otherwise, nothing contained in this electronic communication should be construed as a digital or electronic signature.



**From:** Jeffrey Watters <jwatters@grayreed.com>
**Sent:** Tuesday, November 11, 2025 12:02 PM
**To:** Rudy Culp <rudy@texasprobateattorney.com>
**Cc:** Trey Avant <tavant@grayreed.com>
**Subject:** Fontenot

Rudy,

Just left you a voicemail on the letter I sent a week and a half ago. Linda owes Dakota a duty of full disclosure. Refusing to answer whether she's paying attorney fees for Dakota's siblings to sue him is a breach of that duty (separate apart from any such distribution being a breach itself). Continued silence will be treated as confirmation that payments are being made and we will have to enforce our remedies for that breach.

**Jeffrey Watters**
**Partner**
Tel 713.986.7113 | Fax 713.730.5870 | jwatters@grayreed.com
1300 Post Oak Blvd., Suite 2000 | Houston, TX 77056
grayreed.com | Connect with me on LinkedIn



# GRAY REED.

**CONFIDENTIALITY NOTICE:** This electronic transmission and any attachments constitute confidential information which is intended only for the named recipient(s) and may be legally privileged. If you have received this communication in error, please contact the sender immediately. Any disclosure, copying, distribution or the taking of any action concerning the contents of this communication by anyone other than the named recipient(s) is strictly prohibited.

Case 4:26-cv-0234   Document Holli   Filed 04/29/26 in TXSD   Page 607 of 1053

**EST. 2001**

# TEXAS PROBATE
## ATTORNEY™ PLLC

| FORT WORTH | HOUSTON | AUSTIN |
|---|---|---|
| PHONE: 682-428-0700 | PHONE: 713-297-0700 | PHONE: 512-788-0700 |
| FAX: 682-428-8137 | FAX: 682-428-8137 | FAX: 682-428-8137 |

### 537721
November 14, 2025

<div style="border:1px solid">EXHIBIT C</div>

Harris County - County

VIA EMAIL: jwatters@grayreed.com; tavant@grayreed.com
Jeffrey Watters
Trey Avant
Gray Reed
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056

> Re:  *Holli Hardin Trust*
> *Response to letter dated October 31, 2025*

Dear Jeff:

This correspondence is in response to your letter dated October 31, 2025, requesting information about attorneys' fees paid out of the Trust. The Binding Mediated Settlement Agreement ("Agreement"), dated January 7, 2022, provides that each side is entitled to receive up to $200,000 from the Trust for attorneys' fees and expenses. Holli Ann Hardin and Dakota Fontenot each used up their $200,000 at some point following the execution of the Agreement. To date, Joe and Michele, who the Trustee is treating as a single side because they have had the same representation throughout, have been paid a total of $93,247.48, which includes $29,670.98 to Romano & Sumner and $63,247.48 to Chamberlain, Hrdlicka, White, Williams & Aughtry, P.C. We are gathering all the statements from the Trust from the date of Linda Goehrs appointment as Successor Trustee to the current date and will provide those as soon as they are received and bates labeled.

If you have any questions regarding the enclosed or this matter, please do not hesitate to contact our office.

Very Truly Yours,

Rudolph M. Culp

Cc: Linda Goehrs, Successor Trustee

UNOFFICIAL COPY

Linda Goehrs, in her capacity as Trustee of the Holli Ann Hardin Trust Number One Plaintiff v. Dakota Fontenot, D

EXHIBIT
D

Probate Court No. 4

537721

NO. 21-CPR-036521

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN THE COUNTY COURT AT LAW |
| | § | |
| DALLAS JOSEPH FONTENOT, JR., | § | NUMBER FOUR (4) OF |
| | § | |
| DECEASED | § | FORT BEND COUNTY, TEXAS |

NO. 21-DCV-288736

| | | |
|---|---|---|
| IN RE: | § | IN THE 240th DISTRICT COURT |
| | § | |
| | § | OF |
| HOLLI ANN HARDIN TRUST | § | |
| NUMBER ONE | § | FORT BEND COUNTY, TEXAS |

## BINDING MEDIATED SETTLEMENT AGREEMENT

The Parties – Dakota Fontenot, individually, in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in his capacity as next friend and virtual representative for S.F., a minor, Holli Ann Fontenot, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, Dallas Joseph Fontenot, III, individually, and in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One, Michelle Ann Fontenot, individually, in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in her capacity as next friend and virtual representative for A.E., a minor, and Ashley Fontenot Estrada, individually and in her capacity as a beneficiary of the Hollis Ann Hardin Trust Number One – hereto agree that all causes of action pending in cause number 21-CPR-036521 and cause number 21-DVC-288736, both of which are pending in Fort Bend County, Texas, and all related claims and/or controversies between them, whether asserted or not, known or unknown, actual or contingent, are hereby settled, in accordance with the terms of this Binding Mediated Settlement Agreement (hereinafter referred to as the "Settlement Agreement").

## A. DEFINITIONS

1.      Whenever used in this Settlement Agreement, the following terms shall have and be construed to have the following meanings:

i.      "Settlement Agreement" shall mean and refer to this Binding Mediated Settlement Agreement.

ii.      "Dakota" shall mean and refer to Dakota Fontenot, individually, in his capacity as beneficiary of the Holli Ann Hardin Trust Number One, and in his capacity as next friend and virtual representative of S.F., a minor.

1

iii.   "Holli" shall mean and refer to Holli Ann Fontenot, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

iv.   "Joe" shall mean and refer Dallas Joseph Fontenot, III, individually and in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

v.   "Michelle" shall mean and refer to Michelle Ann Fontenot, individually, in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in her capacity as next friend and virtual representative of A.E., a minor.

vi.   "Ashley" shall mean and refer to Ashley Fontenot Estrada, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

vii.   "Trust" shall mean and refer to the Holli Ann Hardin Trust Number One.

viii.   "Estate" shall mean and refer to the Estate of Dallas Joseph Fontenot, Jr., whose administration is pending in cause number 21-CPR-036521, in the County Court at Law Number Four (4) of Fort Bend County, Texas.

ix.   "Parties" shall mean and refer to Dakota, Holli, Joe, Michelle, and Ashley, collectively, as described in paragraphs two (ii) through six (vi) above.

x.   "Claims" shall mean and include any and all causes of action, demands, debts, obligations, duties, liens, liabilities, and theories of liabilities of whatsoever kind and nature, whether based in contract or tort, whether arising in equity or under the common law, whether by statute or regulation, whether known or unknown, whether past or present, whether contingent or matured, whether for damages relief, injunctive relief, declaratory relief, equitable relief, or any other type of relief, whether for actual damages, personal injury damages, mental anguish, liquidated damages, punitive damages, exemplary damages, compensatory damages, consequential damages, incidental damages, pecuniary damages, costs, expenses, attorneys' fees, penalties, or fines that are (is), were (was), could be, or could have been asserted as of the Effective Date, regardless of whether actually asserted, whether by claim, counterclaim, cross-claim, motion, third-party claim regarding the Estate and Trust, including but not limited to, claims, whether asserted or not, known or unknown, actual or contingent.

xi.   "Effective Date" shall mean and refer to the date that the last Party to this Settlement Agreement executes the same.

xii.   In respect to any defined term herein, the singular shall include the plural, and the plural shall include the singular.

2

## B. TERMS, CONDITIONS, AND MUTUAL CONSIDERATION

1.      The Parties acknowledge that bona fide disputes and controversies exist between them, both as to liability and the amount thereof in damages, if any, and by reason of such disputes and controversies they desire to compromise and settle all Claims and causes of action of any kind whatsoever which the Parties have or may have arising out of the transactions or occurrences which have been brought or could have been brought regarding the Trust.

**2.      THE PARTIES AGREE AND ACKNOWLEDGE THAT UPON THE EXECUTION OF THIS SETTLEMENT AGREEMENT, THIS SETTLEMENT AGREEMENT SHALL BECOME BINDING AND IRREVOCABLE.**

3.      The Parties agree that the 2013 Last Will and Testament and 2017 First Codicil to the Last Will and Testament will be admitted to probate.  The Parties agree that Holli will be appointed as the Independent Executor of the Estate and agree not to object to the same.

4.      All of the Estate's assets, including all associated bank accounts, shall be distributed to Holli, save and expect the following items:

- The following items are going to be distributed to Dakota:

  o   The 2017 F150 Truck
  o   The 2013 Toyota Sequoia
  o   All interest, including all associated bank accounts, in Entertainment Marketing and Management, LP
  o   The coin collection and gold located in the backpack at the Rosenburg Office

- The following items are going to be distributed to Joe:

  o   The 2008 Honda Ridgeline
  o   One-half (1/2) of the Decedent's Tiki Mug Collection

The Parties agree to execute all documents necessary to effectuate the conveyance of all property described above the individual recipients stated in paragraph four (4).

5.      From the Rosenburg office, Holli shall be entitled to obtain:

- The remaining $150,000 in non-earmarked cash located in the backpack;
- Any and all Playboy Magazines

6.      The Parties agree that all personal property belonging to Dakota, Joe, and/or Michelle that is currently located at 10402 W. Hidden Lake Lane, Richmond, Texas 77406 shall be distributed to Dakota, Joe, and/or Michelle as appropriate.  Dakota, Joe and/or Michelle shall

3

be afforded the opportunity, within thirty (30) days of the Effective Date of this Settlement Agreement, to conduct a supervised walkthrough of their personal property located at 10402 W. Hidden Lake Lane, Richmond, Texas 77406. During that time, Dakota, Joe, and/or Michelle will take photographs of their personal property which they would like to obtain. A list and accompanying photographs will be delivered to counsel for Holli of those items within fourteen (14) days of the walkthrough being completed. Holli will have fourteen (14) days to object to the items which Dakota, Joe, and/or Michelle would like to obtain. If the parties cannot reach a resolution regarding the same, Russ Jones will mediate, at an hourly rate, the division of the disputed personal property. Upon the completion and approval of a final list of items, Dakota, Joe, and/or Michelle, at their expense, shall obtain and remove the items on the approved final list of items at a mutually agreeable date and time within fourteen (14) days of the approval of the final list of items.

7. The attorney's fees for Holli, Dakota, Joe, Michelle, and/or Ashley may be paid from the assets of the Holli Ann Hardin Trust Number One in an amount no more than $200,000.00 per side. The Parties will present their fees to Linda Goehrs, in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, for payment. The Parties agree that they will not object to the payment of the fees of any other party.

8. The real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183 shall be distributed to Holli. Dakota, Michelle, and Joe, with Dakota as authorized representative, shall retain a right of first refusal in the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183. If Holli decides to sell or otherwise transfer the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183, Holli shall notify Dakota, Michelle, and Joe in writing and provide an appraisal completed by a certified and licensed real estate appraiser. From the date of receipt of that notice, Dakota, Michelle, and/or Joe shall have 30 days to exercise their right to purchase the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183. If exercised, Dakota, Michelle, and/or Joe shall enter into a real estate contract to purchase the property with a proposed closing date sixty (60) days from the date of receipt of the notice of sale or transfer triggering the right of first refusal. Holli is not required to sell at the appraised value if she receives offers in excess of the appraised value. If Holli receives an offer greater than the appraised value, the right of first refusal will be triggered upon delivery of the great offer to Dakota as authorized representative. The right of refusal will not renew if it is not exercised against the greatest value delivered by Holli.

9. With regard to the further administration of the Holli Ann Hardin Trust Number One:

- The Parties agree that the assets of the Holli Ann Hardin Trust Number One shall be appraised by certified and licensed business or real estate appraisers, as is appropriate for the particular asset. Russ Jones shall select the appraisers to complete the real estate and business appraisals. The costs of the appraisals shall be borne by the Holli Ann Hardin Trust Number One.

4

- The Parties agree that, once the values on the appraisals are obtained for all Holli Ann Hardin Trust Number One assets, Holli's interest will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One in an amount equal to the twenty percent (20%) of the total value of the assets. Such purchase will occur within ninety days (90) of the completion of the valuation of the assets of the Holli Ann Hardin Trust Number One.

- The Parties agree that during the appraisal period described above, Linda Goehrs, in her capacity as Temporary Successor Trustee and/or Dakota, shall execute the necessary documents to install Dakota as an Officer and/or Director of Ice Embassy, Inc., HRF Enterprises, Inc., and Entertainment Marketing and Management, LP.

- The Parties agree that Linda Goehrs shall remain Temporary Successor Trustee of the Holli Ann Hardin Trust Number One until the closing of a sale on Holli's interest in the Holli Ann Hardin Trust Number One. At the time that Holli's interest is purchased, Linda Goehrs will resign as Temporary Successor Trustee, and Dakota, Joe, Michelle, and Ashley shall select a Successor Trustee of the Trust.

- Holli agrees to execute an assignment of interest and disclaimer of further interest in the Holli Ann Hardin Trust Number One at the time that her interest is purchased in accordance with this Settlement Agreement.

- The Parties agree that Dakota and Holli shall remain employees of Entertainment Marketing and Management, LP, and/or the business, or businesses owned by the Holli Ann Hardin Trust Number One. Holli shall be removed from the payroll on the date that her interest is purchased pursuant to this Agreement. The compensation amount that Dakota and Holli have been receiving shall remain unchanged.

- The Parties agree that Dakota and Holli shall remain on the insurance paid for by Entertainment Marketing and Management, LP, and/or the business or businesses owned by the Holli Ann Hardin Trust Number One. Holli shall be removed from the insurance plan on the date that her interest is purchased pursuant to this Agreement.

- To the extent owned by the Trust, Linda Goehrs as Temporary Successor Trustee, shall gift the horses known as Coco and Rusty to Holli.

10. With regard to the further administration of the Dakota Trust:

- The Parties agree that the assets of the Dakota Trust shall be appraised by certified and licensed real estate appraisers. Russ Jones shall select the appraisers to complete the real estate appraisal. The cost of the appraisal shall be borne by the Dakota Trust.

5

- Upon completion of the appraisal, the total value of the assets will be compiled and Holli's interest will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One in an amount equal to eighty-five percent (85%) of the total value of the assets. Such purchase will occur within ninety days (90) of the completion of the valuation of the assets of the Dakota Trust.

- Holli agrees to execute an assignment of interest and disclaimer of further interest in the Dakota Trust at the time that her interest in purchased in accordance with this Settlement Agreement.

11.    Within seven (7) days of the Effective Date of this agreement, Dakota, Joe, Michelle, and/or Ashley agree to dismiss all pending pleas, pleadings, and/or motions, with prejudice regarding the Estate and/or Trust pending in cause number 21-CPR-036521 and cause number 21-DVC-288736, both of which are pending in Fort Bend County, Texas.

12.    Neither the Trust nor any entity owned, held, or possessed by the Holli Ann Hardin Trust Number One, the Dakota Trust, and/or the Estate have any claims against any of the Parties.

13.    The Parties agree to release Linda Goehrs, in her capacity as Temporary Successor Trustee, for making distributions according to this Settlement Agreement which contradict the terms of the Trust Agreement for the Holli Ann Hardin Trust Number One or the Dakota Trust.

## C. RELEASES AND DISCHARGE

1.    **Release of Claims by Dakota.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Dakota, on behalf of himself and all his heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Holli, Joe, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Dakota hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Dakota expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Holli, Joe, Michelle, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Dakota does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

2.    **Release of Claims by Holli.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Holli, on behalf of herself and all her heirs, successors,

6

executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Joe, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Holli hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Holli expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Michelle, Joe, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Holli does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

3.     **Release of Claims by Joe.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Joe, on behalf of himself and all his heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Joe hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Joe expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Michelle, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Joe does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

4.     **Release of Claims by Michelle.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Michelle, on behalf of herself and all her heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Joe, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Michelle hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Michelle expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind

7

known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Joe, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Michelle does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

5. **Release of Claims by Ashley.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Ashley, on behalf of herself and all her heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Joe, Michelle, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Ashley hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Ashley expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Joe, and Michelle. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Ashley does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

## D. REPRESENTATIONS AND WARRANTIES

1. **Representations and Warranties.** Each of the Parties hereto represents and warrants to the other that:

    a.    They are adequately represented by competent counsel in connection with the execution and delivery of this Settlement Agreement and/or had an opportunity to retain counsel in connection with this Settlement Agreement;

    b.    In executing this Settlement Agreement, they relied upon the Party's own judgment and any advice it received from its own attorneys;

    c.    They were not induced to sign or execute this Settlement Agreement by promises, omissions, agreements, or representations not expressly stated in this Settlement Agreement;

    d.    They freely and willingly executed this Settlement Agreement and expressly disclaims reliance upon any facts, promises, statements made or not made, undertakings, or representations made by any person or entity

prior to the Effective Date of this Settlement Agreement except as specifically enumerated herein;

e.  They consent that this Settlement Agreement was not procured, obtained, or induced by improper conduct or undue influence;

f.  After an opportunity to consult with an attorney concerning the matters made subject of this Settlement Agreement, and after reviewing this Settlement Agreement, they agree this Settlement Agreement is fair, reasonable, and supported by good, valuable, and adequate consideration; and

g.  They understand and agree to the terms and conditions of this Settlement Agreement, which contains the entire agreement between the Parties relating to the matters made the subject of this Settlement Agreement.

2.  **Capacity and Authority.** Each of the Parties hereto represents and warrants to the other that the person signing this Settlement Agreement in a representative capacity has the requisite authority and consent to execute this Settlement Agreement on behalf of the Party for whom he or she has executed this Settlement Agreement, and that this Settlement Agreement is binding upon the Party for whom he or she has executed this Settlement Agreement and upon such Party's successors and assigns.

3.  **Assignment of Claims.** Each of the Parties hereto represents and warrants to the other that it has not transferred, assigned, or otherwise conveyed, excepting any interest held by counsel, in whole or in part, its respective interest in the Claims at issue and that it is the owner and holder thereof. Each of the Parties further represents and warrants that, aside from any interest held by counsel, it is the only holder of the Claims being released and that no other person or entity owns, or has any interest in, any of the Claims being released. Despite any interest held by counsel, this Settlement Agreement applies to the entirety of each of the Parties' Claims.

4.  **Cooperation in Execution of Further Documents.** Each of the Parties expressly agrees to execute any other documents reasonably necessary to effectuate the terms, purpose, and intent of this Settlement Agreement.

## E. MISCELLANEOUS PROVISIONS

1.  **Invalidity.** In the event any one or more of the provisions of this Settlement Agreement shall, for any reason, be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Settlement Agreement.

2.  **Entire Agreement.** This Settlement Agreement reflects the final and complete agreement between the parties concerning the matters made subject of this Settlement Agreement and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the Parties. There are no unwritten oral agreements between the Parties. The Parties expressly

9

acknowledge that any rights, duties, or obligations, whether contractual or otherwise, owed by or between the Parties prior to the effective date of this Settlement Agreement are terminated as of the Effective Date of this Settlement Agreement and the only rights, duties, or obligations owed by or between the Parties from this point forward shall be those set forth in this Settlement Agreement.

3. **Governing Law and Venue.** The validity, effect, and construction of this Settlement Agreement shall be governed by the laws of the State of Texas. Venue for any cause of action, controversy, or dispute regarding this Settlement Agreement or the subject matter hereof shall be proper only in the state courts of Fort Bend County, Texas.

4. **Amendment.** This Settlement Agreement may not be amended, modified, waived, or terminated unless such is done in a writing signed by all the Parties.

5. **Construction of Agreement.** This Settlement Agreement shall not be construed in favor of or against any Party on the basis that the Party did or did not author this Settlement Agreement or any attachment related to it. It is intended that this Settlement Agreement shall be comprehensive in nature and shall be construed liberally to affect its purposes.

6. **Titles or Headings.** All titles or headings used in this Settlement Agreement are used only for the convenience of the Parties and shall not be construed to have any effect or meaning with respect to the other content of the Settlement Agreement, such other content being controlling as to the Settlement Agreement of the Parties.

7. **Costs and Attorneys' Fees.** Each party shall bear its own costs and attorneys' fees in relation to the claims and the negotiation and preparation of this Settlement Agreement, subject to the attorney's fees provisions within this Settlement Agreement.

8. **Waiver.** The failure of any of the Parties to enforce, at any time, any provision of this Settlement Agreement shall not be construed to be a waiver of such provision, nor in any way affect the validity of this Settlement Agreement or any part thereof or any right of any Party thereafter to enforce each and every provision. No waiver of any breach of this Settlement Agreement shall be held to constitute a waiver of any other breach.

9. **Binding Agreement.** This Settlement Agreement is binding on the Parties hereto and not subject to revocation, repudiation, or withdrawal of consent, even if one or more of them shall become debtors in a bankruptcy proceeding. This binding effect is an integral part of this Agreement.

10. **Execution of Agreement.** This Settlement Agreement may be executed in a number of identical counterparts, each of which shall be deemed an original for all purposes. A fax signature or a copy of an original signature shall constitute an original signature for purposes of this Settlement Agreement. This Settlement Agreement shall be valid only if fully executed by all Parties and/or their representatives as agreed to herein. If not fully executed by all Parties, this Settlement Agreement shall be null and void and of no effect.

10

11.     **Future Disputes.**  In the event that there are future disputes, disagreements, and/or conflicts regarding the terms and/or implementation of any terms of this Settlement Agreement, the Parties agree to return to Russ Jones for mediation regarding the dispute.  The Parties agree to return to mediation prior to filing any litigation regarding a breach of this settlement agreement or these terms.  If a Party refuses to return to mediation, the remaining parties are permitted to file litigation without returning to mediation. Should further litigation be filed regarding a breach of the agreement, the prevailing party shall be entitled to an award of attorney's fees as determined by a jury or judge.

12.     **Indemnity.**  Each party shall indemnify the other parties for all claims made by, through, or under the indemnifying party.

AGREED TO BY ALL PARTIES AS EVIDENCED BY THEIR SIGNATURE BELOW ON THIS THE 7th DAY OF JANUARY, 2022.

_____
Dakota Fontenot, in all capacities

_____
Holli Ann Fontenot, in all capacities

_____
Dallas Joseph Fontenot, III, in all capacities

_____
Michelle Ann Fontenot, in all capacities

_____
Ashley Fontenot Estrada, in all capacities

_____
Christopher Burt
*Counsel for Dakota Fontenot*

11

11.    **Future Disputes.** In the event that there are future disputes, disagreements, and/or conflicts regarding the terms and/or implementation of any terms of this Settlement Agreement, the Parties agree to return to Russ Jones for mediation regarding the dispute. The Parties agree to return to mediation prior to filing any litigation regarding a breach of this settlement agreement or these terms. If a Party refuses to return to mediation, the remaining parties are permitted to file litigation without returning to mediation. Should further litigation be filed regarding a breach of the agreement, the prevailing party shall be entitled to an award of attorney's fees as determined by a jury or judge.

12.    **Indemnity.** Each party shall indemnify the other parties for all claims made by, through, or under the indemnifying party.

AGREED TO BY ALL PARTIES AS EVIDENCED BY THEIR SIGNATURE BELOW ON THIS THE 7th DAY OF JANUARY, 2022.

_____
Dakota Fontenot, in all capacities

_____
Holli Ann Fontenot, in all capacities

# Dallas Joseph Fontenot III
_____
Dallas Joseph Fontenot, III, in all capacities

# Michelle Ann Fontenot
_____
Michelle Ann Fontenot, in all capacities

# Ashley Fontenot Estrada
_____
Ashley Fontenot Estrada, in all capacities

_____
Christopher Burt
*Counsel for Dakota Fontenot*

11

_____
Steven Mendel
*Counsel for Holli Ann Fontenot*


_____
Kenneth Sumner
*Counsel for Dallas Joseph Fontenot, III,*
*Michelle Ann Fontenot, and Ashley Estrada*

UNOFFICIAL COPY

12

Steven Mendel
*Counsel for Holli Ann Fontenot*

# Kenneth E. Sumner, Jr.

Kenneth Sumner
*Counsel for Dallas Joseph Fontenot, III,*
*Michelle Ann Fontenot, and Ashley Estrada*

**Signature:** *Dallas Joseph Fontenot III*
Dallas Joseph Fontenot III (Jan 7, 2022 19:33 CST)

**Email:** djoef3@hotmail.com

**Signature:** _____
Ashley Fontenot Estrada (Jan 7, 2022 19:38 CST)

**Email:** ashleyafontenot@gmail.com

**Signature:** _____
Michelle Fontenot (Jan 7, 2022 19:36 CST)

**Email:** mannefontenot@gmail.com

**Signature:** *Kenneth E. Sumner, Jr*

**Email:** ksumner@romanosumner.com

12

EXHIBIT

26

exhibitsticker.com

FILED
12/02/2025 9:28:29 AM
Teneshia Hudspeth
County Clerk
Harris County, Texas
nelson.aguilar

CAUSE NO. 537,721

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY AS TRUSTEE OF THE HOLLI ANN HARDIN TRUST NUMBER ONE<br>*Plaintiff*, | §<br>§<br>§<br>§<br>§<br>§<br>§ | IN PROBATE COURT |
| v. | §<br>§<br>§ | NUMBER ONE OF |
| DAKOTA FONTENOT<br>*Defendant*. | §<br>§ | HARRIS COUNTY, TEXAS |

## ORDER GRANTING INTERIM RELIEF

Before the Court is Michelle Fontenot and Dallas Joseph Fontenot III's ("Joe") Amended Application for Relief under Texas Property Code § 114.008. Based on all applicable authority and evidence, the Court GRANTS the Application as set forth herein.

The Court finds that interim relief is warranted to remedy a breach of trust that has occurred or might occur. *See* TEX. PROP. CODE § 114.008. Specifically, the Court finds that under the Trust Declaration and the October 14, 2017 Designation of Successor Trustee for the Dakota Trust, Dakota Fontenot a dispute exists as to whether Dakota has the authority to act as Trustee of the Dakota Trust. The Court further finds that Dakota Fontenot, acting as purported Trustee of the Dakota Trust, has personally distributed and received proceeds from the sale of property belonging to the Dakota Trust to himself personally from the sale of real property previously owned by the Trust, contrary to the interests of the Trust beneficiaries.

It is therefore ORDERED that Dakota Fontenot is hereby ENJOINED AND RESTRAINED from taking any action as purported Trustee of the Dakota Trust without prior approval of the Court. This includes, but is not limited to, making any distributions of Trust assets, entering into any transactions on behalf of the Trust, acting in reliance on any documents executed by himself as purported trustee, and any other powers of the Trustee contemplated by the Trust Declaration. To the extent Dakota believes action needs to be taken with respect to Trust assets,

1

32708344.v2

Dakota is ordered to confer through counsel with Applicants prior to seeking relief before the Court.

It is further ORDERED that Dakota is ENJOINED AND RESTRAINED from taking any further action as purported officer or director of Viva Las Vegas Properties, Inc. pursuant to the May 19, 2023 Purported Unanimous Joint Written Consent of Viva Las Vegas Properties, Inc., without prior approval of the Court. To the extent Dakota believes action needs to be taken with respect to Trust assets, Dakota is ordered to confer through counsel with Applicants prior to seeking relief before the Court.

It is ORDERED that the Court hereby imposes a constructive trust on the sales proceeds received by Dakota Fontenot from the sale of the real property located at 3400 Old Richmond Road, Rosenberg, Texas and any traceable proceeds from this real property in favor of Michelle and Joe. Such constructive trust shall follow the sales proceeds and any permutations of the sales proceeds. Such funds subject to the constructive trust are to be administered and held for the benefit of the Trust beneficiaries.

It is further ORDERED that within 90 days of this Order, Dakota Fontenot shall provide a written, sworn accounting for all trust property and liabilities, including tracing the proceeds from the sale of the real property located at 3400 Old Richmond Road, Rosenberg, Texas to Dakota's personal accounts and transfers of such proceeds to/from personal accounts, including accounts held at Origin/Chase Banks. Dakota is further ordered to provide a complete accounting with proof of payment and corresponding documentation of any and all expenses Dakota contends he paid for the benefit of Dakota Trust assets.

Signed: 11/30/2025
10:43:12 AM

JUDGE JERRY SIMONEAUX

2

32708344.v2

EXHIBIT

27

exhibitsticker.com

FILED
1/15/2026 4:21 PM
Teneshia Hudspeth
County Clerk
Harris County - County Probate Court No. 1
Accepted By: CS

No. 537,721

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY AS | § | IN THE PROBATE COURT |
| TRUSTEE OF THE HOLLI ANN HARDIN | § | |
| TRUST NUMBER ONE | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | NUMBER ONE (1) OF |
| v. | § | |
| | § | |
| | § | |
| DAKOTA FONTENOT, | § | |
| *Defendant.* | § | HARRIS COUNTY, TEXAS |

## MOTION TO WITHDRAW AS ATTORNEY

Jeffrey D. Watters, Jr., John P. "Trey" Avant III, and Andrew McCarty of Gray Reed, counsel of record for Defendant Dakota Fontenot ("Dakota" or "Defendant"), respectfully moves to withdraw as counsel pursuant to Texas Rule of Civil Procedure 10, and would show as follows:

1.     Movants are counsel of record for Defendant Dakota Fontenot in the above-captioned matter.

2.     Good cause exists for withdrawal under Texas Rule of Civil Procedure 10. Continued representation is not feasible, and withdrawal can be accomplished without material adverse effect on Defendant's interests.

3.     Defendant has been provided a copy of this Motion and notified of his right to object, but Defendant has not responded, as of the time of this filing, to specifically indicate as to whether he consents or objects to this Motion.

4.     Defendant's last known contact information is as follows:

    a.   Name: Dakota Fontenot

    b.   Mailing address: 2926 Fontana Drive, Houston, Texas 77043

    c.   Primary email: dakotajamesfontenot@gmail.com

    d.   Telephone number: (713) 419-2966

- 1 -

4928-0093-0695.2

5.    In accordance with Texas Rule of Civil Procedure 10, Movant has provided written notice to Defendant of counsel's intent to withdraw, advised Defendant of the right to obtain substitute counsel, and warned that failure to do so could result in adverse consequences.

6.    To Movant's knowledge, and based on the court's docket as of the date of filing, there are no hearings presently set in this matter. No trial setting has been entered. No discovery is pending.  The only deadline is January 30th, 2026, for the accounting ordered by the Court on November 30, 2025.  Defendant has been advised that he remains responsible for complying with all existing and future deadlines and court orders and for keeping the Court and all parties informed of current contact information.

7.    A copy of this Motion is being served on Defendant at the email listed above, and on all counsel and parties of record through the Court's electronic filing system.

8.    Movant respectfully requests that the Court grant this Motion, permit the withdrawal of Jeffrey D. Watters, Jr, John Paul "Trey" Avant III, Andrew McCarty and the law firm of Gray Reed as counsel of record for Defendant, and direct that all future notices, pleadings, and communications be served on Defendant's remaining counsel, Paul S. Beik, unless and until substitute counsel appears. Movant further requests that this Motion be decided without oral hearing in light of the absence of any current settings, or alternatively that the Court set the Motion for submission at its convenience.

9.    This motion is not filed for the purpose of seeking delay.

WHEREFORE, Jeffrey D. Watters, Jr., John Paul "Trey" Avant III of Gray Reed respectfully requests that this Court enter an Order permitting them to withdraw from this case as counsel for Defendant, and that the Court grant such other and further relief as may be just and equitable.

4928-0093-0695.2

Respectfully submitted,

*/s/ Trey Avant*
JEFFREY D. WATTERS, JR.
Texas State Bar Number: 2406695
jwatters@grayreed.com
JOHN P. ("TREY") AVANT III
Texas State Bar Number: 24101471
tavant@grayreed.com
ANDREW B. MCCARTY
Texas State Bar Number: 24126139
amccarty@grayreed.com
GRAY REED & McGRAW LLP
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000

**ATTORNEYS FOR DEFENDANT,
DAKOTA FONTENOT**

## CERTIFICATE OF SERVICE AND CONFERENCE

I hereby certify that a true and correct copy of the foregoing instrument was duly furnished to all counsel of record electronically through the electronic filing manager (www.efiletexas.gov) on this 15th day of January, 2026.

Additionally, I hereby certify that this Motion was provided to Defendant Dakota Fontenot on January 12, 2026, via e-mail. As of the time of this filing, Defendant has not indicated whether or not he objects to this Motion.

*/s/ Trey Avant*
JOHN P. ("TREY") AVANT III

- 3 -

4928-0093-0695.2

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Debbie Gurley on behalf of Trey Avant
Bar No. 24101471
dgurley@grayreed.com
Envelope ID: 110113001
Filing Code Description: Application to Withdraw as Attorney of Record
Filing Description:
Status as of 1/15/2026 4:36 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Paul Beik | 24054444 | paul@beiklaw.com | 1/15/2026 4:21:50 PM | SENT |
| James Ardoin | 24045420 | jimmy@jimmyardoinlaw.com | 1/15/2026 4:21:50 PM | SENT |
| John P. TreyAvant | | tavant@grayreed.com | 1/15/2026 4:21:50 PM | SENT |
| Debbie Gurley | | dgurley@grayreed.com | 1/15/2026 4:21:50 PM | SENT |
| Andrew McCarty | | amccarty@grayreed.com | 1/15/2026 4:21:50 PM | SENT |
| Kayla Brake | | kayla@texasprobateattorney.com | 1/15/2026 4:21:50 PM | SENT |
| Texas Probate Attorney, PLLC | | efile@texasprobateattorney.com | 1/15/2026 4:21:50 PM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 1/15/2026 4:21:50 PM | SENT |
| Jeffrey D.Watters | | jwatters@grayreed.com | 1/15/2026 4:21:50 PM | SENT |
| Ryan Cantrell | | ryan.cantrell@chamberlainlaw.com | 1/15/2026 4:21:50 PM | SENT |
| Mariah Karigan | | mariah.karigan@chamberlainlaw.com | 1/15/2026 4:21:50 PM | SENT |
| Marcie Cardenas | | mcardenas@grayreed.com | 1/15/2026 4:21:50 PM | SENT |
| Rudy Culp | | rudy@texasprobateattorney.com | 1/15/2026 4:21:50 PM | SENT |
| Bailey Bowe | | bailey@texasprobateattorney.com | 1/15/2026 4:21:50 PM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 1/15/2026 4:21:50 PM | SENT |

UNOFFICIAL COPY

EXHIBIT

28

exhibitsticker.com

FILED
1/16/2026 10:26 AM
Teneshia Hudspeth
County Clerk
Harris County - County Probate Court No. 1
Accepted By: SC



## CAUSE NO. 537721

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY AS TRUSTEE OF THE HOLLI ANN HARDIN TRUST NUMBER ONE<br>*Plaintiff*, | § § § § § § § § § § § | IN THE PROBATE COURT<br><br>NUMBER ONE (1) |
| v.<br><br>DAKOTA FONTENOT<br>*Defendant*. | | <br><br>HARRIS COUNTY, TEXAS |

### PLAINTIFF'S FIRST AMENDED PETITION AND APPLICATION FOR ADDITIONAL TEMPORARY AND PERMANENT INJUNCTIVE RELIEF

Post
1/20/26
CD

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff LINDA GOEHRS ("Plaintiff"), in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, and files this her First Amended Petition and Application for Additional Temporary and Permanent Injunctive Relief against Defendant DAKOTA FONTENOT ("Defendant"), and in support thereof would respectfully show unto the Court the following:

## I.
## DISCOVERY CONTROL PLAN

1.    Plaintiff intends to conduct discovery under Level 3 of Rule 190.4 of the Texas Rules of Civil Procedure.

## II.
## CLAIM FOR RELIEF

2.    Pursuant to Rule 47 of the Texas Rules of Civil Procedure, Plaintiff seeks monetary relief of more than $1,000,000.00 and non-monetary relief.

First Amended Petition: Goehrs-Fontenot

## III.
## PARTIES

3.      Plaintiff LINDA GOEHRS ("Plaintiff") is an individual residing in Harris County, Texas and currently serving as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One (the "Hardin Trust"). Plaintiff may be served through the undersigned attorneys of record.

4.      Defendant DAKOTA FONTENOT ("Defendant") has appeared through counsel in the matter before the Court and may be served through his attorneys of record, Jeffrey D. Watters, Jr., John P. Avant III, James Madison Ardoin III, and Paul S. Beik.

5.      Intervenor MICHELLE FONTENOT ("Michelle") has appeared through counsel in the matter before the Court and may be served through her attorneys of record, Ryan O. Cantrell and Mariah J. Karigan.

6.      Intervenor DALLAS JOSEPH FONTENOT III ("Joe") has appeared through counsel in the matter before the Court and may be served through her attorneys of record, Ryan O. Cantrell and Mariah J. Karigan.

7.      Intervenor MADISON E. FONTENOT ("Madison"), as next friend of minor children S.F. and W.F., has appeared through counsel in the matter before the Court and may be served through her attorney of record, Paul S. Beik.

## IV.
## JURISDICTION AND VENUE

8.      Personal jurisdiction exists over Defendant because Defendant is an individual domiciled in Harris County, Texas, and this lawsuit arises from actions within the State of Texas.

9.      This Court has subject matter jurisdiction over the lawsuit because the amount in controversy exceeds the Court's minimum jurisdictional requirements. This Court further has

First Amended Petition: Goehrs-Fontenot

subject matter jurisdiction pursuant to Texas Estates Code § 32.006 because it is an action by or against a trustee and an action involving an inter vivos trust.

10.    Venue is proper in Harris County, Texas pursuant to Texas Property Code § 115.001 because Defendant, the purported Trustee of the Dakota Trust, is an individual resident of Harris County and upon information and belief, the situs of the administration of the Dakota Trust is in Harris County. Venue is further proper in Harris County, Texas pursuant to Texas Civil Practice & Remedies Code § 15.002 because Harris County is the county in which all or a substantial portion of the events giving rise to Plaintiff's claims occurred.

## V.
## FACTS

11.    The Hardin Trust was created on or about June 5, 1991, by Holli Ann Hardin Fontenot ("Holli"). *See* **Exhibit "A"**, *Trust Agreement*. At the time, Holli was married to Dallas Joseph Fontenot, Jr. ("Dallas"). Defendant is the child of Holli and Dallas.

12.    Dallas had two children from a previous marriage, Joe and Michelle. Defendant, Holli, Joe, and Michelle were each initial beneficiaries of the Hardin Trust. During his lifetime, Dallas owned numerous properties and businesses centered around the Colorado Bar & Grill (the "Colorado Club"), a gentleman's club located in Houston, Texas. Dallas accumulated millions of dollars of assets which at the time of his death were spread between his estate, the Hardin Trust, and a separate trust known as the Dakota Trust, which was created on November 9, 1994, by Holli as settlor. *See* **Exhibit "B"**, *Dakota Trust Agreement*.

13.    Dallas died on September 3, 2021, and his estate was probated in Fort Bend County Court at Law Number Four (4) under Cause No. 21-CPR-036521. Litigation pertaining to Dallas's estate and the two above-mentioned trusts (collectively the "Trusts") was resolved through a

First Amended Petition: Goehrs-Fontenot

settlement agreement dated January 7, 2022 (the "Settlement Agreement"). *See* **Exhibit "C"**, *Binding Mediated Settlement Agreement.*

14.     As part of the Settlement Agreement, the parties ultimately agreed that Holli would be bought out as a beneficiary of the Trusts, with certain assets to be paid to Holli in consideration of her disclaimer of further interest in the Trusts. Specifically, the Settlement Agreement dictated that Holli's interest in both Trusts "will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One." *Id.* at p. 5–6. Subsequently, Defendant, acting as President of HFR Enterprises, Inc. entered into a 2.8 million dollar loan agreement, in part to provide the necessary consideration for Holli's interest in both Trusts. *See* **Exhibit "D"**, *Amended and Restated Promissory Note.* The Hardin Trust then paid Holli $2,823,464 for her interest in both Trusts, representing 85% of the total value of the Dakota Trust assets and 20% of the total value of the Hardin Trust assets. *See* **Exhibit "E"**, *Assignment of Interest and Disclaimer of Further Interest.*

*Running of the Colorado Club Entities.*

15.     As agreed upon by Defendant, Joe and Michelle, following the entry of the Settlement Agreement, Defendant took over and began to manage/run all of the entities held by the Trust. Additionally, as part of the Settlement Agreement, Defendant also was given full ownership of Entertainment Marketing & Management, LTD ("EMM").

16.     Following the execution of the Settlement Agreement, Defendant was named the President and sole Director of HFR Enterprises, Inc., ICE Embassy Inc., and the Colorado Bar & Grill, Corporation.

17.     On or before May 19, 2023, Defendant was appointed as sole Director, as well as President and Secretary for the Colorado Bar & Grill Corporation, a corporation which is wholly

First Amended Petition: Goehrs-Fontenot

owned by the Hardin Trust. **Exhibit "F".** On or before May 19, 2023, Defendant was appointed as sole Director, as well as President and Secretary for HFR Enterprises Inc, a corporation which is wholly owned by the Hardin Trust. **Exhibit "G".** On or before May 19, 2023, Defendant was appointed as sole Director, as well as President and Secretary for ICE Embassy, Inc, a corporation which is wholly owned by the Hardin Trust. **Exhibit "H".** Defendant served in these positions (as well as sole shareholder/officer/director of EMM) until the sale of the Colorado Bar & Grill, Corporation.

18.     After taking over full management of the entities (following the longtime manager Frank Kent retiring), Defendant caused waste to assets held in the Hardin Trust and engaged in extensive self-dealing. Defendant mismanaged the Colorado Club for personal benefit to the detriment of the Hardin Trust, including, but not limited to, the following:

a.    Hiring his wife, who had little to no experience, to manage the Colorado Club;

b.    Paying his personal credit cards out of the company;

c.    Taking vacations and claiming them as a business expense;

d.    Paying personal expenses from the company;

e.    Making unnecessary and unreasonable improvements, many of which were never completed;

f.    Firing multiple consultants and paying them hundreds of thousands of dollars with no apparent benefits provided;

g.    Changing the system of the Colorado Club to have less oversight and allowing money to be taken or taking money from the club;

UNOFFICIAL COPY

Page **5** of **21**

First Amended Petition: Goehrs-Fontenot

h. Taking a loan from his wife's stepfather for $150,000 and within a month repaying the loan with $50,000 in interest, which was wired directly to an offshore account

i. Obligating the entities held by the Hardin Trust to enter into an unnecessary Management Agreements and Administrative Agreements with an entity he owns, on top of taking a salary from the club; and

j. Using funds earmarked for repayment of the loan used to buy Holli's interest for his own personal benefit, allowing the company to default on the loan for months and causing a fire sale of the land and stock.

19. Defendant entered the Management Agreement between Ice Embassy, Inc. d/b/a the Colorado Bar & Grill, as President of both entities. **Exhibit "I".** Defendant used this Management Agreement to take sums that violated the terms of the Settlement Agreement.

**The Sale of the Entities**

20. Defendant notified the Trustee of the necessity to find a buyer for the entities because if they did not sell, they would be foreclosed upon and lose everything. The Trustee would come to find out that Defendant was months behind on the loan payments, as well as failing to pay other necessary business expenses. His actions and/or inactions put the entities in a position that it appeared that a quick sale would be necessitated to avoid foreclosure.

21. In his work to sell the Entities, Defendant, without notice to Trustee, entered into two consulting agreements (each for $100,000 to be paid at the sale of the Entities) to assist him in the sale of HFR and Ice's Stock, the real property and improvements HFR owns located at 6710 Southwest Freeway, and/or assets of the foregoing through one or more purchase agreements. Defendant, as President for both ICE and HFR, entered into consulting agreements with Gray

First Amended Petition: Goehrs-Fontenot

Entertainment Inc., **(Exhibit "J")** and Tim Wilson **(Exhibit "K").** There was no mention of EMM in any of these consulting agreements.

22.     HFR was sold to CLE Group SKZ Real Estate, LLC, a company that was formed on June 9, 2025, and managed by JZT Investments, LLC and Nightlife Investments II, LLC. [1] The Purchase and Sale Agreement was signed by Trustee and Zack Truesdell, as President of CLE Group SKZ Real Estate, LLC.

23.     ICE was purchased by Colorado Rose, LLC, a company that was formed in April of 2025, managed by Salim Dehkordi. The ICE Stock Purchase Agreement ("Stock Purchase Agreement") was signed by Trustee, Defendant, in his individual capacity and as director and president of ICE and Justin Truesdell, as Manager of Colorado Rose, LLC. **Exhibit "L".**

24.     Although undisclosed until recently, a few months after the sale of the other entities in June of 2025, EMM was purchased by Colorado Rose, LLC, the same company that purchased ICE.  This Partnership Interest Purchase Agreement ("Partnership Interest Purchase Agreement") was executed by Defendant, individually, as sole member of BFD GP, LLC, BFD LP, LLC, and as BFD GP, LLC, as sole member of general partner, and Justin Truesdell, as Manager for Colorado Rose, LLC. **Exhibit "M".**

25.     Because of information provided to Plaintiff related to the running of the entities by the Defendant, Plaintiff was forced to file suit on August 21, 2025. On September 25, 2025, a Temporary Injunction was entered against Defendant enjoining him from the sale of the real property located at 3414 Old Richmond Road, Rosenberg, Texas 77471, owned by Viva Las Vegas Properties, Inc. *See* **Exhibit "N",** *Temporary Injunction.* With discovery currently ongoing, more wrongful actions of Defendant have been uncovered since the inception of this suit.

---

[1] In its articles of Incorporation, this entity also included JZT Investment II, LLC, as a manager, but it was removed within 30 days of its formation.

First Amended Petition: Goehrs-Fontenot

26.    Specifically, on October 24, 2025, at the hearing on Defendant's Motion to Compel Mediation, over the objection of counsel for Defendant, Defendant admitted to receiving $2,750,000 for the sale of Entertainment Marketing & Management, Ltd. ("EMM"). This occurred when the entities and assets comprising the Colorado Club netted approximately $1,300,000 with Defendant urging such sale on the false premise that it was necessary to mitigate a failing financial situation.    Defendant failed to disclose the fact that he was simultaneously selling EMM to the same buyer (or related entity) and although, upon information and belief, EMM had little to no value, Defendant secured a purchase price that netted him more than twice what was received by the Trust.

27.    As of December 31, 2024, EMM's only asset was a bank account with approximately $50,000. Upon information and belief, at the time of its sale in July of 2025, EMM was insolvent, had no contractual rights to future income, and that any purchase price allocation to this entity would lack economic foundation. EMM was a management company for the Colorado Club with no ownership over assets aside from such bank account, making the purchase of EMM for $2,750,000 to be without justification. Defendant appears to have orchestrated an allocation of the Colorado Club's sale proceeds that was grossly disproportionate, diverting substantial funds from the trusts to an entity under his exclusive control. This maneuver effectively stripped the Hardin Trust of millions in value. While the Hardin Trust was intended to benefit Defendant and his two siblings, the structure of the EMM sale ensured that Defendant alone reaped the financial advantage.

28.    For these reasons, Plaintiff is left with no alternative but to assert additional claims against Defendant and seek further injunctive relief to prevent ongoing harm in the interim.

First Amended Petition: Goehrs-Fontenot

UNOFFICIAL COPY

**The Dakota Trust**

29.    Defendant purports to be the Trustee of the Dakota Trust. However, upon information and belief, Defendant was not validly appointed as Trustee of the Dakota Trust. Defendant is not a named successor trustee in the Dakota Trust Agreement. *See* **Exhibit "B"**. On May 1, 2013, Decedent, as Trustee of the Dakota Trust, designated Defendant as a successor Trustee, but he later revoked this designation on October 14, 2017. *See* **Exhibit "O"**, *5/1/13 Designation of Successor Trustee*; *See* **Exhibit "P"**, *10/14/17 Designation of Successor Trustee.* Decedent similarly removed Defendant from all officer and director positions for any entities owned by the Dakota Trust, including Viva Las Vegas Properties, Inc. on the same day. *See* **Exhibit "Q"**, *Viva Las Vegas Resolution.* After Decedent's death, however, without the authority to do so, Defendant started acting as Trustee of the Dakota Trust and officer and director of Viva Las Vegas Properties, Inc. As purported Trustee of the Dakota Trust, Defendant has not repaid the Hardin Trust for any of the Hardin Trust assets used to buy out Holli's interest in the Dakota Trust.

30.    It has also been discovered that Defendant is not the only beneficiary of the Dakota Trust and that his two siblings, Joe and Michele, are equal beneficiaries of this Trust. **Exhibit "B".** As such, the necessity to have the Hardin Trust to reimburse the Trust for prior transactions is less important because the beneficiaries of the trusts are similar. That said, Defendant has sold assets and withdrawn large sums of money from the Dakota Trust without making any distributions to Joe and Michele.

## VI.
## ARGUMENT AND AUTHORITIES

A.    DECLARATORY JUDGMENT

31.    A person interested in or through a trustee or other fiduciary in the administration of a trust may have a declaration of rights or legal relations in respect to the trust to determine any

question arising in the administration of the trust. TEX. CIV. PRAC. & REM. CODE § 37.005. The two prerequisites for a declaratory judgment action are: (1) there must be a real controversy between the parties and (2) the controversy must be one that will actually be determined by the judicial declaration sought. *Houston Chronicle Publ'g Co. v. Thomas*, 196 S.W.3d 396, 401 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

32.     The matter at issue involves two trusts and the mismanagement of entities and assets associated with the trusts by Defendant. A declaration determining the rights of the parties will straightforwardly determine the controversy between Plaintiff and Defendant. Accordingly, Plaintiff's request for declaratory judgment is appropriate.

33.     Holli was a beneficiary of the two trusts at issue before being bought out pursuant to the Settlement Agreement. Plaintiff, Joe, and Michelle never agreed and the Settlement Agreement did not dictate that Defendant would benefit as if he were the sole beneficiary of the Dakota Trust while the Hardin Trust covers all costs pertaining to Holli's buyout without receiving adequate consideration from the Dakota Trust. As of the date of this filing, Dakota has failed or otherwise declined to reimburse the Hardin Trust for amounts paid to Holli for the buyout, wrongfully depriving the Hardin Trust and resulting in an ultimately illicit benefit received by Defendant.

34.     Accordingly, there exists a controversy between Plaintiff and Defendant pertaining to the stipulations of the Settlement Agreement and Defendant's failure to abide thereby. Such controversy can by resolved through a declaration by the Court ordering that Defendant repay to the Hardin Trust the amounts received by Holli under the Settlement Agreement.

35.     Despite no authority to do so, Defendant has wrongfully acted when convenient for his self-dealing as the trustee of the Dakota Trust and/or officer/director of the entities comprising

First Amended Petition: Goehrs-Fontenot

the Colorado Club in which Plaintiff holds an interest. Plaintiff is resultingly entitled to a declaration from the Court stipulating that, pursuant to the Settlement Agreement, Defendant is liable to Plaintiff for 50% of the amounts received by Holli under the Settlement Agreement buyout and that Defendant is not trustee of the Dakota Trust or an officer/director of any entity within the Colorado Club in which Plaintiff holds an interest.

B.     BREACH OF FIDUCIARY DUTY

36.     To prevail on a breach of fiduciary duty claim, a plaintiff must prove that (1) there is a fiduciary relationship between the plaintiff and defendant, (2) the defendant breached their fiduciary duty to the plaintiff, and (3) the breach resulted in an injury to the plaintiff or benefit to the defendant. *Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). The existence of a fiduciary duty is dependent upon the facts of a specific case, and may arise where one person trusts in and relies on another. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 176–77 (Tex. 1997). The breach here arise before and at the moment of consent, not merely as a downstream corporate harm.

37.     In 2022, Defendant assumed management and control of the Colorado Club, which is comprised of numerous entities held in the Hardin Trust, all of which Defendant served as an officer and director. By controlling the multi-million-dollar business responsible for the value and funding of the Hardin Trust, Defendant assumed a position carrying fiduciary duties toward Plaintiff as Trustee of the Hardin Trust. Defendant further acted as trustee of the Dakota Trust throughout this period without the lawful authority to do so. By his own actions, Defendant assumed formal and/or informal fiduciary duties toward both trusts and their beneficiaries.

38.     Despite this, Defendant blatantly disregarded his responsibilities and duties toward the Hardin Trust as beneficial owner of the Colorado Club. Defendant fraudulently diverted

UNOFFICIAL COPY

First Amended Petition: Goehrs-Fontenot

hundreds of thousands of dollars from the operations of the Colorado Club, causing the operation to substantially decline in value. Because of this, Defendant has wrongfully benefitted to the detriment of the Hardin Trust.

39.    Upon Defendant's insistence, the Colorado Club was sold, with the Hardin Trust receiving $1,300,000, though it has since been discovered that $2,750,000 of the total purchase price was instead allocated to EMM, which held no assets and was fully controlled by Defendant. As a result, Defendant again benefitted to the detriment of the Hardin Trust, and Plaintiff is entitled to recover against Defendant upon her breach of fiduciary duty claim.

C.    NEGLIGENT MISREPRESENTATION

40.    Defendant, as officer and director, provided false and/or misinformation and/or half-truths to Plaintiff about the sales transaction involving the Colorado Club and EMM. Defendant made a representation to the Plaintiff in the course of the Defendant's business, profession, or employment, or in a transaction in which the Defendant had a pecuniary interest; the Defendant supplied false information for the guidance of Plaintiff in their business transactions; the Defendant failed to exercise reasonable care or competence in obtaining or communicating the information; Plaintiff justifiably relied on the representation; and Defendant's negligent misrepresentation proximately caused the Plaintiff to suffer pecuniary loss or injury.

D.    FRAUDULENT INDUCEMENT

41.    A fraudulent inducement claim is similar to common law fraud and arises only in the context of a contract. *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018); *Int'l Bus. Machs. Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 228 (Tex. 2019). Such a claim requires proof that: (1) the defendant made a material misrepresentation; (2) the defendant knew at the time that the representation was false or lacked knowledge of its truth; (3) the defendant intended that the

First Amended Petition: Goehrs-Fontenot

plaintiff should rely or act on the misrepresentation; (4) the plaintiff relied on the misrepresentation; and (5) the plaintiff's reliance on the misrepresentation caused injury. *Id.*

42.     In the matter at issue, Defendant represented to Plaintiff that the Colorado Club was insolvent and sale was the only option to remediate the situation. This came at a time when Defendant had wrongfully assumed a position of authority within the Colorado Club and extensively defrauded the Hardin Trust of assets to which it was entitled. Upon information provided by Defendant, the Colorado Club was sold and resulted in a net receipt of $1,300,000 by the Hardin Trust. Defendant purposefully declined to disclose that $2,750,000 was paid to EMM, an entity of relatively nominal actual value under Defendant's control, for the sale.

43.     As a result of Defendant's intent to defraud and Plaintiff's reliance on Defendant's misrepresentation, Plaintiff was damaged and Defendant impermissibly benefitted. Plaintiff is resultingly entitled to recovery against Defendant upon her fraudulent inducement cause of action.

E.     FRAUD BY NONDISCLOSURE

44.     The elements of fraud by non-disclosure are: (1) a party fails to disclose a material fact within the knowledge of that party, (2) the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth, (3) the party intends to induce the other party to take some action by failing to disclose that fact, and (4) the other party suffers injury as a result of acting without knowledge of the undisclosed fact.

45.     In the matter at issue, Defendant failed to disclose to Plaintiff that he was selling EMM, an entity that appears to have no value, to the same buyer for $2,750,000, funds that, upon information and belief, should have been paid to the Trust. Defendant, as an officer and director, handled all of the transactions in question, including the sale of the Colorado Club for $1,300,000 by the Hardin Trust. Defendant purposefully declined to disclose that $2,750,000 was paid to

First Amended Petition: Goehrs-Fontenot

EMM, an entity of relatively nominal actual value under Defendant's control and full ownership, for the sale. Trustee would not have approved or would have renegotiated the sale had the EMM allocation been disclosed.

46.    Plaintiff was induced to enter the transaction by Defendant as a result of Defendant's nondisclosure and Plaintiff was damaged and Defendant impermissibly benefitted. Plaintiff is resultingly entitled to recovery against Defendant upon her fraud by non-disclosure cause of action.

## F.    TEXAS THEFT LIABILITY ACT (TTLA)

47.    "A person who commits theft is liable for the damages resulting from the theft." TEX. CIV. PRAC. & REM. CODE § 134.003(a). Theft is defined as unlawfully appropriating property or unlawfully obtaining services in violation of the Texas Penal Code. *Coe v. DNOW LP*, 718 S.W.3d 338, 363–64 (Tex. App.—Houston [14th Dist.] 2025, pet. filed Oct. 10, 2025).

48.    As detailed above, in the years following Dallas's death while wrongfully acting in numerous capacities relating to the Colorado Club, Defendant purposefully misdirected assets away from the Colorado Club and the trusts to himself or entities within his control. Defendant's theft violates the Texas Penal Code and has caused damages to Plaintiff, and Plaintiff is accordingly entitled to judgment against Defendant pursuant to the TTLA.  Defendant knew he had no lawful entitlement to EMM consideration attributable to the Colorado club entities value.

## G.    UNJUST ENRICHMENT

49.    In certain circumstances where a party profits from the inequities borne by another, a cause of action for unjust enrichment is appropriate. *HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 891 (Tex. 1998). Unjust enrichment occurs when a person has wrongfully secured a benefit which

First Amended Petition: Goehrs-Fontenot

it would be unconscionable to retain. *Eun Bok Lee v. Ho Change Lee*, 411 S.W.3d 95, 111 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

50.     Despite no authority, on numerous occasions, Defendant has received an unwarranted benefit to the detriment of Plaintiff, the trusts, and the entities comprising the Colorado Club. Defendant utilized the Colorado Club as a means of funding his lifestyle, misallocating funds away from Plaintiff for his personal benefit. This includes the recent revelation of $2,750,000 being paid to a valueless entity under Defendant's control for the sale of the Colorado Club, as admitted to by Defendant in open court.

51.     For these reasons, despite the Trusts existing to continue the business built by Dallas for the benefit of his family, Defendant has robbed the Hardin Trusts of substantial assets which should have fulfilled such purpose. Defendant has caused himself to be unjustly enriched while the Hardin Trust has suffered, entitling Plaintiff to recovery on her unjust enrichment claim against Defendant.

H.     MONEY HAD AND RECEIVED

52.     Defendant is liable for money had and received as the Defendant: (1) received money, and (2) that in equity and good conscience, the money belongs to the Plaintiff as Trustee. Money had and received is not premised on wrongdoing but looks to the justice of the case and inquires whether the defendant has received money which rightfully belongs to another. The money received form the sale of EMM belongs to the Plaintiff as Trustee as EMM had little to no value.

## VII.
## DAMAGES

53.     As a result of Defendant's actions, Plaintiff has been damaged in an amount far in excess of the minimum jurisdictional limits of the Court. With discovery ongoing, the full extent

First Amended Petition: Goehrs-Fontenot

of Plaintiff's damages are not currently known, and the full extent may be difficult to calculate. However, Plaintiff's damages currently include $2,750,000 wrongfully received by Defendant for the sale of the Colorado Club and extensive amounts directed from Defendant away from the Colorado Club under his direction and authority.

54.     Additionally, Defendant's fraudulent and malicious actions were taken with the purposeful intent to cause substantial injury or harm to Plaintiff. TEX. CIV. PRAC. & REM. CODE § 41.007(7). Because of this, Plaintiff is entitled to an award of exemplary damages against Defendant. TEX. CIV. PRAC. & REM. CODE § 41.003.

55.     Plaintiff also seeks equitable fee forfeiture and disgorgement of all applicable fees received by Defendant and/or his representatives.

## VIII.
## APPLICATION FOR INJUNCTIVE RELIEF

56.     Based on the foregoing, there is a substantial likelihood that Plaintiff will prevail on the merits of the claims against Defendant. *See Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993). The matters at issue are extensively documented through financial records in Plaintiff's possession and those yet to be discovered.

57.     In addition, Plaintiff has no adequate remedy at law for Defendant's wrongful actions causing unknown damages unlikely to be fully traceable. *See Sharma v. Vinman Int'l, Ltd.*, 231 S.W.3d 405, 426–27 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Specifically, Defendant has established and demonstrated a propensity to hide money through illicit transactions, utilizing shell companies and directing money in a way that will be difficult to trace. Even though he received over one million from his sale of EMM, he stated that he did not have access to funds that would be necessary to refund the sale of another property for $300,000. As the damages complained of herein total in the millions, it is highly likely that Defendant will face insolvency

First Amended Petition: Goehrs-Fontenot

or become judgment proof upon an award of the damages incurred by Plaintiff. *Axis Energy Mktg., LLC v. Apricus Enters., LLC*, No. 01-23-00660-CV, 2025 WL 2470572 at *8 (Tex. App.—Houston [1st Dist.] Aug. 28, 2025, no pet. h.). Plaintiff has suffered and will continue to suffer irreparable harm from Defendant's conduct. Even if Defendant was able to respond in payment of money damages, which he most likely is not able or willing to do, Plaintiff has been irreparably harmed with years of lost profits through management of the Colorado Club which would have continued through the present and into the future and cannot be easily calculated.

58.    The harm to Plaintiff is ongoing and further harm is imminent, and if the Court does not issue injunctive relief, Plaintiff will be irreparably injured. Failure to enjoin Defendant is extremely likely to lead to further depletion of property belonging to the Hardin Trust which Defendant has methodically withheld through fraudulent means. This includes the active threat of Defendant leaving the country, depriving Plaintiff of the possibility of recovery.

59.    Plaintiff has no adequate remedy at law because Defendant has absconded with funds that are very unlikely to be fully traceable. Defendant has additionally liquidated and misappropriated assets belonging to the Hardin Trust which are unlikely to ever be found. Further, the possibility to manage and profit from the Colorado Club has been taken from Plaintiff as a result of Defendant's wrongful actions, to which no value can be assuredly attributed.

60.    Greater injury will be inflicted upon Plaintiff by the denial of the requested injunctive relief than would be inflicted upon Defendant by granting such relief. Granting the injunctive relief herein would simply preserve the status quo by requiring Defendant to abide by his legal obligations and cease his purposeful harming of Plaintiff.

61.    The issuance of injunctive relief will not disserve the public interest. Balancing the equities and other factors, the significant potential of irreparable harm to Plaintiff without the

First Amended Petition: Goehrs-Fontenot

injunctive relief and the lack of harm due to the entry of injunctive relief demonstrate that the requested relief will not disserve the public interest.

62.     In order to preserve the status quo during the pendency of this action, Plaintiff seeks a Temporary Restraining Order and Temporary Injunction against Defendant. Plaintiff requests a Temporary Restraining Order that Defendant, his agents, and other persons or entities in active concert or participation who receive actual notice of the Court's Order, by personal service or otherwise, be enjoined as follows:

    a. Defendant is restrained from access, using, moving and/or touching any of the funds that were received from the sale of EMM;

    b. Defendant is restrained from destroying any and all documents, records, or other information pertaining to the Colorado Club, EMM, ICE, HFR, the Holli Ann Hardin Trust Number One, Dakota Trust, or other records and assets received from Dallas Joseph Fontenot, Jr. or his estate. This includes, but shall not be limited to, all financial records, business records, information from banking or other financial institutions, and information pertaining to Defendant's personal bank accounts and other financial institutions accounts;

    c. All accounts in Defendant's care, custody, or control pertaining to or otherwise holding assets received from the sale of EMM; and

63.     Plaintiff further seeks a temporary injunction and, upon final hearing or trial hereof, a permanent injunction for the relief requested above.

64.     Plaintiff is willing to post the necessary reasonable bond to facilitate the injunctive relief requested.

## IX.
## REQUEST FOR APPOINTMENT OF SUCCESSOR TRUSTEE

65.     As detailed above, despite Defendant's wrongful actions under the guise of the capacity of trustee, there currently exists no trustee of the Dakota Trust. The trust agreement of the Dakota Trust dictates that First Interstate Bank of Texas, N.A. shall serve as successor trustee following Dallas, who is deceased, and Holli, who no longer holds any interest in the Dakota Trust.

First Amended Petition: Goehrs-Fontenot

UNOFFICIAL COPY

*See* **Exhibit "B"**, *Dakota Trust Agreement*, at p. 5–7. First Interstate Bank of Texas, N.A. has not accepted appointment or otherwise acted as successor trustee in the more than four years since Dallas's death.

66.     Pursuant to Texas Property Code § 113.083(a), upon the vacancy of the position of trustee or failure to select a party for such role and upon petition of an interested party, a court may appoint a successor trustee. Because of the current lack of a trustee of the Dakota Trust, coupled with the extensive fraudulent actions of Defendant, Plaintiff requests that the Court appoint a neutral third-party as successor trustee of the Dakota Trust.

## X.
## JUDICIAL DISCHARGE

67.     Defendant has taken the position that Trustee's temporary administration of the Trust has or should have terminated. If the Court determines that Trustee's temporary administration has or should be terminated, then Plaintiff seeks to resign and to obtain a judicial discharge by this Court for the actions taken as Trustee of the Trust in accordance with the Texas Trust Code.

## XI.
## CONSTRUCTIVE TRUST

68.     Plaintiff seeks to have this Court place a constructive Trust on all funds received from the purported sale of EMM.  Plaintiff will prove that there was: (1) breach of a special trust, fiduciary relationship, or actual fraud; (2) unjust enrichment of the wrongdoer; and (3) tracing to an identifiable res. Defendant breached his fiduciary duty to Plaintiff and committed fraud, he was unjustly enriched from this breach and/or fraud and the funds are those directly traceable to the purported sale of EMM, an entity with little to no value.

First Amended Petition: Goehrs-Fontenot

## XII.
## CONDITIONS PRECEDENT

69.     All conditions precedent to Plaintiff's claims for relief have been performed or have occurred.

## XIII.
## JURY DEMAND

70.     Plaintiff requests a trial by jury on all claims included in this Amended Petition.

## XIV.
## ATTORNEY'S FEES

71.     Plaintiff has been required to employ counsel to bring this suit and requests an award of all reasonable and necessary attorney's fees for the services provided in representation and pursuit of this action. Plaintiff seeks an award of fees under the Texas Trust Code and Texas Common law.  Plaintiff also seeks the award of attorney fees under the Texas Civil Practice & Remedies Code Section 38,001.

### PRAYER

WHEREFORE, PREMISES CONSIDERED, for the reasons detailed herein, Plaintiff LINDA GOEHRS, in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, respectfully requests that the Court set her Application for Temporary Restraining Order for hearing, that a Temporary Restraining Order be issued against Defendant DAKOTA FONTENOT as detailed herein, that the Court set Plaintiff's Application for Temporary Injunction for hearing and upon hearing issue a Temporary Injunction against Defendant, that upon final hearing or trial hereof the Court enter judgment against Defendant for the relief prayed for herein, and for all such other and further relief, general or special, at law or in equity, to which Plaintiff may show herself to be justly entitled.

UNOFFICIAL COPY

First Amended Petition: Goehrs-Fontenot

Respectfully submitted,




EST. 2001

**TEXAS PROBATE ATTORNEY**PLLC



RUDOLPH M. CULP
State Bar No. 24043014
rudy@texsprobateattorney.com
COLLIN J. BULLARD
State Bar No. 24129570
collin@texasprobateattorney.com
***EFILE EMAIL: efile@texasprobateattorney.com***
**HOUSTON OFFICE:**
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
O: (713) 297-0700
F: (682) 428-8137
**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was forwarded to all counsel of record in accordance with the Texas Rules of Civil Procedure on this 15th day of January 2026.

RUDOLPH M. CULP

First Amended Petition: Goehrs-Fontenot

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 110160791
Filing Code Description: Amended Filing
Filing Description: First Amended Petition and Application for Injunctive Relief Post Return Date 2/2/26 CD
Status as of 1/20/2026 11:23 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Paul Beik | 24054444 | paul@beiklaw.com | 1/16/2026 3:20:15 PM | SENT |
| James Ardoin | 24045420 | jimmy@jimmyardoinlaw.com | 1/16/2026 3:20:15 PM | SENT |
| John P. TreyAvant | | tavant@grayreed.com | 1/16/2026 3:20:15 PM | SENT |
| Debbie Gurley | | dgurley@grayreed.com | 1/16/2026 3:20:15 PM | SENT |
| Andrew McCarty | | amccarty@grayreed.com | 1/16/2026 3:20:15 PM | SENT |
| Texas Probate Attorney, PLLC | | efile@texasprobateattorney.com | 1/16/2026 3:20:15 PM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 1/16/2026 3:20:15 PM | SENT |
| Jeffrey D.Watters | | jwatters@grayreed.com | 1/16/2026 3:20:15 PM | SENT |
| Ryan Cantrell | | ryan.cantrell@chamberlainlaw.com | 1/16/2026 3:20:15 PM | SENT |
| Mariah Karigan | | mariah.karigan@chamberlainlaw.com | 1/16/2026 3:20:15 PM | SENT |
| Marcie Cardenas | | mcardenas@grayreed.com | 1/16/2026 3:20:15 PM | SENT |
| Rudy Culp | | rudy@texasprobateattorney.com | 1/16/2026 3:20:15 PM | SENT |
| Bailey Bowe | | bailey@texasprobateattorney.com | 1/16/2026 3:20:15 PM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 1/16/2026 3:20:15 PM | SENT |
| Kayla Brake | | kayla@texasprobateattorney.com | 1/16/2026 3:20:15 PM | SENT |

# EXHIBIT A

## TRUST DECLARATION FOR
## THE HOLLI ANN HARDIN TRUST NUMBER ONE

THIS TRUST DECLARATION is made this day by declaration of HOLLI HARDIN FONTENOT, a resident of Harris County, Texas ("Trustor"). The Effective Date of this Trust Declaration is June 5, 1991.

COPY

1. **Trust Estate.**

1.1 <u>Creation of Trust</u>. The Trustor hereby establishes, declares, and creates this Trust for the purposes hereinafter set forth, and the Trustee agrees to serve as the initial trustee and to hold the Trust Estate (as hereinafter defined) in trust upon the following provisions.

1.2 <u>Transfer in Trust</u>. On or about the Effective Date, the Trustor has transferred and delivered to the Trustee the cash sum of One Thousand and No/100 Dollars ($1,000.00). Such property shall constitute the initial property of the Trust Estate.

1.3 <u>Beneficiaries</u>. The Beneficiaries of this Trust shall be HOLLI HARDIN FONTENOT, DALLAS JOSEPH FONTENOT, JR., ANNE S. FONTENOT, DALLAS JOSEPH FONTENOT, III, MICHELLE ANNE FONTENOT, and any children of the marriage of HOLLI HARDIN FONTENOT and DALLAS JOSEPH FONTENOT, JR., including any children adopted by HOLLI HARDIN FONTENOT and DALLAS JOSEPH FONTENOT, JR. after the Effective Date (collectively, "Primary Beneficiaries"). Also Beneficiaries of this Trust are the children and other issue of each of the Primary Beneficiaries. The term "Beneficiary" will also mean any and all persons, organizations, trusts, and entities who may have or may acquire a beneficial interest in this Trust, whether vested or contingent in nature, resulting from the exercise of a power of appointment by a Beneficiary or otherwise.

1.4 <u>Release of All Rights in Property</u>. The Trustor hereby releases for the benefit of this Trust any and all rights which the Trustor may have in her individual capacity in the property constituting the Trust Estate.

1.5 <u>Acceptance of the Trust</u>. By acceptance hereof the Trustee, on her behalf and on behalf of her successors in trust, does by the execution hereof acknowledge receipt of the Trust Estate. The Trustee shall own, hold, and possess the Trust Estate (including any additional property which may

Page 1 of 18 Pages

81142_81.01

UNOFFICIAL COPY

at any time hereafter be transferred to the Trustee) in trust solely in the capacity of Trustee. The Trustee and her successors in trust shall hold, manage, sell, exchange, invest, and reinvest the Trust Estate; collect all income therefrom; and, after deducting such expenses as are properly payable from income, accumulate and distribute the Trust Estate as herein provided.

1.6  Additions to Trust Estate. The Trustor and any other person shall have the right at any time to add property to the Trust created herein. Such property, when received and accepted by the Trustee, shall become part of the Trust Estate.

1.7  Name of Trust. This Trust shall be known as THE HOLLI ANN HARDIN TRUST NUMBER ONE.

2.  Irrevocability of Trust. The Trust herein created shall be irrevocable and shall not be altered, amended, revoked, or terminated by the Trustor or any other person except as specifically permitted by law.

3.  Definitions. As used herein, the following terms shall have the following meanings.

3.1  Children, Issue. The term "child" or "children" shall refer only to any and all children born in lawful wedlock or lawfully adopted, whether born or adopted before or after the date of execution of this Trust Declaration. The term "issue" shall refer to the lawful blood descendants in the first, second, or any other degree of the ancestor designated.

3.2  Heirs at Law. Whenever a trustee or a legal advisor to the Trustee is called upon to determine the heirs at law of the Trustor or any other person beneficially interested in this Trust, the determination will be made to identify those individual, other than creditors, who would receive the personal property of a decedent upon his or her death as determined in accordance with the laws of intestate succession of the State of Texas, and further determined as if the Trustor of this Trust shall have predeceased the person or persons so named or described.

3.3  Minor Beneficiary. The term "Minor Beneficiary" identifies a Beneficiary who is less than twenty one years of age.

3.4  Disability. A Beneficiary will be considered "disabled" if he or she is incapacitated to an extent to make it impossible or impractical to give prompt and intelligent

Page 2 of 18 Pages

H1142_81.01

003186

consideration to business matters.    The Trustee may act upon such evidence as the Trustee reasonably deems appropriate and reliable without liability by reason thereof.

3.5    Power of Appointment, Qualified Beneficiary Designation.    Whenever this Trust gives a Beneficiary the power or authority to appoint a beneficiary of the Trust, the designation must be in writing and be acknowledged in the form required of acknowledgements by Texas law or exercised by a will executed with the formalities required by law of the Beneficiary's residence;    it must clearly evidence the intent of the Beneficiary to exercise a power of appointment; and the written beneficiary designation must have been delivered to the Trustee prior to the Beneficiary's death or, if exercised by will, the will must have been filed for probate within three months from the date of the Beneficiary's date of death and must subsequently be admitted to probate no matter the time interval.    The term of this Trust may be extended if the Qualified Beneficiary Designation requires that a Beneficiary's interest remain in Trust, or may be divided and be held as a separate trust which is governed by the terms of this Trust.

3.6    Trust Estate.    The term "Trust Estate" shall mean any and all of the property delivered to the Trustee to be held, managed, and distributed under the terms of this Trust.

3.7    Trustee.    For convenience, the term "Trustee," used in the singular, will mean and identify singular and multiple Trustees serving and acting pursuant to the directions of this Trust Declaration.    The term "corporate Trustee" will identify a banking or trust corporation with trust powers.

4.    Appointment of Trustee.

4.1    Original Appointment.    The Trustor appoints HOLLI HARDIN FONTENOT as Trustee of this Trust.    In the event HOLLI HARDIN FONTENOT should fail to qualify, or having qualified, should die, resign, or become incapacitated or unable to act as Trustee of this Trust, or having qualified should subsequently become divorced from DALLAS JOSEPH FONTENOT, JR., then the Trustor appoints DALLAS JOSEPH FONTENOT, JR. as Trustee of this Trust.    The parties acknowledge and agree that the rights and obligations of HOLLI HARDIN FONTENOT to serve as Trustee and to resign as Trustee in accordance with the foregoing have been and are the subject of separate consideration,

Page 3 of 18 Pages
H1142_81.01

003187

receipt of which is hereby acknowledged in full, and such rights and obligations are in the best interest of the administration of the Trust for its Beneficiaries.  HOLLI HARDIN FONTENOT specifically waives any rights which she may have to rescind or revoke her obligation to resign as Trustee upon divorce from DALLAS JOSEPH FONTENOT, JR.

4.2  Succession.  At any time on or after his appointment as Trustee of this Trust, DALLAS JOSEPH FONTENOT, JR. will have the right to appoint a successor or successors to serve as Trustee in the event that DALLAS JOSEPH FONTENOT, JR. chooses not to serve as Trustee or ceases to serve as Trustee for any reason, and DALLAS JOSEPH FONTENOT, JR. may specify any conditions upon succession and service as may be permitted by law.

For example, a successor may be required to furnish a fiduciary bond as a prerequisite or a successor's service may be condition upon the death, resignation, or inability to serve of another appointee.

At any time on or after his appointment as Trustee of this Trust, DALLAS JOSEPH FONTENOT, JR. may also provide that one or more designated successors will have the authority to appoint his, her, or its successor as Trustee.  An appointment of successor Trustee must be in writing and must be acknowledged to be effective.

In the absence of an appointment, or in the event all successors appointed by a Trustee shall fail or cease to serve for any reason, DALLAS JOSEPH FONTENOT, III is to be the successor as Trustee.

Trustor specifically provides that upon assumption of actual service as Trustee, DALLAS JOSEPH FONTENOT, III will have the right to appoint his successor as Trustee and to vest in a successor Trustee, upon assumption of that person's service, the right and authority to designate succession as Trustee.

In the event all of the Trustees named above, including duly appointed successors, fail or cease to serve for any reason, then FIRST INTERSTATE BANK OF TEXAS, N.A. is to be the successor Trustee.  The appointment of FIRST INTERSTATE BANK OF TEXAS, N.A. as Trustee will include any successor to FIRST INTERSTATE BANK OF TEXAS, N.A. by reason of its merger, reorganization, or sale to another banking corporation with trust powers or a trust company with trust powers.

Page 4 of 18 Pages

E1142_81.01

003188

5.   <u>Distribution of Income and Trust Corpus, Living and Port-Mortem</u>.   The Trustee shall hold in trust or dispose of the Trust Estate as follows.

5.1   <u>Distribution of Income and Principal</u>.   The Trustee will have the discretionary authority to distribute to any or all of the Primary Beneficiaries or to apply for the Primary Beneficiaries' use and benefit such amounts of the Trust income and principal of the Trust Estate, even to the exhaustion thereof, as the Trustee shall desire, in the absolute discretion of the Trustee.   The Trustee will have the discretionary authority to apportion or accumulate income to or for one or more of the Primary Beneficiaries in such amounts as the Trustee shall desire, in the absolute discretion of the Trustee; and the Trustee may distribute such amounts in equal or unequal shares, in the Trustee's absolute discretion. The Trustee may elect not to distribute any sums to any one or more of the Primary Beneficiaries.   Accumulated income shall be added to the principal of the Trust.

5.2   <u>Term of the Trust</u>.   The term of this Trust shall be for so long as any of HOLLI HARDIN FONTENOT, DALLAS JOSEPH FONTENOT, JR., and ANNE S. FONTENOT shall live.   Upon the last to die of all of the foregoing, this Trust shall terminate; provided, however, that the Trust will continue for a reasonable term thereafter for the purpose of liquidation and settlement.

5.3   <u>Distributions for Death Taxes</u>.   If the testamentary estate of the Trustor or any other Primary Beneficiary shall include any property of the Trust Estate because of the provisions of Sections 2036, 2037, and 2038 of the Internal Revenue Code of 1986 or any other provisions of the Internal Revenue Code of 1986, as amended, or under any corresponding statute hereafter in effect (dealing with inclusion of the Trust assets in the testamentary estate because of retained powers or otherwise), any death taxes (including but not limited to any estate tax) owing as a result of such inclusion shall be paid by this Trust.   This provision shall control notwithstanding any other provision contained in this Trust.   As used in this Trust Agreement, the term "death taxes" refers to all estate, inheritance, transfer, succession, legacy, or other death taxes of any kind and interest or penalty on such taxes, if any.

5.4   <u>Distributions Upon Termination of the Trust</u>.   Upon termination of this Trust, the undistributed principal and income after the distributions, if any, allowed under Section 5.3 above, shall be divided in equal shares, one for each of DALLAS

Page 5 of 18 Pages
H1142_81.01

003189

JOSEPH FONTENOT, III, MICHELLE ANNE FONTENOT, and each of the children of the marriage of HOLLI HARDIN FONTENOT and DALLAS JOSEPH FONTENOT, JR., including any children adopted by HOLLI HARDIN FONTENOT and DALLAS JOSEPH FONTENOT, JR. after the Effective Date ("Trust Share"). Each of the foregoing, using a Qualified Beneficiary Designation, shall have the right to appoint the Beneficiary or Beneficiaries of the Trust Estate upon his or her death and the manner in which an appointee is to receive his, her, or its Trust Share. If such Beneficiary does not exercise his power of appointment with a Qualified Beneficiary Designation, the Beneficiary's Trust Share of the remaining property of the Trust, net of settlement costs, will pass upon the termination of the Trust *per stirpes*, outright and free of Trust, to his issue living at the time of his death or, if none, *per stirpes* to the Trustor's issue then living.

5.5 <u>Distribution In Accordance With Texas Intestate Laws</u>. In the event all Primary Beneficiaries and all of the issue of the Primary Beneficiaries have died, upon termination of this Trust the Trustee shall distribute the Trust Estate among the heirs at law of DALLAS JOSEPH FONTENOT, JR. in accordance with the Texas rules for intestate distribution as if the Primary Beneficiaries and all of the children and other issue of the Primary Beneficiaries had predeceased the Trustor.

5.6 <u>Method of Distribution</u>. During such time as the Trustee is so expending sums from the Trust Estate for the benefit of any Beneficiary or otherwise as provided herein, the Trustee is authorized to make payments or delivery of the portion or portions of the Trust Estate, either to the Beneficiary directly or to the person having the care and custody of the Beneficiary, all without the necessity of the appointment of any guardian. Without limitation on the foregoing, it is acknowledged and agreed that this Trust constitutes a grantor trust within the meaning of Sections 671, <u>et seq</u>. of the Internal Revenue Code of 1986, as amended and that the income therefrom will be taxed to the Trustor for so long as the Trustor shall live. It is further understood and agreed that the Trustee shall distribute to the Trustor (or to any other person who is deemed to be a grantor of this Trust and taxable on the income of the Trust within the meaning of Section 671, <u>et seq</u>. of the Internal Revenue Code of 1986, as amended) the incremental income taxes arising in connection with the taxable income of the Trust Estate or, at the election of the Trustee, the Trustee may make

Page 6 of 18 Pages
H1142_81.01



such distribution directly to the Internal Revenue Service for the benefit of such person.

5.7    <u>Partial and Final Distributions</u>.    The Trustee, in making or preparing to make a partial or final distribution, may prepare an accounting and may require any or all of the following as a condition to payment:   a written and acknowledged statement from each distributee that the accounting has been thoroughly examined and accepted as correct; a discharge of the Trustee; a release from any loss, liability, claim, or question concerning the exercise of due care, skill, and prudence of the Trustee in the management, investment, retention, and distribution of property during the Trustee's term of service (except for any undisclosed error or omission having basis in fraud or bad faith); and/or an indemnity for the benefit of the Trustee, to include the payment of attorney's fees, from any asserted claim of any taxing agency, governmental authority, or other claimant.   Any Beneficiary having a question or potential claim may require an audit of the Trust as an expense of administration.   Failure to require the audit prior to acceptance of the Trustee's report or the acceptance of payment will operate as a final release and discharge of the Trustee except as to any error or omission having basis in fraud or bad faith.

5.8    <u>Contingent Trust for Certain Beneficiaries</u>.   The interest of any Beneficiary who has not attained the age of thirty (30) years (the "Required Age") or who may be otherwise legally disabled and whose interest is not otherwise covered by the provisions of this Trust Declaration may, in the sole and absolute discretion of the Trustee, be continued in Trust or be held as a separate trust, for the use and benefit of that person until such person shall attain the Required Age or until such person is no longer disabled.   For so long as the Trustee holds the Trust for a Beneficiary pursuant to these terms, the Beneficiary, using the Qualified Beneficiary Designation, shall have the right to appoint the Beneficiaries of his or her interest in the Trust entitled to his or her interest upon the death of the Beneficiary.   If the Beneficiary dies prior to a final distribution of his or her interest from the Trust without having made a Qualified Beneficiary Designation, that person's interest in the Trust will pass *per stirpes* to his or her issue then living, or if none, *per stirpes* to the issue of the Trustor then living.

Page 7 of 18 Pages
B1142_B1.01

003191

6.   Powers of the Trustee.   In order to carry out the purposes of this Trust Declaration, the Trustee, in addition to all other powers granted by law, shall have the following powers and discretions.

6.1   Retain Assets.   The Trustee shall have the power to continue to hold any and all property received by the Trustee or subsequently added to the Trust Estate or acquired pursuant to proper authority if and as long as the Trustee, in exercising reasonable prudence, discretion, and intelligence, considers that the retention is in the best interest of the Trust.

6.2   Investments.   The Trustee shall have the power to invest and reinvest in every kind of property, real, personal, or mixed, and every kind of investment, specifically including, but not by way of limitation, corporate obligations of every kind, and stocks, preferred or common, without regard to risk of loss or decline in value.

6.3   Management of Securities.   The Trustee shall have the power to exercise, respecting securities held in the Trust Estate, all the rights, powers, and privileges of owners, including, but not limited to the power to vote, give proxies, and to pay assessments and other sums deemed by the Trustee necessary for the protection of the Trust Estate; to participate in voting trusts, pooling agreements, foreclosures, reorganizations, consolidations, mergers, and liquidations, and in connection therewith to deposit securities with and transfer title to any protective or other committee under such terms as the Trustee may deem advisable; to exercise or sell stock subscription or conversion rights; to accept and retain as an investment any securities or other property received through the exercise of any of the foregoing powers, regardless of any limitations elsewhere in this instrument relative to investments by the Trustee.

6.4   Form of Ownership of Trust Property.   The Trustee shall have the power to hold securities or other Trust property in the name of the Trustee as Trustee under this Trust Declaration or in the Trustee's own name or in the name of a nominee or in such conditions where ownership will pass by delivery.

6.5   Business Interests.   The Trustee shall have the power to continue and operate, to sell or to liquidate, as the Trustee deems advisable at the risk of the Trust Estate,

Page 8 of 18 Pages

E1142_81.01

any business or partnership interests received by the Trust Estate.

6.6     Sell and Exchange.  The Trustee shall have the power to sell for cash or on deferred payments and on such terms and conditions as are deemed appropriate by the Trustee, whether at public or private sale, to exchange, and to convey any property of the Trust Estate.

6.7     Abandonment of Trust Assets.  The Trustee shall have the power to abandon any Trust asset or interest therein in the discretion of the Trustee.

6.8     Option.  The Trustee shall have the power to grant an option involving disposition of a Trust asset and to take an option for the acquisition of any asset by the Trust Estate.

6.9     Lease.  The Trustee shall have the power to lease any real or personal property of the Trust Estate for any purpose for terms within or extending beyond the duration of the Trust.

6.10    Property Management.  The Trustee shall have the power to manage, control, improve, and repair real and personal property belonging to the Trust Estate.

6.11    Development of Property.  The Trustee shall have the power to partition, divide, subdivide, assign, develop, and improve any Trust property; to make or obtain the vacation of plats and adjust boundaries or to adjust difference in valuation on exchange or partition by giving or receiving consideration; and to dedicate land or easements to public use with or without consideration.

6.12    Repair, Alter, Demolish, and Effect.  The Trustee shall have the power to make ordinary and extraordinary repairs and alterations in buildings or other trust property, to demolish any improvements, to raze party walls or buildings, and to erect new party walls or buildings as the Trustee deems advisable.

6.13    Borrowing and Encumbering.  The Trustee shall have the power to borrow money for any Trust purpose from any person, firm, or corporation on the terms and conditions deemed appropriate by the Trustee and to obligate the Trust Estate for repayment, upon such terms and conditions (including a term extending beyond the duration of the Trust) as the Trustee deems advisable; to encumber the Trust Estate or any of its property by mortgage, deed of

81142_81.01

003193

trust, pledge, or otherwise, using whatever procedures to consummate the transaction deemed advisable by the Trustee; and to replace, renew, and extend any encumbrance and to pay loans or other obligations of the Trust Estate deemed advisable by the Trustee.

6.14    Natural Resources.    The Trustee shall have the power to enter into oil, gas, liquid or gaseous hydrocarbon, sulphur, metal and any and all other natural resource leases on terms deemed advisable by the Trustee, and to enter into any pooling, unitization, repressurization, community, and other types of agreements relating to the exploration, development, operation, and conservation of properties containing minerals or other natural resources; to drill, mine, and otherwise operate for the development of oil, gas, and other minerals; to contract for the installation and operation of absorption and repressurizing plants; and to install and maintain pipelines.

6.15    Insurance.    The Trustee shall have the power to procure and carry at the expense of the Trust Estate insurance of the kinds, forms, and amounts deemed advisable by the Trustee to protect the Trust Estate and the Trustee against any hazard.

6.16    Enforcement of Hypothecations.    The Trustee shall have the power to enforce any deed of trust, mortgage, or pledge held by the Trust Estate and to purchase at any sale thereunder any property subject to any such hypothecation.

6.17    Extending Time of Payment of Obligations.    The Trustee shall have the power to extend the time of payment of any note or other obligation held in the Trust Estate, including accrued or future interests, in the discretion of the Trustee.

6.18    Adjustment of Claim.    The Trustee shall have the power to compromise, submit to arbitration, release with or without consideration, or otherwise adjust claims in favor of or against the Trust Estate.

6.19    Litigation.    The Trustee shall have the power to commence or defend at the expense of the Trust Estate any litigation affecting the Trust or any property of the Trust Estate deemed advisable by the Trustee.

6.20    Administration Expenses.    The Trustee shall have the power to pay all taxes, assessments, compensation of the Trustee, and all other expenses incurred in the collection, care, administration, and protection of the Trust Estate.

Page 10 of 18 Pages

B1142_81.01

003194

6.21    **Employment of Attorneys, Advisers, and Other Agents.**  The Trustee shall have the power to employ any attorney, investment adviser, accountant, broker, tax specialist, or any other agent deemed necessary in the discretion of the Trustee and to pay from the Trust Estate reasonable compensation for all services performed by any of them.

6.22    **Termination by Trustee of Small Trust.**  The Trustee shall have the power to terminate, in the discretion of the Trustee, the Trust held for the Beneficiaries if the fair market value of the Trust at any time becomes less than $25,000.00 and, regardless of the age of the Beneficiaries to distribute the principal and any accrued or undistributed income to the Beneficiaries, or to their respective guardians, conservators, or other fiduciaries.

6.23    **Distribution.**  The Trustee shall have the power on any partial or final distribution of the income or principal of the Trust Estate, to apportion and allocate the assets of the Trust Estate in cash or in kind, or partly in cash and partly in kind, or in undivided interests in the manner deemed advisable in the discretion of the Trustee and to sell any property deemed necessary by the Trustee to make the distribution.

6.24    **Merger.**  The Trustee shall have the power to merge this Trust with any trust established for the benefit of substantially the same beneficiaries as the Beneficiaries of this Trust and to manage and administer the respective Trusts and Trust Estate as one Trust and Trust Estate subject to the terms and conditions of the Trust Declaration governing each of said Trusts.

6.25    **General.**  The Trustee shall have the power to do all the acts, to take all the proceeds, and to exercise all the rights, powers, and privileges which an absolute owner of the property would have.  The enumeration of certain powers in this Trust Declaration shall not limit the general or implied powers of the Trustee.  The Trustee shall have all additional powers that may now or hereafter be conferred by law or that may be necessary to enable the Trustee to administer the Trust in accordance with the provisions of this Trust Declaration, subject to any limitations specified in this Trust Declaration.  The Trustee shall further have the discretion to maintain reserves for depreciation and/or depletion.

Page 11 of 18 Pages

81142_81.01

UNOFFICIAL COPY

003195

7. **Duties and Compensation of the Trustee.**

7.1 **Allocation of Income and Principal.** The Trustee shall determine what is income and what is principal of the Trust created under this Trust Declaration and what expenses, costs, taxes, and charges of any kind whatsoever shall be charged against income and what shall be charged against principal in accordance with the applicable statutes of the State of Texas as they now exist and may from time to time be enacted, amended, or repealed.

7.2 **Relations With Trustee.** No one dealing with the Trustee need inquire concerning the validity of anything the Trustee purports to do, or need see to the application of any money paid or any property transferred to or upon the order of the Trustee.

7.3 **Compensation.** Unless such fee is waived or unless specific provision is otherwise made in the appointment of any Trustee, each Trustee shall be entitled to reasonable compensation for services as Trustee in accordance with the usual and customary charges in the community where and when such services are rendered. The fee schedules of area trust departments prescribing fees for the same or similar services may be used to establish reasonable compensation. A Trustee will be entitled to full reimbursement for expenses, costs, or other obligations incurred as the result of service, including attorney's, accountant's, and other professional's fees.

7.4 **Exculpation From Liability of Trustee.** The Trustee shall not be liable for any error or judgment or for any act done or omitted by the Trustee in good faith or for anything which the Trustee may in good faith do or refrain from doing in connection with this Trust. Accordingly, the Trustee shall not incur any liability with respect to any action taken or omitted in good faith upon the advice of counsel given in respect to any questions relating to the duties and responsibilities of the Trustee under this Trust Declaration or any action taken or omitted in reliance upon any instrument, including the written advice provided for herein, not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and accuracy of any information contained therein, which the Trustee shall in good faith believe to be genuine, to have been signed and presented by a proper person or persons, and to have conformed with the provisions of this Trust Declaration. The parties acknowledge and agree that the Trustee has no obligations to the Trust or any Beneficiary to offer to the Trust any investment opportunities presented to

Page 12 of 18 Pages

H1142_81.01

003196

Trustee individually during the term of the Trust Declaration.

7.5 Indemnity. The Trustor shall at all times release and indemnify any successor Trustee and hold such successor Trustee harmless against any and all claims, suits, actions, debts, damages, costs, charges, and expenses, including court costs and attorney's fees, and against all liabilities, losses, or damages of any nature whatsoever that the Trustee shall at any time sustain or suffer in connection with acceptance or appointment as Trustee under this Agreement or as a result or arising out of the acquisition of any assets contributing to the Trust Estate, except to the extent of any such matter arising by reason or in consequence of the fraud or bad faith of the Trustee.

7.6 Bond. No bond shall be required of the original Trustee hereunder. Unless any instrument appointing a successor may provide otherwise, no bond shall be required of any successor Trustee; or if a bond is required by law, no surety shall be required on such bond.

7.7 Resignation. Any Trustee of this Trust may at any time resign with respect to such Trust, with or without cause, effective ninety (90) days after delivery of notice of resignation thereof in writing to each current Beneficiary of this Trust. If such Beneficiary is a minor, such delivery may be made to any guardian of such minor Beneficiary or to any adult with whom such minor Beneficiary resides.

7.8 Removal of a Trustee. The Beneficiaries who are then entitled to receive distributions of income from the Trust or distributions of income from any separate trust created by this Trust Declaration may remove any corporate Trustee then serving, the notice of removal to be delivered in writing to the corporate Trustee. Unless this Trust Declaration or any instrument appointing a successor provides otherwise, the selection of a successor to the corporate Trustee will be made by a court of competent jurisdiction. In the event there is more than one Beneficiary entitled to the income from the Trust, all income Beneficiaries must join in the written notice of removal. The consent of any person who is deceased or legally disabled will not be required in meeting the unanimous consent requirements for removal.

7.9 Liability of Trustee. The Trustee in carrying out the Trustee's powers and performing the Trustee's duties may act in the

Page 13 of 18 Pages

H1142_81.01

003197

Trustee's discretion and shall be personally or individually liable only for fraud or acts or omissions in bad faith. No Trustee shall be liable individually or personally for any act or omission of any agent or employee of Trustee unless the Trustee shall have acted in bad faith in the selection and retention of such agent or employee.

7.10 <u>Accounts</u>. The Trustee shall each year render an account of the administration of the Trust hereunder to each living Primary Beneficiary. If a Federal Fiduciary Income Tax Return is then required for this Trust, such accounting may be made by submission of a copy of such return filed for the Trust. If no objection to an accounting has been made in writing by such Primary Beneficiary within sixty (60) days after the date of mailing of such accounting by the Trustee, it shall be deemed approved. Such approval of such account shall, as to all matters and transactions stated therein or shown thereby be final and binding upon all persons (whether in being or not) who are then or may thereafter become interested in, or entitled to share in, either the income or the principal of such Trust, provided always, however, that nothing contained in this Section 7.10 shall be deemed to give such person (or the guardian or representative) acting in conjunction with the Trustee the power to alter, amend, revoke, or terminate the Trust.

7.11 <u>Multiple Trustees</u>. In the event that there are two or more Trustees serving the Trust, all Trustees must sign any instrument transferring real property from the Trust. If the Trustees agree to do so, one Trustee acting alone may be given the primary responsibility of administration and accounting, and one Trustee alone may be authorized to deposit, transfer, and withdraw funds from any depository account held by the Trust. The authority vested in two Trustees may be exercised only by both of the Trustees; and, subject to the foregoing provisions, the authority vested in three or more trustees may be exercised by a majority of the Trustees. In the event of an action or decision by a majority, the non-consenting Trustee will not be responsible for the act of the majority.

8. <u>Spendthrift Provision</u>. The interests of each of the Beneficiaries in the principal or income of the Trust created hereunder shall not be subject to the claims of his or her creditors or creditors of others, including creditors of a spouse of a married Beneficiary, nor to legal process, and may not be voluntarily or involuntarily alienated or encumbered until actually distributed to such Beneficiary.

Page 14 of 18 Pages

EII42_8).01

003198

9.  Perpetuities Savings Clause.  Unless sooner terminated as otherwise provided in this Trust Declaration, the Trust created herein shall fully cease and terminate twenty-one (21) years after the date of the last survivor of the Trustor, the Primary Beneficiaries, and the children of each of the Primary Beneficiaries in existence as of the date of this Trust.  Upon such termination, the entire principal of the Trust Estate of the Trust, together with any undistributed income therefrom, shall vest in and be distributed to the persons entitled to take under the provisions of the Trust.

10. In Terrorem Provision.  If any person entitled to receive any interest from this Trust shall contest the validity of this Trust or any provision thereof or shall institute or join in (except as a party defendant) any proceeding to contest the validity of this Trust or to prevent any provision thereof from being carried out in accordance with its terms (regardless of whether or not such proceedings are instituted in good faith and with probable cause), then all benefits provided to such person in this Trust shall be revoked, and such benefits shall pass as if such person were not then living.

11. Construction of Trust.

    11.1  Governing Law.  This Trust Declaration shall be governed by the laws of the State of Texas.

    11.2  Severability.  If any part, clause, provision, or condition of this Trust Declaration is held to be void, invalid, or inoperative, such voidness, invalidity, or inoperativeness shall not affect any other clause, provision, or condition hereof; but the remainder of this Trust Declaration shall be effective as though such clause, provision, or condition had not been contained herein.

    11.3  Interpretative Clause.  As used in this Trust Declaration, the masculine, feminine, or neuter gender, and the singular or plural number shall each be deemed to include the others whenever the context so indicates.

    11.4  Notices.  All communications required to be given to the Trustor, the initial Trustee hereunder, or the Primary Beneficiaries (including notice of change of address) shall be in writing and shall be deemed to be duly given if and when personally delivered, or, if mailed via certified mail, return receipt requested, when tendered into the care and custody of the United States postal service properly addressed to as follows:

Page 15 of 18 Pages
B1142_81.01

UNOFFICIAL COPY

003199

If to Trustor or Trustee:

HOLLI HARDIN FONTENOT
6002 Burning Tree Drive
Houston, Texas   77036

If to Primary Beneficiaries:

Dallas Joseph Fontenot, Jr.
6002 Burning Tree Drive
Houston, Texas   77036

Anne S. Fontenot
8526 Leader
Houston, Texas   77036

Dallas Joseph Fontenot, III
8526 Leader
Houston, Texas   77036

Michelle Anne Fontenot
8526 Leader
Houston, Texas   77036

11.5   Copies.   To the same extent as if it were the original, anyone may rely on a copy of this Trust Declaration certified by a notary public to be a true copy of this Trust Declaration.  Anyone may rely on any statement of fact certified by anyone who appears from the original Trust Declaration or a certified copy thereof to be a Trustee hereunder.

IN WITNESS WHEREOF, I, the undersigned, HOLLI HARDIN FONTENOT, attest that I have executed this Declaration of Trust and that the terms thereof will bind me and my successors and assigns, my heirs and personal representatives, and any Trustee of this Trust.  This Trust Declaration has been signed by the Trustor on the Effective Date.

HOLLI HARDIN FONTENOT

Page 16 of 18 Pages
HJ142_81.01

003200

THE STATE OF TEXAS       §
                         §
COUNTY OF HARRIS         §

      This instrument was acknowledged before me on this the 5th day of June, 1991, by HOLLI HARDIN FONTENOT.



_____
Notary Public in and for
The State of T E X A S

_____
(Printed or Typed Name of Notary)

_____
(Commission Expiration Date)

## ACCEPTANCE BY TRUSTEE

I acknowledged that I have been appointed as a Trustee of THE HOLLI ANN HARDIN TRUST NUMBER ONE, and I hereby evidence my acceptance of the office of Trustee and will hold and administer the Trust according to the provisions thereof as required by law.

Date: _____ June 5, 1991 _____

_____
HOLLI HARDIN FONTENOT

Page 17 of 18 Pages
81142_81.01

003201

THE STATE OF TEXAS     §
                        §
COUNTY OF HARRIS     §

        This instrument was acknowledged before me on this the 5th day of June, 1991, by HOLLI HARDIN FONTENOT, TRUSTEE.



Notary Public in and for
The State of T E X A S

_____
(Printed or Typed Name of Notary)

_____
(Commission Expiration Date)

UNOFFICIAL COPY

Page 18 of 18 Pages
H1142_81.01

003202

TO WHOM IT MAY CONCERN:

I, Holli Ann Hardin Fontenot, hereby voluntarily resign as trustee of the Holli Ann Hardin Fontenot Trust Number One and the Dakota Trust. This resignation as trustee shall be effective immediately upon acceptance by Dallas J. Fontenot, Jr.

Very truly yours,

Holli Ann Hardin Fontenot

Agreed and accepted this __8__ day of __Sept.__, 1996.

Dallas J. Fontenot, Jr.

LDK238:19

003203

537721

# EXHIBIT B

Probate Court No. 1

---

## TRUST DECLARATION
## DAKOTA TRUST

---

THIS TRUST DECLARATION is made this day by declaration of Holli Hardin Fontenot ("Settlor"), who presently resides in Fort Bend County, Texas.

### ARTICLE I.
### TRUST BENEFICIARY

This Trust is created for the use and benefit of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot. The term "Trust Beneficiary" or "beneficiary" will also mean any and all persons, organizations, trusts, and entities who may have or may acquire a beneficial interest in this Trust, whether vested or contingent in nature, including a transfer of an interest in the Trust during the life of either Dallas Joseph Fontenot, Jr. or Holli Hardin Fontenot, or both, or from the exercise of a power of appointment by a Trust Beneficiary or otherwise.

For reference, the only child of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot is Dakota James Fontenot, who was born on June 22, 1994. Holli Hardin Fontenot has no other children born to her or adopted by her on the date of this Trust Declaration.

For reference, the only other children of Dallas Joseph Fontenot, Jr. are: Dallas Joseph Fontenot, III (who was born on March 29, 1969) and Michelle Anne Fontenot (who was born on March 12, 1970). Dallas Joseph Fontenot, Jr. has no other children born to him or adopted by him on the date of this Trust Declaration.

### ARTICLE II.
### INITIAL TRUST CORPUS AND RIGHT TO ADD TO THE TRUST

A.    **INITIAL TRUST CORPUS.** Settlor does hereby declare that from and after the date of this Trust Declaration, Settlor holds in trust the assets described in Schedule A attached to this Declaration, which assets are the initial corpus of this Trust and as Trustee acknowledges receipts of those assets. Settlor or any other person, trust, or entity may add property of any

003271

character to this Trust by a Last Will and Testament, from another trust (whether inter vivos or testamentary), or by deed or other transfer, subject only to the acceptance thereof by the Trustee.

B.   **ADDITIONS TO TRUST CORPUS.**   Additional contributions may be made to the corpus of the Trust, including testamentary contributions.

C.   **SEPARATE PROPERTY.**   The assets of this trust are the separate property of Holli Hardin Fontenot.  No inter vivos transfer of property will be made to this Trust unless the property constitutes the separate property of Holli Hardin Fontenot. Holli Hardin Fontenot may make a testamentary contribution of property to this Trust, and such contribution may constitute the separate property of Holli Hardin Fontenot and Holli Hardin Fontenot's interest in community property.

## ARTICLE III.
### NO REVOCATION OR AMENDMENT

A.   **TRUST IS IRREVOCABLE.**   This Trust is an irrevocable Trust.

B.   **THIS TRUST MAY NOT BE AMENDED.**   This Trust Declaration may not be amended, except by a Court of competent jurisdiction under the doctrine of *cy pres*.

C.   **INCOME TAX MATTERS.**   For so long as the Settlor or Dallas Joseph Fontenot, Jr. is a Trustee of the Trust, the Trust will be treated for income tax reporting purposes as a Grantor Trust under Treasury Regulation § 1.671-4(b).  Thereafter, the Trust is to be treated for income tax purposes as required by the applicable provisions of Subchapter J of the Internal Revenue Code.

## ARTICLE IV.
### DEFINITIONS

A.   **DESCENDANTS.**   The term "Descendants" means the legitimate children of the person designated and the legitimate lineal descendants of such children.  The term includes any person adopted before attaining age eighteen (18) and the adopted person's legitimate lineal descendants.  A posthumous child shall be considered as living at the death of his parent.

Page 2 of 23 Pages

003272

B.    **HEIRS AT LAW.** Whenever a trustee, or a legal advisor to the Trustee is called upon to determine the heirs at law of Settlor, or any other person beneficially interested in this Trust, the determination will be made to identify those individuals, other than creditors, who would receive the personal property of a decedent upon his or her death as determined in accordance with the laws of intestate succession of the State of Texas, United States of America, determined as if the decedent had then died single, intestate, and domiciled in Texas and further determined as if the Settlor of this Trust had predeceased the person or persons so named or described.

C.    **INCOMPETENT, DISABILITY.** A beneficiary will be considered "incompetent" or "disabled" if he or she is incapacitated to an extent to make it impossible or impractical to give prompt and intelligent consideration to business matters. The Trustee may act upon such evidence as the Trustee reasonably deems appropriate and reliable without liability by reason thereof.

D.    **MINOR BENEFICIARY.** The term "Minor Beneficiary" or "Minor" identifies a beneficiary who is less than 21 years of age.

E.    **PER STIRPES.** Whenever a distribution is directed to be made to the descendants, *per stirpes*, of any person or persons, including the descendants of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot, the property to be distributed shall be divided into as many equal shares as there are then living children of each of those persons and deceased children of each those persons who have descendants then living. Each then living child of such person shall take one share, and the share for the descendants of each deceased child shall be divided among the deceased child's then living descendants on a *per stirpes* basis.

For example, if a distribution were to be made to the descendants, *per stirpes*, of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot, assuming the recitations in Article I, the property to be distributed would be divided into three equal shares, one for each of Dallas Joseph Fontenot, III, Michelle Anne Fontenot, and Dakota James Fontenot.

F.    **RELATIVE OR RELATIVES.** Reference to a "Relative" or "Relatives" will identify any person or persons related to Settlor by blood or lawful adoption in any degree.

Page 3 of 23 Pages

003273

G. **POWER OF APPOINTMENT, QUALIFIED BENEFICIARY DESIGNATION.** Whenever this Trust Declaration gives a Trust Beneficiary the power or authority to appoint a beneficiary of the Trust, the designation must be in writing and be acknowledged in the form required of acknowledgements by Texas law or exercised by a will executed with the formalities required by law of the Trust Beneficiary's residence; it must clearly evidence the intent of the Trust Beneficiary to exercise a power of appointment; and the written beneficiary designation must have been delivered to the Trustee prior to the Trust Beneficiary's death or, if exercised by will, the will must have been filed for probate within three months from the date of the Trust Beneficiary's date of death and must subsequently be admitted to probate no matter the time interval. The term of this Trust may be extended if the qualified beneficiary designation requires that a Beneficiary's interest remain in Trust, or may be divided and be held as a separate trust which is governed by the terms of this Trust Declaration.

H. **SURVIVE.** For the purpose of vesting in the event two or more persons who have an interest in the trust die within a short time of one another, one must have survived the other for a period of at least 90 days as a condition to vesting.

I. **TESTAMENTARY CONTRIBUTIONS.** The term "testamentary contributions" will mean any contribution to the Trust made by reason of the death of a person, including transfers made under the direction of a will, a beneficiary designation in a life insurance policy or other contract, by reason of survivorship language contained in a depository contract, or transfers from another Trust which designates this Trust as a beneficiary.

J. **TRUST.** "Trust" means the Trust created by this Trust Declaration

K. **TRUST DECLARATION.** The term "Trust Declaration" and the term "Trust Agreement" each refer to this Trust Declaration.

L. **TRUST FUND.** The term "Trust Fund" or "Trust Property" means all property comprising: the initial contribution of corpus to the Trust; all property paid or transferred to, or otherwise vested in, the Trustee as additions to the corpus of this Trust; accumulated income, if any, whether or not added to the corpus of this Trust; and the investments and reinvestment of the Trust property, including the increase and decrease in the values thereof as determined from time to

003274

time.    The   terms    "corpus"   and   "principal"   are   used
interchangeably.

M.    **TRUSTEE.**    For  convenience,  the  term  "Trustee," used  in  the
singular,  will  mean  and  identify  multiple  Trustees  serving  and
acting  pursuant  to  the  directions  of  this  Trust  Declaration.
The  term "corporate Trustee" will identify a banking or trust
corporation with trust powers.

N.    **GENDER, PLURAL USAGE.**    The  use  of  personal  pronouns,  such  as
he,  she,  or  it,  are  to  be  construed  in  context.    The  term
"person"  will  include  a  non-person,  such  as  a  corporation,
trust,  partnership  or  other  entity  as  is  appropriate  in
context.    The  identification  of  person  in  the  plural  will
include  the  singular  and  *vice  versa*,  as  is  appropriate  in
context.

<div align="center">

**ARTICLE V.**
**APPOINTMENT OF TRUSTEE**

</div>

A.    **ORIGINAL APPOINTMENT.**    Holli  Hardin  Fontenot  shall  serve  as
initial  Trustee  of  this  Trust.

B.    **FIRST SUCCESSOR.**    In  the  event  that  Holli  Hardin  Fontenot
should  die,  resign,  or  become  incapacitated  or  unable  to  act
as  Trustee  of  this  Trust,  or  in  the  event  that  Holli  Hardin
Fontenot  should  subsequently  become  divorced  from  Dallas
Joseph  Fontenot,  Jr.,  then  Dallas  Joseph  Fontenot,  Jr.  shall
serve  as  successor  Trustee  of  this  Trust.    In  the  event  that
Dallas  Joseph  Fontenot,  Jr.  should  elect  not  to  serve  as
Trustee  of  this  Trust,  Dallas  Joseph  Fontenot,  Jr.  will  have
the  right  to  appoint  a  successor  or  successors  to  serve  as
Trustee,  as  set  forth  in  Section  V.C  below,  and  he  may  specify
any  conditions  upon  succession  and  service  as  may  be  permitted
by  law.

Holli  Hardin  Fontenot  acknowledges  and  agrees  that  the  rights
and  obligations  of  Holli  Hardin  Fontenot  to  serve  as  Trustee
and  to  resign  as  Trustee  in  accordance  with  the  foregoing  have
been  and  are  the  subject  of  separate  consideration,  receipt  of
which  is  hereby  acknowledged  in  full;  and  such  rights  and
obligations  are  in  the  best  interest  of  the  administration  of
the  Trust  for  its  Beneficiaries.    Holli  Hardin  Fontenot
specifically  waives  any  rights  which  she  may  have  to  rescind

003275

or revoke her obligation to resign as Trustee upon divorce from Dallas Joseph Fontenot, Jr.

C.    **SUCCESSION.**    Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment will have the right to appoint a successor or successors to serve as Trustee in the event that person ceases to serve for any reason, and each Trustee may specify any conditions upon succession and service as may be permitted by law.    For example, a successor may be required to furnish a fiduciary bond as a prerequisite or a successor's service may be conditioned upon another appointee's death, resignation, or inability to serve.    Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment may also provide that one or more designated successors as Trustee will have the authority to appoint his, her, or its successor as Trustee.    An appointment of successor Trustee must be in writing and must be acknowledged to be effective.    Unless other specified by a Trustee in a written designation of succession, succession is to be determined as follows.

If a Trustee by original appointment does not appoint a successor, the remaining Trustee or Trustees then serving will continue service alone.    If all Trustees by original appointment fail or cease to serve for any reason without having appointed a successor or successors, the successor or successors as Trustee will be as named below and in the order of succession herein prescribed.

FIRST:    Dallas Joseph Fontenot, III

BUT:    Settlor specifically provides that upon assumption of actual service as Trustee, Dallas Joseph Fontenot, III will have the right to appoint Dallas Joseph Fontenot, III's successor as Trustee, and to vest in a successor Trustee, upon assumption of that person's service, the right and authority to designate succession as Trustee. To the extent this is done, the appointment of succession will supersede the appointments which follow the designation of Dallas Joseph Fontenot, III as Trustee.

NEXT:    Michelle Anne Fontenot

BUT:    Settlor specifically provides that upon assumption of actual service as Trustee, Michelle Anne Fontenot will have the right to appoint Michelle Anne Fontenot's successor as Trustee, and to vest in a successor Trustee, upon assumption of that person's service, the right and

003276

authority to designate succession as Trustee. To the extent this is done, the appointment of succession will supersede the appointments which follow the designation of Michelle Anne Fontenot as Trustee.

FINALLY: First Interstate Bank of Texas, N.A., in the event all of the above, including duly appointed successors, fail or cease to serve for any reason. The appointment of First Interstate Bank of Texas, N.A. as Trustee will include any successor to First Interstate Bank of Texas, N.A. by reason of its merger, reorganization, or sale to another banking corporation with trust powers or a trust company with trust powers.

D. **AUTHORITY OF SUCCESSOR TRUSTEE.** A successor will have the authority vested in a Trustee by original appointment under this Trust Declaration, subject to any lawful limitations or qualifications upon the service of a successor imposed by one Trustee in a written document appointing a successor. A successor Trustee will not be obliged to examine the accounts, records, or acts of the previous Trustee or Trustees; nor will a successor Trustee in any way or manner be responsible for any act or omission to act on the part of any previous Trustee. Reference to "Trustee" in the singular will include the plural.

E. **BOND.** No one serving as Trustee will be required to furnish a fiduciary bond as a prerequisite to service.

F. **RESIGNATION OR REMOVAL OF A TRUSTEE.** Any appointee serving or entitled to serve as Trustee may resign at any time and without cause, and the instructions in this Trust Declaration will determine who the successor will be (including successors appointed by a Trustee as herein provided). The trust beneficiary or beneficiaries who are then entitled to receive distributions of income from the trust, or distributions of income from any separate trust created by this document, may remove any corporate Trustee then serving, the notice of removal to be delivered in writing to the corporate Trustee. Unless this Trust Declaration or any instrument appointing a successor provides otherwise, the selection of a successor to the corporate Trustee will be made by a Court of competent jurisdiction. In the event there is more than one beneficiary entitled to the income from the trust, all income beneficiaries must join in the written notice of removal. The consent of any person who is deceased or legally disabled will not be required in meeting the unanimous consent requirements for removal.

003277

G.   **AFFIDAVIT OF AUTHORITY.**  Any person or entity dealing with the Trust may rely upon the affidavit of a Trustee or Trustees of the Trust:

> On my [our] oath, and under the penalties of perjury, I [we] swear that I [we] am [are] the duly appointed and authorized Trustee[s] of DAKOTA TRUST.  I [we] certify that I [we] have not been removed as Trustee[s] and have the authority to act for, and bind, DAKOTA TRUST in the transaction of the business for which this affidavit is given as affirmation of my [our] authority.

_____
Signature Line

Sworn and subscribed before me, the undersigned authority, by _____ this _____ day of _____, 19___.

_____
Notary Public - State of Texas

H.   **DOCUMENTING SUCCESSION.**  The successor to any Trustee may document succession with an affidavit setting forth that the preceding Trustee has failed or ceased to serve and the successor has assumed the duties of Trustee.  The affidavit may be filed in the deed records of Fort Bend County, Texas and in each county in which real property held in Trust is located or in the county in which the principal assets and records of the Trust are located.  The public and all persons interested in and dealing with the Trust and the Trustee may rely upon a certified copy of the recorded affidavit as conclusive evidence of a successor's authority to serve and act as the Trustee of the Trust.

I.   **COMPENSATION.**  Any person who serves as Trustee may elect to receive a reasonable compensation, reasonable compensation to be measured by the time required in the administration of the Trust and the responsibility assumed in the discharge of the duties of office.  The fee schedules of area Trust departments prescribing fees for the same or similar services may be used to establish reasonable compensation.  A corporate Trustee will be entitled to receive as its compensation such fees as are then prescribed by its published schedule of charges for Trusts of a similar size and nature and additional compensation for extraordinary services performed by the corporate Trustee.  A Trustee will be entitled to full reimbursement for expenses, costs, or other obligations incurred as the result of service, including attorney's, accountant's, and other professional fees.

J.   **MULTIPLE TRUSTEES.**  In the event there are two Trustees serving the Trust, both must sign any instrument transferring real property from the Trust.  If the Trustees agree to do so, one Trustee acting alone may be given the primary

UNOFFICIAL COPY

003278

responsibility of administration and accounting, and one Trustee alone may be authorized to deposit, transfer and withdraw funds from any depository account held by the Trust. The authority vested in three or more trustees may be exercised by a majority of the trustees. In the event of an action or decision by a majority, the non-consenting Trustee will not be responsible for the act of the majority.

## ARTICLE VI.
## DISTRIBUTIONS FROM THE TRUST,
## LIVING AND POST-MORTEM

A. **FOR SO LONG AS HOLLI HARDIN FONTENOT AND DALLAS JOSEPH FONTENOT, JR. SHALL REMAIN MARRIED.** For so long as Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr. shall remain married, the Trustee may from time to time distribute to or pay for the benefit of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., or either of them, so much of the net income (and, if the net income of the Trust is not sufficient, the principal of the Trust) as the Trustee determines may be necessary for the support, maintenance, health, and general welfare of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., or either of them. Such determination shall be in the absolute discretion of the Trustee, whose decisions shall be binding.

B. **UPON THE TERMINATION BY DIVORCE OF THE MARITAL RELATIONSHIP OF HOLLI HARDIN FONTENOT AND DALLAS JOSEPH FONTENOT, JR.** Upon the termination by divorce of the marital relationship of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., the interest of Holli Hardin Fontenot in this Trust will terminate and this Trust is to be continued in trust for the benefit of Dallas Joseph Fontenot, Jr. as follows:

1. This trust will is to be continued in Trust for the sole use and benefit of Dallas Joseph Fontenot, Jr. for so long as he shall live. Dallas Joseph Fontenot, Jr. will, for the duration of the Trust, be entitled to the net income of the Trust, this amount to be paid in convenient installment payments to be not less than quarter-annually. Distributions of income to Dallas Joseph Fontenot, Jr. shall be made in the amount, form, and manner required by Section 2523(f) of the Internal Revenue Code. If the income known by the Trustee to be available to Dallas Joseph Fontenot, Jr. from other sources is insufficient to provide for his continued

Page 9 of 23 Pages

003279

support and maintenance in good health, the Trustee will have the authority to pay to Dallas Joseph Fontenot, Jr. or apply for his benefit, so much of the principal of the Trust, even to the exhaustion thereof, as is necessary to provide for his support and maintenance in the style and comfort to which he is accustomed and to provide for his medical needs and maintenance of good health. It is intended that the payment of principal be limited by the ascertainable standard provided above, that this provision comply fully with Treasury Regulation §20.2041-1(c)(2), and that this Trust is to be construed and limited to that end. Dallas Joseph Fontenot, Jr. may at any time require that property which does not produce an income or a sufficient income be sold and invested in income producing property.

2.   Upon the death of Dallas Joseph Fontenot, Jr., Dallas Joseph Fontenot, Jr., by a clause in his Will in which he specifically exercises this power of appointment, shall have the power to appoint the then remaining trust assets to or for the benefit of any one or more of the descendants of Dallas Joseph Fontenot, Jr. or the descendants of Holli Hardin Fontenot, in such shares, proportions, or amounts, upon such trusts and for such estates as he alone may determine. If Dallas Joseph Fontenot, Jr. fails to exercise this special power of appointment to the fullest extent, then, subject to the other provisions of this Trust, upon his death, the unappointed trust assets shall be delivered to the living descendants of Holli Hardin Fontenot who were born prior to the date of divorce and to the living descendants of Dallas Joseph Fontenot, Jr., *per stirpes*.

C.   **UPON THE DEATH OF HOLLI HARDIN FONTENOT WHILE MARRIED TO DALLAS JOSEPH FONTENOT, JR.**   Upon the death of Holli Hardin Fontenot while married to Dallas Joseph Fontenot, Jr. this Trust is to be continued in Trust as follows:

1.   This trust will is to be continued in Trust for the sole use and benefit of Dallas Joseph Fontenot, Jr. for so long as he shall live. Dallas Joseph Fontenot, Jr. will, for the duration of the Trust, be entitled to the net income of the Trust, this amount to be paid in convenient installment payments to be not less than quarter-annually. Distributions of income to Dallas Joseph Fontenot, Jr. shall be made in the amount, form, and manner required by Section 2056(b)(7)(B) of the Internal Revenue Code. If the income known by the Trustee to be

UNOFFICIAL COPY

003280

available to Dallas Joseph Fontenot, Jr. from other sources is insufficient to provide for his continued support and maintenance in good health, the Trustee will have the authority to pay to Dallas Joseph Fontenot, Jr. or apply for his benefit, so much of the principal of the Trust, even to the exhaustion thereof, as is necessary to provide for his support and maintenance in the style and comfort to which he is accustomed and to provide for his medical needs and maintenance of good health. It is intended that the payment of principal be limited by the ascertainable standard provided above, that this provision comply fully with Treasury Regulation §20.2041-1(c)(2), and that this Trust is to be construed and limited to that end. Dallas Joseph Fontenot, Jr. may at any time require that property which does not produce an income or a sufficient income be sold and invested in income producing property.

2. Upon the death of Dallas Joseph Fontenot, Jr., Dallas Joseph Fontenot, Jr., by a clause in his Will in which he specifically exercises this power of appointment, shall have the power to appoint the then remaining trust assets to or for the benefit of any one or more of the descendants of Dallas Joseph Fontenot, Jr. or the descendants of Holli Hardin Fontenot, in such shares, proportions, or amounts, upon such trusts and for such estates as he alone may determine. If Dallas Joseph Fontenot, Jr. fails to exercise this special power of appointment to the fullest extent, then, subject to the other provisions of this Trust, upon his death, the unappointed trust assets shall be delivered to the living descendants of Holli Hardin Fontenot and to the living descendants of Dallas Joseph Fontenot, Jr., *per stirpes*.

D. **UPON THE DEATH OF DALLAS JOSEPH FONTENOT, JR. WHILE MARRIED TO HOLLI HARDIN FONTENOT.** Upon the death of Dallas Joseph Fontenot, Jr. while married to Holli Hardin Fontenot, this Trust is to be continued in Trust as follows:

1. This trust will is to be continued in Trust for the sole use and benefit of Holli Hardin Fontenot for so long as she shall live. Holli Hardin Fontenot will, for the duration of the Trust, be entitled to the net income of the Trust, this amount to be paid in convenient installment payments to be not less than quarter-annually. If the income known by the Trustee to be available to Holli Hardin Fontenot from other sources is insufficient to provide for her continued support and

Page 11 of 23 Pages

003281

maintenance in good health, the Trustee will have the authority to pay to Holli Hardin Fontenot or apply for her benefit, so much of the principal of the Trust, even to the exhaustion thereof, as is necessary to provide for her support and maintenance in the style and comfort to which she is accustomed and to provide for her medical needs and maintenance of good health. Holli Hardin Fontenot may at any time require that property which does not produce an income or a sufficient income be sold and invested in income producing property.

2.    Upon the death of Holli Hardin Fontenot, unless Holli Hardin Fontenot shall issue a direction to the contrary, the Trustee will pay from the Trust assets the entire increment in the taxes payable by reason of her death to the extent that the total of such taxes is greater than would have been imposed if the trust assets had not been taken into account in determining such taxes.

3.    Dallas Joseph Fontenot, Jr., by a clause in his Will in which he specifically exercises this power of appointment, shall have the power to appoint the trust assets remaining upon the death of Holli Hardin Fontenot to or for the benefit of any one or more of the descendants of Dallas Joseph Fontenot, Jr. or the descendants of Holli Hardin Fontenot, in such shares, proportions, or amounts, upon such trusts and for such estates as he alone may determine. If Dallas Joseph Fontenot, Jr. fails to exercise this special power of appointment to the fullest extent, then, subject to the other provisions of this Trust, upon his death, the unappointed trust assets shall be delivered to the living descendants of Holli Hardin Fontenot and to the living descendants of Dallas Joseph Fontenot, Jr., *per stirpes*.

E.    **ELECTION, QUALIFIED TERMINABLE INTEREST PROPERTY.** It is important to emphasize that upon the death of Holli Hardin Fontenot, or the termination by divorce of the marital relationship of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., Dallas Joseph Fontenot, Jr. will have no more than a life interest in the Trust. Dallas Joseph Fontenot, Jr. will have no right or power to revoke or amend this Trust. The Trustee may, without liability for doing so or the failure to do so, elect to treat all or a part of the Trust as Qualified Terminable Interest Property pursuant to the requirements of Section 2056(b)(7) or Section 2523(f) of the Internal Revenue Code, whichever is applicable. To the extent that an election is made, and unless Dallas Joseph Fontenot,

003282

Jr. shall issue a direction to the contrary, the Trustee will pay from the Trust assets the entire increment in the taxes payable by reason of his death to the extent that the total of such taxes is greater than would have been imposed if the property treated as qualified terminable interest property had not been taken into account in determining such taxes. To the extent a partial election is made, and to the extent and in the manner then permitted by law, the Trustee will have the authority (1) to divide the Trust into separate trusts to reflect the partial election, or (2) to continue the Trust as a whole, with the fraction or percentage of the whole representing the elective share to be administered and maintained in a manner to reflect its proportionate share of the increment or decline in the whole of the property for the purposes of applying Sections 2044 and 2519 of the Internal Revenue Code. If the Trust is divided into separate parts, the Trustee will make the division according to the fair market value at the time the division is made. It is Settlor's intent and purpose to comply with state and federal law so that the least amount of federal estate tax will be payable upon the deaths of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., and this Trust Declaration is to be applied and construed to accomplish this objective.

F.  **DIVISION INTO SEPARATE TRUSTS.** If, following the death of Holli Hardin Fontenot or the termination by divorce of the marital relationship between Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot, the Trust is divided into separate trusts, the appreciation or depreciation in the value of each such trust or account will measure the value thereof for the purpose of disposition and taxation. For example, if the Trustee elects to treat all but $600,000 of the Trust assets as qualified terminable interest property for the federal estate tax marital deduction, and if the Trustee segregates the $600,000 amount into a separate trust, the amount distributable therefrom upon the death of Dallas Joseph Fontenot, Jr. will be the value of that account upon the death of Dallas Joseph Fontenot, Jr. If, however, the $600,000 amount represents 25 percent of the total trust estate, and is continued and maintained as a fractional percentage of the whole, the value of the fractional interest upon the death of Dallas Joseph Fontenot, Jr. is to be determined with regard to its proportional share of any increase or decrease in the value of the whole.

G.  **ITEMS OF TANGIBLE PERSONAL PROPERTY IN TRUST.** Holli Hardin Fontenot may have certain items of tangible personal property which are her separate property and which have been

003283

transferred to the Trust or otherwise subject to the Trustee's control. The term "personal belongings" or "tangible personal property" will mean and identify personal wearing apparel, jewelry, household furnishings and equipment, books, albums, art work, entertainment and sports equipment, and all items of decoration or adornment. Holli Hardin Fontenot may at any time and from time to time deliver to the Trustee written instructions as to any living or post mortem gifts of such personal belongings, and the Trustee shall be authorized and bound to make disposition of these items as Holli Hardin Fontenot has reasonably directed.

H. **PARTIAL AND FINAL DISTRIBUTIONS.** The Trustee, in making or preparing to make a partial or final distribution, may prepare an accounting and may require, as a condition to payment, a written and acknowledged statement from each distributee that the accounting has been thoroughly examined and accepted as correct; a discharge of the Trustee; a release from any loss, liability, claim or question concerning the exercise of due care, skill, and prudence of the Trustee in the management, investment, retention, and distribution of property during the Trustee's term of service, except for any undisclosed error or omission having basis in fraud or bad faith; and an indemnity of the Trustee, to include the payment of attorney's fees, from any asserted claim of any taxing agency, governmental authority, or other claimant. Any remainder beneficiary having a question or potential claim may require an audit of the Trust as an expense of administration. Failure to require the audit prior to acceptance of the Trustee's report, or the acceptance of payment, will operate as a final release and discharge of the Trustee except as to any error or omission having basis in fraud or bad faith.

The Trustee, in making or preparing to make a partial or final distribution will have the authority to: (1) partition any asset or class of assets and deliver divided and segregated interests to the beneficiaries; (2) sell any asset or class of assets (whether or not susceptible to partition in kind), and deliver to a beneficiary or beneficiaries a divided interest in the proceeds of sale and/or divided or undivided interests in any note and security arrangement taken as part of the purchase price; and/or (3) deliver undivided interests in an asset or class of assets to the beneficiaries subject to any indebtedness which may be secured by the property.

I. **CONTINUATION OF THE TRUST DURING DISSOLUTION.** The Trust may continue beyond its termination for a time reasonably necessary to conclude the administration of the Trust, pay

003284

expenses of termination and to distribute to the Trust property to those entitled thereto.

J.  **CONTINGENT TRUST FOR CERTAIN BENEFICIARIES.** The interest of any Trust Beneficiary who has not attained the age of thirty-five (35) years (the "required age"), or who may be otherwise legally disabled, and whose interest is not otherwise covered by the provisions of this Trust Declaration or another Trust, may, in the sole and absolute discretion of the Trustee, be continued in Trust, or be held as a separate trust, for the use and benefit of that person until such person shall attain the required age or until such person is no longer disabled. For so long as the trust shall exist, the Trustee shall hold, manage, and make distributions of income and principal to provide for his or her health, education, support and maintenance. The Trustee may make an entire distribution of principal to a Trust Beneficiary prior to the required age if, in the Trustee's determination alone, the beneficiary has demonstrated an ability to conserve his or her resources or if it is no longer feasible for the trust to continue considering the size of the trust and the time and cost to maintain the trust. The Trust Beneficiary, with consent of the Trustee, may also extend the term of the trust.

For so long as the Trust is held for a beneficiary pursuant to these terms, the Trust Beneficiary, using a qualified beneficiary designation, will have the right to appoint the beneficiaries of his or her interest in the Trust entitled to his or her interest upon the Trust Beneficiary's death. If the Trust Beneficiary dies prior to a final distribution of his or her interest from the Trust, without having made a qualified beneficiary designation, that person's interest will pass *per stirpes* to his or her descendants then living, or if none, *per stirpes* to Settlor's descendants then living.

K.  **PERPETUITIES.** In no event will the term of this Trust continue for a term greater than twenty-one (21) years after the death of the last survivor of Settlor and all relatives of Settlor living on the effective date of this Trust Declaration. Any continuation of the Trust by the qualified exercise of a power of appointment will be construed as the creation of a separate trust and an extension of the Rule Against Perpetuities to the extent permitted by law. A court of competent jurisdiction is to liberally construe and apply this provision to validate an interest consistent with Settlor's intent and may reform or construe an interest according to the doctrine of *cy pres*.

003285

ARTICLE VII.
PAYMENT OF DEBTS, TAXES, AND
SETTLEMENT COSTS
EXERCISE OF ELECTIONS

The following directions concern the payment of debts, taxes, estate and trust settlement costs, and the exercise of any election permitted by Texas law or by the Internal Revenue Code:

A.    **PAYMENT OF INDEBTEDNESS AND SETTLEMENT COSTS.**  The Trustee will have the discretionary authority to pay from the Trust Fund the costs reasonably and lawfully required to settle the estate of a deceased beneficiary.  In the event there is more than one Trust Beneficiary immediately preceding the death of a beneficiary, distributions of Trust income and principal to pay settlement costs will not exceed that person's trust share or the fair market value of the beneficiary's interest in the Trust which is distributable by reason of his or her death.

B.    **SPECIAL BEQUESTS.**  Unless otherwise provided in this Trust document, or in any amendment, or in a document exercising a power to appoint the beneficiaries of this Trust, if property given as a special bequest or gift is subject to a mortgage or other security interest, the designated recipient of the property will take the asset subject to the obligation and the recipient's assumption of the indebtedness upon distribution of the asset to the recipient.  The obligation to be assumed shall be the principal balance of the indebtedness on date of death, and the Trust shall be entitled to reimbursement or offset for principal and interest payments paid by the Trust to date of distribution.

C.    **ESTATE, GENERATION SKIPPING, OR OTHER DEATH TAX.**  Unless otherwise provided in this Trust document, or in a document exercising a power to appoint the beneficiaries of this Trust, estate, inheritance, succession, or other similar tax shall be charged to and apportioned to those whose gifts or distributive share generate a death tax liability by reason of Settlor's death or by reason of a taxable distribution from the Trust or a taxable termination of the Trust.  To the extent Settlor may lawfully provide, a Trustee may pay and deduct from a beneficiary's distributive share (whether the distribution is to be paid outright or is to be continued in Trust) the increment in taxes payable by reason of a required distribution or termination of interest (i.e., estate, gift, inheritance, or generation skipping taxes) to the extent that the total of such taxes payable by reason of a distribution or

UNOFFICIAL COPY

003286

termination is greater than the tax which would have been imposed if the property of the Trust subject to the distribution or termination of interest had not been taken into account in determining the amount of such tax. To the extent a tax liability results from the distribution of property to a beneficiary other than under this Trust, the Trustee will have the authority to reduce any distribution to the beneficiary from this Trust by the amount of the tax liability apportioned to the beneficiary, or if the distribution is insufficient, the Trustee will have the authority to proceed against the beneficiary for his, her, or its share of the tax liability. In making an allocation, the Trustee may consider all property included in the gross estate of the Settlor for federal estate tax purposes, including all property subject to probate, all amounts paid or payable to another as the result of death, including life insurance proceeds, proceeds from a qualified retirement plan or account, proceeds from a joint and survivorship account with a financial institution or brokerage company, proceeds from a buy-sell or redemption contract, and/or any other plan or policy which provides for a payment of death benefits. This provision further contemplates and includes any tax which results from the inclusion of a prior transfer in the federal gross estate of Settlor even though possession of the property previously transferred is vested in someone other than the Trustee. This provision does not include a reduction in the unified credit by reason of taxable gifts previously made by Settlor. If the Trustee determines that the collection of an apportioned tax liability against another is not economically feasible or probable, the tax liability will be paid by the Trust and will reduce the amount distributable to the residuary beneficiaries. The Trustee's judgment with regard to the feasibility of collection is to be conclusive.

D.  **SPECIAL ELECTION FOR QUALIFIED TERMINABLE INTEREST PROPERTY.** For the purpose of identifying the "transferror" in allocating a GST exemption, the estate of Holli Hardin Fontenot or the Trustee of this Trust may elect to treat all of the property which passes in Trust to Dallas Joseph Fontenot, Jr. for which a marital deduction is allowed, by reason of Section 2056(b)(7) or Section 2523(f) of the Internal Revenue Code, as if the election to be treated as Qualified Terminable Interest Property had not been made. Reference to the "Special Election For Qualified Terminable Interest Property" will mean and identify the election provided by Section 2652(a)(2) of the Internal Revenue Code. The term "GST Exemption" or "GST Exemption Amount" is the dollar amount of property which may pass as generation skipping transfers under Subtitle B,

Chapter 13, of the Internal Revenue Code of 1986 which is exempt from the generation-skipping tax.

E.    **ELECTIVE DEDUCTIONS.**  A Trustee will have the discretionary authority to claim any obligation, expense, cost, or loss as a deduction against either estate tax or income tax, or to make any election provided by Texas law, the Internal Revenue Code, or other applicable law, and the Trustee's decision will be conclusive and binding upon all interested parties and shall be effective without obligation to make an equitable adjustment or apportionment between or among the beneficiaries of this Trust or the estate of deceased beneficiary.

<div align="center">

**ARTICLE VIII.**
**SERVICE OF THE TRUSTEE**
**OTHER MATTERS**

</div>

A.    **GENERAL AUTHORITY.**  A Trustee is to serve without Court supervision.  The service of a Trustee is to be governed first by the terms, conditions, and authority prescribed by this Trust Declaration, and then as prescribed by the trust laws of the State of Texas.

B.    **RETENTION OF ASSETS.**  A Trustee will have the authority to retain, without liability, any and all property in the form in which it is received by the Trustee without regard to its productivity or the proportion that any one asset or class of assets may bear to the whole.  A Trustee will not have liability nor responsibility for loss of income from or depreciation in the value of property which was retained in the form which the Trustee received it.

C.    **UNDIVIDED INTERESTS.**  A Trustee will have the authority to hold, acquire, and dispose of undivided interests in property.

D.    **LENDING, INVESTING.**  A Trustee will have the authority to lend, borrow, lease, sell, and purchase property, including undivided fractional interests in property, upon such terms and conditions as are reasonably prudent under the facts and circumstances then existing. A Trustee may transact business, including lending, borrowing, leasing, and sale, between two or more related trusts or persons upon such terms and conditions as are reasonably prudent under the facts and circumstances then existing.  Without limiting the general authority above given, a Trustee will have the authority to hold, acquire and sell:

<div align="center">

Page 18 of 23 Pages

</div>

003288

- Publicly traded securities, including stocks, bonds, warrants, futures, mutual funds, partnerships, real estate investment trusts, diversified asset funds.
- Interests in a closely held corporation, partnership, or trust, whether registered or not registered for public sale.
- Obligations of the United States Government or any other government.
- Cash deposits, money market funds, brokerage company accounts, certificates of deposit, savings accounts, and checking accounts, without limitation as to the location of the account or depository.
- Promissory notes, secured and unsecured, including mortgage notes purchased at a discount.
- Land, improved and unimproved, whether presently income producing or held for appreciation in value.
- Land, building and equipment leases.
- Minerals, mineral rights and working interests in mineral producing property or property held for future development.
- Equipment, implements, stock in trade, leasehold improvements, and livestock.
- Insurance policies.

E.  **LIMITATION UPON A TRUSTEE'S LIABILITY.**  A Trustee, other than a banking corporation serving as a Trustee, will not have personal liability for service in a fiduciary capacity other than for acts or omissions to act which, as determined by a court of law, constitute gross negligence or fraud.

F.  **PROTECTION OF THE INTERESTS OF BENEFICIARIES.**  No beneficiary will have the power to anticipate, encumber or transfer any interest in the Trust.  No part of the Trust will be liable for or charged with any debts, contracts, liabilities or torts of a beneficiary or subject to seizure or other process by any creditor of a beneficiary.

G.  **RELATIONSHIP WITH BENEFICIARIES WHO ARE MINORS OR INCOMPETENTS.**  Distributions to an incompetent or disabled beneficiary, or a Minor Beneficiary may be made in such of the following ways as in the Trustee's opinion will be most beneficial to the interests of the beneficiary:  (a) directly to such beneficiary; (b) to his or her parent, guardian or legal representative; (c) to a custodian for said beneficiary under any Uniform Gifts to Minors Act and/or Gifts of Securities to Minors Act in the jurisdiction of residence of such beneficiary; (d) to any person with whom he or she is residing; (e) to some near relative or close friend; or (f) by

003289

the Trustee using such payment directly for the benefit of such beneficiary, including payments made to or for the benefit of any person or persons whom said beneficiary has a legal obligation to support. The Trustee may in the Trustee's sole discretion instead hold such income or corpus for the account of such beneficiary as custodian. A receipt from a beneficiary or from his parent, guardian, legal representative, relative, close friend, or other person described above shall be a sufficient discharge to the Trustee from any liability for making said payments.

The Trustee is likewise authorized to consult with and act upon the advice of the parent, guardian, custodian, or legal representative of any beneficiary who is either an incompetent or a Minor with respect to any and all matters which may arise under this Declaration and as concerns the rights or interests of said beneficiary. All statements, accounts, documents, releases, notices, or other written instruments, including but not limited to written instruments concerning the resignation or replacement of any Trustee or Trustees, required to be delivered to or executed by such beneficiary may be delivered to or executed by the parent, guardian, custodian, or legal representative of said incompetent or Minor Beneficiary, and when so delivered or executed shall be binding upon said incompetent or Minor Beneficiary, and shall be of the same force and effect as though delivered to or executed by a beneficiary acting under no legal disability.

## ARTICLE IX.
### UNPRODUCTIVE OR UNDERPRODUCTIVE PROPERTY

A beneficiary who is then entitled to the income of the Trust, or the income of any other Trust established or continued pursuant to this trust declaration, will have the authority to issue a written directive to the Trustee to convert Trust Property which does not produce an income, or which is underproductive, into property which is income producing or which will provide a greater income to the trust. Upon actual receipt of an income beneficiary's written directive, the Trustee will reasonably and prudently proceed to convert unproductive or underproductive property into property which will produce a reasonable and safe rate of return. The Trustee may do so by selling the unproductive or underproductive asset upon such terms and conditions as is prudent and reasonable under all circumstances which may then exist (including the acceptance of an income or interest bearing obligation as the whole or a part of the sales price), and investing the proceeds of sale in income producing instruments or obligations. Notwithstanding

003290

these requirements, a Trust Beneficiary cannot direct the Trustee to invest or reinvest trust property in a trust investment which is speculative in nature or which, in result, would violate the spendthrift provisions of this Trust Declaration.

## ARTICLE X.
### NO-CONTEST REQUIREMENTS

Settlor vests in the Trustee the authority to construe this Trust instrument and to resolve all matters pertaining to disputed issues or controverted claims. Settlor does not want to burden this Trust with the cost of a litigated proceeding to resolve questions of law or fact unless the proceeding is originated by the Trustee or with the Trustee's written permission. Any other person, agency, or organization who shall originate (or who shall cause to be instituted) a judicial proceeding to construe or contest this Trust instrument, or any will which requires distribution of property to this Trust, or to resolve any claim or controversy in the nature of reimbursement, or seeking to impress a constructive or resulting Trust, or alleging any other theory which, if assumed as true, would enlarge (or originate) a claimant's interest in this Trust or in Settlor's estate, without the Trustee's written permission, shall forfeit any amount to which that person, agency, or organization is or may be entitled and the interest of any such litigant or contestant shall pass as if he or she or it had predeceased us. These directions shall apply even though the person, agency or organization shall be found by a court of law to have originated the judicial proceeding in good faith and with probable cause and even though the proceedings may seek nothing more than to construe the application of this no-contest provision. This requirement is to be limited, even to the exclusion thereof, in the event it operates to deny the benefits of the federal estate tax or federal gift tax marital deduction.

## ARTICLE XI.
### JURISDICTION

The jurisdiction of this Trust will be the State of Texas. Any issue of law or fact pertaining to the creation, continuation, administration, and termination of the Trust, or any other matter incident to this Trust, is to be determined with reference to the specific directions in the Trust Declaration and then under the laws of the State of Texas. If a Article or Subsection of this Trust Declaration is in conflict with a prohibition of state law or federal law, the Article or Subsection, or the Trust Declaration as a whole, is to be construed in a manner which will cause it to be

003291

in compliance with state and federal law and in a manner which will result in the least amount of taxes and estate settlement costs.

## ARTICLE XII.
### ACCEPTANCE BY TRUSTEE

Holli Hardin Fontenot acknowledges that she is the initial Trustee of the DAKOTA TRUST. By execution of this Trust Declaration, Holli Hardin Fontenot accepts the office of Trustee and agrees to hold and administer the Trust according to the provisions thereof and as required by law.

### CONCLUSION AND ATTESTATION

Holli Hardin Fontenot attests that she has executed this Trust Declaration on the date set forth below, and the terms thereof will bind her, her successors and assigns, and her heirs and personal representatives. This instrument is to be effective upon the date recorded immediately below.

Dated:    November 9, 1994

original signed by Holli Hardin Fontenot

Holli Hardin Fontenot, individually and as Trustee

Page 22 of 23 Pages

003292

STATE OF TEXAS          §
                        §
COUNTY OF HARRIS        §

On this __9th__ day of __November__ in the year 199_4_ before me, a Notary Public of said State, personally appeared Holli Hardin Fontenot, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument, and acknowledged that she executed the same in the capacities expressed therein.

WITNESS MY HAND and official seal.

_____
Notary Public, State of Texas

[SEAL]

UNOFFICIAL COPY

003293

## SCHEDULE A TO
## TRUST DECLARATION
## DAKOTA TRUST

The Sum of SIXTY FOUR THOUSAND AND NO/100 DOLLARS ($64,000.00) from the Holli Ann Hardin Sole and Separate Property Account, which sum constitutes the separate property of the Settlor

Page 24 of 23 Pages

003294

This trust may need a demand power after Holli's death so that we can take advantages of $10,000 per year exclusion for gifts of present interest.

UNOFFICIAL COPY

Page 23 of 23 Pages

003295



TO WHOM IT MAY CONCERN:

I, Holli Ann Hardin Fontenot, hereby voluntarily resign as trustee of the Holli Ann Hardin Fontenot Trust Number One and the Dakota Trust. This resignation as trustee shall be effective immediately upon acceptance by Dallas J. Fontenot, Jr.

Very truly yours,

Holli Ann Hardin Fontenot

Agreed and accepted this __8__ day of __SEPT.__, 1996.

Dallas J. Fontenot, Jr.

LDK238:19

UNOFFICIAL COPY

003296

# EXHIBIT C    537721

## NO. 21-CPR-036521

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN THE COUNTY COURT AT LAW |
| | § | |
| DALLAS JOSEPH FONTENOT, JR., | § | NUMBER FOUR (4) OF |
| | § | |
| DECEASED | § | FORT BEND COUNTY, TEXAS |

## NO. 21-DCV-288736

| | | |
|---|---|---|
| IN RE: | § | IN THE 240th DISTRICT COURT |
| | § | |
| | § | OF |
| HOLLI ANN HARDIN TRUST | § | |
| NUMBER ONE | § | FORT BEND COUNTY, TEXAS |

### BINDING MEDIATED SETTLEMENT AGREEMENT

The Parties – Dakota Fontenot, individually, in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in his capacity as next friend and virtual representative for S.F., a minor, Holli Ann Fontenot, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, Dallas Joseph Fontenot, III, individually, and in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One, Michelle Ann Fontenot, individually, in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in her capacity as next friend and virtual representative for A.E., a minor, and Ashley Fontenot Estrada, individually and in her capacity as a beneficiary of the Hollis Ann Hardin Trust Number One – hereto agree that all causes of action pending in cause number 21-CPR-036521 and cause number 21-DVC-288736, both of which are pending in Fort Bend County, Texas, and all related claims and/or controversies between them, whether asserted or not, known or unknown, actual or contingent, are hereby settled, in accordance with the terms of this Binding Mediated Settlement Agreement (hereinafter referred to as the "Settlement Agreement").

### A. DEFINITIONS

1.      Whenever used in this Settlement Agreement, the following terms shall have and be construed to have the following meanings:

i.      "Settlement Agreement" shall mean and refer to this Binding Mediated Settlement Agreement.

ii.      "Dakota" shall mean and refer to Dakota Fontenot, individually, in his capacity as beneficiary of the Holli Ann Hardin Trust Number One, and in his capacity as next friend and virtual representative of S.F., a minor.

1

iii.    "Holli" shall mean and refer to Holli Ann Fontenot, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

iv.    "Joe" shall mean and refer Dallas Joseph Fontenot, III, individually and in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

v.    "Michelle" shall mean and refer to Michelle Ann Fontenot, individually, in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in her capacity as next friend and virtual representative of A.E., a minor.

vi.    "Ashley" shall mean and refer to Ashley Fontenot Estrada, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

vii.    "Trust" shall mean and refer to the Holli Ann Hardin Trust Number One.

viii.    "Estate" shall mean and refer to the Estate of Dallas Joseph Fontenot, Jr., whose administration is pending in cause number 21-CPR-036521, in the County Court at Law Number Four (4) of Fort Bend County, Texas.

ix.    "Parties" shall mean and refer to Dakota, Holli, Joe, Michelle, and Ashley, collectively, as described in paragraphs two (ii) through six (vi) above.

x.    "Claims" shall mean and include any and all causes of action, demands, debts, obligations, duties, liens, liabilities, and theories of liabilities of whatsoever kind and nature, whether based in contract or tort, whether arising in equity or under the common law, whether by statute or regulation, whether known or unknown, whether past or present, whether contingent or matured, whether for damages relief, injunctive relief, declaratory relief, equitable relief, or any other type of relief, whether for actual damages, personal injury damages, mental anguish, liquidated damages, punitive damages, exemplary damages, compensatory damages, consequential damages, incidental damages, pecuniary damages, costs, expenses, attorneys' fees, penalties, or fines that are (is), were (was), could be, or could have been asserted as of the Effective Date, regardless of whether actually asserted, whether by claim, counterclaim, cross-claim, motion, third-party claim regarding the Estate and Trust, including but not limited to, claims, whether asserted or not, known or unknown, actual or contingent.

xi.    "Effective Date" shall mean and refer to the date that the last Party to this Settlement Agreement executes the same.

xii.    In respect to any defined term herein, the singular shall include the plural, and the plural shall include the singular.

2

## B. TERMS, CONDITIONS, AND MUTUAL CONSIDERATION

1.      The Parties acknowledge that bona fide disputes and controversies exist between them, both as to liability and the amount thereof in damages, if any, and by reason of such disputes and controversies they desire to compromise and settle all Claims and causes of action of any kind whatsoever which the Parties have or may have arising out of the transactions or occurrences which have been brought or could have been brought regarding the Trust.

2.      **THE PARTIES AGREE AND ACKNOWLEDGE THAT UPON THE EXECUTION OF THIS SETTLEMENT AGREEMENT, THIS SETTLEMENT AGREEMENT SHALL BECOME BINDING AND IRREVOCABLE.**

3.      The Parties agree that the 2013 Last Will and Testament and 2017 First Codicil to the Last Will and Testament will be admitted to probate.  The Parties agree that Holli will be appointed as the Independent Executor of the Estate and agree not to object to the same.

4.      All of the Estate's assets, including all associated bank accounts, shall be distributed to Holli, save and expect the following items:

- The following items are going to be distributed to Dakota:

    o   The 2017 F150 Truck
    o   The 2013 Toyota Sequoia
    o   All interest, including all associated bank accounts, in Entertainment Marketing and Management, LP
    o   The coin collection and gold located in the backpack at the Rosenburg Office

- The following items are going to be distributed to Joe:

    o   The 2008 Honda Ridgeline
    o   One-half (1/2) of the Decedent's Tiki Mug Collection

The Parties agree to execute all documents necessary to effectuate the conveyance of all property described above the individual recipients stated in paragraph four (4).

5.      From the Rosenburg office, Holli shall be entitled to obtain:

- The remaining $150,000 in non-earmarked cash located in the backpack;
- Any and all Playboy Magazines

6.      The Parties agree that all personal property belonging to Dakota, Joe, and/or Michelle that is currently located at 10402 W. Hidden Lake Lane, Richmond, Texas 77406 shall be distributed to Dakota, Joe, and/or Michelle as appropriate.  Dakota, Joe and/or Michelle shall

3

be afforded the opportunity, within thirty (30) days of the Effective Date of this Settlement Agreement, to conduct a supervised walkthrough of their personal property located at 10402 W. Hidden Lake Lane, Richmond, Texas 77406. During that time, Dakota, Joe, and/or Michelle will take photographs of their personal property which they would like to obtain. A list and accompanying photographs will be delivered to counsel for Holli of those items within fourteen (14) days of the walkthrough being completed. Holli will have fourteen (14) days to object to the items which Dakota, Joe, and/or Michelle would like to obtain. If the parties cannot reach a resolution regarding the same, Russ Jones will mediate, at an hourly rate, the division of the disputed personal property. Upon the completion and approval of a final list of items, Dakota, Joe, and/or Michelle, at their expense, shall obtain and remove the items on the approved final list of items at a mutually agreeable date and time within fourteen (14) days of the approval of the final list of items.

7.      The attorney's fees for Holli, Dakota, Joe, Michelle, and/or Ashley may be paid from the assets of the Holli Ann Hardin Trust Number One in an amount no more than $200,000.00 per side. The Parties will present their fees to Linda Goehrs, in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, for payment. The Parties agree that they will not object to the payment of the fees of any other party.

8.      The real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183 shall be distributed to Holli. Dakota, Michelle, and Joe, with Dakota as authorized representative, shall retain a right of first refusal in the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183. If Holli decides to sell or otherwise transfer the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183, Holli shall notify Dakota, Michelle, and Joe in writing and provide an appraisal completed by a certified and licensed real estate appraiser. From the date of receipt of that notice, Dakota, Michelle, and/or Joe shall have 30 days to exercise their right to purchase the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183. If exercised, Dakota, Michelle, and/or Joe shall enter into a real estate contract to purchase the property with a proposed closing date sixty (60) days from the date of receipt of the notice of sale or transfer triggering the right of first refusal. Holli is not required to sell at the appraised value if she receives offers in excess of the appraised value. If Holli receives an offer greater than the appraised value, the right of first refusal will be triggered upon delivery of the great offer to Dakota as authorized representative. The right of refusal will not renew if it is not exercised against the greatest value delivered by Holli.

9.      With regard to the further administration of the Holli Ann Hardin Trust Number One:

- The Parties agree that the assets of the Holli Ann Hardin Trust Number One shall be appraised by certified and licensed business or real estate appraisers, as is appropriate for the particular asset. Russ Jones shall select the appraisers to complete the real estate and business appraisals. The costs of the appraisals shall be borne by the Holli Ann Hardin Trust Number One.

4

● The Parties agree that, once the values on the appraisals are obtained for all Holli Ann Hardin Trust Number One assets, Holli's interest will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One in an amount equal to the twenty percent (20%) of the total value of the assets. Such purchase will occur within ninety days (90) of the completion of the valuation of the assets of the Holli Ann Hardin Trust Number One.

● The Parties agree that during the appraisal period described above, Linda Goehrs, in her capacity as Temporary Successor Trustee and/or Dakota, shall execute the necessary documents to install Dakota as an Officer and/or Director of Ice Embassy, Inc., HRF Enterprises, Inc., and Entertainment Marketing and Management, LP.

● The Parties agree that Linda Goehrs shall remain Temporary Successor Trustee of the Holli Ann Hardin Trust Number One until the closing of a sale on Holli's interest in the Holli Ann Hardin Trust Number One. At the time that Holli's interest is purchased, Linda Goehrs will resign as Temporary Successor Trustee, and Dakota, Joe, Michelle, and Ashley shall select a Successor Trustee of the Trust.

● Holli agrees to execute an assignment of interest and disclaimer of further interest in the Holli Ann Hardin Trust Number One at the time that her interest is purchased in accordance with this Settlement Agreement.

● The Parties agree that Dakota and Holli shall remain employees of Entertainment Marketing and Management, LP, and/or the business, or businesses owned by the Holli Ann Hardin Trust Number One. Holli shall be removed from the payroll on the date that her interest is purchased pursuant to this Agreement. The compensation amount that Dakota and Holli have been receiving shall remain unchanged.

● The Parties agree that Dakota and Holli shall remain on the insurance paid for by Entertainment Marketing and Management, LP, and/or the business or businesses owned by the Holli Ann Hardin Trust Number One. Holli shall be removed from the insurance plan on the date that her interest is purchased pursuant to this Agreement.

● To the extent owned by the Trust, Linda Goehrs as Temporary Successor Trustee, shall gift the horses known as Coco and Rusty to Holli.

10.    With regard to the further administration of the Dakota Trust:

● The Parties agree that the assets of the Dakota Trust shall be appraised by certified and licensed real estate appraisers. Russ Jones shall select the appraisers to complete the real estate appraisal. The cost of the appraisal shall be borne by the Dakota Trust.

5

- Upon completion of the appraisal, the total value of the assets will be compiled and Holli's interest will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One in an amount equal to eighty-five percent (85%) of the total value of the assets. Such purchase will occur within ninety days (90) of the completion of the valuation of the assets of the Dakota Trust.

- Holli agrees to execute an assignment of interest and disclaimer of further interest in the Dakota Trust at the time that her interest in purchased in accordance with this Settlement Agreement.

11.    Within seven (7) days of the Effective Date of this agreement, Dakota, Joe, Michelle, and/or Ashley agree to dismiss all pending pleas, pleadings, and/or motions, with prejudice regarding the Estate and/or Trust pending in cause number 21-CPR-036521 and cause number 21-DVC-288736, both of which are pending in Fort Bend County, Texas.

12.    Neither the Trust nor any entity owned, held, or possessed by the Holli Ann Hardin Trust Number One, the Dakota Trust, and/or the Estate have any claims against any of the Parties.

13.    The Parties agree to release Linda Goehrs, in her capacity as Temporary Successor Trustee, for making distributions according to this Settlement Agreement which contradict the terms of the Trust Agreement for the Holli Ann Hardin Trust Number One or the Dakota Trust.

## C. RELEASES AND DISCHARGE

1.    **Release of Claims by Dakota.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Dakota, on behalf of himself and all his heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Holli, Joe, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Dakota hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Dakota expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Holli, Joe, Michelle, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Dakota does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

2.    **Release of Claims by Holli.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Holli, on behalf of herself and all her heirs, successors,

6

executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Joe, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Holli hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Holli expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Michelle, Joe, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Holli does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

3.     **Release of Claims by Joe.**  For and in consideration of the mutual promises, covenants, and agreements stated herein, Joe, on behalf of himself and all his heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Joe hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Joe expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Michelle, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Joe does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

4.     **Release of Claims by Michelle.**  For and in consideration of the mutual promises, covenants, and agreements stated herein, Michelle, on behalf of herself and all her heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Joe, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Michelle hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Michelle expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind

7

known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Joe, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Michelle does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

5.      **Release of Claims by Ashley**.  For and in consideration of the mutual promises, covenants, and agreements stated herein, Ashley, on behalf of herself and all her heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Joe, Michelle, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Ashley hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Ashley expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Joe, and Michelle. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Ashley does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

## D. REPRESENTATIONS AND WARRANTIES

1.      **Representations and Warranties**. Each of the Parties hereto represents and warrants to the other that:

      a.     They are adequately represented by competent counsel in connection with the execution and delivery of this Settlement Agreement and/or had an opportunity to retain counsel in connection with this Settlement Agreement;

      b.     In executing this Settlement Agreement, they relied upon the Party's own judgment and any advice it received from its own attorneys;

      c.     They were not induced to sign or execute this Settlement Agreement by promises, omissions, agreements, or representations not expressly stated in this Settlement Agreement;

      d.     They freely and willingly executed this Settlement Agreement and expressly disclaims reliance upon any facts, promises, statements made or not made, undertakings, or representations made by any person or entity

8

prior to the Effective Date of this Settlement Agreement except as specifically enumerated herein;

e.      They consent that this Settlement Agreement was not procured, obtained, or induced by improper conduct or undue influence;

f.      After an opportunity to consult with an attorney concerning the matters made subject of this Settlement Agreement, and after reviewing this Settlement Agreement, they agree this Settlement Agreement is fair, reasonable, and supported by good, valuable, and adequate consideration; and

g.      They understand and agree to the terms and conditions of this Settlement Agreement, which contains the entire agreement between the Parties relating to the matters made the subject of this Settlement Agreement.

2.      **Capacity and Authority.** Each of the Parties hereto represents and warrants to the other that the person signing this Settlement Agreement in a representative capacity has the requisite authority and consent to execute this Settlement Agreement on behalf of the Party for whom he or she has executed this Settlement Agreement, and that this Settlement Agreement is binding upon the Party for whom he or she has executed this Settlement Agreement and upon such Party's successors and assigns.

3.      **Assignment of Claims.** Each of the Parties hereto represents and warrants to the other that it has not transferred, assigned, or otherwise conveyed, excepting any interest held by counsel, in whole or in part, its respective interest in the Claims at issue and that it is the owner and holder thereof. Each of the Parties further represents and warrants that, aside from any interest held by counsel, it is the only holder of the Claims being released and that no other person or entity owns, or has any interest in, any of the Claims being released. Despite any interest held by counsel, this Settlement Agreement applies to the entirety of each of the Parties' Claims.

4.      **Cooperation in Execution of Further Documents.** Each of the Parties expressly agrees to execute any other documents reasonably necessary to effectuate the terms, purpose, and intent of this Settlement Agreement.

E. MISCELLANEOUS PROVISIONS

1.      **Invalidity.** In the event any one or more of the provisions of this Settlement Agreement shall, for any reason, be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Settlement Agreement.

2.      **Entire Agreement.** This Settlement Agreement reflects the final and complete agreement between the parties concerning the matters made subject of this Settlement Agreement and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the Parties. There are no unwritten oral agreements between the Parties. The Parties expressly

9

acknowledge that any rights, duties, or obligations, whether contractual or otherwise, owed by or between the Parties prior to the effective date of this Settlement Agreement are terminated as of the Effective Date of this Settlement Agreement and the only rights, duties, or obligations owed by or between the Parties from this point forward shall be those set forth in this Settlement Agreement.

3.    **Governing Law and Venue.** The validity, effect, and construction of this Settlement Agreement shall be governed by the laws of the State of Texas. Venue for any cause of action, controversy, or dispute regarding this Settlement Agreement or the subject matter hereof shall be proper only in the state courts of Fort Bend County, Texas.

4.    **Amendment.** This Settlement Agreement may not be amended, modified, waived, or terminated unless such is done in a writing signed by all the Parties.

5.    **Construction of Agreement.** This Settlement Agreement shall not be construed in favor of or against any Party on the basis that the Party did or did not author this Settlement Agreement or any attachment related to it. It is intended that this Settlement Agreement shall be comprehensive in nature and shall be construed liberally to affect its purposes.

6.    **Titles or Headings.** All titles or headings used in this Settlement Agreement are used only for the convenience of the Parties and shall not be construed to have any effect or meaning with respect to the other content of the Settlement Agreement, such other content being controlling as to the Settlement Agreement of the Parties.

7.    **Costs and Attorneys' Fees.** Each party shall bear its own costs and attorneys' fees in relation to the claims and the negotiation and preparation of this Settlement Agreement, subject to the attorney's fees provisions within this Settlement Agreement.

8.    **Waiver.** The failure of any of the Parties to enforce, at any time, any provision of this Settlement Agreement shall not be construed to be a waiver of such provision, nor in any way affect the validity of this Settlement Agreement or any part thereof or any right of any Party thereafter to enforce each and every provision. No waiver of any breach of this Settlement Agreement shall be held to constitute a waiver of any other breach.

9.    **Binding Agreement.** This Settlement Agreement is binding on the Parties hereto and not subject to revocation, repudiation, or withdrawal of consent, even if one or more of them shall become debtors in a bankruptcy proceeding. This binding effect is an integral part of this Agreement.

10.    **Execution of Agreement.** This Settlement Agreement may be executed in a number of identical counterparts, each of which shall be deemed an original for all purposes. A fax signature or a copy of an original signature shall constitute an original signature for purposes of this Settlement Agreement. This Settlement Agreement shall be valid only if fully executed by all Parties and/or their representatives as agreed to herein. If not fully executed by all Parties, this Settlement Agreement shall be null and void and of no effect.

10

11.     **Future Disputes.**  In the event that there are future disputes, disagreements, and/or conflicts regarding the terms and/or implementation of any terms of this Settlement Agreement, the Parties agree to return to Russ Jones for mediation regarding the dispute.  The Parties agree to return to mediation prior to filing any litigation regarding a breach of this settlement agreement or these terms.  If a Party refuses to return to mediation, the remaining parties are permitted to file litigation without returning to mediation. Should further litigation be filed regarding a breach of the agreement, the prevailing party shall be entitled to an award of attorney's fees as determined by a jury or judge.

12.     **Indemnity.**  Each party shall indemnify the other parties for all claims made by, through, or under the indemnifying party.

AGREED TO BY ALL PARTIES AS EVIDENCED BY THEIR SIGNATURE BELOW ON THIS THE 7th DAY OF JANUARY, 2022.

_____
Dakota Fontenot, in all capacities

_____
Holli Ann Fontenot, in all capacities

_____
Dallas Joseph Fontenot, III, in all capacities

_____
Michelle Ann Fontenot, in all capacities

_____
Ashley Fontenot Estrada, in all capacities

_____
Christopher Burt
*Counsel for Dakota Fontenot*

11

11.    **Future Disputes.** In the event that there are future disputes, disagreements, and/or conflicts regarding the terms and/or implementation of any terms of this Settlement Agreement, the Parties agree to return to Russ Jones for mediation regarding the dispute. The Parties agree to return to mediation prior to filing any litigation regarding a breach of this settlement agreement or these terms. If a Party refuses to return to mediation, the remaining parties are permitted to file litigation without returning to mediation. Should further litigation be filed regarding a breach of the agreement, the prevailing party shall be entitled to an award of attorney's fees as determined by a jury or judge.

12.    **Indemnity.** Each party shall indemnify the other parties for all claims made by, through, or under the indemnifying party.

AGREED TO BY ALL PARTIES AS EVIDENCED BY THEIR SIGNATURE BELOW ON THIS THE 7th DAY OF JANUARY, 2022.


_____
Dakota Fontenot, in all capacities


_____
Holli Ann Fontenot, in all capacities


# Dallas Joseph Fontenot III
_____
Dallas Joseph Fontenot, III, in all capacities


# Michelle Ann Fontenot
_____
Michelle Ann Fontenot, in all capacities


# Ashley Fontenot Estrada
_____
Ashley Fontenot Estrada, in all capacities


_____
Christopher Burt
*Counsel for Dakota Fontenot*


11



_Steven Mendel_
_Counsel for Holli Ann Fontenot_


_Kenneth Sumner_
_Counsel for Dallas Joseph Fontenot, III,_
_Michelle Ann Fontenot, and Ashley Estrada_

UNOFFICIAL COPY

12

Steven Mendel
*Counsel for Holli Ann Fontenot*

# Kenneth E. Sumner, Jr.

Kenneth Sumner
*Counsel for Dallas Joseph Fontenot, III,*
*Michelle Ann Fontenot, and Ashley Estrada*

Signature: *Dallas Joseph Fontenot III*
Dallas Joseph Fontenot III (Jan 7, 2022 19:33 CST)

Email: djoef3@hotmail.com

Signature: Michelle Fontenot
Michelle Fontenot (Jan 7, 2022 19:36 CST)

Email: mannefontenot@gmail.com

Signature: Ashley Fontenot Estrada
Ashley Fontenot Estrada (Jan 7, 2022 19:38 CST)

Email: ashleyafontenot@gmail.com

Signature: *Kenneth C. Sumner, Jr*

Email: ksumner@romanosumner.com

UNOFFICIAL COPY

12

# EXHIBIT D

537721

## AMENDED AND RESTATED PROMISSORY NOTE     Probate Court No. 1

$2,825,000.00                    Houston, Texas                    May 22, 2023

FOR VALUE RECEIVED, the undersigned, **HFR ENTERPRISES, INC.**, a Texas corporation (the "Maker"), hereby promises to pay to the order of **LHS HOMES, L.L.C.**, a Texas limited liability company ("Lender"), at its offices at 5920 Hillcroft Street, Suite A, Houston, Texas 77036, in lawful money of the United States of America, the principal sum of up to TWO MILLION, EIGHT HUNDRED TWENTY-FIVE THOUSAND AND 00/100 DOLLARS ($2,825,000.00) or so much thereof as may be advanced and outstanding hereunder, together with interest.

This amended and restated promissory note (this "Note") is given in substitution of that certain promissory note executed by Maker in favor of Lender dated January 6, 2023 in the amount of ONE MILLION, EIGHT HUNDRED TWENTY-FIVE THOUSAND AND 00/100 DOLLARS ($1,825,000.00), which fully funded on or about January 6, 2023, (the "Original Note") and to evidence current and future advances in the aggregate amount of ONE MILLION AND 00/100 DOLLARS ($1,000,000.00) (the "New Funds") in accordance with the terms hereof. The Original Note shall, in its entirety, be superseded, amended, and restated by this Note and payment of the indebtedness thereunder shall be governed by this Note as if the aggregate unpaid indebtedness due under the Original Note had been advanced hereunder by Lender. Maker hereby renews and extends its covenant and agreement to pay the indebtedness evidenced by the Original Note, as amended and restated pursuant to this Note, and Maker hereby renews and extends its covenant and agreement to perform, comply with, and be bound by each and every term and provisions of the Original Note, as amended and restated by the terms of this Note. Maker confirms and agrees that this Note is, and shall continue to be, secured by the Deed of Trust recorded on January 9, 2023 under Instrument No. RP-2023-7823 in the Official Public Records of Harris County, Texas (the "Deed of Trust"), and in no way acts as a release or relinquishment of the liens created by the Deed of Trust. All of the provisions of the Deed of Trust now or heretofore executed by Maker as heretofore or contemporaneously herewith modified are hereby ratified and affirmed in all respects. The liens securing payment of the Original Note are hereby modified, extended, renewed, carried forward, and confirmed by Maker in all respects and shall remain in full force and effect until the principal and all accrued interest under this Note shall be fully and finally paid. As of the date hereof, all principal and interest payments due and owing under the Old Note have been paid in full when due and the outstanding unpaid principal balance of the Old Note is $1,809,300.24 (the "Old Note Balance").

This Note is further secured by certain Conditional Guaranty Agreements of even date herewith executed by Viva Las Vegas Properties, Inc., a Texas corporation and an affiliate of Maker ("VLV Guarantor"), Dakota Fontenot, an individual resident of Fort Bend County ("DF Guarantor"), and Ice Embassy, Inc., a Texas corporation (collectively referred to as "Guarantors"), respectively, in favor of Lender.

It is understood and agreed by and between Maker and Lender that (i) the entire principal of the Old Note has been advanced to Maker pursuant to the Old Note and that (ii) the entire principal of the New Funds under this Note is not being advanced in full to Maker upon the execution hereof, but subsequent and periodic advancements in various increments of the New Funds will be made to Maker, upon request to Lender, up to, but not to exceed, the amount of the New Funds pursuant to

1

the terms hereof. Interest on this Note shall accrue only on the principal amount of the New Funds advanced from the time it is so advanced, at the Contract Rate.

Lender shall advance the New Funds by wire transfer to an account designated by Maker as follows:

(i)     An amount equal to $250,000.00 (the "First New Advance") shall be funded immediately upon execution of this Note.

(ii)    Advances of the remaining New Funds, in amounts up to and not exceeding $750,000.00 in the aggregate, shall be advanced incrementally (such incremental advances being referred to individually and collectively as the "Future Advances") within five (5) Business Days after Lender receives a written request for advance ("Request for Advance") from Maker. Each Request for Advance shall be accompanied by a percentage of completion and cost schedule (a "Schedule of Values") describing the construction, maintenance, repair and/or renovation work completed at Maker's property located at 6710 Southwest Freeway, Houston, Harris County, Texas 77074 (the "Project") as of the date of the applicable Request for Advance, including backup documentation as may be reasonably requested by Lender. Additionally, Lender shall not be required to advance any Future Advances unless: (a) Lender's first lien deed of trust and security interest in the property identified in the Deed of Trust remains in a first lien position without tax liens, mechanics liens or any other monetary encumbrances against such Property other than normal permitted exceptions for current property taxes; (b) The VLV Guarantor's Fort Bend Property securing such Guaranty must have received a mortgagee title policy reflecting a first lien in favor of Lender other than normal permitted exceptions for current property taxes and assessments and nonmonetary encumbrances; (c) Maker and the VLV Guarantor must not otherwise be in any breach of any of its agreements, representation or warranties as set forth in this Note. If Lender refuses to advance the amount requested in any applicable Request for Advance, Lender shall within such 5 Business Day period provide written notice to Maker specifying the reason for such refusal, whereupon Maker and Lender shall endeavor in good faith to reach agreement on the amount to be advanced within ten (10) days after Maker receives notice of Lender's refusal to fund the amount initially requested. If the parties are unable to agree on the funding amount for the applicable Future Advance within such 10-day period, then either party may submit the matter to mediation. The final Future Advance of New Funds shall be made after completion of the Project in such amount that the sum of all Future Advances by Lender shall not exceed $750,000.00.

The unpaid principal balance of this Note shall bear interest prior to maturity at an annual rate equal to the lesser of (a) the Maximum Lawful Rate or (b) eight percent (8.0%) (the "Contract Rate"). Interest on this Note shall be calculated on a per annum basis of 360 days and for the actual number of days elapsed (including the first day but excluding the last day) unless such calculation would result in a rate that exceeds the Maximum Lawful Rate, in which case, interest shall be calculated on a per annum basis of 365 or 366 days, as the case may be. Maker hereby expressly promises to pay to the order of Lender or any other holder hereof the principal amount of this Note and all accrued but unpaid interest now or hereafter to become due and payable under this Note in the

2

manner provided herein. Notwithstanding anything herein to the contrary, the final installment payment under this Note shall include all of the then outstanding principal, accrued but unpaid interest and all other costs, expenses and fees arising out of this Note. All sums paid hereon (whether regularly scheduled payment or prepayment) shall be applied first to the satisfaction of accrued unpaid interest and the remainder, if any, to the reduction of the principal balance hereof.

Subject to prior acceleration as provided in this Note, this Note shall be paid as follows:

Principal and interest under this Note shall be due and payable monthly as follows ("Monthly Payments"):

(i)     Principal and interest on an amount equal to the sum of the Old Note Balance and the First New Advance (or $2,059,300.24) shall be due and payable in sixty (60) equal monthly installments, based on a 20-year amortization, of $17,225.00, with the first such payment being due on June 15, 2023, and continuing on the same day of each month thereafter until May 15, 2028 (the "Maturity Date"), on which date a final payment in the amount of $1,802,414.35 shall be due and payable in full.

(ii)    Interest only on Future Advances shall be due and payable monthly beginning on the 15th day of the calendar month after the month in which the first Future Advance is made and shall continue regularly on the same day of each succeeding calendar month thereafter until and including the Maturity Date, on which date a final payment, which shall include all then outstanding principal and accrued and unpaid interest due on Future Advances, shall be due and payable in full.

For purposes of this Note, the following terms have the meanings assigned to such terms as provided below:

"Applicable Laws" means the laws of the State of Texas and laws of the United States of America in effect from time to time and applicable to this Note.

"Business Day" means a day that is not a Saturday, Sunday, or federal or state holiday.

"Default Rate" means the Maximum Lawful Rate.

"Event of Default" means the failure to pay when due the principal and interest under this Note, or any part thereof, and such failure continues for more than thirty (30) days after Maker receives written notice from Lender specifying the amount of the delinquent payment. Event of Default shall also include Maker shall (a) become insolvent within the meaning of the Bankruptcy Code of the United States, as amended; (b) admit in writing its inability to pay or otherwise fail to pay its/his debts generally as they become due; (c) voluntarily seek consent to, or acquiesce in the benefit or benefits of any Debtor Relief Law; or (d) be made the subject of any proceeding provided for by any Debtor Relief Law that could suspend or otherwise affect any of the rights of Lender or any other holder hereof and such proceeding shall continue for sixty (60) days without dismissal or discharge; or (e) any default by Maker under that certain Deed of Trust securing this Note, executed by Maker in favor of Lender. As used herein, "Debtor Relief Laws" means the Bankruptcy Code of the United States, as amended and all other applicable liquidation, conservatorship, bankruptcy,

3

moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws from time to time in effect affecting the rights of creditors generally.

"Indebtedness" means the obligations of Maker under this Note.

"Maximum Lawful Rate" means, at any time, the maximum rate of interest which may be charged, contracted for, taken, received or reserved by the Lender in accordance with Applicable Laws. Each change in any interest rate provided for herein based upon the Maximum Lawful Rate resulting from a change in the Maximum Lawful Rate shall take effect with written notice to the Maker before such change in the Maximum Lawful Rate.

All payments due under this Note shall be made by Maker without offset or other reduction of any kind. Any outstanding principal that is not paid in full when due shall bear interest at the Default Rate for the period from and including the due date thereof to but excluding the date the same is paid in full.

If any payment of principal or interest on this Note shall become due on a day which is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computing of interest in connection with such payment. In the event an installment, or the maturity date as set forth herein, is due on the 29th, 30th, or 31st day of the month, for each month which does not have a 29th, 30th, or 31st day, such installment, or the final payment, as applicable, shall be due on the last day of such month. Payments received on weekends or bank holidays will be credited as of the next Business Day. Any check, draft, money order or other instrument given in payment of all or any portion of this Note may be accepted by Lender and handled in collection in the customary manner, but the same shall not constitute payment or diminish any rights of Lender except to the extent that actual cash proceeds of such instrument are unconditionally received by Lender.

Unless otherwise agreed in writing, or otherwise required by Applicable Laws, interest on this Note will be calculated on the unpaid principal balance to the date each installment is paid and payments received will be applied in the following order of priority: (i) the payment or reimbursement of any expenses, costs, or obligations (other than the outstanding principal balance hereof and interest hereon) for which either Maker shall be obligated or Lender shall be entitled pursuant to the provisions of this Note, (ii) the payment of accrued but unpaid interest hereon, and (iii) the payment of principal. However, any Monthly Payments timely made by Maker shall be credited as of the date such Monthly Payment is due, and Lender shall not be required to ledger and compute reductions in interest for Monthly Payments made before such Monthly Payment is due.

Maker shall have the privilege to prepay at any time, and from time to time, all or any part of the principal amount of this Note, without notice, penalty or fee. Except as expressly provided herein to the contrary, all prepayments on this Note shall be applied in the following order of priority: (i) the payment of accrued but unpaid interest hereon, and (ii) the payment of all or any portion of the principal balance hereof then outstanding hereunder, in the inverse order of maturity.

Time is of the essence in the performance of this Note. Maker agrees that all past-due principal and past-due accrued interest under this Note shall bear interest from the date it is due until paid at the Maximum Lawful Rate.

4

Upon the occurrence of an Event of Default, Lender may, at its option, after the expiration of the notice and right to cure period provided herein, (i) declare the outstanding principal balance of and accrued but unpaid interest on this Note at once due and payable, or (ii) foreclose all liens securing payment hereof. Upon the occurrence of an Event of Default, if this Note is placed in the hands of an attorney for collection (whether or not suit is filed), or if this Note is collected by suit or legal proceedings or through the probate court or bankruptcy proceedings, Maker agrees to pay an additional amount as attorney's fees as may be reasonable.

Except as otherwise provided herein, Maker waives presentment for payment, demand, protest, notice thereof and dishonor, notice of intent to accelerate, notice of acceleration, and diligence in collecting and consents that the time of payment may be extended from time to time without notice and without releasing Maker.

Until such time as all New Funds have been advanced hereunder, Lender shall not assign this Note without the prior written consent of Maker, which consent shall not be unreasonably withheld. Following the final advance of New Funds after completion of the Project, Lender shall have the right to assign this Note without necessity of Maker's consent. In such event, the term "Lender" shall mean any permitted assignee of this Note.

This Note and its validity, enforcement and interpretation, shall be construed in accordance with Applicable Laws, without regard to any conflict of law rules or principles except as otherwise expressly set forth herein. It is expressly stipulated and agreed to be the intent of the Maker and the Lender at all times to comply strictly with Applicable Laws governing the maximum rate or amount of interest payable on the indebtedness evidenced by this Note. If Applicable Law is ever judicially interpreted so as to render usurious any amount (i) contracted for, charged, taken, reserved or received pursuant to this Note, (ii) contracted for, charged, taken, reserved or received by reason of the Lender's exercise of the option to accelerate the maturity of the Indebtedness, or (iii) the Maker will have paid or the Lender will have received by reason of any voluntary prepayment by the Maker of the Indebtedness, then it is the Maker's and the Lender's express intent that all amounts charged in excess of the Maximum Lawful Rate shall be automatically canceled, *ab initio*, and all amounts in excess of the Maximum Lawful Rate theretofore collected by the Lender shall be credited on the principal balance of the Indebtedness (or, if the Indebtedness have been or would thereby be paid in full, refunded to the Maker), and the provisions of this Note shall immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder and thereunder; provided, however, if this Note has been paid in full before the end of the stated term of this Note, then the Maker and the Lender agree that the Lender shall, with reasonable promptness after the Lender discovers or is advised by the Maker that interest was received in an amount in excess of the Maximum Lawful Rate, either refund such excess interest to the Maker and/or credit such excess interest against the Indebtedness then owing by the Maker to the Lender. The Maker hereby agrees that as a condition precedent to any claim seeking usury penalties against the Lender, the Maker will provide written notice to the Lender, advising the Lender in reasonable detail of the nature and amount of the violation, and the Lender shall have thirty (30) days after receipt of such notice in which to correct such usury violation, if any, by either refunding such excess interest to the Maker or crediting such excess interest against the Indebtedness then owing by the Maker to the Lender. All sums contracted for, charged, taken, reserved or received by the Lender for the use, forbearance or detention of any Indebtedness shall, to the extent permitted by applicable law, be amortized or spread, using the

5

actuarial method, throughout the stated term of this Note (including any and all renewal and extension periods) until payment in full so that the rate or amount of interest on account of this Note does not exceed the Maximum Lawful Rate from time to time in effect and applicable to this for so long as any Indebtedness is outstanding. In no event shall the provisions of Chapter 346 of the Texas Finance Code (which regulates certain revolving credit loan accounts and revolving triparty accounts) apply to this Note. Notwithstanding anything to the contrary contained herein, it is not the intention of the Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

To the extent that Lender is relying on Chapter 303 of the Texas Finance Code to determine the Maximum Lawful Rate payable on any Indebtedness, the Lender will utilize the weekly ceiling from time to time in effect as provided in such Chapter 303, as amended. Additionally, to the extent permitted by Applicable Laws now or hereafter in effect, the Lender may, at its option and from time to time, utilize any other method of establishing the Maximum Lawful Rate under such Chapter 303 or under other Applicable Law by giving notice, if required, to the Maker as provided by Applicable Law now or hereafter in effect.

In case any one or more of the provisions contained in this Note shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Note, and this Note shall be construed as if such invalid, illegal, or unenforceable provision had never been included in this Note.

No amendment, modification, or alteration of the terms of this Note shall be binding unless the same is in writing, dated subsequent to the date of this Note, and duly executed by the parties to this Note.

All notices sent to Maker shall be sent by hand delivery or by certified mail, return receipt requested to HFR Enterprises, Inc., Attn: Dakota Fontenot, 3414 Old Richmond Road, Rosenberg, Texas 77471 (with a copy to BoyarMiller, Attn: Christopher Barteau and Tiffany Melchers, 2925 Richmond Avenue, 14th Floor, Houston, Texas 77098), unless directed otherwise by Maker after notice to the Lender (or any other holder hereof) at the address set forth on Page 1 herein, or at such other address of the Lender (or any other holder hereof) specified by notice to Maker as described herein. Any notice required herein shall be sufficient if it provides at least 10 days of notice after mailing, unless otherwise required by law.

[Remainder of page intentionally left blank.]

6

IN WITNESS WHEREOF, Maker has duly executed this Note as of the day and year first above written.

**MAKER:**

**HFR ENTERPRISES, INC.,**
a Texas corporation

By: _____
Name: Dakota Fontenot
Title: President

Address:
6710 Southwest Freeway
Houston, Texas 77074
Attention: Dakota Fontenot

THE STATE OF TEXAS          §
                           §
COUNTY OF HARRIS           §

This instrument was acknowledged before me on May 22, 2023, by Dakota Fontenot, President of HFR Enterprises, Inc., a Texas nonprofit corporation, for and on behalf of such corporation.

_____
NOTARY PUBLIC, STATE OF TEXAS

SIGNATURE PAGE TO
NOTE

CONFIDENTIAL DOCUMENTS                                        HAH001246

# EXHIBIT E

Probate Court No. 1

**537721**

C.A. 21-CPR-036521

| | | |
|---|---|---|
| ESTATE OF | § | IN COUNTY COURT AT LAW |
| DALLAS JOSEPH FONTENOT, JR., | § | |
| DECEASED | § | NO. FOUR (4) OF |
| | § | |
| | § | FORT BEND COUNTY, TEXAS |

---

No. 21-DCV-288736

| | | |
|---|---|---|
| IN RE | § | IN THE 240TH DISTRICT COURT |
| HOLLI ANN HARDIN TRUST | § | |
| NUMBER ONE | § | OF |
| | § | |
| | § | FORT BEND COUNTY, TEXAS |

## Assignment of Interest &
## Disclaimer of Further Interest

Pursuant to the Binding Mediation Settlement Agreement reached in the above-captioned cases, and which is attached hereto as Exhibit "A":

1. Holli Ann Fontenot acknowledges receipt of check number 1005 payable to Holli Ann Fontenot in the amount of $2,823,464.00, and which sum represents full satisfaction of eighty five percent (85%) of the total value of The Dakota Trust assets ($1,899,514.00) and twenty percent (20%) of the total value of the Holli Ann Hardin Trust No. 1 assets ($923,950.00).

2. Holli Ann Fontenot hereby assigns any and all beneficial interest she has in the Holli Ann Hardin Trust No. 1 to the Trustee for further administration and distribution by the Trustee.

3. Holli Ann Fontenot assigns any and all beneficial interest she has in The Dakota Trust to the Trustee for further administration and distribution by the Trustee.

4. Holli Ann Fontenot disclaims any right to any further interest in the Holli Ann Hardin Trust No. 1. Holli Ann Fontenot previously resigned as the Trustee of said Trust.

5. Holli Ann Fontenot disclaims any right to any further interest in The Dakota Trust. Holli Ann Fontenot hereby resigns as a fiduciary of said Trust.

[SIGNATURE ON THE FOLLOWING PAGE]

UNOFFICIAL COPY

SIGNED AND EXECUTED ON __18__ DAY OF JANUARY 2023.



HOLLI ANN FONTENOT

STATE OF TEXAS          §
                        §
COUNTY OF HARRIS        §

    This instrument was acknowledged before me on this the _18_ day of January 2023 by Holli Ann Fontenot.

Notary Public in and for
The State of Texas

KARI OLAH
NOTARY PUBLIC
STATE OF TEXAS
ID. 131483116
EXP. 03-09-2026

NO. 21-CPR-036521

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN THE COUNTY COURT AT LAW |
| | § | |
| DALLAS JOSEPH FONTENOT, JR., | § | NUMBER FOUR (4) OF |
| | § | |
| DECEASED | § | FORT BEND COUNTY, TEXAS |

NO. 21-DCV-288736

| | | |
|---|---|---|
| IN RE: | § | IN THE 240th DISTRICT COURT |
| | § | |
| | § | OF |
| HOLLI ANN HARDIN TRUST | § | |
| NUMBER ONE | § | FORT BEND COUNTY, TEXAS |

## BINDING MEDIATED SETTLEMENT AGREEMENT

The Parties – Dakota Fontenot, individually, in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in his capacity as next friend and virtual representative for S.F., a minor, Holli Ann Fontenot, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, Dallas Joseph Fontenot, III, individually, and in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One, Michelle Ann Fontenot, individually, in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in her capacity as next friend and virtual representative for A.E., a minor, and Ashley Fontenot Estrada, individually and in her capacity as a beneficiary of the Hollis Ann Hardin Trust Number One – hereto agree that all causes of action pending in cause number 21-CPR-036521 and cause number 21-DVC-288736, both of which are pending in Fort Bend County, Texas, and all related claims and/or controversies between them, whether asserted or not, known or unknown, actual or contingent, are hereby settled, in accordance with the terms of this Binding Mediated Settlement Agreement (hereinafter referred to as the "Settlement Agreement").

## A. DEFINITIONS

1.      Whenever used in this Settlement Agreement, the following terms shall have and be construed to have the following meanings:

i.      "Settlement Agreement" shall mean and refer to this Binding Mediated Settlement Agreement.

ii.      "Dakota" shall mean and refer to Dakota Fontenot, individually, in his capacity as beneficiary of the Holli Ann Hardin Trust Number One, and in his capacity as next friend and virtual representative of S.F., a minor.

1

iii.    "Holli" shall mean and refer to Holli Ann Fontenot, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

iv.    "Joe" shall mean and refer Dallas Joseph Fontenot, III, individually and in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

v.    "Michelle" shall mean and refer to Michelle Ann Fontenot, individually, in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in her capacity as next friend and virtual representative of A.E., a minor.

vi.    "Ashley" shall mean and refer to Ashley Fontenot Estrada, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

vii.    "Trust" shall mean and refer to the Holli Ann Hardin Trust Number One.

viii.    "Estate" shall mean and refer to the Estate of Dallas Joseph Fontenot, Jr., whose administration is pending in cause number 21-CPR-036521, in the County Court at Law Number Four (4) of Fort Bend County, Texas.

ix.    "Parties" shall mean and refer to Dakota, Holli, Joe, Michelle, and Ashley, collectively, as described in paragraphs two (ii) through six (vi) above.

x.    "Claims" shall mean and include any and all causes of action, demands, debts, obligations, duties, liens, liabilities, and theories of liabilities of whatsoever kind and nature, whether based in contract or tort, whether arising in equity or under the common law, whether by statute or regulation, whether known or unknown, whether past or present, whether contingent or matured, whether for damages relief, injunctive relief, declaratory relief, equitable relief, or any other type of relief, whether for actual damages, personal injury damages, mental anguish, liquidated damages, punitive damages, exemplary damages, compensatory damages, consequential damages, incidental damages, pecuniary damages, costs, expenses, attorneys' fees, penalties, or fines that are (is), were (was), could be, or could have been asserted as of the Effective Date, regardless of whether actually asserted, whether by claim, counterclaim, cross-claim, motion, third-party claim regarding the Estate and Trust, including but not limited to, claims, whether asserted or not, known or unknown, actual or contingent.

xi.    "Effective Date" shall mean and refer to the date that the last Party to this Settlement Agreement executes the same.

xii.    In respect to any defined term herein, the singular shall include the plural, and the plural shall include the singular.

2

UNOFFICIAL COPY

## B. TERMS, CONDITIONS, AND MUTUAL CONSIDERATION

1.      The Parties acknowledge that bona fide disputes and controversies exist between them, both as to liability and the amount thereof in damages, if any, and by reason of such disputes and controversies they desire to compromise and settle all Claims and causes of action of any kind whatsoever which the Parties have or may have arising out of the transactions or occurrences which have been brought or could have been brought regarding the Trust.

2.      THE PARTIES AGREE AND ACKNOWLEDGE THAT UPON THE EXECUTION OF THIS SETTLEMENT AGREEMENT, THIS SETTLEMENT AGREEMENT SHALL BECOME BINDING AND IRREVOCABLE.

3.      The Parties agree that the 2013 Last Will and Testament and 2017 First Codicil to the Last Will and Testament will be admitted to probate.  The Parties agree that Holli will be appointed as the Independent Executor of the Estate and agree not to object to the same.

4.      All of the Estate's assets, including all associated bank accounts, shall be distributed to Holli, save and expect the following items:

- The following items are going to be distributed to Dakota:

    o  The 2017 F150 Truck
    o  The 2013 Toyota Sequoia
    o  All interest, including all associated bank accounts, in Entertainment Marketing and Management, LP
    o  The coin collection and gold located in the backpack at the Rosenburg Office

- The following items are going to be distributed to Joe:

    o  The 2008 Honda Ridgeline
    o  One-half (1/2) of the Decedent's Tiki Mug Collection

The Parties agree to execute all documents necessary to effectuate the conveyance of all property described above the individual recipients stated in paragraph four (4).

5.      From the Rosenburg office, Holli shall be entitled to obtain:

- The remaining $150,000 in non-earmarked cash located in the backpack;
- Any and all Playboy Magazines

6.      The Parties agree that all personal property belonging to Dakota, Joe, and/or Michelle that is currently located at 10402 W. Hidden Lake Lane, Richmond, Texas 77406 shall be distributed to Dakota, Joe, and/or Michelle as appropriate.  Dakota, Joe and/or Michelle shall

3

be afforded the opportunity, within thirty (30) days of the Effective Date of this Settlement Agreement, to conduct a supervised walkthrough of their personal property located at 10402 W. Hidden Lake Lane, Richmond, Texas 77406. During that time, Dakota, Joe, and/or Michelle will take photographs of their personal property which they would like to obtain. A list and accompanying photographs will be delivered to counsel for Holli of those items within fourteen (14) days of the walkthrough being completed. Holli will have fourteen (14) days to object to the items which Dakota, Joe, and/or Michelle would like to obtain. If the parties cannot reach a resolution regarding the same, Russ Jones will mediate, at an hourly rate, the division of the disputed personal property. Upon the completion and approval of a final list of items, Dakota, Joe, and/or Michelle, at their expense, shall obtain and remove the items on the approved final list of items at a mutually agreeable date and time within fourteen (14) days of the approval of the final list of items.

7.    The attorney's fees for Holli, Dakota, Joe, Michelle, and/or Ashley may be paid from the assets of the Holli Ann Hardin Trust Number One in an amount no more than $200,000.00 per side. The Parties will present their fees to Linda Goehrs, in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, for payment. The Parties agree that they will not object to the payment of the fees of any other party.

8.    The real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183 shall be distributed to Holli. Dakota, Michelle, and Joe, with Dakota as authorized representative, shall retain a right of first refusal in the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183. If Holli decides to sell or otherwise transfer the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183, Holli shall notify Dakota, Michelle, and Joe in writing and provide an appraisal completed by a certified and licensed real estate appraiser. From the date of receipt of that notice, Dakota, Michelle, and/or Joe shall have 30 days to exercise their right to purchase the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183. If exercised, Dakota, Michelle, and/or Joe shall enter into a real estate contract to purchase the property with a proposed closing date sixty (60) days from the date of receipt of the notice of sale or transfer triggering the right of first refusal. Holli is not required to sell at the appraised value if she receives offers in excess of the appraised value. If Holli receives an offer greater than the appraised value, the right of first refusal will be triggered upon delivery of the great offer to Dakota as authorized representative. The right of refusal will not renew if it is not exercised against the greatest value delivered by Holli.

9.    With regard to the further administration of the Holli Ann Hardin Trust Number One:

- The Parties agree that the assets of the Holli Ann Hardin Trust Number One shall be appraised by certified and licensed business or real estate appraisers, as is appropriate for the particular asset. Russ Jones shall select the appraisers to complete the real estate and business appraisals. The costs of the appraisals shall be borne by the Holli Ann Hardin Trust Number One.

4

- The Parties agree that, once the values on the appraisals are obtained for all Holli Ann Hardin Trust Number One assets, Holli's interest will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One in an amount equal to the twenty percent (20%) of the total value of the assets. Such purchase will occur within ninety days (90) of the completion of the valuation of the assets of the Holli Ann Hardin Trust Number One.

- The Parties agree that during the appraisal period described above, Linda Goehrs, in her capacity as Temporary Successor Trustee and/or Dakota, shall execute the necessary documents to install Dakota as an Officer and/or Director of Ice Embassy, Inc., HRF Enterprises, Inc., and Entertainment Marketing and Management, LP.

- The Parties agree that Linda Goehrs shall remain Temporary Successor Trustee of the Holli Ann Hardin Trust Number One until the closing of a sale on Holli's interest in the Holli Ann Hardin Trust Number One. At the time that Holli's interest is purchased, Linda Goehrs will resign as Temporary Successor Trustee, and Dakota, Joe, Michelle, and Ashley shall select a Successor Trustee of the Trust.

- Holli agrees to execute an assignment of interest and disclaimer of further interest in the Holli Ann Hardin Trust Number One at the time that her interest is purchased in accordance with this Settlement Agreement.

- The Parties agree that Dakota and Holli shall remain employees of Entertainment Marketing and Management, LP, and/or the business, or businesses owned by the Holli Ann Hardin Trust Number One. Holli shall be removed from the payroll on the date that her interest is purchased pursuant to this Agreement. The compensation amount that Dakota and Holli have been receiving shall remain unchanged.

- The Parties agree that Dakota and Holli shall remain on the insurance paid for by Entertainment Marketing and Management, LP, and/or the business or businesses owned by the Holli Ann Hardin Trust Number One. Holli shall be removed from the insurance plan on the date that her interest is purchased pursuant to this Agreement.

- To the extent owned by the Trust, Linda Goehrs as Temporary Successor Trustee, shall gift the horses known as Coco and Rusty to Holli.

10.    With regard to the further administration of the Dakota Trust:

- The Parties agree that the assets of the Dakota Trust shall be appraised by certified and licensed real estate appraisers. Russ Jones shall select the appraisers to complete the real estate appraisal. The cost of the appraisal shall be borne by the Dakota Trust.

5

- Upon completion of the appraisal, the total value of the assets will be compiled and Holli's interest will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One in an amount equal to eighty-five percent (85%) of the total value of the assets. Such purchase will occur within ninety days (90) of the completion of the valuation of the assets of the Dakota Trust.

- Holli agrees to execute an assignment of interest and disclaimer of further interest in the Dakota Trust at the time that her interest in purchased in accordance with this Settlement Agreement.

11.    Within seven (7) days of the Effective Date of this agreement, Dakota, Joe, Michelle, and/or Ashley agree to dismiss all pending pleas, pleadings, and/or motions, with prejudice regarding the Estate and/or Trust pending in cause number 21-CPR-036521 and cause number 21-DVC-288736, both of which are pending in Fort Bend County, Texas.

12.    Neither the Trust nor any entity owned, held, or possessed by the Holli Ann Hardin Trust Number One, the Dakota Trust, and/or the Estate have any claims against any of the Parties.

13.    The Parties agree to release Linda Goehrs, in her capacity as Temporary Successor Trustee, for making distributions according to this Settlement Agreement which contradict the terms of the Trust Agreement for the Holli Ann Hardin Trust Number One or the Dakota Trust.

## C. RELEASES AND DISCHARGE

1.    **Release of Claims by Dakota.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Dakota, on behalf of himself and all his heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Holli, Joe, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Dakota hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Dakota expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Holli, Joe, Michelle, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Dakota does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

2.    **Release of Claims by Holli.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Holli, on behalf of herself and all her heirs, successors,

6

UNOFFICIAL COPY

executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Joe, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Holli hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Holli expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Michelle, Joe, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Holli does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

3.    **Release of Claims by Joe.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Joe, on behalf of himself and all his heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Joe hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Joe expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Michelle, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Joe does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

4.    **Release of Claims by Michelle.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Michelle, on behalf of herself and all her heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Joe, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Michelle hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Michelle expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind

7

known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Joe, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Michelle does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

5.    **Release of Claims by Ashley.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Ashley, on behalf of herself and all her heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Joe, Michelle, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Ashley hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Ashley expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Joe, and Michelle. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Ashley does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

## D. REPRESENTATIONS AND WARRANTIES

1.    **Representations and Warranties.** Each of the Parties hereto represents and warrants to the other that:

    a.    They are adequately represented by competent counsel in connection with the execution and delivery of this Settlement Agreement and/or had an opportunity to retain counsel in connection with this Settlement Agreement;

    b.    In executing this Settlement Agreement, they relied upon the Party's own judgment and any advice it received from its own attorneys;

    c.    They were not induced to sign or execute this Settlement Agreement by promises, omissions, agreements, or representations not expressly stated in this Settlement Agreement;

    d.    They freely and willingly executed this Settlement Agreement and expressly disclaims reliance upon any facts, promises, statements made or not made, undertakings, or representations made by any person or entity

8

prior to the Effective Date of this Settlement Agreement except as specifically enumerated herein;

e. They consent that this Settlement Agreement was not procured, obtained, or induced by improper conduct or undue influence;

f. After an opportunity to consult with an attorney concerning the matters made subject of this Settlement Agreement, and after reviewing this Settlement Agreement, they agree this Settlement Agreement is fair, reasonable, and supported by good, valuable, and adequate consideration; and

g. They understand and agree to the terms and conditions of this Settlement Agreement, which contains the entire agreement between the Parties relating to the matters made the subject of this Settlement Agreement.

2. **Capacity and Authority.** Each of the Parties hereto represents and warrants to the other that the person signing this Settlement Agreement in a representative capacity has the requisite authority and consent to execute this Settlement Agreement on behalf of the Party for whom he or she has executed this Settlement Agreement, and that this Settlement Agreement is binding upon the Party for whom he or she has executed this Settlement Agreement and upon such Party's successors and assigns.

3. **Assignment of Claims.** Each of the Parties hereto represents and warrants to the other that it has not transferred, assigned, or otherwise conveyed, excepting any interest held by counsel, in whole or in part, its respective interest in the Claims at issue and that it is the owner and holder thereof. Each of the Parties further represents and warrants that, aside from any interest held by counsel, it is the only holder of the Claims being released and that no other person or entity owns, or has any interest in, any of the Claims being released. Despite any interest held by counsel, this Settlement Agreement applies to the entirety of each of the Parties' Claims.

4. **Cooperation in Execution of Further Documents.** Each of the Parties expressly agrees to execute any other documents reasonably necessary to effectuate the terms, purpose, and intent of this Settlement Agreement.

### E. MISCELLANEOUS PROVISIONS

1. **Invalidity.** In the event any one or more of the provisions of this Settlement Agreement shall, for any reason, be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Settlement Agreement.

2. **Entire Agreement.** This Settlement Agreement reflects the final and complete agreement between the parties concerning the matters made subject of this Settlement Agreement and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the Parties. There are no unwritten oral agreements between the Parties. The Parties expressly

9

acknowledge that any rights, duties, or obligations, whether contractual or otherwise, owed by or between the Parties prior to the effective date of this Settlement Agreement are terminated as of the Effective Date of this Settlement Agreement and the only rights, duties, or obligations owed by or between the Parties from this point forward shall be those set forth in this Settlement Agreement.

3. **Governing Law and Venue.** The validity, effect, and construction of this Settlement Agreement shall be governed by the laws of the State of Texas. Venue for any cause of action, controversy, or dispute regarding this Settlement Agreement or the subject matter hereof shall be proper only in the state courts of Fort Bend County, Texas.

4. **Amendment.** This Settlement Agreement may not be amended, modified, waived, or terminated unless such is done in a writing signed by all the Parties.

5. **Construction of Agreement.** This Settlement Agreement shall not be construed in favor of or against any Party on the basis that the Party did or did not author this Settlement Agreement or any attachment related to it. It is intended that this Settlement Agreement shall be comprehensive in nature and shall be construed liberally to affect its purposes.

6. **Titles or Headings.** All titles or headings used in this Settlement Agreement are used only for the convenience of the Parties and shall not be construed to have any effect or meaning with respect to the other content of the Settlement Agreement, such other content being controlling as to the Settlement Agreement of the Parties.

7. **Costs and Attorneys' Fees.** Each party shall bear its own costs and attorneys' fees in relation to the claims and the negotiation and preparation of this Settlement Agreement, subject to the attorney's fees provisions within this Settlement Agreement.

8. **Waiver.** The failure of any of the Parties to enforce, at any time, any provision of this Settlement Agreement shall not be construed to be a waiver of such provision, nor in any way affect the validity of this Settlement Agreement or any part thereof or any right of any Party thereafter to enforce each and every provision. No waiver of any breach of this Settlement Agreement shall be held to constitute a waiver of any other breach.

9. **Binding Agreement.** This Settlement Agreement is binding on the Parties hereto and not subject to revocation, repudiation, or withdrawal of consent, even if one or more of them shall become debtors in a bankruptcy proceeding. This binding effect is an integral part of this Agreement.

10. **Execution of Agreement.** This Settlement Agreement may be executed in a number of identical counterparts, each of which shall be deemed an original for all purposes. A fax signature or a copy of an original signature shall constitute an original signature for purposes of this Settlement Agreement. This Settlement Agreement shall be valid only if fully executed by all Parties and/or their representatives as agreed to herein. If not fully executed by all Parties, this Settlement Agreement shall be null and void and of no effect.

10

11.    **Future Disputes.** In the event that there are future disputes, disagreements, and/or conflicts regarding the terms and/or implementation of any terms of this Settlement Agreement, the Parties agree to return to Russ Jones for mediation regarding the dispute. The Parties agree to return to mediation prior to filing any litigation regarding a breach of this settlement agreement or these terms. If a Party refuses to return to mediation, the remaining parties are permitted to file litigation without returning to mediation. Should further litigation be filed regarding a breach of the agreement, the prevailing party shall be entitled to an award of attorney's fees as determined by a jury or judge.

12.    **Indemnity.** Each party shall indemnify the other parties for all claims made by, through, or under the indemnifying party.

AGREED TO BY ALL PARTIES AS EVIDENCED BY THEIR SIGNATURE BELOW ON THIS THE 7th DAY OF JANUARY, 2022.

_____
Dakota Fontenot, in all capacities

_____
Holli Ann Fontenot, in all capacities

_____
Dallas Joseph Fontenot, III, in all capacities

_____
Michelle Ann Fontenot, in all capacities

_____
Ashley Fontenot Estrada, in all capacities

_____
Christopher Burt
*Counsel for Dakota Fontenot*

11

11.     **Future Disputes.** In the event that there are future disputes, disagreements, and/or conflicts regarding the terms and/or implementation of any terms of this Settlement Agreement, the Parties agree to return to Russ Jones for mediation regarding the dispute. The Parties agree to return to mediation prior to filing any litigation regarding a breach of this settlement agreement or these terms. If a Party refuses to return to mediation, the remaining parties are permitted to file litigation without returning to mediation. Should further litigation be filed regarding a breach of the agreement, the prevailing party shall be entitled to an award of attorney's fees as determined by a jury or judge.

12.     **Indemnity.** Each party shall indemnify the other parties for all claims made by, through, or under the indemnifying party.

AGREED TO BY ALL PARTIES AS EVIDENCED BY THEIR SIGNATURE BELOW ON THIS THE 7th DAY OF JANUARY, 2022.

_____
Dakota Fontenot, in all capacities


_____
Holli Ann Fontenot, in all capacities


# Dallas Joseph Fontenot III
_____
Dallas Joseph Fontenot, III, in all capacities


# Michelle Ann Fontenot
_____
Michelle Ann Fontenot, in all capacities


# Ashley Fontenot Estrada
_____
Ashley Fontenot Estrada, in all capacities


_____
Christopher Burt
*Counsel for Dakota Fontenot*

11

_____

Steven Mendel
*Counsel for Holli Ann Fontenot*


_____

Kenneth Sumner
*Counsel for Dallas Joseph Fontenot, III,*
*Michelle Ann Fontenot, and Ashley Estrada*

UNOFFICIAL COPY

12

Steven Mendel
*Counsel for Holli Ann Fontenot*

## Kenneth E. Sumner, Jr.

Kenneth Sumner
*Counsel for Dallas Joseph Fontenot, III,*
*Michelle Ann Fontenot, and Ashley Estrada*

Signature: *Dallas Joseph Fontenot III*
Dallas Joseph Fontenot III (Jan 7, 2022 19:33 CST)
Email: djoef3@hotmail.com

Signature: ~~Michelle Fontenot~~
Michelle Fontenot (Jan 7, 2022 19:36 CST)
Email: mannefontenot@gmail.com

Signature: ~~Ashley Fontenot Estrada~~
Ashley Fontenot Estrada (Jan 7, 2022 19:38 CST)
Email: ashleyafontenot@gmail.com

Signature: *Kenneth C. Sumner, Jr.*
Email: ksumner@romanosumner.com

12

537721

# EXHIBIT F

Probate Court No. 1

## THE COLORADO BAR & GRILL CORPORATION

### UNANIMOUS JOINT WRITTEN CONSENT OF THE
### SOLE SHAREHOLDER AND SOLE DIRECTOR

### IN LIEU OF A SPECIAL MEETING

May 19, 2023

The undersigned, being the sole shareholder (the "*Shareholder*") and the sole member of the Board of Directors (the "*Board*") of **THE COLORADO BAR & GRILL CORPORATION,** a Texas corporation (the "*Corporation*"), in lieu of holding a special meeting of the Shareholder and the Board, the call and notice of each of which are hereby expressly waived, do hereby consent to the following resolutions:

**Loss or Destruction of Corporate Records**

> **WHEREAS,** the Corporation was formed as a Texas Corporation by filing of Articles of Incorporation (the "*Articles*") with the Texas Secretary of State on June 7, 1994 (the "*Formation*");

> **WHEREAS,** subsequent to the Formation, all corporate records of the Corporation were maintained by or on the behalf of Dallas Joseph Fontenot, Jr. ("*Mr. Fontenot*");

> **WHEREAS,** Mr. Fontenot died on September 3, 2021, and since such date, no corporate records of the Corporation have been located after a diligent search by his heirs and authorized affiliates; and

> **WHEREAS,** the Shareholder and the Board desire to create new corporate records to govern the affairs of the Corporation, effective as of the date first set forth above to, among other things, replace the original records of the Corporation which have been lost or misplaced, elect the sole member of the Board, elect officers, adopt new Bylaws, and adopt and reflect the issuance of new share certificates (collectively, the "*New Records*").

> **RESOLVED,** that New Records shall be obtained and adopted to replace any records of the Corporation which may be in existence, as of the date first written above.

**Election of Directors**

> **WHEREAS,** the Shareholder desires to reconstitute the Board of the Corporation and remove any members of the Board which may have been previously elected.

008402\00002\3480123.2 - 5/17/2023 1:55:00 PM

1

HAH 000169

RESOLVED, that the following named person be, and hereby is, elected to serve as a member of the Board, and to serve in such capacity until his respective successor has been duly elected and qualified, or until his earlier death, resignation or removal:

Dakota Fontenot

FURTHER RESOLVED, that any member of the Board not listed above is hereby removed from the Board.

<u>Election of Officers</u>

WHEREAS, immediately following the reconstitution of the Board, the Board desires to reconstitute the officers of the Corporation and remove any officers which may have been previously elected.

RESOLVED, that the following named person be, and hereby is, elected to the offices set forth opposite his name, to serve in such capacity until his successor is duly elected and qualified or until his earlier death, resignation or removal:

Dakota Fontenot                              President and Secretary

FURTHER RESOLVED, that the officer is empowered to carry out the day-to-day business of the Corporation, subject to the direction and control of the Board.

FURTHER RESOLVED, that any officer of the Corporation not listed above is hereby removed from any such office they may have held with the Corporation.

<u>Corporate Records</u>

WHEREAS, the corporate records of the Corporation, including its minute book cannot be located, and as such the Shareholder and the Board desire to create the New Records to replace the missing corporate records.

RESOLVED, that the Corporation shall recreate and maintain, as part of its corporate records, a minute book that shall include, but that shall not be limited to, records of the Corporation's Certificate of Formation and amendments thereto, its Bylaws and amendments thereto, minutes of all meetings of the Board, minutes of all meetings of the Shareholder, the time and the place of each such meeting, whether the meeting was regular or special, the manner in which the meeting was authorized, the notice given, the names of those present or represented at the meeting and the proceedings of each meeting; and

FURTHER RESOLVED, that the Secretary of the Corporation be, and hereby is, authorized and directed to procure such a replacement minute book and such other books and records as may be required by the Corporation.

2

HAH 000170

### Articles of Incorporation

RESOLVED, that a copy of the filed Articles bearing the file stamp of the Secretary of State of Texas be inserted into the replacement minute book of the Corporation.

### Amended and Restated Bylaws

WHERAS, consistent with the adoption of New Records, and immediately following the reconstitution of the Board, the Board and Shareholder deem it advisable and in the best interests of the Corporation to enter into those certain Amended and Restated Bylaws dated as of even date herewith (the "*Amended and Restated Bylaws*"), by which any Bylaws, amendments thereto, or amendments and restatements thereof, of the Corporation shall be amended and restated in their entirety.

RESOLVED, that the form of Amended and Restated Bylaws presented to the Board and Shareholder for review be, and hereby are, approved and adopted as the Amended and Restated Bylaws of the Corporation; and

FURTHER RESOLVED, that the President of the Corporation is directed to certify a copy of the Amended and Restated Bylaws, insert them into the minute book of the Corporation, and maintain them in the principal office of the Corporation, open for inspection by the Shareholder of the Corporation at all reasonable times during office hours.

### Qualification in Other Jurisdictions

RESOLVED, that the Corporation qualify to engage in business in any state of the United States or any foreign country in which the Board determines it to be necessary or appropriate for the Corporation to qualify to do business;

FURTHER RESOLVED, that the proper officers of the Corporation be, and hereby are, authorized and directed on behalf of the Corporation to make and file such certificates, reports or other instruments as may be required by the laws of such jurisdiction to be filed for that purpose; and

FURTHER RESOLVED, that the officers of the Corporation be, and each acting separately hereby is, authorized and directed to pay all fees and expenses incident to and necessary for the qualification of the Corporation to do business in any state or foreign country.

### Licenses and Tax Permits

RESOLVED, that the officers of the Corporation be, and each acting separately hereby is, authorized and directed to obtain, in the name of the Corporation, such licenses and tax permits as may be required by any applicable federal, state, county or municipal governmental statute, ordinance or regulation for the conduct of the business of the Corporation within any jurisdiction in which the Corporation shall have qualified to do business.

3

HAH 000171

## Banking Authority

RESOLVED, that the Secretary of the Corporation be, and hereby is, authorized and directed to select one or more financial institutions for the deposit of the Corporation's cash and securities, the deposit and collection of checks and drafts made payable to the order of the Corporation, issuance of letters of credit on behalf of the Corporation, extensions of credit, and other financial transactions on behalf of the Corporation, and to designate the names of the persons authorized to sign checks, drafts, borrowing requests and other instructions to such financial institutions on behalf of the Corporation;

FURTHER RESOLVED, that the Secretary of the Corporation be, and hereby is, authorized to open additional accounts with such additional financial institutions, close any accounts with financial institutions, change the names of the persons authorized to sign check, drafts, borrowing requests and other instructions on behalf of the Corporation as the Secretary deems to be necessary of convenient from time to time;

FURTHER RESOLVED, that the form of resolutions specified by any such financial institutions that are designated by the Secretary from time to time be, and hereby are, ratified and approved as the official resolutions of the Corporation and the persons designated from time to time by the Secretary as signatories on such accounts be, and hereby are, approved; and

FURTHER RESOLVED, that the Secretary of the Corporation be, and hereby is, authorized and directed to certify the adoption of the form of resolutions required by any such financial institutions from time to time designated by the Secretary and to certify the names and signatures of the persons designated by the Secretary from time to time as signatories on behalf of the Corporation.

## Adoption and Issuance of Share Certificates

WHEREAS, all certificates representing shares of stock in the Corporation have been lost or misplaced, and have not been recovered after a diligent search (collectively, the *"Lost Certificates"*).

WHEREAS, the Corporation has received that certain Affidavit of Lost Stock Certificate of the Shareholder, and the Board and Shareholder believe it is in the best interest of the Corporation to reissue a certificate to the Shareholder, representing 1,000 shares of common stock (no par value) of the Corporation.

RESOLVED, that consistent with the adoption of the New Records, the form of share certificate attached hereto as **Exhibit A** be, and hereby is, approved and adopted as the form of share certificate representing the common stock (no par value per share) of the Corporation; and

FURTHER RESOLVED, that the certificates shall be consecutively numbered, beginning with the number 1; that the certificates shall bear all legends required by law to be placed on the Corporation's share certificates; and that the certificates shall only be issued in the manner and upon the conditions set forth in the Bylaws.

4

HAH 000172

RESOLVED, that the Corporation issue shares of its Common Stock, no par value per share, to the following persons and prepare or cause to be prepared, issued, and executed a certificate representing such shares in exchange for the considerations set forth below, the receipt of which is hereby acknowledged on behalf of the Corporation, which shares, when so issued, shall be validly issued, fully paid and non-assessable, with no personal liability attaching to the ownership thereof:

| Shareholder | Shares | Consideration |
|---|---|---|
| Holli Ann Hardin Trust Number One | 1,000 | $0.00 |

FURTHER RESOLVED, that the Corporation shall refuse to recognize any person other than the Shareholder as a shareholder of the Corporation, refuse to make any payment, transfer, registration, delivery or exchange called for by the Lost Certificates to any person other than the Shareholder, and refuse to take any other action pursuant to the request or demand of any person other than the Shareholder.

General Authority

RESOLVED, that the officers of the Corporation be, and each acting separately hereby is, authorized and directed to do any and all acts and things and to execute and deliver and accept delivery of, in the name of and on behalf of the Corporation, any and all instruments, agreements, consents, certificates and other documents as in their opinion, or in the opinion of counsel to the Corporation, may be necessary or appropriate in order to carry out the purposes and intent of any of the foregoing resolutions;

FURTHER RESOLVED, that any act or acts of any of the officers of the Corporation which acts would have been authorized by the foregoing resolutions, except that such acts were taken prior to the adoption of such resolutions, be, and they hereby are, severally ratified, confirmed, approved and adopted in all respects as acts in the name and on behalf of the Corporation and

FURTHER RESOLVED, that the Secretary of the Corporation be, and hereby is, authorized and directed to certify the adoption of these resolutions.

*[Balance of Page Intentionally Blank. Signature Page Follows]*

5

HAH 000173

This Consent shall be effective as of the date hereof regardless of whether any signature occurs before, or after such date. All actions taken in this Consent shall be deemed to be taken simultaneously in the location of the Corporation's principal office on the date of this Consent.

EXECUTED by the undersigned to be effective as of the date first set forth above.

SHAREHOLDER:

HOLLI ANN HARDIN TRUST NUMBER ONE

By: _____

Name: Linda Goehrs
Title: Trustee

DIRECTOR:

By: _____

Name: Dakota Fontenot

Signature Page
Unanimous Joint Written Consent of the Sole Shareholder and Sole Director
Of
The Colorado Bar & Grill Corporation

HAH 000174

## EXHIBIT A

SPECIMEN SHARE CERTIFICATE

See attached.



HAH 000175

537721

# EXHIBIT G

Probate Court No. 1

**HFR ENTERPRISES, INC.**

**UNANIMOUS JOINT WRITTEN CONSENT OF THE
SOLE SHAREHOLDER AND SOLE DIRECTOR**

**IN LIEU OF A SPECIAL MEETING**

May 19, 2023

The undersigned, being the sole shareholder (the *"Shareholder"*) and the sole member of the Board of Directors (the *"Board"*) of HFR ENTERPRISES, INC., a Texas corporation (the *"Corporation"*), in lieu of holding a special meeting of the Shareholder and the Board, the call and notice of each of which are hereby expressly waived, do hereby consent to the following resolutions:

<u>Loss or Destruction of Corporate Records</u>

WHEREAS, the Corporation was formed as a Texas Corporation by filing of Articles of Incorporation (the *"Articles"*) with the Texas Secretary of State on April 28, 1988 (the *"Formation"*);

WHEREAS, subsequent to the Formation, all corporate records of the Corporation were maintained by or on the behalf of Dallas Joseph Fontenot, Jr. (*"Mr. Fontenot"*);

WHEREAS, Mr. Fontenot died on September 3, 2021, and since such date, no corporate records of the Corporation have been located after a diligent search by his heirs and authorized affiliates; and

WHEREAS, the Shareholder and the Board desire to create new corporate records to govern the affairs of the Corporation, effective as of the date first set forth above to, among other things, replace the original records of the Corporation which have been lost or misplaced, elect the sole member of the Board, elect officers, adopt new Bylaws, and adopt and reflect the issuance of new share certificates (collectively, the *"New Records"*).

RESOLVED, that New Records shall be obtained and adopted to replace any records of the Corporation which may be in existence, as of the date first written above.

<u>Election of Directors</u>

WHEREAS, the Shareholder desires to reconstitute the Board of the Corporation and remove any members of the Board which may have been previously elected.

008402\00002\3535010.1 - 5/17/2023 1:51:36 PM

1

HAH 000155

RESOLVED, that the following named person be, and hereby is, elected to serve as a member of the Board, and to serve in such capacity until his respective successor has been duly elected and qualified, or until his earlier death, resignation or removal:

Dakota Fontenot

FURTHER RESOLVED, that any member of the Board not listed above is hereby removed from the Board.

### Election of Officers

WHEREAS, immediately following the reconstitution of the Board, the Board desires to reconstitute the officers of the Corporation and remove any officers which may have been previously elected.

RESOLVED, that the following named person be, and hereby is, elected to the offices set forth opposite his name, to serve in such capacity until his successor is duly elected and qualified or until his earlier death, resignation or removal:

Dakota Fontenot                    President and Secretary

FURTHER RESOLVED, that the officer is empowered to carry out the day-to-day business of the Corporation, subject to the direction and control of the Board.

FURTHER RESOLVED, that any officer of the Corporation not listed above is hereby removed from any such office they may have held with the Corporation.

### Corporate Records

WHEREAS, the corporate records of the Corporation, including its minute book cannot be located, and as such the Shareholder and the Board desire to create the New Records to replace the missing corporate records.

RESOLVED, that the Corporation shall recreate and maintain, as part of its corporate records, a minute book that shall include, but that shall not be limited to, records of the Corporation's Certificate of Formation and amendments thereto, its Bylaws and amendments thereto, minutes of all meetings of the Board, minutes of all meetings of the Shareholder, the time and the place of each such meeting, whether the meeting was regular or special, the manner in which the meeting was authorized, the notice given, the names of those present or represented at the meeting and the proceedings of each meeting; and

FURTHER RESOLVED, that the Secretary of the Corporation be, and hereby is, authorized and directed to procure such a replacement minute book and such other books and records as may be required by the Corporation.

2

HAH 000156

### Articles of Incorporation

RESOLVED, that a copy of the filed Articles bearing the file stamp of the Secretary of State of Texas be inserted into the replacement minute book of the Corporation.

### Amended and Restated Bylaws

WHERAS, consistent with the adoption of New Records, and immediately following the reconstitution of the Board, the Board and Shareholder deem it advisable and in the best interests of the Corporation to enter into those certain Amended and Restated Bylaws dated as of even date herewith (the "*Amended and Restated Bylaws*"), by which any Bylaws, amendments thereto, or amendments and restatements thereof, of the Corporation shall be amended and restated in their entirety.

RESOLVED, that the form of Amended and Restated Bylaws presented to the Board and Shareholder for review be, and hereby are, approved and adopted as the Amended and Restated Bylaws of the Corporation; and

FURTHER RESOLVED, that the President of the Corporation is directed to certify a copy of the Amended and Restated Bylaws, insert them into the minute book of the Corporation, and maintain them in the principal office of the Corporation, open for inspection by the Shareholder of the Corporation at all reasonable times during office hours.

### Qualification in Other Jurisdictions

RESOLVED, that the Corporation qualify to engage in business in any state of the United States or any foreign country in which the Board determines it to be necessary or appropriate for the Corporation to qualify to do business;

FURTHER RESOLVED, that the proper officers of the Corporation be, and hereby are, authorized and directed on behalf of the Corporation to make and file such certificates, reports or other instruments as may be required by the laws of such jurisdiction to be filed for that purpose; and

FURTHER RESOLVED, that the officers of the Corporation be, and each acting separately hereby is, authorized and directed to pay all fees and expenses incident to and necessary for the qualification of the Corporation to do business in any state or foreign country.

### Licenses and Tax Permits

RESOLVED, that the officers of the Corporation be, and each acting separately hereby is, authorized and directed to obtain, in the name of the Corporation, such licenses and tax permits as may be required by any applicable federal, state, county or municipal governmental statute, ordinance or regulation for the conduct of the business of the Corporation within any jurisdiction in which the Corporation shall have qualified to do business.

3

HAH 000157

<u>Banking Authority</u>

RESOLVED, that the Secretary of the Corporation be, and hereby is, authorized and directed to select one or more financial institutions for the deposit of the Corporation's cash and securities, the deposit and collection of checks and drafts made payable to the order of the Corporation, issuance of letters of credit on behalf of the Corporation, extensions of credit, and other financial transactions on behalf of the Corporation, and to designate the names of the persons authorized to sign checks, drafts, borrowing requests and other instructions to such financial institutions on behalf of the Corporation;

FURTHER RESOLVED, that the Secretary of the Corporation be, and hereby is, authorized to open additional accounts with such additional financial institutions, close any accounts with financial institutions, change the names of the persons authorized to sign check, drafts, borrowing requests and other instructions on behalf of the Corporation as the Secretary deems to be necessary of convenient from time to time;

FURTHER RESOLVED, that the form of resolutions specified by any such financial institutions that are designated by the Secretary from time to time be, and hereby are, ratified and approved as the official resolutions of the Corporation and the persons designated from time to time by the Secretary as signatories on such accounts be, and hereby are, approved; and

FURTHER RESOLVED, that the Secretary of the Corporation be, and hereby is, authorized and directed to certify the adoption of the form of resolutions required by any such financial institutions from time to time designated by the Secretary and to certify the names and signatures of the persons designated by the Secretary from time to time as signatories on behalf of the Corporation.

<u>Adoption and Issuance of Share Certificates</u>

WHEREAS, all certificates representing shares of stock in the Corporation have been lost or misplaced, and have not been recovered after a diligent search (collectively, the "*Lost Certificates*").

WHEREAS, the Corporation has received that certain Affidavit of Lost Stock Certificate of the Shareholder, and the Board and Shareholder believe it is in the best interest of the Corporation to reissue a certificate to the Shareholder, representing 1,000 shares of common stock ($1.00 par value) of the Corporation.

RESOLVED, that consistent with the adoption of the New Records, the form of share certificate attached hereto as **Exhibit A** be, and hereby is, approved and adopted as the form of share certificate representing the common stock (no par value per share) of the Corporation; and

FURTHER RESOLVED, that the certificates shall be consecutively numbered, beginning with the number 1; that the certificates shall bear all legends required by law to be placed on the Corporation's share certificates; and that the certificates shall only be issued in the manner and upon the conditions set forth in the Bylaws.

4

HAH 000158

RESOLVED, that the Corporation issue shares of its Common Stock, no par value per share, to the following persons and prepare or cause to be prepared, issued, and executed a certificate representing such shares in exchange for the considerations set forth below, the receipt of which is hereby acknowledged on behalf of the Corporation, which shares, when so issued, shall be validly issued, fully paid and non-assessable, with no personal liability attaching to the ownership thereof:

| Shareholder | Shares | Consideration |
|---|---|---|
| Holli Ann Hardin Trust Number One | 1,000 | $0.00 |

FURTHER RESOLVED, that the Corporation shall refuse to recognize any person other than the Shareholder as a shareholder of the Corporation, refuse to make any payment, transfer, registration, delivery or exchange called for by the Lost Certificates to any person other than the Shareholder, and refuse to take any other action pursuant to the request or demand of any person other than the Shareholder.

<u>General Authority</u>

RESOLVED, that the officers of the Corporation be, and each acting separately hereby is, authorized and directed to do any and all acts and things and to execute and deliver and accept delivery of, in the name of and on behalf of the Corporation, any and all instruments, agreements, consents, certificates and other documents as in their opinion, or in the opinion of counsel to the Corporation, may be necessary or appropriate in order to carry out the purposes and intent of any of the foregoing resolutions;

FURTHER RESOLVED, that any act or acts of any of the officers of the Corporation which acts would have been authorized by the foregoing resolutions, except that such acts were taken prior to the adoption of such resolutions, be, and they hereby are, severally ratified, confirmed, approved and adopted in all respects as acts in the name and on behalf of the Corporation and

FURTHER RESOLVED, that the Secretary of the Corporation be, and hereby is, authorized and directed to certify the adoption of these resolutions.

*[Balance of Page Intentionally Blank. Signature Page Follows]*

5

HAH 000159

This Consent shall be effective as of the date hereof regardless of whether any signature occurs before, or after such date. All actions taken in this Consent shall be deemed to be taken simultaneously in the location of the Corporation's principal office on the date of this Consent.

**EXECUTED** by the undersigned to be effective as of the date first set forth above.

SHAREHOLDER:

HOLLI ANN HARDIN TRUST NUMBER ONE

By: _____
Name: Linda Goehrs
Title: Trustee

DIRECTOR:

By: _____
Name: Dakota Fontenot

Signature Page
Unanimous Joint Written Consent of the Sole Shareholder and Sole Director
Of
HFR Enterprises, Inc.

HAH 000160

## EXHIBIT A

SPECIMEN SHARE CERTIFICATE

See attached.

UNOFFICIAL COPY

HAH 000161

Probate Court No. 1

# EXHIBIT H    537721

## ICE EMBASSY, INC.

## UNANIMOUS JOINT WRITTEN CONSENT OF THE SOLE SHAREHOLDER AND SOLE DIRECTOR

### IN LIEU OF A SPECIAL MEETING

May 19, 2023

The undersigned, being the sole shareholder (the "*Shareholder*") and the sole member of the Board of Directors (the "*Board*") of ICE EMBASSY, INC., a Texas corporation (the "*Corporation*"), in lieu of holding a special meeting of the Shareholder and the Board, the call and notice of each of which are hereby expressly waived, do hereby consent to the following resolutions:

<u>Loss or Destruction of Corporate Records</u>

WHEREAS, the Corporation was formed as a Texas Corporation by filing of Articles of Incorporation (the "*Articles*") with the Texas Secretary of State on April 28, 1988 (the "*Formation*");

WHEREAS, subsequent to the Formation, all corporate records of the Corporation were maintained by or on the behalf of Dallas Joseph Fontenot, Jr. ("*Mr. Fontenot*");

WHEREAS, Mr. Fontenot died on September 3, 2021, and since such date, no corporate records of the Corporation have been located after a diligent search by his heirs and authorized affiliates; and

WHEREAS, the Shareholder and the Board desire to create new corporate records to govern the affairs of the Corporation, effective as of the date first set forth above to, among other things, replace the original records of the Corporation which have been lost or misplaced, elect the sole member of the Board, elect officers, adopt new Bylaws, and adopt and reflect the issuance of new share certificates (collectively, the "*New Records*").

RESOLVED, that New Records shall be obtained and adopted to replace any records of the Corporation which may be in existence, as of the date first written above.

<u>Election of Directors</u>

WHEREAS, the Shareholder desires to reconstitute the Board of the Corporation and remove any members of the Board which may have been previously elected.

008402\00002\3535052.1 - 5/17/2023 12:46:45 PM

1

HAH 000162

RESOLVED, that the following named person be, and hereby is, elected to serve as a member of the Board, and to serve in such capacity until his respective successor has been duly elected and qualified, or until his earlier death, resignation or removal:

Dakota Fontenot

FURTHER RESOLVED, that any member of the Board not listed above is hereby removed from the Board.

## Election of Officers

WHEREAS, immediately following the reconstitution of the Board, the Board desires to reconstitute the officers of the Corporation and remove any officers which may have been previously elected.

RESOLVED, that the following named person be, and hereby is, elected to the offices set forth opposite his name, to serve in such capacity until his successor is duly elected and qualified or until his earlier death, resignation or removal:

Dakota Fontenot                    President and Secretary

FURTHER RESOLVED, that the officer is empowered to carry out the day-to-day business of the Corporation, subject to the direction and control of the Board.

FURTHER RESOLVED, that any officer of the Corporation not listed above is hereby removed from any such office they may have held with the Corporation.

## Corporate Records

WHEREAS, the corporate records of the Corporation, including its minute book cannot be located, and as such the Shareholder and the Board desire to create the New Records to replace the missing corporate records.

RESOLVED, that the Corporation shall recreate and maintain, as part of its corporate records, a minute book that shall include, but that shall not be limited to, records of the Corporation's Certificate of Formation and amendments thereto, its Bylaws and amendments thereto, minutes of all meetings of the Board, minutes of all meetings of the Shareholder, the time and the place of each such meeting, whether the meeting was regular or special, the manner in which the meeting was authorized, the notice given, the names of those present or represented at the meeting and the proceedings of each meeting; and

FURTHER RESOLVED, that the Secretary of the Corporation be, and hereby is, authorized and directed to procure such a replacement minute book and such other books and records as may be required by the Corporation.

2

## Articles of Incorporation

RESOLVED, that a copy of the filed Articles bearing the file stamp of the Secretary of State of Texas be inserted into the replacement minute book of the Corporation.

## Amended and Restated Bylaws

WHERAS, consistent with the adoption of New Records, and immediately following the reconstitution of the Board, the Board and Shareholder deem it advisable and in the best interests of the Corporation to enter into those certain Amended and Restated Bylaws dated as of even date herewith (the "*Amended and Restated Bylaws*"), by which any Bylaws, amendments thereto, or amendments and restatements thereof, of the Corporation shall be amended and restated in their entirety.

RESOLVED, that the form of Amended and Restated Bylaws presented to the Board and Shareholder for review be, and hereby are, approved and adopted as the Amended and Restated Bylaws of the Corporation; and

FURTHER RESOLVED, that the President of the Corporation is directed to certify a copy of the Amended and Restated Bylaws, insert them into the minute book of the Corporation, and maintain them in the principal office of the Corporation, open for inspection by the Shareholder of the Corporation at all reasonable times during office hours.

## Qualification in Other Jurisdictions

RESOLVED, that the Corporation qualify to engage in business in any state of the United States or any foreign country in which the Board determines it to be necessary or appropriate for the Corporation to qualify to do business;

FURTHER RESOLVED, that the proper officers of the Corporation be, and hereby are, authorized and directed on behalf of the Corporation to make and file such certificates, reports or other instruments as may be required by the laws of such jurisdiction to be filed for that purpose; and

FURTHER RESOLVED, that the officers of the Corporation be, and each acting separately hereby is, authorized and directed to pay all fees and expenses incident to and necessary for the qualification of the Corporation to do business in any state or foreign country.

## Licenses and Tax Permits

RESOLVED, that the officers of the Corporation be, and each acting separately hereby is, authorized and directed to obtain, in the name of the Corporation, such licenses and tax permits as may be required by any applicable federal, state, county or municipal governmental statute, ordinance or regulation for the conduct of the business of the Corporation within any jurisdiction in which the Corporation shall have qualified to do business.

UNOFFICIAL COPY

3

HAH 000164

<u>Banking Authority</u>

RESOLVED, that the Secretary of the Corporation be, and hereby is, authorized and directed to select one or more financial institutions for the deposit of the Corporation's cash and securities, the deposit and collection of checks and drafts made payable to the order of the Corporation, issuance of letters of credit on behalf of the Corporation, extensions of credit, and other financial transactions on behalf of the Corporation, and to designate the names of the persons authorized to sign checks, drafts, borrowing requests and other instructions to such financial institutions on behalf of the Corporation;

FURTHER RESOLVED, that the Secretary of the Corporation be, and hereby is, authorized to open additional accounts with such additional financial institutions, close any accounts with financial institutions, change the names of the persons authorized to sign check, drafts, borrowing requests and other instructions on behalf of the Corporation as the Secretary deems to be necessary of convenient from time to time;

FURTHER RESOLVED, that the form of resolutions specified by any such financial institutions that are designated by the Secretary from time to time be, and hereby are, ratified and approved as the official resolutions of the Corporation and the persons designated from time to time by the Secretary as signatories on such accounts be, and hereby are, approved; and

FURTHER RESOLVED, that the Secretary of the Corporation be, and hereby is, authorized and directed to certify the adoption of the form of resolutions required by any such financial institutions from time to time designated by the Secretary and to certify the names and signatures of the persons designated by the Secretary from time to time as signatories on behalf of the Corporation.

<u>Adoption and Issuance of Share Certificates</u>

WHEREAS, all certificates representing shares of stock in the Corporation have been lost or misplaced, and have not been recovered after a diligent search (collectively, the "*Lost Certificates*").

WHEREAS, the Corporation has received that certain Affidavit of Lost Stock Certificate of the Shareholder, and the Board and Shareholder believe it is in the best interest of the Corporation to reissue a certificate to the Shareholder, representing 1,000 shares of common stock ($1.00 par value) of the Corporation.

RESOLVED, that consistent with the adoption of the New Records, the form of share certificate attached hereto as **Exhibit A** be, and hereby is, approved and adopted as the form of share certificate representing the common stock (no par value per share) of the Corporation; and

FURTHER RESOLVED, that the certificates shall be consecutively numbered, beginning with the number 1; that the certificates shall bear all legends required by law to be placed on the Corporation's share certificates; and that the certificates shall only be issued in the manner and upon the conditions set forth in the Bylaws.

4

HAH 000165

RESOLVED, that the Corporation issue shares of its Common Stock, no par value per share, to the following persons and prepare or cause to be prepared, issued, and executed a certificate representing such shares in exchange for the considerations set forth below, the receipt of which is hereby acknowledged on behalf of the Corporation, which shares, when so issued, shall be validly issued, fully paid and non-assessable, with no personal liability attaching to the ownership thereof:

| Shareholder | Shares | Consideration |
|---|---|---|
| Holli Ann Hardin Trust Number One | 1,000 | $0.00 |

FURTHER RESOLVED, that the Corporation shall refuse to recognize any person other than the Shareholder as a shareholder of the Corporation, refuse to make any payment, transfer, registration, delivery or exchange called for by the Lost Certificates to any person other than the Shareholder, and refuse to take any other action pursuant to the request or demand of any person other than the Shareholder.

General Authority

RESOLVED, that the officers of the Corporation be, and each acting separately hereby is, authorized and directed to do any and all acts and things and to execute and deliver and accept delivery of, in the name of and on behalf of the Corporation, any and all instruments, agreements, consents, certificates and other documents as in their opinion, or in the opinion of counsel to the Corporation, may be necessary or appropriate in order to carry out the purposes and intent of any of the foregoing resolutions;

FURTHER RESOLVED, that any act or acts of any of the officers of the Corporation which acts would have been authorized by the foregoing resolutions, except that such acts were taken prior to the adoption of such resolutions, be, and they hereby are, severally ratified, confirmed, approved and adopted in all respects as acts in the name and on behalf of the Corporation and

FURTHER RESOLVED, that the Secretary of the Corporation be, and hereby is, authorized and directed to certify the adoption of these resolutions.

*[Balance of Page Intentionally Blank. Signature Page Follows]*

5

HAH 000166

This Consent shall be effective as of the date hereof regardless of whether any signature occurs before, or after such date. All actions taken in this Consent shall be deemed to be taken simultaneously in the location of the Corporation's principal office on the date of this Consent.

EXECUTED by the undersigned to be effective as of the date first set forth above.

SHAREHOLDER:

HOLLI ANN HARDIN TRUST NUMBER ONE

By: _____

Name: Linda Goehrs

Title: Trustee

DIRECTOR:

By: _____

Name: Dakota Fontenot

Signature Page
Unanimous Joint Written Consent of the Sole Shareholder and Sole Director
Of
Ice Embassy, Inc.

HAH 000167

## EXHIBIT A

SPECIMEN SHARE CERTIFICATE

See attached.



HAH 000168

# EXHIBIT I

## MANAGEMENT AGREEMENT

THIS MANAGEMENT AGREEMENT (this "Agreement") is made effective January 1, 2024 (the "Effective Date"), between ENTERTAINMENT MARKETING & MANAGEMENT, LTD., a Texas limited partnership ("Manager"), and ICE EMBASSY, INC. d/b/a THE COLORADO BAR AND GRILL, a Texas corporation (the "Owner").

## RECITALS

A. The Owner leases space from HFR ENTERPRISES, INC., a Texas corporation ("HFR") where it operates a sexually oriented business, bar, and restaurant (the "Club") located at the municipal address: 6710 Southwest Fwy, Houston, Texas 77074.

B. The Owner's corporate records and contracts were previously maintained by or on behalf of Dallas Joseph Fontenot, Jr. ("Mr. Fontenot").

C. Mr. Fontenot died on September 3, 2021, and since such date, neither corporate records of the Owner, nor records of any contract or agreement relating to the management of the Club have been located after a diligent search by his heirs and authorized affiliates.

D. On or about the Effective Date, the Owner previously retained Manager to manage and operate the Club, which such relationship may have been memorialized pursuant to a written or oral agreement, which neither the Owner, nor the Manager have been able to locate (the "Original Agreement").

E. The Owner desires to continue to retain Manager to manage and operate the Club, and provide support services to the Owner, on the terms and conditions set forth in this Agreement. Any reference to the Owner throughout this Agreement shall mean and include any and all of the Owner's designated affiliates that may directly or indirectly control or own an interest in the Club.

F. Manager is experienced in bar operations and management and has the staff, expertise and capability to perform the terms of this Agreement.

G. The Owner and the Manager desire that this Agreement amend, supersede, and replace the Original Agreement, and further desire that their relationship be governed in accordance with the terms and provisions of this Agreement effective as of the Effective Date.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements contained in this Agreement and other good and valuable consideration not recited in this Agreement, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Engagement and Authorization.

1.01 Engagement As Manager. The Owner hereby engages Manager as its sole and exclusive agent to supervise, manage, direct and control the operations of the Club, in accordance with the terms



1

and conditions hereof. Manager hereby accepts such engagement as the manager of the Club during the Term, as hereafter defined, of this Agreement. The parties acknowledge such engagement does not include alcoholic beverage operations at the Club. In accordance with applicable law, Owner, as the holder of the TABC permit for the Club, maintains control over the purchase, sale, and service of alcoholic beverages at the Club.

1.02 Grant of Authority. The Owner hereby grants Manager the power and authority to take all actions and to do all things reasonably required to perform the obligations of the Manager under this Agreement. For the avoidance of doubt, Manager shall not have the power and authority to (i) borrow any money or execute any promissory note, bill of exchange or other credit obligation, mortgage or encumbrance, or pledge the credit of the Owner without, in each case, the prior written consent of the Owner, (ii) file, prosecute, defend or settle any legal or regulatory proceedings involving the Owner or the Club without the Owner's prior written approval, or (iii) act on behalf of, or hold itself out as having authority to act on behalf of, the Owner in any manner which is beyond the scope of the terms of this Agreement. In the performance of this Agreement, Manager shall act as the agent of the Owner; the creation of this agency shall not in any manner relieve the Owner of its duties or obligations under contract or law.

2. Manager's Duties. During the Term, Manager shall provide the Owner with the following specific services (hereinafter collectively referred to as the "Services"), at the Club:

2.01 Club Management. Manager shall oversee the day-to-day management of the Club, which responsibilities shall include: (a) the hiring, training and supervising of all Club employees, as more particularly described below; ; (b) the maintenance of business files and records; (c) the performance of general administrative functions; and (d) the preparation of the Club's monthly activities, as more particularly described below. In addition, Manager shall manage, operate, and maintain the Club in such a manner that the Club is at all times in substantial compliance with: (i) all zoning and use restrictions, fire codes, building codes, and other requirements issued by any governmental authority; (ii) all licenses, permits and other authorizations required in the operation of the Club; (iii) any policy of insurance covering the Club; (iv) that certain Real Estate Lease between the Owner and HFR (the "Club Lease") and that certain Sublease between the Owner and HFR (the "Parking Lot Lease" and collectively with the Club Lease, the "Leases"), to avoid any default by the Owner thereunder; (v) the negotiation of inventory purchase contracts with vendors, including combining purchasing quantity of Manager and its franchisee and/or licensees with the purchasing quantity of the Owner, its affiliates and franchisee and/or licensees in order to obtain any vendor discounts, rebates or refunds; and (vi) all applicable laws and regulations. With the written consent of the Owner, Manager may in the name of itself, the Owner or both, take such appropriate action as necessary to challenge to protest the validity or application of any legal requirement, tax or other imposition against the Club. The Owner agrees to execute and deliver any documents which Manager and the Owner deem reasonably necessary and appropriate in connection with such action.

2.02 Reimbursement of Expenses

2.

HAH 000194

Owner shall reimburse Manager for all expenses incurred by Manager in connection with this Agreement or otherwise incurred in connection with the Club. Such expenses shall be reimbursed on demand, subject to reconciliation on a monthly basis.

2.03 – 2.04 Intentionally Blank

2.05 Financial Reports.

(a) Manager shall maintain full and adequate records and books of account and such other records as might be appropriate to reflect the results of operation of the Club, and which shall reflect all revenues and expenditures and all other receipts and disbursements relating to each of the Club. All books and records will be kept in accordance with generally accepted accounting principles ("GAAP") and shall be the property of the Owner and the Owner will have access thereto at all reasonable times.

(b) Within fifteen (15) days after the end of each month, Manager shall prepare and furnish to the Owner the following information for the preceding calendar month for each of the Club:

(i) Financial Statements. An accrual basis balance sheet in reasonable detail, together with a reasonably detailed accrual basis profit and loss statement for such preceding calendar month next preceding and with a cumulative calendar year accrual basis profit and loss statement to date, and a statement of cash flows for each monthly and cumulative period for which a profit and loss statement is prepared;

(ii) Supporting Data. At the Owner's request, copies of the following: (a) all checks, bank statements, bank deposit slips and bank reconciliations; (b) detailed cash receipts and disbursement records; (c) copies of all invoices; (d) supporting documentation for payroll, payroll taxes and employee benefits; and (e) such other information as the Owner might reasonably request;

(iii) Other Reports. Such other reports and documents as might be reasonably requested by the Owner from time to time (including, without implied limitation, certificates of compliance and other instruments required in connection with any bond financing relating to the Club); and

(iv) Management Fee Invoice. An invoice for the Management Fee (defined below) for such preceding calendar month and any other preceding calendar month for which the Management Fee is outstanding, based on the Gross Revenues set forth in the applicable financial statements.

(c) Within forty-five (45) days after the end of each calendar year, Manager shall furnish to the Owner year-end financial statements for the Club (including a balance sheet, income statement and statement of cashflows) which statements shall be unaudited and shall be prepared in accordance with GAAP. The Owner may engage an independent certified public accounting firm to provide audited annual financial statements, which cost shall be an operating expense of the Club. Manager shall cooperate in all respects with such accountant in the preparation of such statements, including the delivery of any financial information generated by Manager pursuant to the terms of this Agreement and reasonably required by the Owner's accountant to prepare such audited financial statements.

3

HAH 000195

(d) The Owner, shall have the right and privilege of examining and inspecting the books and records (including audit rights) during customary business hours following reasonable advance notice to Manager. Upon the termination of this Agreement; all such books and records shall be turned over to the Owner to insure the orderly continuance of the operation of the Club. If an audit or inspection of the books reveals that the calculation of Gross Revenues was miscalculated by Manager such that the fees paid out of the operating funds of the Club by the Owner pursuant to this Agreement varied by five percent (5%) or more from the amount provided by Manager in the statements delivered pursuant to this Agreement, then Manager will reimburse the Owner for all inspection and audit costs (including, without limitation, reasonable travel, lodging, meals, salaries and other expenses of the inspecting or auditing personnel) in addition to any adjustment or reimbursement for fees owing pursuant to this Agreement.

2.06 <u>Human Resources</u>. Manager shall hire, train, supervise, and pay all of its own employees and other personnel ("Employees") necessary to fulfill its obligations hereunder. All Employees shall be the employees or independent contractors of Manager, not the Owner. Manager may discharge any Employee in its discretion and pursuant to applicable state and federal law. Manager shall cause Employees to be covered by workers' compensation insurance and such other insurance as is now or hereafter required by law. Manager shall maintain all personnel and payroll records and manage all Employee benefits programs, including, but not limited to, health insurance, dental insurance, short and long term disability plans, life insurance, workers' compensation, cafeteria plans, vacation plans, sick leave and employee policy manuals in accordance with this Agreement, may draw down from the Gross Revenues (defined herein), all costs and expenses incurred in connection with all on and offsite Employees, including, without limitation, wages, salaries, on-site staff, reasonable bonuses, contract labor, commissions, fringe benefits, employee benefits, recruitment costs, workers' compensation and unemployment insurance premiums, payroll taxes, vacation and sick leave (but excluding any such costs or expenses and overhead of any offsite personnel). In addition, Manager shall maintain businesslike relations with the customers of the Club and all customer complaints will be received, logged and resolved in a systematic fashion. Complaints of a serious nature will be reported to the Owner with appropriate recommendations from the Manager.

2.07 <u>Accounting</u>. Manager shall perform general accounting functions for the operation of the Club, including, without limitation: cash management and banking relations; budgeting, forecasting and financial statement reporting; the preparation and maintenance of records necessary to produce financial statements; the preparation of financial statements in accordance with this Agreement; the preparation, execution, and filing, punctually, when due all forms, reports, and returns required by law relating to the employment of Employees or to the management, operation, occupancy, maintenance or use of the Club, including without limitation any sales or use tax forms, reports, and income tax returns; audit support; and any other general accounting function as requested by the Owner. In addition, Manager shall pay punctually when due any sales, use, employment or other taxes relating to the operation of the Club.

2.08 <u>Marketing</u>. Manager will devise a strategy for and assist in the implementation, at the Owner's sole costs and expense, of a marketing program to advertise and promote the business of the Club. Manager may cause the Club to participate in such marketing plans, oral and written presentations,

4

promotional materials, public relations, media relations and any other general marketing functions to promote the Club.

2.09 Point-of-Sale Management Information System. Manager shall operate, administer, maintain, repair and upgrade, at the Owner's expense, the existing point-of-sale management information system for tracking purchases and inventory of each of the Club. Manager shall provide to the Owner an automated, monthly point-of-sale report on the first day of each calendar month.

2.10 Manager Personnel. Owner understands and agrees that Manager may hire or contract with outside contractors for some of its responsibilities hereunder.

2.11 Deletion of Specified Services. Any time during the Term of this Agreement, upon prior written notice by the Owner to Manager, the Owner may delete any specified service from the Services to be provided to the Club.

2.12. Term. Unless sooner terminated as hereafter provided, this Agreement shall be effective for a period of one (1) year commencing on the Effective Date of this Agreement (the "Term"), which Term shall be automatically extended for additional periods of one (1) year each, unless on or before thirty (30) days prior to the expiration of the Term, as extended, either party provides written notice to the other party not to so extend the Term.

3.01 Events for Termination.

(a) The Owner may terminate this Agreement, at any time and for any reason by providing Manager at least thirty (30) days' prior written notice.

(b) In addition, the Owner, at its sole option, may terminate this Agreement if any of the following events of default occur:

(i) The filing of a voluntary petition in bankruptcy or insolvency or a petition for reorganization under any bankruptcy law by Manager;

(ii) The consent to any involuntary petition in bankruptcy or the failure to vacate, within ninety (90) days from the date of entry thereof, any order approving an involuntary petition by Manager;

(iii) The entering of an order, judgment or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating Manager as bankrupt or insolvent, or approving a petition seeking reorganization or appointing a receiver, trustee, or liquidator of all or a substantial part of such party's assets, and such order, judgment or decree continues unstayed and in effect for any period of ninety (90) days or more;

(iv) The appointment of a receiver for all or any substantial portion of the property of Manager;

(v) The failure of Manager to make any payment required to be made in accordance with the terms of this Agreement within ten (10) days after receipt of written notice from the Owner, specifying said default with reasonable specificity, when such payment is due and payable; or

5

HAH 000197

(vi) The failure of Manager to perform, keep or fulfill any of the material covenants, undertakings, obligations or conditions set forth in this Agreement (but excluding any default set forth in Section 3.01(b)(v)), and the continuance of such default for a period of thirty (30) days after written notice of said failure from the Owner; provided, however, if such default cannot be cured within such thirty (30) day period and Manager commences to cure such default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended so long as it shall require Manager in the exercise of due diligence to cure such default, but not to exceed 180 days; provided, further, however, in the event of a default of the type set forth in this Section 3.01(b)(vi) shall result in a default by the Owner under any financing or loan agreement, such shorter cure period (if any) with respect to such default as shall be provided for therein; provided further that the cure period for any breach of this Agreement that would result in criminal sanctions against the Owner must be cured within ten (10) days following written notice thereof from the Owner.

(c) Manager, at its sole option, may terminate this Agreement if any of the following events of default occur:

(i) The filing of a voluntary petition in bankruptcy or insolvency or a petition for reorganization under any bankruptcy law by the Owner;

(ii) The consent to any involuntary petition in bankruptcy or the failure to vacate, within ninety (90) days from the date of entry thereof, any order approving an involuntary petition by the Owner;

(iii) The entering of an order, judgment or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating the Owner as bankrupt or insolvent, or approving a petition seeking reorganization or appointing a receiver, trustee, or liquidator of all or a substantial part of such party's assets, and such order, judgment or decree continues unstayed and in effect for any period of ninety (90) days or more;

(iv) The appointment of a receiver for all or any substantial portion of the property of the Owner;

(v) The failure of the Owner to make any payment required to be made in accordance with the terms of this Agreement within ten (10) days after receipt of written notice from Manager, specifying said default with reasonable specificity, when such payment is due and payable; or

(vi) The failure of the Owner to perform, keep or fulfill any of the material covenants, undertakings, obligations or conditions set forth in this Agreement (but excluding any default set forth in Section 3.01(c)(v)), and the continuance of such default for a period of thirty (30) days after written notice of said failure from Manager; provided, however, if such default cannot be cured within such thirty (30) day period and the Owner commences to cure such default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended so long as it shall require the Owner in the exercise of due diligence to cure such default, but not to exceed 180 days; provided, further, however, that the cure period for any breach of this Agreement that would result in criminal sanctions against Manager must be cured within ten (10) days following written notice thereof from Manager.

6

3.02 Certain Obligations of Manager After Termination. Upon termination of this Agreement, Manager shall: (i) deliver to the Owner all records, books, accounts, files, and other documentation (the "Records") pertaining to the management, maintenance, operation, marketing and use of the Club, including, without limitation, all records relative to the employees, suppliers, finances, and affairs of the Club; (ii) deliver and assign, transfer or otherwise convey to the Owner all contracts and all personal property relating to or used in the management, operation and maintenance of the Club, including, without limitation, all keys, combinations to locks and other security devices, documents, materials, operating supplies, furnishings and equipment, provided that any personal property owned by Manager may be retained by Manager; (iii) prepare and deliver to the Owner a full set of reports for the Club in accordance with Section 2.05, current to the date of termination; (iv) deliver all funds held by Manager on behalf of the Owner; and (v) render such assistance as the Owner might reasonably request to facilitate an orderly transition in the management and operation of the Club.

4. Management Fee. As compensation for all Services to be rendered by Manager during the Term of this Agreement, the Owner agrees to pay to Manager the following:

4.01 Management Fee. The Owner shall pay to Manager a management fee (the "Management Fee") for the Services in an amount equal to Seventeen Thousand Five Hundred and No/100 Dollars ($17,500.00) per month, with a true-up at the end of each calendar year, such that the aggregate annualized Management Fee is equal to ten percent (10%) of the Gross Revenues of the Club, for such calendar year. For the purposes of this Agreement, "Gross Revenues" means all revenues from the Club, except from the sale of alcoholic beverages, less any sales, use, employment or other taxes relating to the operation of the Club. The Management Fee shall be paid on a monthly basis within ten (10) days following the Owner's receipt of the applicable financial reports set forth in Section 2.05(b), but in no event earlier than the twentieth (20th) of the applicable month. In the event this Agreement is terminated during a calendar month, the Management Fee payable for the month in which such termination occurs will be prorated based upon a thirty (30) day month. Any short-fall of the Management Fee payment(s) shall carry over and shall be paid by Owner as soon as practicable.

5. Insurance; Indemnification; Exculpation from Liability.

5.01 Insurance.

(a) Manager, as an operating expense of the Club, shall obtain and maintain all the insurance policies and endorsements required under the Leases.

(b) Furthermore, Manager, at its sole cost and expense, shall obtain a commercial general liability insurance policy with amounts not less than $1,000,000 combined single limit for each occurrence and $2,000,000 for the aggregate of all occurrences within each policy year, as well as excess liability (umbrella) insurance with limit of at least $5,000,000 per occurrence, covering each of the following: bodily injury, death, or property damage liability per occurrence, personal and advertising injury, general aggregate, products and completed operations, and "all risk legal liability".

7

HAH 000199

(c) Owner, at is sole cost and expense, shall obtain a liquor liability insurance policy with amounts not less than $1,000,000 combined single limit for each occurrence and $2,000,000 for the aggregate of all occurrences within each policy year and shall list Manager as an additional insurance on the policy.

5.02 Indemnity.

(a) MANAGER SHALL INDEMNIFY AND HOLD THE OWNER (AND THE OWNER'S AGENTS, SHAREHOLDERS, OFFICERS, DIRECTORS, AGENTS, PRINCIPALS AND EMPLOYEES) HARMLESS FROM AND AGAINST ALL CLAIMS, DEMANDS, DAMAGES, JUDGMENTS, COSTS, LOSSES, PENALTIES, FINES, LIENS, SUITS, AND EXPENSES AND LIABILITIES, INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND COSTS AND EXPENSES INCIDENT THERETO (COLLECTIVELY, "CLAIMS") WHICH ARE NOT COVERED BY INSURANCE PROCEEDS PAYABLE TO THE OWNER OR THE INDEMNIFIED PARTY THAT MAY BE INCURRED BY OR ASSERTED AGAINST ANY SUCH PARTY AND THAT ARISE FROM (A) THE FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE OF MANAGER, ITS AGENTS, PRINCIPALS, PARTNERS, MEMBERS, OFFICERS, DIRECTORS, AND EXECUTIVE AND KEY EMPLOYEES, INCLUDING, WITHOUT LIMITATION, IN THE SUPERVISION OR TRAINING OF EMPLOYEES AND OTHER EMPLOYMENT MATTERS; OR (B) PLACING, DISCHARGE, LEAKAGE, USE OR STORAGE, OF HAZARDOUS MATERIALS ON THE PREMISES OR IN THE HOTEL BY MANAGER OR ITS AGENTS, PRINCIPALS, PARTNERS, MEMBERS, OFFICERS, DIRECTORS, AND EMPLOYEES DURING THE TERM IN VIOLATION OF THE LEASES. THIS INDEMNITY EXPRESSLY COVERS AND INCLUDES CLAIMS ARISING FROM THE NEGLIGENCE (BUT NOT GROSS NEGLIGENCE) OF THE OWNER.

(b) EXCEPT WITH RESPECT TO MATTERS FOR WHICH MANAGER IS OBLIGATED TO PROVIDE INDEMNIFICATION PURSUANT TO SECTION 5.02(a) OR ARISING SOLELY OUT OF AN EVENT OF DEFAULT BY MANAGER UNDER THIS AGREEMENT, OWNER SHALL INDEMNIFY AND HOLD MANAGER AND THE MANAGER AFFILIATED ENTITIES (AND THEIR RESPECTIVE AGENTS, PRINCIPALS, PARTNERS, MEMBERS, OFFICERS, DIRECTORS, AND EMPLOYEES) HARMLESS FROM AND AGAINST ALL CLAIMS WHICH ARE NOT COVERED BY INSURANCE PROCEEDS PAYABLE TO MANAGER OR THE INDEMNIFIED PARTY THAT ARISE FROM OR IN CONNECTION WITH (A) THE OWNERSHIP AND OPERATION OF THE CLUB, (B) THE CONDITION OR USE OF THE CLUB, INCLUDING INJURY TO PERSONS OR PROPERTY OR BUSINESS, (C) THE FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE OF THE OWNER, OR (D) PLACING, DISCHARGE, LEAKAGE, USE OR STORAGE, OF HAZARDOUS MATERIALS IN THE CLUB BY THE OWNER DURING THE TERM, THE EXISTENCE OF HAZARDOUS MATERIALS IN, ON OR UNDER THE PREMISES BEFORE THE COMMENCEMENT OF THE TERM. MANAGER SHALL PROMPTLY PROVIDE THE OWNER WITH WRITTEN NOTICE OF ANY CLAIM OR SUIT BROUGHT AGAINST IT BY A THIRD PARTY WHICH MIGHT RESULT IN SUCH INDEMNIFICATION.

8

HAH 000200

**THIS INDEMNITY EXPRESSLY COVERS AND INCLUDES CLAIMS ARISING FROM THE NEGLIGENCE (BUT NOT GROSS NEGLIGENCE) OF MANAGER.**

(c) Any party obligated to indemnify the other party under this Agreement (the "Indemnifying Party") shall have the right, by written notice to the other party, to assume the defense of any claim with respect to which the other party is entitled to indemnification hereunder. If the Indemnifying Party gives such written notice, (i) such defense shall be conducted by counsel selected by the Indemnifying Party and approved by the other party, such approval not to be unreasonably withheld or delayed (provided, however, that the other party's approval shall not be required with respect to counsel designated by the Indemnifying Party's insurer); (ii) so long as the Indemnifying Party is conducting such defense with reasonable diligence, the Indemnifying Party shall have the right to control said defense and shall not be required to pay the fees or disbursements of any counsel engaged by the other party for services rendered after the Indemnifying Party has given the written notice provided for above to the other party, except if there is a conflict of interest between the parties with respect to such claim or defense; and (iii) the Indemnifying Party shall have the right, without the consent of the other party, to settle such claim, but only provided that such settlement involves only the payment of money, the Indemnifying Party pays all amounts due in connection with or by reason of such settlement and, as part thereof, the other party is unconditionally released from all liability in respect of such claim. The other party shall have the right to participate in the defense of such claim being defended by the Indemnifying Party at the expense of the other party, but the Indemnifying Party shall have the right to control such defense (other than in the event of a conflict of interest between the parties with respect to such claim or defense). In no event shall (i) the other party settle any claim without the consent of the Indemnifying Party so long as the Indemnifying Party is conducting the defense thereof in accordance with this Agreement; or (ii) if a claim is covered by the Indemnifying Party's liability insurance, take or omit to take any action which would cause the insurer not to defend such claim or to disclaim liability in respect thereof.

(d) The provisions of this Section 5.02 shall survive the termination of this Agreement with respect to acts, omissions and occurrences arising during the Term and shall be binding on the successors and assigns of the Owner and Manager.

6. Miscellaneous Provisions.

6.01 Notices. All notices, requests, demands, and other communications required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given if delivered by hand, mailed by certified or registered mail with postage prepaid or by overnight mail, electronic mail transmission, or if sent by facsimile as follows:

If to Manager, to:          Entertainment Marketing & Management, Ltd.
                            3414 Old Richmond Road
                            Rosenberg, Texas 77471
                            Attn: Dakota Fontenot
                            Email: dakotajamesfontenot@gmail.com

If to the Owner, to:        ICE Embassy, Inc.

·9·

HAH 000201

> 3414 Old Richmond Road
> Rosenberg, Texas 77471
> Attn: Dakota Fontenot
> Email: dakotajamesfontenot@gmail.com

In either case, with a copy to:

> BoyarMiller
> 2925 Richmond Avenue, 14th Floor
> Houston, Texas 77098
> Attn: Tiffany Melchers
> Email: tmelchers@boyarmiller.com

or to such other person or address as such party hereafter designates (by written notice to the other party).

6.02 Notices Concerning the Club. Upon the receipt by Manager of any notice pertaining to the Club not of a routine nature, including in any event, but not limited to, notices of any violation of any legal requirements, Manager shall immediately inform the Owner of such notice and shall deliver a copy of the notice to the Owner as expeditiously as possible.

6.03 Assignment. This Agreement and all of the provisions of this Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations shall be assigned by either of the parties without the prior written consent of the other party.

6.04 Governing Law. This Agreement and the legal relations among the parties shall be governed by and construed in accordance with the laws of the State of Texas.

6.05 Counterparts. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

6.06 Headings. The headings in this Agreement are inserted for convenience only and shall not affect the construction of this Agreement.

6.07 Entire Agreement; Modification. This Agreement embodies the entire agreement and understanding of the parties with respect to the subject matter contained in this Agreement. This Agreement supersedes all prior agreements and understandings between the parties with respect to the subject matter contained herein. This Agreement may not be amended or modified in any manner except by an instrument in writing signed by the parties.

6.08 Severability. The provisions of this Agreement are severable and the invalidity of any one provision shall not affect the validity of any other provision.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

10

HAH 000202

**IN WITNESS WHEREOF**, the undersigned have executed and delivered this Agreement effective as of the date first above written.

OWNER:

ICE EMBASSY, INC. d/b/a THE COLORADO BAR AND GRILL

By: _____
Name: Dakota Fontenot
Title: President

MANAGER:

ENTERTAINMENT MARKETING & MANAGEMENT, LTD.

By:    BFD GP, LLC, its general partner

By: _____
Name: Dakota Fontenot
Title: President

ii

HAH 000203

537721

# EXHIBIT J

Probate Court No. 1

## CONSULTING AGREEMENT

This Consulting Agreement ("**Agreement**") is entered into between HFR Enterprises, Inc., a Texas corporation ("**HFR**") having offices at 3414 Old Richmond Road, Rosenberg, TX 77471, Ice Embassy, Inc. a Texas corporation ("**Ice**") having offices at 3414 Old Richmond Road, Rosenberg, TX 77471, and Gray Entertainment Inc, a Texas corporation having offices at 6111 Burning Tree Drive, Houston, Texas 77036 ("**Consultant**") (each a "**Party**" and, collectively, "**Parties**"), is made effective as of the 24th day of January 2025 ("**Effective Date**"). HFR and Ice shall be referred to herein collectively as the "**Company**." Obligations of HFR and Ice hereunder shall be joint and several. References herein to HFR and Ice shall include the Affiliates of each. "Affiliate" means a person, natural or legal, that (a) is owned by, controlled by or under the direction of, directly or indirectly, a Party, (b) owns or controls, directly or indirectly, a Party, (c) is under common control as a Party or (d) is a familial relative of a Party or an Affiliate; and includes any person that acquires any ownership interest in HFR, Ice, the assets of HFR, or the assets of Ice.

WHEREAS, Company is in the business of owning and operating a sexually oriented business ("SOB") in Harris County, Texas;

WHEREAS, Consultant works with persons owning, operating, and acquiring businesses similar to that of the Company;

WHEREAS, Company desires to engage Consultant to provide certain services in the area of Consultant's expertise, and Consultant is willing to provide such services to Company;

THEREFORE, in consideration of the mutual promises exchanged in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows

### SECTION 1: CONSULTING DUTIES

**1.1** **Term**. Company agrees to retain Consultant, and Consultant agrees to be retained by Company, beginning as of the Effective Date and continuing until HFR and Ice enters into the Purchase Agreement (defined below)("Term"). The Term is subject to the provisions in Section 3 of this Agreement.

**1.2** **Duties and Responsibilities**. Consultant will assist with the sale of HFR and Ice and/or the sale of all or substantially all the assets of HFR and Ice. For purposes of clarity, "all or substantially all the assets" of each entity shall mean those assets used in connection with the SOB and may or may not include any realty that may be owned by HFR and/or Ice.

**1.3** **Extent of Service**. Consultant shall, during the Term, devote such time to the business and affairs of Company as Consultant, in Consultant's sole discretion, deems appropriate. Notwithstanding the foregoing, it is understood that Consultant may have other business and personal interests that are not contrary to the interests of Company. For the avoidance of doubt, Company and Consultant agree that Consultant shall fulfill his obligation to devote reasonable business time under this Agreement, as such is determined in the sole and absolute discretion of

UNOFFICIAL COPY

Consultant.





CONFIDENTIAL

## SECTION 2: COMPENSATION

**2.1    Purchase Agreement.** Company is currently negotiating the sale of HFR and Ice's stock, the real property and improvements HFR owns located at 6710 Southwest Freeway, Houston, Texas 77074 (the "Property"), and/or the assets of the foregoing through one or more purchase agreements (individually and collectively, the "Purchase Agreement").

**2.2    Compensation.** Consultant's compensation shall be one hundred fifty thousand dollars ($150,000) ("Compensation") if Purchase Agreement is with Colorado Rose, LLC, a Texas limited liability company, directly or indirectly, including its Affiliates (collectively, **"Colorado Rose"**). Company will each pay to Consultant the Compensation within four (4) business days of their respective actual receipt of any proceeds it receives from the Purchase Agreement provided, however the total amount paid to Consultant shall not exceed one hundred fifty thousand dollars ($150,000).

**2.3    Independent Contractor.** The relationship between Company and Consultant shall be an Independent Contractor/Contractor relationship. Nothing contained in this Agreement shall be regarded as creating any other kind of relationship between Consultant and Company, including but not limited to an employee/employer relationship or a relationship between joint ventures, partners, shareholders, or the like. Consultant shall be liable for his own debts, obligations, acts, and omissions, the payment of all applicable compensation, wages, pensions, workers' compensation, insurance benefits, and all required taxes, including but not limited to withholding, social security, and other taxes and benefits. Consultant shall not be subject to any Company policies solely applicable to Company or Company's employees, or be eligible for any benefit plan offered by Company.

## SECTION 3: TERMINATION PRIOR TO EXPIRATION OF TERM

**3.1    Termination by HFR.** If a Purchase Agreement with Colorado Rose is not executed within one (1) year of the Effective Date, this Agreement is null and void.

**3.2    Termination by Consultant.** Consultant may terminate this Agreement at any time upon written notice.

**3.3    Termination by Completion. Upon closing of a purchase of HFR or Ice, and/or the assets of HFR or Ice by Colorado Rose, this agreement shall terminate subject to Section 3.4.**

**3.4    Survival of Obligations.** Termination of the Consulting relationship does not terminate those obligations imposed by this Agreement which are continuing obligations, including, without limitation, Consultant's obligations under **Sections 4 and 5** and the Company's obligation to pay the Compensation under **Section 2.2**. Notwithstanding the foregoing, the Company's obligation to pay the Compensation is terminated in the event of termination under Section 3.1 and Section 3.2.

CONFIDENTIAL
HAH011841

## SECTION 4: CONFIDENTIAL INFORMATION AND
## FIDUCIARY OBLIGATIONS

**Confidential Information.** The Parties recognize and acknowledge that during the term of this Agreement in order for Consultant to perform the duties required under this Agreement, Company is obligated to provide some, but not all, of certain confidential information of Company, including, but not limited to, (i) software, devices, inventions, processes, compilations of information, records, source codes, object codes, and specifications, that are owned by Company and that are used in the operation of the business of Company, (ii) customer lists, financial, accounting, statistical, and personnel information concerning Company and their customers and (iii) lists of and the relationships that Company have with entities (all of the foregoing are collectively referred to hereinafter as the "Company Confidential Information"). Consultant acknowledges and agrees that Company Confidential Information constitutes valuable, special and unique property of Company. Consultant further acknowledges that protection of such Company Confidential Information and trade secrets against unauthorized disclosure and use is of critical importance to Company in maintaining their competitive position. Consultant hereby agrees that Consultant will not, at any time during term of this Agreement and for a period of five (5) years from the date of this Agreement, make any unauthorized disclosure of any Company Confidential Information or trade secrets of Company , or make any use thereof, except in the carrying out of Consultant's consulting responsibilities hereunder. As a result of Consultant's services on behalf of Company , Consultant may also from time to time have access to, or knowledge of, confidential business information or trade secrets of third parties, such as customers, suppliers, partners, joint venturers, and the like, of Company. Consultant also agrees to preserve and protect the confidentiality of such third-party confidential business information and trade secrets to the same extent, and on the same basis, as Company's Confidential Information and trade secrets. Consultant acknowledges that money damages would not be a sufficient remedy for any breach of this Section by Consultant, and Company shall be entitled to enforce the provisions of this Section by terminating any payments then owing to Consultant under this Agreement and/or to specific performance and injunctive relief as remedies for such breach or any threatened breach. Such remedies shall not be deemed the exclusive remedies for a breach of this Section but shall be in addition to all remedies available at law or in equity to Company, including the recovery of damages from Consultant and Consultant's agents involved in such breach. In connection with any such equitable action, Consultant agrees that Company shall not be required to post a bond greater than One Hundred Dollars ($100).

Confidential Information shall not include information that is or becomes generally available to the public other than through Consultant's breach of this Agreement; or is communicated to Consultant by a third party that had no confidentiality obligations with respect to such information; or was known to Consultant prior to the effective date of this Agreement; or was created by Consultant without regard to the Company Confidential Information; or is part of Consultant's general knowledge. Nothing herein shall be construed to prevent disclosure of Company Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation or order. Consultant agrees to provide written notice of any such order to an authorized officer of the Company within three (3) days of receiving such order, but in any event sufficiently in advance of making any disclosure to permit the Company to contest the order or seek

confidentiality protections, as determined in the Company's sole discretion.



CONFIDENTIAL

Page 5 of 8
HAH011843

## SECTION 5: OWNERSHIP AND PROTECTION OF INFORMATION; COPYRIGHTS

**5.1** <u>Ownership of</u> Company <u>Confidential Information</u>. All Company Confidential Information, including, but not limited to, customer and prospects lists, ideas, concepts, improvements, discoveries, and inventions, whether patentable or not, which are conceived, made, developed or acquired by Consultant, individually or in conjunction with others, during Consultant's retention by Company (whether during business hours or otherwise and whether on Company's premises or otherwise) which relate to Company's business, products, customers or services shall be disclosed to HFR and are and shall be the sole and exclusive property of Company. Moreover, all drawings, memoranda, notes, records, files, correspondence, manuals, models, specifications, computer programs, source code, object code, and all other writings or materials of any type embodying any of such information, ideas, concepts, improvements, discoveries, and inventions are and shall be the sole and exclusive property of Company .

**5.2** <u>Return of Company Confidential Information</u>. All written materials, records, and other documents made by, or coming into the possession of, Consultant during the Term which contain or disclose confidential business information or trade secrets of Company shall be and remain the property of Company, as the case may be. Upon termination of Consultant's services on behalf of Company, for any reason, Consultant promptly shall deliver the same and all copies thereof, to Company . Notwithstanding the foregoing, Confidential Information may be retained by the Consultant to the extent that retention of such Confidential Information is necessary to comply with the Consultant's reasonable internal document retention policies aimed at legal, corporate governance or regulatory compliance and any such retained Confidential Information shall remain subject to the disclosure and use restrictions set forth herein, notwithstanding any termination of this Agreement. The Consultant shall not be deemed to have retained or failed to return or destroy any Company Confidential Information if Company Confidential Information received or stored in digital format is deleted from local hard drives so long as no attempt is made to recover such Company Confidential Information from servers or back-up sources, provided that any such retained Company Confidential Information shall remain subject to the disclosure and use restrictions set forth herein, notwithstanding any termination of this Agreement.

## SECTION 6: MISCELLANEOUS

**6.1** <u>Choice of Law</u>. This Agreement shall be governed in all respects by the laws of the State of Texas, notwithstanding any conflict-of-law, rule or principle that might refer the construction of the Agreement to the laws of another State or country.

**6.2** <u>Choice of Venue and Service of Process</u>. The Company and Consultant are citizens of the State of Texas. Company's principal place of business is in Harris County, Texas. This Agreement was negotiated and signed in Harris County, Texas. This Agreement shall be performed in Harris County, Texas. Any litigation that may be brought by either Company or Consultant involving the enforcement of this Agreement or the rights, duties, or obligations of this Agreement shall be brought exclusively in the State or federal courts sitting in Harris County, Texas, or the next nearest county in Texas where such courts reside. In the event that service of process cannot be effected upon a party, each party hereby irrevocably appoints the Secretary of State for the State of Texas as its, his, or her agent for service of process to receive the summons and other pleadings in connection with any such litigation. In the event of an action based on the



CONFIDENTIAL

HAH011844

terms of this Agreement in which a Party incurs costs, including but not limited to attorneys' fees, to enforce or defend its rights under this Agreement, the prevailing Party in such action shall be entitled to recover from the other Party its costs and reasonable attorneys' fees incurred in such proceeding, including the investigation in connection therewith.

      6.3    <u>Non-Waiver</u>. No failure by either Party hereto at any time to give notice of any breach by the other Party of, or to require compliance with, any condition or provision of this Agreement shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time.

      6.4    <u>Severability; Headings</u>. It is a desire and intent of the parties that the terms, provisions, covenants, and remedies contained in this Agreement shall be enforceable to the fullest extent permitted by law. If any such term, provision, covenant, or remedy of this Agreement or the application thereof to any person, association, or entity or circumstances shall, to any extent, be construed to be invalid or unenforceable in whole or in part, then such term, provision, covenant, or remedy shall be construed in a manner so as to permit its enforceability under the applicable law to the fullest extent permitted by law. In any case, the remaining provisions of this Agreement or the application thereof to any person, association, or entity or circumstances other than those to which they have been held invalid or unenforceable, shall remain in full force and effect. Headings and other references are for the convenience of the Parties and shall in no way affect the construction, enforcement or interpretation of this Agreement.

      6.5    <u>Binding Effect and Non-Assignment</u>. This Agreement shall be binding upon and inure to the benefit of the Company and any other person, association, or entity which may hereafter acquire or succeed to all or substantially all of the business or assets of Company by any means whether direct or indirect, by purchase, merger, consolidation, or otherwise. Consultant's rights and obligations under Agreement hereof are personal and such rights, benefits, and obligations of Consultant shall not be voluntarily or involuntarily assigned, alienated, or transferred, whether by operation of law or otherwise.

      6.6    <u>Entire Agreement, Construction and Modification</u>. This Agreement constitutes the entire agreement of the Parties with regard to such subject matters, and contains all of the covenants, promises, representations, warranties, and agreements between the Parties with respect to such subject matters. Each Party to this Agreement acknowledges that no representation, inducement, promise, or agreement, oral or written, has been made by either Party with respect to such subject matters, which is not embodied herein, and that no agreement, statement, or promise relating to the Consulting of Consultant by Company that is not contained in this Agreement shall be valid or binding. This Agreement shall not be construed either more favorably for or strongly against Consultant or Company. Any modification of this Agreement will be effective only if it is in writing and signed by each party whose rights hereunder are affected thereby, provided that any such modification must be authorized or approved by the Directors of Company.

      6.7    <u>Counterparts</u>. Counterparts of this Agreement may be executed in one (1) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one (1) and the same instrument.

      6.8    <u>Representations of the Company</u>. Company has all requisite power and authority to enter into this Agreement. This Agreement, when duly executed and delivered in accordance



Page 7 of 8

HAH011845

with its terms, will constitute a valid and binding obligation of Company, enforceable in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, and other similar laws of general application relating to or affecting creditors' rights and to general equitable principles. Company owns all equitable interests in HFR and Ice, free and clear of any liens, claims, equities, charges, options, rights of first refusal, or encumbrances, and no other person or party has any right, title or claim on the equity of Company or the assets thereof. The execution, delivery, and performance of this Agreement by Company does not conflict with, violate, or constitute a breach of or a default under other outstanding agreements of which Company are a party that would have a materially adverse effect on their ability to complete the sale as contemplated herein, or result in the creation or imposition of any lien, claim, or encumbrance of any kind upon the interests of the Company and/or the assets of Company.

IN WITNESS WHEREOF, Company and Consultant have duly executed this Agreement in  multiple originals to be effective on the date first stated above.

**HFR Enterprises, Inc.**

_____

Dakota Fontenot, President

**Ice Embassy, Inc.**

_____

Dakota Fontenot, President

**GRAY ENTERTAINMENT INC.**

_____   1/24/25

John Gray, President

# EXHIBIT K

## CONSULTING AGREEMENT

This Consulting Agreement ("**Agreement**") is entered into between Ice Embassy, Inc., a Texas corporation ("ICE") having offices at 3414 Old Richmond Road, Rosenberg, TX 77471, and Tim Wilson, an individual residing in Waller County, Texas ("**Consultant**") (collectively, "**Parties**"), is made effective as of the 13ᵗʰ day of February 2025 ("**Effective Date**").

WHEREAS, ICE is in the business of running a sexually oriented business ("SOB") in Harris County, Texas;

WHEREAS, Consultant works with governmental entities in Harris County, Texas;

WHEREAS, ICE desires to engage Consultant to provide certain services in the area of Consultant's expertise and Consultant is willing to provide such services to ICE;

THEREFORE, in consideration of the mutual promises exchanged in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows

### SECTION 1: CONSULTING DUTIES

**1.1**    **Term**. ICE agrees to retain Consultant, and Consultant agrees to be retained by ICE, beginning as of the Effective Date and continuing until ICE enters into the Purchase Agreement (defined below)("Term").

**1.2**    **Duties and Responsibilities**. Consultant will assist with the sale of ICE.

**1.3**    **Extent of Service**. Consultant shall, during the Term, devote reasonable business time to the business and affairs of ICE, but it is understood that Consultant may have other business and personal interests that are not contrary to the interests of ICE. For the avoidance of doubt, ICE and Consultant agree that Consultant shall fulfill his obligation to devote reasonable business time under this Agreement.

### SECTION 2: COMPENSATION

**2.1**    **Purchase Agreement**. ICE is currently negotiating the sale of its stock, the real property and improvements HFR Enterprises Inc. ("HFR") owns, located at 6710 Southwest Freeway, Houston, Texas 77074 (the "Property"), and the sale of BFD LP, LLC ("LP"), and BFD GP, LLC's ("GP") stock. (collectively, "Purchase Agreement").

**2.2**    **Compensation**. Consultant's compensation shall be $175,000.00 from the net proceeds of the Purchase Agreement ("Compensation"). ICE will pay Consultant the Compensation within four (4) days of ICE's actual receipt of any proceeds it receives from the Purchase Agreement.

**2.3**    **Independent Contractor**. The relationship between ICE and Consultant shall be an Independent Contractor/Contractor relationship. Nothing contained in this Agreement shall be

1

HAH011847

regarded as creating any other kind of relationship between Consultant and ICE, including but not limited to an employee/employer relationship or a relationship between joint ventures, partners, shareholders, or the like. Consultant shall be liable for his own debts, obligations, acts, and omissions, the payment of all applicable compensation, wages, pensions, workers' compensation, insurance benefits, and all required taxes, including but not limited to withholding, social security, and other taxes and benefits. Consultant shall not be subject to any ICE policies solely applicable to ICE or ICE's employees, or be eligible for any benefit plan offered by ICE.

## SECTION 3: TERMINATION PRIOR TO EXPIRATION OF TERM

**3.1    Termination by ICE**. If Consultant fails to perform his obligations in Section 1.2 of this Agreement before a Purchase Agreement for the sale of ICE can be executed, this Agreement is null and void.

**3.2    Survival of Obligations**. Termination of the Consulting relationship does not terminate those obligations imposed by this Agreement, which are continuing obligations, including, without limitation, Consultant's obligations under **Sections 4, and 5.**

## SECTION 4: CONFIDENTIAL INFORMATION AND FIDUCIARY OBLIGATIONS

**Confidential Information**. The Parties recognize and acknowledge that during the term of this Agreement in order for Consultant to perform the duties required under this Agreement, ICE is obligated to provide some, but not all, of certain confidential information of ICE, including, but not limited to, (i) software, devices, inventions, processes, compilations of information, records, source codes, object codes, and specifications, that are owned by ICE and that are used in the operation of the business of ICE, (ii) customer lists, financial, accounting, statistical, and personnel information concerning ICE and its customers and (iii) lists of and the relationships that ICE have with entities (all of the foregoing are collectively referred to hereinafter as the "ICE Confidential Information"). Consultant acknowledges and agrees that ICE Confidential Information constitutes valuable, special and unique property of ICE. Consultant further acknowledges that protection of such ICE Confidential Information and trade secrets against unauthorized disclosure and use is of critical importance to ICE in maintaining their competitive position. Consultant hereby agrees that Consultant will not, at any time during term of this Agreement and for a period of five (5) years from the date of this Agreement, make any unauthorized disclosure of any ICE Confidential Information or trade secrets of ICE, or make any use thereof, except in the carrying out of Consultant's consulting responsibilities hereunder. As a result of Consultant's services on behalf of ICE, Consultant may also from time to time have access to, or knowledge of, confidential business information or trade secrets of third parties, such as customers, suppliers, partners, joint venturers, and the like, of ICE. Consultant also agrees to preserve and protect the confidentiality of such third-party confidential business information and trade secrets to the same extent, and on the same basis, as ICE's Confidential Information and trade secrets. Consultant acknowledges that money damages would not be a sufficient remedy for any breach of this Section by Consultant, and ICE shall be entitled to enforce the provisions of this Section by terminating any payments then owing to Consultant under this Agreement and/or to specific performance and injunctive relief as remedies for such breach or any threatened breach.

.2

Such remedies shall not be deemed the exclusive remedies for a breach of this Section but shall be in addition to all remedies available at law or in equity to ICE, including the recovery of damages from Consultant and Consultant's agents involved in such breach. In connection with any such equitable action, Consultant agrees that ICE shall not be required to post a bond greater than One Hundred Dollars ($100).

## SECTION 5: OWNERSHIP AND PROTECTION OF INFORMATION; COPYRIGHTS

**5.1    Ownership of ICE Confidential Information.** All ICE Confidential Information, including, but not limited to, customer and prospects lists, ideas, concepts, improvements, discoveries, and inventions, whether patentable or not, which are conceived, made, developed or acquired by Consultant, individually or in conjunction with others, during Consultant's retention by ICE (whether during business hours or otherwise and whether on ICE's premises or otherwise) which relate to ICE's business, products, customers or services shall be disclosed to ICE and are and shall be the sole and exclusive property of ICE. Moreover, all drawings, memoranda, notes, records, files, correspondence, manuals, models, specifications, computer programs, source code, object code, and all other writings or materials of any type embodying any of such information, ideas, concepts, improvements, discoveries, and inventions are and shall be the sole and exclusive property of ICE.

**5.2    Return of Confidential Information.** All written materials, records, and other documents made by, or coming into the possession of, Consultant during the period of Consultant's services on behalf of ICE which contain or disclose confidential business information or trade secrets of ICE shall be and remain the property of ICE, as the case may be. Upon termination of Consultant's services on behalf of ICE, for any reason, Consultant promptly shall deliver the same and all copies thereof, to ICE.

## SECTION 6: MISCELLANEOUS

**6.1    Choice of Law.** This Agreement shall be governed in all respects by the laws of the State of Texas, notwithstanding any conflict-of-law, rule or principle that might refer the construction of the Agreement to the laws of another State or country.

**6.2    Choice of Venue and Service of Process.** Each of ICE and Consultant is a citizen of the State of Texas. ICE's principal place of business is in Harris County, Texas. This Agreement was negotiated and signed in Harris County, Texas. This Agreement shall be performed in Harris County, Texas. Any litigation that may be brought by either ICE or Consultant involving the enforcement of this Agreement or the rights, duties, or obligations of this Agreement shall be brought exclusively in the State or federal courts sitting in Harris County, Texas, or the next nearest county in Texas where such courts reside. In the event that service of process cannot be effected upon a party, each party hereby irrevocably appoints the Secretary of State for the State of Texas as its, his, or her agent for service of process to receive the summons and other pleadings in connection with any such litigation.

3

CONFIDENTIAL

HAH011849



**6.3    Non-Waiver.** No failure by either party hereto at any time to give notice of any breach by the other party of, or to require compliance with, any condition or provision of this Agreement shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time.

**6.4    Severability; Headings.** It is a desire and intent of the parties that the terms, provisions, covenants, and remedies contained in this Agreement shall be enforceable to the fullest extent permitted by law. If any such term, provision, covenant, or remedy of this Agreement or the application thereof to any person, association, or entity or circumstances shall, to any extent, be construed to be invalid or unenforceable in whole or in part, then such term, provision, covenant, or remedy shall be construed in a manner so as to permit its enforceability under the applicable law to the fullest extent permitted by law. In any case, the remaining provisions of this Agreement or the application thereof to any person, association, or entity or circumstances other than those to which they have been held invalid or unenforceable, shall remain in full force and effect. Headings and other references are for the convenience of the parties and shall in no way affect the construction, enforcement or interpretation of this Agreement,

**6.5    Binding Effect and Non-Assignment.** This Agreement shall be binding upon and inure to the benefit of ICE and any other person, association, or entity which may hereafter acquire or succeed to all or substantially all of the business or assets of ICE by any means whether direct or indirect, by purchase, merger, consolidation, or otherwise. Consultant's rights and obligations under Agreement hereof are personal and such rights, benefits, and obligations of Consultant shall not be voluntarily or involuntarily assigned, alienated, or transferred, whether by operation of law or otherwise.

**6.6    Entire Agreement, Construction and Modification.** This Agreement constitutes the entire agreement of the parties with regard to such subject matters, and contains all of the covenants, promises, representations, warranties, and agreements between the parties with respect to such subject matters. Each party to this Agreement acknowledges that no representation, inducement, promise, or agreement, oral or written, has been made by either party with respect to such subject matters, which is not embodied herein, and that no agreement, statement, or promise relating to the Consulting of Consultant by ICE that is not contained in this Agreement shall be valid or binding. This Agreement shall not be construed either more favorably for or strongly against Consultant or ICE. Any modification of this Agreement will be effective only if it is in writing and signed by each party whose rights hereunder are affected thereby, provided that any such modification must be authorized or approved by the Directors of ICE.

**6.7    Counterparts.** Counterparts of this Agreement may be executed in one (1) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one (1) and the same instrument.

IN WITNESS WHEREOF, ICE and Consultant have duly executed this Agreement in multiple originals to be effective on the date first stated above.

4

CONFIDENTIAL

HAH011850

ICE:

Ice Embassy, Inc.

Dakota Fontenot, President

CONSULTANT:

Printed Name: Tim D Wilson Sr

UNOFFICIAL COPY

5

HAH011851

# EXHIBIT L

## STOCK PURCHASE AGREEMENT

This STOCK PURCHASE AGREEMENT is effective as of the "**Effective Date**" (as defined herein), by and among Colorado Rose, LLC, a Texas limited liability company ("**Purchaser**"), and Linda Goehrs, Trustee for the Holli Ann Hardin Trust Number One ("**Seller**"), who are joined herein by Ice Embassy, Inc., a Texas corporation ("**Ice Embassy**"). The Purchaser and Seller are joined herein by Dakota Fontenot, an individual resident of Texas ("**Fontenot**", and together with Seller and Ice Embassy, collectively the "**Seller Parties**") for the purposes herein expressed.

### RECITALS

A.      The Seller owns the Acquired Interests.

B.      The Seller desires to sell the Acquired Interests to Purchaser, and the Purchaser desires to purchase the Acquired Interests in accordance with the terms of this Agreement.

C.      Contemporaneously herewith, the Parties and/or their Affiliates or related parties are entering into the Parallel Agreements, and the Acquisition contemplated herein is conditioned upon the consummation of the transactions contemplated under the Parallel Agreements.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants, agreements, and conditions hereinafter set forth, and intending to be legally bound hereby, the Parties agree as follows:

### ARTICLE I
### PURCHASE AND SALE

Section 1.1      Agreement to Purchase and Sell. On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Seller will sell, transfer and deliver to the Purchaser, and the Purchaser will purchase and acquire from the Seller, all of the Acquired Interests, and by reason of such purchase shall acquire all assets of the Company, regardless of whether such assets are listed in the Company's books and records; provided, however, that Seller shall be allowed to transfer to itself at or prior to Closing the Excluded Assets listed in Schedule 1.1. At the Closing, Seller shall transfer, convey and assign to Purchaser the Acquired Interests free and clear of all Liens and encumbrances whatsoever. At Closing, Seller will deliver, transfer and assign the Acquired Interests to Purchaser by delivering stock certificates representing all of the capital stock of the Company duly endorsed or accompanied by stock powers duly executed in blank, with any required seals or stamps affixed thereto, and otherwise in proper form for transfer, as shall be necessary to vest in Purchaser, full, complete, good and marketable title to such Acquired Interests.

Section 1.2      Consideration. At Closing, Purchaser shall pay the Consideration (subject to any adjustments set forth herein) to Seller. Seller agrees to pay the Retained Liabilities at the Closing and Seller agrees to either (i) escrow funds with the Title Company in an amount equal to the Retained Liabilities and have the Title Company, as escrow agent, pay the Retained Liabilities via cashier's check or wire transfer at the Closing, or (ii) through reduction of the Consideration have pay the Retained Liabilities directly to the holders thereof via cashier's check or wire transfer at the Closing, with any remaining balance paid by Seller. Purchaser shall pay an amount equal to the Cash Consideration less the Retained Liabilities to Seller via cashier's check or wire transfer on the Closing Date.

Section 1.3      C Corporation Status. Seller represents and warrants to Purchaser that Ice Embassy is and has always been classified as a "C Corporation" for federal income tax purposes and no election has been made to classify Ice Embassy as an "S Corporation".

CONFIDENTIAL DOCUMENTS HAH011516

Section 1.4    Accounts Receivable and Bank Accounts. All Accounts Receivable existing as of the Effective Date are listed on Schedule 1.4A, which Schedule shall be updated immediately prior to Closing. The bank accounts and other deposit accounts of the Company are listed in Schedule 1.4B, which shall be updated immediately prior to Closing to reflect the then current cash balances of such accounts net of any uncleared checks/debits and any uncleared deposits/credits. At or prior to Closing, Seller shall obtain and provide all necessary signature cards and updates to same to reflect the designated officer of Purchaser as signatory on such accounts and to remove all parties affiliated with Seller from such accounts

Section 1.5    Parallel Agreements. The Parties understand and agree that simultaneous with the execution of this Agreement, the Parties and/or their Affiliates (and related parties) shall enter into the Parallel Agreements, and the Acquisition contemplated herein is conditioned upon the contemporaneous closing and consummation of the transactions contemplated under the Parallel Agreements.

# ARTICLE II
# REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller Parties hereby, jointly and severally, represent and warrant to the Purchaser that the statements, representations and warranties contained in this Article II are true and correct as of Effective Date and, shall continue to be true and correct as of the Closing Date. In addition, the Seller Parties hereby understand and confirm that the Purchaser is relying on the statements, representations and warranties set forth in this Article II in connection with Purchaser's execution and delivery of this Agreement and in completing the transactions contemplated by this Agreement and the Parallel Agreements.

Section 2.1    Organization. Ice Embassy is a corporation duly formed, validly existing, and in good standing under the laws of Texas and is not a reporting issuer (as such term is defined or used under U.S. securities laws). Ice Embassy has all requisite power and authority to own, lease and operate its assets and properties and to carry on its business as now being conducted, and is duly qualified or registered and in good standing as a domestic corporation to transact business under the laws of each jurisdiction where the character of its activities or the location of the properties owned or leased by it requires such qualification or registration. Ice Embassy does not have and has never had any subsidiaries.

Section 2.2    Authorization. Each of the Seller Parties has full power, capacity and authority to enter into, execute and deliver this Agreement and the Seller Ancillary Documents (to which it is a signatory), and to perform such Person's obligations under this Agreement and the Seller Ancillary Documents and to consummate the transactions contemplated hereby and thereby. The Seller Parties shall (and shall cause Ice Embassy to) duly execute and deliver, as applicable, this Agreement and the Seller Ancillary Documents as of the Closing Date, and (assuming each other parties' execution, delivery, and due authorization of same) constitute, or will constitute, as the case may be, legal, valid and binding agreements of the Seller Parties and Ice Embassy, as applicable, enforceable against each of them, as applicable, in accordance with their respective terms, subject to applicable bankruptcy, insolvency and other similar laws affecting the enforceability of creditors' rights generally, general equitable principles and the discretion of courts in granting equitable remedies.

Section 2.3    Capitalization.

(a)    Seller owns 100% of the Stock of Ice Embassy, which is comprised of 1,000shares of common stock, represented by share certificate number CS001, and Seller is the original and only shareholder of Ice Embassy.

(b)    Ice Embassy has never issued any securities or other equity interests to any Person other than to the Seller, and the Seller has been the sole shareholder of Ice Embassy since its formation. All of the issued and outstanding Stock of Ice Embassy is duly authorized, validly issued, fully paid, and non-assessable. As of the date hereof, all of the Acquired Interests, are held beneficially and of record by the

Stock Purchase Agreement – Ice Embassy

CONFIDENTIAL DOCUMENTS                                    HAH011517

CONFIDENTIAL DOCUMENTS

HAH011518

Seller free and clear of any Liens, except for restrictions imposed thereon by applicable securities laws, and none of the Acquired Interests were issued in violation of any purchase or call option, right of first refusal, subscription right, preemptive right or any similar rights. At the Closing upon payment of the Consideration, the Purchaser shall be vested with sole beneficial and record ownership of the Acquired Interests, free and clear of all Liens.

Section 2.4     Absence of Restrictions and Conflicts; Consents. The Seller Parties and Ice Embassy's execution, delivery and performance of this Agreement and the Seller Ancillary Documents, the consummation of the transactions contemplated under this Agreement and the Seller Ancillary Documents and the fulfillment of and compliance with the terms and conditions of this Agreement and the Seller Ancillary Documents, do not and will not (as the case may be), with the passing of time or the giving of notice or both, contravene, violate or conflict with, constitute a breach of or default under, result in the loss of any benefit under, permit the acceleration of any obligation under or create in any party the right to terminate, modify or cancel: (a) any term or provision of the constituent, charter or organizational documents of Ice Embassy or any resolution adopted by the board of directors (or any committee thereof) or owner of Ice Embassy (all of which have been delivered to Seller), (b) any of the Contracts, the licenses or any other material contract, agreement, permit, franchise or license applicable to Ice Embassy or Seller, including but not limited to any documents necessary to run the business of Ice Embassy (all of which that are material to the operation of Ice Embassy or its Business have been or shall be disclosed by Seller to Purchaser prior to Closing), (c) any judgment, decree, order, injunction, award or ruling of any Governmental Entity or arbitration panel to which Ice Embassy or Seller is a party or by which any Company or Seller or any of their respective assets or properties are bound (all of which have been or shall be disclosed by Seller to Purchaser prior to Closing ) or (d) any Applicable Laws applicable to Ice Embassy or Seller. No consent, permit, waiver, license, approval, order or authorization of, or registration, declaration or filing with, any Governmental Entity or public or regulatory unit, agency or authority is required with respect to Ice Embassy or the Seller Parties in connection with the execution, delivery or performance of this Agreement or the Seller Ancillary Documents or the consummation of the transactions contemplated hereby or thereby.

Section 2.5     Real and Personal Property.

(a)     *Real Property.* Ice Embassy does not currently own and has never owned any real property and does not hold any option to acquire any real property for use with respect to the Business.

(b)     Personal Property; Title, Condition and Related Matters. The books and records of Seller and Ice Embassy adequately identify all tangible Personal Property owned by Ice Embassy used in or relating to the Business and all leasehold interests in Personal Property used in this Business. Ice Embassy has good, marketable, and transferable title to or a legal, valid, and binding leasehold or license interest in the Personal Property as of the Closing Date. The Personal Property is sufficient for Ice Embassy to continue conducting the Business after the Closing in substantially the same manner as conducted prior to the Closing and constitutes all of Ice Embassy's rights, property, and assets necessary to conduct the Business as currently conducted.

Section 2.6     Ice Embassy Financial Statements, Liabilities and Indebtedness.

(a)     *Financial Statements.* Attached hereto as Schedule 2.6 are the Financial Statements. The Financial Statements are true, complete, and prepared in accordance with generally accepted accounting principles (GAAP) and fairly present the Ice Embassy's financial condition as of the respective dates of such Financial Statements and the results of Ice Embassy operation of the Business for the periods indicated.

(b)     *Undisclosed Liabilities.* Ice Embassy does not have any liabilities or obligations, whether known or unknown, absolute, contingent or otherwise (and, to Seller's knowledge, there is no basis for any present or future proceeding against Ice Embassy giving rise to any liabilities or obligations), except

UNOFFICIAL COPY

Stock Purchase Agreement – Ice Embassy

CONFIDENTIAL DOCUMENTS                                    HAH011519

CONFIDENTIAL DOCUMENTS

HAH011520

liabilities and obligations (i) that are expressly disclosed or specifically reserved against in the Financial Statements as of the Interim Balance Sheet Date, (ii) that have been incurred since such date pursuant to bona fide transactions entered into in the ordinary course of business consistent with reasonable past practice of Ice Embassy, and (iii) that are listed in the Schedules attached to this Agreement, and none of the liabilities described in (i), (ii) and (iii) are, or would reasonably be expected to be, individually or in the aggregate, material in amount or resulting from any claim based in tort or pursuant to a breach of contract.

(c) *Indebtedness*. Ice Embassy does not have any Indebtedness not reflected on the Financial Statements and those listed in the Schedules attached to this Agreement, all of which shall be considered Closing Date Debt which shall be paid in full by Seller on or prior to Closing.

Section 2.7    Legal Proceedings and Potential Claims.

Except for the legal proceedings and potential claims listed in Schedule 2.7 attached to this Agreement, (a) there are no known Actions that are before, under the authority of or within the purview of any Governmental Entity or arbitrator of any kind pending or, to the Knowledge of the Seller, threatened against or by or relating to or involving Ice Embassy or the real or personal property (whether leased or owned) of Ice Embassy, (b) Ice Embassy has not, and none of its assets or operations has, been a party or subject to any Action during the five (5) years prior to the Closing Date, and (c) Ice Embassy is not subject to any settlement, consent decree, judgment, injunction, ruling, order or finding of any Governmental Entity or arbitrator.

Section 2.8    Compliance with Law. Ice Embassy is, and for the past three (3) years has been, in compliance in all material respects with all Applicable Laws.

Section 2.9    Tax Returns; Taxes.

(i) all Tax Returns of Ice Embassy required to be filed through the Closing Date in accordance with any Applicable Law have been duly and timely filed;

(ii) all such Tax Returns are true, complete, correct, were prepared in accordance with Applicable Law and generally accepted accounting principals, and accurately reflect the income, business, assets, operations, status, and other matters of Ice Embassy;

(iii) all Taxes (whether or not shown on any Tax Return) that are due and payable on or prior to the Closing Date by Ice Embassy have been paid in full;

(iv) the provisions for Taxes, if reflected in the Financial Statements, are sufficient to cover all liabilities for Taxes Ice Embassy owes for the periods covered by such Financial Statements ;

(v) there are not now any extensions of time in effect with respect to the dates on which any Tax Returns of Ice Embassy were or are due to be filed;

(vi) all deficiencies asserted as a result of any examination, audits, assessments, or reassessments of any Tax Returns of Ice Embassy have been paid in full or finally settled;

(vii) no claims have been asserted and no proposals, deficiencies or assessments for any Taxes are being asserted or, to the Knowledge of the Seller, proposed or threatened against Ice Embassy and, to the Knowledge of the Seller, no audit, investigation, assessment or reassessment of any return or report of Taxes is currently underway, pending or threatened, and no Seller has received any written notice thereof;

(viii) to the Knowledge of Seller, no claim has ever been made by an authority in a jurisdiction in which Ice Embassy does not file Tax Returns that it is or may be subject to taxation by that jurisdiction;

CONFIDENTIAL DOCUMENTS                    HAH011521

CONFIDENTIAL DOCUMENTS                    HAH011522

(ix)    Ice Embassy has complied with all Applicable Laws relating to the withholding of Taxes (including from employees of the Business for income Taxes and social security and other payroll Taxes) and has withheld and paid on a timely basis all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, manager, creditor, member, or other third party;

(x)    there are no Liens for Taxes (other than Liens for Taxes which are not yet due and payable) on any of the Acquired Interests or any of the assets of Ice Embassy;

(xi)    no Tax Authority has proposed any adjustment, assessment or reassessment, or change in accounting method of Ice Embassy, and Ice Embassy does not have an application pending with any Tax Authority requesting permission for any change in accounting method; and

(xii)    none of the assets of Ice Embassy are properly treated as owned by persons other than Ice Embassy for income Tax purposes.

Section 2.10    Insurance Policies. Ice Embassy has maintained all insurance required to be maintained pursuant to each material Company contract and the types and amounts of insurance that a reasonably prudent operator of the Business would maintain. Ice Embassy's current insurance policies are listed in Schedule 2.10 and such policies (a) are valid, outstanding, in full force and effect, and enforceable in accordance with their terms, (b) have not been subject to any lapse in coverage, and (c) are sufficient for compliance with all Applicable Laws. All premiums due on the Company insurance policies will be paid prior to Closing in accordance with the payment terms of each such insurance policy.

Section 2.11    Intellectual Property. Ice Embassy has good, marketable, and transferable title to or possesses adequate licenses, assignments, or other valid rights to use the Intellectual Property, free and clear of all Liens, and has paid all maintenance fees, renewals or expenses related to such Intellectual Property. The Intellectual Property is subsisting and is not invalid or unenforceable, in whole or in part.

Section 2.12    Licenses and Permits. Ice Embassy owns, holds or possesses all Licenses that are necessary to enable Ice Embassy to own, lease, and operate the Business and its assets and properties and to carry on its operations as presently conducted. All Licenses are valid, binding, and in full force and effect. Ice Embassy has taken all necessary action to maintain each of its Licenses, including the payment of all fees and charges with respect to the Licenses due or payable as of the Closing Date. No loss or expiration of any material License is pending or, to the Knowledge of Seller, would reasonably be expected or, to the Knowledge of the Seller, is threatened. Ice Embassy has fulfilled and performed its obligations under each of Licenses, and no event has occurred or condition or state of facts exists which constitutes or, after notice or lapse of time or both, would constitute a breach or default under any such Applicable Laws or which permits or, after notice or lapse of time or both, would permit revocation or termination of any License, or which might adversely affect the rights of Ice Embassy under any License.

Section 2.13    Employee Matters.

(a)    Except as set forth in Schedule 2.13, with respect to all employees of Ice Embassy and its Affiliate, EM&M:

(i)    there are no collective bargaining agreements, and no employee is represented by a union or other labor organization or collective bargaining entity;

(ii)    all employees are employed at will;

(iii)    as of the date of this Agreement, Ice Embassy and the Seller Parties have not received notice of any charge or complaint with respect to or concerning any employee before any Governmental Entity responsible for the prevention or redress of unlawful, discriminatory, or unsafe employment or labor practices;

Stock Purchase Agreement – Ice Embassy

CONFIDENTIAL DOCUMENTS    HAH011523

CONFIDENTIAL DOCUMENTS

HAH011524

(iv)      there have not been any investigations by a Governmental Entity responsible for the enforcement of applicable labor or employment laws, and, to the Knowledge of Seller, no such investigation has been threatened;

(v)      Ice Embassy and EM&M are in compliance with all applicable Laws relating to labor or employment matters;

(vi)      All current employees and all former employees who worked in the Business or who were employed by Ice Embassy or EM&M within the five (5) years prior to the Closing Date, were legally authorized to work in the United States. Ice Embassy has completed and retained the necessary employment verification paperwork under the Immigration Reform and Control Act of 1986 ("IRCA") for the employees hired prior to the Closing Date. Further, at all times prior to the Closing Date, Ice Embassy and EM&M were in compliance with both the employment verification provisions (including the paperwork and documentation requirements) and the anti-discrimination provisions of IRCA.

(viii)      (A) Ice Embassy and EM&M have each paid to their current and former employees and independent contractors all salaries, wages, wage premiums, overtime, bonuses, commissions, accrued unused paid time off, fees, and other compensation to which they are entitled under Applicable Laws, Contracts, or policies of Ice Embassy and EM&M, and they are not liable for any arrears of wages or any Taxes or penalties for failure to comply with any of the foregoing; and (B) each individual who provides or has provided services to Ice Embassy or EM&M is or has been, as applicable, properly classified as "exempt" or "non exempt" and as an employee or independent contractor, as applicable, for purposes of the Fair Labor Standards Act and all other applicable employment-related Laws.

(b)      Ice Embassy and EM&M have not implemented any plant closing or mass layoff without providing notice in accordance with the WARN Act in the past six years, and no such actions are currently contemplated, planned, or announced.

(c)      Ice Embassy and EM&M have not created, put into effect or maintained any benefit plan for the employees of Ice Embassy or EM&M (or any Affiliate entity) including but not limited to any welfare benefit plan or other plan subject to Employee Retirement Income Security Act of 1974 (ERISA),(or that is intended to qualify under Section 401(a) of the Internal Revenue Code.

Section 2.14      Brokers, Finders, and Investment Bankers.  Seller has not employed any broker, finder, or investment banker or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, or finders' fees in connection with the transactions contemplated by this Agreement.

Section 2.15      Disclosure.

(a)      No representation, warranty or covenant made by Seller or Ice Embassy in this Agreement, the Schedules or the Exhibits attached to this Agreement, or the Seller Ancillary Documents contains an untrue statement of a material fact or omits to state a material fact required to be stated herein or therein or necessary to make the statements contained herein or therein, in light of the circumstances in which they were made, not misleading.

(b)      Prior to the execution of this Agreement, the Seller has delivered to the Purchaser true and complete copies of all security agreements and other instruments creating or imposing any Lien on the real or personal property of Ice Embassy and any other documents or instruments identified or referred to in the Schedules.

---

Stock Purchase Agreement – Ice Embassy

CONFIDENTIAL DOCUMENTS                    HAH011525

UNOFFICIAL COPY

HAH011526

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to Seller that the statements contained in this Article III are true and correct as of the date of this Agreement and as of the Closing Date. In addition, the Purchaser hereby confirms that the Seller is relying on the representations and warranties set forth in this Article III in connection with their execution and delivery of this Agreement and in completing the transactions contemplated by this Agreement.

Section 3.1    Organization.  Purchaser is a limited liability company duly formed, validly existing, and in good standing under the laws of Texas and is not a reporting issuer (as such term is defined or used under U.S. securities laws).  The Purchaser has all requisite power and authority to own, lease and operate its assets and properties and to carry on its business as now being conducted, and is duly qualified or registered and in good standing as a foreign corporation to transact business under the laws of each jurisdiction where the character of its activities or the location of the properties it owns or leases requires such qualification or registration.

Section 3.2    Authorization.  The Purchaser has full power, capacity, and authority to enter into, execute, and deliver this Agreement (if a signatory hereto) and the Purchaser Ancillary Documents and to perform such Person's obligations under this Agreement and the Purchaser Ancillary Documents and to consummate the transactions contemplated hereby and thereby.  Purchaser will duly execute and deliver at the time of Closing this Agreement and the Purchaser Ancillary Documents, and (assuming the due authorization, execution and delivery thereof by each other party thereto) constitute, or will constitute, as the case may be, legal, valid and binding agreements of the Purchaser enforceable against it in accordance with their respective terms, subject to applicable bankruptcy, insolvency and other similar laws affecting the enforceability of creditors' rights generally, general equitable principles and the discretion of courts in granting equitable remedies.

Section 3.3    Absence of Restrictions and Conflicts; Consents.

(a)    Purchaser's execution, delivery and performance of this Agreement and the Purchaser Ancillary Documents, the consummation of the transactions contemplated in this Agreement and the Purchaser Ancillary Documents and the fulfillment of and compliance with the terms and conditions of this Agreement and the Purchaser Ancillary Documents, do not and will not (as the case may be), with the passing of time or the giving of notice or both, contravene, violate or conflict with, constitute a breach of or default under, result in the loss of any benefit under, permit the acceleration of any obligation under or create in any party the right to terminate, modify or cancel any judgment, decree, order, injunction, award or ruling of any Governmental Entity or arbitration panel to which the Purchaser are a party or by which the Purchaser or any of its respective assets or properties are bound or any Applicable Laws applicable to the Purchaser.

(b)    No consent, approval, order or authorization of, or registration, declaration or filing with, any Person (other than a Governmental Entity) is required by or with respect to the Purchaser in connection with the execution, delivery or performance of this Agreement or the Purchaser Ancillary Documents or the consummation of the transactions contemplated hereby or thereby other than any such consents, approvals, orders or authorization of, registrations, declarations or filings that have already been obtained or made by the Purchaser, as applicable.

Section 3.4    Brokers, Finders, and Investment Bankers.  Purchaser has not employed any broker, finder, or investment banker or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, or finders' fees in connection with the transactions contemplated in this Agreement.

Stock Purchase Agreement – Ice Embassy

CONFIDENTIAL DOCUMENTS                                    HAH011527

CONFIDENTIAL DOCUMENTS

HAH011528

## ARTICLE IV
## CERTAIN COVENANTS AND AGREEMENTS

Section 4.1    Reasonable Efforts; Further Assurances; Cooperation.  Subject to the other provisions of this Agreement, each of the Parties will use their reasonable, good faith efforts to perform their respective obligations in this Agreement and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable under Applicable Laws to obtain all required consents and regulatory approvals and to satisfy all conditions to their respective obligations under this Agreement and to cause the transactions contemplated in this Agreement to be effected on the Closing Date, in accordance with the terms of this Agreement, and will cooperate fully with each other and their respective Affiliates, officers, directors, employees, agents, counsel, accountants and other designees in connection with any steps required to be taken as a part of their respective obligations under this Agreement, including:

(a)    Each of the Parties will promptly make their respective filings and submissions and will take all actions necessary, proper, or advisable under Applicable Laws to obtain any required approval of any Governmental Entity with jurisdiction over the transactions contemplated by this Agreement. Each of the Parties will furnish all information required for any application or other filing to be made pursuant to any Applicable Law in connection with the transactions contemplated in this Agreement.

(b)    In the event any claim, action, suit, investigation or other proceeding by any Governmental Entity or other Person is commenced which questions the validity or legality of the Acquisition or any of the other transactions contemplated by this Agreement or seeks damages in connection therewith, the Parties agree to cooperate and use all reasonable commercial efforts to defend against such claim, action, suit, investigation or other proceeding and, if an injunction or other order is issued in any such action, suit or other proceeding, to use all reasonable efforts to have such injunction or other order lifted and to cooperate reasonably regarding any other impediment to the consummation of the transactions contemplated in this Agreement.

(c)    The Seller and Ice Embassy, as applicable, will give, and will cause their Affiliates to give, any notices to third parties and use all commercially reasonable efforts (in consultation with the Purchaser) necessary to obtain any third party consents (i) necessary, proper or advisable to consummate the transactions contemplated by this Agreement, (ii) disclosed or required to be disclosed in the Schedules to this Agreement, and (iii) required to avoid a breach of or default under any material Company contract in connection with the consummation of the transactions contemplated by this Agreement; provided, however, that this paragraph will not require the Seller to pay any money (other than customary fees and expenses), or agree to any material contract concession, waiver, indemnity, guaranty or amendment, as a condition of receiving a consent.

(d)    The Seller or the Purchaser, as the case may be, will give prompt notice to each other Party of any failure of such Party to comply in any material respect with or satisfy any covenant, condition, or agreement to be complied with or satisfied by such Party under this Agreement. Each Party acknowledges that each other Party does not and will not waive any rights it may have under this Agreement as a result of any such notifications and delivery of any notice pursuant to this Section 4.1(d) will not limit or otherwise affect the rights or remedies available hereunder to the recipient of such notice.

Section 4.2    Intentionally omitted.

Section 4.3    Tax Matters.

(a)    Tax Periods Ending on or Before the Closing Date. The Seller has prepared all prior Tax Returns of Ice Embassy with respect to any taxation period ending on or before the Closing Date. Such Tax Returns were prepared by treating items on such Tax Returns in a manner consistent with the past practice. The Seller will provide to Purchaser a copy of such Tax Return already filed when the Purchaser requests copies. The Seller has the ultimate responsibility for all taxes prior to the Closing Date. No payment pursuant to this Section 4.3(a) shall excuse the Seller from their indemnification obligations. If

CONFIDENTIAL DOCUMENTS                                                    HAH011529

UNOFFICIAL COPY

the federal or applicable state and local income tax returns for Ice Embassy for the taxable year ending March 31, 2025 (the "2024 Tax Period") are not prepared and filed prior to the Closing Date, then Seller shall, at its sole cost and expense, be responsible for causing such returns (the "2024 Tax Returns") to be timely prepared by a tax professional or accounting firm customarily engaged by Ice Embassy for such matters, or another firm reasonably acceptable to Purchaser. Seller shall deliver complete drafts of the 2024 Tax Returns to Purchaser no later than sixty (60) days prior to the applicable filing deadline (including extensions) for such returns. Purchaser shall have thirty (30) days from receipt of the draft 2024 Tax Returns to review and provide comments to Seller. Seller shall, in good faith, consider all reasonable comments made by Purchaser and incorporate such comments to the extent required to ensure the 2024 Tax Returns are prepared in accordance with Applicable Laws and consistent with past practice, unless otherwise required by a change in law or fact. Upon resolution of any comments from Purchaser, Seller (with Purchaser's cooperation) shall file or cause to be filed the 2024 Tax Returns on or before the due date (including extensions) and shall provide Purchaser with a final copy of each filed return within five (5) business days after filing. Nothing in this Section shall limit or impair Purchaser's right to challenge or dispute the contents of any such return in connection with any audit, proceeding, or indemnification claim under this Agreement, including under Article VII (Indemnification).

(b)     Tax Periods Ending After the Closing Date. The Purchaser shall prepare or cause to be prepared and timely file or cause to be timely filed all other tax returns required for Ice Embassy. The Tax Returns will be prepared by treating items on such Tax Returns in a manner consistent with the past practice unless otherwise required by Applicable Law. For the avoidance of doubt, Purchaser shall be permitted to use the accrual method of accounting for the Tax Returns. For tax year 2025, Purchaser will provide to the Seller a draft of each such Tax Return (along with supporting workpapers and showing all tax elections) at least thirty (30) days prior to the due date for its filing and, in the case of a Tax Return due within thirty (30) days after the Closing Date, as soon as practical before the filing date. For tax year, 2025, within fifteen (15) days after receipt of the draft of each such Tax Return, or as soon as practical after the receipt of a Tax Return, the Seller will notify Purchaser of the existence of any objection, specifying in reasonable detail the nature and basis of such objection, to any items set forth on such draft Tax Return. Purchaser and Seller agree to consult and resolve in good faith any such objection, it being agreed that if an item is being treated in a manner consistent with past practice, such item will be rebuttably presumed to be reasonable and appropriate. If Purchaser desires to make any tax election in the Tax Return that is inconsistent with past practice of the prior Tax Returns and would be materially adverse to Seller's interests, Seller shall have the right to review and approve such elections. In addition, Purchaser agrees not to make a Section 338 or 336 election. There will be no allocation of purchase price among assets as only the Stock is being purchased, not the assets of Ice Embassy directly.

(c)     For purposes of determining the amount of any Taxes due for the Tax Return for which Seller shall have liability for the amount of Taxes attributable to the portion of the year ending on the Closing Date shall be:

(i)     in the case of Taxes that are either (A) based upon or related to income or receipts, or (B) imposed in connection with any sale or other transfer or assignment of property (real or personal, tangible or intangible), deemed equal to the amount that would be payable if the Tax period of Ice Embassy ended with (and included) the Closing Date; *provided* that exemptions, allowances or deductions that are calculated on an annual basis (including depreciation and amortization deductions) shall be allocated between the period ending on and including the Closing Date and the period beginning after the Closing Date in proportion to the number of days in each period; and

(ii)     in the case of Taxes that are imposed on a periodic basis with respect to the assets or capital of Ice Embassy, deemed to be the amount of such Taxes for the entire period (or, in the case of such Taxes determined on an arrears basis, the amount of such Taxes for the immediately preceding period), multiplied by a fraction the numerator of which is the number of calendar days

Stock Purchase Agreement – Ice Embassy                    Page 9 of 21

CONFIDENTIAL DOCUMENTS                                                HAH011531

CONFIDENTIAL DOCUMENTS

HAH011532

in the portion of the period ending on and including the Closing Date and the denominator of which is the number of calendar days in the entire period.

Section 4.4    Intentionally Omitted.

Section 4.5    Closing Adjustments. The Consideration payable by Purchaser at Closing may be adjusted so that is reduced by the estimated 2025 Tax Year liability of Ice Embassy apportioned to Seller under Section 4.3(b) of this Agreement.

## ARTICLE V
## SIMULTANEOUS CLOSING OF PARALLEL AGREEMENTS

The Parties agree that the transactions contemplated under this Agreement and the Parallel Agreements shall be closed and consummated as simultaneous closings, to be treated as having all occurred at the same time, and conditioned upon each of the such transactions being properly closed.

## ARTICLE VI
## CLOSING

Unless this Agreement shall have been terminated and the transactions contemplated herein shall have been abandoned pursuant to and subject to the satisfaction or waiver of the conditions set forth in Article V, the Closing will occur or about June 13, 2025 or in the alternative on such date as the Parties may agree. The Closing will take place via the electronic exchange of executed documents, or at such place or via such other method as the Parties may agree.

## ARTICLE VII
## INDEMNIFICATION

Section 7.1    Indemnification Obligations of the Seller. Subject to the other terms of this Article VII, the Seller, each beneficiary of any trust that owns or controls Ice Embassy (each, a "Trust Beneficiary"), and each of the other Seller Parties and their Affiliates (collectively, the "Seller Related Parties") will jointly and severally indemnify, defend, and hold harmless the Purchaser Indemnified Parties from, against, and in respect of the Losses resulting from, arising out of, relating to, or in connection with:

(a)    any breach or inaccuracy of any representation or warranty made by any of the Seller Related Parties in this Agreement, in any of the Seller Ancillary Documents, or Parallel Agreements, or by Ice Embassy in the Company Ancillary Documents;

(b)    any breach of any covenant, agreement, or undertaking made by Ice Embassy, any of the Seller Related Parties (or their Affiliates) in this Agreement, any of the Seller Ancillary Documents, or Parallel Agreements or any breach, at or prior to Closing, of any covenant, agreement, or undertaking Ice Embassy made in connection with the transactions contemplated by this Agreement;

(c)    any fraud, intentional misrepresentation, willful misconduct, criminal act, bad faith, or gross negligence of any of the Seller Related Parties in connection with this Agreement, the Seller Ancillary Documents, or Parallel Agreements or any fraud, intentional misrepresentation, willful misconduct, criminal act, bad faith, or gross negligence at or prior to Closing, of Ice Embassy in connection with the transactions contemplated by this Agreement;

(d)    any Closing Date Debt;

(e)    any and all Taxes that Seller is responsible for under the terms of this Agreement;

(f)    any and all liabilities, indebtedness, obligations, and/or claim (whether known or unknown, contingent or otherwise) related to the ownership, operation, maintenance, leasing, use, or occupancy of the Business or Ice Embassy's assets for all periods prior to the Closing Date, including but not limited to

Stock Purchase Agreement – Ice Embassy

CONFIDENTIAL DOCUMENTS                                    HAH011533



CONFIDENTIAL DOCUMENTS                                    HAH011534

Tax liabilities, contractual obligations, or tort claims, regardless of whether such liabilities are discovered before or after Closing; and

(g)     any other indemnifiable matter identified by Purchaser in Schedule 7.1(g).

Section 7.2     Indemnification Obligations of the Purchaser . Subject to the other terms of this Article VII, the Purchaser will indemnify, defend, and hold harmless the Seller Indemnified Parties from, against, and in respect of any and all Losses arising out of, relating to, or in connection with:

(a)     any breach or inaccuracy of any representation or warranty the Purchaser made in this Agreement, in any of the Purchaser Ancillary Documents, or Parallel Agreements on the execution date hereof and as of the Closing Date;

(b)     any breach of any covenant, agreement, or undertaking Purchaser made in this Agreement, in any of the Purchaser Ancillary Documents, or Parallel Agreements;

(c)     any fraud, intentional misrepresentation, willful misconduct, criminal act, or bad faith of the Purchaser in connection with this Agreement, the Purchaser Ancillary Documents, or Parallel Agreements; and

(d)     any liability of the Seller under personal guarantees executed for the benefit of Ice Embassy on or prior to the Closing Date, but solely to the extent related to the operation of Ice Embassy's business following the Closing and that is not otherwise a part of Purchaser Losses under this Agreement.

Section 7.3     Indemnification Procedure.

(a)     Promptly after and Indemnified Party's receipt of a third party's notice (including any Governmental Entity) of any Action with respect to which such Indemnified Party may be entitled to receive payment hereunder for any Purchaser Losses or any Seller Losses (as the case may be), such Indemnified Party will notify the Indemnifying Party, of any such Action; *provided, however*, that (x) the failure to so notify the Indemnifying Party will relieve the Indemnifying Party from liability under this Agreement with respect to such Action only if, and only to the extent that, such failure to notify the Indemnifying Party results in the Indemnifying Party's forfeiture of material rights and defenses otherwise available to the Indemnifying Party with respect to such Action and (y) no such notice shall be required with respect to any of the matters covered by Section 7.1(d).    Unless (i) the Indemnified Party shall have received advice from its selected counsel that a conflict of interest exists that would make joint representation inappropriate, (ii) if the Seller are the Indemnifying Party, such Action seeks an injunction or other equitable relief against any Indemnified Party, (iii) upon request of the Indemnified Party at any time, the Indemnifying Party fails to provide reasonable assurance to the Indemnified Party of its financial capacity to defend and provide indemnification with respect to such Action or (iv) the Action involves any of the matters covered by Section 7.1(d), the Indemnifying Party will have the right, at its sole expense, to assume the defense of such Action, upon written notice delivered to the Indemnified Party within ten (10) days after receiving such notice and, with respect to each Action for which it has assumed the defense under this Section 7.3(a), to maintain the defense of such Action, in each case with counsel selected by the Indemnifying Party and reasonably satisfactory to the Indemnified Party; *provided* that the Indemnifying Party shall have acknowledged in writing to the Indemnified Party its unqualified obligation to fully indemnify the Indemnified Party pursuant to this Article VII with respect to each Action for which the Indemnifying Party has assumed the defense under this Section 7.3(a), and the Indemnifying Party agrees to its unqualified obligation to fully indemnify the Indemnified Party pursuant to Article VII with respect to each Action for which the Indemnifying Party maintains the defense. In the event, however, that (A) the Indemnifying Party declines or fails to (1) assume or maintain the defense of the Action, (2) provide reasonable assurance to the Indemnified Party of its financial capacity to defend and provide indemnification with respect to such Action or (3) employ counsel reasonably satisfactory to the Indemnified Party, in any case, on the terms provided above, or (B) the Indemnified Party shall have

CONFIDENTIAL DOCUMENTS                         HAH011535

received advice from its selected counsel that a conflict of interest exists that would make joint representation inappropriate, then such Indemnified Party may employ counsel to represent or defend it in any such Action and the Indemnifying Party will pay, after payments are first taken out of the Fee Agreement Proceeds, the reasonable fees and disbursements of such counsel as incurred; *provided, however*, that the Indemnifying Party will not be required to pay the fees and disbursements of more than one counsel for all Indemnified Parties in any jurisdiction in any single Action. The Indemnifying Party shall use its best efforts to maintain the defense of each Action for which it has assumed the defense under this Section 7.3(a) and of each Action related to the matters covered by Section 7.1(d). In any Action with respect to which indemnification is being sought hereunder, the Indemnified Party or the Indemnifying Party, whichever is not assuming or maintaining the defense of such Action, will have the right to participate in such matter and to retain its own counsel at such Person's own expense, so long as, in the event the Indemnifying Party fails to assume or maintain the defense of any such Action, the Indemnifying Party either (x) acknowledges in writing to the Indemnified Party that it is, without qualification, obligated to fully indemnify the Indemnified Party pursuant to this Article VII with respect to such Action and pays the amounts, after giving credit for any Fee Agreement Proceeds received or credited to Ice Embassy after Closing but prior to such date, as may be required hereunder, including the reasonable fees and disbursements of the Indemnified Party's counsel as incurred, or (y) has complied with its obligations pursuant to the immediately preceding sentence, has disputed in writing its obligation to indemnify the Indemnified Party pursuant to this Article VII with respect to such Action and has demonstrated in writing a reasonable basis therefor; *provided* that, for the avoidance of doubt, the fees and expenses incurred by the Indemnified Party prior to the assumption of any Action by the Indemnifying Party shall be borne by the Indemnifying Party and the fees and expenses incurred by the Indemnified Party after the assumption of any Action by the Indemnifying Party shall be borne by the Indemnified Party to the extent that the Indemnifying Party has already properly assumed and maintained such defense. The Indemnifying Party or the Indemnified Party, as the case may be, will at all times use reasonable efforts to keep the Indemnified Party or the Indemnifying Party, as the case may be, reasonably and promptly apprised of the status of the defense of any Action the defense of which they are maintaining and to cooperate in good faith with each other with respect to the defense of any such Action; *provided, however*, that, in the event the Indemnifying Party fails to assume or maintain the defense of any such Action, the Indemnified Party will have no such obligations unless the Indemnifying Party either (x) acknowledges in writing to the Indemnified Party that it is, without qualification, obligated to fully indemnify the Indemnified Party pursuant to this Article VII with respect to such Action and pays the amounts required hereunder, including the reasonable fees and disbursements of the Indemnified Party's counsel as incurred, or (y) has complied with its obligations use its best efforts to maintain the defense of each Action for which it has assumed the defense under this Section 7.3(a) and of each Action related to the matters covered by Error! Reference source not found., has disputed in writing its obligation to indemnify the Indemnified Party pursuant to this Article VII with respect to such Action and has demonstrated in writing a reasonable basis therefor.

(b) No Indemnified Party may settle or compromise any claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party, unless: (i) the Indemnifying Party does not assume or fails to maintain the defense of such claim pursuant to Section 7.3(a), (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party from all liability arising out of such claim, or (iii) the amount of Fee Agreement Proceeds received by or credited to Ice Embassy prior to such date fully covers such settlement, compromise, or consent. An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise or consent (1) includes an unconditional release of each Indemnified Party (including its Affiliates) from all liability arising out of such claim, (2) does not contain any admission or statement suggesting any wrongdoing or liability on behalf of any Indemnified Party or any of its Affiliates, (3) does not contain any equitable order, judgment or term which in any manner adversely affects, restrains or interferes with the business of any

CONFIDENTIAL DOCUMENTS HAH011536

UNOFFICIAL COPY

Indemnified Party or any Indemnified Party's Affiliates and (4) does not and will not result in any increase in Taxes of any Indemnified Party or any Indemnified Party's Affiliate, or adverse effect on Taxes of any Indemnified Party or any Indemnified Party's Affiliate, for any taxable period or portion thereof after the Closing Date.

(c)     A claim for indemnification by an Indemnified Party for any matter not involving an Action by a third party shall be asserted by written notice to the Indemnifying Party from whom indemnification is sought. Such notice will specify in reasonable detail the basis for such claim. As promptly as possible after the Indemnified Party has given such notice, such Indemnified Party and the appropriate Indemnifying Party will establish the merits and amount of such claim (by mutual agreement, litigation, arbitration or otherwise) and, within five (5) Business Days of the final determination of the merits and amount of such claim, the Indemnifying Party will pay, after giving credit for any Fee Agreement Proceeds received or credited to Ice Embassy after Closing but prior to such date, to the Indemnified Party immediately available funds in an amount equal to such claim as determined hereunder. If the Indemnified Party and the Indemnifying Party agree with respect to any of such claims, the Indemnified Party and the Indemnifying Party shall promptly prepare and sign, if applicable, an instruction to the Escrow Agent.

(d)     The General Representations of the Seller Parties shall survive Closing for the General Representation Survival Period.

(e)     Any representations and warranties set forth in this Agreement or any of the Seller Ancillary Documents pertaining to Taxes shall survive Closing for six (6) years after the Closing Date, and all Fundamental Representations and all covenants of the Seller Parties shall survive Closing for the appliable statute of limitations period.

(f)     No claim for a breach of any representation or warranty of Seller shall be actionable or payable unless written notice containing a description of the specific nature of such breach shall have been provided to Seller within the survival periods set forth in (d) and (e).

(g)     All amounts owing to Purchaser Indemnified Parties for Purchaser Losses may, after giving credit for any Fee Agreement Proceeds received or credited to Ice Embassy after Closing, be paid through application and delivery to Purchaser of Escrow Funds, being maintained by the Escrow Agent in accordance with the terms of the Real Estate Purchase Agreement, and upon Purchaser demand therefor Seller shall cause the delivery of all necessary instruments and written release to effectuate the release of Escrow Funds in the amount of Purchaser Losses to Purchaser.

## ARTICLE VIII
## MISCELLANEOUS PROVISIONS

Section 8.1     Notices. All notices, communications and deliveries under this Agreement will be made in writing signed by or on behalf of the Person making the same, will specify the Section under this Agreement pursuant to which it is given or being made, and will be delivered personally or by facsimile transmission or sent by registered or certified mail (return receipt requested) or by nationally recognized overnight courier (with evidence of delivery and postage and other fees prepaid) as follows:

If to the Purchaser:

Colorado Rose, LLC
c/o Zack Truesdell
1800 W Loop S, Ste. 1125
Houston, TX 77027
zack@theclegroup.com

With copies to:

ChristianAttar Law Firm
Ardalan Attar
1177 W Loop S, Ste. 1700
Houston, TX 77027
aattar@christianattarlaw.com

Stock Purchase Agreement – Ice Embassy

Page 13 of 21

CONFIDENTIAL DOCUMENTS                                      HAH011538

If to the Seller:

Linda Goehrs, Trustee for
the Holli Ann Hardin Trust Number One
3414 Old Richmond Road
Rosenberg, TX 77471

With copies to:

Sean Greenwood
THE GREENWOOD LAW FIRM
1415 N. LOOP WEST, SUITE 1250
HOUSTON, TX 77008
Facsimile: 832-356-1589
sean@woodlaw.com

If to Fontenot:

Dakota Fontenot
2926 Fontana Dr
Houston, TX 77043
(713) 419-2966
dakotajamesfontenot@gmail.com

or to such other representative or at such other address or facsimile number of a Party as such Party may furnish to the other Parties in writing. Any such notice, communication or delivery will be deemed given or made (a) if personally delivered, when so delivered in person, (b) if given by facsimile, when transmitted, with written confirmation of transmission, (c) if given by nationally recognized overnight courier, one (1) Business Day after being sent by nationally recognized overnight courier, or (d) if given by registered or certified mail, upon the date of delivery as confirmed in writing.

Section 8.2    Schedules and Exhibits. The Schedules and Exhibits to this Agreement are hereby incorporated into this Agreement and are hereby made a part of this Agreement as if set out in full in this Agreement.

Section 8.3    Assignment; Successors in Interest. No assignment or transfer by any Party of its rights and obligations under this Agreement will be made except with the prior written consent of the other Parties to this Agreement. This Agreement will be binding upon and will inure to the benefit of the Parties and their successors and permitted assigns, and any reference to a Party will also be a reference to a successor or permitted assign.

Section 8.4    Number; Gender. Whenever the context so requires, the singular number will include the plural, and the plural will include the singular, and the gender of any pronoun will include the other genders.

Section 8.5    Captions. The titles, captions, and table of contents contained in this Agreement are inserted in this Agreement only as a matter of convenience and for reference and in no way define, limit, extend, or describe the scope of this Agreement or the intent of any provision of this Agreement. Unless otherwise specified to the contrary, all references to Articles and Sections are references to Articles and Sections of this Agreement, and all references to Schedules or Exhibits are references to Schedules and Exhibits, respectively, to this Agreement.

Section 8.6    Controlling Law; Amendment. This Agreement will be governed by, construed, and enforced in accordance with the internal laws of the State of Texas without reference to its choice of law rules. This Agreement may not be amended, modified, or supplemented except by written agreement executed and delivered by all of the Parties.

Stock Purchase Agreement – Ice Embassy

CONFIDENTIAL DOCUMENTS                                    HAH011539



CONFIDENTIAL DOCUMENTS

HAH011540

Section 8.7        Consent to Jurisdiction, Etc.; Waiver of Jury Trial. Each of the Parties hereby irrevocably consents and agrees to the exclusive personal jurisdiction of the courts of the State of Texas in Harris County, Texas, or the federal courts for the Southern District of Texas, for any Legal Dispute.

Section 8.8        Attorneys Fees. In the event of any Legal Dispute, the prevailing party shall be entitled to recover its reasonable attorneys' fees and costs from the non-prevailing party.

Section 8.9        Severability. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction will, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement, and any such prohibition or unenforceability in any jurisdiction will not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by Applicable Laws, the Parties waive any provision of Applicable Laws that renders any such provision prohibited or unenforceable in any respect.

Section 8.10       Counterparts. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one and the same instrument. Facsimile or scanned and emailed transmission of any signed original document or retransmission of any signed facsimile or scanned and emailed transmission will be deemed the same as delivery of an original. At the request of any Party, the Parties will confirm facsimile or scanned and emailed transmission by signing a duplicate original document.

Section 8.11       No Third-Party Beneficiaries. Except as provided in Article VII, nothing expressed or implied in this Agreement is intended, or will be construed, to confer upon or give any Person other than the Parties, the Purchaser Indemnified Parties and the Seller Indemnified Parties and their respective successors and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement, or result in such Person being deemed a third party beneficiary of this Agreement.

Section 8.12       Waiver. Any agreement on the part of a Party to any extension or waiver of any provision of this Agreement will be valid only if set forth in an instrument in writing signed on behalf of such Party. A waiver by a Party of the performance of any covenant, agreement, obligation, condition, representation, or warranty will not be construed as a waiver of any other covenant, agreement, obligation, condition, representation, or warranty. A waiver by any Party of the performance of any act will not constitute a waiver of the performance of any other act or an identical act required to be performed at a later time.

Section 8.13       Entire Agreement. This Agreement and the documents executed pursuant to this Agreement supersede all negotiations, agreements and understandings among the Parties with respect to the subject matter of this Agreement (including, for the avoidance of doubt, that certain letter of intent, dated August 16, 2021, by and between Purchaser and Seller) and constitute the entire agreement between the Parties with regards to the subject matter of this Agreement.

Section 8.14       Transaction Costs. Except as provided above or as otherwise expressly provided herein, (a) the Purchaser will pay their own fees, costs and expenses incurred in connection with this Agreement and the transactions contemplated by this Agreement, including the fees, costs and expenses of its financial advisors, accountants and counsel, and (b) the Seller will pay the fees, costs and expenses of the Seller and Ice Embassy incurred in connection with this Agreement and the transactions contemplated by this Agreement (including any such fees, costs or expenses incurred in connection with any pre-closing restructuring or transactions undertaken in contemplation of the completion of the transactions contemplated hereby), including the fees, costs and expenses of their financial advisors, accountants and counsel.

Section 8.15       Construction and Further Assurances. This Agreement has been freely and fairly negotiated among the Parties. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if the Parties jointly drafted the same, and no presumption or burden of proof will arise favoring or disfavoring any Party because of the authorship of any provision of this Agreement. Any

CONFIDENTIAL DOCUMENTS                                    HAH011541

reference to any law will be deemed also to refer to such law as amended, modified, succeeded, or supplemented from time to time and in effect at any given time, and all rules and regulations promulgated thereunder, unless the context requires otherwise. From time to time following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement. Without limiting the foregoing, Seller shall execute and deliver, or cause to be executed and delivered, to Purchaser such other instruments of conveyance and transfer as Purchaser may reasonably request or as may be otherwise necessary to more effectively convey and transfer to, and vest in, Purchaser and put Purchaser in possession of, the Acquired Interests and the assets of Ice Embassy.

## ARTICLE IX

## DEFINITIONS

The following defined terms have the meanings ascribed to such terms as used in this Agreement:

**Accounts Receivables** means all rights the Company has now or in the future to payments including, but not limited to, payment for goods and other property sold or leased or for services rendered, whether or not the Company has earned such payment by performance listed in Schedule 1.4.

**Acquired Interests** means the issued and outstanding capital stock of Ice Embassy.

**Acquisition** means the purchase and sale of all the Acquired Interests pursuant to the terms of the Agreement.

**Action or Actions** means individually or collectively, known actions, customer demands or allegations, complaints, suits, arbitrations, mediations, claims, audits, proceedings, assessments or reassessments of Taxes or charges, indictments or investigations, in each case of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

**Affiliates** mean any Person that directly or indirectly controls, or is under common control with, or is controlled by, another Person and, if such Person is an individual, any member of the immediate family (including parents, spouse, children and siblings) of such individual and any trust whose principal beneficiary is such individual or one or more members of such immediate family and any Person who is controlled by any such member or trust. As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise).

**Agreement** means this Stock Purchase Agreement.

**Applicable Laws** means all applicable federal, state, municipal, local and foreign laws (including the common and civil law and equity), statutes, rules, regulations, ordinances, codes, orders, decrees, injunctions, judgments and other legislative, administrative or judicial promulgations, including those relating to zoning, Taxes, immigration, environmental matters, labor and employment, security, privacy, data production and the safety and health of employees, of all Governmental Entities or arbitration panels

CONFIDENTIAL DOCUMENTS                    HAH011542

UNOFFICIAL COPY

CONFIDENTIAL DOCUMENTS

HAH011543

and contained in all published requirements, plans, notices, permits, licenses, authorizations, approvals, consents and demand letters issued, entered, promulgated or approved thereunder, in each case as amended and in effect from time to time.

**Business** means the business Ice Embassy currently conducts, including (without limitation) the ownership and operation of a restaurant, bar, sexually oriented business known as the "Colorado".

**Business Day** means any day except Saturday, Sunday, or any day on which banks are generally not open for business in Houston, Texas.

**Closing** means the consummation of and reference to the transactions contemplated under this Agreement.

**Closing Date** means the date on which the Closing occurs.

**Closing Date Debt** means an aggregate amount equal to the current and non-current portions of the indebtedness and all other long-term liabilities of Ice Embassy outstanding as of the Closing Date, including, obligations for borrowed money, obligations evidenced by loan agreements, notes, bonds or similar instruments, capital leases, amounts due to the Seller or their respective Affiliates, amounts drawn and unpaid under outstanding letters of credit, net obligations under any swap, derivative or similar transactions, obligations for deferred purchase price, deferred compensation or other deferred payments for which Ice Embassy is liable, accounts payable as of the Closing Date, prepayment fees and penalties related to the payoff of any of the foregoing as of the Closing, any guarantee (which, for purposes of this definition, shall include any obligation, contingent or otherwise, having the economic effect of guaranteeing any indebtedness or other obligation payable or performable by another Person in any manner, whether directly or indirectly) by Ice Embassy of any of the foregoing, and any outstanding obligations or liabilities of Ice Embassy pursuant to any shares of preferred stock or any other equity or equity-based interest or instrument, in each case, whether or not such items are included as indebtedness or liabilities in the Financial Statements pursuant to GAAP and, in each case, whether short-term or long-term.

**Consideration or Cash Consideration** means TWO HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($250,000.00).

**Contracts** means Ice Embassy's contracts listed on Schedule 2.4A.

**Company or Ice Embassy** means Ice Embassy, Inc., a Texas corporation.

**Company Ancillary Documents** means any certificate, agreement, document, or other instrument Ice Embassy executes and delivers in connection with the transactions contemplated in this Agreement.

**Effective Date** means the date all Parties have executed the Agreement.

**EM&M** means Entertainment Marketing & Management, Ltd., a Texas limited partnership.

**EM&M Agreement** means that certain agreement for the purchase of the partnership interests of EM&M, made by and among BFD GP, LLC, a Texas limited liability company, BFD LP, LLC, a Texas limited liability company and Fontenot, as seller parties therein, and Purchaser, as purchaser therein.

Stock Purchase Agreement – Ice Embassy                    Page 17 of 21

CONFIDENTIAL DOCUMENTS                                  HAH011544

**Excluded Assets** means the assets listed on Schedule 1.1.

**Fee Agreement Proceeds** means the monetary amount or compensation that Ice Embassy is entitled to receive as a result of a resolution, judgment, or settlement arising from litigation or disputes related to credit card fees Visa and Mastercard charged to Ice Embassy.

**Financial Statements** means Ice Embassy's (i) the balance sheets of Ice Embassy with respect to the Business as of March 31st of 2022, 2023 and 2024 and the related statements of income for each of the years then ended (collectively, "Annual Financial Statements"), and (ii) the balance sheet of Ice Embassy with respect to the Business as of April 30, 2025 ("Interim Balance Sheet Date") and the related statements of income for the one month then ended ("Interim Financial Statement", and together with the Annual Financial Statements, the "Financial Statements", which are attached hereto as Schedule 2.6.

**Fundamental Representations** means all statements, representations and warranties set forth in Article II other than General Representations.

**General Representations** means the representations and warranties contained in Sections 2.4, 2.10 and 2.12 of this Agreement.

**General Representations Survival Period** means the period beginning on the Closing Date and ending on the 60th day after the one (1) year anniversary of the Closing Date, which is the period in which Purchaser may present claims pertaining to any default, inaccuracy or breach of the General Representations set forth in Article II of this Agreement, which period shall continue for such period of time as needed to resolve by settlement, litigation or other proceeding such presented claims. .

**Governmental Entity or Governmental Entities** means, individually or collectively, any federal, state, municipal, local, or foreign government or any court, tribunal, administrative or regulatory agency or commission, or other governmental authority or agency, domestic or foreign.

**Indebtedness** means all such indebtedness, obligations, and liabilities collectively referred to under this Agreement. means with respect to Ice Embassy, as of any date, without duplication, (a) all obligations for borrowed money (or issued in substitution for or exchange of indebtedness for borrowed money), including all principal, interest, premiums, fees, expenses, overdrafts and penalties with respect thereto, whether short term or long term, and whether secured or unsecured, (b) all obligations evidenced by bonds, debentures, notes or similar instruments, (c) all obligations upon which interest charges are customarily paid (other than trade payables incurred in the ordinary course of business or any Taxes), (d) all obligations under conditional sale or other title retention agreements relating to property or assets purchased by Ice Embassy, (e) all guarantees, whether direct or indirect, of Indebtedness of others or Indebtedness of any other person or entity secured by any assets of Ice Embassy, and (f) all capital lease obligations.

**Indemnified Party** means the Party receiving indemnification.

**Indemnifying Party** means the Party providing the indemnification.

**Intellectual Property** means all registered and unregistered copyrights, trade names, trade secrets, trademarks, service marks (including logos), patents (or application therefor), know-how or other

---

CONFIDENTIAL DOCUMENTS                                                    HAH011545

intellectual property or proprietary property rights that are material to the business of Ice Embassy or as to which Ice Embassy claims an ownership interest or as to which Ice Embassy is a licensee or licensor.

**Interim Balance Sheet Date** means April 30, 2025.

**Knowledge or Know** shall mean with respect to the Seller Parties (a) the actual or constructive knowledge of the Seller Parties, after due and reasonable inquiry with those employees, officers, directors, and representatives of Ice Embassy having responsibility for or who could reasonably be expected to be aware with respect to the matters at hand.

**Legal Dispute** means any action, suit, or proceeding arising in connection with any disagreement, dispute, controversy, or claim arising out of or relating to this Agreement or any related document.

**Licenses** means all notifications, licenses, permits, franchises, grants, easements, variances, exceptions, consents, orders, certificates (including certificates of occupancy with respect to all Leased Real Property, where applicable), approvals, exemptions, classifications, registrations and other similar documents and authorizations, including the date and expiration, and applications therefor.

**Liens.** Means all mortgages, liens (statutory or other), pledges, hypothecations, security interests, assignments, charges, claims, community property interests, title defects, conditions, covenants, options, equitable interests, rights of first refusal, restrictions of any kind, easements, and encumbrances of any nature whatsoever.

**Losses** means any and all claims, liabilities, obligations, losses, damages, costs, expenses, penalties, interest, awards, fines and judgments (in equity or at law) and damages whenever arising or incurred (including amounts paid in settlement, costs of investigation and reasonable attorneys' and consultants' fees and expenses).

**Parallel Agreements** means the Real Estate Purchase Agreement and the EM&M Agreement.

**Parties** means Purchaser and Seller.

**Person** means any individual, corporation, company, limited liability company, association, partnership, joint venture, trust, unincorporated organization, or government authority.

**Personal Property** means all of Ice Embassy's intangible and tangible personal property including (without limitation) all equipment, inventory, and other items of personal property, and all other assets useful or needed for the operations of the Business currently conducted by Ice Embassy.

**Purchaser** means Colorado Rose, LLC, a Texas limited liability company, its members, managers, officers, predecessors, successors, agents, and assigns.

**Purchaser Ancillary Documents** means any other certificate, agreement, document, or other instrument to be executed and delivered by Purchaser in connection with the transactions contemplated by this Agreement.

**Purchaser Indemnified Parties** means the Purchaser and Purchaser's Affiliates (including Ice Embassy from and after Closing), and each of their respective shareholders, officers, directors, members, employees,

CONFIDENTIAL DOCUMENTS                    HAH011546

agents, and representatives and each of the heirs, executors, successors, and permitted assigns of any of the foregoing (in each case other than the Seller).

**Purchaser's Losses** means the Losses of the Purchaser Indemnified Parties described in Section 7.1 as to which the Purchaser Indemnified Parties are entitled to indemnification from the Seller Parties.

**Real Estate Purchase Agreement** means that certain agreement for the purchase of the real property and improvements located at 6710 Southwest Freeway, Houston, Texas 77074 used for the operation of the Business for a purchase price of Four Million Seven Hundred Fifty Thousand and No/100 Dollars ($4,750,000.00), of even date herewith, made by and between HFR Enterprises Inc., a Texas corporation, as seller therein, and CLE Group SKZ Real Estate, LLC, a Texas limited liability company, as purchaser therein.

**Retained Liabilities** means debt and/or liabilities set forth in Schedule 1.2B, attached hereto.

**Seller or Trust** means Linda Gochrs, Trustee for the Holli Ann Hardin Trust Number One.

**Seller Ancillary Documents** means any other certificate, agreement, document, or other instrument Seller or Ice Embassy executes and delivers in connection with the transactions contemplated under this Agreement.

**Seller Indemnified Parties** means the Seller and each of their respective shareholders, officers, directors, members, employees, agents, and representatives and each of the heirs, executors, successors, and permitted assigns of any of the foregoing.

**Seller Losses** means the losses of the Seller Indemnified Parties described in Section 7.2 as to which the Seller Indemnified Parties are entitled to indemnification.

**Stock** means all of the issued and outstanding shares of common stock of the Company.

**Tax Authority** means any Governmental Entity responsible for the imposition, assessment, or reassessment of any Taxes.

**Taxes** means all taxes, installments, assessments, charges, duties, fees, levies or other governmental charges, including income, franchise, margin, capital stock, real property, personal property, tangible, withholding, employment, payroll, social security, land transfer, employer, health, goods and services, harmonized sales, social contribution, employment insurance premium, unemployment compensation, disability, transfer, sales, use, service, license, excise, gross receipts, value-added (ad valorem), add-on or alternative minimum, environmental, severance, stamp, occupation, premium, unclaimed property, escheat and all other taxes of any kind for which a Person may have any liability imposed by any Governmental Entity, whether disputed or not, and any charges, fines, interest or penalties imposed by any Governmental Entity or any additional amounts attributable or imposed with respect to such amounts.

**Tax Return** means any report, return, information return, statement, form, election, slip, declaration, or other information required to be supplied to a Governmental Entity in connection with Taxes, including any estimated or amended returns and reports of any kind with respect to Taxes.

**Title Company** means Post Oak Title; by and through its escrow agent Zeeshan Jivani.

CONFIDENTIAL DOCUMENTS                                   HAH011547

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed, as of the date first above written.

**SELLER**
**Holi Ann Hardin Trust Number One**

*Linda Goehrs*
_____
Linda Goehrs, Trustee for the Holli Ann
Hardin Trust Number One

**FONTENOT**

_____
Dakota Fontenot

**Ice Embassy, Inc.**

By: _____
Title: Director / President

**PURCHASER**
**Colorado Rose, LLC**

By: _____
Printed Name: Justin Zachariah Truaxdell
Title: Manager

CONFIDENTIAL DOCUMENTS                                    HAH011548

537721

Probate Court No. 1

# EXHIBIT M

## PARTNERSHIP INTEREST PURCHASE AGREEMENT

THIS PARTNERSHIP INTEREST PURCHASE AGREEMENT (this "**Agreement**") is made and entered into as of June ___, 2025, by and among Colorado Rose, LLC a Texas limited liability company, with a principal place of business at 1800 West Loop S, Ste. 1125, Houston, TX 77027 ("**Buyer**"), BFD GP, LLC a Texas limited liability company with a principal place of business at 3414 Old Richmond Road, Rosenberg, TX 77471 ("**BFD GP**") and BFD LP, LLC a Texas limited liability company with a principal place of business at 3414 Old Richmond Road, Rosenberg, TX 77471 ("**BFD LP**", and together with BFD GP, collectively, the "**Sellers**" and each individually a "**Seller**") and Entertainment Marketing & Management, Ltd., a Texas limited partnership with a principal place of business at 3414 Old Richmond Road, Rosenberg, TX 77471 ("**Company**"). The Buyer and Sellers are joined herein by Dakota Fontenot, an individual resident of Texas ("**Fontenot**, and together with the Sellers, collectively the "**Seller Parties**"). Buyer, Seller Parties, and the Company are hereinafter collectively referred to as the "**Parties**."

WHEREAS, BFD GP, LLC is the sole general partner holding all of the general partnership interests of the Company (the "**GP Interests**"), and BFD LP, LLC is the sole limited partner holding all of the limited partnership interests of the Company (the "**LP Interests**"), and together, Sellers own 100% of the issued and outstanding GP Interests and LP Interests in the Company (collectively, the "**Interests**");

WHEREAS, contemporaneously with this Agreement, the Parties and/or their affiliates or related parties are entering into that certain Stock Purchase Agreement (the "**SPA**") for the acquisition of stock in Ice Embassy, Inc., a Texas corporation ("**Ice Embassy**"), and that certain Purchase and Sale Agreement (the "**PSA**") for the acquisition of that certain real property located at 6710 Southwest Freeway, Houston, Texas 77074, as further described in the PSA (the "**Property**") from HFR Enterprises Inc., a Texas corporation ("**HFR**") (the SPA and PSA collectively referred to herein as the "**Parallel Agreements**");

WHEREAS, Fontenot owns 100% of the membership interests of the Sellers, and further, Fontenot and/or his affiliates own, possess, manage and control ICE Embassy and HFR through equity ownership and management (or services) agreements, and by which Fontenot will benefit from the closing of all transactions under this Agreement and the Parallel Agreements;

WHEREAS, the Parties desire to enter into this Agreement, pursuant to which the Buyer agrees to purchase from the Seller, and the Seller agrees to sell to the Buyer and assign to Buyer (and Buyer's designee, with respect to the LP Interests), all of the Interests, on the terms and subject to the conditions set forth in this Agreement; and

WHEREAS, the Seller and the Buyer desire to consummate the proposed transaction pursuant to the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1

DF000502

# ARTICLE I

## PURCHASE AND SALE OF INTERESTS

1.1 Purchase and Sale of Interests. Upon the terms and subject to the conditions of this Agreement, at the Closing on the Closing Date, the Seller agrees to sell, assign, convey, transfer and deliver to the Buyer (and Buyer's designee, with respect to the LP Interests), and the Buyer and Buyer's designee agrees to acquire from the Seller all of the Interests, free and clear of all Liens (as defined below) (other than restrictions under the Securities Act and state securities Laws), excluding the assets listed in Exhibit A, attached hereto and incorporated herein by this reference ("Excluded Assets").

1.2 Purchase Price.

(a) Upon the terms and subject to the conditions of this Agreement, in consideration of the aforesaid sale, assignment, conveyance, transfer and delivery of the Interests, the purchase price payable by the Buyer to the Seller at the Closing (the "Purchase Price") shall be in the aggregate: Two Million Seven Hundred Fifty Thousand and 00/100 ($2,750,000.00) Dollars, payable as follows:

(i) the Buyer shall pay the Seller One Million Five Hundred Thousand and 00/100 ($1,500,000.00) Dollars via wire transfer at Closing (the "Closing Cash Payment");

(ii) subject to Section 1.2(b), the Buyer shall pay the Sellers an aggregate sum of One Million Two Hundred Fifty Thousand and 00/100 ($1,250,000.00) Dollars ("Installment Amount"), pro-rata in accordance with each Seller's proportionate share of the Interests, via wire transfer, to be paid as follows:

(iii) One half of the Installment Amount ($625,000) shall be paid in quarterly installments, with the first installment being due and payable on October 1, 2025 and three successive installments being due and payable on the first day of the succeeding fiscal quarter thereafter (i.e., January 1, 2026, April 1, 2026, and July 1, 2026), and with the remaining one-half of the Installment Amount ($625,000) shall be paid in 12 monthly increments, with the first payment being due and payable on August 1, 2026, and with successive monthly payments being due on the first day of each month until the Installment Amount is paid in full.

The quarterly and monthly payments of the Installment Amount are collectively referred to herein as the "Installment Payments". As security for payment of the Installment Payments, Sellers shall be granted a subordinate lien covering the Property being purchased under the PSA, which will be provided under a second-priority lien deed of trust security interest in the Property. Buyer shall execute and deliver a deed of trust in favor of Sellers, in form and substance reasonably satisfactory to Sellers and Buyer.

(b) Notwithstanding anything to the contrary, Buyer shall be entitled to offset against any unpaid Installment Payments due to the Buyer Indemnified Parties for Buyer's Losses as set forth

DF000503

in Article VIII herein or under any of the Parallel Agreements. Any offset shall reduce the applicable Installment Payment(s) on a dollar-for-dollar basis.

1.3 [Reserved].

1.4 Excluded Assets License. As part of this Agreement, Buyer is granted a non-exclusive, revocable license to use Item No. 16 in the Excluded Assets ("**Twin Zebras**") while operating its business at the Property. This license shall remain in effect for as long as the Buyer continues to operate on the Property and desires to use the Twin Zebras. In the event that the Buyer ceases operations on the Property, no longer wishes to use the Twin Zebras, or is otherwise unable to continue using the Twin Zebras, the Buyer shall promptly return the Twin Zebras to Dakota Fontenot in their original condition, reasonable wear and tear excepted. The Seller Parties reserve the right to inspect the Twin Zebras upon their return to ensure compliance with this provision. This license is non-transferable and may not be assigned or sublicensed by the Buyer without the prior written consent of Sellers. The Seller Parties retain all ownership rights to the Twin Zebras and may revoke this license at their discretion with reasonable notice to the Buyer.

1.5 Removal of Excluded Assets. Sellers shall have thirty (30) days following the Closing Date to remove all Excluded Assets from the Property. Sellers shall coordinate and arrange mutually agreeable times with Buyer for the removal of such Excluded Assets, ensuring minimal disruption to Buyer's operation of its business at the Property. Sellers shall be responsible for any costs associated with the removal and shall leave the Property in a clean and orderly condition following removal of the Excluded Assets.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES OF SELLERS

2. Representations and Warranties of the Seller Parties. As an inducement to the Buyer to enter into this Agreement, each of the Seller Parties, jointly and severally, represent and warrant to the Buyer that as of the date of this Agreement and the Closing Date:

a. Title to Partnership Interests. The Sellers own, possess, and have good and marketable title to the Interests free and clear of all liens, leases, pledges, charges, encumbrances, equities, covenants, conditions, restrictions, or claims of every nature and kind whatsoever (the "**Liens**").

b. Legal Requirements. The Sellers have all requisite power, authority, and approvals to transfer ownership of the Interests. The Company and Sellers are in good standing with the State of Texas and has complied and will continue to comply with all applicable federal, state, or local statutes, laws, and regulations, if any, with respect to its transfer of the Interests.

c. Consents and Approvals. Other than in compliance with the provisions of applicable statutes and regulations, no notice to, filing with, or authorization, consent, or approval of any domestic or foreign public body or authority is necessary for the consummation of the transactions contemplated by this Agreement. The execution, delivery, performance and consummation of this Agreement does not and will

3

DF000504



not: (i) violate, conflict with or constitute a default or an event that, with notice or lapse of time or both, would be a default, breach or violation under any term or provision of any instrument, agreement, contract, commitment, license, promissory note, conditional sales contract, indenture, mortgage, deed of trust, lease or other agreement, instrument or arrangement to which the Company or Seller Parties are a party or by which the Sellers' Interests are bound; (ii) violate, conflict or constitute a breach of any statute, regulation or judicial or administrative order, award, judgment or decree to which the Seller Parties or the Company or to which the Sellers' Interests are bound or subject; or (iii) result in the creation or imposition of any adverse claim or interest, or any lien, encumbrance, charge, equity or restriction of any nature whatever, upon or affecting the Seller Parties, the Company, or Sellers' Interests. The sole member of the Sellers, Fontenot, has consented to the sale of the Sellers' Interests and this Agreement. The Sellers, being the sole partners of the Company have consented to the sale of the Sellers' Interests and this Agreement.

     d.     <u>Litigation</u>. There is no: (i) action, suit or proceeding pending or threatened against the Sellers, Sellers' Interests, the Company, or Fontenot; or (ii) proceeding, investigation, charges, audit or inquiry threatened or pending before or by any federal, state, municipal or other governmental court, department, commission, board, bureau, agency or instrumentality which might result in an adverse effect on the Sellers, Sellers' Interests, the Company, or Fontenot.

     e.     <u>Taxes</u>. There is no pending or known threatened claim against the Sellers, the Company, or Fontenot for payment of any taxes arising from the Sellers' ownership of the Interests or Fontenot's ownership of the membership interests in the Sellers. There is no pending or known threatened claim against the Company or Seller Parties for payment of taxes. Neither the Sellers, the Company, nor Fontenot has executed any waiver of any statute of limitations against assessments of taxes.

     f.     <u>Authority</u>. The Sellers, the Company, and Fontenot have taken all necessary action to authorize the execution, delivery, and performance of this Agreement and has adequate power, authority, and legal right to enter into, execute, deliver, and perform this Agreement and to consummate the transactions contemplated hereby. This Agreement is legal, valid, and binding with respect to the Sellers and is enforceable in accordance with its terms. On execution, delivery, and performance of this Agreement in accordance with its terms, the Buyer will own one hundred percent (100%) of the Sellers' Interests free of all claims, Liens, encumbrances, and liabilities, thereby owning one hundred percent (100%) of the Company free of all claims, Liens, encumbrances, and liabilities.

     g.     <u>Full Disclosure</u>. This Agreement, any schedule referenced in or attached to this Agreement, any document furnished to the Buyer under this Agreement or any certification furnished to the Buyer under this Agreement does not contain any untrue statement of a material fact and does not omit to state a material fact necessary to make such statement, in the circumstances under which it was made, is not misleading. All of the representations, warranties and covenants in this Agreement: (i) are true and correct as of the date made; (ii) will be true and correct as of the Closing Date; and (iii) will survive

4

DF000505

and not be waived, discharged, released, modified, terminated or affected by any due diligence by the Buyer.

<div align="center">

**ARTICLE III**

**REPRESENTATIONS AND WARRANTIES OF BUYER**

</div>

3.      Representations and Warranties of Buyer. As an inducement to the Sellers to enter into this Agreement, the Buyer represents and warrants to the Sellers that as of the date of this Agreement and the Closing Date:

a.      Legal Requirements. The Buyer has all requisite power, authority, and approvals to purchase ownership of the Interests. The Buyer is in good standing with the State of Texas and has complied and will continue to comply with all applicable federal, state, or local statutes, laws, and regulations, if any, with respect to its transfer of the Interests.

b.      Consents and Approvals. Other than in compliance with the provisions of applicable statutes and regulations, no notice to, filing with, or authorization, consent, or approval of any domestic or foreign public body or authority is necessary for the consummation of the transactions contemplated by this Agreement. The execution, delivery, performance and consummation of this Agreement does not and will not: (i) violate, conflict with or constitute a default or an event that, with notice or lapse of time or both, would be a default, breach or violation under any term or provision of any instrument, agreement, contract, commitment, license, promissory note, conditional sales contract, indenture, mortgage, deed of trust, lease or other agreement, instrument or arrangement to which the Buyer is a party; (ii) violate, conflict or constitute a breach of any statute, regulation or judicial or administrative order, award, judgment or decree to which the Buyer is bound or subject; or (iii) result in the creation or imposition of any adverse claim or interest, or any lien, encumbrance, charge, equity or restriction of any nature whatever, upon or affecting the Buyer. The members of the Buyer have consented to the purchase of the Sellers' Interests and this Agreement.

c.      Litigation. There is no: (i) action, suit or proceeding pending or threatened against the Buyer that would materially and adversely affect Buyer's ability to perform its material obligations under this Agreement; or (ii) proceeding, investigation, charges, audit or inquiry threatened or pending before or by any federal, state, municipal or other governmental court, department, commission, board, bureau, agency or instrumentality which might result in an materially adverse effect on the Buyer's ability to perform its material obligations under this Agreement.

d.      Taxes. There is no pending or known threatened claim against the Buyer for payment of any taxes. The Buyer has not executed any waiver of any statute of limitations against assessments of taxes.

<div align="center">

5

</div>

DF000506

e.    Authority. The Buyer has taken all necessary action to authorize the execution, delivery, and performance of this Agreement and has adequate power, authority, and legal right to enter into, execute, deliver, and perform this Agreement and to consummate the transactions contemplated hereby. This Agreement is legal, valid, and binding with respect to the Buyer and is enforceable in accordance with its terms. On execution, delivery, and performance of this Agreement in accordance with its terms, the Buyer will own one hundred percent (100%) of the Sellers' Interests free of all claims, Liens, encumbrances, and liabilities.

f.    Full Disclosure. This Agreement, any schedule referenced in or attached to this Agreement, any document furnished to the Sellers under this Agreement or any certification furnished to the Sellers under this Agreement does not contain any untrue statement of a material fact and does not omit to state a material fact necessary to make such statement, in the circumstances under which it was made, is not misleading. All of the representations, warranties and covenants in this Agreement: (i) are true and correct as of the date made; (ii) will be true and correct as of the Closing Date; and (iii) will survive and not be waived, discharged, released, modified, terminated or affected by any due diligence by the Sellers.

## ARTICLE IV

## CONDITIONS TO CLOSING

4.    Conditions to Closing. Prior to the Closing Date, the Buyer and Seller Parties will take all necessary steps to ensure the proper transfer of the Interests from the Sellers to the Buyer at closing in compliance with the operating agreement and other governing documents, if any, of the Company.

## ARTICLE V

## THE CLOSING

5.    The Closing. This Agreement will be consummated remotely by the exchange of the Buyer's Deliverables and Seller Parties' Deliverables (defined herein) by the Buyer and the Sellers on June __, 2025 (the "**Closing Date**").

## ARTICLE VI

## BUYER AND SELLER PARTIES DELIVERABLES

6.1    The Buyer's Deliverables. On the Closing Date, the Buyer will deliver or cause to be delivered to the Sellers the following items (all documents will be duly executed and acknowledged where required): (a) the Purchase Price less Installment Payments; (b) such corporate resolutions and other evidence of authority with respect to the Buyer as might be reasonably requested by the Sellers; (and (c) such additional documents as might be reasonably requested by the Sellers to consummate this Agreement.

6.2.    Seller Parties' Deliverables. On the Closing Date, the Seller Parties will deliver or cause to be delivered to the Buyer the following items (all documents will be duly executed and

6

UNOFFICIAL COPY

acknowledged where required): (a) assignments and conveyances acceptable to the Buyer necessary to convey to the Buyer (and Buyer's designee, with respect to the LP Interests) all of the Sellers' right, title and interest in and to all of the Interests; (b) written consent and/or approval of the transfer of the Interests to Buyer (and Buyer's designee, with respect to the LP Interests); (c) such corporate resolutions and other evidence of authority with respect to the Company as might be reasonable requested by the Buyer; and (d) Such additional documents as might be reasonably requested by the Buyer to consummate this Agreement.

<div align="center">

**ARTICLE VII**
**DEFAULT**

</div>

7.  <u>Default</u>. If a Party fails to perform any obligation contained in this Agreement, the Party claiming default will serve written notice to the other party specifying the nature of such default and demanding performance. If such default has not been cured within ten (10) business days after receipt of such default notice, the non defaulting party will be entitled to exercise all remedies arising at law or in equity by reason of such default.

<div align="center">

**ARTICLE VIII**
**INDEMNIFICATION**

</div>

8.1  <u>Definitions</u>.

    a.  **"Buyer Indemnified Parties"** means Buyer, the purchaser entities under the Parallel Agreements, and each of their respective shareholders, officers, directors, members, employees, agents, and representatives and each of the heirs, executors, successors, and permitted assigns of any of the foregoing.

    b.  **"Buyer's Losses"** means any and all claims, liabilities, obligations, losses, costs, expenses, penalties, interest, awards, fines and judgments (in equity or at law) and damages whenever arising or incurred (including amounts paid in settlement, costs of investigation and reasonable attorneys' and consultants' fees and expenses) of the Buyer Indemnified Parties described in Section 8.2, as to which the Buyer Indemnified Parties are entitled to indemnification.

    c.  **"ERC Credit"** means the refundable tax credit Ice Embassy, Inc. may receive as provided under the Coronavirus Aid, Relief, and Economic Security Act, designed to encourage businesses to retain employees during the COVID-19 pandemic.

    d.  **"Escrow Agreement"** has the meaning ascribed thereto in the PSA.

    e.  **"Fee Agreement"** means the monetary amount or compensation that Ice Embassy, Inc. is entitled to receive as a result of a resolution, judgment, or settlement arising from litigation or disputes related to credit card fees Visa and Mastercard charged to Ice Embassy, Inc.

<div align="center">

7

</div>

DF000508

       f.      "**Indemnity Escrow Account**" has the meaning ascribed thereto in the PSA.

       g.      "**Indemnity Escrow Amount**" has the meaning ascribed thereto in the PSA.

       h.      "**Parallel Agreements**" shall mean any agreement between Buyer and Seller Parties, or any of Seller Parties' affiliated entities, including but not limited to agreements with or involving the Company, Ice Embassy, Inc., HFR Enterprises, or any of its subsidiaries.

       8.2.    <u>Indemnification by Seller Parties</u>. Subject to the terms and conditions of this Agreement (including the limitations set forth in Section 8.3 below), the Seller Parties, and each of its and their affiliates, officers, agents, representatives, subsidiaries, owners, members, trustees, beneficiaries (including any individual beneficiaries of any trust that owns or controls any such entities) (collectively, the "**Seller Indemnifying Parties**"), jointly and severally agree to indemnify, defend, and hold harmless Buyer and the other Buyer Indemnified Parties from and against any and all Buyer's Losses arising out of, relating to, in connection with, or resulting from:

       a.      any liability, obligation, or claim (whether known or unknown, contingent or otherwise) related to the Interests or the ownership, operation, maintenance, leasing, use, or occupancy of the Property or the business or assets of the Seller Indemnifying Parties occurring or relating to any period prior the Closing Date, regardless of when asserted, including but not limited to tax liabilities, contractual obligations, or tort claims, regardless of whether such liabilities are discovered before or after Closing and regardless of whether such liabilities are covered by insurance;

       b.      any fraud, intentional misrepresentation, willful misconduct, criminal act, bad faith, or gross negligence of the Seller Indemnifying Parties in connection with this Agreement and the Parallel Agreements;

       c.      any breach of or inaccuracy in any representation or warranty made by Seller Parties in this Agreement, in any Parallel Agreements, or in any certificate, document, or instrument delivered pursuant hereto; and

       d.      any breach or non-fulfillment of any covenant or agreement of the Seller Parties contained in this Agreement, in any Parallel Agreements, or in any certificate, document, or instrument delivered pursuant hereto.

       8.3.    <u>Application of Funds for Losses</u>. Any Buyer's Losses for which the Buyer Indemnified Parties are entitled to indemnification under this Article VIII may be satisfied by the following sources in the following order: (i) by applying any proceeds actually received by Buyer from the Fee Agreement to such Buyer's Losses; (ii) by withdrawing the applicable portion of the Indemnity Escrow Amount from the Indemnity Escrow Account in accordance with the Escrow Agreement; (iii) through a set-off against any amounts owed by any Buyer Indemnified Party to any Seller Indemnifying Party under this Agreement or any other Parallel Agreements, including

8

DF000509

the Installment Payments: or (iv) to the extent Buyer's Losses are not fully satisfied by the foregoing (i) – (iii), by direct payment from any of the Seller Indemnifying Parties without Buyer being required to first pursue recovery from any other Seller Indemnifying Party.

8.4.    Survival. The representations, warranties and covenants of the Parties made in this Agreement, including specifically Article II and Article III herein, shall survive the Closing of the transactions contemplated in this Agreement for the applicable statute of limitations period. Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the non-breaching Party to the breaching Party prior to the expiration date of the applicable statute of limitations period shall not thereafter be barred by the expiration of the relevant representation or warranty and such claims shall survive until finally resolved.

8.5.    No Waiver. The indemnification rights under this Article are in addition to, and not in lieu of, any other remedies available at law or in equity or pursuant to any other provision of this Agreement. Nothing in this Section shall limit Buyer's right to seek specific performance, injunctive relief, or other equitable remedies.

## ARTICLE IX

## TAXES

9.    2024 Tax Returns – Responsibility for Preparation. If the federal or applicable state and local income tax returns for the Company for the taxable year ending December 31, 2024 (the "2024 Tax Period") are not prepared and filed prior to the Closing Date, then Sellers shall, at its sole cost and expense, be responsible for causing such returns (the "2024 Tax Returns") to be timely prepared by a tax professional or accounting firm customarily engaged by the Company for such matters, or another firm reasonably acceptable to Buyer. Sellers shall deliver complete drafts of the 2024 Tax Returns to Buyer no later than sixty (60) days prior to the applicable filing deadline (including extensions) for such returns. Buyer shall have thirty (30) days from receipt of the draft 2024 Tax Returns to review and provide comments to Sellers. Sellers shall, in good faith, consider all reasonable comments made by Buyer and incorporate such comments to the extent required to ensure the 2024 Tax Returns are prepared in accordance with applicable law and consistent with past practice, unless otherwise required by a change in law or fact. Upon resolution of any comments from Buyer, Sellers shall file or cause to be filed the 2024 Tax Returns on or before the due date (including extensions) and shall provide Buyer with a final copy of each filed return within five (5) business days after filing. Nothing in this Section shall limit or impair Buyer's right to challenge or dispute the contents of any such return in connection with any audit, proceeding, or indemnification claim under this Agreement.

9

DF000510

## ARTICLE X

## MISCELLANEOUS

10.1. Time. Time is of the essence for this Agreement.

10.2 Notices. Any notice, demand or communication required or permitted to be given by any provision of this Agreement will be in writing and will be deemed to have been given and received when delivered personally or by telefacsimile to the party designated to receive such notice, or on the date following the day sent by overnight courier, or on the third (3rd) day after the same is sent by certified mail, postage and charges prepaid, directed to the addresses first set forth above.

10.3. Representations and Warranties. The respective representations and warranties of the Parties contained herein or in any certificates or other documents delivered prior to or at the Closing Date will not be deemed waived or otherwise affected by any investigation made by any party hereto. Each and every such representation and warranty will survive the Closing Date and will not be terminated or extinguished for a period of twelve (12) months after the Closing Date.

10.4. Cooperation. Prior to and at all times following the termination of this Agreement the parties agree to execute and deliver, or cause to be executed and delivered, such documents and do, or cause to be done, such other acts and things as might reasonably be requested by any party to this Agreement to assure that the benefits of this Agreement are realized by the Parties.

10.5. Headings. The paragraph headings contained in this Agreement are for reference purposes only and are not intended to affect in any way the meaning or interpretation of this Agreement.

10.6. Entire Agreement. This Agreement, the Parallel Agreements, and any document executed in connection herewith on or after the date of this Agreement constitute the entire agreement between the Parties with respect to the subject matter hereof and there are no agreements, understandings, warranties or representations except as set forth herein or in the Parallel Agreements.

10.7. Assignment. It is agreed that the Parties may not assign such party's rights nor delegate such party's duties under this Agreement without the express written consent of the other parties to this Agreement.

10.8. Amendment. Neither this Agreement, nor any of the provisions hereof, can be changed, waived, discharged, or terminated, except by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge, or termination is sought.

10.9. Severability. If any clause or provision of this Agreement is illegal, invalid, or unenforceable under any present or future law, the remainder of this Agreement will not be affected thereby. It is the intention of the Parties that if any such provision is held to be illegal, invalid, or unenforceable, there will be added in lieu thereof a provision as similar in terms to such provisions as is possible and to be legal, valid, and enforceable.

10

DF000511

10.10. <u>Governing Law; Consent to Jurisdiction</u>. This Agreement will be interpreted, construed, and enforced in accordance with the laws of the State of Texas, regardless of any applicable principles of conflicts of law. Each of the Parties hereby irrevocably consents and agrees to the exclusive personal jurisdiction of the courts of the State of Texas in Harris County, Texas or the federal courts for the Southern District of Texas, for any action, suit or proceeding arising in connection with any disagreement, dispute, controversy or claim arising out of or relating to this Agreement or any related document.

10.11. <u>Attorney Fees</u>. If any party institutes an action or proceeding against any other party relating to the provisions of this Agreement, the party to such action or proceeding that does not prevail will reimburse the prevailing party therein for the reasonable expenses of attorneys' fees and disbursements incurred by the prevailing party.

10.12. <u>Waiver</u>. Waiver of performance of any obligation or term contained in this Agreement by any party, or waiver by one party of the other's default hereunder will not operate as a waiver of performance of any other obligation or term of this Agreement or a future waiver of the same obligation or a waiver of any future default.

10.13. <u>Counterpart Execution</u>. This Agreement may be executed in counterparts, including by telefacsimile, each of which will be deemed an original document but all of which will constitute a single document. Also, for the purposes of this Agreement, a facsimile or electronic signature shall serve as an original.

[signature page follows]

11

DF000512

**IN WITNESS WHEREOF,** this Agreement has been executed by the parties effective the date first above written.

**Seller Parties:**

BFD GP, LLC

Dakota Fontenot, Sole Member

BFD LP, LLC

Dakota Fontenot, Sole Member

Dakota Fontenot, individually
Address: 2926 Fontana Dr
Houston Tx 77043

**Buyer:**
Colorado Rose, LLC

Name: Justin Zachariah Truesdell
Title: manager

**Company:**
Entertainment Marketing & Management, Ltd.

By: BFD GP, LLC
Its General Partner

Dakota Fontenot, Sole Member

Signature Page to Partnership Interest Purchase Agreement

UNOFFICIAL COPY

DF000513

**EXHIBIT A**
**Sellers Excluded Assets**

*The Excluded Assets below are located at the real property and improvements at 6710 Southwest Freeway, Houston, Texas 77074.*

1. Dallas Fontenot's desk and side table in manager's office.

2. Lion taxidermy.

3. Smartboard in conference room.


a.

4. Art on walls in conference room.


a.


b.

5. Dakota Fontenot's Pool Table and pool table chairs, equipment, etc., in the shed.

6. Memorabilia addressed to Dallas Fontenot (limited to 10 items)

UNOFFICIAL COPY

DF000514

7. Playboy Memorabilia (limited to 5 items)

8. Bear in sports bar



a.

9. Frank Sinatra autographed portrait in sports bar



a.

10. Beaded native American moccasins next to sports bar and ATMs and framed fish hooks beneath



a.

11. Beaded native American necklaces next to entertainer's locker room and Bar 1 station area

DF000515

12. Gibson Les Paul guitar hanging on ceiling by canoe bar



a.

13. These Playboy memorabilia items



a.



b.

DF000516



c.

14. Other



a.



b.

UNOFFICIAL COPY

DF000517



c.

15. Art on wall by Bar 2 and coffee bar

16. Twin Zebras taxidermy.

UNOFFICIAL COPY



DF000518

# EXHIBIT N

FILED
09/26/2025 8:51:31 AM
Teneshia Hudspeth
County Clerk
Harris County, Texas
nelson.aguilar

## CAUSE NO. 537721

| | | |
|---|---|---|
| **LINDA GOEHRS, IN HER CAPACITY AS** | § | **IN THE PROBATE COURT** |
| **TRUSTEE OF THE HOLLI ANN** | § | |
| **HARDIN TRUST NUMBER ONE** | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | **NUMBER ONE (1)** |
| **v.** | § | |
| | § | |
| | § | |
| **DAKOTA FONTENOT** | § | |
| *Defendant.* | § | **HARRIS COUNTY, TEXAS** |

### TEMPORARY INJUNCTION

On this day, came on for consideration the Application for Temporary Injunction filed by Plaintiff LINDA GOEHRS ("Plaintiff"), in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, against Defendant DAKOTA FONTENOT ("Defendant"). The Court, having considered the Application, evidence, and arguments of counsel, finds that the Application is well taken and should be in all things GRANTED.

It appears from the evidence that unless a Temporary Injunction is granted against Defendant that Plaintiff will suffer probable, imminent, and irreparable harm including but not limited to the loss of assets held in the Holli Ann Hardin Trust Number One, loss of information pertaining to such assets, and inability to recover such assets should Defendant attempt to avoid potential liability. Plaintiff has demonstrated a likelihood of success on the merits of this case and there is no adequate remedy at law for the damages threatened. Plaintiff has further demonstrated a probable right to the relief sought upon final hearing or trial hereof. A balancing of the equities strongly favors the granting of this Temporary Injunction to prevent the threatened harm, and the threatened injury to Plaintiff outweighs the threatened harm to Defendant by the

Copy from re:SearchTX

granting of this Temporary Injunction, which is limited in time and will not disserve the public interest.

The Court THEREFORE ORDERS as follows:

1. Defendant is enjoined from selling the real property located at 3414 Old Richmond Road, Rosenberg, Texas 77471;

IT IS FURTHER ORDERED, that this Temporary Injunction is binding upon Defendant and all officers, agents, services, employees, attorneys, and all other persons in active concert or participation with Defendant who receive notice of this Order.

IT IS FURTHER ORDERED, that the Clerk of the Court shall issue a Writ of Injunction pending final hearing and determination of this case enjoining all parties detailed in the preceding paragraph from the actions detailed herein.

IT IS FURTHER ORDERED, that prior to the issuance of the injunction, Plaintiff shall file with the Court a bond executed by Plaintiff in the sum of $5,000.00 payable to Defendant, approved and conditioned as required by law.

IT IS FURTHER ORDERED, that this Temporary Injunction shall be effective upon filing of the bond and shall remain intact and will not expire, until the conclusion of the trial on the merits.

All relief not expressly granted in is hereby DENIED.

Signed: 09/25/2025
3:56:23 PM

JUDGE PRESIDING

Copy from re:SearchTX

APPROVED AND ENTRY REQUESTED:





TEXAS PROBATE
ATTORNEY™ PLLC

RUDOLPH M. CULP
State Bar No. 24043014
rudy@texsprobateattorney.com
COLLIN J. BULLARD
State Bar No. 24129570
collin@texasprobateattorney.com
BAILEY D. BOWE
State Bar No. 24142201
bailey@texasprobateattorney.com
*EFILE EMAIL: efile@texasprobateattorney.com*
**HOUSTON OFFICE:**
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
O: (713) 297-0700
F: (817) 383-5110
**ATTORNEYS FOR PLAINTIFF**

Copy from re:SearchTX

537721

## DESIGNATION OF SUCCESSOR TRUSTEE
Dakota Trust

The undersigned Dallas Joseph Fontenot, Jr., Successor Trustee of Dakota Trust, a trust established by Trust Declaration of Holli Ann Fontenot dated November 9, 1994 ("Trust Declaration") does hereby declare as follows:

Article V, Section C of the Trust Declaration provides in part that:

> SUCCESSION. Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment will have the right to appoint a successor or successors to serve as Trustee in the event that person ceases to serve for any reason, and each Trustee may specify any conditions upon succession and service as may be permitted by law. For example, a successor may be required to furnish a fiduciary bond as a prerequisite or a successor's service may be conditioned upon another appointee's death, resignation, or inability to serve. Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment may also provide that one or more designated successors as Trustee will have the authority to appoint his, her, or its successor as Trustee. An appointment of successor Trustee must be in writing and must be acknowledged to be effective.

Pursuant to Article V, Section C of the Trust Declaration, Dallas Joseph Fontenot, Jr. appoints Dakota James Fontenot as successor Trustee, to serve immediately upon the death, disability, resignation, or disqualification of Dallas Joseph Fontenot, Jr.

Dallas Joseph Fontenot, Jr. appoints Frost Bank to serve as successor Trustee upon the death, disability, resignation, or disqualification of Dakota James Fontenot.

Each Trustee will have the right to appoint a successor or successors to serve as trustee of the Trust in the event that he ceases to serve for any reason, and such Trustee may specify any conditions upon succession and service as may be permitted by law.

The incapacity or disability of a trustee hereunder shall be (i) determined by a duly licensed physician representing that he or she is certified by a recognized medical board and is not related by blood or marriage to any trustee or beneficiary hereunder; and (ii) evidenced by a writing which is executed, witnessed, and acknowledged certifying that such a physician is familiar with the physical and mental condition of a person and has concluded that, by reason of accident, physical, or mental deterioration, or other similar cause, such person was, as of the date thereof, unable to give prudent, prompt, and intelligent consideration to financial matters. No judicial determination of incapacity

UNOFFICIAL COPY

000355

or disability shall be necessary. Any physician's certificate described above may be revoked by a similar certificate to the effect that such person is no longer incapacitated, which certificate must be executed either (i) by the originally certifying physician or (ii) by two other licensed, unrelated physicians. In the case of a revocation of a certificate of incapacity or disability of a trustee hereunder, such revocation shall cause such trustee to regain his or her appointment as trustee, and the then serving successor trustee shall be relieved of his or her duties.

This Designation of Successor Trustee shall be effective as of May 1, 2013 and shall revoke and replace all prior Designations of Successor Trustee.

_____ "

Dallas Joseph Fontenot, Jr., Trustee

STATE OF NEVADA

COUNTY OF _Clark_

This document was acknowledged before me on the _7TH_ day of May, 2013 by Dallas Joseph Fontenot, Jr., Trustee.

_____

Notary Public, State of Nevada

MICHAEL J. MOORE
Notary Public State of Nevada
No. 08-7991-1
My Appt. Exp. September 11, 2016

000356

537721

## DESIGNATION OF SUCCESSOR TRUSTEE
### Dakota Trust

The undersigned Dallas Joseph Fontenot, Jr., Successor Trustee of Dakota Trust, a trust established by Trust Declaration of Holli Ann Fontenot dated November 9, 1994 ("Trust Declaration") does hereby declare as follows:

Article V, Section C of the Trust Declaration provides in part that:

> SUCCESSION. Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment will have the right to appoint a successor or successors to serve as Trustee in the event that person ceases to serve for any reason, and each Trustee may specify any conditions upon succession and service as may be permitted by law. For example, a successor may be required to furnish a fiduciary bond as a prerequisite or a successor's service may be conditioned upon another appointee's death, resignation, or inability to serve. Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment may also provide that one or more designated successors as Trustee will have the authority to appoint his, her, or its successor as Trustee. An appointment of successor Trustee must be in writing and must be acknowledged to be effective.

Pursuant to Article V, Section C of the Trust Declaration, Dallas Joseph Fontenot, Jr. removes all prior appointments of appoints Dakota James Fontenot as successor Trustee and, instead, appoints Frost Bank to serve as successor Trustee upon the death, disability, resignation, or disqualification of Dallas Joseph Fontenot, Jr.

Each Successor Trustee will have the right to appoint a successor or successors to serve as trustee of the Trust in the event that he ceases to serve for any reason, and such Trustee may specify any conditions upon succession and service as may be permitted by law.

The incapacity or disability of a trustee hereunder shall be (i) determined by a duly licensed physician representing that he or she is certified by a recognized medical board and is not related by blood or marriage to any trustee or beneficiary hereunder; and (ii) evidenced by a writing which is executed, witnessed, and acknowledged certifying that such a physician is familiar with the physical and mental condition of a person and has concluded that, by reason of accident, physical, or mental deterioration, or other similar cause, such person was, as of the date thereof, unable to give prudent, prompt, and intelligent consideration to financial matters. No judicial determination of incapacity or disability shall be necessary. Any physician's certificate described above may be

revoked by a similar certificate to the effect that such person is no longer incapacitated, which certificate must be executed either (i) by the originally certifying physician or (ii) by two other licensed, unrelated physicians. In the case of a revocation of a certificate of incapacity or disability of a trustee hereunder, such revocation shall cause such trustee to regain his or her appointment as trustee, and the then serving successor trustee shall be relieved of his or her duties.

This Designation of Successor Trustee shall be effective as of October 14, 2017 and shall revoke and replace all prior Designations of Successor Trustee.

_____
Dallas Joseph Fontenot, Jr., Trustee

STATE OF TEXAS
COUNTY OF Harris

This document was acknowledged before me on the 14th day of October, 2017 by Dallas Joseph Fontenot, Jr., Trustee.

_____
Notary Public, State of Texas

DIANNE N SKINNER
Notary ID # 126280969
My Commission Expires
November 11, 2019

000457

**RESOLUTIONS ADOPTED BY**
**WRITTEN CONSENT OF SHAREHOLDER AND DIRECTOR OF**
**VIVA LAS VEGAS PROPERTIES, INC.**
(OCTOBER 14, 2017)

The undersigned, being the sole shareholder of Viva Las Vegas Properties, Inc., a corporation organized and existing under the laws of Texas, does by this writing consent to take the following actions and adopt the following resolutions:

RESOLVED that the following persons person is elected as the sole Director of Viva Las Vegas Properties, Inc., to serve at the discretion of the Shareholder from October 14, 2017 until such time as his successors are elected by the Shareholder and qualify:

Dallas Fontenot

The undersigned direct that this consent be filed with the minutes of the proceeding of the Shareholders of Viva Las Vegas Properties, Inc.

The undersigned, now being the sole director of Viva Las Vegas Properties, Inc., does by this writing consent to take the following actions and adopt the following resolutions:

RESOLVED that the following person is elected to the offices of Viva Las Vegas Properties, Inc. set forth below, to serve at the discretion of the director from October 14, 2017 until such time as his successors are elected by the Shareholder and qualify:

Dallas Fontenot    President
Dallas Fontenot    Secretary

ESOLVED that Dakota Fontenot is hereby removed from all offices and all positions as a Director of Viva Las Vegas Properties, Inc. from and after October 14, 2017.

The undersigned direct that this consent be filed with the minutes of the proceeding of the Directors of Viva Las Vegas Properties, Inc.

This consent is executed pursuant to the laws of Texas and the Bylaws of Viva Las Vegas Properties, Inc., which authorize the taking of action by the Shareholders and Directors by unanimous written consent without a meeting. This consent is intended to substitute for a special meeting of the Shareholders and Directors of Viva Las Vegas Properties, Inc. Only those persons named above shall serve as Directors until a subsequent election or appointment by the

000437

Shareholder of Viva Las Vegas Properties, Inc. Only those persons named above shall serve as an officer until a subsequent election or appointment by the Director of Viva Las Vegas Properties, Inc.

Dated to be effective as of October 14, 2017.

Viva Las Vegas Properties, Inc., Shareholder

by: _____
Dallas Fontenot, President

_____
Dallas Fontenot, Director

UNOFFICIAL COPY

000438



EXHIBIT

29

FILED
1/16/2026 2:16 PM
Teneshia Hudspeth
County Clerk
Harris County - County Probate Court No. 1
Accepted By: CS

CAUSE NO. 537721

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY AS TRUSTEE OF THE HOLLI ANN HARDIN TRUST NUMBER ONE <br> *Plaintiff*, <br><br> v. <br><br> DAKOTA FONTENOT <br> *Defendant.* | § § § § § § § § § § | IN THE PROBATE COURT <br><br><br><br> NUMBER ONE (1) <br><br><br> HARRIS COUNTY, TEXAS |

### LINDA GOEHRS' RESPONSE TO DAKOTA FONTENOT'S APPLICATION FOR INTERIM RELIEF UNDER TEXAS TRUST CODE § 114.008

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff LINDA GOEHRS ("Plaintiff"), in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One (the "Trust"), and files this her Response to the Application for Interim Relief under Texas Trust Code § 114.008 filed by Defendant DAKOTA FONTENOT ("Defendant"), and in support thereof would respectfully show unto the Court the following:

## I.
## BACKGROUND

1. The litigation before the Court summarily arises out of what appears to be several years of deceitful and selfish actions taken by Defendant with the purposeful intent of defrauding the Trust and entities and assets within its domain of millions, ultimately to the detriment of beneficiaries MICHELLE FONTENOT ("Michelle") and DALLAS JOSEPH FONTENOT III ("Joe").

2. Defendant's actions are well known at this point not only by the parties hereto, but also by the Court. Perhaps most egregiously, it was disclosed on the record in open court that, during the sale of Trust assets promulgated by misinformation fabricated by Defendant, Defendant

Page 1 of 9

Response to Motion for Interim Relief

caused $2,750,000.00 rightfully belonging to the Trust to be diverted instead toward the purchase of EMM, an entity owned wholly by Defendant that had at most, a nominal value, defrauding the Trust and its beneficiaries of this amount. This alarmingly became known at a time when Defendant was emphatically seeking quick mediation and resolution before the complete extent of his actions could be fully understood.

3.      Joe and Michelle Fontenot's Application for Relief Under Texas Property Code was set for October 24, 2025 at 9:00 am. On that same date and time, Defendant set his Motion for Continuance and Objection to Notice, seeking to delay the hearing on Michelle and Joe's Application for Relief under Texas Property Code, along with his "Motion to Compel Mediation" seeking to have the Parties attend mediation before any discovery had been conducted.  It appears that Defendant was attempting to avoid disclosure of this improper and indefensible sale by getting the court to continue the hearing and have the Parties attend early mediation. If it was not clear what Defendant was attempting to do based on this, I am sure the Court will recall the immediate reaction and objection of counsel for Defendant when the question was asked of Defendant made it clear, avoiding disclosure of this sale was Defendant's clear objective.

4.      Discovery is currently ongoing and is necessary to understand the full scope of what transpired with the sale of EMM. Hoping to assert leverage and distract from what will ultimately result in a finding of liability by Defendant, on November 26, 2025, Defendant filed his Application for Interim Relief under Texas Trust Code § 114.008 against Plaintiff pertaining to distributions from the Trust to Joe and Michelle to reimburse attorney's fees incurred in this action.

5.      Defendant therein seeks an order from the Court requiring a distribution of $63,247.48 from the Trust to Defendant, representing attorney's fees incurred by Joe and Michelle,

Page **2** of 9

Response to Motion for Interim Relief

and additionally preventing further distributions from the Trust as reimbursement for attorney's fees.

6.      The Trustee is paying the attorney's fees and expenses of Michelle and Joe Fontenot in accordance with the Settlement Agreement reached by the Parties. **Exhibit "A".** The Settlement Agreement states:

> "The attorney's fees for Holli, Dakota, Joe, Michelle, and/or Ashley may be paid from the assets of the Holli Ann Hardin Trust Number One in an amount no more than $200,00.00 per side. The Parties will present their fees to Linda Goehrs, in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, for payment. The Parties agree that they will no object to the payment of the fees of any other party."

**7.**      In this Settlement Agreement, each of the Parties were allowed up to $200,000 from the Trust for their attorneys' fees and expenses. From the beginning, Defendant, Dakota, who had his own counsel, and Micchelle and Joe, who had their own counsel, were treated as separate sides. Defendant and Holi used up their $200,000 at some point following the execution of the Settlement Agreement, whereas Michelle and Joe had only used $29,670.98, which was paid to their initial attorneys, Romano & Sumner, leaving approximately $170,000 available for payment of attorneys' fees. This was disclosed to counsel for Defendant by letter dated November 14, 2025. **Exhibit "B".**

8.      As a result of the wrongful actions of Defendant mentioned above, a Temporary Injunction and Order Granting Interim Relief have been rendered against Defendant. This is largely a result of Joe and Michelle's reasonable and necessary retention of counsel to prevent further harm by Defendant. This and the actions of Plaintiff before the Court have occurred with the sole intention of protecting the Trust and its beneficiaries from Defendant and in compliance with the Settlement Agreement.

Page **3** of **9**

Response to Motion for Interim Relief

UNOFFICIAL COPY

9.    Even if the Court determines that the payment of Joe and Michelle's attorney's fees is a distribution and not part of the Settlement Agreement, the Court must consider the probable offset related to the claims against Defendant include the 2.75 million he received in his individual capacity from the sale of EMM, an almost valueless company.  Upon information and belief, those proceeds should have been received by the Trust as the only entities with value were owned by the Trust and netted less than 1.75 million. Additionally, there is the issue with the $300,000 that Defendant received from sale of property that should have been deposited into the Dakota Trust, a trust that Defendant, Michelle and Joe have an equal interest. Additionally, the Holli Hardin Trust has a claim against the Dakota Trust for repayment of funds paid on behalf of the Dakota Trust to purchase Holli Hardin's 85% interest in the Dakota Trust, which means 85% of the $300,000 that Defendant improperly and without authority distributed directly to himself. Michelle and Joe are equal beneficiaries with Defendant for both the Holli Hardin Trust and the Dakota Trust, meaning that Defendant has received over $3,000,000.00 whereas Joe and Michelle have received less than $100,000.00 each. Finally, if the Court determines that Defendant has not committed any wrongful act and is entitled to an equal distribution, there is $100,000 available in the Hardin Trust to equalize distributions.

10.    Defendant now comes to the Court with unclean hands, seeking equitable relief premised entirely upon an understanding that his best strategy for success is based upon a hypothetical inability of Joe and Michelle to fund extensive litigation which Defendant is capable of doing by using amounts he misappropriated from Trust assets. *See Defendant's Application for Interim Relief under Texas Trust Code § 114.008*, at ¶ 2. For the reasons detailed herein, Defendant's requested relief must be denied in its entirety.

Page **4** of 9

Response to Motion for Interim Relief

## II.
## ARGUMENT AND AUTHORITIES

A.   DEFENDANT'S BAD FAITH PRECLUDES AN AWARD OF EQUITABLE RELIEF

11.   The doctrine of unclean hands allows a court to refuse to grant equitable relief sought by one whose conduct "has been unconscientious, unjust, or marked by a want of good faith, or one who has violated the principles of equity and righteous dealing." *Stewart Beach Condo. Homeowners Ass'n, Inc. v. Gili N. Prop Invs., LLC*, 481 S.W.3d 336, 351 (Tex. App.—Houston [1st Dist.] 2015, no pet.). The party asserting the doctrine of unclean hands as a defense must show an injury arising from the bad faith conduct of the party seeking equitable relief. *In re Jim Walter Homes, Inc.*, 207 S.W.3d 888, 899 (Tex. App.—Houston [14th Dist.] 2006, no pet.); *Grohn v. Marquardt*, 657 S.W.2d 851, 855 (Tex. App.—San Antonio 1983, writ ref'd n.r.e.).

12.   Dakota admitted under oath that he sold a parcel owned by Viva Las Vegas (the sole Dakota Trust asset) and received the proceeds personally, depositing them into his individual bank account, not a trust account. Although by this time he had already received well over a million from the sale of EMM, he testifies that his accounts have very little in them and he would not have funds available to cover the $300,000. **Exhibit "C";** p. 31 l. 15 – p. 34 l. 16.

13.   The entirety of the relief sought by Defendant falls in equity, requesting that Plaintiff be (1) enjoined from further distributions to Joe and Michelle reimbursing attorney's fees, and (2) compelled to distribute to Defendant an amount equal to prior reimbursements to Joe and Michelle. Equitable remedies apply when there is no remedy at law, and Defendant does not present nor does there exist any portion of the Texas Property Code dictating the applicability of § 114.008 in a scenario such as this where a beneficiary's wrongful actions have defrauded the trust and necessitated remedial actions for which reimbursement is unequivocally appropriate. Further, Defendant is entitled to bring suit to recover funds from the Trust, but a determination of whether

Response to Motion for Interim Relief

he is entitled to an equal distribution, or any funds that are currently held in the Trust, would be a final determination of the matter pending before the Court.

14.    Defendant seeks what he considers an equitable reallocation of Trust asset distributions as compensation for prior reimbursements to Joe and Michelle, in addition to the prevention of further such reimbursements. The basis of reimbursements made to Joe and Michelle stem entirely from Defendant's actions taken in denuding amounts rightfully belonging to the Trust in which Joe and Michelle are beneficiaries. Joe and Michelle were reimbursed for attorney's fees incurred in taking ongoing corrective action against Defendant's fraud. Even if the Court ultimately determines that the payment of attorneys' fees is a distribution, there are sufficient funds available in the Trust to ultimately make an equal distribution to Defendant.  However, before any equalizing distributions are made, the Court must consider the diversion of assets from the Trust to Defendant in his sale of EMM.

15.    Because of this, to turn back to the Trust as the source of Defendant's illicitly acquired assets and demand compensation equal to the reimbursements made to Joe and Michelle is disingenuous, brought in bad faith, and barred by the doctrine of unclean hands. Accordingly, Defendant's requests must be denied.

B.    <u>DEFENDANT PRESENTS NO EVIDENCE INDICATING BREACH OF TRUST</u>

16.    "A breach of trust occurs when a trustee breaches his statutory or common law fiduciary duties." *Moody Nat'l Bank v. Moody*, No. 14-21-00096-CV, 2022 WL 14205534 at \*6 (Tex. App.—Houston [14th Dist.] Oct. 25, 2022, pet. denied) (finding that disclosure of information materially affecting beneficiary rights more than two years after trustee's knowledge of the information constituted breach of trust). The overarching duty of every trustee is to

Response to Motion for Interim Relief

administer the trust in good faith, in accordance with its terms, for the benefit of the trust beneficiaries. TEX. PROP. CODE § 113.051.

17.    Defendant alleges that unequal distributions to beneficiaries by Plaintiff constitute breach of trust. *See Defendant's Application for Interim Relief under Texas Trust Code § 114.008*, at ¶ 7. This is strangely premised upon the Court's November 30, 2025, Order Granting Interim Relief finding Defendant to have wrongfully distributed assets from the Dakota Trust to himself personally, which for the reasons detailed above besets the entirety of Defendant's requested relief. *Id.*

18.    The Trust agreement dictates the powers of Plaintiff as Temporary Successor Trustee. *Myrick v. Moody Nat'l Bank*, 336 S.W.3d 795, 802 (Tex. App.—Houston [1st Dist.] 2011, no pet.). Despite alleging that Plaintiff committed breach of trust in causing unequal distributions through reimbursement of Joe and Michelle, Defendant points to no portion of the Trust agreement as evidence. Further, Defendant declines to cite any case law or statutes showing that an unequal distribution in the form of reimbursement summarily amounts to breach of trust, instead asking the Court to take Defendant's word that breach of trust has occurred.

19.    Contrary to Defendant's assertions, the relevant language of the Trust agreement specifically allows for unequal distributions:

> 5.1 <u>Distribution of Income and Principal</u>. The Trustee will have the discretionary authority to distribute to any or all of the Primary Beneficiaries or to apply for the Primary Beneficiaries' use and benefit such amounts of the Trust income and principal of the Trust Estate, even to the exhaustion thereof, as the Trustee shall desire, in the absolute discretion of the Trustee. *<u>The Trustee will have the discretionary authority to apportion or accumulate income to or for one or more of the Primary Beneficiaries in such amounts as the Trustee shall desire, in the absolute discretion of the Trustee; and the Trustee may distribute such amounts in equal or unequal shares, in the Trustee's absolute discretion.</u>* The Trustee may elect not to distribute any sums to any one or more of the Primary Beneficiaries. Accumulated income shall be added to the principal of the Trust. (emphasis added)

Page **7** of **9**

Response to Motion for Interim Relief

6.23 <u>Distribution</u>. The Trustee shall have the power on any partial or final distribution of the income or principal of the Trust Estate, to apportion and allocate the assets of the Trust Estate in cash or in kind, or in undivided interests *in the manner deemed advisable in the discretion of the Trustee* and to sell any property deemed necessary by the Trustee to make the distribution.

*See* **Exhibit "A"**, *Trust Declaration for the Holli Ann Hardin Trust Number One.*

20.    Defendant's lone argument in favor of a finding of breach of trust is resultingly an action specifically contemplated by the grantor and allowed under the Trust agreement. There is no language in the Trust agreement obligating that partial distributions of Trust assets must be made equally to the beneficiaries, which Defendant seemingly argues. Instead, Plaintiff rightfully decided to reimburse Joe and Michelle for attorney's fees incurred in furtherance of the objectives of the Trust and protection of Trust assets from Defendant's greed.

21.    Because of this, there exists no evidence that any breach of trust has occurred or might occur, as required by Texas Property Code § 114.008(a) for Defendant's requested relief to be appropriate. Contrarily, the lack of evidence presented by Defendant is far removed from proof of what Texas courts have taken as proof of breach of trust. *See Moody Nat'l Bank v. Moody*, No. 14-21-00096-CV, 2022 WL 14205534 at *7. Accordingly, Defendant's requested relief must be denied in its entirety.

**PRAYER**

WHEREFORE, PREMISES CONSIDERED, for the reasons detailed herein, Plaintiff LINDA GOEHRS, in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, respectfully requests that the Court enter an Order denying all relief requested by Defendant DAKOTA FONTENOT in his Application for Interim Relief under Texas Trust Code § 114.008, and for all such other and further relief, general or special, at law or in equity, to which Plaintiff may show herself to be justly entitled.

Page **8** of **9**

Response to Motion for Interim Relief

Respectfully Submitted,



★
EST. 2001

**TEXAS PROBATE
ATTORNEY**ᴾᴸᴸᶜ

RUDOLPH M. CULP
State Bar No. 24043014
rudy@texsprobateattorney.com
COLLIN J. BULLARD
State Bar No. 24129570
collin@texasprobateattorney.com
*EFILE EMAIL: efile@texasprobateattorney.com*
**HOUSTON OFFICE:**
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
O: (713) 297-0700
F: (682) 428-8137
**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was forwarded to all parties of record in accordance with the Texas Rules of Civil Procedure on this 16th day of January, 2026.

RUDOLPH M. CULP

UNOFFICIAL COPY

Response to Motion for Interim Relief

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 110154543
Filing Code Description: ANSWER/RESPONSE
Filing Description: LINDA GOEHRS' RESPONSE TO APPLICATION FOR INTERIM RELIEF
Status as of 1/20/2026 7:40 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Paul Beik | 24054444 | paul@beiklaw.com | 1/16/2026 2:16:03 PM | SENT |
| James Ardoin | 24045420 | jimmy@jimmyardoinlaw.com | 1/16/2026 2:16:03 PM | SENT |
| John P. TreyAvant | | tavant@grayreed.com | 1/16/2026 2:16:03 PM | SENT |
| Debbie Gurley | | dgurley@grayreed.com | 1/16/2026 2:16:03 PM | SENT |
| Andrew McCarty | | amccarty@grayreed.com | 1/16/2026 2:16:03 PM | SENT |
| Kayla Brake | | kayla@texasprobateattorney.com | 1/16/2026 2:16:03 PM | SENT |
| Texas Probate Attorney, PLLC | | efile@texasprobateattorney.com | 1/16/2026 2:16:03 PM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 1/16/2026 2:16:03 PM | SENT |
| Jeffrey D.Watters | | jwatters@grayreed.com | 1/16/2026 2:16:03 PM | SENT |
| Ryan Cantrell | | ryan.cantrell@chamberlainlaw.com | 1/16/2026 2:16:03 PM | SENT |
| Mariah Karigan | | mariah.karigan@chamberlainlaw.com | 1/16/2026 2:16:03 PM | SENT |
| Marcie Cardenas | | mcardenas@grayreed.com | 1/16/2026 2:16:03 PM | SENT |
| Rudy Culp | | rudy@texasprobateattorney.com | 1/16/2026 2:16:03 PM | SENT |
| Bailey Bowe | | bailey@texasprobateattorney.com | 1/16/2026 2:16:03 PM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 1/16/2026 2:16:03 PM | SENT |

EXHIBIT A

Probate Court No. 1

537721

NO. 21-CPR-036521

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN THE COUNTY COURT AT LAW |
| | § | |
| DALLAS JOSEPH FONTENOT, JR., | § | NUMBER FOUR (4) OF |
| | § | |
| DECEASED | § | FORT BEND COUNTY, TEXAS |

NO. 21-DCV-288736

| | | |
|---|---|---|
| IN RE: | § | IN THE 240th DISTRICT COURT |
| | § | |
| | § | OF |
| HOLLI ANN HARDIN TRUST | § | |
| NUMBER ONE | § | FORT BEND COUNTY, TEXAS |

## BINDING MEDIATED SETTLEMENT AGREEMENT

The Parties – Dakota Fontenot, individually, in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in his capacity as next friend and virtual representative for S.F., a minor, Holli Ann Fontenot, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, Dallas Joseph Fontenot, III, individually, and in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One, Michelle Ann Fontenot, individually, in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in her capacity as next friend and virtual representative for A.E., a minor, and Ashley Fontenot Estrada, individually and in her capacity as a beneficiary of the Hollis Ann Hardin Trust Number One – hereto agree that all causes of action pending in cause number 21-CPR-036521 and cause number 21-DVC-288736, both of which are pending in Fort Bend County, Texas, and all related claims and/or controversies between them, whether asserted or not, known or unknown, actual or contingent, are hereby settled, in accordance with the terms of this Binding Mediated Settlement Agreement (hereinafter referred to as the "Settlement Agreement").

## A. DEFINITIONS

1.     Whenever used in this Settlement Agreement, the following terms shall have and be construed to have the following meanings:

i.     "Settlement Agreement" shall mean and refer to this Binding Mediated Settlement Agreement.

ii.     "Dakota" shall mean and refer to Dakota Fontenot, individually, in his capacity as beneficiary of the Holli Ann Hardin Trust Number One, and in his capacity as next friend and virtual representative of S.F., a minor.

1

iii.    "Holli" shall mean and refer to Holli Ann Fontenot, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

iv.    "Joe" shall mean and refer Dallas Joseph Fontenot, III, individually and in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

v.    "Michelle" shall mean and refer to Michelle Ann Fontenot, individually, in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in her capacity as next friend and virtual representative of A.E., a minor.

vi.    "Ashley" shall mean and refer to Ashley Fontenot Estrada, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

vii.    "Trust" shall mean and refer to the Holli Ann Hardin Trust Number One.

viii.    "Estate" shall mean and refer to the Estate of Dallas Joseph Fontenot, Jr., whose administration is pending in cause number 21-CPR-036521, in the County Court at Law Number Four (4) of Fort Bend County, Texas.

ix.    "Parties" shall mean and refer to Dakota, Holli, Joe, Michelle, and Ashley, collectively, as described in paragraphs two (ii) through six (vi) above.

x.    "Claims" shall mean and include any and all causes of action, demands, debts, obligations, duties, liens, liabilities, and theories of liabilities of whatsoever kind and nature, whether based in contract or tort, whether arising in equity or under the common law, whether by statute or regulation, whether known or unknown, whether past or present, whether contingent or matured, whether for damages relief, injunctive relief, declaratory relief, equitable relief, or any other type of relief, whether for actual damages, personal injury damages, mental anguish, liquidated damages, punitive damages, exemplary damages, compensatory damages, consequential damages, incidental damages, pecuniary damages, costs, expenses, attorneys' fees, penalties, or fines that are (is), were (was), could be, or could have been asserted as of the Effective Date, regardless of whether actually asserted, whether by claim, counterclaim, cross-claim, motion, third-party claim regarding the Estate and Trust, including but not limited to, claims, whether asserted or not, known or unknown, actual or contingent.

xi.    "Effective Date" shall mean and refer to the date that the last Party to this Settlement Agreement executes the same.

xii.    In respect to any defined term herein, the singular shall include the plural, and the plural shall include the singular.

2

## B. TERMS, CONDITIONS, AND MUTUAL CONSIDERATION

1.     The Parties acknowledge that bona fide disputes and controversies exist between them, both as to liability and the amount thereof in damages, if any, and by reason of such disputes and controversies they desire to compromise and settle all Claims and causes of action of any kind whatsoever which the Parties have or may have arising out of the transactions or occurrences which have been brought or could have been brought regarding the Trust.

**2.     THE PARTIES AGREE AND ACKNOWLEDGE THAT UPON THE EXECUTION OF THIS SETTLEMENT AGREEMENT, THIS SETTLEMENT AGREEMENT SHALL BECOME BINDING AND IRREVOCABLE.**

3.     The Parties agree that the 2013 Last Will and Testament and 2017 First Codicil to the Last Will and Testament will be admitted to probate.  The Parties agree that Holli will be appointed as the Independent Executor of the Estate and agree not to object to the same.

4.     All of the Estate's assets, including all associated bank accounts, shall be distributed to Holli, save and expect the following items:

- The following items are going to be distributed to Dakota:

   o   The 2017 F150 Truck
   o   The 2013 Toyota Sequoia
   o   All interest, including all associated bank accounts, in Entertainment Marketing and Management, LP
   o   The coin collection and gold located in the backpack at the Rosenburg Office

- The following items are going to be distributed to Joe:

   o   The 2008 Honda Ridgeline
   o   One-half (1/2) of the Decedent's Tiki Mug Collection

The Parties agree to execute all documents necessary to effectuate the conveyance of all property described above the individual recipients stated in paragraph four (4).

5.     From the Rosenburg office, Holli shall be entitled to obtain:

- The remaining $150,000 in non-earmarked cash located in the backpack;
- Any and all Playboy Magazines

6.     The Parties agree that all personal property belonging to Dakota, Joe, and/or Michelle that is currently located at 10402 W. Hidden Lake Lane, Richmond, Texas 77406 shall be distributed to Dakota, Joe, and/or Michelle as appropriate.  Dakota, Joe and/or Michelle shall

3

be afforded the opportunity, within thirty (30) days of the Effective Date of this Settlement Agreement, to conduct a supervised walkthrough of their personal property located at 10402 W. Hidden Lake Lane, Richmond, Texas 77406. During that time, Dakota, Joe, and/or Michelle will take photographs of their personal property which they would like to obtain. A list and accompanying photographs will be delivered to counsel for Holli of those items within fourteen (14) days of the walkthrough being completed. Holli will have fourteen (14) days to object to the items which Dakota, Joe, and/or Michelle would like to obtain. If the parties cannot reach a resolution regarding the same, Russ Jones will mediate, at an hourly rate, the division of the disputed personal property. Upon the completion and approval of a final list of items, Dakota, Joe, and/or Michelle, at their expense, shall obtain and remove the items on the approved final list of items at a mutually agreeable date and time within fourteen (14) days of the approval of the final list of items.

7.      The attorney's fees for Holli, Dakota, Joe, Michelle, and/or Ashley may be paid from the assets of the Holli Ann Hardin Trust Number One in an amount no more than $200,000.00 per side. The Parties will present their fees to Linda Goehrs, in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, for payment. The Parties agree that they will not object to the payment of the fees of any other party.

8.      The real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183 shall be distributed to Holli. Dakota, Michelle, and Joe, with Dakota as authorized representative, shall retain a right of first refusal in the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183. If Holli decides to sell or otherwise transfer the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183, Holli shall notify Dakota, Michelle, and Joe in writing and provide an appraisal completed by a certified and licensed real estate appraiser. From the date of receipt of that notice, Dakota, Michelle, and/or Joe shall have 30 days to exercise their right to purchase the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183. If exercised, Dakota, Michelle, and/or Joe shall enter into a real estate contract to purchase the property with a proposed closing date sixty (60) days from the date of receipt of the notice of sale or transfer triggering the right of first refusal. Holli is not required to sell at the appraised value if she receives offers in excess of the appraised value. If Holli receives an offer greater than the appraised value, the right of first refusal will be triggered upon delivery of the great offer to Dakota as authorized representative. The right of refusal will not renew if it is not exercised against the greatest value delivered by Holli.

9.      With regard to the further administration of the Holli Ann Hardin Trust Number One:

       • The Parties agree that the assets of the Holli Ann Hardin Trust Number One shall be appraised by certified and licensed business or real estate appraisers, as is appropriate for the particular asset. Russ Jones shall select the appraisers to complete the real estate and business appraisals. The costs of the appraisals shall be borne by the Holli Ann Hardin Trust Number One.

4

- The Parties agree that, once the values on the appraisals are obtained for all Holli Ann Hardin Trust Number One assets, Holli's interest will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One in an amount equal to the twenty percent (20%) of the total value of the assets. Such purchase will occur within ninety days (90) of the completion of the valuation of the assets of the Holli Ann Hardin Trust Number One.

- The Parties agree that during the appraisal period described above, Linda Goehrs, in her capacity as Temporary Successor Trustee and/or Dakota, shall execute the necessary documents to install Dakota as an Officer and/or Director of Ice Embassy, Inc., HRF Enterprises, Inc., and Entertainment Marketing and Management, LP.

- The Parties agree that Linda Goehrs shall remain Temporary Successor Trustee of the Holli Ann Hardin Trust Number One until the closing of a sale on Holli's interest in the Holli Ann Hardin Trust Number One. At the time that Holli's interest is purchased, Linda Goehrs will resign as Temporary Successor Trustee, and Dakota, Joe, Michelle, and Ashley shall select a Successor Trustee of the Trust.

- Holli agrees to execute an assignment of interest and disclaimer of further interest in the Holli Ann Hardin Trust Number One at the time that her interest is purchased in accordance with this Settlement Agreement.

- The Parties agree that Dakota and Holli shall remain employees of Entertainment Marketing and Management, LP, and/or the business, or businesses owned by the Holli Ann Hardin Trust Number One. Holli shall be removed from the payroll on the date that her interest is purchased pursuant to this Agreement. The compensation amount that Dakota and Holli have been receiving shall remain unchanged.

- The Parties agree that Dakota and Holli shall remain on the insurance paid for by Entertainment Marketing and Management, LP, and/or the business or businesses owned by the Holli Ann Hardin Trust Number One. Holli shall be removed from the insurance plan on the date that her interest is purchased pursuant to this Agreement.

- To the extent owned by the Trust, Linda Goehrs as Temporary Successor Trustee, shall gift the horses known as Coco and Rusty to Holli.

10. With regard to the further administration of the Dakota Trust:

- The Parties agree that the assets of the Dakota Trust shall be appraised by certified and licensed real estate appraisers. Russ Jones shall select the appraisers to complete the real estate appraisal. The cost of the appraisal shall be borne by the Dakota Trust.

5

- Upon completion of the appraisal, the total value of the assets will be compiled and Holli's interest will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One in an amount equal to eighty-five percent (85%) of the total value of the assets. Such purchase will occur within ninety days (90) of the completion of the valuation of the assets of the Dakota Trust.

- Holli agrees to execute an assignment of interest and disclaimer of further interest in the Dakota Trust at the time that her interest in purchased in accordance with this Settlement Agreement.

11.     Within seven (7) days of the Effective Date of this agreement, Dakota, Joe, Michelle, and/or Ashley agree to dismiss all pending pleas, pleadings, and/or motions, with prejudice regarding the Estate and/or Trust pending in cause number 21-CPR-036521 and cause number 21-DVC-288736, both of which are pending in Fort Bend County, Texas.

12.     Neither the Trust nor any entity owned, held, or possessed by the Holli Ann Hardin Trust Number One, the Dakota Trust, and/or the Estate have any claims against any of the Parties.

13.     The Parties agree to release Linda Goehrs, in her capacity as Temporary Successor Trustee, for making distributions according to this Settlement Agreement which contradict the terms of the Trust Agreement for the Holli Ann Hardin Trust Number One or the Dakota Trust.

## C. RELEASES AND DISCHARGE

1.     **Release of Claims by Dakota.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Dakota, on behalf of himself and all his heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Holli, Joe, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Dakota hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Dakota expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Holli, Joe, Michelle, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Dakota does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

2.     **Release of Claims by Holli.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Holli, on behalf of herself and all her heirs, successors,

6

executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Joe, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Holli hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Holli expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Michelle, Joe, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Holli does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

3.    **Release of Claims by Joe.**  For and in consideration of the mutual promises, covenants, and agreements stated herein, Joe, on behalf of himself and all his heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Joe hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Joe expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Michelle, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Joe does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

4.    **Release of Claims by Michelle.**  For and in consideration of the mutual promises, covenants, and agreements stated herein, Michelle, on behalf of herself and all her heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Joe, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Michelle hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Michelle expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind

7

known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Joe, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Michelle does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

5.     **Release of Claims by Ashley.**  For and in consideration of the mutual promises, covenants, and agreements stated herein, Ashley, on behalf of herself and all her heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Joe, Michelle, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Ashley hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Ashley expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Joe, and Michelle. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Ashley does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

## D. REPRESENTATIONS AND WARRANTIES

1.     **Representations and Warranties.** Each of the Parties hereto represents and warrants to the other that:

a.     They are adequately represented by competent counsel in connection with the execution and delivery of this Settlement Agreement and/or had an opportunity to retain counsel in connection with this Settlement Agreement;

b.     In executing this Settlement Agreement, they relied upon the Party's own judgment and any advice it received from its own attorneys;

c.     They were not induced to sign or execute this Settlement Agreement by promises, omissions, agreements, or representations not expressly stated in this Settlement Agreement;

d.     They freely and willingly executed this Settlement Agreement and expressly disclaims reliance upon any facts, promises, statements made or not made, undertakings, or representations made by any person or entity

8

prior to the Effective Date of this Settlement Agreement except as specifically enumerated herein;

e.      They consent that this Settlement Agreement was not procured, obtained, or induced by improper conduct or undue influence;

f.      After an opportunity to consult with an attorney concerning the matters made subject of this Settlement Agreement, and after reviewing this Settlement Agreement, they agree this Settlement Agreement is fair, reasonable, and supported by good, valuable, and adequate consideration; and

g.      They understand and agree to the terms and conditions of this Settlement Agreement, which contains the entire agreement between the Parties relating to the matters made the subject of this Settlement Agreement.

2.      **Capacity and Authority.** Each of the Parties hereto represents and warrants to the other that the person signing this Settlement Agreement in a representative capacity has the requisite authority and consent to execute this Settlement Agreement on behalf of the Party for whom he or she has executed this Settlement Agreement, and that this Settlement Agreement is binding upon the Party for whom he or she has executed this Settlement Agreement and upon such Party's successors and assigns.

3.      **Assignment of Claims.** Each of the Parties hereto represents and warrants to the other that it has not transferred, assigned, or otherwise conveyed, excepting any interest held by counsel, in whole or in part, its respective interest in the Claims at issue and that it is the owner and holder thereof. Each of the Parties further represents and warrants that, aside from any interest held by counsel, it is the only holder of the Claims being released and that no other person or entity owns, or has any interest in, any of the Claims being released. Despite any interest held by counsel, this Settlement Agreement applies to the entirety of each of the Parties' Claims.

4.      **Cooperation in Execution of Further Documents.** Each of the Parties expressly agrees to execute any other documents reasonably necessary to effectuate the terms, purpose, and intent of this Settlement Agreement.

## E. MISCELLANEOUS PROVISIONS

1.      **Invalidity.** In the event any one or more of the provisions of this Settlement Agreement shall, for any reason, be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Settlement Agreement.

2.      **Entire Agreement.** This Settlement Agreement reflects the final and complete agreement between the parties concerning the matters made subject of this Settlement Agreement and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the Parties. There are no unwritten oral agreements between the Parties. The Parties expressly

9

acknowledge that any rights, duties, or obligations, whether contractual or otherwise, owed by or between the Parties prior to the effective date of this Settlement Agreement are terminated as of the Effective Date of this Settlement Agreement and the only rights, duties, or obligations owed by or between the Parties from this point forward shall be those set forth in this Settlement Agreement.

3. **Governing Law and Venue.** The validity, effect, and construction of this Settlement Agreement shall be governed by the laws of the State of Texas. Venue for any cause of action, controversy, or dispute regarding this Settlement Agreement or the subject matter hereof shall be proper only in the state courts of Fort Bend County, Texas.

4. **Amendment.** This Settlement Agreement may not be amended, modified, waived, or terminated unless such is done in a writing signed by all the Parties.

5. **Construction of Agreement.** This Settlement Agreement shall not be construed in favor of or against any Party on the basis that the Party did or did not author this Settlement Agreement or any attachment related to it. It is intended that this Settlement Agreement shall be comprehensive in nature and shall be construed liberally to affect its purposes.

6. **Titles or Headings.** All titles or headings used in this Settlement Agreement are used only for the convenience of the Parties and shall not be construed to have any effect or meaning with respect to the other content of the Settlement Agreement, such other content being controlling as to the Settlement Agreement of the Parties.

7. **Costs and Attorneys' Fees.** Each party shall bear its own costs and attorneys' fees in relation to the claims and the negotiation and preparation of this Settlement Agreement, subject to the attorney's fees provisions within this Settlement Agreement.

8. **Waiver.** The failure of any of the Parties to enforce, at any time, any provision of this Settlement Agreement shall not be construed to be a waiver of such provision, nor in any way affect the validity of this Settlement Agreement or any part thereof or any right of any Party thereafter to enforce each and every provision. No waiver of any breach of this Settlement Agreement shall be held to constitute a waiver of any other breach.

9. **Binding Agreement.** This Settlement Agreement is binding on the Parties hereto and not subject to revocation, repudiation, or withdrawal of consent, even if one or more of them shall become debtors in a bankruptcy proceeding. This binding effect is an integral part of this Agreement.

10. **Execution of Agreement.** This Settlement Agreement may be executed in a number of identical counterparts, each of which shall be deemed an original for all purposes. A fax signature or a copy of an original signature shall constitute an original signature for purposes of this Settlement Agreement. This Settlement Agreement shall be valid only if fully executed by all Parties and/or their representatives as agreed to herein. If not fully executed by all Parties, this Settlement Agreement shall be null and void and of no effect.

10

11.    **Future Disputes.**  In the event that there are future disputes, disagreements, and/or conflicts regarding the terms and/or implementation of any terms of this Settlement Agreement, the Parties agree to return to Russ Jones for mediation regarding the dispute.  The Parties agree to return to mediation prior to filing any litigation regarding a breach of this settlement agreement or these terms.  If a Party refuses to return to mediation, the remaining parties are permitted to file litigation without returning to mediation. Should further litigation be filed regarding a breach of the agreement, the prevailing party shall be entitled to an award of attorney's fees as determined by a jury or judge.

12.    **Indemnity.**  Each party shall indemnify the other parties for all claims made by, through, or under the indemnifying party.

AGREED TO BY ALL PARTIES AS EVIDENCED BY THEIR SIGNATURE BELOW ON THIS THE 7th DAY OF JANUARY, 2022.

_____
Dakota Fontenot, in all capacities

_____
Holli Ann Fontenot, in all capacities

_____
Dallas Joseph Fontenot, III, in all capacities

_____
Michelle Ann Fontenot, in all capacities

_____
Ashley Fontenot Estrada, in all capacities

_____
Christopher Burt
*Counsel for Dakota Fontenot*

11

11.     **Future Disputes.**  In the event that there are future disputes, disagreements, and/or conflicts regarding the terms and/or implementation of any terms of this Settlement Agreement, the Parties agree to return to Russ Jones for mediation regarding the dispute.  The Parties agree to return to mediation prior to filing any litigation regarding a breach of this settlement agreement or these terms.  If a Party refuses to return to mediation, the remaining parties are permitted to file litigation without returning to mediation. Should further litigation be filed regarding a breach of the agreement, the prevailing party shall be entitled to an award of attorney's fees as determined by a jury or judge.

12.     **Indemnity.**  Each party shall indemnify the other parties for all claims made by, through, or under the indemnifying party.

AGREED TO BY ALL PARTIES AS EVIDENCED BY THEIR SIGNATURE BELOW ON THIS THE 7th DAY OF JANUARY, 2022.

_____
Dakota Fontenot, in all capacities

_____
Holli Ann Fontenot, in all capacities

**Dallas Joseph Fontenot III**
_____
Dallas Joseph Fontenot, III, in all capacities

**Michelle Ann Fontenot**
_____
Michelle Ann Fontenot, in all capacities

**Ashley Fontenot Estrada**
_____
Ashley Fontenot Estrada, in all capacities

_____
Christopher Burt
*Counsel for Dakota Fontenot*

11



_____

Steven Mendel
*Counsel for Holli Ann Fontenot*


_____

Kenneth Sumner
*Counsel for Dallas Joseph Fontenot, III,*
*Michelle Ann Fontenot, and Ashley Estrada*

UNOFFICIAL COPY

12

Steven Mendel
*Counsel for Holli Ann Fontenot*

# Kenneth E. Sumner, Jr.

Kenneth Sumner
*Counsel for Dallas Joseph Fontenot, III,*
*Michelle Ann Fontenot, and Ashley Estrada*

**Signature:** *Dallas Joseph Fontenot III*
Dallas Joseph Fontenot III (Jan 7, 2022 19:33 CST)

**Email:** djoef3@hotmail.com

**Signature:** Ashley Fontenot Estrada (Jan 7, 2022 19:38 CST)

**Email:** ashleyafontenot@gmail.com

**Signature:** Michelle Fontenot (Jan 7, 2022 19:36 CST)

**Email:** mannefontenot@gmail.com

**Signature:** *Kenneth C. Sumner, Jr*

**Email:** ksumner@romanosumner.com

12

**EST. 2001**

# TEXAS PROBATE
## ATTORNEY PLLC

| FORT WORTH | HOUSTON | AUSTIN |
|---|---|---|
| PHONE: 682-428-0700 | PHONE: 713-297-0700 | PHONE: 512-788-0700 |
| FAX: 682-428-8137 | FAX: 682-428-8137 | FAX: 682-428-8137 |

# EXHIBIT B    537721

November 14, 2025

VIA EMAIL: jwatters@grayreed.com; tavant@grayreed.com
Jeffrey Watters
Trey Avant
Gray Reed
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056

> **Re:** ***Holli Hardin Trust***
> ***Response to letter dated October 31, 2025***

Dear Jeff:

This correspondence is in response to your letter dated October 31, 2025, requesting information about attorneys' fees paid out of the Trust. The Binding Mediated Settlement Agreement ("Agreement"), dated January 7, 2022, provides that each side is entitled to receive up to $200,000 from the Trust for attorneys' fees and expenses. Holli Ann Hardin and Dakota Fontenot each used up their $200,000 at some point following the execution of the Agreement. To date, Joe and Michele, who the Trustee is treating as a single side because they have had the same representation throughout, have been paid a total of $93,247.48, which includes $29,670.98 to Romano & Sumner and $63,247.48 to Chamberlain, Hrdlicka, White, Williams & Aughtry, P.C. We are gathering all the statements from the Trust from the date of Linda Goehrs appointment as Successor Trustee to the current date and will provide those as soon as they are received and bates labeled.

If you have any questions regarding the enclosed or this matter, please do not hesitate to contact our office.

Very Truly Yours,

Rudolph M. Culp

Cc: Linda Goehrs, Successor Trustee

UNOFFICIAL COPY



FILED
1/16/2026 5:16 PM
Teneshia Hudspeth
County Clerk
Harris County - County Probate Court No. 1
Accepted By: SC

<div align="center">CAUSE NO. 537,721</div>

| | | |
|---|---|---|
| **LINDA GOEHRS, IN HER CAPACITY AS TRUSTEE OF THE HOLLI ANN HARDIN TRUST NUMBER ONE**<br>    *Plaintiff,*<br><br>v.<br><br>**DAKOTA FONTENOT**<br>    *Defendant.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **IN PROBATE COURT**<br><br><br>**NUMBER ONE OF**<br><br><br>**HARRIS COUNTY, TEXAS** |

<div align="center">

**INTERVENORS' SECOND AMENDED ANSWER, AFFIRMATIVE DEFENSES, CROSS-CLAIMS, AND VERIFIED APPLICATION FOR TEMPORARY INJUNCTIVE RELIEF**

</div>

Michelle Fontenot ("Michelle") and Dallas Joseph Fontenot III ("Joe"), individually, as beneficiaries of the Holli Ann Hardin Trust Number One and Dakota Trust, file this Second Amended Answer, Affirmative Defenses, and Cross-Claims and Verified Application for Temporary Injunctive Relief and respectfully show the Court as follows:

<div align="center">GENERAL DENIAL</div>

1.      Michelle and Joe generally deny the allegations contained in Defendant Dakota Fontenot's First Amended Counterclaim and Cross-Claim as permitted by Rule 92 of the Texas Rules of Civil Procedure and require that Dakota prove his causes of action by a preponderance of the credible evidence.

<div align="center">AFFIRMATIVE DEFENSES</div>

2.      Michelle and Joe plead the following affirmative defenses:

   a.   Dakota lacks authority as Trustee of the Dakota Trust and any entities held by the Dakota Trust.

   b.   Dakota's claims are barred by the doctrines of waiver, estoppel, laches, and release.

   c.   Dakota's claims are barred by the doctrine of unclean hands.

<div align="center">1</div>

32806614.v3

UNOFFICIAL COPY

    d. Dakota's claims are barred by the statute of limitations.

    e. Dakota's claims are barred by the doctrines of res judicata or collateral estoppel.

## ATTORNEYS' FEES

3. Michelle and Joe seek their reasonable and necessary attorneys' fees under all applicable authority, including Section 37.009 of the Texas Civil Practice and Remedies Code and Section 114.064 of the Texas Property Code.

## FIRST AMENDED CROSSCLAIMS

4. Intervenors Michelle Fontenot and Joe Fontenot file these First Amended Crossclaims against Dakota Fontenot, and respectfully show the Court the following:

## DISCOVERY CONTROL PLAN

5. This is a Level 2 case under Texas Rule of Civil Procedure 190.3.

## PARTIES

6. Michelle Fontenot, individually as a beneficiary of the Dakota Trust and the Holli Ann Hardin Trust Number One, is an individual residing in Fort Bend County, Texas. Michelle has made an appearance in this matter through her counsel of record.

7. Joe Fontenot, individually as a beneficiary of the Dakota Trust and the Holli Ann Hardin Trust Number One, is an individual residing in Fort Bend County, Texas. Joe has made an appearance in this matter through his counsel of record.

8. Dakota Fontenot, individually and as purported Trustee of the Dakota Trust and purported officer and director of Viva Las Vegas Properties, Inc., and is an individual residing in Harris County, Texas. Dakota has made an appearance in this matter through his counsel of record.

2

32806614.v3

9.      Linda Goehrs, as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, is an individual residing in Harris County, Texas. Ms. Goehrs has made an appearance in this matter through her counsel of record.

### JURISDICTION AND VENUE

10.     This Court has jurisdiction under Texas Estates Code § 32.006. Venue is proper in Harris County under Texas Property Code § 115.002(b).

### RULE 47 STATEMENT

11.     Michelle and Joe seek monetary relief over $1,000,000 and non-monetary relief. The damages sought are within the jurisdictional limits of this court.

### RELEVANT FACTS

*The Dakota Trust*

12.     Holli Ann Hardin, as Settlor, created the Dakota Trust, an irrevocable inter vivos trust, on November 9, 1994. The Dakota Trust was never amended and could not be amended except by a court of competent jurisdiction. Holli Ann Hardin served as the original named Trustee of the Dakota Trust. *See* Exhibit 1, Dakota Trust Declaration, Article V, Section A. The Trust Agreement named the following successor Trustees, in order: Dallas, Joe, Michelle, and finally First Interstate Bank of Texas. *See* Exhibit 1, Dakota Trust Declaration, Article V, Sections B and C.

13.     On September 8, 1996, Holli resigned as Trustee by serving written notice of her resignation on Dallas. *See* Exhibit 2, 9/8/1996 Trustee Resignation; *see also* Exhibit 1, Dakota Trust Declaration, Section V.F. ("Any appointee serving or entitled to serve as Trustee may resign at any time and without cause.").

3

32806614.v3

14.    After Holli's resignation, Dallas, as the named first successor Trustee, served as Trustee for the Dakota Trust until his death on September 3, 2021. During his tenure as Trustee, Dallas exercised the authority under Article V, Section C. of the Trust Agreement to designate successor trustees. On May 1, 2013, Dallas executed a Designation of Successor Trustee, naming Dakota as his successor, followed by Frost Bank. *See* Exhibit 3, 5/1/13 Designation of Successor Trustee. On October 14, 2017, Dallas then revoked the designation of Dakota as successor Trustee, designating Frost Bank as his successor in a formal Designation of Successor Trustee:

> Pursuant to Article V, Section C of the Trust Declaration, Dallas Joseph Fontenot, Jr. removes all prior appointments of appoints Dakota James Fontenot as successor Trustee and, instead, appoints Frost Bank to serve as successor Trustee upon the death, disability, resignation, or disqualification of Dallas Joseph Fontenot, Jr.

*See* Exhibit 4, 10/14/17 Designation of Successor Trustee.

15.    At the same time, Dallas removed Dakota as officer of Viva Las Vegas Properties, Inc., among other entities. *See* Exhibit 5, 10/14/17 Resolutions Adopted by Consent of the Shareholder and Director of Viva Las Vegas Properties, Inc. The Dakota Trust owns 100% of the stock of Viva Las Vegas Properties, Inc. (*see* Exhibit 6) and accordingly the Trustee of the Dakota Trust is the sole shareholder for Viva Las Vegas Properties, Inc.

> RESOLVED that Dakota Fontenot is hereby removed from all offices and all positions as a Director of Viva Las Vegas Properties, Inc. from and after October 14, 2017.

*See* Exhibit 5, 10/14/17 Resolutions Adopted by Consent of the Shareholder and Director of Viva Las Vegas Properties, Inc.

16.    Dakota is not a named successor trustee in the Trust Agreement for the Dakota Trust, and the only document that purports to give him any claim to the trustee position was

4

32806614.v3

revoked in October 2017. Upon Dallas's death in 2021, a vacancy in the trustee position was created, and Frost Bank was the named successor trustee in the 2017 Designation of Successor Trustee. Neither Dallas, nor Frost Bank, ever executed any other document that would appoint Dakota as successor trustee.

17.    Despite the lack of authority, Dakota currently purports to serve as Trustee of the Dakota Trust and director/officer of Viva Las Vegas Properties, Inc. To support his claimed status as Trustee, Dakota now asserts that the October 14, 2017 Designation of Successor Trustee is "invalid as a forgery and/or revoked document." *See* Dakota's Amended Answer and Counterclaim, ¶ 12. Dakota has not, and cannot, produce any document that would validly appoint him as successor trustee of the Dakota Trust. As Dakota's purported authority to act on behalf of Viva Las Vegas Properties, Inc. stems from actions he invalidly took as purported trustee, he likewise has no authority to act on behalf of Viva Las Vegas Properties, Inc.[1]

18.    Dakota, however, not only claims to be the Trustee of the Dakota Trust and the officer and director of Viva Las Vegas Properties, Inc., but Dakota claims that he is the "only current beneficiary of the Dakota Trust." *See* Dakota's First Amended Answer and Counterclaim, ¶ 14. However, the terms of the Dakota Trust dictate that Joe and Michelle are 2/3 beneficiaries of the Dakota Trust. After Dallas's death in 2021, Dakota sought to probate Dallas's 2013 Will, and Holli sought to probate Dallas's 2013 Will and 2017 Codicil. Dakota claimed that the 2017 Codicil was a forgery or was the product of undue influence. Dakota also initiated litigation regarding the Holli Ann Hardin Trust Number One, seeking a declaratory judgment and appointment of a successor trustee of the Holli Ann Hardin Trust Number One. The parties settled both the Estate

---

[1] After hearing on an Application for Temporary Injunction filed by the Holli Ann Hardin Trust Trustee, and partially joined by Joe and Michelle, the Court granted a Temporary Injunction enjoining Dakota from selling the real property held by Viva Las Vegas Properties, Inc.

5

and Trust litigation on January 7, 2022. Dallas's 2013 Will and 2017 Codicil were admitted to probate, and Holli was appointed Independent Executor of Dallas's Estate. *See* Exhibit 7, Order Admitting Will and Codicil to Probate.

19. As part of the Settlement Agreement, Holli's interest in both the Holli Ann Hardin Trust Number One and the Dakota Trust Number One were bought out, and Holli disclaimed her interest in these Trusts. *See* Exhibit 8, Assignment of Interest and Disclaimer of Further Interest ("Holli Ann Fontenot disclaims any right to further interest in the Dakota Trust.").

20. Pursuant to the terms of the Dakota Trust, upon Holli's death, absent Dallas's exercise of a power of appointment, the Trust property passes to the descendants of Holli Hardin Fontenot and to the descendants of Dallas Joseph Fontenot, Jr., *per stirpes*:

> 3. Dallas Joseph Fontenot, Jr., by a clause in his Will in which he specifically exercises this power of appointment, shall have the power to appoint the trust assets remaining upon the death of Holli Hardin Fontenot to or for the benefit of any one or more of the descendants of Dallas Joseph Fontenot, Jr. or the descendants of Holli Hardin Fontenot, in such shares, proportions, or amounts, upon such trusts and for such estates as he alone may determine. If Dallas Joseph Fontenot, Jr. fails to exercise this special power of appointment to the fullest extent, then, subject to the other provisions of this Trust, upon his death, the unappointed trust assets shall be delivered to the living descendants of Holli Hardin Fontenot and to the living descendants of Dallas Joseph Fontenot, Jr., per stirpes.

*See* Exhibit 1, Article VI, Section D.3. *See also* Article IV, Section E ("For example, if a distribution were to be made to the descendants, *per stirpes*, of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot, assuming the recitations in Article I, the property to be distributed would be divided into three equal shares, one for each of Dallas Joseph Fontenot, III, Michelle Anne Fontenot, and Dakota James Fontenot.").

6

32806614.v3

21.    As he testified at the injunction hearing, Dakota, purportedly believing himself to be the acting Trustee and sole beneficiary of the Dakota Trust, has recently sold property located belonging to Viva Las Vegas Properties, Inc. and deposited all of the proceeds into a personal bank account, and subsequently depleted the proceeds for his own personal obligations. He did not notify Michelle or Joe about the sale of the property, and inappropriately accepted all of the proceeds for himself, sharing none with the other beneficiaries.

22.    As a result of Dakota's actions and baseless claims, and Joe and Michelle bring this action for damages, declaratory judgments, and to prevent further breaches of trust.

***The Holli Ann Hardin Trust Number One***

23.    The Holli Ann Hardin Trust Number One was created on June 5, 1991. *See* Exhibit 12, Holli Ann Hardin Trust Number One Trust Declaration. Disputes arose after the death of Dallas Fontenot, Junior, relating to his Estate and the Holli Ann Hardin Trust Number One. As discussed *supra*, the parties entered into a Binding Mediated Settlement Agreement on January 7, 2022 to resolve these disputes. *See* Exhibit 13, Binding Mediated Settlement Agreement.

24.    As part of the Settlement Agreement, the parties agreed that Dakota would receive "[a]ll interest, including all associated bank accounts, in Entertainment Marketing and Management, LP," which had a value of $10,000 according to the Temporary Administrator, Gus Tamborello's Inventory. *Id.* at ¶ 4; Exhibit 14, 11/23/21 Inventory and List of Claims; Exhibit 15, 1/25/22 Order Approving Inventory and List of Claims.

25.    Trusting that Dakota would treat them fairly and had their best interests at heart, Joe and Michelle also agreed to have Dakota appointed as Officer and/or Director of Ice Embassy, Inc. and HFR Enterprises, Inc., the entities owned by the Holli Ann Hardin Trust Number One. *See* Exhibit 13, Binding Mediated Settlement Agreement, ¶ 9.

7

32806614.v3

26.     The Binding Mediated Settlement Agreement also provides that Dakota would remain employed by "the businesses owned by the Holli Ann Hardin Trust Number One," but "[t]he compensation amount that Dakota [] ha[s] been receiving shall remain unchanged." *See id.* at ¶ 9.

27.     As discussed in Plaintiff Linda Goehrs' Original Petition, during the years in which Dakota was responsible for managing Ice Embassy and HFR Enterprises, the entities appeared to experience a significant loss in value, while Dakota ensured that he received significant compensation increases. For example, Dakota entered into a Management Agreement on behalf of Ice Embassy with EMM, an entity that he owned, whereby EMM would receive $17,500 per month, with a true-up at the end of each year to 10% of the gross revenue for the Club. *See* Exhibit 16, 1/1/24 Management Agreement. Dakota also entered into an Administrative Services Agreement on behalf of HFR, whereby EMM would receive less than a thousand dollars per month for 2021 and 2022, but then in 2023 and beyond would receive $1,850 per month. *See* Exhibit 17, 1/1/24 Administrative Services Agreement.

28.     In May of 2025, after repeated requests for information regarding the Holli Ann Hardin Trust Number One assets, Michelle and Joe learned for the first time that Dakota had allowed the entities to fall behind on payments under the note used to buy out Holli's interest for *seven months*. The note was guaranteed by the Holli Ann Hardin Trust Number One assets, and the lender threatened to foreclose on the note if a sale of the assets was not made.

29.     Unbeknownst to Michelle and Joe, Dakota had been negotiating a sale of Ice Embassy and the real property owned by HFR to remedy the note default that he allowed for seven months while he continued receiving a substantial salary. Dakota and the Trustee closed on the sale of Ice Embassy and the real property owned by HFR in June of 2025. The initial sales price

8

for the stock of Ice Embassy was $250,000 and $4,750,000 for the HFR real property. However, due to additional Ice Embassy debts that Dakota had allowed to accrue that exceeded the Ice Embassy stock sales price, the HFR real property sales price was reduced to $4,689,424.72. *See* Exhibit 18, 6/27/25 Amendment to Real Estate Purchase Agreement.

30.    After the closing of the Ice Embassy and HFR real property transactions, Michelle and Joe were once again blindsided by Dakota's wrongdoing. Dakota had apparently reached a side agreement with the purchasers of the Ice Embassy stock and HFR real property for the purchase of the EMM partnership interests. *See* Exhibit 19, Partnership Interest Purchase Agreement. EMM, an entity with no real assets (as acknowledged by the buyers' counsel), was sold for $2,750,000. *Id.*; *see also* Exhibit 20, 5/8/25 Email from Buyers' Counsel ("the only assets of any consequence in the Partnership (as I understand it) are the Administrative Services Agreement ("ASA") and any goodwill associated with the Partnership's management business activities."). EMM's financial records reflect that it was insolvent as of December 31, 2024, the entity was insolvent, and its only contractual rights to future income could be terminated by Ice or HFR for any reason with thirty days' notice. *See* Exhibit 16, at 3.01(a), Exhibit 17, at 8.2; Exhibit 21, 12/31/24 Balance Sheet; Exhibit 22, 4/30/25 Balance Sheet. Inexplicably, Dakota sold EMM—a shell company—for $2,750,000 ***payable to him personally!*** in connection with the sale of the Ice Embassy stock and HFR real property, demonstrating a clear diversion of Trust assets away from the Holli Ann Hardin Trust Number One, Michelle, and Joe. To make matters worse, Dakota obligated both assets belonging to Ice Embassy (any monetary award from Ice Embassy credit card fee class action litigation) and the escrow amount from the HFR real property sale for any of the buyers' losses *before* the sellers could withhold payments owed to Dakota under the EMM agreement, such that Ice Embassy assets and the escrow amount that should ultimately belong to

9

the Holli Ann Hardin Trust Number One will bear the cost of any of 1) EMM's obligations incurred before the closing, 2) any fraud, intentional misrepresentation, willful misconduct, criminal act, bad faith, or gross negligence of Dakota in connection with the EMM agreement, 3) any breach of or inaccuracy in any representation or warranty made by Dakota in the EMM agreement, and 4) any breach or non-fulfillment of any covenant or agreement of Dakota in the EMM agreement. *See* Exhibit 19, at 8.2 and 8.3.

31.     Moreover, Dakota also included Ice Embassy assets as "Excluded Assets" for the EMM partnership Interest Purchase Agreement in an attempt to divert more Trust property to himself personally. *See* Exhibit 19.

32.     As a result of Dakota's shocking and undisclosed diversion of funds and assets to himself through the EMM Agreement, Michelle and Joe bring this action for damages and equitable relief.

### CAUSES OF ACTION

### AMENDED APPLICATION FOR RELIEF UNDER TEXAS PROPERTY CODE § 114.008

33.     Michelle and Joe incorporate by reference paragraphs 12 through 22 as though fully set forth herein.

34.     Texas Property Code § 114.008 gives the Court broad authority to remedy a breach of trust that has occurred or might occur. As explained *supra*, Dakota has no authority to act on behalf of the Dakota Trust. Numerous breaches of trust have occurred and will continue to occur if Dakota continues to act without proper authority.

35.     As Dakota's designation as successor trustee was revoked in 2017, Dakota is not validly serving as Trustee of the Dakota Trust. Any actions he has taken as purported Trustee of the Dakota Trust are invalid and ineffective.

10

36.     Importantly, Dakota cannot become the Trustee of the Dakota Trust by some equitable doctrine of waiver or consent. *See Alpert v. Riley*, 274 S.W.3d 277 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) ("We have not located, and Riley does not identify, any authority that recognizes a trustee by estoppel in the presence of express trust language outlining the procedure for appointment of a successor trustee…Texas law prohibits the equitable rule proposed by Riley for other reasons as well. The Texas Trust Code requires adherence to the trustee selection method prescribed in the trust instrument, which necessarily forecloses the exercise of equitable discretion unless that method fails.") (citing TEX. PROP. CODE § 113.083).

37.     The Texas Property Code authorizes the Court to issue an injunction to remedy a breach of trust that has occurred or might occur. TEX. PROP. CODE § 114.008; *see also Matter of Bumstead Family Irrevocable Trust*, 2022 WL 710159 (Tex. App.—Corpus Christi-Edinburg March 10, 2022, pet. denied) (affirming trial court temporary injunction that enjoined an individual from acting as trustee and appointed a receiver when the validity of the purported trustee's appointment was at issue). Dakota taking any action on behalf of the Dakota Trust would be a further breach of trust, as he has no authority to act under the terms of the Trust agreement and subsequent designations of successor trustees.

38.     Similarly, Dakota has no authority to act on behalf of Viva Las Vegas Properties, Inc. Dallas removed Dakota as an officer and/or director of Viva Las Vegas Properties, Inc. on October 14, 2017. *See* Exhibit 5, 10/14/17 Resolutions Adopted by Written Consent of Shareholder.

39.     The only documents Dakota has produced that would purport to give him authority to act on behalf of Viva Las Vegas Properties, Inc. are documents that he executed as purported trustee in May of 2023. *See* Exhibit 9, 5/19/23 Purported Unanimous Joint Written Consent of Viva

11

Las Vegas Properties, Inc. However, as discussed *supra*, Dakota is not validly serving as the trustee of the Dakota Trust. Therefore, he had no authority to execute these Viva Las Vegas Properties, Inc. corporate governance documents that he relies upon for authority to act on behalf of Viva Las Vegas Properties, Inc. As a result, Dakota was not validly appointed officer and director of Viva Las Vegas Properties, Inc. and he has no authority to take action on its behalf, including selling real property and accessing funds belonging to Viva Las Vegas Properties, Inc. To the extent necessary, Joe and Michelle request that the Court void the execution of the May 19, 2023 Purported Unanimous Joint Written Consent of Viva Las Vegas Properties, Inc. under Texas Property Code § 114.008(a)(9).

40.    Accordingly, Joe and Michelle request that the Court order the following relief under Texas Property Code § 114.008:

    a.    enjoin Dakota from acting as trustee on behalf of the Dakota Trust (TEX. PROP. CODE § 114.008(a)(2));

    b.    compel Dakota to redress a breach of trust, including ordering Dakota to pay the proceeds of the sale of Trust property to the Trust (TEX. PROP. CODE § 114.008(a)(3));

    c.    appoint a receiver to take possession of the trust property and administer the trust (TEX. PROP. CODE § 114.008(a)(5));

    d.    suspend or remove Dakota as trustee, to the extent necessary (TEX. PROP. CODE § 114.008(a)(6)–(7));

    e.    void the execution of the May 19, 2023 Purported Unanimous Joint Written Consent of Viva Las Vegas Properties, Inc. (TEX. PROP. CODE § 114.008(a)(9)); and/or

UNOFFICIAL COPY

12

32806614.v3

f.    impose a lien and/or constructive trust on any property Dakota received that belonged to the Dakota Trust, including but not limited to the sales proceeds from the sale of 3400 Old Richmond Road (TEX. PROP. CODE § 114.008(a)(9)).

**DECLARATORY JUDGMENT – JOE AND MICHELLE ARE EACH 1/3 BENEFICIARIES OF THE DAKOTA TRUST**

41.    Michelle and Joe incorporate by reference paragraphs 12 through 22 as though fully set forth herein.

42.    An interested person in the administration of a trust may bring suit for a "declaration of rights or legal relations in respect to the trust…to determine any question arising in the administration of the trust, including questions of construction of wills and other writings." TEX. CIV. PRAC. & REM. CODE § 37.005.

43.    As discussed *supra*, as Holli no longer has any interest in the Dakota Trust. *See* Exhibit 7, Assignment of Interest and Disclaimer of Further Interest. As Holli no longer has any interest in the Dakota Trust and has released nay and all interest effective January 2023, Michelle and Joe are at least the two-thirds beneficiaries of the Dakota Trust.

44.    Dakota disputes Michelle and Joe's status as beneficiaries of the Dakota Trust, and instead claims he is the sole beneficiary of the Dakota Trust. Dakota, believes, however, without any authority, that he is the sole beneficiary of the Dakota Trust, despite the lack of any document that would alter Michelle and Joe's status as beneficiaries. Dakota has relied upon Section 3.2 of Dallas's Last Will and Testament for his claim to be the sole beneficiary; however, Section 3.2 of Dallas's Last Will and Testament was revoked by Dallas's First Codicil, which was admitted to probate. *See* Exhibit 10, Last Will and Testament; Exhibit 11, First Codicil; Exhibit 7, Order Admitting Will and Codicil to Probate.

13

45.     Accordingly, Michelle and Joe request that the Court issue a declaratory judgment that Michelle and Joe are each 1/3 beneficiaries of the Dakota Trust.

**DECLARATORY JUDGMENT – JOE IS SUCCESSOR TRUSTEE OF THE DAKOTA TRUST**

46.     Michelle and Joe incorporate by reference paragraphs 12 through 22 as though fully set forth herein.

47.     An interested person in the administration of a trust may bring suit for a "declaration of rights or legal relations in respect to the trust…to determine any question arising in the administration of the trust, including questions of construction of wills and other writings." TEX. CIV. PRAC. & REM. CODE § 37.005.

48.     On October 14, 2017, Dallas Fontenot designated Frost Bank as his successor trustee. *See* Exhibit 4, 10/14/17 Designation of Successor Trustee. Frost Bank has failed to serve, and has executed a formal declination to serve as trustee of the Dakota Trust. Under the trustee succession provisions contained in the original Trust Agreement, Joe is the next named successor trustee and is prepared to serve as such. However, given the controversy created by Dakota claiming to be the Trustee and sole beneficiary, Joe and Michelle seek a declaration that Joe is the successor trustee of the Dakota Trust.

**APPLICATION TO FILL TRUSTEE VACANCY UNDER TEXAS PROPERTY CODE § 113.083**

49.     Michelle and Joe incorporate by reference paragraphs 12 through 22 as though fully set forth herein.

50.     As the trust instrument confirms, Joe is the successor trustee of the Dakota Trust, Michelle and Joe ask the Court to fill the trustee vacancy under Texas Property Code § 113.083. Upon information and belief, Frost is not serving as successor trustee and does not intend to serve as successor trustee.

14

32806614.v3

51.     Under Texas Property Code § 113.083, on the death, resignation, incapacity, or removal of a sole or surviving trustee, a successor trustee shall be selected according to the method, if any, prescribed in the trust instrument. TEX. PROP. CODE § 113.083(a). "If for any reason a successor is not selected under the terms of the trust instrument, a court may and on petition of any interested person shall appoint a successor in whom the trust shall vest." *Id.*

52.     As described *supra*, Dakota is not the Trustee of the Dakota Trust, and Michelle and Joe believe that the Trust Agreement provides that Joe is the successor trustee. As there is a vacancy in the trustee position, Michelle and Joe therefore request the Court fill the vacancy and appoint Joe to serve as successor Trustee.

**MISAPPROPRIATION OF TRUST ASSETS**

53.     Michelle and Joe incorporate by reference paragraphs 12 through 22 as though fully set forth herein.

54.     Dakota sold property held in an entity of which the Dakota Trust is the 100% owner, without any authority. Under Texas Property Code § 114.031, a beneficiary is liable for loss to the trust if the beneficiary has misappropriated or otherwise wrongfully dealt with the trust property or failed to repay a distribution or disbursement from the trust in excess of that to which the beneficiary is entitled. *See* TEX. PROP. CODE § 114.031(a)(1), (4). Dakota has misappropriated trust assets and accordingly, the trustee may offset his liability to the trust estate against his interest in the trust estate. Michelle and Joe bring this claim for misappropriation of trust assets as beneficiaries of the Dakota Trust derivatively on behalf of the Dakota Trust.

**UNJUST ENRICHMENT**

55.     Michelle and Joe incorporate by reference paragraphs 12 through 22 as though fully set forth herein.

15

56.     Dakota received all of the sales proceeds of property belonging to an entity held by the Dakota Trust, of which he is only a 1/3 beneficiary. As a result, he has been unjustly enriched by receiving a benefit that would be unconscionable to retain. Accordingly, Michelle and Joe bring this claim for unjust enrichment derivatively on behalf of the Dakota Trust. Any future distributions to Dakota from the Dakota Trust should be offset by the amounts he has already received. *See* TEX. PROP. CODE § 114.031(b).

**MONEY HAD AND RECEIVED**

57.     Michelle and Joe incorporate by reference paragraphs 12 through 22 as though fully set forth herein.

58.     As a result of the sale of the property located at 3400 Old Richmond Road, Dakota holds funds which, in equity and good conscience, belong to the Dakota Trust. The Dakota Trust has suffered damages as a result of Dakota's inequitable conduct. Accordingly, Michelle and Joe bring this claim for money had and received derivatively on behalf of the Dakota Trust. Any future distributions to Dakota from the Dakota Trust should be offset by the amounts he has already received. *See* TEX. PROP. CODE § 114.031(b).

**BREACH OF FIDUCIARY DUTY**

59.     Michelle and Joe incorporate by reference paragraphs 23 through 32 as though fully set forth herein.

60.     To prevail on a breach of fiduciary duty claim, a plaintiff must prove that (1) there is a fiduciary relationship between the plaintiff and defendant, (2) the defendant breached their fiduciary duty to the plaintiff, and (3) the breach resulted in an injury to the plaintiff or benefit to the defendant. *Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.] 2008, pet. denied).

16

61.     In addition to a formal fiduciary relationship, an informal fiduciary duty can also arise based on a moral, social, domestic, or purely personal relationship of trust and confidence. *See Tex. Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 507–08 (Tex. 1980) (recognizing the existence of an informal fiduciary relationship in those cases "in which influence has been acquired and abused, in which confidence has been reposed and betrayed."); *Siddiqui v. Fancy Bites, LLC*, 504 S.W.3d 349, 365 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). When one family member "is accustomed to being guided by the judgment or advice of another or is justified in believing one will act in the best interest of another because of a family relationship, a confidential relationship may arise." *Garcia v. Vera*, 342 S.W.3d 721, 724 (Tex. App.—El Paso 2011, no pet.). Factors considered in determining when an informal fiduciary relationship exists include whether the plaintiff relied on the defendant for support, the plaintiff's age and health, and evidence of the plaintiff's trust. *Young v. Fawcett*, 376 S.W.3d 209, 215 (Tex. App.—Beaumont 2012, no pet.).

62.     Here, an informal fiduciary relationship existed between Michelle, Joe, and Dakota. Michelle and Joe relied on Dakota and trusted that he would act in their best interests when agreeing to his appointment as officer and director of the Holli Ann Hardin Trust Number One entities. As a fiduciary, Dakota owed Michelle and Joe the duty of loyalty and utmost good faith, the duty of candor, the duty to refrain from self-dealing, which extends to dealings with a fiduciary's spouse, agents, employees, and other persons whose interests are closely identified with those of the fiduciary, the duty to act with integrity of the strictest kind, the duty of fair, honest dealing, and the duty of full disclosure. *See Miller v. Lucas*, No. 02-13-00298-CV, 2015 WL 2437887 (Tex. App.—Fort Worth May 21, 2015, pet. denied). Dakota breached these fiduciary duties with his countless actions to benefit himself at the expense of Michelle, Joe, and the Holli Ann Hardin Trust Number One.

17

63.     Accordingly, Michelle and Joe seek relief for Dakota's breach of his fiduciary duties, including monetary damages, a constructive trust over any assets or funds received in connection with the sale of EMM, and disgorgement of any fees.

**UNJUST ENRICHMENT: SALE OF EMM**

64.     Michelle and Joe incorporate by reference paragraphs 23 through 32 as though fully set forth herein.

65.     As a result of Dakota's diversion of proceeds to himself, he has been unjustly enriched by receiving a benefit that would be unconscionable to retain. Accordingly, Michelle and Joe bring this claim for unjust enrichment.

**MONEY HAD AND RECEIVED: SALE OF EMM**

66.     Michelle and Joe incorporate by reference paragraphs 23 through 32 as though fully set forth herein.

67.     As a result of Dakota's wrongdoing and misappropriation of assets, Dakota holds funds and assets which, in good conscience, belong to Michelle, Joe, and/or the Holli Ann Hardin Trust Number One. Michelle, Joe, and/or the Holli Ann Hardin Trust Number One have suffered damages as a result of Dakota's inequitable conduct. Accordingly, Michelle and Joe bring this claim for money had and received.

**ATTORNEYS' FEES**

68.     Michelle and Joe seek their reasonable and necessary attorneys' fees under all applicable authority, including Section 37.009 of the Texas Civil Practice and Remedies Code and Section 114.064 of the Texas Property Code.

32806614.v3

**APPLICATION FOR TEMPORARY INJUNCTIVE RELIEF**

69.     Michelle and Joe incorporate the preceding paragraphs as though fully set forth herein.

70.     Pursuant to Texas Rule of Civil Procedure 680, to prevent irreparable harm in the interim, Michelle and Joe request that the Court issue immediate injunctive relief.

71.     The issuance of temporary injunctions are intended "to maintain the status quo between the parties." *Cannan v. Green Oaks Apts., Ltd.*, 758 S.W.2d 753, 755 (Tex. 1988); *see also Clint Indep. Sch. Dist. v. Marquez*, 487 S.W.3d 538, 556 n.12 (Tex. 2026). As a general matter, in order to obtain a temporary injunction, the applicant "must plead and prove that it (1) has a cause of action against the opposing party; (2) has a probable right of relief on final trial to the relief sought; and (3) faces probable, imminent, and irreparable injury in the interim." *Clark v. Hastings Equity Partners, LLC*, 651 S.W.3d 359, 366 (Tex. App.—Houston [1st Dist.] 2022, no pet.). At this stage, the applicant "is not required to establish that the applicant will prevail on final trial." *Clark v. Clark*, 638 S.W.3d 829, 840 (Tex. App.—Houston [14th Dist.] 2021, no pet.). "The decision to grant or deny a temporary injunction lies in the sound discretion of the trial court, and the court's grant or denial is subject to reversal only for a clear abuse of that discretion." *Pidgeon v. Turner*, 625 S.W.3d 583, 606 (Tex. App.—Houston [14th Dist.] 2021). The court's discretion is not abused where the Court "applies the law correctly and some evidence reasonably supports its ruling." *Id.*

**A. Michelle and Joe have causes of action against Dakota for breach of fiduciary duty, money had and received, and unjust enrichment.**

72.     As shown through the allegations above, Michelle and Joe have several viable causes of action against Dakota individually and as an informal fiduciary to Michelle and Joe relating to his actions in diverting funds to himself through the sale of EMM. Michelle and Joe

19

UNOFFICIAL COPY

32806614.v3

plead causes of action for breach of fiduciary duty, unjust enrichment, and money had and received. Therefore, Michelle and Joe have satisfied this element of their entitlement to injunctive relief.

**B. Michelle and Joe are likely to succeed on the merits of their cause of action.**

73. The applicant "must establish a likelihood of success on the merits of the party's claims in order to obtain injunctive relief." *Courtright v. Allied Custom Homes, Inc.*, 647 S.W.3d 504, 519 (Tex. App.—Houston [1st Dist.] 2022, pet. denied). This element is satisfied where an applicant "produce[s] some evidence supporting every element of at least one valid legal theory." *31 Holdings I, LLC v. Argonaut Ins. Co.*, 640 S.W.3d 915, 923 (Tex. App.—Dallas 2022, no pet.); *see also Cameron Intern. Corp. v. Guillory*, 445 S.W.3d 840, 846 (Tex. App.—Houston [1st Dist.] 2014, no pet.). In other words, "[a] probable right of recovery is shown by alleging a cause of action and presenting evidence tending to sustain it." *Draper v. City of Arlington*, 629 S.W.3d 777, 784 (Tex. App.—Fort Worth 2021, pet. denied).

74. As discussed *supra*, Dakota has received or will receive millions of dollars at the expense of Michelle and Joe. As an informal fiduciary, Dakota owed Michelle and Joe the highest duty of good faith, fair dealing, honest performance, and strict accountability. Dakota breached these duties and inequitably received benefits at Michelle and Joe's expense. The evidence attached to this pleading as Exhibits 12 through 22 support a finding that Michelle and Joe are likely to succeed on the merits.

**C. Michelle and Joe face probable, imminent, and irreparable injury in the interim.**

75. Courts have held an injury is irreparable when, as here, "the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 024 (Tex. 2002). Michelle and

20

Joe have no adequate remedy at law for Dakota's wrongful actions. *See Sharma v. Vinman Int'l, Ltd.*, 231 S.W.3d 405, 426–27 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Specifically, Dakota has established and demonstrated a propensity to hide money through illicit transaction, utilizing shell companies and directing money in a way that will be difficult to trace. Further, upon information and belief, Dakota may be insolvent or become judgment proof upon an award of the damages incurred by Michelle and Joe. As Dakota has previously testified, he used the funds from the sale of the Dakota Trust real property to pay off certain "obligations," and would be unable to return those funds—an amount significantly less than the millions of dollars currently at issue, and within six months of receiving close to two million dollars between the sale of the Dakota Trust real property and sale of EMM. Michelle and Joe will be irreparably harmed if Dakota retains his control over and unlimited access to the proceeds from the sale of EMM, some of which are still forthcoming. *See Hartwell v. Lone Star, PCA*, 528 S.W.3d 750 (Tex. App.—Texarkana 2017, pet dism'd) (where borrower in default and evidence showed he could not repay loan, irreparable injury found); *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 611 (Tex. App.—Houston [1st Dist.] 2002, no pet.); *Blackthorne v. Bellush*, 61 S.W.3d 439, 444 (Tex. App.— San Antonio 2001, no pet.) (plaintiff does not have adequate remedy at law if defendant is insolvent).

### D. Requested Injunctive Relief

76.     Michelle and Joe have satisfied the elements necessary to establish their right to injunctive relief. Michelle and Joe respectfully request that the Court issue a Temporary Injunction and maintain the Temporary Injunction in place until a final trial on the merits. Michelle and Joe request an order by this Court restraining Dakota as follows:

21

a.  Dakota Fontenot is restrained from spending, transferring, distributing, or assigning any proceeds or assets traceable to proceeds from the sale of Entertainment Marketing & Management, Ltd.;

b.  All accounts in Dakota's care, custody, or control pertaining to or otherwise holding assets or proceeds received from the sale of Entertainment Marketing & Management, Ltd. shall be frozen; and

c.  Dakota Fontenot is ordered to account for all proceeds received from the sale of Entertainment Marketing & Management, Ltd.

77.     Michelle and Joe will suffer irreparable injury, loss, or damage if injunctive relief is not immediately granted. A temporary injunction should issue, and Michelle and Joe should only be required to post a minimal bond, if any, to preserve the status quo. Michelle and Joe ask the Court to promptly set an evidentiary hearing to consider the issuance of a temporary injunction against Dakota.

## PRAYER

Michelle Fontenot and Dallas Joseph Fontenot III, request that Dakota Fontenot be cited to appear and answer herein, and after proper consideration by the Court, they be subject to orders and judgment of the Court as follows:

a.  Equitable relief under Texas Property Code § 114.008 as specified above;

b.  Equitable relief in the form of a temporary injunction as specified above;

c.  Declaratory judgments that:

   a.  Joe and Michelle are each 1/3 beneficiaries of the Dakota Trust; and

   b.  Joe is the Trustee of the Dakota Trust;

d.  Fill and vacancy in the trustee position and appoint Joe as successor trustee;

e.  Monetary damages, including offset against Dakota's interest in the Dakota Trust; and

f.  Attorneys' fees and costs of court.

22

32806614.v3

Michelle and Joe request that the Court award them all other relief to which they may be justly entitled.

<div style="margin-left:45%">

Respectfully submitted,

**CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY, P.C.**

By:    */s/ Ryan O. Cantrell*
       Ryan O. Cantrell
       Texas Bar No. 24055259
       ryan.cantrell@chamberlainlaw.com
       Mariah J. Karigan
       Texas Bar No. 24123088
       mariah.karigan@chamberlainlaw.com
       1200 Smith Street, Suite 1400
       Houston, Texas 77002
       Telephone:   (713) 658-1818
       Facsimile:   (713) 658-2553
       **COUNSEL FOR MICHELLE FONTENOT AND DALLAS JOSEPH FONTENOT III**

</div>



23

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing instrument was served on this the 16th day of January, 2026, to the following:

Rudy Culp
Collin Bullard
TEXAS PROBATE ATTORNEY PLLC
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
*Counsel for Linda Goehrs*

Jeffrey D. Watters, Jr.
John P. ("Trey") Avant III
Andrew B. McCarty
GRAY REED & MCGRAW LLP
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
*Counsel for Dakota Fontenot*

James Madison ("Jimmy") Ardoin III
4900 Fournace Place, Suite 414
Bellaire, Texas 77401
*Counsel for Dakota Fontenot*

Paul S. Beik
440 Louisiana Street, Suite 1800
Houston, Texas 77002
*Counsel for Dakota Fontenot*

/s/ Ryan O. Cantrell
Ryan O. Cantrell

UNOFFICIAL COPY

24

32806614.v3

CAUSE NO. 537,721

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY AS | § | IN PROBATE COURT |
| TRUSTEE OF THE HOLLI ANN | § | |
| HARDIN TRUST NUMBER ONE | § | |
| *Plaintiff,* | § | |
| | § | NUMBER ONE OF |
| | § | |
| v. | § | |
| | § | |
| DAKOTA FONTENOT | § | |
| *Defendant.* | § | HARRIS COUNTY, TEXAS |

VERIFICATION

STATE OF TEXAS          §
                                       §
COUNTY OF Harris    §

Before me, the undersigned notary, on this day personally appeared Dallas Joseph Fontenot, III, the affiant, whose identity is known to me. After I administered an oath, the affiant testified as follows:

"My name is Dallas Joseph Fontenot, III. I have read Intervenors' Application for Temporary Injunctive Relief and the facts stated in it are within my personal knowledge and are true and correct."

_____
Dallas Joseph Fontenot, III

Sworn to and subscribed before me by Dallas Joseph Fontenot, III on January 14, 2026.

_____
Notary Public in and for the State of Texas

LISA J. ADAIR
NOTARY PUBLIC, STATE OF TEXAS
Notary ID #7487329
Expires December 28, 2029

## TRUST DECLARATION
## DAKOTA TRUST

THIS TRUST DECLARATION is made this day by declaration of Holli Hardin Fontenot ("Settlor"), who presently resides in Fort Bend County, Texas.

### ARTICLE I.
### TRUST BENEFICIARY

This Trust is created for the use and benefit of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot. The term "Trust Beneficiary" or "beneficiary" will also mean any and all persons, organizations, trusts, and entities who may have or may acquire a beneficial interest in this Trust, whether vested or contingent in nature, including a transfer of an interest in the Trust during the life of either Dallas Joseph Fontenot, Jr. or Holli Hardin Fontenot, or both, or from the exercise of a power of appointment by a Trust Beneficiary or otherwise.

For reference, the only child of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot is Dakota James Fontenot, who was born on June 22, 1994. Holli Hardin Fontenot has no other children born to her or adopted by her on the date of this Trust Declaration.

For reference, the only other children of Dallas Joseph Fontenot, Jr. are: Dallas Joseph Fontenot, III (who was born on March 29, 1969) and Michelle Anne Fontenot (who was born on March 12, 1970). Dallas Joseph Fontenot, Jr. has no other children born to him or adopted by him on the date of this Trust Declaration.

### ARTICLE II.
### INITIAL TRUST CORPUS AND RIGHT TO ADD TO THE TRUST

A.    INITIAL TRUST CORPUS. Settlor does hereby declare that from and after the date of this Trust Declaration, Settlor holds in trust the assets described in Schedule A attached to this Declaration, which assets are the initial corpus of this Trust and as Trustee acknowledges receipts of those assets. Settlor or any other person, trust, or entity may add property of any

Page 1 of 23 Pages

UNOFFICIAL COPY

EXHIBIT

1

003271

character to this Trust by a Last Will and Testament, from another trust (whether inter vivos or testamentary), or by deed or other transfer, subject only to the acceptance thereof by the Trustee.

B.    **ADDITIONS TO TRUST CORPUS.**    Additional contributions may be made to the corpus of the Trust, including testamentary contributions.

C.    **SEPARATE PROPERTY.**    The assets of this trust are the separate property of Holli Hardin Fontenot.    No inter vivos transfer of property will be made to this Trust unless the property constitutes the separate property of Holli Hardin Fontenot. Holli Hardin Fontenot may make a testamentary contribution of property to this Trust, and such contribution may constitute the separate property of Holli Hardin Fontenot and Holli Hardin Fontenot's interest in community property.

### ARTICLE III.
### NO REVOCATION OR AMENDMENT

A.    **TRUST IS IRREVOCABLE.**    This Trust is an irrevocable Trust.

B.    **THIS TRUST MAY NOT BE AMENDED.**    This Trust Declaration may not be amended, except by a Court of competent jurisdiction under the doctrine of cy pres.

C.    **INCOME TAX MATTERS.**    For so long as the Settlor or Dallas Joseph Fontenot, Jr. is a Trustee of the Trust, the Trust will be treated for income tax reporting purposes as a Grantor Trust under Treasury Regulation § 1.671-4(b).    Thereafter, the Trust is to be treated for income tax purposes as required by the applicable provisions of Subchapter J of the Internal Revenue Code.

### ARTICLE IV.
### DEFINITIONS

A.    **DESCENDANTS.**    The term "Descendants" means the legitimate children of the person designated and the legitimate lineal descendants of such children.    The term includes any person adopted before attaining age eighteen (18) and the adopted person's legitimate lineal descendants.    A posthumous child shall be considered as living at the death of his parent.

Page 2 of 23 Pages

003272

B.   **HEIRS AT LAW.**  Whenever a trustee, or a legal advisor to the Trustee is called upon to determine the heirs at law of Settlor, or any other person beneficially interested in this Trust, the determination will be made to identify those individuals, other than creditors, who would receive the personal property of a decedent upon his or her death as determined in accordance with the laws of intestate succession of the State of Texas, United States of America, determined as if the decedent had then died single, intestate, and domiciled in Texas and further determined as if the Settlor of this Trust had predeceased the person or persons so named or described.

C.   **INCOMPETENT, DISABILITY.**  A beneficiary will be considered "incompetent" or "disabled" if he or she is incapacitated to an extent to make it impossible or impractical to give prompt and intelligent consideration to business matters.  The Trustee may act upon such evidence as the Trustee reasonably deems appropriate and reliable without liability by reason thereof.

D.   **MINOR BENEFICIARY.**  The term "Minor Beneficiary" or "Minor" identifies a beneficiary who is less than 21 years of age.

E.   **PER STIRPES.**  Whenever a distribution is directed to be made to the descendants, *per stirpes*, of any person or persons, including the descendants of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot, the property to be distributed shall be divided into as many equal shares as there are then living children of each of those persons and deceased children of each those persons who have descendants then living.  Each then living child of such person shall take one share, and the share for the descendants of each deceased child shall be divided among the deceased child's then living descendants on a *per stirpes* basis.

For example, if a distribution were to be made to the descendants, *per stirpes*, of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot, assuming the recitations in Article I, the property to be distributed would be divided into three equal shares, one for each of Dallas Joseph Fontenot, III, Michelle Anne Fontenot, and Dakota James Fontenot.

F.   **RELATIVE OR RELATIVES.**  Reference to a "Relative" or "Relatives" will identify any person or persons related to Settlor by blood or lawful adoption in any degree.

Page 3 of 23 Pages

003273

G.   **POWER OF APPOINTMENT, QUALIFIED BENEFICIARY DESIGNATION.** Whenever this Trust Declaration gives a Trust Beneficiary the power or authority to appoint a beneficiary of the Trust, the designation must be in writing and be acknowledged in the form required of acknowledgements by Texas law or exercised by a will executed with the formalities required by law of the Trust Beneficiary's residence; it must clearly evidence the intent of the Trust Beneficiary to exercise a power of appointment; and the written beneficiary designation must have been delivered to the Trustee prior to the Trust Beneficiary's death or, if exercised by will, the will must have been filed for probate within three months from the date of the Trust Beneficiary's date of death and must subsequently be admitted to probate no matter the time interval.   The term of this Trust may be extended if the qualified beneficiary designation requires that a Beneficiary's interest remain in Trust, or may be divided and be held as a separate trust which is governed by the terms of this Trust Declaration.

H.   **SURVIVE.** For the purpose of vesting in the event two or more persons who have an interest in the trust die within a short time of one another, one must have survived the other for a period of at least 90 days as a condition to vesting.

I.   **TESTAMENTARY CONTRIBUTIONS.** The term "testamentary contributions" will mean any contribution to the Trust made by reason of the death of a person, including transfers made under the direction of a will, a beneficiary designation in a life insurance policy or other contract, by reason of survivorship language contained in a depository contract, or transfers from another Trust which designates this Trust as a beneficiary.

J.   **TRUST.** "Trust" means the Trust created by this Trust Declaration

K.   **TRUST DECLARATION.** The term "Trust Declaration" and the term "Trust Agreement" each refer to this Trust Declaration.

L.   **TRUST FUND.** The term "Trust Fund" or "Trust Property" means all property comprising:  the initial contribution of corpus to the Trust; all property paid or transferred to, or otherwise vested in, the Trustee as additions to the corpus of this Trust; accumulated income, if any, whether or not added to the corpus of this Trust; and the investments and reinvestment of the Trust property, including the increase and decrease in the values thereof as determined from time to

Page 4 of 23 Pages

003274

time.    The terms "corpus" and "principal" are used interchangeably.

M.    **TRUSTEE.**  For convenience, the term "Trustee," used in the singular, will mean and identify multiple Trustees serving and acting pursuant to the directions of this Trust Declaration. The term "corporate Trustee" will identify a banking or trust corporation with trust powers.

N.    **GENDER, PLURAL USAGE.**  The use of personal pronouns, such as he, she, or it, are to be construed in context.  The term "person" will include a non-person, such as a corporation, trust, partnership or other entity as is appropriate in context.  The identification of person in the plural will include the singular and *vice versa*, as is appropriate in context.

<div align="center">

ARTICLE V.
APPOINTMENT OF TRUSTEE

</div>

A.    **ORIGINAL APPOINTMENT.**  Holli Hardin Fontenot shall serve as initial Trustee of this Trust.

B.    **FIRST SUCCESSOR.**  In the event that Holli Hardin Fontenot should die, resign, or become incapacitated or unable to act as Trustee of this Trust, or in the event that Holli Hardin Fontenot should subsequently become divorced from Dallas Joseph Fontenot, Jr., then Dallas Joseph Fontenot, Jr. shall serve as successor Trustee of this Trust.  In the event that Dallas Joseph Fontenot, Jr. should elect not to serve as Trustee of this Trust, Dallas Joseph Fontenot, Jr. will have the right to appoint a successor or successors to serve as Trustee, as set forth in Section V.C below, and he may specify any conditions upon succession and service as may be permitted by law.

Holli Hardin Fontenot acknowledges and agrees that the rights and obligations of Holli Hardin Fontenot to serve as Trustee and to resign as Trustee in accordance with the foregoing have been and are the subject of separate consideration, receipt of which is hereby acknowledged in full; and such rights and obligations are in the best interest of the administration of the Trust for its Beneficiaries.  Holli Hardin Fontenot specifically waives any rights which she may have to rescind

<div align="center">Page 5 of 23 Pages</div>

003275

or revoke her obligation to resign as Trustee upon divorce from Dallas Joseph Fontenot, Jr.

C.  **SUCCESSION.**  Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment will have the right to appoint a successor or successors to serve as Trustee in the event that person ceases to serve for any reason, and each Trustee may specify any conditions upon succession and service as may be permitted by law.  For example, a successor may be required to furnish a fiduciary bond as a prerequisite or a successor's service may be conditioned upon another appointee's death, resignation, or inability to serve.  Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment may also provide that one or more designated successors as Trustee will have the authority to appoint his, her, or its successor as Trustee.  An appointment of successor Trustee must be in writing and must be acknowledged to be effective.  Unless other specified by a Trustee in a written designation of succession, succession is to be determined as follows.

If a Trustee by original appointment does not appoint a successor, the remaining Trustee or Trustees then serving will continue service alone.  If all Trustees by original appointment fail or cease to serve for any reason without having appointed a successor or successors, the successor or successors as Trustee will be as named below and in the order of succession herein prescribed.

FIRST:　　Dallas Joseph Fontenot, III

BUT:　　　Settlor specifically provides that upon assumption of actual service as Trustee, Dallas Joseph Fontenot, III will have the right to appoint Dallas Joseph Fontenot, III's successor as Trustee, and to vest in a successor Trustee, upon assumption of that person's service, the right and authority to designate succession as Trustee. To the extent this is done, the appointment of succession will supersede the appointments which follow the designation of Dallas Joseph Fontenot, III as Trustee.

NEXT:　　Michelle Anne Fontenot

BUT:　　　Settlor specifically provides that upon assumption of actual service as Trustee, Michelle Anne Fontenot will have the right to appoint Michelle Anne Fontenot's successor as Trustee, and to vest in a successor Trustee, upon assumption of that person's service, the right and

UNOFFICIAL COPY

003276

authority to designate succession as Trustee.  To the extent this is done, the appointment of succession will supersede the appointments which follow the designation of Michelle Anne Fontenot as Trustee.

FINALLY:  First Interstate Bank of Texas, N.A., in the event all of the above, including duly appointed successors, fail or cease to serve for any reason.  The appointment of First Interstate Bank of Texas, N.A. as Trustee will include any successor to First Interstate Bank of Texas, N.A. by reason of its merger, reorganization, or sale to another banking corporation with trust powers or a trust company with trust powers.

D.   **AUTHORITY OF SUCCESSOR TRUSTEE.**  A successor will have the authority vested in a Trustee by original appointment under this Trust Declaration, subject to any lawful limitations or qualifications upon the service of a successor imposed by one Trustee in a written document appointing a successor.  A successor Trustee will not be obliged to examine the accounts, records, or acts of the previous Trustee or Trustees; nor will a successor Trustee in any way or manner be responsible for any act or omission to act on the part of any previous Trustee.  Reference to "Trustee" in the singular will include the plural.

E.   **BOND.**  No one serving as Trustee will be required to furnish a fiduciary bond as a prerequisite to service.

F.   **RESIGNATION OR REMOVAL OF A TRUSTEE.**  Any appointee serving or entitled to serve as Trustee may resign at any time and without cause, and the instructions in this Trust Declaration will determine who the successor will be (including successors appointed by a Trustee as herein provided).  The trust beneficiary or beneficiaries who are then entitled to receive distributions of income from the trust, or distributions of income from any separate trust created by this document, may remove any corporate Trustee then serving, the notice of removal to be delivered in writing to the corporate Trustee.  Unless this Trust Declaration or any instrument appointing a successor provides otherwise, the selection of a successor to the corporate Trustee will be made by a Court of competent jurisdiction.  In the event there is more than one beneficiary entitled to the income from the trust, all income beneficiaries must join in the written notice of removal.  The consent of any person who is deceased or legally disabled will not be required in meeting the unanimous consent requirements for removal.

Page 7 of 23 Pages

003277

G.  **AFFIDAVIT OF AUTHORITY.** Any person or entity dealing with the Trust may rely upon the affidavit of a Trustee or Trustees of the Trust:

On my [our] oath, and under the penalties of perjury, I [we] swear that I [we] am [are] the duly appointed and authorized trustee[s] of DAKOTA TRUST. I [we] certify that I [we] have not been removed as Trustee[s] and have the authority to act for, and bind, DAKOTA TRUST in the transaction of the business for which this affidavit is given as affirmation of my [our] authority.

_____
Signature Line

Sworn and subscribed before me, the undersigned authority, by _____ this _____ day of
_____, 19___.

_____
Notary Public - State of Texas

H.  **DOCUMENTING SUCCESSION.** The successor to any Trustee may document succession with an affidavit setting forth that the preceding Trustee has failed or ceased to serve and the successor has assumed the duties of Trustee. The affidavit may be filed in the deed records of Fort Bend County, Texas and in each county in which real property held in Trust is located or in the county in which the principal assets and records of the Trust are located. The public and all persons interested in and dealing with the Trust and the Trustee may rely upon a certified copy of the recorded affidavit as conclusive evidence of a successor's authority to serve and act as the Trustee of the Trust.

I.  **COMPENSATION.** Any person who serves as Trustee may elect to receive a reasonable compensation, reasonable compensation to be measured by the time required in the administration of the Trust and the responsibility assumed in the discharge of the duties of office. The fee schedules of area Trust departments prescribing fees for the same or similar services may be used to establish reasonable compensation. A corporate Trustee will be entitled to receive as its compensation such fees as are then prescribed by its published schedule of charges for Trusts of a similar size and nature and additional compensation for extraordinary services performed by the corporate Trustee. A Trustee will be entitled to full reimbursement for expenses, costs, or other obligations incurred as the result of service, including attorney's, accountant's, and other professional fees.

J.  **MULTIPLE TRUSTEES.** In the event there are two Trustees serving the Trust, both must sign any instrument transferring real property from the Trust. If the Trustees agree to do so, one Trustee acting alone may be given the primary

Page 8 of 23 Pages

003278

responsibility of administration and accounting, and one Trustee alone may be authorized to deposit, transfer and withdraw funds from any depository account held by the Trust. The authority vested in three or more trustees may be exercised by a majority of the trustees. In the event of an action or decision by a majority, the non-consenting Trustee will not be responsible for the act of the majority.

<div align="center">

ARTICLE VI.
DISTRIBUTIONS FROM THE TRUST,
LIVING AND POST-MORTEM

</div>

A.  **FOR SO LONG AS HOLLI HARDIN FONTENOT AND DALLAS JOSEPH FONTENOT, JR. SHALL REMAIN MARRIED.** For so long as Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr. shall remain married, the Trustee may from time to time distribute to or pay for the benefit of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., or either of them, so much of the net income (and, if the net income of the Trust is not sufficient, the principal of the Trust) as the Trustee determines may be necessary for the support, maintenance, health, and general welfare of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., or either of them. Such determination shall be in the absolute discretion of the Trustee, whose decisions shall be binding.

B.  **UPON THE TERMINATION BY DIVORCE OF THE MARITAL RELATIONSHIP OF HOLLI HARDIN FONTENOT AND DALLAS JOSEPH FONTENOT, JR.** Upon the termination by divorce of the marital relationship of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., the interest of Holli Hardin Fontenot in this Trust will terminate and this Trust is to be continued in trust for the benefit of Dallas Joseph Fontenot, Jr. as follows:

1.  This trust will is to be continued in Trust for the sole use and benefit of Dallas Joseph Fontenot, Jr. for so long as he shall live. Dallas Joseph Fontenot, Jr. will, for the duration of the Trust, be entitled to the net income of the Trust, this amount to be paid in convenient installment payments to be not less than quarter-annually. Distributions of income to Dallas Joseph Fontenot, Jr. shall be made in the amount, form, and manner required by Section 2523(f) of the Internal Revenue Code. If the income known by the Trustee to be available to Dallas Joseph Fontenot, Jr. from other sources is insufficient to provide for his continued

<div align="center">

Page 9 of 23 Pages

</div>

UNOFFICIAL COPY

support and maintenance in good health, the Trustee will have the authority to pay to Dallas Joseph Fontenot, Jr. or apply for his benefit, so much of the principal of the Trust, even to the exhaustion thereof, as is necessary to provide for his support and maintenance in the style and comfort to which he is accustomed and to provide for his medical needs and maintenance of good health. It is intended that the payment of principal be limited by the ascertainable standard provided above, that this provision comply fully with Treasury Regulation §20.2041-1(c)(2), and that this Trust is to be construed and limited to that end. Dallas Joseph Fontenot, Jr. may at any time require that property which does not produce an income or a sufficient income be sold and invested in income producing property.

2.  Upon the death of Dallas Joseph Fontenot, Jr., Dallas Joseph Fontenot, Jr., by a clause in his Will in which he specifically exercises this power of appointment, shall have the power to appoint the then remaining trust assets to or for the benefit of any one or more of the descendants of Dallas Joseph Fontenot, Jr. or the descendants of Holli Hardin Fontenot, in such shares, proportions, or amounts, upon such trusts and for such estates as he alone may determine. If Dallas Joseph Fontenot, Jr. fails to exercise this special power of appointment to the fullest extent, then, subject to the other provisions of this Trust, upon his death, the unappointed trust assets shall be delivered to the living descendants of Holli Hardin Fontenot who were born prior to the date of divorce and to the living descendants of Dallas Joseph Fontenot, Jr., *per stirpes*.

C.  **UPON THE DEATH OF HOLLI HARDIN FONTENOT WHILE MARRIED TO DALLAS JOSEPH FONTENOT, JR.** Upon the death of Holli Hardin Fontenot while married to Dallas Joseph Fontenot, Jr. this Trust is to be continued in Trust as follows:

1.  This trust will is to be continued in Trust for the sole use and benefit of Dallas Joseph Fontenot, Jr. for so long as he shall live. Dallas Joseph Fontenot, Jr. will, for the duration of the Trust, be entitled to the net income of the Trust, this amount to be paid in convenient installment payments to be not less than quarter-annually. Distributions of income to Dallas Joseph Fontenot, Jr. shall be made in the amount, form, and manner required by Section 2056(b)(7)(B) of the Internal Revenue Code. If the income known by the Trustee to be

003280

available to Dallas Joseph Fontenot, Jr. from other sources is insufficient to provide for his continued support and maintenance in good health, the Trustee will have the authority to pay to Dallas Joseph Fontenot, Jr. or apply for his benefit, so much of the principal of the Trust, even to the exhaustion thereof, as is necessary to provide for his support and maintenance in the style and comfort to which he is accustomed and to provide for his medical needs and maintenance of good health.  It is intended that the payment of principal be limited by the ascertainable standard provided above, that this provision comply fully with Treasury Regulation §20.2041-1(c)(2), and that this Trust is to be construed and limited to that end.  Dallas Joseph Fontenot, Jr. may at any time require that property which does not produce an income or a sufficient income be sold and invested in income producing property.

2.  Upon the death of Dallas Joseph Fontenot, Jr., Dallas Joseph Fontenot, Jr., by a clause in his Will in which he specifically exercises this power of appointment, shall have the power to appoint the then remaining trust assets to or for the benefit of any one or more of the descendants of Dallas Joseph Fontenot, Jr. or the descendants of Holli Hardin Fontenot, in such shares, proportions, or amounts, upon such trusts and for such estates as he alone may determine.  If Dallas Joseph Fontenot, Jr. fails to exercise this special power of appointment to the fullest extent, then, subject to the other provisions of this Trust, upon his death, the unappointed trust assets shall be delivered to the living descendants of Holli Hardin Fontenot and to the living descendants of Dallas Joseph Fontenot, Jr., *per stirpes*.

D.  **UPON THE DEATH OF DALLAS JOSEPH FONTENOT, JR. WHILE MARRIED TO HOLLI HARDIN FONTENOT.**  Upon the death of Dallas Joseph Fontenot, Jr. while married to Holli Hardin Fontenot, this Trust is to be continued in Trust as follows:

1.  This trust will is to be continued in Trust for the sole use and benefit of Holli Hardin Fontenot for so long as she shall live.  Holli Hardin Fontenot will, for the duration of the Trust, be entitled to the net income of the Trust, this amount to be paid in convenient installment payments to be not less than quarter-annually.  If the income known by the Trustee to be available to Holli Hardin Fontenot from other sources is insufficient to provide for her continued support and

UNOFFICIAL COPY

003281

maintenance in good health, the Trustee will have the authority to pay to Holli Hardin Fontenot or apply for her benefit, so much of the principal of the Trust, even to the exhaustion thereof, as is necessary to provide for her support and maintenance in the style and comfort to which she is accustomed and to provide for her medical needs and maintenance of good health. Holli Hardin Fontenot may at any time require that property which does not produce an income or a sufficient income be sold and invested in income producing property.

2. Upon the death of Holli Hardin Fontenot, unless Holli Hardin Fontenot shall issue a direction to the contrary, the Trustee will pay from the Trust assets the entire increment in the taxes payable by reason of her death to the extent that the total of such taxes is greater than would have been imposed if the trust assets had not been taken into account in determining such taxes.

3. Dallas Joseph Fontenot, Jr., by a clause in his Will in which he specifically exercises this power of appointment, shall have the power to appoint the trust assets remaining upon the death of Holli Hardin Fontenot to or for the benefit of any one or more of the descendants of Dallas Joseph Fontenot, Jr. or the descendants of Holli Hardin Fontenot, in such shares, proportions, or amounts, upon such trusts and for such estates as he alone may determine. If Dallas Joseph Fontenot, Jr. fails to exercise this special power of appointment to the fullest extent, then, subject to the other provisions of this Trust, upon his death, the unappointed trust assets shall be delivered to the living descendants of Holli Hardin Fontenot and to the living descendants of Dallas Joseph Fontenot, Jr., *per stirpes*.

E. ELECTION, QUALIFIED TERMINABLE INTEREST PROPERTY. It is important to emphasize that upon the death of Holli Hardin Fontenot, or the termination by divorce of the marital relationship of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., Dallas Joseph Fontenot, Jr. will have no more than a life interest in the Trust. Dallas Joseph Fontenot, Jr. will have no right or power to revoke or amend this Trust. The Trustee may, without liability for doing so or the failure to do so, elect to treat all or a part of the Trust as Qualified Terminable Interest Property pursuant to the requirements of Section 2056(b)(7) or Section 2523(f) of the Internal Revenue Code, whichever is applicable. To the extent that an election is made, and unless Dallas Joseph Fontenot,

Page 12 of 23 Pages

003282

Jr. shall issue a direction to the contrary, the Trustee will pay from the Trust assets the entire increment in the taxes payable by reason of his death to the extent that the total of such taxes is greater than would have been imposed if the property treated as qualified terminable interest property had not been taken into account in determining such taxes. To the extent a partial election is made, and to the extent and in the manner then permitted by law, the Trustee will have the authority (1) to divide the Trust into separate trusts to reflect the partial election, or (2) to continue the Trust as a whole, with the fraction or percentage of the whole representing the elective share to be administered and maintained in a manner to reflect its proportionate share of the increment or decline in the whole of the property for the purposes of applying Sections 2044 and 2519 of the Internal Revenue Code. If the Trust is divided into separate parts, the Trustee will make the division according to the fair market value at the time the division is made. It is Settlor's intent and purpose to comply with state and federal law so that the least amount of federal estate tax will be payable upon the deaths of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., and this Trust Declaration is to be applied and construed to accomplish this objective.

F.  **DIVISION INTO SEPARATE TRUSTS.** If, following the death of Holli Hardin Fontenot or the termination by divorce of the marital relationship between Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot, the Trust is divided into separate trusts, the appreciation or depreciation in the value of each such trust or account will measure the value thereof for the purpose of disposition and taxation. For example, if the Trustee elects to treat all but $600,000 of the Trust assets as qualified terminable interest property for the federal estate tax marital deduction, and, if the Trustee segregates the $600,000 amount into a separate trust, the amount distributable therefrom upon the death of Dallas Joseph Fontenot, Jr. will be the value of that account upon the death of Dallas Joseph Fontenot, Jr. If, however, the $600,000 amount represents 25 percent of the total trust estate, and is continued and maintained as a fractional percentage of the whole, the value of the fractional interest upon the death of Dallas Joseph Fontenot, Jr. is to be determined with regard to its proportional share of any increase or decrease in the value of the whole.

G.  **ITEMS OF TANGIBLE PERSONAL PROPERTY IN TRUST.** Holli Hardin Fontenot may have certain items of tangible personal property which are her separate property and which have been

UNOFFICIAL COPY

003283

transferred to the Trust or otherwise subject to the Trustee's control. The term "personal belongings" or "tangible personal property" will mean and identify personal wearing apparel, jewelry, household furnishings and equipment, books, albums, art work, entertainment and sports equipment, and all items of decoration or adornment. Holli Hardin Fontenot may at any time and from time to time deliver to the Trustee written instructions as to any living or post mortem gifts of such personal belongings, and the Trustee shall be authorized and bound to make disposition of these items as Holli Hardin Fontenot has reasonably directed.

H.   **PARTIAL AND FINAL DISTRIBUTIONS.** The Trustee, in making or preparing to make a partial or final distribution, may prepare an accounting and may require, as a condition to payment, a written and acknowledged statement from each distributee that the accounting has been thoroughly examined and accepted as correct; a discharge of the Trustee; a release from any loss, liability, claim or question concerning the exercise of due care, skill, and prudence of the Trustee in the management, investment, retention, and distribution of property during the Trustee's term of service, except for any undisclosed error or omission having basis in fraud or bad faith; and an indemnity of the Trustee, to include the payment of attorney's fees, from any asserted claim of any taxing agency, governmental authority, or other claimant. Any remainder beneficiary having a question or potential claim may require an audit of the Trust as an expense of administration. Failure to require the audit prior to acceptance of the Trustee's report, or the acceptance of payment, will operate as a final release and discharge of the Trustee except as to any error or omission having basis in fraud or bad faith.

The Trustee, in making or preparing to make a partial or final distribution will have the authority to: (1) partition any asset or class of assets and deliver divided and segregated interests to the beneficiaries; (2) sell any asset or class of assets (whether or not susceptible to partition in kind), and deliver to a beneficiary or beneficiaries a divided interest in the proceeds of sale and/or divided or undivided interests in any note and security arrangement taken as part of the purchase price; and/or (3) deliver undivided interests in an asset or class of assets to the beneficiaries subject to any indebtedness which may be secured by the property.

I.   **CONTINUATION OF THE TRUST DURING DISSOLUTION.** The Trust may continue beyond its termination for a time reasonably necessary to conclude the administration of the Trust, pay

003284

expenses of termination and to distribute to the Trust property to those entitled thereto.

J.    CONTINGENT TRUST FOR CERTAIN BENEFICIARIES.  The interest of any Trust Beneficiary who has not attained the age of thirty-five (35) years (the "required age"), or who may be otherwise legally disabled, and whose interest is not otherwise covered by the provisions of this Trust Declaration or another Trust, may, in the sole and absolute discretion of the Trustee, be continued in Trust, or be held as a separate trust, for the use and benefit of that person until such person shall attain the required age or until such person is no longer disabled. For so long as the trust shall exist, the Trustee shall hold, manage, and make distributions of income and principal to provide for his or her health, education, support and maintenance.  The Trustee may make an entire distribution of principal to a Trust Beneficiary prior to the required age if, in the Trustee's determination alone, the beneficiary has demonstrated an ability to conserve his or her resources or if it is no longer feasible for the trust to continue considering the size of the trust and the time and cost to maintain the trust.  The Trust Beneficiary, with consent of the Trustee, may also extend the term of the trust.

For so long as the Trust is held for a beneficiary pursuant to these terms, the Trust Beneficiary, using a qualified beneficiary designation, will have the right to appoint the beneficiaries of his or her interest in the Trust entitled to his or her interest upon the Trust Beneficiary's death.  If the Trust Beneficiary dies prior to a final distribution of his or her interest from the Trust, without having made a qualified beneficiary designation, that person's interest will pass *per stirpes* to his or her descendants then living, or if none, *per stirpes* to Settlor's descendants then living.

K.    PERPETUITIES.  In no event will the term of this Trust continue for a term greater than twenty-one (21) years after the death of the last survivor of Settlor and all relatives of Settlor living on the effective date of this Trust Declaration.  Any continuation of the Trust by the qualified exercise of a power of appointment will be construed as the creation of a separate trust and an extension of the Rule Against Perpetuities to the extent permitted by law.  A court of competent jurisdiction is to liberally construe and apply this provision to validate an interest consistent with Settlor's intent and may reform or construe an interest according to the doctrine of *cy pres*.

003285

## ARTICLE VII.
## PAYMENT OF DEBTS, TAXES, AND
## SETTLEMENT COSTS
## EXERCISE OF ELECTIONS

The following directions concern the payment of debts, taxes, estate and trust settlement costs, and the exercise of any election permitted by Texas law or by the Internal Revenue Code:

A.  **PAYMENT OF INDEBTEDNESS AND SETTLEMENT COSTS.** The Trustee will have the discretionary authority to pay from the Trust Fund the costs reasonably and lawfully required to settle the estate of a deceased beneficiary. In the event there is more than one Trust Beneficiary immediately preceding the death of a beneficiary, distributions of Trust income and principal to pay settlement costs will not exceed that person's trust share or the fair market value of the beneficiary's interest in the Trust which is distributable by reason of his or her death.

B.  **SPECIAL BEQUESTS.** Unless otherwise provided in this Trust document, or in any amendment, or in a document exercising a power to appoint the beneficiaries of this Trust, if property given as a special bequest or gift is subject to a mortgage or other security interest, the designated recipient of the property will take the asset subject to the obligation and the recipient's assumption of the indebtedness upon distribution of the asset to the recipient. The obligation to be assumed shall be the principal balance of the indebtedness on date of death, and the Trust shall be entitled to reimbursement or offset for principal and interest payments paid by the Trust to date of distribution.

C.  **ESTATE, GENERATION SKIPPING, OR OTHER DEATH TAX.** Unless otherwise provided in this Trust document, or in a document exercising a power to appoint the beneficiaries of this Trust, estate, inheritance, succession, or other similar tax shall be charged to and apportioned to those whose gifts or distributive share generate a death tax liability by reason of Settlor's death or by reason of a taxable distribution from the Trust or a taxable termination of the Trust. To the extent Settlor may lawfully provide, a Trustee may pay and deduct from a beneficiary's distributive share (whether the distribution is to be paid outright or is to be continued in Trust) the increment in taxes payable by reason of a required distribution or termination of interest (i.e., estate, gift, inheritance, or generation skipping taxes) to the extent that the total of such taxes payable by reason of a distribution or

003286

termination is greater than the tax which would have been imposed if the property of the Trust subject to the distribution or termination of interest had not been taken into account in determining the amount of such tax. To the extent a tax liability results from the distribution of property to a beneficiary other than under this Trust, the Trustee will have the authority to reduce any distribution to the beneficiary from this Trust by the amount of the tax liability apportioned to the beneficiary, or if the distribution is insufficient, the Trustee will have the authority to proceed against the beneficiary for his, her, or its share of the tax liability. In making an allocation, the Trustee may consider all property included in the gross estate of the Settlor for federal estate tax purposes, including all property subject to probate, all amounts paid or payable to another as the result of death, including life insurance proceeds, proceeds from a qualified retirement plan or account, proceeds from a joint and survivorship account with a financial institution or brokerage company, proceeds from a buy-sell or redemption contract, and/or any other plan or policy which provides for a payment of death benefits. This provision further contemplates and includes any tax which results from the inclusion of a prior transfer in the federal gross estate of Settlor even though possession of the property previously transferred is vested in someone other than the Trustee. This provision does not include a reduction in the unified credit by reason of taxable gifts previously made by Settlor. If the Trustee determines that the collection of an apportioned tax liability against another is not economically feasible or probable, the tax liability will be paid by the Trust and will reduce the amount distributable to the residuary beneficiaries. The Trustee's judgment with regard to the feasibility of collection is to be conclusive.

D. **SPECIAL ELECTION FOR QUALIFIED TERMINABLE INTEREST PROPERTY.** For the purpose of identifying the "transferror" in allocating a GST exemption, the estate of Holli Hardin Fontenot or the Trustee of this Trust may elect to treat all of the property which passes in Trust to Dallas Joseph Fontenot, Jr. for which a marital deduction is allowed, by reason of Section 2056(b)(7) or Section 2523(f) of the Internal Revenue Code, as if the election to be treated as Qualified Terminable Interest Property had not been made. Reference to the "Special Election For Qualified Terminable Interest Property" will mean and identify the election provided by Section 2652(a)(2) of the Internal Revenue Code. The term "GST Exemption" or "GST Exemption Amount" is the dollar amount of property which may pass as generation skipping transfers under Subtitle B,

Page 17 of 23 Pages

003287

Chapter 13, of the Internal Revenue Code of 1986 which is exempt from the generation-skipping tax.

E. **ELECTIVE DEDUCTIONS.** A Trustee will have the discretionary authority to claim any obligation, expense, cost, or loss as a deduction against either estate tax or income tax, or to make any election provided by Texas law, the Internal Revenue Code, or other applicable law, and the Trustee's decision will be conclusive and binding upon all interested parties and shall be effective without obligation to make an equitable adjustment or apportionment between or among the beneficiaries of this Trust or the estate of deceased beneficiary.

## ARTICLE VIII.
### SERVICE OF THE TRUSTEE
### OTHER MATTERS

A. **GENERAL AUTHORITY.** A Trustee is to serve without Court supervision. The service of a Trustee is to be governed first by the terms, conditions, and authority prescribed by this Trust Declaration, and then as prescribed by the trust laws of the State of Texas.

B. **RETENTION OF ASSETS.** A Trustee will have the authority to retain, without liability, any and all property in the form in which it is received by the Trustee without regard to its productivity or the proportion that any one asset or class of assets may bear to the whole. A Trustee will not have liability nor responsibility for loss of income from or depreciation in the value of property which was retained in the form which the Trustee received it.

C. **UNDIVIDED INTERESTS.** A Trustee will have the authority to hold, acquire, and dispose of undivided interests in property.

D. **LENDING, INVESTING.** A Trustee will have the authority to lend, borrow, lease, sell, and purchase property, including undivided fractional interests in property, upon such terms and conditions as are reasonably prudent under the facts and circumstances then existing. A Trustee may transact business, including lending, borrowing, leasing, and sale, between two or more related trusts or persons upon such terms and conditions as are reasonably prudent under the facts and circumstances then existing. Without limiting the general authority above given, a Trustee will have the authority to hold, acquire and sell:

Page 18 of 23 Pages

003288

- Publicly traded securities, including stocks, bonds, warrants, futures, mutual funds, partnerships, real estate investment trusts, diversified asset funds.
- Interests in a closely held corporation, partnership, or trust, whether registered or not registered for public sale.
- Obligations of the United States Government or any other government.
- Cash deposits, money market funds, brokerage company accounts, certificates of deposit, savings accounts, and checking accounts, without limitation as to the location of the account or depository.
- Promissory notes, secured and unsecured, including mortgage notes purchased at a discount.
- Land, improved and unimproved, whether presently income producing or held for appreciation in value.
- Land, building and equipment leases.
- Minerals, mineral rights and working interests in mineral producing property or property held for future development.
- Equipment, implements, stock in trade, leasehold improvements, and livestock.
- Insurance policies.

E.  **LIMITATION UPON A TRUSTEE'S LIABILITY.**  A Trustee, other than a banking corporation serving as a Trustee, will not have personal liability for service in a fiduciary capacity other than for acts or omissions to act which, as determined by a court of law, constitute gross negligence or fraud.

F.  **PROTECTION OF THE INTERESTS OF BENEFICIARIES.**  No beneficiary will have the power to anticipate, encumber or transfer any interest in the Trust.  No part of the Trust will be liable for or charged with any debts, contracts, liabilities or torts of a beneficiary or subject to seizure or other process by any creditor of a beneficiary.

G.  **RELATIONSHIP WITH BENEFICIARIES WHO ARE MINORS OR INCOMPETENTS.**  Distributions to an incompetent or disabled beneficiary, or a Minor Beneficiary may be made in such of the following ways as in the Trustee's opinion will be most beneficial to the interests of the beneficiary:  (a) directly to such beneficiary; (b) to his or her parent, guardian or legal representative; (c) to a custodian for said beneficiary under any Uniform Gifts to Minors Act and/or Gifts of Securities to Minors Act in the jurisdiction of residence of such beneficiary; (d) to any person with whom he or she is residing; (e) to some near relative or close friend; or (f) by

Page 19 of 23 Pages

003289

the Trustee using such payment directly for the benefit of such beneficiary, including payments made to or for the benefit of any person or persons whom said beneficiary has a legal obligation to support. The Trustee may in the Trustee's sole discretion instead hold such income or corpus for the account of such beneficiary as custodian. A receipt from a beneficiary or from his parent, guardian, legal representative, relative, close friend, or other person described above shall be a sufficient discharge to the Trustee from any liability for making said payments.

The Trustee is likewise authorized to consult with and act upon the advice of the parent, guardian, custodian, or legal representative of any beneficiary who is either an incompetent or a Minor with respect to any and all matters which may arise under this Declaration and as concerns the rights or interests of said beneficiary. All statements, accounts, documents, releases, notices, or other written instruments, including but not limited to written instruments concerning the resignation or replacement of any Trustee or Trustees, required to be delivered to or executed by such beneficiary may be delivered to or executed by the parent, guardian, custodian, or legal representative of said incompetent or Minor Beneficiary, and when so delivered or executed shall be binding upon said incompetent or Minor Beneficiary, and shall be of the same force and effect as though delivered to or executed by a beneficiary acting under no legal disability.

## ARTICLE IX.
### UNPRODUCTIVE OR UNDERPRODUCTIVE PROPERTY

A beneficiary who is then entitled to the income of the Trust, or the income of any other Trust established or continued pursuant to this trust declaration, will have the authority to issue a written directive to the Trustee to convert Trust Property which does not produce an income, or which is underproductive, into property which is income producing or which will provide a greater income to the trust. Upon actual receipt of an income beneficiary's written directive, the Trustee will reasonably and prudently proceed to convert unproductive or underproductive property into property which will produce a reasonable and safe rate of return. The Trustee may do so by selling the unproductive or underproductive asset upon such terms and conditions as is prudent and reasonable under all circumstances which may then exist (including the acceptance of an income or interest bearing obligation as the whole or a part of the sales price), and investing the proceeds of sale in income producing instruments or obligations. Notwithstanding

Page 20 of 23 Pages

003290

these requirements, a Trust Beneficiary cannot direct the Trustee to invest or reinvest trust property in a trust investment which is speculative in nature or which, in result, would violate the spendthrift provisions of this Trust Declaration.

## ARTICLE X.
### NO-CONTEST REQUIREMENTS

Settlor vests in the Trustee the authority to construe this Trust instrument and to resolve all matters pertaining to disputed issues or controverted claims.  Settlor does not want to burden this Trust with the cost of a litigated proceeding to resolve questions of law or fact unless the proceeding is originated by the Trustee or with the Trustee's written permission.  Any other person, agency, or organization who shall originate (or who shall cause to be instituted) a judicial proceeding to construe or contest this Trust instrument, or any will which requires distribution of property to this Trust, or to resolve any claim or controversy in the nature of reimbursement, or seeking to impress a constructive or resulting Trust, or alleging any other theory which, if assumed as true, would enlarge (or originate) a claimant's interest in this Trust or in Settlor's estate, without the Trustee's written permission, shall forfeit any amount to which that person, agency, or organization is or may be entitled and the interest of any such litigant or contestant shall pass as if he or she or it had predeceased us.  These directions shall apply even though the person, agency or organization shall be found by a court of law to have originated the judicial proceeding in good faith and with probable cause and even though the proceedings may seek nothing more than to construe the application of this no-contest provision. This requirement is to be limited, even to the exclusion thereof, in the event it operates to deny the benefits of the federal estate tax or federal gift tax marital deduction.

## ARTICLE XI.
### JURISDICTION

The jurisdiction of this Trust will be the State of Texas.  Any issue of law or fact pertaining to the creation, continuation, administration, and termination of the Trust, or any other matter incident to this Trust, is to be determined with reference to the specific directions in the Trust Declaration and then under the laws of the State of Texas.  If a Article or Subsection of this Trust Declaration is in conflict with a prohibition of state law or federal law, the Article or Subsection, or the Trust Declaration as a whole, is to be construed in a manner which will cause it to be

003291

in compliance with state and federal law and in a manner which will result in the least amount of taxes and estate settlement costs.

## ARTICLE XII.
### ACCEPTANCE BY TRUSTEE

Holli Hardin Fontenot acknowledges that she is the initial Trustee of the DAKOTA TRUST. By execution of this Trust Declaration, Holli Hardin Fontenot accepts the office of Trustee and agrees to hold and administer the Trust according to the provisions thereof and as required by law.

### CONCLUSION AND ATTESTATION

Holli Hardin Fontenot attests that she has executed this Trust Declaration on the date set forth below, and the terms thereof will bind her, her successors and assigns, and her heirs and personal representatives. This instrument is to be effective upon the date recorded immediately below.

Dated:    November 9, 1994



original signed by Holli Hardin Fontenot
_____

Holli Hardin Fontenot, individually and as Trustee

003292

STATE OF TEXAS        §
                      §
COUNTY OF HARRIS      §

On this __9th__ day of ___November___ in the year 199_4_ before me, a Notary Public of said State, personally appeared Holli Hardin Fontenot, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument, and acknowledged that she executed the same in the capacities expressed therein.

WITNESS MY HAND and official seal.

_____
Notary Public, State of Texas

[SEAL]

Page 23 of 23 Pages

003293



## SCHEDULE A TO
## TRUST DECLARATION
## DAKOTA TRUST

The Sum of SIXTY FOUR THOUSAND AND NO/100 DOLLARS ($64,000.00) from the Holli Ann Hardin Sole and Separate Property Account, which sum constitutes the separate property of the Settlor

Page 24 of 23 Pages

003294

This trust may need a demand power after Holli's death so that we can take advantages of $10,000 per year exclusion for gifts of present interest.

003295



TO WHOM IT MAY CONCERN:

I, Holli Ann Hardin Fontenot, hereby voluntarily resign as trustee of the Holli Ann Hardin Fontenot Trust Number One and the Dakota Trust. This resignation as trustee shall be effective immediately upon acceptance by Dallas J. Fontenot, Jr.

Very truly yours,

Holli Ann Hardin Fontenot

Agreed and accepted this 8 day of SEPT , 1996.

Dallas J. Fontenot, Jr.

LDK233:19

UNOFFICIAL COPY

TOTAL P.02

003296



TO WHOM IT MAY CONCERN:

I, Holli Ann Hardin Fontenot, hereby voluntarily resign as trustee of the Holli Ann Hardin Fontenot Trust Number One and the Dakota Trust. This resignation as trustee shall be effective immediately upon acceptance by Dallas J. Fontenot, Jr.

Very truly yours,

Holli Ann Hardin Fontenot

Agreed and accepted this __8__ day of __SEPT__, 1996.

Dallas J. Fontenot, Jr.

LDK233:19

**EXHIBIT**

**2**

003296

## DESIGNATION OF SUCCESSOR TRUSTEE
Dakota Trust

The undersigned Dallas Joseph Fontenot, Jr., Successor Trustee of Dakota Trust, a trust established by Trust Declaration of Holli Ann Fontenot dated November 9, 1994 ("Trust Declaration") does hereby declare as follows:

Article V, Section C of the Trust Declaration provides in part that:

> SUCCESSION. Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment will have the right to appoint a successor or successors to serve as Trustee in the event that person ceases to serve for any reason, and each Trustee may specify any conditions upon succession and service as may be permitted by law. For example, a successor may be required to furnish a fiduciary bond as a prerequisite or a successor's service may be conditioned upon another appointee's death, resignation, or inability to serve. Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment may also provide that one or more designated successors as Trustee will have the authority to appoint his, her, or its successor as Trustee. An appointment of successor Trustee must be in writing and must be acknowledged to be effective.

Pursuant to Article V, Section C of the Trust Declaration, Dallas Joseph Fontenot, Jr. appoints Dakota James Fontenot as successor Trustee, to serve immediately upon the death, disability, resignation, or disqualification of Dallas Joseph Fontenot, Jr.

Dallas Joseph Fontenot, Jr. appoints Frost Bank to serve as successor Trustee upon the death, disability, resignation, or disqualification of Dakota James Fontenot.

Each Trustee will have the right to appoint a successor or successors to serve as trustee of the Trust in the event that he ceases to serve for any reason, and such Trustee may specify any conditions upon succession and service as may be permitted by law.

The incapacity or disability of a trustee hereunder shall be (i) determined by a duly licensed physician representing that he or she is certified by a recognized medical board and is not related by blood or marriage to any trustee or beneficiary hereunder; and (ii) evidenced by a writing which is executed, witnessed, and acknowledged certifying that such a physician is familiar with the physical and mental condition of a person and has concluded that, by reason of accident, physical, or mental deterioration, or other similar cause, such person was, as of the date thereof, unable to give prudent, prompt, and intelligent consideration to financial matters. No judicial determination of incapacity

UNOFFICIAL COPY

**EXHIBIT**

3

000355

or disability shall be necessary. Any physician's certificate described above may be revoked by a similar certificate to the effect that such person is no longer incapacitated, which certificate must be executed either (i) by the originally certifying physician or (ii) by two other licensed, unrelated physicians. In the case of a revocation of a certificate of incapacity or disability of a trustee hereunder, such revocation shall cause such trustee to regain his or her appointment as trustee, and the then serving successor trustee shall be relieved of his or her duties.

This Designation of Successor Trustee shall be effective as of May 1, 2013 and shall revoke and replace all prior Designations of Successor Trustee.

_____ "

Dallas Joseph Fontenot, Jr., Trustee

STATE OF NEVADA
COUNTY OF _Clark_

This document was acknowledged before me on the _7TH_ day of May, 2013 by Dallas Joseph Fontenot, Jr., Trustee.

MICHAEL J. MOORE
Notary Public State of Nevada
No. 08-7991-1
My Appt. Exp. September 11, 2016

_____
Notary Public, State of Nevada

000356

## DESIGNATION OF SUCCESSOR TRUSTEE
### Dakota Trust

The undersigned Dallas Joseph Fontenot, Jr., Successor Trustee of Dakota Trust, a trust established by Trust Declaration of Holli Ann Fontenot dated November 9, 1994 ("Trust Declaration") does hereby declare as follows:

Article V, Section C of the Trust Declaration provides in part that:

> SUCCESSION. Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment will have the right to appoint a successor or successors to serve as Trustee in the event that person ceases to serve for any reason, and each Trustee may specify any conditions upon succession and service as may be permitted by law. For example, a successor may be required to furnish a fiduciary bond as a prerequisite or a successor's service may be conditioned upon another appointee's death, resignation, or inability to serve. Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment may also provide that one or more designated successors as Trustee will have the authority to appoint his, her, or its successor as Trustee. An appointment of successor Trustee must be in writing and must be acknowledged to be effective.

Pursuant to Article V, Section C of the Trust Declaration, Dallas Joseph Fontenot, Jr. removes all prior appointments of appoints Dakota James Fontenot as successor Trustee and, instead, appoints Frost Bank to serve as successor Trustee upon the death, disability, resignation, or disqualification of Dallas Joseph Fontenot, Jr.

Each Successor Trustee will have the right to appoint a successor or successors to serve as trustee of the Trust in the event that he ceases to serve for any reason, and such Trustee may specify any conditions upon succession and service as may be permitted by law.

The incapacity or disability of a trustee hereunder shall be (i) determined by a duly licensed physician representing that he or she is certified by a recognized medical board and is not related by blood or marriage to any trustee or beneficiary hereunder; and (ii) evidenced by a writing which is executed, witnessed, and acknowledged certifying that such a physician is familiar with the physical and mental condition of a person and has concluded that, by reason of accident, physical, or mental deterioration, or other similar cause, such person was, as of the date thereof, unable to give prudent, prompt, and intelligent consideration to financial matters. No judicial determination of incapacity or disability shall be necessary. Any physician's certificate described above may be

UNOFFICIAL COPY

EXHIBIT

4

revoked by a similar certificate to the effect that such person is no longer incapacitated, which certificate must be executed either (i) by the originally certifying physician or (ii) by two other licensed, unrelated physicians. In the case of a revocation of a certificate of incapacity or disability of a trustee hereunder, such revocation shall cause such trustee to regain his or her appointment as trustee, and the then serving successor trustee shall be relieved of his or her duties.

This Designation of Successor Trustee shall be effective as of October 14, 2017 and shall revoke and replace all prior Designations of Successor Trustee.

_____
Dallas Joseph Fontenot, Jr., Trustee

STATE OF TEXAS
COUNTY OF Harris

This document was acknowledged before me on the 14th day of October, 2017 by Dallas Joseph Fontenot, Jr., Trustee.

_____
Notary Public, State of Texas

DIANNE N SKINNER
Notary ID # 126280969
My Commission Expires:
November 11, 2019

000457

## RESOLUTIONS ADOPTED BY
## WRITTEN CONSENT OF SHAREHOLDER AND DIRECTOR OF
## VIVA LAS VEGAS PROPERTIES, INC.
### (OCTOBER 14, 2017)

The undersigned, being the sole shareholder of Viva Las Vegas Properties, Inc., a corporation organized and existing under the laws of Texas, does by this writing consent to take the following actions and adopt the following resolutions:

> RESOLVED that the following persons person is elected as the sole Director of Viva Las Vegas Properties, Inc., to serve at the discretion of the Shareholder from October 14, 2017 until such time as his successors are elected by the Shareholder and qualify:

> Dallas Fontenot

The undersigned direct that this consent be filed with the minutes of the proceeding of the Shareholders of Viva Las Vegas Properties, Inc.

The undersigned, now being the sole director of Viva Las Vegas Properties, Inc., does by this writing consent to take the following actions and adopt the following resolutions:

> RESOLVED that the following person is elected to the offices of Viva Las Vegas Properties, Inc. set forth below, to serve at the discretion of the director from October 14, 2017 until such time as his successors are elected by the Shareholder and qualify:

> Dallas Fontenot    President
> Dallas Fontenot    Secretary

> ESOLVED that Dakota Fontenot is hereby removed from all offices and all positions as a Director of Viva Las Vegas Properties, Inc. from and after October 14, 2017.

The undersigned direct that this consent be filed with the minutes of the proceeding of the Directors of Viva Las Vegas Properties, Inc.

This consent is executed pursuant to the laws of Texas and the Bylaws of Viva Las Vegas Properties, Inc., which authorize the taking of action by the Shareholders and Directors by unanimous written consent without a meeting. This consent is intended to substitute for a special meeting of the Shareholders and Directors of Viva Las Vegas Properties, Inc. Only those persons named above shall serve as Directors until a subsequent election or appointment by the

UNOFFICIAL COPY

EXHIBIT

5

000437

Shareholder of Viva Las Vegas Properties, Inc. Only those persons named above shall serve as an officer until a subsequent election or appointment by the Director of Viva Las Vegas Properties, Inc.

Dated to be effective as of October 14, 2017.

Viva Las Vegas Properties, Inc., Shareholder

by:

Dallas Fontenot, President

Dallas Fontenot, Director

000438

## AFFIDAVIT OF LOST STOCK CERTIFICATE

STATE OF _Texas_ §

COUNTY OF _Harris_ §
§

**DAKOTA TRUST** (the "<u>Stockholder</u>"), deposes and says:

(1)    The Stockholder is entitled to the possession and is the true, lawful and sole beneficial owner of all stock certificates representing shares of issued and outstanding Common Stock, estimated to be 1,000 shares of Common Stock (collectively, the "<u>Original Certificates</u>"), issued by **VIVA LAS VEGAS PROPERTIES, INC.**, a corporation created under the laws of the State of Texas (the "<u>Corporation</u>"), in the name of the Stockholder.

(2)    The Original Certificates were originally acquired by the Stockholder directly from the Corporation, and have been lost, stolen or destroyed.

(3)    The Stockholder has not otherwise endorsed, or authorized anyone else to endorse, the Original Certificates.

(4)    The Stockholder has made or caused to be made a diligent search for the Original Certificates, and has been unable to find or recover them; the Stockholder has not sold, assigned, pledged, transferred, deposited under any agreement or hypothecated the Original Certificates or any interest therein, or signed any power of attorney or other authorization respecting the same which is now outstanding and in force, or otherwise disposed of the same; and no person, firm, corporation, agency or government other than the Stockholder has or has asserted any right, title, claim, equity or interest in, to or respecting the Original Certificates or the proceeds thereof.

(5)    The Stockholder hereby requests that the Corporation, and this Affidavit of Lost Stock Certificate is made for the purposes of inducing the Corporation to, (i) refuse to recognize any person other than the Stockholder as the owner of the Original Certificates; (ii) refuse to make any payment, transfer, registration, delivery or exchange called for by the Original Certificates to any person other than the Stockholder; (iii) refuse to take any other action pursuant to the request or demand of any person other than the Stockholder; and (iv) complete the return of the shares represented by the Original Certificates to the Corporation, and reissue a certificate to the Stockholder in replacement of the Original Certificates, representing 1,000 shares of Common Stock in the Corporation.

(6)    If the Stockholder should find or recover the Original Certificate, the Stockholder will immediately surrender it to the Corporation for cancellation without requiring any consideration therefor.

(7)    The Stockholder agrees in consideration of compliance with the foregoing requests by the Corporation to indemnify and protect the Corporation from any and all liabilities, loss, damage or expense to which the Corporation may be subjected by reason of the loss of the Original Certificates, including claims by any person claiming ownership of the Original Certificates or shares of Corporation's stock represented thereby.

*[SIGNATURE PAGE FOLLOWS]*

008402\00002\3534943.1 - 5/17/2023 12:29:14 PM

1

**EXHIBIT**

**6**

Signed and delivered by the Stockholder this ___19___ day of May, 2023.

DAKOTA TRUST

By: _____

Name: Dakota Fontenot

Title: Trustee

STATE OF __Texas__          §
                            §
COUNTY OF __Harris__        §
                            §

BEFORE ME, a notary public, on this day personally appeared Dakota Fontenot, known to me to be the person whose name is subscribed to the foregoing instrument and, being by me first duly sworn, declared that the statements therein contained are true and correct.

GIVEN UNDER MY HAND AND SEAL of office this ___19___ day of May, 2023.

THANH N DO
Notary ID #126241618
My Commission Expires
September 4, 2023

(Notary's Seal)

NOTARY    PUBLIC    IN    AND    FOR    THE
STATE OF __Texas__

UNOFFICIAL COPY

Signature Page to
Affidavit of Lost Stock Certificate
(Viva Las Vegas Properties, Inc.)
008402\00002\3534943.1 - 5/17/2023 12:29:14 PM

Electronically Filed
2/9/2022 4:45 PM
Laura Richard
County Clerk
Fort Bend County, Texas

No. 21-CPR-036521

| | | |
|---|---|---|
| ESTATE OF | § | IN COUNTY COURT AT LAW |
| DALLAS JOSEPH FONTENOT, JR., | § | |
| DECEASED | § | NO. FOUR (4) |
| | § | |
| | § | FORT BEND COUNTY, TEXAS |

# Order Admitting Will to Probate & Authorizing Letters Testamentary

On this day the Court heard the Application for Probate of Will and Issuance of Letters Testamentary ("Application") filed by Holli H. Fontenot ("Applicant") in the Estate of Dallas Joseph Fontenot, Jr., Deceased ("Decedent").

The Court considered the evidence presented and reviewed the Will and the other documents filed herein and makes the following findings:

1. The allegations contained in the Application are true.

2. Notice and citation have been given in the manner and for the length of time required by law.

3. Decedent died on September 3, 2021, and four (4) years have not elapsed since the date of Decedent's death.

4. This Court has jurisdiction and venue of the Decedent's Estate.

5. Decedent left a Will dated May 7, 2013 (the "Will"), executed with the formalities and solemnities and under the circumstances required by law to make it a valid Will.

6. That on such date Decedent had attained the age of eighteen (18) years and was of sound mind.

7. The Will was amended and republished by the First Codicil, dated October 31, 2017.

8. No child or children were born to or adopted by the Decedent after the execution of the Will.

9. At the time of Decedent's death, Decedent was married to Applicant, and Applicant survived Decedent.

10. Decedent's Will did not name either the State of Texas, a governmental agency of the State of Texas, or a charitable organization as devisee.

**EXHIBIT**

**7**

11. No objection to or contest of the probate of the Will has been filed.

12. All of the necessary proof required for the probate of the Will has been made.

13. The Will is entitled to probate.

14. In the Will, Decedent named Dakota James Fontenot to serve as Independent Executor without bond. However, Decedent's First Codicil *revoked* the appointment of Dakota James Fontenot as Independent Executor, and instead named Applicant to serve as Independent Executor of the Estate without bond.

15. Applicant is duly qualified and not disqualified by law to act as Independent Executor and is entitled to receive Letters Testamentary.

16. A necessity exists for the administration of this Estate.

17. No interested person has applied for the appointment of appraisers and none are deemed necessary by the Court.

It is ORDERED that the Will is admitted to probate, and the Clerk of this Court is ORDERED to record the Will, together with the Application on the Judge's Probate Docket.

It is ORDERED that no bond or other security is required and that upon the taking and filing of the Oath required by law, Letters Testamentary shall issue to Holli H. Fontenot, who is appointed as Independent Executor of Decedent's Will and Estate, and no other action shall be had in this Court other than the return of an Inventory, Appraisement, & List of Claims or Affidavit in Lieu of Inventory, and the filing of the Certificate of Notice to Beneficiaries pursuant to TEX. EST. CODE § 308 as required by law.

It is further ORDERED that the appointment of an appraiser of said Estate is waived at this time; that upon the return of an Inventory, Appraisement, & List of Claims of said Estate or Affidavit in Lieu of Inventory, and the payment of costs of Court, this Estate shall be dropped from the Court's active docket.

[SIGNATURE ON FOLLOWING PAGE]

Page 2 of 3

SIGNED on this ___2/14/2022___

_____
Judge Presiding

APPROVED AS TO FORM ONLY:

// s // Emily J. Wyatt

_____
Stephen A. Mendel (13930650)
Emily J. Wyatt (24088685)
The Mendel Law Firm, L.P.
1155 Dairy Ashford, Ste. 104
Houston, TX 77079
Tel:  281-759-3213
Fax: 281-759-3214
Info@mendellawfirm.com

Attorneys for the Executor

Filed: 02/15/2022 12:52:20
Laura Richard
County Clerk
Fort Bend County, Texas
Padron, Velma

Page 3 of 3

C.A. 21-CPR-036521

| | | |
|---|---|---|
| ESTATE OF | § | IN COUNTY COURT AT LAW |
| DALLAS JOSEPH FONTENOT, JR., | § | |
| DECEASED | § | NO. FOUR (4) OF |
| | § | |
| | § | FORT BEND COUNTY, TEXAS |

No. 21-DCV-288736

| | | |
|---|---|---|
| IN RE | § | IN THE 240TH DISTRICT COURT |
| HOLLI ANN HARDIN TRUST | § | |
| NUMBER ONE | § | OF |
| | § | |
| | § | FORT BEND COUNTY, TEXAS |

## Assignment of Interest & Disclaimer of Further Interest

Pursuant to the Binding Mediation Settlement Agreement reached in the above-captioned cases, and which is attached hereto as Exhibit "A":

1. Holli Ann Fontenot acknowledges receipt of check number 1005 payable to Holli Ann Fontenot in the amount of $2,823,464.00, and which sum represents full satisfaction of eighty five percent (85%) of the total value of The Dakota Trust assets ($1,899,514.00) and twenty percent (20%) of the total value of the Holli Ann Hardin Trust No. 1 assets ($923,950.00).

2. Holli Ann Fontenot hereby assigns any and all beneficial interest she has in the Holli Ann Hardin Trust No. 1 to the Trustee for further administration and distribution by the Trustee.

3. Holli Ann Fontenot assigns any and all beneficial interest she has in The Dakota Trust to the Trustee for further administration and distribution by the Trustee.

4. Holli Ann Fontenot disclaims any right to any further interest in the Holli Ann Hardin Trust No. 1. Holli Ann Fontenot previously resigned as the Trustee of said Trust.

5. Holli Ann Fontenot disclaims any right to any further interest in The Dakota Trust. Holli Ann Fontenot hereby resigns as a fiduciary of said Trust.

[SIGNATURE ON THE FOLLOWING PAGE]

UNOFFICIAL COPY

EXHIBIT

8

SIGNED AND EXECUTED ON __18__ DAY OF JANUARY 2023.

HOLLI ANN FONTENOT

STATE OF TEXAS            §
                         §
COUNTY OF HARRIS          §

This instrument was acknowledged before me on this the _18_ day of January 2023 by Holli Ann Fontenot.



Notary Public in and for
The State of Texas

UNOFFICIAL COPY

# VIVA LAS VEGAS PROPERTIES, INC.

## UNANIMOUS JOINT WRITTEN CONSENT OF THE SOLE SHAREHOLDER AND SOLE DIRECTOR

## IN LIEU OF A SPECIAL MEETING

### May 1̃, 2023

The undersigned, being the sole shareholder (the "*Shareholder*") and the sole member of the Board of Directors (the "*Board*") of **VIVA LAS VEGAS PROPERTIES, INC.**, a Texas corporation (the "*Corporation*"), in lieu of holding a special meeting of the Shareholder and the Board, the call and notice of each of which are hereby expressly waived, do hereby consent to the following resolutions:

### Loss or Destruction of Corporate Records

**WHEREAS**, the Corporation was formed as a Texas Corporation by filing of Articles of Incorporation (the "*Articles*") with the Texas Secretary of State on September 20, 1994 (the "*Formation*");

**WHEREAS**, subsequent to the Formation, all corporate records of the Corporation were maintained by or on the behalf of Dallas Joseph Fontenot, Jr. ("*Mr. Fontenot*");

**WHEREAS**, Mr. Fontenot died on September 3, 2021, and since such date, no corporate records of the Corporation have been located after a diligent search by his heirs and authorized affiliates; and

**WHEREAS**, the Shareholder and the Board desire to create new corporate records to govern the affairs of the Corporation, effective as of the date first set forth above to, among other things, replace the original records of the Corporation which have been lost or misplaced, elect the sole member of the Board, elect officers, adopt new Bylaws, and adopt and reflect the issuance of new share certificates (collectively, the "*New Records*").

**RESOLVED**, that New Records shall be obtained and adopted to replace any records of the Corporation which may be in existence, as of the date first written above.

### Election of Directors

**WHEREAS**, the Shareholder desires to reconstitute the Board of the Corporation and remove any members of the Board which may have been previously elected.

008402\00002\3535058.1 - 5/17/2023 12:45:19 PM

1

**EXHIBIT 9**

**RESOLVED**, that the following named person be, and hereby is, elected to serve as a member of the Board, and to serve in such capacity until his respective successor has been duly elected and qualified, or until his earlier death, resignation or removal:

Dakota Fontenot

**FURTHER RESOLVED**, that any member of the Board not listed above is hereby removed from the Board.

## Election of Officers

**WHEREAS**, immediately following the reconstitution of the Board, the Board desires to reconstitute the officers of the Corporation and remove any officers which may have been previously elected.

**RESOLVED**, that the following named person be, and hereby is, elected to the offices set forth opposite his name, to serve in such capacity until his successor is duly elected and qualified or until his earlier death, resignation or removal:

Dakota Fontenot                                    President and Secretary

**FURTHER RESOLVED**, that the officer is empowered to carry out the day-to-day business of the Corporation, subject to the direction and control of the Board.

**FURTHER RESOLVED**, that any officer of the Corporation not listed above is hereby removed from any such office they may have held with the Corporation.

## Corporate Records

**WHEREAS**, the corporate records of the Corporation, including its minute book cannot be located, and as such the Shareholder and the Board desire to create the New Records to replace the missing corporate records.

**RESOLVED**, that the Corporation shall recreate and maintain, as part of its corporate records, a minute book that shall include, but that shall not be limited to, records of the Corporation's Certificate of Formation and amendments thereto, its Bylaws and amendments thereto, minutes of all meetings of the Board, minutes of all meetings of the Shareholder, the time and the place of each such meeting, whether the meeting was regular or special, the manner in which the meeting was authorized, the notice given, the names of those present or represented at the meeting and the proceedings of each meeting; and

**FURTHER RESOLVED**, that the Secretary of the Corporation be, and hereby is, authorized and directed to procure such a replacement minute book and such other books and records as may be required by the Corporation.

2

## Articles of Incorporation

RESOLVED, that a copy of the filed Articles bearing the file stamp of the Secretary of State of Texas be inserted into the replacement minute book of the Corporation.

## Amended and Restated Bylaws

WHERAS, consistent with the adoption of New Records, and immediately following the reconstitution of the Board, the Board and Shareholder deem it advisable and in the best interests of the Corporation to enter into those certain Amended and Restated Bylaws dated as of even date herewith (the "*Amended and Restated Bylaws*"), by which any Bylaws, amendments thereto, or amendments and restatements thereof, of the Corporation shall be amended and restated in their entirety.

RESOLVED, that the form of Amended and Restated Bylaws presented to the Board and Shareholder for review be, and hereby are, approved and adopted as the Amended and Restated Bylaws of the Corporation; and

FURTHER RESOLVED, that the President of the Corporation is directed to certify a copy of the Amended and Restated Bylaws, insert them into the minute book of the Corporation, and maintain them in the principal office of the Corporation, open for inspection by the Shareholder of the Corporation at all reasonable times during office hours.

## Qualification in Other Jurisdictions

RESOLVED, that the Corporation qualify to engage in business in any state of the United States or any foreign country in which the Board determines it to be necessary or appropriate for the Corporation to qualify to do business;

FURTHER RESOLVED, that the proper officers of the Corporation be, and hereby are, authorized and directed on behalf of the Corporation to make and file such certificates, reports or other instruments as may be required by the laws of such jurisdiction to be filed for that purpose; and

FURTHER RESOLVED, that the officers of the Corporation be, and each acting separately hereby is, authorized and directed to pay all fees and expenses incident to and necessary for the qualification of the Corporation to do business in any state or foreign country.

## Licenses and Tax Permits

RESOLVED, that the officers of the Corporation be, and each acting separately hereby is, authorized and directed to obtain, in the name of the Corporation, such licenses and tax permits as may be required by any applicable federal, state, county or municipal governmental statute, ordinance or regulation for the conduct of the business of the Corporation within any jurisdiction in which the Corporation shall have qualified to do business.

3

## Banking Authority

RESOLVED, that the Secretary of the Corporation be, and hereby is, authorized and directed to select one or more financial institutions for the deposit of the Corporation's cash and securities, the deposit and collection of checks and drafts made payable to the order of the Corporation, issuance of letters of credit on behalf of the Corporation, extensions of credit, and other financial transactions on behalf of the Corporation, and to designate the names of the persons authorized to sign checks, drafts, borrowing requests and other instructions to such financial institutions on behalf of the Corporation;

FURTHER RESOLVED, that the Secretary of the Corporation be, and hereby is, authorized to open additional accounts with such additional financial institutions, close any accounts with financial institutions, change the names of the persons authorized to sign check, drafts, borrowing requests and other instructions on behalf of the Corporation as the Secretary deems to be necessary of convenient from time to time;

FURTHER RESOLVED, that the form of resolutions specified by any such financial institutions that are designated by the Secretary from time to time be, and hereby are, ratified and approved as the official resolutions of the Corporation and the persons designated from time to time by the Secretary as signatories on such accounts be, and hereby are, approved; and

FURTHER RESOLVED, that the Secretary of the Corporation be, and hereby is, authorized and directed to certify the adoption of the form of resolutions required by any such financial institutions from time to time designated by the Secretary and to certify the names and signatures of the persons designated by the Secretary from time to time as signatories on behalf of the Corporation.

## Adoption and Issuance of Share Certificates

WHEREAS, all certificates representing shares of stock in the Corporation have been lost or misplaced, and have not been recovered after a diligent search (collectively, the *"Lost Certificates"*).

WHEREAS, the Corporation has received that certain Affidavit of Lost Stock Certificate of the Shareholder, and the Board and Shareholder believe it is in the best interest of the Corporation to reissue a certificate to the Shareholder, representing 1,000 shares of common stock (no par value) of the Corporation.

RESOLVED, that consistent with the adoption of the New Records, the form of share certificate attached hereto as Exhibit A be, and hereby is, approved and adopted as the form of share certificate representing the common stock (no par value per share) of the Corporation; and

FURTHER RESOLVED, that the certificates shall be consecutively numbered, beginning with the number 1; that the certificates shall bear all legends required by law to be placed on the Corporation's share certificates; and that the certificates shall only be issued in the manner and upon the conditions set forth in the Bylaws.

UNOFFICIAL COPY

4

RESOLVED, that the Corporation issue shares of its Common Stock, no par value per share, to the following persons and prepare or cause to be prepared, issued, and executed a certificate representing such shares in exchange for the considerations set forth below, the receipt of which is hereby acknowledged on behalf of the Corporation, which shares, when so issued, shall be validly issued, fully paid and non-assessable, with no personal liability attaching to the ownership thereof:

| Shareholder | Shares | Consideration |
|---|---|---|
| Dakota Trust | 1,000 | $0.00 |

FURTHER RESOLVED, that the Corporation shall refuse to recognize any person other than the Shareholder as a shareholder of the Corporation, refuse to make any payment, transfer, registration, delivery or exchange called for by the Lost Certificates to any person other than the Shareholder, and refuse to take any other action pursuant to the request or demand of any person other than the Shareholder.

General Authority

RESOLVED, that the officers of the Corporation be, and each acting separately hereby is, authorized and directed to do any and all acts and things and to execute and deliver and accept delivery of, in the name of and on behalf of the Corporation, any and all instruments, agreements, consents, certificates and other documents as in their opinion, or in the opinion of counsel to the Corporation, may be necessary or appropriate in order to carry out the purposes and intent of any of the foregoing resolutions;

FURTHER RESOLVED, that any act or acts of any of the officers of the Corporation which acts would have been authorized by the foregoing resolutions, except that such acts were taken prior to the adoption of such resolutions, be, and they hereby are, severally ratified, confirmed, approved and adopted in all respects as acts in the name and on behalf of the Corporation and

FURTHER RESOLVED, that the Secretary of the Corporation be, and hereby is, authorized and directed to certify the adoption of these resolutions.

*[Balance of Page Intentionally Blank.  Signature Page Follows]*

5

This Consent shall be effective as of the date hereof regardless of whether any signature occurs before, or after such date. All actions taken in this Consent shall be deemed to be taken simultaneously in the location of the Corporation's principal office on the date of this Consent.

EXECUTED by the undersigned to be effective as of the date first set forth above.

SHAREHOLDER:

DAKOTA TRUST

By: _____
Name: Dakota Fontenot
Title: Trustee

DIRECTOR:

By: _____
Name: Dakota Fontenot

Signature Page
Unanimous Joint Written Consent of the Sole Shareholder and Sole Director
of
Viva Las Vegas Properties, Inc.

## EXHIBIT A

SPECIMEN SHARE CERTIFICATE

See attached.



# Last Will and Testament
## Of
## Dallas Joseph Fontenot, Jr.

The State of Texas                    §
                                      §
County of Fort Bend                   §

I, Dallas Joseph Fontenot, Jr., now domiciled in Fort Bend County, Texas, being of sound and disposing mind, memory and understanding, do make and publish this, my Last Will and Testament, hereby revoking all Wills, codicils and other testamentary instruments heretofore made by me.

## Article 1
### Introduction, Family History, and Intention

1.1    My wife's name is Holli Ann Fontenot. All references in this Will to my wife are to Holli Ann Fontenot.

1.2    At the time of execution of this Will, I have three (3) children: Michelle Anne Fontenot, Dallas Joseph Fontenot, III, and Dakota James Fontenot. I have no other children, either by birth or by adoption, and no deceased children. All references in this Will to "my children" are to said named children and to any children hereafter born or adopted by me.

1.3    In this Will I intend to dispose of all property which I own at the time of my death, including all property payable to me or my Estate after my death.

1.4    In this Will I intend to dispose of all of my separate property, and only my proportionate interest in the community property of my wife and myself. It is my intention to dispose of my community interest in all property which I own at the time of my death including all property payable to me or my Estate after my death.

1.5    This Will is not the result of any contract or agreement and may be revoked at any time.

D.J.F.

UNOFFICIAL COPY

EXHIBIT

10

ARTICLE 2
EXECUTOR

2.1    I appoint Dakota James Fontenot as Independent Executor of this my Last Will and Testament and of my Estate.  In the event Dakota James Fontenot should fail to qualify, or having qualified, should die, resign, or become incapacitated or unable to act as such, then I appoint Frost Bank, NA to serve as Successor Independent Executor of this Will and my Estate.

2.2    Each and every act, decision or determination relating to the administration of my Estate shall be finally authorized, approved, or confirmed by my Executor.

2.3    Herein the term "Executor" shall refer to any duly appointed and qualified Executor then acting under the foregoing appointments.

2.4    I direct that no bond or other security be required of my Executor hereunder, and my Executor hereunder shall be independent of the supervision and direction of the Probate Court to the full extent permitted by law.  I further direct that no action shall be had in any court of probate jurisdiction in connection with this Will or in the administration or settlement of my Estate other than the probating of this Will and the return of the statutory inventory, appraisement, and list of claims.  The provisions hereof shall not be deemed to prohibit the closing of administration of my Estate in accordance with Sections 151 and 152 of the Texas Probate Code or the relevant provisions of the Texas Estates Code, as in effect at the date of the execution hereof.

2.5    I direct that my Executor pay all my valid and just debts and obligations and pay all funeral expenses, expenses of my last illness, and expenses of administration and other testamentary expenses imposed by or made payable under the laws of any state or country by reason of my death, out of my Estate as soon as practical after my death and without the unnecessary sacrifice of any of the properties of my Estate.  Should it be necessary to liquidate any portion of my Estate for the purpose of paying any of the aforesaid testamentary expenses or taxes, my Executor, in his sole discretion, shall determine which particular assets of my Estate shall be liquidated for such purposes.  Any of my debts which are payable in installments or are not due until at least one year from the date of my death need not be paid during the administration of my Estate but may, if the terms of such debts permit, be continued and paid according to their tenor.  My Executor shall elect to claim administrative expenses as deductions either on the income tax returns of my Estate or on the estate tax return, whichever will result in the least amount of total tax being paid by my Estate.  My Executor shall not make any adjustments in the interests of my beneficiaries

Page 2 of 16 Pages

D.J.F.

as the result of this election, and my Executor shall incur no liability for making such election.

2.6     My Executor shall make final distribution of my Estate as soon after my death as he, in his discretion, shall deem practical.  Prior to the final distribution of my Estate, my Executor may, in his discretion, make partial distributions.  My Executor may make any distribution of my Estate subject to any indebtedness or liability of my Estate, and subject to all instruments evidencing same.  Income from a portion of my Estate which has not been distributed shall accrue to the legatee or devisee provided for herein, as if final distribution thereof had been made at the time of my death.  The income so accrued may be paid in whole or in part, and from time to time, to the respective legatee or devisee hereunder, or may be withheld, in the discretion of my Executor, until final distribution of my Estate is made.

2.7     My Executor shall not be responsible or liable for any loss or depreciation in value of the properties of my Estate unless such loss or depreciation is due to his gross negligence, bad faith, or fraud.  My Executor shall not be accountable or held liable for any act or omission of any agent of my Executor if my Executor shall have exercised good faith and reasonable diligence in the selection of such person, and in such event any liability to my Estate shall be solely that of such selected person.

2.8     My Executor shall receive as compensation for services rendered in such capacity such fees as are then customary and usual for payment in Fort Bend County, Texas, for the services, unless my Executor shall waive payment for such services.  My Executor shall be entitled to reimbursement from my Estate for all expenses paid personally by my Executor, including but not limited to compensation to agents and fees for professional services incurred in the administration hereof.

2.9     I direct that my Executor shall have the power and authority to sell, lease, mortgage, pledge, hypothecate, or otherwise encumber and dispose of real and personal property, and the authority to do any and all things as Executor that a trustee may do under the provisions of the Texas Trust Code, being Section 111.001, et seq., of the Property Code of Texas as such Code as amended reads at the date hereof.

2.10     After my Executor has distributed to the beneficiaries of my Estate all of the assets or property of my Estate that remain in his hands and after all of the debts of my Estate have been paid (except for a reasonable reserve of assets which my Executor may retain in a fiduciary capacity pending court approval of the final account), my Executor may file, but shall not be required to file, an action for declaratory judgment under Chapter 37, Civil Practice and Remedies Code, seeking to discharge my Executor from any liability involving matters relating to the past administration of my Estate.  Unless the court orders otherwise, my Executor is entitled to pay from my Estate all

D.J.F.

legal fees, expenses, and other costs of a proceeding incurred in relation to any final account required under Section 149E of the Texas Probate Code or the relevant provisions of the Texas Estates Code.

2.11   In determining the death taxes, estate, inheritance  and income tax liabilities related to my Estate, the decisions of my Executor as to all available tax elections shall be conclusive on all concerned.

2.12   If the Executor shall join with my wife in filing income tax returns, or consents for gift tax purposes to having gifts made by either of us during my life considered as made one-half by each of us, any resulting liability shall be borne by my Estate and my wife in such proportions as they may agree.

2.13   Unless otherwise specifically directed herein, my Executor shall pay all death taxes out of the residue of my estate without apportionment.

2.14   My Executor shall have complete discretion as to what assets of my residuary Estate shall be used or sold to pay death taxes and shall not be bound by any law requiring the use or sale of any type or category of property in priority to any other.

## ARTICLE 3
## DISPOSITION

3.1   I request that my Executor distribute certain tangible personal property in accordance with handwritten instructions which I may leave.  To comply with my instructions, my Executor shall have a special power of appointment over my tangible personal property.  This special power of appointment may be exercised only in favor of the persons I name in my handwritten instructions to receive such property.  If I leave instructions for my Executor to receive tangible personal property, my Executor may distribute this property to my Executor.  Otherwise, this power of appointment can not be exercised in favor of my Executor, the estate of my Executor, the creditors of my Executor, or the creditors of the estate of my Executor.  If I do not leave handwritten instructions for my Executor or if any person designated in my instructions to receive property does not accept any of such property, this gift shall lapse.

3.2   If Dakota James Fontenot survives me, I give the residuary of my Estate, including any assets over which I may have a power of appointment, to Dakota James Fontenot.  If Dakota James Fontenot does not survive me, but my wife, Holli Ann Fontenot, survives me, I give the residuary of my Estate, including any assets over which I may have a power of appointment, to Holli Ann Fontenot.

3.3    Nothing contained in this Will shall prevent any beneficiary from disclaiming, in whole or in part, any bequest or inheritance under this Will.


### ARTICLE 4
### POWERS AND RIGHTS OF EXECUTOR

4.1    In the administration of my Estate, my Executor shall act independently of control by any court, and shall be under all the duties and shall have all of the powers conferred upon trustees by the Texas Trust Code and by any amendments to the Texas Trust Code subsequent to the date hereof, except for any instance in which the Texas Trust Code may conflict with the express provisions of this Will, in which instance, the provisions hereof shall control.  Without intending to limit the powers hereinabove granted, but in addition thereto, my Executor shall be also specifically authorized as to my Estate as follows:

4.1.1    To exercise all powers now or hereafter granted to Independent Executors by the Texas Probate Code or the relevant provisions of the Texas Estates Code as now in force or hereafter amended, and by all other laws of Texas now in effect or hereafter enacted.

4.1.2    To exercise all of the powers now or hereafter granted to Trustees of express trusts by the Texas Trust Code as now in force or hereafter amended, and by all other laws of Texas now in effect or hereafter enacted.

4.1.3    To abandon, adjust, arbitrate, compromise, sue on or defend, and otherwise deal with and settle claims in favor of or against my Estate as to said Executor may seem most advantageous to my Estate, and whose discretion in such matters shall be final and binding upon all parties in interest.

4.1.4    To continue and operate, solely or in cooperation with others, any business or enterprise, in which I may have an interest at the time of my death whether as sole proprietor, partner, joint venturer, stockholder, or otherwise, and to do any and all things deemed appropriate by my Executor, without liability for any losses incurred in the continuance of the business except those arising from gross negligence or bad faith; to sell the business as a going concern or to close out and liquidate the business as and when it shall appear to my Executor to be advisable and upon such terms as shall appear to my Executor to be most advantageous to my Estate and

Page 5 of 16 Pages

the beneficiaries thereof.  In all such matters I grant complete discretion to my Executor and the Successor Title:__Executor2, as the case may be, in whose judgment I have full confidence.

4.1.5  To renew existing indebtedness, both secured and unsecured, and to perform, renew and extend all obligations relating to my business affairs which I may have entered into prior to my death, and to borrow money on the credit of my Estate for the purpose of paying all debts, estate and inheritance taxes and expenses of administration, and preserving and managing my Estate for the benefit of all beneficiaries; and in connection therewith to pledge, mortgage, or otherwise encumber any property held as a part of my Estate; and my Executor shall be authorized to lend money to my Estate upon such terms and conditions as my Executor shall deem advisable.

4.1.6  Upon distribution of any share or portion of my Estate to more than one distributee, to distribute in money or in kind or partly in money and partly in kind, and to partition real property, securities, chattels, and other personal property, and undivided interests in real and/or personal property, making necessary equalization in cash, at values to be determined by my Executor, whose judgment as to values shall be binding and conclusive upon all parties in interest.

4.1.7  To retain any of the original property constituting my Estate at my death, to acquire by purchase or otherwise, and to retain, temporarily or permanently, any kind of real, personal or mixed property, regardless of the income produced, and without any requirement as to diversification; to invest and reinvest said Estate as my Executor shall see fit in bonds, debentures, and other corporate obligations, and stocks, preferred or common, of any corporation, and private loans, secured or unsecured, oil, gas and mineral interests, or any other form of property, real or personal, which my Executor  shall deem proper; to use either income or corpus to purchase or pay the premiums on life insurance, retirement, income or annuity contracts on the lives of the beneficiaries or any person in which any beneficiary of the trust may have an insurable interest subject in all instances to the provisions of Section ?.

4.1.8  To delegate administrative authority and to authorize any agent, employee, or attorney-in-fact to exercise any or all of the powers granted to the Executor herein; to register and hold title to any property in the name of any nominee, without in any way affecting the responsibility of the fiduciaries.

4.1.9  To exercise all options and elections that I could exercise, if living, as well as all options and elections available to executors and trustees under the laws of the United States of America and the several states thereof, with reference to (I) my Estate and all property and interest at any time constituting a part of my probate Estate and (ii) income, estate and inheritance and gift taxes levied under the laws of the United States of America and the several states thereof, and all other taxing jurisdictions having lawful authority to do so.

4.1.10  To determine whether any money or property coming into the hands of my Executor shall be treated as part of the corpus of the Estate or as part of the income therefrom and to apportion between such income, any gain, loss or expenditures in connection with the Estate as to him may seem just and equitable and his determination shall be conclusive, and to determine and maintain, if the Executor shall deem appropriate in his sole discretion, a reserve for depreciation and/or depletion.

4.1.11  To take possession of, hold, manage and control the Estate, and to collect all rents, income, dividends and profits thereof, as I might do if living except as herein restricted and without the restrictions provided by the Texas Probate Code or the relevant provisions of the Texas Estates Code as it now exists or as it may be amended in the future; provided, however, that the Executor shall have all of the powers, privileges and immunities conferred upon trustees by such laws insofar as such laws add to the powers of the Executor and do not detract from, limit or otherwise restrict or require certain acts of the Executor, and such sections and parts of sections of such laws as confer such powers and privileges shall be considered a part of this Will as though set forth herein.

D.J.F

4.1.12    To invest or reinvest surplus funds belonging to the Estate from time to time, in any property, real or personal, including securities of domestic and foreign corporations and investment trusts, bonds, preferred stocks, common stocks, mortgages, mortgage participations, even though such investment (by reason of its character, amount, proportion to the total Estate or otherwise) would not be considered appropriate for a fiduciary apart from this provision, and even though such investment causes a greater proportion of the total Estate to be invested in one company than would be considered appropriate for a fiduciary apart from this provision.

4.1.13    To litigate, compromise, adjust and settle all claims arising out of or in connection with my Estate.

4.1.14    At any time, either by public offering or private negotiations, and from time to time, and for such price and on such terms and with such security for deferred payment as to my Executor may seem reasonable, to sell, exchange, pledge, mortgage, assign, transfer or otherwise dispose of or alienate any part or all of the personal property or any part or all of any real property belonging to the Estate in order to fulfill the purposes hereunder.

4.1.15    To exchange the stock or other securities of any corporation held by my Executor for other stock or securities of the same corporation or of a successor corporation or of a corporation with which such corporation shall be merged or consolidated; to participate in mergers, re-organizations, consolidations, receiverships or dissolutions of any corporation in which the Executor may hold securities or other evidences of indebtedness or ownership; to vote in person or by proxy all stock or other securities held by the Executor, to exercise options and stock rights, if it is to the advantage of the Estate, even though the same results in the investment of funds of the Estate other than those to which the Executor shall be hereinabove restricted; to pay all assessments, taxes and other dues necessary for the protection of securities or other property held by the Executor; to renew and extend the maturity date of real

Page 8 of 16 Pages

estate notes and mortgages held by the Executor and do any and all things necessary for the protection of the Estate.

4.1.16 To lease or partition any property which the Executor may hold at public or private sales and to execute any and all instruments necessary to discharge the authority hereby conferred; to make loans, secured or unsecured, in such amounts and upon such terms, for such rates of interest and to such persons, firms or corporations as the Executor shall deem proper; to borrow money, to execute promissory notes therefor and to secure said obligations by mortgage or pledge of any of the Estate; to conduct the operation or to continue the operation of any business in which I may be interested and to act as an officer or director of any corporation in which I may hold shares; to improve any real estate owned by the Estate, including the power to demolish any buildings; to foreclose, extend, assign, partially release, and discharge mortgages; to execute any and all leases for the development of any of my property for oil, gas and mineral developments; to enter into any pooling, unitization, repressurization, community, and other types of agreements relating to the exploration, development, operation, and conservation of properties containing minerals or other natural resources; to drill, mine, and otherwise operate for the development of oil, gas and other minerals; to install and maintain pipelines; to renew, re-arrange or extend any debts owing to or by the Estate, and the liens securing such debts; to employ such attorneys, brokers, banks, custodians and other agents and to delegate them such of the duties, rights and powers of the Executor for such periods as the Executor shall think proper; and, to pay taxes, maintain insurance, sue for the recovery of any debts and property, make repairs and do all things necessary for the proper management of the said Estate, and to incur reasonable expenses in managing, distributing and conveying any property in the said estate, commonly in a single investment for the benefit of any or all of such Estate, and in such proportions from such Estate as the Executor shall deem proper. Such investments shall be governed by the laws pertaining to common estate funds in the State of Texas.

D.J.F.

UNOFFICIAL COPY

4.1.17    To receive, preserve, manage, administer, dispose of, partition and distribute my Estate and the corpus and income thereof for the benefit of the beneficiaries of this Will, in the same manner as if my Executor were the owner in fee simple of all property comprising my Estate or any part thereof; and in the administration of my Estate, the recitals contained in any instrument executed by a duly qualified and acting Executor shall be prima facie evidence of the truth of the facts recited, and all persons dealing with such Executor may rely upon the truth of such recitals and shall not be obliged to make further inquiry.

4.2    My Executor shall have full power and discretion to select how the assets will be distributed and allocated among my beneficiaries. It is my desire that my Executor shall exercise discretion and attempt to allocate assets in a fair and equitable manner so that the potential income tax consequences to each beneficiary are considered. However, my Executor shall not be liable for any distribution made in good faith under the provisions of this Will.

4.3    Should my Estate contain property located in another state or a foreign jurisdiction and my Executor cannot or chooses not to serve under the laws of such state or foreign jurisdiction, my Executor shall have the power to appoint an ancillary Executor of such property. An ancillary Executor appointed pursuant to this section may be an individual or corporate fiduciary.

ARTICLE 5
NON-BINDING INSTRUCTIONS TO AND GOALS FOR PERSONAL REPRESENTATIVE

I have created a valuable estate of property, some of which I own outright and some of which I own indirectly as trustee. I have directed elsewhere in this Will that Dakota should be my Independent Executor, and I have directed in other instruments that Dakota should be the Trustee of each of the trusts. Without binding him to do so, it is my desire that Dakota or his successor, acting either as trustee or as Executor (herein, jointly, my "Personal Representative"), should use the assets of these estates, each subject to the terms of my Will and the respective Trust Declarations, to achieve the following broadly-stated goals. I have not suggested specific provisions for operation or maintenance, as I leave those decisions to Dakota, whom I trust explicitly, to make salient decisions about my estates after my death. I may supplement or amend these instructions from time to time by subsequent memoranda, which I may not execute with the formalities of a Will. These instructions and any subsequent supplements or amendments are only an expression of my desires and a distillation of my business

Page 10 of 16 Pages

experiences and my perception of my family's needs. They should not be read to direct or constrain my Executor or to amend any of the trusts. They should not be construed to create any beneficial interest except those expressed in other Articles of this Will or in the Trust Declarations for each trust.

Subject to the foregoing, I recommend the following to my Personal Representative:

5.1     Do not sell the land and property of the Colorado Bar & Grill because it is the source of my income. The Colorado Bar and Grill is the top source of income for the whole company. Don't ever sell this land and building. You can always run a retail business there and it's a place to rent to other people for income. The location is a great location and must stay in the trust for income. Your Mother, Frank, Nan, and lawyers will tell you this. Don't let this place go ever. Keep the place looking good and don't overspend money on it unless the place is making the cash to do the upgrades. There is a fine line on managing the place and losing the income. This place will need 24 hour attention at all times. Don't mess this up. Always consult with your Mother and lawyer. Mark Everett is the only lawyer that will not tell you wrong.

5.2     Take care of Holli Fontenot's medical and healthcare needs. Make sure she gets a regular paycheck. Dakota, you must have your Mother work for the company and work with Nan to help her and be part of the company team. She needs what I give her and her paycheck from the company. She needs help to take care of the 25 ½ acre ranch and income to support the place. You must help her in life and see that nothing happens to her. Look after her for me please. She will depend on you to keep the ranch. A place for you and her to always live if you choose to do so. You never will find a place like that again and it's worth lots of money and will go up in value over the years. Don't sell the place. Your Mom makes income of about $1,300.00 net every two weeks and $5,000.00 net from me a month. She can't pay all the bills with that for the ranch The big house needs funds also. Nan will tell you what I pay to keep up the other part of the ranch. Your Mom knows too. Work together with your Mom.

5.3     Continue to employ Nan Evanich and Frank Kent for operation of the club. Nan and Frank should stay with the company. Don't just run them off. Frank has been there 25 years and Nan has been with me for 35 years. You must try your best to keep them working. You and your Mother can work together on how to keep them in place. They are very good people and you need them to help run the company. You must talk to them every day. Work with them and try to do what they have done for years. Stay on top of their game and tell them what you and they would do if Dad were here.

5.4     Continue to support yourself until you have completed your education. Dakota, you need to work for the company to get a paycheck for school and living cost.

UNOFFICIAL COPY

You need to make part of what I am making.  Five thousand dollars a month to be director of the companies and ten thousand a month to be the trustee and manager of the company.  The company will pay for your car or truck and vacation days of 30 days a year pay and time off.  But there is very little time off.  You must stay in school and get your degrees.  This is going to be a very hard time in your life.  Your Mother can help, but "You" must be the person to work with all these people.  <u>The above income is net income for you.  If there is more needed to pay bills then change it.</u>

5.5     Provide for  a modest stipend for Joseph Fontenot and Michelle Anne Fontenot.  Dakota, you will need to help Michelle and Joe out with income at some time.  They will get old and need some help.  You can have the trust pay some payments to them per month if they are in a bind.  Depends on what is in the bank each month.  Twenty-five thousand a year is a good amount to pay to them as a gift.  To each of them.  25k each a year gross payment.  <u>Talk to Mark Everett, attorney, on this, but don't make them officers or directors of the company</u>.  The amount can be less at first or more, you will decide what this can be.  Remember you are taking care of yourself, your Mother, Sister, and Brother, and Nan and Frank.  Plus paying the bills for the company.  Lots to take care of.  Don't pay any more money than people are making at this time, but you can change the pay at any time.  Just be careful of spending.

5.6     Maintain the Texas ranch for investment; lease it if possible.  The ranch is a special place.  <u>Your Mother and you can live there forever.</u>  Your Mother would like to live there <u>until she dies</u>.  Please don't sell the ranch.  If you or your mother wants to move, then rent the place out.  Lease the ranch to a doctor or lawyer or wealthy person.  The ranch will be worth millions of dollars over the years.  It's paid for and that location is a gold mine.  Don't sell the ranch ever.  Keep it for your Mom and your family some day.  This is a place to keep for yourself and your Mom.  It is an income producing place for rent/lease money.  If you move and your Mother dies, then rent/lease the place.  Don't sell it.  <u>Your Mother will own half of this place.  It's her's too.  Share this place with her.</u>

On the ranch property there are three homes, two barns, and lots of other storage and game room buildings. The whole ranch has a lot of equipment there too. Your mother owns half of this stuff and you will own the other half.  There are some things that belong to the Colorado club, all the club props and decoration from Rudolph's Place, sports stuff, old signs, lots of lights, and other things that you know go to the club.  All these things are stored there on the ranch.  My safes are full of things that are yours, such as guns, etc.

5.7     Pay off the mortgage for the residence in Nevada and share use and occupancy with Holli.  Pay off the house in Las Vegas and keep the house for you and your Mom.  Sell the place only if you can get seven hundred thousand for it.  That will

D.J.F

be in 5 or 7 years.  Take care of the house and repair it.  Keep it in good shape.  <u>Your Mom owns half of this house.</u>

5.8    Maintain and do not sell the tract on Highway 59 near Rosenberg, Texas. The land on Hwy 59 south and FM 529 is about 9.6 acres.  Rudolph's Place was the club.  Never sell this place.  Lease it to a gas company or oil company for a retail business.  This is an income producer for the trust.  You can lease this place for a lot of money for years.  Some day the gas and oil companies will want this place.  Can lease for 99 years for big bucks.  Income to trust.  Also it's a great asset for the trust.  This place can rent for the right people.  Don't put any money in it.  Just upkeep.  New renters will need to put their money into the place.  That is why you give them a long lease.  Only a large company should get this place.  A company with money.  Like a gas station.  You will need a real estate law firm to help handle this with you.  Mark Everett, attorney, can help you with this.  This is a very important rental property.

5.9    The Rosenberg property consists of 4 acres in Rosenberg, Texas.  The property is owned by a corporation, the shares of which are held in trust for you.  Use it for operation of the club.  Maintain and do not sell the Rosenberg property; the 4 acres and office is also a great place to have and not to sell.  Don't let your brother or sister or anyone get you to sell this land and building.  <u>Run your trust and business from there.</u>  If you do ever close down your trust and other companies, you need to lease the place out for income.  It's income producing property.  Always keep property that you can rent or lease.  The office is a place to keep your records and company records. Also storage files and a place to run the trusts and other companies.  Keep the office in good standing,, looking good, and well taken care of.

5.10    In conclusion, Dakota, your job as a trustee is to manage the trusts for yourself, taking into account your duties to your Mom, your brother (Joe Fontenot), and your sister (Michelle Fontenot).  Your job is to make the right decisions and not lose the money which you own outright, which you own in trust, or which is owned by the companies whose stock you own in trust.  Your job is to hold those assets and to manage the companies so that they produce income for the trust.  Your job for the trust assets is not for anyone else but the beneficiaries of the trusts.  Mark Everett will talk with you about your responsibilities as the trustee of the four trusts.  You need to hook up with Mark and get a classroom course about what trusts and trustees are all about. This is a must; you must do this first.  Don't forget this: look after your Mom, brother, sister, and yourself.  Take good care of them and see that they are happy also.

Dakota, when I'm gone people will try to ask for more income as soon as I am in the grave.  You will need to ask them to back off and tell them that you need to get your life on track with this new job of looking after the trusts, that you will study on this and get with your lawyer and others to see what to do about giving more income to

D.J.F.

others. People will make you feel that they will leave you and go elsewhere to work. If they do this, tell them good-bye. Good people will not put you under this type of pressure.

Also Nan and Frank have been with me for 25 to 35 years. Don't forget that they run your business and your need to look out for them too. Nan and Frank are very important to you and your success.

ARTICLE 6
DEFINITIONS

6.1    "Internal Revenue Code" shall mean the Internal Revenue Code of 1986, as amended, and applicable Treasury Regulations thereunder.

6.2    "Descendants" means the legitimate children of the person designated and the legitimate lineal descendants of such children, and includes any person adopted before attaining age eighteen (18) and the adopted person's legitimate lineal descendants. A posthumous child shall be considered as living at the death of his parent.

6.3    "Death taxes" refers to all federal estate, state and foreign estate, inheritance, transfer, succession, legacy, or other death taxes of any kind (including generation-skipping transfer taxes payable with respect to assets passing under this Will in a manner that constitutes a "direct skip," as defined in Section 2612(c) of the Internal Revenue Code, but not including any other generation-skipping transfer taxes) and interest or penalty on such taxes, imposed by reason of my death with respect to property required to be included in my gross Estate for purposes of such taxes, whether such property passes under this Will or otherwise, and payable to any federal, state, or foreign taxing authority, whether payable by my Estate or by any recipient of such property.

6.4    "Heirs" means those persons who would have inherited a decedent's personal property if the decedent had then died single, intestate, and domiciled in Texas.

6.5    Whenever a distribution is directed to be made to the descendants, per stirpes, of any person, the property to be distributed shall be divided into as many equal shares as there are then living children of that person and deceased children of that person who have descendants then living. Each then living child of such person shall take one share, and the share for the descendants of each deceased child shall be divided among the deceased child's then living descendants on a per stirpes basis.

Page 14 of 16 Pages

ARTICLE 7
MISCELLANEOUS

7.1    If any legatee, devisee, or beneficiary hereunder should die within sixty (60) days of the date of my death, or should we die as a result of a common accident or calamity in such a manner that it cannot be determined in what order our deaths occurred, it shall be considered, for purposes of this Will, that such person predeceased me.

7.2    Unless my Executor shall elect otherwise, payments from an employee or self-employed benefit plan which are not includible in my gross Estate for federal estate tax purposes shall not be liable for or used for the payment of (or loaned for the purpose of paying) any taxes, liabilities, debts, or any other claims or charges against my Estate, including but not limited to death taxes, provided, however, that such proceeds and payments may be used for the payment of federal estate and state inheritance or estate taxes assessed with respect to such payments or proceeds.

7.3    If any provision of this Will shall be held invalid, illegal or inoperative under any circumstances, it is my intention that, so far as possible and reasonable, such provision under all other circumstances and all other provisions shall be effective and fully operative.  My Executor may seek and obtain Court instructions for the purpose of carrying out, as nearly as possible, the intention of this Will shown by the terms hereof, including the terms held invalid, illegal, and inoperative.

I, Dallas Joseph Fontenot, Jr., as testator, after being duly sworn, declare to the undersigned witnesses and to the undersigned authority that this instrument (which, including this page, is contained on 16 pages) is my will, that I have willingly made and executed it in the presence of the undersigned witnesses, all of whom were present at the same time, as my free act and deed, and that I have requested each of the undersigned witnesses to sign this will in my presence and in the presence of each other.  I now sign this will in the presence of the attesting witnesses and the undersigned authority on this _7_ day of May, 2013.

Dallas Joseph Fontenot, Jr.
Testator

The undersigned, _Maria Mojica_ and _Gladys Velez_, each being above fourteen years of age, after being duly sworn, declare to the testator and to the undersigned authority that the testator declared to us that this instrument is the testator's will and that the testator requested us to act as witnesses to the testator's will and signature. The testator then signed this will in our presence, all of us being present at the same time. The testator is eighteen years of age or over (or being under such age, is or has been lawfully married, or is a member of the armed forces of the United States or of an auxiliary thereof or of the Maritime Service), and we believe the testator to be of sound mind. We now sign our names as attesting witnesses in the presence of the testator, each other, and the undersigned authority on this ___ day of May, 2013.

_____
Witness

_LAS VEGAS._
_STATE OF NEVADA COUNTY OF CLARK_
Address

_____
Witness

_LOS VEGAS_
_STATE OF NEVADA County of Clark_
Address

UNOFFICIAL COPY

The State of Nevada    §
                       §
County of _Clark_      §

Subscribed and sworn to before me by the said Dallas Joseph Fontenot, Jr., Testator, and by the said _Maria Mojica_ and _Gladys Velez_, witnesses, this _7th_ day of May, 2013.

_____
Notary Public, State of Nevada

(SEAL)

MICHAEL J. MOORE
Notary Public State of Nevada
No. 08-7991-1
My Appt. Exp. September 11, 2016



Page 16 of 16 Pages

# FIRST CODICIL TO LAST WILL AND TESTAMENT
## OF
## DALLAS JOSEPH FONTENOT, JR.

The State of Texas                    §
                                      §
County of Fort Bend                   §


I, Dallas Joseph Fontenot, Jr., now domiciled in Fort Bend County, Texas, being of sound and disposing mind, memory and understanding, do make and publish this, my First Codicil to my Last Will and Testament.

### ARTICLE 1
### INTRODUCTION AND INTENTION

1.1    On or about May 7, 2013, I executed my Last Will and Testament.  I shall refer to this document as my Will.  By executing this First Codicil, I intend to modify certain provisions of my Will as set forth below and, to the extent that I do not modify or revoke the provisions of my Will, to ratify the remaining provisions of my Will.

1.2    My wife's name is Holli Ann Fontenot.  All references in this First Codicil to my wife are to Holli Ann Fontenot.

1.3    At the time of execution of this First Codicil, I have three (3) children: Michelle Anne Fontenot , Dallas Joseph Fontenot, III, and Dakota James Fontenot.  I have no other children, either by birth or by adoption, and no deceased children.  All references in this First Codicil to "my children" are to said named children and to any children hereafter born or adopted by me.

1.4    In this First Codicil I intend to dispose of all of my separate property, and only my proportionate interest in the community property of my wife and myself.  It is my intention to dispose of my community interest in all property which I own at the time of my death including all property payable to me or my Estate after my death.

1.5    This First Codicil is not the result of any contract or agreement and may be revoked at any time.

Page 1 of 4 Pages

D.J.F.

UNOFFICIAL COPY

**EXHIBIT**

11

ARTICLE 2
EXECUTOR

2.1    I revoke the provisions of Section 2.1 of my Will, in which I have named the Executor of my Estate. In its place, I substitute the following:

I hereby appoint the following persons, in the order named, as Independent Executor of this my Last Will and Testament and of my Estate, with each successor to serve when the person named immediately before him or her shall fail to qualify, or having qualified, shall resign, become incapacitated, or otherwise fail or cease to act:

First, Holli Ann Fontenot
Second, Michelle Anne Fontenot
Third, Dallas Joseph Fontenot, III
And finally, Frost Bank, NA.

ARTICLE 3
DISPOSITION

3.1    I revoke the provisions of Section 3.2 of my Will, in which I have disposed of the residuary of my Estate. In its place, I substitute the following:

If Holli Ann Fontenot survives me, I give the residuary of my Estate, including any assets over which I may have a power of appointment, to Holli Ann Fontenot.  If Holli Ann Fontenot does not survive me, I give the residuary of my Estate, including any assets over which I may have a power of appointment, to Michelle Anne Fontenot and Dallas Joseph Fontenot, III or their descendants, *per stirpes* and not *per capita*.  I especially desire that neither Dakota James Fontenot nor any of his descendants shall be a beneficiary of my Estate.

ARTICLE 4
REPUBLICATION OF LAST WILL AND TESTAMENT

In every other respect I confirm and republish my Last Will and Testament dated May 7, 2013.

Page 2 of 4 Pages

D.J.F.

UNOFFICIAL COPY

I, Dallas Joseph Fontenot, Jr., as testator, after being duly sworn, declare to the undersigned witnesses and to the undersigned authority that this instrument (which, including this page, is contained on 4 pages) is my First Codicil to my Last Will and Testament; that I have willingly made and executed it in the presence of the undersigned witnesses, all of whom were present at the same time, as my free act and deed, and that I have requested each of the undersigned witnesses to sign this in my presence and in the presence of each other. I now sign this in the presence of the attesting witnesses and the undersigned authority on this **3 1** day of _____**OCTOBER**_____, 2017.

_____
Dallas Joseph Fontenot, Jr.,
Testator

The undersigned, **FRANK KENT** and **JOSE LUIS MANZANA**, each being above fourteen years of age, after being duly sworn, declare to the testator and to the undersigned authority that the testator declared to us that this instrument is the testator's First Codicil to his Last Will and Testament dated May 13, 2017, and that the testator requested us to act as witnesses to the testator's First Codicil to his Last Will and Testament and signature. The testator then signed this his First Codicil to his Last Will and Testament in our presence, all of us being present at the same time. The testator is eighteen years of age or over (or being under such age, is or has been lawfully married, or is a member of the armed forces of the United States or of an auxiliary thereof or of the Maritime Service), and we believe the testator to be of sound mind. We now sign our names as attesting witnesses in the presence of the testator, each other, and the undersigned authority on this **31** day of _____**OCTOBER**_____, 2017.

_____
Witness

Address **Houston, TEXAS 77084**

_____
Witness

Address **HOUSTON TX 77082**

## TRUST DECLARATION FOR
## THE HOLLI ANN HARDIN TRUST NUMBER ONE

THIS TRUST DECLARATION is made this day by declaration of HOLLI HARDIN FONTENOT, a resident of Harris County, Texas ("Trustor"). The Effective Date of this Trust Declaration is June 5, 1991.

1. **Trust Estate.**

    1.1 **Creation of Trust.** The Trustor hereby establishes, declares, and creates this Trust for the purposes hereinafter set forth, and the Trustee agrees to serve as the initial trustee and to hold the Trust Estate (as hereinafter defined) in trust upon the following provisions.

    1.2 **Transfer In Trust.** On or about the Effective Date, the Trustor has transferred and delivered to the Trustee the cash sum of One Thousand and No/100 Dollars ($1,000.00). Such property shall constitute the initial property of the Trust Estate.

    1.3 **Beneficiaries.** The Beneficiaries of this Trust shall be HOLLI HARDIN FONTENOT, DALLAS JOSEPH FONTENOT, JR., ANNE S. FONTENOT, DALLAS JOSEPH FONTENOT, III, MICHELLE ANNE FONTENOT, and any children of the marriage of HOLLI HARDIN FONTENOT and DALLAS JOSEPH FONTENOT, JR., including any children adopted by HOLLI HARDIN FONTENOT and DALLAS JOSEPH FONTENOT, JR. after the Effective Date (collectively, "Primary Beneficiaries"). Also Beneficiaries of this Trust are the children and other issue of each of the Primary Beneficiaries. The term "Beneficiary" will also mean any and all persons, organizations, trusts, and entities who may have or may acquire a beneficial interest in this Trust, whether vested or contingent in nature, resulting from the exercise of a power of appointment by a Beneficiary or otherwise.

    1.4 **Release of All Rights In Property.** The Trustor hereby releases for the benefit of this Trust any and all rights which the Trustor may have in her individual capacity in the property constituting the Trust Estate.

    1.5 **Acceptance of the Trust.** By acceptance hereof the Trustee, on her behalf and on behalf of her successors in trust, does by the execution hereof acknowledge receipt of the Trust Estate. The Trustee shall own, hold, and possess the Trust Estate (including any additional property which may

Page 1 of 18 Pages

B1142_81.01

EXHIBIT

1

003158

at any time hereafter be transferred to the Trustee) in trust solely in the capacity of Trustee. The Trustee and her successors in trust shall hold, manage, sell, exchange, invest, and reinvest the Trust Estate; collect all income therefrom; and, after deducting such expenses as are properly payable from income, accumulate and distribute the Trust Estate as herein provided.

1.6 Additions to Trust Estate. The Trustor and any other person shall have the right at any time to add property to the Trust created herein. Such property, when received and accepted by the Trustee, shall become part of the Trust Estate.

1.7 Name of Trust. This Trust shall be known as THE HOLLI ANN HARDIN TRUST NUMBER ONE.

2. Irrevocability of Trust. The Trust herein created shall be irrevocable and shall not be altered, amended, revoked, or terminated by the Trustor or any other person except as specifically permitted by law.

3. Definitions. As used herein, the following terms shall have the following meanings.

3.1 Children. Issue. The term "child" or "children" shall refer only to any and all children born in lawful wedlock or lawfully adopted, whether born or adopted before or after the date of execution of this Trust Declaration. The term "issue" shall refer to the lawful blood descendants in the first, second, or any other degree of the ancestor designated.

3.2 Heirs at Law. Whenever a trustee or a legal advisor to the Trustee is called upon to determine the heirs at law of the Trustor or any other person beneficially interested in this Trust, the determination will be made to identify those individual, other than creditors, who would receive the personal property of a decedent upon his or her death as determined in accordance with the laws of intestate succession of the State of Texas, and further determined as if the Trustor of this Trust shall have predeceased the person or persons so named or described.

3.3 Minor Beneficiary. The term "Minor Beneficiary" identifies a Beneficiary who is less than twenty one years of age.

3.4 Disability. A Beneficiary will be considered "disabled" if he or she is incapacitated to an extent to make it impossible or impractical to give prompt and intelligent

Page 2 of 18 Pages
H1142_81.01

UNOFFICIAL COPY

003159

consideration to business matters. The Trustee may act upon such evidence as the Trustee reasonably deems appropriate and reliable without liability by reason thereof.

3.5    Power of Appointment, Qualified Beneficiary Designation. Whenever this Trust gives a Beneficiary the power or authority to appoint a beneficiary of the Trust, the designation must be in writing and be acknowledged in the form required of acknowledgements by Texas law or exercised by a will executed with the formalities required by law of the Beneficiary's residence; it must clearly evidence the intent of the Beneficiary to exercise a power of appointment; and the written beneficiary designation must have been delivered to the Trustee prior to the Beneficiary's death or, if exercised by will, the will must have been filed for probate within three months from the date of the Beneficiary's date of death and must subsequently be admitted to probate no matter the time interval. The term of this Trust may be extended if the Qualified Beneficiary Designation requires that a Beneficiary's interest remain in Trust, or may be divided and be held as a separate trust which is governed by the terms of this Trust.

3.6    Trust Estate. The term "Trust Estate" shall mean any and all of the property delivered to the Trustee to be held, managed, and distributed under the terms of this Trust.

3.7    Trustee. For convenience, the term "Trustee," used in the singular, will mean and identify singular and multiple Trustees serving and acting pursuant to the directions of this Trust Declaration. The term "corporate Trustee" will identify a banking or trust corporation with trust powers.

4.    Appointment of Trustee.

4.1    Original Appointment. The Trustor appoints HOLLI HARDIN FONTENOT as Trustee of this Trust. In the event HOLLI HARDIN FONTENOT should fail to qualify, or having qualified, should die, resign, or become incapacitated or unable to act as Trustee of this Trust, or having qualified should subsequently become divorced from DALLAS JOSEPH FONTENOT, JR., then the Trustor appoints DALLAS JOSEPH FONTENOT, JR. as Trustee of this Trust. The parties acknowledge and agree that the rights and obligations of HOLLI HARDIN FONTENOT to serve as Trustee and to resign as Trustee in accordance with the foregoing have been and are the subject of separate consideration,

Page 3 of 18 Pages
H1142_81.01

003160

receipt of which is hereby acknowledged in full, and such rights and obligations are in the best interest of the administration of the Trust for its Beneficiaries. HOLLI HARDIN FONTENOT specifically waives any rights which she may have to rescind or revoke her obligation to resign as Trustee upon divorce from DALLAS JOSEPH FONTENOT, JR.

4.2  Succession.  At any time on or after his appointment as Trustee of this Trust, DALLAS JOSEPH FONTENOT, JR. will have the right to appoint a successor or successors to serve as Trustee in the event that DALLAS JOSEPH FONTENOT, JR. chooses not to serve as Trustee or ceases to serve as Trustee for any reason, and DALLAS JOSEPH FONTENOT, JR. may specify any conditions upon succession and service as may be permitted by law.

For example, a successor may be required to furnish a fiduciary bond as a prerequisite or a successor's service may be condition upon the death, resignation, or inability to serve of another appointee.

At any time on or after his appointment as Trustee of this Trust, DALLAS JOSEPH FONTENOT, JR. may also provide that one or more designated successors will have the authority to appoint his, her, or its successor as Trustee. An appointment of successor Trustee must be in writing and must be acknowledged to be effective.

In the absence of an appointment, or in the event all successors appointed by a Trustee shall fail or cease to serve for any reason, DALLAS JOSEPH FONTENOT, III is to be the successor as Trustee.

Trustor specifically provides that upon assumption of actual service as Trustee, DALLAS JOSEPH FONTENOT, III will have the right to appoint his successor as Trustee and to vest in a successor Trustee, upon assumption of that person's service, the right and authority to designate succession as Trustee.

In the event all of the Trustees named above, including duly appointed successors, fail or cease to serve for any reason, then FIRST INTERSTATE BANK OF TEXAS, N.A. is to be the successor Trustee. The appointment of FIRST INTERSTATE BANK OF TEXAS, N.A. as Trustee will include any successor to FIRST INTERSTATE BANK OF TEXAS, N.A. by reason of its merger, reorganization, or sale to another banking corporation with trust powers or a trust company with trust powers.

Page 4 of 18 Pages

E1142_81.01

003161

5. <u>Distribution of Income and Trust Corpus, Living and Post-Mortem</u>. The Trustee shall hold in trust or dispose of the Trust Estate as follows.

   5.1 <u>Distribution of Income and Principal</u>. The Trustee will have the discretionary authority to distribute to any or all of the Primary Beneficiaries or to apply for the Primary Beneficiaries' use and benefit such amounts of the Trust income and principal of the Trust Estate, even to the exhaustion thereof, as the Trustee shall desire, in the absolute discretion of the Trustee. The Trustee will have the discretionary authority to apportion or accumulate income to or for one or more of the Primary Beneficiaries in such amounts as the Trustee shall desire, in the absolute discretion of the Trustee; and the Trustee may distribute such amounts in equal or unequal shares, in the Trustee's absolute discretion. The Trustee may elect not to distribute any sums to any one or more of the Primary Beneficiaries. Accumulated income shall be added to the principal of the Trust.

   5.2 <u>Term of the Trust</u>. The term of this Trust shall be for so long as any of HOLLI HARDIN FONTENOT, DALLAS JOSEPH FONTENOT, JR., and ANNE S. FONTENOT shall live. Upon the last to die of all of the foregoing, this Trust shall terminate; provided, however, that the Trust will continue for a reasonable term thereafter for the purpose of liquidation and settlement.

   5.3 <u>Distributions for Death Taxes</u>. If the testamentary estate of the Trustor or any other Primary Beneficiary shall include any property of the Trust Estate because of the provisions of Sections 2036, 2037, and 2038 of the Internal Revenue Code of 1986 or any other provisions of the Internal Revenue Code of 1986, as amended, or under any corresponding statute hereafter in effect (dealing with inclusion of the Trust assets in the testamentary estate because of retained powers or otherwise), any death taxes (including but not limited to any estate tax) owing as a result of such inclusion shall be paid by this Trust. This provision shall control notwithstanding any other provision contained in this Trust. As used in this Trust Agreement, the term "death taxes" refers to all estate, inheritance, transfer, succession, legacy, or other death taxes of any kind and interest or penalty on such taxes, if any.

   5.4 <u>Distributions Upon Termination of the Trust</u>. Upon termination of this Trust, the undistributed principal and income after the distributions, if any, allowed under Section 5.3 above, shall be divided in equal shares, one for each of DALLAS

Page 5 of 18 Pages
B1142_81.01

UNOFFICIAL COPY

003162

JOSEPH FONTENOT, III, MICHELLE ANNE FONTENOT, and each of the children of the marriage of HOLLI HARDIN FONTENOT and DALLAS JOSEPH FONTENOT, JR., including any children adopted by HOLLI HARDIN FONTENOT and DALLAS JOSEPH FONTENOT, JR. after the Effective Date ("Trust Share"). Each of the foregoing, using a Qualified Beneficiary Designation, shall have the right to appoint the Beneficiary or Beneficiaries of the Trust Estate upon his or her death and the manner in which an appointee is to receive his, her, or its Trust Share. If such Beneficiary does not exercise his power of appointment with a Qualified Beneficiary Designation, the Beneficiary's Trust Share of the remaining property of the Trust, net of settlement costs, will pass upon the termination of the Trust *per stirpes*, outright and free of Trust, to his issue living at the time of his death or, if none, *per stirpes* to the Trustor's issue then living.

5.5    **Distribution In Accordance With Texas Intestate Laws**. In the event all Primary Beneficiaries and all of the issue of the Primary Beneficiaries have died, upon termination of this Trust the Trustee shall distribute the Trust Estate among the heirs at law of DALLAS JOSEPH FONTENOT, JR. in accordance with the Texas rules for intestate distribution as if the Primary Beneficiaries and all of the children and other issue of the Primary Beneficiaries had predeceased the Trustor.

5.6    **Method of Distribution**. During such time as the Trustee is so expending sums from the Trust Estate for the benefit of any Beneficiary or otherwise as provided herein, the Trustee is authorized to make payments or delivery of the portion or portions of the Trust Estate, either to the Beneficiary directly or to the person having the care and custody of the Beneficiary, all without the necessity of the appointment of any guardian. Without limitation on the foregoing, it is acknowledged and agreed that this Trust constitutes a grantor trust within the meaning of Sections 671, et seq. of the Internal Revenue Code of 1986, as amended and that the income therefrom will be taxed to the Trustor for so long as the Trustor shall live. It is further understood and agreed that the Trustee shall distribute to the Trustor (or to any other person who is deemed to be a grantor of this Trust and taxable on the income of the Trust within the meaning of Section 671, et seq. of the Internal Revenue Code of 1986, as amended) the incremental income taxes arising in connection with the taxable income of the Trust Estate or, at the election of the Trustee, the Trustee may make

Page 6 of 18 Pages
E1142_81.01

UNOFFICIAL COPY

003163

such distribution directly to the Internal Revenue Service for the benefit of such person.

5.7    **Partial and Final Distributions.** The Trustee, in making or preparing to make a partial or final distribution, may prepare an accounting and may require any or all of the following as a condition to payment: a written and acknowledged statement from each distributee that the accounting has been thoroughly examined and accepted as correct; a discharge of the Trustee; a release from any loss, liability, claim, or question concerning the exercise of due care, skill, and prudence of the Trustee in the management, investment, retention, and distribution of property during the Trustee's term of service (except for any undisclosed error or omission having basis in fraud or bad faith); and/or an indemnity for the benefit of the Trustee, to include the payment of attorney's fees, from any asserted claim of any taxing agency, governmental authority, or other claimant. Any Beneficiary having a question or potential claim may require an audit of the Trust as an expense of administration. Failure to require the audit prior to acceptance of the Trustee's report or the acceptance of payment will operate as a final release and discharge of the Trustee except as to any error or omission having basis in fraud or bad faith.

5.8    **Contingent Trust for Certain Beneficiaries.** The interest of any Beneficiary who has not attained the age of thirty (30) years (the "Required Age") or who may be otherwise legally disabled and whose interest is not otherwise covered by the provisions of this Trust Declaration may, in the sole and absolute discretion of the Trustee, be continued in Trust or be held as a separate trust, for the use and benefit of that person until such person shall attain the Required Age or until such person is no longer disabled. For so long as the Trustee holds the Trust for a Beneficiary pursuant to these terms, the Beneficiary, using the Qualified Beneficiary Designation, shall have the right to appoint the Beneficiaries of his or her interest in the Trust entitled to his or her interest upon the death of the Beneficiary. If the Beneficiary dies prior to a final distribution of his or her interest from the Trust without having made a Qualified Beneficiary Designation, that person's interest in the Trust will pass *per stirpes* to his or her issue then living, or if none, *per stirpes* to the issue of the Trustor then living.

Page 7 of 18 Pages
B1142_81.01

003164

6.    Powers of the Trustee.  In order to carry out the purposes of this Trust Declaration, the Trustee, in addition to all other powers granted by law, shall have the following powers and discretions.

6.1    Retain Assets.  The Trustee shall have the power to continue to hold any and all property received by the Trustee or subsequently added to the Trust Estate or acquired pursuant to proper authority if and as long as the Trustee, in exercising reasonable prudence, discretion, and intelligence, considers that the retention is in the best interest of the Trust.

6.2    Investments.  The Trustee shall have the power to invest and reinvest in every kind of property, real, personal, or mixed, and every kind of investment, specifically including, but not by way of limitation, corporate obligations of every kind, and stocks, preferred or common, without regard to risk of loss or decline in value.

6.3    Management of Securities.  The Trustee shall have the power to exercise, respecting securities held in the Trust Estate, all the rights, powers, and privileges of owners, including, but not limited to the power to vote, give proxies, and to pay assessments and other sums deemed by the Trustee necessary for the protection of the Trust Estate; to participate in voting trusts, pooling agreements, foreclosures, reorganizations, consolidations, mergers, and liquidations, and in connection therewith to deposit securities with and transfer title to any protective or other committee under such terms as the Trustee may deem advisable; to exercise or sell stock subscription or conversion rights; to accept and retain as an investment any securities or other property received through the exercise of any of the foregoing powers, regardless of any limitations elsewhere in this instrument relative to investments by the Trustee.

6.4    Form of Ownership of Trust Property.  The Trustee shall have the power to hold securities or other Trust property in the name of the Trustee as Trustee under this Trust Declaration or in the Trustee's own name or in the name of a nominee or in such conditions where ownership will pass by delivery.

6.5    Business Interests.  The Trustee shall have the power to continue and operate, to sell or to liquidate, as the Trustee deems advisable at the risk of the Trust Estate,

Page 8 of 18 Pages

E1142_81.01

NOT AN OFFICIAL COPY

any business or partnership interests received by the Trust Estate.

6.6 Sell and Exchange. The Trustee shall have the power to sell for cash or on deferred payments and on such terms and conditions as are deemed appropriate by the Trustee, whether at public or private sale, to exchange, and to convey any property of the Trust Estate.

6.7 Abandonment of Trust Assets. The Trustee shall have the power to abandon any Trust asset or interest therein in the discretion of the Trustee.

6.8 Option. The Trustee shall have the power to grant an option involving disposition of a Trust asset and to take an option for the acquisition of any asset by the Trust Estate.

6.9 Lease. The Trustee shall have the power to lease any real or personal property of the Trust Estate for any purpose for terms within or extending beyond the duration of the Trust.

6.10 Property Management. The Trustee shall have the power to manage, control, improve, and repair real and personal property belonging to the Trust Estate.

6.11 Development of Property. The Trustee shall have the power to partition, divide, subdivide, assign, develop, and improve any Trust property; to make or obtain the vacation of plats and adjust boundaries or to adjust difference in valuation on exchange or partition by giving or receiving consideration; and to dedicate land or easements to public use with or without consideration.

6.12 Repair, Alter, Demolish, and Effect. The Trustee shall have the power to make ordinary and extraordinary repairs and alterations in buildings or other trust property, to demolish any improvements, to raze party walls or buildings, and to erect new party walls or buildings as the Trustee deems advisable.

6.13 Borrowing and Encumbering. The Trustee shall have the power to borrow money for any Trust purpose from any person, firm, or corporation on the terms and conditions deemed appropriate by the Trustee and to obligate the Trust Estate for repayment, upon such terms and conditions (including a term extending beyond the duration of the Trust) as the Trustee deems advisable; to encumber the Trust Estate or any of its property by mortgage, deed of

Page 9 of 18 Pages

H1142_81.01

003166

trust, pledge, or otherwise, using whatever procedures to consummate the transaction deemed advisable by the Trustee; and to replace, renew, and extend any encumbrance and to pay loans or other obligations of the Trust Estate deemed advisable by the Trustee.

6.14    Natural Resources.  The Trustee shall have the power to enter into oil, gas, liquid or gaseous hydrocarbon, sulphur, metal and any and all other natural resource leases on terms deemed advisable by the Trustee, and to enter into any pooling, unitization, repressurization, community, and other types of agreements relating to the exploration, development, operation, and conservation of properties containing minerals or other natural resources; to drill, mine, and otherwise operate for the development of oil, gas, and other minerals; to contract for the installation and operation of absorption and repressurizing plants; and to install and maintain pipelines.

6.15    Insurance.  The Trustee shall have the power to procure and carry at the expense of the Trust Estate insurance of the kinds, forms, and amounts deemed advisable by the Trustee to protect the Trust Estate and the Trustee against any hazard.

6.16    Enforcement of Hypothecations.  The Trustee shall have the power to enforce any deed of trust, mortgage, or pledge held by the Trust Estate and to purchase at any sale thereunder any property subject to any such hypothecation.

6.17    Extending Time of Payment of Obligations.  The Trustee shall have the power to extend the time of payment of any note or other obligation held in the Trust Estate, including accrued or future interests, in the discretion of the Trustee.

6.18    Adjustment of Claim.  The Trustee shall have the power to compromise, submit to arbitration, release with or without consideration, or otherwise adjust claims in favor of or against the Trust Estate.

6.19    Litigation.  The Trustee shall have the power to commence or defend at the expense of the Trust Estate any litigation affecting the Trust or any property of the Trust Estate deemed advisable by the Trustee.

6.20    Administration Expenses.  The Trustee shall have the power to pay all taxes, assessments, compensation of the Trustee, and all other expenses incurred in the collection, care, administration, and protection of the Trust Estate.

Page 10 of 18 Pages
B1142_B1.01

003167

6.21 <u>Employment of Attorneys, Advisers, and Other Agents</u>. The Trustee shall have the power to employ any attorney, investment adviser, accountant, broker, tax specialist, or any other agent deemed necessary in the discretion of the Trustee and to pay from the Trust Estate reasonable compensation for all services performed by any of them.

6.22 <u>Termination by Trustee of Small Trust</u>. The Trustee shall have the power to terminate, in the discretion of the Trustee, the Trust held for the Beneficiaries if the fair market value of the Trust at any time becomes less than $25,000.00 and, regardless of the age of the Beneficiaries to distribute the principal and any accrued or undistributed income to the Beneficiaries, or to their respective guardians, conservators, or other fiduciaries.

6.23 <u>Distribution</u>. The Trustee shall have the power on any partial or final distribution of the income or principal of the Trust Estate, to apportion and allocate the assets of the Trust Estate in cash or in kind, or partly in cash and partly in kind, or in undivided interests in the manner deemed advisable in the discretion of the Trustee and to sell any property deemed necessary by the Trustee to make the distribution.

6.24 <u>Merger</u>. The Trustee shall have the power to merge this Trust with any trust established for the benefit of substantially the same beneficiaries as the Beneficiaries of this Trust and to manage and administer the respective Trusts and Trust Estate as one Trust and Trust Estate subject to the terms and conditions of the Trust Declaration governing each of said Trusts.

6.25 <u>General</u>. The Trustee shall have the power to do all the acts, to take all the proceeds, and to exercise all the rights, powers, and privileges which an absolute owner of the property would have. The enumeration of certain powers in this Trust Declaration shall not limit the general or implied powers of the Trustee. The Trustee shall have all additional powers that may now or hereafter be conferred by law or that may be necessary to enable the Trustee to administer the Trust in accordance with the provisions of this Trust Declaration, subject to any limitations specified in this Trust Declaration. The Trustee shall further have the discretion to maintain reserves for depreciation and/or depletion.

Page 11 of 18 Pages
81142_81.01

003168

7. **Duties and Compensation of the Trustee.**

7.1 **Allocation of Income and Principal.** The Trustee shall determine what is income and what is principal of the Trust created under this Trust Declaration and what expenses, costs, taxes, and charges of any kind whatsoever shall be charged against income and what shall be charged against principal in accordance with the applicable statutes of the State of Texas as they now exist and may from time to time be enacted, amended, or repealed.

7.2 **Relations With Trustee.** No one dealing with the Trustee need inquire concerning the validity of anything the Trustee purports to do, or need see to the application of any money paid or any property transferred to or upon the order of the Trustee.

7.3 **Compensation.** Unless such fee is waived or unless specific provision is otherwise made in the appointment of any Trustee, each Trustee shall be entitled to reasonable compensation for services as Trustee in accordance with the usual and customary charges in the community where and when such services are rendered. The fee schedules of area trust departments prescribing fees for the same or similar services may be used to establish reasonable compensation. A Trustee will be entitled to full reimbursement for expenses, costs, or other obligations incurred as the result of service, including attorney's, accountant's, and other professional's fees.

7.4 **Exculpation From Liability of Trustee.** The Trustee shall not be liable for any error or judgment or for any act done or omitted by the Trustee in good faith or for anything which the Trustee may in good faith do or refrain from doing in connection with this Trust. Accordingly, the Trustee shall not incur any liability with respect to any action taken or omitted in good faith upon the advice of counsel given in respect to any questions relating to the duties and responsibilities of the Trustee under this Trust Declaration or any action taken or omitted in reliance upon any instrument, including the written advice provided for herein, not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and accuracy of any information contained therein, which the Trustee shall in good faith believe to be genuine, to have been signed and presented by a proper person or persons, and to have conformed with the provisions of this Trust Declaration. The parties acknowledge and agree that the Trustee has no obligations to the Trust or any Beneficiary to offer to the Trust any investment opportunities presented to

Page 12 of 18 Pages

B1142_81.01

003169

Trustee individually during the term of the Trust Declaration.

7.5   Indemnity.   The Trustor shall at all times release and indemnify any successor Trustee and hold such successor Trustee harmless against any and all claims, suits, actions, debts, damages, costs, charges, and expenses, including court costs and attorney's fees, and against all liabilities, losses, or damages of any nature whatsoever that the Trustee shall at any time sustain or suffer in connection with acceptance or appointment as Trustee under this Agreement or as a result or arising out of the acquisition of any assets contributing to the Trust Estate, except to the extent of any such matter arising by reason or in consequence of the fraud or bad faith of the Trustee.

7.6   Bond.   No bond shall be required of the original Trustee hereunder.   Unless any instrument appointing a successor may provide otherwise, no bond shall be required of any successor Trustee; or if a bond is required by law, no surety shall be required on such bond.

7.7   Resignation.   Any Trustee of this Trust may at any time resign with respect to such Trust, with or without cause, effective ninety (90) days after delivery of notice of resignation thereof in writing to each current Beneficiary of this Trust.   If such Beneficiary is a minor, such delivery may be made to any guardian of such minor Beneficiary or to any adult with whom such minor Beneficiary resides.

7.8   Removal of a Trustee.   The Beneficiaries who are then entitled to receive distributions of income from the Trust or distributions of income from any separate trust created by this Trust Declaration may remove any corporate Trustee then serving, the notice of removal to be delivered in writing to the corporate Trustee.   Unless this Trust Declaration or any instrument appointing a successor provides otherwise, the selection of a successor to the corporate Trustee will be made by a court of competent jurisdiction.   In the event there is more than one Beneficiary entitled to the income from the Trust, all income Beneficiaries must join in the written notice of removal.   The consent of any person who is deceased or legally disabled will not be required in meeting the unanimous consent requirements for removal.

7.9   Liability of Trustee.   The Trustee in carrying out the Trustee's powers and performing the Trustee's duties may act in the

Page 13 of 18 Pages

H1142_81.01

003170

Trustee's discretion and shall be personally or individually liable only for fraud or acts or omissions in bad faith. No Trustee shall be liable individually or personally for any act or omission of any agent or employee of Trustee unless the Trustee shall have acted in bad faith in the selection and retention of such agent or employee.

7.10 Accounts. The Trustee shall each year render an account of the administration of the Trust hereunder to each living Primary Beneficiary. If a Federal Fiduciary Income Tax Return is then required for this Trust, such accounting may be made by submission of a copy of such return filed for the Trust. If no objection to an accounting has been made in writing by such Primary Beneficiary within sixty (60) days after the date of mailing of such accounting by the Trustee, it shall be deemed approved. Such approval of such account shall, as to all matters and transactions stated therein or shown thereby be final and binding upon all persons (whether in being or not) who are then or may thereafter become interested in, or entitled to share in, either the income or the principal of such Trust, provided always, however, that nothing contained in this Section 7.10 shall be deemed to give such person (or the guardian or representative) acting in conjunction with the Trustee the power to alter, amend, revoke, or terminate the Trust.

7.11 Multiple Trustees. In the event that there are two or more Trustees serving the Trust, all Trustees must sign any instrument transferring real property from the Trust. If the Trustees agree to do so, one Trustee acting alone may be given the primary responsibility of administration and accounting, and one Trustee alone may be authorized to deposit, transfer, and withdraw funds from any depository account held by the Trust. The authority vested in two Trustees may be exercised only by both of the Trustees; and, subject to the foregoing provisions, the authority vested in three or more trustees may be exercised by a majority of the Trustees. In the event of an action or decision by a majority, the non-consenting Trustee will not be responsible for the act of the majority.

8. Spendthrift Provision. The interests of each of the Beneficiaries in the principal or income of the Trust created hereunder shall not be subject to the claims of his or her creditors or creditors of others, including creditors of a spouse of a married Beneficiary, nor to legal process, and may not be voluntarily or involuntarily alienated or encumbered until actually distributed to such Beneficiary.

Page 14 of 18 Pages

81142_81.01

003171

9. __Perpetuities Savings Clause__.  Unless sooner terminated as otherwise provided in this Trust Declaration, the Trust created herein shall fully cease and terminate twenty-one (21) years after the date of the last survivor of the Trustor, the Primary Beneficiaries, and the children of each of the Primary Beneficiaries in existence as of the date of this Trust.  Upon such termination, the entire principal of the Trust Estate of the Trust, together with any undistributed income therefrom, shall vest in and be distributed to the persons entitled to take under the provisions of the Trust.

10. __In Terrorem Provision__.  If any person entitled to receive any interest from this Trust shall contest the validity of this Trust or any provision thereof or shall institute or join in (except as a party defendant) any proceeding to contest the validity of this Trust or to prevent any provision thereof from being carried out in accordance with its terms (regardless of whether or not such proceedings are instituted in good faith and with probable cause), then all benefits provided to such person in this Trust shall be revoked, and such benefits shall pass as if such person were not then living.

11. __Construction of Trust__.

   11.1 __Governing Law__.  This Trust Declaration shall be governed by the laws of the State of Texas.

   11.2 __Severability__.  If any part, clause, provision, or condition of this Trust Declaration is held to be void, invalid, or inoperative, such voidness, invalidity, or inoperativeness shall not affect any other clause, provision, or condition hereof; but the remainder of this Trust Declaration shall be effective as though such clause, provision, or condition had not been contained herein.

   11.3 __Interpretative Clause__.  As used in this Trust Declaration, the masculine, feminine, or neuter gender, and the singular or plural number shall each be deemed to include the others whenever the context so indicates.

   11.4 __Notices__.  All communications required to be given to the Trustor, the initial Trustee hereunder, or the Primary Beneficiaries (including notice of change of address) shall be in writing and shall be deemed to be duly given if and when personally delivered, or, if mailed via certified mail, return receipt requested, when tendered into the care and custody of the United States postal service properly addressed to as follows:

Page 15 of 18 Pages

B1142_81.01

003172

If to Trustor or Trustee:

HOLLI HARDIN FONTENOT
6002 Burning Tree Drive
Houston, Texas   77036


If to Primary Beneficiaries:

Dallas Joseph Fontenot, Jr.
6002 Burning Tree Drive
Houston, Texas   77036

Anne S. Fontenot
8526 Leader
Houston, Texas   77036

Dallas Joseph Fontenot, III
8526 Leader
Houston, Texas   77036

Michelle Anne Fontenot
8526 Leader
Houston, Texas   77036

11.5  Copies.  To the same extent as if it were the original,
anyone may rely on a copy of this Trust Declaration
certified by a notary public to be a true copy of this
Trust Declaration.  Anyone may rely on any statement of
fact certified by anyone who appears from the original
Trust Declaration or a certified copy thereof to be a
Trustee hereunder.

IN WITNESS WHEREOF, I, the undersigned, HOLLI HARDIN
FONTENOT, attest that I have executed this Declaration of Trust
and that the terms thereof will bind me and my successors and
assigns, my heirs and personal representatives, and any Trustee
of this Trust.  This Trust Declaration has been signed by the
Trustor on the Effective Date.

_____
HOLLI HARDIN FONTENOT

Page 16 of 18 Pages
B1142_B1.01

003173

THE STATE OF TEXAS    §
                           §
COUNTY OF HARRIS    §

This instrument was acknowledged before me on this the 5th day of June, 1991, by HOLLI HARDIN FONTENOT.



_____
Notary Public in and for
The State of T E X A S
_____
(Printed or Typed Name of Notary)
_____
(Commission Expiration Date)

## ACCEPTANCE BY TRUSTEE

I acknowledged that I have been appointed as a Trustee of THE HOLLI ANN HARDIN TRUST NUMBER ONE, and I hereby evidence my acceptance of the office of Trustee and will hold and administer the Trust according to the provisions thereof as required by law.

Date: _____June 5, 1991_____

_____
HOLLI HARDIN FONTENOT

Page 17 of 18 Pages
21142_81.01

UNOFFICIAL COPY

THE STATE OF TEXAS     §
                       §
COUNTY OF HARRIS       §

        This instrument was acknowledged before me on this the 5th day of June, 1991, by HOLLI HARDIN FONTENOT, TRUSTEE.



Notary Public in and for
The State of T E X A S

(Printed or Typed Name of Notary)

(Commission Expiration Date)

Page 18 of 18 Pages
81142_81.01

COPY

UNOFFICIAL

003175

NO. 21-CPR-036521

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN THE COUNTY COURT AT LAW |
| | § | |
| DALLAS JOSEPH FONTENOT, JR., | § | NUMBER FOUR (4) OF |
| | § | |
| DECEASED | § | FORT BEND COUNTY, TEXAS |

NO. 21-DCV-288736

| | | |
|---|---|---|
| IN RE: | § | IN THE 240th DISTRICT COURT |
| | § | |
| | § | OF |
| HOLLI ANN HARDIN TRUST | § | |
| NUMBER ONE | § | FORT BEND COUNTY, TEXAS |

## BINDING MEDIATED SETTLEMENT AGREEMENT

The Parties – Dakota Fontenot, individually, in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in his capacity as next friend and virtual representative for S.F., a minor, Holli Ann Fontenot, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, Dallas Joseph Fontenot, III, individually, and in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One, Michelle Ann Fontenot, individually, in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in her capacity as next friend and virtual representative for A.E., a minor, and Ashley Fontenot Estrada, individually and in her capacity as a beneficiary of the Hollis Ann Hardin Trust Number One – hereto agree that all causes of action pending in cause number 21-CPR-036521 and cause number 21-DVC-288736, both of which are pending in Fort Bend County, Texas, and all related claims and/or controversies between them, whether asserted or not, known or unknown, actual or contingent, are hereby settled, in accordance with the terms of this Binding Mediated Settlement Agreement (hereinafter referred to as the "Settlement Agreement").

## A. DEFINITIONS

1.      Whenever used in this Settlement Agreement, the following terms shall have and be construed to have the following meanings:

i.      "Settlement Agreement" shall mean and refer to this Binding Mediated Settlement Agreement.

ii.     "Dakota" shall mean and refer to Dakota Fontenot, individually, in his capacity as beneficiary of the Holli Ann Hardin Trust Number One, and in his capacity as next friend and virtual representative of S.F., a minor.

UNOFFICIAL COPY

1

EXHIBIT
13

iii.    "Holli" shall mean and refer to Holli Ann Fontenot, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

iv.    "Joe" shall mean and refer Dallas Joseph Fontenot, III, individually and in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

v.    "Michelle" shall mean and refer to Michelle Ann Fontenot, individually, in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in her capacity as next friend and virtual representative of A.E., a minor.

vi.    "Ashley" shall mean and refer to Ashley Fontenot Estrada, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

vii.    "Trust" shall mean and refer to the Holli Ann Hardin Trust Number One.

viii.    "Estate" shall mean and refer to the Estate of Dallas Joseph Fontenot, Jr., whose administration is pending in cause number 21-CPR-036521, in the County Court at Law Number Four (4) of Fort Bend County, Texas.

ix.    "Parties" shall mean and refer to Dakota, Holli, Joe, Michelle, and Ashley, collectively, as described in paragraphs two (ii) through six (vi) above.

x.    "Claims" shall mean and include any and all causes of action, demands, debts, obligations, duties, liens, liabilities, and theories of liabilities of whatsoever kind and nature, whether based in contract or tort, whether arising in equity or under the common law, whether by statute or regulation, whether known or unknown, whether past or present, whether contingent or matured, whether for damages relief, injunctive relief, declaratory relief, equitable relief, or any other type of relief, whether for actual damages, personal injury damages, mental anguish, liquidated damages, punitive damages, exemplary damages, compensatory damages, consequential damages, incidental damages, pecuniary damages, costs, expenses, attorneys' fees, penalties, or fines that are (is), were (was), could be, or could have been asserted as of the Effective Date, regardless of whether actually asserted, whether by claim, counterclaim, cross-claim, motion, third-party claim regarding the Estate and Trust, including but not limited to, claims, whether asserted or not, known or unknown, actual or contingent.

xi.    "Effective Date" shall mean and refer to the date that the last Party to this Settlement Agreement executes the same.

xii.    In respect to any defined term herein, the singular shall include the plural, and the plural shall include the singular.

UNOFFICIAL COPY

2

## B. TERMS, CONDITIONS, AND MUTUAL CONSIDERATION

1.      The Parties acknowledge that bona fide disputes and controversies exist between them, both as to liability and the amount thereof in damages, if any, and by reason of such disputes and controversies they desire to compromise and settle all Claims and causes of action of any kind whatsoever which the Parties have or may have arising out of the transactions or occurrences which have been brought or could have been brought regarding the Trust.

2.      **THE PARTIES AGREE AND ACKNOWLEDGE THAT UPON THE EXECUTION OF THIS SETTLEMENT AGREEMENT, THIS SETTLEMENT AGREEMENT SHALL BECOME BINDING AND IRREVOCABLE.**

3.      The Parties agree that the 2013 Last Will and Testament and 2017 First Codicil to the Last Will and Testament will be admitted to probate. The Parties agree that Holli will be appointed as the Independent Executor of the Estate and agree not to object to the same.

4.      All of the Estate's assets, including all associated bank accounts, shall be distributed to Holli, save and expect the following items:

- The following items are going to be distributed to Dakota:

  - o   The 2017 F150 Truck
  - o   The 2013 Toyota Sequoia
  - o   All interest, including all associated bank accounts, in Entertainment Marketing and Management, LP
  - o   The coin collection and gold located in the backpack at the Rosenburg Office

- The following items are going to be distributed to Joe:

  - o   The 2008 Honda Ridgeline
  - o   One-half (1/2) of the Decedent's Tiki Mug Collection

The Parties agree to execute all documents necessary to effectuate the conveyance of all property described above the individual recipients stated in paragraph four (4).

5.      From the Rosenburg office, Holli shall be entitled to obtain:

- The remaining $150,000 in non-earmarked cash located in the backpack;
- Any and all Playboy Magazines

6.      The Parties agree that all personal property belonging to Dakota, Joe, and/or Michelle that is currently located at 10402 W. Hidden Lake Lane, Richmond, Texas 77406 shall be distributed to Dakota, Joe, and/or Michelle as appropriate. Dakota, Joe and/or Michelle shall

3

be afforded the opportunity, within thirty (30) days of the Effective Date of this Settlement Agreement, to conduct a supervised walkthrough of their personal property located at 10402 W. Hidden Lake Lane, Richmond, Texas 77406. During that time, Dakota, Joe, and/or Michelle will take photographs of their personal property which they would like to obtain. A list and accompanying photographs will be delivered to counsel for Holli of those items within fourteen (14) days of the walkthrough being completed. Holli will have fourteen (14) days to object to the items which Dakota, Joe, and/or Michelle would like to obtain. If the parties cannot reach a resolution regarding the same, Russ Jones will mediate, at an hourly rate, the division of the disputed personal property. Upon the completion and approval of a final list of items, Dakota, Joe, and/or Michelle, at their expense, shall obtain and remove the items on the approved final list of items at a mutually agreeable date and time within fourteen (14) days of the approval of the final list of items.

7.  The attorney's fees for Holli, Dakota, Joe, Michelle, and/or Ashley may be paid from the assets of the Holli Ann Hardin Trust Number One in an amount no more than $200,000.00 per side. The Parties will present their fees to Linda Goehrs, in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, for payment. The Parties agree that they will not object to the payment of the fees of any other party.

8.  The real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183 shall be distributed to Holli. Dakota, Michelle, and Joe, with Dakota as authorized representative, shall retain a right of first refusal in the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183. If Holli decides to sell or otherwise transfer the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183, Holli shall notify Dakota, Michelle, and Joe in writing and provide an appraisal completed by a certified and licensed real estate appraiser. From the date of receipt of that notice, Dakota, Michelle, and/or Joe shall have 30 days to exercise their right to purchase the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183. If exercised, Dakota, Michelle, and/or Joe shall enter into a real estate contract to purchase the property with a proposed closing date sixty (60) days from the date of receipt of the notice of sale or transfer triggering the right of first refusal. Holli is not required to sell at the appraised value if she receives offers in excess of the appraised value. If Holli receives an offer greater than the appraised value, the right of first refusal will be triggered upon delivery of the great offer to Dakota as authorized representative. The right of refusal will not renew if it is not exercised against the greatest value delivered by Holli.

9.  With regard to the further administration of the Holli Ann Hardin Trust Number One:

- The Parties agree that the assets of the Holli Ann Hardin Trust Number One shall be appraised by certified and licensed business or real estate appraisers, as is appropriate for the particular asset. Russ Jones shall select the appraisers to complete the real estate and business appraisals. The costs of the appraisals shall be borne by the Holli Ann Hardin Trust Number One.

4

- The Parties agree that, once the values on the appraisals are obtained for all Holli Ann Hardin Trust Number One assets, Holli's interest will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One in an amount equal to the twenty percent (20%) of the total value of the assets. Such purchase will occur within ninety days (90) of the completion of the valuation of the assets of the Holli Ann Hardin Trust Number One.

- The Parties agree that during the appraisal period described above, Linda Goehrs, in her capacity as Temporary Successor Trustee and/or Dakota, shall execute the necessary documents to install Dakota as an Officer and/or Director of Ice Embassy, Inc., HRF Enterprises, Inc., and Entertainment Marketing and Management, LP.

- The Parties agree that Linda Goehrs shall remain Temporary Successor Trustee of the Holli Ann Hardin Trust Number One until the closing of a sale on Holli's interest in the Holli Ann Hardin Trust Number One. At the time that Holli's interest is purchased, Linda Goehrs will resign as Temporary Successor Trustee, and Dakota, Joe, Michelle, and Ashley shall select a Successor Trustee of the Trust.

- Holli agrees to execute an assignment of interest and disclaimer of further interest in the Holli Ann Hardin Trust Number One at the time that her interest is purchased in accordance with this Settlement Agreement.

- The Parties agree that Dakota and Holli shall remain employees of Entertainment Marketing and Management, LP, and/or the business, or businesses owned by the Holli Ann Hardin Trust Number One. Holli shall be removed from the payroll on the date that her interest is purchased pursuant to this Agreement. The compensation amount that Dakota and Holli have been receiving shall remain unchanged.

- The Parties agree that Dakota and Holli shall remain on the insurance paid for by Entertainment Marketing and Management, LP, and/or the business or businesses owned by the Holli Ann Hardin Trust Number One. Holli shall be removed from the insurance plan on the date that her interest is purchased pursuant to this Agreement.

- To the extent owned by the Trust, Linda Goehrs as Temporary Successor Trustee, shall gift the horses known as Coco and Rusty to Holli.

10. With regard to the further administration of the Dakota Trust:

- The Parties agree that the assets of the Dakota Trust shall be appraised by certified and licensed real estate appraisers. Russ Jones shall select the appraisers to complete the real estate appraisal. The cost of the appraisal shall be borne by the Dakota Trust.

5

- Upon completion of the appraisal, the total value of the assets will be compiled and Holli's interest will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One in an amount equal to eighty-five percent (85%) of the total value of the assets. Such purchase will occur within ninety days (90) of the completion of the valuation of the assets of the Dakota Trust.

- Holli agrees to execute an assignment of interest and disclaimer of further interest in the Dakota Trust at the time that her interest in purchased in accordance with this Settlement Agreement.

11. Within seven (7) days of the Effective Date of this agreement, Dakota, Joe, Michelle, and/or Ashley agree to dismiss all pending pleas, pleadings, and/or motions, with prejudice regarding the Estate and/or Trust pending in cause number 21-CPR-036521 and cause number 21-DVC-288736, both of which are pending in Fort Bend County, Texas.

12. Neither the Trust nor any entity owned, held, or possessed by the Holli Ann Hardin Trust Number One, the Dakota Trust, and/or the Estate have any claims against any of the Parties.

13. The Parties agree to release Linda Goehrs, in her capacity as Temporary Successor Trustee, for making distributions according to this Settlement Agreement which contradict the terms of the Trust Agreement for the Holli Ann Hardin Trust Number One or the Dakota Trust.

## C. RELEASES AND DISCHARGE

1. **Release of Claims by Dakota.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Dakota, on behalf of himself and all his heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Holli, Joe, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Dakota hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Dakota expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Holli, Joe, Michelle, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Dakota does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

2. **Release of Claims by Holli.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Holli, on behalf of herself and all her heirs, successors,

6

executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Joe, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Holli hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Holli expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Michelle, Joe, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Holli does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

3.    **Release of Claims by Joe.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Joe, on behalf of himself and all his heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Joe hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Joe expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Michelle, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Joe does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

4.    **Release of Claims by Michelle.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Michelle, on behalf of herself and all her heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Joe, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Michelle hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Michelle expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind

7

known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Joe, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Michelle does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

5.      **Release of Claims by Ashley.**  For and in consideration of the mutual promises, covenants, and agreements stated herein, Ashley, on behalf of herself and all her heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Joe, Michelle, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Ashley hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Ashley expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Joe, and Michelle. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Ashley does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

## D. REPRESENTATIONS AND WARRANTIES

1.      **Representations and Warranties.** Each of the Parties hereto represents and warrants to the other that:

    a.      They are adequately represented by competent counsel in connection with the execution and delivery of this Settlement Agreement and/or had an opportunity to retain counsel in connection with this Settlement Agreement;

    b.      In executing this Settlement Agreement, they relied upon the Party's own judgment and any advice it received from its own attorneys;

    c.      They were not induced to sign or execute this Settlement Agreement by promises, omissions, agreements, or representations not expressly stated in this Settlement Agreement;

    d.      They freely and willingly executed this Settlement Agreement and expressly disclaims reliance upon any facts, promises, statements made or not made, undertakings, or representations made by any person or entity

8

prior to the Effective Date of this Settlement Agreement except as specifically enumerated herein;

e. They consent that this Settlement Agreement was not procured, obtained, or induced by improper conduct or undue influence;

f. After an opportunity to consult with an attorney concerning the matters made subject of this Settlement Agreement, and after reviewing this Settlement Agreement, they agree this Settlement Agreement is fair, reasonable, and supported by good, valuable, and adequate consideration; and

g. They understand and agree to the terms and conditions of this Settlement Agreement, which contains the entire agreement between the Parties relating to the matters made the subject of this Settlement Agreement.

2. **Capacity and Authority.** Each of the Parties hereto represents and warrants to the other that the person signing this Settlement Agreement in a representative capacity has the requisite authority and consent to execute this Settlement Agreement on behalf of the Party for whom he or she has executed this Settlement Agreement, and that this Settlement Agreement is binding upon the Party for whom he or she has executed this Settlement Agreement and upon such Party's successors and assigns.

3. **Assignment of Claims.** Each of the Parties hereto represents and warrants to the other that it has not transferred, assigned, or otherwise conveyed, excepting any interest held by counsel, in whole or in part, its respective interest in the Claims at issue and that it is the owner and holder thereof. Each of the Parties further represents and warrants that, aside from any interest held by counsel, it is the only holder of the Claims being released and that no other person or entity owns, or has any interest in, any of the Claims being released. Despite any interest held by counsel, this Settlement Agreement applies to the entirety of each of the Parties' Claims.

4. **Cooperation in Execution of Further Documents.** Each of the Parties expressly agrees to execute any other documents reasonably necessary to effectuate the terms, purpose, and intent of this Settlement Agreement.

## E. MISCELLANEOUS PROVISIONS

1. **Invalidity.** In the event any one or more of the provisions of this Settlement Agreement shall, for any reason, be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Settlement Agreement.

2. **Entire Agreement.** This Settlement Agreement reflects the final and complete agreement between the parties concerning the matters made subject of this Settlement Agreement and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the Parties. There are no unwritten oral agreements between the Parties. The Parties expressly

9

acknowledge that any rights, duties, or obligations, whether contractual or otherwise, owed by or between the Parties prior to the effective date of this Settlement Agreement are terminated as of the Effective Date of this Settlement Agreement and the only rights, duties, or obligations owed by or between the Parties from this point forward shall be those set forth in this Settlement Agreement.

3.    **Governing Law and Venue.** The validity, effect, and construction of this Settlement Agreement shall be governed by the laws of the State of Texas. Venue for any cause of action, controversy, or dispute regarding this Settlement Agreement or the subject matter hereof shall be proper only in the state courts of Fort Bend County, Texas.

4.    **Amendment.** This Settlement Agreement may not be amended, modified, waived, or terminated unless such is done in a writing signed by all the Parties.

5.    **Construction of Agreement.** This Settlement Agreement shall not be construed in favor of or against any Party on the basis that the Party did or did not author this Settlement Agreement or any attachment related to it. It is intended that this Settlement Agreement shall be comprehensive in nature and shall be construed liberally to affect its purposes.

6.    **Titles or Headings.** All titles or headings used in this Settlement Agreement are used only for the convenience of the Parties and shall not be construed to have any effect or meaning with respect to the other content of the Settlement Agreement, such other content being controlling as to the Settlement Agreement of the Parties.

7.    **Costs and Attorneys' Fees.** Each party shall bear its own costs and attorneys' fees in relation to the claims and the negotiation and preparation of this Settlement Agreement, subject to the attorney's fees provisions within this Settlement Agreement.

8.    **Waiver.** The failure of any of the Parties to enforce, at any time, any provision of this Settlement Agreement shall not be construed to be a waiver of such provision, nor in any way affect the validity of this Settlement Agreement or any part thereof or any right of any Party thereafter to enforce each and every provision. No waiver of any breach of this Settlement Agreement shall be held to constitute a waiver of any other breach.

9.    **Binding Agreement.** This Settlement Agreement is binding on the Parties hereto and not subject to revocation, repudiation, or withdrawal of consent, even if one or more of them shall become debtors in a bankruptcy proceeding. This binding effect is an integral part of this Agreement.

10.    **Execution of Agreement.** This Settlement Agreement may be executed in a number of identical counterparts, each of which shall be deemed an original for all purposes. A fax signature or a copy of an original signature shall constitute an original signature for purposes of this Settlement Agreement. This Settlement Agreement shall be valid only if fully executed by all Parties and/or their representatives as agreed to herein. If not fully executed by all Parties, this Settlement Agreement shall be null and void and of no effect.

10

11.     **Future Disputes.** In the event that there are future disputes, disagreements, and/or conflicts regarding the terms and/or implementation of any terms of this Settlement Agreement, the Parties agree to return to Russ Jones for mediation regarding the dispute. The Parties agree to return to mediation prior to filing any litigation regarding a breach of this settlement agreement or these terms. If a Party refuses to return to mediation, the remaining parties are permitted to file litigation without returning to mediation. Should further litigation be filed regarding a breach of the agreement, the prevailing party shall be entitled to an award of attorney's fees as determined by a jury or judge.

12.     **Indemnity.** Each party shall indemnify the other parties for all claims made by, through, or under the indemnifying party.

AGREED TO BY ALL PARTIES AS EVIDENCED BY THEIR SIGNATURE BELOW ON THIS THE 7th DAY OF JANUARY, 2022.

_____
Dakota Fontenot, in all capacities

_____
Holli Ann Fontenot, in all capacities

_____
Dallas Joseph Fontenot, III, in all capacities

_____
Michelle Ann Fontenot, in all capacities

_____
Ashley Fontenot Estrada, in all capacities

_____
Christopher Burt
*Counsel for Dakota Fontenot*

11

11.    **Future Disputes.** In the event that there are future disputes, disagreements, and/or conflicts regarding the terms and/or implementation of any terms of this Settlement Agreement, the Parties agree to return to Russ Jones for mediation regarding the dispute. The Parties agree to return to mediation prior to filing any litigation regarding a breach of this settlement agreement or these terms. If a Party refuses to return to mediation, the remaining parties are permitted to file litigation without returning to mediation. Should further litigation be filed regarding a breach of the agreement, the prevailing party shall be entitled to an award of attorney's fees as determined by a jury or judge.

12.    **Indemnity.** Each party shall indemnify the other parties for all claims made by, through, or under the indemnifying party.

AGREED TO BY ALL PARTIES AS EVIDENCED BY THEIR SIGNATURE BELOW ON THIS THE 7th DAY OF JANUARY, 2022.

_____
Dakota Fontenot, in all capacities

_____
Holli Ann Fontenot, in all capacities

Dallas Joseph Fontenot III
_____
Dallas Joseph Fontenot, III, in all capacities

Michelle Ann Fontenot
_____
Michelle Ann Fontenot, in all capacities

Ashley Fontenot Estrada
_____
Ashley Fontenot Estrada, in all capacities

_____
Christopher Burt
*Counsel for Dakota Fontenot*

11

UNOFFICIAL COPY

Steven Mendel
*Counsel for Holli Ann Fontenot*

Kenneth Sumner
*Counsel for Dallas Joseph Fontenot, III,*
*Michelle Ann Fontenot, and Ashley Estrada*

UNOFFICIAL COPY

12

_____

Steven Mendel
_Counsel for Holli Ann Fontenot_


# Kenneth E. Sumner, Jr.

_____

Kenneth Sumner
_Counsel for Dallas Joseph Fontenot, III,_
_Michelle Ann Fontenot, and Ashley Estrada_


**Signature:** _Dallas Joseph Fontenot III_
Dallas Joseph Fontenot III (Jan 7, 2022 19:33 CST)

**Email:** djoef3@hotmail.com


**Signature:** _____
Ashley Fontenot Estrada (Jan 7, 2022 19:38 CST)

**Email:** ashleyafontenot@gmail.com


**Signature:** _____
Michelle Fontenot (Jan 7, 2022 19:36 CST)

**Email:** mannefontenot@gmail.com


**Signature:** _Kenneth C. Sumner, Jr._

**Email:** ksumner@romanosumner.com


12

Electronically Filed
11/23/2021 6:35 PM
Laura Richard
County Clerk
Fort Bend County, Texas

NO. 21-CPR-036521

| | | |
|---|---|---|
| IN RE: ESTATE OF | § | IN THE COUNTY COURT |
| DALLAS JOSEPH FONTENOT, JR. | § | AT LAW NUMBER 4 OF |
| DECEASED | § | FORT BEND COUNTY, TEXAS |

## INVENTORY AND LIST OF CLAIMS

DATE OF DEATH:    September 3, 2021

GUS TAMBORELLO, TEMPORARY ADMINISTRATOR OF THE ESTATE OF DALLAS JOSEPH FONTENOT, JR., DECEASED files this Inventory and List of Claims of all property belonging to the probate estate of DALLAS JOSEPH FONTENOT, JR. ("Decedent") which has come to his possession or knowledge, together with a List of Claims due and owing to the estate.

### Summary of Assets

| | |
|---|---|
| Cash - See Schedule "A" | $  11,942.50 |
| Other Personal Property - See Schedule "B" | 299,820.00 |
| Real Estate - See Schedule "C" | 945,485.00 |
| **TOTAL VALUE OF DECEDENT'S ESTATE** | **$1,257,247.50** |

### List of Claims Belonging to Estate

There are no known claims due and owing to the Decedent's estate. However, Administrator is continuing to investigate the issue.

I, GUS TAMBORELLO, TEMPORARY ADMINISTRATOR OF THE ESTATE OF DALLAS JOSEPH FONTENOT, JR., DECEASED , do solemnly swear that this Inventory and List of Claims of the Estate of the Decedent is a full and complete Inventory and List of the property and claims of said probate estate that have come to my knowledge or possession, and Administrator requests that the Court approve the Inventory and List of Claims.

UNOFFICIAL COPY

EXHIBIT

14

_____

GUS    TAMBORELLO,    TEMPORARY
ADMINISTRATOR OF THE ESTATE OF DALLAS
JOSEPH FONTENOT, JR., DECEASED

SUBSCRIBED AND SWORN TO BEFORE ME, on this __23__<sup>rd</sup> day of November, 2021.



_____
Notary Public in and for
the State of Texas

ANN ZIENTEK
Notary Public, State of Texas
Comm. Expires 02-13-2025
Notary ID 12237974

OF COUNSEL:

Gus G. Tamborello
S.B.N. 19632000
Gus G. Tamborello, P.C.
2900 Weslayan, Suite 150
Houston, Texas 77027
(713) 659-7777
(713) 659-7780 (fax)
Gus@Tamborellolaw.com

ATTORNEY FOR GUS TAMBORELLO,
TEMPORARY ADMINISTRATOR OF THE
ESTATE OF DALLAS JOSEPH FONTENOT, JR., DECEASED

## ESTATE OF DALLAS JOSEPH FONTENOT, JR., DECEASED
## SCHEDULE "A"
## CASH

**DESCRIPTION**                                    **DATE OF DEATH VALUE**

A.    *Community Property*

Cash on hand                                       $ 23,885.00[1]

    Total Community Cash                           $ 23,885.00

    Value of Decedent's undivided ½ interest       $ 11,942.50

B.    *Separate Property*

None

**TOTAL CASH**                                     $ 11,942.50[2]



---

[1] This was cash turned over to the administrator by Dakota Fontenot, who stated he retrieved it from the Decedent's residence.

[2] Other cash assets are in bank accounts under the names of various corporations. The stock of two of the corporations appears to be owned by the Decedent. The cash in those entities is addressed in Schedule "C" as part of the value of the Decedent's interest in those entities. The other two entities are owned by a trust and are, therefore, not part of the Decedent's probate estate.

**ESTATE OF DALLAS JOSEPH FONTENOT, JR., DECEASED**
**SCHEDULE "B"**
**OTHER PERSONAL PROPERTY**

**DESCRIPTION**                                      **DATE OF DEATH VALUE**

*A.      Community Property*

(i)      Motor Vehicles

1.       2020 Ford F350 Super
         VIN 1FT8W3BT6LED48824
         License Plate: NKT1213
         (Estimated Value per kbb.com)                   $ 52,000.00

2.       2010 Toyota Sequoia
         VIN 5TDDW5G10AS027256
         License Plate: HTX4463
         (Estimated Value per kbb.com)                   $18,000.00[3]

3.       1999 Ford Pick up
         VIN 1FTWW33S1XEC80483
         License Plate: CNG4278
         (Estimated Value per kbb.com)                   14,000.00

4.       2018 Toyota Sequoia
         VIN 5TDYY5G165JS070155
         (Estimated Value per kbb.com)                   50,000.00[4]

5.       2017 Ford F150
         VIN 1FTEW1EF4HFC13310
         (Estimated Value per kbb.com)                   32,000.00[5]

6.       2008 Honda Ridgeline Pickup 4WD
         VIN 2HJYK165X8H507657
         (Estimated Value in Las Vegas per cars.com)     20,000.00[6]

---

[3] This vehicle appears to be titled in the name of Ice Embassy, Inc. and the Decedent.

[4] This vehicle is being driven by the Decedent's spouse, Holli Fontenot.

[5] This vehicle is being driven by the Decedent's son, Dakota James Fontenot. Title appears to be in the name of both the Decedent and Dakota James Fontenot.

[6] This vehicle is apparently located at Decedent's residence in Las Vegas, Nevada.

UNOFFICIAL COPY

**ESTATE OF DALLAS JOSEPH FONTENOT, JR., DECEASED**
**SCHEDULE "B"**
**OTHER PERSONAL PROPERTY (CONTINUED)**

**DESCRIPTION**                                                        **DATE OF DEATH VALUE**

7.    2013 Toyota Sequoia 4D 4X2 Platinum V8
      VIN 5TDYY5G12DS044222
      License Plate: BKJ3504
      (Estimated Value in Las Vegas per cargurus.com)    $21,000.00[7]

8.    2003 Ford Thunderbird
      VIN 1FAHP62A83Y103279
      License Plate: BS1L744
      (Estimated Value per cars.com)                     17,000.00

(ii)  Manufactured Homes

1.    Mobile Home
      GASTON-FULSHEAR CORP,
      SERIAL # BRK001554TXA & B,
      TITLE # MH00356826,
      LABEL # PFS1071292 & 3,
      MODEL 94CLS30603AH10,
      MH ONLY ON #0490
      (Market value for FCAD)                            39,340.00

(iii) Trailers

1.    2002 Sundowner Horse Trailer
      VIN 13SVE252221VB4916
      License: FNXX31
      (Average Retail per nadaguides.com)`               20,000.00

2.    2003 Haulmark box Trailer
      VIN 16HGB22253G051189
      License: 25576C
      (Estimated value per smartrvguide.com)             5,000.00

3.    1995 Goos Livestock Trailer
      VIN 16GSH6C21SB047946
      License: DMCP99

---

[7] This vehicle is apparently located at Decedent's residence in Las Vegas, Nevada and is registered in the name of Decedent and Ice Embassy, Inc.

**ESTATE OF DALLAS JOSEPH FONTENOT, JR., DECEASED**
**SCHEDULE "B"**
**OTHER PERSONAL PROPERTY (CONTINUED)**

| DESCRIPTION | DATE OF DEATH VALUE |
|---|---|
| (titled in the name of Circle 8 Ranch) (Estimated value per horsetrailerworld.com) | $4,300.00 |
| 4. 1996 FW Utility Trailer VIN 1C9G12022T1288119 License: CNPG10 (titled in the name of Circle 8 Ranch) (Estimated value per smartrvguide.com) | 2,500.00 |
| 5. 2006 Big Tex Utility Trailer VIN 16VAX121762A24988 License: FDKC37 (titled in the name of Circle 8 Ranch) (Estimated value internet search) | 3,500.00 |
| (iv) Farming Equipment | |
| 1. Misc. Farming Equipment (Estimated, not yet appraised) | 35,000.00 |
| 2. John Deere Tractor (Based upon remaining balance due on note) | 25,000.00 |
| (v) Livestock/Animals | |
| Horse, Various cattle | 1,000.00 |
| (vi) Misc. Furnishings and Personal Effects (Estimated, not yet appraised) | 50,000.00 |
| (vii) Misc. Collectibles (Estimated, not yet appraised) | 100,000.00 |

UNOFFICIAL COPY

**ESTATE OF DALLAS JOSEPH FONTENOT, JR., DECEASED**
**SCHEDULE "B"**
**OTHER PERSONAL PROPERTY (CONTINUED)**

**DESCRIPTION**                                                    **DATE OF DEATH VALUE**

(viii)   Business Interests

1.      Entertainment Marketing and Management, Ltd
        General Partner: Showbizz, Inc.[8]
        (a Texas domestic limited partnership formed 3/29/1995)
        Limited Partners:[9]
        BFD #1, Inc., a Nevada Corporation
        BFD #2, Inc., a Nevada Corporation
        BFD #3, Inc., a Nevada Corporation
        BFD #4, Inc., a Nevada Corporation
        Created: March 29, 1985
        (Value based upon approx. value of assets)              $10,000.00

2.      Showbizz, Inc.
        (a Texas corporation formed on 2/6/1992)
        (serves as general partner of Entertainment  Marketing
        and Management, Ltd)
        (Decedent appears to be sole shareholder)
        (Value based upon approx. value of assets)              $0.00

3.      The Lucky Dog Pub & Grille, LLC
        Director: Dallas Fontenot
        Formed September 10, 2015
        Shareholder: Decedent (100% ownership)
        (Value based upon approx. value of assets)              80,000.00

4.      Naughty Leprechaun Tavern, LLC
        (a Texas limited liability corporation formed
         on 9/10/2015)
        Shareholder: Decedent (100%)
        (Value based upon information obtained to date)          0.00

                Total Community Personal Property     $599,640.00

---

[8] This entity is apparently owned by Decedent. Decedent was the President of the entity.

[9] The BFD entities are believed to be dissolved for failure to file with the Nevada
Secretary of State. It is also believed that the Decedent owned the stock in those entities.
Decedent was also President of these entities.

**ESTATE OF DALLAS JOSEPH FONTENOT, JR., DECEASED**
**SCHEDULE "B"**
**OTHER PERSONAL PROPERTY (CONTINUED)**

**DESCRIPTION**                                    **DATE OF DEATH VALUE**



Value of Decedent's undivided ½ interest       $299,820.00

B.    *Separate Property*

None.

**TOTAL OTHER PERSONAL PROPERTY**        **$ 299,820.00**

**ESTATE OF DALLAS JOSEPH FONTENOT, JR., DECEASED**
**SCHEDULE "C"**
**REAL ESTATE**

**DESCRIPTION**                                    **DATE OF DEATH VALUE**

*A.*    *Community Property*

1.    Gaston-Fulshear Corp, Lots 42-A, 42-B,
      43, 44, 52, 53 (part), and 55, Tract 40,
      20.478 acres located in Richmond, Fort
      Bend County, Texas (address is listed as
      ██████████████████ Richmond,
      Texas 77406
      (2021 Market Value per FBCAD)          $ 1,034,640.00

      Gaston-Fulshear Corp, Lots 52 and 53 (part),
      2.0 acres located in Richmond, Fort
      Bend County, Texas (this property is
      contiguous to the 20.478 acre tract)
      (2021 Market Value per FBCAD)          $    643,170.00

      Gaston-Fulshear Corp, Lot 10-B, Tract 40,
      3.0 acres located in Richmond, Fort Bend
      County, Texas (this property is located across
      the street from the back side of the 20.478
      acre tract)
      (2021 Market Value per FBCAD)          $    213,160.00

            Total Community Real Estate       $ 1,890,970.00

            Value of Decedent's undivided ½ interest   $    945,485.00

*B.*    *Separate Property*

      None.

      **TOTAL REAL ESTATE**                 **$ 945,485.00**[10]

---

[10] Other real property which may be associated with the Decedent are titled in corporations which are owned by trusts and are not part of the Decedent's probate estate. In addition, there is real property in Las Vegas, Nevada which is governed by the State of Nevada and is not under this court's jurisdiction. Administrator currently does not have any authority over the Nevada real estate.

UNOFFICIAL COPY

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Gus Tamborello
Bar No. 19632000
gus@tamborellolaw.com
Envelope ID: 59449914
Status as of 11/29/2021 8:42 AM CST

Associated Case Party: Dakota Fontenot

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Barbara Light | 24109472 | blight@boyarmiller.com | 11/23/2021 6:35:06 PM | SENT |
| Christopher CBurt | | cburt@boyarmiller.com | 11/23/2021 6:35:06 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Debra TPellegrin | | dpellegrin@boyarmiller.com | 11/23/2021 6:35:06 PM | SENT |
| Stephen A.Mendel | | info@mendellawfirm.com | 11/23/2021 6:35:06 PM | SENT |
| Kenneth E.Sumner, Jr. | | ksumner@romanosumner.com | 11/23/2021 6:35:06 PM | SENT |
| Lindsey Hebert | | lhebert@romanosumner.com | 11/23/2021 6:35:06 PM | SENT |

Associated Case Party: HolliHFontenot

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| MENDEL LAWFIRM | | info@mendellawfirm.com | 11/23/2021 6:35:06 PM | SENT |

Associated Case Party: GusGTamborello

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Gus G. Tamborello | 19632000 | gus@tamborellolaw.com | 11/23/2021 6:35:06 PM | SENT |

UNOFFICIAL COPY

Electronically Filed
11/23/2021 6:35 PM
Laura Richard
County Clerk
Fort Bend County, Texas

NO. 21-CPR-036521

| | | |
|---|---|---|
| IN RE: ESTATE OF | § | IN THE COUNTY COURT |
| DALLAS JOSEPH FONTENOT, JR. | § | AT LAW NUMBER 4 OF |
| DECEASED | § | FORT BEND COUNTY, TEXAS |

## ORDER APPROVING INVENTORY AND LIST OF CLAIMS

On this day the Court considered the Inventory and List of Claims of the Estate of

DALLAS JOSEPH FONTENOT, JR., Deceased, filed herein by GUS TAMBORELLO,

TEMPORARY ADMINISTRATOR OF THE ESTATE OF DALLAS JOSEPH FONTENOT,

JR., DECEASED, and the Court, having examined the same, is satisfied that it should in all

respects be approved. There having been no objections made thereto, it is therefore

ORDERED, ADJUDGED, and DECREED that the Inventory and List of Claims filed by

GUS TAMBORELLO, TEMPORARY ADMINISTRATOR OF THE ESTATE OF DALLAS

JOSEPH FONTENOT, JR., DECEASED is APPROVED.

SIGNED this ___1/25/2022___

_____
JUDGE PRESIDING

APPROVED AS TO FORM:

/s/ Gus G. Tamborello

Gus G. Tamborello
S.B.N. 19632000
Gus G. Tamborello, P.C.
2900 Weslayan, Suite 150
Houston, Texas 77027
(713) 659-7777
(713) 659-7780 (fax)
Gus@Tamborellolaw.com

ATTORNEY FOR ADMINISTRATOR

Filed: 01/26/2022 08:13:30
Laura Richard
County Clerk
Fort Bend County, Texas
Hlipala, Sarah

EXHIBIT

15

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Gus Tamborello
Bar No. 19632000
gus@tamborellolaw.com
Envelope ID: 59449914
Status as of 11/29/2021 8:42 AM CST

Associated Case Party: Dakota Fontenot

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Christopher CBurt | | cburt@boyarmiller.com | 11/23/2021 6:35:06 PM | SENT |
| Barbara Light | 24109472 | blight@boyarmiller.com | 11/23/2021 6:35:06 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Debra TPellegrin | | dpellegrin@boyarmiller.com | 11/23/2021 6:35:06 PM | SENT |
| Stephen A.Mendel | | info@mendellawfirm.com | 11/23/2021 6:35:06 PM | SENT |
| Kenneth E.Sumner, Jr. | | ksumner@romanosumner.com | 11/23/2021 6:35:06 PM | SENT |
| Lindsey Hebert | | lhebert@romanosumner.com | 11/23/2021 6:35:06 PM | SENT |

Associated Case Party: HolliHFontenot

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| MENDEL LAWFIRM | | info@mendellawfirm.com | 11/23/2021 6:35:06 PM | SENT |

Associated Case Party: GusGTamborello

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Gus G. Tamborello | 19632000 | gus@tamborellolaw.com | 11/23/2021 6:35:06 PM | SENT |

UNOFFICIAL COPY

<u>MANAGEMENT AGREEMENT</u>

THIS MANAGEMENT AGREEMENT (this "Agreement") is made effective January 1, 2024 (the "Effective Date"), between ENTERTAINMENT MARKETING & MANAGEMENT, LTD., a Texas limited partnership ("Manager"), and ICE EMBASSY, INC. d/b/a THE COLORADO BAR AND GRILL, a Texas corporation (the "Owner").

<div align="center">RECITALS</div>

A. The Owner leases space from HFR ENTERPRISES, INC., a Texas corporation ("HFR") where it operates a sexually oriented business, bar, and restaurant (the "Club") located at the municipal address: 6710 Southwest Fwy, Houston, Texas 77074.

B. The Owner's corporate records and contracts were previously maintained by or on behalf of Dallas Joseph Fontenot, Jr. ("Mr. Fontenot").

C. Mr. Fontenot died on September 3, 2021, and since such date, neither corporate records of the Owner, nor records of any contract or agreement relating to the management of the Club have been located after a diligent search by his heirs and authorized affiliates.

D. On or about the Effective Date, the Owner previously retained Manager to manage and operate the Club, which such relationship may have been memorialized pursuant to a written or oral agreement, which neither the Owner, nor the Manager have been able to locate (the "Original Agreement").

E. The Owner desires to continue to retain Manager to manage and operate the Club, and provide support services to the Owner, on the terms and conditions set forth in this Agreement. Any reference to the Owner throughout this Agreement shall mean and include any and all of the Owner's designated affiliates that may directly or indirectly control or own an interest in the Club.

F. Manager is experienced in bar operations and management and has the staff, expertise and capability to perform the terms of this Agreement.

G. The Owner and the Manager desire that this Agreement amend, supersede, and replace the Original Agreement, and further desire that their relationship be governed in accordance with the terms and provisions of this Agreement effective as of the Effective Date.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements contained in this Agreement and other good and valuable consideration not recited in this Agreement, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. <u>Engagement and Authorization.</u>

1.01 <u>Engagement As Manager.</u> The Owner hereby engages Manager as its sole and exclusive agent to supervise, manage, direct and control the operations of the Club, in accordance with the terms

<div align="center">1</div>

EXHIBIT
16

HAH 000193

and conditions hereof. Manager hereby accepts such engagement as the manager of the Club during the Term, as hereafter defined, of this Agreement. The parties acknowledge such engagement does not include alcoholic beverage operations at the Club. In accordance with applicable law, Owner, as the holder of the TABC permit for the Club, maintains control over the purchase, sale, and service of alcoholic beverages at the Club.

1.02 Grant of Authority. The Owner hereby grants Manager the power and authority to take all actions and to do all things reasonably required to perform the obligations of the Manager under this Agreement. For the avoidance of doubt, Manager shall not have the power and authority to (i) borrow any money or execute any promissory note, bill of exchange or other credit obligation, mortgage or encumbrance, or pledge the credit of the Owner without, in each case, the prior written consent of the Owner, (ii) file, prosecute, defend or settle any legal or regulatory proceedings involving the Owner or the Club without the Owner's prior written approval, or (iii) act on behalf of, or hold itself out as having authority to act on behalf of, the Owner in any manner which is beyond the scope of the terms of this Agreement. In the performance of this Agreement, Manager shall act as the agent of the Owner; the creation of this agency shall not in any manner relieve the Owner of its duties or obligations under contract or law.

2. Manager's Duties. During the Term, Manager shall provide the Owner with the following specific services (hereinafter collectively referred to as the "Services"), at the Club:

2.01 Club Management. Manager shall oversee the day-to-day management of the Club, which responsibilities shall include: (a) the hiring, training and supervising of all Club employees, as more particularly described below; ; (b) the maintenance of business files and records; (c) the performance of general administrative functions; and (d) the preparation of the Club's monthly activities, as more particularly described below. In addition, Manager shall manage, operate, and maintain the Club in such a manner that the Club is at all times in substantial compliance with: (i) all zoning and use restrictions, fire codes, building codes, and other requirements issued by any governmental authority; (ii) all licenses, permits and other authorizations required in the operation of the Club; (iii) any policy of insurance covering the Club; (iv) that certain Real Estate Lease between the Owner and HFR (the "Club Lease") and that certain Sublease between the Owner and HFR (the "Parking Lot Lease" and collectively with the Club Lease, the "Leases"), to avoid any default by the Owner thereunder; (v) the negotiation of inventory purchase contracts with vendors, including combining purchasing quantity of Manager and its franchisee and/or licensees with the purchasing quantity of the Owner, its affiliates and franchisee and/or licensees in order to obtain any vendor discounts, rebates or refunds; and (vi) all applicable laws and regulations. With the written consent of the Owner, Manager may in the name of itself, the Owner or both, take such appropriate action as necessary to challenge to protest the validity or application of any legal requirement, tax or other imposition against the Club. The Owner agrees to execute and deliver any documents which Manager and the Owner deem reasonably necessary and appropriate in connection with such action.

2.02 Reimbursement of Expenses

2.

HAH 000194

Owner shall reimburse Manager for all expenses incurred by Manager in connection with this Agreement or otherwise incurred in connection with the Club. Such expenses shall be reimbursed on demand, subject to reconciliation on a monthly basis.

2.03 – 2.04 Intentionally Blank

2.05 Financial Reports.

(a) Manager shall maintain full and adequate records and books of account and such other records as might be appropriate to reflect the results of operation of the Club, and which shall reflect all revenues and expenditures and all other receipts and disbursements relating to each of the Club. All books and records will be kept in accordance with generally accepted accounting principles ("GAAP") and shall be the property of the Owner and the Owner will have access thereto at all reasonable times.

(b) Within fifteen (15) days after the end of each month, Manager shall prepare and furnish to the Owner the following information for the preceding calendar month for each of the Club:

(i) Financial Statements. An accrual basis balance sheet in reasonable detail, together with a reasonably detailed accrual basis profit and loss statement for such preceding calendar month next preceding and with a cumulative calendar year accrual basis profit and loss statement to date, and a statement of cash flows for each monthly and cumulative period for which a profit and loss statement is prepared;

(ii) Supporting Data. At the Owner's request, copies of the following: (a) all checks, bank statements, bank deposit slips and bank reconciliations; (b) detailed cash receipts and disbursement records; (c) copies of all invoices; (d) supporting documentation for payroll, payroll taxes and employee benefits; and (e) such other information as the Owner might reasonably request;

(iii) Other Reports. Such other reports and documents as might be reasonably requested by the Owner from time to time (including, without implied limitation, certificates of compliance and other instruments required in connection with any bond financing relating to the Club); and

(iv) Management Fee Invoice. An invoice for the Management Fee (defined below) for such preceding calendar month and any other preceding calendar month for which the Management Fee is outstanding, based on the Gross Revenues set forth in the applicable financial statements.

(c) Within forty-five (45) days after the end of each calendar year, Manager shall furnish to the Owner year-end financial statements for the Club (including a balance sheet, income statement and statement of cashflows) which statements shall be unaudited and shall be prepared in accordance with GAAP. The Owner may engage an independent certified public accounting firm to provide audited annual financial statements, which cost shall be an operating expense of the Club. Manager shall cooperate in all respects with such accountant in the preparation of such statements, including the delivery of any financial information generated by Manager pursuant to the terms of this Agreement and reasonably required by the Owner's accountant to prepare such audited financial statements.

3

HAH 000195

(d) The Owner, shall have the right and privilege of examining and inspecting the books and records (including audit rights) during customary business hours following reasonable advance notice to Manager. Upon the termination of this Agreement, all such books and records shall be turned over to the Owner to insure the orderly continuance of the operation of the Club. If an audit or inspection of the books reveals that the calculation of Gross Revenues was miscalculated by Manager such that the fees paid out of the operating funds of the Club by the Owner pursuant to this Agreement varied by five percent (5%) or more from the amount provided by Manager in the statements delivered pursuant to this Agreement, then Manager will reimburse the Owner for all inspection and audit costs (including, without limitation, reasonable travel, lodging, meals, salaries and other expenses of the inspecting or auditing personnel) in addition to any adjustment or reimbursement for fees owing pursuant to this Agreement.

2.06 Human Resources. Manager shall hire, train, supervise, and pay all of its own employees and other personnel ("Employees") necessary to fulfill its obligations hereunder. All Employees shall be the employees or independent contractors of Manager, not the Owner. Manager may discharge any Employee in its discretion and pursuant to applicable state and federal law. Manager shall cause Employees to be covered by workers' compensation insurance and such other insurance as is now or hereafter required by law. Manager shall maintain all personnel and payroll records and manage all Employee benefits programs, including, but not limited to, health insurance, dental insurance, short and long term disability plans, life insurance, workers' compensation, cafeteria plans, vacation plans, sick leave and employee policy manuals in accordance with this Agreement; may draw down from the Gross Revenues (defined herein), all costs and expenses incurred in connection with all on and offsite Employees, including, without limitation, wages, salaries, on-site staff, reasonable bonuses, contract labor, commissions, fringe benefits, employee benefits, recruitment costs, workers' compensation and unemployment insurance premiums, payroll taxes, vacation and sick leave (but excluding any such costs or expenses and overhead of any offsite personnel). In addition, Manager shall maintain businesslike relations with the customers of the Club and all customer complaints will be received, logged and resolved in a systematic fashion. Complaints of a serious nature will be reported to the Owner with appropriate recommendations from the Manager.

2.07 Accounting. Manager shall perform general accounting functions for the operation of the Club, including, without limitation: cash management and banking relations; budgeting, forecasting and financial statement reporting; the preparation and maintenance of records necessary to produce financial statements; the preparation of financial statements in accordance with this Agreement; the preparation, execution, and filing, punctually, when due all forms, reports, and returns required by law relating to the employment of Employees or to the management, operation, occupancy, maintenance or use of the Club, including without limitation any sales or use tax forms, reports, and income tax returns; audit support; and any other general accounting function as requested by the Owner. In addition, Manager shall pay punctually when due any sales, use, employment or other taxes relating to the operation of the Club.

2.08 Marketing. Manager will devise a strategy for and assist in the implementation, at the Owner's sole costs and expense, of a marketing program to advertise and promote the business of the Club. Manager may cause the Club to participate in such marketing plans, oral and written presentations,

4

HAH 000196

promotional materials, public relations, media relations and any other general marketing functions to promote the Club.

2.09 Point-of-Sale Management Information System. Manager shall operate, administer, maintain, repair and upgrade, at the Owner's expense, the existing point-of-sale management information system for tracking purchases and inventory of each of the Club. Manager shall provide to the Owner an automated, monthly point-of-sale report on the first day of each calendar month.

2.10 Manager Personnel. Owner understands and agrees that Manager may hire or contract with outside contractors for some of its responsibilities hereunder.

2.11 Deletion of Specified Services. Any time during the Term of this Agreement, upon prior written notice by the Owner to Manager, the Owner may delete any specified service from the Services to be provided to the Club.

2.12. Term. Unless sooner terminated as hereafter provided, this Agreement shall be effective for a period of one (1) year commencing on the Effective Date of this Agreement (the "Term"), which Term shall be automatically extended for additional periods of one (1) year each, unless on or before thirty (30) days prior to the expiration of the Term, as extended, either party provides written notice to the other party not to so extend the Term.

3.01 Events for Termination.

(a) The Owner may terminate this Agreement, at any time and for any reason by providing Manager at least thirty (30) days' prior written notice.

(b) In addition, the Owner, at its sole option, may terminate this Agreement if any of the following events of default occur:

(i) The filing of a voluntary petition in bankruptcy or insolvency or a petition for reorganization under any bankruptcy law by Manager;

(ii) The consent to any involuntary petition in bankruptcy or the failure to vacate, within ninety (90) days from the date of entry thereof, any order approving an involuntary petition by Manager;

(iii) The entering of an order, judgment or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating Manager as bankrupt or insolvent, or approving a petition seeking reorganization or appointing a receiver, trustee, or liquidator of all or a substantial part of such party's assets, and such order, judgment or decree continues unstayed and in effect for any period of ninety (90) days or more;

(iv) The appointment of a receiver for all or any substantial portion of the property of Manager;

(v) The failure of Manager to make any payment required to be made in accordance with the terms of this Agreement within ten (10) days after receipt of written notice from the Owner, specifying said default with reasonable specificity, when such payment is due and payable; or

5

HAH 000197

(vi) The failure of Manager to perform, keep or fulfill any of the material covenants, undertakings, obligations or conditions set forth in this Agreement (but excluding any default set forth in Section 3.01(b)(v)), and the continuance of such default for a period of thirty (30) days after written notice of said failure from the Owner; provided, however, if such default cannot be cured within such thirty (30) day period and Manager commences to cure such default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended so long as it shall require Manager in the exercise of due diligence to cure such default, but not to exceed 180 days; provided, further, however, in the event of a default of the type set forth in this Section 3.01(b)(vi) shall result in a default by the Owner under any financing or loan agreement, such shorter cure period (if any) with respect to such default as shall be provided for therein; provided further that the cure period for any breach of this Agreement that would result in criminal sanctions against the Owner must be cured within ten (10) days following written notice thereof from the Owner.

(c) Manager, at its sole option, may terminate this Agreement if any of the following events of default occur:

(i) The filing of a voluntary petition in bankruptcy or insolvency or a petition for reorganization under any bankruptcy law by the Owner;

(ii) The consent to any involuntary petition in bankruptcy or the failure to vacate, within ninety (90) days from the date of entry thereof, any order approving an involuntary petition by the Owner;

(iii) The entering of an order, judgment or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating the Owner as bankrupt or insolvent, or approving a petition seeking reorganization or appointing a receiver, trustee, or liquidator of all or a substantial part of such party's assets, and such order, judgment or decree continues unstayed and in effect for any period of ninety (90) days or more;

(iv) The appointment of a receiver for all or any substantial portion of the property of the Owner;

(v) The failure of the Owner to make any payment required to be made in accordance with the terms of this Agreement within ten (10) days after receipt of written notice from Manager, specifying said default with reasonable specificity, when such payment is due and payable; or

(vi) The failure of the Owner to perform, keep or fulfill any of the material covenants, undertakings, obligations or conditions set forth in this Agreement (but excluding any default set forth in Section 3.01(c)(v)), and the continuance of such default for a period of thirty (30) days after written notice of said failure from Manager; provided, however, if such default cannot be cured within such thirty (30) day period and the Owner commences to cure such default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended so long as it shall require the Owner in the exercise of due diligence to cure such default, but not to exceed 180 days; provided, further, however, that the cure period for any breach of this Agreement that would result in criminal sanctions against Manager must be cured within ten (10) days following written notice thereof from Manager.

6

HAH 000198

3.02 <u>Certain Obligations of Manager After Termination</u>. Upon termination of this Agreement, Manager shall: (i) deliver to the Owner all records, books, accounts, files, and other documentation (the "Records") pertaining to the management, maintenance, operation, marketing and use of the Club, including, without limitation, all records relative to the employees, suppliers, finances, and affairs of the Club; (ii) deliver and assign, transfer or otherwise convey to the Owner all contracts and all personal property relating to or used in the management, operation and maintenance of the Club, including, without limitation, all keys, combinations to locks and other security devices, documents, materials, operating supplies, furnishings and equipment, provided that any personal property owned by Manager may be retained by Manager; (iii) prepare and deliver to the Owner a full set of reports for the Club in accordance with Section 2.05, current to the date of termination; (iv) deliver all funds held by Manager on behalf of the Owner; and (v) render such assistance as the Owner might reasonably request to facilitate an orderly transition in the management and operation of the Club.

4. <u>Management Fee</u>. As compensation for all Services to be rendered by Manager during the Term of this Agreement, the Owner agrees to pay to Manager the following:

4.01 <u>Management Fee</u>. The Owner shall pay to Manager a management fee (the "Management Fee") for the Services in an amount equal to Seventeen Thousand Five Hundred and No/100 Dollars ($17,500.00) per month, with a true-up at the end of each calendar year, such that the aggregate annualized Management Fee is equal to ten percent (10%) of the Gross Revenues of the Club, for such calendar year. For the purposes of this Agreement, "Gross Revenues" means all revenues from the Club, except from the sale of alcoholic beverages, less any sales, use, employment or other taxes relating to the operation of the Club. The Management Fee shall be paid on a monthly basis within ten (10) days following the Owner's receipt of the applicable financial reports set forth in Section 2.05(b), but in no event earlier than the twentieth (20th) of the applicable month. In the event this Agreement is terminated during a calendar month, the Management Fee payable for the month in which such termination occurs will be prorated based upon a thirty (30) day month. Any short-fall of the Management Fee payment(s) shall carry over and shall be paid by Owner as soon as practicable.



5. <u>Insurance; Indemnification; Exculpation from Liability</u>.

5.01 <u>Insurance</u>.

(a) Manager, as an operating expense of the Club, shall obtain and maintain all the insurance policies and endorsements required under the Leases.

(b) Furthermore, Manager, at its sole cost and expense, shall obtain a commercial general liability insurance policy with amounts not less than $1,000,000 combined single limit for each occurrence and $2,000,000 for the aggregate of all occurrences within each policy year, as well as excess liability (umbrella) insurance with limit of at least $5,000,000 per occurrence, covering each of the following: bodily injury, death, or property damage liability per occurrence, personal and advertising injury, general aggregate, products and completed operations, and "all risk legal liability".

7

HAH 000199

(c) Owner, at is sole cost and expense, shall obtain a liquor liability insurance policy with amounts not less than $1,000,000 combined single limit for each occurrence and $2,000,000 for the aggregate of all occurrences within each policy year and shall list Manager as an additional insurance on the policy.

5.02 Indemnity.

(a) MANAGER SHALL INDEMNIFY AND HOLD THE OWNER (AND THE OWNER'S AGENTS, SHAREHOLDERS, OFFICERS, DIRECTORS, AGENTS, PRINCIPALS AND EMPLOYEES) HARMLESS FROM AND AGAINST ALL CLAIMS, DEMANDS, DAMAGES, JUDGMENTS, COSTS, LOSSES, PENALTIES, FINES, LIENS, SUITS, AND EXPENSES AND LIABILITIES, INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND COSTS AND EXPENSES INCIDENT THERETO (COLLECTIVELY, "CLAIMS") WHICH ARE NOT COVERED BY INSURANCE PROCEEDS PAYABLE TO THE OWNER OR THE INDEMNIFIED PARTY THAT MAY BE INCURRED BY OR ASSERTED AGAINST ANY SUCH PARTY AND THAT ARISE FROM (A) THE FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE OF MANAGER, ITS AGENTS, PRINCIPALS, PARTNERS, MEMBERS, OFFICERS, DIRECTORS, AND EXECUTIVE AND KEY EMPLOYEES, INCLUDING, WITHOUT LIMITATION, IN THE SUPERVISION OR TRAINING OF EMPLOYEES AND OTHER EMPLOYMENT MATTERS; OR (B) PLACING, DISCHARGE, LEAKAGE, USE OR STORAGE, OF HAZARDOUS MATERIALS ON THE PREMISES OR IN THE HOTEL BY MANAGER OR ITS AGENTS, PRINCIPALS, PARTNERS, MEMBERS, OFFICERS, DIRECTORS, AND EMPLOYEES DURING THE TERM IN VIOLATION OF THE LEASES. THIS INDEMNITY EXPRESSLY COVERS AND INCLUDES CLAIMS ARISING FROM THE NEGLIGENCE (BUT NOT GROSS NEGLIGENCE) OF THE OWNER.

(b) EXCEPT WITH RESPECT TO MATTERS FOR WHICH MANAGER IS OBLIGATED TO PROVIDE INDEMNIFICATION PURSUANT TO SECTION 5.02(a) OR ARISING SOLELY OUT OF AN EVENT OF DEFAULT BY MANAGER UNDER THIS AGREEMENT, OWNER SHALL INDEMNIFY AND HOLD MANAGER AND THE MANAGER AFFILIATED ENTITIES (AND THEIR RESPECTIVE AGENTS, PRINCIPALS, PARTNERS, MEMBERS, OFFICERS, DIRECTORS, AND EMPLOYEES) HARMLESS FROM AND AGAINST ALL CLAIMS WHICH ARE NOT COVERED BY INSURANCE PROCEEDS PAYABLE TO MANAGER OR THE INDEMNIFIED PARTY THAT ARISE FROM OR IN CONNECTION WITH (A) THE OWNERSHIP AND OPERATION OF THE CLUB, (B) THE CONDITION OR USE OF THE CLUB, INCLUDING INJURY TO PERSONS OR PROPERTY OR BUSINESS, (C) THE FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE OF THE OWNER, OR (D) PLACING, DISCHARGE, LEAKAGE, USE OR STORAGE, OF HAZARDOUS MATERIALS IN THE CLUB BY THE OWNER DURING THE TERM, THE EXISTENCE OF HAZARDOUS MATERIALS IN, ON OR UNDER THE PREMISES BEFORE THE COMMENCEMENT OF THE TERM. MANAGER SHALL PROMPTLY PROVIDE THE OWNER WITH WRITTEN NOTICE OF ANY CLAIM OR SUIT BROUGHT AGAINST IT BY A THIRD PARTY WHICH MIGHT RESULT IN SUCH INDEMNIFICATION.

8

HAH 000200

**THIS INDEMNITY EXPRESSLY COVERS AND INCLUDES CLAIMS ARISING FROM THE NEGLIGENCE (BUT NOT GROSS NEGLIGENCE) OF MANAGER.**

(c) Any party obligated to indemnify the other party under this Agreement (the "Indemnifying Party") shall have the right, by written notice to the other party, to assume the defense of any claim with respect to which the other party is entitled to indemnification hereunder. If the Indemnifying Party gives such written notice, (i) such defense shall be conducted by counsel selected by the Indemnifying Party and approved by the other party, such approval not to be unreasonably withheld or delayed (provided, however, that the other party's approval shall not be required with respect to counsel designated by the Indemnifying Party's insurer); (ii) so long as the Indemnifying Party is conducting such defense with reasonable diligence, the Indemnifying Party shall have the right to control said defense and shall not be required to pay the fees or disbursements of any counsel engaged by the other party for services rendered after the Indemnifying Party has given the written notice provided for above to the other party, except if there is a conflict of interest between the parties with respect to such claim or defense; and (iii) the Indemnifying Party shall have the right, without the consent of the other party, to settle such claim, but only provided that such settlement involves only the payment of money, the Indemnifying Party pays all amounts due in connection with or by reason of such settlement and, as part thereof, the other party is unconditionally released from all liability in respect of such claim. The other party shall have the right to participate in the defense of such claim being defended by the Indemnifying Party at the expense of the other party, but the Indemnifying Party shall have the right to control such defense (other than in the event of a conflict of interest between the parties with respect to such claim or defense). In no event shall (i) the other party settle any claim without the consent of the Indemnifying Party, so long as the Indemnifying Party is conducting the defense thereof in accordance with this Agreement; or (ii) if a claim is covered by the Indemnifying Party's liability insurance, take or omit to take any action which would cause the insurer not to defend such claim or to disclaim liability in respect thereof.

(d) The provisions of this Section 5.02 shall survive the termination of this Agreement with respect to acts, omissions and occurrences arising during the Term and shall be binding on the successors and assigns of the Owner and Manager.

6. Miscellaneous Provisions.

6.01 Notices. All notices, requests, demands, and other communications required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given if delivered by hand; mailed by certified or registered mail with postage prepaid or by overnight mail, electronic mail transmission, or if sent by facsimile as follows:

If to Manager, to:      Entertainment Marketing & Management, Ltd.
                        3414 Old Richmond Road
                        Rosenberg, Texas 77471
                        Attn: Dakota Fontenot
                        Email: dakotajamesfontenot@gmail.com

If to the Owner, to:    ICE Embassy, Inc.

·9·

HAH 000201

3414 Old Richmond Road
Rosenberg, Texas 77471
Attn: Dakota Fontenot
Email: dakotajamesfontenot@gmail.com

In either case, with a copy to:    BoyarMiller
2925 Richmond Avenue, 14th Floor
Houston, Texas 77098
Attn: Tiffany Melchers
Email: tmelchers@boyarmiller.com

or to such other person or address as such party hereafter designates (by written notice to the other party).

6.02 <u>Notices Concerning the Club</u>. Upon the receipt by Manager of any notice pertaining to the Club not of a routine nature, including in any event, but not limited to, notices of any violation of any legal requirements, Manager shall immediately inform the Owner of such notice and shall deliver a copy of the notice to the Owner as expeditiously as possible.

6.03 <u>Assignment</u>. This Agreement and all of the provisions of this Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations shall be assigned by either of the parties without the prior written consent of the other party.

6.04 <u>Governing Law</u>. This Agreement and the legal relations among the parties shall be governed by and construed in accordance with the laws of the State of Texas.

6.05 <u>Counterparts</u>. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

6.06 <u>Headings</u>. The headings in this Agreement are inserted for convenience only and shall not affect the construction of this Agreement.

6.07 <u>Entire Agreement; Modification</u>. This Agreement embodies the entire agreement and understanding of the parties with respect to the subject matter contained in this Agreement. This Agreement supersedes all prior agreements and understandings between the parties with respect to the subject matter contained herein. This Agreement may not be amended or modified in any manner except by an instrument in writing signed by the parties.

6.08 <u>Severability</u>. The provisions of this Agreement are severable and the invalidity of any one provision shall not affect the validity of any other provision.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

-10-

UNOFFICIAL COPY

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement effective as of the date first above written.

OWNER:

ICE EMBASSY, INC. d/b/a THE COLORADO BAR AND GRILL

By: _____

Name: Dakota Fontenot

Title: _President_____

MANAGER:

ENTERTAINMENT MARKETING & MANAGEMENT, LTD.

By:    BFD GP, LLC, its general partner

By: _____

Name: Dakota Fontenot

Title: President

ii

HAH 000203

## ADMINISTRATIVE SERVICES AGREEMENT

This ADMINISTRATIVE SERVICES AGREEMENT (this "**Agreement**"), dated as of January 1, 2024 (the "**Effective Time**"), is by and between ENTERTAINMENT MARKETING & MANAGEMENT, LTD., a Texas limited partnership (the "**Company**") and HFR ENTERPRISES, INC., a Texas corporation (the "**Service Recipient**").

### RECITALS

WHEREAS, the Company previously provided certain management and administrative support services to the Service Recipient, which relationship may or may not have been memorialized by a written agreement (the "**Original Agreement**");

WHEREAS, all records of the Company and Service Recipient, including the Original Agreement were previously maintained by or on behalf of Dallas Joseph Fontenot, Jr. ("**Mr. Fontenot**");

WHEREAS, Mr. Fontenot died on September 3, 2021, and since such date the Original Agreement has not been located after a diligent search by his heirs and authorized affiliates;

WHEREAS, the Service Recipient desires to engage the Company to provide certain management and administrative support services on the terms set out herein; and

WHEREAS, the Parties desire that this Agreement amend, restate, and supersede the Original Agreement in all respects.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Service Recipient (hereinafter, collectively the "**Parties**", or each, individually, a "**Party**") agree as follows:

1.    Provision of Services.

    1.1    Agreement to Provide Services. Upon the terms and subject to the conditions contained herein, the Company hereby agrees to provide to the Service Recipient the services ("**Administrative Services**") set forth in Section 1.2. Each of the Administrative Services shall be provided and accepted in accordance with the terms, limitations, and conditions set forth herein.

    1.2    Scope of Services. The Administrative Services provided under this Agreement shall include the following:[1]

        (a)    Tax. Tax services include tax support and tax compliance services as may be necessary to ensure that a Service Recipient complies with applicable tax laws and tax consulting services relating to research and planning.

        (b)    Accounting and Financial Statements/Periodic Reports. Accounting services include accounting support services to assist in the maintenance of a system

---

[1] NTD – Review the following list to ensure it is accurate/sufficient.

UNOFFICIAL COPY

EXHIBIT

**17**

of accounting for a Service Recipient and the preparation of unaudited balance sheets, statements of income and results of operations and cash flows.

(c)    Bookkeeping Services. Bookkeeping services include the process of systematically recording, organizing and managing financial transactions and records, maintaining accurate records of all financial transactions, sales, purchases, payments, receipts, and reconciling bank statements of the Services Recipient.

(d)    Lease Management. Lease management services include negotiation, lease administration, rent collection, lease renewal and termination, and other ancillary services related thereto.

(e)    Human Resources ("HR"). HR services include assistance with staffing and recruitment, training and employee development, and advice and establishment of policies for employee compensation and benefits.

(f)    Insurance Management. Insurance services include evaluation of insurance needs, policies and risks, management of brokers, placement of coverages, supervision over claims, and support of compliance functions.

2.    Fees and Payment.

2.1    Fees. For the Company's provision of the Administrative Services, Service Recipient shall pay to the Company a fee (the "Services Fee"). The amount of the Services Fee is set forth in Exhibit A attached hereto. The Services Fee set forth on Exhibit A may be amended from time to time by the Parties' mutual execution of an updated Exhibit A and subsequent attachment of such executed Exhibit A to this Agreement.

2.2    Payment. Beginning in calendar year 2023, the Company shall submit a statement to the Service Recipient no later than 15 days after the end of each calendar month (unless otherwise agreed to by the Parties) with respect to the amount of Services Fee payable by the Service Recipient for such month (a "Statement"). Each Statement shall set forth in reasonable detail the Services Fee. At least 30 days prior to December 31 of each calendar year during the term of this Agreement (each such date a "Settlement Date"), the Parties shall negotiate in good faith to determine a discount or premium to be applied to the Services Fees accrued during the preceding 12 months (the "Adjustment Amount"). Full payment for all Administrative Services, net of any Adjustment Amount, as set forth in the Statements, and less any applicable withholding taxes, shall be made no later than the applicable Settlement Date. In the event of any disagreement between the Company and the Service Recipient with respect to any Statement, or any amounts owed thereunder, the Company and the Service Recipient agree to negotiate in good faith to resolve such dispute. In the event of any disagreement between the Company and the Service Recipient with respect to any Adjustment Amount, which remains unresolved prior to the applicable Settlement Date, the Adjustment Amount shall default to $0.00. The Company and the Service Recipient shall make adjustments to charges as required to reflect the discovery of errors or omissions or changes in the charges.

3.    Taxes.

2

HAH 000182

3.1     Sales Tax and VAT. The Service Recipient will be liable for and will reimburse the Company or pay, as applicable, any applicable sales, value added or similar taxes with respect to the Administrative Services provided pursuant to this Agreement. The Service Recipient will not be responsible for any other taxes, assessment, duties, permits, tariffs, fees or other charges of any kind, including, but not limited to, taxes based on the Company's income or equity and withholding taxes imposed on the Company.

3.2     Withholding Tax. If the Service Recipient is required to withhold from any amount owed to the Company for which the Company is responsible, the amount withheld shall be subtracted from the amount owed by the Service Recipient and the Company will receive the amount remaining after the tax withheld.

4.     Accounting. The Company shall maintain accounting records of all services rendered pursuant to this Agreement and such additional information as the Service Recipient may reasonably request for purposes of their internal bookkeeping and accounting operations.

5.     Independent Contractor.

5.1     No Partnership or Joint Venture. In performing services pursuant to this Agreement, the Company will be an independent contractor of the Service Recipient and this Agreement will not be deemed to create a partnership, joint venture, or other arrangement between the Parties.

5.2     Company Employees. The employees or agents of the Company shall not be deemed or construed to be the employees, agents, or partners of the Service Recipient for any purposes whatsoever.

5.3     No Signature Authority. The Company and the Company's personnel or agents shall not enter into contracts on behalf of, or execute contracts as employees or agents of, the Service Recipient, or bind the Service Recipient in any manner, written or oral, express or implied.

6.     Indemnification. The Service Recipient shall indemnify, defend, and hold harmless the Company, its affiliates, officers, directors, employees, agents, and representatives from and against any and all losses, liabilities, claims, damages, actions, fines, penalties, expenses or costs (including court costs and reasonable attorneys' fees) suffered or incurred by the Company relating to any claim of a third party arising from or in connection with the Company's performance or non-performance of any covenant, agreement or obligation of the Company hereunder, other than by reason of the Company's gross negligence, willful misconduct or bad faith. This Section 6 shall survive any termination or expiration of this Agreement.

7.     Limitation of Liability. Notwithstanding any other provision of this Agreement and except for liability caused by the Company's gross negligence, willful misconduct or bad faith, (i) no Party nor their respective directors, officers, employees, and agents, will have any liability to any other Party, or their respective directors, officers, employees and agents, whether based on contract, warranty, tort, strict liability, or any other theory, for any indirect, incidental, consequential, or special damages, and (ii) the Company, as a result of providing an

3

HAH 000183

Administrative Service pursuant to this Agreement, shall not be liable to any other Party for more than the cost of the Administrative Services related to the claim or damages.

8.    Term and Termination.

    8.1    Term of Services. The term of this Agreement shall be one (1) year beginning as of the Effective Time, provided that such term shall renew automatically for successive terms of one (1) year unless the Company provides notice to the Service Recipient that this Agreement shall not be renewed at least thirty (30) days prior to the expiration of any one-year term.

    8.2    Termination. Either Party may terminate this Agreement, or any part of this Agreement, at any time upon thirty (30) days prior notice to the other Party.

9.    General Provisions.

    9.1    Assignment. Neither Party shall assign or transfer its rights and obligations hereunder in whole or in part without the prior written consent of the other Party.

    9.2    Successor and Assigns. This Agreement is binding on and inures to the benefit of the Parties and their respective permitted successors and permitted assigns.

    9.3    Amendments. No amendment to this Agreement shall be effective unless it is in writing and signed by the Parties.

    9.4    No Third-Party Beneficiaries. Except for the right of the Company's affiliates, officers, directors, employees, agents and representatives to enforce their rights to indemnification under Section 6, this Agreement benefits solely the Parties to this Agreement and their respective permitted successors and assigns and nothing in this Agreement, express or implied, confers on any other person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

    9.5    Cooperation. The Service Recipient will provide all information that the Company reasonably requests for performance of services pursuant to this Agreement, and the Service Recipient will cooperate with any reasonable request of the Company in connection with the performance of services pursuant to this Agreement.

    9.6    Counterparts. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement.

    9.7    Severability. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

    9.8    Governing Law. This Agreement, including all exhibits, schedules, attachments and appendices attached to this Agreement and thereto, and all matters arising

4

UNOFFICIAL COPY

out of or relating to this Agreement, are governed by, and construed in accordance with, the laws of the State of Texas, without regard to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Texas.

9.9     Waiver. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

9.10    Notices. All correspondence or notices required or permitted to be given under this Agreement shall be in writing, in English and addressed to the other Party at its address set out below (or to any other address that the receiving Party may designate from time to time). Each Party shall deliver all notices by personal delivery, nationally recognized overnight courier (with all fees prepaid), facsimile or e-mail (with confirmation of transmission) or certified or registered mail (in each case, return receipt requested, postage prepaid). Except as otherwise provided in this Agreement, a notice is effective only (a) upon receipt by the receiving Party and (b) if the Party giving the notice has complied with the requirements of this Section. Such communications must be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 9.11):

| If to Company: | Entertainment Marketing & Management, Ltd.<br>3414 Old Richmond Road<br>Rosenberg, Texas 77471<br>E-mail: dakotajamesfontenot@gmail.com<br>Attention: Dakota Fontenot |
| --- | --- |
| If to Service Recipient: | HFR Enterprises, Inc.<br>3414 Old Richmond Road<br>Rosenberg, Texas 77471<br>E-mail: dakotajamesfontenot@gmail.com<br>Attention: Dakota Fontenot |
| In either case, with a copy to: | BoyarMiller<br>2925 Richmond Ave., 14th Floor<br>Houston, Texas 77098<br>E-mail: tmelchers@boyarmiller.com<br>Attention: Tiffany Melchers |

9.11    Entire Agreement. This Agreement, including and together with any related exhibits, schedules, attachments and appendices, constitutes the sole and entire agreement of the Company and the Service Recipient with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, regarding such subject matter.

[SIGNATURE PAGE FOLLOWS]

5

UNOFFICIAL COPY

HAH 000185

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the date set forth above.

COMPANY:

**ENTERTAINMENT MARKETING &**
**MANAGEMENT, LTD.,**
a Texas limited partnership

By: **BFD GP, LLC,**
a Texas limited liability company
its general partner

By: _____
Name: Dakota Fontenot
Title: President

SERVICES RECIPIENT:

**HFR ENTERPRISES, INC.,**
a Texas corporation

By: _____
Name: Dakota Fontenot
Title: President

6

HAH 000186

## EXHIBIT A

## SERVICES FEE

- Prior to Calendar Year 2021: As reflected on the books and records of the Company.
- Calendar Year 2021: $977.59 per Month.
- Calendar Year 2022: $462.50 per Month.
- Calendar Year 2023 and all future Calendar Years: $1,850.00 per Month.

7



HAH 000187

## AMENDMENT OF PURCHASE AND SALE AGREEMENT

This Amendment (the "*Amendment*") is made and entered into between HFR ENTERPRISES, INC., a Texas corporation ("*Seller*") and CLE GROUP SKZ REAL ESTATE, LLC, a Texas limited partnership ("*Purchaser*") as an amendment to that certain Purchase And Sale Agreement ("*Agreement*"), dated June ___, 2025, regarding the purchase and sale of that certain property municipally located at 6710 Southwest Freeway, Houston, Texas 77074 land in Harris County, Texas. Capitalized terms contained but not otherwise defined herein shall have the meanings ascribed thereto in the Agreement.

**WHEREAS**, the original Sales Price under the Agreement was $4,750,000.00; and

**WHEREAS**, the parties hereto have agreed to reduce the Sales Price in order to satisfy certain liabilities of the Seller prior to Closing.

**NOW THEREFORE,** the Purchaser and Seller hereby agree that the Agreement is hereby amended as follows:

1.    The Sales Price shall be reduced to the amount of Four Million Six Hundred Eighty-Nine Thousand Four Hundred Twenty Four and 72/100 Dollars ($4,689,424.72).

2.    The parties agree that the above listed amendments shall be hereinafter considered a part of the Agreement as if originally set forth therein. The amendments shall be subject to any and all other provisions of the Agreement, with the exception of the parts or provisions of the Agreement which have been modified by this Amendment. The Agreement, as amended hereby, is hereby ratified and confirmed.

3.    The parties may execute this Amendment in one or more identical counterparts, all of which, when taken together, will constitute one and the same instrument. A facsimile or electronic mail transmission shall be binding on the party or parties whose signatures appear thereon.

In witness whereof, the undersigned parties hereto have executed this Amendment.

**SELLER:**                                    **PURCHASER:**

**HFR ENTERPRISES INC.**                        **CLE GROUP SKZ REAL ESTATE, LLC,**
a Texas corporation                            a Texas limited liability company

*Linda Goehrs, Trustee*                         Ꝝ
_____                         _____
By: Linda Goehrs, Trustee for the               By: Zack Truesdell
Holli Ann Hardin Trust Number One               Title: President

EXHIBIT
18

## PARTNERSHIP INTEREST PURCHASE AGREEMENT

THIS PARTNERSHIP INTEREST PURCHASE AGREEMENT (this "Agreement") is made and entered into as of June ___, 2025, by and among Colorado Rose, LLC a Texas limited liability company, with a principal place of business at 1800 West Loop S, Ste. 1125, Houston, TX 77027 ("Buyer"), BFD GP, LLC a Texas limited liability company with a principal place of business at 3414 Old Richmond Road, Rosenberg, TX 77471 ("BFD GP") and BFD LP, LLC a Texas limited liability company with a principal place of business at 3414 Old Richmond Road, Rosenberg, TX 77471 ("BFD LP", and together with BFD GP, collectively, the "Sellers" and each individually a "Seller") and Entertainment Marketing & Management, Ltd., a Texas limited partnership with a principal place of business at 3414 Old Richmond Road, Rosenberg, TX 77471 ("Company"). The Buyer and Sellers are joined herein by Dakota Fontenot, an individual resident of Texas ("Fontenot, and together with the Sellers, collectively the "Seller Parties"). Buyer, Seller Parties, and the Company are hereinafter collectively referred to as the "Parties."

WHEREAS, BFD GP, LLC is the sole general partner holding all of the general partnership interests of the Company (the "GP Interests"), and BFD LP, LLC is the sole limited partner holding all of the limited partnership interests of the Company (the "LP Interests"), and together, Sellers own 100% of the issued and outstanding GP Interests and LP Interests in the Company (collectively, the "Interests");

WHEREAS, contemporaneously with this Agreement, the Parties and/or their affiliates or related parties are entering into that certain Stock Purchase Agreement (the "SPA") for the acquisition of stock in Ice Embassy, Inc., a Texas corporation ("Ice Embassy"), and that certain Purchase and Sale Agreement (the "PSA") for the acquisition of that certain real property located at 6710 Southwest Freeway, Houston, Texas 77074, as further described in the PSA (the "Property") from HFR Enterprises Inc., a Texas corporation ("HFR") (the SPA and PSA collectively referred to herein as the "Parallel Agreements");

WHEREAS, Fontenot owns 100% of the membership interests of the Sellers, and further, Fontenot and/or his affiliates own, possess, manage and control ICE Embassy and HFR through equity ownership and management (or services) agreements, and by which Fontenot will benefit from the closing of all transactions under this Agreement and the Parallel Agreements;

WHEREAS, the Parties desire to enter into this Agreement, pursuant to which the Buyer agrees to purchase from the Seller, and the Seller agrees to sell to the Buyer and assign to Buyer (and Buyer's designee, with respect to the LP Interests), all of the Interests, on the terms and subject to the conditions set forth in this Agreement; and

WHEREAS, the Seller and the Buyer desire to consummate the proposed transaction pursuant to the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1

EXHIBIT
19

DF000502

## ARTICLE I

## PURCHASE AND SALE OF INTERESTS

1.1 Purchase and Sale of Interests. Upon the terms and subject to the conditions of this Agreement, at the Closing on the Closing Date, the Seller agrees to sell, assign, convey, transfer and deliver to the Buyer (and Buyer's designee, with respect to the LP Interests), and the Buyer and Buyer's designee agrees to acquire from the Seller all of the Interests, free and clear of all Liens (as defined below) (other than restrictions under the Securities Act and state securities Laws), excluding the assets listed in Exhibit A, attached hereto and incorporated herein by this reference ("**Excluded Assets**").

1.2 Purchase Price.

(a) Upon the terms and subject to the conditions of this Agreement, in consideration of the aforesaid sale, assignment, conveyance, transfer and delivery of the Interests, the purchase price payable by the Buyer to the Seller at the Closing (the "**Purchase Price**") shall be in the aggregate: Two Million Seven Hundred Fifty Thousand and 00/100 ($2,750,000.00) Dollars, payable as follows:

(i) the Buyer shall pay the Seller One Million Five Hundred Thousand and 00/100 ($1,500,000.00) Dollars via wire transfer at Closing (the "**Closing Cash Payment**");

(ii) subject to Section 1.2(b), the Buyer shall pay the Sellers an aggregate sum of One Million Two Hundred Fifty Thousand and 00/100 ($1,250,000.00) Dollars ("**Installment Amount**"), pro-rata in accordance with each Seller's proportionate share of the Interests, via wire transfer, to be paid as follows:

(iii) One half of the Installment Amount ($625,000) shall be paid in quarterly installments, with the first installment being due and payable on October 1, 2025 and three successive installments being due and payable on the first day of the succeeding fiscal quarter thereafter (i.e., January 1, 2026, April 1, 2026, and July 1, 2026), and with the remaining one-half of the Installment Amount ($625,000) shall be paid in 12 monthly increments, with the first payment being due and payable on August 1, 2026, and with successive monthly payments being due on the first day of each month until the Installment Amount is paid in full.

The quarterly and monthly payments of the Installment Amount are collectively referred to herein as the "**Installment Payments**". As security for payment of the Installment Payments, Sellers shall be granted a subordinate lien covering the Property being purchased under the PSA, which will be provided under a second-priority lien deed of trust security interest in the Property. Buyer shall execute and deliver a deed of trust in favor of Sellers, in form and substance reasonably satisfactory to Sellers and Buyer.

(b) Notwithstanding anything to the contrary, Buyer shall be entitled to offset against any unpaid Installment Payments due to the Buyer Indemnified Parties for Buyer's Losses as set forth

2

DF000503

in Article VIII herein or under any of the Parallel Agreements. Any offset shall reduce the applicable Installment Payment(s) on a dollar-for-dollar basis.

1.3 [Reserved].

1.4 Excluded Assets License. As part of this Agreement, Buyer is granted a non-exclusive, revocable license to use Item No. 16 in the Excluded Assets ("**Twin Zebras**") while operating its business at the Property. This license shall remain in effect for as long as the Buyer continues to operate on the Property and desires to use the Twin Zebras. In the event that the Buyer ceases operations on the Property, no longer wishes to use the Twin Zebras, or is otherwise unable to continue using the Twin Zebras, the Buyer shall promptly return the Twin Zebras to Dakota Fontenot in their original condition, reasonable wear and tear excepted. The Seller Parties reserve the right to inspect the Twin Zebras upon their return to ensure compliance with this provision. This license is non-transferable and may not be assigned or sublicensed by the Buyer without the prior written consent of Sellers. The Seller Parties retain all ownership rights to the Twin Zebras and may revoke this license at their discretion with reasonable notice to the Buyer.

1.5 Removal of Excluded Assets. Sellers shall have thirty (30) days following the Closing Date to remove all Excluded Assets from the Property. Sellers shall coordinate and arrange mutually agreeable times with Buyer for the removal of such Excluded Assets, ensuring minimal disruption to Buyer's operation of its business at the Property. Sellers shall be responsible for any costs associated with the removal and shall leave the Property in a clean and orderly condition following removal of the Excluded Assets.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES OF SELLERS

2.    Representations and Warranties of the Seller Parties. As an inducement to the Buyer to enter into this Agreement, each of the Seller Parties, jointly and severally, represent and warrant to the Buyer that as of the date of this Agreement and the Closing Date:

a.    Title to Partnership Interests. The Sellers own, possess, and have good and marketable title to the Interests free and clear of all liens, leases, pledges, charges, encumbrances, equities, covenants, conditions, restrictions, or claims of every nature and kind whatsoever (the "**Liens**").

b.    Legal Requirements. The Sellers have all requisite power, authority, and approvals to transfer ownership of the Interests. The Company and Sellers are in good standing with the State of Texas and has complied and will continue to comply with all applicable federal, state, or local statutes, laws, and regulations, if any, with respect to its transfer of the Interests.

c.    Consents and Approvals. Other than in compliance with the provisions of applicable statutes and regulations, no notice to, filing with, or authorization, consent, or approval of any domestic or foreign public body or authority is necessary for the consummation of the transactions contemplated by this Agreement. The execution, delivery, performance and consummation of this Agreement does not and will

3

DF000504

not: (i) violate, conflict with or constitute a default or an event that, with notice or lapse of time or both, would be a default, breach or violation under any term or provision of any instrument, agreement, contract, commitment, license, promissory note, conditional sales contract, indenture, mortgage, deed of trust, lease or other agreement, instrument or arrangement to which the Company or Seller Parties are a party or by which the Sellers' Interests are bound; (ii) violate, conflict or constitute a breach of any statute, regulation or judicial or administrative order, award, judgment or decree to which the Seller Parties or the Company or to which the Sellers' Interests are bound or subject; or (iii) result in the creation or imposition of any adverse claim or interest, or any lien, encumbrance, charge, equity or restriction of any nature whatever, upon or affecting the Seller Parties, the Company, or Sellers' Interests. The sole member of the Sellers, Fontenot, has consented to the sale of the Sellers' Interests and this Agreement. The Sellers, being the sole partners of the Company have consented to the sale of the Sellers' Interests and this Agreement.

d.      Litigation. There is no: (i) action, suit or proceeding pending or threatened against the Sellers, Sellers' Interests, the Company, or Fontenot; or (ii) proceeding, investigation, charges, audit or inquiry threatened or pending before or by any federal, state, municipal or other governmental court, department, commission, board, bureau, agency or instrumentality which might result in an adverse effect on the Sellers, Sellers' Interests, the Company, or Fontenot.

e.      Taxes. There is no pending or known threatened claim against the Sellers, the Company, or Fontenot for payment of any taxes arising from the Sellers' ownership of the Interests or Fontenot's ownership of the membership interests in the Sellers. There is no pending or known threatened claim against the Company or Seller Parties for payment of taxes. Neither the Sellers, the Company, nor Fontenot has executed any waiver of any statute of limitations against assessments of taxes.

f.      Authority. The Sellers, the Company, and Fontenot have taken all necessary action to authorize the execution, delivery, and performance of this Agreement and has adequate power, authority, and legal right to enter into, execute, deliver, and perform this Agreement and to consummate the transactions contemplated hereby. This Agreement is legal, valid, and binding with respect to the Sellers and is enforceable in accordance with its terms. On execution, delivery, and performance of this Agreement in accordance with its terms, the Buyer will own one hundred percent (100%) of the Sellers' Interests free of all claims, Liens, encumbrances, and liabilities, thereby owning one hundred percent (100%) of the Company free of all claims, Liens, encumbrances, and liabilities.

g.      Full Disclosure. This Agreement, any schedule referenced in or attached to this Agreement, any document furnished to the Buyer under this Agreement or any certification furnished to the Buyer under this Agreement does not contain any untrue statement of a material fact and does not omit to state a material fact necessary to make such statement, in the circumstances under which it was made, is not misleading. All of the representations, warranties and covenants in this Agreement: (i) are true and correct as of the date made; (ii) will be true and correct as of the Closing Date; and (iii) will survive

4

DF000505

and not be waived, discharged, released, modified, terminated or affected by any due diligence by the Buyer.

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES OF BUYER

3.    Representations and Warranties of Buyer. As an inducement to the Sellers to enter into this Agreement, the Buyer represents and warrants to the Sellers that as of the date of this Agreement and the Closing Date:

a.    Legal Requirements. The Buyer has all requisite power, authority, and approvals to purchase ownership of the Interests. The Buyer is in good standing with the State of Texas and has complied and will continue to comply with all applicable federal, state, or local statutes, laws, and regulations, if any, with respect to its transfer of the Interests.

b.    Consents and Approvals. Other than in compliance with the provisions of applicable statutes and regulations, no notice to, filing with, or authorization, consent, or approval of any domestic or foreign public body or authority is necessary for the consummation of the transactions contemplated by this Agreement. The execution, delivery, performance and consummation of this Agreement does not and will not: (i) violate, conflict with or constitute a default or an event that, with notice or lapse of time or both, would be a default, breach or violation under any term or provision of any instrument, agreement, contract, commitment, license, promissory note, conditional sales contract, indenture, mortgage, deed of trust, lease or other agreement, instrument or arrangement to which the Buyer is a party; (ii) violate, conflict or constitute a breach of any statute, regulation or judicial or administrative order, award, judgment or decree to which the Buyer is bound or subject; or (iii) result in the creation or imposition of any adverse claim or interest, or any lien, encumbrance, charge, equity or restriction of any nature whatever, upon or affecting the Buyer. The members of the Buyer have consented to the purchase of the Sellers' Interests and this Agreement.

c.    Litigation. There is no: (i) action, suit or proceeding pending or threatened against the Buyer that would materially and adversely affect Buyer's ability to perform its material obligations under this Agreement; or (ii) proceeding, investigation, charges, audit or inquiry threatened or pending before or by any federal, state, municipal or other governmental court, department, commission, board, bureau, agency or instrumentality which might result in an materially adverse effect on the Buyer's ability to perform its material obligations under this Agreement.

d.    Taxes. There is no pending or known threatened claim against the Buyer for payment of any taxes. The Buyer has not executed any waiver of any statute of limitations against assessments of taxes.

5

DF000506

e.      Authority. The Buyer has taken all necessary action to authorize the execution, delivery, and performance of this Agreement and has adequate power, authority, and legal right to enter into, execute, deliver, and perform this Agreement and to consummate the transactions contemplated hereby. This Agreement is legal, valid, and binding with respect to the Buyer and is enforceable in accordance with its terms. On execution, delivery, and performance of this Agreement in accordance with its terms, the Buyer will own one hundred percent (100%) of the Sellers' Interests free of all claims, Liens, encumbrances, and liabilities.

f.      Full Disclosure. This Agreement, any schedule referenced in or attached to this Agreement, any document furnished to the Sellers under this Agreement or any certification furnished to the Sellers under this Agreement does not contain any untrue statement of a material fact and does not omit to state a material fact necessary to make such statement, in the circumstances under which it was made, is not misleading. All of the representations, warranties and covenants in this Agreement: (i) are true and correct as of the date made; (ii) will be true and correct as of the Closing Date; and (iii) will survive and not be waived, discharged, released, modified, terminated or affected by any due diligence by the Sellers.

## ARTICLE IV

## CONDITIONS TO CLOSING

4.      Conditions to Closing. Prior to the Closing Date, the Buyer and Seller Parties will take all necessary steps to ensure the proper transfer of the Interests from the Sellers to the Buyer at closing in compliance with the operating agreement and other governing documents, if any, of the Company.

## ARTICLE V

## THE CLOSING

5.      The Closing. This Agreement will be consummated remotely by the exchange of the Buyer's Deliverables and Seller Parties' Deliverables (defined herein) by the Buyer and the Sellers on June __, 2025 (the "**Closing Date**").

## ARTICLE VI

## BUYER AND SELLER PARTIES DELIVERABLES

6.1      The Buyer's Deliverables. On the Closing Date, the Buyer will deliver or cause to be delivered to the Sellers the following items (all documents will be duly executed and acknowledged where required): (a) the Purchase Price less Installment Payments; (b) such corporate resolutions and other evidence of authority with respect to the Buyer as might be reasonably requested by the Sellers; (and (c) such additional documents as might be reasonably requested by the Sellers to consummate this Agreement.

6.2.      Seller Parties' Deliverables. On the Closing Date, the Seller Parties will deliver or cause to be delivered to the Buyer the following items (all documents will be duly executed and

6

DF000507

acknowledged where required): (a) assignments and conveyances acceptable to the Buyer necessary to convey to the Buyer (and Buyer's designee, with respect to the LP Interests) all of the Sellers' right, title and interest in and to all of the Interests; (b) written consent and/or approval of the transfer of the Interests to Buyer (and Buyer's designee, with respect to the LP Interests); (c) such corporate resolutions and other evidence of authority with respect to the Company as might be reasonable requested by the Buyer; and (d) Such additional documents as might be reasonably requested by the Buyer to consummate this Agreement.

<div align="center">

**ARTICLE VII**
**DEFAULT**

</div>

7.    Default. If a Party fails to perform any obligation contained in this Agreement, the Party claiming default will serve written notice to the other party specifying the nature of such default and demanding performance. If such default has not been cured within ten (10) business days after receipt of such default notice, the non defaulting party will be entitled to exercise all remedies arising at law or in equity by reason of such default.

<div align="center">

**ARTICLE VIII**
**INDEMNIFICATION**

</div>

8.1    Definitions.

a.    **"Buyer Indemnified Parties"** means Buyer, the purchaser entities under the Parallel Agreements, and each of their respective shareholders, officers, directors, members, employees, agents, and representatives and each of the heirs, executors, successors, and permitted assigns of any of the foregoing.

b.    **"Buyer's Losses"** means any and all claims, liabilities, obligations, losses, costs, expenses, penalties, interest, awards, fines and judgments (in equity or at law) and damages whenever arising or incurred (including amounts paid in settlement, costs of investigation and reasonable attorneys' and consultants' fees and expenses) of the Buyer Indemnified Parties described in Section 8.2, as to which the Buyer Indemnified Parties are entitled to indemnification.

c.    **"ERC Credit"** means the refundable tax credit Ice Embassy, Inc. may receive as provided under the Coronavirus Aid, Relief, and Economic Security Act, designed to encourage businesses to retain employees during the COVID-19 pandemic.

d.    **"Escrow Agreement"** has the meaning ascribed thereto in the PSA.

e.    **"Fee Agreement"** means the monetary amount or compensation that Ice Embassy, Inc. is entitled to receive as a result of a resolution, judgment, or settlement arising from litigation or disputes related to credit card fees Visa and Mastercard charged to Ice Embassy, Inc.

<div align="center">7</div>

DF000508

f.    "**Indemnity Escrow Account**" has the meaning ascribed thereto in the PSA.

g.    "**Indemnity Escrow Amount**" has the meaning ascribed thereto in the PSA.

h.    "**Parallel Agreements**" shall mean any agreement between Buyer and Seller Parties, or any of Seller Parties' affiliated entities, including but not limited to agreements with or involving the Company, Ice Embassy, Inc., HFR Enterprises, or any of its subsidiaries.

8.2.    Indemnification by Seller Parties. Subject to the terms and conditions of this Agreement (including the limitations set forth in Section 8.3 below), the Seller Parties, and each of its and their affiliates, officers, agents, representatives, subsidiaries, owners, members, trustees, beneficiaries (including any individual beneficiaries of any trust that owns or controls any such entities) (collectively, the "**Seller Indemnifying Parties**"), jointly and severally agree to indemnify, defend, and hold harmless Buyer and the other Buyer Indemnified Parties from and against any and all Buyer's Losses arising out of, relating to, in connection with, or resulting from:

a.    any liability, obligation, or claim (whether known or unknown, contingent or otherwise) related to the Interests or the ownership, operation, maintenance, leasing, use, or occupancy of the Property or the business or assets of the Seller Indemnifying Parties occurring or relating to any period prior the Closing Date, regardless of when asserted, including but not limited to tax liabilities, contractual obligations, or tort claims, regardless of whether such liabilities are discovered before or after Closing and regardless of whether such liabilities are covered by insurance;

b.    any fraud, intentional misrepresentation, willful misconduct, criminal act, bad faith, or gross negligence of the Seller Indemnifying Parties in connection with this Agreement and the Parallel Agreements;

c.    any breach of or inaccuracy in any representation or warranty made by Seller Parties in this Agreement, in any Parallel Agreements, or in any certificate, document, or instrument delivered pursuant hereto; and

d.    any breach or non-fulfillment of any covenant or agreement of the Seller Parties contained in this Agreement, in any Parallel Agreements, or in any certificate, document, or instrument delivered pursuant hereto.

8.3.    Application of Funds for Losses. Any Buyer's Losses for which the Buyer Indemnified Parties are entitled to indemnification under this Article VIII may be satisfied by the following sources in the following order: (i) by applying any proceeds actually received by Buyer from the Fee Agreement to such Buyer's Losses; (ii) by withdrawing the applicable portion of the Indemnity Escrow Amount from the Indemnity Escrow Account in accordance with the Escrow Agreement; (iii) through a set-off against any amounts owed by any Buyer Indemnified Party to any Seller Indemnifying Party under this Agreement or any other Parallel Agreements, including

8

DF000509

the Installment Payments: or (iv) to the extent Buyer's Losses are not fully satisfied by the foregoing (i) – (iii), by direct payment from any of the Seller Indemnifying Parties without Buyer being required to first pursue recovery from any other Seller Indemnifying Party.

8.4.    Survival. The representations, warranties and covenants of the Parties made in this Agreement, including specifically Article II and Article III herein, shall survive the Closing of the transactions contemplated in this Agreement for the applicable statute of limitations period. Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the non-breaching Party to the breaching Party prior to the expiration date of the applicable statute of limitations period shall not thereafter be barred by the expiration of the relevant representation or warranty and such claims shall survive until finally resolved.

8.5.    No Waiver. The indemnification rights under this Article are in addition to, and not in lieu of, any other remedies available at law or in equity or pursuant to any other provision of this Agreement. Nothing in this Section shall limit Buyer's right to seek specific performance, injunctive relief, or other equitable remedies.

## ARTICLE IX

## TAXES

9.    2024 Tax Returns – Responsibility for Preparation. If the federal or applicable state and local income tax returns for the Company for the taxable year ending December 31, 2024 (the "**2024 Tax Period**") are not prepared and filed prior to the Closing Date, then Sellers shall, at its sole cost and expense, be responsible for causing such returns (the "**2024 Tax Returns**") to be timely prepared by a tax professional or accounting firm customarily engaged by the Company for such matters, or another firm reasonably acceptable to Buyer. Sellers shall deliver complete drafts of the 2024 Tax Returns to Buyer no later than sixty (60) days prior to the applicable filing deadline (including extensions) for such returns. Buyer shall have thirty (30) days from receipt of the draft 2024 Tax Returns to review and provide comments to Sellers. Sellers shall, in good faith, consider all reasonable comments made by Buyer and incorporate such comments to the extent required to ensure the 2024 Tax Returns are prepared in accordance with applicable law and consistent with past practice, unless otherwise required by a change in law or fact. Upon resolution of any comments from Buyer, Sellers shall file or cause to be filed the 2024 Tax Returns on or before the due date (including extensions) and shall provide Buyer with a final copy of each filed return within five (5) business days after filing. Nothing in this Section shall limit or impair Buyer's right to challenge or dispute the contents of any such return in connection with any audit, proceeding, or indemnification claim under this Agreement.

9

DF000510

## ARTICLE X

## MISCELLANEOUS

10.1.    Time.  Time is of the essence for this Agreement.

10.2    Notices.  Any notice, demand or communication required or permitted to be given by any provision of this Agreement will be in writing and will be deemed to have been given and received when delivered personally or by telefacsimile to the party designated to receive such notice, or on the date following the day sent by overnight courier, or on the third (3rd) day after the same is sent by certified mail, postage and charges prepaid, directed to the addresses first set forth above.

10.3.    Representations and Warranties.  The respective representations and warranties of the Parties contained herein or in any certificates or other documents delivered prior to or at the Closing Date will not be deemed waived or otherwise affected by any investigation made by any party hereto.  Each and every such representation and warranty will survive the Closing Date and will not be terminated or extinguished for a period of twelve (12) months after the Closing Date.

10.4.    Cooperation.  Prior to and at all times following the termination of this Agreement the parties agree to execute and deliver, or cause to be executed and delivered, such documents and do, or cause to be done, such other acts and things as might reasonably be requested by any party to this Agreement to assure that the benefits of this Agreement are realized by the Parties.

10.5.    Headings.  The paragraph headings contained in this Agreement are for reference purposes only and are not intended to affect in any way the meaning or interpretation of this Agreement.

10.6.    Entire Agreement.  This Agreement, the Parallel Agreements, and any document executed in connection herewith on or after the date of this Agreement constitute the entire agreement between the Parties with respect to the subject matter hereof and there are no agreements, understandings, warranties or representations except as set forth herein or in the Parallel Agreements.

10.7.    Assignment.  It is agreed that the Parties may not assign such party's rights nor delegate such party's duties under this Agreement without the express written consent of the other parties to this Agreement.

10.8.    Amendment.  Neither this Agreement, nor any of the provisions hereof, can be changed, waived, discharged, or terminated, except by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge, or termination is sought.

10.9.    Severability.  If any clause or provision of this Agreement is illegal, invalid, or unenforceable under any present or future law, the remainder of this Agreement will not be affected thereby.  It is the intention of the Parties that if any such provision is held to be illegal, invalid, or unenforceable, there will be added in lieu thereof a provision as similar in terms to such provisions as is possible and to be legal, valid, and enforceable.

10

DF000511

10.10. <u>Governing Law; Consent to Jurisdiction</u>. This Agreement will be interpreted, construed, and enforced in accordance with the laws of the State of Texas, regardless of any applicable principles of conflicts of law. Each of the Parties hereby irrevocably consents and agrees to the exclusive personal jurisdiction of the courts of the State of Texas in Harris County, Texas or the federal courts for the Southern District of Texas, for any action, suit or proceeding arising in connection with any disagreement, dispute, controversy or claim arising out of or relating to this Agreement or any related document.

10.11. <u>Attorney Fees</u>. If any party institutes an action or proceeding against any other party relating to the provisions of this Agreement, the party to such action or proceeding that does not prevail will reimburse the prevailing party therein for the reasonable expenses of attorneys' fees and disbursements incurred by the prevailing party.

10.12. <u>Waiver</u>. Waiver of performance of any obligation or term contained in this Agreement by any party, or waiver by one party of the other's default hereunder will not operate as a waiver of performance of any other obligation or term of this Agreement or a future waiver of the same obligation or a waiver of any future default.

10.13. <u>Counterpart Execution</u>. This Agreement may be executed in counterparts, including by telefacsimile, each of which will be deemed an original document but all of which will constitute a single document. Also, for the purposes of this Agreement, a facsimile or electronic signature shall serve as an original.

[signature page follows]

11

DF000512

**IN WITNESS WHEREOF,** this Agreement has been executed by the parties effective the date first above written.

**Seller Parties:**

BFD GP, LLC

_Dakota Fontenot, Sole Member_

BFD LP, LLC

_Dakota Fontenot, Sole Member_

_Dakota Fontenot, individually_
Address: 2926 Fontana Dr
Houston Tx 77043

**Buyer:**
Colorado Rose, LLC

Name: Justin Zachariah Teuesdell
Title: manager

**Company:**
Entertainment Marketing & Management, Ltd.

By: BFD GP, LLC
Its General Partner

_Dakota Fontenot, Sole Member_

Signature Page to Partnership Interest Purchase Agreement

DF000513

**EXHIBIT A**
**Sellers Excluded Assets**

*The Excluded Assets below are located at the real property and improvements at 6710 Southwest Freeway, Houston, Texas 77074.*

1. Dallas Fontenot's desk and side table in manager's office.

2. Lion taxidermy.

3. Smartboard in conference room.



   a.

4. Art on walls in conference room.



   a.



   b.

5. Dakota Fontenot's Pool Table and pool table chairs, equipment, etc., in the shed.

6. Memorabilia addressed to Dallas Fontenot (limited to 10 items)

DF000514

7. Playboy Memorabilia (limited to 5 items)

8. Bear in sports bar



a.

9. Frank Sinatra autographed portrait in sports bar



a.

10. Beaded native American moccasins next to sports bar and ATMs and framed fish hooks beneath



a.

11. Beaded native American necklaces next to entertainer's locker room and Bar 1 station area

UNOFFICIAL COPY

DF000515

12. Gibson Les Paul guitar hanging on ceiling by canoe bar



a.

13. These Playboy memorabilia items



a.



b.

DF000516



c.

14. Other



a.



b.

UNOFFICIAL COPY

DF000517



c.

15. Art on wall by Bar 2 and coffee bar

16. Twin Zebras taxidermy.

UNOFFICIAL COPY

Date : 5/8/2025 5:30:19 PM
From : "Glynn Nance" gnance@nancesimpson.com
To : "John Hebert, Jr." john@gwoodlaw.com, "Ardalan Attar" aattar@christianattarlaw.com
Cc : "Nicole Newman" nnewman@christianattarlaw.com, "Sean Greenwood" sean@gwoodlaw.com, "Zack Truesdell" zack@theclegroup.com, "Kyle Kinsel" kwkinsel@gmail.com, "Dakota Fontenot" dakotajamesfontenot@gmail.com
Subject : RE: Revised Purchase Documents
Attachment : image002.png;

John,

With respect to Entertainment Management & Marketing, Ltd and its GP and LP entities, my client who is a material investor in Buyer would like the transaction changed so that it is a purchase of only the partnership interests of in Entertainment Marketing & Management, Ltd (the "Partnership"), and not the Membership Interests of the GP and LP owner entities.  I have discussed this with Ardalan and Nicole (and Zack) and I was asked to reach out directly to you on this point.

We believe that the transaction being structured as the purchase of the partnership interests in the Partnership will have the same tax result to your client as a sale of the membership interests in the GP and LP entities – i.e., he would achieve capital gain on the sale.   This is because the only assets of any consequence in the Partnership (as I understand it) are the Administrative Services Agreement ("ASA") and any goodwill associated with the Partnership's management business activities.   The sale of the Partnership Interests would be treated virtually the same as if the Seller sold the ASA and associated goodwill, which are both treated under the Internal Revenue Code as intangible capital assets.  Thus, the deemed sale of those assets would flow through capital gain to your client – the same as he is expecting to receive from the sale of the membership interests in the GP and LP entities.

However, because the Buyer will be an LLC taxed as a partnership, the purchase of your client's ownership interests in the GP and LP entities – which are taxed as S Corporations - will terminate the S Corp elections of those entities and turn them into C Corps.  This would be very adverse to the Buyer's interests.

Ultimately, we believe that your client's tax advisors would agree that his selling the partnership interests in the Partnership will have the same tax result (i.e., capital gain treatment) as the sale of the LLC Interests in the GP and LP entities.

Please let me know if you would like to discuss further by phone.

**Glynn D. Nance, Jr., LL.M.**
Nance & Simpson, LLP
(713) 520.9100 – Tel
(832) 721-1705 – Cell
www.nancesimpson.com

**CONFIDENTIALITY NOTICE:** This electronic transmission and any attachments constitute confidential information which is intended only for the named recipient(s) and may be legally privileged.  If you have received this communication in error, please contact the sender immediately.  Any disclosure, copying, distribution, or the taking of any action concerning the contents of this communication by anyone other than the named recipient(s) is strictly prohibited.

---

**From:** John Hebert, Jr. <john@gwoodlaw.com>
**Sent:** Thursday, May 8, 2025 4:51 PM
**To:** Ardalan Attar <aattar@christianattarlaw.com>
**Cc:** Nicole Newman <nnewman@christianattarlaw.com>; Sean Greenwood <sean@gwoodlaw.com>; Zack Truesdell <zack@theclegroup.com>; Kyle Kinsel <kwkinsel@gmail.com>; Dakota Fontenot <dakotajamesfontenot@gmail.com>; Glynn Nance <gnance@nancesimpson.com>
**Subject:** Re: Revised Purchase Documents

EXHIBIT
20

DF005506

Ardalan,

See attached revisions and comments to the purchase documents for your review.

Thank you,

**John Hebert Jr.**

**The Greenwood Law Firm PLLC**

1415 North Loop West, Ste. 1250

Houston, TX  77008

TEL (832)356-1588

**DIRECT (832) 371-6247**

FAX (832)356-1589

EMAIL john@gwoodlaw.com

WEB www.gwoodlaw.com

**Confidentiality Notice:** The contents of this email may contain confidential and/or attorney-client privileged information.  If you are not the intended recipient, please reply to this email indicating that you received it and destroy it, along with any copies or attachments.  I appreciate your compliance and courtesy.

---

**From:** Ardalan Attar
**Sent:** Thursday, May 8, 2025 1:13 PM
**To:** John Hebert, Jr.
**Cc:** Nicole Newman; Sean Greenwood; Zack Truesdell; Kyle Kinsel; Dakota Fontenot; Glynn Nance
**Subject:** Re: Revised Purchase Documents

John,

Let us know when you have reviewed the real estate purchase agreement sent by Nicole. Once we are done with the documents we should all get on a call to discuss closing.

I am available tomorrow 10-2pm.

**Ardalan Attar**

*Partner*

1177 W Loop S, Ste. 1700| Houston, Texas 77027
p. 713-659-7617 | f. 713-659-7641

UNOFFICIAL COPY

DF005507

CONFIDENTIALITY NOTICE: This email transmission and any attachments may be privileged, confidential or otherwise protected from disclosure and is intended only for the named recipient. The use, distribution, transmittal by an unintended recipient of this communication is strictly prohibited without our express approval in writing. If you are not the intended recipient, please delete it from your system without copying it and notify our firm. Receipt by anyone other than the intended recipient is not a waiver of any attorney-client or work-product privilege.

---

**From:** Nicole Newman <nnewman@christianattarlaw.com>
**Sent:** Wednesday, May 7, 2025 2:06 PM
**To:** John Hebert, Jr. <john@gwoodlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** RE: Revised Purchase Documents

John:

Got it, thanks. Please find attached the real estate purchase agreement. Redlines should show the new changes.

Thank you,

Nicole

---

**From:** John Hebert, Jr. <john@gwoodlaw.com>
**Sent:** Tuesday, May 6, 2025 5:38 PM
**To:** Nicole Newman <nnewman@christianattarlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** Re: Revised Purchase Documents

See attached revised membership agreement for your review. We adjusted the purchase price (see comment in draft).

Thank you,

**John Hebert Jr.**

**The Greenwood Law Firm PLLC**

1415 North Loop West, Ste. 1250

Houston, TX  77008

TEL (832)356-1588

DF005508

**DIRECT (832) 371-6247**

FAX (832)356-1589

EMAIL john@gwoodlaw.com

WEB www.gwoodlaw.com

**Confidentiality Notice:** The contents of this email may contain confidential and/or attorney-client privileged information. If you are not the intended recipient, please reply to this email indicating that you received it and destroy it, along with any copies or attachments. I appreciate your compliance and courtesy.

---

**From:** John Hebert, Jr.
**Sent:** Tuesday, May 6, 2025 3:23 PM
**To:** Nicole Newman
**Cc:** Sean Greenwood; Ardalan Attar
**Subject:** Re: Revised Purchase Documents

That's fine.

Thank you,

**John Hebert Jr.**

**The Greenwood Law Firm PLLC**

1415 North Loop West, Ste. 1250

Houston, TX  77008

TEL (832)356-1588

**DIRECT (832) 371-6247**

FAX (832)356-1589

EMAIL john@gwoodlaw.com

WEB www.gwoodlaw.com

**Confidentiality Notice:** The contents of this email may contain confidential and/or attorney-client privileged information. If you are not the intended recipient, please reply to this email indicating that you received it and destroy it, along with any copies or attachments. I appreciate your compliance and courtesy.

---

**From:** Nicole Newman <nnewman@christianattarlaw.com>

DF005509

**Sent:** Tuesday, May 6, 2025 2:49 PM
**To:** John Hebert, Jr. <john@gwoodlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** RE: Revised Purchase Documents

John:

If HFR's only asset is the real property, please let me know if you're okay with going off of the prior draft of the Purchase and Sale Agreement for the real property. If so, I can find the latest draft and redline from there if we have additional changes.

Thanks,

Nicole

---

**From:** John Hebert, Jr. <john@gwoodlaw.com>
**Sent:** Tuesday, May 6, 2025 2:15 PM
**To:** Nicole Newman <nnewman@christianattarlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** Re: Revised Purchase Documents

Nicole,

My client told me your client wants to do an asset purchase for HFR instead of a stock purchase. If so, please draft the asset purchase agreement so we can review it.

Thank you,

**John Hebert Jr.**

**The Greenwood Law Firm PLLC**

1415 North Loop West, Ste. 1250

Houston, TX 77008

TEL (832)356-1588

**DIRECT (832) 371-6247**

DF005510

FAX (832)356-1589

EMAIL john@gwoodlaw.com

WEB www.gwoodlaw.com

**Confidentiality Notice:** The contents of this email may contain confidential and/or attorney-client privileged information. If you are not the intended recipient, please reply to this email indicating that you received it and destroy it, along with any copies or attachments. I appreciate your compliance and courtesy.

---

**From:** Nicole Newman <nnewman@christianattarlaw.com>
**Sent:** Tuesday, May 6, 2025 10:18 AM
**To:** John Hebert, Jr. <john@gwoodlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** RE: Revised Purchase Documents

John: I think I've only seen documents to be included for Schedules 1.2 and 2.3 – which appear to be the same doc (as identified in the DropBox) The attached is the latest version of this I have seen though. I've also seen the excluded assets for BFD GP & LP. Otherwise, I don't think I've seen any of the other schedules.

---

**From:** John Hebert, Jr. <john@gwoodlaw.com>
**Sent:** Tuesday, May 6, 2025 9:32 AM
**To:** Nicole Newman <nnewman@christianattarlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** Re: Revised Purchase Documents

Nicole,

See attached comments and revisions to the redline documents for your review. I've included the following documents responsive to your comments:

- Amended and Restated Limited Partnership Agreement (responsive to your comment in the Membership Purchase)
- Attachment A and short legal descriptions of HFR real property (Exhibit A comment)

Please let me know what Schedules are missing so I can make sure that we have provided them to you.

Thank you,

DF005511

**John Hebert Jr.**

**The Greenwood Law Firm PLLC**

1415 North Loop West, Ste. 1250

Houston, TX  77008

TEL (832)356-1588

**DIRECT (832) 371-6247**

FAX (832)356-1589

EMAIL john@gwoodlaw.com

WEB www.gwoodlaw.com

**Confidentiality Notice:**  The contents of this email may contain confidential and/or attorney-client privileged information.  If you are not the intended recipient, please reply to this email indicating that you received it and destroy it, along with any copies or attachments.  I appreciate your compliance and courtesy.



**From:** Nicole Newman <nnewman@christianattarlaw.com>
**Sent:** Monday, May 5, 2025 5:06 PM
**To:** John Hebert, Jr. <john@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>
**Subject:** RE: Revised Purchase Documents

John:

I accepted nearly all of the redlines in the docs and deleted resolved or pending comments to clean up the docs. I made a comment if redlines were left unaccepted. I also made a few more proposed changes for your review.

Also, I don't think we've received all the Schedules mentioned in the Ice Embassy or HFR Stock Purchase Agreement. Please let me know if this is in error.

Thank you,

Nicole

**From:** John Hebert, Jr. <john@gwoodlaw.com>
**Sent:** Thursday, May 1, 2025 6:21 PM
**To:** Ardalan Attar <aattar@christianattarlaw.com>

DF005512

**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Nicole Newman <nnewman@christianattarlaw.com>
**Subject:** Re: Revised Purchase Documents

That's good news. Please see attached updated revised agreements and documents for your review.

Thank you,

**John Hebert Jr.**

**The Greenwood Law Firm PLLC**

1415 North Loop West, Ste. 1250

Houston, TX  77008

TEL (832)356-1588

**DIRECT (832) 371-6247**

FAX (832)356-1589

EMAIL john@gwoodlaw.com

WEB www.gwoodlaw.com

**Confidentiality Notice:** The contents of this email may contain confidential and/or attorney-client privileged information.  If you are not the intended recipient, please reply to this email indicating that you received it and destroy it, along with any copies or attachments.  I appreciate your compliance and courtesy.



**From:** Ardalan Attar <aattar@christianattarlaw.com>
**Sent:** Thursday, May 1, 2025 4:23 PM
**To:** John Hebert, Jr. <john@gwoodlaw.com>; Nicole Newman <nnewman@christianattarlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>
**Subject:** Re: Revised Purchase Documents

I think Zack and your client figured it out.

Thanks.

Get Outlook for iOS

**From:** John Hebert, Jr. <john@gwoodlaw.com>
**Sent:** Thursday, May 1, 2025 4:22:32 PM
**To:** Nicole Newman <nnewman@christianattarlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** Re: Revised Purchase Documents

Nicole,

Following up on my previous email. Let me know what time works for you to have our call.

Thank you,

**John Hebert Jr.**

**The Greenwood Law Firm PLLC**

1415 North Loop West, Ste. 1250

Houston, TX  77008

TEL (832)356-1588

**DIRECT (832) 371-6247**

FAX (832)356-1589

EMAIL john@gwoodlaw.com

WEB www.gwoodlaw.com

**Confidentiality Notice**:  The contents of this email may contain confidential and/or attorney-client privileged information.  If you are not the intended recipient, please reply to this email indicating that you received it and destroy it, along with any copies or attachments.  I appreciate your compliance and courtesy.

---

**From:** John Hebert, Jr. <john@gwoodlaw.com>
**Sent:** Wednesday, April 30, 2025 8:33 PM
**To:** Nicole Newman <nnewman@christianattarlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** Re: Revised Purchase Documents

I have some time tomorrow afternoon from 1:30 p.m. to 3:30 p.m., and I'm fairly flexible for most of Friday. Let me know what works for you.

DF005514

Thank you,

**John Hebert Jr.**

**The Greenwood Law Firm PLLC**

1415 North Loop West, Ste. 1250

Houston, TX 77008

TEL (832)356-1588

**DIRECT (832) 371-6247**

FAX (832)356-1589

EMAIL john@gwoodlaw.com

WEB www.gwoodlaw.com

**Confidentiality Notice**: The contents of this email may contain confidential and/or attorney-client privileged information. If you are not the intended recipient, please reply to this email indicating that you received it and destroy it, along with any copies or attachments. I appreciate your compliance and courtesy.

---

**From:** Nicole Newman <nnewman@christianattarlaw.com>
**Sent:** Wednesday, April 30, 2025 3:55 PM
**To:** John Hebert, Jr. <john@gwoodlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** RE: Revised Purchase Documents

John, please let me know if we can get on a call this week to discuss the treatment of the outstanding bills to make sure we're all on the same page. Thank you, Nicole

---

**From:** Nicole Newman
**Sent:** Wednesday, April 30, 2025 3:21 PM
**To:** John Hebert, Jr. <john@gwoodlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** RE: Revised Purchase Documents

John, we also began going through the DropBox provided but noticed there are folders for the Schedules to be attached to these agreements, but some of the folders have a document while others do not. Will you please confirm whether those Schedules will be provided? For each entity, I think I have only seen the "Outstanding Bills" tables. Thank you.

DF005515

**From:** Nicole Newman
**Sent:** Wednesday, April 30, 2025 2:42 PM
**To:** 'John Hebert, Jr.' <john@gwoodlaw.com>
**Cc:** 'Sean Greenwood' <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** RE: Revised Purchase Documents

John,

Please find attached our edits to the agreements. I accepted all outstanding redlines, responded or resolved comments, and on a few agreements, left some redlines to reflect the latest proposed changes.

I've also attached the Exhibit A to the HFR Stock Purchase Agreement. Most of the language was taken from the original Real Estate Purchase Agreement and revised.

Thank you,

Nicole

---

**From:** Nicole Newman
**Sent:** Tuesday, April 29, 2025 2:52 PM
**To:** John Hebert, Jr. <john@gwoodlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** RE: Revised Purchase Documents

Hi John, expecting to have my changes back to you by tomorrow. Thank you, Nicole

---

**From:** John Hebert, Jr. <john@gwoodlaw.com>
**Sent:** Tuesday, April 29, 2025 1:45 PM
**To:** Nicole Newman <nnewman@christianattarlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** Re: Revised Purchase Documents

Nicole,

Any update on your review of the revised agreements? Let me know.

DF005516

Thank you,


**John Hebert Jr.**

**The Greenwood Law Firm PLLC**

1415 North Loop West, Ste. 1250

Houston, TX  77008

TEL (832)356-1588

**DIRECT (832) 371-6247**

FAX (832)356-1589

EMAIL john@gwoodlaw.com

WEB www.gwoodlaw.com


**Confidentiality Notice:**  The contents of this email may contain confidential and/or attorney-client privileged information.  If you are not the intended recipient, please reply to this email indicating that you received it and destroy it, along with any copies or attachments.  I appreciate your compliance and courtesy.

---

**From:** John Hebert, Jr.
**Sent:** Friday, April 25, 2025 3:08 PM
**To:** Nicole Newman
**Cc:** Sean Greenwood; Ardalan Attar
**Subject:** Revised Purchase Documents


Nicole,


See attached new revisions to the purchase agreements for your review. Let me know if you have any questions.


Thank you,


**John Hebert Jr.**

**The Greenwood Law Firm PLLC**

DF005517



1415 North Loop West, Ste. 1250

Houston, TX  77008

TEL (832)356-1588

**DIRECT (832) 371-6247**

FAX (832)356-1589

EMAIL john@gwoodlaw.com

WEB www.gwoodlaw.com



**Confidentiality Notice**:  The contents of this email may contain confidential and/or attorney-client privileged information.  If you are not the intended recipient, please reply to this email indicating that you received it and destroy it, along with any copies or attachments.  I appreciate your compliance and courtesy.

DF005518



DF005519

# ENTERTAINMENT MARKETING & MANAGEMENT, LP

## Balance Sheet

As of December 31, 2024

| | TOTAL |
|---|---|
| ASSETS | |
| Current Assets | |
| Bank Accounts | |
| Cash on Hand | 0.00 |
| ORIGIN BANK #1518 | 0.00 |
| TX 1st BANK | 286.31 |
| WFB (1633) | 0.00 |
| **Total Bank Accounts** | **$286.31** |
| Accounts Receivable | |
| A/R - ACCOUNTS RECEIVABLE | 0.00 |
| **Total Accounts Receivable** | **$0.00** |
| Other Current Assets | |
| 1000322 A/R - BFD | 0.00 |
| 1000323 A/R - DALLAS | 0.00 |
| 1000324 A/R - SHOWBIZ | 0.00 |
| 1000325 A/R - HFR | 0.00 |
| 1000325 A/R - ICE EMBASSY, INC. | -380,216.00 |
| 1000326 A/R - HFR INTERPRISES | 0.00 |
| 1000328 A/R - VIVA LAS VEGAS PROPERTIES | 0.00 |
| 1000331 A/R - CELEBRITY PIZZA | 0.00 |
| 1000332 A/R - HOLLI ANN HARDIN TRUST | 0.00 |
| 1000411 EMPLOYEE ADVANCE-DAKOTA FONENOT | 0.00 |
| 1000412 EMPLOYEE ADVANCE-DALLAS FONTENO | 0.00 |
| 12000 Undeposited Funds | 0.00 |
| 3000175 A/R HFR | 0.00 |
| ICE PPP MONEY TO LUCKY DOG PUB | 0.00 |
| LOAN TO DALLAS FONTENOT | 419,420.99 |
| LOAN TO DF FROM HAH TRUST NO. 1 | 0.00 |
| LOAN TO HOLLI FONTENOT | 3,097.88 |
| **Total Other Current Assets** | **$42,302.87** |
| **Total Current Assets** | **$42,589.18** |
| Fixed Assets | |
| 2000000 PROPERTY & EQUIPMENT | 219.96 |
| 2520000 COMPUTERS | 749.99 |
| 2520001 SCANNER | 329.99 |
| **Total 2000000 PROPERTY & EQUIPMENT** | **1,299.94** |
| **Total Fixed Assets** | **$1,299.94** |
| **TOTAL ASSETS** | **$43,889.12** |

EXHIBIT
21

DF008866

# ENTERTAINMENT MARKETING & MANAGEMENT, LP

## Balance Sheet

### As of December 31, 2024

| | TOTAL |
|---|---|
| LIABILITIES AND EQUITY | |
| Liabilities | |
| Current Liabilities | |
| Accounts Payable | |
| 2000 Accounts Payable | -1,503.63 |
| **Total Accounts Payable** | **$ -1,503.63** |
| Credit Cards | |
| AMEX #42007 (Dakota) | 50.00 |
| CAP ON 7913 - HOLLI | 0.00 |
| CHASE #4046 (Dakota) | 182.82 |
| DISCOVER #0907 (DAKOTA) | 0.00 |
| WF #3818 CC  Rhino Construction | 0.00 |
| WF #6811 CC Ice Embassy | 0.00 |
| **Total Credit Cards** | **$232.82** |
| Other Current Liabilities | |
| 2100 Payroll Liabilities | 4,341.05 |
| Dental Insurance | 4,327.18 |
| Federal Taxes (941/943/944) | 23,649.16 |
| Federal Unemployment (940) | 210.00 |
| Health Insurance | 86,757.80 |
| Life Insurance | 458.10 |
| TX Unemployment Tax | 15.77 |
| Vision Insurance | 666.76 |
| **Total 2100 Payroll Liabilities** | **120,425.82** |
| 2100100 PAYROLL LIABILITIES - OTHER | 0.00 |
| 2110 Direct Deposit Liabilities | 3,115.48 |
| 3400041 A/P - HFR ENTERPRISES | 79,475.00 |
| 3400042 A/P-Holli Ann Hardin Trust # 1 | 222,050.00 |
| 4000110 N/P DUE TO/FROM ICE (OPERATING) | 123,062.76 |
| ASK ACCOUNTANT | 0.00 |
| DAKOTA SCHOOL LOAN | 0.00 |
| Direct Deposit Payable | 0.00 |
| EIDL Loan | 0.00 |
| EMM PPP Loan | 0.00 |
| EMM PPP Loan #2 | 0.00 |
| FREAKY TIKI | 0.00 |
| **Total Other Current Liabilities** | **$548,129.06** |
| **Total Current Liabilities** | **$546,858.25** |

UNOFFICIAL COPY

DF008867

# ENTERTAINMENT MARKETING & MANAGEMENT, LP

## Balance Sheet

As of December 31, 2024

| | TOTAL |
|---|---:|
| **Long-Term Liabilities** | |
| 4000100 NOTE - HFR ENTERPRISES | 0.00 |
| 4000103 NOTE - DALLAS FONTENOT | 0.00 |
| 4000106 NOTE - DAKOTA TRUST | 0.00 |
| 4000107 HOLLI ANN HARDIN TRUST | 0.00 |
| 4000108 NOTE - ICE EMBASSY | 0.00 |
| Due To Shareholders | -0.67 |
| **Total Long-Term Liabilities** | **$ -0.67** |
| **Total Liabilities** | **$546,857.58** |
| **Equity** | |
| 5000500 PAID IN CAPITAL | 0.00 |
| 5000501 BFD #1 - PAID IN CAPITAL | 2,475.00 |
| 5000502 BFD #2 - PAID IN CAPITAL | 2,475.00 |
| 5000503 BFD #3 - PAID IN CAPITAL | 2,475.00 |
| 5000504 BFD #4 - PAID IN CAPITAL | 2,475.00 |
| 5000505 SHOWBIZZ - PAID IN CAPITAL | 100.00 |
| **Total 5000500 PAID IN CAPITAL** | **10,000.00** |
| 5100100 BFD #1 EARNINGS | 0.00 |
| 5100200 BFD #1 DISTRIBUTIONS | 0.00 |
| 5200100 BFD #2 EARNINGS | 0.00 |
| 5200200 BFD #2 DISTRIBUTIONS | 0.00 |
| 5300100 BFD #3 EARNINGS | 0.00 |
| 5300200 BFD #3 DISTRIBUTIONS | 0.00 |
| 5400100 BFD #4 EARNINGS | 0.00 |
| 5400200 BFD #4 DISTRIBUTIONS | 0.00 |
| 5500100 SHOWBIZZ EARNINGS | 0.00 |
| 5500200 SHOWBIZZ DISTRIBUTIONS | 0.00 |
| 5800003 TREASURY STOCK | 0.00 |
| 5800005 RETAINED EARNINGS | 123,534.00 |
| Net Income | -636,502.46 |
| **Total Equity** | **$ -502,968.46** |
| **TOTAL LIABILITIES AND EQUITY** | **$43,889.12** |

UNOFFICIAL COPY

DF008868

# ENTERTAINMENT MARKETING & MANAGEMENT, LP

## Balance Sheet

As of April 30, 2025

| | TOTAL |
|---|---|
| **ASSETS** | |
| Current Assets | |
| Bank Accounts | |
| Cash on Hand | 0.00 |
| ORIGIN BANK #1518 | 0.00 |
| TX 1st BANK | 8,241.18 |
| WFB (1633) | 0.00 |
| **Total Bank Accounts** | **$8,241.18** |
| Accounts Receivable | |
| A/R - ACCOUNTS RECEIVABLE | 0.00 |
| **Total Accounts Receivable** | **$0.00** |
| Other Current Assets | |
| 1000322 A/R - BFD | 0.00 |
| 1000323 A/R - DALLAS | 0.00 |
| 1000324 A/R - SHOWBIZ | 0.00 |
| 1000325 A/R - HFR | 0.00 |
| 1000325 A/R - ICE EMBASSY, INC. | -432,454.30 |
| 1000326 A/R - HFR INTERPRISES | 0.00 |
| 1000328 A/R - VIVA LAS VEGAS PROPERTIES | 0.00 |
| 1000331 A/R - CELEBRITY PIZZA | 0.00 |
| 1000332 A/R - HOLLI ANN HARDIN TRUST | 10,470.00 |
| 1000411 EMPLOYEE ADVANCE-DAKOTA FONENOT | 0.00 |
| 1000412 EMPLOYEE ADVANCE-DALLAS FONTENO | 0.00 |
| 12000 Undeposited Funds | 0.00 |
| 3000175 A/R HFR | 0.00 |
| ICE PPP MONEY TO LUCKY DOG PUB | 0.00 |
| LOAN TO DALLAS FONTENOT | 419,420.99 |
| LOAN TO DF FROM HAH TRUST NO. 1 | 0.00 |
| LOAN TO HOLLI FONTENOT | 3,097.88 |
| Payroll Refunds | -2,269.23 |
| **Total Other Current Assets** | **$ -1,734.66** |
| **Total Current Assets** | **$6,506.52** |
| Fixed Assets | |
| 2000000 PROPERTY & EQUIPMENT | 219.96 |
| 2520000 COMPUTERS | 749.99 |
| 2520001 SCANNER | 329.99 |
| **Total 2000000 PROPERTY & EQUIPMENT** | **1,299.94** |
| **Total Fixed Assets** | **$1,299.94** |
| **TOTAL ASSETS** | **$7,806.46** |

COPY UNOFFICIAL

EXHIBIT
22

Accrual Basis  Monday, May 5, 2025 03:20 PM GMT-05:00

1/3

DF002731

# ENTERTAINMENT MARKETING & MANAGEMENT, LP

### Balance Sheet
As of April 30, 2025

| | TOTAL |
|---|---|
| **LIABILITIES AND EQUITY** | |
| Liabilities | |
| Current Liabilities | |
| Accounts Payable | |
| 2000 Accounts Payable | -1,088.62 |
| **Total Accounts Payable** | **$ -1,088.62** |
| Credit Cards | |
| AMEX #42007 (Dakota) | 50.00 |
| CAP ON 7913 - HOLLI | 0.00 |
| CHASE #4046 (Dakota) | 182.82 |
| DISCOVER #0907 (DAKOTA) | 0.00 |
| WF #3818 CC  Rhino Construction | 0.00 |
| WF #6811 CC Ice Embassy | 0.00 |
| **Total Credit Cards** | **$232.82** |
| Other Current Liabilities | |
| 2100 Payroll Liabilities | 4,341.05 |
| Dental Insurance | 5,450.38 |
| Federal Taxes (941/943/944) | 51,478.57 |
| Federal Unemployment (940) | 168.00 |
| Health Insurance | 110,300.72 |
| Life Insurance | 589.23 |
| TX Unemployment Tax | 0.00 |
| Vision Insurance | 837.04 |
| **Total 2100 Payroll Liabilities** | **173,164.99** |
| 2100100 PAYROLL LIABILITIES - OTHER | 0.00 |
| 2110 Direct Deposit Liabilities | 3,115.48 |
| 3400010 A/P - ICE EMBASSY INC | 80,364.27 |
| 3400041 A/P - HFR ENTERPRISES | 78,841.17 |
| 3400042 A/P-Holli Ann Hardin Trust # 1 | 222,050.00 |
| 4000110 N/P DUE TO/FROM ICE (OPERATING) | 123,062.76 |
| ASK ACCOUNTANT | 0.00 |
| DAKOTA SCHOOL LOAN | 0.00 |
| Direct Deposit Payable | 0.00 |
| EIDL Loan | 0.00 |
| EMM PPP Loan | 0.00 |
| EMM PPP Loan #2 | 0.00 |
| FREAKY TIKI | 10,470.00 |
| **Total Other Current Liabilities** | **$691,068.67** |
| **Total Current Liabilities** | **$690,212.87** |

UNOFFICIAL COPY

Accrual Basis  Monday, May 5, 2025 03:20 PM GMT-05:00

2/3

DF002732

# ENTERTAINMENT MARKETING & MANAGEMENT, LP
## Balance Sheet
As of April 30, 2025

|  | TOTAL |
|---|---|
| Long-Term Liabilities |  |
| 4000100 NOTE - HFR ENTERPRISES | 0.00 |
| 4000103 NOTE - DALLAS FONTENOT | 0.00 |
| 4000106 NOTE - DAKOTA TRUST | 0.00 |
| 4000107 HOLLI ANN HARDIN TRUST | 0.00 |
| 4000108 NOTE - ICE EMBASSY | 0.00 |
| Due To Shareholders | -0.67 |
| **Total Long-Term Liabilities** | **$ -0.67** |
| **Total Liabilities** | **$690,212.20** |
| Equity |  |
| 5000500 PAID IN CAPITAL | 0.00 |
| 5000501 BFD #1 - PAID IN CAPITAL | 2,475.00 |
| 5000502 BFD #2 - PAID IN CAPITAL | 2,475.00 |
| 5000503 BFD #3 - PAID IN CAPITAL | 2,475.00 |
| 5000504 BFD #4 - PAID IN CAPITAL | 2,475.00 |
| 5000505 SHOWBIZZ - PAID IN CAPITAL | 100.00 |
| Total 5000500 PAID IN CAPITAL | 10,000.00 |
| 5100100 BFD #1 EARNINGS | 0.00 |
| 5100200 BFD #1 DISTRIBUTIONS | 0.00 |
| 5200100 BFD #2 EARNINGS | 0.00 |
| 5200200 BFD #2 DISTRIBUTIONS | 0.00 |
| 5300100 BFD #3 EARNINGS | 0.00 |
| 5300200 BFD #3 DISTRIBUTIONS | 0.00 |
| 5400100 BFD #4 EARNINGS | 0.00 |
| 5400200 BFD #4 DISTRIBUTIONS | 0.00 |
| 5500100 SHOWBIZZ EARNINGS | 0.00 |
| 5500200 SHOWBIZZ DISTRIBUTIONS | 0.00 |
| 5800003 TREASURY STOCK | 0.00 |
| 5800005 RETAINED EARNINGS | -512,968.46 |
| Net Income | -179,437.28 |
| **Total Equity** | **$ -682,405.74** |
| **TOTAL LIABILITIES AND EQUITY** | **$7,806.46** |

UNOFFICIAL COPY

**Accrual Basis  Monday, May 5, 2025 03:20 PM GMT-05:00**

DF002733

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Debbie Kennedy on behalf of Ryan Cantrell
Bar No. 24055259
debbie.kennedy@chamberlainlaw.com
Envelope ID: 110171618
Filing Code Description: Amended Filing
Filing Description: Intervenors' Second Amended Answer, Affirmative Defenses, Cross-Claims, and Verified Application for Temporary Injunctive Relief, Exhs. 1-22
Status as of 1/20/2026 11:32 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Paul Beik | 24054444 | paul@beiklaw.com | 1/16/2026 5:16:48 PM | SENT |
| James Ardoin | 24045420 | jimmy@jimmyardoinlaw.com | 1/16/2026 5:16:48 PM | SENT |
| John P. TreyAvant | | tavant@grayreed.com | 1/16/2026 5:16:48 PM | SENT |
| Debbie Gurley | | dgurley@grayreed.com | 1/16/2026 5:16:48 PM | SENT |
| Andrew McCarty | | amccarty@grayreed.com | 1/16/2026 5:16:48 PM | SENT |
| Kayla Brake | | kayla@texasprobateattorney.com | 1/16/2026 5:16:48 PM | SENT |
| Texas Probate Attorney, PLLC | | efile@texasprobateattorney.com | 1/16/2026 5:16:48 PM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 1/16/2026 5:16:48 PM | SENT |
| Jeffrey D.Watters | | jwatters@grayreed.com | 1/16/2026 5:16:48 PM | SENT |
| Ryan Cantrell | | ryan.cantrell@chamberlainlaw.com | 1/16/2026 5:16:48 PM | SENT |
| Mariah Karigan | | mariah.karigan@chamberlainlaw.com | 1/16/2026 5:16:48 PM | SENT |
| Marcie Cardenas | | mcardenas@grayreed.com | 1/16/2026 5:16:48 PM | SENT |
| Rudy Culp | | rudy@texasprobateattorney.com | 1/16/2026 5:16:48 PM | SENT |
| Bailey Bowe | | bailey@texasprobateattorney.com | 1/16/2026 5:16:48 PM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 1/16/2026 5:16:48 PM | SENT |

UNOFFICIAL COPY