EXHIBIT

31

exhibitsticker.com

FILED
2/27/2026 9:28 PM
Teneshia Hudspeth
County Clerk
Harris County - County Probate Court No. 1
Accepted By: EK

No. 537,721

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY AS TRUSTEE OF THE HOLLI ANN HARDIN TRUST NUMBER ONE | § § § § | IN THE PROBATE COURT |
| *Plaintiff,* | § | |
| | § | NUMBER ONE (1) OF |
| v. | § § | |
| DAKOTA FONTENOT, | § | |
| *Defendant.* | § | HARRIS COUNTY, TEXAS |

## DECLARATION

My name is John P. "Trey" Avant III and my date of birth is October 14, 1990. My current address is 1300 Post Oak Blvd, Suite 2000, Houston, Texas 77056. I declare under penalty of perjury that the foregoing declaration is true and correct:

1. On January 15, 2026, my office filed a Motion to Withdraw as Attorney ("Motion") for Dakota Fontenot ("Dakota") in the above-captioned matter.

2. At the time the Motion was filed, Dakota had not yet responded to multiple e-mails to indicate whether he consented or objected to the Motion. However, shortly after filing the Motion, Dakota responded by e-mail on January 15, 2026, indicating that he received the Motion and consented to the Motion but did not sign it as it had already been filed.

3. The Motion and Notice of Submission for the Motion, initially set for February 5, 2026, was subsequently mailed and delivered to Dakota's last known address by both certified and regular first-class mail as required by Texas Rule of Civil Procedure 10.

4. Accordingly, all notice requirements under Texas Rule of Civil Procedure 10 have been complied with, and Dakota has consented to the Motion.

5. Paul Biek remains counsel of record for Dakota and Dakota consented to Mr. Biek assuming the responsibility for his representation going forward.

Executed in Harris County, Texas, on the 27th day of February 2026.

*/s/ Trey Avant*

_____
John P. "Trey" Avant III

UNOFFICIAL COPY

1

4931-7267-2402.1

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Marcie Cardenas on behalf of Trey Avant
Bar No. 24101471
mcardenas@grayreed.com
Envelope ID: 111841636
Filing Code Description: Notice
Filing Description: Declaration of John P "Trey" Avant III
Status as of 3/2/2026 3:45 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Paul Beik | 24054444 | paul@beiklaw.com | 2/27/2026 9:28:45 PM | SENT |
| James Ardoin | 24045420 | jimmy@jimmyardoinlaw.com | 2/27/2026 9:28:45 PM | SENT |
| John P. TreyAvant | | tavant@grayreed.com | 2/27/2026 9:28:45 PM | SENT |
| Debbie Gurley | | dgurley@grayreed.com | 2/27/2026 9:28:45 PM | SENT |
| Andrew McCarty | | amccarty@grayreed.com | 2/27/2026 9:28:45 PM | SENT |
| Kayla Brake | | kayla@texasprobateattorney.com | 2/27/2026 9:28:45 PM | SENT |
| Texas Probate Attorney, PLLC | | efile@texasprobateattorney.com | 2/27/2026 9:28:45 PM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 2/27/2026 9:28:45 PM | SENT |
| Jeffrey D.Watters | | jwatters@grayreed.com | 2/27/2026 9:28:45 PM | SENT |
| Ryan Cantrell | | ryan.cantrell@chamberlainlaw.com | 2/27/2026 9:28:45 PM | SENT |
| Mariah Karigan | | mariah.karigan@chamberlainlaw.com | 2/27/2026 9:28:45 PM | SENT |
| Marcie Cardenas | | mcardenas@grayreed.com | 2/27/2026 9:28:45 PM | SENT |
| Rudy Culp | | rudy@texasprobateattorney.com | 2/27/2026 9:28:45 PM | SENT |
| Bailey Bowe | | bailey@texasprobateattorney.com | 2/27/2026 9:28:45 PM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 2/27/2026 9:28:45 PM | SENT |

UNOFFICIAL COPY



FILED
03/09/2026 8:58:18 AM
Teneshia Hudspeth
County Clerk
Harris County, Texas
nelson.aguilar

No. 537,721

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY AS TRUSTEE OF THE HOLLI ANN HARDIN TRUST NUMBER ONE<br>*Plaintiff,*<br><br>v.<br><br>DAKOTA FONTENOT,<br>*Defendant.* | § § § § § § § § § § § | IN THE PROBATE COURT<br><br><br><br>NUMBER ONE (1) OF<br><br><br><br>HARRIS COUNTY, TEXAS |

## ORDER GRANTING MOTION TO WITHDRAW AT ATTORNEY

On this day, Jeffrey D. Watters, Jr., John P. "Trey" Avant III, and Andrew McCarty, and the law firm of Gray Reed & McGraw LLP's ("Movant") Motion to Withdraw as Attorney ("Motion"), was considered by this Court. After considering the evidence (if any), applicable law, and arguments of counsel (if any), the Court finds that the Motion should be Granted.

It is therefore ORDERED that the Motion is granted, and Movant is hereby withdrawn as counsel of record for Defendant Dakota Fontenot ("Dakota" or "Defendant") in the above referenced matter.

Signed: 03/06/2026
4:19:17 PM

_____
JUDGE PRESIDING

4922-5051-8152.1

ENTRY REQUESTED:

*/s/ Trey Avant*
JEFFREY D. WATTERS, JR.
Texas State Bar Number: 2406695
jwatters@grayreed.com
JOHN P. ("TREY") AVANT III
Texas State Bar Number: 24101471
tavant@grayreed.com
ANDREW B. MCCARTY
Texas State Bar Number: 24126139
amccarty@grayreed.com
GRAY REED & McGRAW LLP
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000



UNOFFICIAL COPY

2

4922-5051-8152.1

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Debbie Gurley on behalf of Trey Avant
Bar No. 24101471
dgurley@grayreed.com
Envelope ID: 110113001
Filing Code Description: Application to Withdraw as Attorney of Record
Filing Description:
Status as of 1/15/2026 4:36 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Paul Beik | 24054444 | paul@beiklaw.com | 1/15/2026 4:21:50 PM | SENT |
| James Ardoin | 24045420 | jimmy@jimmyardoinlaw.com | 1/15/2026 4:21:50 PM | SENT |
| John P. TreyAvant | | tavant@grayreed.com | 1/15/2026 4:21:50 PM | SENT |
| Debbie Gurley | | dgurley@grayreed.com | 1/15/2026 4:21:50 PM | SENT |
| Andrew McCarty | | amccarty@grayreed.com | 1/15/2026 4:21:50 PM | SENT |
| Kayla Brake | | kayla@texasprobateattorney.com | 1/15/2026 4:21:50 PM | SENT |
| Texas Probate Attorney, PLLC | | efile@texasprobateattorney.com | 1/15/2026 4:21:50 PM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 1/15/2026 4:21:50 PM | SENT |
| Jeffrey D.Watters | | jwatters@grayreed.com | 1/15/2026 4:21:50 PM | SENT |
| Ryan Cantrell | | ryan.cantrell@chamberlainlaw.com | 1/15/2026 4:21:50 PM | SENT |
| Mariah Karigan | | mariah.karigan@chamberlainlaw.com | 1/15/2026 4:21:50 PM | SENT |
| Marcie Cardenas | | mcardenas@grayreed.com | 1/15/2026 4:21:50 PM | SENT |
| Rudy Culp | | rudy@texasprobateattorney.com | 1/15/2026 4:21:50 PM | SENT |
| Bailey Bowe | | bailey@texasprobateattorney.com | 1/15/2026 4:21:50 PM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 1/15/2026 4:21:50 PM | SENT |

UNOFFICIAL COPY



EXHIBIT

_____33_____

exhibitsticker.com

| | | |
|---|---|---|
| **LINDA GOEHRS, IN HER CAPACITY AS** | § | **IN PROBATE COURT** |
| **TRUSTEE OF THE HOLLI ANN** | § | |
| **HARDIN TRUST NUMBER ONE** | § | |
| *Plaintiff*, | § | |
| | § | **NUMBER ONE OF** |
| **v.** | § | |
| | § | |
| **DAKOTA FONTENOT** | § | |
| *Defendant*. | § | **HARRIS COUNTY, TEXAS** |

### INTERVENORS' THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, CROSS-CLAIMS, AND APPLICATION FOR TEMPORARY INJUNCTIVE RELIEF

Michelle Fontenot ("Michelle") and Dallas Joseph Fontenot III ("Joe"), individually, as beneficiaries of the Holli Ann Hardin Trust Number One and Dakota Trust, file this Third Amended Answer, Affirmative Defenses, and Cross-Claims and Application for Temporary Injunctive Relief and respectfully show the Court as follows:

#### GENERAL DENIAL

1.      Michelle and Joe generally deny the allegations contained in Defendant Dakota Fontenot's First Amended Counterclaim and Cross-Claim as permitted by Rule 92 of the Texas Rules of Civil Procedure and require that Dakota prove his causes of action by a preponderance of the credible evidence.

#### AFFIRMATIVE DEFENSES

2.      Michelle and Joe plead the following affirmative defenses:

   a. Dakota lacks authority as Trustee of the Dakota Trust and any entities held by the Dakota Trust.

   b. Dakota's claims are barred by the doctrines of waiver, estoppel, laches, and release.

   c. Dakota's claims are barred by the doctrine of unclean hands.

1

    d.  Dakota's claims are barred by the statute of limitations.

    e.  Dakota's claims are barred by the doctrines of res judicata or collateral estoppel.

## ATTORNEYS' FEES

3.    Michelle and Joe seek their reasonable and necessary attorneys' fees under all applicable authority, including Section 37.009 of the Texas Civil Practice and Remedies Code and Section 114.064 of the Texas Property Code.

## AMENDED CROSSCLAIMS

4.    Intervenors Michelle Fontenot and Joe Fontenot file these First Amended Crossclaims against Dakota Fontenot, and respectfully show the Court the following:

## DISCOVERY CONTROL PLAN

5.    This is a Level 2 case under Texas Rule of Civil Procedure 190.3.

## PARTIES

6.    Michelle Fontenot, individually as a beneficiary of the Dakota Trust and the Holli Ann Hardin Trust Number One, is an individual residing in Fort Bend County, Texas. Michelle has made an appearance in this matter through her counsel of record.

7.    Joe Fontenot, individually as a beneficiary of the Dakota Trust and the Holli Ann Hardin Trust Number One, is an individual residing in Fort Bend County, Texas. Joe has made an appearance in this matter through his counsel of record.

8.    Dakota Fontenot, individually and as purported Trustee of the Dakota Trust and purported officer and director of Viva Las Vegas Properties, Inc., and is an individual residing in Harris County, Texas. Dakota has made an appearance in this matter through his counsel of record.

2

35034788.v1

9.      Linda Goehrs, as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, is an individual residing in Harris County, Texas. Ms. Goehrs has made an appearance in this matter through her counsel of record.

10.     Madison Fontenot, individually and as Next Friend of S.F. and W.F., is an individual. She has made an appearance in this matter as Next Friend through her counsel of record, Paul Beik.

JURISDICTION AND VENUE

11.     This Court has jurisdiction under Texas Estates Code § 32.006. Venue is proper in Harris County under Texas Property Code § 115.002(b).

RULE 47 STATEMENT

12.     Michelle and Joe seek monetary relief over $1,000,000 and non-monetary relief. The damages sought are within the jurisdictional limits of this court.

RELEVANT FACTS

*The Dakota Trust*

13.     Holli Ann Hardin, as Settlor, created the Dakota Trust, an irrevocable inter vivos trust, on November 9, 1994. The Dakota Trust was never amended and could not be amended except by a court of competent jurisdiction. Holli Ann Hardin served as the original named Trustee of the Dakota Trust. *See* Exhibit 1, Dakota Trust Declaration, Article V, Section A. The Trust Agreement named the following successor Trustees, in order: Dallas, Joe, Michelle, and finally First Interstate Bank of Texas. *See* Exhibit 1, Dakota Trust Declaration, Article V, Sections B and C.

14.     On September 8, 1996, Holli resigned as Trustee by serving written notice of her resignation on Dallas. *See* Exhibit 2, 9/8/1996 Trustee Resignation; *see also* Exhibit 1, Dakota

3

Trust Declaration, Section V.F. ("Any appointee serving or entitled to serve as Trustee may resign at any time and without cause.").

15. After Holli's resignation, Dallas, as the named first successor Trustee, served as Trustee for the Dakota Trust until his death on September 3, 2021. During his tenure as Trustee, Dallas exercised the authority under Article V, Section C. of the Trust Agreement to designate successor trustees. On May 1, 2013, Dallas executed a Designation of Successor Trustee, naming Dakota as his successor, followed by Frost Bank. *See* Exhibit 3, 5/1/13 Designation of Successor Trustee. On October 14, 2017, Dallas then revoked the designation of Dakota as successor Trustee, designating Frost Bank as his successor in a formal Designation of Successor Trustee:

> Pursuant to Article V, Section C of the Trust Declaration, Dallas Joseph Fontenot, Jr. removes all prior appointments of appoints Dakota James Fontenot as successor Trustee and, instead, appoints Frost Bank to serve as successor Trustee upon the death, disability, resignation, or disqualification of Dallas Joseph Fontenot, Jr.

*See* Exhibit 4, 10/14/17 Designation of Successor Trustee.

16. At the same time, Dallas removed Dakota as officer of Viva Las Vegas Properties, Inc., among other entities. *See* Exhibit 5, 10/14/17 Resolutions Adopted by Consent of the Shareholder and Director of Viva Las Vegas Properties, Inc. The Dakota Trust owns 100% of the stock of Viva Las Vegas Properties, Inc. (*see* Exhibit 6) and accordingly the Trustee of the Dakota Trust is the sole shareholder for Viva Las Vegas Properties, Inc.

> ESOLVED that Dakota Fontenot is hereby removed from all offices and all positions as a Director of Viva Las Vegas Properties, Inc. from and after October 14, 2017.

*See* Exhibit 5, 10/14/17 Resolutions Adopted by Consent of the Shareholder and Director of Viva Las Vegas Properties, Inc.

35034788.v1

17.     Dakota is not a named successor trustee in the Trust Agreement for the Dakota Trust, and the only document that purports to give him any claim to the trustee position was revoked in October 2017. Upon Dallas's death in 2021, a vacancy in the trustee position was created, and Frost Bank was the named successor trustee in the 2017 Designation of Successor Trustee. Neither Dallas, nor Frost Bank, ever executed any other document that would appoint Dakota as successor trustee.

18.     Despite the lack of authority, Dakota currently purports to serve as Trustee of the Dakota Trust and director/officer of Viva Las Vegas Properties, Inc. To support his claimed status as Trustee, Dakota now asserts that the October 14, 2017 Designation of Successor Trustee is "invalid as a forgery and/or revoked document." *See* Dakota's Amended Answer and Counterclaim, ¶ 12. Dakota has not, and cannot, produce any document that would validly appoint him as successor trustee of the Dakota Trust. As Dakota's purported authority to act on behalf of Viva Las Vegas Properties, Inc. stems from actions he invalidly took as purported trustee, he likewise has no authority to act on behalf of Viva Las Vegas Properties, Inc.[1]

19.     Dakota, however, not only claims to be the Trustee of the Dakota Trust and the officer and director of Viva Las Vegas Properties, Inc., but Dakota claims that he is the "only current beneficiary of the Dakota Trust." *See* Dakota's First Amended Answer and Counterclaim, ¶ 14. However, the terms of the Dakota Trust dictate that Joe and Michelle are 2/3 beneficiaries of the Dakota Trust. After Dallas's death in 2021, Dakota sought to probate Dallas's 2013 Will, and Holli sought to probate Dallas's 2013 Will and 2017 Codicil. Dakota claimed that the 2017 Codicil was a forgery or was the product of undue influence. Dakota also initiated litigation regarding the

---

[1] After hearing on an Application for Temporary Injunction filed by the Holli Ann Hardin Trust Trustee, and partially joined by Joe and Michelle, the Court granted a Temporary Injunction enjoining Dakota from selling the real property held by Viva Las Vegas Properties, Inc.

5

Holli Ann Hardin Trust Number One, seeking a declaratory judgment and appointment of a successor trustee of the Holli Ann Hardin Trust Number One. The parties settled both the Estate and Trust litigation on January 7, 2022. Dallas's 2013 Will and 2017 Codicil were admitted to probate, and Holli was appointed Independent Executor of Dallas's Estate. *See* Exhibit 7, Order Admitting Will and Codicil to Probate.

20.     As part of the Settlement Agreement, Holli's interest in both the Holli Ann Hardin Trust Number One and the Dakota Trust Number One were bought out, and Holli disclaimed her interest in these Trusts. *See* Exhibit 8, Assignment of Interest and Disclaimer of Further Interest ("Holli Ann Fontenot disclaims any right to further interest in the Dakota Trust.").

21.     Pursuant to the terms of the Dakota Trust, upon Holli's death, absent Dallas's exercise of a power of appointment, the Trust property passes to the descendants of Holli Hardin Fontenot and to the descendants of Dallas Joseph Fontenot, Jr., *per stirpes*:

> 3.    Dallas Joseph Fontenot, Jr., by a clause in his Will in which he specifically exercises this power of appointment, shall have the power to appoint the trust assets remaining upon the death of Holli Hardin Fontenot to or for the benefit of any one or more of the descendants of Dallas Joseph Fontenot, Jr. or the descendants of Holli Hardin Fontenot, in such shares, proportions, or amounts, upon such trusts and for such estates as he alone may determine. If Dallas Joseph Fontenot, Jr. fails to exercise this special power of appointment to the fullest extent, then, subject to the other provisions of this Trust, upon his death, the unappointed trust assets shall be delivered to the living descendants of Holli Hardin Fontenot and to the living descendants of Dallas Joseph Fontenot, Jr., *per stirpes*.

*See* Exhibit 1, Article VI, Section D.3. *See also* Article IV, Section E ("For example, if a distribution were to be made to the descendants, *per stirpes*, of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot, assuming the recitations in Article I, the property to be distributed would

6

be divided into three equal shares, one for each of Dallas Joseph Fontenot, III, Michelle Anne Fontenot, and Dakota James Fontenot.").

22.     As he testified at the injunction hearing, Dakota, purportedly believing himself to be the acting Trustee and sole beneficiary of the Dakota Trust, has recently sold property located belonging to Viva Las Vegas Properties, Inc. and deposited all of the proceeds into a personal bank account, and subsequently depleted the proceeds for his own personal obligations. He did not notify Michelle or Joe about the sale of the property, and inappropriately accepted all of the proceeds for himself, sharing none with the other beneficiaries.

23.     As a result of Dakota's actions and baseless claims, and Joe and Michelle bring this action for damages, declaratory judgments, and to prevent further breaches of trust.

***The Holli Ann Hardin Trust Number One***

24.     The Holli Ann Hardin Trust Number One was created on June 5, 1991. *See* Exhibit 12, Holli Ann Hardin Trust Number One Trust Declaration. Disputes arose after the death of Dallas Fontenot, Junior, relating to his Estate and the Holli Ann Hardin Trust Number One. As discussed *supra*, the parties entered into a Binding Mediated Settlement Agreement on January 7, 2022 to resolve these disputes. *See* Exhibit 13, Binding Mediated Settlement Agreement.

25.     As part of the Settlement Agreement, the parties agreed that Dakota would receive "[a]ll interest, including all associated bank accounts, in Entertainment Marketing and Management, LP," which had a value of $10,000 according to the Temporary Administrator, Gus Tamborello's Inventory. *Id.* at ¶ 4; Exhibit 14, 11/23/21 Inventory and List of Claims; Exhibit 15, 1/25/22 Order Approving Inventory and List of Claims.

26.     Trusting that Dakota would treat them fairly and had their best interests at heart, Joe and Michelle also agreed to have Dakota appointed as Officer and/or Director of Ice Embassy,

7

Inc. and HFR Enterprises, Inc., the entities owned by the Holli Ann Hardin Trust Number One. *See* Exhibit 13, Binding Mediated Settlement Agreement, ¶ 9.

27.    The Binding Mediated Settlement Agreement also provides that Dakota would remain employed by "the businesses owned by the Holli Ann Hardin Trust Number One," but "[t]he compensation amount that Dakota [] ha[s] been receiving shall remain unchanged." *See id.* at ¶ 9.

28.    As discussed in Plaintiff Linda Goehrs' Original Petition, during the years in which Dakota was responsible for managing Ice Embassy and HFR Enterprises, the entities appeared to experience a significant loss in value, while Dakota ensured that he received significant compensation increases. For example, Dakota entered into a Management Agreement on behalf of Ice Embassy with EMM, an entity that he owned, whereby EMM would receive $17,500 per month, with a true-up at the end of each year to 10% of the gross revenue for the Club. *See* Exhibit 16, 1/1/24 Management Agreement. Dakota also entered into an Administrative Services Agreement on behalf of HFR, whereby EMM would receive less than a thousand dollars per month for 2021 and 2022, but then in 2023 and beyond would receive $1,850 per month. *See* Exhibit 17, 1/1/24 Administrative Services Agreement.

29.    In May of 2025, after repeated requests for information regarding the Holli Ann Hardin Trust Number One assets, Michelle and Joe learned for the first time that Dakota had allowed the entities to fall behind on payments under the note used to buy out Holli's interest for *seven months*. The note was guaranteed by the Holli Ann Hardin Trust Number One assets, and the lender threatened to foreclose on the note if a sale of the assets was not made.

30.    Unbeknownst to Michelle and Joe, Dakota had been negotiating a sale of Ice Embassy and the real property owned by HFR to remedy the note default that he allowed for seven

35034788.v1

months while he continued receiving a substantial salary. Dakota and the Trustee closed on the sale of Ice Embassy and the real property owned by HFR in June of 2025. The initial sales price for the stock of Ice Embassy was $250,000 and $4,750,000 for the HFR real property. However, due to additional Ice Embassy debts that Dakota had allowed to accrue that exceeded the Ice Embassy stock sales price, the HFR real property sales price was reduced to $4,689,424.72. *See* Exhibit 18, 6/27/25 Amendment to Real Estate Purchase Agreement.

31.    After the closing of the Ice Embassy and HFR real property transactions, Michelle and Joe were once again blindsided by Dakota's wrongdoing. Dakota had apparently reached a side agreement with the purchasers of the Ice Embassy stock and HFR real property for the purchase of the EMM partnership interests. *See* Exhibit 19, Partnership Interest Purchase Agreement. EMM, an entity with no real assets (as acknowledged by the buyers' counsel), was sold for $2,750,000. *Id.*; *see also* Exhibit 20, 5/8/25 Email from Buyers' Counsel ("the only assets of any consequence in the Partnership (as I understand it) are the Administrative Services Agreement ("ASA") and any goodwill associated with the Partnership's management business activities."). EMM's financial records reflect that it was insolvent as of December 31, 2024, the entity was insolvent, and its only contractual rights to future income could be terminated by Ice or HFR for any reason with thirty days' notice. *See* Exhibit 16, at 3.01(a), Exhibit 17, at 8.2; Exhibit 21, 12/31/24 Balance Sheet; Exhibit 22, 4/30/25 Balance Sheet. Inexplicably, Dakota sold EMM—a shell company—for $2,750,000 ***payable to him personally!*** in connection with the sale of the Ice Embassy stock and HFR real property, demonstrating a clear diversion of Trust assets away from the Holli Ann Hardin Trust Number One, Michelle, and Joe. To make matters worse, Dakota obligated both assets belonging to Ice Embassy (any monetary award from Ice Embassy credit card fee class action litigation) and the escrow amount from the HFR real property sale for any of

9

the buyers' losses *before* the sellers could withhold payments owed to Dakota under the EMM agreement, such that Ice Embassy assets and the escrow amount that should ultimately belong to the Holli Ann Hardin Trust Number One will bear the cost of any of 1) EMM's obligations incurred before the closing, 2) any fraud, intentional misrepresentation, willful misconduct, criminal act, bad faith, or gross negligence of Dakota in connection with the EMM agreement, 3) any breach of or inaccuracy in any representation or warranty made by Dakota in the EMM agreement, and 4) any breach or non-fulfillment of any covenant or agreement of Dakota in the EMM agreement. *See* Exhibit 19, at 8.2 and 8.3.

32.     Moreover, Dakota also included Ice Embassy assets as "Excluded Assets" for the EMM partnership Interest Purchase Agreement in an attempt to divert more Trust property to himself personally. *See* Exhibit 19.

33.     Recently, Dakota has revealed that after wrongfully diverting millions of dollars to himself through the EMM Agreement, he and his wife, Madison, then created an entity in the U.S. Virgin Islands called Emerald Island Holdings, LLC and used the entity to purchase a home for approximately $2.4 million with the wrongfully acquired proceeds pursuant to the EMM Agreement. Dakota and Madison then transferred the entity to Madison's parents, Amir Shenaq and Sheila Shenaq, allegedly in exchange for a cancellation of an unidentified debt. All the while, Dakota and Madison continued to treat the $2.4 million U.S. Virgin Islands home as their own, storing their furniture and personal effects in the home and assisting with remodeling the home.

34.     Unfortunately, Dakota's brazen fraudulent behavior didn't stop there. During the second day of the Temporary Injunction hearing, Dakota revealed that *the day before* the Temporary Injunction hearing was set to take place seeking to secure the remaining installment payments to avoid any further dissipation by Dakota, he signed a release of any rights to future

10

installment payments (a value of approximately $937,500) in exchange for a reduced lump sum payment of $575,000—giving up $362,500 in an attempt to avoid an injunction that would prevent him from receiving any further payments. Dakota received a wire for the $575,000 lump sum payment *during the Temporary Injunction hearing on March 6, 2026*, and wired the money to an account in Madison's name the same day. Madison then apparently began transferring the money, including to her parents or an entity they control for an alleged "lease" of the $2.4 million U.S. Virgin Islands home.

35.    As a result of Dakota's shocking and undisclosed diversion of funds and assets to himself through the EMM Agreement, and Dakota and Madison's fraudulent transfers of these assets, Michelle and Joe bring this action for damages and equitable relief.

### CAUSES OF ACTION

**AMENDED APPLICATION FOR RELIEF UNDER TEXAS PROPERTY CODE § 114.008**

36.    Michelle and Joe incorporate by reference paragraphs 12 through 22 as though fully set forth herein.

37.    Texas Property Code § 114.008 gives the Court broad authority to remedy a breach of trust that has occurred or might occur. As explained *supra*, Dakota has no authority to act on behalf of the Dakota Trust. Numerous breaches of trust have occurred and will continue to occur if Dakota continues to act without proper authority.

38.    As Dakota's designation as successor trustee was revoked in 2017, Dakota is not validly serving as Trustee of the Dakota Trust. Any actions he has taken as purported Trustee of the Dakota Trust are invalid and ineffective.

39.    Importantly, Dakota cannot become the Trustee of the Dakota Trust by some equitable doctrine of waiver or consent. *See Alpert v. Riley*, 274 S.W.3d 277 (Tex. App.—Houston

11

[1st Dist.] 2008, pet. denied) ("We have not located, and Riley does not identify, any authority that recognizes a trustee by estoppel in the presence of express trust language outlining the procedure for appointment of a successor trustee...Texas law prohibits the equitable rule proposed by Riley for other reasons as well. The Texas Trust Code requires adherence to the trustee selection method prescribed in the trust instrument, which necessarily forecloses the exercise of equitable discretion unless that method fails.") (citing TEX. PROP. CODE § 113.083).

40.    The Texas Property Code authorizes the Court to issue an injunction to remedy a breach of trust that has occurred or might occur. TEX. PROP. CODE § 114.008; *see also Matter of Bumstead Family Irrevocable Trust*, 2022 WL 710159 (Tex. App.—Corpus Christi-Edinburg March 10, 2022, pet. denied) (affirming trial court temporary injunction that enjoined an individual from acting as trustee and appointed a receiver when the validity of the purported trustee's appointment was at issue). Dakota taking any action on behalf of the Dakota Trust would be a further breach of trust, as he has no authority to act under the terms of the Trust agreement and subsequent designations of successor trustees.

41.    Similarly, Dakota has no authority to act on behalf of Viva Las Vegas Properties, Inc. Dallas removed Dakota as an officer and/or director of Viva Las Vegas Properties, Inc. on October 14, 2017. *See* Exhibit 5, 10/14/17 Resolutions Adopted by Written Consent of Shareholder.

42.    The only documents Dakota has produced that would purport to give him authority to act on behalf of Viva Las Vegas Properties, Inc. are documents that he executed as purported trustee in May of 2023. *See* Exhibit 9, 5/19/23 Purported Unanimous Joint Written Consent of Viva Las Vegas Properties, Inc. However, as discussed *supra*, Dakota is not validly serving as the trustee of the Dakota Trust. Therefore, he had no authority to execute these Viva Las Vegas Properties,

12

Inc. corporate governance documents that he relies upon for authority to act on behalf of Viva Las Vegas Properties, Inc. As a result, Dakota was not validly appointed officer and director of Viva Las Vegas Properties, Inc. and he has no authority to take action on its behalf, including selling real property and accessing funds belonging to Viva Las Vegas Properties, Inc. To the extent necessary, Joe and Michelle request that the Court void the execution of the May 19, 2023 Purported Unanimous Joint Written Consent of Viva Las Vegas Properties, Inc. under Texas Property Code § 114.008(a)(9).

43.    Accordingly, Joe and Michelle request that the Court order the following relief under Texas Property Code § 114.008:

    a. enjoin Dakota from acting as trustee on behalf of the Dakota Trust (TEX. PROP. CODE § 114.008(a)(2));

    b. compel Dakota to redress a breach of trust, including ordering Dakota to pay the proceeds of the sale of Trust property to the Trust (TEX. PROP. CODE § 114.008(a)(3));

    c. appoint a receiver to take possession of the trust property and administer the trust (TEX. PROP. CODE § 114.008(a)(5));

    d. suspend or remove Dakota as trustee, to the extent necessary (TEX. PROP. CODE § 114.008(a)(6)–(7));

    e. void the execution of the May 19, 2023 Purported Unanimous Joint Written Consent of Viva Las Vegas Properties, Inc. (TEX. PROP. CODE § 114.008(a)(9)); and/or

13

35034788.v1

f.   impose a lien and/or constructive trust on any property Dakota received that belonged to the Dakota Trust, including but not limited to the sales proceeds from the sale of 3400 Old Richmond Road (TEX. PROP. CODE § 114.008(a)(9)).

**DECLARATORY JUDGMENT – JOE AND MICHELLE ARE EACH 1/3 BENEFICIARIES OF THE DAKOTA TRUST**

44.   Michelle and Joe incorporate by reference paragraphs 12 through 22 as though fully set forth herein.

45.   An interested person in the administration of a trust may bring suit for a "declaration of rights or legal relations in respect to the trust…to determine any question arising in the administration of the trust, including questions of construction of wills and other writings." TEX. CIV. PRAC. & REM. CODE § 37.005.

46.   As discussed *supra*, as Holli no longer has any interest in the Dakota Trust. *See* Exhibit 7, Assignment of Interest and Disclaimer of Further Interest. As Holli no longer has any interest in the Dakota Trust and has released nay and all interest effective January 2023, Michelle and Joe are at least the two-thirds beneficiaries of the Dakota Trust.

47.   Dakota disputes Michelle and Joe's status as beneficiaries of the Dakota Trust, and instead claims he is the sole beneficiary of the Dakota Trust. Dakota, believes, however, without any authority, that he is the sole beneficiary of the Dakota Trust, despite the lack of any document that would alter Michelle and Joe's status as beneficiaries. Dakota has relied upon Section 3.2 of Dallas's Last Will and Testament for his claim to be the sole beneficiary; however, Section 3.2 of Dallas's Last Will and Testament was revoked by Dallas's First Codicil, which was admitted to probate. *See* Exhibit 10, Last Will and Testament; Exhibit 11, First Codicil; Exhibit 7, Order Admitting Will and Codicil to Probate.

14

48.     Accordingly, Michelle and Joe request that the Court issue a declaratory judgment that Michelle and Joe are each 1/3 beneficiaries of the Dakota Trust.

**DECLARATORY JUDGMENT – JOE IS SUCCESSOR TRUSTEE OF THE DAKOTA TRUST**

49.     Michelle and Joe incorporate by reference paragraphs 12 through 22 as though fully set forth herein.

50.     An interested person in the administration of a trust may bring suit for a "declaration of rights or legal relations in respect to the trust…to determine any question arising in the administration of the trust, including questions of construction of wills and other writings." TEX. CIV. PRAC. & REM. CODE § 37.005.

51.     On October 14, 2017, Dallas Fontenot designated Frost Bank as his successor trustee. *See* Exhibit 4, 10/14/17 Designation of Successor Trustee. Frost Bank has failed to serve, and has executed a formal declination to serve as trustee of the Dakota Trust. Under the trustee succession provisions contained in the original Trust Agreement, Joe is the next named successor trustee and is prepared to serve as such. However, given the controversy created by Dakota claiming to be the Trustee and sole beneficiary, Joe and Michelle seek a declaration that Joe is the successor trustee of the Dakota Trust.

**APPLICATION TO FILL TRUSTEE VACANCY UNDER TEXAS PROPERTY CODE § 113.083**

52.     Michelle and Joe incorporate by reference paragraphs 12 through 22 as though fully set forth herein.

53.     As the trust instrument confirms, Joe is the successor trustee of the Dakota Trust, Michelle and Joe ask the Court to fill the trustee vacancy under Texas Property Code § 113.083. Upon information and belief, Frost is not serving as successor trustee and does not intend to serve as successor trustee.

35034788.v1

54.     Under Texas Property Code § 113.083, on the death, resignation, incapacity, or removal of a sole or surviving trustee, a successor trustee shall be selected according to the method, if any, prescribed in the trust instrument. TEX. PROP. CODE § 113.083(a). "If for any reason a successor is not selected under the terms of the trust instrument, a court may and on petition of any interested person shall appoint a successor in whom the trust shall vest." *Id.*

55.     As described *supra*, Dakota is not the Trustee of the Dakota Trust, and Michelle and Joe believe that the Trust Agreement provides that Joe is the successor trustee. As there is a vacancy in the trustee position, Michelle and Joe therefore request the Court fill the vacancy and appoint Joe to serve as successor Trustee.

**MISAPPROPRIATION OF TRUST ASSETS**

56.     Michelle and Joe incorporate by reference paragraphs 12 through 22 as though fully set forth herein.

57.     Dakota sold property held in an entity of which the Dakota Trust is the 100% owner, without any authority. Under Texas Property Code § 114.031, a beneficiary is liable for loss to the trust if the beneficiary has misappropriated or otherwise wrongfully dealt with the trust property or failed to repay a distribution or disbursement from the trust in excess of that to which the beneficiary is entitled. *See* TEX. PROP. CODE § 114.031(a)(1), (4). Dakota has misappropriated trust assets and accordingly, the trustee may offset his liability to the trust estate against his interest in the trust estate. Michelle and Joe bring this claim for misappropriation of trust assets as beneficiaries of the Dakota Trust derivatively on behalf of the Dakota Trust.

**UNJUST ENRICHMENT**

58.     Michelle and Joe incorporate by reference paragraphs 12 through 22 as though fully set forth herein.

16

59.     Dakota received all of the sales proceeds of property belonging to an entity held by the Dakota Trust, of which he is only a 1/3 beneficiary. As a result, he has been unjustly enriched by receiving a benefit that would be unconscionable to retain. Accordingly, Michelle and Joe bring this claim for unjust enrichment derivatively on behalf of the Dakota Trust. Any future distributions to Dakota from the Dakota Trust should be offset by the amounts he has already received. *See* TEX. PROP. CODE § 114.031(b).

### MONEY HAD AND RECEIVED

60.     Michelle and Joe incorporate by reference paragraphs 12 through 22 as though fully set forth herein.

61.     As a result of the sale of the property located at 3400 Old Richmond Road, Dakota holds funds which, in equity and good conscience, belong to the Dakota Trust. The Dakota Trust has suffered damages as a result of Dakota's inequitable conduct. Accordingly, Michelle and Joe bring this claim for money had and received derivatively on behalf of the Dakota Trust. Any future distributions to Dakota from the Dakota Trust should be offset by the amounts he has already received. *See* TEX. PROP. CODE § 114.031(b).

### BREACH OF FIDUCIARY DUTY

62.     Michelle and Joe incorporate by reference paragraphs 23 through 35 as though fully set forth herein.

63.     To prevail on a breach of fiduciary duty claim, a plaintiff must prove that (1) there is a fiduciary relationship between the plaintiff and defendant, (2) the defendant breached their fiduciary duty to the plaintiff, and (3) the breach resulted in an injury to the plaintiff or benefit to the defendant. *Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.] 2008, pet. denied).

35034788.v1

64.     In addition to a formal fiduciary relationship, an informal fiduciary duty can also arise based on a moral, social, domestic, or purely personal relationship of trust and confidence. *See Tex. Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 507–08 (Tex. 1980) (recognizing the existence of an informal fiduciary relationship in those cases "in which influence has been acquired and abused, in which confidence has been reposed and betrayed."); *Siddiqui v. Fancy Bites, LLC*, 504 S.W.3d 349, 365 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). When one family member "is accustomed to being guided by the judgment or advice of another or is justified in believing one will act in the best interest of another because of a family relationship, a confidential relationship may arise." *Garcia v. Vera*, 342 S.W.3d 721, 724 (Tex. App.—El Paso 2011, no pet.). Factors considered in determining when an informal fiduciary relationship exists include whether the plaintiff relied on the defendant for support, the plaintiff's age and health, and evidence of the plaintiff's trust. *Young v. Fawcett*, 376 S.W.3d 209, 215 (Tex. App.—Beaumont 2012, no pet.).

65.     Here, an informal fiduciary relationship existed between Michelle, Joe, and Dakota. Michelle and Joe relied on Dakota and trusted that he would act in their best interests when agreeing to his appointment as officer and director of the Holli Ann Hardin Trust Number One entities. As a fiduciary, Dakota owed Michelle and Joe the duty of loyalty and utmost good faith, the duty of candor, the duty to refrain from self-dealing, which extends to dealings with a fiduciary's spouse, agents, employees, and other persons whose interests are closely identified with those of the fiduciary, the duty to act with integrity of the strictest kind, the duty of fair, honest dealing, and the duty of full disclosure. *See Miller v. Lucas*, No. 02-13-00298-CV, 2015 WL 2437887 (Tex. App.—Fort Worth May 21, 2015, pet. denied). Dakota breached these fiduciary duties with his countless actions to benefit himself at the expense of Michelle, Joe, and the Holli Ann Hardin Trust Number One.

18

66.     Accordingly, Michelle and Joe seek relief for Dakota's breach of his fiduciary duties, including monetary damages, a constructive trust over any assets or funds received in connection with the sale of EMM, and disgorgement of any fees.

**UNJUST ENRICHMENT: SALE OF EMM**

67.     Michelle and Joe incorporate by reference paragraphs 23 through 35 as though fully set forth herein.

68.     As a result of Dakota's diversion of proceeds to himself, he has been unjustly enriched by receiving a benefit that would be unconscionable to retain. Accordingly, Michelle and Joe bring this claim for unjust enrichment.

**MONEY HAD AND RECEIVED: SALE OF EMM**

69.     Michelle and Joe incorporate by reference paragraphs 23 through 35 as though fully set forth herein.

70.     As a result of Dakota's wrongdoing and misappropriation of assets, Dakota holds funds and assets which, in good conscience, belong to Michelle, Joe, and/or the Holli Ann Hardin Trust Number One. Michelle, Joe, and/or the Holli Ann Hardin Trust Number One have suffered damages as a result of Dakota's inequitable conduct. Accordingly, Michelle and Joe bring this claim for money had and received.

**FRAUDULENT TRANSFERS AND CONVEYANCES: TEXAS UNIFORM FRAUDULENT TRANSFER ACT §§ 24.005 AND 24.006**

71.     Michelle and Joe incorporate by reference paragraphs 23 through 35 as though fully set forth herein.

72.     The Texas Uniform Fraudulent Transfer Acts' ("TUFTA") overriding goal is to protect creditors, such as Michelle, Joe, and the Holli Ann Hardin Trust Number One, from being defrauded or left without recourse due to a debtor's unscrupulous actions. TUFTA also allows

35034788.v1

creditors to sue third parties who received a fraudulent transfer to void the transaction and recover its losses.

73.　　Dakota is a debtor because he is a person who is liable on a claim.

74.　　Michelle and Joe are creditors because they have a claim, which TUFTA broadly defines as a right to payment or property, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.

75.　　A transfer is fraudulent if, among other things, it was made with actual intent to hinder, delay, or defraud any of the debtor's creditors. Badges of fraud shed light on whether a debtor made a transfer with the requisite fraudulent intent.

76.　　Transfers can also be constructively fraudulent if the debtor made a transfer without receiving a reasonably equivalent value.

77.　　Dakota and Madison's transfers to insiders—their own family members or entities controlled by their family members—qualify as fraudulent and impermissible transfers under TUFTA. Dakota and Madison's transfers were made with actual intent to hinder, delay, and/or defraud Michelle and Joe. This intent is amply demonstrated by the evidence and circumstances surrounding the transfers, including, without limitation, the following:

a.　The transfers were to insiders;

b.　Dakota and Madison retained possession or control of the property transferred after the transfer;

c.　Dakota and Madison concealed the circumstances and nature of the transfers;

d.　The transfers were made during the pendency of this litigation, and on the eve of a Temporary Injunction hearing regarding the assets transferred; and

20

35034788.v1

e.  The transfers were of substantially all of their assets, and Dakota was insolvent.

When there is a concurrence of badges, as here, they make a strong case of fraud. Dakota and Madison's above-referenced actions violated section 24.005(a)(1).

78.  Under section 24.005(a)(2), a transfer made by a debtor is fraudulent as to a creditor, if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due. Dakota and Madison made transfers to insiders without receiving reasonably equivalent value in exchange for the transfers, at a time when Dakota has admitted he was incurring debts beyond his ability to pay as they became due.

79.  Further, Dakota and Madison's transfers were fraudulent under section 24.006, as they were made without receiving reasonably equivalent value in exchange for the transfer and Dakota was insolvent or became insolvent as a result of the transfer; and/or the transfers were made to an insider for an antecedent debt, Dakota was insolvent at the time of the transfer, and the insider had reasonable cause to believe that Dakota was insolvent.

80.  Michelle and Joe therefore seek all remedies available to them for Dakota and Madison's fraudulent transfers, including avoidance of the transfers and obligations, attachment against the assets transferred, and judgment against Dakota and Madison for the value of the assets transferred or in an amount necessary to satisfy Michelle and Joe's claims. Michelle and Joe also request that the Court award it exemplary damages, costs, and reasonable attorneys' fees.

**CONSPIRACY**

81.  Michelle and Joe incorporate by reference paragraphs 23 through 35 as though fully set forth herein.

21

35034788.v1

82.    As part of Dakota's diversion of funds to himself and misappropriation of assets, Dakota and Madison also engaged in a conspiracy to conceal assets defraud Michelle and Joe.

83.    Dakota and Madison conspired to accomplish and unlawful purpose, had a meeting of the minds on the object or course of action, and Dakota and/or Madison committed an unlawful, overt act to further the object or course of action. Michelle, Joe, and/or the Holli Ann Hardin Trust have suffered damages as a result, and accordingly Michelle and Joe bring this action for conspiracy against Dakota and Madison.

### ATTORNEYS' FEES

84.    Michelle and Joe seek their reasonable and necessary attorneys' fees under all applicable authority, including Section 37.009 of the Texas Civil Practice and Remedies Code, Section 114.064 of the Texas Property Code, and Section 24.013 of the Texas Business and Commerce Code.

### APPLICATION FOR TEMPORARY INJUNCTIVE RELIEF

85.    Michelle and Joe incorporate the preceding paragraphs as though fully set forth herein.

86.    Pursuant to Texas Rule of Civil Procedure 680, to prevent irreparable harm in the interim, Michelle and Joe request that the Court issue immediate injunctive relief.

87.    The issuance of temporary injunctions are intended "to maintain the status quo between the parties." *Cannan v. Green Oaks Apts., Ltd.*, 758 S.W.2d 753, 755 (Tex. 1988); *see also Clint Indep. Sch. Dist. v. Marquez*, 487 S.W.3d 538, 556 n.12 (Tex. 2026). As a general matter, in order to obtain a temporary injunction, the applicant "must plead and prove that it (1) has a cause of action against the opposing party; (2) has a probable right of relief on final trial to the relief sought; and (3) faces probable, imminent, and irreparable injury in the interim." *Clark v.*

22

*Hastings Equity Partners, LLC*, 651 S.W.3d 359, 366 (Tex. App.—Houston [1st Dist.] 2022, no pet.). At this stage, the applicant "is not required to establish that the applicant will prevail on final trial." *Clark v. Clark*, 638 S.W.3d 829, 840 (Tex. App.—Houston [14th Dist.] 2021, no pet.). "The decision to grant or deny a temporary injunction lies in the sound discretion of the trial court, and the court's grant or denial is subject to reversal only for a clear abuse of that discretion." *Pidgeon v. Turner*, 625 S.W.3d 583, 606 (Tex. App.—Houston [14th Dist.] 2021). The court's discretion is not abused where the Court "applies the law correctly and some evidence reasonably supports its ruling." *Id.*

88.     Additionally, in an action involving fraudulent transfer claims under the Texas Uniform Fraudulent Transfer Act, a creditor may obtain "an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property, appointment of a receiver to take charge of the asset transferred or of other property of the transferee, or any other relief the circumstances may require." TEX. BUS. & COM. CODE § 24.008.

### A. Michelle and Joe have causes of action against Dakota for breach of fiduciary duty, money had and received, and unjust enrichment.

89.     As shown through the allegations above, Michelle and Joe have several viable causes of action against Dakota individually and as an informal fiduciary to Michelle and Joe relating to his actions in diverting funds to himself through the sale of EMM. Michelle and Joe plead causes of action for breach of fiduciary duty, unjust enrichment, money had and received, fraudulent transfer, and conspiracy. Therefore, Michelle and Joe have satisfied this element of their entitlement to injunctive relief.

### B. Michelle and Joe are likely to succeed on the merits of their cause of action.

90.     The applicant "must establish a likelihood of success on the merits of the party's claims in order to obtain injunctive relief." *Courtright v. Allied Custom Homes, Inc.*, 647 S.W.3d

23

35034788.v1

504, 519 (Tex. App.—Houston [1st Dist.] 2022, pet. denied). This element is satisfied where an applicant "produce[s] some evidence supporting every element of at least one valid legal theory." *31 Holdings I, LLC v. Argonaut Ins. Co.*, 640 S.W.3d 915, 923 (Tex. App.—Dallas 2022, no pet.); *see also Cameron Intern. Corp. v. Guillory*, 445 S.W.3d 840, 846 (Tex. App.—Houston [1st Dist.] 2014, no pet.). In other words, "[a] probable right of recovery is shown by alleging a cause of action and presenting evidence tending to sustain it." *Draper v. City of Arlington*, 629 S.W.3d 777, 784 (Tex. App.—Fort Worth 2021, pet. denied).

91.     As discussed *supra*, Dakota has received or will receive millions of dollars at the expense of Michelle and Joe. As an informal fiduciary, Dakota owed Michelle and Joe the highest duty of good faith, fair dealing, honest performance, and strict accountability. Dakota breached these duties and inequitably received benefits at Michelle and Joe's expense. The evidence attached to this pleading as Exhibits 12 through 22 support a finding that Michelle and Joe are likely to succeed on the merits.

**C. Michelle and Joe face probable, imminent, and irreparable injury in the interim.**

92.     Courts have held an injury is irreparable when, as here, "the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 024 (Tex. 2002). Michelle and Joe have no adequate remedy at law for Dakota's wrongful actions. *See Sharma v. Vinman Int'l, Ltd.*, 231 S.W.3d 405, 426–27 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Specifically, Dakota has established and demonstrated a propensity to hide money through illicit transaction, utilizing shell companies and directing money in a way that will be difficult to trace. Further, upon information and belief, Dakota may be insolvent or become judgment proof upon an award of the damages incurred by Michelle and Joe. As Dakota has previously testified, he used the funds from

24

35034788.v1

the sale of the Dakota Trust real property to pay off certain "obligations," and would be unable to return those funds—an amount significantly less than the millions of dollars currently at issue, and within six months of receiving close to two million dollars between the sale of the Dakota Trust real property and sale of EMM. Michelle and Joe will be irreparably harmed if Dakota retains his control over and unlimited access to the proceeds from the sale of EMM, some of which are still forthcoming. *See Hartwell v. Lone Star, PCA*, 528 S.W.3d 750 (Tex. App.—Texarkana 2017, pet dism'd) (where borrower in default and evidence showed he could not repay loan, irreparable injury found); *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 611 (Tex. App.—Houston [1st Dist.] 2002, no pet.); *Blackthorne v. Bellush*, 61 S.W.3d 439, 444 (Tex. App.— San Antonio 2001, no pet.) (plaintiff does not have adequate remedy at law if defendant is insolvent).

### D.  Requested Injunctive Relief

93.     Michelle and Joe have satisfied the elements necessary to establish their right to injunctive relief. Michelle and Joe respectfully request that the Court issue a Temporary Injunction and maintain the Temporary Injunction in place until a final trial on the merits. Michelle and Joe request an order by this Court restraining Dakota as follows:

a.   Within fifteen days of the date of the Court's order, Dakota Fontenot and his officers, agents, servants, employees, attorneys, and any person in active concert or participation with him who receives actual notice of the Order, are ordered to deposit $2,174,500 (all proceeds received under the EMM Agreement) in the registry of the Court;

b.   Dakota Fontenot and Madison Fontenot, their officers, agents, servants, employees, attorneys, and any person in active concert with them who receive actual notice of this order by personal service or otherwise, are prohibited from spending, transferring, distributing, encumbering, pledging, or assigning any proceeds or assets held in any bank account in either of their names at any financial institution;

c.   Dakota Fontenot, his officers, agents, servants, employees, attorneys, and any person in active concert or participation with him who receives actual notice of this

35034788.v1

order by personal service or otherwise, are restrained from spending, transferring, distributing, encumbering, pledging, or assigning any proceeds or assets traceable to any payments for the sale of BFD GP, LLC, BFD LP, LLC, Emerald Islands, LLC, and Entertainment Marketing & Management, Ltd., as well as any subsidiaries, successor entities, assigns, or transferees, including any payments made pursuant to the Partnership Interest Purchase Agreement;

d. Dakota Fontenot, Colorado Rose, LLC, Cle Group SKZ Real Estate, LLC, including each of their agents, officers, members, affiliates, and assignees, shall be required to deposit any payments received under the Partnership Interest Purchase Agreement and any amendments or supplements thereto, and any future amounts payable to Dakota Fontenot under the Partnership Interest Purchase Agreement and any amendments or supplements thereto, into the registry of the Court, including payments pursuant to Section 1.2(a)(ii) and 1.2(a)(iii) of the Partnership Interest Purchase Agreement;

e. Dakota Fontenot is restrained from spending, transferring, distributing, or assigning any proceeds or assets traceable to proceeds from the sale of Entertainment Marketing & Management, Ltd.;

f. All accounts in Dakota's care, custody, or control pertaining to or otherwise holding assets or proceeds received from the sale of Entertainment Marketing & Management, Ltd. shall be frozen; and

g. Dakota Fontenot is ordered to account for all proceeds received from the sale of Entertainment Marketing & Management, Ltd.

94. Michelle and Joe will suffer irreparable injury, loss, or damage if injunctive relief is not immediately granted. A temporary injunction should issue, and Michelle and Joe should only be required to post a minimal bond, if any, to preserve the status quo. Michelle and Joe ask the Court to promptly set an evidentiary hearing to consider the issuance of a temporary injunction against Dakota.

## PRAYER

Michelle Fontenot and Dallas Joseph Fontenot III, request that Dakota Fontenot be cited to appear and answer herein, and after proper consideration by the Court, they be subject to orders and judgment of the Court as follows:

a. Equitable relief under Texas Property Code § 114.008 as specified above;

26

b.  Equitable relief in the form of a temporary injunction as specified above;

c.  Declaratory judgments that:

   a.  Joe and Michelle are each 1/3 beneficiaries of the Dakota Trust; and

   b.  Joe is the Trustee of the Dakota Trust;

d.  Fill and vacancy in the trustee position and appoint Joe as successor trustee;

e.  Monetary damages, including offset against Dakota's interest in the Dakota Trust; and

f.  Attorneys' fees and costs of court.

Michelle and Joe request that the Court award them all other relief to which they may be justly entitled.

Respectfully submitted,

**CHAMBERLAIN, HRDLICKA, WHITE,
  WILLIAMS & AUGHTRY, P.C.**

By:     */s/ Ryan O. Cantrell*
        Ryan O. Cantrell
        Texas Bar No. 24055259
        ryan.cantrell@chamberlainlaw.com
        Mariah J. Karigan
        Texas Bar No. 24123088
        mariah.karigan@chamberlainlaw.com
        1200 Smith Street, Suite 1400
        Houston, Texas 77002
        Telephone:     (713) 658-1818
        Facsimile:     (713) 658-2553
        **COUNSEL FOR MICHELLE FONTENOT AND
        DALLAS JOSEPH FONTENOT III**

27

35034788.v1

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing instrument was served on this the 12th day of March, 2026, to the following:

Rudy Culp
Collin Bullard
TEXAS PROBATE ATTORNEY PLLC
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
*Counsel for Linda Goehrs*

Jeffrey D. Watters, Jr.
John P. ("Trey") Avant III
Andrew B. McCarty
GRAY REED & MCGRAW LLP
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
*Counsel for Dakota Fontenot*

James Madison ("Jimmy") Ardoin III
4900 Fournace Place, Suite 414
Bellaire, Texas 77401
*Counsel for Dakota Fontenot*

Paul S. Beik
440 Louisiana Street, Suite 1800
Houston, Texas 77002
*Counsel for Dakota Fontenot*

*/s/ Ryan O. Cantrell*
Ryan O. Cantrell

28

35034788.v1

Harris County - County Probate Court No. 1

537721

---

# TRUST DECLARATION
# DAKOTA TRUST

---

THIS TRUST DECLARATION is made this day by declaration of Holli Hardin Fontenot ("Settlor"), who presently resides in Fort Bend County, Texas.

## ARTICLE I.
### TRUST BENEFICIARY

This Trust is created for the use and benefit of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot. The term "Trust Beneficiary" or "beneficiary" will also mean any and all persons, organizations, trusts, and entities who may have or may acquire a beneficial interest in this Trust, whether vested or contingent in nature, including a transfer of an interest in the Trust during the life of either Dallas Joseph Fontenot, Jr. or Holli Hardin Fontenot, or both, or from the exercise of a power of appointment by a Trust Beneficiary or otherwise.

For reference, the only child of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot is Dakota James Fontenot, who was born on June 22, 1994. Holli Hardin Fontenot has no other children born to her or adopted by her on the date of this Trust Declaration.

For reference, the only other children of Dallas Joseph Fontenot, Jr. are: Dallas Joseph Fontenot, III (who was born on March 29, 1969) and Michelle Anne Fontenot (who was born on March 12, 1970). Dallas Joseph Fontenot, Jr. has no other children born to him or adopted by him on the date of this Trust Declaration.

## ARTICLE II.
### INITIAL TRUST CORPUS AND RIGHT TO ADD TO THE TRUST

A. **INITIAL TRUST CORPUS.** Settlor does hereby declare that from and after the date of this Trust Declaration, Settlor holds in trust the assets described in Schedule A attached to this Declaration, which assets are the initial corpus of this Trust and as Trustee acknowledges receipts of those assets. Settlor or any other person, trust, or entity may add property of any

Page 1 of 23 Pages

EXHIBIT

1

003271

character to this Trust by a Last Will and Testament, from another trust (whether inter vivos or testamentary), or by deed or other transfer, subject only to the acceptance thereof by the Trustee.

B.  **ADDITIONS TO TRUST CORPUS.**  Additional contributions may be made to the corpus of the Trust, including testamentary contributions.

C.  **SEPARATE PROPERTY.**  The assets of this trust are the separate property of Holli Hardin Fontenot.  No inter vivos transfer of property will be made to this Trust unless the property constitutes the separate property of Holli Hardin Fontenot. Holli Hardin Fontenot may make a testamentary contribution of property to this Trust, and such contribution may constitute the separate property of Holli Hardin Fontenot and Holli Hardin Fontenot's interest in community property.

## ARTICLE III.
### NO REVOCATION OR AMENDMENT

A.  **TRUST IS IRREVOCABLE.**  This Trust is an irrevocable Trust.

B.  **THIS TRUST MAY NOT BE AMENDED.**  This Trust Declaration may not be amended, except by a Court of competent jurisdiction under the doctrine of *cy pres*.

C.  **INCOME TAX MATTERS.**  For so long as the Settlor or Dallas Joseph Fontenot, Jr. is a Trustee of the Trust, the Trust will be treated for income tax reporting purposes as a Grantor Trust under Treasury Regulation § 1.671-4(b).  Thereafter, the Trust is to be treated for income tax purposes as required by the applicable provisions of Subchapter J of the Internal Revenue Code.

## ARTICLE IV.
### DEFINITIONS

A.  **DESCENDANTS.**  The term "Descendants" means the legitimate children of the person designated and the legitimate lineal descendants of such children.  The term includes any person adopted before attaining age eighteen (18) and the adopted person's legitimate lineal descendants.  A posthumous child shall be considered as living at the death of his parent.

UNOFFICIAL COPY

003272

B.  **HEIRS AT LAW.** Whenever a trustee, or a legal advisor to the Trustee is called upon to determine the heirs at law of Settlor, or any other person beneficially interested in this Trust, the determination will be made to identify those individuals, other than creditors, who would receive the personal property of a decedent upon his or her death as determined in accordance with the laws of intestate succession of the State of Texas, United States of America, determined as if the decedent had then died single, intestate, and domiciled in Texas and further determined as if the Settlor of this Trust had predeceased the person or persons so named or described.

C.  **INCOMPETENT, DISABILITY.** A beneficiary will be considered "incompetent" or "disabled" if he or she is incapacitated to an extent to make it impossible or impractical to give prompt and intelligent consideration to business matters. The Trustee may act upon such evidence as the Trustee reasonably deems appropriate and reliable without liability by reason thereof.

D.  **MINOR BENEFICIARY.** The term "Minor Beneficiary" or "Minor" identifies a beneficiary who is less than 21 years of age.

E.  **PER STIRPES.** Whenever a distribution is directed to be made to the descendants, *per stirpes*, of any person or persons, including the descendants of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot, the property to be distributed shall be divided into as many equal shares as there are then living children of each of those persons and deceased children of each those persons who have descendants then living. Each then living child of such person shall take one share, and the share for the descendants of each deceased child shall be divided among the deceased child's then living descendants on a *per stirpes* basis.

For example, if a distribution were to be made to the descendants, *per stirpes*, of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot, assuming the recitations in Article I, the property to be distributed would be divided into three equal shares, one for each of Dallas Joseph Fontenot, III, Michelle Anne Fontenot, and Dakota James Fontenot.

F.  **RELATIVE OR RELATIVES.** Reference to a "Relative" or "Relatives" will identify any person or persons related to Settlor by blood or lawful adoption in any degree.

Page 3 of 23 Pages

UNOFFICIAL COPY

003273

G.    **POWER OF APPOINTMENT, QUALIFIED BENEFICIARY DESIGNATION.**
Whenever this Trust Declaration gives a Trust Beneficiary the power or authority to appoint a beneficiary of the Trust, the designation must be in writing and be acknowledged in the form required of acknowledgements by Texas law or exercised by a will executed with the formalities required by law of the Trust Beneficiary's residence; it must clearly evidence the intent of the Trust Beneficiary to exercise a power of appointment; and the written beneficiary designation must have been delivered to the Trustee prior to the Trust Beneficiary's death or, if exercised by will, the will must have been filed for probate within three months from the date of the Trust Beneficiary's date of death and must subsequently be admitted to probate no matter the time interval. The term of this Trust may be extended if the qualified beneficiary designation requires that a Beneficiary's interest remain in Trust, or may be divided and be held as a separate trust which is governed by the terms of this Trust Declaration.

H.    **SURVIVE.** For the purpose of vesting in the event two or more persons who have an interest in the trust die within a short time of one another, one must have survived the other for a period of at least 90 days as a condition to vesting.

I.    **TESTAMENTARY CONTRIBUTIONS.** The term "testamentary contributions" will mean any contribution to the Trust made by reason of the death of a person, including transfers made under the direction of a will, a beneficiary designation in a life insurance policy or other contract, by reason of survivorship language contained in a depository contract, or transfers from another Trust which designates this Trust as a beneficiary.

J.    **TRUST.** "Trust" means the Trust created by this Trust Declaration

K.    **TRUST DECLARATION.** The term "Trust Declaration" and the term "Trust Agreement" each refer to this Trust Declaration.

L.    **TRUST FUND.** The term "Trust Fund" or "Trust Property" means all property comprising: the initial contribution of corpus to the Trust; all property paid or transferred to, or otherwise vested in, the Trustee as additions to the corpus of this Trust; accumulated income, if any, whether or not added to the corpus of this Trust; and the investments and reinvestment of the Trust property, including the increase and decrease in the values thereof as determined from time to

Page 4 of 23 Pages

003274

time.    The terms "corpus" and "principal" are used interchangeably.

M.    **TRUSTEE.**  For convenience, the term "Trustee," used in the singular, will mean and identify multiple Trustees serving and acting pursuant to the directions of this Trust Declaration. The term "corporate Trustee" will identify a banking or trust corporation with trust powers.

N.    **GENDER, PLURAL USAGE.**  The use of personal pronouns, such as he, she, or it, are to be construed in context.  The term "person" will include a non-person, such as a corporation, trust, partnership or other entity as is appropriate in context.  The identification of person in the plural will include the singular and *vice versa*, as is appropriate in context.

## ARTICLE V.
## APPOINTMENT OF TRUSTEE

A.    **ORIGINAL APPOINTMENT.** Holli Hardin Fontenot shall serve as initial Trustee of this Trust.

B.    **FIRST SUCCESSOR.**  In the event that Holli Hardin Fontenot should die, resign, or become incapacitated or unable to act as Trustee of this Trust, or in the event that Holli Hardin Fontenot should subsequently become divorced from Dallas Joseph Fontenot, Jr., then Dallas Joseph Fontenot, Jr. shall serve as successor Trustee of this Trust.  In the event that Dallas Joseph Fontenot, Jr. should elect not to serve as Trustee of this Trust, Dallas Joseph Fontenot, Jr. will have the right to appoint a successor or successors to serve as Trustee, as set forth in Section V.C below, and he may specify any conditions upon succession and service as may be permitted by law.

Holli Hardin Fontenot acknowledges and agrees that the rights and obligations of Holli Hardin Fontenot to serve as Trustee and to resign as Trustee in accordance with the foregoing have been and are the subject of separate consideration, receipt of which is hereby acknowledged in full; and such rights and obligations are in the best interest of the administration of the Trust for its Beneficiaries.  Holli Hardin Fontenot specifically waives any rights which she may have to rescind

Page 5 of 23 Pages

003275

or revoke her obligation to resign as Trustee upon divorce from Dallas Joseph Fontenot, Jr.

C.   **SUCCESSION.**   Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment will have the right to appoint a successor or successors to serve as Trustee in the event that person ceases to serve for any reason, and each Trustee may specify any conditions upon succession and service as may be permitted by law.   For example, a successor may be required to furnish a fiduciary bond as a prerequisite or a successor's service may be conditioned upon another appointee's death, resignation, or inability to serve.   Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment may also provide that one or more designated successors as Trustee will have the authority to appoint his, her, or its successor as Trustee.   An appointment of successor Trustee must be in writing and must be acknowledged to be effective.   Unless other specified by a Trustee in a written designation of succession, succession is to be determined as follows.

If a Trustee by original appointment does not appoint a successor, the remaining Trustee or Trustees then serving will continue service alone.   If all Trustees by original appointment fail or cease to serve for any reason without having appointed a successor or successors, the successor or successors as Trustee will be as named below and in the order of succession herein prescribed.

FIRST:    Dallas Joseph Fontenot, III

BUT:     Settlor specifically provides that upon assumption of actual service as Trustee, Dallas Joseph Fontenot, III will have the right to appoint Dallas Joseph Fontenot, III's successor as Trustee, and to vest in a successor Trustee, upon assumption of that person's service, the right and authority to designate succession as Trustee. To the extent this is done, the appointment of succession will supersede the appointments which follow the designation of Dallas Joseph Fontenot, III as Trustee.

NEXT:    Michelle Anne Fontenot

BUT:     Settlor specifically provides that upon assumption of actual service as Trustee, Michelle Anne Fontenot will have the right to appoint Michelle Anne Fontenot's successor as Trustee, and to vest in a successor Trustee, upon assumption of that person's service, the right and

Page 6 of 23 Pages

003276

authority to designate succession as Trustee. To the extent this is done, the appointment of succession will supersede the appointments which follow the designation of Michelle Anne Fontenot as Trustee.

FINALLY: First Interstate Bank of Texas, N.A., in the event all of the above, including duly appointed successors, fail or cease to serve for any reason. The appointment of First Interstate Bank of Texas, N.A. as Trustee will include any successor to First Interstate Bank of Texas, N.A. by reason of its merger, reorganization, or sale to another banking corporation with trust powers or a trust company with trust powers.

D.  **AUTHORITY OF SUCCESSOR TRUSTEE.** A successor will have the authority vested in a Trustee by original appointment under this Trust Declaration, subject to any lawful limitations or qualifications upon the service of a successor imposed by one Trustee in a written document appointing a successor. A successor Trustee will not be obliged to examine the accounts, records, or acts of the previous Trustee or Trustees; nor will a successor Trustee in any way or manner be responsible for any act or omission to act on the part of any previous Trustee. Reference to "Trustee" in the singular will include the plural.

E.  **BOND.** No one serving as Trustee will be required to furnish a fiduciary bond as a prerequisite to service.

F.  **RESIGNATION OR REMOVAL OF A TRUSTEE.** Any appointee serving or entitled to serve as Trustee may resign at any time and without cause, and the instructions in this Trust Declaration will determine who the successor will be (including successors appointed by a Trustee as herein provided). The trust beneficiary or beneficiaries who are then entitled to receive distributions of income from the trust, or distributions of income from any separate trust created by this document, may remove any corporate Trustee then serving, the notice of removal to be delivered in writing to the corporate Trustee. Unless this Trust Declaration or any instrument appointing a successor provides otherwise, the selection of a successor to the corporate Trustee will be made by a Court of competent jurisdiction. In the event there is more than one beneficiary entitled to the income from the trust, all income beneficiaries must join in the written notice of removal. The consent of any person who is deceased or legally disabled will not be required in meeting the unanimous consent requirements for removal.

Page 7 of 23 Pages

003277

G.   **AFFIDAVIT OF AUTHORITY.** Any person or entity dealing with the Trust may rely upon the affidavit of a Trustee or Trustees of the Trust:

> On my [our] oath, and under the penalties of perjury, I [we] swear that I [we] am [are] the duly appointed and authorized trustee[s] of DAKOTA TRUST. I [we] certify that I [we] have not been removed as Trustee[s] and have the authority to act for, and bind, DAKOTA TRUST in the transaction of the business for which this affidavit is given as affirmation of my [our] authority.

_____
Signature Line

Sworn and subscribed before me, the undersigned authority, by _____ this _____ day of
_____, 19___.

_____
Notary Public - State of Texas

H.   **DOCUMENTING SUCCESSION.** The successor to any Trustee may document succession with an affidavit setting forth that the preceding Trustee has failed or ceased to serve and the successor has assumed the duties of Trustee. The affidavit may be filed in the deed records of Fort Bend County, Texas and in each county in which real property held in Trust is located or in the county in which the principal assets and records of the Trust are located. The public and all persons interested in and dealing with the Trust and the Trustee may rely upon a certified copy of the recorded affidavit as conclusive evidence of a successor's authority to serve and act as the Trustee of the Trust.

I.   **COMPENSATION.** Any person who serves as Trustee may elect to receive a reasonable compensation, reasonable compensation to be measured by the time required in the administration of the Trust and the responsibility assumed in the discharge of the duties of office. The fee schedules of area Trust departments prescribing fees for the same or similar services may be used to establish reasonable compensation. A corporate Trustee will be entitled to receive as its compensation such fees as are then prescribed by its published schedule of charges for Trusts of a similar size and nature and additional compensation for extraordinary services performed by the corporate Trustee. A Trustee will be entitled to full reimbursement for expenses, costs, or other obligations incurred as the result of service, including attorney's, accountant's, and other professional fees.

J.   **MULTIPLE TRUSTEES.** In the event there are two Trustees serving the Trust, both must sign any instrument transferring real property from the Trust. If the Trustees agree to do so, one Trustee acting alone may be given the primary

Page 8 of 23 Pages

003278

responsibility of administration and accounting, and one Trustee alone may be authorized to deposit, transfer and withdraw funds from any depository account held by the Trust. The authority vested in three or more trustees may be exercised by a majority of the trustees. In the event of an action or decision by a majority, the non-consenting Trustee will not be responsible for the act of the majority.

ARTICLE VI.
DISTRIBUTIONS FROM THE TRUST,
LIVING AND POST-MORTEM

A.  **FOR SO LONG AS HOLLI HARDIN FONTENOT AND DALLAS JOSEPH FONTENOT, JR. SHALL REMAIN MARRIED.** For so long as Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr. shall remain married, the Trustee may from time to time distribute to or pay for the benefit of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., or either of them, so much of the net income (and, if the net income of the Trust is not sufficient, the principal of the Trust) as the Trustee determines may be necessary for the support, maintenance, health, and general welfare of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., or either of them. Such determination shall be in the absolute discretion of the Trustee, whose decisions shall be binding.

B.  **UPON THE TERMINATION BY DIVORCE OF THE MARITAL RELATIONSHIP OF HOLLI HARDIN FONTENOT AND DALLAS JOSEPH FONTENOT, JR.** Upon the termination by divorce of the marital relationship of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., the interest of Holli Hardin Fontenot in this Trust will terminate and this Trust is to be continued in trust for the benefit of Dallas Joseph Fontenot, Jr. as follows:

1.  This trust will is to be continued in Trust for the sole use and benefit of Dallas Joseph Fontenot, Jr. for so long as he shall live. Dallas Joseph Fontenot, Jr. will, for the duration of the Trust, be entitled to the net income of the Trust, this amount to be paid in convenient installment payments to be not less than quarter-annually. Distributions of income to Dallas Joseph Fontenot, Jr. shall be made in the amount, form, and manner required by Section 2523(f) of the Internal Revenue Code. If the income known by the Trustee to be available to Dallas Joseph Fontenot, Jr. from other sources is insufficient to provide for his continued

Page 9 of 23 Pages

003279

support and maintenance in good health, the Trustee will have the authority to pay to Dallas Joseph Fontenot, Jr. or apply for his benefit, so much of the principal of the Trust, even to the exhaustion thereof, as is necessary to provide for his support and maintenance in the style and comfort to which he is accustomed and to provide for his medical needs and maintenance of good health.   It is intended that the payment of principal be limited by the ascertainable standard provided above, that this provision comply fully with Treasury Regulation §20.2041-1(c)(2), and that this Trust is to be construed and limited to that end.   Dallas Joseph Fontenot, Jr. may at any time require that property which does not produce an income or a sufficient income be sold and invested in income producing property.

2.   Upon the death of Dallas Joseph Fontenot, Jr., Dallas Joseph Fontenot, Jr., by a clause in his Will in which he specifically exercises this power of appointment, shall have the power to appoint the then remaining trust assets to or for the benefit of any one or more of the descendants of Dallas Joseph Fontenot, Jr. or the descendants of Holli Hardin Fontenot, in such shares, proportions, or amounts, upon such trusts and for such estates as he alone may determine.   If Dallas Joseph Fontenot, Jr. fails to exercise this special power of appointment to the fullest extent, then, subject to the other provisions of this Trust, upon his death, the unappointed trust assets shall be delivered to the living descendants of Holli Hardin Fontenot who were born prior to the date of divorce and to the living descendants of Dallas Joseph Fontenot, Jr., *per stirpes*.

C.   **UPON THE DEATH OF HOLLI HARDIN FONTENOT WHILE MARRIED TO DALLAS JOSEPH FONTENOT, JR.**   Upon the death of Holli Hardin Fontenot while married to Dallas Joseph Fontenot, Jr. this Trust is to be continued in Trust as follows:

1.   This trust will is to be continued in Trust for the sole use and benefit of Dallas Joseph Fontenot, Jr. for so long as he shall live.   Dallas Joseph Fontenot, Jr. will, for the duration of the Trust, be entitled to the net income of the Trust, this amount to be paid in convenient installment payments to be not less than quarter-annually.   Distributions of income to Dallas Joseph Fontenot, Jr. shall be made in the amount, form, and manner required by Section 2056(b)(7)(B) of the Internal Revenue Code.   If the income known by the Trustee to be

Page 10 of 23 Pages

003280

available to Dallas Joseph Fontenot, Jr. from other sources is insufficient to provide for his continued support and maintenance in good health, the Trustee will have the authority to pay to Dallas Joseph Fontenot, Jr. or apply for his benefit, so much of the principal of the Trust, even to the exhaustion thereof, as is necessary to provide for his support and maintenance in the style and comfort to which he is accustomed and to provide for his medical needs and maintenance of good health. It is intended that the payment of principal be limited by the ascertainable standard provided above, that this provision comply fully with Treasury Regulation §20.2041-1(c)(2), and that this Trust is to be construed and limited to that end. Dallas Joseph Fontenot, Jr. may at any time require that property which does not produce an income or a sufficient income be sold and invested in income producing property.

2.   Upon the death of Dallas Joseph Fontenot, Jr., Dallas Joseph Fontenot, Jr., by a clause in his Will in which he specifically exercises this power of appointment, shall have the power to appoint the then remaining trust assets to or for the benefit of any one or more of the descendants of Dallas Joseph Fontenot, Jr. or the descendants of Holli Hardin Fontenot, in such shares, proportions, or amounts, upon such trusts and for such estates as he alone may determine. If Dallas Joseph Fontenot, Jr. fails to exercise this special power of appointment to the fullest extent, then, subject to the other provisions of this Trust, upon his death, the unappointed trust assets shall be delivered to the living descendants of Holli Hardin Fontenot and to the living descendants of Dallas Joseph Fontenot, Jr., *per stirpes*.

D.   **UPON THE DEATH OF DALLAS JOSEPH FONTENOT, JR. WHILE MARRIED TO HOLLI HARDIN FONTENOT.** Upon the death of Dallas Joseph Fontenot, Jr. while married to Holli Hardin Fontenot, this Trust is to be continued in Trust as follows:

1.   This trust will is to be continued in Trust for the sole use and benefit of Holli Hardin Fontenot for so long as she shall live. Holli Hardin Fontenot will, for the duration of the Trust, be entitled to the net income of the Trust, this amount to be paid in convenient installment payments to be not less than quarter-annually. If the income known by the Trustee to be available to Holli Hardin Fontenot from other sources is insufficient to provide for her continued support and

003281

maintenance in good health, the Trustee will have the authority to pay to Holli Hardin Fontenot or apply for her benefit, so much of the principal of the Trust, even to the exhaustion thereof, as is necessary to provide for her support and maintenance in the style and comfort to which she is accustomed and to provide for her medical needs and maintenance of good health. Holli Hardin Fontenot may at any time require that property which does not produce an income or a sufficient income be sold and invested in income producing property.

2.  Upon the death of Holli Hardin Fontenot, unless Holli Hardin Fontenot shall issue a direction to the contrary, the Trustee will pay from the Trust assets the entire increment in the taxes payable by reason of her death to the extent that the total of such taxes is greater than would have been imposed if the trust assets had not been taken into account in determining such taxes.

3.  Dallas Joseph Fontenot, Jr., by a clause in his Will in which he specifically exercises this power of appointment, shall have the power to appoint the trust assets remaining upon the death of Holli Hardin Fontenot to or for the benefit of any one or more of the descendants of Dallas Joseph Fontenot, Jr. or the descendants of Holli Hardin Fontenot, in such shares, proportions, or amounts, upon such trusts and for such estates as he alone may determine. If Dallas Joseph Fontenot, Jr. fails to exercise this special power of appointment to the fullest extent, then, subject to the other provisions of this Trust, upon his death, the unappointed trust assets shall be delivered to the living descendants of Holli Hardin Fontenot and to the living descendants of Dallas Joseph Fontenot, Jr., *per stirpes*.

E.  **ELECTION, QUALIFIED TERMINABLE INTEREST PROPERTY.** It is important to emphasize that upon the death of Holli Hardin Fontenot, or the termination by divorce of the marital relationship of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., Dallas Joseph Fontenot, Jr. will have no more than a life interest in the Trust. Dallas Joseph Fontenot, Jr. will have no right or power to revoke or amend this Trust. The Trustee may, without liability for doing so or the failure to do so, elect to treat all or a part of the Trust as Qualified Terminable Interest Property pursuant to the requirements of Section 2056(b)(7) or Section 2523(f) of the Internal Revenue Code, whichever is applicable. To the extent that an election is made, and unless Dallas Joseph Fontenot,

Page 12 of 23 Pages

003282



Jr. shall issue a direction to the contrary, the Trustee will pay from the Trust assets the entire increment in the taxes payable by reason of his death to the extent that the total of such taxes is greater than would have been imposed if the property treated as qualified terminable interest property had not been taken into account in determining such taxes. To the extent a partial election is made, and to the extent and in the manner then permitted by law, the Trustee will have the authority (1) to divide the Trust into separate trusts to reflect the partial election, or (2) to continue the Trust as a whole, with the fraction or percentage of the whole representing the elective share to be administered and maintained in a manner to reflect its proportionate share of the increment or decline in the whole of the property for the purposes of applying Sections 2044 and 2519 of the Internal Revenue Code. If the Trust is divided into separate parts, the Trustee will make the division according to the fair market value at the time the division is made. It is Settlor's intent and purpose to comply with state and federal law so that the least amount of federal estate tax will be payable upon the deaths of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., and this Trust Declaration is to be applied and construed to accomplish this objective.

F.    **DIVISION INTO SEPARATE TRUSTS.**  If, following the death of Holli Hardin Fontenot or the termination by divorce of the marital relationship between Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot, the Trust is divided into separate trusts, the appreciation or depreciation in the value of each such trust or account will measure the value thereof for the purpose of disposition and taxation. For example, if the Trustee elects to treat all but $600,000 of the Trust assets as qualified terminable interest property for the federal estate tax marital deduction, and, if the Trustee segregates the $600,000 amount into a separate trust, the amount distributable therefrom upon the death of Dallas Joseph Fontenot, Jr. will be the value of that account upon the death of Dallas Joseph Fontenot, Jr. If, however, the $600,000 amount represents 25 percent of the total trust estate, and is continued and maintained as a fractional percentage of the whole, the value of the fractional interest upon the death of Dallas Joseph Fontenot, Jr. is to be determined with regard to its proportional share of any increase or decrease in the value of the whole.

G.    **ITEMS OF TANGIBLE PERSONAL PROPERTY IN TRUST.** Holli Hardin Fontenot may have certain items of tangible personal property which are her separate property and which have been

Page 13 of 23 Pages

003283

transferred to the Trust or otherwise subject to the Trustee's control. The term "personal belongings" or "tangible personal property" will mean and identify personal wearing apparel, jewelry, household furnishings and equipment, books, albums, art work, entertainment and sports equipment, and all items of decoration or adornment. Holli Hardin Fontenot may at any time and from time to time deliver to the Trustee written instructions as to any living or post mortem gifts of such personal belongings, and the Trustee shall be authorized and bound to make disposition of these items as Holli Hardin Fontenot has reasonably directed.

H.  **PARTIAL AND FINAL DISTRIBUTIONS.** The Trustee, in making or preparing to make a partial or final distribution, may prepare an accounting and may require, as a condition to payment, a written and acknowledged statement from each distributee that the accounting has been thoroughly examined and accepted as correct; a discharge of the Trustee; a release from any loss, liability, claim or question concerning the exercise of due care, skill, and prudence of the Trustee in the management, investment, retention, and distribution of property during the Trustee's term of service, except for any undisclosed error or omission having basis in fraud or bad faith; and an indemnity of the Trustee, to include the payment of attorney's fees, from any asserted claim of any taxing agency, governmental authority, or other claimant. Any remainder beneficiary having a question or potential claim may require an audit of the Trust as an expense of administration. Failure to require the audit prior to acceptance of the Trustee's report, or the acceptance of payment, will operate as a final release and discharge of the Trustee except as to any error or omission having basis in fraud or bad faith.

The Trustee, in making or preparing to make a partial or final distribution will have the authority to: (1) partition any asset or class of assets and deliver divided and segregated interests to the beneficiaries; (2) sell any asset or class of assets (whether or not susceptible to partition in kind), and deliver to a beneficiary or beneficiaries a divided interest in the proceeds of sale and/or divided or undivided interests in any note and security arrangement taken as part of the purchase price; and/or (3) deliver undivided interests in an asset or class of assets to the beneficiaries subject to any indebtedness which may be secured by the property.

I.  **CONTINUATION OF THE TRUST DURING DISSOLUTION.** The Trust may continue beyond its termination for a time reasonably necessary to conclude the administration of the Trust, pay

UNOFFICIAL COPY

003284

expenses of termination and to distribute to the Trust property to those entitled thereto.

J.  **CONTINGENT TRUST FOR CERTAIN BENEFICIARIES.** The interest of any Trust Beneficiary who has not attained the age of thirty-five (35) years (the "required age"), or who may be otherwise legally disabled, and whose interest is not otherwise covered by the provisions of this Trust Declaration or another Trust, may, in the sole and absolute discretion of the Trustee, be continued in Trust, or be held as a separate trust, for the use and benefit of that person until such person shall attain the required age or until such person is no longer disabled. For so long as the trust shall exist, the Trustee shall hold, manage, and make distributions of income and principal to provide for his or her health, education, support and maintenance. The Trustee may make an entire distribution of principal to a Trust Beneficiary prior to the required age if, in the Trustee's determination alone, the beneficiary has demonstrated an ability to conserve his or her resources or if it is no longer feasible for the trust to continue considering the size of the trust and the time and cost to maintain the trust. The Trust Beneficiary, with consent of the Trustee, may also extend the term of the trust.

For so long as the Trust is held for a beneficiary pursuant to these terms, the Trust Beneficiary, using a qualified beneficiary designation, will have the right to appoint the beneficiaries of his or her interest in the Trust entitled to his or her interest upon the Trust Beneficiary's death. If the Trust Beneficiary dies prior to a final distribution of his or her interest from the Trust, without having made a qualified beneficiary designation, that person's interest will pass *per stirpes* to his or her descendants then living, or if none, *per stirpes* to Settlor's descendants then living.

K.  **PERPETUITIES.** In no event will the term of this Trust continue for a term greater than twenty-one (21) years after the death of the last survivor of Settlor and all relatives of Settlor living on the effective date of this Trust Declaration. Any continuation of the Trust by the qualified exercise of a power of appointment will be construed as the creation of a separate trust and an extension of the Rule Against Perpetuities to the extent permitted by law. A court of competent jurisdiction is to liberally construe and apply this provision to validate an interest consistent with Settlor's intent and may reform or construe an interest according to the doctrine of *cy pres*.

003285

## ARTICLE VII.
## PAYMENT OF DEBTS, TAXES, AND
## SETTLEMENT COSTS
## EXERCISE OF ELECTIONS

The following directions concern the payment of debts, taxes, estate and trust settlement costs, and the exercise of any election permitted by Texas law or by the Internal Revenue Code:

A.   **PAYMENT OF INDEBTEDNESS AND SETTLEMENT COSTS.**   The Trustee will have the discretionary authority to pay from the Trust Fund the costs reasonably and lawfully required to settle the estate of a deceased beneficiary.   In the event there is more than one Trust Beneficiary immediately preceding the death of a beneficiary, distributions of Trust income and principal to pay settlement costs will not exceed that person's trust share or the fair market value of the beneficiary's interest in the Trust which is distributable by reason of his or her death.

B.   **SPECIAL BEQUESTS.**   Unless otherwise provided in this Trust document, or in any amendment, or in a document exercising a power to appoint the beneficiaries of this Trust, if property given as a special bequest or gift is subject to a mortgage or other security interest, the designated recipient of the property will take the asset subject to the obligation and the recipient's assumption of the indebtedness upon distribution of the asset to the recipient.   The obligation to be assumed shall be the principal balance of the indebtedness on date of death, and the Trust shall be entitled to reimbursement or offset for principal and interest payments paid by the Trust to date of distribution.

C.   **ESTATE, GENERATION SKIPPING, OR OTHER DEATH TAX.**   Unless otherwise provided in this Trust document, or in a document exercising a power to appoint the beneficiaries of this Trust, estate, inheritance, succession, or other similar tax shall be charged to and apportioned to those whose gifts or distributive share generate a death tax liability by reason of Settlor's death or by reason of a taxable distribution from the Trust or a taxable termination of the Trust.   To the extent Settlor may lawfully provide, a Trustee may pay and deduct from a beneficiary's distributive share (whether the distribution is to be paid outright or is to be continued in Trust) the increment in taxes payable by reason of a required distribution or termination of interest (i.e., estate, gift, inheritance, or generation skipping taxes) to the extent that the total of such taxes payable by reason of a distribution or

003286

termination is greater than the tax which would have been imposed if the property of the Trust subject to the distribution or termination of interest had not been taken into account in determining the amount of such tax. To the extent a tax liability results from the distribution of property to a beneficiary other than under this Trust, the Trustee will have the authority to reduce any distribution to the beneficiary from this Trust by the amount of the tax liability apportioned to the beneficiary, or if the distribution is insufficient, the Trustee will have the authority to proceed against the beneficiary for his, her, or its share of the tax liability. In making an allocation, the Trustee may consider all property included in the gross estate of the Settlor for federal estate tax purposes, including all property subject to probate, all amounts paid or payable to another as the result of death, including life insurance proceeds, proceeds from a qualified retirement plan or account, proceeds from a joint and survivorship account with a financial institution or brokerage company, proceeds from a buy-sell or redemption contract, and/or any other plan or policy which provides for a payment of death benefits. This provision further contemplates and includes any tax which results from the inclusion of a prior transfer in the federal gross estate of Settlor even though possession of the property previously transferred is vested in someone other than the Trustee. This provision does not include a reduction in the unified credit by reason of taxable gifts previously made by Settlor. If the Trustee determines that the collection of an apportioned tax liability against another is not economically feasible or probable, the tax liability will be paid by the Trust and will reduce the amount distributable to the residuary beneficiaries. The Trustee's judgment with regard to the feasibility of collection is to be conclusive.

D.   **SPECIAL ELECTION FOR QUALIFIED TERMINABLE INTEREST PROPERTY.** For the purpose of identifying the "transferror" in allocating a GST exemption, the estate of Holli Hardin Fontenot or the Trustee of this Trust may elect to treat all of the property which passes in Trust to Dallas Joseph Fontenot, Jr. for which a marital deduction is allowed, by reason of Section 2056(b)(7) or Section 2523(f) of the Internal Revenue Code, as if the election to be treated as Qualified Terminable Interest Property had not been made. Reference to the "Special Election For Qualified Terminable Interest Property" will mean and identify the election provided by Section 2652(a)(2) of the Internal Revenue Code. The term "GST Exemption" or "GST Exemption Amount" is the dollar amount of property which may pass as generation skipping transfers under Subtitle B,

UNOFFICIAL COPY

Chapter 13, of the Internal Revenue Code of 1986 which is exempt from the generation-skipping tax.

E.  **ELECTIVE DEDUCTIONS.**  A Trustee will have the discretionary authority to claim any obligation, expense, cost, or loss as a deduction against either estate tax or income tax, or to make any election provided by Texas law, the Internal Revenue Code, or other applicable law, and the Trustee's decision will be conclusive and binding upon all interested parties and shall be effective without obligation to make an equitable adjustment or apportionment between or among the beneficiaries of this Trust or the estate of deceased beneficiary.

## ARTICLE VIII.
## SERVICE OF THE TRUSTEE
## OTHER MATTERS

A.  **GENERAL AUTHORITY.**  A Trustee is to serve without Court supervision.  The service of a Trustee is to be governed first by the terms, conditions, and authority prescribed by this Trust Declaration, and then as prescribed by the trust laws of the State of Texas.

B.  **RETENTION OF ASSETS.**  A Trustee will have the authority to retain, without liability, any and all property in the form in which it is received by the Trustee without regard to its productivity or the proportion that any one asset or class of assets may bear to the whole.  A Trustee will not have liability nor responsibility for loss of income from or depreciation in the value of property which was retained in the form which the Trustee received it.

C.  **UNDIVIDED INTERESTS.**  A Trustee will have the authority to hold, acquire, and dispose of undivided interests in property.

D.  **LENDING, INVESTING.**  A Trustee will have the authority to lend, borrow, lease, sell, and purchase property, including undivided fractional interests in property, upon such terms and conditions as are reasonably prudent under the facts and circumstances then existing.  A Trustee may transact business, including lending, borrowing, leasing, and sale, between two or more related trusts or persons upon such terms and conditions as are reasonably prudent under the facts and circumstances then existing.  Without limiting the general authority above given, a Trustee will have the authority to hold, acquire and sell:

Page 18 of 23 Pages

003288

- Publicly traded securities, including stocks, bonds, warrants, futures, mutual funds, partnerships, real estate investment trusts, diversified asset funds.
- Interests in a closely held corporation, partnership, or trust, whether registered or not registered for public sale.
- Obligations of the United States Government or any other government.
- Cash deposits, money market funds, brokerage company accounts, certificates of deposit, savings accounts, and checking accounts, without limitation as to the location of the account or depository.
- Promissory notes, secured and unsecured, including mortgage notes purchased at a discount.
- Land, improved and unimproved, whether presently income producing or held for appreciation in value.
- Land, building and equipment leases.
- Minerals, mineral rights and working interests in mineral producing property or property held for future development.
- Equipment, implements, stock in trade, leasehold improvements, and livestock.
- Insurance policies.

E.  **LIMITATION UPON A TRUSTEE'S LIABILITY.** A Trustee, other than a banking corporation serving as a Trustee, will not have personal liability for service in a fiduciary capacity other than for acts or omissions to act which, as determined by a court of law, constitute gross negligence or fraud.

F.  **PROTECTION OF THE INTERESTS OF BENEFICIARIES.** No beneficiary will have the power to anticipate, encumber or transfer any interest in the Trust. No part of the Trust will be liable for or charged with any debts, contracts, liabilities or torts of a beneficiary or subject to seizure or other process by any creditor of a beneficiary.

G.  **RELATIONSHIP WITH BENEFICIARIES WHO ARE MINORS OR INCOMPETENTS.** Distributions to an incompetent or disabled beneficiary, or a Minor Beneficiary may be made in such of the following ways as in the Trustee's opinion will be most beneficial to the interests of the beneficiary: (a) directly to such beneficiary; (b) to his or her parent, guardian or legal representative; (c) to a custodian for said beneficiary under any Uniform Gifts to Minors Act and/or Gifts of Securities to Minors Act in the jurisdiction of residence of such beneficiary; (d) to any person with whom he or she is residing; (e) to some near relative or close friend; or (f) by

Page 19 of 23 Pages

003289

the Trustee using such payment directly for the benefit of such beneficiary, including payments made to or for the benefit of any person or persons whom said beneficiary has a legal obligation to support. The Trustee may in the Trustee's sole discretion instead hold such income or corpus for the account of such beneficiary as custodian. A receipt from a beneficiary or from his parent, guardian, legal representative, relative, close friend, or other person described above shall be a sufficient discharge to the Trustee from any liability for making said payments.

The Trustee is likewise authorized to consult with and act upon the advice of the parent, guardian, custodian, or legal representative of any beneficiary who is either an incompetent or a Minor with respect to any and all matters which may arise under this Declaration and as concerns the rights or interests of said beneficiary. All statements, accounts, documents, releases, notices, or other written instruments, including but not limited to written instruments concerning the resignation or replacement of any Trustee or Trustees, required to be delivered to or executed by such beneficiary may be delivered to or executed by the parent, guardian, custodian, or legal representative of said incompetent or Minor Beneficiary, and when so delivered or executed shall be binding upon said incompetent or Minor Beneficiary, and shall be of the same force and effect as though delivered to or executed by a beneficiary acting under no legal disability.

## ARTICLE IX.
### UNPRODUCTIVE OR UNDERPRODUCTIVE PROPERTY

A beneficiary who is then entitled to the income of the Trust, or the income of any other Trust established or continued pursuant to this trust declaration, will have the authority to issue a written directive to the Trustee to convert Trust Property which does not produce an income, or which is underproductive, into property which is income producing or which will provide a greater income to the trust. Upon actual receipt of an income beneficiary's written directive, the Trustee will reasonably and prudently proceed to convert unproductive or underproductive property into property which will produce a reasonable and safe rate of return. The Trustee may do so by selling the unproductive or underproductive asset upon such terms and conditions as is prudent and reasonable under all circumstances which may then exist (including the acceptance of an income or interest bearing obligation as the whole or a part of the sales price), and investing the proceeds of sale in income producing instruments or obligations. Notwithstanding

Page 20 of 23 Pages

003290

these requirements, a Trust Beneficiary cannot direct the Trustee to invest or reinvest trust property in a trust investment which is speculative in nature or which, in result, would violate the spendthrift provisions of this Trust Declaration.

## ARTICLE X.
### NO-CONTEST REQUIREMENTS

Settlor vests in the Trustee the authority to construe this Trust instrument and to resolve all matters pertaining to disputed issues or controverted claims. Settlor does not want to burden this Trust with the cost of a litigated proceeding to resolve questions of law or fact unless the proceeding is originated by the Trustee or with the Trustee's written permission. Any other person, agency, or organization who shall originate (or who shall cause to be instituted) a judicial proceeding to construe or contest this Trust instrument, or any will which requires distribution of property to this Trust, or to resolve any claim or controversy in the nature of reimbursement, or seeking to impress a constructive or resulting Trust, or alleging any other theory which, if assumed as true, would enlarge (or originate) a claimant's interest in this Trust or in Settlor's estate, without the Trustee's written permission, shall forfeit any amount to which that person, agency, or organization is or may be entitled and the interest of any such litigant or contestant shall pass as if he or she or it had predeceased us. These directions shall apply even though the person, agency or organization shall be found by a court of law to have originated the judicial proceeding in good faith and with probable cause and even though the proceedings may seek nothing more than to construe the application of this no-contest provision. This requirement is to be limited, even to the exclusion thereof, in the event it operates to deny the benefits of the federal estate tax or federal gift tax marital deduction.

## ARTICLE XI.
### JURISDICTION

The jurisdiction of this Trust will be the State of Texas. Any issue of law or fact pertaining to the creation, continuation, administration, and termination of the Trust, or any other matter incident to this Trust, is to be determined with reference to the specific directions in the Trust Declaration and then under the laws of the State of Texas. If a Article or Subsection of this Trust Declaration is in conflict with a prohibition of state law or federal law, the Article or Subsection, or the Trust Declaration as a whole, is to be construed in a manner which will cause it to be

003291

in compliance with state and federal law and in a manner which will result in the least amount of taxes and estate settlement costs.

### ARTICLE XII.
### ACCEPTANCE BY TRUSTEE

Holli Hardin Fontenot acknowledges that she is the initial Trustee of the DAKOTA TRUST.  By execution of this Trust Declaration, Holli Hardin Fontenot accepts the office of Trustee and agrees to hold and administer the Trust according to the provisions thereof and as required by law.

### CONCLUSION AND ATTESTATION

Holli Hardin Fontenot attests that she has executed this Trust Declaration on the date set forth below, and the terms thereof will bind her, her successors and assigns, and her heirs and personal representatives.  This instrument is to be effective upon the date recorded immediately below.

Dated:     November 9, 1994

original signed by Holli Hardin Fontenot
_____
Holli Hardin Fontenot, individually and as Trustee

Page 22 of 23 Pages

003292

STATE OF TEXAS            §
                         §
COUNTY OF HARRIS          §

On this __9th__ day of ___November___ in the year 199_4_ before me, a Notary Public of said State, personally appeared Holli Hardin Fontenot, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument, and acknowledged that she executed the same in the capacities expressed therein.

WITNESS MY HAND and official seal.

_____
Notary Public, State of Texas

[SEAL]

Page 23 of 23 Pages

UNOFFICIAL COPY

003293



---

**SCHEDULE A TO**
**TRUST DECLARATION**
**DAKOTA TRUST**

---

The Sum of SIXTY FOUR THOUSAND AND NO/100 DOLLARS ($64,000.00) from the Holli Ann Hardin Sole and Separate Property Account, which sum constitutes the separate property of the Settlor

Page 24 of 23 Pages

003294

This trust may need a demand power after Holli's death so that we can take advantages of $10,000 per year exclusion for gifts of present interest.



UNOFFICIAL COPY

Page 25 of 23 Pages

003295



TO WHOM IT MAY CONCERN:

I, Holli Ann Hardin Fontenot, hereby voluntarily resign as trustee of the Holli Ann Hardin Fontenot Trust Number One and the Dakota Trust. This resignation as trustee shall be effective immediately upon acceptance by Dallas J. Fontenot, Jr.

Very truly yours,

Holli Ann Hardin Fontenot

Agreed and accepted this 8 day of SEPT , 1996.

Dallas J. Fontenot, Jr.

LDK233:19

UNOFFICIAL COPY

TOTAL P.02

003296

537721

TO WHOM IT MAY CONCERN:

I, Holli Ann Hardin Fontenot, hereby voluntarily resign as trustee of the Holli Ann Hardin Fontenot Trust Number One and the Dakota Trust. This resignation as trustee shall be effective immediately upon acceptance by Dallas J. Fontenot, Jr.

Very truly yours,

Holli Ann Hardin Fontenot

Agreed and accepted this 8 day of SEPT., 1996.

Dallas J. Fontenot, Jr.

LDK233:19

**EXHIBIT**

**2**

TOTAL P.02

003296

Harris County - County Probate Court No. 1

## DESIGNATION OF SUCCESSOR TRUSTEE
### Dakota Trust

The undersigned Dallas Joseph Fontenot, Jr., Successor Trustee of Dakota Trust, a trust established by Trust Declaration of Holli Ann Fontenot dated November 9, 1994 ("Trust Declaration") does hereby declare as follows:

Article V, Section C of the Trust Declaration provides in part that:

> SUCCESSION.  Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment will have the right to appoint a successor or successors to serve as Trustee in the event that person ceases to serve for any reason, and each Trustee may specify any conditions upon succession and service as may be permitted by law.  For example, a successor may be required to furnish a fiduciary bond as a prerequisite or a successor's service may be conditioned upon another appointee's death, resignation, or inability to serve.  Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment may also provide that one or more designated successors as Trustee will have the authority to appoint his, her, or its successor as Trustee. An appointment of successor Trustee must be in writing and must be acknowledged to be effective.

Pursuant to Article V, Section C of the Trust Declaration, Dallas Joseph Fontenot, Jr. appoints Dakota James Fontenot as successor Trustee, to serve immediately upon the death, disability, resignation, or disqualification of Dallas Joseph Fontenot, Jr.

Dallas Joseph Fontenot, Jr. appoints Frost Bank to serve as successor Trustee upon the death, disability, resignation, or disqualification of Dakota James Fontenot.

Each Trustee will have the right to appoint a successor or successors to serve as trustee of the Trust in the event that he ceases to serve for any reason, and such Trustee may specify any conditions upon succession and service as may be permitted by law.

The incapacity or disability of a trustee hereunder shall be (i) determined by a duly licensed physician representing that he or she is certified by a recognized medical board and is not related by blood or marriage to any trustee or beneficiary hereunder; and (ii) evidenced by a writing which is executed, witnessed, and acknowledged certifying that such a physician is familiar with the physical and mental condition of a person and has concluded that, by reason of accident, physical, or mental deterioration, or other similar cause, such person was, as of the date thereof, unable to give prudent, prompt, and intelligent consideration to financial matters.  No judicial determination of incapacity

EXHIBIT

3

000355

or disability shall be necessary. Any physician's certificate described above may be revoked by a similar certificate to the effect that such person is no longer incapacitated, which certificate must be executed either (i) by the originally certifying physician or (ii) by two other licensed, unrelated physicians. In the case of a revocation of a certificate of incapacity or disability of a trustee hereunder, such revocation shall cause such trustee to regain his or her appointment as trustee, and the then serving successor trustee shall be relieved of his or her duties.

This Designation of Successor Trustee shall be effective as of May 1, 2013 and shall revoke and replace all prior Designations of Successor Trustee.

_____ "

Dallas Joseph Fontenot, Jr., Trustee

STATE OF NEVADA
COUNTY OF _Clark_
This document was acknowledged before me on the _7TH_ day of May, 2013 by Dallas Joseph Fontenot, Jr., Trustee.

_____

Notary Public, State of Nevada

MICHAEL J. MOORE
Notary Public State of Nevada
No. 08-7991-1
My Appt. Exp. September 11, 2016

UNOFFICIAL COPY

000356

## DESIGNATION OF SUCCESSOR TRUSTEE
### Dakota Trust

The undersigned Dallas Joseph Fontenot, Jr., Successor Trustee of Dakota Trust, a trust established by Trust Declaration of Holli Ann Fontenot dated November 9, 1994 ("Trust Declaration") does hereby declare as follows:

Article V, Section C of the Trust Declaration provides in part that:

SUCCESSION. Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment will have the right to appoint a successor or successors to serve as Trustee in the event that person ceases to serve for any reason, and each Trustee may specify any conditions upon succession and service as may be permitted by law. For example, a successor may be required to furnish a fiduciary bond as a prerequisite or a successor's service may be conditioned upon another appointee's death, resignation, or inability to serve. Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment may also provide that one or more designated successors as Trustee will have the authority to appoint his, her, or its successor as Trustee. An appointment of successor Trustee must be in writing and must be acknowledged to be effective.

Pursuant to Article V, Section C of the Trust Declaration, Dallas Joseph Fontenot, Jr. removes all prior appointments of appoints Dakota James Fontenot as successor Trustee and, instead, appoints Frost Bank to serve as successor Trustee upon the death, disability, resignation, or disqualification of Dallas Joseph Fontenot, Jr.

Each Successor Trustee will have the right to appoint a successor or successors to serve as trustee of the Trust in the event that he ceases to serve for any reason, and such Trustee may specify any conditions upon succession and service as may be permitted by law.

The incapacity or disability of a trustee hereunder shall be (i) determined by a duly licensed physician representing that he or she is certified by a recognized medical board and is not related by blood or marriage to any trustee or beneficiary hereunder; and (ii) evidenced by a writing which is executed, witnessed, and acknowledged certifying that such a physician is familiar with the physical and mental condition of a person and has concluded that, by reason of accident, physical, or mental deterioration, or other similar cause, such person was, as of the date thereof, unable to give prudent, prompt, and intelligent consideration to financial matters. No judicial determination of incapacity or disability shall be necessary. Any physician's certificate described above may be

UNOFFICIAL COPY

**EXHIBIT**

4

revoked by a similar certificate to the effect that such person is no longer incapacitated, which certificate must be executed either (i) by the originally certifying physician or (ii) by two other licensed, unrelated physicians. In the case of a revocation of a certificate of incapacity or disability of a trustee hereunder, such revocation shall cause such trustee to regain his or her appointment as trustee, and the then serving successor trustee shall be relieved of his or her duties.

This Designation of Successor Trustee shall be effective as of October 14, 2017 and shall revoke and replace all prior Designations of Successor Trustee.

_____
Dallas Joseph Fontenot, Jr., Trustee

STATE OF TEXAS
COUNTY OF Harris

This document was acknowledged before me on the 14th day of October, 2017 by Dallas Joseph Fontenot, Jr., Trustee.

_____
Notary Public, State of Texas

DIANNE N SKINNER
Notary ID # 126280969
My Commission Expires
November 11, 2019

000457

Harris County - County Probate Court No. 1

537721

## RESOLUTIONS ADOPTED BY
## WRITTEN CONSENT OF SHAREHOLDER AND DIRECTOR OF
## VIVA LAS VEGAS PROPERTIES, INC.
### (OCTOBER 14, 2017)

The undersigned, being the sole shareholder of Viva Las Vegas Properties, Inc., a corporation organized and existing under the laws of Texas, does by this writing consent to take the following actions and adopt the following resolutions:

> RESOLVED that the following persons person is elected as the sole Director of Viva Las Vegas Properties, Inc., to serve at the discretion of the Shareholder from October 14, 2017 until such time as his successors are elected by the Shareholder and qualify:
>
> Dallas Fontenot

The undersigned direct that this consent be filed with the minutes of the proceeding of the Shareholders of Viva Las Vegas Properties, Inc.

The undersigned, now being the sole director of Viva Las Vegas Properties, Inc., does by this writing consent to take the following actions and adopt the following resolutions:

> RESOLVED that the following person is elected to the offices of Viva Las Vegas Properties, Inc. set forth below, to serve at the discretion of the director from October 14, 2017 until such time as his successors are elected by the Shareholder and qualify:
>
> Dallas Fontenot    President
> Dallas Fontenot    Secretary
>
> ESOLVED that Dakota Fontenot is hereby removed from all offices and all positions as a Director of Viva Las Vegas Properties, Inc. from and after October 14, 2017.

The undersigned direct that this consent be filed with the minutes of the proceeding of the Directors of Viva Las Vegas Properties, Inc.

This consent is executed pursuant to the laws of Texas and the Bylaws of Viva Las Vegas Properties, Inc., which authorize the taking of action by the Shareholders and Directors by unanimous written consent without a meeting. This consent is intended to substitute for a special meeting of the Shareholders and Directors of Viva Las Vegas Properties, Inc. Only those persons named above shall serve as Directors until a subsequent election or appointment by the

EXHIBIT

5

000437

Shareholder of Viva Las Vegas Properties, Inc. Only those persons named above shall serve as an officer until a subsequent election or appointment by the Director of Viva Las Vegas Properties, Inc.

Dated to be effective as of October 14, 2017.

Viva Las Vegas Properties, Inc., Shareholder

by: _____
Dallas Fontenot, President

_____
Dallas Fontenot, Director

UNOFFICIAL COPY

000438

Harris County - County Probate Court No. 1

537721

## AFFIDAVIT OF LOST STOCK CERTIFICATE

STATE OF _Texas_ §
§
COUNTY OF _Harris_ §

**DAKOTA TRUST** (the "Stockholder"), deposes and says:

(1)    The Stockholder is entitled to the possession and is the true, lawful and sole beneficial owner of all stock certificates representing shares of issued and outstanding Common Stock, estimated to be 1,000 shares of Common Stock (collectively, the "Original Certificates"), issued by **VIVA LAS VEGAS PROPERTIES, INC.**, a corporation created under the laws of the State of Texas (the "Corporation"), in the name of the Stockholder.

(2)    The Original Certificates were originally acquired by the Stockholder directly from the Corporation, and have been lost, stolen or destroyed.

(3)    The Stockholder has not otherwise endorsed, or authorized anyone else to endorse, the Original Certificates.

(4)    The Stockholder has made or caused to be made a diligent search for the Original Certificates, and has been unable to find or recover them; the Stockholder has not sold, assigned, pledged, transferred, deposited under any agreement or hypothecated the Original Certificates or any interest therein, or signed any power of attorney or other authorization respecting the same which is now outstanding and in force, or otherwise disposed of the same; and no person, firm, corporation, agency or government other than the Stockholder has or has asserted any right, title, claim, equity or interest in, to or respecting the Original Certificates or the proceeds thereof.

(5)    The Stockholder hereby requests that the Corporation, and this Affidavit of Lost Stock Certificate is made for the purposes of inducing the Corporation to, (i) refuse to recognize any person other than the Stockholder as the owner of the Original Certificates; (ii) refuse to make any payment, transfer, registration, delivery or exchange called for by the Original Certificates to any person other than the Stockholder; (iii) refuse to take any other action pursuant to the request or demand of any person other than the Stockholder; and (iv) complete the return of the shares represented by the Original Certificates to the Corporation, and reissue a certificate to the Stockholder in replacement of the Original Certificates, representing 1,000 shares of Common Stock in the Corporation.

(6)    If the Stockholder should find or recover the Original Certificate, the Stockholder will immediately surrender it to the Corporation for cancellation without requiring any consideration therefor.

(7)    The Stockholder agrees in consideration of compliance with the foregoing requests by the Corporation to indemnify and protect the Corporation from any and all liabilities, loss, damage or expense to which the Corporation may be subjected by reason of the loss of the Original Certificates, including claims by any person claiming ownership of the Original Certificates or shares of Corporation's stock represented thereby.

*[SIGNATURE PAGE FOLLOWS]*

EXHIBIT

6

008402\00002\3534943.1 - 5/17/2023 12:29:14 PM

1

Signed and delivered by the Stockholder this __19__ day of May, 2023.

**DAKOTA TRUST**

By: _____

Name: Dakota Fontenot

Title: Trustee

STATE OF __Texas__ §

COUNTY OF __Harris__ §
§

  BEFORE ME, a notary public, on this day personally appeared Dakota Fontenot, known to me to be the person whose name is subscribed to the foregoing instrument and, being by me first duly sworn, declared that the statements therein contained are true and correct.

  GIVEN UNDER MY HAND AND SEAL of office this __19__ day of May, 2023.

> THANH N DO
> Notary ID #126241618
> My Commission Expires
> September 4, 2023

(Notary's Seal)

NOTARY PUBLIC IN AND FOR THE
STATE OF __Texas__

Signature Page to
Affidavit of Lost Stock Certificate
(Viva Las Vegas Properties, Inc.)

008402\00002\3534943.1 - 5/17/2023 12:29:14 PM

Electronically Filed
2/9/2022 4:45 PM
Laura Richard
County Clerk
Fort Bend County, Texas

No. 21-CPR-036521

| | | |
|---|---|---|
| ESTATE OF | § | IN COUNTY COURT AT LAW |
| DALLAS JOSEPH FONTENOT, JR., | § | |
| DECEASED | § | NO. FOUR (4) |
| | § | |
| | § | FORT BEND COUNTY, TEXAS |

## <u>Order Admitting Will to Probate &<br>Authorizing Letters Testamentary</u>

On this day the Court heard the Application for Probate of Will and Issuance of Letters Testamentary ("Application") filed by Holli H. Fontenot ("Applicant") in the Estate of Dallas Joseph Fontenot, Jr., Deceased ("Decedent").

The Court considered the evidence presented and reviewed the Will and the other documents filed herein and makes the following findings:

1.  The allegations contained in the Application are true.

2.  Notice and citation have been given in the manner and for the length of time required by law.

3.  Decedent died on September 3, 2021, and four (4) years have not elapsed since the date of Decedent's death.

4.  This Court has jurisdiction and venue of the Decedent's Estate.

5.  Decedent left a Will dated May 7, 2013 (the "Will"), executed with the formalities and solemnities and under the circumstances required by law to make it a valid Will.

6.  That on such date Decedent had attained the age of eighteen (18) years and was of sound mind.

7.  The Will was amended and republished by the First Codicil, dated October 31, 2017.

8.  No child or children were born to or adopted by the Decedent after the execution of the Will.

9.  At the time of Decedent's death, Decedent was married to Applicant, and Applicant survived Decedent.

10. Decedent's Will did not name either the State of Texas, a governmental agency of the State of Texas, or a charitable organization as devisee.

EXHIBIT

7

11. No objection to or contest of the probate of the Will has been filed.

12. All of the necessary proof required for the probate of the Will has been made.

13. The Will is entitled to probate.

14. In the Will, Decedent named Dakota James Fontenot to serve as Independent Executor without bond. However, Decedent's First Codicil *revoked* the appointment of Dakota James Fontenot as Independent Executor, and instead named Applicant to serve as Independent Executor of the Estate without bond.

15. Applicant is duly qualified and not disqualified by law to act as Independent Executor and is entitled to receive Letters Testamentary.

16. A necessity exists for the administration of this Estate.

17. No interested person has applied for the appointment of appraisers and none are deemed necessary by the Court.

It is ORDERED that the Will is admitted to probate, and the Clerk of this Court is ORDERED to record the Will, together with the Application on the Judge's Probate Docket.

It is ORDERED that no bond or other security is required and that upon the taking and filing of the Oath required by law, Letters Testamentary shall issue to Holli H. Fontenot, who is appointed as Independent Executor of Decedent's Will and Estate, and no other action shall be had in this Court other than the return of an Inventory, Appraisement, & List of Claims or Affidavit in Lieu of Inventory, and the filing of the Certificate of Notice to Beneficiaries pursuant to TEX. EST. CODE § 308 as required by law.

It is further ORDERED that the appointment of an appraiser of said Estate is waived at this time; that upon the return of an Inventory, Appraisement, & List of Claims of said Estate or Affidavit in Lieu of Inventory, and the payment of costs of Court, this Estate shall be dropped from the Court's active docket.

[SIGNATURE ON FOLLOWING PAGE]

SIGNED on this    **2/14/2022**

_____
Judge Presiding

APPROVED AS TO FORM ONLY:

// s // Emily J. Wyatt

_____

Stephen A. Mendel (13930650)
Emily J. Wyatt (24088685)
The Mendel Law Firm, L.P.
1155 Dairy Ashford, Ste. 104
Houston, TX 77079
Tel:  281-759-3213
Fax: 281-759-3214
Info@mendellawfirm.com

Attorneys for the Executor

UNOFFICIAL COPY

Filed: 02/15/2022 12:52:20
Laura Richard
County Clerk
Fort Bend County, Texas
Padron, Velma

537721

C.A. 21-CPR-036521

| | | |
|---|---|---|
| ESTATE OF<br>DALLAS JOSEPH FONTENOT, JR.,<br>DECEASED | §<br>§<br>§<br>§<br>§<br>§ | IN COUNTY COURT AT LAW<br><br>NO. FOUR (4) OF<br><br>FORT BEND COUNTY, TEXAS |

No. 21-DCV-288736

| | | |
|---|---|---|
| IN RE<br>HOLLI ANN HARDIN TRUST<br>NUMBER ONE | §<br>§<br>§<br>§<br>§ | IN THE 240TH DISTRICT COURT<br><br>OF<br><br>FORT BEND COUNTY, TEXAS |

## Assignment of Interest & Disclaimer of Further Interest

Pursuant to the Binding Mediation Settlement Agreement reached in the above-captioned cases, and which is attached hereto as Exhibit "A":

1. Holli Ann Fontenot acknowledges receipt of check number 1005 payable to Holli Ann Fontenot in the amount of $2,823,464.00, and which sum represents full satisfaction of eighty five percent (85%) of the total value of The Dakota Trust assets ($1,899,514.00) and twenty percent (20%) of the total value of the Holli Ann Hardin Trust No. 1 assets ($923,950.00).

2. Holli Ann Fontenot hereby assigns any and all beneficial interest she has in the Holli Ann Hardin Trust No. 1 to the Trustee for further administration and distribution by the Trustee.

3. Holli Ann Fontenot assigns any and all beneficial interest she has in The Dakota Trust to the Trustee for further administration and distribution by the Trustee.

4. Holli Ann Fontenot disclaims any right to any further interest in the Holli Ann Hardin Trust No. 1. Holli Ann Fontenot previously resigned as the Trustee of said Trust.

5. Holli Ann Fontenot disclaims any right to any further interest in The Dakota Trust. Holli Ann Fontenot hereby resigns as a fiduciary of said Trust.

[SIGNATURE ON THE FOLLOWING PAGE]

EXHIBIT

8

SIGNED AND EXECUTED ON __18__ DAY OF JANUARY 2023.

HOLLI ANN FONTENOT

STATE OF TEXAS            §
                         §
COUNTY OF HARRIS         §

This instrument was acknowledged before me on this the _18_ day of January 2023 by Holli Ann Fontenot.

Notary Public in and for
The State of Texas

UNOFFICIAL COPY

537721

# VIVA LAS VEGAS PROPERTIES, INC.

## UNANIMOUS JOINT WRITTEN CONSENT OF THE
## SOLE SHAREHOLDER AND SOLE DIRECTOR

## IN LIEU OF A SPECIAL MEETING

May 11, 2023

The undersigned, being the sole shareholder (the "*Shareholder*") and the sole member of the Board of Directors (the "*Board*") of **VIVA LAS VEGAS PROPERTIES, INC.**, a Texas corporation (the "*Corporation*"), in lieu of holding a special meeting of the Shareholder and the Board, the call and notice of each of which are hereby expressly waived, do hereby consent to the following resolutions:

<u>Loss or Destruction of Corporate Records</u>

**WHEREAS**, the Corporation was formed as a Texas Corporation by filing of Articles of Incorporation (the "*Articles*") with the Texas Secretary of State on September 20, 1994 (the "*Formation*");

**WHEREAS**, subsequent to the Formation, all corporate records of the Corporation were maintained by or on the behalf of Dallas Joseph Fontenot, Jr. ("*Mr. Fontenot*");

**WHEREAS**, Mr. Fontenot died on September 3, 2021, and since such date, no corporate records of the Corporation have been located after a diligent search by his heirs and authorized affiliates; and

**WHEREAS**, the Shareholder and the Board desire to create new corporate records to govern the affairs of the Corporation, effective as of the date first set forth above to, among other things, replace the original records of the Corporation which have been lost or misplaced, elect the sole member of the Board, elect officers, adopt new Bylaws, and adopt and reflect the issuance of new share certificates (collectively, the "*New Records*").

**RESOLVED**, that New Records shall be obtained and adopted to replace any records of the Corporation which may be in existence, as of the date first written above.

<u>Election of Directors</u>

**WHEREAS**, the Shareholder desires to reconstitute the Board of the Corporation and remove any members of the Board which may have been previously elected.

008402\00002\3535058.1 - 5/17/2023 12:45:19 PM

1

EXHIBIT

9

**RESOLVED**, that the following named person be, and hereby is, elected to serve as a member of the Board, and to serve in such capacity until his respective successor has been duly elected and qualified, or until his earlier death, resignation or removal:

Dakota Fontenot

**FURTHER RESOLVED**, that any member of the Board not listed above is hereby removed from the Board.

## Election of Officers

**WHEREAS**, immediately following the reconstitution of the Board, the Board desires to reconstitute the officers of the Corporation and remove any officers which may have been previously elected.

**RESOLVED**, that the following named person be, and hereby is, elected to the offices set forth opposite his name, to serve in such capacity until his successor is duly elected and qualified or until his earlier death, resignation or removal:

Dakota Fontenot                      President and Secretary

**FURTHER RESOLVED**, that the officer is empowered to carry out the day-to-day business of the Corporation, subject to the direction and control of the Board.

**FURTHER RESOLVED**, that any officer of the Corporation not listed above is hereby removed from any such office they may have held with the Corporation.

## Corporate Records

**WHEREAS**, the corporate records of the Corporation, including its minute book cannot be located, and as such the Shareholder and the Board desire to create the New Records to replace the missing corporate records.

**RESOLVED**, that the Corporation shall recreate and maintain, as part of its corporate records, a minute book that shall include, but that shall not be limited to, records of the Corporation's Certificate of Formation and amendments thereto, its Bylaws and amendments thereto, minutes of all meetings of the Board, minutes of all meetings of the Shareholder, the time and the place of each such meeting, whether the meeting was regular or special, the manner in which the meeting was authorized, the notice given, the names of those present or represented at the meeting and the proceedings of each meeting; and

**FURTHER RESOLVED**, that the Secretary of the Corporation be, and hereby is, authorized and directed to procure such a replacement minute book and such other books and records as may be required by the Corporation.

UNOFFICIAL COPY

2

## Articles of Incorporation

RESOLVED, that a copy of the filed Articles bearing the file stamp of the Secretary of State of Texas be inserted into the replacement minute book of the Corporation.

## Amended and Restated Bylaws

WHERAS, consistent with the adoption of New Records, and immediately following the reconstitution of the Board, the Board and Shareholder deem it advisable and in the best interests of the Corporation to enter into those certain Amended and Restated Bylaws dated as of even date herewith (the *"Amended and Restated Bylaws"*), by which any Bylaws, amendments thereto, or amendments and restatements thereof, of the Corporation shall be amended and restated in their entirety.

RESOLVED, that the form of Amended and Restated Bylaws presented to the Board and Shareholder for review be, and hereby are, approved and adopted as the Amended and Restated Bylaws of the Corporation; and

FURTHER RESOLVED, that the President of the Corporation is directed to certify a copy of the Amended and Restated Bylaws, insert them into the minute book of the Corporation, and maintain them in the principal office of the Corporation, open for inspection by the Shareholder of the Corporation at all reasonable times during office hours.

## Qualification in Other Jurisdictions

RESOLVED, that the Corporation qualify to engage in business in any state of the United States or any foreign country in which the Board determines it to be necessary or appropriate for the Corporation to qualify to do business;

FURTHER RESOLVED, that the proper officers of the Corporation be, and hereby are, authorized and directed on behalf of the Corporation to make and file such certificates, reports or other instruments as may be required by the laws of such jurisdiction to be filed for that purpose; and

FURTHER RESOLVED, that the officers of the Corporation be, and each acting separately hereby is, authorized and directed to pay all fees and expenses incident to and necessary for the qualification of the Corporation to do business in any state or foreign country.

## Licenses and Tax Permits

RESOLVED, that the officers of the Corporation be, and each acting separately hereby is, authorized and directed to obtain, in the name of the Corporation, such licenses and tax permits as may be required by any applicable federal, state, county or municipal governmental statute, ordinance or regulation for the conduct of the business of the Corporation within any jurisdiction in which the Corporation shall have qualified to do business.

3

## Banking Authority

RESOLVED, that the Secretary of the Corporation be, and hereby is, authorized and directed to select one or more financial institutions for the deposit of the Corporation's cash and securities, the deposit and collection of checks and drafts made payable to the order of the Corporation, issuance of letters of credit on behalf of the Corporation, extensions of credit, and other financial transactions on behalf of the Corporation, and to designate the names of the persons authorized to sign checks, drafts, borrowing requests and other instructions to such financial institutions on behalf of the Corporation;

FURTHER RESOLVED, that the Secretary of the Corporation be, and hereby is, authorized to open additional accounts with such additional financial institutions, close any accounts with financial institutions, change the names of the persons authorized to sign check, drafts, borrowing requests and other instructions on behalf of the Corporation as the Secretary deems to be necessary of convenient from time to time;

FURTHER RESOLVED, that the form of resolutions specified by any such financial institutions that are designated by the Secretary from time to time be, and hereby are, ratified and approved as the official resolutions of the Corporation and the persons designated from time to time by the Secretary as signatories on such accounts be, and hereby are, approved; and

FURTHER RESOLVED, that the Secretary of the Corporation be, and hereby is, authorized and directed to certify the adoption of the form of resolutions required by any such financial institutions from time to time designated by the Secretary and to certify the names and signatures of the persons designated by the Secretary from time to time as signatories on behalf of the Corporation.

## Adoption and Issuance of Share Certificates

WHEREAS, all certificates representing shares of stock in the Corporation have been lost or misplaced, and have not been recovered after a diligent search (collectively, the "*Lost Certificates*").

WHEREAS, the Corporation has received that certain Affidavit of Lost Stock Certificate of the Shareholder, and the Board and Shareholder believe it is in the best interest of the Corporation to reissue a certificate to the Shareholder, representing 1,000 shares of common stock (no par value) of the Corporation.

RESOLVED, that consistent with the adoption of the New Records, the form of share certificate attached hereto as Exhibit A be, and hereby is, approved and adopted as the form of share certificate representing the common stock (no par value per share) of the Corporation; and

FURTHER RESOLVED, that the certificates shall be consecutively numbered, beginning with the number 1; that the certificates shall bear all legends required by law to be placed on the Corporation's share certificates; and that the certificates shall only be issued in the manner and upon the conditions set forth in the Bylaws.

4

UNOFFICIAL COPY

RESOLVED, that the Corporation issue shares of its Common Stock, no par value per share, to the following persons and prepare or cause to be prepared, issued, and executed a certificate representing such shares in exchange for the considerations set forth below, the receipt of which is hereby acknowledged on behalf of the Corporation, which shares, when so issued, shall be validly issued, fully paid and non-assessable, with no personal liability attaching to the ownership thereof:

| Shareholder | Shares | Consideration |
|---|---|---|
| Dakota Trust | 1,000 | $0.00 |

FURTHER RESOLVED, that the Corporation shall refuse to recognize any person other than the Shareholder as a shareholder of the Corporation, refuse to make any payment, transfer, registration, delivery or exchange called for by the Lost Certificates to any person other than the Shareholder, and refuse to take any other action pursuant to the request or demand of any person other than the Shareholder.

General Authority

RESOLVED, that the officers of the Corporation be, and each acting separately hereby is, authorized and directed to do any and all acts and things and to execute and deliver and accept delivery of, in the name of and on behalf of the Corporation, any and all instruments, agreements, consents, certificates and other documents as in their opinion, or in the opinion of counsel to the Corporation, may be necessary or appropriate in order to carry out the purposes and intent of any of the foregoing resolutions;

FURTHER RESOLVED, that any act or acts of any of the officers of the Corporation which acts would have been authorized by the foregoing resolutions, except that such acts were taken prior to the adoption of such resolutions, be, and they hereby are, severally ratified, confirmed, approved and adopted in all respects as acts in the name and on behalf of the Corporation and

FURTHER RESOLVED, that the Secretary of the Corporation be, and hereby is, authorized and directed to certify the adoption of these resolutions.

*[Balance of Page Intentionally Blank. Signature Page Follows]*

5

This Consent shall be effective as of the date hereof regardless of whether any signature occurs before, or after such date. All actions taken in this Consent shall be deemed to be taken simultaneously in the location of the Corporation's principal office on the date of this Consent.

EXECUTED by the undersigned to be effective as of the date first set forth above.

SHAREHOLDER:

DAKOTA TRUST

By: _____
Name: Dakota Fontenot
Title: Trustee

DIRECTOR:

By: _____
Name: Dakota Fontenot

UNOFFICIAL COPY

Signature Page
Unanimous Joint Written Consent of the Sole Shareholder and Sole Director
of
Viva Las Vegas Properties, Inc.

## EXHIBIT A

SPECIMEN SHARE CERTIFICATE

See attached.



UNOFFICIAL COPY

# LAST WILL AND TESTAMENT
## OF
### DALLAS JOSEPH FONTENOT, JR.

The State of Texas          §
                            §
County of Fort Bend         §

I, Dallas Joseph Fontenot, Jr., now domiciled in Fort Bend County, Texas, being of sound and disposing mind, memory and understanding, do make and publish this, my Last Will and Testament, hereby revoking all Wills, codicils and other testamentary instruments heretofore made by me.

## ARTICLE 1
### INTRODUCTION, FAMILY HISTORY, AND INTENTION

1.1     My wife's name is Holli Ann Fontenot.  All references in this Will to my wife are to Holli Ann Fontenot.

1.2     At the time of execution of this Will, I have three (3) children:  Michelle Anne Fontenot , Dallas Joseph Fontenot, III, and Dakota James Fontenot.  I have no other children, either by birth or by adoption, and no deceased children.  All references in this Will to "my children" are to said named children and to any children hereafter born or adopted by me.

1.3     In this Will I intend to dispose of all property which I own at the time of my death, including all property payable to me or my Estate after my death.

1.4     In this Will I intend to dispose of all of my separate property, and only my proportionate interest in the community property of my wife and myself.  It is my intention to dispose of my community interest in all property which I own at the time of my death including all property payable to me or my Estate after my death.

1.5     This Will is not the result of any contract or agreement and may be revoked at any time.

UNOFFICIAL COPY

Page 1 of 16 Pages

D.J.F.

**EXHIBIT**

10

ARTICLE 2
EXECUTOR

2.1    I appoint Dakota James Fontenot as Independent Executor of this my Last Will and Testament and of my Estate.  In the event Dakota James Fontenot should fail to qualify, or having qualified, should die, resign, or become incapacitated or unable to act as such, then I appoint Frost Bank, NA to serve as Successor Independent Executor of this Will and my Estate.

2.2    Each and every act, decision or determination relating to the administration of my Estate shall be finally authorized, approved, or confirmed by my Executor.

2.3    Herein the term "Executor" shall refer to any duly appointed and qualified Executor then acting under the foregoing appointments.

2.4    I direct that no bond or other security be required of my Executor hereunder, and my Executor hereunder shall be independent of the supervision and direction of the Probate Court to the full extent permitted by law.  I further direct that no action shall be had in any court of probate jurisdiction in connection with this Will or in the administration or settlement of my Estate other than the probating of this Will and the return of the statutory inventory, appraisement, and list of claims.  The provisions hereof shall not be deemed to prohibit the closing of administration of my Estate in accordance with Sections 151 and 152 of the Texas Probate Code or the relevant provisions of the Texas Estates Code, as in effect at the date of the execution hereof.

2.5    I direct that my Executor pay all my valid and just debts and obligations and pay all funeral expenses, expenses of my last illness, and expenses of administration and other testamentary expenses imposed by or made payable under the laws of any state or country by reason of my death, out of my Estate as soon as practical after my death and without the unnecessary sacrifice of any of the properties of my Estate.  Should it be necessary to liquidate any portion of my Estate for the purpose of paying any of the aforesaid testamentary expenses or taxes, my Executor, in his sole discretion, shall determine which particular assets of my Estate shall be liquidated for such purposes.  Any of my debts which are payable in installments or are not due until at least one year from the date of my death need not be paid during the administration of my Estate but may, if the terms of such debts permit, be continued and paid according to their tenor.  My Executor shall elect to claim administrative expenses as deductions either on the income tax returns of my Estate or on the estate tax return, whichever will result in the least amount of total tax being paid by my Estate.  My Executor shall not make any adjustments in the interests of my beneficiaries

Page 2 of 16 Pages

D.J.F.

as the result of this election, and my Executor shall incur no liability for making such election.

2.6     My Executor shall make final distribution of my Estate as soon after my death as he, in his discretion, shall deem practical.  Prior to the final distribution of my Estate, my Executor may, in his discretion, make partial distributions.  My Executor may make any distribution of my Estate subject to any indebtedness or liability of my Estate, and subject to all instruments evidencing same.  Income from a portion of my Estate which has not been distributed shall accrue to the legatee or devisee provided for herein, as if final distribution thereof had been made at the time of my death.  The income so accrued may be paid in whole or in part, and from time to time, to the respective legatee or devisee hereunder, or may be withheld, in the discretion of my Executor, until final distribution of my Estate is made.

2.7     My Executor shall not be responsible or liable for any loss or depreciation in value of the properties of my Estate unless such loss or depreciation is due to his gross negligence, bad faith, or fraud.  My Executor shall not be accountable or held liable for any act or omission of any agent of my Executor if my Executor shall have exercised good faith and reasonable diligence in the selection of such person, and in such event any liability to my Estate shall be solely that of such selected person.

2.8     My Executor shall receive as compensation for services rendered in such capacity such fees as are then customary and usual for payment in Fort Bend County, Texas, for the services, unless my Executor shall waive payment for such services.  My Executor shall be entitled to reimbursement from my Estate for all expenses paid personally by my Executor, including but not limited to compensation to agents and fees for professional services incurred in the administration hereof.

2.9     I direct that my Executor shall have the power and authority to sell, lease, mortgage, pledge, hypothecate, or otherwise encumber and dispose of real and personal property, and the authority to do any and all things as Executor that a trustee may do under the provisions of the Texas Trust Code, being Section 111.001, et seq., of the Property Code of Texas as such Code as amended reads at the date hereof.

2.10     After my Executor has distributed to the beneficiaries of my Estate all of the assets or property of my Estate that remain in his hands and after all of the debts of my Estate have been paid (except for a reasonable reserve of assets which my Executor may retain in a fiduciary capacity pending court approval of the final account), my Executor may file, but shall not be required to file, an action for declaratory judgment under Chapter 37, Civil Practice and Remedies Code, seeking to discharge my Executor from any liability involving matters relating to the past administration of my Estate.  Unless the court orders otherwise, my Executor is entitled to pay from my Estate all

Page 3 of 16 Pages

D.J.F.

legal fees, expenses, and other costs of a proceeding incurred in relation to any final account required under Section 149E of the Texas Probate Code or the relevant provisions of the Texas Estates Code.

2.11   In determining the death taxes, estate, inheritance  and income tax liabilities related to my Estate, the decisions of my Executor as to all available tax elections shall be conclusive on all concerned.

2.12   If the Executor shall join with my wife in filing income tax returns, or consents for gift tax purposes to having gifts made by either of us during my life considered as made one-half by each of us, any resulting liability shall be borne by my Estate and my wife in such proportions as they may agree.

2.13   Unless otherwise specifically directed herein, my Executor shall pay all death taxes out of the residue of my estate without apportionment.

2.14   My Executor shall have complete discretion as to what assets of my residuary Estate shall be used or sold to pay death taxes and shall not be bound by any law requiring the use or sale of any type or category of property in priority to any other.

ARTICLE 3
DISPOSITION

3.1   I request that my Executor distribute certain tangible personal property in accordance with handwritten instructions which I may leave.  To comply with my instructions, my Executor shall have a special power of appointment over my tangible personal property.  This special power of appointment may be exercised only in favor of the persons I name in my handwritten instructions to receive such property.  If I leave instructions for my Executor to receive tangible personal property, my Executor may distribute this property to my Executor.  Otherwise, this power of appointment can not be exercised in favor of my Executor, the estate of my Executor, the creditors of my Executor, or the creditors of the estate of my Executor.  If I do not leave handwritten instructions for my Executor or if any person designated in my instructions to receive property does not accept any of such property, this gift shall lapse.

3.2   If Dakota James Fontenot survives me, I give the residuary of my Estate, including any assets over which I may have a power of appointment, to Dakota James Fontenot.  If Dakota James Fontenot does not survive me, but my wife, Holli Ann Fontenot, survives me, I give the residuary of my Estate, including any assets over which I may have a power of appointment, to Holli Ann Fontenot.

UNOFFICIAL COPY

3.3    Nothing contained in this Will shall prevent any beneficiary from disclaiming, in whole or in part, any bequest or inheritance under this Will.


ARTICLE 4
POWERS AND RIGHTS OF EXECUTOR

4.1    In the administration of my Estate, my Executor shall act independently of control by any court, and shall be under all the duties and shall have all of the powers conferred upon trustees by the Texas Trust Code and by any amendments to the Texas Trust Code subsequent to the date hereof, except for any instance in which the Texas Trust Code may conflict with the express provisions of this Will, in which instance, the provisions hereof shall control.  Without intending to limit the powers hereinabove granted, but in addition thereto, my Executor shall be also specifically authorized as to my Estate as follows:

4.1.1    To exercise all powers now or hereafter granted to Independent Executors by the Texas Probate Code or the relevant provisions of the Texas Estates Code as now in force or hereafter amended, and by all other laws of Texas now in effect or hereafter enacted.

4.1.2    To exercise all of the powers now or hereafter granted to Trustees of express trusts by the Texas Trust Code as now in force or hereafter amended, and by all other laws of Texas now in effect or hereafter enacted.

4.1.3    To abandon, adjust, arbitrate, compromise, sue on or defend, and otherwise deal with and settle claims in favor of or against my Estate as to said Executor may seem most advantageous to my Estate, and whose discretion in such matters shall be final and binding upon all parties in interest.

4.1.4    To continue and operate, solely or in cooperation with others, any business or enterprise, in which I may have an interest at the time of my death whether as sole proprietor, partner, joint venturer, stockholder, or otherwise, and to do any and all things deemed appropriate by my Executor, without liability for any losses incurred in the continuance of the business except those arising from gross negligence or bad faith; to sell the business as a going concern or to close out and liquidate the business as and when it shall appear to my Executor to be advisable and upon such terms as shall appear to my Executor to be most advantageous to my Estate and

Page 5 of 16 Pages

UNOFFICIAL COPY

the beneficiaries thereof.  In all such matters I grant complete discretion to my Executor and the Successor Title:__Executor2, as the case may be, in whose judgment I have full confidence.

4.1.5    To renew existing indebtedness, both secured and unsecured, and to perform, renew and extend all obligations relating to my business affairs which I may have entered into prior to my death, and to borrow money on the credit of my Estate for the purpose of paying all debts, estate and inheritance taxes and expenses of administration, and preserving and managing my Estate for the benefit of all beneficiaries; and in connection therewith to pledge, mortgage, or otherwise encumber any property held as a part of my Estate; and my Executor shall be authorized to lend money to my Estate upon such terms and conditions as my Executor shall deem advisable.

4.1.6    Upon distribution of any share or portion of my Estate to more than one distributee, to distribute in money or in kind or partly in money and partly in kind, and to partition real property, securities, chattels, and other personal property, and undivided interests in real and/or personal property, making necessary equalization in cash, at values to be determined by my Executor, whose judgment as to values shall be binding and conclusive upon all parties in interest.

4.1.7    To retain any of the original property constituting my Estate at my death, to acquire by purchase or otherwise, and to retain, temporarily or permanently, any kind of real, personal or mixed property, regardless of the income produced, and without any requirement as to diversification; to invest and reinvest said Estate as my Executor shall see fit in bonds, debentures, and other corporate obligations, and stocks, preferred or common, of any corporation, and private loans, secured or unsecured, oil, gas and mineral interests, or any other form of property, real or personal, which my Executor  shall deem proper; to use either income or corpus to purchase or pay the premiums on life insurance, retirement, income or annuity contracts on the lives of the beneficiaries or any person in which any beneficiary of the trust may have an insurable interest subject in all instances to the provisions of Section ?.

Page 6 of 16 Pages

D.J.F.

UNOFFICIAL COPY

4.1.8   To delegate administrative authority and to authorize any agent, employee, or attorney-in-fact to exercise any or all of the powers granted to the Executor herein; to register and hold title to any property in the name of any nominee, without in any way affecting the responsibility of the fiduciaries.

4.1.9   To exercise all options and elections that I could exercise, if living, as well as all options and elections available to executors and trustees under the laws of the United States of America and the several states thereof, with reference to (I) my Estate and all property and interest at any time constituting a part of my probate Estate and (ii) income, estate and inheritance and gift taxes levied under the laws of the United States of America and the several states thereof, and all other taxing jurisdictions having lawful authority to do so.

4.1.10   To determine whether any money or property coming into the hands of my Executor shall be treated as part of the corpus of the Estate or as part of the income therefrom and to apportion between such income, any gain, loss or expenditures in connection with the Estate as to him may seem just and equitable and his determination shall be conclusive, and to determine and maintain, if the Executor shall deem appropriate in his sole discretion, a reserve for depreciation and/or depletion.

4.1.11   To take possession of, hold, manage and control the Estate, and to collect all rents, income, dividends and profits thereof, as I might do if living except as herein restricted and without the restrictions provided by the Texas Probate Code or the relevant provisions of the Texas Estates Code as it now exists or as it may be amended in the future; provided, however, that the Executor shall have all of the powers, privileges and immunities conferred upon trustees by such laws insofar as such laws add to the powers of the Executor and do not detract from, limit or otherwise restrict or require certain acts of the Executor, and such sections and parts of sections of such laws as confer such powers and privileges shall be considered a part of this Will as though set forth herein.

UNOFFICIAL COPY

D.J.H.

4.1.12    To invest or reinvest surplus funds belonging to the Estate from time to time, in any property, real or personal, including securities of domestic and foreign corporations and investment trusts, bonds, preferred stocks, common stocks, mortgages, mortgage participations, even though such investment (by reason of its character, amount, proportion to the total Estate or otherwise) would not be considered appropriate for a fiduciary apart from this provision, and even though such investment causes a greater proportion of the total Estate to be invested in one company than would be considered appropriate for a fiduciary apart from this provision.

4.1.13    To litigate, compromise, adjust and settle all claims arising out of or in connection with my Estate.

4.1.14    At any time, either by public offering or private negotiations, and from time to time, and for such price and on such terms and with such security for deferred payment as to my Executor may seem reasonable, to sell, exchange, pledge, mortgage, assign, transfer or otherwise dispose of or alienate any part or all of the personal property or any part or all of any real property belonging to the Estate in order to fulfill the purposes hereunder.

4.1.15    To exchange the stock or other securities of any corporation held by my Executor for other stock or securities of the same corporation or of a successor corporation or of a corporation with which such corporation shall be merged or consolidated; to participate in mergers, re-organizations, consolidations, receiverships or dissolutions of any corporation in which the Executor may hold securities or other evidences of indebtedness or ownership; to vote in person or by proxy all stock or other securities held by the Executor, to exercise options and stock rights, if it is to the advantage of the Estate, even though the same results in the investment of funds of the Estate other than those to which the Executor shall be hereinabove restricted; to pay all assessments, taxes and other dues necessary for the protection of securities or other property held by the Executor; to renew and extend the maturity date of real

Page 8 of 16 Pages

D.J.F.

estate notes and mortgages held by the Executor and do any and all things necessary for the protection of the Estate.

4.1.16　　To lease or partition any property which the Executor may hold at public or private sales and to execute any and all instruments necessary to discharge the authority hereby conferred; to make loans, secured or unsecured, in such amounts and upon such terms, for such rates of interest and to such persons, firms or corporations as the Executor shall deem proper; to borrow money, to execute promissory notes therefor and to secure said obligations by mortgage or pledge of any of the Estate; to conduct the operation or to continue the operation of any business in which I may be interested and to act as an officer or director of any corporation in which I may hold shares; to improve any real estate owned by the Estate, including the power to demolish any buildings; to foreclose, extend, assign, partially release, and discharge mortgages; to execute any and all leases for the development of any of my property for oil, gas and mineral developments; to enter into any pooling, unitization, repressurization, community, and other types of agreements relating to the exploration, development, operation, and conservation of properties containing minerals or other natural resources; to drill, mine, and otherwise operate for the development of oil, gas and other minerals; to install and maintain pipelines; to renew, re-arrange or extend any debts owing to or by the Estate, and the liens securing such debts; to employ such attorneys, brokers, banks, custodians and other agents and to delegate them such of the duties, rights and powers of the Executor for such periods as the Executor shall think proper; and, to pay taxes, maintain insurance, sue for the recovery of any debts and property, make repairs and do all things necessary for the proper management of the said Estate, and to incur reasonable expenses in managing, distributing and conveying any property in the said estate, commonly in a single investment for the benefit of any or all of such Estate, and in such proportions from such Estate as the Executor shall deem proper. Such investments shall be governed by the laws pertaining to common estate funds in the State of Texas.

Page 9 of 16 Pages

D.J.F.

4.1.17        To receive, preserve, manage, administer, dispose of, partition and distribute my Estate and the corpus and income thereof for the benefit of the beneficiaries of this Will, in the same manner as if my Executor were the owner in fee simple of all property comprising my Estate or any part thereof; and in the administration of my Estate, the recitals contained in any instrument executed by a duly qualified and acting Executor shall be prima facie evidence of the truth of the facts recited, and all persons dealing with such Executor may rely upon the truth of such recitals and shall not be obliged to make further inquiry.

4.2     My Executor shall have full power and discretion to select how the assets will be distributed and allocated among my beneficiaries. It is my desire that my Executor shall exercise discretion and attempt to allocate assets in a fair and equitable manner so that the potential income tax consequences to each beneficiary are considered. However, my Executor shall not be liable for any distribution made in good faith under the provisions of this Will.

4.3     Should my Estate contain property located in another state or a foreign jurisdiction and my Executor cannot or chooses not to serve under the laws of such state or foreign jurisdiction, my Executor shall have the power to appoint an ancillary Executor of such property. An ancillary Executor appointed pursuant to this section may be an individual or corporate fiduciary.

UNOFFICIAL COPY

ARTICLE 5

NON-BINDING INSTRUCTIONS TO AND GOALS FOR PERSONAL REPRESENTATIVE

I have created a valuable estate of property, some of which I own outright and some of which I own indirectly as trustee. I have directed elsewhere in this Will that Dakota should be my Independent Executor, and I have directed in other instruments that Dakota should be the Trustee of each of the trusts. Without binding him to do so, it is my desire that Dakota or his successor, acting either as trustee or as Executor (herein, jointly, my "Personal Representative"), should use the assets of these estates, each subject to the terms of my Will and the respective Trust Declarations, to achieve the following broadly-stated goals. I have not suggested specific provisions for operation or maintenance, as I leave those decisions to Dakota, whom I trust explicitly, to make salient decisions about my estates after my death. I may supplement or amend these instructions from time to time by subsequent memoranda, which I may not execute with the formalities of a Will. These instructions and any subsequent supplements or amendments are only an expression of my desires and a distillation of my business

Page 10 of 16 Pages

D.J.F.

experiences and my perception of my family's needs. They should not be read to direct or constrain my Executor or to amend any of the trusts. They should not be construed to create any beneficial interest except those expressed in other Articles of this Will or in the Trust Declarations for each trust.

Subject to the foregoing, I recommend the following to my Personal Representative:

5.1 Do not sell the land and property of the Colorado Bar & Grill because it is the source of my income. The Colorado Bar and Grill is the top source of income for the whole company. Don't ever sell this land and building. You can always run a retail business there and it's a place to rent to other people for income. The location is a great location and must stay in the trust for income. Your Mother, Frank, Nan, and lawyers will tell you this. Don't let this place go ever. Keep the place looking good and don't overspend money on it unless the place is making the cash to do the upgrades. There is a fine line on managing the place and losing the income. This place will need 24 hour attention at all times. Don't mess this up. Always consult with your Mother and lawyer. Mark Everett is the only lawyer that will not tell you wrong.

5.2 Take care of Holli Fontenot's medical and healthcare needs. Make sure she gets a regular paycheck. Dakota, you must have your Mother work for the company and work with Nan to help her and be part of the company team. She needs what I give her and her paycheck from the company. She needs help to take care of the 25 ½ acre ranch and income to support the place. You must help her in life and see that nothing happens to her. Look after her for me please. She will depend on you to keep the ranch. A place for you and her to always live if you choose to do so. You never will find a place like that again and it's worth lots of money and will go up in value over the years. Don't sell the place. Your Mom makes income of about $1,300.00 net every two weeks and $5,000.00 net from me a month. She can't pay all the bills with that for the ranch The big house needs funds also. Nan will tell you what I pay to keep up the other part of the ranch. Your Mom knows too. Work together with your Mom.

5.3 Continue to employ Nan Evanich and Frank Kent for operation of the club. Nan and Frank should stay with the company. Don't just run them off. Frank has been there 25 years and Nan has been with me for 35 years. You must try your best to keep them working. You and your Mother can work together on how to keep them in place. They are very good people and you need them to help run the company. You must talk to them every day. Work with them and try to do what they have done for years. Stay on top of their game and tell them what you and they would do if Dad were here.

5.4 Continue to support yourself until you have completed your education. Dakota, you need to work for the company to get a paycheck for school and living cost.

You need to make part of what I am making.  Five thousand dollars a month to be director of the companies and ten thousand a month to be the trustee and manager of the company.  The company will pay for your car or truck and vacation days of 30 days a year pay and time off.  But there is very little time off.  You must stay in school and get your degrees.  This is going to be a very hard time in your life.  Your Mother can help, but "You" must be the person to work with all these people.  The above income is net income for you.  If there is more needed to pay bills then change it.

5.5     Provide for  a modest stipend for Joseph Fontenot and Michelle Anne Fontenot.  Dakota, you will need to help Michelle and Joe out with income at some time.  They will get old and need some help.  You can have the trust pay some payments to them per month if they are in a bind.  Depends on what is in the bank each month.  Twenty-five thousand a year is a good amount to pay to them as a gift.  To each of them.  25k each a year gross payment.  Talk to Mark Everett, attorney, on this, but don't make them officers or directors of the company.  The amount can be less at first or more, you will decide what this can be.  Remember you are taking care of yourself, your Mother, Sister, and Brother, and Nan and Frank.  Plus paying the bills for the company.  Lots to take care of.  Don't pay any more money than people are making at this time, but you can change the pay at any time.  Just be careful of spending.

5.6     Maintain the Texas ranch for investment; lease it if possible.  The ranch is a special place.  Your Mother and you can live there forever.  Your Mother would like to live there until she dies.  Please don't sell the ranch.  If you or your mother wants to move, then rent the place out.  Lease the ranch to a doctor or lawyer or wealthy person.  The ranch will be worth millions of dollars over the years.  It's paid for and that location is a gold mine.  Don't sell the ranch ever.  Keep it for your Mom and your family some day.  This is a place to keep for yourself and your Mom.  It is an income producing place for rent/lease money.  If you move and your Mother dies, then rent/lease the place.  Don't sell it.  Your Mother will own half of this place.  It's her's too.  Share this place with her.

On the ranch property there are three homes, two barns, and lots of other storage and game room buildings. The whole ranch has a lot of equipment there too. Your mother owns half of this stuff and you will own the other half.  There are some things that belong to the Colorado club, all the club props and decoration from Rudolph's Place, sports stuff, old signs, lots of lights, and other things that you know go to the club.  All these things are stored there on the ranch.  My safes are full of things that are yours, such as guns, etc.

5.7     Pay off the mortgage for the residence in Nevada and share use and occupancy with Holli.  Pay off the house in Las Vegas and keep the house for you and your Mom.  Sell the place only if you can get seven hundred thousand for it.  That will

Page 12 of 16 Pages

D.J.F

be in 5 or 7 years.  Take care of the house and repair it.  Keep it in good shape.  <u>Your Mom owns half of this house</u>.

5.8    Maintain and do not sell the tract on Highway 59 near Rosenberg, Texas. The land on Hwy 59 south and FM 529 is about 9.6 acres.  Rudolph's Place was the club.  Never sell this place.  Lease it to a gas company or oil company for a retail business.  This is an income producer for the trust.  You can lease this place for a lot of money for years.  Some day the gas and oil companies will want this place.  Can lease for 99 years for big bucks.  Income to trust.  Also it's a great asset for the trust.  This place can rent for the right people.  Don't put any money in it.  Just upkeep.  New renters will need to put their money into the place.  That is why you give them a long lease.  Only a large company should get this place.  A company with money.  Like a gas station.  You will need a real estate law firm to help handle this with you.  Mark Everett, attorney, can help you with this.  This is a very important rental property.

5.9    The Rosenberg property consists of 4 acres in Rosenberg, Texas.  The property is owned by a corporation, the shares of which are held in trust for you.  Use it for operation of the club.  Maintain and do not sell the Rosenberg property; the 4 acres and office is also a great place to have and not to sell.  Don't let your brother or sister or anyone get you to sell this land and building.  <u>Run your trust and business from there.</u>  If you do ever close down your trust and other companies, you need to lease the place out for income.  It's income producing property.  Always keep property that you can rent or lease.  The office is a place to keep your records and company records. Also storage files and a place to run the trusts and other companies.  Keep the office in good standing,, looking good, and well taken care of.

5.10    In conclusion, Dakota, your job as a trustee is to manage the trusts for yourself, taking into account your duties to your Mom, your brother (Joe Fontenot), and your sister (Michelle Fontenot).  Your job is to make the right decisions and not lose the money which you own outright, which you own in trust, or which is owned by the companies whose stock you own in trust.  Your job is to hold those assets and to manage the companies so that they produce income for the trust.  Your job for the trust assets is not for anyone else but the beneficiaries of the trusts.  Mark Everett will talk with you about your responsibilities as the trustee of the four trusts.  You need to hook up with Mark and get a classroom course about what trusts and trustees are all about. This is a must; you must do this first.  Don't forget this: look after your Mom, brother, sister, and yourself.  Take good care of them and see that they are happy also.

Dakota, when I'm gone people will try to ask for more income as soon as I am in the grave.  You will need to ask them to back off and tell them that you need to get your life on track with this new job of looking after the trusts, that you will study on this and get with your lawyer and others to see what to do about giving more income to

D.J.F.

others.  People will make you feel that they will leave you and go elsewhere to work.  If they do this, tell them good-bye.  Good people will not put you under this type of pressure.

Also Nan and Frank have been with me for 25 to 35 years.  Don't forget that they run your business and your need to look out for them too.  Nan and Frank are very important to you and your success.

## ARTICLE 6
### DEFINITIONS

6.1     "Internal Revenue Code" shall mean the Internal Revenue Code of 1986, as amended, and applicable Treasury Regulations thereunder.

6.2     "Descendants" means the legitimate children of the person designated and the legitimate lineal descendants of such children, and includes any person adopted before attaining age eighteen (18) and the adopted person's legitimate lineal descendants.  A posthumous child shall be considered as living at the death of his parent.

6.3     "Death taxes" refers to all federal estate, state and foreign estate, inheritance, transfer, succession, legacy, or other death taxes of any kind (including generation-skipping transfer taxes payable with respect to assets passing under this Will in a manner that constitutes a "direct skip," as defined in Section 2612(c) of the Internal Revenue Code, but not including any other generation-skipping transfer taxes) and interest or penalty on such taxes, imposed by reason of my death with respect to property required to be included in my gross Estate for purposes of such taxes, whether such property passes under this Will or otherwise, and payable to any federal, state, or foreign taxing authority, whether payable by my Estate or by any recipient of such property.

6.4     "Heirs" means those persons who would have inherited a decedent's personal property if the decedent had then died single, intestate, and domiciled in Texas.

6.5     Whenever a distribution is directed to be made to the descendants, per stirpes, of any person, the property to be distributed shall be divided into as many equal shares as there are then living children of that person and deceased children of that person who have descendants then living.  Each then living child of such person shall take one share, and the share for the descendants of each deceased child shall be divided among the deceased child's then living descendants on a per stirpes basis.

Page 14 of 16 Pages

D.J.F.

### ARTICLE 7
### MISCELLANEOUS

7.1     If any legatee, devisee, or beneficiary hereunder should die within sixty (60) days of the date of my death, or should we die as a result of a common accident or calamity in such a manner that it cannot be determined in what order our deaths occurred, it shall be considered, for purposes of this Will, that such person predeceased me.

7.2     Unless my Executor shall elect otherwise, payments from an employee or self-employed benefit plan which are not includible in my gross Estate for federal estate tax purposes shall not be liable for or used for the payment of (or loaned for the purpose of paying) any taxes, liabilities, debts, or any other claims or charges against my Estate, including but not limited to death taxes, provided, however, that such proceeds and payments may be used for the payment of federal estate and state inheritance or estate taxes assessed with respect to such payments or proceeds.

7.3     If any provision of this Will shall be held invalid, illegal or inoperative under any circumstances, it is my intention that, so far as possible and reasonable, such provision under all other circumstances and all other provisions shall be effective and fully operative.  My Executor may seek and obtain Court instructions for the purpose of carrying out, as nearly as possible, the intention of this Will shown by the terms hereof, including the terms held invalid, illegal, and inoperative.

I, Dallas Joseph Fontenot, Jr., as testator, after being duly sworn, declare to the undersigned witnesses and to the undersigned authority that this instrument (which, including this page, is contained on 16 pages) is my will, that I have willingly made and executed it in the presence of the undersigned witnesses, all of whom were present at the same time, as my free act and deed, and that I have requested each of the undersigned witnesses to sign this will in my presence and in the presence of each other.  I now sign this will in the presence of the attesting witnesses and the undersigned authority on this _7_ day of May, 2013.

_____
Dallas Joseph Fontenot, Jr.,
Testator

The undersigned, _Maria Mojica_ and _Gladys Velez_, each being above fourteen years of age, after being duly sworn, declare to the testator and to the undersigned authority that the testator declared to us that this instrument is the testator's will and that the testator requested us to act as witnesses to the testator's will and signature. The testator then signed this will in our presence, all of us being present at the same time. The testator is eighteen years of age or over (or being under such age, is or has been lawfully married, or is a member of the armed forces of the United States or of an auxiliary thereof or of the Maritime Service), and we believe the testator to be of sound mind. We now sign our names as attesting witnesses in the presence of the testator, each other, and the undersigned authority on this ___ day of May, 2013.

_____    _Las Vegas._
Witness                              _State of Nevada County of Clark_
                                     Address

_____    _Los Vegas_
Witness                              _State of Nevada County of Clark_
                                     Address

The State of Nevada                  §
                                     §
County of _Clark_                    §

Subscribed and sworn to before me by the said Dallas Joseph Fontenot, Jr., Testator, and by the said _Maria Mojica_ and _Gladys Velez_, witnesses, this _7th_ day of May, 2013.

(SEAL)                               _____
                                     Notary Public, State of Nevada

MICHAEL J. MOORE
Notary Public State of Nevada
No. 08-7991-1
My Appt. Exp. September 11, 2016



Page 16 of 16 Pages

537721

# FIRST CODICIL TO LAST WILL AND TESTAMENT
## OF
## DALLAS JOSEPH FONTENOT, JR.

The State of Texas                          §
                                            §
County of Fort Bend                         §

       I, Dallas Joseph Fontenot, Jr., now domiciled in Fort Bend County, Texas, being of sound and disposing mind, memory and understanding, do make and publish this, my First Codicil to my Last Will and Testament.

### ARTICLE 1
### INTRODUCTION AND INTENTION

      1.1    On or about May 7, 2013, I executed my Last Will and Testament. I shall refer to this document as my Will. By executing this First Codicil, I intend to modify certain provisions of my Will as set forth below and, to the extent that I do not modify or revoke the provisions of my Will, to ratify the remaining provisions of my Will.

      1.2    My wife's name is Holli Ann Fontenot. All references in this First Codicil to my wife are to Holli Ann Fontenot.

      1.3    At the time of execution of this First Codicil, I have three (3) children: Michelle Anne Fontenot , Dallas Joseph Fontenot, III, and Dakota James Fontenot. I have no other children, either by birth or by adoption, and no deceased children. All references in this First Codicil to "my children" are to said named children and to any children hereafter born or adopted by me.

      1.4    In this First Codicil I intend to dispose of all of my separate property, and only my proportionate interest in the community property of my wife and myself. It is my intention to dispose of my community interest in all property which I own at the time of my death including all property payable to me or my Estate after my death.

      1.5    This First Codicil is not the result of any contract or agreement and may be revoked at any time.

Page 1 of 4 Pages

D.J.F.

UNOFFICIAL COPY

EXHIBIT

11

ARTICLE 2
EXECUTOR

2.1    I revoke the provisions of Section 2.1 of my Will, in which I have named the Executor of my Estate. In its place, I substitute the following:

I hereby appoint the following persons, in the order named, as Independent Executor of this my Last Will and Testament and of my Estate, with each successor to serve when the person named immediately before him or her shall fail to qualify, or having qualified, shall resign, become incapacitated, or otherwise fail or cease to act:

First, Holli Ann Fontenot
Second, Michelle Anne Fontenot
Third, Dallas Joseph Fontenot, III
And finally, Frost Bank, NA.

ARTICLE 3
DISPOSITION

3.1    I revoke the provisions of Section 3.2 of my Will, in which I have disposed of the residuary of my Estate. In its place, I substitute the following:

If Holli Ann Fontenot survives me, I give the residuary of my Estate, including any assets over which I may have a power of appointment, to Holli Ann Fontenot.  If Holli Ann Fontenot does not survive me, I give the residuary of my Estate, including any assets over which I may have a power of appointment, to Michelle Anne Fontenot and Dallas Joseph Fontenot, III or their descendants, *per stirpes* and not *per capita*.  I especially desire that neither Dakota James Fontenot nor any of his descendants shall be a beneficiary of my Estate.

ARTICLE 4
REPUBLICATION OF LAST WILL AND TESTAMENT

In every other respect I confirm and republish my Last Will and Testament dated May 7, 2013.

Page 2 of 4 Pages

I, Dallas Joseph Fontenot, Jr., as testator, after being duly sworn, declare to the undersigned witnesses and to the undersigned authority that this instrument (which, including this page, is contained on 4 pages) is my First Codicil to my Last Will and Testament; that I have willingly made and executed it in the presence of the undersigned witnesses, all of whom were present at the same time, as my free act and deed, and that I have requested each of the undersigned witnesses to sign this in my presence and in the presence of each other. I now sign this in the presence of the attesting witnesses and the undersigned authority on this **3 1** day of _____ **OcTOBER** _____, 2017.

                                          Dallas Joseph Fontenot, Jr.,
                                          Testator

The undersigned, **FRANK KENT** and **Jose Luis MANZANA**, each being above fourteen years of age, after being duly sworn, declare to the testator and to the undersigned authority that the testator declared to us that this instrument is the testator's First Codicil to his Last Will and Testament dated May 13, 2017, and that the testator requested us to act as witnesses to the testator's First Codicil to his Last Will and Testament and signature. The testator then signed this his First Codicil to his Last Will and Testament in our presence, all of us being present at the same time. The testator is eighteen years of age or over (or being under such age, is or has been lawfully married, or is a member of the armed forces of the United States or of an auxiliary thereof or of the Maritime Service), and we believe the testator to be of sound mind. We now sign our names as attesting witnesses in the presence of the testator, each other, and the undersigned authority on this **31** day of _____ **OcTOBER** _____, 2017.

UNOFFICIAL COPY

_____
Witness

_____
Witness

Address ~~Houston~~, **TEXAS 77084**

Address **HOUSTON TX 77082**

## TRUST DECLARATION FOR
## THE HOLLI ANN HARDIN TRUST NUMBER ONE

THIS TRUST DECLARATION is made this day by declaration of HOLLI HARDIN FONTENOT, a resident of Harris County, Texas ("Trustor"). The Effective Date of this Trust Declaration is June 5, 1991.

1. Trust Estate.

    1.1 Creation of Trust. The Trustor hereby establishes, declares, and creates this Trust for the purposes hereinafter set forth, and the Trustee agrees to serve as the initial trustee and to hold the Trust Estate (as hereinafter defined) in trust upon the following provisions.

    1.2 Transfer In Trust. On or about the Effective Date, the Trustor has transferred and delivered to the Trustee the cash sum of One Thousand and No/100 Dollars ($1,000.00). Such property shall constitute the initial property of the Trust Estate.

    1.3 Beneficiaries. The Beneficiaries of this Trust shall be HOLLI HARDIN FONTENOT, DALLAS JOSEPH FONTENOT, JR., ANNE S. FONTENOT, DALLAS JOSEPH FONTENOT, III, MICHELLE ANNE FONTENOT, and any children of the marriage of HOLLI HARDIN FONTENOT and DALLAS JOSEPH FONTENOT, JR., including any children adopted by HOLLI HARDIN FONTENOT and DALLAS JOSEPH FONTENOT, JR. after the Effective Date (collectively, "Primary Beneficiaries"). Also Beneficiaries of this Trust are the children and other issue of each of the Primary Beneficiaries. The term "Beneficiary" will also mean any and all persons, organizations, trusts, and entities who may have or may acquire a beneficial interest in this Trust, whether vested or contingent in nature, resulting from the exercise of a power of appointment by a Beneficiary or otherwise.

    1.4 Release of All Rights In Property. The Trustor hereby releases for the benefit of this Trust any and all rights which the Trustor may have in her individual capacity in the property constituting the Trust Estate.

    1.5 Acceptance of the Trust. By acceptance hereof the Trustee, on her behalf and on behalf of her successors in trust, does by the execution hereof acknowledge receipt of the Trust Estate. The Trustee shall own, hold, and possess the Trust Estate (including any additional property which may

Page 1 of 18 Pages

B1142_81.01

COPY
UNOFFICIAL

EXHIBIT
12

003158

at any time hereafter be transferred to the Trustee) in trust solely in the capacity of Trustee. The Trustee and her successors in trust shall hold, manage, sell, exchange, invest, and reinvest the Trust Estate; collect all income therefrom; and, after deducting such expenses as are properly payable from income, accumulate and distribute the Trust Estate as herein provided.

1.6   Additions to Trust Estate.   The Trustor and any other person shall have the right at any time to add property to the Trust created herein.   Such property, when received and accepted by the Trustee, shall become part of the Trust Estate.

1.7   Name of Trust.   This Trust shall be known as THE HOLLI ANN HARDIN TRUST NUMBER ONE.

2.   Irrevocability of Trust.   The Trust herein created shall be irrevocable and shall not be altered, amended, revoked, or terminated by the Trustor or any other person except as specifically permitted by law.

3.   Definitions.   As used herein, the following terms shall have the following meanings.

3.1   Children. Issue.   The term "child" or "children" shall refer only to any and all children born in lawful wedlock or lawfully adopted, whether born or adopted before or after the date of execution of this Trust Declaration.   The term "issue" shall refer to the lawful blood descendants in the first, second, or any other degree of the ancestor designated.

3.2   Heirs at Law.   Whenever a trustee or a legal advisor to the Trustee is called upon to determine the heirs at law of the Trustor or any other person beneficially interested in this Trust, the determination will be made to identify those individual, other than creditors, who would receive the personal property of a decedent upon his or her death as determined in accordance with the laws of intestate succession of the State of Texas, and further determined as if the Trustor of this Trust shall have predeceased the person or persons so named or described.

3.3   Minor Beneficiary.   The term "Minor Beneficiary" identifies a Beneficiary who is less than twenty one years of age.

3.4   Disability.   A Beneficiary will be considered "disabled" if he or she is incapacitated to an extent to make it impossible or impractical to give prompt and intelligent

Page 2 of 18 Pages
H1142_81.01

003159

consideration to business matters.  The Trustee may act upon such evidence as the Trustee reasonably deems appropriate and reliable without liability by reason thereof.

3.5  Power of Appointment, Qualified Beneficiary Designation.  Whenever this Trust gives a Beneficiary the power or authority to appoint a beneficiary of the Trust, the designation must be in writing and be acknowledged in the form required of acknowledgements by Texas law or exercised by a will executed with the formalities required by law of the Beneficiary's residence; it must clearly evidence the intent of the Beneficiary to exercise a power of appointment; and the written beneficiary designation must have been delivered to the Trustee prior to the Beneficiary's death or, if exercised by will, the will must have been filed for probate within three months from the date of the Beneficiary's date of death and must subsequently be admitted to probate no matter the time interval.  The term of this Trust may be extended if the Qualified Beneficiary Designation requires that a Beneficiary's interest remain in Trust, or may be divided and be held as a separate trust which is governed by the terms of this Trust.

3.6  Trust Estate.  The term "Trust Estate" shall mean any and all of the property delivered to the Trustee to be held, managed, and distributed under the terms of this Trust.

3.7  Trustee.  For convenience, the term "Trustee," used in the singular, will mean and identify singular and multiple Trustees serving and acting pursuant to the directions of this Trust Declaration.  The term "corporate Trustee" will identify a banking or trust corporation with trust powers.

4.  Appointment of Trustee.

4.1  Original Appointment.  The Trustor appoints HOLLI HARDIN FONTENOT as Trustee of this Trust.  In the event HOLLI HARDIN FONTENOT should fail to qualify, or having qualified, should die, resign, or become incapacitated or unable to act as Trustee of this Trust, or having qualified should subsequently become divorced from DALLAS JOSEPH FONTENOT, JR., then the Trustor appoints DALLAS JOSEPH FONTENOT, JR. as Trustee of this Trust.  The parties acknowledge and agree that the rights and obligations of HOLLI HARDIN FONTENOT to serve as Trustee and to resign as Trustee in accordance with the foregoing have been and are the subject of separate consideration,

Page 3 of 18 Pages
H1142_81.01

003160

receipt of which is hereby acknowledged in full, and such rights and obligations are in the best interest of the administration of the Trust for its Beneficiaries.  HOLLI HARDIN FONTENOT specifically waives any rights which she may have to rescind or revoke her obligation to resign as Trustee upon divorce from DALLAS JOSEPH FONTENOT, JR.

4.2    Succession.  At any time on or after his appointment as Trustee of this Trust, DALLAS JOSEPH FONTENOT, JR. will have the right to appoint a successor or successors to serve as Trustee in the event that DALLAS JOSEPH FONTENOT, JR. chooses not to serve as Trustee or ceases to serve as Trustee for any reason, and DALLAS JOSEPH FONTENOT, JR. may specify any conditions upon succession and service as may be permitted by law.

For example, a successor may be required to furnish a fiduciary bond as a prerequisite or a successor's service may be condition upon the death, resignation, or inability to serve of another appointee.

At any time on or after his appointment as Trustee of this Trust, DALLAS JOSEPH FONTENOT, JR. may also provide that one or more designated successors will have the authority to appoint his, her, or its successor as Trustee.  An appointment of successor Trustee must be in writing and must be acknowledged to be effective.

In the absence of an appointment, or in the event all successors appointed by a Trustee shall fail or cease to serve for any reason, DALLAS JOSEPH FONTENOT, III is to be the successor as Trustee.

Trustor specifically provides that upon assumption of actual service as Trustee, DALLAS JOSEPH FONTENOT, III will have the right to appoint his successor as Trustee and to vest in a successor Trustee, upon assumption of that person's service, the right and authority to designate succession as Trustee.

In the event all of the Trustees named above, including duly appointed successors, fail or cease to serve for any reason, then FIRST INTERSTATE BANK OF TEXAS, N.A. is to be the successor Trustee.  The appointment of FIRST INTERSTATE BANK OF TEXAS, N.A. as Trustee will include any successor to FIRST INTERSTATE BANK OF TEXAS, N.A. by reason of its merger, reorganization, or sale to another banking corporation with trust powers or a trust company with trust powers.

Page 4 of 18 Pages
B1142_81.01

UNCONDITIONAL COPY

5. <u>Distribution of Income and Trust Corpus, Living and Port-Mortem</u>. The Trustee shall hold in trust or dispose of the Trust Estate as follows.

  5.1 <u>Distribution of Income and Principal</u>. The Trustee will have the discretionary authority to distribute to any or all of the Primary Beneficiaries or to apply for the Primary Beneficiaries' use and benefit such amounts of the Trust income and principal of the Trust Estate, even to the exhaustion thereof, as the Trustee shall desire, in the absolute discretion of the Trustee. The Trustee will have the discretionary authority to apportion or accumulate income to or for one or more of the Primary Beneficiaries in such amounts as the Trustee shall desire, in the absolute discretion of the Trustee; and the Trustee may distribute such amounts in equal or unequal shares, in the Trustee's absolute discretion. The Trustee may elect not to distribute any sums to any one or more of the Primary Beneficiaries. Accumulated income shall be added to the principal of the Trust.

  5.2 <u>Term of the Trust</u>. The term of this Trust shall be for so long as any of HOLLI HARDIN FONTENOT, DALLAS JOSEPH FONTENOT, JR., and ANNE S. FONTENOT shall live. Upon the last to die of all of the foregoing, this Trust shall terminate; provided, however, that the Trust will continue for a reasonable term thereafter for the purpose of liquidation and settlement.

  5.3 <u>Distributions for Death Taxes</u>. If the testamentary estate of the Trustor or any other Primary Beneficiary shall include any property of the Trust Estate because of the provisions of Sections 2036, 2037, and 2038 of the Internal Revenue Code of 1986 or any other provisions of the Internal Revenue Code of 1986, as amended, or under any corresponding statute hereafter in effect (dealing with inclusion of the Trust assets in the testamentary estate because of retained powers or otherwise), any death taxes (including but not limited to any estate tax) owing as a result of such inclusion shall be paid by this Trust. This provision shall control notwithstanding any other provision contained in this Trust. As used in this Trust Agreement, the term "death taxes" refers to all estate, inheritance, transfer, succession, legacy, or other death taxes of any kind and interest or penalty on such taxes, if any.

  5.4 <u>Distributions Upon Termination of the Trust</u>. Upon termination of this Trust, the undistributed principal and income after the distributions, if any, allowed under Section 5.3 above, shall be divided in equal shares, one for each of DALLAS

Page 5 of 18 Pages

E1142_81.01

003162

JOSEPH FONTENOT, III, MICHELLE ANNE FONTENOT, and each of the children of the marriage of HOLLI HARDIN FONTENOT and DALLAS JOSEPH FONTENOT, JR., including any children adopted by HOLLI HARDIN FONTENOT and DALLAS JOSEPH FONTENOT, JR. after the Effective Date ("Trust Share"). Each of the foregoing, using a Qualified Beneficiary Designation, shall have the right to appoint the Beneficiary or Beneficiaries of the Trust Estate upon his or her death and the manner in which an appointee is to receive his, her, or its Trust Share. If such Beneficiary does not exercise his power of appointment with a Qualified Beneficiary Designation, the Beneficiary's Trust Share of the remaining property of the Trust, net of settlement costs, will pass upon the termination of the Trust *per stirpes*, outright and free of Trust, to his issue living at the time of his death or, if none, *per stirpes* to the Trustor's issue then living.

5.5    Distribution In Accordance With Texas Intestate Laws. In the event all Primary Beneficiaries and all of the issue of the Primary Beneficiaries have died, upon termination of this Trust the Trustee shall distribute the Trust Estate among the heirs at law of DALLAS JOSEPH FONTENOT, JR. in accordance with the Texas rules for intestate distribution as if the Primary Beneficiaries and all of the children and other issue of the Primary Beneficiaries had predeceased the Trustor.

5.6    Method of Distribution. During such time as the Trustee is so expending sums from the Trust Estate for the benefit of any Beneficiary or otherwise as provided herein, the Trustee is authorized to make payments or delivery of the portion or portions of the Trust Estate, either to the Beneficiary directly or to the person having the care and custody of the Beneficiary, all without the necessity of the appointment of any guardian. Without limitation on the foregoing, it is acknowledged and agreed that this Trust constitutes a grantor trust within the meaning of Sections 671, et seq. of the Internal Revenue Code of 1986, as amended and that the income therefrom will be taxed to the Trustor for so long as the Trustor shall live. It is further understood and agreed that the Trustee shall distribute to the Trustor (or to any other person who is deemed to be a grantor of this Trust and taxable on the income of the Trust within the meaning of Section 671, et seq. of the Internal Revenue Code of 1986, as amended) the incremental income taxes arising in connection with the taxable income of the Trust Estate or, at the election of the Trustee, the Trustee may make

Page 6 of 18 Pages
E1142_81.01

003163

such distribution directly to the Internal Revenue Service for the benefit of such person.

5.7    **Partial and Final Distributions.**  The Trustee, in making or preparing to make a partial or final distribution, may prepare an accounting and may require any or all of the following as a condition to payment:  a written and acknowledged statement from each distributee that the accounting has been thoroughly examined and accepted as correct; a discharge of the Trustee; a release from any loss, liability, claim, or question concerning the exercise of due care, skill, and prudence of the Trustee in the management, investment, retention, and distribution of property during the Trustee's term of service (except for any undisclosed error or omission having basis in fraud or bad faith); and/or an indemnity for the benefit of the Trustee, to include the payment of attorney's fees, from any asserted claim of any taxing agency, governmental authority, or other claimant.  Any Beneficiary having a question or potential claim may require an audit of the Trust as an expense of administration.  Failure to require the audit prior to acceptance of the Trustee's report or the acceptance of payment will operate as a final release and discharge of the Trustee except as to any error or omission having basis in fraud or bad faith.

5.8    **Contingent Trust for Certain Beneficiaries.**  The interest of any Beneficiary who has not attained the age of thirty (30) years (the "Required Age") or who may be otherwise legally disabled and whose interest is not otherwise covered by the provisions of this Trust Declaration may, in the sole and absolute discretion of the Trustee, be continued in Trust or be held as a separate trust, for the use and benefit of that person until such person shall attain the Required Age or until such person is no longer disabled.  For so long as the Trustee holds the Trust for a Beneficiary pursuant to these terms, the Beneficiary, using the Qualified Beneficiary Designation, shall have the right to appoint the Beneficiaries of his or her interest in the Trust entitled to his or her interest upon the death of the Beneficiary.  If the Beneficiary dies prior to a final distribution of his or her interest from the Trust without having made a Qualified Beneficiary Designation, that person's interest in the Trust will pass *per stirpes* to his or her issue then living, or if none, *per stirpes* to the issue of the Trustor then living.

Page 7 of 18 Pages
81142_81.01

6. <u>Powers of the Trustee</u>.  In order to carry out the purposes of this Trust Declaration, the Trustee, in addition to all other powers granted by law, shall have the following powers and discretions.

6.1 <u>Retain Assets</u>.  The Trustee shall have the power to continue to hold any and all property received by the Trustee or subsequently added to the Trust Estate or acquired pursuant to proper authority if and as long as the Trustee, in exercising reasonable prudence, discretion, and intelligence, considers that the retention is in the best interest of the Trust.

6.2 <u>Investments</u>.  The Trustee shall have the power to invest and reinvest in every kind of property, real, personal, or mixed, and every kind of investment, specifically including, but not by way of limitation, corporate obligations of every kind, and stocks, preferred or common, without regard to risk of loss or decline in value.

6.3 <u>Management of Securities</u>.  The Trustee shall have the power to exercise, respecting securities held in the Trust Estate, all the rights, powers, and privileges of owners, including, but not limited to the power to vote, give proxies, and to pay assessments and other sums deemed by the Trustee necessary for the protection of the Trust Estate; to participate in voting trusts, pooling agreements, foreclosures, reorganizations, consolidations, mergers, and liquidations, and in connection therewith to deposit securities with and transfer title to any protective or other committee under such terms as the Trustee may deem advisable; to exercise or sell stock subscription or conversion rights; to accept and retain as an investment any securities or other property received through the exercise of any of the foregoing powers, regardless of any limitations elsewhere in this instrument relative to investments by the Trustee.

6.4 <u>Form of Ownership of Trust Property</u>.  The Trustee shall have the power to hold securities or other Trust property in the name of the Trustee as Trustee under this Trust Declaration or in the Trustee's own name or in the name of a nominee or in such conditions where ownership will pass by delivery.

6.5 <u>Business Interests</u>.  The Trustee shall have the power to continue and operate, to sell or to liquidate, as the Trustee deems advisable at the risk of the Trust Estate,

Page 8 of 18 Pages

51142_81.01

003165

any business or partnership interests received by the Trust Estate.

6.6   Sell and Exchange.   The Trustee shall have the power to sell for cash or on deferred payments and on such terms and conditions as are deemed appropriate by the Trustee, whether at public or private sale, to exchange, and to convey any property of the Trust Estate.

6.7   Abandonment of Trust Assets.   The Trustee shall have the power to abandon any Trust asset or interest therein in the discretion of the Trustee.

6.8   Option.   The Trustee shall have the power to grant an option involving disposition of a Trust asset and to take an option for the acquisition of any asset by the Trust Estate.

6.9   Lease.   The Trustee shall have the power to lease any real or personal property of the Trust Estate for any purpose for terms within or extending beyond the duration of the Trust.

6.10   Property Management.   The Trustee shall have the power to manage, control, improve, and repair real and personal property belonging to the Trust Estate.

6.11   Development of Property.   The Trustee shall have the power to partition, divide, subdivide, assign, develop, and improve any Trust property; to make or obtain the vacation of plats and adjust boundaries or to adjust difference in valuation on exchange or partition by giving or receiving consideration; and to dedicate land or easements to public use with or without consideration.

6.12   Repair, Alter, Demolish, and Effect.   The Trustee shall have the power to make ordinary and extraordinary repairs and alterations in buildings or other trust property, to demolish any improvements, to raze party walls or buildings, and to erect new party walls or buildings as the Trustee deems advisable.

6.13   Borrowing and Encumbering.   The Trustee shall have the power to borrow money for any Trust purpose from any person, firm, or corporation on the terms and conditions deemed appropriate by the Trustee and to obligate the Trust Estate for repayment, upon such terms and conditions (including a term extending beyond the duration of the Trust) as the Trustee deems advisable; to encumber the Trust Estate or any of its property by mortgage, deed of

Page 9 of 18 Pages

81142_81.01

003166

trust, pledge, or otherwise, using whatever procedures to consummate the transaction deemed advisable by the Trustee; and to replace, renew, and extend any encumbrance and to pay loans or other obligations of the Trust Estate deemed advisable by the Trustee.

6.14  Natural Resources.  The Trustee shall have the power to enter into oil, gas, liquid or gaseous hydrocarbon, sulphur, metal and any and all other natural resource leases on terms deemed advisable by the Trustee, and to enter into any pooling, unitization, repressurization, community, and other types of agreements relating to the exploration, development, operation, and conservation of properties containing minerals or other natural resources; to drill, mine, and otherwise operate for the development of oil, gas, and other minerals; to contract for the installation and operation of absorption and repressurizing plants; and to install and maintain pipelines.

6.15  Insurance.  The Trustee shall have the power to procure and carry at the expense of the Trust Estate insurance of the kinds, forms, and amounts deemed advisable by the Trustee to protect the Trust Estate and the Trustee against any hazard.

6.16  Enforcement of Hypothecations.  The Trustee shall have the power to enforce any deed of trust, mortgage, or pledge held by the Trust Estate and to purchase at any sale thereunder any property subject to any such hypothecation.

6.17  Extending Time of Payment of Obligations.  The Trustee shall have the power to extend the time of payment of any note or other obligation held in the Trust Estate, including accrued or future interests, in the discretion of the Trustee.

6.18  Adjustment of Claim.  The Trustee shall have the power to compromise, submit to arbitration, release with or without consideration, or otherwise adjust claims in favor of or against the Trust Estate.

6.19  Litigation.  The Trustee shall have the power to commence or defend at the expense of the Trust Estate any litigation affecting the Trust or any property of the Trust Estate deemed advisable by the Trustee.

6.20  Administration Expenses.  The Trustee shall have the power to pay all taxes, assessments, compensation of the Trustee, and all other expenses incurred in the collection, care, administration, and protection of the Trust Estate.

Page 10 of 18 Pages
B1142_81.01

003167

6.21   Employment of Attorneys, Advisers, and Other Agents.   The Trustee shall have the power to employ any attorney, investment adviser, accountant, broker, tax specialist, or any other agent deemed necessary in the discretion of the Trustee and to pay from the Trust Estate reasonable compensation for all services performed by any of them.

6.22   Termination by Trustee of Small Trust.   The Trustee shall have the power to terminate, in the discretion of the Trustee, the Trust held for the Beneficiaries if the fair market value of the Trust at any time becomes less than $25,000.00 and, regardless of the age of the Beneficiaries to distribute the principal and any accrued or undistributed income to the Beneficiaries, or to their respective guardians, conservators, or other fiduciaries.

6.23   Distribution.   The Trustee shall have the power on any partial or final distribution of the income or principal of the Trust Estate, to apportion and allocate the assets of the Trust Estate in cash or in kind, or partly in cash and partly in kind, or in undivided interests in the manner deemed advisable in the discretion of the Trustee and to sell any property deemed necessary by the Trustee to make the distribution.

6.24   Merger.   The Trustee shall have the power to merge this Trust with any trust established for the benefit of substantially the same beneficiaries as the Beneficiaries of this Trust and to manage and administer the respective Trusts and Trust Estate as one Trust and Trust Estate subject to the terms and conditions of the Trust Declaration governing each of said Trusts.

6.25   General.   The Trustee shall have the power to do all the acts, to take all the proceeds, and to exercise all the rights, powers, and privileges which an absolute owner of the property would have.   The enumeration of certain powers in this Trust Declaration shall not limit the general or implied powers of the Trustee.   The Trustee shall have all additional powers that may now or hereafter be conferred by law or that may be necessary to enable the Trustee to administer the Trust in accordance with the provisions of this Trust Declaration, subject to any limitations specified in this Trust Declaration.   The Trustee shall further have the discretion to maintain reserves for depreciation and/or depletion.

Page 11 of 18 Pages
81142_81.01

003168

7.    Duties and Compensation of the Trustee.

   7.1    Allocation of Income and Principal.    The Trustee shall determine what is income and what is principal of the Trust created under this Trust Declaration and what expenses, costs, taxes, and charges of any kind whatsoever shall be charged against income and what shall be charged against principal in accordance with the applicable statutes of the State of Texas as they now exist and may from time to time be enacted, amended, or repealed.

   7.2    Relations With Trustee.    No one dealing with the Trustee need inquire concerning the validity of anything the Trustee purports to do, or need see to the application of any money paid or any property transferred to or upon the order of the Trustee.

   7.3    Compensation.    Unless such fee is waived or unless specific provision is otherwise made in the appointment of any Trustee, each Trustee shall be entitled to reasonable compensation for services as Trustee in accordance with the usual and customary charges in the community where and when such services are rendered.  The fee schedules of area trust departments prescribing fees for the same or similar services may be used to establish reasonable compensation.  A Trustee will be entitled to full reimbursement for expenses, costs, or other obligations incurred as the result of service, including attorney's, accountant's, and other professional's fees.

   7.4    Exculpation From Liability of Trustee.    The Trustee shall not be liable for any error or judgment or for any act done or omitted by the Trustee in good faith or for anything which the Trustee may in good faith do or refrain from doing in connection with this Trust.  Accordingly, the Trustee shall not incur any liability with respect to any action taken or omitted in good faith upon the advice of counsel given in respect to any questions relating to the duties and responsibilities of the Trustee under this Trust Declaration or any action taken or omitted in reliance upon any instrument, including the written advice provided for herein, not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and accuracy of any information contained therein, which the Trustee shall in good faith believe to be genuine, to have been signed and presented by a proper person or persons, and to have conformed with the provisions of this Trust Declaration. The parties acknowledge and agree that the Trustee has no obligations to the Trust or any Beneficiary to offer to the Trust any investment opportunities presented to

Page 12 of 18 Pages
B1142_81.01

003169

Trustee individually during the term of the Trust Declaration.

7.5    Indemnity.    The Trustor shall at all times release and indemnify any successor Trustee and hold such successor Trustee harmless against any and all claims, suits, actions, debts, damages, costs, charges, and expenses, including court costs and attorney's fees, and against all liabilities, losses, or damages of any nature whatsoever that the Trustee shall at any time sustain or suffer in connection with acceptance or appointment as Trustee under this Agreement or as a result or arising out of the acquisition of any assets contributing to the Trust Estate, except to the extent of any such matter arising by reason or in consequence of the fraud or bad faith of the Trustee.

7.6    Bond.    No bond shall be required of the original Trustee hereunder.    Unless any instrument appointing a successor may provide otherwise, no bond shall be required of any successor Trustee; or if a bond is required by law, no surety shall be required on such bond.

7.7    Resignation.    Any Trustee of this Trust may at any time resign with respect to such Trust, with or without cause, effective ninety (90) days after delivery of notice of resignation thereof in writing to each current Beneficiary of this Trust.    If such Beneficiary is a minor, such delivery may be made to any guardian of such minor Beneficiary or to any adult with whom such minor Beneficiary resides.

7.8    Removal of a Trustee.    The Beneficiaries who are then entitled to receive distributions of income from the Trust or distributions of income from any separate trust created by this Trust Declaration may remove any corporate Trustee then serving, the notice of removal to be delivered in writing to the corporate Trustee.    Unless this Trust Declaration or any instrument appointing a successor provides otherwise, the selection of a successor to the corporate Trustee will be made by a court of competent jurisdiction.    In the event there is more than one Beneficiary entitled to the income from the Trust, all income Beneficiaries must join in the written notice of removal.    The consent of any person who is deceased or legally disabled will not be required in meeting the unanimous consent requirements for removal.

7.9    Liability of Trustee.    The Trustee in carrying out the Trustee's powers and performing the Trustee's duties may act in the

Page 13 of 18 Pages
H1142_81.01

UNOFFICIAL COPY

003170

Trustee's discretion and shall be personally or individually liable only for fraud or acts or omissions in bad faith. No Trustee shall be liable individually or personally for any act or omission of any agent or employee of Trustee unless the Trustee shall have acted in bad faith in the selection and retention of such agent or employee.

7.10 **Accounts.** The Trustee shall each year render an account of the administration of the Trust hereunder to each living Primary Beneficiary. If a Federal Fiduciary Income Tax Return is then required for this Trust, such accounting may be made by submission of a copy of such return filed for the Trust. If no objection to an accounting has been made in writing by such Primary Beneficiary within sixty (60) days after the date of mailing of such accounting by the Trustee, it shall be deemed approved. Such approval of such account shall, as to all matters and transactions stated therein or shown thereby be final and binding upon all persons (whether in being or not) who are then or may thereafter become interested in, or entitled to share in, either the income or the principal of such Trust, provided always, however, that nothing contained in this Section 7.10 shall be deemed to give such person (or the guardian or representative) acting in conjunction with the Trustee the power to alter, amend, revoke, or terminate the Trust.

7.11 **Multiple Trustees.** In the event that there are two or more Trustees serving the Trust, all Trustees must sign any instrument transferring real property from the Trust. If the Trustees agree to do so, one Trustee acting alone may be given the primary responsibility of administration and accounting, and one Trustee alone may be authorized to deposit, transfer, and withdraw funds from any depository account held by the Trust. The authority vested in two Trustees may be exercised only by both of the Trustees; and, subject to the foregoing provisions, the authority vested in three or more trustees may be exercised by a majority of the Trustees. In the event of an action or decision by a majority, the non-consenting Trustee will not be responsible for the act of the majority.

8. **Spendthrift Provision.** The interests of each of the Beneficiaries in the principal or income of the Trust created hereunder shall not be subject to the claims of his or her creditors or creditors of others, including creditors of a spouse of a married Beneficiary, nor to legal process, and may not be voluntarily or involuntarily alienated or encumbered until actually distributed to such Beneficiary.

Page 14 of 18 Pages

H1142_81.01

003171

9. <u>Perpetuities Savings Clause</u>. Unless sooner terminated as otherwise provided in this Trust Declaration, the Trust created herein shall fully cease and terminate twenty-one (21) years after the date of the last survivor of the Trustor, the Primary Beneficiaries, and the children of each of the Primary Beneficiaries in existence as of the date of this Trust. Upon such termination, the entire principal of the Trust Estate of the Trust, together with any undistributed income therefrom, shall vest in and be distributed to the persons entitled to take under the provisions of the Trust.

10. <u>In Terrorem Provision</u>. If any person entitled to receive any interest from this Trust shall contest the validity of this Trust or any provision thereof or shall institute or join in (except as a party defendant) any proceeding to contest the validity of this Trust or to prevent any provision thereof from being carried out in accordance with its terms (regardless of whether or not such proceedings are instituted in good faith and with probable cause), then all benefits provided to such person in this Trust shall be revoked, and such benefits shall pass as if such person were not then living.

11. <u>Construction of Trust</u>.

11.1 <u>Governing Law</u>. This Trust Declaration shall be governed by the laws of the State of Texas.

11.2 <u>Severability</u>. If any part, clause, provision, or condition of this Trust Declaration is held to be void, invalid, or inoperative, such voidness, invalidity, or inoperativeness shall not affect any other clause, provision, or condition hereof; but the remainder of this Trust Declaration shall be effective as though such clause, provision, or condition had not been contained herein.

11.3 <u>Interpretative Clause</u>. As used in this Trust Declaration, the masculine, feminine, or neuter gender, and the singular or plural number shall each be deemed to include the others whenever the context so indicates.

11.4 <u>Notices</u>. All communications required to be given to the Trustor, the initial Trustee hereunder, or the Primary Beneficiaries (including notice of change of address) shall be in writing and shall be deemed to be duly given if and when personally delivered, or, if mailed via certified mail, return receipt requested, when tendered into the care and custody of the United States postal service properly addressed to as follows:

Page 15 of 18 Pages

81142_81.01

If to Trustor or Trustee:

HOLLI HARDIN FONTENOT
6002 Burning Tree Drive
Houston, Texas   77036


If to Primary Beneficiaries:

Dallas Joseph Fontenot, Jr.
6002 Burning Tree Drive
Houston, Texas   77036

Anne S. Fontenot
8526 Leader
Houston, Texas   77036

Dallas Joseph Fontenot, III
8526 Leader
Houston, Texas   77036

Michelle Anne Fontenot
8526 Leader
Houston, Texas   77036

11.5   Copies.  To the same extent as if it were the original,
       anyone may rely on a copy of this Trust Declaration
       certified by a notary public to be a true copy of this
       Trust Declaration.  Anyone may rely on any statement of
       fact certified by anyone who appears from the original
       Trust Declaration or a certified copy thereof to be a
       Trustee hereunder.

     IN WITNESS WHEREOF, I, the undersigned, HOLLI HARDIN
FONTENOT, attest that I have executed this Declaration of Trust
and that the terms thereof will bind me and my successors and
assigns, my heirs and personal representatives, and any Trustee
of this Trust.  This Trust Declaration has been signed by the
Trustor on the Effective Date.


                                        HOLLI HARDIN FONTENOT


Page 16 of 18 Pages
B1142_B1.01

003173

THE STATE OF TEXAS      §
                         §
COUNTY OF HARRIS      §

           This instrument was acknowledged before me on this the 5th day of June, 1991, by HOLLI HARDIN FONTENOT.



                    Notary Public in and for
                    The State of T E X A S

                    (Printed or Typed Name of Notary)

                    (Commission Expiration Date)

## ACCEPTANCE BY TRUSTEE

I acknowledged that I have been appointed as a Trustee of THE HOLLI ANN HARDIN TRUST NUMBER ONE, and I hereby evidence my acceptance of the office of Trustee and will hold and administer the Trust according to the provisions thereof as required by law.

           Date: _____

                HOLLI HARDIN FONTENOT

UNOFFICIAL COPY

Page 17 of 18 Pages
Z1142_81.01

003174

THE STATE OF TEXAS          §
                            §
COUNTY  OF  HARRIS          §

        This instrument was acknowledged before me on this the 5th day of June, 1991, by HOLLI HARDIN FONTENOT, TRUSTEE.



Notary Public in and for
The State of T E X A S

_____
(Printed or Typed Name of Notary)

_____
(Commission Expiration Date)

Page 18 of 18 Pages
81142_81.01

UNOFFICIAL COPY

Harris County - County Probate Court No. 1

537721

## NO. 21-CPR-036521

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN THE COUNTY COURT AT LAW |
| | § | |
| DALLAS JOSEPH FONTENOT, JR., | § | NUMBER FOUR (4) OF |
| | § | |
| DECEASED | § | FORT BEND COUNTY, TEXAS |

## NO. 21-DCV-288736

| | | |
|---|---|---|
| IN RE: | § | IN THE 240th DISTRICT COURT |
| | § | |
| | § | OF |
| HOLLI ANN HARDIN TRUST | § | |
| NUMBER ONE | § | FORT BEND COUNTY, TEXAS |

### BINDING MEDIATED SETTLEMENT AGREEMENT

The Parties – Dakota Fontenot, individually, in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in his capacity as next friend and virtual representative for S.F., a minor, Holli Ann Fontenot, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, Dallas Joseph Fontenot, III, individually, and in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One, Michelle Ann Fontenot, individually, in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in her capacity as next friend and virtual representative for A.E., a minor, and Ashley Fontenot Estrada, individually and in her capacity as a beneficiary of the Hollis Ann Hardin Trust Number One – hereto agree that all causes of action pending in cause number 21-CPR-036521 and cause number 21-DVC-288736, both of which are pending in Fort Bend County, Texas, and all related claims and/or controversies between them, whether asserted or not, known or unknown, actual or contingent, are hereby settled, in accordance with the terms of this Binding Mediated Settlement Agreement (hereinafter referred to as the "Settlement Agreement").

### A. DEFINITIONS

1.    Whenever used in this Settlement Agreement, the following terms shall have and be construed to have the following meanings:

i.    "Settlement Agreement" shall mean and refer to this Binding Mediated Settlement Agreement.

ii.    "Dakota" shall mean and refer to Dakota Fontenot, individually, in his capacity as beneficiary of the Holli Ann Hardin Trust Number One, and in his capacity as next friend and virtual representative of S.F., a minor.

1

EXHIBIT

13

iii.    "Holli" shall mean and refer to Holli Ann Fontenot, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

iv.    "Joe" shall mean and refer Dallas Joseph Fontenot, III, individually and in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

v.    "Michelle" shall mean and refer to Michelle Ann Fontenot, individually, in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in her capacity as next friend and virtual representative of A.E., a minor.

vi.    "Ashley" shall mean and refer to Ashley Fontenot Estrada, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

vii.    "Trust" shall mean and refer to the Holli Ann Hardin Trust Number One.

viii.    "Estate" shall mean and refer to the Estate of Dallas Joseph Fontenot, Jr., whose administration is pending in cause number 21-CPR-036521, in the County Court at Law Number Four (4) of Fort Bend County, Texas.

ix.    "Parties" shall mean and refer to Dakota, Holli, Joe, Michelle, and Ashley, collectively, as described in paragraphs two (ii) through six (vi) above.

x.    "Claims" shall mean and include any and all causes of action, demands, debts, obligations, duties, liens, liabilities, and theories of liabilities of whatsoever kind and nature, whether based in contract or tort, whether arising in equity or under the common law, whether by statute or regulation, whether known or unknown, whether past or present, whether contingent or matured, whether for damages relief, injunctive relief, declaratory relief, equitable relief, or any other type of relief, whether for actual damages, personal injury damages, mental anguish, liquidated damages, punitive damages, exemplary damages, compensatory damages, consequential damages, incidental damages, pecuniary damages, costs, expenses, attorneys' fees, penalties, or fines that are (is), were (was), could be, or could have been asserted as of the Effective Date, regardless of whether actually asserted, whether by claim, counterclaim, cross-claim, motion, third-party claim regarding the Estate and Trust, including but not limited to, claims, whether asserted or not, known or unknown, actual or contingent.

xi.    "Effective Date" shall mean and refer to the date that the last Party to this Settlement Agreement executes the same.

xii.    In respect to any defined term herein, the singular shall include the plural, and the plural shall include the singular.

2

## B. TERMS, CONDITIONS, AND MUTUAL CONSIDERATION

1.     The Parties acknowledge that bona fide disputes and controversies exist between them, both as to liability and the amount thereof in damages, if any, and by reason of such disputes and controversies they desire to compromise and settle all Claims and causes of action of any kind whatsoever which the Parties have or may have arising out of the transactions or occurrences which have been brought or could have been brought regarding the Trust.

2.     **THE PARTIES AGREE AND ACKNOWLEDGE THAT UPON THE EXECUTION OF THIS SETTLEMENT AGREEMENT, THIS SETTLEMENT AGREEMENT SHALL BECOME BINDING AND IRREVOCABLE.**

3.     The Parties agree that the 2013 Last Will and Testament and 2017 First Codicil to the Last Will and Testament will be admitted to probate. The Parties agree that Holli will be appointed as the Independent Executor of the Estate and agree not to object to the same.

4.     All of the Estate's assets, including all associated bank accounts, shall be distributed to Holli, save and expect the following items:

- The following items are going to be distributed to Dakota:

    o   The 2017 F150 Truck
    o   The 2013 Toyota Sequoia
    o   All interest, including all associated bank accounts, in Entertainment Marketing and Management, LP
    o   The coin collection and gold located in the backpack at the Rosenburg Office

- The following items are going to be distributed to Joe:

    o   The 2008 Honda Ridgeline
    o   One-half (1/2) of the Decedent's Tiki Mug Collection

The Parties agree to execute all documents necessary to effectuate the conveyance of all property described above the individual recipients stated in paragraph four (4).

5.     From the Rosenburg office, Holli shall be entitled to obtain:

- The remaining $150,000 in non-earmarked cash located in the backpack;
- Any and all Playboy Magazines

6.     The Parties agree that all personal property belonging to Dakota, Joe, and/or Michelle that is currently located at 10402 W. Hidden Lake Lane, Richmond, Texas 77406 shall be distributed to Dakota, Joe, and/or Michelle as appropriate. Dakota, Joe and/or Michelle shall

3

be afforded the opportunity, within thirty (30) days of the Effective Date of this Settlement Agreement, to conduct a supervised walkthrough of their personal property located at 10402 W. Hidden Lake Lane, Richmond, Texas 77406. During that time, Dakota, Joe, and/or Michelle will take photographs of their personal property which they would like to obtain. A list and accompanying photographs will be delivered to counsel for Holli of those items within fourteen (14) days of the walkthrough being completed. Holli will have fourteen (14) days to object to the items which Dakota, Joe, and/or Michelle would like to obtain. If the parties cannot reach a resolution regarding the same, Russ Jones will mediate, at an hourly rate, the division of the disputed personal property. Upon the completion and approval of a final list of items, Dakota, Joe, and/or Michelle, at their expense, shall obtain and remove the items on the approved final list of items at a mutually agreeable date and time within fourteen (14) days of the approval of the final list of items.

7.    The attorney's fees for Holli, Dakota, Joe, Michelle, and/or Ashley may be paid from the assets of the Holli Ann Hardin Trust Number One in an amount no more than $200,000.00 per side. The Parties will present their fees to Linda Goehrs, in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, for payment. The Parties agree that they will not object to the payment of the fees of any other party.

8.    The real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183 shall be distributed to Holli. Dakota, Michelle, and Joe, with Dakota as authorized representative, shall retain a right of first refusal in the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183. If Holli decides to sell or otherwise transfer the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183, Holli shall notify Dakota, Michelle, and Joe in writing and provide an appraisal completed by a certified and licensed real estate appraiser. From the date of receipt of that notice, Dakota, Michelle, and/or Joe shall have 30 days to exercise their right to purchase the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183. If exercised, Dakota, Michelle, and/or Joe shall enter into a real estate contract to purchase the property with a proposed closing date sixty (60) days from the date of receipt of the notice of sale or transfer triggering the right of first refusal. Holli is not required to sell at the appraised value if she receives offers in excess of the appraised value. If Holli receives an offer greater than the appraised value, the right of first refusal will be triggered upon delivery of the great offer to Dakota as authorized representative. The right of refusal will not renew if it is not exercised against the greatest value delivered by Holli.

9.    With regard to the further administration of the Holli Ann Hardin Trust Number One:

- The Parties agree that the assets of the Holli Ann Hardin Trust Number One shall be appraised by certified and licensed business or real estate appraisers, as is appropriate for the particular asset. Russ Jones shall select the appraisers to complete the real estate and business appraisals. The costs of the appraisals shall be borne by the Holli Ann Hardin Trust Number One.

4

- The Parties agree that, once the values on the appraisals are obtained for all Holli Ann Hardin Trust Number One assets, Holli's interest will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One in an amount equal to the twenty percent (20%) of the total value of the assets. Such purchase will occur within ninety days (90) of the completion of the valuation of the assets of the Holli Ann Hardin Trust Number One.

- The Parties agree that during the appraisal period described above, Linda Goehrs, in her capacity as Temporary Successor Trustee and/or Dakota, shall execute the necessary documents to install Dakota as an Officer and/or Director of Ice Embassy, Inc., HRF Enterprises, Inc., and Entertainment Marketing and Management, LP.

- The Parties agree that Linda Goehrs shall remain Temporary Successor Trustee of the Holli Ann Hardin Trust Number One until the closing of a sale on Holli's interest in the Holli Ann Hardin Trust Number One. At the time that Holli's interest is purchased, Linda Goehrs will resign as Temporary Successor Trustee, and Dakota, Joe, Michelle, and Ashley shall select a Successor Trustee of the Trust.

- Holli agrees to execute an assignment of interest and disclaimer of further interest in the Holli Ann Hardin Trust Number One at the time that her interest is purchased in accordance with this Settlement Agreement.

- The Parties agree that Dakota and Holli shall remain employees of Entertainment Marketing and Management, LP, and/or the business, or businesses owned by the Holli Ann Hardin Trust Number One. Holli shall be removed from the payroll on the date that her interest is purchased pursuant to this Agreement. The compensation amount that Dakota and Holli have been receiving shall remain unchanged.

- The Parties agree that Dakota and Holli shall remain on the insurance paid for by Entertainment Marketing and Management, LP, and/or the business or businesses owned by the Holli Ann Hardin Trust Number One. Holli shall be removed from the insurance plan on the date that her interest is purchased pursuant to this Agreement.

- To the extent owned by the Trust, Linda Goehrs as Temporary Successor Trustee, shall gift the horses known as Coco and Rusty to Holli.

10.    With regard to the further administration of the Dakota Trust:

- The Parties agree that the assets of the Dakota Trust shall be appraised by certified and licensed real estate appraisers. Russ Jones shall select the appraisers to complete the real estate appraisal. The cost of the appraisal shall be borne by the Dakota Trust.

5

- Upon completion of the appraisal, the total value of the assets will be compiled and Holli's interest will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One in an amount equal to eighty-five percent (85%) of the total value of the assets. Such purchase will occur within ninety days (90) of the completion of the valuation of the assets of the Dakota Trust.

- Holli agrees to execute an assignment of interest and disclaimer of further interest in the Dakota Trust at the time that her interest in purchased in accordance with this Settlement Agreement.

11. Within seven (7) days of the Effective Date of this agreement, Dakota, Joe, Michelle, and/or Ashley agree to dismiss all pending pleas, pleadings, and/or motions, with prejudice regarding the Estate and/or Trust pending in cause number 21-CPR-036521 and cause number 21-DVC-288736, both of which are pending in Fort Bend County, Texas.

12. Neither the Trust nor any entity owned, held, or possessed by the Holli Ann Hardin Trust Number One, the Dakota Trust, and/or the Estate have any claims against any of the Parties.

13. The Parties agree to release Linda Goehrs, in her capacity as Temporary Successor Trustee, for making distributions according to this Settlement Agreement which contradict the terms of the Trust Agreement for the Holli Ann Hardin Trust Number One or the Dakota Trust.

## C. RELEASES AND DISCHARGE

1. **Release of Claims by Dakota.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Dakota, on behalf of himself and all his heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Holli, Joe, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Dakota hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Dakota expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Holli, Joe, Michelle, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Dakota does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

2. **Release of Claims by Holli.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Holli, on behalf of herself and all her heirs, successors,

6

executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Joe, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Holli hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Holli expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Michelle, Joe, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Holli does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

3.     **Release of Claims by Joe.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Joe, on behalf of himself and all his heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Joe hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Joe expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Michelle, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Joe does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

4.     **Release of Claims by Michelle.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Michelle, on behalf of herself and all her heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Joe, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Michelle hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Michelle expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind

7

known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Joe, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Michelle does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

5.    **Release of Claims by Ashley.**  For and in consideration of the mutual promises, covenants, and agreements stated herein, Ashley, on behalf of herself and all her heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Joe, Michelle, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Ashley hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Ashley expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Joe, and Michelle. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Ashley does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

## D. REPRESENTATIONS AND WARRANTIES

1.    **Representations and Warranties.** Each of the Parties hereto represents and warrants to the other that:

a.    They are adequately represented by competent counsel in connection with the execution and delivery of this Settlement Agreement and/or had an opportunity to retain counsel in connection with this Settlement Agreement;

b.    In executing this Settlement Agreement, they relied upon the Party's own judgment and any advice it received from its own attorneys;

c.    They were not induced to sign or execute this Settlement Agreement by promises, omissions, agreements, or representations not expressly stated in this Settlement Agreement;

d.    They freely and willingly executed this Settlement Agreement and expressly disclaims reliance upon any facts, promises, statements made or not made, undertakings, or representations made by any person or entity

8

prior to the Effective Date of this Settlement Agreement except as specifically enumerated herein;

e. They consent that this Settlement Agreement was not procured, obtained, or induced by improper conduct or undue influence;

f. After an opportunity to consult with an attorney concerning the matters made subject of this Settlement Agreement, and after reviewing this Settlement Agreement, they agree this Settlement Agreement is fair, reasonable, and supported by good, valuable, and adequate consideration; and

g. They understand and agree to the terms and conditions of this Settlement Agreement, which contains the entire agreement between the Parties relating to the matters made the subject of this Settlement Agreement.

2.    **Capacity and Authority.** Each of the Parties hereto represents and warrants to the other that the person signing this Settlement Agreement in a representative capacity has the requisite authority and consent to execute this Settlement Agreement on behalf of the Party for whom he or she has executed this Settlement Agreement, and that this Settlement Agreement is binding upon the Party for whom he or she has executed this Settlement Agreement and upon such Party's successors and assigns.

3.    **Assignment of Claims.** Each of the Parties hereto represents and warrants to the other that it has not transferred, assigned, or otherwise conveyed, excepting any interest held by counsel, in whole or in part, its respective interest in the Claims at issue and that it is the owner and holder thereof. Each of the Parties further represents and warrants that, aside from any interest held by counsel, it is the only holder of the Claims being released and that no other person or entity owns, or has any interest in, any of the Claims being released. Despite any interest held by counsel, this Settlement Agreement applies to the entirety of each of the Parties' Claims.

4.    **Cooperation in Execution of Further Documents.** Each of the Parties expressly agrees to execute any other documents reasonably necessary to effectuate the terms, purpose, and intent of this Settlement Agreement.

## E. MISCELLANEOUS PROVISIONS

1.    **Invalidity.** In the event any one or more of the provisions of this Settlement Agreement shall, for any reason, be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Settlement Agreement.

2.    **Entire Agreement.** This Settlement Agreement reflects the final and complete agreement between the parties concerning the matters made subject of this Settlement Agreement and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the Parties. There are no unwritten oral agreements between the Parties. The Parties expressly

9

acknowledge that any rights, duties, or obligations, whether contractual or otherwise, owed by or between the Parties prior to the effective date of this Settlement Agreement are terminated as of the Effective Date of this Settlement Agreement and the only rights, duties, or obligations owed by or between the Parties from this point forward shall be those set forth in this Settlement Agreement.

3.    **Governing Law and Venue.** The validity, effect, and construction of this Settlement Agreement shall be governed by the laws of the State of Texas. Venue for any cause of action, controversy, or dispute regarding this Settlement Agreement or the subject matter hereof shall be proper only in the state courts of Fort Bend County, Texas.

4.    **Amendment.** This Settlement Agreement may not be amended, modified, waived, or terminated unless such is done in a writing signed by all the Parties.

5.    **Construction of Agreement.** This Settlement Agreement shall not be construed in favor of or against any Party on the basis that the Party did or did not author this Settlement Agreement or any attachment related to it. It is intended that this Settlement Agreement shall be comprehensive in nature and shall be construed liberally to affect its purposes.

6.    **Titles or Headings.** All titles or headings used in this Settlement Agreement are used only for the convenience of the Parties and shall not be construed to have any effect or meaning with respect to the other content of the Settlement Agreement, such other content being controlling as to the Settlement Agreement of the Parties.

7.    **Costs and Attorneys' Fees.** Each party shall bear its own costs and attorneys' fees in relation to the claims and the negotiation and preparation of this Settlement Agreement, subject to the attorney's fees provisions within this Settlement Agreement.

8.    **Waiver.** The failure of any of the Parties to enforce, at any time, any provision of this Settlement Agreement shall not be construed to be a waiver of such provision, nor in any way affect the validity of this Settlement Agreement or any part thereof or any right of any Party thereafter to enforce each and every provision. No waiver of any breach of this Settlement Agreement shall be held to constitute a waiver of any other breach.

9.    **Binding Agreement.** This Settlement Agreement is binding on the Parties hereto and not subject to revocation, repudiation, or withdrawal of consent, even if one or more of them shall become debtors in a bankruptcy proceeding. This binding effect is an integral part of this Agreement.

10.    **Execution of Agreement.** This Settlement Agreement may be executed in a number of identical counterparts, each of which shall be deemed an original for all purposes. A fax signature or a copy of an original signature shall constitute an original signature for purposes of this Settlement Agreement. This Settlement Agreement shall be valid only if fully executed by all Parties and/or their representatives as agreed to herein. If not fully executed by all Parties, this Settlement Agreement shall be null and void and of no effect.

10

11.    **Future Disputes.** In the event that there are future disputes, disagreements, and/or conflicts regarding the terms and/or implementation of any terms of this Settlement Agreement, the Parties agree to return to Russ Jones for mediation regarding the dispute. The Parties agree to return to mediation prior to filing any litigation regarding a breach of this settlement agreement or these terms. If a Party refuses to return to mediation, the remaining parties are permitted to file litigation without returning to mediation. Should further litigation be filed regarding a breach of the agreement, the prevailing party shall be entitled to an award of attorney's fees as determined by a jury or judge.

12.    **Indemnity.** Each party shall indemnify the other parties for all claims made by, through, or under the indemnifying party.

AGREED TO BY ALL PARTIES AS EVIDENCED BY THEIR SIGNATURE BELOW ON THIS THE 7th DAY OF JANUARY, 2022.

_____
Dakota Fontenot, in all capacities

_____
Holli Ann Fontenot, in all capacities

_____
Dallas Joseph Fontenot, III, in all capacities

_____
Michelle Ann Fontenot, in all capacities

_____
Ashley Fontenot Estrada, in all capacities

_____
Christopher Burt
*Counsel for Dakota Fontenot*

11

11.    **Future Disputes.** In the event that there are future disputes, disagreements, and/or conflicts regarding the terms and/or implementation of any terms of this Settlement Agreement, the Parties agree to return to Russ Jones for mediation regarding the dispute. The Parties agree to return to mediation prior to filing any litigation regarding a breach of this settlement agreement or these terms. If a Party refuses to return to mediation, the remaining parties are permitted to file litigation without returning to mediation. Should further litigation be filed regarding a breach of the agreement, the prevailing party shall be entitled to an award of attorney's fees as determined by a jury or judge.

12.    **Indemnity.** Each party shall indemnify the other parties for all claims made by, through, or under the indemnifying party.

AGREED TO BY ALL PARTIES AS EVIDENCED BY THEIR SIGNATURE BELOW ON THIS THE 7th DAY OF JANUARY, 2022.

_____
Dakota Fontenot, in all capacities

_____
Holli Ann Fontenot, in all capacities

**Dallas Joseph Fontenot III**
_____
Dallas Joseph Fontenot, III, in all capacities

**Michelle Ann Fontenot**
_____
Michelle Ann Fontenot, in all capacities

**Ashley Fontenot Estrada**
_____
Ashley Fontenot Estrada, in all capacities

_____
Christopher Burt
*Counsel for Dakota Fontenot*

11

Steven Mendel
*Counsel for Holli Ann Fontenot*

Kenneth Sumner
*Counsel for Dallas Joseph Fontenot, III,*
*Michelle Ann Fontenot, and Ashley Estrada*

UNOFFICIAL COPY

12

Steven Mendel
*Counsel for Holli Ann Fontenot*

# Kenneth E. Sumner, Jr.

Kenneth Sumner
*Counsel for Dallas Joseph Fontenot, III,*
*Michelle Ann Fontenot, and Ashley Estrada*

Signature: *Dallas Joseph Fontenot III*
Dallas Joseph Fontenot III (Jan 7, 2022 19:33 CST)
Email: djoef3@hotmail.com

Signature: ~~Ashley Fontenot Estrada~~
Ashley Fontenot Estrada (Jan 7, 2022 19:38 CST)
Email: ashleyafontenot@gmail.com

Signature: ~~Michelle Fontenot~~
Michelle Fontenot (Jan 7, 2022 19:36 CST)
Email: mannefontenot@gmail.com

Signature: *Kenneth C. Sumner, Jr.*
Email: ksumner@romanosumner.com

12

Electronically Filed
11/23/2021 6:35 PM
Laura Richard
County Clerk
Fort Bend County, Texas

NO. 21-CPR-036521

| | | |
|---|---|---|
| IN RE: ESTATE OF | § | IN THE COUNTY COURT |
| DALLAS JOSEPH FONTENOT, JR. | § | AT LAW NUMBER 4 OF |
| DECEASED | § | FORT BEND COUNTY, TEXAS |

**INVENTORY AND LIST OF CLAIMS**

DATE OF DEATH:    September 3, 2021

GUS TAMBORELLO, TEMPORARY ADMINISTRATOR OF THE ESTATE OF DALLAS JOSEPH FONTENOT, JR., DECEASED files this Inventory and List of Claims of all property belonging to the probate estate of DALLAS JOSEPH FONTENOT, JR. ("Decedent") which has come to his possession or knowledge, together with a List of Claims due and owing to the estate.

### Summary of Assets

| | |
|---|---|
| Cash - See Schedule "A" | $  11,942.50 |
| Other Personal Property - See Schedule "B" | 299,820.00 |
| Real Estate - See Schedule "C" | 945,485.00 |
| **TOTAL VALUE OF DECEDENT'S ESTATE** | **$1,257,247.50** |

### List of Claims Belonging to Estate

There are no known claims due and owing to the Decedent's estate. However, Administrator is continuing to investigate the issue.

I, GUS TAMBORELLO, TEMPORARY ADMINISTRATOR OF THE ESTATE OF DALLAS JOSEPH FONTENOT, JR., DECEASED , do solemnly swear that this Inventory and List of Claims of the Estate of the Decedent is a full and complete Inventory and List of the property and claims of said probate estate that have come to my knowledge or possession, and Administrator requests that the Court approve the Inventory and List of Claims.

**EXHIBIT**

**14**

GUS TAMBORELLO, TEMPORARY ADMINISTRATOR OF THE ESTATE OF DALLAS JOSEPH FONTENOT, JR., DECEASED

SUBSCRIBED AND SWORN TO BEFORE ME, on this __23__$^{rd}$ day of November, 2021.



ANN ZIENTEK
Notary Public, State of Texas
Comm. Expires 02-13-2025
Notary ID 12237974

Notary Public in and for
the State of Texas

OF COUNSEL:

Gus G. Tamborello
S.B.N. 19632000
Gus G. Tamborello, P.C.
2900 Weslayan, Suite 150
Houston, Texas 77027
(713) 659-7777
(713) 659-7780 (fax)
Gus@Tamborellolaw.com

ATTORNEY FOR GUS TAMBORELLO,
TEMPORARY ADMINISTRATOR OF THE
ESTATE OF DALLAS JOSEPH FONTENOT, JR., DECEASED

**ESTATE OF DALLAS JOSEPH FONTENOT, JR., DECEASED**
**SCHEDULE "A"**
**CASH**

**DESCRIPTION**                                    **DATE OF DEATH VALUE**

A.    *Community Property*

Cash on hand                                        $ 23,885.00[1]

    Total Community Cash                        $ 23,885.00

    Value of Decedent's undivided ½ interest    $ 11,942.50

B.    *Separate Property*

None

**TOTAL CASH**                                     **$ 11,942.50[2]**

---

[1] This was cash turned over to the administrator by Dakota Fontenot, who stated he retrieved it from the Decedent's residence.

[2] Other cash assets are in bank accounts under the names of various corporations. The stock of two of the corporations appears to be owned by the Decedent. The cash in those entities is addressed in Schedule "C" as part of the value of the Decedent's interest in those entities. The other two entities are owned by a trust and are, therefore, not part of the Decedent's probate estate.

**ESTATE OF DALLAS JOSEPH FONTENOT, JR., DECEASED**
**SCHEDULE "B"**
**OTHER PERSONAL PROPERTY**

**DESCRIPTION**                                        **DATE OF DEATH VALUE**

*A.*     *Community Property*

(i)      Motor Vehicles

1.       2020 Ford F350 Super
         VIN 1FT8W3BT6LED48824
         License Plate: NKT1213
         (Estimated Value per kbb.com)                  $ 52,000.00

2.       2010 Toyota Sequoia
         VIN 5TDDW5G10AS027256
         License Plate: HTX4463
         (Estimated Value per kbb.com)                  $18,000.00[3]

3.       1999 Ford Pick up
         VIN 1FTWW33S1XEC80483
         License Plate: CNG4278
         (Estimated Value per kbb.com)                  14,000.00

4.       2018 Toyota Sequoia
         VIN 5TDYY5G165JS070155
         (Estimated Value per kbb.com)                  50,000.00[4]

5.       2017 Ford F150
         VIN 1FTEW1EF4HFC13310
         (Estimated Value per kbb.com)                  32,000.00[5]

6.       2008 Honda Ridgeline Pickup 4WD
         VIN 2HJYK165X8H507657
         (Estimated Value in Las Vegas per cars.com)    20,000.00[6]

---

[3] This vehicle appears to be titled in the name of Ice Embassy, Inc. and the Decedent.

[4] This vehicle is being driven by the Decedent's spouse, Holli Fontenot.

[5] This vehicle is being driven by the Decedent's son, Dakota James Fontenot. Title appears to be in the name of both the Decedent and Dakota James Fontenot.

[6] This vehicle is apparently located at Decedent's residence in Las Vegas, Nevada.

## ESTATE OF DALLAS JOSEPH FONTENOT, JR., DECEASED
## SCHEDULE "B"
## OTHER PERSONAL PROPERTY (CONTINUED)

**DESCRIPTION**                                           **DATE OF DEATH VALUE**

7.    2013 Toyota Sequoia 4D 4X2 Platinum V8
      VIN 5TDYY5G12DS044222
      License Plate: BKJ3504
      (Estimated Value in Las Vegas per cargurus.com)    $21,000.00[7]

8.    2003 Ford Thunderbird
      VIN 1FAHP62A83Y103279
      License Plate: BS1L744
      (Estimated Value per cars.com)                     17,000.00

(ii)   Manufactured Homes

1.    Mobile Home
      GASTON-FULSHEAR CORP,
      SERIAL # BRK001554TXA & B,
      TITLE # MH00356826,
      LABEL # PFS1071292 & 3,
      MODEL 94CLS30603AH10,
      MH ONLY ON #0490
      (Market value for FCAD)                            39,340.00

(iii)  Trailers

1.    2002 Sundowner Horse Trailer
      VIN 13SVE252221VB4916
      License: FNXX31
      (Average Retail per nadaguides.com)`               20,000.00

2.    2003 Haulmark box Trailer
      VIN 16HGB22253G051189
      License: 25576C
      (Estimated value per smartrvguide.com)             5,000.00

3.    1995 Goos Livestock Trailer
      VIN 16GSH6C21SB047946
      License: DMCP99

---

[7] This vehicle is apparently located at Decedent's residence in Las Vegas, Nevada and is registered in the name of Decedent and Ice Embassy, Inc.

COPY UNOFFICIAL UNOFFICIAL

## ESTATE OF DALLAS JOSEPH FONTENOT, JR., DECEASED
## SCHEDULE "B"
## OTHER PERSONAL PROPERTY (CONTINUED)

| DESCRIPTION | DATE OF DEATH VALUE |
|---|---|
| (titled in the name of Circle 8 Ranch) (Estimated value per horsetrailerworld.com) | $4,300.00 |
| 4. 1996 FW Utility Trailer VIN 1C9G12022T1288119 License: CNPG10 (titled in the name of Circle 8 Ranch) (Estimated value per smartrvguide.com) | 2,500.00 |
| 5. 2006 Big Tex Utility Trailer VIN 16VAX121762A24988 License: FDKC37 (titled in the name of Circle 8 Ranch) (Estimated value internet search) | 3,500.00 |
| (iv) Farming Equipment | |
| 1. Misc. Farming Equipment (Estimated, not yet appraised) | 35,000.00 |
| 2. John Deere Tractor (Based upon remaining balance due on note) | 25,000.00 |
| (v) Livestock/Animals | |
| Horse, Various cattle | 1,000.00 |
| (vi) Misc. Furnishings and Personal Effects (Estimated, not yet appraised) | 50,000.00 |
| (vii) Misc. Collectibles (Estimated, not yet appraised) | 100,000.00 |

UNOFFICIAL Copy

**ESTATE OF DALLAS JOSEPH FONTENOT, JR., DECEASED**
**SCHEDULE "B"**
**OTHER PERSONAL PROPERTY (CONTINUED)**

**DESCRIPTION**                                    **DATE OF DEATH VALUE**

(viii)   Business Interests

1.       Entertainment Marketing and Management, Ltd
         General Partner: Showbizz, Inc.[8]
         (a Texas domestic limited partnership formed 3/29/1995)
         Limited Partners:[9]
         BFD #1, Inc., a Nevada Corporation
         BFD #2, Inc., a Nevada Corporation
         BFD #3, Inc., a Nevada Corporation
         BFD #4, Inc., a Nevada Corporation
         Created: March 29, 1985
         (Value based upon approx. value of assets)        $10,000.00

2.       Showbizz, Inc.
         (a Texas corporation formed on 2/6/1992)
         (serves as general partner of Entertainment Marketing
         and Management, Ltd)
         (Decedent appears to be sole shareholder)
         (Value based upon approx. value of assets)         $0.00

3.       The Lucky Dog Pub & Grille, LLC
         Director: Dallas Fontenot
         Formed September 10, 2015
         Shareholder: Decedent (100% ownership)
         (Value based upon approx. value of assets)         80,000.00

4.       Naughty Leprechaun Tavern, LLC
         (a Texas limited liability corporation formed
          on 9/10/2015)
         Shareholder: Decedent (100%)
         (Value based upon information obtained to date)     0.00

              Total Community Personal Property     $599,640.00

_____

[8] This entity is apparently owned by Decedent. Decedent was the President of the entity.

[9] The BFD entities are believed to be dissolved for failure to file with the Nevada Secretary of State. It is also believed that the Decedent owned the stock in those entities. Decedent was also President of these entities.

ESTATE OF DALLAS JOSEPH FONTENOT, JR., DECEASED
SCHEDULE "B"
OTHER PERSONAL PROPERTY (CONTINUED)

DESCRIPTION                                      DATE OF DEATH VALUE


    Value of Decedent's undivided ½ interest    $299,820.00

B.     *Separate Property*

    None.

    TOTAL OTHER PERSONAL PROPERTY    $ 299,820.00

### ESTATE OF DALLAS JOSEPH FONTENOT, JR., DECEASED
### SCHEDULE "C"
### REAL ESTATE

| DESCRIPTION | DATE OF DEATH VALUE |
|---|---|

*A.  Community Property*

1.  Gaston-Fulshear Corp, Lots 42-A, 42-B,
    43, 44, 52, 53 (part), and 55, Tract 40,
    20.478 acres located in Richmond, Fort
    Bend County, Texas (address is listed as
    ███████████████████Richmond,
    Texas 77406
    (2021 Market Value per FBCAD)                  $ 1,034,640.00

    Gaston-Fulshear Corp, Lots 52 and 53 (part),
    2.0 acres located in Richmond, Fort
    Bend County, Texas (this property is
    contiguous to the 20.478 acre tract)
    (2021 Market Value per FBCAD)                  $   643,170.00

    Gaston-Fulshear Corp, Lot 10-B, Tract 40,
    3.0 acres located in Richmond, Fort Bend
    County, Texas (this property is located across
    the street from the back side of the 20.478
    acre tract)
    (2021 Market Value per FBCAD)                  $   213,160.00

            Total Community Real Estate           $ 1,890,970.00

            Value of Decedent's undivided ½ interest   $   945,485.00

*B.  Separate Property*

None.

**TOTAL REAL ESTATE**                             **$ 945,485.00**[10]

---

[10] Other real property which may be associated with the Decedent are titled in corporations which are owned by trusts and are not part of the Decedent's probate estate. In addition, there is real property in Las Vegas, Nevada which is governed by the State of Nevada and is not under this court's jurisdiction. Administrator currently does not have any authority over the Nevada real estate.

UNOFFICIAL COPY

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Gus Tamborello
Bar No. 19632000
gus@tamborellolaw.com
Envelope ID: 59449914
Status as of 11/29/2021 8:42 AM CST

Associated Case Party: Dakota Fontenot

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Barbara Light | 24109472 | blight@boyarmiller.com | 11/23/2021 6:35:06 PM | SENT |
| Christopher CBurt | | cburt@boyarmiller.com | 11/23/2021 6:35:06 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Debra TPellegrin | | dpellegrin@boyarmiller.com | 11/23/2021 6:35:06 PM | SENT |
| Stephen A.Mendel | | info@mendellawfirm.com | 11/23/2021 6:35:06 PM | SENT |
| Kenneth E.Sumner, Jr. | | ksumner@romanosumner.com | 11/23/2021 6:35:06 PM | SENT |
| Lindsey Hebert | | lhebert@romanosumner.com | 11/23/2021 6:35:06 PM | SENT |

Associated Case Party: HolliHFontenot

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| MENDEL LAWFIRM | | info@mendellawfirm.com | 11/23/2021 6:35:06 PM | SENT |

Associated Case Party: GusGTamborello

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Gus G. Tamborello | 19632000 | gus@tamborellolaw.com | 11/23/2021 6:35:06 PM | SENT |

UNOFFICIAL COPY

Electronically Filed
11/23/2021 6:35 PM
Laura Richard
County Clerk
Fort Bend County, Texas

537721

NO. 21-CPR-036521

| | | |
|---|---|---|
| IN RE: ESTATE OF | § | IN THE COUNTY COURT |
| DALLAS JOSEPH FONTENOT, JR. | § | AT LAW NUMBER 4 OF |
| DECEASED | § | FORT BEND COUNTY, TEXAS |

## ORDER APPROVING INVENTORY AND LIST OF CLAIMS

On this day the Court considered the Inventory and List of Claims of the Estate of

DALLAS JOSEPH FONTENOT, JR., Deceased, filed herein by GUS TAMBORELLO,

TEMPORARY ADMINISTRATOR OF THE ESTATE OF DALLAS JOSEPH FONTENOT,

JR., DECEASED, and the Court, having examined the same, is satisfied that it should in all

respects be approved. There having been no objections made thereto, it is therefore

ORDERED, ADJUDGED, and DECREED that the Inventory and List of Claims filed by

GUS TAMBORELLO, TEMPORARY ADMINISTRATOR OF THE ESTATE OF DALLAS

JOSEPH FONTENOT, JR., DECEASED is APPROVED.

SIGNED this __1/25/2022__

_____
JUDGE PRESIDING

APPROVED AS TO FORM:

/s/ Gus G. Tamborello

Gus G. Tamborello
S.B.N. 19632000
Gus G. Tamborello, P.C.
2900 Weslayan, Suite 150
Houston, Texas 77027
(713) 659-7777
(713) 659-7780 (fax)
Gus@Tamborellolaw.com

ATTORNEY FOR ADMINISTRATOR

Filed: 01/26/2022 08:13:30
Laura Richard
County Clerk
Fort Bend County, Texas
Hlipala, Sarah

EXHIBIT

15

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Gus Tamborello
Bar No. 19632000
gus@tamborellolaw.com
Envelope ID: 59449914
Status as of 11/29/2021 8:42 AM CST

Associated Case Party: Dakota Fontenot

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Christopher CBurt | | cburt@boyarmiller.com | 11/23/2021 6:35:06 PM | SENT |
| Barbara Light | 24109472 | blight@boyarmiller.com | 11/23/2021 6:35:06 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Debra TPellegrin | | dpellegrin@boyarmiller.com | 11/23/2021 6:35:06 PM | SENT |
| Stephen A.Mendel | | info@mendellawfirm.com | 11/23/2021 6:35:06 PM | SENT |
| Kenneth E.Sumner, Jr. | | ksumner@romanosumner.com | 11/23/2021 6:35:06 PM | SENT |
| Lindsey Hebert | | lhebert@romanosumner.com | 11/23/2021 6:35:06 PM | SENT |

Associated Case Party: HolliHFontenot

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| MENDEL LAWFIRM | | info@mendellawfirm.com | 11/23/2021 6:35:06 PM | SENT |

Associated Case Party: GusGTamborello

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Gus G. Tamborello | 19632000 | gus@tamborellolaw.com | 11/23/2021 6:35:06 PM | SENT |

537721

## MANAGEMENT AGREEMENT

THIS MANAGEMENT AGREEMENT (this "Agreement") is made effective January 1, 2024 (the "Effective Date"), between ENTERTAINMENT MARKETING & MANAGEMENT, LTD., a Texas limited partnership ("Manager"), and ICE EMBASSY, INC. d/b/a THE COLORADO BAR AND GRILL, a Texas corporation (the "Owner").

## RECITALS

A. The Owner leases space from HFR ENTERPRISES, INC., a Texas corporation ("HFR") where it operates a sexually oriented business, bar, and restaurant (the "Club") located at the municipal address: 6710 Southwest Fwy, Houston, Texas 77074.

B. The Owner's corporate records and contracts were previously maintained by or on behalf of Dallas Joseph Fontenot, Jr. ("Mr. Fontenot").

C. Mr. Fontenot died on September 3, 2021, and since such date, neither corporate records of the Owner, nor records of any contract or agreement relating to the management of the Club have been located after a diligent search by his heirs and authorized affiliates.

D. On or about the Effective Date, the Owner previously retained Manager to manage and operate the Club, which such relationship may have been memorialized pursuant to a written or oral agreement, which neither the Owner, nor the Manager have been able to locate (the "Original Agreement").

E. The Owner desires to continue to retain Manager to manage and operate the Club, and provide support services to the Owner, on the terms and conditions set forth in this Agreement. Any reference to the Owner throughout this Agreement shall mean and include any and all of the Owner's designated affiliates that may directly or indirectly control or own an interest in the Club.

F. Manager is experienced in bar operations and management and has the staff, expertise and capability to perform the terms of this Agreement.

G. The Owner and the Manager desire that this Agreement amend, supersede, and replace the Original Agreement, and further desire that their relationship be governed in accordance with the terms and provisions of this Agreement effective as of the Effective Date.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements contained in this Agreement and other good and valuable consideration not recited in this Agreement, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Engagement and Authorization.

1.01 Engagement As Manager. The Owner hereby engages Manager as its sole and exclusive agent to supervise, manage, direct and control the operations of the Club, in accordance with the terms

1

UNOFFICIAL COPY

EXHIBIT
16



and conditions hereof. Manager hereby accepts such engagement as the manager of the Club during the Term, as hereafter defined, of this Agreement. The parties acknowledge such engagement does not include alcoholic beverage operations at the Club. In accordance with applicable law, Owner, as the holder of the TABC permit for the Club, maintains control over the purchase, sale, and service of alcoholic beverages at the Club.

1.02 Grant of Authority. The Owner hereby grants Manager the power and authority to take all actions and to do all things reasonably required to perform the obligations of the Manager under this Agreement. For the avoidance of doubt, Manager shall not have the power and authority to (i) borrow any money or execute any promissory note, bill of exchange or other credit obligation, mortgage or encumbrance, or pledge the credit of the Owner without, in each case, the prior written consent of the Owner, (ii) file, prosecute, defend or settle any legal or regulatory proceedings involving the Owner or the Club without the Owner's prior written approval, or (iii) act on behalf of, or hold itself out as having authority to act on behalf of, the Owner in any manner which is beyond the scope of the terms of this Agreement. In the performance of this Agreement, Manager shall act as the agent of the Owner; the creation of this agency shall not in any manner relieve the Owner of its duties or obligations under contract or law.

2. Manager's Duties. During the Term, Manager shall provide the Owner with the following specific services (hereinafter collectively referred to as the "Services"), at the Club:

2.01 Club Management. Manager shall oversee the day-to-day management of the Club, which responsibilities shall include: (a) the hiring, training and supervising of all Club employees, as more particularly described below; (b) the maintenance of business files and records; (c) the performance of general administrative functions; and (d) the preparation of the Club's monthly activities, as more particularly described below. In addition, Manager shall manage, operate, and maintain the Club in such a manner that the Club is at all times in substantial compliance with: (i) all zoning and use restrictions, fire codes, building codes, and other requirements issued by any governmental authority; (ii) all licenses, permits and other authorizations required in the operation of the Club; (iii) any policy of insurance covering the Club; (iv) that certain Real Estate Lease between the Owner and HFR (the "Club Lease") and that certain Sublease between the Owner and HFR (the "Parking Lot Lease" and collectively with the Club Lease, the "Leases"), to avoid any default by the Owner thereunder; (v) the negotiation of inventory purchase contracts with vendors, including combining purchasing quantity of Manager and its franchisee and/or licensees with the purchasing quantity of the Owner, its affiliates and franchisee and/or licensees in order to obtain any vendor discounts, rebates or refunds; and (vi) all applicable laws and regulations. With the written consent of the Owner, Manager may in the name of itself, the Owner or both, take such appropriate action as necessary to challenge to protest the validity or application of any legal requirement, tax or other imposition against the Club. The Owner agrees to execute and deliver any documents which Manager and the Owner deem reasonably necessary and appropriate in connection with such action.

2.02 Reimbursement of Expenses

2.

HAH 000194

Owner shall reimburse Manager for all expenses incurred by Manager in connection with this Agreement or otherwise incurred in connection with the Club. Such expenses shall be reimbursed on demand, subject to reconciliation on a monthly basis.

2.03 – 2.04 Intentionally Blank

2.05 Financial Reports.

(a) Manager shall maintain full and adequate records and books of account and such other records as might be appropriate to reflect the results of operation of the Club, and which shall reflect all revenues and expenditures and all other receipts and disbursements relating to each of the Club. All books and records will be kept in accordance with generally accepted accounting principles ("GAAP") and shall be the property of the Owner and the Owner will have access thereto at all reasonable times.

(b) Within fifteen (15) days after the end of each month, Manager shall prepare and furnish to the Owner the following information for the preceding calendar month for each of the Club:

(i) Financial Statements. An accrual basis balance sheet in reasonable detail, together with a reasonably detailed accrual basis profit and loss statement for such preceding calendar month next preceding and with a cumulative calendar year accrual basis profit and loss statement to date, and a statement of cash flows for each monthly and cumulative period for which a profit and loss statement is prepared;

(ii) Supporting Data. At the Owner's request, copies of the following: (a) all checks, bank statements, bank deposit slips and bank reconciliations; (b) detailed cash receipts and disbursement records; (c) copies of all invoices; (d) supporting documentation for payroll, payroll taxes and employee benefits; and (e) such other information as the Owner might reasonably request;

(iii) Other Reports. Such other reports and documents as might be reasonably requested by the Owner from time to time (including, without implied limitation, certificates of compliance and other instruments required in connection with any bond financing relating to the Club); and

(iv) Management Fee Invoice. An invoice for the Management Fee (defined below) for such preceding calendar month and any other preceding calendar month for which the Management Fee is outstanding, based on the Gross Revenues set forth in the applicable financial statements.

(c) Within forty-five (45) days after the end of each calendar year, Manager shall furnish to the Owner year-end financial statements for the Club (including a balance sheet, income statement and statement of cashflows) which statements shall be unaudited and shall be prepared in accordance with GAAP. The Owner may engage an independent certified public accounting firm to provide audited annual financial statements, which cost shall be an operating expense of the Club. Manager shall cooperate in all respects with such accountant in the preparation of such statements, including the delivery of any financial information generated by Manager pursuant to the terms of this Agreement and reasonably required by the Owner's accountant to prepare such audited financial statements.

3

HAH 000195

(d) The Owner, shall have the right and privilege of examining and inspecting the books and records (including audit rights) during customary business hours following reasonable advance notice to Manager. Upon the termination of this Agreement, all such books and records shall be turned over to the Owner to insure the orderly continuance of the operation of the Club. If an audit or inspection of the books reveals that the calculation of Gross Revenues was miscalculated by Manager such that the fees paid out of the operating funds of the Club by the Owner pursuant to this Agreement varied by five percent (5%) or more from the amount provided by Manager in the statements delivered pursuant to this Agreement, then Manager will reimburse the Owner for all inspection and audit costs (including, without limitation, reasonable travel, lodging, meals, salaries and other expenses of the inspecting or auditing personnel) in addition to any adjustment or reimbursement for fees owing pursuant to this Agreement.

2.06 Human Resources. Manager shall hire, train, supervise, and pay all of its own employees and other personnel ("Employees") necessary to fulfill its obligations hereunder. All Employees shall be the employees or independent contractors of Manager, not the Owner. Manager may discharge any Employee in its discretion and pursuant to applicable state and federal law. Manager shall cause Employees to be covered by workers' compensation insurance and such other insurance as is now or hereafter required by law. Manager shall maintain all personnel and payroll records and manage all Employee benefits programs, including, but not limited to, health insurance, dental insurance, short and long term disability plans, life insurance, workers' compensation, cafeteria plans, vacation plans, sick leave and employee policy manuals in accordance with this Agreement, may draw down from the Gross Revenues (defined herein), all costs and expenses incurred in connection with all on and offsite Employees, including, without limitation, wages, salaries, on-site staff, reasonable bonuses, contract labor, commissions, fringe benefits, employee benefits, recruitment costs, workers' compensation and unemployment insurance premiums, payroll taxes, vacation and sick leave (but excluding any such costs or expenses and overhead of any offsite personnel). In addition, Manager shall maintain businesslike relations with the customers of the Club and all customer complaints will be received, logged and resolved in a systematic fashion. Complaints of a serious nature will be reported to the Owner with appropriate recommendations from the Manager.

2.07 Accounting. Manager shall perform general accounting functions for the operation of the Club, including, without limitation: cash management and banking relations; budgeting, forecasting and financial statement reporting; the preparation and maintenance of records necessary to produce financial statements; the preparation of financial statements in accordance with this Agreement; the preparation, execution, and filing, punctually, when due all forms, reports, and returns required by law relating to the employment of Employees or to the management, operation, occupancy, maintenance or use of the Club, including without limitation any sales or use tax forms, reports, and income tax returns; audit support; and any other general accounting function as requested by the Owner. In addition, Manager shall pay punctually when due any sales, use, employment or other taxes relating to the operation of the Club.

2.08 Marketing. Manager will devise a strategy for and assist in the implementation, at the Owner's sole costs and expense, of a marketing program to advertise and promote the business of the Club. Manager may cause the Club to participate in such marketing plans, oral and written presentations,

4

HAH 000196

promotional materials, public relations, media relations and any other general marketing functions to promote the Club.

2.09 <u>Point-of-Sale Management Information System</u>. Manager shall operate, administer, maintain, repair and upgrade, at the Owner's expense, the existing point-of-sale management information system for tracking purchases and inventory of each of the Club. Manager shall provide to the Owner an automated, monthly point-of-sale report on the first day of each calendar month.

2.10 <u>Manager Personnel</u>. Owner understands and agrees that Manager may hire or contract with outside contractors for some of its responsibilities hereunder.

2.11 <u>Deletion of Specified Services</u>. Any time during the Term of this Agreement, upon prior written notice by the Owner to Manager, the Owner may delete any specified service from the Services to be provided to the Club.

2.12. <u>Term</u>. Unless sooner terminated as hereafter provided, this Agreement shall be effective for a period of one (1) year commencing on the Effective Date of this Agreement (the "Term"), which Term shall be automatically extended for additional periods of one (1) year each, unless on or before thirty (30) days prior to the expiration of the Term, as extended, either party provides written notice to the other party not to so extend the Term.

3.01 <u>Events for Termination</u>.

(a) The Owner may terminate this Agreement, at any time and for any reason by providing Manager at least thirty (30) days' prior written notice.

(b) In addition, the Owner, at its sole option, may terminate this Agreement if any of the following events of default occur:

(i) The filing of a voluntary petition in bankruptcy or insolvency or a petition for reorganization under any bankruptcy law by Manager;

(ii) The consent to any involuntary petition in bankruptcy or the failure to vacate, within ninety (90) days from the date of entry thereof, any order approving an involuntary petition by Manager;

(iii) The entering of an order, judgment or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating Manager as bankrupt or insolvent, or approving a petition seeking reorganization or appointing a receiver, trustee, or liquidator of all or a substantial part of such party's assets, and such order, judgment or decree continues unstayed and in effect for any period of ninety (90) days or more;

(iv) The appointment of a receiver for all or any substantial portion of the property of Manager;

(v) The failure of Manager to make any payment required to be made in accordance with the terms of this Agreement within ten (10) days after receipt of written notice from the Owner, specifying said default with reasonable specificity, when such payment is due and payable; or

5

HAH 000197

(vi) The failure of Manager to perform, keep or fulfill any of the material covenants, undertakings, obligations or conditions set forth in this Agreement (but excluding any default set forth in Section 3.01(b)(v)), and the continuance of such default for a period of thirty (30) days after written notice of said failure from the Owner; provided, however, if such default cannot be cured within such thirty (30) day period and Manager commences to cure such default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended so long as it shall require Manager in the exercise of due diligence to cure such default, but not to exceed 180 days; provided, further, however, in the event of a default of the type set forth in this Section 3.01(b)(vi) shall result in a default by the Owner under any financing or loan agreement, such shorter cure period (if any) with respect to such default as shall be provided for therein; provided further that the cure period for any breach of this Agreement that would result in criminal sanctions against the Owner must be cured within ten (10) days following written notice thereof from the Owner.

(c) Manager, at its sole option, may terminate this Agreement if any of the following events of default occur:

(i) The filing of a voluntary petition in bankruptcy or insolvency or a petition for reorganization under any bankruptcy law by the Owner;

(ii) The consent to any involuntary petition in bankruptcy or the failure to vacate, within ninety (90) days from the date of entry thereof, any order approving an involuntary petition by the Owner;

(iii) The entering of an order, judgment or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating the Owner as bankrupt or insolvent, or approving a petition seeking reorganization or appointing a receiver, trustee, or liquidator of all or a substantial part of such party's assets, and such order, judgment or decree continues unstayed and in effect for any period of ninety (90) days or more;

(iv) The appointment of a receiver for all or any substantial portion of the property of the Owner;

(v) The failure of the Owner to make any payment required to be made in accordance with the terms of this Agreement within ten (10) days after receipt of written notice from Manager, specifying said default with reasonable specificity, when such payment is due and payable; or

(vi) The failure of the Owner to perform, keep or fulfill any of the material covenants, undertakings, obligations or conditions set forth in this Agreement (but excluding any default set forth in Section 3.01(c)(v)), and the continuance of such default for a period of thirty (30) days after written notice of said failure from Manager; provided, however, if such default cannot be cured within such thirty (30) day period and the Owner commences to cure such default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended so long as it shall require the Owner in the exercise of due diligence to cure such default, but not to exceed 180 days; provided, further, however, that the cure period for any breach of this Agreement that would result in criminal sanctions against Manager must be cured within ten (10) days following written notice thereof from Manager.

6

HAH 000198

3.02 <u>Certain Obligations of Manager After Termination</u>. Upon termination of this Agreement, Manager shall: (i) deliver to the Owner all records, books, accounts, files, and other documentation (the "Records") pertaining to the management, maintenance, operation, marketing and use of the Club, including, without limitation, all records relative to the employees, suppliers, finances, and affairs of the Club; (ii) deliver and assign, transfer or otherwise convey to the Owner all contracts and all personal property relating to or used in the management, operation and maintenance of the Club, including, without limitation, all keys, combinations to locks and other security devices, documents, materials, operating supplies, furnishings and equipment, provided that any personal property owned by Manager may be retained by Manager; (iii) prepare and deliver to the Owner a full set of reports for the Club in accordance with Section 2.05, current to the date of termination; (iv) deliver all funds held by Manager on behalf of the Owner; and (v) render such assistance as the Owner might reasonably request to facilitate an orderly transition in the management and operation of the Club.

4. <u>Management Fee</u>. As compensation for all Services to be rendered by Manager during the Term of this Agreement, the Owner agrees to pay to Manager the following:

4.01 <u>Management Fee</u>. The Owner shall pay to Manager a management fee (the "Management Fee") for the Services in an amount equal to Seventeen Thousand Five Hundred and No/100 Dollars ($17,500.00) per month, with a true-up at the end of each calendar year, such that the aggregate annualized Management Fee is equal to ten percent (10%) of the Gross Revenues of the Club, for such calendar year. For the purposes of this Agreement, "Gross Revenues" means all revenues from the Club, except from the sale of alcoholic beverages, less any sales, use, employment or other taxes relating to the operation of the Club. The Management Fee shall be paid on a monthly basis within ten (10) days following the Owner's receipt of the applicable financial reports set forth in Section 2.05(b), but in no event earlier than the twentieth (20th) of the applicable month. In the event this Agreement is terminated during a calendar month, the Management Fee payable for the month in which such termination occurs will be prorated based upon a thirty (30) day month. Any short-fall of the Management Fee payment(s) shall carry over and shall be paid by Owner as soon as practicable.




5. <u>Insurance; Indemnification; Exculpation from Liability</u>.

5.01 <u>Insurance</u>.

(a) Manager, as an operating expense of the Club, shall obtain and maintain all the insurance policies and endorsements required under the Leases.

(b) Furthermore, Manager, at its sole cost and expense, shall obtain a commercial general liability insurance policy with amounts not less than $1,000,000 combined single limit for each occurrence and $2,000,000 for the aggregate of all occurrences within each policy year, as well as excess liability (umbrella) insurance with limit of at least $5,000,000 per occurrence, covering each of the following: bodily injury, death, or property damage liability per occurrence; personal and advertising injury, general aggregate, products and completed operations, and "all risk legal liability".

HAH 000199

(c) Owner, at is sole cost and expense, shall obtain a liquor liability insurance policy with amounts not less than $1,000,000 combined single limit for each occurrence and $2,000,000 for the aggregate of all occurrences within each policy year and shall list Manager as an additional insurance on the policy.

5.02 Indemnity.

(a) MANAGER SHALL INDEMNIFY AND HOLD THE OWNER (AND THE OWNER'S AGENTS, SHAREHOLDERS, OFFICERS, DIRECTORS, AGENTS, PRINCIPALS AND EMPLOYEES) HARMLESS FROM AND AGAINST ALL CLAIMS, DEMANDS, DAMAGES, JUDGMENTS, COSTS, LOSSES, PENALTIES, FINES, LIENS, SUITS, AND EXPENSES AND LIABILITIES, INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND COSTS AND EXPENSES INCIDENT THERETO (COLLECTIVELY, "CLAIMS") WHICH ARE NOT COVERED BY INSURANCE PROCEEDS PAYABLE TO THE OWNER OR THE INDEMNIFIED PARTY THAT MAY BE INCURRED BY OR ASSERTED AGAINST ANY SUCH PARTY AND THAT ARISE FROM (A) THE FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE OF MANAGER, ITS AGENTS, PRINCIPALS, PARTNERS, MEMBERS, OFFICERS, DIRECTORS, AND EXECUTIVE AND KEY EMPLOYEES, INCLUDING, WITHOUT LIMITATION, IN THE SUPERVISION OR TRAINING OF EMPLOYEES AND OTHER EMPLOYMENT MATTERS; OR (B) PLACING, DISCHARGE, LEAKAGE, USE OR STORAGE, OF HAZARDOUS MATERIALS ON THE PREMISES OR IN THE HOTEL BY MANAGER OR ITS AGENTS, PRINCIPALS, PARTNERS, MEMBERS, OFFICERS, DIRECTORS, AND EMPLOYEES DURING THE TERM IN VIOLATION OF THE LEASES. THIS INDEMNITY EXPRESSLY COVERS AND INCLUDES CLAIMS ARISING FROM THE NEGLIGENCE (BUT NOT GROSS NEGLIGENCE) OF THE OWNER.

(b) EXCEPT WITH RESPECT TO MATTERS FOR WHICH MANAGER IS OBLIGATED TO PROVIDE INDEMNIFICATION PURSUANT TO SECTION 5.02(a) OR ARISING SOLELY OUT OF AN EVENT OF DEFAULT BY MANAGER UNDER THIS AGREEMENT, OWNER SHALL INDEMNIFY AND HOLD MANAGER AND THE MANAGER AFFILIATED ENTITIES (AND THEIR RESPECTIVE AGENTS, PRINCIPALS, PARTNERS, MEMBERS, OFFICERS, DIRECTORS, AND EMPLOYEES) HARMLESS FROM AND AGAINST ALL CLAIMS WHICH ARE NOT COVERED BY INSURANCE PROCEEDS PAYABLE TO MANAGER OR THE INDEMNIFIED PARTY THAT ARISE FROM OR IN CONNECTION WITH (A) THE OWNERSHIP AND OPERATION OF THE CLUB, (B) THE CONDITION OR USE OF THE CLUB, INCLUDING INJURY TO PERSONS OR PROPERTY OR BUSINESS, (C) THE FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE OF THE OWNER, OR (D) PLACING, DISCHARGE, LEAKAGE, USE OR STORAGE, OF HAZARDOUS MATERIALS IN THE CLUB BY THE OWNER DURING THE TERM, THE EXISTENCE OF HAZARDOUS MATERIALS IN, ON OR UNDER THE PREMISES BEFORE THE COMMENCEMENT OF THE TERM. MANAGER SHALL PROMPTLY PROVIDE THE OWNER WITH WRITTEN NOTICE OF ANY CLAIM OR SUIT BROUGHT AGAINST IT BY A THIRD PARTY WHICH MIGHT RESULT IN SUCH INDEMNIFICATION.

8

HAH 000200

**THIS INDEMNITY EXPRESSLY COVERS AND INCLUDES CLAIMS ARISING FROM THE NEGLIGENCE (BUT NOT GROSS NEGLIGENCE) OF MANAGER.**

(c) Any party obligated to indemnify the other party under this Agreement (the "Indemnifying Party") shall have the right, by written notice to the other party, to assume the defense of any claim with respect to which the other party is entitled to indemnification hereunder. If the Indemnifying Party gives such written notice, (i) such defense shall be conducted by counsel selected by the Indemnifying Party and approved by the other party, such approval not to be unreasonably withheld or delayed (provided, however, that the other party's approval shall not be required with respect to counsel designated by the Indemnifying Party's insurer); (ii) so long as the Indemnifying Party is conducting such defense with reasonable diligence, the Indemnifying Party shall have the right to control said defense and shall not be required to pay the fees or disbursements of any counsel engaged by the other party for services rendered after the Indemnifying Party has given the written notice provided for above to the other party, except if there is a conflict of interest between the parties with respect to such claim or defense; and (iii) the Indemnifying Party shall have the right, without the consent of the other party, to settle such claim, but only provided that such settlement involves only the payment of money, the Indemnifying Party pays all amounts due in connection with or by reason of such settlement and, as part thereof, the other party is unconditionally released from all liability in respect of such claim. The other party shall have the right to participate in the defense of such claim being defended by the Indemnifying Party at the expense of the other party, but the Indemnifying Party shall have the right to control such defense (other than in the event of a conflict of interest between the parties with respect to such claim or defense). In no event shall (i) the other party settle any claim without the consent of the Indemnifying Party so long as the Indemnifying Party is conducting the defense thereof in accordance with this Agreement; or (ii) if a claim is covered by the Indemnifying Party's liability insurance, take or omit to take any action which would cause the insurer not to defend such claim or to disclaim liability in respect thereof.

(d) The provisions of this Section 5.02 shall survive the termination of this Agreement with respect to acts, omissions and occurrences arising during the Term and shall be binding on the successors and assigns of the Owner and Manager.

6. Miscellaneous Provisions.

6.01 Notices. All notices, requests, demands, and other communications required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given if delivered by hand, mailed by certified or registered mail with postage prepaid or by overnight mail, electronic mail transmission, or if sent by facsimile as follows:

If to Manager, to:          Entertainment Marketing & Management, Ltd.
                            3414 Old Richmond Road
                            Rosenberg, Texas 77471
                            Attn: Dakota Fontenot
                            Email: dakotajamesfontenot@gmail.com

If to the Owner, to:        ICE Embassy, Inc.

·9·

HAH 000201

> 3414 Old Richmond Road
> Rosenberg, Texas 77471
> Attn: Dakota Fontenot
> Email: dakotajamesfontenot@gmail.com

In either case, with a copy to:     BoyarMiller
> 2925 Richmond Avenue, 14th Floor
> Houston, Texas 77098
> Attn: Tiffany Melchers
> Email: tmelchers@boyarmiller.com

or to such other person or address as such party hereafter designates (by written notice to the other party).

6.02 <u>Notices Concerning the Club</u>. Upon the receipt by Manager of any notice pertaining to the Club not of a routine nature, including in any event, but not limited to, notices of any violation of any legal requirements, Manager shall immediately inform the Owner of such notice and shall deliver a copy of the notice to the Owner as expeditiously as possible.

6.03 <u>Assignment</u>. This Agreement and all of the provisions of this Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations shall be assigned by either of the parties without the prior written consent of the other party.

6.04 <u>Governing Law</u>. This Agreement and the legal relations among the parties shall be governed by and construed in accordance with the laws of the State of Texas.

6.05 <u>Counterparts</u>. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

6.06 <u>Headings</u>. The headings in this Agreement are inserted for convenience only and shall not affect the construction of this Agreement.

6.07 <u>Entire Agreement; Modification</u>. This Agreement embodies the entire agreement and understanding of the parties with respect to the subject matter contained in this Agreement. This Agreement supersedes all prior agreements and understandings between the parties with respect to the subject matter contained herein. This Agreement may not be amended or modified in any manner except by an instrument in writing signed by the parties.

6.08 <u>Severability</u>. The provisions of this Agreement are severable and the invalidity of any one provision shall not affect the validity of any other provision.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

10

HAH 000202

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement effective as of the date first above written.

OWNER:

ICE EMBASSY, INC. d/b/a THE COLORADO BAR AND GRILL

By: _____
Name: Dakota Fontenot
Title: President

MANAGER:

ENTERTAINMENT MARKETING & MANAGEMENT, LTD.

By:     BFD GP, LLC, its general partner

By: _____
Name: Dakota Fontenot
Title: President

ii

HAH 000203

537721

## ADMINISTRATIVE SERVICES AGREEMENT

This ADMINISTRATIVE SERVICES AGREEMENT (this "**Agreement**"), dated as of January 1, 2024 (the "**Effective Time**"), is by and between ENTERTAINMENT MARKETING & MANAGEMENT, LTD., a Texas limited partnership (the "**Company**") and HFR ENTERPRISES, INC., a Texas corporation (the "**Service Recipient**").

### RECITALS

WHEREAS, the Company previously provided certain management and administrative support services to the Service Recipient, which relationship may or may not have been memorialized by a written agreement (the "**Original Agreement**");

WHEREAS, all records of the Company and Service Recipient, including the Original Agreement were previously maintained by or on behalf of Dallas Joseph Fontenot, Jr. ("**Mr. Fontenot**");

WHEREAS, Mr. Fontenot died on September 3, 2021, and since such date the Original Agreement has not been located after a diligent search by his heirs and authorized affiliates;

WHEREAS, the Service Recipient desires to engage the Company to provide certain management and administrative support services on the terms set out herein; and

WHEREAS, the Parties desire that this Agreement amend, restate, and supersede the Original Agreement in all respects.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Service Recipient (hereinafter, collectively the "**Parties**", or each, individually, a "**Party**") agree as follows:

1. <u>Provision of Services.</u>

    1.1    <u>Agreement to Provide Services.</u> Upon the terms and subject to the conditions contained herein, the Company hereby agrees to provide to the Service Recipient the services ("**Administrative Services**") set forth in Section 1.2. Each of the Administrative Services shall be provided and accepted in accordance with the terms, limitations, and conditions set forth herein.

    1.2    <u>Scope of Services.</u> The Administrative Services provided under this Agreement shall include the following:[1]

        (a)    <u>Tax.</u> Tax services include tax support and tax compliance services as may be necessary to ensure that a Service Recipient complies with applicable tax laws and tax consulting services relating to research and planning.

        (b)    <u>Accounting and Financial Statements/Periodic Reports.</u> Accounting services include accounting support services to assist in the maintenance of a system

---

[1] NTD – Review the following list to ensure it is accurate/sufficient.

EXHIBIT

17

HAH 000181

of accounting for a Service Recipient and the preparation of unaudited balance sheets, statements of income and results of operations and cash flows.

(c) Bookkeeping Services. Bookkeeping services include the process of systematically recording, organizing and managing financial transactions and records, maintaining accurate records of all financial transactions, sales, purchases, payments, receipts, and reconciling bank statements of the Services Recipient.

(d) Lease Management. Lease management services include negotiation, lease administration, rent collection, lease renewal and termination, and other ancillary services related thereto.

(e) Human Resources ("HR"). HR services include assistance with staffing and recruitment, training and employee development, and advice and establishment of policies for employee compensation and benefits.

(f) Insurance Management. Insurance services include evaluation of insurance needs, policies and risks, management of brokers, placement of coverages, supervision over claims, and support of compliance functions.

2. Fees and Payment.

2.1 Fees. For the Company's provision of the Administrative Services, Service Recipient shall pay to the Company a fee (the "Services Fee"). The amount of the Services Fee is set forth in Exhibit A attached hereto. The Services Fee set forth on Exhibit A may be amended from time to time by the Parties' mutual execution of an updated Exhibit A and subsequent attachment of such executed Exhibit A to this Agreement.

2.2 Payment. Beginning in calendar year 2023, the Company shall submit a statement to the Service Recipient no later than 15 days after the end of each calendar month (unless otherwise agreed to by the Parties) with respect to the amount of Services Fee payable by the Service Recipient for such month (a "Statement"). Each Statement shall set forth in reasonable detail the Services Fee. At least 30 days prior to December 31 of each calendar year during the term of this Agreement (each such date a "Settlement Date"), the Parties shall negotiate in good faith to determine a discount or premium to be applied to the Services Fees accrued during the preceding 12 months (the "Adjustment Amount"). Full payment for all Administrative Services, net of any Adjustment Amount, as set forth in the Statements, and less any applicable withholding taxes, shall be made no later than the applicable Settlement Date. In the event of any disagreement between the Company and the Service Recipient with respect to any Statement, or any amounts owed thereunder, the Company and the Service Recipient agree to negotiate in good faith to resolve such dispute. In the event of any disagreement between the Company and the Service Recipient with respect to any Adjustment Amount, which remains unresolved prior to the applicable Settlement Date, the Adjustment Amount shall default to $0.00. The Company and the Service Recipient shall make adjustments to charges as required to reflect the discovery of errors or omissions or changes in the charges.

3. Taxes.

2

3.1    Sales Tax and VAT. The Service Recipient will be liable for and will reimburse the Company or pay, as applicable, any applicable sales, value added or similar taxes with respect to the Administrative Services provided pursuant to this Agreement. The Service Recipient will not be responsible for any other taxes, assessment, duties, permits, tariffs, fees or other charges of any kind, including, but not limited to, taxes based on the Company's income or equity, and withholding taxes imposed on the Company.

3.2    Withholding Tax. If the Service Recipient is required to withhold from any amount owed to the Company for which the Company is responsible, the amount withheld shall be subtracted from the amount owed by the Service Recipient and the Company will receive the amount remaining after the tax withheld.

4.    Accounting. The Company shall maintain accounting records of all services rendered pursuant to this Agreement and such additional information as the Service Recipient may reasonably request for purposes of their internal bookkeeping and accounting operations.

5.    Independent Contractor.

5.1    No Partnership or Joint Venture. In performing services pursuant to this Agreement, the Company will be an independent contractor of the Service Recipient and this Agreement will not be deemed to create a partnership, joint venture, or other arrangement between the Parties.

5.2    Company Employees. The employees or agents of the Company shall not be deemed or construed to be the employees, agents, or partners of the Service Recipient for any purposes whatsoever.

5.3    No Signature Authority. The Company and the Company's personnel or agents shall not enter into contracts on behalf of, or execute contracts as employees or agents of, the Service Recipient, or bind the Service Recipient in any manner, written or oral, express or implied.

6.    Indemnification. The Service Recipient shall indemnify, defend, and hold harmless the Company, its affiliates, officers, directors, employees, agents, and representatives from and against any and all losses, liabilities, claims, damages, actions, fines, penalties, expenses or costs (including court costs and reasonable attorneys' fees) suffered or incurred by the Company relating to any claim of a third party arising from or in connection with the Company's performance or non-performance of any covenant, agreement or obligation of the Company hereunder, other than by reason of the Company's gross negligence, willful misconduct or bad faith. This Section 6 shall survive any termination or expiration of this Agreement.

7.    Limitation of Liability. Notwithstanding any other provision of this Agreement and except for liability caused by the Company's gross negligence, willful misconduct or bad faith, (i) no Party nor their respective directors, officers, employees, and agents, will have any liability to any other Party, or their respective directors, officers, employees and agents, whether based on contract, warranty, tort, strict liability, or any other theory, for any indirect, incidental, consequential, or special damages, and (ii) the Company, as a result of providing an

3

HAH 000183

Administrative Service pursuant to this Agreement, shall not be liable to any other Party for more than the cost of the Administrative Services related to the claim or damages.

8. Term and Termination.

8.1 Term of Services. The term of this Agreement shall be one (1) year beginning as of the Effective Time, provided that such term shall renew automatically for successive terms of one (1) year unless the Company provides notice to the Service Recipient that this Agreement shall not be renewed at least thirty (30) days prior to the expiration of any one-year term.

8.2 Termination. Either Party may terminate this Agreement, or any part of this Agreement, at any time upon thirty (30) days prior notice to the other Party.

9. General Provisions.

9.1 Assignment. Neither Party shall assign or transfer its rights and obligations hereunder in whole or in part without the prior written consent of the other Party.

9.2 Successor and Assigns. This Agreement is binding on and inures to the benefit of the Parties and their respective permitted successors and permitted assigns.

9.3 Amendments. No amendment to this Agreement shall be effective unless it is in writing and signed by the Parties.

9.4 No Third-Party Beneficiaries. Except for the right of the Company's affiliates, officers, directors, employees, agents and representatives to enforce their rights to indemnification under Section 6, this Agreement benefits solely the Parties to this Agreement and their respective permitted successors and assigns and nothing in this Agreement, express or implied, confers on any other person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

9.5 Cooperation. The Service Recipient will provide all information that the Company reasonably requests for performance of services pursuant to this Agreement, and the Service Recipient will cooperate with any reasonable request of the Company in connection with the performance of services pursuant to this Agreement.

9.6 Counterparts. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement.

9.7 Severability. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

9.8 Governing Law. This Agreement, including all exhibits, schedules, attachments and appendices attached to this Agreement and thereto, and all matters arising

4

UNOFFICIAL COPY

HAH 000184

out of or relating to this Agreement, are governed by, and construed in accordance with, the laws of the State of Texas, without regard to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Texas.

9.9    Waiver. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

9.10    Notices. All correspondence or notices required or permitted to be given under this Agreement shall be in writing, in English and addressed to the other Party at its address set out below (or to any other address that the receiving Party may designate from time to time). Each Party shall deliver all notices by personal delivery, nationally recognized overnight courier (with all fees prepaid), facsimile or e-mail (with confirmation of transmission) or certified or registered mail (in each case, return receipt requested, postage prepaid). Except as otherwise provided in this Agreement, a notice is effective only (a) upon receipt by the receiving Party and (b) if the Party giving the notice has complied with the requirements of this Section. Such communications must be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 9.11):

| If to Company: | Entertainment Marketing & Management, Ltd. |
| | 3414 Old Richmond Road |
| | Rosenberg, Texas 77471 |
| | E-mail: dakotajamesfontenot@gmail.com |
| | Attention: Dakota Fontenot |
| If to Service Recipient: | HFR Enterprises, Inc. |
| | 3414 Old Richmond Road |
| | Rosenberg, Texas 77471 |
| | E-mail: dakotajamesfontenot@gmail.com |
| | Attention: Dakota Fontenot |
| In either case, with a copy to: | BoyarMiller |
| | 2925 Richmond Ave., 14th Floor |
| | Houston, Texas 77098 |
| | E-mail: tmelchers@boyarmiller.com |
| | Attention: Tiffany Melchers |

9.11    Entire Agreement. This Agreement, including and together with any related exhibits, schedules, attachments and appendices, constitutes the sole and entire agreement of the Company and the Service Recipient with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, regarding such subject matter.

[SIGNATURE PAGE FOLLOWS]

5

HAH 000185

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date set forth above.

COMPANY:

ENTERTAINMENT MARKETING &
MANAGEMENT, LTD.,
a Texas limited partnership

By: BFD GP, LLC,
a Texas limited liability company
its general partner

By: _____
Name: Dakota Fontenot
Title: President

SERVICES RECIPIENT:

HFR ENTERPRISES, INC.,
a Texas corporation

By: _____
Name: Dakota Fontenot
Title: President

6

HAH 000186

## EXHIBIT A

## SERVICES FEE

- Prior to Calendar Year 2021: As reflected on the books and records of the Company.
- Calendar Year 2021: $977.59 per Month.
- Calendar Year 2022: $462.50 per Month.
- Calendar Year 2023 and all future Calendar Years: $1,850.00 per Month.

7

HAH 000187

537721

## AMENDMENT OF PURCHASE AND SALE AGREEMENT

This Amendment (the "*Amendment*") is made and entered into between HFR ENTERPRISES, INC., a Texas corporation ("*Seller*") and CLE GROUP SKZ REAL ESTATE, LLC, a Texas limited partnership ("*Purchaser*") as an amendment to that certain Purchase And Sale Agreement ("*Agreement*"), dated June ___, 2025, regarding the purchase and sale of that certain property municipally located at 6710 Southwest Freeway, Houston, Texas 77074 land in Harris County, Texas. Capitalized terms contained but not otherwise defined herein shall have the meanings ascribed thereto in the Agreement.

**WHEREAS**, the original Sales Price under the Agreement was $4,750,000.00; and

**WHEREAS**, the parties hereto have agreed to reduce the Sales Price in order to satisfy certain liabilities of the Seller prior to Closing.

**NOW THEREFORE,** the Purchaser and Seller hereby agree that the Agreement is hereby amended as follows:

1.      The Sales Price shall be reduced to the amount of Four Million Six Hundred Eighty-Nine Thousand Four Hundred Twenty Four and 72/100 Dollars ($4,689,424.72).

2.      The parties agree that the above listed amendments shall be hereinafter considered a part of the Agreement as if originally set forth therein. The amendments shall be subject to any and all other provisions of the Agreement, with the exception of the parts or provisions of the Agreement which have been modified by this Amendment. The Agreement, as amended hereby, is hereby ratified and confirmed.

3.      The parties may execute this Amendment in one or more identical counterparts, all of which, when taken together, will constitute one and the same instrument. A facsimile or electronic mail transmission shall be binding on the party or parties whose signatures appear thereon.

In witness whereof, the undersigned parties hereto have executed this Amendment.

**SELLER:**                                                      **PURCHASER:**

**HFR ENTERPRISES INC.**                          **CLE GROUP SKZ REAL ESTATE, LLC,**
a Texas corporation                                        a Texas limited liability company

*Linda Goehrs, Trustee*                               ꝪꝪ
_____                      _____
By: Linda Goehrs, Trustee for the               By: Zack Truesdell
Holli Ann Hardin Trust Number One             Title: President

**EXHIBIT**
**18**

CONFIDENTIAL DOCUMENTS                                    HAH011438

537721

## PARTNERSHIP INTEREST PURCHASE AGREEMENT

THIS PARTNERSHIP INTEREST PURCHASE AGREEMENT (this "**Agreement**") is made and entered into as of June ___, 2025, by and among Colorado Rose, LLC a Texas limited liability company, with a principal place of business at 1800 West Loop S, Ste. 1125, Houston, TX 77027 ("**Buyer**"), BFD GP, LLC a Texas limited liability company with a principal place of business at 3414 Old Richmond Road, Rosenberg, TX 77471 ("**BFD GP**") and  BFD LP, LLC a Texas limited liability company with a principal place of business at 3414 Old Richmond Road, Rosenberg, TX 77471 ("**BFD LP**", and together with BFD GP, collectively, the "**Sellers**" and each individually a "**Seller**") and Entertainment Marketing & Management, Ltd., a Texas limited partnership with a principal place of business at 3414 Old Richmond Road, Rosenberg, TX 77471 ("**Company**"). The Buyer and Sellers are joined herein by Dakota Fontenot, an individual resident of Texas ("**Fontenot**, and together with the Sellers, collectively the "**Seller Parties**"). Buyer, Seller Parties, and the Company are hereinafter collectively referred to as the "**Parties**."

WHEREAS, BFD GP, LLC is the sole general partner holding all of the general partnership interests of the Company (the "**GP Interests**"), and BFD LP, LLC is the sole limited partner holding all of the limited partnership interests of the Company (the "**LP Interests**"), and together, Sellers own 100% of the issued and outstanding GP Interests and LP Interests in the Company (collectively, the "**Interests**");

WHEREAS, contemporaneously with this Agreement, the Parties and/or their affiliates or related parties are entering into that certain Stock Purchase Agreement (the "**SPA**") for the acquisition of stock in Ice Embassy, Inc., a Texas corporation ("**Ice Embassy**"), and that certain Purchase and Sale Agreement (the "**PSA**") for the acquisition of that certain real property located at 6710 Southwest Freeway, Houston, Texas 77074, as further described in the PSA (the "**Property**") from HFR Enterprises Inc., a Texas corporation ("**HFR**") (the SPA and PSA collectively referred to herein as the "**Parallel Agreements**");

WHEREAS, Fontenot owns 100% of the membership interests of the Sellers, and further, Fontenot and/or his affiliates own, possess, manage and control ICE Embassy and HFR through equity ownership and management (or services) agreements, and by which Fontenot will benefit from the closing of all transactions under this Agreement and the Parallel Agreements;

WHEREAS, the Parties desire to enter into this Agreement, pursuant to which the Buyer agrees to purchase from the Seller, and the Seller agrees to sell to the Buyer and assign to Buyer (and Buyer's designee, with respect to the LP Interests), all of the Interests, on the terms and subject to the conditions set forth in this Agreement; and

WHEREAS, the Seller and the Buyer desire to consummate the proposed transaction pursuant to the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1

> **EXHIBIT**
> **19**

DF000502

## ARTICLE I

## PURCHASE AND SALE OF INTERESTS

1.1 Purchase and Sale of Interests. Upon the terms and subject to the conditions of this Agreement, at the Closing on the Closing Date, the Seller agrees to sell, assign, convey, transfer and deliver to the Buyer (and Buyer's designee, with respect to the LP Interests), and the Buyer and Buyer's designee agrees to acquire from the Seller all of the Interests, free and clear of all Liens (as defined below) (other than restrictions under the Securities Act and state securities Laws), excluding the assets listed in Exhibit A, attached hereto and incorporated herein by this reference ("**Excluded Assets**").

1.2 Purchase Price.

(a) Upon the terms and subject to the conditions of this Agreement, in consideration of the aforesaid sale, assignment, conveyance, transfer and delivery of the Interests, the purchase price payable by the Buyer to the Seller at the Closing (the "**Purchase Price**") shall be in the aggregate: Two Million Seven Hundred Fifty Thousand and 00/100 ($2,750,000.00) Dollars, payable as follows:

(i) the Buyer shall pay the Seller One Million Five Hundred Thousand and 00/100 ($1,500,000.00) Dollars via wire transfer at Closing (the "**Closing Cash Payment**");

(ii) subject to Section 1.2(b), the Buyer shall pay the Sellers an aggregate sum of One Million Two Hundred Fifty Thousand and 00/100 ($1,250,000.00) Dollars ("**Installment Amount**"), pro-rata in accordance with each Seller's proportionate share of the Interests, via wire transfer, to be paid as follows:

(iii) One half of the Installment Amount ($625,000) shall be paid in quarterly installments, with the first installment being due and payable on October 1, 2025 and three successive installments being due and payable on the first day of the succeeding fiscal quarter thereafter (i.e., January 1, 2026, April 1, 2026, and July 1, 2026), and with the remaining one-half of the Installment Amount ($625,000) shall be paid in 12 monthly increments, with the first payment being due and payable on August 1, 2026, and with successive monthly payments being due on the first day of each month until the Installment Amount is paid in full.

The quarterly and monthly payments of the Installment Amount are collectively referred to herein as the "**Installment Payments**". As security for payment of the Installment Payments, Sellers shall be granted a subordinate lien covering the Property being purchased under the PSA, which will be provided under a second-priority lien deed of trust security interest in the Property. Buyer shall execute and deliver a deed of trust in favor of Sellers, in form and substance reasonably satisfactory to Sellers and Buyer.

(b) Notwithstanding anything to the contrary, Buyer shall be entitled to offset against any unpaid Installment Payments due to the Buyer Indemnified Parties for Buyer's Losses as set forth

2

DF000503

in Article VIII herein or under any of the Parallel Agreements. Any offset shall reduce the applicable Installment Payment(s) on a dollar-for-dollar basis.

1.3 [Reserved].

1.4 Excluded Assets License. As part of this Agreement, Buyer is granted a non-exclusive, revocable license to use Item No. 16 in the Excluded Assets ("**Twin Zebras**") while operating its business at the Property. This license shall remain in effect for as long as the Buyer continues to operate on the Property and desires to use the Twin Zebras. In the event that the Buyer ceases operations on the Property, no longer wishes to use the Twin Zebras, or is otherwise unable to continue using the Twin Zebras, the Buyer shall promptly return the Twin Zebras to Dakota Fontenot in their original condition, reasonable wear and tear excepted. The Seller Parties reserve the right to inspect the Twin Zebras upon their return to ensure compliance with this provision. This license is non-transferable and may not be assigned or sublicensed by the Buyer without the prior written consent of Sellers. The Seller Parties retain all ownership rights to the Twin Zebras and may revoke this license at their discretion with reasonable notice to the Buyer.

1.5 Removal of Excluded Assets. Sellers shall have thirty (30) days following the Closing Date to remove all Excluded Assets from the Property. Sellers shall coordinate and arrange mutually agreeable times with Buyer for the removal of such Excluded Assets, ensuring minimal disruption to Buyer's operation of its business at the Property. Sellers shall be responsible for any costs associated with the removal and shall leave the Property in a clean and orderly condition following removal of the Excluded Assets.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES OF SELLERS

2.    Representations and Warranties of the Seller Parties. As an inducement to the Buyer to enter into this Agreement, each of the Seller Parties, jointly and severally, represent and warrant to the Buyer that as of the date of this Agreement and the Closing Date:

a.    Title to Partnership Interests. The Sellers own, possess, and have good and marketable title to the Interests free and clear of all liens, leases, pledges, charges, encumbrances, equities, covenants, conditions, restrictions, or claims of every nature and kind whatsoever (the "**Liens**").

b.    Legal Requirements. The Sellers have all requisite power, authority, and approvals to transfer ownership of the Interests. The Company and Sellers are in good standing with the State of Texas and has complied and will continue to comply with all applicable federal, state, or local statutes, laws, and regulations, if any, with respect to its transfer of the Interests.

c.    Consents and Approvals. Other than in compliance with the provisions of applicable statutes and regulations, no notice to, filing with, or authorization, consent, or approval of any domestic or foreign public body or authority is necessary for the consummation of the transactions contemplated by this Agreement. The execution, delivery, performance and consummation of this Agreement does not and will

3

DF000504

not: (i) violate, conflict with or constitute a default or an event that, with notice or lapse of time or both, would be a default, breach or violation under any term or provision of any instrument, agreement, contract, commitment, license, promissory note, conditional sales contract, indenture, mortgage, deed of trust, lease or other agreement, instrument or arrangement to which the Company or Seller Parties are a party or by which the Sellers' Interests are bound; (ii) violate, conflict or constitute a breach of any statute, regulation or judicial or administrative order, award, judgment or decree to which the Seller Parties or the Company or to which the Sellers' Interests are bound or subject; or (iii) result in the creation or imposition of any adverse claim or interest, or any lien, encumbrance, charge, equity or restriction of any nature whatever, upon or affecting the Seller Parties, the Company, or Sellers' Interests. The sole member of the Sellers, Fontenot, has consented to the sale of the Sellers' Interests and this Agreement. The Sellers, being the sole partners of the Company have consented to the sale of the Sellers' Interests and this Agreement.

    d.    Litigation. There is no: (i) action, suit or proceeding pending or threatened against the Sellers, Sellers' Interests, the Company, or Fontenot; or (ii) proceeding, investigation, charges, audit or inquiry threatened or pending before or by any federal, state, municipal or other governmental court, department, commission, board, bureau, agency or instrumentality which might result in an adverse effect on the Sellers, Sellers' Interests, the Company, or Fontenot.

    e.    Taxes. There is no pending or known threatened claim against the Sellers, the Company, or Fontenot for payment of any taxes arising from the Sellers' ownership of the Interests or Fontenot's ownership of the membership interests in the Sellers. There is no pending or known threatened claim against the Company or Seller Parties for payment of taxes. Neither the Sellers, the Company, nor Fontenot has executed any waiver of any statute of limitations against assessments of taxes.

    f.    Authority. The Sellers, the Company, and Fontenot have taken all necessary action to authorize the execution, delivery, and performance of this Agreement and has adequate power, authority, and legal right to enter into, execute, deliver, and perform this Agreement and to consummate the transactions contemplated hereby. This Agreement is legal, valid, and binding with respect to the Sellers and is enforceable in accordance with its terms. On execution, delivery, and performance of this Agreement in accordance with its terms, the Buyer will own one hundred percent (100%) of the Sellers' Interests free of all claims, Liens, encumbrances, and liabilities, thereby owning one hundred percent (100%) of the Company free of all claims, Liens, encumbrances, and liabilities.

    g.    Full Disclosure. This Agreement, any schedule referenced in or attached to this Agreement, any document furnished to the Buyer under this Agreement or any certification furnished to the Buyer under this Agreement does not contain any untrue statement of a material fact and does not omit to state a material fact necessary to make such statement, in the circumstances under which it was made, is not misleading. All of the representations, warranties and covenants in this Agreement: (i) are true and correct as of the date made; (ii) will be true and correct as of the Closing Date; and (iii) will survive

DF000505

and not be waived, discharged, released, modified, terminated or affected by any due diligence by the Buyer.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF BUYER

3.     Representations and Warranties of Buyer. As an inducement to the Sellers to enter into this Agreement, the Buyer represents and warrants to the Sellers that as of the date of this Agreement and the Closing Date:

a.     Legal Requirements. The Buyer has all requisite power, authority, and approvals to purchase ownership of the Interests. The Buyer is in good standing with the State of Texas and has complied and will continue to comply with all applicable federal, state, or local statutes, laws, and regulations, if any, with respect to its transfer of the Interests.

b.     Consents and Approvals. Other than in compliance with the provisions of applicable statutes and regulations, no notice to, filing with, or authorization, consent, or approval of any domestic or foreign public body or authority is necessary for the consummation of the transactions contemplated by this Agreement. The execution, delivery, performance and consummation of this Agreement does not and will not: (i) violate, conflict with or constitute a default or an event that, with notice or lapse of time or both, would be a default, breach or violation under any term or provision of any instrument, agreement, contract, commitment, license, promissory note, conditional sales contract, indenture, mortgage, deed of trust, lease or other agreement, instrument or arrangement to which the Buyer is a party; (ii) violate, conflict or constitute a breach of any statute, regulation or judicial or administrative order, award, judgment or decree to which the Buyer is bound or subject; or (iii) result in the creation or imposition of any adverse claim or interest, or any lien, encumbrance, charge, equity or restriction of any nature whatever, upon or affecting the Buyer. The members of the Buyer have consented to the purchase of the Sellers' Interests and this Agreement.

c.     Litigation. There is no: (i) action, suit or proceeding pending or threatened against the Buyer that would materially and adversely affect Buyer's ability to perform its material obligations under this Agreement; or (ii) proceeding, investigation, charges, audit or inquiry threatened or pending before or by any federal, state, municipal or other governmental court, department, commission, board, bureau, agency or instrumentality which might result in an materially adverse effect on the Buyer's ability to perform its material obligations under this Agreement.

d.     Taxes. There is no pending or known threatened claim against the Buyer for payment of any taxes. The Buyer has not executed any waiver of any statute of limitations against assessments of taxes.

5

UNOFFICIAL COPY

e.    Authority. The Buyer has taken all necessary action to authorize the execution, delivery, and performance of this Agreement and has adequate power, authority, and legal right to enter into, execute, deliver, and perform this Agreement and to consummate the transactions contemplated hereby. This Agreement is legal, valid, and binding with respect to the Buyer and is enforceable in accordance with its terms. On execution, delivery, and performance of this Agreement in accordance with its terms, the Buyer will own one hundred percent (100%) of the Sellers' Interests free of all claims, Liens, encumbrances, and liabilities.

f.    Full Disclosure. This Agreement, any schedule referenced in or attached to this Agreement, any document furnished to the Sellers under this Agreement or any certification furnished to the Sellers under this Agreement does not contain any untrue statement of a material fact and does not omit to state a material fact necessary to make such statement, in the circumstances under which it was made, is not misleading. All of the representations, warranties and covenants in this Agreement: (i) are true and correct as of the date made; (ii) will be true and correct as of the Closing Date; and (iii) will survive and not be waived, discharged, released, modified, terminated or affected by any due diligence by the Sellers.

## ARTICLE IV

## CONDITIONS TO CLOSING

4.    Conditions to Closing. Prior to the Closing Date, the Buyer and Seller Parties will take all necessary steps to ensure the proper transfer of the Interests from the Sellers to the Buyer at closing in compliance with the operating agreement and other governing documents, if any, of the Company.

## ARTICLE V

## THE CLOSING

5.    The Closing. This Agreement will be consummated remotely by the exchange of the Buyer's Deliverables and Seller Parties' Deliverables (defined herein) by the Buyer and the Sellers on June __, 2025 (the "**Closing Date**").

## ARTICLE VI

## BUYER AND SELLER PARTIES DELIVERABLES

6.1    The Buyer's Deliverables. On the Closing Date, the Buyer will deliver or cause to be delivered to the Sellers the following items (all documents will be duly executed and acknowledged where required): (a) the Purchase Price less Installment Payments; (b) such corporate resolutions and other evidence of authority with respect to the Buyer as might be reasonably requested by the Sellers; (and (c) such additional documents as might be reasonably requested by the Sellers to consummate this Agreement.

6.2.    Seller Parties' Deliverables. On the Closing Date, the Seller Parties will deliver or cause to be delivered to the Buyer the following items (all documents will be duly executed and

6

DF000507

acknowledged where required): (a) assignments and conveyances acceptable to the Buyer necessary to convey to the Buyer (and Buyer's designee, with respect to the LP Interests) all of the Sellers' right, title and interest in and to all of the Interests; (b) written consent and/or approval of the transfer of the Interests to Buyer (and Buyer's designee, with respect to the LP Interests); (c) such corporate resolutions and other evidence of authority with respect to the Company as might be reasonable requested by the Buyer; and (d) Such additional documents as might be reasonably requested by the Buyer to consummate this Agreement.

**ARTICLE VII**
**DEFAULT**

7.     Default. If a Party fails to perform any obligation contained in this Agreement, the Party claiming default will serve written notice to the other party specifying the nature of such default and demanding performance. If such default has not been cured within ten (10) business days after receipt of such default notice, the non defaulting party will be entitled to exercise all remedies arising at law or in equity by reason of such default.

**ARTICLE VIII**
**INDEMNIFICATION**

8.1     Definitions.

a.     "**Buyer Indemnified Parties**" means Buyer, the purchaser entities under the Parallel Agreements, and each of their respective shareholders, officers, directors, members, employees, agents, and representatives and each of the heirs, executors, successors, and permitted assigns of any of the foregoing.

b.     "**Buyer's Losses**" means any and all claims, liabilities, obligations, losses, costs, expenses, penalties, interest, awards, fines and judgments (in equity or at law) and damages whenever arising or incurred (including amounts paid in settlement, costs of investigation and reasonable attorneys' and consultants' fees and expenses) of the Buyer Indemnified Parties described in Section 8.2, as to which the Buyer Indemnified Parties are entitled to indemnification.

c.     "**ERC Credit**" means the refundable tax credit Ice Embassy, Inc. may receive as provided under the Coronavirus Aid, Relief, and Economic Security Act, designed to encourage businesses to retain employees during the COVID-19 pandemic.

d.     "**Escrow Agreement**" has the meaning ascribed thereto in the PSA.

e.     "**Fee Agreement**" means the monetary amount or compensation that Ice Embassy, Inc. is entitled to receive as a result of a resolution, judgment, or settlement arising from litigation or disputes related to credit card fees Visa and Mastercard charged to Ice Embassy, Inc.

7

DF000508

f.    "**Indemnity Escrow Account**" has the meaning ascribed thereto in the PSA.

g.    "**Indemnity Escrow Amount**" has the meaning ascribed thereto in the PSA.

h.    "**Parallel Agreements**" shall mean any agreement between Buyer and Seller Parties, or any of Seller Parties' affiliated entities, including but not limited to agreements with or involving the Company, Ice Embassy, Inc., HFR Enterprises, or any of its subsidiaries.

8.2.    <u>Indemnification by Seller Parties</u>. Subject to the terms and conditions of this Agreement (including the limitations set forth in Section 8.3 below), the Seller Parties, and each of its and their affiliates, officers, agents, representatives, subsidiaries, owners, members, trustees, beneficiaries (including any individual beneficiaries of any trust that owns or controls any such entities) (collectively, the "**Seller Indemnifying Parties**"), jointly and severally agree to indemnify, defend, and hold harmless Buyer and the other Buyer Indemnified Parties from and against any and all Buyer's Losses arising out of, relating to, in connection with, or resulting from:

a.    any liability, obligation, or claim (whether known or unknown, contingent or otherwise) related to the Interests or the ownership, operation, maintenance, leasing, use, or occupancy of the Property or the business or assets of the Seller Indemnifying Parties occurring or relating to any period prior the Closing Date, regardless of when asserted, including but not limited to tax liabilities, contractual obligations, or tort claims, regardless of whether such liabilities are discovered before or after Closing and regardless of whether such liabilities are covered by insurance;

b.    any fraud, intentional misrepresentation, willful misconduct, criminal act, bad faith, or gross negligence of the Seller Indemnifying Parties in connection with this Agreement and the Parallel Agreements;

c.    any breach of or inaccuracy in any representation or warranty made by Seller Parties in this Agreement, in any Parallel Agreements, or in any certificate, document, or instrument delivered pursuant hereto; and

d.    any breach or non-fulfillment of any covenant or agreement of the Seller Parties contained in this Agreement, in any Parallel Agreements, or in any certificate, document, or instrument delivered pursuant hereto.

8.3.    <u>Application of Funds for Losses</u>. Any Buyer's Losses for which the Buyer Indemnified Parties are entitled to indemnification under this Article VIII may be satisfied by the following sources in the following order: (i) by applying any proceeds actually received by Buyer from the Fee Agreement to such Buyer's Losses; (ii) by withdrawing the applicable portion of the Indemnity Escrow Amount from the Indemnity Escrow Account in accordance with the Escrow Agreement; (iii) through a set-off against any amounts owed by any Buyer Indemnified Party to any Seller Indemnifying Party under this Agreement or any other Parallel Agreements, including

8

DF000509

the Installment Payments: or (iv) to the extent Buyer's Losses are not fully satisfied by the foregoing (i) – (iii), by direct payment from any of the Seller Indemnifying Parties without Buyer being required to first pursue recovery from any other Seller Indemnifying Party.

8.4.    Survival. The representations, warranties and covenants of the Parties made in this Agreement, including specifically Article II and Article III herein, shall survive the Closing of the transactions contemplated in this Agreement for the applicable statute of limitations period. Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the non-breaching Party to the breaching Party prior to the expiration date of the applicable statute of limitations period shall not thereafter be barred by the expiration of the relevant representation or warranty and such claims shall survive until finally resolved.

8.5.    No Waiver. The indemnification rights under this Article are in addition to, and not in lieu of, any other remedies available at law or in equity or pursuant to any other provision of this Agreement. Nothing in this Section shall limit Buyer's right to seek specific performance, injunctive relief, or other equitable remedies.

## ARTICLE IX

## TAXES

9.    2024 Tax Returns – Responsibility for Preparation. If the federal or applicable state and local income tax returns for the Company for the taxable year ending December 31, 2024 (the "**2024 Tax Period**") are not prepared and filed prior to the Closing Date, then Sellers shall, at its sole cost and expense, be responsible for causing such returns (the "**2024 Tax Returns**") to be timely prepared by a tax professional or accounting firm customarily engaged by the Company for such matters, or another firm reasonably acceptable to Buyer. Sellers shall deliver complete drafts of the 2024 Tax Returns to Buyer no later than sixty (60) days prior to the applicable filing deadline (including extensions) for such returns. Buyer shall have thirty (30) days from receipt of the draft 2024 Tax Returns to review and provide comments to Sellers. Sellers shall, in good faith, consider all reasonable comments made by Buyer and incorporate such comments to the extent required to ensure the 2024 Tax Returns are prepared in accordance with applicable law and consistent with past practice, unless otherwise required by a change in law or fact. Upon resolution of any comments from Buyer, Sellers shall file or cause to be filed the 2024 Tax Returns on or before the due date (including extensions) and shall provide Buyer with a final copy of each filed return within five (5) business days after filing. Nothing in this Section shall limit or impair Buyer's right to challenge or dispute the contents of any such return in connection with any audit, proceeding, or indemnification claim under this Agreement.

9

DF000510

## ARTICLE X

## MISCELLANEOUS

10.1.    Time. Time is of the essence for this Agreement.

10.2    Notices. Any notice, demand or communication required or permitted to be given by any provision of this Agreement will be in writing and will be deemed to have been given and received when delivered personally or by telefacsimile to the party designated to receive such notice, or on the date following the day sent by overnight courier, or on the third (3rd) day after the same is sent by certified mail, postage and charges prepaid, directed to the addresses first set forth above.

10.3.    Representations and Warranties. The respective representations and warranties of the Parties contained herein or in any certificates or other documents delivered prior to or at the Closing Date will not be deemed waived or otherwise affected by any investigation made by any party hereto. Each and every such representation and warranty will survive the Closing Date and will not be terminated or extinguished for a period of twelve (12) months after the Closing Date.

10.4.    Cooperation. Prior to and at all times following the termination of this Agreement the parties agree to execute and deliver, or cause to be executed and delivered, such documents and do, or cause to be done, such other acts and things as might reasonably be requested by any party to this Agreement to assure that the benefits of this Agreement are realized by the Parties.

10.5.    Headings. The paragraph headings contained in this Agreement are for reference purposes only and are not intended to affect in any way the meaning or interpretation of this Agreement.

10.6.    Entire Agreement. This Agreement, the Parallel Agreements, and any document executed in connection herewith on or after the date of this Agreement constitute the entire agreement between the Parties with respect to the subject matter hereof and there are no agreements, understandings, warranties or representations except as set forth herein or in the Parallel Agreements.

10.7.    Assignment. It is agreed that the Parties may not assign such party's rights nor delegate such party's duties under this Agreement without the express written consent of the other parties to this Agreement.

10.8.    Amendment. Neither this Agreement, nor any of the provisions hereof, can be changed, waived, discharged, or terminated, except by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge, or termination is sought.

10.9.    Severability. If any clause or provision of this Agreement is illegal, invalid, or unenforceable under any present or future law, the remainder of this Agreement will not be affected thereby. It is the intention of the Parties that if any such provision is held to be illegal, invalid, or unenforceable, there will be added in lieu thereof a provision as similar in terms to such provisions as is possible and to be legal, valid, and enforceable.

10

DF000511

10.10. Governing Law; Consent to Jurisdiction. This Agreement will be interpreted, construed, and enforced in accordance with the laws of the State of Texas, regardless of any applicable principles of conflicts of law. Each of the Parties hereby irrevocably consents and agrees to the exclusive personal jurisdiction of the courts of the State of Texas in Harris County, Texas or the federal courts for the Southern District of Texas, for any action, suit or proceeding arising in connection with any disagreement, dispute, controversy or claim arising out of or relating to this Agreement or any related document.

10.11. Attorney Fees. If any party institutes an action or proceeding against any other party relating to the provisions of this Agreement, the party to such action or proceeding that does not prevail will reimburse the prevailing party therein for the reasonable expenses of attorneys' fees and disbursements incurred by the prevailing party.

10.12. Waiver. Waiver of performance of any obligation or term contained in this Agreement by any party, or waiver by one party of the other's default hereunder will not operate as a waiver of performance of any other obligation or term of this Agreement or a future waiver of the same obligation or a waiver of any future default.

10.13. Counterpart Execution. This Agreement may be executed in counterparts, including by telefacsimile, each of which will be deemed an original document but all of which will constitute a single document. Also, for the purposes of this Agreement, a facsimile or electronic signature shall serve as an original.

[signature page follows]

11

DF000512

**IN WITNESS WHEREOF,** this Agreement has been executed by the parties effective the date first above written.

<u>Seller Parties</u>:

BFD GP, LLC

_____
Dakota Fontenot, Sole Member

BFD LP, LLC

_____
Dakota Fontenot, Sole Member

_____
Dakota Fontenot, individually
Address: 2926 Fontana Dr
Houston Tx 77043

<u>Buyer</u>:
Colorado Rose, LLC

_____
Name: Justin Zachariah Truesdell
Title: manager

<u>Company</u>:
Entertainment Marketing & Management, Ltd.

By: BFD GP, LLC
Its General Partner

_____
Dakota Fontenot, Sole Member

Signature Page to Partnership Interest Purchase Agreement

UNOFFICIAL COPY

DF000513

## EXHIBIT A
### Sellers Excluded Assets

*The Excluded Assets below are located at the real property and improvements at 6710 Southwest Freeway, Houston, Texas 77074.*

1. Dallas Fontenot's desk and side table in manager's office.

2. Lion taxidermy.

3. Smartboard in conference room.



   a.

4. Art on walls in conference room.



   a.



   b.

5. Dakota Fontenot's Pool Table and pool table chairs, equipment, etc., in the shed.

6. Memorabilia addressed to Dallas Fontenot (limited to 10 items)

DF000514

7. Playboy Memorabilia (limited to 5 items)

8. Bear in sports bar



a.

9. Frank Sinatra autographed portrait in sports bar



a.

10. Beaded native American moccasins next to sports bar and ATMs and framed fish hooks beneath



a.

11. Beaded native American necklaces next to entertainer's locker room and Bar 1 station area

DF000515

12. Gibson Les Paul guitar hanging on ceiling by canoe bar



a.

13. These Playboy memorabilia items



a.



b.

DF000516



c.

14. Other



a.



b.

UNOFFICIAL COPY

DF000517



c.

15. Art on wall by Bar 2 and coffee bar

16. Twin Zebras taxidermy.

UNOFFICIAL COPY

DF000518

Date : 5/8/2025 5:30:19 PM
From : "Glynn Nance" gnance@nancesimpson.com
To : "John Hebert, Jr." john@gwoodlaw.com, "Ardalan Attar" aattar@christianattarlaw.com
Cc : "Nicole Newman" nnewman@christianattarlaw.com, "Sean Greenwood" sean@gwoodlaw.com,
"Zack Truesdell" zack@theclegroup.com, "Kyle Kinsel" kwkinsel@gmail.com, "Dakota Fontenot"
dakotajamesfontenot@gmail.com
Subject : RE: Revised Purchase Documents
Attachment : image002.png;

John,

With respect to Entertainment Management & Marketing, Ltd and its GP and LP entities, my client who is a material investor in Buyer would like the transaction changed so that it is a purchase of only the partnership interests of in Entertainment Marketing & Management, Ltd (the "Partnership"), and not the Membership Interests of the GP and LP owner entities. I have discussed this with Ardalan and Nicole (and Zack) and I was asked to reach out directly to you on this point.

We believe that the transaction being structured as the purchase of the partnership interests in the Partnership will have the same tax result to your client as a sale of the membership interests in the GP and LP entities – i.e., he would achieve capital gain on the sale. This is because the only assets of any consequence in the Partnership (as I understand it) are the Administrative Services Agreement ("ASA") and any goodwill associated with the Partnership's management business activities. The sale of the Partnership Interests would be treated virtually the same as if the Seller sold the ASA and associated goodwill, which are both treated under the Internal Revenue Code as intangible capital assets. Thus, the deemed sale of those assets would flow through capital gain to your client – the same as he is expecting to receive from the sale of the membership interests in the GP and LP entities.

However, because the Buyer will be an LLC taxed as a partnership, the purchase of your client's ownership interests in the GP and LP entities – which are taxed as S Corporations - will terminate the S Corp elections of those entities and turn them into C Corps. This would be very adverse to the Buyer's interests.

Ultimately, we believe that your client's tax advisors would agree that his selling the partnership interests in the Partnership will have the same tax result (i.e., capital gain treatment) as the sale of the LLC Interests in the GP and LP entities.

Please let me know if you would like to discuss further by phone.

Glynn D. Nance, Jr., LL.M.
Nance & Simpson, LLP
(713) 520.9100 – Tel
(832) 721-1705 – Cell
www.nancesimpson.com

CONFIDENTIALITY NOTICE: This electronic transmission and any attachments constitute confidential information which is intended only for the named recipient(s) and may be legally privileged. If you have received this communication in error, please contact the sender immediately. Any disclosure, copying, distribution, or the taking of any action concerning the contents of this communication by anyone other than the named recipient(s) is strictly prohibited.

---

From: John Hebert, Jr. <john@gwoodlaw.com>
Sent: Thursday, May 8, 2025 4:51 PM
To: Ardalan Attar <aattar@christianattarlaw.com>
Cc: Nicole Newman <nnewman@christianattarlaw.com>; Sean Greenwood <sean@gwoodlaw.com>; Zack Truesdell <zack@theclegroup.com>; Kyle Kinsel <kwkinsel@gmail.com>; Dakota Fontenot <dakotajamesfontenot@gmail.com>; Glynn Nance <gnance@nancesimpson.com>
Subject: Re: Revised Purchase Documents

EXHIBIT
20

DF005506

Ardalan,

See attached revisions and comments to the purchase documents for your review.

Thank you,

**John Hebert Jr.**

**The Greenwood Law Firm PLLC**

1415 North Loop West, Ste. 1250

Houston, TX  77008

TEL (832)356-1588

**DIRECT (832) 371-6247**

FAX (832)356-1589

EMAIL john@gwoodlaw.com

WEB www.gwoodlaw.com

**Confidentiality Notice:** The contents of this email may contain confidential and/or attorney-client privileged information.  If you are not the intended recipient, please reply to this email indicating that you received it and destroy it, along with any copies or attachments.  I appreciate your compliance and courtesy.

---

**From:** Ardalan Attar
**Sent:** Thursday, May 8, 2025 1:13 PM
**To:** John Hebert, Jr.
**Cc:** Nicole Newman; Sean Greenwood; Zack Truesdell; Kyle Kinsel; Dakota Fontenot; Glynn Nance
**Subject:** Re: Revised Purchase Documents

John,

Let us know when you have reviewed the real estate purchase agreement sent by Nicole. Once we are done with the documents we should all get on a call to discuss closing.

I am available tomorrow 10-2pm.

**Ardalan Attar**

*Partner*

1177 W Loop S, Ste. 1700| Houston, Texas 77027
p. 713-659-7617 | f. 713-659-7641

UNOFFICIAL COPY

DF005507

CONFIDENTIALITY NOTICE: This email transmission and any attachments may be privileged, confidential or otherwise protected from disclosure and is intended only for the named recipient. The use, distribution, transmittal by an unintended recipient of this communication is strictly prohibited without our express approval in writing. If you are not the intended recipient, please delete it from your system without copying it and notify our firm. Receipt by anyone other than the intended recipient is not a waiver of any attorney-client or work-product privilege.

---

**From:** Nicole Newman <nnewman@christianattarlaw.com>
**Sent:** Wednesday, May 7, 2025 2:06 PM
**To:** John Hebert, Jr. <john@gwoodlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** RE: Revised Purchase Documents

John:

Got it, thanks. Please find attached the real estate purchase agreement. Redlines should show the new changes.

Thank you,

Nicole

---

**From:** John Hebert, Jr. <john@gwoodlaw.com>
**Sent:** Tuesday, May 6, 2025 5:38 PM
**To:** Nicole Newman <nnewman@christianattarlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** Re: Revised Purchase Documents

See attached revised membership agreement for your review. We adjusted the purchase price (see comment in draft).

Thank you,

**John Hebert Jr.**

**The Greenwood Law Firm PLLC**

1415 North Loop West, Ste. 1250

Houston, TX 77008

TEL (832)356-1588

DF005508

DIRECT (832) 371-6247

FAX (832)356-1589

EMAIL john@gwoodlaw.com

WEB www.gwoodlaw.com

**Confidentiality Notice:** The contents of this email may contain confidential and/or attorney-client privileged information. If you are not the intended recipient, please reply to this email indicating that you received it and destroy it, along with any copies or attachments. I appreciate your compliance and courtesy.

---

**From:** John Hebert, Jr.
**Sent:** Tuesday, May 6, 2025 3:23 PM
**To:** Nicole Newman
**Cc:** Sean Greenwood; Ardalan Attar
**Subject:** Re: Revised Purchase Documents

That's fine.

Thank you,

**John Hebert Jr.**

**The Greenwood Law Firm PLLC**

1415 North Loop West, Ste. 1250

Houston, TX  77008

TEL (832)356-1588

**DIRECT (832) 371-6247**

FAX (832)356-1589

EMAIL john@gwoodlaw.com

WEB www.gwoodlaw.com

**Confidentiality Notice:** The contents of this email may contain confidential and/or attorney-client privileged information. If you are not the intended recipient, please reply to this email indicating that you received it and destroy it, along with any copies or attachments. I appreciate your compliance and courtesy.

---

**From:** Nicole Newman <nnewman@christianattarlaw.com>

UNOFFICIAL COPY

DF005509

**Sent:** Tuesday, May 6, 2025 2:49 PM
**To:** John Hebert, Jr. <john@gwoodlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** RE: Revised Purchase Documents

John:

If HFR's only asset is the real property, please let me know if you're okay with going off of the prior draft of the Purchase and Sale Agreement for the real property. If so, I can find the latest draft and redline from there if we have additional changes.

Thanks,

Nicole

_____

**From:** John Hebert, Jr. <john@gwoodlaw.com>
**Sent:** Tuesday, May 6, 2025 2:15 PM
**To:** Nicole Newman <nnewman@christianattarlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** Re: Revised Purchase Documents

Nicole,

My client told me your client wants to do an asset purchase for HFR instead of a stock purchase. If so, please draft the asset purchase agreement so we can review it.

Thank you,

**John Hebert Jr.**

**The Greenwood Law Firm PLLC**

1415 North Loop West, Ste. 1250

Houston, TX 77008

TEL (832)356-1588

**DIRECT (832) 371-6247**

DF005510

FAX (832)356-1589

EMAIL john@gwoodlaw.com

WEB www.gwoodlaw.com

**Confidentiality Notice:** The contents of this email may contain confidential and/or attorney-client privileged information. If you are not the intended recipient, please reply to this email indicating that you received it and destroy it, along with any copies or attachments. I appreciate your compliance and courtesy.

---

**From:** Nicole Newman <nnewman@christianattarlaw.com>
**Sent:** Tuesday, May 6, 2025 10:18 AM
**To:** John Hebert, Jr. <john@gwoodlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** RE: Revised Purchase Documents

John: I think I've only seen documents to be included for Schedules 1.2 and 2.3 – which appear to be the same doc (as identified in the DropBox) The attached is the latest version of this I have seen though. I've also seen the excluded assets for BFD GP & LP. Otherwise, I don't think I've seen any of the other schedules.

---

**From:** John Hebert, Jr. <john@gwoodlaw.com>
**Sent:** Tuesday, May 6, 2025 9:32 AM
**To:** Nicole Newman <nnewman@christianattarlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** Re: Revised Purchase Documents

Nicole,

See attached comments and revisions to the redline documents for your review. I've included the following documents responsive to your comments:

- Amended and Restated Limited Partnership Agreement (responsive to your comment in the Membership Purchase)
- Attachment A and short legal descriptions of HFR real property (Exhibit A comment)

Please let me know what Schedules are missing so I can make sure that we have provided them to you.

Thank you,

DF005511

**John Hebert Jr.**

**The Greenwood Law Firm PLLC**

1415 North Loop West, Ste. 1250

Houston, TX  77008

TEL (832)356-1588

**DIRECT (832) 371-6247**

FAX (832)356-1589

EMAIL john@gwoodlaw.com

WEB www.gwoodlaw.com

**Confidentiality Notice:**  The contents of this email may contain confidential and/or attorney-client privileged information.  If you are not the intended recipient, please reply to this email indicating that you received it and destroy it, along with any copies or attachments.  I appreciate your compliance and courtesy.

---

**From:** Nicole Newman <nnewman@christianattarlaw.com>
**Sent:** Monday, May 5, 2025 5:06 PM
**To:** John Hebert, Jr. <john@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>
**Subject:** RE: Revised Purchase Documents

John:

I accepted nearly all of the redlines in the docs and deleted resolved or pending comments to clean up the docs. I made a comment if redlines were left unaccepted. I also made a few more proposed changes for your review.

Also, I don't think we've received all the Schedules mentioned in the Ice Embassy or HFR Stock Purchase Agreement. Please let me know if this is in error.

Thank you,

Nicole

---

**From:** John Hebert, Jr. <john@gwoodlaw.com>
**Sent:** Thursday, May 1, 2025 6:21 PM
**To:** Ardalan Attar <aattar@christianattarlaw.com>

DF005512

**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Nicole Newman <nnewman@christianattarlaw.com>
**Subject:** Re: Revised Purchase Documents

That's good news. Please see attached updated revised agreements and documents for your review.

Thank you,

**John Hebert Jr.**

**The Greenwood Law Firm PLLC**

1415 North Loop West, Ste. 1250

Houston, TX  77008

TEL (832)356-1588

**DIRECT (832) 371-6247**

FAX (832)356-1589

EMAIL john@gwoodlaw.com

WEB www.gwoodlaw.com

**Confidentiality Notice:**  The contents of this email may contain confidential and/or attorney-client privileged information.  If you are not the intended recipient, please reply to this email indicating that you received it and destroy it, along with any copies or attachments.  I appreciate your compliance and courtesy.

**From:** Ardalan Attar <aattar@christianattarlaw.com>
**Sent:** Thursday, May 1, 2025 4:23 PM
**To:** John Hebert, Jr. <john@gwoodlaw.com>; Nicole Newman <nnewman@christianattarlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>
**Subject:** Re: Revised Purchase Documents

I think Zack and your client figured it out.

Thanks.

Get Outlook for iOS

UNOFFICIAL COPY

DF005513

**From:** John Hebert, Jr. <john@gwoodlaw.com>
**Sent:** Thursday, May 1, 2025 4:22:32 PM
**To:** Nicole Newman <nnewman@christianattarlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** Re: Revised Purchase Documents

Nicole,

Following up on my previous email. Let me know what time works for you to have our call.

Thank you,

**John Hebert Jr.**

**The Greenwood Law Firm PLLC**

1415 North Loop West, Ste. 1250

Houston, TX  77008

TEL (832)356-1588

**DIRECT (832) 371-6247**

FAX (832)356-1589

EMAIL john@gwoodlaw.com

WEB www.gwoodlaw.com

**Confidentiality Notice:**  The contents of this email may contain confidential and/or attorney-client privileged information.  If you are not the intended recipient, please reply to this email indicating that you received it and destroy it, along with any copies or attachments.  I appreciate your compliance and courtesy.

---

**From:** John Hebert, Jr. <john@gwoodlaw.com>
**Sent:** Wednesday, April 30, 2025 8:33 PM
**To:** Nicole Newman <nnewman@christianattarlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** Re: Revised Purchase Documents

I have some time tomorrow afternoon from 1:30 p.m. to 3:30 p.m., and I'm fairly flexible for most of Friday. Let me know what works for you.

DF005514

Thank you,

**John Hebert Jr.**

**The Greenwood Law Firm PLLC**

1415 North Loop West, Ste. 1250

Houston, TX  77008

TEL (832)356-1588

**DIRECT (832) 371-6247**

FAX (832)356-1589

EMAIL john@gwoodlaw.com

WEB www.gwoodlaw.com

**Confidentiality Notice:**  The contents of this email may contain confidential and/or attorney-client privileged information.  If you are not the intended recipient, please reply to this email indicating that you received it and destroy it, along with any copies or attachments.  I appreciate your compliance and courtesy.

**From:** Nicole Newman <nnewman@christianattarlaw.com>
**Sent:** Wednesday, April 30, 2025 3:55 PM
**To:** John Hebert, Jr. <john@gwoodlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** RE: Revised Purchase Documents

John, please let me know if we can get on a call this week to discuss the treatment of the outstanding bills to make sure we're all on the same page. Thank you, Nicole

---

**From:** Nicole Newman
**Sent:** Wednesday, April 30, 2025 3:21 PM
**To:** John Hebert, Jr. <john@gwoodlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** RE: Revised Purchase Documents

John, we also began going through the DropBox provided but noticed there are folders for the Schedules to be attached to these agreements, but some of the folders have a document while others do not. Will you please confirm whether those Schedules will be provided? For each entity, I think I have only seen the "Outstanding Bills" tables. Thank you.

UNOFFICIAL COPY

DF005515

**From:** Nicole Newman
**Sent:** Wednesday, April 30, 2025 2:42 PM
**To:** 'John Hebert, Jr.' <john@gwoodlaw.com>
**Cc:** 'Sean Greenwood' <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** RE: Revised Purchase Documents

John,

Please find attached our edits to the agreements. I accepted all outstanding redlines, responded or resolved comments, and on a few agreements, left some redlines to reflect the latest proposed changes.

I've also attached the Exhibit A to the HFR Stock Purchase Agreement. Most of the language was taken from the original Real Estate Purchase Agreement and revised.

Thank you,

Nicole

---

**From:** Nicole Newman
**Sent:** Tuesday, April 29, 2025 2:52 PM
**To:** John Hebert, Jr. <john@gwoodlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** RE: Revised Purchase Documents

Hi John, expecting to have my changes back to you by tomorrow. Thank you, Nicole

---

**From:** John Hebert, Jr. <john@gwoodlaw.com>
**Sent:** Tuesday, April 29, 2025 1:45 PM
**To:** Nicole Newman <nnewman@christianattarlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** Re: Revised Purchase Documents

Nicole,

Any update on your review of the revised agreements? Let me know.

UNOFFICIAL COPY

DF005516

Thank you,


**John Hebert Jr.**

**The Greenwood Law Firm PLLC**

1415 North Loop West, Ste. 1250

Houston, TX  77008

TEL (832)356-1588

**DIRECT (832) 371-6247**

FAX (832)356-1589

EMAIL john@gwoodlaw.com

WEB www.gwoodlaw.com


**Confidentiality Notice:**  The contents of this email may contain confidential and/or attorney-client privileged information.  If you are not the intended recipient, please reply to this email indicating that you received it and destroy it, along with any copies or attachments.  I appreciate your compliance and courtesy.

---

**From:** John Hebert, Jr.
**Sent:** Friday, April 25, 2025 3:08 PM
**To:** Nicole Newman
**Cc:** Sean Greenwood; Ardalan Attar
**Subject:** Revised Purchase Documents


Nicole,


See attached new revisions to the purchase agreements for your review. Let me know if you have any questions.


Thank you,


**John Hebert Jr.**

**The Greenwood Law Firm PLLC**

DF005517

1415 North Loop West, Ste. 1250

Houston, TX  77008

TEL (832)356-1588

**DIRECT (832) 371-6247**

FAX (832)356-1589

EMAIL john@gwoodlaw.com

WEB www.gwoodlaw.com

**Confidentiality Notice**:  The contents of this email may contain confidential and/or attorney-client privileged information.  If you are not the intended recipient, please reply to this email indicating that you received it and destroy it, along with any copies or attachments.  I appreciate your compliance and courtesy.

DF005518

UNOFFICIAL COPY

DF005519

# ENTERTAINMENT MARKETING & MANAGEMENT, LP

## Balance Sheet

### As of December 31, 2024

| | TOTAL |
|---|---:|
| **ASSETS** | |
| Current Assets | |
| Bank Accounts | |
| Cash on Hand | 0.00 |
| ORIGIN BANK #1518 | 0.00 |
| TX 1st BANK | 286.31 |
| WFB (1633) | 0.00 |
| **Total Bank Accounts** | **$286.31** |
| Accounts Receivable | |
| A/R - ACCOUNTS RECEIVABLE | 0.00 |
| **Total Accounts Receivable** | **$0.00** |
| Other Current Assets | |
| 1000322 A/R - BFD | 0.00 |
| 1000323 A/R - DALLAS | 0.00 |
| 1000324 A/R - SHOWBIZ | 0.00 |
| 1000325 A/R - HFR | 0.00 |
| 1000325 A/R - ICE EMBASSY, INC. | -380,216.00 |
| 1000326 A/R - HFR INTERPRISES | 0.00 |
| 1000328 A/R - VIVA LAS VEGAS PROPERTIES | 0.00 |
| 1000331 A/R - CELEBRITY PIZZA | 0.00 |
| 1000332 A/R - HOLLI ANN HARDIN TRUST | 0.00 |
| 1000411 EMPLOYEE ADVANCE-DAKOTA FONENOT | 0.00 |
| 1000412 EMPLOYEE ADVANCE-DALLAS FONTENO | 0.00 |
| 12000 Undeposited Funds | 0.00 |
| 3000175 A/R HFR | 0.00 |
| ICE PPP MONEY TO LUCKY DOG PUB | 0.00 |
| LOAN TO DALLAS FONTENOT | 419,420.99 |
| LOAN TO DF FROM HAH TRUST NO. 1 | 0.00 |
| LOAN TO HOLLI FONTENOT | 3,097.88 |
| **Total Other Current Assets** | **$42,302.87** |
| **Total Current Assets** | **$42,589.18** |
| Fixed Assets | |
| 2000000 PROPERTY & EQUIPMENT | 219.96 |
| 2520000 COMPUTERS | 749.99 |
| 2520001 SCANNER | 329.99 |
| **Total 2000000 PROPERTY & EQUIPMENT** | **1,299.94** |
| **Total Fixed Assets** | **$1,299.94** |
| **TOTAL ASSETS** | **$43,889.12** |

UNOFFICIAL COPY

> EXHIBIT
> **21**

Accrual Basis  Monday, January 13, 2025 04:15 PM GMT-06:00

DF008866

# ENTERTAINMENT MARKETING & MANAGEMENT, LP

### Balance Sheet

As of December 31, 2024

| | TOTAL |
|---|---|
| LIABILITIES AND EQUITY | |
| Liabilities | |
| Current Liabilities | |
| Accounts Payable | |
| 2000 Accounts Payable | -1,503.63 |
| **Total Accounts Payable** | **$ -1,503.63** |
| Credit Cards | |
| AMEX #42007 (Dakota) | 50.00 |
| CAP ON 7913 - HOLLI | 0.00 |
| CHASE #4046 (Dakota) | 182.82 |
| DISCOVER #0907 (DAKOTA) | 0.00 |
| WF #3818 CC  Rhino Construction | 0.00 |
| WF #6811 CC Ice Embassy | 0.00 |
| **Total Credit Cards** | **$232.82** |
| Other Current Liabilities | |
| 2100 Payroll Liabilities | 4,341.05 |
| Dental Insurance | 4,327.18 |
| Federal Taxes (941/943/944) | 23,649.16 |
| Federal Unemployment (940) | 210.00 |
| Health Insurance | 86,757.80 |
| Life Insurance | 458.10 |
| TX Unemployment Tax | 15.77 |
| Vision Insurance | 666.76 |
| **Total 2100 Payroll Liabilities** | **120,425.82** |
| 2100100 PAYROLL LIABILITIES - OTHER | 0.00 |
| 2110 Direct Deposit Liabilities | 3,115.48 |
| 3400041 A/P - HFR ENTERPRISES | 79,475.00 |
| 3400042 A/P-Holli Ann Hardin Trust # 1 | 222,050.00 |
| 4000110 N/P DUE TO/FROM ICE (OPERATING) | 123,062.76 |
| ASK ACCOUNTANT | 0.00 |
| DAKOTA SCHOOL LOAN | 0.00 |
| Direct Deposit Payable | 0.00 |
| EIDL Loan | 0.00 |
| EMM PPP Loan | 0.00 |
| EMM PPP Loan #2 | 0.00 |
| FREAKY TIKI | 0.00 |
| **Total Other Current Liabilities** | **$548,129.06** |
| **Total Current Liabilities** | **$546,858.25** |

UNOFFICIAL COPY

**Accrual Basis  Monday, January 13, 2025 04:15 PM GMT-06:00**

DF008867

# ENTERTAINMENT MARKETING & MANAGEMENT, LP

## Balance Sheet

As of December 31, 2024

|  | TOTAL |
|---|---|
| Long-Term Liabilities |  |
| 4000100 NOTE - HFR ENTERPRISES | 0.00 |
| 4000103 NOTE - DALLAS FONTENOT | 0.00 |
| 4000106 NOTE - DAKOTA TRUST | 0.00 |
| 4000107 HOLLI ANN HARDIN TRUST | 0.00 |
| 4000108 NOTE - ICE EMBASSY | 0.00 |
| Due To Shareholders | -0.67 |
| **Total Long-Term Liabilities** | **$ -0.67** |
| **Total Liabilities** | **$546,857.58** |
| Equity |  |
| 5000500 PAID IN CAPITAL | 0.00 |
| 5000501 BFD #1 - PAID IN CAPITAL | 2,475.00 |
| 5000502 BFD #2 - PAID IN CAPITAL | 2,475.00 |
| 5000503 BFD #3 - PAID IN CAPITAL | 2,475.00 |
| 5000504 BFD #4 - PAID IN CAPITAL | 2,475.00 |
| 5000505 SHOWBIZZ - PAID IN CAPITAL | 100.00 |
| **Total 5000500 PAID IN CAPITAL** | **10,000.00** |
| 5100100 BFD #1 EARNINGS | 0.00 |
| 5100200 BFD #1 DISTRIBUTIONS | 0.00 |
| 5200100 BFD #2 EARNINGS | 0.00 |
| 5200200 BFD #2 DISTRIBUTIONS | 0.00 |
| 5300100 BFD #3 EARNINGS | 0.00 |
| 5300200 BFD #3 DISTRIBUTIONS | 0.00 |
| 5400100 BFD #4 EARNINGS | 0.00 |
| 5400200 BFD #4 DISTRIBUTIONS | 0.00 |
| 5500100 SHOWBIZZ EARNINGS | 0.00 |
| 5500200 SHOWBIZZ DISTRIBUTIONS | 0.00 |
| 5800003 TREASURY STOCK | 0.00 |
| 5800005 RETAINED EARNINGS | 123,534.00 |
| Net Income | -636,502.46 |
| **Total Equity** | **$ -502,968.46** |
| **TOTAL LIABILITIES AND EQUITY** | **$43,889.12** |

UNOFFICIAL COPY

**Accrual Basis  Monday, January 13, 2025 04:15 PM GMT-06:00**

DF008868

# ENTERTAINMENT MARKETING & MANAGEMENT, LP

## Balance Sheet
As of April 30, 2025

|  | TOTAL |
|---|---:|
| **ASSETS** | |
|   Current Assets | |
|   Bank Accounts | |
|     Cash on Hand | 0.00 |
|     ORIGIN BANK #1518 | 0.00 |
|     TX 1st BANK | 8,241.18 |
|     WFB (1633) | 0.00 |
|   Total Bank Accounts | **$8,241.18** |
|   Accounts Receivable | |
|     A/R - ACCOUNTS RECEIVABLE | 0.00 |
|   Total Accounts Receivable | **$0.00** |
|   Other Current Assets | |
|     1000322 A/R - BFD | 0.00 |
|     1000323 A/R - DALLAS | 0.00 |
|     1000324 A/R - SHOWBIZ | 0.00 |
|     1000325 A/R - HFR | 0.00 |
|     1000325 A/R - ICE EMBASSY, INC. | -432,454.30 |
|     1000326 A/R - HFR INTERPRISES | 0.00 |
|     1000328 A/R - VIVA LAS VEGAS PROPERTIES | 0.00 |
|     1000331 A/R - CELEBRITY PIZZA | 0.00 |
|     1000332 A/R - HOLLI ANN HARDIN TRUST | 10,470.00 |
|     1000411 EMPLOYEE ADVANCE-DAKOTA FONENOT | 0.00 |
|     1000412 EMPLOYEE ADVANCE-DALLAS FONTENO | 0.00 |
|     12000 Undeposited Funds | 0.00 |
|     3000175 A/R HFR | 0.00 |
|     ICE PPP MONEY TO LUCKY DOG PUB | 0.00 |
|     LOAN TO DALLAS FONTENOT | 419,420.99 |
|     LOAN TO DF FROM HAH TRUST NO. 1 | 0.00 |
|     LOAN TO HOLLI FONTENOT | 3,097.88 |
|     Payroll Refunds | -2,269.23 |
|   Total Other Current Assets | **$ -1,734.66** |
|   Total Current Assets | **$6,506.52** |
|   Fixed Assets | |
|     2000000 PROPERTY & EQUIPMENT | 219.96 |
|     2520000 COMPUTERS | 749.99 |
|     2520001 SCANNER | 329.99 |
|   Total 2000000 PROPERTY & EQUIPMENT | 1,299.94 |
|   Total Fixed Assets | **$1,299.94** |
| **TOTAL ASSETS** | **$7,806.46** |

**EXHIBIT 22**

DF002731

# ENTERTAINMENT MARKETING & MANAGEMENT, LP

## Balance Sheet

As of April 30, 2025

UNOFFICIAL COPY

| | TOTAL |
|---|---|
| LIABILITIES AND EQUITY | |
| Liabilities | |
| Current Liabilities | |
| Accounts Payable | |
| 2000 Accounts Payable | -1,088.62 |
| **Total Accounts Payable** | **$ -1,088.62** |
| Credit Cards | |
| AMEX #42007 (Dakota) | 50.00 |
| CAP ON 7913 - HOLLI | 0.00 |
| CHASE #4046 (Dakota) | 182.82 |
| DISCOVER #0907 (DAKOTA) | 0.00 |
| WF #3818 CC  Rhino Construction | 0.00 |
| WF #6811 CC Ice Embassy | 0.00 |
| **Total Credit Cards** | **$232.82** |
| Other Current Liabilities | |
| 2100 Payroll Liabilities | 4,341.05 |
| Dental Insurance | 5,450.38 |
| Federal Taxes (941/943/944) | 51,478.57 |
| Federal Unemployment (940) | 168.00 |
| Health Insurance | 110,300.72 |
| Life Insurance | 589.23 |
| TX Unemployment Tax | 0.00 |
| Vision Insurance | 837.04 |
| **Total 2100 Payroll Liabilities** | **173,164.99** |
| 2100100 PAYROLL LIABILITIES - OTHER | 0.00 |
| 2110 Direct Deposit Liabilities | 3,115.48 |
| 3400010 A/P - ICE EMBASSY INC | 80,364.27 |
| 3400041 A/P - HFR ENTERPRISES | 78,841.17 |
| 3400042 A/P-Holli Ann Hardin Trust # 1 | 222,050.00 |
| 4000110 N/P DUE TO/FROM ICE (OPERATING) | 123,062.76 |
| ASK ACCOUNTANT | 0.00 |
| DAKOTA SCHOOL LOAN | 0.00 |
| Direct Deposit Payable | 0.00 |
| EIDL Loan | 0.00 |
| EMM PPP Loan | 0.00 |
| EMM PPP Loan #2 | 0.00 |
| FREAKY TIKI | 10,470.00 |
| **Total Other Current Liabilities** | **$691,068.67** |
| **Total Current Liabilities** | **$690,212.87** |

DF002732

# ENTERTAINMENT MARKETING & MANAGEMENT, LP

## Balance Sheet

As of April 30, 2025

| | TOTAL |
|---|---|
| **Long-Term Liabilities** | |
| 4000100 NOTE - HFR ENTERPRISES | 0.00 |
| 4000103 NOTE - DALLAS FONTENOT | 0.00 |
| 4000106 NOTE - DAKOTA TRUST | 0.00 |
| 4000107 HOLLI ANN HARDIN TRUST | 0.00 |
| 4000108 NOTE - ICE EMBASSY | 0.00 |
| Due To Shareholders | -0.67 |
| **Total Long-Term Liabilities** | **$ -0.67** |
| **Total Liabilities** | **$690,212.20** |
| **Equity** | |
| 5000500 PAID IN CAPITAL | 0.00 |
| 5000501 BFD #1 - PAID IN CAPITAL | 2,475.00 |
| 5000502 BFD #2 - PAID IN CAPITAL | 2,475.00 |
| 5000503 BFD #3 - PAID IN CAPITAL | 2,475.00 |
| 5000504 BFD #4 - PAID IN CAPITAL | 2,475.00 |
| 5000505 SHOWBIZZ - PAID IN CAPITAL | 100.00 |
| **Total 5000500 PAID IN CAPITAL** | **10,000.00** |
| 5100100 BFD #1 EARNINGS | 0.00 |
| 5100200 BFD #1 DISTRIBUTIONS | 0.00 |
| 5200100 BFD #2 EARNINGS | 0.00 |
| 5200200 BFD #2 DISTRIBUTIONS | 0.00 |
| 5300100 BFD #3 EARNINGS | 0.00 |
| 5300200 BFD #3 DISTRIBUTIONS | 0.00 |
| 5400100 BFD #4 EARNINGS | 0.00 |
| 5400200 BFD #4 DISTRIBUTIONS | 0.00 |
| 5500100 SHOWBIZZ EARNINGS | 0.00 |
| 5500200 SHOWBIZZ DISTRIBUTIONS | 0.00 |
| 5800003 TREASURY STOCK | 0.00 |
| 5800005 RETAINED EARNINGS | -512,968.46 |
| Net Income | -179,437.28 |
| **Total Equity** | **$ -682,405.74** |
| **TOTAL LIABILITIES AND EQUITY** | **$7,806.46** |

UNOFFICIAL COPY

DF002733

FILED
3/16/2026 8:02 PM
Teneshia Hudspeth
County Clerk
Harris County - County Probate Court No. 1
Accepted By: NA



**EXHIBIT**

**34**

No. 537,721

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY AS | § | IN THE PROBATE COURT |
| TRUSTEE OF THE HOLLI ANN HARDIN | § | |
| TRUST NUMBER ONE | § | |
| *Plaintiff,* | § | |
| | § | NUMBER ONE (1) OF |
| v. | § | |
| | § | |
| DAKOTA FONTENOT, | § | |
| *Defendant.* | § | HARRIS COUNTY, TEXAS |

## DEFENDANT'S OBJECTION TO THE PROPOSED ORDER
## FOR TEMPORARY INJUNCTION

Defendant, Dakota Fontenot ("Defendant"), submits his Objection to the Proposed Order for Temporary Injunction filed on March 13, 2026, and would respectfully show as follows:

1. The Court conducted an evidentiary hearing on Plaintiff Linda Goehrs ("Plaintiff"), Successor Trustee of the Holli Ann Hardin Trust Number One and Intervenors Applications for Temporary Injunction on March 6, 2026.

2. The Court continued the hearing on March 9, 2026, and March 13, 2026.

3. On March 9, 2026, Plaintiff submitted a proposed order for temporary injunction.

4. The hearing concluded on March 13, 2026.

5. At the conclusion of the hearing, the Court ruled that the application for temporary injunction should be granted and stated that the bond be set in the amount of $1,000.00.

6. The Court also requested that a proposed order for temporary injunction be submitted.

1

7. Later that same day, a proposed order for Temporary Injunction was submitted to the Court.

8. Defendant objects to the proposed order for temporary injunction as submitted because it contains numerous factual statements and findings that were not made by the Court and are not supported by the record. The proposed order contains a litany of facts that, as drafted, state that the "Court finds" these facts. However, the Court did not make any findings of fact at the hearing, announce any findings of fact, and the proposed order improperly inserts heavily disputed facts and argumentative characterizations which are prejudicial to Defendant. In addition, the proposed order cites third parties and provides obligations to those third parties which are not before the Court and have not been served with process in this action.

9. It is highly prejudicial for the proposed order to state that the "Court finds" the numerous factual findings when these facts are highly contested and not stated in a neutral order which contains the relief that the Court did find, which was that the injunction should issue and the bond amount is set at $1,000.00.

10. A proposed order must accurately reflect the Court's ruling, not expand it. A proposed order should not include "findings" or "conclusions" that the Court did not announce.

11. On March 9, 2026, a proposed order for temporary injunction was submitted by Plaintiff Linda Goehrs, in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One. Defendant respectfully submits that the proposed order, submitted by Plaintiff, accurately reflects the Court's ruling, is void of any "findings" or "conclusions" which the Court did not announce, and should be adopted by the Court. A copy of the proposed order for temporary

2

injunction is attached to this Objection.

Accordingly, Defendant respectfully requests that the Court reject Intervenors' proposed order for temporary injunction and adopt the attached neutral proposed order for temporary injunction that accurately reflects the Court's ruling.

Respectfully submitted,

*/s/ Paul S. Beik*
PAUL S. BEIK
Texas State Bar Number: 24054444
paul@beiklaw.com
440 Louisiana Street, Suite 1800
Houston, Texas 77002
Telephone: (713) 869-6975
**ATTORNEY FOR DEFENDANT
DAKOTA FONTENOT**

3

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been served upon all parties of record in this Cause, in accordance with the Texas Rules of Civil Procedure on March 16, 2025.

RUDOLPH M. CULP                    VIA E-SERVICE
State Bar No. 24043014
rudy@texasprobateattorney.com
COLLIN J. BULLARD
State Bar No. 24129570
collin@texasprobateattorney.com
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
Telephone: (713) 297-0700
Fax: (817) 383-5110

**ATTORNEYS FOR PLAINTIFF,
LINDA GOEHRS, IN HER CAPACITY AS
TRUSTEE OF THE HOLLI ANN HARDIN
TRUST NUMBER ONE**

Ryan O. Cantrell                   VIA E-SERVICE
Texas Bar No. 24055259
ryan.cantrell@chamberlainlaw.com
Mariah J. Karigan
Texas Bar No. 24123088
mariah.karigan@chamberlainlaw.com
1200 Smith Street, Suite 1400
Houston, Texas 77002
Telephone: (713) 658-1818
Facsimile: (713) 658-2553

**COUNSEL FOR MICHELLE FONTENOT AND
DALLAS JOSEPH FONTENOT III**

_/s/  Paul S. Beik_____
PAUL S. BEIK

4

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Paul Beik on behalf of Paul Beik
Bar No. 24054444
paul@beiklaw.com
Envelope ID: 112490162
Filing Code Description: Objection
Filing Description: to the Proposed Order for Temporary Injunction
Status as of 3/17/2026 3:10 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Paul Beik | 24054444 | paul@beiklaw.com | 3/16/2026 8:02:28 PM | SENT |
| James Ardoin | 24045420 | jimmy@jimmyardoinlaw.com | 3/16/2026 8:02:28 PM | SENT |
| Ryan Cantrell | | ryan.cantrell@chamberlainlaw.com | 3/16/2026 8:02:28 PM | SENT |
| Mariah Karigan | | mariah.karigan@chamberlainlaw.com | 3/16/2026 8:02:28 PM | SENT |

Associated Case Party: Linda Goehrs

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Kayla Brake | | kayla@texasprobateattorney.com | 3/16/2026 8:02:28 PM | SENT |
| Texas Probate Attorney, PLLC | | efile@texasprobateattorney.com | 3/16/2026 8:02:28 PM | SENT |
| Rudy Culp | | rudy@texasprobateattorney.com | 3/16/2026 8:02:28 PM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 3/16/2026 8:02:28 PM | SENT |
| Bailey Bowe | | bailey@texasprobateattorney.com | 3/16/2026 8:02:28 PM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 3/16/2026 8:02:28 PM | SENT |



EXHIBIT

35

FILED
3/17/2026 9:35 AM
Teneshia Hudspeth
County Clerk
Harris County - County Probate Court No. 1
Accepted By: EK



**CAUSE NO. 537,721**

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY AS TRUSTEE OF THE HOLLI ANN HARDIN TRUST NUMBER ONE<br>　　*Plaintiff,*<br><br>v.<br><br>DAKOTA FONTENOT<br>　　*Defendant.* | § § § § § § § § § § § § | IN PROBATE COURT<br><br><br>NUMBER ONE OF<br><br><br>HARRIS COUNTY, TEXAS |

**INTERVENORS' VERIFIED APPLICATION FOR *EX PARTE* TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

Michelle Fontenot ("Michelle") and Dallas Joseph Fontenot III ("Joe"), individually, as beneficiaries of the Holli Ann Hardin Trust Number One and Dakota Trust, file this Application for *Ex Parte* Temporary Restraining Order and Temporary Injunction, and in support thereof would respectfully show the Court as follows:

### FACTUAL BACKGROUND

1.　　As discussed in Michelle and Joe's Third Amended Answer, Affirmative Defenses, Cross-Claims, and Application for Temporary Injunctive Relief filed March 12, 2026 and incorporated herein by reference, Dakota Fontenot breached his fiduciary duties and diverted assets from the sale of the Colorado Club to an entity he controlled, at the expense of Michelle, Joe, and the Holli Ann Hardin Trust Number One. *See also* Exhibits 1-11.

2.　　Recently, Dakota has revealed that after wrongfully diverting millions of dollars to himself through the EMM Agreement, he and his wife, Madison, then created an entity in the U.S. Virgin Islands called Emerald Island Holdings, LLC and used the entity to purchase a home for approximately $2.4 million with the wrongfully acquired proceeds pursuant to the EMM Agreement. *See* Exhibit 12, Certificate of Formation. Dakota and Madison then transferred the entity to Madison's parents, Amir Shenaq and Sheila Shenaq, allegedly in exchange for a

NOT OFFICIAL COPY

1

35036999.v2

cancellation of an unidentified debt(s). *See* Exhibit 13, Articles of Amendment.  All the while, Dakota and Madison continued to treat the $2.4 million U.S. Virgin Islands home as their own, storing their furniture and personal effects in the home and assisting with remodeling the home.

3.      Unfortunately, Dakota and Madison's brazen fraudulent behavior didn't stop there. During the second day of the Temporary Injunction hearing, Dakota revealed that *the day before* the Temporary Injunction hearing was set to take place seeking to secure the remaining installment payments to avoid any further dissipation by Dakota, he signed a release of any rights to future installment payments (a value of approximately $937,500) in exchange for a reduced lump sum payment of $575,000—giving up $362,500 in an attempt to avoid an injunction that would prevent him from receiving any further payments. Dakota received a wire for the $575,000 lump sum payment *during the Temporary Injunction hearing on March 6, 2026*, and wired the money to an account in Madison's name the same day. Madison then apparently began transferring the money, including to her parents or an entity they control for an alleged "lease" of the $2.4 million U.S. Virgin Islands home.

4.      On Friday, March 13, 2026, the Court granted a Temporary Injunction against Dakota relating to the proceeds from the EMM Agreement. However, this Temporary Injunction will not suffice to protect Joe and Michelle, as Madison has received assets from the EMM Agreement and knowingly participated in unlawful conduct to defraud Joe and Michelle as set forth in Intervenor's Third Amended Answer, Affirmative Defenses, Cross-Claims, and Application for Temporary Injunctive Relief. Accordingly, Michelle and Joe bring this Application for Ex Parte Temporary Restraining Order and Temporary Injunction.

2

35036999.v2

**APPLICATION FOR *EX PARTE* TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

5.    Pursuant to Texas Rule of Civil Procedure 680, to prevent irreparable harm in the interim, Michelle and Joe request that the Court issue immediate injunctive relief.

6.    The purpose of a temporary restraining order and to preserve the status quo until a hearing can be held on a temporary injunction. Likewise, the issuance of a temporary injunction is intended "to maintain the status quo between the parties." *Cannan v. Green Oaks Apts., Ltd.*, 758 S.W.2d 753, 755 (Tex. 1988); *see also Clint Indep. Sch. Dist. v. Marquez*, 487 S.W.3d 538, 556 n.12 (Tex. 2026). As a general matter, in order to obtain a temporary injunction, the applicant "must plead and prove that it (1) has a cause of action against the opposing party; (2) has a probable right of relief on final trial to the relief sought; and (3) faces probable, imminent, and irreparable injury in the interim." *Clark v. Hastings Equity Partners, LLC*, 651 S.W.3d 359, 366 (Tex. App.— Houston [1st Dist.] 2022, no pet.). At this stage, the applicant "is not required to establish that the applicant will prevail on final trial." *Clark v. Clark*, 638 S.W.3d 829, 840 (Tex. App.—Houston [14th Dist.] 2021, no pet.). "The decision to grant or deny a temporary injunction lies in the sound discretion of the trial court, and the court's grant or denial is subject to reversal only for a clear abuse of that discretion." *Pidgeon v. Turner*, 625 S.W.3d 583, 606 (Tex. App.—Houston [14th Dist.] 2021). The court's discretion is not abused where the Court "applies the law correctly and some evidence reasonably supports its ruling." *Id.*

7.    Additionally, in an action involving fraudulent transfer claims under the Texas Uniform Fraudulent Transfer Act, a creditor may obtain "an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property, appointment of a receiver to take charge of the asset transferred or of other property of the transferee, or any other relief the circumstances may require." TEX. BUS. & COM. CODE § 24.008.

3

35036999.v2

**A. Michelle and Joe have causes of action against Madison for fraudulent transfers and conspiracy.**

8.  As shown through allegations above and the allegations contained in Michelle and Joe's Third Amended Answer, Affirmative Defenses, Cross-Claims, and Application for Temporary Injunctive Relief filed March 12, 2026 and incorporated herein by reference, Michelle and Joe have several viable causes of action against Madison relating to her actions in knowingly receiving and transferring misappropriated assets. Michelle and Joe have pleaded causes of action for fraudulent transfer and conspiracy. Therefore, Michelle and Joe have satisfied this element of their entitlement to injunctive relief.

**B. Michelle and Joe are likely to succeed on the merits of their causes of action.**

9.  The applicant "must establish a likelihood of success on the merits of the party's claims in order to obtain injunctive relief." *Courtright v. Allied Custom Homes, Inc.*, 647 S.W.3d 504, 519 (Tex. App.—Houston [1st Dist.] 2022, pet. denied). This element is satisfied where an applicant "produce[s] some evidence supporting every element of at least one valid legal theory." *31 Holdings I, LLC v. Argonaut Ins. Co.*, 640 S.W.3d 915, 923 (Tex. App.—Dallas 2022, no pet.); *see also Cameron Intern. Corp. v. Guillory*, 445 S.W.3d 840, 846 (Tex. App.—Houston [1st Dist.] 2014, no pet.). In other words, "[a] probable right of recovery is shown by alleging a cause of action and presenting evidence tending to sustain it." *Draper v. City of Arlington*, 629 S.W.3d 777, 784 (Tex. App.—Fort Worth 2021, pet. denied).

10.  As discussed *supra*, Madison knowingly received assets during the pendency of this litigation that were received through Dakota's breach of his fiduciary duty and misappropriation of assets, and engaged in transfers with Dakota in an attempt to hinder, delay, and defraud creditors. Madison is not a good faith transferee, and engaged in unlawful conduct with Dakota at the expense of Michelle and Joe. Notably, Madison was also an officer and director

4

35036999.v2

of HFR Enterprises and Ice Embassy, and owed the Holli Ann Hardin Trust fiduciary duties in connection with the sale of HFR Enterprises' assets, Ice Embassy, and EMM. The evidence attached to this Application as Exhibits 1 through 13 (e.g., Articles of Organization Emerald Islands Holdings LLC and Amended Articles of Organization Emerald Islands, LLC, which depict the transfer of the USVI entity to Madison's parents in the midst of the litigation) and Dakota's recent testimony at the Temporary Injunction proceedings, discussed *supra*, support a finding that Michelle and Joe are likely to succeed on the merits.

## C. Michelle and Joe face probable, imminent, and irreparably injury in the interim.

11.     Courts have held an injury is irreparable when, as here, "the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 024 (Tex. 2002). Michelle and Joe have no adequate remedy at law for Madison's wrongful actions. *See Sharma v. Vinman Int'l, Ltd.*, 231 S.W.3d 405, 426–27 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Specifically, Madison and Dakota have established and demonstrated a propensity to hide money through illicit transactions, utilizing shell companies and directing money in a way that will be difficult to trace, including the use of USVI entities and properties and related party insider transactions without consideration. As discussed *supra*, Madison and Dakota have transferred misappropriated assets to insiders—namely, Madison's parents—in an attempt to hide the assets and place them out of reach of Michelle and Joe as creditors. Dakota has consistently testified that he is insolvent, and upon information and belief Madison is also insolvent or may become judgment proof upon an award of the damages incurred by Michelle and Joe. Michelle and Joe will be irreparably harmed if Madison retains any control over and access to any of the proceeds from the sale of EMM. *See Hartwell v. Lone Star, PCA*, 528 S.W.3d 750 (Tex. App.—Texarkana 2017, pet dism'd) (where

35036999.v2

borrower in default and evidence showed he could not repay loan, irreparable injury found); *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 611 (Tex. App.—Houston [1st Dist.] 2002, no pet.); *Blackthorne v. Bellush*, 61 S.W.3d 439, 444 (Tex. App.—San Antonio 2001, no pet.) (plaintiff does not have adequate remedy at law if defendant is insolvent).

### D. Requested Injunctive Relief

12.     Michelle and Joe have satisfied the elements necessary to establish their right to injunctive relief. Michelle and Joe respectfully request that the Court issue a Temporary Restraining Order without a hearing given Madison's residence in the Virgin Islands and her actions in transferring assets during the pendency of the Temporary Injunction proceedings against her husband, Dakota. Michelle and Joe further request that the Court issue a Temporary Injunction and maintain the Temporary Injunction in place until a final trial on the merits. Michelle and Joe request that the Court enter a Temporary Restraining Order stating that:

a.  Madison Fontenot, her officers, agents, servants, employees, attorneys, and any person in active concert with her who receives actual notice of this Order by personal service or otherwise, are prohibited from spending, transferring, distributing, encumbering, pledging, or assigning any proceeds or assets held in any bank account in her name at any financial institution; and

b.  Madison Fontenot, her officers, agents, servants, employees, attorneys, and any person in active concert or participation with her who receives actual notice of this Order by personal service or otherwise, are restrained from spending, transferring, distributing, encumbering, pledging, or assigning any proceeds or assets traceable to any payment for the sale of BFD GP, LLC, BFD LP, LLC, and Entertainment Marketing & Management, Ltd., as well as any subsidiaries, successor entities, assigns, or transferees, including any payments made pursuant to the Partnership Interest Purchase Agreement and any amendments or supplements thereto, and any proceeds or assets received from Dakota Fontenot traceable to any payment for the sale of BFD GP, LLC, BFD LP, LLC, and Entertainment Marketing & Management, Ltd..

13.     Michelle and Joe request that the Court enter a Temporary Injunction stating that:

a.  Madison Fontenot, her officers, agents, servants, employees, attorneys, and any person in active concert with her who receives actual notice of this Order by

6

35036999.v2

personal service or otherwise, are prohibited from spending, transferring, distributing, encumbering, pledging, or assigning any proceeds or assets held in any bank account in her name at any financial institution; and

b. Madison Fontenot, her officers, agents, servants, employees, attorneys, and any person in active concert or participation with her who receives actual notice of this Order by personal service or otherwise, are restrained from spending, transferring, distributing, encumbering, pledging, or assigning any proceeds or assets traceable to any payment for the sale of BFD GP, LLC, BFD LP, LLC, and Entertainment Marketing & Management, Ltd., as well as any subsidiaries, successor entities, assigns, or transferees, including any payments made pursuant to the Partnership Interest Purchase Agreement and any amendments or supplements thereto, and any proceeds or assets received from Dakota Fontenot traceable to any payment for the sale of BFD GP, LLC, BFD LP, LLC, and Entertainment Marketing & Management, Ltd..

c. Within 15 days of the date of this Order, Madison Fontenot and her officers, agents, servants, employees, attorneys, and any person in active concert or participation with him who receives actual notice of this Order, are ordered to deposit all proceeds received that are traceable to the Partnership Interest Purchase Agreement in the registry of the Court;

d. Within 10 days of the date of this Order, Madison Fontenot is ordered to produce, in native format with any and all accompanying metadata:

   i. Documents relating to the creation, formation of Emerald Island Holdings, LLC, including any company agreements, formation documents, charters, amendments, or related documents, and any correspondence with any party relating to the establishment or creation of Emerald Island Holdings, LLC from January 1, 2025 to the present;

   ii. Any and all documents reflecting any transfer of interest or sale of Emerald Island Holdings, LLC, including any contracts, purchase orders, assignment of interest, correspondence, deeds, or related documents to any transfer from January 1, 2025 to the present;

   iii. Documents reflecting any wire transfer confirmations, transmittal emails, and bank account statements that relate to the sale of BFD GP, LLC, BFD LP, LLC, and Entertainment Marketing & Management, Ltd. and the Partnership Interest Purchase Agreement between Colorado Rose, LLC, BFD GP, LLC, BFD LP, LLC, Entertainment Marketing & Management, Ltd., and Dakota Fontenot (the "Partnership Interest Purchase Agreement") and any amendments or supplements thereto, Entertainment Marketing & Management, Ltd. or received any proceeds from the sale of Entertainment Marketing & Management, Ltd.;

7

iv. Any amendments or supplements to the Partnership Interest Purchase Agreement, including any drafts, and all communications with Amir Shenaq, Sheila Shenaq, Ardalan Attar, Christian Attar, Kyle Kinsel, Zack Truesdale, any agents or representatives of Colorado Rose, LLC, and any agents or representatives of Cle Group SKZ Real Estate, LLC regarding any amendments or supplements to the Partnership Interest Purchase Agreement;

v. Communications and contracts with Emerald Island Holdings, LLC, Amir Shenaq, Sheila Shenaq, Ardalan Attar, Christian Attar, Kyle Kinsel, Zack Truesdale, Colorado Rose, LLC, and/or Cle Group SKZ Real Estate, LLC, regarding Entertainment Marketing & Management, Ltd., the Partnership Interest Purchase Agreement and any amendments or supplements thereto, and payments for the sale of Entertainment Marketing & Management, Ltd., including any text messages and electronic correspondence;

vi. Documents relating to the purchase, acquisition, or lease of real property in the U.S. Virgin Islands, including any and all lease agreements, contracts, and communications;

vii. Documents relating to the sale of the 2926 Fontana Drive property, including contracts, written correspondences, payment receipts, settlement statements, and proof of payments;

viii. Documents relating to any loans with Amir Shenaq and/or Sheila Shenaq, including any emails, written correspondence, notes, text messages, electronic correspondence, contracts, support or justification for any loan agreement and/or loan forgiveness.

14. Michelle and Joe will suffer irreparable injury, loss, or damage if injunctive relief is not immediately granted. An *ex parte* temporary restraining order and temporary injunction should issue, and Michelle and Joe should only be required to post a minimal bond, if any, to preserve the status quo.

**PRAYER**

Michelle Fontenot and Dallas Joseph Fontenot III, respectfully request that the Court granted this Verified Application for *Ex Parte* Temporary Restraining Order and Temporary Injunction, award the relief requested herein, set the matter for a hearing for a Temporary Injunction, and grant them all other relief to which they may be justly entitled.

8

35036999.v2

Respectfully submitted,

**CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY, P.C.**

By:    /s/ Ryan O. Cantrell
      Ryan O. Cantrell
      Texas Bar No. 24055259
      ryan.cantrell@chamberlainlaw.com
      Mariah J. Karigan
      Texas Bar No. 24123088
      mariah.karigan@chamberlainlaw.com
      1200 Smith Street, Suite 1400
      Houston, Texas 77002
      Telephone:   (713) 658-1818
      Facsimile:   (713) 658-2553
      **COUNSEL FOR MICHELLE FONTENOT AND DALLAS JOSEPH FONTENOT III**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing instrument was served on this the 17th day of March, 2026, to the following:

Rudy Culp
Collin Bullard
TEXAS PROBATE ATTORNEY PLLC
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
*Counsel for Linda Goehrs*

Paul S. Beik
440 Louisiana Street, Suite 1800
Houston, Texas 77002
*Counsel for Dakota Fontenot*

                       /s/ Ryan O. Cantrell
                       Ryan O. Cantrell

9

35036999.v2

UNOFFICIAL COPY

CAUSE NO. 537,721

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY AS | § | IN PROBATE COURT |
| TRUSTEE OF THE HOLLI ANN | § | |
| HARDIN TRUST NUMBER ONE | § | |
| *Plaintiff,* | § | |
| | § | NUMBER ONE OF |
| v. | § | |
| | § | |
| DAKOTA FONTENOT | § | |
| *Defendant.* | § | HARRIS COUNTY, TEXAS |

VERIFICATION

STATE OF TEXAS            §
                                        §
COUNTY OF HARRIS     §

Before me, the undersigned notary, on this day personally appeared Dallas Joseph Fontenot, III, the affiant, whose identity is known to me. After I administered an oath, the affiant testified as follows:

"My name is Dallas Joseph Fontenot, III. I have read Intervenors' Verified Application for *Ex Parte* Temporary Restraining Order and Temporary Injunction and the facts stated in it are within my personal knowledge and are true and correct."

_____
Dallas Joseph Fontenot, III

Sworn to and subscribed before me by Dallas Joseph Fontenot, III on MARCH 16 _____, 2026.

_____
Notary Public in and for the State of Texas

MARIAH JILL KARIGAN
Notary Public, State of Texas
Comm. Expires 10-02-2029
Notary ID 135534850

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Lisa Adair on behalf of Ryan Cantrell
Bar No. 24055259
lisa.adair@chamberlainlaw.com
Envelope ID: 112500630
Filing Code Description: Application in an Existing Estate
Filing Description: Intervenors' Verified Application for Ex Parte Temporary
Restraining Order and Temporary Injunction
Status as of 3/17/2026 4:19 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Paul Beik | 24054444 | paul@beiklaw.com | 3/17/2026 9:35:13 AM | SENT |
| James Ardoin | 24045420 | jimmy@jimmyardoinlaw.com | 3/17/2026 9:35:13 AM | SENT |
| Kayla Brake | | kayla@texasprobateattorney.com | 3/17/2026 9:35:13 AM | SENT |
| Texas Probate Attorney, PLLC | | efile@texasprobateattorney.com | 3/17/2026 9:35:13 AM | SENT |
| Rudy Culp | | rudy@texasprobateattorney.com | 3/17/2026 9:35:13 AM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 3/17/2026 9:35:13 AM | SENT |
| Ryan Cantrell | | ryan.cantrell@chamberlainlaw.com | 3/17/2026 9:35:13 AM | SENT |
| Mariah Karigan | | mariah.karigan@chamberlainlaw.com | 3/17/2026 9:35:13 AM | SENT |
| Bailey Bowe | | bailey@texasprobateattorney.com | 3/17/2026 9:35:13 AM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 3/17/2026 9:35:13 AM | SENT |



Linda Goehrs, in her capacity as Trustee of the Holli Ann Hardin Trust Number One, Plaintiff
vs.
Dakota Fontenot, Defendant

Case 4:26-cv-02743     Document 7-1     Filed 04/29/26 in TXSD     Page 216 of 406

Harris County County Probate Court No.
537721

## TRUST DECLARATION FOR
## THE HOLLI ANN HARDIN TRUST NUMBER ONE

THIS TRUST DECLARATION is made this day by declaration of HOLLI HARDIN FONTENOT, a resident of Harris County, Texas ("Trustor"). The Effective Date of this Trust Declaration is June 5, 1991.

1. Trust Estate.

1.1 Creation of Trust. The Trustor hereby establishes, declares, and creates this Trust for the purposes hereinafter set forth, and the Trustee agrees to serve as the initial trustee and to hold the Trust Estate (as hereinafter defined) in trust upon the following provisions.

1.2 Transfer In Trust. On or about the Effective Date, the Trustor has transferred and delivered to the Trustee the cash sum of One Thousand and No/100 Dollars ($1,000.00). Such property shall constitute the initial property of the Trust Estate.

1.3 Beneficiaries. The Beneficiaries of this Trust shall be HOLLI HARDIN FONTENOT, DALLAS JOSEPH FONTENOT, JR., ANNE S. FONTENOT, DALLAS JOSEPH FONTENOT, III, MICHELLE ANNE FONTENOT, and any children of the marriage of HOLLI HARDIN FONTENOT and DALLAS JOSEPH FONTENOT, JR., including any children adopted by HOLLI HARDIN FONTENOT and DALLAS JOSEPH FONTENOT, JR. after the Effective Date (collectively, "Primary Beneficiaries"). Also Beneficiaries of this Trust are the children and other issue of each of the Primary Beneficiaries. The term "Beneficiary" will also mean any and all persons, organizations, trusts, and entities who may have or may acquire a beneficial interest in this Trust, whether vested or contingent in nature, resulting from the exercise of a power of appointment by a Beneficiary or otherwise.

1.4 Release of All Rights In Property. The Trustor hereby releases for the benefit of this Trust any and all rights which the Trustor may have in her individual capacity in the property constituting the Trust Estate.

1.5 Acceptance of the Trust. By acceptance hereof the Trustee, on her behalf and on behalf of her successors in trust, does by the execution hereof acknowledge receipt of the Trust Estate. The Trustee shall own, hold, and possess the Trust Estate (including any additional property which may

Page 1 of 18 Pages
B1142_81.01

COPY
UNOFFICIAL COPY

EXHIBIT
1

003158

at any time hereafter be transferred to the Trustee) in trust solely in the capacity of Trustee. The Trustee and her successors in trust shall hold, manage, sell, exchange, invest, and reinvest the Trust Estate; collect all income therefrom; and, after deducting such expenses as are properly payable from income, accumulate and distribute the Trust Estate as herein provided.

1.6   Additions to Trust Estate. The Trustor and any other person shall have the right at any time to add property to the Trust created herein. Such property, when received and accepted by the Trustee, shall become part of the Trust Estate.

1.7   Name of Trust. This Trust shall be known as THE HOLLI ANN HARDIN TRUST NUMBER ONE.

2. Irrevocability of Trust. The Trust herein created shall be irrevocable and shall not be altered, amended, revoked, or terminated by the Trustor or any other person except as specifically permitted by law.

3. Definitions. As used herein, the following terms shall have the following meanings.

3.1   Children. Issue. The term "child" or "children" shall refer only to any and all children born in lawful wedlock or lawfully adopted, whether born or adopted before or after the date of execution of this Trust Declaration. The term "issue" shall refer to the lawful blood descendants in the first, second, or any other degree of the ancestor designated.

3.2   Heirs at Law. Whenever a trustee or a legal advisor to the Trustee is called upon to determine the heirs at law of the Trustor or any other person beneficially interested in this Trust, the determination will be made to identify those individual, other than creditors, who would receive the personal property of a decedent upon his or her death as determined in accordance with the laws of intestate succession of the State of Texas, and further determined as if the Trustor of this Trust shall have predeceased the person or persons so named or described.

3.3   Minor Beneficiary. The term "Minor Beneficiary" identifies a Beneficiary who is less than twenty one years of age.

3.4   Disability. A Beneficiary will be considered "disabled" if he or she is incapacitated to an extent to make it impossible or impractical to give prompt and intelligent

Page 2 of 18 Pages

H1142_81.01

003159

consideration to business matters. The Trustee may act upon such evidence as the Trustee reasonably deems appropriate and reliable without liability by reason thereof.

3.5    Power of Appointment, Qualified Beneficiary Designation. Whenever this Trust gives a Beneficiary the power or authority to appoint a beneficiary of the Trust, the designation must be in writing and be acknowledged in the form required of acknowledgements by Texas law or exercised by a will executed with the formalities required by law of the Beneficiary's residence; it must clearly evidence the intent of the Beneficiary to exercise a power of appointment; and the written beneficiary designation must have been delivered to the Trustee prior to the Beneficiary's death or, if exercised by will, the will must have been filed for probate within three months from the date of the Beneficiary's date of death and must subsequently be admitted to probate no matter the time interval. The term of this Trust may be extended if the Qualified Beneficiary Designation requires that a Beneficiary's interest remain in Trust, or may be divided and be held as a separate trust which is governed by the terms of this Trust.

3.6    Trust Estate. The term "Trust Estate" shall mean any and all of the property delivered to the Trustee to be held, managed, and distributed under the terms of this Trust.

3.7    Trustee. For convenience, the term "Trustee," used in the singular, will mean and identify singular and multiple Trustees serving and acting pursuant to the directions of this Trust Declaration. The term "corporate Trustee" will identify a banking or trust corporation with trust powers.

4.    Appointment of Trustee.

4.1    Original Appointment. The Trustor appoints HOLLI HARDIN FONTENOT as Trustee of this Trust. In the event HOLLI HARDIN FONTENOT should fail to qualify, or having qualified, should die, resign, or become incapacitated or unable to act as Trustee of this Trust, or having qualified should subsequently become divorced from DALLAS JOSEPH FONTENOT, JR., then the Trustor appoints DALLAS JOSEPH FONTENOT, JR. as Trustee of this Trust. The parties acknowledge and agree that the rights and obligations of HOLLI HARDIN FONTENOT to serve as Trustee and to resign as Trustee in accordance with the foregoing have been and are the subject of separate consideration,

003160

receipt of which is hereby acknowledged in full, and such rights and obligations are in the best interest of the administration of the Trust for its Beneficiaries. HOLLI HARDIN FONTENOT specifically waives any rights which she may have to rescind or revoke her obligation to resign as Trustee upon divorce from DALLAS JOSEPH FONTENOT, JR.

4.2    Succession. At any time on or after his appointment as Trustee of this Trust, DALLAS JOSEPH FONTENOT, JR. will have the right to appoint a successor or successors to serve as Trustee in the event that DALLAS JOSEPH FONTENOT, JR. chooses not to serve as Trustee or ceases to serve as Trustee for any reason, and DALLAS JOSEPH FONTENOT, JR. may specify any conditions upon succession and service as may be permitted by law.

For example, a successor may be required to furnish a fiduciary bond as a prerequisite or a successor's service may be condition upon the death, resignation, or inability to serve of another appointee.

At any time on or after his appointment as Trustee of this Trust, DALLAS JOSEPH FONTENOT, JR. may also provide that one or more designated successors will have the authority to appoint his, her, or its successor as Trustee. An appointment of successor Trustee must be in writing and must be acknowledged to be effective.

In the absence of an appointment, or in the event all successors appointed by a Trustee shall fail or cease to serve for any reason, DALLAS JOSEPH FONTENOT, III is to be the successor as Trustee.

Trustor specifically provides that upon assumption of actual service as Trustee, DALLAS JOSEPH FONTENOT, III will have the right to appoint his successor as Trustee and to vest in a successor Trustee, upon assumption of that person's service, the right and authority to designate succession as Trustee.

In the event all of the Trustees named above, including duly appointed successors, fail or cease to serve for any reason, then FIRST INTERSTATE BANK OF TEXAS, N.A. is to be the successor Trustee. The appointment of FIRST INTERSTATE BANK OF TEXAS, N.A. as Trustee will include any successor to FIRST INTERSTATE BANK OF TEXAS, N.A. by reason of its merger, reorganization, or sale to another banking corporation with trust powers or a trust company with trust powers.

Page 4 of 18 Pages
B1142_81.01

5. **Distribution of Income and Trust Corpus, Living and Port-Mortem.** The Trustee shall hold in trust or dispose of the Trust Estate as follows.

5.1 **Distribution of Income and Principal.** The Trustee will have the discretionary authority to distribute to any or all of the Primary Beneficiaries or to apply for the Primary Beneficiaries' use and benefit such amounts of the Trust income and principal of the Trust Estate, even to the exhaustion thereof, as the Trustee shall desire, in the absolute discretion of the Trustee. The Trustee will have the discretionary authority to apportion or accumulate income to or for one or more of the Primary Beneficiaries in such amounts as the Trustee shall desire, in the absolute discretion of the Trustee; and the Trustee may distribute such amounts in equal or unequal shares, in the Trustee's absolute discretion. The Trustee may elect not to distribute any sums to any one or more of the Primary Beneficiaries. Accumulated income shall be added to the principal of the Trust.

5.2 **Term of the Trust.** The term of this Trust shall be for so long as any of HOLLI HARDIN FONTENOT, DALLAS JOSEPH FONTENOT, JR., and ANNE S. FONTENOT shall live. Upon the last to die of all of the foregoing, this Trust shall terminate; provided, however, that the Trust will continue for a reasonable term thereafter for the purpose of liquidation and settlement.

5.3 **Distributions for Death Taxes.** If the testamentary estate of the Trustor or any other Primary Beneficiary shall include any property of the Trust Estate because of the provisions of Sections 2036, 2037, and 2038 of the Internal Revenue Code of 1986 or any other provisions of the Internal Revenue Code of 1986, as amended, or under any corresponding statute hereafter in effect (dealing with inclusion of the Trust assets in the testamentary estate because of retained powers or otherwise), any death taxes (including but not limited to any estate tax) owing as a result of such inclusion shall be paid by this Trust. This provision shall control notwithstanding any other provision contained in this Trust. As used in this Trust Agreement, the term "death taxes" refers to all estate, inheritance, transfer, succession, legacy, or other death taxes of any kind and interest or penalty on such taxes, if any.

5.4 **Distributions Upon Termination of the Trust.** Upon termination of this Trust, the undistributed principal and income after the distributions, if any, allowed under Section 5.3 above, shall be divided in equal shares, one for each of DALLAS

Page 5 of 18 Pages

B1142_81.01

003162

JOSEPH FONTENOT, III, MICHELLE ANNE FONTENOT, and each of the children of the marriage of HOLLI HARDIN FONTENOT and DALLAS JOSEPH FONTENOT, JR., including any children adopted by HOLLI HARDIN FONTENOT and DALLAS JOSEPH FONTENOT, JR. after the Effective Date ("Trust Share"). Each of the foregoing, using a Qualified Beneficiary Designation, shall have the right to appoint the Beneficiary or Beneficiaries of the Trust Estate upon his or her death and the manner in which an appointee is to receive his, her, or its Trust Share. If such Beneficiary does not exercise his power of appointment with a Qualified Beneficiary Designation, the Beneficiary's Trust Share of the remaining property of the Trust, net of settlement costs, will pass upon the termination of the Trust *per stirpes*, outright and free of Trust, to his issue living at the time of his death or, if none, *per stirpes* to the Trustor's issue then living.

5.5    **Distribution In Accordance With Texas Intestate Laws**. In the event all Primary Beneficiaries and all of the issue of the Primary Beneficiaries have died, upon termination of this Trust the Trustee shall distribute the Trust Estate among the heirs at law of DALLAS JOSEPH FONTENOT, JR. in accordance with the Texas rules for intestate distribution as if the Primary Beneficiaries and all of the children and other issue of the Primary Beneficiaries had predeceased the Trustor.

5.6    **Method of Distribution**. During such time as the Trustee is so expending sums from the Trust Estate for the benefit of any Beneficiary or otherwise as provided herein, the Trustee is authorized to make payments or delivery of the portion or portions of the Trust Estate, either to the Beneficiary directly or to the person having the care and custody of the Beneficiary, all without the necessity of the appointment of any guardian. Without limitation on the foregoing, it is acknowledged and agreed that this Trust constitutes a grantor trust within the meaning of Sections 671, et seq. of the Internal Revenue Code of 1986, as amended and that the income therefrom will be taxed to the Trustor for so long as the Trustor shall live. It is further understood and agreed that the Trustee shall distribute to the Trustor (or to any other person who is deemed to be a grantor of this Trust and taxable on the income of the Trust within the meaning of Section 671, et seq. of the Internal Revenue Code of 1986, as amended) the incremental income taxes arising in connection with the taxable income of the Trust Estate or, at the election of the Trustee, the Trustee may make

Page 6 of 18 Pages
E1142_81.01

003163

such distribution directly to the Internal Revenue Service for the benefit of such person.

5.7   **Partial and Final Distributions**.   The Trustee, in making or preparing to make a partial or final distribution, may prepare an accounting and may require any or all of the following as a condition to payment:  a written and acknowledged statement from each distributee that the accounting has been thoroughly examined and accepted as correct; a discharge of the Trustee; a release from any loss, liability, claim, or question concerning the exercise of due care, skill, and prudence of the Trustee in the management, investment, retention, and distribution of property during the Trustee's term of service (except for any undisclosed error or omission having basis in fraud or bad faith); and/or an indemnity for the benefit of the Trustee, to include the payment of attorney's fees, from any asserted claim of any taxing agency, governmental authority, or other claimant.  Any Beneficiary having a question or potential claim may require an audit of the Trust as an expense of administration.  Failure to require the audit prior to acceptance of the Trustee's report or the acceptance of payment will operate as a final release and discharge of the Trustee except as to any error or omission having basis in fraud or bad faith.

5.8   **Contingent Trust for Certain Beneficiaries**.   The interest of any Beneficiary who has not attained the age of thirty (30) years (the "Required Age") or who may be otherwise legally disabled and whose interest is not otherwise covered by the provisions of this Trust Declaration may, in the sole and absolute discretion of the Trustee, be continued in Trust or be held as a separate trust, for the use and benefit of that person until such person shall attain the Required Age or until such person is no longer disabled.  For so long as the Trustee holds the Trust for a Beneficiary pursuant to these terms, the Beneficiary, using the Qualified Beneficiary Designation, shall have the right to appoint the Beneficiaries of his or her interest in the Trust entitled to his or her interest upon the death of the Beneficiary.  If the Beneficiary dies prior to a final distribution of his or her interest from the Trust without having made a Qualified Beneficiary Designation, that person's interest in the Trust will pass *per stirpes* to his or her issue then living, or if none, *per stirpes* to the issue of the Trustor then living.

Page 7 of 18 Pages
B1142_81.01

003164

6. <u>Powers of the Trustee</u>.  In order to carry out the purposes of this Trust Declaration, the Trustee, in addition to all other powers granted by law, shall have the following powers and discretions.

6.1 <u>Retain Assets</u>.  The Trustee shall have the power to continue to hold any and all property received by the Trustee or subsequently added to the Trust Estate or acquired pursuant to proper authority if and as long as the Trustee, in exercising reasonable prudence, discretion, and intelligence, considers that the retention is in the best interest of the Trust.

6.2 <u>Investments</u>.  The Trustee shall have the power to invest and reinvest in every kind of property, real, personal, or mixed, and every kind of investment, specifically including, but not by way of limitation, corporate obligations of every kind, and stocks, preferred or common, without regard to risk of loss or decline in value.

6.3 <u>Management of Securities</u>.  The Trustee shall have the power to exercise, respecting securities held in the Trust Estate, all the rights, powers, and privileges of owners, including, but not limited to the power to vote, give proxies, and to pay assessments and other sums deemed by the Trustee necessary for the protection of the Trust Estate; to participate in voting trusts, pooling agreements, foreclosures, reorganizations, consolidations, mergers, and liquidations, and in connection therewith to deposit securities with and transfer title to any protective or other committee under such terms as the Trustee may deem advisable; to exercise or sell stock subscription or conversion rights; to accept and retain as an investment any securities or other property received through the exercise of any of the foregoing powers, regardless of any limitations elsewhere in this instrument relative to investments by the Trustee.

6.4 <u>Form of Ownership of Trust Property</u>.  The Trustee shall have the power to hold securities or other Trust property in the name of the Trustee as Trustee under this Trust Declaration or in the Trustee's own name or in the name of a nominee or in such conditions where ownership will pass by delivery.

6.5 <u>Business Interests</u>.  The Trustee shall have the power to continue and operate, to sell or to liquidate, as the Trustee deems advisable at the risk of the Trust Estate,

Page 8 of 18 Pages

51142_81.01

003165

any business or partnership interests received by the Trust Estate.

6.6  Sell and Exchange.  The Trustee shall have the power to sell for cash or on deferred payments and on such terms and conditions as are deemed appropriate by the Trustee, whether at public or private sale, to exchange, and to convey any property of the Trust Estate.

6.7  Abandonment of Trust Assets.  The Trustee shall have the power to abandon any Trust asset or interest therein in the discretion of the Trustee.

6.8  Option.  The Trustee shall have the power to grant an option involving disposition of a Trust asset and to take an option for the acquisition of any asset by the Trust Estate.

6.9  Lease.  The Trustee shall have the power to lease any real or personal property of the Trust Estate for any purpose for terms within or extending beyond the duration of the Trust.

6.10  Property Management.  The Trustee shall have the power to manage, control, improve, and repair real and personal property belonging to the Trust Estate.

6.11  Development of Property.  The Trustee shall have the power to partition, divide, subdivide, assign, develop, and improve any Trust property; to make or obtain the vacation of plats and adjust boundaries or to adjust difference in valuation on exchange or partition by giving or receiving consideration; and to dedicate land or easements to public use with or without consideration.

6.12  Repair, Alter, Demolish, and Effect.  The Trustee shall have the power to make ordinary and extraordinary repairs and alterations in buildings or other trust property, to demolish any improvements, to raze party walls or buildings, and to erect new party walls or buildings as the Trustee deems advisable.

6.13  Borrowing and Encumbering.  The Trustee shall have the power to borrow money for any Trust purpose from any person, firm, or corporation on the terms and conditions deemed appropriate by the Trustee and to obligate the Trust Estate for repayment, upon such terms and conditions (including a term extending beyond the duration of the Trust) as the Trustee deems advisable; to encumber the Trust Estate or any of its property by mortgage, deed of

Page 9 of 18 Pages

H1142_81.01

003166

trust, pledge, or otherwise, using whatever procedures to consummate the transaction deemed advisable by the Trustee; and to replace, renew, and extend any encumbrance and to pay loans or other obligations of the Trust Estate deemed advisable by the Trustee.

6.14  Natural Resources.  The Trustee shall have the power to enter into oil, gas, liquid or gaseous hydrocarbon, sulphur, metal and any and all other natural resource leases on terms deemed advisable by the Trustee, and to enter into any pooling, unitization, repressurization, community, and other types of agreements relating to the exploration, development, operation, and conservation of properties containing minerals or other natural resources; to drill, mine, and otherwise operate for the development of oil, gas, and other minerals; to contract for the installation and operation of absorption and repressurizing plants; and to install and maintain pipelines.

6.15  Insurance.  The Trustee shall have the power to procure and carry at the expense of the Trust Estate insurance of the kinds, forms, and amounts deemed advisable by the Trustee to protect the Trust Estate and the Trustee against any hazard.

6.16  Enforcement of Hypothecations.  The Trustee shall have the power to enforce any deed of trust, mortgage, or pledge held by the Trust Estate and to purchase at any sale thereunder any property subject to any such hypothecation.

6.17  Extending Time of Payment of Obligations.  The Trustee shall have the power to extend the time of payment of any note or other obligation held in the Trust Estate, including accrued or future interests, in the discretion of the Trustee.

6.18  Adjustment of Claim.  The Trustee shall have the power to compromise, submit to arbitration, release with or without consideration, or otherwise adjust claims in favor of or against the Trust Estate.

6.19  Litigation.  The Trustee shall have the power to commence or defend at the expense of the Trust Estate any litigation affecting the Trust or any property of the Trust Estate deemed advisable by the Trustee.

6.20  Administration Expenses.  The Trustee shall have the power to pay all taxes, assessments, compensation of the Trustee, and all other expenses incurred in the collection, care, administration, and protection of the Trust Estate.

Page 10 of 18 Pages

B1142_61.01

003167

6.21 Employment of Attorneys, Advisers, and Other Agents. The Trustee shall have the power to employ any attorney, investment adviser, accountant, broker, tax specialist, or any other agent deemed necessary in the discretion of the Trustee and to pay from the Trust Estate reasonable compensation for all services performed by any of them.

6.22 Termination by Trustee of Small Trust. The Trustee shall have the power to terminate, in the discretion of the Trustee, the Trust held for the Beneficiaries if the fair market value of the Trust at any time becomes less than $25,000.00 and, regardless of the age of the Beneficiaries to distribute the principal and any accrued or undistributed income to the Beneficiaries, or to their respective guardians, conservators, or other fiduciaries.

6.23 Distribution. The Trustee shall have the power on any partial or final distribution of the income or principal of the Trust Estate, to apportion and allocate the assets of the Trust Estate in cash or in kind, or partly in cash and partly in kind, or in undivided interests in the manner deemed advisable in the discretion of the Trustee and to sell any property deemed necessary by the Trustee to make the distribution.

6.24 Merger. The Trustee shall have the power to merge this Trust with any trust established for the benefit of substantially the same beneficiaries as the Beneficiaries of this Trust and to manage and administer the respective Trusts and Trust Estate as one Trust and Trust Estate subject to the terms and conditions of the Trust Declaration governing each of said Trusts.

6.25 General. The Trustee shall have the power to do all the acts, to take all the proceeds, and to exercise all the rights, powers, and privileges which an absolute owner of the property would have. The enumeration of certain powers in this Trust Declaration shall not limit the general or implied powers of the Trustee. The Trustee shall have all additional powers that may now or hereafter be conferred by law or that may be necessary to enable the Trustee to administer the Trust in accordance with the provisions of this Trust Declaration, subject to any limitations specified in this Trust Declaration. The Trustee shall further have the discretion to maintain reserves for depreciation and/or depletion.

Page 11 of 18 Pages
fl142_81.01

003168

7.    Duties and Compensation of the Trustee.

7.1    Allocation of Income and Principal.    The Trustee shall determine what is income and what is principal of the Trust created under this Trust Declaration and what expenses, costs, taxes, and charges of any kind whatsoever shall be charged against income and what shall be charged against principal in accordance with the applicable statutes of the State of Texas as they now exist and may from time to time be enacted, amended, or repealed.

7.2    Relations With Trustee.    No one dealing with the Trustee need inquire concerning the validity of anything the Trustee purports to do, or need see to the application of any money paid or any property transferred to or upon the order of the Trustee.

7.3    Compensation.    Unless such fee is waived or unless specific provision is otherwise made in the appointment of any Trustee, each Trustee shall be entitled to reasonable compensation for services as Trustee in accordance with the usual and customary charges in the community where and when such services are rendered.  The fee schedules of area trust departments prescribing fees for the same or similar services may be used to establish reasonable compensation.  A Trustee will be entitled to full reimbursement for expenses, costs, or other obligations incurred as the result of service, including attorney's, accountant's, and other professional's fees.

7.4    Exculpation From Liability of Trustee.    The Trustee shall not be liable for any error or judgment or for any act done or omitted by the Trustee in good faith or for anything which the Trustee may in good faith do or refrain from doing in connection with this Trust.  Accordingly, the Trustee shall not incur any liability with respect to any action taken or omitted in good faith upon the advice of counsel given in respect to any questions relating to the duties and responsibilities of the Trustee under this Trust Declaration or any action taken or omitted in reliance upon any instrument, including the written advice provided for herein, not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and accuracy of any information contained therein, which the Trustee shall in good faith believe to be genuine, to have been signed and presented by a proper person or persons, and to have conformed with the provisions of this Trust Declaration. The parties acknowledge and agree that the Trustee has no obligations to the Trust or any Beneficiary to offer to the Trust any investment opportunities presented to

Page 12 of 18 Pages

B1142_81.01

UNOFFICIAL COPY

Trustee individually during the term of the Trust Declaration.

7.5    Indemnity.    The Trustor shall at all times release and indemnify any successor Trustee and hold such successor Trustee harmless against any and all claims, suits, actions, debts, damages, costs, charges, and expenses, including court costs and attorney's fees, and against all liabilities, losses, or damages of any nature whatsoever that the Trustee shall at any time sustain or suffer in connection with acceptance or appointment as Trustee under this Agreement or as a result or arising out of the acquisition of any assets contributing to the Trust Estate, except to the extent of any such matter arising by reason or in consequence of the fraud or bad faith of the Trustee.

7.6    Bond.    No bond shall be required of the original Trustee hereunder.    Unless any instrument appointing a successor may provide otherwise, no bond shall be required of any successor Trustee; or if a bond is required by law, no surety shall be required on such bond.

7.7    Resignation.    Any Trustee of this Trust may at any time resign with respect to such Trust, with or without cause, effective ninety (90) days after delivery of notice of resignation thereof in writing to each current Beneficiary of this Trust.    If such Beneficiary is a minor, such delivery may be made to any guardian of such minor Beneficiary or to any adult with whom such minor Beneficiary resides.

7.8    Removal of a Trustee.    The Beneficiaries who are then entitled to receive distributions of income from the Trust or distributions of income from any separate trust created by this Trust Declaration may remove any corporate Trustee then serving, the notice of removal to be delivered in writing to the corporate Trustee.    Unless this Trust Declaration or any instrument appointing a successor provides otherwise, the selection of a successor to the corporate Trustee will be made by a court of competent jurisdiction.    In the event there is more than one Beneficiary entitled to the income from the Trust, all income Beneficiaries must join in the written notice of removal.    The consent of any person who is deceased or legally disabled will not be required in meeting the unanimous consent requirements for removal.

7.9    Liability of Trustee.    The Trustee in carrying out the Trustee's powers and performing the Trustee's duties may act in the

Page 13 of 18 Pages
H1142_81.01

003170

Trustee's discretion and shall be personally or individually liable only for fraud or acts or omissions in bad faith. No Trustee shall be liable individually or personally for any act or omission of any agent or employee of Trustee unless the Trustee shall have acted in bad faith in the selection and retention of such agent or employee.

7.10  Accounts.  The Trustee shall each year render an account of the administration of the Trust hereunder to each living Primary Beneficiary. If a Federal Fiduciary Income Tax Return is then required for this Trust, such accounting may be made by submission of a copy of such return filed for the Trust. If no objection to an accounting has been made in writing by such Primary Beneficiary within sixty (60) days after the date of mailing of such accounting by the Trustee, it shall be deemed approved. Such approval of such account shall, as to all matters and transactions stated therein or shown thereby be final and binding upon all persons (whether in being or not) who are then or may thereafter become interested in, or entitled to share in, either the income or the principal of such Trust, provided always, however, that nothing contained in this Section 7.10 shall be deemed to give such person (or the guardian or representative) acting in conjunction with the Trustee the power to alter, amend, revoke, or terminate the Trust.

7.11  Multiple Trustees.  In the event that there are two or more Trustees serving the Trust, all Trustees must sign any instrument transferring real property from the Trust. If the Trustees agree to do so, one Trustee acting alone may be given the primary responsibility of administration and accounting, and one Trustee alone may be authorized to deposit, transfer, and withdraw funds from any depository account held by the Trust. The authority vested in two Trustees may be exercised only by both of the Trustees; and, subject to the foregoing provisions, the authority vested in three or more trustees may be exercised by a majority of the Trustees. In the event of an action or decision by a majority, the non-consenting Trustee will not be responsible for the act of the majority.

8.  Spendthrift Provision.  The interests of each of the Beneficiaries in the principal or income of the Trust created hereunder shall not be subject to the claims of his or her creditors or creditors of others, including creditors of a spouse of a married Beneficiary, nor to legal process, and may not be voluntarily or involuntarily alienated or encumbered until actually distributed to such Beneficiary.

Page 14 of 18 Pages

H1142_81.01

003171

9. <u>Perpetuities Savings Clause</u>.   Unless sooner terminated as otherwise provided in this Trust Declaration, the Trust created herein shall fully cease and terminate twenty-one (21) years after the date of the last survivor of the Trustor, the Primary Beneficiaries, and the children of each of the Primary Beneficiaries in existence as of the date of this Trust.   Upon such termination, the entire principal of the Trust Estate of the Trust, together with any undistributed income therefrom, shall vest in and be distributed to the persons entitled to take under the provisions of the Trust.

10. <u>In Terrorem Provision</u>.   If any person entitled to receive any interest from this Trust shall contest the validity of this Trust or any provision thereof or shall institute or join in (except as a party defendant) any proceeding to contest the validity of this Trust or to prevent any provision thereof from being carried out in accordance with its terms (regardless of whether or not such proceedings are instituted in good faith and with probable cause), then all benefits provided to such person in this Trust shall be revoked, and such benefits shall pass as if such person were not then living.

11. <u>Construction of Trust</u>.

   11.1   <u>Governing Law</u>.   This Trust Declaration shall be governed by the laws of the State of Texas.

   11.2   <u>Severability</u>.   If any part, clause, provision, or condition of this Trust Declaration is held to be void, invalid, or inoperative, such voidness, invalidity, or inoperativeness shall not affect any other clause, provision, or condition hereof; but the remainder of this Trust Declaration shall be effective as though such clause, provision, or condition had not been contained herein.

   11.3   <u>Interpretative Clause</u>.   As used in this Trust Declaration, the masculine, feminine, or neuter gender, and the singular or plural number shall each be deemed to include the others whenever the context so indicates.

   11.4   <u>Notices</u>.   All communications required to be given to the Trustor, the initial Trustee hereunder, or the Primary Beneficiaries (including notice of change of address) shall be in writing and shall be deemed to be duly given if and when personally delivered, or, if mailed via certified mail, return receipt requested, when tendered into the care and custody of the United States postal service properly addressed to as follows:

Page 15 of 18 Pages

81142_81.01

If to Trustor or Trustee:

HOLLI HARDIN FONTENOT
6002 Burning Tree Drive
Houston, Texas   77036


If to Primary Beneficiaries:

Dallas Joseph Fontenot, Jr.
6002 Burning Tree Drive
Houston, Texas   77036

Anne S. Fontenot
8526 Leader
Houston, Texas   77036

Dallas Joseph Fontenot, III
8526 Leader
Houston, Texas   77036

Michelle Anne Fontenot
8526 Leader
Houston, Texas   77036

11.5   Copies.   To the same extent as if it were the original,
anyone may rely on a copy of this Trust Declaration
certified by a notary public to be a true copy of this
Trust Declaration.   Anyone may rely on any statement of
fact certified by anyone who appears from the original
Trust Declaration or a certified copy thereof to be a
Trustee hereunder.

IN WITNESS WHEREOF, I, the undersigned, HOLLI HARDIN
FONTENOT, attest that I have executed this Declaration of Trust
and that the terms thereof will bind me and my successors and
assigns, my heirs and personal representatives, and any Trustee
of this Trust.   This Trust Declaration has been signed by the
Trustor on the Effective Date.

HOLLI HARDIN FONTENOT

Page 16 of 18 Pages
81142_81.01

UNOFFICIAL COPY

003173

THE STATE OF TEXAS     §
                        §
COUNTY OF HARRIS    §

         This instrument was acknowledged before me on this the 5th day of June, 1991, by HOLLI HARDIN FONTENOT.



_____
Notary Public in and for
The State of T E X A S

_____
(Printed or Typed Name of Notary)

_____
(Commission Expiration Date)

### ACCEPTANCE BY TRUSTEE

I acknowledged that I have been appointed as a Trustee of THE HOLLI ANN HARDIN TRUST NUMBER ONE, and I hereby evidence my acceptance of the office of Trustee and will hold and administer the Trust according to the provisions thereof as required by law.

Date: _____

_____
HOLLI HARDIN FONTENOT

Page 17 of 18 Pages
H1142_81.01

UNOFFICIAL COPY

003174

THE STATE OF TEXAS  §
           §
COUNTY OF HARRIS  §

    This instrument was acknowledged before me on this the 5th day of June, 1991, by HOLLI HARDIN FONTENOT, TRUSTEE.



Notary Public in and for
The State of T E X A S

_____
(Printed or Typed Name of Notary)

_____
(Commission Expiration Date)

Page 18 of 18 Pages
81142_81.01

003175

Linda Goehrs, in her capacity as Trustee of the Holli Ann Hardin Trust Number One, Plaintiff
vs.
Dakota Fontenot, Defendant

Case 4:26-cv-02743    Document 7-1    Filed 04/29/26 in TXSD    Page 234 of 406

**537721**

### NO. 21-CPR-036521

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN THE COUNTY COURT AT LAW |
| | § | |
| DALLAS JOSEPH FONTENOT, JR., | § | NUMBER FOUR (4) OF |
| | § | |
| DECEASED | § | FORT BEND COUNTY, TEXAS |

### NO. 21-DCV-288736

| | | |
|---|---|---|
| IN RE: | § | IN THE 240th DISTRICT COURT |
| | § | |
| | § | OF |
| HOLLI ANN HARDIN TRUST | § | |
| NUMBER ONE | § | FORT BEND COUNTY, TEXAS |

### BINDING MEDIATED SETTLEMENT AGREEMENT

The Parties – Dakota Fontenot, individually, in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in his capacity as next friend and virtual representative for S.F., a minor, Holli Ann Fontenot, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, Dallas Joseph Fontenot, III, individually, and in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One, Michelle Ann Fontenot, individually, in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in her capacity as next friend and virtual representative for A.E., a minor, and Ashley Fontenot Estrada, individually and in her capacity as a beneficiary of the Hollis Ann Hardin Trust Number One – hereto agree that all causes of action pending in cause number 21-CPR-036521 and cause number 21-DVC-288736, both of which are pending in Fort Bend County, Texas, and all related claims and/or controversies between them, whether asserted or not, known or unknown, actual or contingent, are hereby settled, in accordance with the terms of this Binding Mediated Settlement Agreement (hereinafter referred to as the "Settlement Agreement").

### A. DEFINITIONS

1.      Whenever used in this Settlement Agreement, the following terms shall have and be construed to have the following meanings:

    i.      "Settlement Agreement" shall mean and refer to this Binding Mediated Settlement Agreement.

    ii.      "Dakota" shall mean and refer to Dakota Fontenot, individually, in his capacity as beneficiary of the Holli Ann Hardin Trust Number One, and in his capacity as next friend and virtual representative of S.F., a minor.

UNOFFICIAL COPY

**EXHIBIT**

**2**

iii.  "Holli" shall mean and refer to Holli Ann Fontenot, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

iv.  "Joe" shall mean and refer Dallas Joseph Fontenot, III, individually and in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

v.  "Michelle" shall mean and refer to Michelle Ann Fontenot, individually, in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in her capacity as next friend and virtual representative of A.E., a minor.

vi.  "Ashley" shall mean and refer to Ashley Fontenot Estrada, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

vii.  "Trust" shall mean and refer to the Holli Ann Hardin Trust Number One.

viii.  "Estate" shall mean and refer to the Estate of Dallas Joseph Fontenot, Jr., whose administration is pending in cause number 21-CPR-036521, in the County Court at Law Number Four (4) of Fort Bend County, Texas.

ix.  "Parties" shall mean and refer to Dakota, Holli, Joe, Michelle, and Ashley, collectively, as described in paragraphs two (ii) through six (vi) above.

x.  "Claims" shall mean and include any and all causes of action, demands, debts, obligations, duties, liens, liabilities, and theories of liabilities of whatsoever kind and nature, whether based in contract or tort, whether arising in equity or under the common law, whether by statute or regulation, whether known or unknown, whether past or present, whether contingent or matured, whether for damages relief, injunctive relief, declaratory relief, equitable relief, or any other type of relief, whether for actual damages, personal injury damages, mental anguish, liquidated damages, punitive damages, exemplary damages, compensatory damages, consequential damages, incidental damages, pecuniary damages, costs, expenses, attorneys' fees, penalties, or fines that are (is), were (was), could be, or could have been asserted as of the Effective Date, regardless of whether actually asserted, whether by claim, counterclaim, cross-claim, motion, third-party claim regarding the Estate and Trust, including but not limited to, claims, whether asserted or not, known or unknown, actual or contingent.

xi.  "Effective Date" shall mean and refer to the date that the last Party to this Settlement Agreement executes the same.

xii.  In respect to any defined term herein, the singular shall include the plural, and the plural shall include the singular.

2

## B. TERMS, CONDITIONS, AND MUTUAL CONSIDERATION

1.      The Parties acknowledge that bona fide disputes and controversies exist between them, both as to liability and the amount thereof in damages, if any, and by reason of such disputes and controversies they desire to compromise and settle all Claims and causes of action of any kind whatsoever which the Parties have or may have arising out of the transactions or occurrences which have been brought or could have been brought regarding the Trust.

2.      **THE PARTIES AGREE AND ACKNOWLEDGE THAT UPON THE EXECUTION OF THIS SETTLEMENT AGREEMENT, THIS SETTLEMENT AGREEMENT SHALL BECOME BINDING AND IRREVOCABLE.**

3.      The Parties agree that the 2013 Last Will and Testament and 2017 First Codicil to the Last Will and Testament will be admitted to probate. The Parties agree that Holli will be appointed as the Independent Executor of the Estate and agree not to object to the same.

4.      All of the Estate's assets, including all associated bank accounts, shall be distributed to Holli, save and expect the following items:

- The following items are going to be distributed to Dakota:

  - o   The 2017 F150 Truck
  - o   The 2013 Toyota Sequoia
  - o   All interest, including all associated bank accounts, in Entertainment Marketing and Management, LP
  - o   The coin collection and gold located in the backpack at the Rosenburg Office

- The following items are going to be distributed to Joe:

  - o   The 2008 Honda Ridgeline
  - o   One-half (1/2) of the Decedent's Tiki Mug Collection

The Parties agree to execute all documents necessary to effectuate the conveyance of all property described above the individual recipients stated in paragraph four (4).

5.      From the Rosenburg office, Holli shall be entitled to obtain:

- The remaining $150,000 in non-earmarked cash located in the backpack;
- Any and all Playboy Magazines

6.      The Parties agree that all personal property belonging to Dakota, Joe, and/or Michelle that is currently located at 10402 W. Hidden Lake Lane, Richmond, Texas 77406 shall be distributed to Dakota, Joe, and/or Michelle as appropriate. Dakota, Joe and/or Michelle shall

3

be afforded the opportunity, within thirty (30) days of the Effective Date of this Settlement Agreement, to conduct a supervised walkthrough of their personal property located at 10402 W. Hidden Lake Lane, Richmond, Texas 77406. During that time, Dakota, Joe, and/or Michelle will take photographs of their personal property which they would like to obtain. A list and accompanying photographs will be delivered to counsel for Holli of those items within fourteen (14) days of the walkthrough being completed. Holli will have fourteen (14) days to object to the items which Dakota, Joe, and/or Michelle would like to obtain. If the parties cannot reach a resolution regarding the same, Russ Jones will mediate, at an hourly rate, the division of the disputed personal property. Upon the completion and approval of a final list of items, Dakota, Joe, and/or Michelle, at their expense, shall obtain and remove the items on the approved final list of items at a mutually agreeable date and time within fourteen (14) days of the approval of the final list of items.

7.    The attorney's fees for Holli, Dakota, Joe, Michelle, and/or Ashley may be paid from the assets of the Holli Ann Hardin Trust Number One in an amount no more than $200,000.00 per side. The Parties will present their fees to Linda Goehrs, in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, for payment. The Parties agree that they will not object to the payment of the fees of any other party.

8.    The real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183 shall be distributed to Holli. Dakota, Michelle, and Joe, with Dakota as authorized representative, shall retain a right of first refusal in the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183. If Holli decides to sell or otherwise transfer the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183, Holli shall notify Dakota, Michelle, and Joe in writing and provide an appraisal completed by a certified and licensed real estate appraiser. From the date of receipt of that notice, Dakota, Michelle, and/or Joe shall have 30 days to exercise their right to purchase the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183. If exercised, Dakota, Michelle, and/or Joe shall enter into a real estate contract to purchase the property with a proposed closing date sixty (60) days from the date of receipt of the notice of sale or transfer triggering the right of first refusal. Holli is not required to sell at the appraised value if she receives offers in excess of the appraised value. If Holli receives an offer greater than the appraised value, the right of first refusal will be triggered upon delivery of the great offer to Dakota as authorized representative. The right of refusal will not renew if it is not exercised against the greatest value delivered by Holli.

9.    With regard to the further administration of the Holli Ann Hardin Trust Number One:

- The Parties agree that the assets of the Holli Ann Hardin Trust Number One shall be appraised by certified and licensed business or real estate appraisers, as is appropriate for the particular asset. Russ Jones shall select the appraisers to complete the real estate and business appraisals. The costs of the appraisals shall be borne by the Holli Ann Hardin Trust Number One.

4

- The Parties agree that, once the values on the appraisals are obtained for all Holli Ann Hardin Trust Number One assets, Holli's interest will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One in an amount equal to the twenty percent (20%) of the total value of the assets. Such purchase will occur within ninety days (90) of the completion of the valuation of the assets of the Holli Ann Hardin Trust Number One.

- The Parties agree that during the appraisal period described above, Linda Goehrs, in her capacity as Temporary Successor Trustee and/or Dakota, shall execute the necessary documents to install Dakota as an Officer and/or Director of Ice Embassy, Inc., HRF Enterprises, Inc., and Entertainment Marketing and Management, LP.

- The Parties agree that Linda Goehrs shall remain Temporary Successor Trustee of the Holli Ann Hardin Trust Number One until the closing of a sale on Holli's interest in the Holli Ann Hardin Trust Number One. At the time that Holli's interest is purchased, Linda Goehrs will resign as Temporary Successor Trustee, and Dakota, Joe, Michelle, and Ashley shall select a Successor Trustee of the Trust.

- Holli agrees to execute an assignment of interest and disclaimer of further interest in the Holli Ann Hardin Trust Number One at the time that her interest is purchased in accordance with this Settlement Agreement.

- The Parties agree that Dakota and Holli shall remain employees of Entertainment Marketing and Management, LP, and/or the business, or businesses owned by the Holli Ann Hardin Trust Number One. Holli shall be removed from the payroll on the date that her interest is purchased pursuant to this Agreement. The compensation amount that Dakota and Holli have been receiving shall remain unchanged.

- The Parties agree that Dakota and Holli shall remain on the insurance paid for by Entertainment Marketing and Management, LP, and/or the business or businesses owned by the Holli Ann Hardin Trust Number One. Holli shall be removed from the insurance plan on the date that her interest is purchased pursuant to this Agreement.

- To the extent owned by the Trust, Linda Goehrs as Temporary Successor Trustee, shall gift the horses known as Coco and Rusty to Holli.

10. With regard to the further administration of the Dakota Trust:

- The Parties agree that the assets of the Dakota Trust shall be appraised by certified and licensed real estate appraisers. Russ Jones shall select the appraisers to complete the real estate appraisal. The cost of the appraisal shall be borne by the Dakota Trust.

5

- Upon completion of the appraisal, the total value of the assets will be compiled and Holli's interest will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One in an amount equal to eighty-five percent (85%) of the total value of the assets. Such purchase will occur within ninety days (90) of the completion of the valuation of the assets of the Dakota Trust.

- Holli agrees to execute an assignment of interest and disclaimer of further interest in the Dakota Trust at the time that her interest in purchased in accordance with this Settlement Agreement.

11.    Within seven (7) days of the Effective Date of this agreement, Dakota, Joe, Michelle, and/or Ashley agree to dismiss all pending pleas, pleadings, and/or motions, with prejudice regarding the Estate and/or Trust pending in cause number 21-CPR-036521 and cause number 21-DVC-288736, both of which are pending in Fort Bend County, Texas.

12.    Neither the Trust nor any entity owned, held, or possessed by the Holli Ann Hardin Trust Number One, the Dakota Trust, and/or the Estate have any claims against any of the Parties.

13.    The Parties agree to release Linda Goehrs, in her capacity as Temporary Successor Trustee, for making distributions according to this Settlement Agreement which contradict the terms of the Trust Agreement for the Holli Ann Hardin Trust Number One or the Dakota Trust.

## C. RELEASES AND DISCHARGE

1.    **Release of Claims by Dakota.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Dakota, on behalf of himself and all his heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Holli, Joe, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Dakota hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Dakota expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Holli, Joe, Michelle, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Dakota does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

2.    **Release of Claims by Holli.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Holli, on behalf of herself and all her heirs, successors,

6

executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Joe, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Holli hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Holli expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Michelle, Joe, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Holli does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

3.    **Release of Claims by Joe.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Joe, on behalf of himself and all his heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Joe hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Joe expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Michelle, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Joe does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

4.    **Release of Claims by Michelle.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Michelle, on behalf of herself and all her heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Joe, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Michelle hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Michelle expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind

UNOFFICIAL COPY

7

known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Joe, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Michelle does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

5.     **Release of Claims by Ashley.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Ashley, on behalf of herself and all her heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Joe, Michelle, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Ashley hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Ashley expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Joe, and Michelle. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Ashley does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

## D. REPRESENTATIONS AND WARRANTIES

1.     **Representations and Warranties.** Each of the Parties hereto represents and warrants to the other that:

a.     They are adequately represented by competent counsel in connection with the execution and delivery of this Settlement Agreement and/or had an opportunity to retain counsel in connection with this Settlement Agreement;

b.     In executing this Settlement Agreement, they relied upon the Party's own judgment and any advice it received from its own attorneys;

c.     They were not induced to sign or execute this Settlement Agreement by promises, omissions, agreements, or representations not expressly stated in this Settlement Agreement;

d.     They freely and willingly executed this Settlement Agreement and expressly disclaims reliance upon any facts, promises, statements made or not made, undertakings, or representations made by any person or entity

8

UNOFFICIAL COPY

prior to the Effective Date of this Settlement Agreement except as specifically enumerated herein;

e. They consent that this Settlement Agreement was not procured, obtained, or induced by improper conduct or undue influence;

f. After an opportunity to consult with an attorney concerning the matters made subject of this Settlement Agreement, and after reviewing this Settlement Agreement, they agree this Settlement Agreement is fair, reasonable, and supported by good, valuable, and adequate consideration; and

g. They understand and agree to the terms and conditions of this Settlement Agreement, which contains the entire agreement between the Parties relating to the matters made the subject of this Settlement Agreement.

2. **Capacity and Authority.** Each of the Parties hereto represents and warrants to the other that the person signing this Settlement Agreement in a representative capacity has the requisite authority and consent to execute this Settlement Agreement on behalf of the Party for whom he or she has executed this Settlement Agreement, and that this Settlement Agreement is binding upon the Party for whom he or she has executed this Settlement Agreement and upon such Party's successors and assigns.

3. **Assignment of Claims.** Each of the Parties hereto represents and warrants to the other that it has not transferred, assigned, or otherwise conveyed, excepting any interest held by counsel, in whole or in part, its respective interest in the Claims at issue and that it is the owner and holder thereof. Each of the Parties further represents and warrants that, aside from any interest held by counsel, it is the only holder of the Claims being released and that no other person or entity owns, or has any interest in, any of the Claims being released. Despite any interest held by counsel, this Settlement Agreement applies to the entirety of each of the Parties' Claims.

4. **Cooperation in Execution of Further Documents.** Each of the Parties expressly agrees to execute any other documents reasonably necessary to effectuate the terms, purpose, and intent of this Settlement Agreement.

## E. MISCELLANEOUS PROVISIONS

1. **Invalidity.** In the event any one or more of the provisions of this Settlement Agreement shall, for any reason, be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Settlement Agreement.

2. **Entire Agreement.** This Settlement Agreement reflects the final and complete agreement between the parties concerning the matters made subject of this Settlement Agreement and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the Parties. There are no unwritten oral agreements between the Parties. The Parties expressly

9

acknowledge that any rights, duties, or obligations, whether contractual or otherwise, owed by or between the Parties prior to the effective date of this Settlement Agreement are terminated as of the Effective Date of this Settlement Agreement and the only rights, duties, or obligations owed by or between the Parties from this point forward shall be those set forth in this Settlement Agreement.

3.     **Governing Law and Venue.** The validity, effect, and construction of this Settlement Agreement shall be governed by the laws of the State of Texas. Venue for any cause of action, controversy, or dispute regarding this Settlement Agreement or the subject matter hereof shall be proper only in the state courts of Fort Bend County, Texas.

4.     **Amendment.** This Settlement Agreement may not be amended, modified, waived, or terminated unless such is done in a writing signed by all the Parties.

5.     **Construction of Agreement.** This Settlement Agreement shall not be construed in favor of or against any Party on the basis that the Party did or did not author this Settlement Agreement or any attachment related to it. It is intended that this Settlement Agreement shall be comprehensive in nature and shall be construed liberally to affect its purposes.

6.     **Titles or Headings.** All titles or headings used in this Settlement Agreement are used only for the convenience of the Parties and shall not be construed to have any effect or meaning with respect to the other content of the Settlement Agreement, such other content being controlling as to the Settlement Agreement of the Parties.

7.     **Costs and Attorneys' Fees.** Each party shall bear its own costs and attorneys' fees in relation to the claims and the negotiation and preparation of this Settlement Agreement, subject to the attorney's fees provisions within this Settlement Agreement.

8.     **Waiver.** The failure of any of the Parties to enforce, at any time, any provision of this Settlement Agreement shall not be construed to be a waiver of such provision, nor in any way affect the validity of this Settlement Agreement or any part thereof or any right of any Party thereafter to enforce each and every provision. No waiver of any breach of this Settlement Agreement shall be held to constitute a waiver of any other breach.

9.     **Binding Agreement.** This Settlement Agreement is binding on the Parties hereto and not subject to revocation, repudiation, or withdrawal of consent, even if one or more of them shall become debtors in a bankruptcy proceeding. This binding effect is an integral part of this Agreement.

10.     **Execution of Agreement.** This Settlement Agreement may be executed in a number of identical counterparts, each of which shall be deemed an original for all purposes. A fax signature or a copy of an original signature shall constitute an original signature for purposes of this Settlement Agreement. This Settlement Agreement shall be valid only if fully executed by all Parties and/or their representatives as agreed to herein. If not fully executed by all Parties, this Settlement Agreement shall be null and void and of no effect.

10

11.    **Future Disputes.** In the event that there are future disputes, disagreements, and/or conflicts regarding the terms and/or implementation of any terms of this Settlement Agreement, the Parties agree to return to Russ Jones for mediation regarding the dispute. The Parties agree to return to mediation prior to filing any litigation regarding a breach of this settlement agreement or these terms. If a Party refuses to return to mediation, the remaining parties are permitted to file litigation without returning to mediation. Should further litigation be filed regarding a breach of the agreement, the prevailing party shall be entitled to an award of attorney's fees as determined by a jury or judge.

12.    **Indemnity.** Each party shall indemnify the other parties for all claims made by, through, or under the indemnifying party.

AGREED TO BY ALL PARTIES AS EVIDENCED BY THEIR SIGNATURE BELOW ON THIS THE 7th DAY OF JANUARY, 2022.

_____
Dakota Fontenot, in all capacities

_____
Holli Ann Fontenot, in all capacities

_____
Dallas Joseph Fontenot, III, in all capacities

_____
Michelle Ann Fontenot, in all capacities

_____
Ashley Fontenot Estrada, in all capacities

_____
Christopher Burt
*Counsel for Dakota Fontenot*

11

11.     **Future Disputes.** In the event that there are future disputes, disagreements, and/or conflicts regarding the terms and/or implementation of any terms of this Settlement Agreement, the Parties agree to return to Russ Jones for mediation regarding the dispute. The Parties agree to return to mediation prior to filing any litigation regarding a breach of this settlement agreement or these terms. If a Party refuses to return to mediation, the remaining parties are permitted to file litigation without returning to mediation. Should further litigation be filed regarding a breach of the agreement, the prevailing party shall be entitled to an award of attorney's fees as determined by a jury or judge.

12.     **Indemnity.** Each party shall indemnify the other parties for all claims made by, through, or under the indemnifying party.

AGREED TO BY ALL PARTIES AS EVIDENCED BY THEIR SIGNATURE BELOW ON THIS THE 7th DAY OF JANUARY, 2022.



_____

Dakota Fontenot, in all capacities


_____

Holli Ann Fontenot, in all capacities


# Dallas Joseph Fontenot III

_____

Dallas Joseph Fontenot, III, in all capacities


# Michelle Ann Fontenot

_____

Michelle Ann Fontenot, in all capacities


# Ashley Fontenot Estrada

_____

Ashley Fontenot Estrada, in all capacities


_____

Christopher Burt
*Counsel for Dakota Fontenot*

11

Steven Mendel
*Counsel for Holli Ann Fontenot*


Kenneth Sumner
*Counsel for Dallas Joseph Fontenot, III,
Michelle Ann Fontenot, and Ashley Estrada*

UNOFFICIAL COPY

12

Steven Mendel
*Counsel for Holli Ann Fontenot*

# Kenneth E. Sumner, Jr.

Kenneth Sumner
*Counsel for Dallas Joseph Fontenot, III,
Michelle Ann Fontenot, and Ashley Estrada*

Signature: *Dallas Joseph Fontenot III*
Dallas Joseph Fontenot III (Jan 7, 2022 19:33 CST)
Email: djoef3@hotmail.com

Signature:
Ashley Fontenot Estrada (Jan 7, 2022 19:38 CST)
Email: ashleyafontenot@gmail.com

Signature:
Michelle Fontenot (Jan 7, 2022 19:36 CST)
Email: mannefontenot@gmail.com

Signature: *Kenneth C. Sumner, Jr.*
Email: ksumner@romanosumner.com

12

Electronically Filed
11/23/2021 6:35 PM
Laura Richard
County Clerk
Fort Bend County, Texas

537721

Harris County - County Probate Court No. 1

NO. 21-CPR-036521

| | | |
|---|---|---|
| IN RE: ESTATE OF | § | IN THE COUNTY COURT |
| DALLAS JOSEPH FONTENOT, JR. | § | AT LAW NUMBER 4 OF |
| DECEASED | § | FORT BEND COUNTY, TEXAS |

## INVENTORY AND LIST OF CLAIMS

DATE OF DEATH:    September 3, 2021

GUS TAMBORELLO, TEMPORARY ADMINISTRATOR OF THE ESTATE OF DALLAS JOSEPH FONTENOT, JR., DECEASED files this Inventory and List of Claims of all property belonging to the probate estate of DALLAS JOSEPH FONTENOT, JR. ("Decedent") which has come to his possession or knowledge, together with a List of Claims due and owing to the estate.

### Summary of Assets

| | |
|---|---|
| Cash - See Schedule "A" | $ 11,942.50 |
| Other Personal Property - See Schedule "B" | 299,820.00 |
| Real Estate - See Schedule "C" | 945,485.00 |
| **TOTAL VALUE OF DECEDENT'S ESTATE** | **$1,257,247.50** |

### List of Claims Belonging to Estate

There are no known claims due and owing to the Decedent's estate. However, Administrator is continuing to investigate the issue.

I, GUS TAMBORELLO, TEMPORARY ADMINISTRATOR OF THE ESTATE OF DALLAS JOSEPH FONTENOT, JR., DECEASED , do solemnly swear that this Inventory and List of Claims of the Estate of the Decedent is a full and complete Inventory and List of the property and claims of said probate estate that have come to my knowledge or possession, and Administrator requests that the Court approve the Inventory and List of Claims.

EXHIBIT
3

_____
GUS    TAMBORELLO,    TEMPORARY
ADMINISTRATOR OF THE ESTATE OF DALLAS
JOSEPH FONTENOT, JR., DECEASED

SUBSCRIBED AND SWORN TO BEFORE ME, on this __23__$^{rd}$ day of November, 2021.



ANN ZIENTEK
Notary Public, State of Texas
Comm. Expires 02-13-2025
Notary ID 12237974

_____
Notary Public in and for
the State of Texas

OF COUNSEL:

Gus G. Tamborello
S.B.N. 19632000
Gus G. Tamborello, P.C.
2900 Weslayan, Suite 150
Houston, Texas 77027
(713) 659-7777
(713) 659-7780 (fax)
Gus@Tamborellolaw.com

ATTORNEY FOR GUS TAMBORELLO,
TEMPORARY ADMINISTRATOR OF THE
ESTATE OF DALLAS JOSEPH FONTENOT, JR., DECEASED

UNOFFICIAL COPY

## ESTATE OF DALLAS JOSEPH FONTENOT, JR., DECEASED
## SCHEDULE "A"
## CASH

**DESCRIPTION**                                         **DATE OF DEATH VALUE**

A.    *Community Property*

Cash on hand                                            $ 23,885.00[1]

      Total Community Cash                            $ 23,885.00

      Value of Decedent's undivided ½ interest       $ 11,942.50

B.    *Separate Property*

None

**TOTAL CASH**                                          **$ 11,942.50**[2]

---

[1] This was cash turned over to the administrator by Dakota Fontenot, who stated he retrieved it from the Decedent's residence.

[2] Other cash assets are in bank accounts under the names of various corporations. The stock of two of the corporations appears to be owned by the Decedent. The cash in those entities is addressed in Schedule "C" as part of the value of the Decedent's interest in those entities. The other two entities are owned by a trust and are, therefore, not part of the Decedent's probate estate.

**ESTATE OF DALLAS JOSEPH FONTENOT, JR., DECEASED**
**SCHEDULE "B"**
**OTHER PERSONAL PROPERTY**

| DESCRIPTION | DATE OF DEATH VALUE |
|---|---|

*A.   Community Property*

(i)   Motor Vehicles

1.   2020 Ford F350 Super
     VIN 1FT8W3BT6LED48824
     License Plate: NKT1213
     (Estimated Value per kbb.com)          $ 52,000.00

2.   2010 Toyota Sequoia
     VIN 5TDDW5G10AS027256
     License Plate: HTX4463
     (Estimated Value per kbb.com)          $18,000.00[3]

3.   1999 Ford Pick up
     VIN 1FTWW33S1XEC80483
     License Plate: CNG4278
     (Estimated Value per kbb.com)          14,000.00

4.   2018 Toyota Sequoia
     VIN 5TDYY5G165JS070155
     (Estimated Value per kbb.com)          50,000.00[4]

5.   2017 Ford F150
     VIN 1FTEW1EF4HFC13310
     (Estimated Value per kbb.com)          32,000.00[5]

6.   2008 Honda Ridgeline Pickup 4WD
     VIN 2HJYK165X8H507657
     (Estimated Value in Las Vegas per cars.com)   20,000.00[6]

---

[3] This vehicle appears to be titled in the name of Ice Embassy, Inc. and the Decedent.

[4] This vehicle is being driven by the Decedent's spouse, Holli Fontenot.

[5] This vehicle is being driven by the Decedent's son, Dakota James Fontenot. Title appears to be in the name of both the Decedent and Dakota James Fontenot.

[6] This vehicle is apparently located at Decedent's residence in Las Vegas, Nevada.

UNOFFICIAL COPY

## ESTATE OF DALLAS JOSEPH FONTENOT, JR., DECEASED
## SCHEDULE "B"
## OTHER PERSONAL PROPERTY (CONTINUED)

| DESCRIPTION | DATE OF DEATH VALUE |
|---|---|

7.   2013 Toyota Sequoia 4D 4X2 Platinum V8
     VIN 5TDYY5G12DS044222
     License Plate: BKJ3504
     (Estimated Value in Las Vegas per cargurus.com)    $21,000.00[7]

8.   2003 Ford Thunderbird
     VIN 1FAHP62A83Y103279
     License Plate: BS1L744
     (Estimated Value per cars.com)                     17,000.00

(ii)  Manufactured Homes

1.   Mobile Home
     GASTON-FULSHEAR CORP,
     SERIAL # BRK001554TXA & B,
     TITLE # MH00356826,
     LABEL # PFS1071292 & 3,
     MODEL 94CLS30603AH10,
     MH ONLY ON #0490
     (Market value for FCAD)                            39,340.00

(iii)  Trailers

1.   2002 Sundowner Horse Trailer
     VIN 13SVE252221VB4916
     License: FNXX31
     (Average Retail per nadaguides.com)`               20,000.00

2.   2003 Haulmark box Trailer
     VIN 16HGB22253G051189
     License: 25576C
     (Estimated value per smartrvguide.com)             5,000.00

3.   1995 Goos Livestock Trailer
     VIN 16GSH6C21SB047946
     License: DMCP99

---

[7] This vehicle is apparently located at Decedent's residence in Las Vegas, Nevada and is registered in the name of Decedent and Ice Embassy, Inc.

**ESTATE OF DALLAS JOSEPH FONTENOT, JR., DECEASED**
**SCHEDULE "B"**
**OTHER PERSONAL PROPERTY (CONTINUED)**

| DESCRIPTION | DATE OF DEATH VALUE |
|---|---|
| (titled in the name of Circle 8 Ranch)<br>(Estimated value per horsetrailerworld.com) | $4,300.00 |
| 4.  1996 FW Utility Trailer<br>VIN 1C9G12022T1288119<br>License: CNPG10<br>(titled in the name of Circle 8 Ranch)<br>(Estimated value per smartrvguide.com) | 2,500.00 |
| 5.  2006 Big Tex Utility Trailer<br>VIN 16VAX121762A24988<br>License: FDKC37<br>(titled in the name of Circle 8 Ranch)<br>(Estimated value internet search) | 3,500.00 |
| (iv)  Farming Equipment | |
| 1.  Misc. Farming Equipment<br>(Estimated, not yet appraised) | 35,000.00 |
| 2.  John Deere Tractor<br>(Based upon remaining balance due on note) | 25,000.00 |
| (v)  Livestock/Animals | |
| Horse, Various cattle | 1,000.00 |
| (vi)  Misc. Furnishings and Personal Effects<br>(Estimated, not yet appraised) | 50,000.00 |
| (vii)  Misc. Collectibles<br>(Estimated, not yet appraised) | 100,000.00 |

UNOFFICIAL COPY

ESTATE OF DALLAS JOSEPH FONTENOT, JR., DECEASED
SCHEDULE "B"
OTHER PERSONAL PROPERTY (CONTINUED)

DESCRIPTION                                    DATE OF DEATH VALUE

(viii)    Business Interests

1.    Entertainment Marketing and Management, Ltd
      General Partner: Showbizz, Inc.[8]
      (a Texas domestic limited partnership formed 3/29/1995)
      Limited Partners:[9]
      BFD #1, Inc., a Nevada Corporation
      BFD #2, Inc., a Nevada Corporation
      BFD #3, Inc., a Nevada Corporation
      BFD #4, Inc., a Nevada Corporation
      Created: March 29, 1985
      (Value based upon approx. value of assets)        $10,000.00

2.    Showbizz, Inc.
      (a Texas corporation formed on 2/6/1992)
      (serves as general partner of Entertainment Marketing
      and Management, Ltd)
      (Decedent appears to be sole shareholder)
      (Value based upon approx. value of assets)        $0.00

3.    The Lucky Dog Pub & Grille, LLC
      Director: Dallas Fontenot
      Formed September 10, 2015
      Shareholder: Decedent (100% ownership)
      (Value based upon approx. value of assets)        80,000.00

4.    Naughty Leprechaun Tavern, LLC
      (a Texas limited liability corporation formed
       on 9/10/2015)
      Shareholder: Decedent (100%)
      (Value based upon information obtained to date)    0.00

          Total Community Personal Property      $599,640.00

---

[8] This entity is apparently owned by Decedent. Decedent was the President of the entity.

[9] The BFD entities are believed to be dissolved for failure to file with the Nevada Secretary of State. It is also believed that the Decedent owned the stock in those entities. Decedent was also President of these entities.

**ESTATE OF DALLAS JOSEPH FONTENOT, JR., DECEASED**
**SCHEDULE "B"**
**OTHER PERSONAL PROPERTY (CONTINUED)**

**DESCRIPTION**

**DATE OF DEATH VALUE**

Value of Decedent's undivided ½ interest　　$299,820.00

B.　　*Separate Property*

None.

**TOTAL OTHER PERSONAL PROPERTY**　　**$ 299,820.00**


UNOFFICIAL COPY

## ESTATE OF DALLAS JOSEPH FONTENOT, JR., DECEASED
## SCHEDULE "C"
## REAL ESTATE

**DESCRIPTION**                                                **DATE OF DEATH VALUE**

*A.     Community Property*

1.      Gaston-Fulshear Corp, Lots 42-A, 42-B,
        43, 44, 52, 53 (part), and 55, Tract 40,
        20.478 acres located in Richmond, Fort
        Bend County, Texas (address is listed as
        ████████████████████Richmond,
        Texas 77406
        (2021 Market Value per FBCAD)                          $ 1,034,640.00

        Gaston-Fulshear Corp, Lots 52 and 53 (part),
        2.0 acres located in Richmond, Fort
        Bend County, Texas (this property is
        contiguous to the 20.478 acre tract)
        (2021 Market Value per FBCAD)                          $    643,170.00

        Gaston-Fulshear Corp, Lot 10-B, Tract 40,
        3.0 acres located in Richmond, Fort Bend
        County, Texas (this property is located across
        the street from the back side of the 20.478
        acre tract)
        (2021 Market Value per FBCAD)                          $    213,160.00

               Total Community Real Estate                     $ 1,890,970.00

               Value of Decedent's undivided ½ interest        $    945,485.00

*B.     Separate Property*

        None.

        **TOTAL REAL ESTATE**                                  **$ 945,485.00**[10]

---

[10] Other real property which may be associated with the Decedent are titled in corporations which are owned by trusts and are not part of the Decedent's probate estate. In addition, there is real property in Las Vegas, Nevada which is governed by the State of Nevada and is not under this court's jurisdiction. Administrator currently does not have any authority over the Nevada real estate.

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Gus Tamborello
Bar No. 19632000
gus@tamborellolaw.com
Envelope ID: 59449914
Status as of 11/29/2021 8:42 AM CST

Associated Case Party: Dakota Fontenot

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Barbara Light | 24109472 | blight@boyarmiller.com | 11/23/2021 6:35:06 PM | SENT |
| Christopher CBurt | | cburt@boyarmiller.com | 11/23/2021 6:35:06 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Debra TPellegrin | | dpellegrin@boyarmiller.com | 11/23/2021 6:35:06 PM | SENT |
| Stephen A.Mendel | | info@mendellawfirm.com | 11/23/2021 6:35:06 PM | SENT |
| Kenneth E.Sumner, Jr. | | ksumner@romanosumner.com | 11/23/2021 6:35:06 PM | SENT |
| Lindsey Hebert | | lhebert@romanosumner.com | 11/23/2021 6:35:06 PM | SENT |

Associated Case Party: HolliHFontenot

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| MENDEL LAWFIRM | | info@mendellawfirm.com | 11/23/2021 6:35:06 PM | SENT |

Associated Case Party: GusGTamborello

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Gus G. Tamborello | 19632000 | gus@tamborellolaw.com | 11/23/2021 6:35:06 PM | SENT |

UNOFFICIAL COPY

Electronically Filed
11/23/2021 6:35 PM
Laura Richard
County Clerk
Fort Bend County, Texas

Harris County - County Probate Court No. 1

537721

NO. 21-CPR-036521

| | | |
|---|---|---|
| IN RE: ESTATE OF | § | IN THE COUNTY COURT |
| DALLAS JOSEPH FONTENOT, JR. | § | AT LAW NUMBER 4 OF |
| DECEASED | § | FORT BEND COUNTY, TEXAS |

## ORDER APPROVING INVENTORY AND LIST OF CLAIMS

On this day the Court considered the Inventory and List of Claims of the Estate of

DALLAS JOSEPH FONTENOT, JR., Deceased, filed herein by GUS TAMBORELLO,

TEMPORARY ADMINISTRATOR OF THE ESTATE OF DALLAS JOSEPH FONTENOT,

JR., DECEASED, and the Court, having examined the same, is satisfied that it should in all

respects be approved. There having been no objections made thereto, it is therefore

ORDERED, ADJUDGED, and DECREED that the Inventory and List of Claims filed by

GUS TAMBORELLO,  TEMPORARY ADMINISTRATOR OF THE ESTATE OF DALLAS

JOSEPH FONTENOT, JR., DECEASED is APPROVED.

SIGNED this ___1/25/2022___

_____
JUDGE PRESIDING

APPROVED AS TO FORM:

/s/ Gus G. Tamborello

Gus G. Tamborello
S.B.N. 19632000
Gus G. Tamborello, P.C.
2900 Weslayan, Suite 150
Houston, Texas 77027
(713) 659-7777
(713) 659-7780 (fax)
Gus@Tamborellolaw.com

ATTORNEY FOR ADMINISTRATOR

Filed: 01/26/2022 08:13:30
Laura Richard
County Clerk
Fort Bend County, Texas
Hlipala, Sarah

EXHIBIT
4

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Gus Tamborello
Bar No. 19632000
gus@tamborellolaw.com
Envelope ID: 59449914
Status as of 11/29/2021 8:42 AM CST

Associated Case Party: Dakota Fontenot

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Christopher CBurt | | cburt@boyarmiller.com | 11/23/2021 6:35:06 PM | SENT |
| Barbara Light | 24109472 | blight@boyarmiller.com | 11/23/2021 6:35:06 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Debra TPellegrin | | dpellegrin@boyarmiller.com | 11/23/2021 6:35:06 PM | SENT |
| Stephen A.Mendel | | info@mendellawfirm.com | 11/23/2021 6:35:06 PM | SENT |
| Kenneth E.Sumner, Jr. | | ksumner@romanosumner.com | 11/23/2021 6:35:06 PM | SENT |
| Lindsey Hebert | | lhebert@romanosumner.com | 11/23/2021 6:35:06 PM | SENT |

Associated Case Party: HolliHFontenot

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| MENDEL LAWFIRM | | info@mendellawfirm.com | 11/23/2021 6:35:06 PM | SENT |

Associated Case Party: GusGTamborello

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Gus G. Tamborello | 19632000 | gus@tamborellolaw.com | 11/23/2021 6:35:06 PM | SENT |

Linda Goehrs, in her capacity as Trustee of the Holli Ann Hardin Trust Number One, Plaintiff
vs.
Dakota Fontenot, Defendant

Case 4:26-cv-02743   Document 7-1   Filed 04/29/26 in TXSD   Page 260 of 406

537721

Harris County - County Probate Court No. 1

## MANAGEMENT AGREEMENT

THIS MANAGEMENT AGREEMENT (this "Agreement") is made effective January 1, 2024 (the "Effective Date"), between ENTERTAINMENT MARKETING & MANAGEMENT, LTD., a Texas limited partnership ("Manager"), and ICE EMBASSY, INC. d/b/a THE COLORADO BAR AND GRILL, a Texas corporation (the "Owner").

## RECITALS

A. The Owner leases space from HFR ENTERPRISES, INC., a Texas corporation ("HFR") where it operates a sexually oriented business, bar, and restaurant (the "Club") located at the municipal address: 6710 Southwest Fwy, Houston, Texas 77074.

B. The Owner's corporate records and contracts were previously maintained by or on behalf of Dallas Joseph Fontenot, Jr. ("Mr. Fontenot").

C. Mr. Fontenot died on September 3, 2021, and since such date, neither corporate records of the Owner, nor records of any contract or agreement relating to the management of the Club have been located after a diligent search by his heirs and authorized affiliates.

D. On or about the Effective Date, the Owner previously retained Manager to manage and operate the Club, which such relationship may have been memorialized pursuant to a written or oral agreement, which neither the Owner, nor the Manager have been able to locate (the "Original Agreement").

E. The Owner desires to continue to retain Manager to manage and operate the Club, and provide support services to the Owner, on the terms and conditions set forth in this Agreement. Any reference to the Owner throughout this Agreement shall mean and include any and all of the Owner's designated affiliates that may directly or indirectly control or own an interest in the Club.

F. Manager is experienced in bar operations and management and has the staff, expertise and capability to perform the terms of this Agreement.

G. The Owner and the Manager desire that this Agreement amend, supersede, and replace the Original Agreement, and further desire that their relationship be governed in accordance with the terms and provisions of this Agreement effective as of the Effective Date.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements contained in this Agreement and other good and valuable consideration not recited in this Agreement, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Engagement and Authorization.

1.01 Engagement As Manager. The Owner hereby engages Manager as its sole and exclusive agent to supervise, manage, direct and control the operations of the Club, in accordance with the terms

1

EXHIBIT
5

HAH 000193

and conditions hereof. Manager hereby accepts such engagement as the manager of the Club during the Term, as hereafter defined, of this Agreement. The parties acknowledge such engagement does not include alcoholic beverage operations at the Club. In accordance with applicable law, Owner, as the holder of the TABC permit for the Club, maintains control over the purchase, sale, and service of alcoholic beverages at the Club.

1.02 Grant of Authority. The Owner hereby grants Manager the power and authority to take all actions and to do all things reasonably required to perform the obligations of the Manager under this Agreement. For the avoidance of doubt, Manager shall not have the power and authority to (i) borrow any money or execute any promissory note, bill of exchange or other credit obligation, mortgage or encumbrance, or pledge the credit of the Owner without, in each case, the prior written consent of the Owner, (ii) file, prosecute, defend or settle any legal or regulatory proceedings involving the Owner or the Club without the Owner's prior written approval, or (iii) act on behalf of, or hold itself out as having authority to act on behalf of, the Owner in any manner which is beyond the scope of the terms of this Agreement. In the performance of this Agreement, Manager shall act as the agent of the Owner; the creation of this agency shall not in any manner relieve the Owner of its duties or obligations under contract or law.

2. Manager's Duties. During the Term, Manager shall provide the Owner with the following specific services (hereinafter collectively referred to as the "Services"), at the Club:

2.01 Club Management. Manager shall oversee the day-to-day management of the Club, which responsibilities shall include: (a) the hiring, training and supervising of all Club employees, as more particularly described below; ; (b) the maintenance of business files and records; (c) the performance of general administrative functions; and (d) the preparation of the Club's monthly activities, as more particularly described below. In addition, Manager shall manage, operate, and maintain the Club in such a manner that the Club is at all times in substantial compliance with: (i) all zoning and use restrictions, fire codes, building codes, and other requirements issued by any governmental authority; (ii) all licenses, permits and other authorizations required in the operation of the Club; (iii) any policy of insurance covering the Club; (iv) that certain Real Estate Lease between the Owner and HFR (the "Club Lease") and that certain Sublease between the Owner and HFR (the "Parking Lot Lease" and collectively with the Club Lease, the "Leases"), to avoid any default by the Owner thereunder; (v) the negotiation of inventory purchase contracts with vendors, including combining purchasing quantity of Manager and its franchisee and/or licensees with the purchasing quantity of the Owner, its affiliates and franchisee and/or licensees in order to obtain any vendor discounts, rebates or refunds; and (vi) all applicable laws and regulations. With the written consent of the Owner, Manager may in the name of itself, the Owner or both, take such appropriate action as necessary to challenge to protest the validity or application of any legal requirement, tax or other imposition against the Club. The Owner agrees to execute and deliver any documents which Manager and the Owner deem reasonably necessary and appropriate in connection with such action.

2.02 Reimbursement of Expenses

2.

HAH 000194

Owner shall reimburse Manager for all expenses incurred by Manager in connection with this Agreement or otherwise incurred in connection with the Club. Such expenses shall be reimbursed on demand, subject to reconciliation on a monthly basis.

2.03 – 2.04 Intentionally Blank

2.05 Financial Reports.

(a) Manager shall maintain full and adequate records and books of account and such other records as might be appropriate to reflect the results of operation of the Club, and which shall reflect all revenues and expenditures and all other receipts and disbursements relating to each of the Club. All books and records will be kept in accordance with generally accepted accounting principles ("GAAP") and shall be the property of the Owner and the Owner will have access thereto at all reasonable times.

(b) Within fifteen (15) days after the end of each month, Manager shall prepare and furnish to the Owner the following information for the preceding calendar month for each of the Club:

(i) Financial Statements. An accrual basis balance sheet in reasonable detail, together with a reasonably detailed accrual basis profit and loss statement for such preceding calendar month next preceding and with a cumulative calendar year accrual basis profit and loss statement to date, and a statement of cash flows for each monthly and cumulative period for which a profit and loss statement is prepared;

(ii) Supporting Data. At the Owner's request, copies of the following: (a) all checks, bank statements, bank deposit slips and bank reconciliations; (b) detailed cash receipts and disbursement records; (c) copies of all invoices; (d) supporting documentation for payroll, payroll taxes and employee benefits; and (e) such other information as the Owner might reasonably request;

(iii) Other Reports. Such other reports and documents as might be reasonably requested by the Owner from time to time (including, without implied limitation, certificates of compliance and other instruments required in connection with any bond financing relating to the Club); and

(iv) Management Fee Invoice. An invoice for the Management Fee (defined below) for such preceding calendar month and any other preceding calendar month for which the Management Fee is outstanding, based on the Gross Revenues set forth in the applicable financial statements.

(c) Within forty-five (45) days after the end of each calendar year, Manager shall furnish to the Owner year-end financial statements for the Club (including a balance sheet, income statement and statement of cashflows) which statements shall be unaudited and shall be prepared in accordance with GAAP. The Owner may engage an independent certified public accounting firm to provide audited annual financial statements, which cost shall be an operating expense of the Club. Manager shall cooperate in all respects with such accountant in the preparation of such statements, including the delivery of any financial information generated by Manager pursuant to the terms of this Agreement and reasonably required by the Owner's accountant to prepare such audited financial statements.

3

HAH 000195

(d) The Owner, shall have the right and privilege of examining and inspecting the books and records (including audit rights) during customary business hours following reasonable advance notice to Manager. Upon the termination of this Agreement, all such books and records shall be turned over to the Owner to insure the orderly continuance of the operation of the Club. If an audit or inspection of the books reveals that the calculation of Gross Revenues was miscalculated by Manager such that the fees paid out of the operating funds of the Club by the Owner pursuant to this Agreement varied by five percent (5%) or more from the amount provided by Manager in the statements delivered pursuant to this Agreement, then Manager will reimburse the Owner for all inspection and audit costs (including, without limitation, reasonable travel, lodging, meals, salaries and other expenses of the inspecting or auditing personnel) in addition to any adjustment or reimbursement for fees owing pursuant to this Agreement.

2.06 Human Resources. Manager shall hire, train, supervise, and pay all of its own employees and other personnel ("Employees") necessary to fulfill its obligations hereunder. All Employees shall be the employees or independent contractors of Manager, not the Owner. Manager may discharge any Employee in its discretion and pursuant to applicable state and federal law. Manager shall cause Employees to be covered by workers' compensation insurance and such other insurance as is now or hereafter required by law. Manager shall maintain all personnel and payroll records and manage all Employee benefits programs, including, but not limited to, health insurance, dental insurance, short and long term disability plans, life insurance, workers' compensation, cafeteria plans, vacation plans, sick leave and employee policy manuals in accordance with this Agreement, may draw down from the Gross Revenues (defined herein), all costs and expenses incurred in connection with all on and offsite Employees, including, without limitation, wages, salaries, on-site staff, reasonable bonuses, contract labor, commissions, fringe benefits, employee benefits, recruitment costs, workers' compensation and unemployment insurance premiums, payroll taxes, vacation and sick leave (but excluding any such costs or expenses and overhead of any offsite personnel). In addition, Manager shall maintain businesslike relations with the customers of the Club and all customer complaints will be received, logged and resolved in a systematic fashion. Complaints of a serious nature will be reported to the Owner with appropriate recommendations from the Manager.

2.07 Accounting. Manager shall perform general accounting functions for the operation of the Club, including, without limitation: cash management and banking relations; budgeting, forecasting and financial statement reporting; the preparation and maintenance of records necessary to produce financial statements; the preparation of financial statements in accordance with this Agreement; the preparation, execution, and filing, punctually, when due all forms, reports, and returns required by law relating to the employment of Employees or to the management, operation, occupancy, maintenance or use of the Club, including without limitation any sales or use tax forms, reports, and income tax returns; audit support; and any other general accounting function as requested by the Owner. In addition, Manager shall pay punctually when due any sales, use, employment or other taxes relating to the operation of the Club.

2.08 Marketing. Manager will devise a strategy for and assist in the implementation, at the Owner's sole costs and expense, of a marketing program to advertise and promote the business of the Club. Manager may cause the Club to participate in such marketing plans, oral and written presentations,

4

HAH 000196

promotional materials, public relations, media relations and any other general marketing functions to promote the Club.

2.09 Point-of-Sale Management Information System. Manager shall operate, administer, maintain, repair and upgrade, at the Owner's expense, the existing point-of-sale management information system for tracking purchases and inventory of each of the Club. Manager shall provide to the Owner an automated, monthly point-of-sale report on the first day of each calendar month.

2.10 Manager Personnel. Owner understands and agrees that Manager may hire or contract with outside contractors for some of its responsibilities hereunder.

2.11 Deletion of Specified Services. Any time during the Term of this Agreement, upon prior written notice by the Owner to Manager, the Owner may delete any specified service from the Services to be provided to the Club.

2.12. Term. Unless sooner terminated as hereafter provided, this Agreement shall be effective for a period of one (1) year commencing on the Effective Date of this Agreement (the "Term"), which Term shall be automatically extended for additional periods of one (1) year each, unless on or before thirty (30) days prior to the expiration of the Term, as extended, either party provides written notice to the other party not to so extend the Term.

3.01 Events for Termination.

(a) The Owner may terminate this Agreement, at any time and for any reason by providing Manager at least thirty (30) days' prior written notice.

(b) In addition, the Owner, at its sole option, may terminate this Agreement if any of the following events of default occur:

(i) The filing of a voluntary petition in bankruptcy or insolvency or a petition for reorganization under any bankruptcy law by Manager;

(ii) The consent to any involuntary petition in bankruptcy or the failure to vacate, within ninety (90) days from the date of entry thereof, any order approving an involuntary petition by Manager;

(iii) The entering of an order, judgment or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating Manager as bankrupt or insolvent, or approving a petition seeking reorganization or appointing a receiver, trustee, or liquidator of all or a substantial part of such party's assets, and such order, judgment or decree continues unstayed and in effect for any period of ninety (90) days or more;

(iv) The appointment of a receiver for all or any substantial portion of the property of Manager;

(v) The failure of Manager to make any payment required to be made in accordance with the terms of this Agreement within ten (10) days after receipt of written notice from the Owner, specifying said default with reasonable specificity, when such payment is due and payable; or

5

HAH 000197

(vi) The failure of Manager to perform, keep or fulfill any of the material covenants, undertakings, obligations or conditions set forth in this Agreement (but excluding any default set forth in Section 3.01(b)(v)), and the continuance of such default for a period of thirty (30) days after written notice of said failure from the Owner; provided, however, if such default cannot be cured within such thirty (30) day period and Manager commences to cure such default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended so long as it shall require Manager in the exercise of due diligence to cure such default, but not to exceed 180 days; provided, further, however, in the event of a default of the type set forth in this Section 3.01(b)(vi) shall result in a default by the Owner under any financing or loan agreement, such shorter cure period (if any) with respect to such default as shall be provided for therein; provided further that the cure period for any breach of this Agreement that would result in criminal sanctions against the Owner must be cured within ten (10) days following written notice thereof from the Owner.

(c) Manager, at its sole option, may terminate this Agreement if any of the following events of default occur:

(i) The filing of a voluntary petition in bankruptcy or insolvency or a petition for reorganization under any bankruptcy law by the Owner;

(ii) The consent to any involuntary petition in bankruptcy or the failure to vacate, within ninety (90) days from the date of entry thereof, any order approving an involuntary petition by the Owner;

(iii) The entering of an order, judgment or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating the Owner as bankrupt or insolvent, or approving a petition seeking reorganization or appointing a receiver, trustee, or liquidator of all or a substantial part of such party's assets, and such order, judgment or decree continues unstayed and in effect for any period of ninety (90) days or more;

(iv) The appointment of a receiver for all or any substantial portion of the property of the Owner;

(v) The failure of the Owner to make any payment required to be made in accordance with the terms of this Agreement within ten (10) days after receipt of written notice from Manager, specifying said default with reasonable specificity, when such payment is due and payable; or

(vi) The failure of the Owner to perform, keep or fulfill any of the material covenants, undertakings, obligations or conditions set forth in this Agreement (but excluding any default set forth in Section 3.01(c)(v)), and the continuance of such default for a period of thirty (30) days after written notice of said failure from Manager; provided, however, if such default cannot be cured within such thirty (30) day period and the Owner commences to cure such default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended so long as it shall require the Owner in the exercise of due diligence to cure such default, but not to exceed 180 days; provided, further, however, that the cure period for any breach of this Agreement that would result in criminal sanctions against Manager must be cured within ten (10) days following written notice thereof from Manager.

6

HAH 000198

3.02 <u>Certain Obligations of Manager After Termination</u>. Upon termination of this Agreement, Manager shall: (i) deliver to the Owner all records, books, accounts, files, and other documentation (the "Records") pertaining to the management, maintenance, operation, marketing and use of the Club, including, without limitation, all records relative to the employees, suppliers, finances, and affairs of the Club; (ii) deliver and assign, transfer or otherwise convey to the Owner all contracts and all personal property relating to or used in the management, operation and maintenance of the Club, including, without limitation, all keys, combinations to locks and other security devices, documents, materials, operating supplies, furnishings and equipment, provided that any personal property owned by Manager may be retained by Manager; (iii) prepare and deliver to the Owner a full set of reports for the Club in accordance with Section 2.05, current to the date of termination; (iv) deliver all funds held by Manager on behalf of the Owner; and (v) render such assistance as the Owner might reasonably request to facilitate an orderly transition in the management and operation of the Club.

4. <u>Management Fee</u>. As compensation for all Services to be rendered by Manager during the Term of this Agreement, the Owner agrees to pay to Manager the following:

4.01 <u>Management Fee</u>. The Owner shall pay to Manager a management fee (the "Management Fee") for the Services in an amount equal to Seventeen Thousand Five Hundred and No/100 Dollars ($17,500.00) per month, with a true-up at the end of each calendar year, such that the aggregate annualized Management Fee is equal to ten percent (10%) of the Gross Revenues of the Club, for such calendar year. For the purposes of this Agreement, "Gross Revenues" means all revenues from the Club, except from the sale of alcoholic beverages, less any sales, use, employment or other taxes relating to the operation of the Club. The Management Fee shall be paid on a monthly basis within ten (10) days following the Owner's receipt of the applicable financial reports set forth in Section 2.05(b), but in no event earlier than the twentieth (20th) of the applicable month. In the event this Agreement is terminated during a calendar month, the Management Fee payable for the month in which such termination occurs will be prorated based upon a thirty (30) day month. Any short-fall of the Management Fee payment(s) shall carry over and shall be paid by Owner as soon as practicable.

5. <u>Insurance; Indemnification; Exculpation from Liability</u>.

5.01 <u>Insurance</u>.

(a) Manager, as an operating expense of the Club, shall obtain and maintain all the insurance policies and endorsements required under the Leases.

(b) Furthermore, Manager, at its sole cost and expense, shall obtain a commercial general liability insurance policy with amounts not less than $1,000,000 combined single limit for each occurrence and $2,000,000 for the aggregate of all occurrences within each policy year, as well as excess liability (umbrella) insurance with limit of at least $5,000,000 per occurrence, covering each of the following: bodily injury, death, or property damage liability per occurrence; personal and advertising injury, general aggregate, products and completed operations, and "all risk legal liability".



7

HAH 000199

(c) Owner, at is sole cost and expense, shall obtain a liquor liability insurance policy with amounts not less than $1,000,000 combined single limit for each occurrence and $2,000,000 for the aggregate of all occurrences within each policy year and shall list Manager as an additional insurance on the policy.

5.02 Indemnity.

(a) MANAGER SHALL INDEMNIFY AND HOLD THE OWNER (AND THE OWNER'S AGENTS, SHAREHOLDERS, OFFICERS, DIRECTORS, AGENTS, PRINCIPALS AND EMPLOYEES) HARMLESS FROM AND AGAINST ALL CLAIMS, DEMANDS, DAMAGES, JUDGMENTS, COSTS, LOSSES, PENALTIES, FINES, LIENS, SUITS, AND EXPENSES AND LIABILITIES, INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND COSTS AND EXPENSES INCIDENT THERETO (COLLECTIVELY, "CLAIMS") WHICH ARE NOT COVERED BY INSURANCE PROCEEDS PAYABLE TO THE OWNER OR THE INDEMNIFIED PARTY THAT MAY BE INCURRED BY OR ASSERTED AGAINST ANY SUCH PARTY AND THAT ARISE FROM (A) THE FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE OF MANAGER, ITS AGENTS, PRINCIPALS, PARTNERS, MEMBERS, OFFICERS, DIRECTORS, AND EXECUTIVE AND KEY EMPLOYEES, INCLUDING, WITHOUT LIMITATION, IN THE SUPERVISION OR TRAINING OF EMPLOYEES AND OTHER EMPLOYMENT MATTERS; OR (B) PLACING, DISCHARGE, LEAKAGE, USE OR STORAGE, OF HAZARDOUS MATERIALS ON THE PREMISES OR IN THE HOTEL BY MANAGER OR ITS AGENTS, PRINCIPALS, PARTNERS, MEMBERS, OFFICERS, DIRECTORS, AND EMPLOYEES DURING THE TERM IN VIOLATION OF THE LEASES. THIS INDEMNITY EXPRESSLY COVERS AND INCLUDES CLAIMS ARISING FROM THE NEGLIGENCE (BUT NOT GROSS NEGLIGENCE) OF THE OWNER.

(b) EXCEPT WITH RESPECT TO MATTERS FOR WHICH MANAGER IS OBLIGATED TO PROVIDE INDEMNIFICATION PURSUANT TO SECTION 5.02(a) OR ARISING SOLELY OUT OF AN EVENT OF DEFAULT BY MANAGER UNDER THIS AGREEMENT, OWNER SHALL INDEMNIFY AND HOLD MANAGER AND THE MANAGER AFFILIATED ENTITIES (AND THEIR RESPECTIVE AGENTS, PRINCIPALS, PARTNERS, MEMBERS, OFFICERS, DIRECTORS, AND EMPLOYEES) HARMLESS FROM AND AGAINST ALL CLAIMS WHICH ARE NOT COVERED BY INSURANCE PROCEEDS PAYABLE TO MANAGER OR THE INDEMNIFIED PARTY THAT ARISE FROM OR IN CONNECTION WITH (A) THE OWNERSHIP AND OPERATION OF THE CLUB, (B) THE CONDITION OR USE OF THE CLUB, INCLUDING INJURY TO PERSONS OR PROPERTY OR BUSINESS, (C) THE FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE OF THE OWNER, OR (D) PLACING, DISCHARGE, LEAKAGE, USE OR STORAGE, OF HAZARDOUS MATERIALS IN THE CLUB BY THE OWNER DURING THE TERM, THE EXISTENCE OF HAZARDOUS MATERIALS IN, ON OR UNDER THE PREMISES BEFORE THE COMMENCEMENT OF THE TERM. MANAGER SHALL PROMPTLY PROVIDE THE OWNER WITH WRITTEN NOTICE OF ANY CLAIM OR SUIT BROUGHT AGAINST IT BY A THIRD PARTY WHICH MIGHT RESULT IN SUCH INDEMNIFICATION.

8

HAH 000200

**THIS INDEMNITY EXPRESSLY COVERS AND INCLUDES CLAIMS ARISING FROM THE NEGLIGENCE (BUT NOT GROSS NEGLIGENCE) OF MANAGER.**

(c) Any party obligated to indemnify the other party under this Agreement (the "Indemnifying Party") shall have the right, by written notice to the other party, to assume the defense of any claim with respect to which the other party is entitled to indemnification hereunder. If the Indemnifying Party gives such written notice, (i) such defense shall be conducted by counsel selected by the Indemnifying Party and approved by the other party, such approval not to be unreasonably withheld or delayed (provided, however, that the other party's approval shall not be required with respect to counsel designated by the Indemnifying Party's insurer); (ii) so long as the Indemnifying Party is conducting such defense with reasonable diligence, the Indemnifying Party shall have the right to control said defense and shall not be required to pay the fees or disbursements of any counsel engaged by the other party for services rendered after the Indemnifying Party has given the written notice provided for above to the other party, except if there is a conflict of interest between the parties with respect to such claim or defense; and (iii) the Indemnifying Party shall have the right, without the consent of the other party, to settle such claim, but only provided that such settlement involves only the payment of money, the Indemnifying Party pays all amounts due in connection with or by reason of such settlement and, as part thereof, the other party is unconditionally released from all liability in respect of such claim. The other party shall have the right to participate in the defense of such claim being defended by the Indemnifying Party at the expense of the other party, but the Indemnifying Party shall have the right to control such defense (other than in the event of a conflict of interest between the parties with respect to such claim or defense). In no event shall (i) the other party settle any claim without the consent of the Indemnifying Party, so long as the Indemnifying Party is conducting the defense thereof in accordance with this Agreement; or (ii) if a claim is covered by the Indemnifying Party's liability insurance, take or omit to take any action which would cause the insurer not to defend such claim or to disclaim liability in respect thereof.

(d) The provisions of this Section 5.02 shall survive the termination of this Agreement with respect to acts, omissions and occurrences arising during the Term and shall be binding on the successors and assigns of the Owner and Manager.

6. <u>Miscellaneous Provisions.</u>

6.01 <u>Notices.</u> All notices, requests, demands, and other communications required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given if delivered by hand, mailed by certified or registered mail with postage prepaid or by overnight mail, electronic mail transmission, or if sent by facsimile as follows:

If to Manager, to:       Entertainment Marketing & Management, Ltd.
                         3414 Old Richmond Road
                         Rosenberg, Texas 77471
                         Attn: Dakota Fontenot
                         Email: dakotajamesfontenot@gmail.com

If to the Owner, to:     ICE Embassy, Inc.

HAH 000201



3414 Old Richmond Road
Rosenberg, Texas 77471
Attn: Dakota Fontenot
Email: dakotajamesfontenot@gmail.com

In either case, with a copy to:   BoyarMiller
2925 Richmond Avenue, 14th Floor
Houston, Texas 77098
Attn: Tiffany Melchers
Email: tmelchers@boyarmiller.com

or to such other person or address as such party hereafter designates (by written notice to the other party).

6.02 Notices Concerning the Club. Upon the receipt by Manager of any notice pertaining to the Club not of a routine nature, including in any event, but not limited to, notices of any violation of any legal requirements, Manager shall immediately inform the Owner of such notice and shall deliver a copy of the notice to the Owner as expeditiously as possible.

6.03 Assignment. This Agreement and all of the provisions of this Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations shall be assigned by either of the parties without the prior written consent of the other party.

6.04 Governing Law. This Agreement and the legal relations among the parties shall be governed by and construed in accordance with the laws of the State of Texas.

6.05 Counterparts. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

6.06 Headings. The headings in this Agreement are inserted for convenience only and shall not affect the construction of this Agreement.

6.07 Entire Agreement; Modification. This Agreement embodies the entire agreement and understanding of the parties with respect to the subject matter contained in this Agreement. This Agreement supersedes all prior agreements and understandings between the parties with respect to the subject matter contained herein. This Agreement may not be amended or modified in any manner except by an instrument in writing signed by the parties

6.08 Severability. The provisions of this Agreement are severable and the invalidity of any one provision shall not affect the validity of any other provision.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

10

HAH 000202

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement effective as of the date first above written.

OWNER:

ICE EMBASSY, INC. d/b/a THE COLORADO BAR AND GRILL

By: _____

Name: Dakota Fontenot

Title: _____

MANAGER:

ENTERTAINMENT MARKETING & MANAGEMENT, LTD.

By:     BFD GP, LLC, its general partner

By: _____

Name: Dakota Fontenot

Title: President

ii

HAH 000203

Linda Goehrs, in her capacity as Trustee of the Holli Ann Hardin Trust Number One, Plaintiff
vs.
Dakota Fontenot, Defendant

## 537721

### ADMINISTRATIVE SERVICES AGREEMENT

This ADMINISTRATIVE SERVICES AGREEMENT (this "**Agreement**"), dated as of January 1, 2024 (the "**Effective Time**"), is by and between ENTERTAINMENT MARKETING & MANAGEMENT, LTD., a Texas limited partnership (the "**Company**") and HFR ENTERPRISES, INC., a Texas corporation (the "**Service Recipient**").

### RECITALS

WHEREAS, the Company previously provided certain management and administrative support services to the Service Recipient, which relationship may or may not have been memorialized by a written agreement (the "**Original Agreement**");

WHEREAS, all records of the Company and Service Recipient, including the Original Agreement were previously maintained by or on behalf of Dallas Joseph Fontenot, Jr. ("**Mr. Fontenot**");

WHEREAS, Mr. Fontenot died on September 3, 2021, and since such date the Original Agreement has not been located after a diligent search by his heirs and authorized affiliates;

WHEREAS, the Service Recipient desires to engage the Company to provide certain management and administrative support services on the terms set out herein; and

WHEREAS, the Parties desire that this Agreement amend, restate, and supersede the Original Agreement in all respects.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Service Recipient (hereinafter, collectively the "**Parties**", or each, individually, a "**Party**") agree as follows:

1. <u>Provision of Services.</u>

    1.1 <u>Agreement to Provide Services.</u> Upon the terms and subject to the conditions contained herein, the Company hereby agrees to provide to the Service Recipient the services ("**Administrative Services**") set forth in Section 1.2. Each of the Administrative Services shall be provided and accepted in accordance with the terms, limitations, and conditions set forth herein.

    1.2 <u>Scope of Services.</u> The Administrative Services provided under this Agreement shall include the following:[1]

        (a) <u>Tax.</u> Tax services include tax support and tax compliance services as may be necessary to ensure that a Service Recipient complies with applicable tax laws and tax consulting services relating to research and planning.

        (b) <u>Accounting and Financial Statements/Periodic Reports.</u> Accounting services include accounting support services to assist in the maintenance of a system

---

[1] NTD – Review the following list to ensure it is accurate/sufficient.

**EXHIBIT**

**6**

HAH 000181

of accounting for a Service Recipient and the preparation of unaudited balance sheets, statements of income and results of operations and cash flows.

(c)    Bookkeeping Services. Bookkeeping services include the process of systematically recording, organizing and managing financial transactions and records, maintaining accurate records of all financial transactions, sales, purchases, payments, receipts, and reconciling bank statements of the Services Recipient.

(d)    Lease Management. Lease management services include negotiation, lease administration, rent collection, lease renewal and termination, and other ancillary services related thereto.

(e)    Human Resources ("HR"). HR services include assistance with staffing and recruitment, training and employee development, and advice and establishment of policies for employee compensation and benefits.

(f)    Insurance Management. Insurance services include evaluation of insurance needs, policies and risks, management of brokers, placement of coverages, supervision over claims, and support of compliance functions.

2.    Fees and Payment.

2.1    Fees. For the Company's provision of the Administrative Services, Service Recipient shall pay to the Company a fee (the "Services Fee"). The amount of the Services Fee is set forth in Exhibit A attached hereto. The Services Fee set forth on Exhibit A may be amended from time to time by the Parties' mutual execution of an updated Exhibit A and subsequent attachment of such executed Exhibit A to this Agreement.

2.2    Payment. Beginning in calendar year 2023, the Company shall submit a statement to the Service Recipient no later than 15 days after the end of each calendar month (unless otherwise agreed to by the Parties) with respect to the amount of Services Fee payable by the Service Recipient for such month (a "Statement"). Each Statement shall set forth in reasonable detail the Services Fee. At least 30 days prior to December 31 of each calendar year during the term of this Agreement (each such date a "Settlement Date"), the Parties shall negotiate in good faith to determine a discount or premium to be applied to the Services Fees accrued during the preceding 12 months (the "Adjustment Amount"). Full payment for all Administrative Services, net of any Adjustment Amount, as set forth in the Statements, and less any applicable withholding taxes, shall be made no later than the applicable Settlement Date. In the event of any disagreement between the Company and the Service Recipient with respect to any Statement, or any amounts owed thereunder, the Company and the Service Recipient agree to negotiate in good faith to resolve such dispute. In the event of any disagreement between the Company and the Service Recipient with respect to any Adjustment Amount, which remains unresolved prior to the applicable Settlement Date, the Adjustment Amount shall default to $0.00. The Company and the Service Recipient shall make adjustments to charges as required to reflect the discovery of errors or omissions or changes in the charges.

3.    Taxes.

2

HAH 000182

3.1    Sales Tax and VAT. The Service Recipient will be liable for and will reimburse the Company or pay, as applicable, any applicable sales, value added or similar taxes with respect to the Administrative Services provided pursuant to this Agreement. The Service Recipient will not be responsible for any other taxes, assessment, duties, permits, tariffs, fees or other charges of any kind, including, but not limited to, taxes based on the Company's income or equity and withholding taxes imposed on the Company.

3.2    Withholding Tax. If the Service Recipient is required to withhold from any amount owed to the Company for which the Company is responsible, the amount withheld shall be subtracted from the amount owed by the Service Recipient and the Company will receive the amount remaining after the tax withheld.

4.    Accounting. The Company shall maintain accounting records of all services rendered pursuant to this Agreement and such additional information as the Service Recipient may reasonably request for purposes of their internal bookkeeping and accounting operations.

5.    Independent Contractor.

5.1    No Partnership or Joint Venture. In performing services pursuant to this Agreement, the Company will be an independent contractor of the Service Recipient and this Agreement will not be deemed to create a partnership, joint venture, or other arrangement between the Parties.

5.2    Company Employees. The employees or agents of the Company shall not be deemed or construed to be the employees, agents, or partners of the Service Recipient for any purposes whatsoever.

5.3    No Signature Authority. The Company and the Company's personnel or agents shall not enter into contracts on behalf of, or execute contracts as employees or agents of, the Service Recipient, or bind the Service Recipient in any manner, written or oral, express or implied.

6.    Indemnification. The Service Recipient shall indemnify, defend, and hold harmless the Company, its affiliates, officers, directors, employees, agents, and representatives from and against any and all losses, liabilities, claims, damages, actions, fines, penalties, expenses or costs (including court costs and reasonable attorneys' fees) suffered or incurred by the Company relating to any claim of a third party arising from or in connection with the Company's performance or non-performance of any covenant, agreement or obligation of the Company hereunder, other than by reason of the Company's gross negligence, willful misconduct or bad faith. This Section 6 shall survive any termination or expiration of this Agreement.

7.    Limitation of Liability. Notwithstanding any other provision of this Agreement and except for liability caused by the Company's gross negligence, willful misconduct or bad faith, (i) no Party nor their respective directors, officers, employees, and agents, will have any liability to any other Party, or their respective directors, officers, employees and agents, whether based on contract, warranty, tort, strict liability, or any other theory, for any indirect, incidental, consequential, or special damages, and (ii) the Company, as a result of providing an

3

HAH 000183

.Administrative Service pursuant to this Agreement, shall not be liable to any other Party for more than the cost of the Administrative Services related to the claim or damages.

8. Term and Termination.

8.1 Term of Services. The term of this Agreement shall be one (1) year beginning as of the Effective Time, provided that such term shall renew automatically for successive terms of one (1) year unless the Company provides notice to the Service Recipient that this Agreement shall not be renewed at least thirty (30) days prior to the expiration of any one-year term.

8.2 Termination. Either Party may terminate this Agreement, or any part of this Agreement, at any time upon thirty (30) days prior notice to the other Party.

9. General Provisions.

9.1 Assignment. Neither Party shall assign or transfer its rights and obligations hereunder in whole or in part without the prior written consent of the other Party.

9.2 Successor and Assigns. This Agreement is binding on and inures to the benefit of the Parties and their respective permitted successors and permitted assigns.

9.3 Amendments. No amendment to this Agreement shall be effective unless it is in writing and signed by the Parties.

9.4 No Third-Party Beneficiaries. Except for the right of the Company's affiliates, officers, directors, employees, agents and representatives to enforce their rights to indemnification under Section 6, this Agreement benefits solely the Parties to this Agreement and their respective permitted successors and assigns and nothing in this Agreement, express or implied, confers on any other person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

9.5 Cooperation. The Service Recipient will provide all information that the Company reasonably requests for performance of services pursuant to this Agreement, and the Service Recipient will cooperate with any reasonable request of the Company in connection with the performance of services pursuant to this Agreement.

9.6 Counterparts. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement.

9.7 Severability. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

9.8 Governing Law. This Agreement, including all exhibits, schedules, attachments and appendices attached to this Agreement and thereto, and all matters arising

4

HAH 000184

out of or relating to this Agreement, are governed by, and construed in accordance with, the laws of the State of Texas, without regard to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Texas.

9.9    Waiver. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

9.10    Notices. All correspondence or notices required or permitted to be given under this Agreement shall be in writing, in English and addressed to the other Party at its address set out below (or to any other address that the receiving Party may designate from time to time). Each Party shall deliver all notices by personal delivery, nationally recognized overnight courier (with all fees prepaid), facsimile or e-mail (with confirmation of transmission) or certified or registered mail (in each case, return receipt requested, postage prepaid). Except as otherwise provided in this Agreement, a notice is effective only (a) upon receipt by the receiving Party and (b) if the Party giving the notice has complied with the requirements of this Section. Such communications must be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 9.11):

If to Company:              Entertainment Marketing & Management, Ltd.
                            3414 Old Richmond Road
                            Rosenberg, Texas 77471
                            E-mail: dakotajamesfontenot@gmail.com
                            Attention: Dakota Fontenot

If to Service Recipient:    HFR Enterprises, Inc.
                            3414 Old Richmond Road
                            Rosenberg, Texas 77471
                            E-mail: dakotajamesfontenot@gmail.com
                            Attention: Dakota Fontenot

In either case, with a copy to:   BoyarMiller
                            2925 Richmond Ave., 14th Floor
                            Houston, Texas 77098
                            E-mail: tmelchers@boyarmiller.com
                            Attention: Tiffany Melchers

9.11    Entire Agreement. This Agreement, including and together with any related exhibits, schedules, attachments and appendices, constitutes the sole and entire agreement of the Company and the Service Recipient with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, regarding such subject matter.

[SIGNATURE PAGE FOLLOWS]

5

HAH 000185

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date set forth above.

COMPANY:

ENTERTAINMENT MARKETING &
MANAGEMENT, LTD.,
a Texas limited partnership

By: BFD GP, LLC,
a Texas limited liability company
its general partner

By: _____
Name: Dakota Fontenot
Title: President

SERVICES RECIPIENT:

HFR ENTERPRISES, INC.,
a Texas corporation

By: _____
Name: Dakota Fontenot
Title: President

6

HAH 000186

## EXHIBIT A

## SERVICES FEE

- Prior to Calendar Year 2021: As reflected on the books and records of the Company.
- Calendar Year 2021: $977.59 per Month.
- Calendar Year 2022: $462.50 per Month.
- Calendar Year 2023 and all future Calendar Years: $1,850.00 per Month.



7

HAH 000187

Linda Goehrs, in her capacity as Trustee of the Holli Ann Hardin Trust Number One, Plaintiff
vs.
Dakota Fontenot, Defendant

Case 4:26-cv-02743    Document 7-1    Filed 04/29/26 in TXSD    Page 278 of 406

537721

## AMENDMENT OF PURCHASE AND SALE AGREEMENT

This Amendment (the "*Amendment*") is made and entered into between HFR ENTERPRISES, INC., a Texas corporation ("*Seller*") and CLE GROUP SKZ REAL ESTATE, LLC, a Texas limited partnership ("*Purchaser*") as an amendment to that certain Purchase And Sale Agreement ("*Agreement*"), dated June ___, 2025, regarding the purchase and sale of that certain property municipally located at 6710 Southwest Freeway, Houston, Texas 77074 land in Harris County, Texas. Capitalized terms contained but not otherwise defined herein shall have the meanings ascribed thereto in the Agreement.

WHEREAS, the original Sales Price under the Agreement was $4,750,000.00; and

WHEREAS, the parties hereto have agreed to reduce the Sales Price in order to satisfy certain liabilities of the Seller prior to Closing.

NOW THEREFORE, the Purchaser and Seller hereby agree that the Agreement is hereby amended as follows:

1.      The Sales Price shall be reduced to the amount of Four Million Six Hundred Eighty-Nine Thousand Four Hundred Twenty Four and 72/100 Dollars ($4,689,424.72).

2.      The parties agree that the above listed amendments shall be hereinafter considered a part of the Agreement as if originally set forth therein. The amendments shall be subject to any and all other provisions of the Agreement, with the exception of the parts or provisions of the Agreement which have been modified by this Amendment. The Agreement, as amended hereby, is hereby ratified and confirmed.

3.      The parties may execute this Amendment in one or more identical counterparts, all of which, when taken together, will constitute one and the same instrument. A facsimile or electronic mail transmission shall be binding on the party or parties whose signatures appear thereon.

In witness whereof, the undersigned parties hereto have executed this Amendment.

SELLER:                                              PURCHASER:

HFR ENTERPRISES INC.                                  CLE GROUP SKZ REAL ESTATE, LLC,
a Texas corporation                                  a Texas limited liability company

*Linda Goehrs, Trustee*                              *ZY*
_____                             _____
By: Linda Goehrs, Trustee for the                    By: Zack Truesdell
Holli Ann Hardin Trust Number One                    Title: President

EXHIBIT
7

Harris County - County Probate Court No. 1

537721

## PARTNERSHIP INTEREST PURCHASE AGREEMENT

THIS PARTNERSHIP INTEREST PURCHASE AGREEMENT (this "Agreement") is made and entered into as of June ___, 2025, by and among Colorado Rose, LLC a Texas limited liability company, with a principal place of business at 1800 West Loop S, Ste. 1125, Houston, TX 77027 ("Buyer"), BFD GP, LLC a Texas limited liability company with a principal place of business at 3414 Old Richmond Road, Rosenberg, TX 77471 ("BFD GP") and BFD LP, LLC a Texas limited liability company with a principal place of business at 3414 Old Richmond Road, Rosenberg, TX 77471 ("BFD LP", and together with BFD GP, collectively, the "Sellers" and each individually a "Seller") and Entertainment Marketing & Management, Ltd., a Texas limited partnership with a principal place of business at 3414 Old Richmond Road, Rosenberg, TX 77471 ("Company"). The Buyer and Sellers are joined herein by Dakota Fontenot, an individual resident of Texas ("Fontenot, and together with the Sellers, collectively the "Seller Parties"). Buyer, Seller Parties, and the Company are hereinafter collectively referred to as the "Parties."

WHEREAS, BFD GP, LLC is the sole general partner holding all of the general partnership interests of the Company (the "GP Interests"), and BFD LP, LLC is the sole limited partner holding all of the limited partnership interests of the Company (the "LP Interests"), and together, Sellers own 100% of the issued and outstanding GP Interests and LP Interests in the Company (collectively, the "Interests");

WHEREAS, contemporaneously with this Agreement, the Parties and/or their affiliates or related parties are entering into that certain Stock Purchase Agreement (the "SPA") for the acquisition of stock in Ice Embassy, Inc., a Texas corporation ("Ice Embassy"), and that certain Purchase and Sale Agreement (the "PSA") for the acquisition of that certain real property located at 6710 Southwest Freeway, Houston, Texas 77074, as further described in the PSA (the "Property") from HFR Enterprises Inc., a Texas corporation ("HFR") (the SPA and PSA collectively referred to herein as the "Parallel Agreements");

WHEREAS, Fontenot owns 100% of the membership interests of the Sellers, and further, Fontenot and/or his affiliates own, possess, manage and control ICE Embassy and HFR through equity ownership and management (or services) agreements, and by which Fontenot will benefit from the closing of all transactions under this Agreement and the Parallel Agreements;

WHEREAS, the Parties desire to enter into this Agreement, pursuant to which the Buyer agrees to purchase from the Seller, and the Seller agrees to sell to the Buyer and assign to Buyer (and Buyer's designee, with respect to the LP Interests), all of the Interests, on the terms and subject to the conditions set forth in this Agreement; and

WHEREAS, the Seller and the Buyer desire to consummate the proposed transaction pursuant to the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1

EXHIBIT
**8**

DF000502

## ARTICLE I

## PURCHASE AND SALE OF INTERESTS

1.1 Purchase and Sale of Interests. Upon the terms and subject to the conditions of this Agreement, at the Closing on the Closing Date, the Seller agrees to sell, assign, convey, transfer and deliver to the Buyer (and Buyer's designee, with respect to the LP Interests), and the Buyer and Buyer's designee agrees to acquire from the Seller all of the Interests, free and clear of all Liens (as defined below) (other than restrictions under the Securities Act and state securities Laws), excluding the assets listed in Exhibit A, attached hereto and incorporated herein by this reference ("Excluded Assets").

1.2 Purchase Price.

(a) Upon the terms and subject to the conditions of this Agreement, in consideration of the aforesaid sale, assignment, conveyance, transfer and delivery of the Interests, the purchase price payable by the Buyer to the Seller at the Closing (the "Purchase Price") shall be in the aggregate:  Two Million Seven Hundred Fifty Thousand and 00/100 ($2,750,000.00) Dollars, payable as follows:

(i) the Buyer shall pay the Seller One Million Five Hundred Thousand and 00/100 ($1,500,000.00) Dollars via wire transfer at Closing (the "Closing Cash Payment");

(ii) subject to Section 1.2(b), the Buyer shall pay the Sellers an aggregate sum of One Million Two Hundred Fifty Thousand and 00/100 ($1,250,000.00) Dollars ("Installment Amount"), pro-rata in accordance with each Seller's proportionate share of the Interests, via wire transfer, to be paid as follows:

(iii) One half of the Installment Amount ($625,000) shall be paid in quarterly installments, with the first installment being due and payable on October 1, 2025 and three successive installments being due and payable on the first day of the succeeding fiscal quarter thereafter (i.e., January 1, 2026, April 1, 2026, and July 1, 2026), and with the remaining one-half of the Installment Amount ($625,000) shall be paid in 12 monthly increments, with the first payment being due and payable on August 1, 2026, and with successive monthly payments being due on the first day of each month until the Installment Amount is paid in full.

The quarterly and monthly payments of the Installment Amount are collectively referred to herein as the "Installment Payments".  As security for payment of the Installment Payments, Sellers shall be granted a subordinate lien covering the Property being purchased under the PSA, which will be provided under a second-priority lien deed of trust security interest in the Property. Buyer shall execute and deliver a deed of trust in favor of Sellers, in form and substance reasonably satisfactory to Sellers and Buyer.

(b) Notwithstanding anything to the contrary, Buyer shall be entitled to offset against any unpaid Installment Payments due to the Buyer Indemnified Parties for Buyer's Losses as set forth

2

DF000503

in Article VIII herein or under any of the Parallel Agreements. Any offset shall reduce the applicable Installment Payment(s) on a dollar-for-dollar basis.

1.3 [Reserved].

1.4 Excluded Assets License. As part of this Agreement, Buyer is granted a non-exclusive, revocable license to use Item No. 16 in the Excluded Assets ("**Twin Zebras**") while operating its business at the Property. This license shall remain in effect for as long as the Buyer continues to operate on the Property and desires to use the Twin Zebras. In the event that the Buyer ceases operations on the Property, no longer wishes to use the Twin Zebras, or is otherwise unable to continue using the Twin Zebras, the Buyer shall promptly return the Twin Zebras to Dakota Fontenot in their original condition, reasonable wear and tear excepted. The Seller Parties reserve the right to inspect the Twin Zebras upon their return to ensure compliance with this provision. This license is non-transferable and may not be assigned or sublicensed by the Buyer without the prior written consent of Sellers. The Seller Parties retain all ownership rights to the Twin Zebras and may revoke this license at their discretion with reasonable notice to the Buyer.

1.5 Removal of Excluded Assets. Sellers shall have thirty (30) days following the Closing Date to remove all Excluded Assets from the Property. Sellers shall coordinate and arrange mutually agreeable times with Buyer for the removal of such Excluded Assets, ensuring minimal disruption to Buyer's operation of its business at the Property. Sellers shall be responsible for any costs associated with the removal and shall leave the Property in a clean and orderly condition following removal of the Excluded Assets.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES OF SELLERS

2. Representations and Warranties of the Seller Parties. As an inducement to the Buyer to enter into this Agreement, each of the Seller Parties, jointly and severally, represent and warrant to the Buyer that as of the date of this Agreement and the Closing Date:

a. Title to Partnership Interests. The Sellers own, possess, and have good and marketable title to the Interests free and clear of all liens, leases, pledges, charges, encumbrances, equities, covenants, conditions, restrictions, or claims of every nature and kind whatsoever (the "**Liens**").

b. Legal Requirements. The Sellers have all requisite power, authority, and approvals to transfer ownership of the Interests. The Company and Sellers are in good standing with the State of Texas and has complied and will continue to comply with all applicable federal, state, or local statutes, laws, and regulations, if any, with respect to its transfer of the Interests.

c. Consents and Approvals. Other than in compliance with the provisions of applicable statutes and regulations, no notice to, filing with, or authorization, consent, or approval of any domestic or foreign public body or authority is necessary for the consummation of the transactions contemplated by this Agreement. The execution, delivery, performance and consummation of this Agreement does not and will

3

DF000504

not: (i) violate, conflict with or constitute a default or an event that, with notice or lapse of time or both, would be a default, breach or violation under any term or provision of any instrument, agreement, contract, commitment, license, promissory note, conditional sales contract, indenture, mortgage, deed of trust, lease or other agreement, instrument or arrangement to which the Company or Seller Parties are a party or by which the Sellers' Interests are bound; (ii) violate, conflict or constitute a breach of any statute, regulation or judicial or administrative order, award, judgment or decree to which the Seller Parties or the Company or to which the Sellers' Interests are bound or subject; or (iii) result in the creation or imposition of any adverse claim or interest, or any lien, encumbrance, charge, equity or restriction of any nature whatever, upon or affecting the Seller Parties, the Company, or Sellers' Interests. The sole member of the Sellers, Fontenot, has consented to the sale of the Sellers' Interests and this Agreement. The Sellers, being the sole partners of the Company have consented to the sale of the Sellers' Interests and this Agreement.

d.  Litigation. There is no: (i) action, suit or proceeding pending or threatened against the Sellers, Sellers' Interests, the Company, or Fontenot; or (ii) proceeding, investigation, charges, audit or inquiry threatened or pending before or by any federal, state, municipal or other governmental court, department, commission, board, bureau, agency or instrumentality which might result in an adverse effect on the Sellers, Sellers' Interests, the Company, or Fontenot.

e.  Taxes. There is no pending or known threatened claim against the Sellers, the Company, or Fontenot for payment of any taxes arising from the Sellers' ownership of the Interests or Fontenot's ownership of the membership interests in the Sellers. There is no pending or known threatened claim against the Company or Seller Parties for payment of taxes. Neither the Sellers, the Company, nor Fontenot has executed any waiver of any statute of limitations against assessments of taxes.

f.  Authority. The Sellers, the Company, and Fontenot  have taken all necessary action to authorize the execution, delivery, and performance of this Agreement and has adequate power, authority, and legal right to enter into, execute, deliver, and perform this Agreement and to consummate the transactions contemplated hereby. This Agreement is legal, valid, and binding with respect to the Sellers and is enforceable in accordance with its terms. On execution, delivery, and performance of this Agreement in accordance with its terms, the Buyer will own one hundred percent (100%) of the Sellers' Interests free of all claims, Liens, encumbrances, and liabilities, thereby owning one hundred percent (100%) of the Company free of all claims, Liens, encumbrances, and liabilities.

g.  Full Disclosure. This Agreement, any schedule referenced in or attached to this Agreement, any document furnished to the Buyer under this Agreement or any certification furnished to the Buyer under this Agreement does not contain any untrue statement of a material fact and does not omit to state a material fact necessary to make such statement, in the circumstances under which it was made, is not misleading. All of the representations, warranties and covenants in this Agreement: (i) are true and correct as of the date made; (ii) will be true and correct as of the Closing Date; and (iii) will survive

4

DF000505

and not be waived, discharged, released, modified, terminated or affected by any due diligence by the Buyer.

# ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF BUYER

3. Representations and Warranties of Buyer. As an inducement to the Sellers to enter into this Agreement, the Buyer represents and warrants to the Sellers that as of the date of this Agreement and the Closing Date:

a. Legal Requirements. The Buyer has all requisite power, authority, and approvals to purchase ownership of the Interests. The Buyer is in good standing with the State of Texas and has complied and will continue to comply with all applicable federal, state, or local statutes, laws, and regulations, if any, with respect to its transfer of the Interests.

b. Consents and Approvals. Other than in compliance with the provisions of applicable statutes and regulations, no notice to, filing with, or authorization, consent, or approval of any domestic or foreign public body or authority is necessary for the consummation of the transactions contemplated by this Agreement. The execution, delivery, performance and consummation of this Agreement does not and will not: (i) violate, conflict with or constitute a default or an event that, with notice or lapse of time or both, would be a default, breach or violation under any term or provision of any instrument, agreement, contract, commitment, license, promissory note, conditional sales contract, indenture, mortgage, deed of trust, lease or other agreement, instrument or arrangement to which the Buyer is a party; (ii) violate, conflict or constitute a breach of any statute, regulation or judicial or administrative order, award, judgment or decree to which the Buyer is bound or subject; or (iii) result in the creation or imposition of any adverse claim or interest, or any lien, encumbrance, charge, equity or restriction of any nature whatever, upon or affecting the Buyer. The members of the Buyer have consented to the purchase of the Sellers' Interests and this Agreement.

c. Litigation. There is no: (i) action, suit or proceeding pending or threatened against the Buyer that would materially and adversely affect Buyer's ability to perform its material obligations under this Agreement; or (ii) proceeding, investigation, charges, audit or inquiry threatened or pending before or by any federal, state, municipal or other governmental court, department, commission, board, bureau, agency or instrumentality which might result in an materially adverse effect on the Buyer's ability to perform its material obligations under this Agreement.

d. Taxes. There is no pending or known threatened claim against the Buyer for payment of any taxes. The Buyer has not executed any waiver of any statute of limitations against assessments of taxes.

5

DF000506

e.    Authority. The Buyer has taken all necessary action to authorize the execution, delivery, and performance of this Agreement and has adequate power, authority, and legal right to enter into, execute, deliver, and perform this Agreement and to consummate the transactions contemplated hereby. This Agreement is legal, valid, and binding with respect to the Buyer and is enforceable in accordance with its terms. On execution, delivery, and performance of this Agreement in accordance with its terms, the Buyer will own one hundred percent (100%) of the Sellers' Interests free of all claims, Liens, encumbrances, and liabilities.

f.    Full Disclosure. This Agreement, any schedule referenced in or attached to this Agreement, any document furnished to the Sellers under this Agreement or any certification furnished to the Sellers under this Agreement does not contain any untrue statement of a material fact and does not omit to state a material fact necessary to make such statement, in the circumstances under which it was made, is not misleading. All of the representations, warranties and covenants in this Agreement: (i) are true and correct as of the date made; (ii) will be true and correct as of the Closing Date; and (iii) will survive and not be waived, discharged, released, modified, terminated or affected by any due diligence by the Sellers.

## ARTICLE IV

## CONDITIONS TO CLOSING

4.    Conditions to Closing. Prior to the Closing Date, the Buyer and Seller Parties will take all necessary steps to ensure the proper transfer of the Interests from the Sellers to the Buyer at closing in compliance with the operating agreement and other governing documents, if any, of the Company.

## ARTICLE V

## THE CLOSING

5.    The Closing. This Agreement will be consummated remotely by the exchange of the Buyer's Deliverables and Seller Parties' Deliverables (defined herein) by the Buyer and the Sellers on June __, 2025 (the "**Closing Date**").

## ARTICLE VI

## BUYER AND SELLER PARTIES DELIVERABLES

6.1    The Buyer's Deliverables. On the Closing Date, the Buyer will deliver or cause to be delivered to the Sellers the following items (all documents will be duly executed and acknowledged where required): (a) the Purchase Price less Installment Payments; (b) such corporate resolutions and other evidence of authority with respect to the Buyer as might be reasonably requested by the Sellers; (and (c) such additional documents as might be reasonably requested by the Sellers to consummate this Agreement.

6.2.    Seller Parties' Deliverables. On the Closing Date, the Seller Parties will deliver or cause to be delivered to the Buyer the following items (all documents will be duly executed and

6

DF000507

acknowledged where required): (a) assignments and conveyances acceptable to the Buyer necessary to convey to the Buyer (and Buyer's designee, with respect to the LP Interests) all of the Sellers' right, title and interest in and to all of the Interests; (b) written consent and/or approval of the transfer of the Interests to Buyer (and Buyer's designee, with respect to the LP Interests); (c) such corporate resolutions and other evidence of authority with respect to the Company as might be reasonable requested by the Buyer; and (d) Such additional documents as might be reasonably requested by the Buyer to consummate this Agreement.

**ARTICLE VII**
**DEFAULT**

7.    <u>Default</u>. If a Party fails to perform any obligation contained in this Agreement, the Party claiming default will serve written notice to the other party specifying the nature of such default and demanding performance. If such default has not been cured within ten (10) business days after receipt of such default notice, the non defaulting party will be entitled to exercise all remedies arising at law or in equity by reason of such default.

**ARTICLE VIII**
**INDEMNIFICATION**

8.1    <u>Definitions</u>.

a.    "**Buyer Indemnified Parties**" means Buyer, the purchaser entities under the Parallel Agreements, and each of their respective shareholders, officers, directors, members, employees, agents, and representatives and each of the heirs, executors, successors, and permitted assigns of any of the foregoing.

b.    "**Buyer's Losses**" means any and all claims, liabilities, obligations, losses, costs, expenses, penalties, interest, awards, fines and judgments (in equity or at law) and damages whenever arising or incurred (including amounts paid in settlement, costs of investigation and reasonable attorneys' and consultants' fees and expenses) of the Buyer Indemnified Parties described in Section 8.2, as to which the Buyer Indemnified Parties are entitled to indemnification.

c.    "**ERC Credit**" means the refundable tax credit Ice Embassy, Inc. may receive as provided under the Coronavirus Aid, Relief, and Economic Security Act, designed to encourage businesses to retain employees during the COVID-19 pandemic.

d.    "**Escrow Agreement**" has the meaning ascribed thereto in the PSA.

e.    "**Fee Agreement**" means the monetary amount or compensation that Ice Embassy, Inc. is entitled to receive as a result of a resolution, judgment, or settlement arising from litigation or disputes related to credit card fees Visa and Mastercard charged to Ice Embassy, Inc.

7

UNOFFICIAL COPY

f.    "**Indemnity Escrow Account**" has the meaning ascribed thereto in the PSA.

g.    "**Indemnity Escrow Amount**" has the meaning ascribed thereto in the PSA.

h.    "**Parallel Agreements**" shall mean any agreement between Buyer and Seller Parties, or any of Seller Parties' affiliated entities, including but not limited to agreements with or involving the Company, Ice Embassy, Inc., HFR Enterprises, or any of its subsidiaries.

8.2.    <u>Indemnification by Seller Parties</u>. Subject to the terms and conditions of this Agreement (including the limitations set forth in Section 8.3 below), the Seller Parties, and each of its and their affiliates, officers, agents, representatives, subsidiaries, owners, members, trustees, beneficiaries (including any individual beneficiaries of any trust that owns or controls any such entities) (collectively, the "**Seller Indemnifying Parties**"), jointly and severally agree to indemnify, defend, and hold harmless Buyer and the other Buyer Indemnified Parties from and against any and all Buyer's Losses arising out of, relating to, in connection with, or resulting from:

a.    any liability, obligation, or claim (whether known or unknown, contingent or otherwise) related to the Interests or the ownership, operation, maintenance, leasing, use, or occupancy of the Property or the business or assets of the Seller Indemnifying Parties occurring or relating to any period prior the Closing Date, regardless of when asserted, including but not limited to tax liabilities, contractual obligations, or tort claims, regardless of whether such liabilities are discovered before or after Closing and regardless of whether such liabilities are covered by insurance;

b.    any fraud, intentional misrepresentation, willful misconduct, criminal act, bad faith, or gross negligence of the Seller Indemnifying Parties in connection with this Agreement and the Parallel Agreements;

c.    any breach of or inaccuracy in any representation or warranty made by Seller Parties in this Agreement, in any Parallel Agreements, or in any certificate, document, or instrument delivered pursuant hereto; and

d.    any breach or non-fulfillment of any covenant or agreement of the Seller Parties contained in this Agreement, in any Parallel Agreements, or in any certificate, document, or instrument delivered pursuant hereto.

8.3.    <u>Application of Funds for Losses</u>. Any Buyer's Losses for which the Buyer Indemnified Parties are entitled to indemnification under this Article VIII may be satisfied by the following sources in the following order: (i) by applying any proceeds actually received by Buyer from the Fee Agreement to such Buyer's Losses; (ii) by withdrawing the applicable portion of the Indemnity Escrow Amount from the Indemnity Escrow Account in accordance with the Escrow Agreement; (iii) through a set-off against any amounts owed by any Buyer Indemnified Party to any Seller Indemnifying Party under this Agreement or any other Parallel Agreements, including

8

DF000509

the Installment Payments; or (iv) to the extent Buyer's Losses are not fully satisfied by the foregoing (i) – (iii), by direct payment from any of the Seller Indemnifying Parties without Buyer being required to first pursue recovery from any other Seller Indemnifying Party.

8.4.    Survival. The representations, warranties and covenants of the Parties made in this Agreement, including specifically Article II and Article III herein, shall survive the Closing of the transactions contemplated in this Agreement for the applicable statute of limitations period. Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the non-breaching Party to the breaching Party prior to the expiration date of the applicable statute of limitations period shall not thereafter be barred by the expiration of the relevant representation or warranty and such claims shall survive until finally resolved.

8.5.    No Waiver. The indemnification rights under this Article are in addition to, and not in lieu of, any other remedies available at law or in equity or pursuant to any other provision of this Agreement. Nothing in this Section shall limit Buyer's right to seek specific performance, injunctive relief, or other equitable remedies.

## ARTICLE IX

## TAXES

9.    2024 Tax Returns – Responsibility for Preparation. If the federal or applicable state and local income tax returns for the Company for the taxable year ending December 31, 2024 (the "**2024 Tax Period**") are not prepared and filed prior to the Closing Date, then Sellers shall, at its sole cost and expense, be responsible for causing such returns (the "**2024 Tax Returns**") to be timely prepared by a tax professional or accounting firm customarily engaged by the Company for such matters, or another firm reasonably acceptable to Buyer. Sellers shall deliver complete drafts of the 2024 Tax Returns to Buyer no later than sixty (60) days prior to the applicable filing deadline (including extensions) for such returns. Buyer shall have thirty (30) days from receipt of the draft 2024 Tax Returns to review and provide comments to Sellers. Sellers shall, in good faith, consider all reasonable comments made by Buyer and incorporate such comments to the extent required to ensure the 2024 Tax Returns are prepared in accordance with applicable law and consistent with past practice, unless otherwise required by a change in law or fact. Upon resolution of any comments from Buyer, Sellers shall file or cause to be filed the 2024 Tax Returns on or before the due date (including extensions) and shall provide Buyer with a final copy of each filed return within five (5) business days after filing. Nothing in this Section shall limit or impair Buyer's right to challenge or dispute the contents of any such return in connection with any audit, proceeding, or indemnification claim under this Agreement.

9

DF000510

## ARTICLE X

## MISCELLANEOUS

10.1.    Time.  Time is of the essence for this Agreement.

10.2    Notices.  Any notice, demand or communication required or permitted to be given by any provision of this Agreement will be in writing and will be deemed to have been given and received when delivered personally or by telefacsimile to the party designated to receive such notice, or on the date following the day sent by overnight courier, or on the third (3rd) day after the same is sent by certified mail, postage and charges prepaid, directed to the addresses first set forth above.

10.3.    Representations and Warranties.  The respective representations and warranties of the Parties contained herein or in any certificates or other documents delivered prior to or at the Closing Date will not be deemed waived or otherwise affected by any investigation made by any party hereto.  Each and every such representation and warranty will survive the Closing Date and will not be terminated or extinguished for a period of twelve (12) months after the Closing Date.

10.4.    Cooperation.  Prior to and at all times following the termination of this Agreement the parties agree to execute and deliver, or cause to be executed and delivered, such documents and do, or cause to be done, such other acts and things as might reasonably be requested by any party to this Agreement to assure that the benefits of this Agreement are realized by the Parties.

10.5.    Headings.  The paragraph headings contained in this Agreement are for reference purposes only and are not intended to affect in any way the meaning or interpretation of this Agreement.

10.6.    Entire Agreement.  This Agreement, the Parallel Agreements, and any document executed in connection herewith on or after the date of this Agreement constitute the entire agreement between the Parties with respect to the subject matter hereof and there are no agreements, understandings, warranties or representations except as set forth herein or in the Parallel Agreements.

10.7.    Assignment.  It is agreed that the Parties may not assign such party's rights nor delegate such party's duties under this Agreement without the express written consent of the other parties to this Agreement.

10.8.    Amendment.  Neither this Agreement, nor any of the provisions hereof, can be changed, waived, discharged, or terminated, except by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge, or termination is sought.

10.9.    Severability.  If any clause or provision of this Agreement is illegal, invalid, or unenforceable under any present or future law, the remainder of this Agreement will not be affected thereby.  It is the intention of the Parties that if any such provision is held to be illegal, invalid, or unenforceable, there will be added in lieu thereof a provision as similar in terms to such provisions as is possible and to be legal, valid, and enforceable.

10

UNOFFICIAL COPY

DF000511

10.10. Governing Law; Consent to Jurisdiction. This Agreement will be interpreted, construed, and enforced in accordance with the laws of the State of Texas, regardless of any applicable principles of conflicts of law. Each of the Parties hereby irrevocably consents and agrees to the exclusive personal jurisdiction of the courts of the State of Texas in Harris County, Texas or the federal courts for the Southern District of Texas, for any action, suit or proceeding arising in connection with any disagreement, dispute, controversy or claim arising out of or relating to this Agreement or any related document.

10.11. Attorney Fees. If any party institutes an action or proceeding against any other party relating to the provisions of this Agreement, the party to such action or proceeding that does not prevail will reimburse the prevailing party therein for the reasonable expenses of attorneys' fees and disbursements incurred by the prevailing party.

10.12. Waiver. Waiver of performance of any obligation or term contained in this Agreement by any party, or waiver by one party of the other's default hereunder will not operate as a waiver of performance of any other obligation or term of this Agreement or a future waiver of the same obligation or a waiver of any future default.

10.13. Counterpart Execution. This Agreement may be executed in counterparts, including by telefacsimile, each of which will be deemed an original document but all of which will constitute a single document. Also, for the purposes of this Agreement, a facsimile or electronic signature shall serve as an original.

[signature page follows]

11

DF000512

IN WITNESS WHEREOF, this Agreement has been executed by the parties effective the date first above written.

**Seller Parties:**

BFD GP, LLC

_____
Dakota Fontenot, Sole Member

BFD LP, LLC

_____
Dakota Fontenot, Sole Member

_____
Dakota Fontenot, individually
Address: 2926 Fontana Dr
Houston Tx 77043

**Buyer:**
Colorado Rose, LLC

_____
Name: Justin Zachariah Truesdell
Title: manager

**Company:**
Entertainment Marketing & Management, Ltd.

By: BFD GP, LLC
Its General Partner

_____
Dakota Fontenot, Sole Member

Signature Page to Partnership Interest Purchase Agreement

DF000513

**EXHIBIT A**
**Sellers Excluded Assets**

*The Excluded Assets below are located at the real property and improvements at 6710 Southwest Freeway, Houston, Texas 77074.*

1. Dallas Fontenot's desk and side table in manager's office.

2. Lion taxidermy.

3. Smartboard in conference room.



   a.

4. Art on walls in conference room.



   a.



   b.

5. Dakota Fontenot's Pool Table and pool table chairs, equipment, etc., in the shed.

6. Memorabilia addressed to Dallas Fontenot (limited to 10 items)

DF000514

7. Playboy Memorabilia (limited to 5 items)

8. Bear in sports bar



a.

9. Frank Sinatra autographed portrait in sports bar



a.

10. Beaded native American moccasins next to sports bar and ATMs and framed fish hooks beneath



a.

11. Beaded native American necklaces next to entertainer's locker room and Bar 1 station area

UNOFFICIAL COPY

DF000515

12. Gibson Les Paul guitar hanging on ceiling by canoe bar



a.

13. These Playboy memorabilia items



a.



b.

UNOFFICIAL COPY

DF000516



c.

14. Other



a.



b.

DF000517



c.

15. Art on wall by Bar 2 and coffee bar

16. Twin Zebras taxidermy.


UNOFFICIAL COPY

DF000518

Linda Goehrs, in her capacity as Trustee of the Holli Ann Hardin Trust Number One, Plaintiff
vs.
Dakota Fontenot, Defendant

Date : 5/8/2025 5:30:19 PM

537721

From : "Glynn Nance" gnance@nancesimpson.com
To : "John Hebert, Jr." john@gwoodlaw.com, "Ardalan Attar" aattar@christianattarlaw.com
Cc : "Nicole Newman" nnewman@christianattarlaw.com, "Sean Greenwood" sean@gwoodlaw.com,
"Zack Truesdell" zack@theclegroup.com, "Kyle Kinsel" kwkinsel@gmail.com, "Dakota Fontenot"
dakotajamesfontenot@gmail.com
Subject : RE: Revised Purchase Documents
Attachment : image002.png;

John,

With respect to Entertainment Management & Marketing, Ltd and its GP and LP entities, my client who is a material investor in Buyer would like the transaction changed so that it is a purchase of only the partnership interests of in Entertainment Marketing & Management, Ltd (the "Partnership"), and not the Membership Interests of the GP and LP owner entities.  I have discussed this with Ardalan and Nicole (and Zack) and I was asked to reach out directly to you on this point.

We believe that the transaction being structured as the purchase of the partnership interests in the Partnership will have the same tax result to your client as a sale of the membership interests in the GP and LP entities – i.e., he would achieve capital gain on the sale.  This is because the only assets of any consequence in the Partnership (as I understand it) are the Administrative Services Agreement ("ASA") and any goodwill associated with the Partnership's management business activities.  The sale of the Partnership Interests would be treated virtually the same as if the Seller sold the ASA and associated goodwill, which are both treated under the Internal Revenue Code as intangible capital assets.  Thus, the deemed sale of those assets would flow through capital gain to your client – the same as he is expecting to receive from the sale of the membership interests in the GP and LP entities.

However, because the Buyer will be an LLC taxed as a partnership, the purchase of your client's ownership interests in the GP and LP entities – which are taxed as S Corporations - will terminate the S Corp elections of those entities and turn them into C Corps.  This would be very adverse to the Buyer's interests.

Ultimately, we believe that your client's tax advisors would agree that his selling the partnership interests in the Partnership will have the same tax result (i.e., capital gain treatment) as the sale of the LLC Interests in the GP and LP entities.

Please let me know if you would like to discuss further by phone.

**Glynn D. Nance, Jr., LL.M.**
Nance & Simpson, LLP
(713) 520.9100 – Tel
(832) 721-1705 – Cell
www.nancesimpson.com

**CONFIDENTIALITY NOTICE:** This electronic transmission and any attachments constitute confidential information which is intended only for the named recipient(s) and may be legally privileged.  If you have received this communication in error, please contact the sender immediately.  Any disclosure, copying, distribution, or the taking of any action concerning the contents of this communication by anyone other than the named recipient(s) is strictly prohibited.

---

**From:** John Hebert, Jr. <john@gwoodlaw.com>
**Sent:** Thursday, May 8, 2025 4:51 PM
**To:** Ardalan Attar <aattar@christianattarlaw.com>
**Cc:** Nicole Newman <nnewman@christianattarlaw.com>; Sean Greenwood <sean@gwoodlaw.com>; Zack Truesdell <zack@theclegroup.com>; Kyle Kinsel <kwkinsel@gmail.com>; Dakota Fontenot <dakotajamesfontenot@gmail.com>; Glynn Nance <gnance@nancesimpson.com>
**Subject:** Re: Revised Purchase Documents

EXHIBIT
9

DF005506

Ardalan,

See attached revisions and comments to the purchase documents for your review.

Thank you,

**John Hebert Jr.**

**The Greenwood Law Firm PLLC**

1415 North Loop West, Ste. 1250

Houston, TX  77008

TEL (832)356-1588

**DIRECT (832) 371-6247**

FAX (832)356-1589

EMAIL john@gwoodlaw.com

WEB www.gwoodlaw.com

**Confidentiality Notice:** The contents of this email may contain confidential and/or attorney-client privileged information.  If you are not the intended recipient, please reply to this email indicating that you received it and destroy it, along with any copies or attachments.  I appreciate your compliance and courtesy.

**From:** Ardalan Attar
**Sent:** Thursday, May 8, 2025 1:13 PM
**To:** John Hebert, Jr.
**Cc:** Nicole Newman; Sean Greenwood; Zack Truesdell; Kyle Kinsel; Dakota Fontenot; Glynn Nance
**Subject:** Re: Revised Purchase Documents

John,

Let us know when you have reviewed the real estate purchase agreement sent by Nicole. Once we are done with the documents we should all get on a call to discuss closing.

I am available tomorrow 10-2pm.

**Ardalan Attar**

*Partner*

1177 W Loop S, Ste. 1700| Houston, Texas 77027
p. 713-659-7617 | f. 713-659-7641

DF005507

CONFIDENTIALITY NOTICE: This email transmission and any attachments may be privileged, confidential or otherwise protected from disclosure and is intended only for the named recipient. The use, distribution, transmittal by an unintended recipient of this communication is strictly prohibited without our express approval in writing. If you are not the intended recipient, please delete it from your system without copying it and notify our firm. Receipt by anyone other than the intended recipient is not a waiver of any attorney-client or work-product privilege.

**From:** Nicole Newman <nnewman@christianattarlaw.com>
**Sent:** Wednesday, May 7, 2025 2:06 PM
**To:** John Hebert, Jr. <john@gwoodlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** RE: Revised Purchase Documents

John:

Got it, thanks. Please find attached the real estate purchase agreement. Redlines should show the new changes.

Thank you,

Nicole

**From:** John Hebert, Jr. <john@gwoodlaw.com>
**Sent:** Tuesday, May 6, 2025 5:38 PM
**To:** Nicole Newman <nnewman@christianattarlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** Re: Revised Purchase Documents

See attached revised membership agreement for your review. We adjusted the purchase price (see comment in draft).

Thank you,

**John Hebert Jr.**

**The Greenwood Law Firm PLLC**

1415 North Loop West, Ste. 1250

Houston, TX  77008

TEL (832)356-1588

DF005508

**DIRECT (832) 371-6247**

FAX (832)356-1589

EMAIL john@gwoodlaw.com

WEB www.gwoodlaw.com

**Confidentiality Notice:** The contents of this email may contain confidential and/or attorney-client privileged information. If you are not the intended recipient, please reply to this email indicating that you received it and destroy it, along with any copies or attachments. I appreciate your compliance and courtesy.

---

**From:** John Hebert, Jr.
**Sent:** Tuesday, May 6, 2025 3:23 PM
**To:** Nicole Newman
**Cc:** Sean Greenwood; Ardalan Attar
**Subject:** Re: Revised Purchase Documents

That's fine.



Thank you,

**John Hebert Jr.**

**The Greenwood Law Firm PLLC**

1415 North Loop West, Ste. 1250

Houston, TX 77008

TEL (832)356-1588

**DIRECT (832) 371-6247**

FAX (832)356-1589

EMAIL john@gwoodlaw.com

WEB www.gwoodlaw.com

**Confidentiality Notice:** The contents of this email may contain confidential and/or attorney-client privileged information. If you are not the intended recipient, please reply to this email indicating that you received it and destroy it, along with any copies or attachments. I appreciate your compliance and courtesy.

---

**From:** Nicole Newman <nnewman@christianattarlaw.com>

DF005509

**Sent:** Tuesday, May 6, 2025 2:49 PM
**To:** John Hebert, Jr. <john@gwoodlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** RE: Revised Purchase Documents

John:

If HFR's only asset is the real property, please let me know if you're okay with going off of the prior draft of the Purchase and Sale Agreement for the real property. If so, I can find the latest draft and redline from there if we have additional changes.

Thanks,

Nicole

---

**From:** John Hebert, Jr. <john@gwoodlaw.com>
**Sent:** Tuesday, May 6, 2025 2:15 PM
**To:** Nicole Newman <nnewman@christianattarlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** Re: Revised Purchase Documents

Nicole,

My client told me your client wants to do an asset purchase for HFR instead of a stock purchase. If so, please draft the asset purchase agreement so we can review it.

Thank you,

**John Hebert Jr.**

**The Greenwood Law Firm PLLC**

1415 North Loop West, Ste. 1250

Houston, TX  77008

TEL (832)356-1588

**DIRECT (832) 371-6247**

UNOFFICIAL COPY

DF005510

FAX (832)356-1589

EMAIL john@gwoodlaw.com

WEB www.gwoodlaw.com

**Confidentiality Notice:** The contents of this email may contain confidential and/or attorney-client privileged information. If you are not the intended recipient, please reply to this email indicating that you received it and destroy it, along with any copies or attachments. I appreciate your compliance and courtesy.

---

**From:** Nicole Newman <nnewman@christianattarlaw.com>
**Sent:** Tuesday, May 6, 2025 10:18 AM
**To:** John Hebert, Jr. <john@gwoodlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** RE: Revised Purchase Documents

John: I think I've only seen documents to be included for Schedules 1.2 and 2.3 – which appear to be the same doc (as identified in the DropBox) The attached is the latest version of this I have seen though. I've also seen the excluded assets for BFD GP & LP. Otherwise, I don't think I've seen any of the other schedules.

---

**From:** John Hebert, Jr. <john@gwoodlaw.com>
**Sent:** Tuesday, May 6, 2025 9:32 AM
**To:** Nicole Newman <nnewman@christianattarlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** Re: Revised Purchase Documents

Nicole,


See attached comments and revisions to the redline documents for your review. I've included the following documents responsive to your comments:


- Amended and Restated Limited Partnership Agreement (responsive to your comment in the Membership Purchase)
- Attachment A and short legal descriptions of HFR real property (Exhibit A comment)


Please let me know what Schedules are missing so I can make sure that we have provided them to you.


Thank you,

DF005511

**John Hebert Jr.**

**The Greenwood Law Firm PLLC**

1415 North Loop West, Ste. 1250

Houston, TX  77008

TEL (832)356-1588

**DIRECT (832) 371-6247**

FAX (832)356-1589

EMAIL john@gwoodlaw.com

WEB www.gwoodlaw.com

**Confidentiality Notice:**  The contents of this email may contain confidential and/or attorney-client privileged information.  If you are not the intended recipient, please reply to this email indicating that you received it and destroy it, along with any copies or attachments.  I appreciate your compliance and courtesy.

---

**From:** Nicole Newman <nnewman@christianattarlaw.com>
**Sent:** Monday, May 5, 2025 5:06 PM
**To:** John Hebert, Jr. <john@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>
**Subject:** RE: Revised Purchase Documents


John:

I accepted nearly all of the redlines in the docs and deleted resolved or pending comments to clean up the docs. I made a comment if redlines were left unaccepted. I also made a few more proposed changes for your review.


Also, I don't think we've received all the Schedules mentioned in the Ice Embassy or HFR Stock Purchase Agreement. Please let me know if this is in error.


Thank you,

Nicole

---

**From:** John Hebert, Jr. <john@gwoodlaw.com>
**Sent:** Thursday, May 1, 2025 6:21 PM
**To:** Ardalan Attar <aattar@christianattarlaw.com>

DF005512

Cc: Sean Greenwood <sean@gwoodlaw.com>; Nicole Newman <nnewman@christianattarlaw.com>
**Subject:** Re: Revised Purchase Documents

That's good news. Please see attached updated revised agreements and documents for your review.

Thank you,

**John Hebert Jr.**

**The Greenwood Law Firm PLLC**

1415 North Loop West, Ste. 1250

Houston, TX  77008

TEL (832)356-1588

**DIRECT (832) 371-6247**

FAX (832)356-1589

EMAIL john@gwoodlaw.com

WEB www.gwoodlaw.com



**Confidentiality Notice:** The contents of this email may contain confidential and/or attorney-client privileged information. If you are not the intended recipient, please reply to this email indicating that you received it and destroy it, along with any copies or attachments.  I appreciate your compliance and courtesy.

**From:** Ardalan Attar <aattar@christianattarlaw.com>
**Sent:** Thursday, May 1, 2025 4:23 PM
**To:** John Hebert, Jr. <john@gwoodlaw.com>; Nicole Newman <nnewman@christianattarlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>
**Subject:** Re: Revised Purchase Documents

I think Zack and your client figured it out.

Thanks.

Get Outlook for iOS

DF005513

**From:** John Hebert, Jr. <john@gwoodlaw.com>
**Sent:** Thursday, May 1, 2025 4:22:32 PM
**To:** Nicole Newman <nnewman@christianattarlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** Re: Revised Purchase Documents

Nicole,

Following up on my previous email. Let me know what time works for you to have our call.

Thank you,

**John Hebert Jr.**

**The Greenwood Law Firm PLLC**

1415 North Loop West, Ste. 1250

Houston, TX 77008

TEL (832)356-1588

**DIRECT (832) 371-6247**

FAX (832)356-1589

EMAIL john@gwoodlaw.com

WEB www.gwoodlaw.com

**Confidentiality Notice:** The contents of this email may contain confidential and/or attorney-client privileged information. If you are not the intended recipient, please reply to this email indicating that you received it and destroy it, along with any copies or attachments. I appreciate your compliance and courtesy.

---

**From:** John Hebert, Jr. <john@gwoodlaw.com>
**Sent:** Wednesday, April 30, 2025 8:33 PM
**To:** Nicole Newman <nnewman@christianattarlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** Re: Revised Purchase Documents

I have some time tomorrow afternoon from 1:30 p.m. to 3:30 p.m., and I'm fairly flexible for most of Friday. Let me know what works for you.

DF005514

Thank you,


**John Hebert Jr.**

**The Greenwood Law Firm PLLC**

1415 North Loop West, Ste. 1250

Houston, TX  77008

TEL (832)356-1588

**DIRECT (832) 371-6247**

FAX (832)356-1589

EMAIL john@gwoodlaw.com

WEB www.gwoodlaw.com


**Confidentiality Notice**:  The contents of this email may contain confidential and/or attorney-client privileged information.  If you are not the intended recipient, please reply to this email indicating that you received it and destroy it, along with any copies or attachments.  I appreciate your compliance and courtesy.

---

**From:** Nicole Newman <nnewman@christianattarlaw.com>
**Sent:** Wednesday, April 30, 2025 3:55 PM
**To:** John Hebert, Jr. <john@gwoodlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** RE: Revised Purchase Documents


John, please let me know if we can get on a call this week to discuss the treatment of the outstanding bills to make sure we're all on the same page. Thank you, Nicole

---

**From:** Nicole Newman
**Sent:** Wednesday, April 30, 2025 3:21 PM
**To:** John Hebert, Jr. <john@gwoodlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** RE: Revised Purchase Documents


John, we also began going through the DropBox provided but noticed there are folders for the Schedules to be attached to these agreements, but some of the folders have a document while others do not. Will you please confirm whether those Schedules will be provided? For each entity, I think I have only seen the "Outstanding Bills" tables. Thank you.

DF005515

**From:** Nicole Newman
**Sent:** Wednesday, April 30, 2025 2:42 PM
**To:** 'John Hebert, Jr.' <john@gwoodlaw.com>
**Cc:** 'Sean Greenwood' <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** RE: Revised Purchase Documents

John,

Please find attached our edits to the agreements. I accepted all outstanding redlines, responded or resolved comments, and on a few agreements, left some redlines to reflect the latest proposed changes.

I've also attached the Exhibit A to the HFR Stock Purchase Agreement. Most of the language was taken from the original Real Estate Purchase Agreement and revised.

Thank you,

Nicole

---

**From:** Nicole Newman
**Sent:** Tuesday, April 29, 2025 2:52 PM
**To:** John Hebert, Jr. <john@gwoodlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** RE: Revised Purchase Documents

Hi John, expecting to have my changes back to you by tomorrow. Thank you, Nicole

---

**From:** John Hebert, Jr. <john@gwoodlaw.com>
**Sent:** Tuesday, April 29, 2025 1:45 PM
**To:** Nicole Newman <nnewman@christianattarlaw.com>
**Cc:** Sean Greenwood <sean@gwoodlaw.com>; Ardalan Attar <aattar@christianattarlaw.com>
**Subject:** Re: Revised Purchase Documents

Nicole,

Any update on your review of the revised agreements? Let me know.

DF005516

Thank you,

**John Hebert Jr.**

**The Greenwood Law Firm PLLC**

1415 North Loop West, Ste. 1250

Houston, TX  77008

TEL (832)356-1588

**DIRECT (832) 371-6247**

FAX (832)356-1589

EMAIL john@gwoodlaw.com

WEB www.gwoodlaw.com

**Confidentiality Notice:**  The contents of this email may contain confidential and/or attorney-client privileged information.  If you are not the intended recipient, please reply to this email indicating that you received it and destroy it, along with any copies or attachments.  I appreciate your compliance and courtesy.

---

**From:** John Hebert, Jr.
**Sent:** Friday, April 25, 2025 3:08 PM
**To:** Nicole Newman
**Cc:** Sean Greenwood; Ardalan Attar
**Subject:** Revised Purchase Documents

Nicole,

See attached new revisions to the purchase agreements for your review. Let me know if you have any questions.

Thank you,

**John Hebert Jr.**

**The Greenwood Law Firm PLLC**

DF005517

1415 North Loop West, Ste. 1250

Houston, TX  77008

TEL (832)356-1588

**DIRECT (832) 371-6247**

FAX (832)356-1589

EMAIL john@gwoodlaw.com

WEB www.gwoodlaw.com

**Confidentiality Notice**:  The contents of this email may contain confidential and/or attorney-client privileged information.  If you are not the intended recipient, please reply to this email indicating that you received it and destroy it, along with any copies or attachments.  I appreciate your compliance and courtesy.

DF005518



UNOFFICIAL COPY

Linda Goehrs, in her capacity as Trustee of the Holli Ann Hardin Trust Number One, Plaintiff
vs.
Dakota Fontenot, Defendant

Case 4:26-cv-02743     Document 7-1     Filed 04/29/26 in TXSD     Page 310 of 406

537721

# ENTERTAINMENT MARKETING & MANAGEMENT, LP

## Balance Sheet

As of December 31, 2024

|  | TOTAL |
|---|---|
| **ASSETS** | |
| Current Assets | |
| Bank Accounts | |
| Cash on Hand | 0.00 |
| ORIGIN BANK #1518 | 0.00 |
| TX 1st BANK | 286.31 |
| WFB (1633) | 0.00 |
| **Total Bank Accounts** | **$286.31** |
| Accounts Receivable | |
| A/R - ACCOUNTS RECEIVABLE | 0.00 |
| **Total Accounts Receivable** | **$0.00** |
| Other Current Assets | |
| 1000322 A/R - BFD | 0.00 |
| 1000323 A/R - DALLAS | 0.00 |
| 1000324 A/R - SHOWBIZ | 0.00 |
| 1000325 A/R - HFR | 0.00 |
| 1000325 A/R - ICE EMBASSY, INC. | -380,216.00 |
| 1000326 A/R - HFR INTERPRISES | 0.00 |
| 1000328 A/R - VIVA LAS VEGAS PROPERTIES | 0.00 |
| 1000331 A/R - CELEBRITY PIZZA | 0.00 |
| 1000332 A/R - HOLLI ANN HARDIN TRUST | 0.00 |
| 1000411 EMPLOYEE ADVANCE-DAKOTA FONENOT | 0.00 |
| 1000412 EMPLOYEE ADVANCE-DALLAS FONTENO | 0.00 |
| 12000 Undeposited Funds | 0.00 |
| 3000175 A/R HFR | 0.00 |
| ICE PPP MONEY TO LUCKY DOG PUB | 0.00 |
| LOAN TO DALLAS FONTENOT | 419,420.99 |
| LOAN TO DF FROM HAH TRUST NO. 1 | 0.00 |
| LOAN TO HOLLI FONTENOT | 3,097.88 |
| **Total Other Current Assets** | **$42,302.87** |
| **Total Current Assets** | **$42,589.18** |
| Fixed Assets | |
| 2000000 PROPERTY & EQUIPMENT | 219.96 |
| 2520000 COMPUTERS | 749.99 |
| 2520001 SCANNER | 329.99 |
| **Total 2000000 PROPERTY & EQUIPMENT** | **1,299.94** |
| **Total Fixed Assets** | **$1,299.94** |
| **TOTAL ASSETS** | **$43,889.12** |

Accrual Basis  Monday, January 13, 2025 04:15 PM GMT-06:00



EXHIBIT
**10**
1/3

DF008866

# ENTERTAINMENT MARKETING & MANAGEMENT, LP

## Balance Sheet
### As of December 31, 2024

| | TOTAL |
|---|---|
| **LIABILITIES AND EQUITY** | |
| Liabilities | |
| Current Liabilities | |
| Accounts Payable | |
| 2000 Accounts Payable | -1,503.63 |
| **Total Accounts Payable** | **$ -1,503.63** |
| Credit Cards | |
| AMEX #42007 (Dakota) | 50.00 |
| CAP ON 7913 - HOLLI | 0.00 |
| CHASE #4046 (Dakota) | 182.82 |
| DISCOVER #0907 (DAKOTA) | 0.00 |
| WF #3818 CC  Rhino Construction | 0.00 |
| WF #6811 CC Ice Embassy | 0.00 |
| **Total Credit Cards** | **$232.82** |
| Other Current Liabilities | |
| 2100 Payroll Liabilities | 4,341.05 |
| Dental Insurance | 4,327.18 |
| Federal Taxes (941/943/944) | 23,649.16 |
| Federal Unemployment (940) | 210.00 |
| Health Insurance | 86,757.80 |
| Life Insurance | 458.10 |
| TX Unemployment Tax | 15.77 |
| Vision Insurance | 666.76 |
| **Total 2100 Payroll Liabilities** | **120,425.82** |
| 2100100 PAYROLL LIABILITIES - OTHER | 0.00 |
| 2110 Direct Deposit Liabilities | 3,115.48 |
| 3400041 A/P - HFR ENTERPRISES | 79,475.00 |
| 3400042 A/P-Holli Ann Hardin Trust # 1 | 222,050.00 |
| 4000110 N/P DUE TO/FROM ICE (OPERATING) | 123,062.76 |
| ASK ACCOUNTANT | 0.00 |
| DAKOTA SCHOOL LOAN | 0.00 |
| Direct Deposit Payable | 0.00 |
| EIDL Loan | 0.00 |
| EMM PPP Loan | 0.00 |
| EMM PPP Loan #2 | 0.00 |
| FREAKY TIKI | 0.00 |
| **Total Other Current Liabilities** | **$548,129.06** |
| **Total Current Liabilities** | **$546,858.25** |

DF008867

# ENTERTAINMENT MARKETING & MANAGEMENT, LP

Balance Sheet

As of December 31, 2024

|  | TOTAL |
|---|---|
| **Long-Term Liabilities** | |
| 4000100 NOTE - HFR ENTERPRISES | 0.00 |
| 4000103 NOTE - DALLAS FONTENOT | 0.00 |
| 4000106 NOTE - DAKOTA TRUST | 0.00 |
| 4000107 HOLLI ANN HARDIN TRUST | 0.00 |
| 4000108 NOTE - ICE EMBASSY | 0.00 |
| Due To Shareholders | -0.67 |
| **Total Long-Term Liabilities** | **$ -0.67** |
| **Total Liabilities** | **$546,857.58** |
| **Equity** | |
| 5000500 PAID IN CAPITAL | 0.00 |
| 5000501 BFD #1 - PAID IN CAPITAL | 2,475.00 |
| 5000502 BFD #2 - PAID IN CAPITAL | 2,475.00 |
| 5000503 BFD #3 - PAID IN CAPITAL | 2,475.00 |
| 5000504 BFD #4 - PAID IN CAPITAL | 2,475.00 |
| 5000505 SHOWBIZZ - PAID IN CAPITAL | 100.00 |
| **Total 5000500 PAID IN CAPITAL** | **10,000.00** |
| 5100100 BFD #1 EARNINGS | 0.00 |
| 5100200 BFD #1 DISTRIBUTIONS | 0.00 |
| 5200100 BFD #2 EARNINGS | 0.00 |
| 5200200 BFD #2 DISTRIBUTIONS | 0.00 |
| 5300100 BFD #3 EARNINGS | 0.00 |
| 5300200 BFD #3 DISTRIBUTIONS | 0.00 |
| 5400100 BFD #4 EARNINGS | 0.00 |
| 5400200 BFD #4 DISTRIBUTIONS | 0.00 |
| 5500100 SHOWBIZZ EARNINGS | 0.00 |
| 5500200 SHOWBIZZ DISTRIBUTIONS | 0.00 |
| 5800003 TREASURY STOCK | 0.00 |
| 5800005 RETAINED EARNINGS | 123,534.00 |
| Net Income | -636,502.46 |
| **Total Equity** | **$ -502,968.46** |
| **TOTAL LIABILITIES AND EQUITY** | **$43,889.12** |

UNOFFICIAL COPY

**Accrual Basis  Monday, January 13, 2025 04:15 PM GMT-06:00**

DF008868

Linda Goehrs, in her capacity as Trustee of the Holli Ann Hardin Trust Number One, Plaintiff
vs.
Dakota Fontenot, Defendant

537721

# ENTERTAINMENT MARKETING & MANAGEMENT, LP

## Balance Sheet

As of April 30, 2025

| | TOTAL |
|---|---|
| **ASSETS** | |
| Current Assets | |
| Bank Accounts | |
| Cash on Hand | 0.00 |
| ORIGIN BANK #1518 | 0.00 |
| TX 1st BANK | 8,241.18 |
| WFB (1633) | 0.00 |
| **Total Bank Accounts** | **$8,241.18** |
| Accounts Receivable | |
| A/R - ACCOUNTS RECEIVABLE | 0.00 |
| **Total Accounts Receivable** | **$0.00** |
| Other Current Assets | |
| 1000322 A/R - BFD | 0.00 |
| 1000323 A/R - DALLAS | 0.00 |
| 1000324 A/R - SHOWBIZ | 0.00 |
| 1000325 A/R - HFR | 0.00 |
| 1000325 A/R - ICE EMBASSY, INC. | -432,454.30 |
| 1000326 A/R - HFR INTERPRISES | 0.00 |
| 1000328 A/R - VIVA LAS VEGAS PROPERTIES | 0.00 |
| 1000331 A/R - CELEBRITY PIZZA | 0.00 |
| 1000332 A/R - HOLLI ANN HARDIN TRUST | 10,470.00 |
| 1000411 EMPLOYEE ADVANCE-DAKOTA FONENOT | 0.00 |
| 1000412 EMPLOYEE ADVANCE-DALLAS FONTENO | 0.00 |
| 12000 Undeposited Funds | 0.00 |
| 3000175 A/R HFR | 0.00 |
| ICE PPP MONEY TO LUCKY DOG PUB | 0.00 |
| LOAN TO DALLAS FONTENOT | 419,420.99 |
| LOAN TO DF FROM HAH TRUST NO. 1 | 0.00 |
| LOAN TO HOLLI FONTENOT | 3,097.88 |
| Payroll Refunds | -2,269.23 |
| **Total Other Current Assets** | **$ -1,734.66** |
| **Total Current Assets** | **$6,506.52** |
| Fixed Assets | |
| 2000000 PROPERTY & EQUIPMENT | 219.96 |
| 2520000 COMPUTERS | 749.99 |
| 2520001 SCANNER | 329.99 |
| **Total 2000000 PROPERTY & EQUIPMENT** | **1,299.94** |
| **Total Fixed Assets** | **$1,299.94** |
| **TOTAL ASSETS** | **$7,806.46** |

UNOFFICIAL COPY

EXHIBIT
**11**

Accrual Basis Monday, May 5, 2025 03:20 PM GMT-05:00

1/3

DF002731

# ENTERTAINMENT MARKETING & MANAGEMENT, LP

## Balance Sheet
### As of April 30, 2025

|  | TOTAL |
|---|---|
| **LIABILITIES AND EQUITY** | |
| Liabilities | |
| Current Liabilities | |
| Accounts Payable | |
| 2000 Accounts Payable | -1,088.62 |
| **Total Accounts Payable** | **$ -1,088.62** |
| Credit Cards | |
| AMEX #42007 (Dakota) | 50.00 |
| CAP ON 7913 - HOLLI | 0.00 |
| CHASE #4046 (Dakota) | 182.82 |
| DISCOVER #0907 (DAKOTA) | 0.00 |
| WF #3818 CC  Rhino Construction | 0.00 |
| WF #6811 CC Ice Embassy | 0.00 |
| **Total Credit Cards** | **$232.82** |
| Other Current Liabilities | |
| 2100 Payroll Liabilities | 4,341.05 |
| Dental Insurance | 5,450.38 |
| Federal Taxes (941/943/944) | 51,478.57 |
| Federal Unemployment (940) | 168.00 |
| Health Insurance | 110,300.72 |
| Life Insurance | 589.23 |
| TX Unemployment Tax | 0.00 |
| Vision Insurance | 837.04 |
| **Total 2100 Payroll Liabilities** | **173,164.99** |
| 2100100 PAYROLL LIABILITIES - OTHER | 0.00 |
| 2110 Direct Deposit Liabilities | 3,115.48 |
| 3400010 A/P - ICE EMBASSY INC | 80,364.27 |
| 3400041 A/P - HFR ENTERPRISES | 78,841.17 |
| 3400042 A/P-Holli Ann Hardin Trust # 1 | 222,050.00 |
| 4000110 N/P DUE TO/FROM ICE (OPERATING) | 123,062.76 |
| ASK ACCOUNTANT | 0.00 |
| DAKOTA SCHOOL LOAN | 0.00 |
| Direct Deposit Payable | 0.00 |
| EIDL Loan | 0.00 |
| EMM PPP Loan | 0.00 |
| EMM PPP Loan #2 | 0.00 |
| FREAKY TIKI | 10,470.00 |
| **Total Other Current Liabilities** | **$691,068.67** |
| **Total Current Liabilities** | **$690,212.87** |

UNOFFICIAL COPY

**Accrual Basis  Monday, May 5, 2025 03:20 PM GMT-05:00**

DF002732

# ENTERTAINMENT MARKETING & MANAGEMENT, LP

## Balance Sheet
### As of April 30, 2025

| | TOTAL |
|---|---|
| **Long-Term Liabilities** | |
| 4000100 NOTE - HFR ENTERPRISES | 0.00 |
| 4000103 NOTE - DALLAS FONTENOT | 0.00 |
| 4000106 NOTE - DAKOTA TRUST | 0.00 |
| 4000107 HOLLI ANN HARDIN TRUST | 0.00 |
| 4000108 NOTE - ICE EMBASSY | 0.00 |
| Due To Shareholders | -0.67 |
| **Total Long-Term Liabilities** | **$ -0.67** |
| **Total Liabilities** | **$690,212.20** |
| **Equity** | |
| 5000500 PAID IN CAPITAL | 0.00 |
| 5000501 BFD #1 - PAID IN CAPITAL | 2,475.00 |
| 5000502 BFD #2 - PAID IN CAPITAL | 2,475.00 |
| 5000503 BFD #3 - PAID IN CAPITAL | 2,475.00 |
| 5000504 BFD #4 - PAID IN CAPITAL | 2,475.00 |
| 5000505 SHOWBIZZ - PAID IN CAPITAL | 100.00 |
| **Total 5000500 PAID IN CAPITAL** | **10,000.00** |
| 5100100 BFD #1 EARNINGS | 0.00 |
| 5100200 BFD #1 DISTRIBUTIONS | 0.00 |
| 5200100 BFD #2 EARNINGS | 0.00 |
| 5200200 BFD #2 DISTRIBUTIONS | 0.00 |
| 5300100 BFD #3 EARNINGS | 0.00 |
| 5300200 BFD #3 DISTRIBUTIONS | 0.00 |
| 5400100 BFD #4 EARNINGS | 0.00 |
| 5400200 BFD #4 DISTRIBUTIONS | 0.00 |
| 5500100 SHOWBIZZ EARNINGS | 0.00 |
| 5500200 SHOWBIZZ DISTRIBUTIONS | 0.00 |
| 5800003 TREASURY STOCK | 0.00 |
| 5800005 RETAINED EARNINGS | -512,968.46 |
| Net Income | -179,437.28 |
| **Total Equity** | **$ -682,405.74** |
| **TOTAL LIABILITIES AND EQUITY** | **$7,806.46** |

UNOFFICIAL COPY

**Accrual Basis  Monday, May 5, 2025 03:20 PM GMT-05:00**

DF002733

Linda Goehrs, in her capacity as Trustee of the Holli Ann Hardin Trust Number One, Plaintiff
vs.
Dakota Fontenot, Defendant

537721

**Business Entity No.** DC0135092



## Government of
## The United States Virgin Islands
-O-
*Office of the Lieutenant Governor*
*Division of Corporations & Trademarks*

# CERTIFICATE OF FORMATION

To Whom These Presents Shall Come:

I, the undersigned Lieutenant Governor the United States Virgin Islands, do hereby certify that **EMERALD ISLAND HOLDINGS, LLC** a **Domestic Limited Liability Company,** has filed a(n) **Articles of Organization** in the Office of the Lieutenant Governor the requisite documents to become a domestic business entity as set forth by the Virgin Islands Code, and the Rules and Regulations of this Office.

Wherefore, the persons who have duly executed the articles, and their successors, shall, from the date of the aforementioned filing, be a domestic business entity in fact and in law, known by the name stated in the formation documents, and by such name shall have succession for the time stated in such documents.

**Registration Date:** August 14, 2025

Witness my hand and the seal of the Government of the United States Virgin Islands, on this 4th day of March, 2026.

Tregenza A. Roach
Lieutenant Governor
United States Virgin Islands

EXHIBIT
12

537721   3/17/2026
3/17/2026



**THE UNITED STATES VIRGIN ISLANDS**

USVI Lieutenant Governor
Filed: January 06, 2026 03:30 PM
BID: DC0135092

Articles of Amendment
# EMERALD ISLAND HOLDINGS, LLC (DC0135092)

# General Details

| | |
|---|---|
| **Handling Option** | Standard Processing |
| **Delayed Effective Date** | |
| **Amendment Adoption Date** | 12/19/2025 |
| **Other Amendments** | |

## Name Change Details (Optional)

| | |
|---|---|
| **Amend Company Name?** | No |

## Business Addresses

**Physical Address**

*Created*

| | |
|---|---|
| **Principal Office or Place of Business** | 5093 Dronningens Gade, Ste. 1, Charlotte Amalie, United States Virgin Islands, 00802, United States |

*Changed*

| | |
|---|---|
| **Principal Office or Place of Business** | 5093 Dronningens Gade, Ste. 1, Charlotte Amalie, United States Virgin Islands, 00802, United States |

**Mailing Address**

| | |
|---|---|
| **Mailing Address** | P.O. Box 6347, Charlotte Amalie, United States Virgin Islands, 00804, United States |

## Amendment Details

| | |
|---|---|
| **Term** | Perpetual |

UNOFFICIAL COPY

EXHIBIT
**13**

| | |
|---|---|
| **Nature of Business/Purpose** | Other, Other |
| **Additional Purpose Details:** | Holding Company |
| **Amount of Capital** | 1,000.00 |
| **Managed By** | Member Managed |
| **Members Liability** | Members are not liable |
| **This Amendment supersedes the original registration and all Amendments to the original registration.** | Yes |

# Resident Agent

| | |
|---|---|
| **Resident Agent in USVI Resident Agent Type** | Registered Business Entity |
| **Entity Name** | HIBISCUS BUSINESS SERVICES, LLC |
| **Business Identifier** | DC0104390 |
| **Physical Address** | 5093 Dronningens Gade, Ste. 1, Charlotte Amalie, United States Virgin Islands, 00802, United States |
| **Mailing Address** | P.O. Box 6347, Charlotte Amalie, United States Virgin Islands, 00804, United States |
| **Start Date** | 08/14/2025 |

# Principals

## Managers/Members

UNOFFICIAL COPY

**Manager/Member**
Individual

|  |  | *Changed* |
| --- | --- | --- |
| **Name** | Dakota James FONTENOT | |
| **Status** | Dissociated | |
| *Previous Value* | *Active* | |
| **Physical Address** | 2926 Fontana Dr., Houston, Texas, 77043, United States | |
| **Mailing Address** | Mailing Address is the same as the Physical Address | |
| **Position** | Member | |

**Manager/Member**
Individual

|  |  | *Changed* |
| --- | --- | --- |
| **Name** | Madison Elaine FONTENOT | |
| **Status** | Dissociated | |
| *Previous Value* | *Active* | |
| **Physical Address** | 2926 Fontana Dr., Houston, Texas, 77043, United States | |
| **Mailing Address** | Mailing Address is the same as the Physical Address | |
| **Position** | Member | |

**Manager/Member**
Individual

|  |  | *Created* |
| --- | --- | --- |
| **Name** | Amir SHENAQ | |
| **Status** | Active | |
| **Physical Address** | 5093 Dronningens Gade, Ste. 1, Charlotte Amalie, United States Virgin Islands, 00802, United States | |
| **Mailing Address** | 9715 Estate Thomas, Pmb 170, St Thomas, United States Virgin Islands, 00802, United States | |
| **Position** | Member | |

UNOFFICIAL COPY

**Manager/Member**
Individual

| | | Created |
|---|---|---|
| **Name** | Sheila SHENAQ | |
| **Status** | Active | |
| **Physical Address** | 5093 Dronningens Gade, Ste. 1, Charlotte Amalie, United States Virgin Islands, 00802, United States | |
| **Mailing Address** | 9715 Estate Thomas, Pmb 170, St Thomas, United States Virgin Islands, 00802, United States | |
| **Position** | Member | |

# Documents

| **Amendment** | | Created |
|---|---|---|
| | Amendment.pdf 12/30/2025 3:12 PM | |

# Signature(s)

| | |
|---|---|
| **Name** | Amir SHENAQ |
| **Position** | Member |
| **Date** | 01/06/2026 |
| **I DECLARE, UNDER PENALTY OF PERJURY, UNDER THE LAWS OF THE UNITED STATES VIRGIN ISLANDS, THAT THIS OFFICER HAS AGREED BY RESOLUTION TO THE CHANGES MADE IN THIS APPLICATION.** | Yes |

# Daytime Contact

| | |
|---|---|
| **Name** | Mrs. Jenifer Smith |
| **Telephone** | (1) 340-774-2944 |

UNOFFICIAL COPY

**Email**                          catalyst@vilaw.com

**I DECLARE, UNDER**               Yes
**PENALTY OR PERJURY,**
**UNDER THE LAWS OF THE**
**UNITED STATES VIRGIN**
**ISLANDS THAT ALL**
**STATEMENTS CONTAINED**
**IN THIS APPLICATION,**
**AND ANY ACCOMPANYING**
**DOCUMENTS, ARE TRUE**
**AND CORRECT, WITH**
**FULL KNOWLEDGE THAT**
**ALL STATEMENTS MADE**
**IN THIS APPLICATION ARE**
**SUBJECT TO**
**INVESTIGATION AND**
**THAT ANY FALSE OR**
**DISHONEST ANSWER TO**
**ANY QUESTION MAY BE**
**GROUNDS FOR DENIAL,**
**SUBSEQUENT**
**REVOCATION OF**
**REGISTRATION, OR**
**OTHER FINES AND**
**PENALTIES PURSUANT TO**
**THE FRAUDULENT CLAIMS**
**STATUTE AS SET FORTH IN**
**14 V.I.C. § 843.**

UNOFFICIAL COPY



03/18/2026 2:48:13 PM
Teneshia Hudspeth
County Clerk
Harris County, Texas
mia.hernandez

CAUSE NO. 537,721

| | | |
|---|---|---|
| LINDA GOEHRS, AS TRUSTEE OF THE HOLLI ANN HARDIN TRUSTS NO. 1, | § § § | IN THE PROBATE COURT |
| *Plaintiff,* | § § | |
| | § | NUMBER ONE (1) OF |
| v. | § § | |
| | § | |
| DAKOTA FONTENOT, | § | |
| *Defendant* | § | HARRIS COUNTY, TEXAS |

## TEMPORARY INJUNCTION

On this day, came on for consideration the Application for Temporary Injunction filed on January 16, 2026, by Plaintiff LINDA GOEHRS ("Plaintiff"), in her capacity as Successor Trustee of the Holli Ann Hardin Trust Number One, and the Application for Temporary Injunction filed by Intervenors MICHELLE FONTENOT and DALLAS JOSEPH FONTENOT III (collectively with Plaintiff, "Applicants"), against Defendant DAKOTA FONTENOT ("Defendant"). The Court conducted an evidentiary hearing on March 6, 9, and 13, 2026. Having considered the Applications, the evidence adduced at hearing, and the arguments of counsel, the Court finds that both Applications are well taken and should be in all things GRANTED.

## FINDINGS

The Court finds that Applicants have demonstrated a probable right to recover on their claims against Defendant, including claims for breach of fiduciary duty, fraudulent transfer under the Texas Uniform Fraudulent Transfer Act, and related causes of action arising from Defendant's conduct in connection with the sale of Entertainment Marketing & Management, Ltd. and associated entities.

The Court finds that, unless a Temporary Injunction is granted, Applicants will suffer probable, imminent, and irreparable harm, including the loss or further dissipation of assets that are the subject of this litigation and the inability to recover those assets or the value thereof through an award of money damages at trial.

The Court finds that Applicants have no adequate remedy at law. The evidence supports a finding that assets traceable to the proceeds of the sale of Entertainment Marketing & Management, Ltd. have been transferred or are at risk of further transfer or dissipation during the pendency of this litigation, such that a money judgment at trial would be an inadequate remedy. The threatened injury to Applicants outweighs any harm to Defendant from the granting of this Temporary Injunction, and this Temporary Injunction will not disserve the public interest.

The Court finds that this Temporary Injunction is necessary to prevent irreparable injury to Applicants pending trial on the merits.

## ORDER

For the foregoing reasons, pursuant to Texas Civil Practice and Remedies Code § 65.011, Texas Rules of Civil Procedure 680–684, and Texas Business and Commerce Code §24.008, it is HEREBY ORDERED as follows:

a.   Within **15 days** of the date of this Order, Defendant Dakota Fontenot, and his officers, agents, servants, employees, attorneys, and any person in active concert or participation with him who receives actual notice of this Order, are ORDERED to deposit **$2,174,500.00** (representing all proceeds received under the Partnership Interest Purchase Agreement) into the registry of this Court.

b.   Within **10 days** of the date of this Order, Defendant Dakota Fontenot is ORDERED to produce the following documents in native format with all accompanying metadata:

   i.   Documents relating to the creation and formation of Emerald Island Holdings, LLC, including any company agreements, formation documents, charters, amendments, and correspondence relating to its establishment or creation from January 1, 2025 to the present;

   ii.   All documents reflecting any transfer of interest in or sale of Emerald Island Holdings, LLC, including contracts, purchase orders, assignments of interest, correspondence, and deeds from January 1, 2025 to the present;

   iii.   Wire transfer confirmations, transmittal emails, and bank account statements relating to the sale of BFD GP, LLC, BFD LP, LLC, and Entertainment Marketing

& Management, Ltd., and the Partnership Interest Purchase Agreement and any amendments or supplements thereto;

iv.  Any amendments or supplements to the Partnership Interest Purchase Agreement, including all drafts and all communications regarding amendments or supplements thereto;

v.  Documents relating to the purchase, acquisition, or lease of real property in the U.S. Virgin Islands, including all lease agreements, contracts, and communications;

vi.  Documents relating to the sale of the property located at 2926 Fontana Drive, including contracts, correspondence, payment receipts, settlement statements, and proof of payment;

vii.  Documents relating to any loans with Amir Shenaq and/or Sheila Shenaq, including emails, correspondence, notes, text messages, contracts, and any support or justification for any loan agreement or loan forgiveness; and

viii.  Communications and contracts with Amir Shenaq, Sheila Shenaq, Ardalan Attar, Christian Attar, Kyle Kinsel, and Zack Truesdale regarding Entertainment Marketing & Management, Ltd., the Partnership Interest Purchase Agreement and any amendments or supplements thereto, and any payments related thereto, including all text messages and electronic correspondence.

c.  Defendant Dakota Fontenot, and his officers, agents, servants, employees, attorneys, and any person in active concert or participation with him who receives actual notice of this Order, are RESTRAINED from spending, transferring, distributing, encumbering, pledging, or assigning any funds or assets held in any bank account or financial account in his name or under his control at any financial institution.

d.  Defendant Dakota Fontenot, and his officers, agents, servants, employees, attorneys, and any person in active concert or participation with him who receives actual notice of this Order, are RESTRAINED from spending, transferring, distributing, encumbering, pledging, or assigning any proceeds or assets traceable to any payments received in connection with the sale of BFD GP, LLC, BFD LP, LLC, Emerald Island Holdings, LLC,

UNOFFICIAL COPY

and Entertainment Marketing & Management, Ltd., including any payments made pursuant to the Partnership Interest Purchase Agreement and any amendments or supplements thereto.

e. Within **90 days** of the date of this Order, Defendant Dakota Fontenot shall provide a written, sworn accounting describing and detailing the distribution of all proceeds received pursuant to the Partnership Interest Purchase Agreement or any amendments or supplements thereto, including tracing such proceeds from Defendant's personal accounts and any transfers to or from personal accounts. The sworn accounting shall be accompanied by account statements for any account that has held proceeds traceable to the Partnership Interest Purchase Agreement from June 1, 2025 to the present, as well as all closing, sale, and loan documents reflecting assets acquired with funds traceable to such proceeds from June 1, 2025 to the present.

IT IS FURTHER ORDERED that, prior to the issuance of the writ of injunction, Applicants shall file with the Clerk of this Court a bond in the amount of **$1,000.00**, payable to Defendant, executed and conditioned as required by Texas Rule of Civil Procedure 684.

IT IS FURTHER ORDERED that this Temporary Injunction is binding upon Defendant Dakota Fontenot and his officers, agents, servants, employees, and attorneys, and upon any persons or entities in active concert or participation with him who receive actual notice of this Temporary Injunction.

IT IS FURTHER ORDERED that this Temporary Injunction shall remain in full force and effect until the conclusion of the trial on the merits of this cause, or until further order of this Court.

The Clerk of this Court shall issue a Writ of Temporary Injunction in conformity with law upon the filing of the bond required herein.

Trial on the merits of this cause shall be set by the court by separate order.

All relief not expressly granted herein is DENIED.

Signed: 03/18/2026
12:01:23 PM

JUDGE JERRY SIMONEAUX
Harris County Probate Court No. 1

**EXHIBIT**

**37**

FILED
3/20/2026 12:10 PM
Teneshia Hudspeth
County Clerk
Harris County - County Probate Court No. 1
Accepted By: MG

# SureTec Insurance Company

### 2103 CityWest Blvd. #1300, Houston, Texas 77042

FILED
03/25/2026 8:11:43 AM
Teneshia Hudspeth
County Clerk
Harris County, Texas
mia.hernandez

| | |
|---|---|
| Linda Goehrs, as Trustee of the Holli Ann Hardin Trusts No. 1 | § § § § § § § § § § § § § |

Harris COUNTY, Texas

Probate Court Number One (1)

V.

Dakota Fontenot

Bond No. 3538867

## TEMPORARY INJUNCTION BOND

Cause No. 537,721

KNOW ALL MEN BY THESE PRESENTS:

That we, _____Linda Goehrs_____, as Principal and _____SureTec Insurance Company_____, as Surety, acknowledge ourselves bound to pay to the said Defendant, in the above entitled and numbered suit, the sum of One Thousand Dollars & no/100, ($ 1,000.00 ) conditioned that said Principal, as complainant in said suit, will abide by the decision which may be made therein, and will pay all sums of money and costs that may be adjudged against the undersigned Principal if the Temporary Injunction be dissolved in whole or in part.

SIGNED AND SEALED this __19th__ day of _____March_____, __2026__

Rudolph Culp
**Attorney of Record**

24 Greenway Plaza #1825
**Address**
Houston, Texas 77046

**Phone**
713-297-0700

The above Bond and Oath approved, 1
Signed: 03/24/2026
4:15:02 PM

Linda Goehrs

Principal
By: _Linda Goehrs_ (signature)

SureTec Insurance Company

By: _____
John H. Compton Attorney in Fact

_____ JUDGE.

By: Probate Court One, Harris County TX

BH

POA# 4221206

# JOINT LIMITED POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS: That SureTec Insurance Company, a Corporation duly organized and existing under the laws of the State of Texas and having its principal office in the County of Harris, Texas and Markel Insurance Company (the "Company"), a corporation duly organized and existing under the laws of the state of Illinois, and having its principal administrative office in Glen Allen, Virginia, does by these presents make, constitute and appoint:

John H. Compton, Higdon Oscar Compton, Jr.

Their true and lawful agent(s) and attorney(s)-in-fact, each in their separate capacity if more than one is named above, to make, execute, seal and deliver for and on their own behalf, individually as a surety or jointly, as co-sureties, and as their act and deed any and all bonds and other undertaking in suretyship provided, however, that the penal sum of any one such instrument executed hereunder shall not exceed the sum of:

Five Million and 00/100 Dollars ($5,000,000.00)

This Power of Attorney is granted and is signed and sealed under and by the authority of the following Resolutions adopted by the Board of Directors of SureTec Insurance Company and Markel Insurance Company:

"RESOLVED, That the President, any Senior Vice President, Vice President, Assistant Vice President, Secretary, Assistant Secretary, Treasurer or Assistant Treasurer and each of them hereby is authorized to execute powers of attorney, and such authority can be executed by use of facsimile signature, which may be attested or acknowledged by any officer or attorney, of the company, qualifying the attorney or attorneys named in the given power of attorney, to execute in behalf of, and acknowledge as the act and deed of the SureTec Insurance Company and Markel Insurance Company, as the case may be, all bond undertakings and contracts of suretyship, and to affix the corporate seal thereto."

IN WITNESS WHEREOF, Markel Insurance Company and SureTec Insurance Company have caused their official seal to be hereunto affixed and these presents to be signed by their duly authorized officers on the 16th day of March , 2026

SureTec Insurance Company

By: _____
Michael C. Keimig, President

Markel Insurance Company

By: _____
Lindey Jennings, Vice President

State of Texas
County of Harris:

On this 16th day of March , 2026 A. D., before me, a Notary Public of the State of Texas, in and for the County of Harris, duly commissioned and qualified, came THE ABOVE OFFICERS OF THE COMPANIES, to me personally known to be the individuals and officers described in, who executed the preceding instrument, and they acknowledged the execution of same, and being by me duly sworn, disposed and said that they are the officers of the said companies aforesaid, and that the seals affixed to the proceeding instrument are the Corporate Seals of said Companies, and the said Corporate Seals and their signatures as officers were duly affixed and subscribed to the said instrument by the authority and direction of the said companies, and that Resolutions adopted by the Board of Directors of said Companies referred to in the preceding instrument is now in force.

IN TESTIMONY WHEREOF, I have hereunto set my hand, and affixed my Official Seal at the County of Harris, the day and year first above written.

KALLYSTA DANAE WHEELER
Notary Public State of Texas
Commission # 135531601
Commission Expires 9/8/2029

By: _____
Kallysta Danae Wheeler, Notary Public
My commission expires 9/8/2029

We, the undersigned Officers of SureTec Insurance Company and Markel Insurance Company do herby certify that the original POWER OF ATTORNEY of which the foregoing is a full, true and correct copy is still in full force and effect and has not been revoked.

IN WITNESS WHEREOF, we have hereunto set our hands, and affixed the Seals of said Companies, on the 19th day of March , 2026

SureTec Insurance Company

By: _____
M. Brent Beaty, Assistant Secretary

Markel Insurance Company

By: _____
Andrew Marquis, Assistant Secretary

Any Instrument Issued in excess of the penalty stated above is totally void and without any validity. 4221206
For verification of the authority of this Power you may call (713)812-0800 on any business day between 8:30 AM and 5:00 PM CST.

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 112675810
Filing Code Description: Bond
Filing Description: $1,000.00
Status as of 3/20/2026 12:44 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Paul Beik | 24054444 | paul@beiklaw.com | 3/20/2026 12:10:00 PM | SENT |
| James Ardoin | 24045420 | jimmy@jimmyardoinlaw.com | 3/20/2026 12:10:00 PM | SENT |
| Kayla Brake | | kayla@texasprobateattorney.com | 3/20/2026 12:10:00 PM | SENT |
| Texas Probate Attorney, PLLC | | efile@texasprobateattorney.com | 3/20/2026 12:10:00 PM | SENT |
| Rudy Culp | | rudy@texasprobateattorney.com | 3/20/2026 12:10:00 PM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 3/20/2026 12:10:00 PM | SENT |
| Ryan Cantrell | | ryan.cantrell@chamberlainlaw.com | 3/20/2026 12:10:00 PM | SENT |
| Mariah Karigan | | mariah.karigan@chamberlainlaw.com | 3/20/2026 12:10:00 PM | SENT |
| Bailey Bowe | | bailey@texasprobateattorney.com | 3/20/2026 12:10:00 PM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 3/20/2026 12:10:00 PM | SENT |





FILED
3/23/2026 8:06 AM
Teneshia Hudspeth
County Clerk
Harris County - County Probate Court No. 1
Accepted By: CA

Cause No. 537,721

| | | |
|---|---|---|
| Linda Goehrs | § | |
| | § | Probate Court No. 1 |
| v. | § | |
| | § | Harris County, Texas |
| Dakota Fontenot | § | |

## Notice of Appeal

Defendant Dakota Fontenot desires to appeal this Court's March 18, 2026 order granting a temporary injunction to the Court of Appeals of Texas for the First or Fourteenth District.

No appeal or original proceeding has been filed in either the First or Fourteenth District Courts of Appeals that is related to this Cause.

Respectfully submitted,

/s/ *Paul S. Beik*
Paul S. Beik
Texas Bar No. 24054444
Beik Law Firm PLLC
440 Louisiana Street, Suite 1800
Houston, Texas 77002
(713) 869-6975
paul@beiklaw.com

*Counsel for Plaintiff*

- 1 -

- 2 -

## Certificate of Service

I certify that on March 23, 2026, I served a copy of this notice on all counsel of record and this Court's reporter via e-filing in accordance with Texas Rule of Civil Procedure 21a, Texas Rule of Appellate Procedure 42.3, and section 51.017(a) of the Texas Civil Practice and Remedies Code.

*/s/ Matthew J. Kita*
Matthew J. Kita

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Matthew Kita on behalf of Matthew Kita
Bar No. 24050883
matt@mattkita.com
Envelope ID: 112717435
Filing Code Description: Notice of Appeal
Filing Description: Notice of Appeal
Status as of 3/23/2026 2:18 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Paul Beik | 24054444 | paul@beiklaw.com | 3/23/2026 8:06:32 AM | SENT |
| James Ardoin | 24045420 | jimmy@jimmyardoinlaw.com | 3/23/2026 8:06:32 AM | SENT |
| Kayla Brake | | kayla@texasprobateattorney.com | 3/23/2026 8:06:32 AM | SENT |
| Texas Probate Attorney, PLLC | | efile@texasprobateattorney.com | 3/23/2026 8:06:32 AM | SENT |
| Rudy Culp | | rudy@texasprobateattorney.com | 3/23/2026 8:06:32 AM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 3/23/2026 8:06:32 AM | SENT |
| Ryan Cantrell | | ryan.cantrell@chamberlainlaw.com | 3/23/2026 8:06:32 AM | SENT |
| Mariah Karigan | | mariah.karigan@chamberlainlaw.com | 3/23/2026 8:06:32 AM | SENT |
| Bailey Bowe | | bailey@texasprobateattorney.com | 3/23/2026 8:06:32 AM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 3/23/2026 8:06:32 AM | SENT |
| Alexis Cook | 24059426 | aacook2@gmail.com | 3/23/2026 8:06:32 AM | SENT |

UNOFFICIAL COPY

FILED
3/25/2026 12:09 PM
Teneshia Hudspeth
County Clerk
Harris County - County Probate Court No. 1
Accepted By: EK

# CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY, P.C.
### ATTORNEYS AT LAW

RYAN O. CANTRELL
SHAREHOLDER
DIRECT: 713.658.2536
RYAN.CANTRELL@CHAMBERLAINLAW.COM

1200 SMITH STREET, SUITE 1400
HOUSTON, TEXAS 77002
713.658.1818          800.342.5829
FAX: 713.658.2553

HOUSTON
ATLANTA
PHILADELPHIA
SAN ANTONIO

**EXHIBIT**

**39**

March 25, 2026

Judge Jerry W. Simoneaux, Jr.
Harris County Probate Court No. 1
201 Caroline, 6th Floor
Houston, Texas 77002

      Re:    Cause No. 537,721; *Linda Goehrs v. Dakota Fontenot*, in Probate Court No. One
              of Harris County, Texas

Dear Judge Simoneaux:

I write on behalf of Intervenors Michelle Fontenot and Joe Fontenot (collectively, "Fontenot") regarding the Court's March 18, 2026, Order Granting Temporary Injunction against Dakota Fontenot ("Dakota). Specifically, to assure full compliance with Rule 683 of the Texas Rules of Civil Procedure, Fontenot requests the Court to enter an Amended Order Granting Temporary Injunction to simply include (i) a trial setting on a date certain, and (ii) the Court's factual findings supporting its legal conclusion that regarding irreparable harm. *See* Tex. R. Civ. P. 683; *see also Ahmed v. Shimi Ventures, L.P.*, 99 S.W.3d 682, 689–91 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (finding that trial court had jurisdiction to enter modified temporary injunction order).

As the Court will recall, it conducted extensive evidentiary hearings on March 6, 9, and 13, 2026, on Fontenot's Application for Temporary Injunction against Dakota. During the hearing, Fontenot established the following facts, justifying its request for injunctive relief.

- Dakota breached his fiduciary duties to the Trustee of the Holli Ann Hardin Trust and Fontenot and misappropriated assets belonging to the Holli Ann Hardin Trust Number One in connection with the sale of HFR Enterprises, Ice Embassy, and Entertainment Marketing & Management, Ltd. by engaging in self-dealing.

- In August 2025, Dakota created an entity in the U.S. Virgin Islands called Emerald Island Holdings, LLC and used the misappropriated assets from the sale of Entertainment Marketing & Management, Ltd. to purchase real property in the name of the entity.

- Dakota subsequently transferred the entity to his in-laws during the pendency of this litigation, receiving no consideration but continuing to exercise control over the entity's assets.

Judge Jerry W. Simoneaux, Jr.
Harris County Probate Court No. 1
March 25, 2026
Page 2

- The day before the Temporary Injunction hearing, Dakota released any right to the $937,500 in future payments under the agreement for the sale of Entertainment Marketing & Management, Ltd. in exchange for a significantly reduced lump sum payment and transferred the proceeds to his wife during the pendency of the Temporary Injunction hearing.

- Dakota has transferred all or substantially all of his assets, and is or would become insolvent and judgment-proof upon an award of damages against him in this case.

- Dakota has engaged in conduct to hinder, delay, and defraud creditors, and will continue to engage in similar conduct to dissipate the misappropriated funds received from the sale of Entertainment Marketing & Management, Ltd., which the Trustee and Fontenot claim rightfully belong to them.

Having heard this evidence, on March 18, 2026, the Court granted Fontenot's application and enjoined Dakota from unlawfully dissipating the disputed funds. In compliance with Rule 683, the Order clearly identifies the acts required by the injunction and the Court's the legal conclusions justifying its ruling ("probable, imminent, and irreparable harm").

However, the Order does not state a trial date, which Rule 683 requires. *See Emex Holdings, LLC v. Naim*, No. 13-09-591-CV, 2010 WL 2163139 (Tex. App.—Corpus Christi 2010, no pet.) ("Reference to an existing docket control order is not a substitute for stating a trial date in the order itself. Logically, if a pre-existing docket control order is insufficient to comply with rule 683, then a yet to be entered docket control order . . . does not comply either.").

Also, while the order finds, factually, that Dakota dissipated assets that are the subject of this dispute, it does not include additional factual findings (such as those identified above) supporting its legal conclusion regarding irreparable harm. *TPLC29 LLC v. Lock Away Hwy 105 W., LLC,* No. 01-24-00465-CV, 2025 WL 2446034, at *5 (Tex. App.—Houston [1st Dist.] Aug. 26, 2025, no pet.) ("A trial court must provide a factual basis explaining the reason for its finding that the applicant will suffer a probable, imminent, and irreparable injury unless the temporary injunction is issued, and it must connect the enjoined actions to the irreparable injury.").

Given the importance of the Court's Order, which is essential in this litigation, and given that Dakota has now filed an interlocutory appeal challenging it, Fontenot respectfully requests the Court to enter an Amended Order Granting Temporary Injunction to remedy its current Order. A proposed amended order is enclosed for the Court's consideration.[1]

---

[1] The enclosed proposed order is the same as the proposed order previously submitted by Fontenot following the injunction hearing, with one change. The previous proposed order mistakenly referenced $2,174,500 as the proceeds received by Dakota; however, the evidence adduced at the temporary injunction hearing reflects that the correct number is $2,387,000 ($1,500,000 received on July 1, 2025, approximately $156,000 received around October 1, 2025, approximately $156,000 received on January 1, 2026, and $575,000 received on March 6, 2026).

Judge Jerry W. Simoneaux, Jr.
Harris County Probate Court No. 1
March 25, 2026
Page 3

Sincerely,



Ryan O. Cantrell
*Counsel for Michelle Fontenot and Joe Fontenot*

cc:    All counsel of record

UNOFFICIAL COPY

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Lisa Adair on behalf of Ryan Cantrell
Bar No. 24055259
lisa.adair@chamberlainlaw.com
Envelope ID: 112847311
Filing Code Description: Letter
Filing Description: Letter to Court regarding Temporary Injunction Order
Status as of 3/25/2026 3:25 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Paul Beik | 24054444 | paul@beiklaw.com | 3/25/2026 12:09:31 PM | SENT |
| James Ardoin | 24045420 | jimmy@jimmyardoinlaw.com | 3/25/2026 12:09:31 PM | SENT |
| Alexis Cook | 24059426 | aacook2@gmail.com | 3/25/2026 12:09:31 PM | SENT |
| Kayla Brake | | kayla@texasprobateattorney.com | 3/25/2026 12:09:31 PM | SENT |
| Texas Probate Attorney, PLLC | | efile@texasprobateattorney.com | 3/25/2026 12:09:31 PM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 3/25/2026 12:09:31 PM | SENT |
| Ryan Cantrell | | ryan.cantrell@chamberlainlaw.com | 3/25/2026 12:09:31 PM | SENT |
| Mariah Karigan | | mariah.karigan@chamberlainlaw.com | 3/25/2026 12:09:31 PM | SENT |
| Rudy Culp | | rudy@texasprobateattorney.com | 3/25/2026 12:09:31 PM | SENT |
| Bailey Bowe | | bailey@texasprobateattorney.com | 3/25/2026 12:09:31 PM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 3/25/2026 12:09:31 PM | SENT |



FILED
4/6/2026 11:12 AM
Teneshia Hudspeth
County Clerk
Harris County - County Probate Court No. 1
Accepted By: KC

CAUSE NO. 537,721

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY AS TRUSTEE OF THE HOLLI ANN HARDIN TRUST, | § § § § | IN THE PROBATE COURT |
| Plaintiff, | § | NUMBER ONE (1) OF |
| v. | § | |
| DAKOTA FONTENOT, | § § | |
| Defendant. | § § | HARRIS COUNTY, TEXAS |

## NOTICE OF NONSUIT WITHOUT PREJUDICE OF COUNTERCLAIMS

Intervenor Madison E. Fontenot, as next friend of her minor children, S.F. and W.F., files this Notice of Nonsuit Without Prejudice of all counterclaims asserted in her Answer and Counterclaim filed on October 22, 2025, and respectfully shows the Court as follows:

I.

Intervenor Madison E. Fontenot, as next friend of S.F. and W.F., hereby nonsuits **without prejudice** all of her claims, causes of action, and counterclaims asserted against Plaintiff Linda Goehrs, in her capacity as Trustee of the Holli Ann Hardin Trust Number One, Intervenors Joe Fontenot and Michelle Fontenot, and any other parties in this proceeding.

II.

This nonsuit is taken pursuant to Rule 162 of the Texas Rules of Civil Procedure and is without prejudice to the refiling of said counterclaims.

UNOFFICIAL COPY

Respectfully submitted,

/s/ Paul S. Beik

PAUL S. BEIK
 Texas State Bar Number: 24054444
paul@beiklaw.com
440 Louisiana Street, Suite 1800
Houston, Texas 77002
Telephone: (713) 869-6975

ATTORNEYS FOR INTERVENOR
MADISON E. FONTENOT, AS NEXT
FRIEND OF S.F. AND W.F.,
BENEFICIARIES OF THE HOLLI ANN
HARDIN TRUST NUMBER ONE

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been served upon all parties of record in this Cause, in accordance with the Texas Rules of Civil Procedure on April 6, 2026  via e-service.

/s/ Paul S. Beik
PAUL S. BEIK

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Paul  Beik on behalf of Paul Beik
Bar No. 24054444
paul@beiklaw.com
Envelope ID: 113268216
Filing Code Description: Application for Non Suit
Filing Description: without prejudice of counterclaims
Status as of 4/7/2026 7:20 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|-------------------|--------|
| Paul Beik | 24054444 | paul@beiklaw.com | 4/6/2026 11:12:39 AM | SENT |
| James Ardoin | 24045420 | jimmy@jimmyardoinlaw.com | 4/6/2026 11:12:39 AM | SENT |
| Alexis Cook | 24059426 | aacook2@gmail.com | 4/6/2026 11:12:39 AM | SENT |
| Ryan Cantrell | | ryan.cantrell@chamberlainlaw.com | 4/6/2026 11:12:39 AM | SENT |
| Mariah Karigan | | mariah.karigan@chamberlainlaw.com | 4/6/2026 11:12:39 AM | SENT |

Associated Case Party: Linda Goehrs

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|-------------------|--------|
| Kayla Brake | | kayla@texasprobateattorney.com | 4/6/2026 11:12:39 AM | SENT |
| Texas Probate Attorney, PLLC | | efile@texasprobateattorney.com | 4/6/2026 11:12:39 AM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 4/6/2026 11:12:39 AM | SENT |
| Rudy Culp | | rudy@texasprobateattorney.com | 4/6/2026 11:12:39 AM | SENT |
| Bailey Bowe | | bailey@texasprobateattorney.com | 4/6/2026 11:12:39 AM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 4/6/2026 11:12:39 AM | SENT |

Associated Case Party: Michelle Fontenot

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|-------------------|--------|
| Paul Gossett | | paul.gossett@chamberlainlaw.com | 4/6/2026 11:12:39 AM | SENT |

UNOFFICIAL COPY

**EXHIBIT**

**41**

exhibitsticker.com

FILED
04/07/2026 9:23:25 AM
Teneshia Hudspeth
County Clerk
Harris County, Texas
david.montano.lopez

CAUSE NO. 537,721

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY AS TRUSTEE OF THE HOLLI ANN HARDIN TRUST, | § § § § | IN THE PROBATE COURT |
| Plaintiff, | § § | NUMBER ONE (1) OF |
| v. | § | |
| DAKOTA FONTENOT, | § § | |
| Defendant. | § § | HARRIS COUNTY, TEXAS |

### ORDER ON INTERVENOR'S NOTICE OF NONSUIT WITHOUT PREJUDICE OF COUNTERCLAIMS

On this day came to be considered the Notice of Nonsuit Without Prejudice of Counterclaims filed by Intervenor Madison E. Fontenot, as next friend of her minor children, S.F. and W.F.

The Court, having considered the same, finds that the notice should be granted.

It is therefore ORDERED that all claims, causes of action, and counterclaims asserted by Madison E. Fontenot, as next friend of S.F. and W.F., minors, in her Answer and Counterclaim filed on October 22, 2025, are hereby DISMISSED WITHOUT PREJUDICE.

Signed: 04/07/2026
9:17:23 AM

_____
**JUDGE PRESIDING**

UNOFFICIAL COPY

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Paul  Beik on behalf of Paul Beik
Bar No. 24054444
paul@beiklaw.com
Envelope ID: 113268543
Filing Code Description: Proposed Order
Filing Description: Intervenor's Notice of Nonsuit without Prejudice of Counterclaims
Status as of 4/7/2026 7:08 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Paul Beik | 24054444 | paul@beiklaw.com | 4/6/2026 11:16:38 AM | SENT |
| James Ardoin | 24045420 | jimmy@jimmyardoinlaw.com | 4/6/2026 11:16:38 AM | SENT |
| Alexis Cook | 24059426 | aacook2@gmail.com | 4/6/2026 11:16:38 AM | SENT |
| Ryan Cantrell | | ryan.cantrell@chamberlainlaw.com | 4/6/2026 11:16:38 AM | SENT |
| Mariah Karigan | | mariah.karigan@chamberlainlaw.com | 4/6/2026 11:16:38 AM | SENT |

Associated Case Party: Linda Goehrs

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Kayla Brake | | kayla@texasprobateattorney.com | 4/6/2026 11:16:38 AM | SENT |
| Texas Probate Attorney, PLLC | | efile@texasprobateattorney.com | 4/6/2026 11:16:38 AM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 4/6/2026 11:16:38 AM | SENT |
| Rudy Culp | | rudy@texasprobateattorney.com | 4/6/2026 11:16:38 AM | SENT |
| Bailey Bowe | | bailey@texasprobateattorney.com | 4/6/2026 11:16:38 AM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 4/6/2026 11:16:38 AM | SENT |

Associated Case Party: Michelle Fontenot

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Paul Gossett | | paul.gossett@chamberlainlaw.com | 4/6/2026 11:16:38 AM | SENT |



**EXHIBIT**

**42**

CAUSE NO. 537,721

| | | |
|---|---|---|
| LINDA GOEHRS | § | IN THE PROBATE COURT |
|     Plaintiff | § | |
|       , | § | |
| | § | |
|       , | § | NUMBER ONE (1) OF |
| v. | § | |
| DAKOTA FONTENOT & | § | |
| MADISON FONTENOT | § | |
|     Defendants. | § | HARRIS COUNTY, TEXAS |

### ORIGINAL ANSWER AND JURY DEMAND
### OF DEFENDANT MADISON FONTENOT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Defendant Madison Fontenot who has been sued in her individual capacity files this Original Answer and Jury Demand and would show the Court as follows:

### GENERAL DENIAL

Defendant Madison Fontenot asserts a general denial as authorized by Rule 92 of the Texas Rules of Civil Procedure and demands that Plaintiff be required to prove each and every charge and allegation asserted against Defendant under the appropriate burden of proof as required by the Constitution and laws of the State of Texas.

### JURY DEMAND

Defendant Madison Fontenot makes this request for a trial by jury.

### AFFIRMATIVE DEFENSES

Defendant Madison Fontenot asserts the following affirmative defenses under Rule 94:

1. Release

2. Waiver

3. Statute of frauds

4. Failure of consideration

5. Estoppel

6. Fraud

7. Payment

8. Res judicata/collateral estoppel

9. Defendant contests the capacity of the Plaintiff to sue her. Linda Goehrs, in her capacity as trustee of the Holli Ann Hardin Trust, lacks the capacity to sue Defendant Madison Fontenot.

10. The Plaintiff does not have the legal capacity to sue.

11. Plaintiff is not entitled to recover in the capacity in which she sues.

12. The instrument upon which Plaintiff is suing is without consideration or the consideration has failed in whole or part.

## PRAYER

For the foregoing reasons, Defendant respectfully requests that Plaintiff take nothing by reason of its claims against Defendant and that Defendant be awarded attorney's fees and for any such other relief, whether at law or in equity to which Defendant may be justly entitled.

Respectfully submitted,

/s/ Lloyd E. Kelley
LLOYD E. KELLEY
State Bar No. 11203180
2726 Bissonnet Ste 240 PMB 12
Houston, Texas 77005
Telephone: 281-492-7766
kelley@lloydekelley.com
Attorney for Defendant Madison Fontenot

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been served upon all parties of record in this Cause, in accordance with the Texas Rules of Civil Procedure on April 7, 2026  via e-service.

/s/ Lloyd E. Kelley
Lloyd E. Kelley

EXHIBIT

43

FILED
4/7/2026 2:36 PM
Teneshia Hudspeth
County Clerk
Harris County - County Probate Court No. 1
Accepted By: CC

CAUSE NO. 537,721

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY | § | IN THE PROBATE COURT |
| AS TRUSTEE OF THE HOLLI ANN | § | |
| HARDIN TRUST, | § | |
| | § | |
| Plaintiff, | § | NUMBER ONE (1) OF |
| v. | § | |
| DAKOTA FONTENOT & | § | |
| MADISON FONTENOT | § | |
| Defendant. | § | HARRIS COUNTY, TEXAS |

**NOTICE OF FILING OF NOTICE OF REMOVAL**

TO THE HONORABLE JUDGE OF SAID COURT:

Please take notice that on April 7, 2026, Defendant Madison Fontenot filed a Notice of Removal in the United States District Court for the Southern District of Texas, removing the above-styled and numbered cause. A true copy of the Notice of Removal and all attachments is attached hereto.

Upon filing of the Notice in federal court, this Court is automatically divested of jurisdiction. 28 U.S.C. § 1446(d).

Respectfully submitted,

/s/ Lloyd E. Kelley
LLOYD E. KELLEY
State Bar No. 11203180
2726 Bissonnet Ste 240 PMB 12
Houston, Texas 77005
Telephone: 281-492-7766
kelley@lloydekelley.com
Counsel for Defendant Madison Fontenot

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been served upon all parties of record in this Cause, in accordance with the Texas Rules of Civil Procedure on April 7, 2026  via e-service.

/s/ Lloyd E. Kelley
Lloyd E. Kelley



## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Lloyd Kelley on behalf of Lloyd Kelley
Bar No. 11203180
kelley@lloydekelley.com
Envelope ID: 113343397
Filing Code Description: Notice
Filing Description: of Filling of Notice of Removal
Status as of 4/7/2026 2:40 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|---------------------|--------|
| Lloyd E.Kelley | | kelley@lloydekelley.com | 4/7/2026 2:36:17 PM | SENT |
| Paul Beik | 24054444 | paul@beiklaw.com | 4/7/2026 2:36:17 PM | SENT |
| James Ardoin | 24045420 | jimmy@jimmyardoinlaw.com | 4/7/2026 2:36:17 PM | SENT |
| Alexis Cook | 24059426 | aacook2@gmail.com | 4/7/2026 2:36:17 PM | SENT |
| Kayla Brake | | kayla@texasprobateattorney.com | 4/7/2026 2:36:17 PM | SENT |
| Texas Probate Attorney, PLLC | | efile@texasprobateattorney.com | 4/7/2026 2:36:17 PM | SENT |
| Collin Bullard | | collin@texasprobateattorney.com | 4/7/2026 2:36:17 PM | SENT |
| Ryan Cantrell | | ryan.cantrell@chamberlainlaw.com | 4/7/2026 2:36:17 PM | SENT |
| Mariah Karigan | | mariah.karigan@chamberlainlaw.com | 4/7/2026 2:36:17 PM | SENT |
| Paul Gossett | | paul.gossett@chamberlainlaw.com | 4/7/2026 2:36:17 PM | SENT |
| Rudy Culp | | rudy@texasprobateattorney.com | 4/7/2026 2:36:17 PM | SENT |
| Bailey Bowe | | bailey@texasprobateattorney.com | 4/7/2026 2:36:17 PM | SENT |
| Robin Edwards | | robin@texasprobateattorney.com | 4/7/2026 2:36:17 PM | SENT |

537721

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **LINDA GOEHRS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| | § | |
| **v.** | § | **Civil Action Number _____** |
| | § | |
| **DAKOTA FONTENOT &** | § | |
| **MADISON FONTENOT** | § | **Jury Demanded in State** |
| | § | **Court** |
| **Defendants.** | § | |
| | § | |

### NOTICE OF REMOVAL

Defendant Madison Fontenot, in her individual capacity (hereinafter "Removing Defendant"), respectfully gives notice pursuant to 28 U.S.C. §§ 1441(a) and 1446 that she removes the above-captioned civil action from the Texas Probate Court One of Harris County, Texas Cause Number 537,721 to the United States District Court for the Southern District of Texas.

### I. PROCEDURAL HISTORY AND TIMELINESS

1. On August 21, 2025, Plaintiff Linda Goehrs (Texas resident) filed this action in Texas probate court against Dakota Fontenot (U.S. Virgin Islands resident).

2. Plaintiff filed a recent pleading asserting claims against Madison Fontenot in her individual capacity.

EXHIBIT

44

3. Madison Fontenot has not been served but was provided notice of the pleading on April 6, 2026 and filed an Answer and Jury Demand in the State Court Proceeding on April 7, 2026. This Notice of Removal is filed within thirty (30) days of notice and is therefore timely under 28 U.S.C. § 1446(b)(2)(B).

## II. GROUNDS FOR REMOVAL – DIVERSITY JURISDICTION

This Court has original jurisdiction under 28 U.S.C. § 1332(a)(1) because:

A. **Complete Diversity Exists**

- Plaintiff: Linda Goehrs is a Texas resident.

- Defendants: Dakota Fontenot is a resident of the U.S. Virgin Islands. Madison Fontenot is a resident of the U.S. Virgin Islands.

B. **Amount in Controversy** The original action and the fraudulent transfer claim each exceed $75,000, exclusive of interest and costs. The amount-in-controversy requirement is satisfied for the entire action.

C. **Probate Exception Inapplicable** The fraudulent transfer claim against Madison Fontenot is an in personam action seeking personal liability and does not require probate of a will, administration of an estate, or control of property in the probate court's custody. *Marshall v. Marshall*, 547 U.S. 293, 308-12 (2006).

## III. CONSENT OF ALL DEFENDANTS

All Defendants, Dakota Fontenot and Madison Fontenot, consent to this removal. See 28 U.S.C. § 1446(b)(2)(C) (.

## IV. ATTACHMENTS

Pursuant to 28 U.S.C. § 1446(a), the following state-court documents are attached by separate pleading:

- All process, pleadings, and orders in the state-court action.

## V. NOTICE TO STATE COURT

A copy of this Notice will be promptly filed with the state probate court.

WHEREFORE, Removing Defendant Madison Fontenot respectfully requests that this action be removed to this Court and that the state court be notified of the removal.

Respectfully submitted,
/s/ Lloyd E. Kelley
LLOYD E. KELLEY
State Bar No. 11203180
2726 Bissonnet Ste 240 PMB 12
Houston, Texas 77005
Telephone: 281-492-7766
kelley@lloydekelley.com
Counsel for Madison Fontenot

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been served upon all parties of record in this Cause, on April 7, 2026 via e-service.

/s/ Lloyd E. Kelley
Lloyd E. Kelley

UNOFFICIAL COPY

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Linda Goehrs, Michelle Fontenot, Joe Fontenot

**DEFENDANTS**

Madison Fontenot, Dakota Fontenot

**(b)** County of Residence of First Listed Plaintiff  Harris
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  U.S. Virgin Islands
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See Attached

Attorneys *(If Known)*

See Attached

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [x] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [x] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [x] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | **PERSONAL INJURY** [ ] 365 Personal Injury - Product Liability | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [x] 370 Other Fraud | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | **LABOR** | [ ] 485 Telephone Consumer Protection Act |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 710 Fair Labor Standards Act | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | | | [ ] 720 Labor/Management Relations | [ ] 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 740 Railway Labor Act | [ ] 890 Other Statutory Actions |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | [ ] 751 Family and Medical Leave Act | [ ] 891 Agricultural Acts |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | [ ] 790 Other Labor Litigation | [ ] 893 Environmental Matters |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | [ ] 791 Employee Retirement Income Security Act | [ ] 895 Freedom of Information Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | **SOCIAL SECURITY** | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | [ ] 861 HIA (1395ff) | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 862 Black Lung (923) | [ ] 950 Constitutionality of State Statutes |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 863 DIWC/DIWW (405(g)) | |
| | | [ ] 550 Civil Rights | [ ] 864 SSID Title XVI | |
| | | [ ] 555 Prison Condition | [ ] 865 RSI (405(g)) | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | **FEDERAL TAX SUITS** | |
| | | **IMMIGRATION** | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | |
| | | [ ] 462 Naturalization Application | [ ] 871 IRS—Third Party 26 USC 7609 | |
| | | [ ] 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [ ] 1 Original Proceeding
- [x] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Diversity

Brief description of cause:
Defendant sued for fraudulent transfer.

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ 8,000,000

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____  DOCKET NUMBER _____

DATE  4/7/2026

SIGNATURE OF ATTORNEY OF RECORD  /s/: Lloyd E. Kelley

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

## ATTORNEYS

LLOYD E. KELLEY
State Bar No. 11203180
2726 Bissonnet Ste 240 PMB 12
Houston, Texas 77005
Telephone: 281-492-7766
lloyd@lloydekelley.com

Attorney for Defendant Madison Fontenot

Culp, Rudolph M.
24 Greenway Plaza
Suite 1825
Houston TX 77046
Phone 713-297-0700
Fax 817-383-5110

Attorney for Plaintiff
LINDA GOEHRS, IN HER CAPACITY
AS TRUSTEE OF THE HOLLI ANN
HARDIN TRUST NUMBER ONE

CANTRELL, RYAN O.
Chamberlain, Hrdlicka, White, Williams, & Aughtry
1200 Smith Street, Suite 1400
Houston TX 77002
Phone 713-658-1818
Fax 713-658-2553

Attorneys for Dallas Joseph Fontenot, III
And Michelle Fontenot

BEIK, PAUL S.
Beik Law Firm PLLC
440 Louisiana Street, Suite 1800
Houston TX 77002
Phone 713-869-6975
Fax 713-868-2262
Dakota Fontenot

UNOFFICIAL COPY

Pro Se
U.S. Virgin Islands.


UNOFFICIAL COPY

UNOFFICIAL COPY

CAUSE NO. 537721

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY | § | IN THE PROBATE COURT |
| AS TRUSTEE OF THE HOLLI ANN | § | |
| HARDIN TRUST NUMBER ONE | § | |
|     *Plaintiff,* | § | |
| | § | |
| | § | NUMBER ONE (1) |
| v. | § | |
| | § | |
| DAKOTA FONTENOT | § | |
|     *Defendant.* | § | HARRIS COUNTY, TEXAS |

## PLAINTIFF'S FIRST AMENDED PETITION AND APPLICATION FOR ADDITIONAL TEMPORARY AND PERMANENT INJUNCTIVE RELIEF

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff LINDA GOEHRS ("Plaintiff"), in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, and files this her First Amended Petition and Application for Additional Temporary and Permanent Injunctive Relief against Defendant DAKOTA FONTENOT ("Defendant"), and in support thereof would respectfully show unto the Court the following:

### I.
### DISCOVERY CONTROL PLAN

1.    Plaintiff intends to conduct discovery under Level 3 of Rule 190.4 of the Texas Rules of Civil Procedure.

### II.
### CLAIM FOR RELIEF

2.    Pursuant to Rule 47 of the Texas Rules of Civil Procedure, Plaintiff seeks monetary relief of more than $1,000,000.00 and non-monetary relief.

First Amended Petition: Goehrs-Fontenot

## III.
## PARTIES

3.     Plaintiff LINDA GOEHRS ("Plaintiff") is an individual residing in Harris County, Texas and currently serving as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One (the "Hardin Trust"). Plaintiff may be served through the undersigned attorneys of record.

4.     Defendant DAKOTA FONTENOT ("Defendant") has appeared through counsel in the matter before the Court and may be served through his attorneys of record, Jeffrey D. Watters, Jr., John P. Avant III, James Madison Ardoin III, and Paul S. Beik.

5.     Intervenor MICHELLE FONTENOT ("Michelle") has appeared through counsel in the matter before the Court and may be served through her attorneys of record, Ryan O. Cantrell and Mariah J. Karigan.

6.     Intervenor DALLAS JOSEPH FONTENOT III ("Joe") has appeared through counsel in the matter before the Court and may be served through her attorneys of record, Ryan O. Cantrell and Mariah J. Karigan.

7.     Intervenor MADISON E. FONTENOT ("Madison"), as next friend of minor children S.F. and W.F., has appeared through counsel in the matter before the Court and may be served through her attorney of record, Paul S. Beik.

## IV.
## JURISDICTION AND VENUE

8.     Personal jurisdiction exists over Defendant because Defendant is an individual domiciled in Harris County, Texas, and this lawsuit arises from actions within the State of Texas.

9.     This Court has subject matter jurisdiction over the lawsuit because the amount in controversy exceeds the Court's minimum jurisdictional requirements. This Court further has

First Amended Petition: Goehrs-Fontenot

subject matter jurisdiction pursuant to Texas Estates Code § 32.006 because it is an action by or against a trustee and an action involving an inter vivos trust.

10. Venue is proper in Harris County, Texas pursuant to Texas Property Code § 115.001 because Defendant, the purported Trustee of the Dakota Trust, is an individual resident of Harris County and upon information and belief, the situs of the administration of the Dakota Trust is in Harris County. Venue is further proper in Harris County, Texas pursuant to Texas Civil Practice & Remedies Code § 15.002 because Harris County is the county in which all or a substantial portion of the events giving rise to Plaintiff's claims occurred.

## V.
## FACTS

11. The Hardin Trust was created on or about June 5, 1991, by Holli Ann Hardin Fontenot ("Holli"). *See* **Exhibit "A"**, *Trust Agreement*. At the time, Holli was married to Dallas Joseph Fontenot, Jr. ("Dallas"). Defendant is the child of Holli and Dallas.

12. Dallas had two children from a previous marriage, Joe and Michelle. Defendant, Holli, Joe, and Michelle were each initial beneficiaries of the Hardin Trust. During his lifetime, Dallas owned numerous properties and businesses centered around the Colorado Bar & Grill (the "Colorado Club"), a gentleman's club located in Houston, Texas. Dallas accumulated millions of dollars of assets which at the time of his death were spread between his estate, the Hardin Trust, and a separate trust known as the Dakota Trust, which was created on November 9, 1994, by Holli as settlor. *See* **Exhibit "B"**, *Dakota Trust Agreement*.

13. Dallas died on September 3, 2021, and his estate was probated in Fort Bend County Court at Law Number Four (4) under Cause No. 21-CPR-036521. Litigation pertaining to Dallas's estate and the two above-mentioned trusts (collectively the "Trusts") was resolved through a

Page **3** of **21**

First Amended Petition: Goehrs-Fontenot

settlement agreement dated January 7, 2022 (the "Settlement Agreement"). *See* **Exhibit "C"**, *Binding Mediated Settlement Agreement.*

14.     As part of the Settlement Agreement, the parties ultimately agreed that Holli would be bought out as a beneficiary of the Trusts, with certain assets to be paid to Holli in consideration of her disclaimer of further interest in the Trusts. Specifically, the Settlement Agreement dictated that Holli's interest in both Trusts "will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One." *Id.* at p. 5–6. Subsequently, Defendant, acting as President of HFR Enterprises, Inc. entered into a 2.8 million dollar loan agreement, in part to provide the necessary consideration for Holli's interest in both Trusts. *See* **Exhibit "D"**, *Amended and Restated Promissory Note.* The Hardin Trust then paid Holli $2,823,464 for her interest in both Trusts, representing 85% of the total value of the Dakota Trust assets and 20% of the total value of the Hardin Trust assets. *See* **Exhibit "E"**, *Assignment of Interest and Disclaimer of Further Interest.*

*Running of the Colorado Club Entities.*

15.     As agreed upon by Defendant, Joe and Michelle, following the entry of the Settlement Agreement, Defendant took over and began to manage/run all of the entities held by the Trust. Additionally, as part of the Settlement Agreement, Defendant also was given full ownership of Entertainment Marketing & Management, LTD ("EMM").

16.     Following the execution of the Settlement Agreement, Defendant was named the President and sole Director of HFR Enterprises, Inc., ICE Embassy Inc., and the Colorado Bar & Grill, Corporation.

17.     On or before May 19, 2023, Defendant was appointed as sole Director, as well as President and Secretary for the Colorado Bar & Grill Corporation, a corporation which is wholly

First Amended Petition: Goehrs-Fontenot

owned by the Hardin Trust. **Exhibit "F".** On or before May 19, 2023, Defendant was appointed as sole Director, as well as President and Secretary for HFR Enterprises Inc, a corporation which is wholly owned by the Hardin Trust. **Exhibit "G".** On or before May 19, 2023, Defendant was appointed as sole Director, as well as President and Secretary for ICE Embassy, Inc, a corporation which is wholly owned by the Hardin Trust. **Exhibit "H".** Defendant served in these positions (as well as sole shareholder/officer/director of EMM) until the sale of the Colorado Bar & Grill, Corporation.

18.    After taking over full management of the entities (following the longtime manager Frank Kent retiring), Defendant caused waste to assets held in the Hardin Trust and engaged in extensive self-dealing. Defendant mismanaged the Colorado Club for personal benefit to the detriment of the Hardin Trust, including, but not limited to, the following:

    a.    Hiring his wife, who had little to no experience, to manage the Colorado Club;

    b.    Paying his personal credit cards out of the company;

    c.    Taking vacations and claiming them as a business expense;

    d.    Paying personal expenses from the company;

    e.    Making unnecessary and unreasonable improvements, many of which were never completed;

    f.    Firing multiple consultants and paying them hundreds of thousands of dollars with no apparent benefits provided;

    g.    Changing the system of the Colorado Club to have less oversight and allowing money to be taken or taking money from the club;

First Amended Petition: Goehrs-Fontenot

h. Taking a loan from his wife's stepfather for $150,000 and within a month repaying the loan with $50,000 in interest, which was wired directly to an offshore account

i. Obligating the entities held by the Hardin Trust to enter into an unnecessary Management Agreements and Administrative Agreements with an entity he owns, on top of taking a salary from the club; and

j. Using funds earmarked for repayment of the loan used to buy Holli's interest for his own personal benefit, allowing the company to default on the loan for months and causing a fire sale of the land and stock.

19. Defendant entered the Management Agreement between Ice Embassy, Inc. d/b/a the Colorado Bar & Grill, as President of both entities. **Exhibit "I"**. Defendant used this Management Agreement to take sums that violated the terms of the Settlement Agreement.

**The Sale of the Entities**

20. Defendant notified the Trustee of the necessity to find a buyer for the entities because if they did not sell, they would be foreclosed upon and lose everything. The Trustee would come to find out that Defendant was months behind on the loan payments, as well as failing to pay other necessary business expenses. His actions and/or inactions put the entities in a position that it appeared that a quick sale would be necessitated to avoid foreclosure.

21. In his work to sell the Entities, Defendant, without notice to Trustee, entered into two consulting agreements (each for $100,000 to be paid at the sale of the Entities) to assist him in the sale of HFR and Ice's Stock, the real property and improvements HFR owns located at 6710 Southwest Freeway, and/or assets of the foregoing through one or more purchase agreements. Defendant, as President for both ICE and HFR, entered into consulting agreements with Gray

First Amended Petition: Goehrs-Fontenot

Entertainment Inc., (**Exhibit "J"**) and Tim Wilson (**Exhibit "K"**). There was no mention of EMM in any of these consulting agreements.

22.     HFR was sold to CLE Group SKZ Real Estate, LLC, a company that was formed on June 9, 2025, and managed by JZT Investments, LLC and Nightlife Investments II, LLC. [1] The Purchase and Sale Agreement was signed by Trustee and Zack Truesdell, as President of CLE Group SKZ Real Estate, LLC.

23.     ICE was purchased by Colorado Rose, LLC, a company that was formed in April of 2025, managed by Salim Dehkordi. The ICE Stock Purchase Agreement ("Stock Purchase Agreement") was signed by Trustee, Defendant, in his individual capacity and as director and president of ICE and Justin Truesdell, as Manager of Colorado Rose, LLC. **Exhibit "L"**.

24.     Although undisclosed until recently, a few months after the sale of the other entities in June of 2025, EMM was purchased by Colorado Rose, LLC, the same company that purchased ICE.  This Partnership Interest Purchase Agreement ("Partnership Interest Purchase Agreement") was executed by Defendant, individually, as sole member of BFD GP, LLC, BFD LP, LLC, and as BFD GP, LLC, as sole member of general partner, and Justin Truesdell, as Manager for Colorado Rose, LLC. **Exhibit "M"**.

25.     Because of information provided to Plaintiff related to the running of the entities by the Defendant, Plaintiff was forced to file suit on August 21, 2025. On September 25, 2025, a Temporary Injunction was entered against Defendant enjoining him from the sale of the real property located at 3414 Old Richmond Road, Rosenberg, Texas 77471, owned by Viva Las Vegas Properties, Inc. *See* **Exhibit "N"**, *Temporary Injunction*. With discovery currently ongoing, more wrongful actions of Defendant have been uncovered since the inception of this suit.

---

[1] In its articles of Incorporation, this entity also included JZT Investment II, LLC, as a manager, but it was removed within 30 days of its formation.

First Amended Petition: Goehrs-Fontenot

26. Specifically, on October 24, 2025, at the hearing on Defendant's Motion to Compel Mediation, over the objection of counsel for Defendant, Defendant admitted to receiving $2,750,000 for the sale of Entertainment Marketing & Management, Ltd. ("EMM"). This occurred when the entities and assets comprising the Colorado Club netted approximately $1,300,000 with Defendant urging such sale on the false premise that it was necessary to mitigate a failing financial situation. Defendant failed to disclose the fact that he was simultaneously selling EMM to the same buyer (or related entity) and although, upon information and belief, EMM had little to no value, Defendant secured a purchase price that netted him more than twice what was received by the Trust.

27. As of December 31, 2024, EMM's only asset was a bank account with approximately $50,000. Upon information and belief, at the time of its sale in July of 2025, EMM was insolvent, had no contractual rights to future income, and that any purchase price allocation to this entity would lack economic foundation. EMM was a management company for the Colorado Club with no ownership over assets aside from such bank account, making the purchase of EMM for $2,750,000 to be without justification. Defendant appears to have orchestrated an allocation of the Colorado Club's sale proceeds that was grossly disproportionate, diverting substantial funds from the trusts to an entity under his exclusive control. This maneuver effectively stripped the Hardin Trust of millions in value. While the Hardin Trust was intended to benefit Defendant and his two siblings, the structure of the EMM sale ensured that Defendant alone reaped the financial advantage.

28. For these reasons, Plaintiff is left with no alternative but to assert additional claims against Defendant and seek further injunctive relief to prevent ongoing harm in the interim.

First Amended Petition: Goehrs-Fontenot

**The Dakota Trust**

29.     Defendant purports to be the Trustee of the Dakota Trust. However, upon information and belief, Defendant was not validly appointed as Trustee of the Dakota Trust. Defendant is not a named successor trustee in the Dakota Trust Agreement. *See* **Exhibit "B"**. On May 1, 2013, Decedent, as Trustee of the Dakota Trust, designated Defendant as a successor Trustee, but he later revoked this designation on October 14, 2017. *See* **Exhibit "O"**, *5/1/13 Designation of Successor Trustee*; *See* **Exhibit "P"**, *10/14/17 Designation of Successor Trustee*. Decedent similarly removed Defendant from all officer and director positions for any entities owned by the Dakota Trust, including Viva Las Vegas Properties, Inc. on the same day. *See* **Exhibit "Q"**, *Viva Las Vegas Resolution*. After Decedent's death, however, without the authority to do so, Defendant started acting as Trustee of the Dakota Trust and officer and director of Viva Las Vegas Properties, Inc. As purported Trustee of the Dakota Trust, Defendant has not repaid the Hardin Trust for any of the Hardin Trust assets used to buy out Holli's interest in the Dakota Trust.

30.     It has also been discovered that Defendant is not the only beneficiary of the Dakota Trust and that his two siblings, Joe and Michele, are equal beneficiaries of this Trust. **Exhibit "B".** As such, the necessity to have the Hardin Trust to reimburse the Trust for prior transactions is less important because the beneficiaries of the trusts are similar. That said, Defendant has sold assets and withdrawn large sums of money from the Dakota Trust without making any distributions to Joe and Michele.

## VI.
## ARGUMENT AND AUTHORITIES

A.     <u>DECLARATORY JUDGMENT</u>

31.     A person interested in or through a trustee or other fiduciary in the administration of a trust may have a declaration of rights or legal relations in respect to the trust to determine any

First Amended Petition: Goehrs-Fontenot

question arising in the administration of the trust. TEX. CIV. PRAC. & REM. CODE § 37.005. The two prerequisites for a declaratory judgment action are: (1) there must be a real controversy between the parties and (2) the controversy must be one that will actually be determined by the judicial declaration sought. *Houston Chronicle Publ'g Co. v. Thomas*, 196 S.W.3d 396, 401 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

32.     The matter at issue involves two trusts and the mismanagement of entities and assets associated with the trusts by Defendant. A declaration determining the rights of the parties will straightforwardly determine the controversy between Plaintiff and Defendant. Accordingly, Plaintiff's request for declaratory judgment is appropriate.

33.     Holli was a beneficiary of the two trusts at issue before being bought out pursuant to the Settlement Agreement. Plaintiff, Joe, and Michelle never agreed and the Settlement Agreement did not dictate that Defendant would benefit as if he were the sole beneficiary of the Dakota Trust while the Hardin Trust covers all costs pertaining to Holli's buyout without receiving adequate consideration from the Dakota Trust. As of the date of this filing, Dakota has failed or otherwise declined to reimburse the Hardin Trust for amounts paid to Holli for the buyout, wrongfully depriving the Hardin Trust and resulting in an ultimately illicit benefit received by Defendant.

34.     Accordingly, there exists a controversy between Plaintiff and Defendant pertaining to the stipulations of the Settlement Agreement and Defendant's failure to abide thereby. Such controversy can by resolved through a declaration by the Court ordering that Defendant repay to the Hardin Trust the amounts received by Holli under the Settlement Agreement.

35.     Despite no authority to do so, Defendant has wrongfully acted when convenient for his self-dealing as the trustee of the Dakota Trust and/or officer/director of the entities comprising

First Amended Petition: Goehrs-Fontenot

the Colorado Club in which Plaintiff holds an interest. Plaintiff is resultingly entitled to a declaration from the Court stipulating that, pursuant to the Settlement Agreement, Defendant is liable to Plaintiff for 50% of the amounts received by Holli under the Settlement Agreement buyout and that Defendant is not trustee of the Dakota Trust or an officer/director of any entity within the Colorado Club in which Plaintiff holds an interest.

B.    BREACH OF FIDUCIARY DUTY

36.    To prevail on a breach of fiduciary duty claim, a plaintiff must prove that (1) there is a fiduciary relationship between the plaintiff and defendant, (2) the defendant breached their fiduciary duty to the plaintiff, and (3) the breach resulted in an injury to the plaintiff or benefit to the defendant. *Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). The existence of a fiduciary duty is dependent upon the facts of a specific case, and may arise where one person trusts in and relies on another. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 176–77 (Tex. 1997). The breach here arise before and at the moment of consent, not merely as a downstream corporate harm.

37.    In 2022, Defendant assumed management and control of the Colorado Club, which is comprised of numerous entities held in the Hardin Trust, all of which Defendant served as an officer and director. By controlling the multi-million-dollar business responsible for the value and funding of the Hardin Trust, Defendant assumed a position carrying fiduciary duties toward Plaintiff as Trustee of the Hardin Trust. Defendant further acted as trustee of the Dakota Trust throughout this period without the lawful authority to do so. By his own actions, Defendant assumed formal and/or informal fiduciary duties toward both trusts and their beneficiaries.

38.    Despite this, Defendant blatantly disregarded his responsibilities and duties toward the Hardin Trust as beneficial owner of the Colorado Club. Defendant fraudulently diverted

First Amended Petition: Goehrs-Fontenot

hundreds of thousands of dollars from the operations of the Colorado Club, causing the operation to substantially decline in value. Because of this, Defendant has wrongfully benefitted to the detriment of the Hardin Trust.

39.     Upon Defendant's insistence, the Colorado Club was sold, with the Hardin Trust receiving $1,300,000, though it has since been discovered that $2,750,000 of the total purchase price was instead allocated to EMM, which held no assets and was fully controlled by Defendant. As a result, Defendant again benefitted to the detriment of the Hardin Trust, and Plaintiff is entitled to recover against Defendant upon her breach of fiduciary duty claim.

C.     NEGLIGENT MISREPRESENTATION

40.     Defendant, as officer and director, provided false and/or misinformation and/or half-truths to Plaintiff about the sales transaction involving the Colorado Club and EMM. Defendant made a representation to the Plaintiff in the course of the Defendant's business, profession, or employment, or in a transaction in which the Defendant had a pecuniary interest; the Defendant supplied false information for the guidance of Plaintiff in their business transactions; the Defendant failed to exercise reasonable care or competence in obtaining or communicating the information; Plaintiff justifiably relied on the representation; and Defendant's negligent misrepresentation proximately caused the Plaintiff to suffer pecuniary loss or injury.

D.     FRAUDULENT INDUCEMENT

41.     A fraudulent inducement claim is similar to common law fraud and arises only in the context of a contract. *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018); *Int'l Bus. Machs. Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 228 (Tex. 2019). Such a claim requires proof that: (1) the defendant made a material misrepresentation; (2) the defendant knew at the time that the representation was false or lacked knowledge of its truth; (3) the defendant intended that the

First Amended Petition: Goehrs-Fontenot

plaintiff should rely or act on the misrepresentation; (4) the plaintiff relied on the misrepresentation; and (5) the plaintiff's reliance on the misrepresentation caused injury. *Id.*

42.     In the matter at issue, Defendant represented to Plaintiff that the Colorado Club was insolvent and sale was the only option to remediate the situation. This came at a time when Defendant had wrongfully assumed a position of authority within the Colorado Club and extensively defrauded the Hardin Trust of assets to which it was entitled. Upon information provided by Defendant, the Colorado Club was sold and resulted in a net receipt of $1,300,000 by the Hardin Trust. Defendant purposefully declined to disclose that $2,750,000 was paid to EMM, an entity of relatively nominal actual value under Defendant's control, for the sale.

43.     As a result of Defendant's intent to defraud and Plaintiff's reliance on Defendant's misrepresentation, Plaintiff was damaged and Defendant impermissibly benefitted. Plaintiff is resultingly entitled to recovery against Defendant upon her fraudulent inducement cause of action.

E.     FRAUD BY NONDISCLOSURE

44.     The elements of fraud by non-disclosure are: (1) a party fails to disclose a material fact within the knowledge of that party, (2) the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth, (3) the party intends to induce the other party to take some action by failing to disclose that fact, and (4) the other party suffers injury as a result of acting without knowledge of the undisclosed fact.

45.     In the matter at issue, Defendant failed to disclose to Plaintiff that he was selling EMM, an entity that appears to have no value, to the same buyer for $2,750,000, funds that, upon information and belief, should have been paid to the Trust. Defendant, as an officer and director, handled all of the transactions in question, including the sale of the Colorado Club for $1,300,000 by the Hardin Trust. Defendant purposefully declined to disclose that $2,750,000 was paid to

First Amended Petition: Goehrs-Fontenot

EMM, an entity of relatively nominal actual value under Defendant's control and full ownership, for the sale. Trustee would not have approved or would have renegotiated the sale had the EMM allocation been disclosed.

46. Plaintiff was induced to enter the transaction by Defendant as a result of Defendant's nondisclosure and Plaintiff was damaged and Defendant impermissibly benefitted. Plaintiff is resultingly entitled to recovery against Defendant upon her fraud by non-disclosure cause of action.

F. TEXAS THEFT LIABILITY ACT (TTLA)

47. "A person who commits theft is liable for the damages resulting from the theft." TEX. CIV. PRAC. & REM. CODE § 134.003(a). Theft is defined as unlawfully appropriating property or unlawfully obtaining services in violation of the Texas Penal Code. *Coe v. DNOW LP*, 718 S.W.3d 338, 363–64 (Tex. App.—Houston [14th Dist.] 2025, pet. filed Oct. 10, 2025).

48. As detailed above, in the years following Dallas's death while wrongfully acting in numerous capacities relating to the Colorado Club, Defendant purposefully misdirected assets away from the Colorado Club and the trusts to himself or entities within his control. Defendant's theft violates the Texas Penal Code and has caused damages to Plaintiff, and Plaintiff is accordingly entitled to judgment against Defendant pursuant to the TTLA. Defendant knew he had no lawful entitlement to EMM consideration attributable to the Colorado club entities value.

G. UNJUST ENRICHMENT

49. In certain circumstances where a party profits from the inequities borne by another, a cause of action for unjust enrichment is appropriate. *HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 891 (Tex. 1998). Unjust enrichment occurs when a person has wrongfully secured a benefit which

UNOFFICIAL COPY

First Amended Petition: Goehrs-Fontenot

it would be unconscionable to retain. *Eun Bok Lee v. Ho Change Lee*, 411 S.W.3d 95, 111 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

50.     Despite no authority, on numerous occasions, Defendant has received an unwarranted benefit to the detriment of Plaintiff, the trusts, and the entities comprising the Colorado Club. Defendant utilized the Colorado Club as a means of funding his lifestyle, misallocating funds away from Plaintiff for his personal benefit. This includes the recent revelation of $2,750,000 being paid to a valueless entity under Defendant's control for the sale of the Colorado Club, as admitted to by Defendant in open court.

51.     For these reasons, despite the Trusts existing to continue the business built by Dallas for the benefit of his family, Defendant has robbed the Hardin Trusts of substantial assets which should have fulfilled such purpose. Defendant has caused himself to be unjustly enriched while the Hardin Trust has suffered, entitling Plaintiff to recovery on her unjust enrichment claim against Defendant.

H.     MONEY HAD AND RECEIVED

52.     Defendant is liable for money had and received as the Defendant: (1) received money, and (2) that in equity and good conscience, the money belongs to the Plaintiff as Trustee. Money had and received is not premised on wrongdoing but looks to the justice of the case and inquires whether the defendant has received money which rightfully belongs to another. The money received form the sale of EMM belongs to the Plaintiff as Trustee as EMM had little to no value.

**VII.**
**DAMAGES**

53.     As a result of Defendant's actions, Plaintiff has been damaged in an amount far in excess of the minimum jurisdictional limits of the Court. With discovery ongoing, the full extent

Page **15** of **21**

of Plaintiff's damages are not currently known, and the full extent may be difficult to calculate. However, Plaintiff's damages currently include $2,750,000 wrongfully received by Defendant for the sale of the Colorado Club and extensive amounts directed from Defendant away from the Colorado Club under his direction and authority.

54.     Additionally, Defendant's fraudulent and malicious actions were taken with the purposeful intent to cause substantial injury or harm to Plaintiff. TEX. CIV. PRAC. & REM. CODE § 41.007(7). Because of this, Plaintiff is entitled to an award of exemplary damages against Defendant. TEX. CIV. PRAC. & REM. CODE § 41.003.

55.     Plaintiff also seeks equitable fee forfeiture and disgorgement of all applicable fees received by Defendant and/or his representatives.

## VIII.
## APPLICATION FOR INJUNCTIVE RELIEF

56.     Based on the foregoing, there is a substantial likelihood that Plaintiff will prevail on the merits of the claims against Defendant. *See Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993). The matters at issue are extensively documented through financial records in Plaintiff's possession and those yet to be discovered.

57.     In addition, Plaintiff has no adequate remedy at law for Defendant's wrongful actions causing unknown damages unlikely to be fully traceable. *See Sharma v. Vinman Int'l, Ltd.*, 231 S.W.3d 405, 426–27 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Specifically, Defendant has established and demonstrated a propensity to hide money through illicit transactions, utilizing shell companies and directing money in a way that will be difficult to trace. Even though he received over one million from his sale of EMM, he stated that he did not have access to funds that would be necessary to refund the sale of another property for $300,000. As the damages complained of herein total in the millions, it is highly likely that Defendant will face insolvency

First Amended Petition: Goehrs-Fontenot

or become judgment proof upon an award of the damages incurred by Plaintiff. *Axis Energy Mktg., LLC v. Apricus Enters., LLC*, No. 01-23-00660-CV, 2025 WL 2470572 at *8 (Tex. App.—Houston [1st Dist.] Aug. 28, 2025, no pet. h.). Plaintiff has suffered and will continue to suffer irreparable harm from Defendant's conduct. Even if Defendant was able to respond in payment of money damages, which he most likely is not able or willing to do, Plaintiff has been irreparably harmed with years of lost profits through management of the Colorado Club which would have continued through the present and into the future and cannot be easily calculated.

58.     The harm to Plaintiff is ongoing and further harm is imminent, and if the Court does not issue injunctive relief, Plaintiff will be irreparably injured. Failure to enjoin Defendant is extremely likely to lead to further depletion of property belonging to the Hardin Trust which Defendant has methodically withheld through fraudulent means. This includes the active threat of Defendant leaving the country, depriving Plaintiff of the possibility of recovery.

59.     Plaintiff has no adequate remedy at law because Defendant has absconded with funds that are very unlikely to be fully traceable. Defendant has additionally liquidated and misappropriated assets belonging to the Hardin Trust which are unlikely to ever be found. Further, the possibility to manage and profit from the Colorado Club has been taken from Plaintiff as a result of Defendant's wrongful actions, to which no value can be assuredly attributed.

60.     Greater injury will be inflicted upon Plaintiff by the denial of the requested injunctive relief than would be inflicted upon Defendant by granting such relief. Granting the injunctive relief herein would simply preserve the status quo by requiring Defendant to abide by his legal obligations and cease his purposeful harming of Plaintiff.

61.     The issuance of injunctive relief will not disserve the public interest. Balancing the equities and other factors, the significant potential of irreparable harm to Plaintiff without the

First Amended Petition: Goehrs-Fontenot

injunctive relief and the lack of harm due to the entry of injunctive relief demonstrate that the requested relief will not disserve the public interest.

62.     In order to preserve the status quo during the pendency of this action, Plaintiff seeks a Temporary Restraining Order and Temporary Injunction against Defendant. Plaintiff requests a Temporary Restraining Order that Defendant, his agents, and other persons or entities in active concert or participation who receive actual notice of the Court's Order, by personal service or otherwise, be enjoined as follows:

   a.  Defendant is restrained from access, using, moving and/or touching any of the funds that were received from the sale of EMM;

   b.  Defendant is restrained from destroying any and all documents, records, or other information pertaining to the Colorado Club, EMM, ICE, HFR, the Holli Ann Hardin Trust Number One, Dakota Trust, or other records and assets received from Dallas Joseph Fontenot, Jr. or his estate. This includes, but shall not be limited to, all financial records, business records, information from banking or other financial institutions, and information pertaining to Defendant's personal bank accounts and other financial institutions accounts;

   c.  All accounts in Defendant's care, custody, or control pertaining to or otherwise holding assets received from the sale of EMM; and

63.     Plaintiff further seeks a temporary injunction and, upon final hearing or trial hereof, a permanent injunction for the relief requested above.

64.     Plaintiff is willing to post the necessary reasonable bond to facilitate the injunctive relief requested.

## IX.
## REQUEST FOR APPOINTMENT OF SUCCESSOR TRUSTEE

65.     As detailed above, despite Defendant's wrongful actions under the guise of the capacity of trustee, there currently exists no trustee of the Dakota Trust. The trust agreement of the Dakota Trust dictates that First Interstate Bank of Texas, N.A. shall serve as successor trustee following Dallas, who is deceased, and Holli, who no longer holds any interest in the Dakota Trust.

First Amended Petition: Goehrs-Fontenot

*See* **Exhibit "B"**, *Dakota Trust Agreement*, at p. 5–7. First Interstate Bank of Texas, N.A. has not accepted appointment or otherwise acted as successor trustee in the more than four years since Dallas's death.

66.     Pursuant to Texas Property Code § 113.083(a), upon the vacancy of the position of trustee or failure to select a party for such role and upon petition of an interested party, a court may appoint a successor trustee. Because of the current lack of a trustee of the Dakota Trust, coupled with the extensive fraudulent actions of Defendant, Plaintiff requests that the Court appoint a neutral third-party as successor trustee of the Dakota Trust.

## X.
## JUDICIAL DISCHARGE

67.     Defendant has taken the position that Trustee's temporary administration of the Trust has or should have terminated. If the Court determines that Trustee's temporary administration has or should be terminated, then Plaintiff seeks to resign and to obtain a judicial discharge by this Court for the actions taken as Trustee of the Trust in accordance with the Texas Trust Code.

## XI.
## CONSTRUCTIVE TRUST

68.     Plaintiff seeks to have this Court place a constructive Trust on all funds received from the purported sale of EMM.  Plaintiff will prove that there was: (1) breach of a special trust, fiduciary relationship, or actual fraud; (2) unjust enrichment of the wrongdoer; and (3) tracing to an identifiable res. Defendant breached his fiduciary duty to Plaintiff and committed fraud, he was unjustly enriched from this breach and/or fraud and the funds are those directly traceable to the purported sale of EMM, an entity with little to no value.

First Amended Petition: Goehrs-Fontenot

## XII.
## CONDITIONS PRECEDENT

69.     All conditions precedent to Plaintiff's claims for relief have been performed or have occurred.

## XIII.
## JURY DEMAND

70.     Plaintiff requests a trial by jury on all claims included in this Amended Petition.

## XIV.
## ATTORNEY'S FEES

71.     Plaintiff has been required to employ counsel to bring this suit and requests an award of all reasonable and necessary attorney's fees for the services provided in representation and pursuit of this action. Plaintiff seeks an award of fees under the Texas Trust Code and Texas Common law.  Plaintiff also seeks the award of attorney fees under the Texas Civil Practice & Remedies Code Section 38,001.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, for the reasons detailed herein, Plaintiff LINDA GOEHRS, in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, respectfully requests that the Court set her Application for Temporary Restraining Order for hearing, that a Temporary Restraining Order be issued against Defendant DAKOTA FONTENOT as detailed herein, that the Court set Plaintiff's Application for Temporary Injunction for hearing and upon hearing issue a Temporary Injunction against Defendant, that upon final hearing or trial hereof the Court enter judgment against Defendant for the relief prayed for herein, and for all such other and further relief, general or special, at law or in equity, to which Plaintiff may show herself to be justly entitled.

First Amended Petition: Goehrs-Fontenot

Respectfully submitted,

★
EST. 2001

**TEXAS PROBATE
ATTORNEY** PLLC

RUDOLPH M. CULP
State Bar No. 24043014
rudy@texsprobateattorney.com
COLLIN J. BULLARD
State Bar No. 24129570
collin@texasprobateattorney.com
*EFILE EMAIL: efile@texasprobateattorney.com*
**HOUSTON OFFICE:**
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
O: (713) 297-0700
F: (682) 428-8137
**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was forwarded to all counsel of record in accordance with the Texas Rules of Civil Procedure on this 15th day of January 2026.

RUDOLPH M. CULP

Page **21** of **21**

First Amended Petition: Goehrs-Fontenot

UNOFFICIAL COPY

CAUSE NO. 537,721

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY AS TRUSTEE OF THE HOLLI ANN HARDIN TRUST NUMBER ONE<br>  *Plaintiff,*<br><br>v.<br><br>DAKOTA FONTENOT<br>  *Defendant.* | § § § § § § § § § § | IN PROBATE COURT<br><br>NUMBER ONE OF<br><br>HARRIS COUNTY, TEXAS |

### INTERVENORS' THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, CROSS-CLAIMS, AND APPLICATION FOR TEMPORARY INJUNCTIVE RELIEF

Michelle Fontenot ("Michelle") and Dallas Joseph Fontenot III ("Joe"), individually, as beneficiaries of the Holli Ann Hardin Trust Number One and Dakota Trust, file this Third Amended Answer, Affirmative Defenses, and Cross-Claims and Application for Temporary Injunctive Relief and respectfully show the Court as follows:

#### GENERAL DENIAL

1. Michelle and Joe generally deny the allegations contained in Defendant Dakota Fontenot's First Amended Counterclaim and Cross-Claim as permitted by Rule 92 of the Texas Rules of Civil Procedure and require that Dakota prove his causes of action by a preponderance of the credible evidence.

#### AFFIRMATIVE DEFENSES

2. Michelle and Joe plead the following affirmative defenses:

 a. Dakota lacks authority as Trustee of the Dakota Trust and any entities held by the Dakota Trust.

 b. Dakota's claims are barred by the doctrines of waiver, estoppel, laches, and release.

 c. Dakota's claims are barred by the doctrine of unclean hands.

1

35034788.v1

    d.  Dakota's claims are barred by the statute of limitations.

    e.  Dakota's claims are barred by the doctrines of res judicata or collateral estoppel.

## ATTORNEYS' FEES

3.    Michelle and Joe seek their reasonable and necessary attorneys' fees under all applicable authority, including Section 37.009 of the Texas Civil Practice and Remedies Code and Section 114.064 of the Texas Property Code.

## AMENDED CROSSCLAIMS

4.    Intervenors Michelle Fontenot and Joe Fontenot file these First Amended Crossclaims against Dakota Fontenot, and respectfully show the Court the following:

## DISCOVERY CONTROL PLAN

5.    This is a Level 2 case under Texas Rule of Civil Procedure 190.3.

## PARTIES

6.    Michelle Fontenot, individually as a beneficiary of the Dakota Trust and the Holli Ann Hardin Trust Number One, is an individual residing in Fort Bend County, Texas. Michelle has made an appearance in this matter through her counsel of record.

7.    Joe Fontenot, individually as a beneficiary of the Dakota Trust and the Holli Ann Hardin Trust Number One, is an individual residing in Fort Bend County, Texas. Joe has made an appearance in this matter through his counsel of record.

8.    Dakota Fontenot, individually and as purported Trustee of the Dakota Trust and purported officer and director of Viva Las Vegas Properties, Inc., and is an individual residing in Harris County, Texas. Dakota has made an appearance in this matter through his counsel of record.

2

UNOFFICIAL COPY

35034788.v1

9.     Linda Goehrs, as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, is an individual residing in Harris County, Texas. Ms. Goehrs has made an appearance in this matter through her counsel of record.

10.    Madison Fontenot, individually and as Next Friend of S.F. and W.F., is an individual. She has made an appearance in this matter as Next Friend through her counsel of record, Paul Beik.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction under Texas Estates Code § 32.006. Venue is proper in Harris County under Texas Property Code § 115.002(b).

## RULE 47 STATEMENT

12.    Michelle and Joe seek monetary relief over $1,000,000 and non-monetary relief. The damages sought are within the jurisdictional limits of this court.

## RELEVANT FACTS

### The Dakota Trust

13.    Holli Ann Hardin, as Settlor, created the Dakota Trust, an irrevocable inter vivos trust, on November 9, 1994. The Dakota Trust was never amended and could not be amended except by a court of competent jurisdiction. Holli Ann Hardin served as the original named Trustee of the Dakota Trust. *See* Exhibit 1, Dakota Trust Declaration, Article V, Section A. The Trust Agreement named the following successor Trustees, in order: Dallas, Joe, Michelle, and finally First Interstate Bank of Texas. *See* Exhibit 1, Dakota Trust Declaration, Article V, Sections B and C.

14.    On September 8, 1996, Holli resigned as Trustee by serving written notice of her resignation on Dallas. *See* Exhibit 2, 9/8/1996 Trustee Resignation; *see also* Exhibit 1, Dakota

3

35034788.v1

Trust Declaration, Section V.F. ("Any appointee serving or entitled to serve as Trustee may resign at any time and without cause.").

15.     After Holli's resignation, Dallas, as the named first successor Trustee, served as Trustee for the Dakota Trust until his death on September 3, 2021. During his tenure as Trustee, Dallas exercised the authority under Article V, Section C. of the Trust Agreement to designate successor trustees. On May 1, 2013, Dallas executed a Designation of Successor Trustee, naming Dakota as his successor, followed by Frost Bank. *See* Exhibit 3, 5/1/13 Designation of Successor Trustee. On October 14, 2017, Dallas then revoked the designation of Dakota as successor Trustee, designating Frost Bank as his successor in a formal Designation of Successor Trustee:

> Pursuant to Article V, Section C of the Trust Declaration, Dallas Joseph Fontenot, Jr. removes all prior appointments of appoints Dakota James Fontenot as successor Trustee and, instead, appoints Frost Bank to serve as successor Trustee upon the death, disability, resignation, or disqualification of Dallas Joseph Fontenot, Jr.

*See* Exhibit 4, 10/14/17 Designation of Successor Trustee.

16.     At the same time, Dallas removed Dakota as officer of Viva Las Vegas Properties, Inc., among other entities. *See* Exhibit 5, 10/14/17 Resolutions Adopted by Consent of the Shareholder and Director of Viva Las Vegas Properties, Inc. The Dakota Trust owns 100% of the stock of Viva Las Vegas Properties, Inc. (*see* Exhibit 6) and accordingly the Trustee of the Dakota Trust is the sole shareholder for Viva Las Vegas Properties, Inc.

> ESOLVED that Dakota Fontenot is hereby removed from all offices and all positions as a Director of Viva Las Vegas Properties, Inc. from and after October 14, 2017.

*See* Exhibit 5, 10/14/17 Resolutions Adopted by Consent of the Shareholder and Director of Viva Las Vegas Properties, Inc.

4

35034788.v1

17.     Dakota is not a named successor trustee in the Trust Agreement for the Dakota Trust, and the only document that purports to give him any claim to the trustee position was revoked in October 2017. Upon Dallas's death in 2021, a vacancy in the trustee position was created, and Frost Bank was the named successor trustee in the 2017 Designation of Successor Trustee. Neither Dallas, nor Frost Bank, ever executed any other document that would appoint Dakota as successor trustee.

18.     Despite the lack of authority, Dakota currently purports to serve as Trustee of the Dakota Trust and director/officer of Viva Las Vegas Properties, Inc. To support his claimed status as Trustee, Dakota now asserts that the October 14, 2017 Designation of Successor Trustee is "invalid as a forgery and/or revoked document." *See* Dakota's Amended Answer and Counterclaim, ¶ 12. Dakota has not, and cannot, produce any document that would validly appoint him as successor trustee of the Dakota Trust. As Dakota's purported authority to act on behalf of Viva Las Vegas Properties, Inc. stems from actions he invalidly took as purported trustee, he likewise has no authority to act on behalf of Viva Las Vegas Properties, Inc.[1]

19.     Dakota, however, not only claims to be the Trustee of the Dakota Trust and the officer and director of Viva Las Vegas Properties, Inc., but Dakota claims that he is the "only current beneficiary of the Dakota Trust." *See* Dakota's First Amended Answer and Counterclaim, ¶ 14. However, the terms of the Dakota Trust dictate that Joe and Michelle are 2/3 beneficiaries of the Dakota Trust. After Dallas's death in 2021, Dakota sought to probate Dallas's 2013 Will, and Holli sought to probate Dallas's 2013 Will and 2017 Codicil. Dakota claimed that the 2017 Codicil was a forgery or was the product of undue influence. Dakota also initiated litigation regarding the

---

[1] After hearing on an Application for Temporary Injunction filed by the Holli Ann Hardin Trust Trustee, and partially joined by Joe and Michelle, the Court granted a Temporary Injunction enjoining Dakota from selling the real property held by Viva Las Vegas Properties, Inc.

5

Holli Ann Hardin Trust Number One, seeking a declaratory judgment and appointment of a successor trustee of the Holli Ann Hardin Trust Number One. The parties settled both the Estate and Trust litigation on January 7, 2022. Dallas's 2013 Will and 2017 Codicil were admitted to probate, and Holli was appointed Independent Executor of Dallas's Estate. *See* Exhibit 7, Order Admitting Will and Codicil to Probate.

20.     As part of the Settlement Agreement, Holli's interest in both the Holli Ann Hardin Trust Number One and the Dakota Trust Number One were bought out, and Holli disclaimed her interest in these Trusts. *See* Exhibit 8, Assignment of Interest and Disclaimer of Further Interest ("Holli Ann Fontenot disclaims any right to further interest in the Dakota Trust.").

21.     Pursuant to the terms of the Dakota Trust, upon Holli's death, absent Dallas's exercise of a power of appointment, the Trust property passes to the descendants of Holli Hardin Fontenot and to the descendants of Dallas Joseph Fontenot, Jr., *per stirpes*:

> 3.  Dallas Joseph Fontenot, Jr., by a clause in his Will in which he specifically exercises this power of appointment, shall have the power to appoint the trust assets remaining upon the death of Holli Hardin Fontenot to or for the benefit of any one or more of the descendants of Dallas Joseph Fontenot, Jr. or the descendants of Holli Hardin Fontenot, in such shares, proportions, or amounts, upon such trusts and for such estates as he alone may determine. If Dallas Joseph Fontenot, Jr. fails to exercise this special power of appointment to the fullest extent, then, subject to the other provisions of this Trust, upon his death, the unappointed trust assets shall be delivered to the living descendants of Holli Hardin Fontenot and to the living descendants of Dallas Joseph Fontenot, Jr., per stirpes.

*See* Exhibit 1, Article VI, Section D.3. *See also* Article IV, Section E ("For example, if a distribution were to be made to the descendants, *per stirpes*, of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot, assuming the recitations in Article I, the property to be distributed would

6

35034788.v1

be divided into three equal shares, one for each of Dallas Joseph Fontenot, III, Michelle Anne Fontenot, and Dakota James Fontenot.").

22.     As he testified at the injunction hearing, Dakota, purportedly believing himself to be the acting Trustee and sole beneficiary of the Dakota Trust, has recently sold property located belonging to Viva Las Vegas Properties, Inc. and deposited all of the proceeds into a personal bank account, and subsequently depleted the proceeds for his own personal obligations. He did not notify Michelle or Joe about the sale of the property, and inappropriately accepted all of the proceeds for himself, sharing none with the other beneficiaries.

23.     As a result of Dakota's actions and baseless claims, and Joe and Michelle bring this action for damages, declaratory judgments, and to prevent further breaches of trust.

***The Holli Ann Hardin Trust Number One***

24.     The Holli Ann Hardin Trust Number One was created on June 5, 1991. *See* Exhibit 12, Holli Ann Hardin Trust Number One Trust Declaration. Disputes arose after the death of Dallas Fontenot, Junior, relating to his Estate and the Holli Ann Hardin Trust Number One. As discussed *supra*, the parties entered into a Binding Mediated Settlement Agreement on January 7, 2022 to resolve these disputes. *See* Exhibit 13, Binding Mediated Settlement Agreement.

25.     As part of the Settlement Agreement, the parties agreed that Dakota would receive "[a]ll interest, including all associated bank accounts, in Entertainment Marketing and Management, LP," which had a value of $10,000 according to the Temporary Administrator, Gus Tamborello's Inventory. *Id.* at ¶ 4; Exhibit 14, 11/23/21 Inventory and List of Claims; Exhibit 15, 1/25/22 Order Approving Inventory and List of Claims.

26.     Trusting that Dakota would treat them fairly and had their best interests at heart, Joe and Michelle also agreed to have Dakota appointed as Officer and/or Director of Ice Embassy,

7

Inc. and HFR Enterprises, Inc., the entities owned by the Holli Ann Hardin Trust Number One. *See* Exhibit 13, Binding Mediated Settlement Agreement, ¶ 9.

27. The Binding Mediated Settlement Agreement also provides that Dakota would remain employed by "the businesses owned by the Holli Ann Hardin Trust Number One," but "[t]he compensation amount that Dakota [] ha[s] been receiving shall remain unchanged." *See id.* at ¶ 9.

28. As discussed in Plaintiff Linda Goehrs' Original Petition, during the years in which Dakota was responsible for managing Ice Embassy and HFR Enterprises, the entities appeared to experience a significant loss in value, while Dakota ensured that he received significant compensation increases. For example, Dakota entered into a Management Agreement on behalf of Ice Embassy with EMM, an entity that he owned, whereby EMM would receive $17,500 per month, with a true-up at the end of each year to 10% of the gross revenue for the Club. *See* Exhibit 16, 1/1/24 Management Agreement. Dakota also entered into an Administrative Services Agreement on behalf of HFR, whereby EMM would receive less than a thousand dollars per month for 2021 and 2022, but then in 2023 and beyond would receive $1,850 per month. *See* Exhibit 17, 1/1/24 Administrative Services Agreement.

29. In May of 2025, after repeated requests for information regarding the Holli Ann Hardin Trust Number One assets, Michelle and Joe learned for the first time that Dakota had allowed the entities to fall behind on payments under the note used to buy out Holli's interest for *seven months*. The note was guaranteed by the Holli Ann Hardin Trust Number One assets, and the lender threatened to foreclose on the note if a sale of the assets was not made.

30. Unbeknownst to Michelle and Joe, Dakota had been negotiating a sale of Ice Embassy and the real property owned by HFR to remedy the note default that he allowed for seven

35034788.v1

months while he continued receiving a substantial salary. Dakota and the Trustee closed on the sale of Ice Embassy and the real property owned by HFR in June of 2025. The initial sales price for the stock of Ice Embassy was $250,000 and $4,750,000 for the HFR real property. However, due to additional Ice Embassy debts that Dakota had allowed to accrue that exceeded the Ice Embassy stock sales price, the HFR real property sales price was reduced to $4,689,424.72. *See* Exhibit 18, 6/27/25 Amendment to Real Estate Purchase Agreement.

31.     After the closing of the Ice Embassy and HFR real property transactions, Michelle and Joe were once again blindsided by Dakota's wrongdoing. Dakota had apparently reached a side agreement with the purchasers of the Ice Embassy stock and HFR real property for the purchase of the EMM partnership interests. *See* Exhibit 19, Partnership Interest Purchase Agreement. EMM, an entity with no real assets (as acknowledged by the buyers' counsel), was sold for $2,750,000. *Id.*; *see also* Exhibit 20, 5/8/25 Email from Buyers' Counsel ("the only assets of any consequence in the Partnership (as I understand it) are the Administrative Services Agreement ("ASA") and any goodwill associated with the Partnership's management business activities."). EMM's financial records reflect that it was insolvent as of December 31, 2024, the entity was insolvent, and its only contractual rights to future income could be terminated by Ice or HFR for any reason with thirty days' notice. *See* Exhibit 16, at 3.01(a), Exhibit 17, at 8.2; Exhibit 21, 12/31/24 Balance Sheet; Exhibit 22, 4/30/25 Balance Sheet. Inexplicably, Dakota sold EMM— a shell company—for $2,750,000 *payable to him personally!* in connection with the sale of the Ice Embassy stock and HFR real property, demonstrating a clear diversion of Trust assets away from the Holli Ann Hardin Trust Number One, Michelle, and Joe. To make matters worse, Dakota obligated both assets belonging to Ice Embassy (any monetary award from Ice Embassy credit card fee class action litigation) and the escrow amount from the HFR real property sale for any of

9

35034788.v1

the buyers' losses *before* the sellers could withhold payments owed to Dakota under the EMM agreement, such that Ice Embassy assets and the escrow amount that should ultimately belong to the Holli Ann Hardin Trust Number One will bear the cost of any of 1) EMM's obligations incurred before the closing, 2) any fraud, intentional misrepresentation, willful misconduct, criminal act, bad faith, or gross negligence of Dakota in connection with the EMM agreement, 3) any breach of or inaccuracy in any representation or warranty made by Dakota in the EMM agreement, and 4) any breach or non-fulfillment of any covenant or agreement of Dakota in the EMM agreement. *See* Exhibit 19, at 8.2 and 8.3.

32.    Moreover, Dakota also included Ice Embassy assets as "Excluded Assets" for the EMM partnership Interest Purchase Agreement in an attempt to divert more Trust property to himself personally. *See* Exhibit 19.

33.    Recently, Dakota has revealed that after wrongfully diverting millions of dollars to himself through the EMM Agreement, he and his wife, Madison, then created an entity in the U.S. Virgin Islands called Emerald Island Holdings, LLC and used the entity to purchase a home for approximately $2.4 million with the wrongfully acquired proceeds pursuant to the EMM Agreement. Dakota and Madison then transferred the entity to Madison's parents, Amir Shenaq and Sheila Shenaq, allegedly in exchange for a cancellation of an unidentified debt. All the while, Dakota and Madison continued to treat the $2.4 million U.S. Virgin Islands home as their own, storing their furniture and personal effects in the home and assisting with remodeling the home.

34.    Unfortunately, Dakota's brazen fraudulent behavior didn't stop there. During the second day of the Temporary Injunction hearing, Dakota revealed that *the day before* the Temporary Injunction hearing was set to take place seeking to secure the remaining installment payments to avoid any further dissipation by Dakota, he signed a release of any rights to future

10

35034788.v1

installment payments (a value of approximately $937,500) in exchange for a reduced lump sum payment of $575,000—giving up $362,500 in an attempt to avoid an injunction that would prevent him from receiving any further payments. Dakota received a wire for the $575,000 lump sum payment *during the Temporary Injunction hearing on March 6, 2026*, and wired the money to an account in Madison's name the same day. Madison then apparently began transferring the money, including to her parents or an entity they control for an alleged "lease" of the $2.4 million U.S. Virgin Islands home.

35.      As a result of Dakota's shocking and undisclosed diversion of funds and assets to himself through the EMM Agreement, and Dakota and Madison's fraudulent transfers of these assets, Michelle and Joe bring this action for damages and equitable relief.

### CAUSES OF ACTION

### AMENDED APPLICATION FOR RELIEF UNDER TEXAS PROPERTY CODE § 114.008

36.      Michelle and Joe incorporate by reference paragraphs 12 through 22 as though fully set forth herein.

37.      Texas Property Code § 114.008 gives the Court broad authority to remedy a breach of trust that has occurred or might occur. As explained *supra*, Dakota has no authority to act on behalf of the Dakota Trust. Numerous breaches of trust have occurred and will continue to occur if Dakota continues to act without proper authority.

38.      As Dakota's designation as successor trustee was revoked in 2017, Dakota is not validly serving as Trustee of the Dakota Trust. Any actions he has taken as purported Trustee of the Dakota Trust are invalid and ineffective.

39.      Importantly, Dakota cannot become the Trustee of the Dakota Trust by some equitable doctrine of waiver or consent. *See Alpert v. Riley*, 274 S.W.3d 277 (Tex. App.—Houston

11

35034788.v1

[1st Dist.] 2008, pet. denied) ("We have not located, and Riley does not identify, any authority that recognizes a trustee by estoppel in the presence of express trust language outlining the procedure for appointment of a successor trustee...Texas law prohibits the equitable rule proposed by Riley for other reasons as well. The Texas Trust Code requires adherence to the trustee selection method prescribed in the trust instrument, which necessarily forecloses the exercise of equitable discretion unless that method fails.") (citing TEX. PROP. CODE § 113.083).

40.   The Texas Property Code authorizes the Court to issue an injunction to remedy a breach of trust that has occurred or might occur. TEX. PROP. CODE § 114.008; *see also Matter of Bumstead Family Irrevocable Trust*, 2022 WL 710159 (Tex. App.—Corpus Christi-Edinburg March 10, 2022, pet. denied) (affirming trial court temporary injunction that enjoined an individual from acting as trustee and appointed a receiver when the validity of the purported trustee's appointment was at issue). Dakota taking any action on behalf of the Dakota Trust would be a further breach of trust, as he has no authority to act under the terms of the Trust agreement and subsequent designations of successor trustees.

41.   Similarly, Dakota has no authority to act on behalf of Viva Las Vegas Properties, Inc. Dallas removed Dakota as an officer and/or director of Viva Las Vegas Properties, Inc. on October 14, 2017. *See* Exhibit 5, 10/14/17 Resolutions Adopted by Written Consent of Shareholder.

42.   The only documents Dakota has produced that would purport to give him authority to act on behalf of Viva Las Vegas Properties, Inc. are documents that he executed as purported trustee in May of 2023. *See* Exhibit 9, 5/19/23 Purported Unanimous Joint Written Consent of Viva Las Vegas Properties, Inc. However, as discussed *supra*, Dakota is not validly serving as the trustee of the Dakota Trust. Therefore, he had no authority to execute these Viva Las Vegas Properties,

12

35034788.v1

Inc. corporate governance documents that he relies upon for authority to act on behalf of Viva Las Vegas Properties, Inc. As a result, Dakota was not validly appointed officer and director of Viva Las Vegas Properties, Inc. and he has no authority to take action on its behalf, including selling real property and accessing funds belonging to Viva Las Vegas Properties, Inc. To the extent necessary, Joe and Michelle request that the Court void the execution of the May 19, 2023 Purported Unanimous Joint Written Consent of Viva Las Vegas Properties, Inc. under Texas Property Code § 114.008(a)(9).

43. Accordingly, Joe and Michelle request that the Court order the following relief under Texas Property Code § 114.008:

a. enjoin Dakota from acting as trustee on behalf of the Dakota Trust (TEX. PROP. CODE § 114.008(a)(2));

b. compel Dakota to redress a breach of trust, including ordering Dakota to pay the proceeds of the sale of Trust property to the Trust (TEX. PROP. CODE § 114.008(a)(3));

c. appoint a receiver to take possession of the trust property and administer the trust (TEX. PROP. CODE § 114.008(a)(5));

d. suspend or remove Dakota as trustee, to the extent necessary (TEX. PROP. CODE § 114.008(a)(6)–(7));

e. void the execution of the May 19, 2023 Purported Unanimous Joint Written Consent of Viva Las Vegas Properties, Inc. (TEX. PROP. CODE § 114.008(a)(9)); and/or

13

35034788.v1

f. impose a lien and/or constructive trust on any property Dakota received that belonged to the Dakota Trust, including but not limited to the sales proceeds from the sale of 3400 Old Richmond Road (TEX. PROP. CODE § 114.008(a)(9)).

**DECLARATORY JUDGMENT – JOE AND MICHELLE ARE EACH 1/3 BENEFICIARIES OF THE DAKOTA TRUST**

44. Michelle and Joe incorporate by reference paragraphs 12 through 22 as though fully set forth herein.

45. An interested person in the administration of a trust may bring suit for a "declaration of rights or legal relations in respect to the trust…to determine any question arising in the administration of the trust, including questions of construction of wills and other writings." TEX. CIV. PRAC. & REM. CODE § 37.005.

46. As discussed *supra*, as Holli no longer has any interest in the Dakota Trust. *See* Exhibit 7, Assignment of Interest and Disclaimer of Further Interest. As Holli no longer has any interest in the Dakota Trust and has released nay and all interest effective January 2023, Michelle and Joe are at least the two-thirds beneficiaries of the Dakota Trust.

47. Dakota disputes Michelle and Joe's status as beneficiaries of the Dakota Trust, and instead claims he is the sole beneficiary of the Dakota Trust. Dakota, believes, however, without any authority, that he is the sole beneficiary of the Dakota Trust, despite the lack of any document that would alter Michelle and Joe's status as beneficiaries. Dakota has relied upon Section 3.2 of Dallas's Last Will and Testament for his claim to be the sole beneficiary; however, Section 3.2 of Dallas's Last Will and Testament was revoked by Dallas's First Codicil, which was admitted to probate. *See* Exhibit 10, Last Will and Testament; Exhibit 11, First Codicil; Exhibit 7, Order Admitting Will and Codicil to Probate.

14

48.     Accordingly, Michelle and Joe request that the Court issue a declaratory judgment that Michelle and Joe are each 1/3 beneficiaries of the Dakota Trust.

**DECLARATORY JUDGMENT – JOE IS SUCCESSOR TRUSTEE OF THE DAKOTA TRUST**

49.     Michelle and Joe incorporate by reference paragraphs 12 through 22 as though fully set forth herein.

50.     An interested person in the administration of a trust may bring suit for a "declaration of rights or legal relations in respect to the trust…to determine any question arising in the administration of the trust, including questions of construction of wills and other writings." TEX. CIV. PRAC. & REM. CODE § 37.005.

51.     On October 14, 2017, Dallas Fontenot designated Frost Bank as his successor trustee. *See* Exhibit 4, 10/14/17 Designation of Successor Trustee. Frost Bank has failed to serve, and has executed a formal declination to serve as trustee of the Dakota Trust. Under the trustee succession provisions contained in the original Trust Agreement, Joe is the next named successor trustee and is prepared to serve as such. However, given the controversy created by Dakota claiming to be the Trustee and sole beneficiary, Joe and Michelle seek a declaration that Joe is the successor trustee of the Dakota Trust.

**APPLICATION TO FILL TRUSTEE VACANCY UNDER TEXAS PROPERTY CODE § 113.083**

52.     Michelle and Joe incorporate by reference paragraphs 12 through 22 as though fully set forth herein.

53.     As the trust instrument confirms, Joe is the successor trustee of the Dakota Trust, Michelle and Joe ask the Court to fill the trustee vacancy under Texas Property Code § 113.083. Upon information and belief, Frost is not serving as successor trustee and does not intend to serve as successor trustee.

15

35034788.v1

54. Under Texas Property Code § 113.083, on the death, resignation, incapacity, or removal of a sole or surviving trustee, a successor trustee shall be selected according to the method, if any, prescribed in the trust instrument. TEX. PROP. CODE § 113.083(a). "If for any reason a successor is not selected under the terms of the trust instrument, a court may and on petition of any interested person shall appoint a successor in whom the trust shall vest." *Id.*

55. As described *supra*, Dakota is not the Trustee of the Dakota Trust, and Michelle and Joe believe that the Trust Agreement provides that Joe is the successor trustee. As there is a vacancy in the trustee position, Michelle and Joe therefore request the Court fill the vacancy and appoint Joe to serve as successor Trustee.

**MISAPPROPRIATION OF TRUST ASSETS**

56. Michelle and Joe incorporate by reference paragraphs 12 through 22 as though fully set forth herein.

57. Dakota sold property held in an entity of which the Dakota Trust is the 100% owner, without any authority. Under Texas Property Code § 114.031, a beneficiary is liable for loss to the trust if the beneficiary has misappropriated or otherwise wrongfully dealt with the trust property or failed to repay a distribution or disbursement from the trust in excess of that to which the beneficiary is entitled. *See* TEX. PROP. CODE § 114.031(a)(1), (4). Dakota has misappropriated trust assets and accordingly, the trustee may offset his liability to the trust estate against his interest in the trust estate. Michelle and Joe bring this claim for misappropriation of trust assets as beneficiaries of the Dakota Trust derivatively on behalf of the Dakota Trust.

**UNJUST ENRICHMENT**

58. Michelle and Joe incorporate by reference paragraphs 12 through 22 as though fully set forth herein.

16

35034788.v1

59.      Dakota received all of the sales proceeds of property belonging to an entity held by the Dakota Trust, of which he is only a 1/3 beneficiary. As a result, he has been unjustly enriched by receiving a benefit that would be unconscionable to retain. Accordingly, Michelle and Joe bring this claim for unjust enrichment derivatively on behalf of the Dakota Trust. Any future distributions to Dakota from the Dakota Trust should be offset by the amounts he has already received. *See* TEX. PROP. CODE § 114.031(b).

**MONEY HAD AND RECEIVED**

60.      Michelle and Joe incorporate by reference paragraphs 12 through 22 as though fully set forth herein.

61.      As a result of the sale of the property located at 3400 Old Richmond Road, Dakota holds funds which, in equity and good conscience, belong to the Dakota Trust. The Dakota Trust has suffered damages as a result of Dakota's inequitable conduct. Accordingly, Michelle and Joe bring this claim for money had and received derivatively on behalf of the Dakota Trust. Any future distributions to Dakota from the Dakota Trust should be offset by the amounts he has already received. *See* TEX. PROP. CODE § 114.031(b).

**BREACH OF FIDUCIARY DUTY**

62.      Michelle and Joe incorporate by reference paragraphs 23 through 35 as though fully set forth herein.

63.      To prevail on a breach of fiduciary duty claim, a plaintiff must prove that (1) there is a fiduciary relationship between the plaintiff and defendant, (2) the defendant breached their fiduciary duty to the plaintiff, and (3) the breach resulted in an injury to the plaintiff or benefit to the defendant. *Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.] 2008, pet. denied).

17

35034788.v1

64.     In addition to a formal fiduciary relationship, an informal fiduciary duty can also arise based on a moral, social, domestic, or purely personal relationship of trust and confidence. *See Tex. Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 507–08 (Tex. 1980) (recognizing the existence of an informal fiduciary relationship in those cases "in which influence has been acquired and abused, in which confidence has been reposed and betrayed."); *Siddiqui v. Fancy Bites, LLC*, 504 S.W.3d 349, 365 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). When one family member "is accustomed to being guided by the judgment or advice of another or is justified in believing one will act in the best interest of another because of a family relationship, a confidential relationship may arise." *Garcia v. Vera*, 342 S.W.3d 721, 724 (Tex. App.—El Paso 2011, no pet.). Factors considered in determining when an informal fiduciary relationship exists include whether the plaintiff relied on the defendant for support, the plaintiff's age and health, and evidence of the plaintiff's trust. *Young v. Fawcett*, 376 S.W.3d 209, 215 (Tex. App.—Beaumont 2012, no pet.).

65.     Here, an informal fiduciary relationship existed between Michelle, Joe, and Dakota. Michelle and Joe relied on Dakota and trusted that he would act in their best interests when agreeing to his appointment as officer and director of the Holli Ann Hardin Trust Number One entities. As a fiduciary, Dakota owed Michelle and Joe the duty of loyalty and utmost good faith, the duty of candor, the duty to refrain from self-dealing, which extends to dealings with a fiduciary's spouse, agents, employees, and other persons whose interests are closely identified with those of the fiduciary, the duty to act with integrity of the strictest kind, the duty of fair, honest dealing, and the duty of full disclosure. *See Miller v. Lucas*, No. 02-13-00298-CV, 2015 WL 2437887 (Tex. App.—Fort Worth May 21, 2015, pet. denied). Dakota breached these fiduciary duties with his countless actions to benefit himself at the expense of Michelle, Joe, and the Holli Ann Hardin Trust Number One.

18

35034788.v1

66.     Accordingly, Michelle and Joe seek relief for Dakota's breach of his fiduciary duties, including monetary damages, a constructive trust over any assets or funds received in connection with the sale of EMM, and disgorgement of any fees.

**UNJUST ENRICHMENT: SALE OF EMM**

67.     Michelle and Joe incorporate by reference paragraphs 23 through 35 as though fully set forth herein.

68.     As a result of Dakota's diversion of proceeds to himself, he has been unjustly enriched by receiving a benefit that would be unconscionable to retain. Accordingly, Michelle and Joe bring this claim for unjust enrichment.

**MONEY HAD AND RECEIVED: SALE OF EMM**

69.     Michelle and Joe incorporate by reference paragraphs 23 through 35 as though fully set forth herein.

70.     As a result of Dakota's wrongdoing and misappropriation of assets, Dakota holds funds and assets which, in good conscience, belong to Michelle, Joe, and/or the Holli Ann Hardin Trust Number One. Michelle, Joe, and/or the Holli Ann Hardin Trust Number One have suffered damages as a result of Dakota's inequitable conduct. Accordingly, Michelle and Joe bring this claim for money had and received.

**FRAUDULENT TRANSFERS AND CONVEYANCES: TEXAS UNIFORM FRAUDULENT TRANSFER ACT §§ 24.005 AND 24.006**

71.     Michelle and Joe incorporate by reference paragraphs 23 through 35 as though fully set forth herein.

72.     The Texas Uniform Fraudulent Transfer Acts' ("TUFTA") overriding goal is to protect creditors, such as Michelle, Joe, and the Holli Ann Hardin Trust Number One, from being defrauded or left without recourse due to a debtor's unscrupulous actions. TUFTA also allows

19

35034788.v1

creditors to sue third parties who received a fraudulent transfer to void the transaction and recover its losses.

73.     Dakota is a debtor because he is a person who is liable on a claim.

74.     Michelle and Joe are creditors because they have a claim, which TUFTA broadly defines as a right to payment or property, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.

75.     A transfer is fraudulent if, among other things, it was made with actual intent to hinder, delay, or defraud any of the debtor's creditors. Badges of fraud shed light on whether a debtor made a transfer with the requisite fraudulent intent.

76.     Transfers can also be constructively fraudulent if the debtor made a transfer without receiving a reasonably equivalent value.

77.     Dakota and Madison's transfers to insiders—their own family members or entities controlled by their family members—qualify as fraudulent and impermissible transfers under TUFTA. Dakota and Madison's transfers were made with actual intent to hinder, delay, and/or defraud Michelle and Joe. This intent is amply demonstrated by the evidence and circumstances surrounding the transfers, including, without limitation, the following:

a.  The transfers were to insiders;

b.  Dakota and Madison retained possession or control of the property transferred after the transfer;

c.  Dakota and Madison concealed the circumstances and nature of the transfers;

d.  The transfers were made during the pendency of this litigation, and on the eve of a Temporary Injunction hearing regarding the assets transferred; and

20

35034788.v1

e.    The transfers were of substantially all of their assets, and Dakota was insolvent. When there is a concurrence of badges, as here, they make a strong case of fraud. Dakota and Madison's above-referenced actions violated section 24.005(a)(1).

78.    Under section 24.005(a)(2), a transfer made by a debtor is fraudulent as to a creditor, if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due. Dakota and Madison made transfers to insiders without receiving reasonably equivalent value in exchange for the transfers, at a time when Dakota has admitted he was incurring debts beyond his ability to pay as they became due.

79.    Further, Dakota and Madison's transfers were fraudulent under section 24.006, as they were made without receiving reasonably equivalent value in exchange for the transfer and Dakota was insolvent or became insolvent as a result of the transfer; and/or the transfers were made to an insider for an antecedent debt, Dakota was insolvent at the time of the transfer, and the insider had reasonable cause to believe that Dakota was insolvent.

80.    Michelle and Joe therefore seek all remedies available to them for Dakota and Madison's fraudulent transfers, including avoidance of the transfers and obligations, attachment against the assets transferred, and judgment against Dakota and Madison for the value of the assets transferred or in an amount necessary to satisfy Michelle and Joe's claims. Michelle and Joe also request that the Court award it exemplary damages, costs, and reasonable attorneys' fees.

CONSPIRACY

81.    Michelle and Joe incorporate by reference paragraphs 23 through 35 as though fully set forth herein.

21

82. As part of Dakota's diversion of funds to himself and misappropriation of assets, Dakota and Madison also engaged in a conspiracy to conceal assets defraud Michelle and Joe.

83. Dakota and Madison conspired to accomplish and unlawful purpose, had a meeting of the minds on the object or course of action, and Dakota and/or Madison committed an unlawful, overt act to further the object or course of action. Michelle, Joe, and/or the Holli Ann Hardin Trust have suffered damages as a result, and accordingly Michelle and Joe bring this action for conspiracy against Dakota and Madison.

## ATTORNEYS' FEES

84. Michelle and Joe seek their reasonable and necessary attorneys' fees under all applicable authority, including Section 37.009 of the Texas Civil Practice and Remedies Code, Section 114.064 of the Texas Property Code, and Section 24.013 of the Texas Business and Commerce Code.

## APPLICATION FOR TEMPORARY INJUNCTIVE RELIEF

85. Michelle and Joe incorporate the preceding paragraphs as though fully set forth herein.

86. Pursuant to Texas Rule of Civil Procedure 680, to prevent irreparable harm in the interim, Michelle and Joe request that the Court issue immediate injunctive relief.

87. The issuance of temporary injunctions are intended "to maintain the status quo between the parties." *Cannan v. Green Oaks Apts., Ltd.*, 758 S.W.2d 753, 755 (Tex. 1988); *see also Clint Indep. Sch. Dist. v. Marquez*, 487 S.W.3d 538, 556 n.12 (Tex. 2026). As a general matter, in order to obtain a temporary injunction, the applicant "must plead and prove that it (1) has a cause of action against the opposing party; (2) has a probable right of relief on final trial to the relief sought; and (3) faces probable, imminent, and irreparable injury in the interim." *Clark v.*

22

35034788.v1

*Hastings Equity Partners, LLC*, 651 S.W.3d 359, 366 (Tex. App.—Houston [1st Dist.] 2022, no pet.). At this stage, the applicant "is not required to establish that the applicant will prevail on final trial." *Clark v. Clark*, 638 S.W.3d 829, 840 (Tex. App.—Houston [14th Dist.] 2021, no pet.). "The decision to grant or deny a temporary injunction lies in the sound discretion of the trial court, and the court's grant or denial is subject to reversal only for a clear abuse of that discretion." *Pidgeon v. Turner*, 625 S.W.3d 583, 606 (Tex. App.—Houston [14th Dist.] 2021). The court's discretion is not abused where the Court "applies the law correctly and some evidence reasonably supports its ruling." *Id.*

88.    Additionally, in an action involving fraudulent transfer claims under the Texas Uniform Fraudulent Transfer Act, a creditor may obtain "an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property, appointment of a receiver to take charge of the asset transferred or of other property of the transferee, or any other relief the circumstances may require." TEX. BUS. & COM. CODE § 24.008.

**A. Michelle and Joe have causes of action against Dakota for breach of fiduciary duty, money had and received, and unjust enrichment.**

89.    As shown through the allegations above, Michelle and Joe have several viable causes of action against Dakota individually and as an informal fiduciary to Michelle and Joe relating to his actions in diverting funds to himself through the sale of EMM. Michelle and Joe plead causes of action for breach of fiduciary duty, unjust enrichment, money had and received, fraudulent transfer, and conspiracy. Therefore, Michelle and Joe have satisfied this element of their entitlement to injunctive relief.

**B. Michelle and Joe are likely to succeed on the merits of their cause of action.**

90.    The applicant "must establish a likelihood of success on the merits of the party's claims in order to obtain injunctive relief." *Courtright v. Allied Custom Homes, Inc.*, 647 S.W.3d

23

504, 519 (Tex. App.—Houston [1st Dist.] 2022, pet. denied). This element is satisfied where an applicant "produce[s] some evidence supporting every element of at least one valid legal theory." *31 Holdings I, LLC v. Argonaut Ins. Co.*, 640 S.W.3d 915, 923 (Tex. App.—Dallas 2022, no pet.); *see also Cameron Intern. Corp. v. Guillory*, 445 S.W.3d 840, 846 (Tex. App.—Houston [1st Dist.] 2014, no pet.). In other words, "[a] probable right of recovery is shown by alleging a cause of action and presenting evidence tending to sustain it." *Draper v. City of Arlington*, 629 S.W.3d 777, 784 (Tex. App.—Fort Worth 2021, pet. denied).

91.     As discussed *supra*, Dakota has received or will receive millions of dollars at the expense of Michelle and Joe. As an informal fiduciary, Dakota owed Michelle and Joe the highest duty of good faith, fair dealing, honest performance, and strict accountability. Dakota breached these duties and inequitably received benefits at Michelle and Joe's expense. The evidence attached to this pleading as Exhibits 12 through 22 support a finding that Michelle and Joe are likely to succeed on the merits.

**C. Michelle and Joe face probable, imminent, and irreparable injury in the interim.**

92.     Courts have held an injury is irreparable when, as here, "the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 024 (Tex. 2002). Michelle and Joe have no adequate remedy at law for Dakota's wrongful actions. *See Sharma v. Vinman Int'l, Ltd.*, 231 S.W.3d 405, 426–27 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Specifically, Dakota has established and demonstrated a propensity to hide money through illicit transaction, utilizing shell companies and directing money in a way that will be difficult to trace. Further, upon information and belief, Dakota may be insolvent or become judgment proof upon an award of the damages incurred by Michelle and Joe. As Dakota has previously testified, he used the funds from

24

the sale of the Dakota Trust real property to pay off certain "obligations," and would be unable to return those funds—an amount significantly less than the millions of dollars currently at issue, and within six months of receiving close to two million dollars between the sale of the Dakota Trust real property and sale of EMM. Michelle and Joe will be irreparably harmed if Dakota retains his control over and unlimited access to the proceeds from the sale of EMM, some of which are still forthcoming. *See Hartwell v. Lone Star, PCA*, 528 S.W.3d 750 (Tex. App.—Texarkana 2017, pet dism'd) (where borrower in default and evidence showed he could not repay loan, irreparable injury found); *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 611 (Tex. App.—Houston [1st Dist.] 2002, no pet.); *Blackthorne v. Bellush*, 61 S.W.3d 439, 444 (Tex. App.—San Antonio 2001, no pet.) (plaintiff does not have adequate remedy at law if defendant is insolvent).

**D. Requested Injunctive Relief**

93. Michelle and Joe have satisfied the elements necessary to establish their right to injunctive relief. Michelle and Joe respectfully request that the Court issue a Temporary Injunction and maintain the Temporary Injunction in place until a final trial on the merits. Michelle and Joe request an order by this Court restraining Dakota as follows:

   a. Within fifteen days of the date of the Court's order, Dakota Fontenot and his officers, agents, servants, employees, attorneys, and any person in active concert or participation with him who receives actual notice of the Order, are ordered to deposit $2,174,500 (all proceeds received under the EMM Agreement) in the registry of the Court;

   b. Dakota Fontenot and Madison Fontenot, their officers, agents, servants, employees, attorneys, and any person in active concert with them who receive actual notice of this order by personal service or otherwise, are prohibited from spending, transferring, distributing, encumbering, pledging, or assigning any proceeds or assets held in any bank account in either of their names at any financial institution;

   c. Dakota Fontenot, his officers, agents, servants, employees, attorneys, and any person in active concert or participation with him who receives actual notice of this

35034788.v1

order by personal service or otherwise, are restrained from spending, transferring, distributing, encumbering, pledging, or assigning any proceeds or assets traceable to any payments for the sale of BFD GP, LLC, BFD LP, LLC, Emerald Islands, LLC, and Entertainment Marketing & Management, Ltd., as well as any subsidiaries, successor entities, assigns, or transferees, including any payments made pursuant to the Partnership Interest Purchase Agreement;

d. Dakota Fontenot, Colorado Rose, LLC, Cle Group SKZ Real Estate, LLC, including each of their agents, officers, members, affiliates, and assignees, shall be required to deposit any payments received under the Partnership Interest Purchase Agreement and any amendments or supplements thereto, and any future amounts payable to Dakota Fontenot under the Partnership Interest Purchase Agreement and any amendments or supplements thereto, into the registry of the Court, including payments pursuant to Section 1.2(a)(ii) and 1.2(a)(iii) of the Partnership Interest Purchase Agreement;

e. Dakota Fontenot is restrained from spending, transferring, distributing, or assigning any proceeds or assets traceable to proceeds from the sale of Entertainment Marketing & Management, Ltd.;

f. All accounts in Dakota's care, custody, or control pertaining to or otherwise holding assets or proceeds received from the sale of Entertainment Marketing & Management, Ltd. shall be frozen; and

g. Dakota Fontenot is ordered to account for all proceeds received from the sale of Entertainment Marketing & Management, Ltd.

94.     Michelle and Joe will suffer irreparable injury, loss, or damage if injunctive relief is not immediately granted. A temporary injunction should issue, and Michelle and Joe should only be required to post a minimal bond, if any, to preserve the status quo. Michelle and Joe ask the Court to promptly set an evidentiary hearing to consider the issuance of a temporary injunction against Dakota.

## PRAYER

Michelle Fontenot and Dallas Joseph Fontenot III, request that Dakota Fontenot be cited to appear and answer herein, and after proper consideration by the Court, they be subject to orders and judgment of the Court as follows:

a. Equitable relief under Texas Property Code § 114.008 as specified above;

26

35034788.v1

b.  Equitable relief in the form of a temporary injunction as specified above;

c.  Declaratory judgments that:

    a.  Joe and Michelle are each 1/3 beneficiaries of the Dakota Trust; and

    b.  Joe is the Trustee of the Dakota Trust;

d.  Fill and vacancy in the trustee position and appoint Joe as successor trustee;

e.  Monetary damages, including offset against Dakota's interest in the Dakota Trust; and

f.  Attorneys' fees and costs of court.

Michelle and Joe request that the Court award them all other relief to which they may be justly entitled.

Respectfully submitted,

**CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY, P.C.**

By:  /s/ Ryan O. Cantrell
Ryan O. Cantrell
Texas Bar No. 24055259
ryan.cantrell@chamberlainlaw.com
Mariah J. Karigan
Texas Bar No. 24123088
mariah.karigan@chamberlainlaw.com
1200 Smith Street, Suite 1400
Houston, Texas 77002
Telephone:  (713) 658-1818
Facsimile:  (713) 658-2553
**COUNSEL FOR MICHELLE FONTENOT AND DALLAS JOSEPH FONTENOT III**

UNOFFICIAL COPY

27

35034788.v1

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing instrument was served on this the 12th day of March, 2026, to the following:

Rudy Culp
Collin Bullard
TEXAS PROBATE ATTORNEY PLLC
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
*Counsel for Linda Goehrs*

Jeffrey D. Watters, Jr.
John P. ("Trey") Avant III
Andrew B. McCarty
GRAY REED & MCGRAW LLP
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
*Counsel for Dakota Fontenot*

James Madison ("Jimmy") Ardoin III
4900 Fournace Place, Suite 414
Bellaire, Texas 77401
*Counsel for Dakota Fontenot*

Paul S. Beik
440 Louisiana Street, Suite 1800
Houston, Texas 77002
*Counsel for Dakota Fontenot*

/s/ Ryan O. Cantrell
Ryan O. Cantrell

28

35034788.v1

CAUSE NO. 537,721

| | | |
|---|---|---|
| LINDA GOEHRS | § | IN THE PROBATE COURT |
| Plaintiff | § | |
| , | § | |
| | § | |
| | § | NUMBER ONE (1) OF |
| , | § | |
| v. | § | |
| DAKOTA FONTENOT & | § | |
| MADISON FONTENOT | § | |
| Defendants. | § | HARRIS COUNTY, TEXAS |

## ORIGINAL ANSWER AND JURY DEMAND
## OF DEFENDANT MADISON FONTENOT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Defendant Madison Fontenot who has been sued in her

individual capacity files this Original Answer and Jury Demand and would show

the Court as follows:

### GENERAL DENIAL

Defendant Madison Fontenot asserts a general denial as authorized by Rule

92 of the Texas Rules of Civil Procedure and demands that Plaintiff be required to

prove each and every charge and allegation asserted against Defendant under the

appropriate burden of proof as required by the Constitution and laws of the State of

Texas.

### JURY DEMAND

Defendant Madison Fontenot makes this request for a trial by jury.

### AFFIRMATIVE DEFENSES

UNOFFICIAL COPY

Defendant Madison Fontenot asserts the following affirmative defenses under Rule 94:

1. Release

2. Waiver

3. Statute of frauds

4. Failure of consideration

5. Estoppel

6. Fraud

7. Payment

8. Res judicata/collateral estoppel

9. Defendant contests the capacity of the Plaintiff to sue her. Linda Goehrs, in her capacity as trustee of the Holli Ann Hardin Trust, lacks the capacity to sue Defendant Madison Fontenot.

10. The Plaintiff does not have the legal capacity to sue.

11. Plaintiff is not entitled to recover in the capacity in which she sues.

12. The instrument upon which Plaintiff is suing is without consideration or the consideration has failed in whole or part.

UNOFFICIAL COPY

## PRAYER

For the foregoing reasons, Defendant respectfully requests that Plaintiff take nothing by reason of its claims against Defendant and that Defendant be awarded attorney's fees and for any such other relief, whether at law or in equity to which Defendant may be justly entitled.

Respectfully submitted,

/s/ Lloyd E. Kelley
LLOYD E. KELLEY
State Bar No. 11203180
2726 Bissonnet Ste 240 PMB 12
Houston, Texas 77005
Telephone: 281-492-7766
kelley@lloydekelley.com
Attorney for Defendant Madison Fontenot

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been served upon all parties of record in this Cause, in accordance with the Texas Rules of Civil Procedure on April 7, 2026 via e-service.

/s/ Lloyd E. Kelley
Lloyd E. Kelley

**EXHIBIT**

**45**

exhibitsticker.com

| | |
|---|---|
| **From:** | no-reply@efilingmail.tylertech.cloud |
| **To:** | kelley@lloydekelley.com |
| **Subject:** | Notification of Service for Case: 537721, Linda Goehrs, in her capacity as Trustee of the Holli Ann Hardin Trust Number One, Plaintiffvs.Dakota Fontenot, Defendant for filing Notice, Envelope Number: 113333071 |
| **Date:** | Tuesday, April 7, 2026 12:35:00 PM |

# Notification of Service



Case Number: 537721
Case Style: Linda Goehrs, in her capacity as Trustee of the Holli Ann Hardin Trust Number One, Plaintiffvs.Dakota Fontenot, Defendant
Envelope Number: 113333071

This is a notification of service for the filing listed. Please click the link below to retrieve the submitted document. If the link does not work, please copy the link and paste into your browser. You can also obtain this document by following the steps on this article.

| Filing Details | |
|---|---|
| **Case Number** | 537721 |
| **Case Style** | Linda Goehrs, in her capacity as Trustee of the Holli Ann Hardin Trust Number One, Plaintiffvs.Dakota Fontenot, Defendant |
| **Date/Time Submitted** | 4/7/2026 12:34 PM CST |
| **Filing Type** | Notice |
| **Filing Description** | |
| **Filed By** | Lloyd Kelley |
| | Other Service Contacts not associated with a party on the case:<br><br>Lloyd Kelley (kelley@lloydekelley.com)<br><br>Paul Beik (paul@beiklaw.com)<br><br>James Ardoin (jimmy@jimmyardoinlaw.com)<br><br>Alexis Cook (aacook2@gmail.com)<br><br>Kayla Brake (kayla@texasprobateattorney.com) |

| Service Contacts | Texas Probate Attorney, PLLC (efile@texasprobateattorney.com) |
|---|---|
| | Collin Bullard (collin@texasprobateattorney.com) |
| | Ryan Cantrell (ryan.cantrell@chamberlainlaw.com) |
| | Mariah Karigan (mariah.karigan@chamberlainlaw.com) |
| | Paul Gossett (paul.gossett@chamberlainlaw.com) |
| | Rudy Culp (rudy@texasprobateattorney.com) |
| | Bailey Bowe (bailey@texasprobateattorney.com) |
| | Robin Edwards (robin@texasprobateattorney.com) |

| Document Details | |
|---|---|
| **Served Document** | Download Document |
| This link is active for 45 days. To access this document, you will be required to enter your email address. Click here for more information.<br><br>If you would like to remove yourself as a Service Contact from this Filing, please click here for instructions on how to do so. | |