**CAUSE NO. 537721**

| | | |
|---|---|---|
| LINDA GOEHRS, IN HER CAPACITY | § | IN THE PROBATE COURT |
| AS TRUSTEE OF THE HOLLI ANN | § | |
| HARDIN TRUST NUMBER ONE | § | |
|     *Plaintiff*, | § | |
| | § | NUMBER ONE (1) |
| v. | § | |
| | § | |
| DAKOTA FONTENOT | § | |
|     *Defendant*. | § | HARRIS COUNTY, TEXAS |

**PLAINTIFF'S FIRST AMENDED PETITION AND APPLICATION FOR
ADDITIONAL TEMPORARY AND PERMANENT INJUNCTIVE RELIEF**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff LINDA GOEHRS ("Plaintiff"), in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, and files this her First Amended Petition and Application for Additional Temporary and Permanent Injunctive Relief against Defendant DAKOTA FONTENOT ("Defendant"), and in support thereof would respectfully show unto the Court the following:

**I.
DISCOVERY CONTROL PLAN**

1.      Plaintiff intends to conduct discovery under Level 3 of Rule 190.4 of the Texas Rules of Civil Procedure.

**II.
CLAIM FOR RELIEF**

2.      Pursuant to Rule 47 of the Texas Rules of Civil Procedure, Plaintiff seeks monetary relief of more than $1,000,000.00 and non-monetary relief.

**EXHIBIT
3**

## III.
## PARTIES

3.       Plaintiff LINDA GOEHRS ("Plaintiff") is an individual residing in Harris County, Texas and currently serving as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One (the "Hardin Trust"). Plaintiff may be served through the undersigned attorneys of record.

4.       Defendant DAKOTA FONTENOT ("Defendant") has appeared through counsel in the matter before the Court and may be served through his attorneys of record, Jeffrey D. Watters, Jr., John P. Avant III, James Madison Ardoin III, and Paul S. Beik.

5.       Intervenor MICHELLE FONTENOT ("Michelle") has appeared through counsel in the matter before the Court and may be served through her attorneys of record, Ryan O. Cantrell and Mariah J. Karigan.

6.       Intervenor DALLAS JOSEPH FONTENOT III ("Joe") has appeared through counsel in the matter before the Court and may be served through her attorneys of record, Ryan O. Cantrell and Mariah J. Karigan.

7.       Intervenor MADISON E. FONTENOT ("Madison"), as next friend of minor children S.F. and W.F., has appeared through counsel in the matter before the Court and may be served through her attorney of record, Paul S. Beik.

## IV.
## JURISDICTION AND VENUE

8.       Personal jurisdiction exists over Defendant because Defendant is an individual domiciled in Harris County, Texas, and this lawsuit arises from actions within the State of Texas.

9.       This Court has subject matter jurisdiction over the lawsuit because the amount in controversy exceeds the Court's minimum jurisdictional requirements. This Court further has

subject matter jurisdiction pursuant to Texas Estates Code § 32.006 because it is an action by or against a trustee and an action involving an inter vivos trust.

10.    Venue is proper in Harris County, Texas pursuant to Texas Property Code § 115.001 because Defendant, the purported Trustee of the Dakota Trust, is an individual resident of Harris County and upon information and belief, the situs of the administration of the Dakota Trust is in Harris County. Venue is further proper in Harris County, Texas pursuant to Texas Civil Practice & Remedies Code § 15.002 because Harris County is the county in which all or a substantial portion of the events giving rise to Plaintiff's claims occurred.

**V.**
**FACTS**

11.    The Hardin Trust was created on or about June 5, 1991, by Holli Ann Hardin Fontenot ("Holli"). *See* **Exhibit "A"**, *Trust Agreement*. At the time, Holli was married to Dallas Joseph Fontenot, Jr. ("Dallas"). Defendant is the child of Holli and Dallas.

12.    Dallas had two children from a previous marriage, Joe and Michelle. Defendant, Holli, Joe, and Michelle were each initial beneficiaries of the Hardin Trust. During his lifetime, Dallas owned numerous properties and businesses centered around the Colorado Bar & Grill (the "Colorado Club"), a gentleman's club located in Houston, Texas. Dallas accumulated millions of dollars of assets which at the time of his death were spread between his estate, the Hardin Trust, and a separate trust known as the Dakota Trust, which was created on November 9, 1994, by Holli as settlor. *See* **Exhibit "B"**, *Dakota Trust Agreement*.

13.    Dallas died on September 3, 2021, and his estate was probated in Fort Bend County Court at Law Number Four (4) under Cause No. 21-CPR-036521. Litigation pertaining to Dallas's estate and the two above-mentioned trusts (collectively the "Trusts") was resolved through a

settlement agreement dated January 7, 2022 (the "Settlement Agreement"). *See* **Exhibit "C"**, *Binding Mediated Settlement Agreement*.

14.    As part of the Settlement Agreement, the parties ultimately agreed that Holli would be bought out as a beneficiary of the Trusts, with certain assets to be paid to Holli in consideration of her disclaimer of further interest in the Trusts. Specifically, the Settlement Agreement dictated that Holli's interest in both Trusts "will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One." *Id.* at p. 5–6. Subsequently, Defendant, acting as President of HFR Enterprises, Inc. entered into a 2.8 million dollar loan agreement, in part to provide the necessary consideration for Holli's interest in both Trusts. *See* **Exhibit "D",** *Amended and Restated Promissory Note*. The Hardin Trust then paid Holli $2,823,464 for her interest in both Trusts, representing 85% of the total value of the Dakota Trust assets and 20% of the total value of the Hardin Trust assets. *See* **Exhibit "E"**, *Assignment of Interest and Disclaimer of Further Interest*.

*Running of the Colorado Club Entities.*

15.    As agreed upon by Defendant, Joe and Michelle, following the entry of the Settlement Agreement, Defendant took over and began to manage/run all of the entities held by the Trust. Additionally, as part of the Settlement Agreement, Defendant also was given full ownership of Entertainment Marketing & Management, LTD ("EMM").

16.    Following the execution of the Settlement Agreement, Defendant was named the President and sole Director of HFR Enterprises, Inc., ICE Embassy Inc., and the Colorado Bar & Grill, Corporation.

17.    On or before May 19, 2023, Defendant was appointed as sole Director, as well as President and Secretary for the Colorado Bar & Grill Corporation, a corporation which is wholly

owned by the Hardin Trust. **Exhibit "F".** On or before May 19, 2023, Defendant was appointed as sole Director, as well as President and Secretary for HFR Enterprises Inc, a corporation which is wholly owned by the Hardin Trust. **Exhibit "G"**. On or before May 19, 2023, Defendant was appointed as sole Director, as well as President and Secretary for ICE Embassy, Inc, a corporation which is wholly owned by the Hardin Trust. **Exhibit "H".** Defendant served in these positions (as well as sole shareholder/officer/director of EMM) until the sale of the Colorado Bar & Grill, Corporation.

18.    After taking over full management of the entities (following the longtime manager Frank Kent retiring), Defendant caused waste to assets held in the Hardin Trust and engaged in extensive self-dealing. Defendant mismanaged the Colorado Club for personal benefit to the detriment of the Hardin Trust, including, but not limited to, the following:

    a.   Hiring his wife, who had little to no experience, to manage the Colorado Club;

    b.   Paying his personal credit cards out of the company;

    c.   Taking vacations and claiming them as a business expense;

    d.   Paying personal expenses from the company;

    e.   Making unnecessary and unreasonable improvements, many of which were never completed;

    f.   Firing multiple consultants and paying them hundreds of thousands of dollars with no apparent benefits provided;

    g.   Changing the system of the Colorado Club to have less oversight and allowing money to be taken or taking money from the club;

h.  Taking a loan from his wife's stepfather for $150,000 and within a month repaying the loan with $50,000 in interest, which was wired directly to an offshore account

i.  Obligating the entities held by the Hardin Trust to enter into an unnecessary Management Agreements and Administrative Agreements with an entity he owns, on top of taking a salary from the club; and

j.  Using funds earmarked for repayment of the loan used to buy Holli's interest for his own personal benefit, allowing the company to default on the loan for months and causing a fire sale of the land and stock.

19.     Defendant entered the Management Agreement between Ice Embassy, Inc. d/b/a the Colorado Bar & Grill, as President of both entities. **Exhibit "I".** Defendant used this Management Agreement to take sums that violated the terms of the Settlement Agreement.

**The Sale of the Entities**

20.     Defendant notified the Trustee of the necessity to find a buyer for the entities because if they did not sell, they would be foreclosed upon and lose everything. The Trustee would come to find out that Defendant was months behind on the loan payments, as well as failing to pay other necessary business expenses. His actions and/or inactions put the entities in a position that it appeared that a quick sale would be necessitated to avoid foreclosure.

21.     In his work to sell the Entities, Defendant, without notice to Trustee, entered into two consulting agreements (each for $100,000 to be paid at the sale of the Entities) to assist him in the sale of HFR and Ice's Stock, the real property and improvements HFR owns located at 6710 Southwest Freeway, and/or assets of the foregoing through one or more purchase agreements. Defendant, as President for both ICE and HFR, entered into consulting agreements with Gray

Entertainment Inc., (**Exhibit "J"**) and Tim Wilson (**Exhibit "K"**). There was no mention of EMM in any of these consulting agreements.

22.    HFR was sold to CLE Group SKZ Real Estate, LLC, a company that was formed on June 9, 2025, and managed by JZT Investments, LLC and Nightlife Investments II, LLC. [1] The Purchase and Sale Agreement was signed by Trustee and Zack Truesdell, as President of CLE Group SKZ Real Estate, LLC.

23.    ICE was purchased by Colorado Rose, LLC, a company that was formed in April of 2025, managed by Salim Dehkordi. The ICE Stock Purchase Agreement ("Stock Purchase Agreement") was signed by Trustee, Defendant, in his individual capacity and as director and president of ICE and Justin Truesdell, as Manager of Colorado Rose, LLC. **Exhibit "L"**.

24.    Although undisclosed until recently, a few months after the sale of the other entities in June of 2025, EMM was purchased by Colorado Rose, LLC, the same company that purchased ICE.  This Partnership Interest Purchase Agreement ("Partnership Interest Purchase Agreement") was executed by Defendant, individually, as sole member of BFD GP, LLC, BFD LP, LLC, and as BFD GP, LLC, as sole member of general partner, and Justin Truesdell, as Manager for Colorado Rose, LLC. **Exhibit "M".**

25.    Because of information provided to Plaintiff related to the running of the entities by the Defendant, Plaintiff was forced to file suit on August 21, 2025. On September 25, 2025, a Temporary Injunction was entered against Defendant enjoining him from the sale of the real property located at 3414 Old Richmond Road, Rosenberg, Texas 77471, owned by Viva Las Vegas Properties, Inc. *See* **Exhibit "N"**, *Temporary Injunction*. With discovery currently ongoing, more wrongful actions of Defendant have been uncovered since the inception of this suit.

---

[1] In its articles of Incorporation, this entity also included JZT Investment II, LLC, as a manager, but it was removed within 30 days of its formation.

26.      Specifically, on October 24, 2025, at the hearing on Defendant's Motion to Compel Mediation, over the objection of counsel for Defendant, Defendant admitted to receiving $2,750,000 for the sale of Entertainment Marketing & Management, Ltd. ("EMM"). This occurred when the entities and assets comprising the Colorado Club netted approximately $1,300,000 with Defendant urging such sale on the false premise that it was necessary to mitigate a failing financial situation.  Defendant failed to disclose the fact that he was simultaneously selling EMM to the same buyer (or related entity) and although, upon information and belief, EMM had little to no value, Defendant secured a purchase price that netted him more than twice what was received by the Trust.

27.      As of December 31, 2024, EMM's only asset was a bank account with approximately $50,000. Upon information and belief, at the time of its sale in July of 2025, EMM was insolvent, had no contractual rights to future income, and that any purchase price allocation to this entity would lack economic foundation. EMM was a management company for the Colorado Club with no ownership over assets aside from such bank account, making the purchase of EMM for $2,750,000 to be without justification. Defendant appears to have orchestrated an allocation of the Colorado Club's sale proceeds that was grossly disproportionate, diverting substantial funds from the trusts to an entity under his exclusive control. This maneuver effectively stripped the Hardin Trust of millions in value. While the Hardin Trust was intended to benefit Defendant and his two siblings, the structure of the EMM sale ensured that Defendant alone reaped the financial advantage.

28.      For these reasons, Plaintiff is left with no alternative but to assert additional claims against Defendant and seek further injunctive relief to prevent ongoing harm in the interim.

**The Dakota Trust**

29.     Defendant purports to be the Trustee of the Dakota Trust. However, upon information and belief, Defendant was not validly appointed as Trustee of the Dakota Trust. Defendant is not a named successor trustee in the Dakota Trust Agreement. *See* **Exhibit "B"**. On May 1, 2013, Decedent, as Trustee of the Dakota Trust, designated Defendant as a successor Trustee, but he later revoked this designation on October 14, 2017. *See* **Exhibit "O"**, *5/1/13 Designation of Successor Trustee*; *See* **Exhibit "P"**, *10/14/17 Designation of Successor Trustee.* Decedent similarly removed Defendant from all officer and director positions for any entities owned by the Dakota Trust, including Viva Las Vegas Properties, Inc. on the same day. *See* **Exhibit "Q",** *Viva Las Vegas Resolution.* After Decedent's death, however, without the authority to do so, Defendant started acting as Trustee of the Dakota Trust and officer and director of Viva Las Vegas Properties, Inc. As purported Trustee of the Dakota Trust, Defendant has not repaid the Hardin Trust for any of the Hardin Trust assets used to buy out Holli's interest in the Dakota Trust.

30.     It has also been discovered that Defendant is not the only beneficiary of the Dakota Trust and that his two siblings, Joe and Michele, are equal beneficiaries of this Trust. **Exhibit "B".** As such, the necessity to have the Hardin Trust to reimburse the Trust for prior transactions is less important because the beneficiaries of the trusts are similar. That said, Defendant has sold assets and withdrawn large sums of money from the Dakota Trust without making any distributions to Joe and Michele.

## VI.
## ARGUMENT AND AUTHORITIES

A.    DECLARATORY JUDGMENT

31.     A person interested in or through a trustee or other fiduciary in the administration of a trust may have a declaration of rights or legal relations in respect to the trust to determine any

question arising in the administration of the trust. Tex. Civ. Prac. & Rem. Code § 37.005. The two prerequisites for a declaratory judgment action are: (1) there must be a real controversy between the parties and (2) the controversy must be one that will actually be determined by the judicial declaration sought. *Houston Chronicle Publ'g Co. v. Thomas*, 196 S.W.3d 396, 401 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

32.     The matter at issue involves two trusts and the mismanagement of entities and assets associated with the trusts by Defendant. A declaration determining the rights of the parties will straightforwardly determine the controversy between Plaintiff and Defendant. Accordingly, Plaintiff's request for declaratory judgment is appropriate.

33.     Holli was a beneficiary of the two trusts at issue before being bought out pursuant to the Settlement Agreement. Plaintiff, Joe, and Michelle never agreed and the Settlement Agreement did not dictate that Defendant would benefit as if he were the sole beneficiary of the Dakota Trust while the Hardin Trust covers all costs pertaining to Holli's buyout without receiving adequate consideration from the Dakota Trust. As of the date of this filing, Dakota has failed or otherwise declined to reimburse the Hardin Trust for amounts paid to Holli for the buyout, wrongfully depriving the Hardin Trust and resulting in an ultimately illicit benefit received by Defendant.

34.     Accordingly, there exists a controversy between Plaintiff and Defendant pertaining to the stipulations of the Settlement Agreement and Defendant's failure to abide thereby. Such controversy can by resolved through a declaration by the Court ordering that Defendant repay to the Hardin Trust the amounts received by Holli under the Settlement Agreement.

35.     Despite no authority to do so, Defendant has wrongfully acted when convenient for his self-dealing as the trustee of the Dakota Trust and/or officer/director of the entities comprising

the Colorado Club in which Plaintiff holds an interest. Plaintiff is resultingly entitled to a declaration from the Court stipulating that, pursuant to the Settlement Agreement, Defendant is liable to Plaintiff for 50% of the amounts received by Holli under the Settlement Agreement buyout and that Defendant is not trustee of the Dakota Trust or an officer/director of any entity within the Colorado Club in which Plaintiff holds an interest.

B.      BREACH OF FIDUCIARY DUTY

36.     To prevail on a breach of fiduciary duty claim, a plaintiff must prove that (1) there is a fiduciary relationship between the plaintiff and defendant, (2) the defendant breached their fiduciary duty to the plaintiff, and (3) the breach resulted in an injury to the plaintiff or benefit to the defendant. *Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). The existence of a fiduciary duty is dependent upon the facts of a specific case, and may arise where one person trusts in and relies on another. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 176–77 (Tex. 1997). The breach here arise before and at the moment of consent, not merely as a downstream corporate harm.

37.     In 2022, Defendant assumed management and control of the Colorado Club, which is comprised of numerous entities held in the Hardin Trust, all of which Defendant served as an officer and director. By controlling the multi-million-dollar business responsible for the value and funding of the Hardin Trust, Defendant assumed a position carrying fiduciary duties toward Plaintiff as Trustee of the Hardin Trust. Defendant further acted as trustee of the Dakota Trust throughout this period without the lawful authority to do so. By his own actions, Defendant assumed formal and/or informal fiduciary duties toward both trusts and their beneficiaries.

38.     Despite this, Defendant blatantly disregarded his responsibilities and duties toward the Hardin Trust as beneficial owner of the Colorado Club. Defendant fraudulently diverted

hundreds of thousands of dollars from the operations of the Colorado Club, causing the operation to substantially decline in value. Because of this, Defendant has wrongfully benefitted to the detriment of the Hardin Trust.

39.     Upon Defendant's insistence, the Colorado Club was sold, with the Hardin Trust receiving $1,300,000, though it has since been discovered that $2,750,000 of the total purchase price was instead allocated to EMM, which held no assets and was fully controlled by Defendant. As a result, Defendant again benefitted to the detriment of the Hardin Trust, and Plaintiff is entitled to recover against Defendant upon her breach of fiduciary duty claim.

C.     NEGLIGENT MISREPRESENTATION

40.     Defendant, as officer and director, provided false and/or misinformation and/or half-truths to Plaintiff about the sales transaction involving the Colorado Club and EMM. Defendant made a representation to the Plaintiff in the course of the Defendant's business, profession, or employment, or in a transaction in which the Defendant had a pecuniary interest; the Defendant supplied false information for the guidance of Plaintiff in their business transactions; the Defendant failed to exercise reasonable care or competence in obtaining or communicating the information; Plaintiff justifiably relied on the representation; and Defendant's negligent misrepresentation proximately caused the Plaintiff to suffer pecuniary loss or injury.

D.     FRAUDULENT INDUCEMENT

41.     A fraudulent inducement claim is similar to common law fraud and arises only in the context of a contract. *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018); *Int'l Bus. Machs. Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 228 (Tex. 2019). Such a claim requires proof that: (1) the defendant made a material misrepresentation; (2) the defendant knew at the time that the representation was false or lacked knowledge of its truth; (3) the defendant intended that the

plaintiff should rely or act on the misrepresentation; (4) the plaintiff relied on the misrepresentation; and (5) the plaintiff's reliance on the misrepresentation caused injury. *Id.*

42.     In the matter at issue, Defendant represented to Plaintiff that the Colorado Club was insolvent and sale was the only option to remediate the situation. This came at a time when Defendant had wrongfully assumed a position of authority within the Colorado Club and extensively defrauded the Hardin Trust of assets to which it was entitled. Upon information provided by Defendant, the Colorado Club was sold and resulted in a net receipt of $1,300,000 by the Hardin Trust. Defendant purposefully declined to disclose that $2,750,000 was paid to EMM, an entity of relatively nominal actual value under Defendant's control, for the sale.

43.     As a result of Defendant's intent to defraud and Plaintiff's reliance on Defendant's misrepresentation, Plaintiff was damaged and Defendant impermissibly benefitted. Plaintiff is resultingly entitled to recovery against Defendant upon her fraudulent inducement cause of action.

E.     FRAUD BY NONDISCLOSURE

44.     The elements of fraud by non-disclosure are: (1) a party fails to disclose a material fact within the knowledge of that party, (2) the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth, (3) the party intends to induce the other party to take some action by failing to disclose that fact, and (4) the other party suffers injury as a result of acting without knowledge of the undisclosed fact.

45.     In the matter at issue, Defendant failed to disclose to Plaintiff that he was selling EMM, an entity that appears to have no value, to the same buyer for $2,750,000, funds that, upon information and belief, should have been paid to the Trust. Defendant, as an officer and director, handled all of the transactions in question, including the sale of the Colorado Club for $1,300,000 by the Hardin Trust. Defendant purposefully declined to disclose that $2,750,000 was paid to

EMM, an entity of relatively nominal actual value under Defendant's control and full ownership, for the sale. Trustee would not have approved or would have renegotiated the sale had the EMM allocation been disclosed.

46.     Plaintiff was induced to enter the transaction by Defendant as a result of Defendant's nondisclosure and Plaintiff was damaged and Defendant impermissibly benefitted. Plaintiff is resultingly entitled to recovery against Defendant upon her fraud by non-disclosure cause of action.

F.     TEXAS THEFT LIABILITY ACT (TTLA)

47.     "A person who commits theft is liable for the damages resulting from the theft." TEX. CIV. PRAC. & REM. CODE § 134.003(a). Theft is defined as unlawfully appropriating property or unlawfully obtaining services in violation of the Texas Penal Code. *Coe v. DNOW LP*, 718 S.W.3d 338, 363–64 (Tex. App.—Houston [14th Dist.] 2025, pet. filed Oct. 10, 2025).

48.     As detailed above, in the years following Dallas's death while wrongfully acting in numerous capacities relating to the Colorado Club, Defendant purposefully misdirected assets away from the Colorado Club and the trusts to himself or entities within his control. Defendant's theft violates the Texas Penal Code and has caused damages to Plaintiff, and Plaintiff is accordingly entitled to judgment against Defendant pursuant to the TTLA.  Defendant knew he had no lawful entitlement to EMM consideration attributable to the Colorado club entities value.

G.     UNJUST ENRICHMENT

49.     In certain circumstances where a party profits from the inequities borne by another, a cause of action for unjust enrichment is appropriate. *HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 891 (Tex. 1998). Unjust enrichment occurs when a person has wrongfully secured a benefit which

it would be unconscionable to retain. *Eun Bok Lee v. Ho Change Lee*, 411 S.W.3d 95, 111 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

50.    Despite no authority, on numerous occasions, Defendant has received an unwarranted benefit to the detriment of Plaintiff, the trusts, and the entities comprising the Colorado Club. Defendant utilized the Colorado Club as a means of funding his lifestyle, misallocating funds away from Plaintiff for his personal benefit. This includes the recent revelation of $2,750,000 being paid to a valueless entity under Defendant's control for the sale of the Colorado Club, as admitted to by Defendant in open court.

51.    For these reasons, despite the Trusts existing to continue the business built by Dallas for the benefit of his family, Defendant has robbed the Hardin Trusts of substantial assets which should have fulfilled such purpose. Defendant has caused himself to be unjustly enriched while the Hardin Trust has suffered, entitling Plaintiff to recovery on her unjust enrichment claim against Defendant.

H.    <u>MONEY HAD AND RECEIVED</u>

52.    Defendant is liable for money had and received as the Defendant: (1) received money, and (2) that in equity and good conscience, the money belongs to the Plaintiff as Trustee. Money had and received is not premised on wrongdoing but looks to the justice of the case and inquires whether the defendant has received money which rightfully belongs to another. The money received form the sale of EMM belongs to the Plaintiff as Trustee as EMM had little to no value.

**VII.**
**DAMAGES**

53.    As a result of Defendant's actions, Plaintiff has been damaged in an amount far in excess of the minimum jurisdictional limits of the Court. With discovery ongoing, the full extent

of Plaintiff's damages are not currently known, and the full extent may be difficult to calculate. However, Plaintiff's damages currently include $2,750,000 wrongfully received by Defendant for the sale of the Colorado Club and extensive amounts directed from Defendant away from the Colorado Club under his direction and authority.

54. Additionally, Defendant's fraudulent and malicious actions were taken with the purposeful intent to cause substantial injury or harm to Plaintiff. TEX. CIV. PRAC. & REM. CODE § 41.007(7). Because of this, Plaintiff is entitled to an award of exemplary damages against Defendant. TEX. CIV. PRAC. & REM. CODE § 41.003.

55. Plaintiff also seeks equitable fee forfeiture and disgorgement of all applicable fees received by Defendant and/or his representatives.

## VIII.
## APPLICATION FOR INJUNCTIVE RELIEF

56. Based on the foregoing, there is a substantial likelihood that Plaintiff will prevail on the merits of the claims against Defendant. *See Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993). The matters at issue are extensively documented through financial records in Plaintiff's possession and those yet to be discovered.

57. In addition, Plaintiff has no adequate remedy at law for Defendant's wrongful actions causing unknown damages unlikely to be fully traceable. *See Sharma v. Vinman Int'l, Ltd.*, 231 S.W.3d 405, 426–27 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Specifically, Defendant has established and demonstrated a propensity to hide money through illicit transactions, utilizing shell companies and directing money in a way that will be difficult to trace. Even though he received over one million from his sale of EMM, he stated that he did not have access to funds that would be necessary to refund the sale of another property for $300,000. As the damages complained of herein total in the millions, it is highly likely that Defendant will face insolvency

or become judgment proof upon an award of the damages incurred by Plaintiff. *Axis Energy Mktg., LLC v. Apricus Enters., LLC*, No. 01-23-00660-CV, 2025 WL 2470572 at *8 (Tex. App.—Houston [1st Dist.] Aug. 28, 2025, no pet. h.). Plaintiff has suffered and will continue to suffer irreparable harm from Defendant's conduct. Even if Defendant was able to respond in payment of money damages, which he most likely is not able or willing to do, Plaintiff has been irreparably harmed with years of lost profits through management of the Colorado Club which would have continued through the present and into the future and cannot be easily calculated.

58.     The harm to Plaintiff is ongoing and further harm is imminent, and if the Court does not issue injunctive relief, Plaintiff will be irreparably injured. Failure to enjoin Defendant is extremely likely to lead to further depletion of property belonging to the Hardin Trust which Defendant has methodically withheld through fraudulent means. This includes the active threat of Defendant leaving the country, depriving Plaintiff of the possibility of recovery.

59.     Plaintiff has no adequate remedy at law because Defendant has absconded with funds that are very unlikely to be fully traceable. Defendant has additionally liquidated and misappropriated assets belonging to the Hardin Trust which are unlikely to ever be found. Further, the possibility to manage and profit from the Colorado Club has been taken from Plaintiff as a result of Defendant's wrongful actions, to which no value can be assuredly attributed.

60.     Greater injury will be inflicted upon Plaintiff by the denial of the requested injunctive relief than would be inflicted upon Defendant by granting such relief. Granting the injunctive relief herein would simply preserve the status quo by requiring Defendant to abide by his legal obligations and cease his purposeful harming of Plaintiff.

61.     The issuance of injunctive relief will not disserve the public interest. Balancing the equities and other factors, the significant potential of irreparable harm to Plaintiff without the

injunctive relief and the lack of harm due to the entry of injunctive relief demonstrate that the requested relief will not disserve the public interest.

62.    In order to preserve the status quo during the pendency of this action, Plaintiff seeks a Temporary Restraining Order and Temporary Injunction against Defendant. Plaintiff requests a Temporary Restraining Order that Defendant, his agents, and other persons or entities in active concert or participation who receive actual notice of the Court's Order, by personal service or otherwise, be enjoined as follows:

a.    Defendant is restrained from access, using, moving and/or touching any of the funds that were received from the sale of EMM;

b.    Defendant is restrained from destroying any and all documents, records, or other information pertaining to the Colorado Club, EMM, ICE, HFR, the Holli Ann Hardin Trust Number One, Dakota Trust, or other records and assets received from Dallas Joseph Fontenot, Jr. or his estate. This includes, but shall not be limited to, all financial records, business records, information from banking or other financial institutions, and information pertaining to Defendant's personal bank accounts and other financial institutions accounts;

c.    All accounts in Defendant's care, custody, or control pertaining to or otherwise holding assets received from the sale of EMM; and

63.    Plaintiff further seeks a temporary injunction and, upon final hearing or trial hereof, a permanent injunction for the relief requested above.

64.    Plaintiff is willing to post the necessary reasonable bond to facilitate the injunctive relief requested.

## IX.
## REQUEST FOR APPOINTMENT OF SUCCESSOR TRUSTEE

65.    As detailed above, despite Defendant's wrongful actions under the guise of the capacity of trustee, there currently exists no trustee of the Dakota Trust. The trust agreement of the Dakota Trust dictates that First Interstate Bank of Texas, N.A. shall serve as successor trustee following Dallas, who is deceased, and Holli, who no longer holds any interest in the Dakota Trust.

*See* **Exhibit "B"**, *Dakota Trust Agreement*, at p. 5–7. First Interstate Bank of Texas, N.A. has not accepted appointment or otherwise acted as successor trustee in the more than four years since Dallas's death.

66.     Pursuant to Texas Property Code § 113.083(a), upon the vacancy of the position of trustee or failure to select a party for such role and upon petition of an interested party, a court may appoint a successor trustee. Because of the current lack of a trustee of the Dakota Trust, coupled with the extensive fraudulent actions of Defendant, Plaintiff requests that the Court appoint a neutral third-party as successor trustee of the Dakota Trust.

## X.
## JUDICIAL DISCHARGE

67.     Defendant has taken the position that Trustee's temporary administration of the Trust has or should have terminated. If the Court determines that Trustee's temporary administration has or should be terminated, then Plaintiff seeks to resign and to obtain a judicial discharge by this Court for the actions taken as Trustee of the Trust in accordance with the Texas Trust Code.

## XI.
## CONSTRUCTIVE TRUST

68.     Plaintiff seeks to have this Court place a constructive Trust on all funds received from the purported sale of EMM.  Plaintiff will prove that there was: (1) breach of a special trust, fiduciary relationship, or actual fraud; (2) unjust enrichment of the wrongdoer; and (3) tracing to an identifiable res. Defendant breached his fiduciary duty to Plaintiff and committed fraud, he was unjustly enriched from this breach and/or fraud and the funds are those directly traceable to the purported sale of EMM, an entity with little to no value.

## XII.
## CONDITIONS PRECEDENT

69.     All conditions precedent to Plaintiff's claims for relief have been performed or have occurred.

## XIII.
## JURY DEMAND

70.     Plaintiff requests a trial by jury on all claims included in this Amended Petition.

## XIV.
## ATTORNEY'S FEES

71.     Plaintiff has been required to employ counsel to bring this suit and requests an award of all reasonable and necessary attorney's fees for the services provided in representation and pursuit of this action. Plaintiff seeks an award of fees under the Texas Trust Code and Texas Common law.  Plaintiff also seeks the award of attorney fees under the Texas Civil Practice & Remedies Code Section 38,001.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, for the reasons detailed herein, Plaintiff LINDA GOEHRS, in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, respectfully requests that the Court set her Application for Temporary Restraining Order for hearing, that a Temporary Restraining Order be issued against Defendant DAKOTA FONTENOT as detailed herein, that the Court set Plaintiff's Application for Temporary Injunction for hearing and upon hearing issue a Temporary Injunction against Defendant, that upon final hearing or trial hereof the Court enter judgment against Defendant for the relief prayed for herein, and for all such other and further relief, general or special, at law or in equity, to which Plaintiff may show herself to be justly entitled.

Respectfully submitted,



RUDOLPH M. CULP
State Bar No. 24043014
rudy@texsprobateattorney.com
COLLIN J. BULLARD
State Bar No. 24129570
collin@texasprobateattorney.com
*EFILE EMAIL: efile@texasprobateattorney.com*
**HOUSTON OFFICE:**
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
O: (713) 297-0700
F: (682) 428-8137
**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was forwarded to all counsel of record in accordance with the Texas Rules of Civil Procedure on this 15th day of January 2026.

RUDOLPH M. CULP

EXHIBIT A

## TRUST DECLARATION FOR
## THE HOLLI ANN HARDIN TRUST NUMBER ONE

THIS TRUST DECLARATION is made this day by declaration of HOLLI HARDIN FONTENOT, a resident of Harris County, Texas ("Trustor"). The Effective Date of this Trust Declaration is June 5, 1991.

COPY

1. Trust Estate.

1.1   Creation of Trust. The Trustor hereby establishes, declares, and creates this Trust for the purposes hereinafter set forth, and the Trustee agrees to serve as the initial trustee and to hold the Trust Estate (as hereinafter defined) in trust upon the following provisions.

1.2   Transfer in Trust. On or about the Effective Date, the Trustor has transferred and delivered to the Trustee the cash sum of One Thousand and No/100 Dollars ($1,000.00). Such property shall constitute the initial property of the Trust Estate.

1.3   Beneficiaries. The Beneficiaries of this Trust shall be HOLLI HARDIN FONTENOT, DALLAS JOSEPH FONTENOT, JR., ANNE S. FONTENOT, DALLAS JOSEPH FONTENOT, III, MICHELLE ANNE FONTENOT, and any children of the marriage of HOLLI HARDIN FONTENOT and DALLAS JOSEPH FONTENOT, JR., including any children adopted by HOLLI HARDIN FONTENOT and DALLAS JOSEPH FONTENOT, JR. after the Effective Date (collectively, "Primary Beneficiaries"). Also Beneficiaries of this Trust are the children and other issue of each of the Primary Beneficiaries. The term "Beneficiary" will also mean any and all persons, organizations, trusts, and entities who may have or may acquire a beneficial interest in this Trust, whether vested or contingent in nature, resulting from the exercise of a power of appointment by a Beneficiary or otherwise.

1.4   Release of All Rights in Property. The Trustor hereby releases for the benefit of this Trust any and all rights which the Trustor may have in her individual capacity in the property constituting the Trust Estate.

1.5   Acceptance of the Trust. By acceptance hereof the Trustee, on her behalf and on behalf of her successors in trust, does by the execution hereof acknowledge receipt of the Trust Estate. The Trustee shall own, hold, and possess the Trust Estate (including any additional property which may

Page 1 of 18 Pages

81142_81.01

003185

at any time hereafter be transferred to the Trustee) in trust solely in the capacity of Trustee.  The Trustee and her successors in trust shall hold, manage, sell, exchange, invest, and reinvest the Trust Estate; collect all income therefrom; and, after deducting such expenses as are properly payable from income, accumulate and distribute the Trust Estate as herein provided.

1.6   Additions to Trust Estate.  The Trustor and any other person shall have the right at any time to add property to the Trust created herein.  Such property, when received and accepted by the Trustee, shall become part of the Trust Estate.

1.7   Name of Trust.  This Trust shall be known as THE HOLLI ANN HARDIN TRUST NUMBER ONE.

2.  Irrevocability of Trust.  The Trust herein created shall be irrevocable and shall not be altered, amended, revoked, or terminated by the Trustor or any other person except as specifically permitted by law.

3.  Definitions.  As used herein, the following terms shall have the following meanings.

3.1   Children, Issue.  The term "child" or "children" shall refer only to any and all children born in lawful wedlock or lawfully adopted, whether born or adopted before or after the date of execution of this Trust Declaration.  The term "issue" shall refer to the lawful blood descendants in the first, second, or any other degree of the ancestor designated.

3.2   Heirs at Law.  Whenever a trustee or a legal advisor to the Trustee is called upon to determine the heirs at law of the Trustor or any other person beneficially interested in this Trust, the determination will be made to identify those individual, other than creditors, who would receive the personal property of a decedent upon his or her death as determined in accordance with the laws of intestate succession of the State of Texas, and further determined as if the Trustor of this Trust shall have predeceased the person or persons so named or described.

3.3   Minor Beneficiary.  The term "Minor Beneficiary" identifies a Beneficiary who is less than twenty one years of age.

3.4   Disability.  A Beneficiary will be considered "disabled" if he or she is incapacitated to an extent to make it impossible or impractical to give prompt and intelligent

Page 2 of 18 Pages

R1142_81.01

003186

consideration to business matters. The Trustee may act upon such evidence as the Trustee reasonably deems appropriate and reliable without liability by reason thereof.

3.5   Power of Appointment, Qualified Beneficiary Designation. Whenever this Trust gives a Beneficiary the power or authority to appoint a beneficiary of the Trust, the designation must be in writing and be acknowledged in the form required of acknowledgements by Texas law or exercised by a will executed with the formalities required by law of the Beneficiary's residence; it must clearly evidence the intent of the Beneficiary to exercise a power of appointment; and the written beneficiary designation must have been delivered to the Trustee prior to the Beneficiary's death or, if exercised by will, the will must have been filed for probate within three months from the date of the Beneficiary's date of death and must subsequently be admitted to probate no matter the time interval. The term of this Trust may be extended if the Qualified Beneficiary Designation requires that a Beneficiary's interest remain in Trust, or may be divided and be held as a separate trust which is governed by the terms of this Trust.

3.6   Trust Estate. The term "Trust Estate" shall mean any and all of the property delivered to the Trustee to be held, managed, and distributed under the terms of this Trust.

3.7   Trustee. For convenience, the term "Trustee," used in the singular, will mean and identify singular and multiple Trustees serving and acting pursuant to the directions of this Trust Declaration. The term "corporate Trustee" will identify a banking or trust corporation with trust powers.

4.   Appointment of Trustee.

4.1   Original Appointment. The Trustor appoints HOLLI HARDIN FONTENOT as Trustee of this Trust. In the event HOLLI HARDIN FONTENOT should fail to qualify, or having qualified, should die, resign, or become incapacitated or unable to act as Trustee of this Trust, or having qualified should subsequently become divorced from DALLAS JOSEPH FONTENOT, JR., then the Trustor appoints DALLAS JOSEPH FONTENOT, JR. as Trustee of this Trust. The parties acknowledge and agree that the rights and obligations of HOLLI HARDIN FONTENOT to serve as Trustee and to resign as Trustee in accordance with the foregoing have been and are the subject of separate consideration,

Page 3 of 18 Pages
H1142_81.01

003187

receipt of which is hereby acknowledged in full, and such rights and obligations are in the best interest of the administration of the Trust for its Beneficiaries.  HOLLI HARDIN FONTENOT specifically waives any rights which she may have to rescind or revoke her obligation to resign as Trustee upon divorce from DALLAS JOSEPH FONTENOT, JR.

4.2   Succession.  At any time on or after his appointment as Trustee of this Trust, DALLAS JOSEPH FONTENOT, JR. will have the right to appoint a successor or successors to serve as Trustee in the event that DALLAS JOSEPH FONTENOT, JR. chooses not to serve as Trustee or ceases to serve as Trustee for any reason, and DALLAS JOSEPH FONTENOT, JR. may specify any conditions upon succession and service as may be permitted by law.

For example, a successor may be required to furnish a fiduciary bond as a prerequisite or a successor's service may be condition upon the death, resignation, or inability to serve of another appointee.

At any time on or after his appointment as Trustee of this Trust, DALLAS JOSEPH FONTENOT, JR. may also provide that one or more designated successors will have the authority to appoint his, her, or its successor as Trustee.  An appointment of successor Trustee must be in writing and must be acknowledged to be effective.

In the absence of an appointment, or in the event all successors appointed by a Trustee shall fail or cease to serve for any reason, DALLAS JOSEPH FONTENOT, III is to be the successor as Trustee.

Trustor specifically provides that upon assumption of actual service as Trustee, DALLAS JOSEPH FONTENOT, III will have the right to appoint his successor as Trustee and to vest in a successor Trustee, upon assumption of that person's service, the right and authority to designate succession as Trustee.

In the event all of the Trustees named above, including duly appointed successors, fail or cease to serve for any reason, then FIRST INTERSTATE BANK OF TEXAS, N.A. is to be the successor Trustee.  The appointment of FIRST INTERSTATE BANK OF TEXAS, N.A. as Trustee will include any successor to FIRST INTERSTATE BANK OF TEXAS, N.A. by reason of its merger, reorganization, or sale to another banking corporation with trust powers or a trust company with trust powers.

Page 4 of 18 Pages
E1142_81.01

5. <u>Distribution of Income and Trust Corpus, Living and Port-Mortem</u>.   The Trustee shall hold in trust or dispose of the Trust Estate as follows.

    5.1    <u>Distribution of Income and Principal</u>.   The Trustee will have the discretionary authority to distribute to any or all of the Primary Beneficiaries or to apply for the Primary Beneficiaries' use and benefit such amounts of the Trust income and principal of the Trust Estate, even to the exhaustion thereof, as the Trustee shall desire, in the absolute discretion of the Trustee.   The Trustee will have the discretionary authority to apportion or accumulate income to or for one or more of the Primary Beneficiaries in such amounts as the Trustee shall desire, in the absolute discretion of the Trustee; and the Trustee may distribute such amounts in equal or unequal shares, in the Trustee's absolute discretion. The Trustee may elect not to distribute any sums to any one or more of the Primary Beneficiaries.   Accumulated income shall be added to the principal of the Trust.

    5.2    <u>Term of the Trust</u>.   The term of this Trust shall be for so long as any of HOLLI HARDIN FONTENOT, DALLAS JOSEPH FONTENOT, JR., and ANNE S. FONTENOT shall live.   Upon the last to die of all of the foregoing, this Trust shall terminate; provided, however, that the Trust will continue for a reasonable term thereafter for the purpose of liquidation and settlement.

    5.3    <u>Distributions for Death Taxes</u>.   If the testamentary estate of the Trustor or any other Primary Beneficiary shall include any property of the Trust Estate because of the provisions of Sections 2036, 2037, and 2038 of the Internal Revenue Code of 1986 or any other provisions of the Internal Revenue Code of 1986, as amended, or under any corresponding statute hereafter in effect (dealing with inclusion of the Trust assets in the testamentary estate because of retained powers or otherwise), any death taxes (including but not limited to any estate tax) owing as a result of such inclusion shall be paid by this Trust.   This provision shall control notwithstanding any other provision contained in this Trust.   As used in this Trust Agreement, the term "death taxes" refers to all estate, inheritance, transfer, succession, legacy, or other death taxes of any kind and interest or penalty on such taxes, if any.

    5.4    <u>Distributions Upon Termination of the Trust</u>.   Upon termination of this Trust, the undistributed principal and income after the distributions, if any, allowed under Section 5.3 above, shall be divided in equal shares, one for each of DALLAS

Page 5 of 18 Pages
H1142_81.01

003189

JOSEPH FONTENOT, III, MICHELLE ANNE FONTENOT, and each of the children of the marriage of HOLLI HARDIN FONTENOT and DALLAS JOSEPH FONTENOT, JR., including any children adopted by HOLLI HARDIN FONTENOT and DALLAS JOSEPH FONTENOT, JR. after the Effective Date ("Trust Share"). Each of the foregoing, using a Qualified Beneficiary Designation, shall have the right to appoint the Beneficiary or Beneficiaries of the Trust Estate upon his or her death and the manner in which an appointee is to receive his, her, or its Trust Share. If such Beneficiary does not exercise his power of appointment with a Qualified Beneficiary Designation, the Beneficiary's Trust Share of the remaining property of the Trust, net of settlement costs, will pass upon the termination of the Trust *per stirpes*, outright and free of Trust, to his issue living at the time of his death or, if none, *per stirpes* to the Trustor's issue then living.

5.5    Distribution In Accordance With Texas Intestate Laws. In the event all Primary Beneficiaries and all of the issue of the Primary Beneficiaries have died, upon termination of this Trust the Trustee shall distribute the Trust Estate among the heirs at law of DALLAS JOSEPH FONTENOT, JR. in accordance with the Texas rules for intestate distribution as if the Primary Beneficiaries and all of the children and other issue of the Primary Beneficiaries had predeceased the Trustor.

5.6    Method of Distribution. During such time as the Trustee is so expending sums from the Trust Estate for the benefit of any Beneficiary or otherwise as provided herein, the Trustee is authorized to make payments or delivery of the portion or portions of the Trust Estate, either to the Beneficiary directly or to the person having the care and custody of the Beneficiary, all without the necessity of the appointment of any guardian. Without limitation on the foregoing, it is acknowledged and agreed that this Trust constitutes a grantor trust within the meaning of Sections 671, et seq. of the Internal Revenue Code of 1986, as amended and that the income therefrom will be taxed to the Trustor for so long as the Trustor shall live. It is further understood and agreed that the Trustee shall distribute to the Trustor (or to any other person who is deemed to be a grantor of this Trust and taxable on the income of the Trust within the meaning of Section 671, et seq. of the Internal Revenue Code of 1986, as amended) the incremental income taxes arising in connection with the taxable income of the Trust Estate or, at the election of the Trustee, the Trustee may make

Page 6 of 18 Pages

H1142_81.01

003190

such distribution directly to the Internal Revenue Service for the benefit of such person.

5.7   _Partial and Final Distributions_. The Trustee, in making or preparing to make a partial or final distribution, may prepare an accounting and may require any or all of the following as a condition to payment: a written and acknowledged statement from each distributee that the accounting has been thoroughly examined and accepted as correct; a discharge of the Trustee; a release from any loss, liability, claim, or question concerning the exercise of due care, skill, and prudence of the Trustee in the management, investment, retention, and distribution of property during the Trustee's term of service (except for any undisclosed error or omission having basis in fraud or bad faith); and/or an indemnity for the benefit of the Trustee, to include the payment of attorney's fees, from any asserted claim of any taxing agency, governmental authority, or other claimant. Any Beneficiary having a question or potential claim may require an audit of the Trust as an expense of administration. Failure to require the audit prior to acceptance of the Trustee's report or the acceptance of payment will operate as a final release and discharge of the Trustee except as to any error or omission having basis in fraud or bad faith.

5.8   _Contingent Trust for Certain Beneficiaries_. The interest of any Beneficiary who has not attained the age of thirty (30) years (the "Required Age") or who may be otherwise legally disabled and whose interest is not otherwise covered by the provisions of this Trust Declaration may, in the sole and absolute discretion of the Trustee, be continued in Trust or be held as a separate trust, for the use and benefit of that person until such person shall attain the Required Age or until such person is no longer disabled. For so long as the Trustee holds the Trust for a Beneficiary pursuant to these terms, the Beneficiary, using the Qualified Beneficiary Designation, shall have the right to appoint the Beneficiaries of his or her interest in the Trust entitled to his or her interest upon the death of the Beneficiary. If the Beneficiary dies prior to a final distribution of his or her interest from the Trust without having made a Qualified Beneficiary Designation, that person's interest in the Trust will pass _per stirpes_ to his or her issue then living, or if none, _per stirpes_ to the issue of the Trustor then living.

Page 7 of 18 Pages
B114Z_81.01

6.  Powers of the Trustee.  In order to carry out the purposes of this Trust Declaration, the Trustee, in addition to all other powers granted by law, shall have the following powers and discretions.

    6.1   Retain Assets.  The Trustee shall have the power to continue to hold any and all property received by the Trustee or subsequently added to the Trust Estate or acquired pursuant to proper authority if and as long as the Trustee, in exercising reasonable prudence, discretion, and intelligence, considers that the retention is in the best interest of the Trust.

    6.2   Investments.  The Trustee shall have the power to invest and reinvest in every kind of property, real, personal, or mixed, and every kind of investment, specifically including, but not by way of limitation, corporate obligations of every kind, and stocks, preferred or common, without regard to risk of loss or decline in value.

    6.3   Management of Securities.  The Trustee shall have the power to exercise, respecting securities held in the Trust Estate, all the rights, powers, and privileges of owners, including, but not limited to the power to vote, give proxies, and to pay assessments and other sums deemed by the Trustee necessary for the protection of the Trust Estate; to participate in voting trusts, pooling agreements, foreclosures, reorganizations, consolidations, mergers, and liquidations, and in connection therewith to deposit securities with and transfer title to any protective or other committee under such terms as the Trustee may deem advisable; to exercise or sell stock subscription or conversion rights; to accept and retain as an investment any securities or other property received through the exercise of any of the foregoing powers, regardless of any limitations elsewhere in this instrument relative to investments by the Trustee.

    6.4   Form of Ownership of Trust Property.  The Trustee shall have the power to hold securities or other Trust property in the name of the Trustee as Trustee under this Trust Declaration or in the Trustee's own name or in the name of a nominee or in such conditions where ownership will pass by delivery.

    6.5   Business Interests.  The Trustee shall have the power to continue and operate, to sell or to liquidate, as the Trustee deems advisable at the risk of the Trust Estate,

Page 8 of 18 Pages

E1142_81.01

any business or partnership interests received by the Trust Estate.

6.6    Sell and Exchange.  The Trustee shall have the power to sell for cash or on deferred payments and on such terms and conditions as are deemed appropriate by the Trustee, whether at public or private sale, to exchange, and to convey any property of the Trust Estate.

6.7    Abandonment of Trust Assets.  The Trustee shall have the power to abandon any Trust asset or interest therein in the discretion of the Trustee.

6.8    Option.  The Trustee shall have the power to grant an option involving disposition of a Trust asset and to take an option for the acquisition of any asset by the Trust Estate.

6.9    Lease.  The Trustee shall have the power to lease any real or personal property of the Trust Estate for any purpose for terms within or extending beyond the duration of the Trust.

6.10   Property Management.  The Trustee shall have the power to manage, control, improve, and repair real and personal property belonging to the Trust Estate.

6.11   Development of Property.  The Trustee shall have the power to partition, divide, subdivide, assign, develop, and improve any Trust property; to make or obtain the vacation of plats and adjust boundaries or to adjust difference in valuation on exchange or partition by giving or receiving consideration; and to dedicate land or easements to public use with or without consideration.

6.12   Repair, Alter, Demolish, and Effect.  The Trustee shall have the power to make ordinary and extraordinary repairs and alterations in buildings or other trust property, to demolish any improvements, to raze party walls or buildings, and to erect new party walls or buildings as the Trustee deems advisable.

6.13   Borrowing and Encumbering.  The Trustee shall have the power to borrow money for any Trust purpose from any person, firm, or corporation on the terms and conditions deemed appropriate by the Trustee and to obligate the Trust Estate for repayment, upon such terms and conditions (including a term extending beyond the duration of the Trust) as the Trustee deems advisable; to encumber the Trust Estate or any of its property by mortgage, deed of

003193

trust, pledge, or otherwise, using whatever procedures to consummate the transaction deemed advisable by the Trustee; and to replace, renew, and extend any encumbrance and to pay loans or other obligations of the Trust Estate deemed advisable by the Trustee.

6.14   Natural Resources.   The Trustee shall have the power to enter into oil, gas, liquid or gaseous hydrocarbon, sulphur, metal and any and all other natural resource leases on terms deemed advisable by the Trustee, and to enter into any pooling, unitization, repressurization, community, and other types of agreements relating to the exploration, development, operation, and conservation of properties containing minerals or other natural resources; to drill, mine, and otherwise operate for the development of oil, gas, and other minerals; to contract for the installation and operation of absorption and repressurizing plants; and to install and maintain pipelines.

6.15   Insurance.   The Trustee shall have the power to procure and carry at the expense of the Trust Estate insurance of the kinds, forms, and amounts deemed advisable by the Trustee to protect the Trust Estate and the Trustee against any hazard.

6.16   Enforcement of Hypothecations.   The Trustee shall have the power to enforce any deed of trust, mortgage, or pledge held by the Trust Estate and to purchase at any sale thereunder any property subject to any such hypothecation.

6.17   Extending Time of Payment of Obligations.   The Trustee shall have the power to extend the time of payment of any note or other obligation held in the Trust Estate, including accrued or future interests, in the discretion of the Trustee.

6.18   Adjustment of Claim.   The Trustee shall have the power to compromise, submit to arbitration, release with or without consideration, or otherwise adjust claims in favor of or against the Trust Estate.

6.19   Litigation.   The Trustee shall have the power to commence or defend at the expense of the Trust Estate any litigation affecting the Trust or any property of the Trust Estate deemed advisable by the Trustee.

6.20   Administration Expenses.   The Trustee shall have the power to pay all taxes, assessments, compensation of the Trustee, and all other expenses incurred in the collection, care, administration, and protection of the Trust Estate.

Page 10 of 18 Pages

B1142_81.01

003194

6.21  Employment of Attorneys, Advisers, and Other Agents.  The Trustee shall have the power to employ any attorney, investment adviser, accountant, broker, tax specialist, or any other agent deemed necessary in the discretion of the Trustee and to pay from the Trust Estate reasonable compensation for all services performed by any of them.

6.22  Termination by Trustee of Small Trust.  The Trustee shall have the power to terminate, in the discretion of the Trustee, the Trust held for the Beneficiaries if the fair market value of the Trust at any time becomes less than $25,000.00 and, regardless of the age of the Beneficiaries to distribute the principal and any accrued or undistributed income to the Beneficiaries, or to their respective guardians, conservators, or other fiduciaries.

6.23  Distribution.  The Trustee shall have the power on any partial or final distribution of the income or principal of the Trust Estate, to apportion and allocate the assets of the Trust Estate in cash or in kind, or partly in cash and partly in kind, or in undivided interests in the manner deemed advisable in the discretion of the Trustee and to sell any property deemed necessary by the Trustee to make the distribution.

6.24  Merger.  The Trustee shall have the power to merge this Trust with any trust established for the benefit of substantially the same beneficiaries as the Beneficiaries of this Trust and to manage and administer the respective Trusts and Trust Estate as one Trust and Trust Estate subject to the terms and conditions of the Trust Declaration governing each of said Trusts.

6.25  General.  The Trustee shall have the power to do all the acts, to take all the proceeds, and to exercise all the rights, powers, and privileges which an absolute owner of the property would have.  The enumeration of certain powers in this Trust Declaration shall not limit the general or implied powers of the Trustee.  The Trustee shall have all additional powers that may now or hereafter be conferred by law or that may be necessary to enable the Trustee to administer the Trust in accordance with the provisions of this Trust Declaration, subject to any limitations specified in this Trust Declaration.  The Trustee shall further have the discretion to maintain reserves for depreciation and/or depletion.

Page 11 of 18 Pages
B1142_81.01

7.  Duties and Compensation of the Trustee.

    7.1    Allocation of Income and Principal.  The Trustee shall determine what is income and what is principal of the Trust created under this Trust Declaration and what expenses, costs, taxes, and charges of any kind whatsoever shall be charged against income and what shall be charged against principal in accordance with the applicable statutes of the State of Texas as they now exist and may from time to time be enacted, amended, or repealed.

    7.2    Relations With Trustee.  No one dealing with the Trustee need inquire concerning the validity of anything the Trustee purports to do, or need see to the application of any money paid or any property transferred to or upon the order of the Trustee.

    7.3    Compensation.  Unless such fee is waived or unless specific provision is otherwise made in the appointment of any Trustee, each Trustee shall be entitled to reasonable compensation for services as Trustee in accordance with the usual and customary charges in the community where and when such services are rendered.  The fee schedules of area trust departments prescribing fees for the same or similar services may be used to establish reasonable compensation.  A Trustee will be entitled to full reimbursement for expenses, costs, or other obligations incurred as the result of service, including attorney's, accountant's, and other professional's fees.

    7.4    Exculpation From Liability of Trustee.  The Trustee shall not be liable for any error or judgment or for any act done or omitted by the Trustee in good faith or for anything which the Trustee may in good faith do or refrain from doing in connection with this Trust.  Accordingly, the Trustee shall not incur any liability with respect to any action taken or omitted in good faith upon the advice of counsel given in respect to any questions relating to the duties and responsibilities of the Trustee under this Trust Declaration or any action taken or omitted in reliance upon any instrument, including the written advice provided for herein, not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and accuracy of any information contained therein, which the Trustee shall in good faith believe to be genuine, to have been signed and presented by a proper person or persons, and to have conformed with the provisions of this Trust Declaration. The parties acknowledge and agree that the Trustee has no obligations to the Trust or any Beneficiary to offer to the Trust any investment opportunities presented to

Page 12 of 18 Pages

B1142_81.01

003196

Trustee individually during the term of the Trust Declaration.

7.5 Indemnity. The Trustor shall at all times release and indemnify any successor Trustee and hold such successor Trustee harmless against any and all claims, suits, actions, debts, damages, costs, charges, and expenses, including court costs and attorney's fees, and against all liabilities, losses, or damages of any nature whatsoever that the Trustee shall at any time sustain or suffer in connection with acceptance or appointment as Trustee under this Agreement or as a result or arising out of the acquisition of any assets contributing to the Trust Estate, except to the extent of any such matter arising by reason or in consequence of the fraud or bad faith of the Trustee.

7.6 Bond. No bond shall be required of the original Trustee hereunder. Unless any instrument appointing a successor may provide otherwise, no bond shall be required of any successor Trustee; or if a bond is required by law, no surety shall be required on such bond.

7.7 Resignation. Any Trustee of this Trust may at any time resign with respect to such Trust, with or without cause, effective ninety (90) days after delivery of notice of resignation thereof in writing to each current Beneficiary of this Trust. If such Beneficiary is a minor, such delivery may be made to any guardian of such minor Beneficiary or to any adult with whom such minor Beneficiary resides.

7.8 Removal of a Trustee. The Beneficiaries who are then entitled to receive distributions of income from the Trust or distributions of income from any separate trust created by this Trust Declaration may remove any corporate Trustee then serving, the notice of removal to be delivered in writing to the corporate Trustee. Unless this Trust Declaration or any instrument appointing a successor provides otherwise, the selection of a successor to the corporate Trustee will be made by a court of competent jurisdiction. In the event there is more than one Beneficiary entitled to the income from the Trust, all income Beneficiaries must join in the written notice of removal. The consent of any person who is deceased or legally disabled will not be required in meeting the unanimous consent requirements for removal.

7.9 Liability of Trustee. The Trustee in carrying out the Trustee's powers and performing the Trustee's duties may act in the

Page 13 of 18 Pages
E1142_81.01

003197

Trustee's discretion and shall be personally or individually liable only for fraud or acts or omissions in bad faith.  No Trustee shall be liable individually or personally for any act or omission of any agent or employee of Trustee unless the Trustee shall have acted in bad faith in the selection and retention of such agent or employee.

7.10  Accounts.  The Trustee shall each year render an account of the administration of the Trust hereunder to each living Primary Beneficiary.  If a Federal Fiduciary Income Tax Return is then required for this Trust, such accounting may be made by submission of a copy of such return filed for the Trust.  If no objection to an accounting has been made in writing by such Primary Beneficiary within sixty (60) days after the date of mailing of such accounting by the Trustee, it shall be deemed approved.  Such approval of such account shall, as to all matters and transactions stated therein or shown thereby be final and binding upon all persons (whether in being or not) who are then or may thereafter become interested in, or entitled to share in, either the income or the principal of such Trust, provided always, however, that nothing contained in this Section 7.10 shall be deemed to give such person (or the guardian or representative) acting in conjunction with the Trustee the power to alter, amend, revoke, or terminate the Trust.

7.11  Multiple Trustees.  In the event that there are two or more Trustees serving the Trust, all Trustees must sign any instrument transferring real property from the Trust.  If the Trustees agree to do so, one Trustee acting alone may be given the primary responsibility of administration and accounting, and one Trustee alone may be authorized to deposit, transfer, and withdraw funds from any depository account held by the Trust.  The authority vested in two Trustees may be exercised only by both of the Trustees; and, subject to the foregoing provisions, the authority vested in three or more trustees may be exercised by a majority of the Trustees.  In the event of an action or decision by a majority, the non-consenting Trustee will not be responsible for the act of the majority.

8.  Spendthrift Provision.  The interests of each of the Beneficiaries in the principal or income of the Trust created hereunder shall not be subject to the claims of his or her creditors or creditors of others, including creditors of a spouse of a married Beneficiary, nor to legal process, and may not be voluntarily or involuntarily alienated or encumbered until actually distributed to such Beneficiary.

Page 14 of 18 Pages
E114Z_81.01

9.  Perpetuities Savings Clause.  Unless sooner terminated as otherwise provided in this Trust Declaration, the Trust created herein shall fully cease and terminate twenty-one (21) years after the date of the last survivor of the Trustor, the Primary Beneficiaries, and the children of each of the Primary Beneficiaries in existence as of the date of this Trust.  Upon such termination, the entire principal of the Trust Estate of the Trust, together with any undistributed income therefrom, shall vest in and be distributed to the persons entitled to take under the provisions of the Trust.

10.  In Terrorem Provision.  If any person entitled to receive any interest from this Trust shall contest the validity of this Trust or any provision thereof or shall institute or join in (except as a party defendant) any proceeding to contest the validity of this Trust or to prevent any provision thereof from being carried out in accordance with its terms (regardless of whether or not such proceedings are instituted in good faith and with probable cause), then all benefits provided to such person in this Trust shall be revoked, and such benefits shall pass as if such person were not then living.

11.  Construction of Trust.

   11.1  Governing Law.  This Trust Declaration shall be governed by the laws of the State of Texas.

   11.2  Severability.  If any part, clause, provision, or condition of this Trust Declaration is held to be void, invalid, or inoperative, such voidness, invalidity, or inoperativeness shall not affect any other clause, provision, or condition hereof; but the remainder of this Trust Declaration shall be effective as though such clause, provision, or condition had not been contained herein.

   11.3  Interpretative Clause.  As used in this Trust Declaration, the masculine, feminine, or neuter gender, and the singular or plural number shall each be deemed to include the others whenever the context so indicates.

   11.4  Notices.  All communications required to be given to the Trustor, the initial Trustee hereunder, or the Primary Beneficiaries (including notice of change of address) shall be in writing and shall be deemed to be duly given if and when personally delivered, or, if mailed via certified mail, return receipt requested, when tendered into the care and custody of the United States postal service properly addressed to as follows:

Page 15 of 18 Pages
B1142_81.01

003199

If to Trustor or Trustee:

HOLLI HARDIN FONTENOT
6002 Burning Tree Drive
Houston, Texas   77036

If to Primary Beneficiaries:

Dallas Joseph Fontenot, Jr.
6002 Burning Tree Drive
Houston, Texas   77036

Anne S. Fontenot
8526 Leader
Houston, Texas   77036

Dallas Joseph Fontenot, III
8526 Leader
Houston, Texas   77036

Michelle Anne Fontenot
8526 Leader
Houston, Texas   77036

11.5  Copies.  To the same extent as if it were the original, anyone may rely on a copy of this Trust Declaration certified by a notary public to be a true copy of this Trust Declaration.  Anyone may rely on any statement of fact certified by anyone who appears from the original Trust Declaration or a certified copy thereof to be a Trustee hereunder.

IN WITNESS WHEREOF, I, the undersigned, HOLLI HARDIN FONTENOT, attest that I have executed this Declaration of Trust and that the terms thereof will bind me and my successors and assigns, my heirs and personal representatives, and any Trustee of this Trust.  This Trust Declaration has been signed by the Trustor on the Effective Date.

HOLLI HARDIN FONTENOT

Page 16 of 18 Pages
B1142_81.01

003200

THE STATE OF TEXAS      §
                        §
COUNTY  OF  HARRIS      §

       This instrument was acknowledged before me on this the 5th day of June, 1991, by HOLLI HARDIN FONTENOT.



_____
Notary Public in and for
The State of T E X A S

_____
(Printed or Typed Name of Notary)

_____
(Commission Expiration Date)

## ACCEPTANCE BY TRUSTEE

I acknowledged that I have been appointed as a Trustee of THE HOLLI ANN HARDIN TRUST NUMBER ONE, and I hereby evidence my acceptance of the office of Trustee and will hold and administer the Trust according to the provisions thereof as required by law.

Date: _____

_____
HOLLI HARDIN FONTENOT

Page 17 of 18 Pages
E1142_81.01

THE STATE OF TEXAS     §
                          §
COUNTY OF HARRIS     §

         This instrument was acknowledged before me on this the 5th day of June, 1991, by HOLLI HARDIN FONTENOT, TRUSTEE.



Notary Public in and for
The State of T E X A S

(Printed or Typed Name of Notary)

(Commission Expiration Date)

Page 18 of 18 Pages
H1142_81.01

TO WHOM IT MAY CONCERN:

I, Holli Ann Hardin Fontenot, hereby voluntarily resign as trustee of the Holli Ann Hardin Fontenot Trust Number One and the Dakota Trust. This resignation as trustee shall be effective immediately upon acceptance by Dallas J. Fontenot, Jr.

Very truly yours,

Holli Ann Hardin Fontenot

Agreed and accepted this __8__ day of __SEPT.__, 1996.

Dallas J. Fontenot, Jr.

LDK238:19

TOTAL P.02

003203

# EXHIBIT B

---

### TRUST DECLARATION
### DAKOTA TRUST

---

THIS TRUST DECLARATION is made this day by declaration of Holli Hardin Fontenot ("Settlor"), who presently resides in Fort Bend County, Texas.

### ARTICLE I.
### TRUST BENEFICIARY

This Trust is created for the use and benefit of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot.    The term "Trust Beneficiary" or "beneficiary" will also mean any and all persons, organizations, trusts, and entities who may have or may acquire a beneficial interest in this Trust, whether vested or contingent in nature, including a transfer of an interest in the Trust during the life of either Dallas Joseph Fontenot, Jr. or Holli Hardin Fontenot, or both, or from the exercise of a power of appointment by a Trust Beneficiary or otherwise.

For reference, the only child of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot is Dakota James Fontenot, who was born on June 22, 1994.  Holli Hardin Fontenot has no other children born to her or adopted by her on the date of this Trust Declaration.

For reference, the only other children of Dallas Joseph Fontenot, Jr. are:  Dallas Joseph Fontenot, III (who was born on March 29, 1969) and Michelle Anne Fontenot (who was born on March 12, 1970). Dallas Joseph Fontenot, Jr. has no other children born to him or adopted by him on the date of this Trust Declaration.

### ARTICLE II.
### INITIAL TRUST CORPUS AND RIGHT TO ADD TO THE TRUST

A.    INITIAL TRUST CORPUS.  Settlor does hereby declare that from and after the date of this Trust Declaration, Settlor holds in trust the assets described in Schedule A attached to this Declaration, which assets are the initial corpus of this Trust and as Trustee acknowledges receipts of those assets.  Settlor or any other person, trust, or entity may add property of any

003271

character to this Trust by a Last Will and Testament, from another trust (whether inter vivos or testamentary), or by deed or other transfer, subject only to the acceptance thereof by the Trustee.

B.   **ADDITIONS TO TRUST CORPUS.**   Additional contributions may be made to the corpus of the Trust, including testamentary contributions.

C.   **SEPARATE PROPERTY.**   The assets of this trust are the separate property of Holli Hardin Fontenot. No inter vivos transfer of property will be made to this Trust unless the property constitutes the separate property of Holli Hardin Fontenot. Holli Hardin Fontenot may make a testamentary contribution of property to this Trust, and such contribution may constitute the separate property of Holli Hardin Fontenot and Holli Hardin Fontenot's interest in community property.

## ARTICLE III.
### NO REVOCATION OR AMENDMENT

A.   **TRUST IS IRREVOCABLE.**   This Trust is an irrevocable Trust.

B.   **THIS TRUST MAY NOT BE AMENDED.**   This Trust Declaration may not be amended, except by a Court of competent jurisdiction under the doctrine of *cy pres.*

C.   **INCOME TAX MATTERS.**   For so long as the Settlor or Dallas Joseph Fontenot, Jr. is a Trustee of the Trust, the Trust will be treated for income tax reporting purposes as a Grantor Trust under Treasury Regulation § 1.671-4(b). Thereafter, the Trust is to be treated for income tax purposes as required by the applicable provisions of Subchapter J of the Internal Revenue Code.

## ARTICLE IV.
### DEFINITIONS

A.   **DESCENDANTS.**   The term "Descendants" means the legitimate children of the person designated and the legitimate lineal descendants of such children. The term includes any person adopted before attaining age eighteen (18) and the adopted person's legitimate lineal descendants. A posthumous child shall be considered as living at the death of his parent.

Page 2 of 23 Pages

B.    **HEIRS AT LAW.**  Whenever a trustee, or a legal advisor to the Trustee is called upon to determine the heirs at law of Settlor, or any other person beneficially interested in this Trust, the determination will be made to identify those individuals, other than creditors, who would receive the personal property of a decedent upon his or her death as determined in accordance with the laws of intestate succession of the State of Texas, United States of America, determined as if the decedent had then died single, intestate, and domiciled in Texas and further determined as if the Settlor of this Trust had predeceased the person or persons so named or described.

C.    **INCOMPETENT, DISABILITY.**  A beneficiary will be considered "incompetent" or "disabled" if he or she is incapacitated to an extent to make it impossible or impractical to give prompt and intelligent consideration to business matters.  The Trustee may act upon such evidence as the Trustee reasonably deems appropriate and reliable without liability by reason thereof.

D.    **MINOR BENEFICIARY.**  The term "Minor Beneficiary" or "Minor" identifies a beneficiary who is less than 21 years of age.

E.    **PER STIRPES.**  Whenever a distribution is directed to be made to the descendants, *per stirpes*, of any person or persons, including the descendants of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot, the property to be distributed shall be divided into as many equal shares as there are then living children of each of those persons and deceased children of each those persons who have descendants then living.  Each then living child of such person shall take one share, and the share for the descendants of each deceased child shall be divided among the deceased child's then living descendants on a *per stirpes* basis.

For example, if a distribution were to be made to the descendants, *per stirpes*, of Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot, assuming the recitations in Article I, the property to be distributed would be divided into three equal shares, one for each of Dallas Joseph Fontenot, III, Michelle Anne Fontenot, and Dakota James Fontenot.

F.    **RELATIVE OR RELATIVES.**  Reference to a "Relative" or "Relatives" will identify any person or persons related to Settlor by blood or lawful adoption in any degree.

Page 3 of 23 Pages

003273

G.   **POWER OF APPOINTMENT, QUALIFIED BENEFICIARY DESIGNATION.** Whenever this Trust Declaration gives a Trust Beneficiary the power or authority to appoint a beneficiary of the Trust, the designation must be in writing and be acknowledged in the form required of acknowledgements by Texas law or exercised by a will executed with the formalities required by law of the Trust Beneficiary's residence; it must clearly evidence the intent of the Trust Beneficiary to exercise a power of appointment; and the written beneficiary designation must have been delivered to the Trustee prior to the Trust Beneficiary's death or, if exercised by will, the will must have been filed for probate within three months from the date of the Trust Beneficiary's date of death and must subsequently be admitted to probate no matter the time interval. The term of this Trust may be extended if the qualified beneficiary designation requires that a Beneficiary's interest remain in Trust, or may be divided and be held as a separate trust which is governed by the terms of this Trust Declaration.

H.   **SURVIVE.** For the purpose of vesting in the event two or more persons who have an interest in the trust die within a short time of one another, one must have survived the other for a period of at least 90 days as a condition to vesting.

I.   **TESTAMENTARY CONTRIBUTIONS.** The term "testamentary contributions" will mean any contribution to the Trust made by reason of the death of a person, including transfers made under the direction of a will, a beneficiary designation in a life insurance policy or other contract, by reason of survivorship language contained in a depository contract, or transfers from another Trust which designates this Trust as a beneficiary.

J.   **TRUST.** "Trust" means the Trust created by this Trust Declaration

K.   **TRUST DECLARATION.** The term "Trust Declaration" and the term "Trust Agreement" each refer to this Trust Declaration.

L.   **TRUST FUND.** The term "Trust Fund" or "Trust Property" means all property comprising: the initial contribution of corpus to the Trust; all property paid or transferred to, or otherwise vested in, the Trustee as additions to the corpus of this Trust; accumulated income, if any, whether or not added to the corpus of this Trust; and the investments and reinvestment of the Trust property, including the increase and decrease in the values thereof as determined from time to

003274

time.    The terms "corpus" and "principal" are used interchangeably.

M.    **TRUSTEE.** For convenience, the term "Trustee," used in the singular, will mean and identify multiple Trustees serving and acting pursuant to the directions of this Trust Declaration. The term "corporate Trustee" will identify a banking or trust corporation with trust powers.

N.    **GENDER, PLURAL USAGE.** The use of personal pronouns, such as he, she, or it, are to be construed in context. The term "person" will include a non-person, such as a corporation, trust, partnership or other entity as is appropriate in context. The identification of person in the plural will include the singular and *vice versa*, as is appropriate in context.

**ARTICLE V.**
**APPOINTMENT OF TRUSTEE**

A.    **ORIGINAL APPOINTMENT.** Holli Hardin Fontenot shall serve as initial Trustee of this Trust.

B.    **FIRST SUCCESSOR.** In the event that Holli Hardin Fontenot should die, resign, or become incapacitated or unable to act as Trustee of this Trust, or in the event that Holli Hardin Fontenot should subsequently become divorced from Dallas Joseph Fontenot, Jr., then Dallas Joseph Fontenot, Jr. shall serve as successor Trustee of this Trust. In the event that Dallas Joseph Fontenot, Jr. should elect not to serve as Trustee of this Trust, Dallas Joseph Fontenot, Jr. will have the right to appoint a successor or successors to serve as Trustee, as set forth in Section V.C below, and he may specify any conditions upon succession and service as may be permitted by law.

Holli Hardin Fontenot acknowledges and agrees that the rights and obligations of Holli Hardin Fontenot to serve as Trustee and to resign as Trustee in accordance with the foregoing have been and are the subject of separate consideration, receipt of which is hereby acknowledged in full; and such rights and obligations are in the best interest of the administration of the Trust for its Beneficiaries. Holli Hardin Fontenot specifically waives any rights which she may have to rescind

003275

or revoke her obligation to resign as Trustee upon divorce from Dallas Joseph Fontenot, Jr.

C.    **SUCCESSION.**    Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment will have the right to appoint a successor or successors to serve as Trustee in the event that person ceases to serve for any reason, and each Trustee may specify any conditions upon succession and service as may be permitted by law. For example, a successor may be required to furnish a fiduciary bond as a prerequisite or a successor's service may be conditioned upon another appointee's death, resignation, or inability to serve. Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment may also provide that one or more designated successors as Trustee will have the authority to appoint his, her, or its successor as Trustee. An appointment of successor Trustee must be in writing and must be acknowledged to be effective. Unless other specified by a Trustee in a written designation of succession, succession is to be determined as follows.

If a Trustee by original appointment does not appoint a successor, the remaining Trustee or Trustees then serving will continue service alone. If all Trustees by original appointment fail or cease to serve for any reason without having appointed a successor or successors, the successor or successors as Trustee will be as named below and in the order of succession herein prescribed.

FIRST:    Dallas Joseph Fontenot, III

BUT:    Settlor specifically provides that upon assumption of actual service as Trustee, Dallas Joseph Fontenot, III will have the right to appoint Dallas Joseph Fontenot, III's successor as Trustee, and to vest in a successor Trustee, upon assumption of that person's service, the right and authority to designate succession as Trustee. To the extent this is done, the appointment of succession will supersede the appointments which follow the designation of Dallas Joseph Fontenot, III as Trustee.

NEXT:    Michelle Anne Fontenot

BUT:    Settlor specifically provides that upon assumption of actual service as Trustee, Michelle Anne Fontenot will have the right to appoint Michelle Anne Fontenot's successor as Trustee, and to vest in a successor Trustee, upon assumption of that person's service, the right and

003276

authority to designate succession as Trustee. To the extent this is done, the appointment of succession will supersede the appointments which follow the designation of Michelle Anne Fontenot as Trustee.

FINALLY:    First Interstate Bank of Texas, N.A., in the event all of the above, including duly appointed successors, fail or cease to serve for any reason. The appointment of First Interstate Bank of Texas, N.A. as Trustee will include any successor to First Interstate Bank of Texas, N.A. by reason of its merger, reorganization, or sale to another banking corporation with trust powers or a trust company with trust powers.

D.    **AUTHORITY OF SUCCESSOR TRUSTEE.** A successor will have the authority vested in a Trustee by original appointment under this Trust Declaration, subject to any lawful limitations or qualifications upon the service of a successor imposed by one Trustee in a written document appointing a successor. A successor Trustee will not be obliged to examine the accounts, records, or acts of the previous Trustee or Trustees; nor will a successor Trustee in any way or manner be responsible for any act or omission to act on the part of any previous Trustee. Reference to "Trustee" in the singular will include the plural.

E.    **BOND.** No one serving as Trustee will be required to furnish a fiduciary bond as a prerequisite to service.

F.    **RESIGNATION OR REMOVAL OF A TRUSTEE.** Any appointee serving or entitled to serve as Trustee may resign at any time and without cause, and the instructions in this Trust Declaration will determine who the successor will be (including successors appointed by a Trustee as herein provided). The trust beneficiary or beneficiaries who are then entitled to receive distributions of income from the trust, or distributions of income from any separate trust created by this document, may remove any corporate Trustee then serving, the notice of removal to be delivered in writing to the corporate Trustee. Unless this Trust Declaration or any instrument appointing a successor provides otherwise, the selection of a successor to the corporate Trustee will be made by a Court of competent jurisdiction. In the event there is more than one beneficiary entitled to the income from the trust, all income beneficiaries must join in the written notice of removal. The consent of any person who is deceased or legally disabled will not be required in meeting the unanimous consent requirements for removal.

Page 7 of 23 Pages

003277

G. **AFFIDAVIT OF AUTHORITY.** Any person or entity dealing with the Trust may rely upon the affidavit of a Trustee or Trustees of the Trust:

*On my [our] oath, and under the penalties of perjury, I [we] swear that I [we] am [are] the duly appointed and authorized Trustee[s] of DAKOTA TRUST. I [we] certify that I [we] have not been removed as Trustee[s] and have the authority to act for, and bind, DAKOTA TRUST in the transaction of the business for which this affidavit is given as affirmation of my [our] authority.*

_____
*Signature Line*

*Sworn and subscribed before me, the undersigned authority, by _____ this _____ day of _____, 19___ .*                                              .

_____
*Notary Public - State of Texas*

H. **DOCUMENTING SUCCESSION.** The successor to any Trustee may document succession with an affidavit setting forth that the preceding Trustee has failed or ceased to serve and the successor has assumed the duties of Trustee. The affidavit may be filed in the deed records of Fort Bend County, Texas and in each county in which real property held in Trust is located or in the county in which the principal assets and records of the Trust are located. The public and all persons interested in and dealing with the Trust and the Trustee may rely upon a certified copy of the recorded affidavit as conclusive evidence of a successor's authority to serve and act as the Trustee of the Trust.

I. **COMPENSATION.** Any person who serves as Trustee may elect to receive a reasonable compensation, reasonable compensation to be measured by the time required in the administration of the Trust and the responsibility assumed in the discharge of the duties of office. The fee schedules of area Trust departments prescribing fees for the same or similar services may be used to establish reasonable compensation. A corporate Trustee will be entitled to receive as its compensation such fees as are then prescribed by its published schedule of charges for Trusts of a similar size and nature and additional compensation for extraordinary services performed by the corporate Trustee. A Trustee will be entitled to full reimbursement for expenses, costs, or other obligations incurred as the result of service, including attorney's, accountant's, and other professional fees.

J. **MULTIPLE TRUSTEES.** In the event there are two Trustees serving the Trust, both must sign any instrument transferring real property from the Trust. If the Trustees agree to do so, one Trustee acting alone may be given the primary

003278

responsibility of administration and accounting, and one Trustee alone may be authorized to deposit, transfer and withdraw funds from any depository account held by the Trust. The authority vested in three or more trustees may be exercised by a majority of the trustees. In the event of an action or decision by a majority, the non-consenting Trustee will not be responsible for the act of the majority.

### ARTICLE VI.
### DISTRIBUTIONS FROM THE TRUST,
### LIVING AND POST-MORTEM

A.  **FOR SO LONG AS HOLLI HARDIN FONTENOT AND DALLAS JOSEPH FONTENOT, JR. SHALL REMAIN MARRIED.** For so long as Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr. shall remain married, the Trustee may from time to time distribute to or pay for the benefit of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., or either of them, so much of the net income (and, if the net income of the Trust is not sufficient, the principal of the Trust) as the Trustee determines may be necessary for the support, maintenance, health, and general welfare of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., or either of them. Such determination shall be in the absolute discretion of the Trustee, whose decisions shall be binding.

B.  **UPON THE TERMINATION BY DIVORCE OF THE MARITAL RELATIONSHIP OF HOLLI HARDIN FONTENOT AND DALLAS JOSEPH FONTENOT, JR.** Upon the termination by divorce of the marital relationship of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., the interest of Holli Hardin Fontenot in this Trust will terminate and this Trust is to be continued in trust for the benefit of Dallas Joseph Fontenot, Jr. as follows:

1.  This trust will is to be continued in Trust for the sole use and benefit of Dallas Joseph Fontenot, Jr. for so long as he shall live. Dallas Joseph Fontenot, Jr. will, for the duration of the Trust, be entitled to the net income of the Trust, this amount to be paid in convenient installment payments to be not less than quarter-annually. Distributions of income to Dallas Joseph Fontenot, Jr. shall be made in the amount, form, and manner required by Section 2523(f) of the Internal Revenue Code. If the income known by the Trustee to be available to Dallas Joseph Fontenot, Jr. from other sources is insufficient to provide for his continued

003279

support and maintenance in good health, the Trustee will have the authority to pay to Dallas Joseph Fontenot, Jr. or apply for his benefit, so much of the principal of the Trust, even to the exhaustion thereof, as is necessary to provide for his support and maintenance in the style and comfort to which he is accustomed and to provide for his medical needs and maintenance of good health. It is intended that the payment of principal be limited by the ascertainable standard provided above, that this provision comply fully with Treasury Regulation §20.2041-1(c)(2), and that this Trust is to be construed and limited to that end. Dallas Joseph Fontenot, Jr. may at any time require that property which does not produce an income or a sufficient income be sold and invested in income producing property.

2. Upon the death of Dallas Joseph Fontenot, Jr., Dallas Joseph Fontenot, Jr., by a clause in his Will in which he specifically exercises this power of appointment, shall have the power to appoint the then remaining trust assets to or for the benefit of any one or more of the descendants of Dallas Joseph Fontenot, Jr. or the descendants of Holli Hardin Fontenot, in such shares, proportions, or amounts, upon such trusts and for such estates as he alone may determine. If Dallas Joseph Fontenot, Jr. fails to exercise this special power of appointment to the fullest extent, then, subject to the other provisions of this Trust, upon his death, the unappointed trust assets shall be delivered to the living descendants of Holli Hardin Fontenot who were born prior to the date of divorce and to the living descendants of Dallas Joseph Fontenot, Jr., *per stirpes*.

C. **UPON THE DEATH OF HOLLI HARDIN FONTENOT WHILE MARRIED TO DALLAS JOSEPH FONTENOT, JR.** Upon the death of Holli Hardin Fontenot while married to Dallas Joseph Fontenot, Jr. this Trust is to be continued in Trust as follows:

1. This trust will is to be continued in Trust for the sole use and benefit of Dallas Joseph Fontenot, Jr. for so long as he shall live. Dallas Joseph Fontenot, Jr. will, for the duration of the Trust, be entitled to the net income of the Trust, this amount to be paid in convenient installment payments to be not less than quarter-annually. Distributions of income to Dallas Joseph Fontenot, Jr. shall be made in the amount, form, and manner required by Section 2056(b)(7)(B) of the Internal Revenue Code. If the income known by the Trustee to be

003280

available to Dallas Joseph Fontenot, Jr. from other sources is insufficient to provide for his continued support and maintenance in good health, the Trustee will have the authority to pay to Dallas Joseph Fontenot, Jr. or apply for his benefit, so much of the principal of the Trust, even to the exhaustion thereof, as is necessary to provide for his support and maintenance in the style and comfort to which he is accustomed and to provide for his medical needs and maintenance of good health. It is intended that the payment of principal be limited by the ascertainable standard provided above, that this provision comply fully with Treasury Regulation §20.2041-1(c)(2), and that this Trust is to be construed and limited to that end. Dallas Joseph Fontenot, Jr. may at any time require that property which does not produce an income or a sufficient income be sold and invested in income producing property.

2.  Upon the death of Dallas Joseph Fontenot, Jr., Dallas Joseph Fontenot, Jr., by a clause in his Will in which he specifically exercises this power of appointment, shall have the power to appoint the then remaining trust assets to or for the benefit of any one or more of the descendants of Dallas Joseph Fontenot, Jr. or the descendants of Holli Hardin Fontenot, in such shares, proportions, or amounts, upon such trusts and for such estates as he alone may determine. If Dallas Joseph Fontenot, Jr. fails to exercise this special power of appointment to the fullest extent, then, subject to the other provisions of this Trust, upon his death, the unappointed trust assets shall be delivered to the living descendants of Holli Hardin Fontenot and to the living descendants of Dallas Joseph Fontenot, Jr., *per stirpes*.

D.  **UPON THE DEATH OF DALLAS JOSEPH FONTENOT, JR. WHILE MARRIED TO HOLLI HARDIN FONTENOT.**  Upon the death of Dallas Joseph Fontenot, Jr. while married to Holli Hardin Fontenot, this Trust is to be continued in Trust as follows:

1.  This trust will is to be continued in Trust for the sole use and benefit of Holli Hardin Fontenot for so long as she shall live. Holli Hardin Fontenot will, for the duration of the Trust, be entitled to the net income of the Trust, this amount to be paid in convenient installment payments to be not less than quarter-annually. If the income known by the Trustee to be available to Holli Hardin Fontenot from other sources is insufficient to provide for her continued support and

003281

maintenance in good health, the Trustee will have the authority to pay to Holli Hardin Fontenot or apply for her benefit, so much of the principal of the Trust, even to the exhaustion thereof, as is necessary to provide for her support and maintenance in the style and comfort to which she is accustomed and to provide for her medical needs and maintenance of good health. Holli Hardin Fontenot may at any time require that property which does not produce an income or a sufficient income be sold and invested in income producing property.

2.   Upon the death of Holli Hardin Fontenot, unless Holli Hardin Fontenot shall issue a direction to the contrary, the Trustee will pay from the Trust assets the entire increment in the taxes payable by reason of her death to the extent that the total of such taxes is greater than would have been imposed if the trust assets had not been taken into account in determining such taxes.

3.   Dallas Joseph Fontenot, Jr., by a clause in his Will in which he specifically exercises this power of appointment, shall have the power to appoint the trust assets remaining upon the death of Holli Hardin Fontenot to or for the benefit of any one or more of the descendants of Dallas Joseph Fontenot, Jr. or the descendants of Holli Hardin Fontenot, in such shares, proportions, or amounts, upon such trusts and for such estates as he alone may determine. If Dallas Joseph Fontenot, Jr. fails to exercise this special power of appointment to the fullest extent, then, subject to the other provisions of this Trust, upon his death, the unappointed trust assets shall be delivered to the living descendants of Holli Hardin Fontenot and to the living descendants of Dallas Joseph Fontenot, Jr., *per stirpes*.

E.   **ELECTION, QUALIFIED TERMINABLE INTEREST PROPERTY.** It is important to emphasize that upon the death of Holli Hardin Fontenot, or the termination by divorce of the marital relationship of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., Dallas Joseph Fontenot, Jr. will have no more than a life interest in the Trust. Dallas Joseph Fontenot, Jr. will have no right or power to revoke or amend this Trust. The Trustee may, without liability for doing so or the failure to do so, elect to treat all or a part of the Trust as Qualified Terminable Interest Property pursuant to the requirements of Section 2056(b)(7) or Section 2523(f) of the Internal Revenue Code, whichever is applicable. To the extent that an election is made, and unless Dallas Joseph Fontenot,

Page 12 of 23 Pages

003282

Jr. shall issue a direction to the contrary, the Trustee will pay from the Trust assets the entire increment in the taxes payable by reason of his death to the extent that the total of such taxes is greater than would have been imposed if the property treated as qualified terminable interest property had not been taken into account in determining such taxes. To the extent a partial election is made, and to the extent and in the manner then permitted by law, the Trustee will have the authority (1) to divide the Trust into separate trusts to reflect the partial election, or (2) to continue the Trust as a whole, with the fraction or percentage of the whole representing the elective share to be administered and maintained in a manner to reflect its proportionate share of the increment or decline in the whole of the property for the purposes of applying Sections 2044 and 2519 of the Internal Revenue Code. If the Trust is divided into separate parts, the Trustee will make the division according to the fair market value at the time the division is made. It is Settlor's intent and purpose to comply with state and federal law so that the least amount of federal estate tax will be payable upon the deaths of Holli Hardin Fontenot and Dallas Joseph Fontenot, Jr., and this Trust Declaration is to be applied and construed to accomplish this objective.

F. **DIVISION INTO SEPARATE TRUSTS**. If, following the death of Holli Hardin Fontenot or the termination by divorce of the marital relationship between Dallas Joseph Fontenot, Jr. and Holli Hardin Fontenot, the Trust is divided into separate trusts, the appreciation or depreciation in the value of each such trust or account will measure the value thereof for the purpose of disposition and taxation. For example, if the Trustee elects to treat all but $600,000 of the Trust assets as qualified terminable interest property for the federal estate tax marital deduction, and, if the Trustee segregates the $600,000 amount into a separate trust, the amount distributable therefrom upon the death of Dallas Joseph Fontenot, Jr. will be the value of that account upon the death of Dallas Joseph Fontenot, Jr. If, however, the $600,000 amount represents 25 percent of the total trust estate, and is continued and maintained as a fractional percentage of the whole, the value of the fractional interest upon the death of Dallas Joseph Fontenot, Jr. is to be determined with regard to its proportional share of any increase or decrease in the value of the whole.

G. **ITEMS OF TANGIBLE PERSONAL PROPERTY IN TRUST**. Holli Hardin Fontenot may have certain items of tangible personal property which are her separate property and which have been

003283

transferred to the Trust or otherwise subject to the Trustee's control. The term "personal belongings" or "tangible personal property" will mean and identify personal wearing apparel, jewelry, household furnishings and equipment, books, albums, art work, entertainment and sports equipment, and all items of decoration or adornment. Holli Hardin Fontenot may at any time and from time to time deliver to the Trustee written instructions as to any living or post mortem gifts of such personal belongings, and the Trustee shall be authorized and bound to make disposition of these items as Holli Hardin Fontenot has reasonably directed.

H.  **PARTIAL AND FINAL DISTRIBUTIONS.**  The Trustee, in making or preparing to make a partial or final distribution, may prepare an accounting and may require, as a condition to payment, a written and acknowledged statement from each distributee that the accounting has been thoroughly examined and accepted as correct; a discharge of the Trustee; a release from any loss, liability, claim or question concerning the exercise of due care, skill, and prudence of the Trustee in the management, investment, retention, and distribution of property during the Trustee's term of service, except for any undisclosed error or omission having basis in fraud or bad faith; and an indemnity of the Trustee, to include the payment of attorney's fees, from any asserted claim of any taxing agency, governmental authority, or other claimant.  Any remainder beneficiary having a question or potential claim may require an audit of the Trust as an expense of administration.  Failure to require the audit prior to acceptance of the Trustee's report, or the acceptance of payment, will operate as a final release and discharge of the Trustee except as to any error or omission having basis in fraud or bad faith.

The Trustee, in making or preparing to make a partial or final distribution will have the authority to:  (1) partition any asset or class of assets and deliver divided and segregated interests to the beneficiaries; (2) sell any asset or class of assets (whether or not susceptible to partition in kind), and deliver to a beneficiary or beneficiaries a divided interest in the proceeds of sale and/or divided or undivided interests in any note and security arrangement taken as part of the purchase price; and/or (3) deliver undivided interests in an asset or class of assets to the beneficiaries subject to any indebtedness which may be secured by the property.

I.  **CONTINUATION OF THE TRUST DURING DISSOLUTION.**  The Trust may continue beyond its termination for a time reasonably necessary to conclude the administration of the Trust, pay

003284

expenses of termination and to distribute to the Trust property to those entitled thereto.

J.  **CONTINGENT TRUST FOR CERTAIN BENEFICIARIES.** The interest of any Trust Beneficiary who has not attained the age of thirty-five (35) years (the "required age"), or who may be otherwise legally disabled, and whose interest is not otherwise covered by the provisions of this Trust Declaration or another Trust, may, in the sole and absolute discretion of the Trustee, be continued in Trust, or be held as a separate trust, for the use and benefit of that person until such person shall attain the required age or until such person is no longer disabled. For so long as the trust shall exist, the Trustee shall hold, manage, and make distributions of income and principal to provide for his or her health, education, support and maintenance. The Trustee may make an entire distribution of principal to a Trust Beneficiary prior to the required age if, in the Trustee's determination alone, the beneficiary has demonstrated an ability to conserve his or her resources or if it is no longer feasible for the trust to continue considering the size of the trust and the time and cost to maintain the trust. The Trust Beneficiary, with consent of the Trustee, may also extend the term of the trust.

For so long as the Trust is held for a beneficiary pursuant to these terms, the Trust Beneficiary, using a qualified beneficiary designation, will have the right to appoint the beneficiaries of his or her interest in the Trust entitled to his or her interest upon the Trust Beneficiary's death. If the Trust Beneficiary dies prior to a final distribution of his or her interest from the Trust, without having made a qualified beneficiary designation, that person's interest will pass *per stirpes* to his or her descendants then living, or if none, *per stirpes* to Settlor's descendants then living.

K.  **PERPETUITIES.** In no event will the term of this Trust continue for a term greater than twenty-one (21) years after the death of the last survivor of Settlor and all relatives of Settlor living on the effective date of this Trust Declaration. Any continuation of the Trust by the qualified exercise of a power of appointment will be construed as the creation of a separate trust and an extension of the Rule Against Perpetuities to the extent permitted by law. A court of competent jurisdiction is to liberally construe and apply this provision to validate an interest consistent with Settlor's intent and may reform or construe an interest according to the doctrine of *cy pres*.

003285

ARTICLE VII.
PAYMENT OF DEBTS, TAXES, AND
SETTLEMENT COSTS
EXERCISE OF ELECTIONS

The following directions concern the payment of debts, taxes, estate and trust settlement costs, and the exercise of any election permitted by Texas law or by the Internal Revenue Code:

A.  **PAYMENT OF INDEBTEDNESS AND SETTLEMENT COSTS.** The Trustee will have the discretionary authority to pay from the Trust Fund the costs reasonably and lawfully required to settle the estate of a deceased beneficiary. In the event there is more than one Trust Beneficiary immediately preceding the death of a beneficiary, distributions of Trust income and principal to pay settlement costs will not exceed that person's trust share or the fair market value of the beneficiary's interest in the Trust which is distributable by reason of his or her death.

B.  **SPECIAL BEQUESTS.** Unless otherwise provided in this Trust document, or in any amendment, or in a document exercising a power to appoint the beneficiaries of this Trust, if property given as a special bequest or gift is subject to a mortgage or other security interest, the designated recipient of the property will take the asset subject to the obligation and the recipient's assumption of the indebtedness upon distribution of the asset to the recipient. The obligation to be assumed shall be the principal balance of the indebtedness on date of death, and the Trust shall be entitled to reimbursement or offset for principal and interest payments paid by the Trust to date of distribution.

C.  **ESTATE, GENERATION SKIPPING, OR OTHER DEATH TAX.** Unless otherwise provided in this Trust document, or in a document exercising a power to appoint the beneficiaries of this Trust, estate, inheritance, succession, or other similar tax shall be charged to and apportioned to those whose gifts or distributive share generate a death tax liability by reason of Settlor's death or by reason of a taxable distribution from the Trust or a taxable termination of the Trust. To the extent Settlor may lawfully provide, a Trustee may pay and deduct from a beneficiary's distributive share (whether the distribution is to be paid outright or is to be continued in Trust) the increment in taxes payable by reason of a required distribution or termination of interest (i.e., estate, gift, inheritance, or generation skipping taxes) to the extent that the total of such taxes payable by reason of a distribution or

003286

termination is greater than the tax which would have been imposed if the property of the Trust subject to the distribution or termination of interest had not been taken into account in determining the amount of such tax. To the extent a tax liability results from the distribution of property to a beneficiary other than under this Trust, the Trustee will have the authority to reduce any distribution to the beneficiary from this Trust by the amount of the tax liability apportioned to the beneficiary, or if the distribution is insufficient, the Trustee will have the authority to proceed against the beneficiary for his, her, or its share of the tax liability. In making an allocation, the Trustee may consider all property included in the gross estate of the Settlor for federal estate tax purposes, including all property subject to probate, all amounts paid or payable to another as the result of death, including life insurance proceeds, proceeds from a qualified retirement plan or account, proceeds from a joint and survivorship account with a financial institution or brokerage company, proceeds from a buy-sell or redemption contract, and/or any other plan or policy which provides for a payment of death benefits. This provision further contemplates and includes any tax which results from the inclusion of a prior transfer in the federal gross estate of Settlor even though possession of the property previously transferred is vested in someone other than the Trustee. This provision does not include a reduction in the unified credit by reason of taxable gifts previously made by Settlor. If the Trustee determines that the collection of an apportioned tax liability against another is not economically feasible or probable, the tax liability will be paid by the Trust and will reduce the amount distributable to the residuary beneficiaries. The Trustee's judgment with regard to the feasibility of collection is to be conclusive.

D.    **SPECIAL ELECTION FOR QUALIFIED TERMINABLE INTEREST PROPERTY.** For the purpose of identifying the "transferror" in allocating a GST exemption, the estate of Holli Hardin Fontenot or the Trustee of this Trust may elect to treat all of the property which passes in Trust to Dallas Joseph Fontenot, Jr. for which a marital deduction is allowed, by reason of Section 2056(b)(7) or Section 2523(f) of the Internal Revenue Code, as if the election to be treated as Qualified Terminable Interest Property had not been made. Reference to the "Special Election For Qualified Terminable Interest Property" will mean and identify the election provided by Section 2652(a)(2) of the Internal Revenue Code. The term "GST Exemption" or "GST Exemption Amount" is the dollar amount of property which may pass as generation skipping transfers under Subtitle B,

003287

Chapter 13, of the Internal Revenue Code of 1986 which is exempt from the generation-skipping tax.

E.  **ELECTIVE DEDUCTIONS.**  A Trustee will have the discretionary authority to claim any obligation, expense, cost, or loss as a deduction against either estate tax or income tax, or to make any election provided by Texas law, the Internal Revenue Code, or other applicable law, and the Trustee's decision will be conclusive and binding upon all interested parties and shall be effective without obligation to make an equitable adjustment or apportionment between or among the beneficiaries of this Trust or the estate of deceased beneficiary.

## ARTICLE VIII.
## SERVICE OF THE TRUSTEE
## OTHER MATTERS

A.  **GENERAL AUTHORITY.**  A Trustee is to serve without Court supervision.  The service of a Trustee is to be governed first by the terms, conditions, and authority prescribed by this Trust Declaration, and then as prescribed by the trust laws of the State of Texas.

B.  **RETENTION OF ASSETS.**  A Trustee will have the authority to retain, without liability, any and all property in the form in which it is received by the Trustee without regard to its productivity or the proportion that any one asset or class of assets may bear to the whole.  A Trustee will not have liability nor responsibility for loss of income from or depreciation in the value of property which was retained in the form which the Trustee received it.

C.  **UNDIVIDED INTERESTS.**  A Trustee will have the authority to hold, acquire, and dispose of undivided interests in property.

D.  **LENDING, INVESTING.**  A Trustee will have the authority to lend, borrow, lease, sell, and purchase property, including undivided fractional interests in property, upon such terms and conditions as are reasonably prudent under the facts and circumstances then existing.  A Trustee may transact business, including lending, borrowing, leasing, and sale, between two or more related trusts or persons upon such terms and conditions as are reasonably prudent under the facts and circumstances then existing.  Without limiting the general authority above given, a Trustee will have the authority to hold, acquire and sell:

003288

- Publicly traded securities, including stocks, bonds, warrants, futures, mutual funds, partnerships, real estate investment trusts, diversified asset funds.
- Interests in a closely held corporation, partnership, or trust, whether registered or not registered for public sale.
- Obligations of the United States Government or any other government.
- Cash deposits, money market funds, brokerage company accounts, certificates of deposit, savings accounts, and checking accounts, without limitation as to the location of the account or depository.
- Promissory notes, secured and unsecured, including mortgage notes purchased at a discount.
- Land, improved and unimproved, whether presently income producing or held for appreciation in value.
- Land, building and equipment leases.
- Minerals, mineral rights and working interests in mineral producing property or property held for future development.
- Equipment, implements, stock in trade, leasehold improvements, and livestock.
- Insurance policies.

E.  **LIMITATION UPON A TRUSTEE'S LIABILITY.**  A Trustee, other than a banking corporation serving as a Trustee, will not have personal liability for service in a fiduciary capacity other than for acts or omissions to act which, as determined by a court of law, constitute gross negligence or fraud.

F.  **PROTECTION OF THE INTERESTS OF BENEFICIARIES.**  No beneficiary will have the power to anticipate, encumber or transfer any interest in the Trust.  No part of the Trust will be liable for or charged with any debts, contracts, liabilities or torts of a beneficiary or subject to seizure or other process by any creditor of a beneficiary.

G.  **RELATIONSHIP WITH BENEFICIARIES WHO ARE MINORS OR INCOMPETENTS.**  Distributions to an incompetent or disabled beneficiary, or a Minor Beneficiary may be made in such of the following ways as in the Trustee's opinion will be most beneficial to the interests of the beneficiary:  (a) directly to such beneficiary; (b) to his or her parent, guardian or legal representative; (c) to a custodian for said beneficiary under any Uniform Gifts to Minors Act and/or Gifts of Securities to Minors Act in the jurisdiction of residence of such beneficiary; (d) to any person with whom he or she is residing; (e) to some near relative or close friend; or (f) by

003289

the Trustee using such payment directly for the benefit of such beneficiary, including payments made to or for the benefit of any person or persons whom said beneficiary has a legal obligation to support. The Trustee may in the Trustee's sole discretion instead hold such income or corpus for the account of such beneficiary as custodian. A receipt from a beneficiary or from his parent, guardian, legal representative, relative, close friend, or other person described above shall be a sufficient discharge to the Trustee from any liability for making said payments.

The Trustee is likewise authorized to consult with and act upon the advice of the parent, guardian, custodian, or legal representative of any beneficiary who is either an incompetent or a Minor with respect to any and all matters which may arise under this Declaration and as concerns the rights or interests of said beneficiary. All statements, accounts, documents, releases, notices, or other written instruments, including but not limited to written instruments concerning the resignation or replacement of any Trustee or Trustees, required to be delivered to or executed by such beneficiary may be delivered to or executed by the parent, guardian, custodian, or legal representative of said incompetent or Minor Beneficiary, and when so delivered or executed shall be binding upon said incompetent or Minor Beneficiary, and shall be of the same force and effect as though delivered to or executed by a beneficiary acting under no legal disability.

## ARTICLE IX.
### UNPRODUCTIVE OR UNDERPRODUCTIVE PROPERTY

A beneficiary who is then entitled to the income of the Trust, or the income of any other Trust established or continued pursuant to this trust declaration, will have the authority to issue a written directive to the Trustee to convert Trust Property which does not produce an income, or which is underproductive, into property which is income producing or which will provide a greater income to the trust. Upon actual receipt of an income beneficiary's written directive, the Trustee will reasonably and prudently proceed to convert unproductive or underproductive property into property which will produce a reasonable and safe rate of return. The Trustee may do so by selling the unproductive or underproductive asset upon such terms and conditions as is prudent and reasonable under all circumstances which may then exist (including the acceptance of an income or interest bearing obligation as the whole or a part of the sales price), and investing the proceeds of sale in income producing instruments or obligations. Notwithstanding

003290

these requirements, a Trust Beneficiary cannot direct the Trustee to invest or reinvest trust property in a trust investment which is speculative in nature or which, in result, would violate the spendthrift provisions of this Trust Declaration.

## ARTICLE X.
### NO-CONTEST REQUIREMENTS

Settlor vests in the Trustee the authority to construe this Trust instrument and to resolve all matters pertaining to disputed issues or controverted claims. Settlor does not want to burden this Trust with the cost of a litigated proceeding to resolve questions of law or fact unless the proceeding is originated by the Trustee or with the Trustee's written permission. Any other person, agency, or organization who shall originate (or who shall cause to be instituted) a judicial proceeding to construe or contest this Trust instrument, or any will which requires distribution of property to this Trust, or to resolve any claim or controversy in the nature of reimbursement, or seeking to impress a constructive or resulting Trust, or alleging any other theory which, if assumed as true, would enlarge (or originate) a claimant's interest in this Trust or in Settlor's estate, without the Trustee's written permission, shall forfeit any amount to which that person, agency, or organization is or may be entitled and the interest of any such litigant or contestant shall pass as if he or she or it had predeceased us. These directions shall apply even though the person, agency or organization shall be found by a court of law to have originated the judicial proceeding in good faith and with probable cause and even though the proceedings may seek nothing more than to construe the application of this no-contest provision. This requirement is to be limited, even to the exclusion thereof, in the event it operates to deny the benefits of the federal estate tax or federal gift tax marital deduction.

## ARTICLE XI.
### JURISDICTION

The jurisdiction of this Trust will be the State of Texas. Any issue of law or fact pertaining to the creation, continuation, administration, and termination of the Trust, or any other matter incident to this Trust, is to be determined with reference to the specific directions in the Trust Declaration and then under the laws of the State of Texas. If a Article or Subsection of this Trust Declaration is in conflict with a prohibition of state law or federal law, the Article or Subsection, or the Trust Declaration as a whole, is to be construed in a manner which will cause it to be

003291

in compliance with state and federal law and in a manner which will result in the least amount of taxes and estate settlement costs.

### ARTICLE XII.
#### ACCEPTANCE BY TRUSTEE

Holli Hardin Fontenot acknowledges that she is the initial Trustee of the DAKOTA TRUST.  By execution of this Trust Declaration, Holli Hardin Fontenot accepts the office of Trustee and agrees to hold and administer the Trust according to the provisions thereof and as required by law.

#### CONCLUSION AND ATTESTATION

Holli Hardin Fontenot attests that she has executed this Trust Declaration on the date set forth below, and the terms thereof will bind her, her successors and assigns, and her heirs and personal representatives.  This instrument is to be effective upon the date recorded immediately below.

Dated:___November 9, 1994_____


_original signed by Holli Hardin Fontenot_

Holli Hardin Fontenot, individually and as Trustee

Page 22 of 23 Pages

003292

STATE OF TEXAS          §
                        §
COUNTY OF HARRIS        §

On this __9th__ day of __November__ in the year 199_4_ before me, a Notary Public of said State, personally appeared Holli Hardin Fontenot, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument, and acknowledged that she executed the same in the capacities expressed therein.

WITNESS MY HAND and official seal.

_____
Notary Public, State of Texas

[SEAL]

003293

## SCHEDULE A TO
## TRUST DECLARATION
## DAKOTA TRUST

The Sum of SIXTY FOUR THOUSAND AND NO/100 DOLLARS ($64,000.00) from the Holli Ann Hardin Sole and Separate Property Account, which sum constitutes the separate property of the Settlor

003294

This trust may need a demand power after Holli's death so that we can take advantages of $10,000 per year exclusion for gifts of present interest.

003295



TO WHOM IT MAY CONCERN:

I, Holli Ann Hardin Fontenot, hereby voluntarily resign as trustee of the Holli Ann Hardin Fontenot Trust Number One and the Dakota Trust. This resignation as trustee shall be effective immediately upon acceptance by Dallas J. Fontenot, Jr.

Very truly yours,

Holli Ann Hardin Fontenot

Agreed and accepted this __8__ day of __SEPT.__, 1996.

Dallas J. Fontenot, Jr.

LDK238:19

TOTAL P 02

003296

# EXHIBIT C

## NO. 21-CPR-036521

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN THE COUNTY COURT AT LAW |
| | § | |
| DALLAS JOSEPH FONTENOT, JR., | § | NUMBER FOUR (4) OF |
| | § | |
| DECEASED | § | FORT BEND COUNTY, TEXAS |

## NO. 21-DCV-288736

| | | |
|---|---|---|
| IN RE: | § | IN THE 240th DISTRICT COURT |
| | § | |
| | § | OF |
| HOLLI ANN HARDIN TRUST | § | |
| NUMBER ONE | § | FORT BEND COUNTY, TEXAS |

### BINDING MEDIATED SETTLEMENT AGREEMENT

The Parties – Dakota Fontenot, individually, in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in his capacity as next friend and virtual representative for S.F., a minor, Holli Ann Fontenot, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, Dallas Joseph Fontenot, III, individually, and in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One, Michelle Ann Fontenot, individually, in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in her capacity as next friend and virtual representative for A.E., a minor, and Ashley Fontenot Estrada, individually and in her capacity as a beneficiary of the Hollis Ann Hardin Trust Number One – hereto agree that all causes of action pending in cause number 21-CPR-036521 and cause number 21-DVC-288736, both of which are pending in Fort Bend County, Texas, and all related claims and/or controversies between them, whether asserted or not, known or unknown, actual or contingent, are hereby settled, in accordance with the terms of this Binding Mediated Settlement Agreement (hereinafter referred to as the "Settlement Agreement").

### A. DEFINITIONS

1.      Whenever used in this Settlement Agreement, the following terms shall have and be construed to have the following meanings:

    i.      "Settlement Agreement" shall mean and refer to this Binding Mediated Settlement Agreement.

    ii.      "Dakota" shall mean and refer to Dakota Fontenot, individually, in his capacity as beneficiary of the Holli Ann Hardin Trust Number One, and in his capacity as next friend and virtual representative of S.F., a minor.

1

iii.    "Holli" shall mean and refer to Holli Ann Fontenot, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

iv.    "Joe" shall mean and refer Dallas Joseph Fontenot, III, individually and in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

v.    "Michelle" shall mean and refer to Michelle Ann Fontenot, individually, in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in her capacity as next friend and virtual representative of A.E., a minor.

vi.    "Ashley" shall mean and refer to Ashley Fontenot Estrada, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

vii.    "Trust" shall mean and refer to the Holli Ann Hardin Trust Number One.

viii.    "Estate" shall mean and refer to the Estate of Dallas Joseph Fontenot, Jr., whose administration is pending in cause number 21-CPR-036521, in the County Court at Law Number Four (4) of Fort Bend County, Texas.

ix.    "Parties" shall mean and refer to Dakota, Holli, Joe, Michelle, and Ashley, collectively, as described in paragraphs two (ii) through six (vi) above.

x.    "Claims" shall mean and include any and all causes of action, demands, debts, obligations, duties, liens, liabilities, and theories of liabilities of whatsoever kind and nature, whether based in contract or tort, whether arising in equity or under the common law, whether by statute or regulation, whether known or unknown, whether past or present, whether contingent or matured, whether for damages relief, injunctive relief, declaratory relief, equitable relief, or any other type of relief, whether for actual damages, personal injury damages, mental anguish, liquidated damages, punitive damages, exemplary damages, compensatory damages, consequential damages, incidental damages, pecuniary damages, costs, expenses, attorneys' fees, penalties, or fines that are (is), were (was), could be, or could have been asserted as of the Effective Date, regardless of whether actually asserted, whether by claim, counterclaim, cross-claim, motion, third-party claim regarding the Estate and Trust, including but not limited to, claims, whether asserted or not, known or unknown, actual or contingent.

xi.    "Effective Date" shall mean and refer to the date that the last Party to this Settlement Agreement executes the same.

xii.    In respect to any defined term herein, the singular shall include the plural, and the plural shall include the singular.

2

## B. TERMS, CONDITIONS, AND MUTUAL CONSIDERATION

1.    The Parties acknowledge that bona fide disputes and controversies exist between them, both as to liability and the amount thereof in damages, if any, and by reason of such disputes and controversies they desire to compromise and settle all Claims and causes of action of any kind whatsoever which the Parties have or may have arising out of the transactions or occurrences which have been brought or could have been brought regarding the Trust.

**2.    THE PARTIES AGREE AND ACKNOWLEDGE THAT UPON THE EXECUTION OF THIS SETTLEMENT AGREEMENT, THIS SETTLEMENT AGREEMENT SHALL BECOME BINDING AND IRREVOCABLE.**

3.    The Parties agree that the 2013 Last Will and Testament and 2017 First Codicil to the Last Will and Testament will be admitted to probate. The Parties agree that Holli will be appointed as the Independent Executor of the Estate and agree not to object to the same.

4.    All of the Estate's assets, including all associated bank accounts, shall be distributed to Holli, save and expect the following items:

- The following items are going to be distributed to Dakota:

    o   The 2017 F150 Truck
    o   The 2013 Toyota Sequoia
    o   All interest, including all associated bank accounts, in Entertainment Marketing and Management, LP
    o   The coin collection and gold located in the backpack at the Rosenburg Office

- The following items are going to be distributed to Joe:

    o   The 2008 Honda Ridgeline
    o   One-half (1/2) of the Decedent's Tiki Mug Collection

The Parties agree to execute all documents necessary to effectuate the conveyance of all property described above the individual recipients stated in paragraph four (4).

5.    From the Rosenburg office, Holli shall be entitled to obtain:

- The remaining $150,000 in non-earmarked cash located in the backpack;
- Any and all Playboy Magazines

6.    The Parties agree that all personal property belonging to Dakota, Joe, and/or Michelle that is currently located at 10402 W. Hidden Lake Lane, Richmond, Texas 77406 shall be distributed to Dakota, Joe, and/or Michelle as appropriate. Dakota, Joe and/or Michelle shall

3

be afforded the opportunity, within thirty (30) days of the Effective Date of this Settlement Agreement, to conduct a supervised walkthrough of their personal property located at 10402 W. Hidden Lake Lane, Richmond, Texas 77406. During that time, Dakota, Joe, and/or Michelle will take photographs of their personal property which they would like to obtain. A list and accompanying photographs will be delivered to counsel for Holli of those items within fourteen (14) days of the walkthrough being completed. Holli will have fourteen (14) days to object to the items which Dakota, Joe, and/or Michelle would like to obtain. If the parties cannot reach a resolution regarding the same, Russ Jones will mediate, at an hourly rate, the division of the disputed personal property. Upon the completion and approval of a final list of items, Dakota, Joe, and/or Michelle, at their expense, shall obtain and remove the items on the approved final list of items at a mutually agreeable date and time within fourteen (14) days of the approval of the final list of items.

7.     The attorney's fees for Holli, Dakota, Joe, Michelle, and/or Ashley may be paid from the assets of the Holli Ann Hardin Trust Number One in an amount no more than $200,000.00 per side. The Parties will present their fees to Linda Goehrs, in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, for payment. The Parties agree that they will not object to the payment of the fees of any other party.

8.     The real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183 shall be distributed to Holli. Dakota, Michelle, and Joe, with Dakota as authorized representative, shall retain a right of first refusal in the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183. If Holli decides to sell or otherwise transfer the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183, Holli shall notify Dakota, Michelle, and Joe in writing and provide an appraisal completed by a certified and licensed real estate appraiser. From the date of receipt of that notice, Dakota, Michelle, and/or Joe shall have 30 days to exercise their right to purchase the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183. If exercised, Dakota, Michelle, and/or Joe shall enter into a real estate contract to purchase the property with a proposed closing date sixty (60) days from the date of receipt of the notice of sale or transfer triggering the right of first refusal. Holli is not required to sell at the appraised value if she receives offers in excess of the appraised value. If Holli receives an offer greater than the appraised value, the right of first refusal will be triggered upon delivery of the great offer to Dakota as authorized representative. The right of refusal will not renew if it is not exercised against the greatest value delivered by Holli.

9.     With regard to the further administration of the Holli Ann Hardin Trust Number One:

- The Parties agree that the assets of the Holli Ann Hardin Trust Number One shall be appraised by certified and licensed business or real estate appraisers, as is appropriate for the particular asset. Russ Jones shall select the appraisers to complete the real estate and business appraisals. The costs of the appraisals shall be borne by the Holli Ann Hardin Trust Number One.

4

- The Parties agree that, once the values on the appraisals are obtained for all Holli Ann Hardin Trust Number One assets, Holli's interest will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One in an amount equal to the twenty percent (20%) of the total value of the assets. Such purchase will occur within ninety days (90) of the completion of the valuation of the assets of the Holli Ann Hardin Trust Number One.

- The Parties agree that during the appraisal period described above, Linda Goehrs, in her capacity as Temporary Successor Trustee and/or Dakota, shall execute the necessary documents to install Dakota as an Officer and/or Director of Ice Embassy, Inc., HRF Enterprises, Inc., and Entertainment Marketing and Management, LP.

- The Parties agree that Linda Goehrs shall remain Temporary Successor Trustee of the Holli Ann Hardin Trust Number One until the closing of a sale on Holli's interest in the Holli Ann Hardin Trust Number One. At the time that Holli's interest is purchased, Linda Goehrs will resign as Temporary Successor Trustee, and Dakota, Joe, Michelle, and Ashley shall select a Successor Trustee of the Trust.

- Holli agrees to execute an assignment of interest and disclaimer of further interest in the Holli Ann Hardin Trust Number One at the time that her interest is purchased in accordance with this Settlement Agreement.

- The Parties agree that Dakota and Holli shall remain employees of Entertainment Marketing and Management, LP, and/or the business, or businesses owned by the Holli Ann Hardin Trust Number One. Holli shall be removed from the payroll on the date that her interest is purchased pursuant to this Agreement. The compensation amount that Dakota and Holli have been receiving shall remain unchanged.

- The Parties agree that Dakota and Holli shall remain on the insurance paid for by Entertainment Marketing and Management, LP, and/or the business or businesses owned by the Holli Ann Hardin Trust Number One. Holli shall be removed from the insurance plan on the date that her interest is purchased pursuant to this Agreement.

- To the extent owned by the Trust, Linda Goehrs as Temporary Successor Trustee, shall gift the horses known as Coco and Rusty to Holli.

10. With regard to the further administration of the Dakota Trust:

- The Parties agree that the assets of the Dakota Trust shall be appraised by certified and licensed real estate appraisers. Russ Jones shall select the appraisers to complete the real estate appraisal. The cost of the appraisal shall be borne by the Dakota Trust.

- Upon completion of the appraisal, the total value of the assets will be compiled and Holli's interest will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One in an amount equal to eighty-five percent (85%) of the total value of the assets. Such purchase will occur within ninety days (90) of the completion of the valuation of the assets of the Dakota Trust.

- Holli agrees to execute an assignment of interest and disclaimer of further interest in the Dakota Trust at the time that her interest in purchased in accordance with this Settlement Agreement.

11.    Within seven (7) days of the Effective Date of this agreement, Dakota, Joe, Michelle, and/or Ashley agree to dismiss all pending pleas, pleadings, and/or motions, with prejudice regarding the Estate and/or Trust pending in cause number 21-CPR-036521 and cause number 21-DVC-288736, both of which are pending in Fort Bend County, Texas.

12.    Neither the Trust nor any entity owned, held, or possessed by the Holli Ann Hardin Trust Number One, the Dakota Trust, and/or the Estate have any claims against any of the Parties.

13.    The Parties agree to release Linda Goehrs, in her capacity as Temporary Successor Trustee, for making distributions according to this Settlement Agreement which contradict the terms of the Trust Agreement for the Holli Ann Hardin Trust Number One or the Dakota Trust.

## C. RELEASES AND DISCHARGE

1.    **Release of Claims by Dakota.**  For and in consideration of the mutual promises, covenants, and agreements stated herein, Dakota, on behalf of himself and all his heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Holli, Joe, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Dakota hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Dakota expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Holli, Joe, Michelle, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Dakota does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

2.    **Release of Claims by Holli.**  For and in consideration of the mutual promises, covenants, and agreements stated herein, Holli, on behalf of herself and all her heirs, successors,

6

executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Joe, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Holli hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Holli expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Michelle, Joe, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Holli does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

3.    **Release of Claims by Joe.**  For and in consideration of the mutual promises, covenants, and agreements stated herein, Joe, on behalf of himself and all his heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Joe hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Joe expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Michelle, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Joe does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

4.    **Release of Claims by Michelle.**  For and in consideration of the mutual promises, covenants, and agreements stated herein, Michelle, on behalf of herself and all her heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Joe, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Michelle hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Michelle expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind

7

known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Joe, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Michelle does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

5.    **Release of Claims by Ashley**.  For and in consideration of the mutual promises, covenants, and agreements stated herein, Ashley, on behalf of herself and all her heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Joe, Michelle, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Ashley hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Ashley expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Joe, and Michelle. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Ashley does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

## D. REPRESENTATIONS AND WARRANTIES

1.    **Representations and Warranties**. Each of the Parties hereto represents and warrants to the other that:

    a.    They are adequately represented by competent counsel in connection with the execution and delivery of this Settlement Agreement and/or had an opportunity to retain counsel in connection with this Settlement Agreement;

    b.    In executing this Settlement Agreement, they relied upon the Party's own judgment and any advice it received from its own attorneys;

    c.    They were not induced to sign or execute this Settlement Agreement by promises, omissions, agreements, or representations not expressly stated in this Settlement Agreement;

    d.    They freely and willingly executed this Settlement Agreement and expressly disclaims reliance upon any facts, promises, statements made or not made, undertakings, or representations made by any person or entity

prior to the Effective Date of this Settlement Agreement except as specifically enumerated herein;

e.  They consent that this Settlement Agreement was not procured, obtained, or induced by improper conduct or undue influence;

f.  After an opportunity to consult with an attorney concerning the matters made subject of this Settlement Agreement, and after reviewing this Settlement Agreement, they agree this Settlement Agreement is fair, reasonable, and supported by good, valuable, and adequate consideration; and

g.  They understand and agree to the terms and conditions of this Settlement Agreement, which contains the entire agreement between the Parties relating to the matters made the subject of this Settlement Agreement.

2.  **Capacity and Authority**. Each of the Parties hereto represents and warrants to the other that the person signing this Settlement Agreement in a representative capacity has the requisite authority and consent to execute this Settlement Agreement on behalf of the Party for whom he or she has executed this Settlement Agreement, and that this Settlement Agreement is binding upon the Party for whom he or she has executed this Settlement Agreement and upon such Party's successors and assigns.

3.  **Assignment of Claims**. Each of the Parties hereto represents and warrants to the other that it has not transferred, assigned, or otherwise conveyed, excepting any interest held by counsel, in whole or in part, its respective interest in the Claims at issue and that it is the owner and holder thereof. Each of the Parties further represents and warrants that, aside from any interest held by counsel, it is the only holder of the Claims being released and that no other person or entity owns, or has any interest in, any of the Claims being released. Despite any interest held by counsel, this Settlement Agreement applies to the entirety of each of the Parties' Claims.

4.  **Cooperation in Execution of Further Documents**. Each of the Parties expressly agrees to execute any other documents reasonably necessary to effectuate the terms, purpose, and intent of this Settlement Agreement.

## E. MISCELLANEOUS PROVISIONS

1.  **Invalidity**. In the event any one or more of the provisions of this Settlement Agreement shall, for any reason, be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Settlement Agreement.

2.  **Entire Agreement**. This Settlement Agreement reflects the final and complete agreement between the parties concerning the matters made subject of this Settlement Agreement and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the Parties. There are no unwritten oral agreements between the Parties. The Parties expressly

9

acknowledge that any rights, duties, or obligations, whether contractual or otherwise, owed by or between the Parties prior to the effective date of this Settlement Agreement are terminated as of the Effective Date of this Settlement Agreement and the only rights, duties, or obligations owed by or between the Parties from this point forward shall be those set forth in this Settlement Agreement.

3.    **Governing Law and Venue**. The validity, effect, and construction of this Settlement Agreement shall be governed by the laws of the State of Texas. Venue for any cause of action, controversy, or dispute regarding this Settlement Agreement or the subject matter hereof shall be proper only in the state courts of Fort Bend County, Texas.

4.    **Amendment**. This Settlement Agreement may not be amended, modified, waived, or terminated unless such is done in a writing signed by all the Parties.

5.    **Construction of Agreement**. This Settlement Agreement shall not be construed in favor of or against any Party on the basis that the Party did or did not author this Settlement Agreement or any attachment related to it. It is intended that this Settlement Agreement shall be comprehensive in nature and shall be construed liberally to affect its purposes.

6.    **Titles or Headings**. All titles or headings used in this Settlement Agreement are used only for the convenience of the Parties and shall not be construed to have any effect or meaning with respect to the other content of the Settlement Agreement, such other content being controlling as to the Settlement Agreement of the Parties.

7.    **Costs and Attorneys' Fees**. Each party shall bear its own costs and attorneys' fees in relation to the claims and the negotiation and preparation of this Settlement Agreement, subject to the attorney's fees provisions within this Settlement Agreement.

8.    **Waiver**. The failure of any of the Parties to enforce, at any time, any provision of this Settlement Agreement shall not be construed to be a waiver of such provision, nor in any way affect the validity of this Settlement Agreement or any part thereof or any right of any Party thereafter to enforce each and every provision. No waiver of any breach of this Settlement Agreement shall be held to constitute a waiver of any other breach.

9.    **Binding Agreement**. This Settlement Agreement is binding on the Parties hereto and not subject to revocation, repudiation, or withdrawal of consent, even if one or more of them shall become debtors in a bankruptcy proceeding. This binding effect is an integral part of this Agreement.

10.    **Execution of Agreement**. This Settlement Agreement may be executed in a number of identical counterparts, each of which shall be deemed an original for all purposes. A fax signature or a copy of an original signature shall constitute an original signature for purposes of this Settlement Agreement. This Settlement Agreement shall be valid only if fully executed by all Parties and/or their representatives as agreed to herein. If not fully executed by all Parties, this Settlement Agreement shall be null and void and of no effect.

10

11.    **Future Disputes.** In the event that there are future disputes, disagreements, and/or conflicts regarding the terms and/or implementation of any terms of this Settlement Agreement, the Parties agree to return to Russ Jones for mediation regarding the dispute. The Parties agree to return to mediation prior to filing any litigation regarding a breach of this settlement agreement or these terms. If a Party refuses to return to mediation, the remaining parties are permitted to file litigation without returning to mediation. Should further litigation be filed regarding a breach of the agreement, the prevailing party shall be entitled to an award of attorney's fees as determined by a jury or judge.

12.    **Indemnity.** Each party shall indemnify the other parties for all claims made by, through, or under the indemnifying party.

AGREED TO BY ALL PARTIES AS EVIDENCED BY THEIR SIGNATURE BELOW ON THIS THE 7th DAY OF JANUARY, 2022.

_____
Dakota Fontenot, in all capacities

_____
Holli Ann Fontenot, in all capacities

_____
Dallas Joseph Fontenot, III, in all capacities

_____
Michelle Ann Fontenot, in all capacities

_____
Ashley Fontenot Estrada, in all capacities

_____
Christopher Burt
*Counsel for Dakota Fontenot*

11

11.    **Future Disputes.** In the event that there are future disputes, disagreements, and/or conflicts regarding the terms and/or implementation of any terms of this Settlement Agreement, the Parties agree to return to Russ Jones for mediation regarding the dispute.  The Parties agree to return to mediation prior to filing any litigation regarding a breach of this settlement agreement or these terms.  If a Party refuses to return to mediation, the remaining parties are permitted to file litigation without returning to mediation. Should further litigation be filed regarding a breach of the agreement, the prevailing party shall be entitled to an award of attorney's fees as determined by a jury or judge.

12.    **Indemnity.**  Each party shall indemnify the other parties for all claims made by, through, or under the indemnifying party.

AGREED TO BY ALL PARTIES AS EVIDENCED BY THEIR SIGNATURE BELOW ON THIS THE 7th DAY OF JANUARY, 2022.


_____
Dakota Fontenot, in all capacities


_____
Holli Ann Fontenot, in all capacities


# Dallas Joseph Fontenot III
_____
Dallas Joseph Fontenot, III, in all capacities


# Michelle Ann Fontenot
_____
Michelle Ann Fontenot, in all capacities


# Ashley Fontenot Estrada
_____
Ashley Fontenot Estrada, in all capacities


_____
Christopher Burt
*Counsel for Dakota Fontenot*


11

_____

Steven Mendel
*Counsel for Holli Ann Fontenot*

_____

Kenneth Sumner
*Counsel for Dallas Joseph Fontenot, III,*
*Michelle Ann Fontenot, and Ashley Estrada*

12

---

Steven Mendel
*Counsel for Holli Ann Fontenot*


# Kenneth E. Sumner, Jr.

Kenneth Sumner
*Counsel for Dallas Joseph Fontenot, III,*
*Michelle Ann Fontenot, and Ashley Estrada*

Signature: *Dallas Joseph Fontenot III*
Dallas Joseph Fontenot III (Jan 7, 2022 19:33 CST)

    Email: djoef3@hotmail.com

Signature: michellefnfnfnt
Michelle Fontenot (Jan 7, 2022 19:36 CST)

    Email: mannefontenot@gmail.com

Signature: _____
Ashley Fontenot Estrada (Jan 7, 2022 19:38 CST)

    Email: ashleyafontenot@gmail.com

Signature: *Kenneth C. Sumner, Jr*

    Email: ksumner@romanosumner.com

12

EXHIBIT D

## AMENDED AND RESTATED PROMISSORY NOTE

$2,825,000.00                    Houston, Texas                    May 22, 2023

FOR VALUE RECEIVED, the undersigned, **HFR ENTERPRISES, INC.**, a Texas corporation (the "Maker"), hereby promises to pay to the order of **LHS HOMES, L.L.C.**, a Texas limited liability company ("Lender"), at its offices at 5920 Hillcroft Street, Suite A, Houston, Texas 77036, in lawful money of the United States of America, the principal sum of up to TWO MILLION, EIGHT HUNDRED TWENTY-FIVE THOUSAND AND 00/100 DOLLARS ($2,825,000.00) or so much thereof as may be advanced and outstanding hereunder, together with interest.

This amended and restated promissory note (this "Note") is given in substitution of that certain promissory note executed by Maker in favor of Lender dated January 6, 2023 in the amount of ONE MILLION, EIGHT HUNDRED TWENTY-FIVE THOUSAND AND 00/100 DOLLARS ($1,825,000.00), which fully funded on or about January 6, 2023, (the "Original Note") and to evidence current and future advances in the aggregate amount of ONE MILLION AND 00/100 DOLLARS ($1,000,000.00) (the "New Funds") in accordance with the terms hereof. The Original Note shall, in its entirety, be superseded, amended, and restated by this Note and payment of the indebtedness thereunder shall be governed by this Note as if the aggregate unpaid indebtedness due under the Original Note had been advanced hereunder by Lender. Maker hereby renews and extends its covenant and agreement to pay the indebtedness evidenced by the Original Note, as amended and restated pursuant to this Note, and Maker hereby renews and extends its covenant and agreement to perform, comply with, and be bound by each and every term and provisions of the Original Note, as amended and restated by the terms of this Note. Maker confirms and agrees that this Note is, and shall continue to be, secured by the Deed of Trust recorded on January 9, 2023 under Instrument No. RP-2023-7823 in the Official Public Records of Harris County, Texas (the "Deed of Trust"), and in no way acts as a release or relinquishment of the liens created by the Deed of Trust. All of the provisions of the Deed of Trust now or heretofore executed by Maker as heretofore or contemporaneously herewith modified are hereby ratified and affirmed in all respects. The liens securing payment of the Original Note are hereby modified, extended, renewed, carried forward, and confirmed by Maker in all respects and shall remain in full force and effect until the principal and all accrued interest under this Note shall be fully and finally paid. As of the date hereof, all principal and interest payments due and owing under the Old Note have been paid in full when due and the outstanding unpaid principal balance of the Old Note is $1,809,300.24 (the "Old Note Balance").

This Note is further secured by certain Conditional Guaranty Agreements of even date herewith executed by Viva Las Vegas Properties, Inc., a Texas corporation and an affiliate of Maker ("VLV Guarantor"), Dakota Fontenot, an individual resident of Fort Bend County ("DF Guarantor"), and Ice Embassy, Inc., a Texas corporation (collectively referred to as "Guarantors"), respectively, in favor of Lender.

It is understood and agreed by and between Maker and Lender that (i) the entire principal of the Old Note has been advanced to Maker pursuant to the Old Note and that (ii) the entire principal of the New Funds under this Note is not being advanced in full to Maker upon the execution hereof, but subsequent and periodic advancements in various increments of the New Funds will be made to Maker, upon request to Lender, up to, but not to exceed, the amount of the New Funds pursuant to

1

the terms hereof. Interest on this Note shall accrue only on the principal amount of the New Funds advanced from the time it is so advanced, at the Contract Rate.

Lender shall advance the New Funds by wire transfer to an account designated by Maker as follows:

(i)     An amount equal to $250,000.00 (the "First New Advance") shall be funded immediately upon execution of this Note.

(ii)    Advances of the remaining New Funds, in amounts up to and not exceeding $750,000.00 in the aggregate, shall be advanced incrementally (such incremental advances being referred to individually and collectively as the "Future Advances") within five (5) Business Days after Lender receives a written request for advance ("Request for Advance") from Maker. Each Request for Advance shall be accompanied by a percentage of completion and cost schedule (a "Schedule of Values") describing the construction, maintenance, repair and/or renovation work completed at Maker's property located at 6710 Southwest Freeway, Houston, Harris County, Texas 77074 (the "Project") as of the date of the applicable Request for Advance, including backup documentation as may be reasonably requested by Lender. Additionally, Lender shall not be required to advance any Future Advances unless: (a) Lender's first lien deed of trust and security interest in the property identified in the Deed of Trust remains in a first lien position without tax liens, mechanics liens or any other monetary encumbrances against such Property other than normal permitted exceptions for current property taxes; (b) The VLV Guarantor's Fort Bend Property securing such Guaranty must have received a mortgagee title policy reflecting a first lien in favor of Lender other than normal permitted exceptions for current property taxes and assessments and nonmonetary encumbrances; (c) Maker and the VLV Guarantor must not otherwise be in any breach of any of its agreements, representation or warranties as set forth in this Note. If Lender refuses to advance the amount requested in any applicable Request for Advance, Lender shall within such 5 Business Day period provide written notice to Maker specifying the reason for such refusal, whereupon Maker and Lender shall endeavor in good faith to reach agreement on the amount to be advanced within ten (10) days after Maker receives notice of Lender's refusal to fund the amount initially requested. If the parties are unable to agree on the funding amount for the applicable Future Advance within such 10-day period, then either party may submit the matter to mediation. The final Future Advance of New Funds shall be made after completion of the Project in such amount that the sum of all Future Advances by Lender shall not exceed $750,000.00.

The unpaid principal balance of this Note shall bear interest prior to maturity at an annual rate equal to the lesser of (a) the Maximum Lawful Rate or (b) eight percent (8.0%) (the "Contract Rate"). Interest on this Note shall be calculated on a per annum basis of 360 days and for the actual number of days elapsed (including the first day but excluding the last day) unless such calculation would result in a rate that exceeds the Maximum Lawful Rate, in which case, interest shall be calculated on a per annum basis of 365 or 366 days, as the case may be. Maker hereby expressly promises to pay to the order of Lender or any other holder hereof the principal amount of this Note and all accrued but unpaid interest now or hereafter to become due and payable under this Note in the

2

CONFIDENTIAL DOCUMENTS                                    HAH001241

manner provided herein.  Notwithstanding anything herein to the contrary, the final installment payment under this Note shall include all of the then outstanding principal, accrued but unpaid interest and all other costs, expenses and fees arising out of this Note.  All sums paid hereon (whether regularly scheduled payment or prepayment) shall be applied first to the satisfaction of accrued unpaid interest and the remainder, if any, to the reduction of the principal balance hereof.

Subject to prior acceleration as provided in this Note, this Note shall be paid as follows:

Principal and interest under this Note shall be due and payable monthly as follows ("Monthly Payments"):

    (i)    Principal and interest on an amount equal to the sum of the Old Note Balance and the First New Advance (or $2,059,300.24) shall be due and payable in sixty (60) equal monthly installments, based on a 20-year amortization, of $17,225.00, with the first such payment being due on June 15, 2023, and continuing on the same day of each month thereafter until May 15, 2028 (the "Maturity Date"), on which date a final payment in the amount of $1,802,414.35 shall be due and payable in full.

    (ii)    Interest only on Future Advances shall be due and payable monthly beginning on the 15th day of the calendar month after the month in which the first Future Advance is made and shall continue regularly on the same day of each succeeding calendar month thereafter until and including the Maturity Date, on which date a final payment, which shall include all then outstanding principal and accrued and unpaid interest due on Future Advances, shall be due and payable in full.

For purposes of this Note, the following terms have the meanings assigned to such terms as provided below:

"Applicable Laws" means the laws of the State of Texas and laws of the United States of America in effect from time to time and applicable to this Note.

"Business Day" means a day that is not a Saturday, Sunday, or federal or state holiday.

"Default Rate" means the Maximum Lawful Rate.

"Event of Default" means the failure to pay when due the principal and interest under this Note, or any part thereof, and such failure continues for more than thirty (30) days after Maker receives written notice from Lender specifying the amount of the delinquent payment. Event of Default shall also include Maker shall (a) become insolvent within the meaning of the Bankruptcy Code of the United States, as amended; (b) admit in writing its inability to pay or otherwise fail to pay its/his debts generally as they become due; (c) voluntarily seek consent to, or acquiesce in the benefit or benefits of any Debtor Relief Law; or (d) be made the subject of any proceeding provided for by any Debtor Relief Law that could suspend or otherwise affect any of the rights of Lender or any other holder hereof and such proceeding shall continue for sixty (60) days without dismissal or discharge; or (e) any default by Maker under that certain Deed of Trust securing this Note, executed by Maker in favor of Lender. As used herein, "Debtor Relief Laws" means the Bankruptcy Code of the United States, as amended and all other applicable liquidation, conservatorship, bankruptcy,

3

 HAH001242

moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws from time to time in effect affecting the rights of creditors generally.

"Indebtedness" means the obligations of Maker under this Note.

"Maximum Lawful Rate" means, at any time, the maximum rate of interest which may be charged, contracted for, taken, received or reserved by the Lender in accordance with Applicable Laws. Each change in any interest rate provided for herein based upon the Maximum Lawful Rate resulting from a change in the Maximum Lawful Rate shall take effect with written notice to the Maker before such change in the Maximum Lawful Rate.

All payments due under this Note shall be made by Maker without offset or other reduction of any kind. Any outstanding principal that is not paid in full when due shall bear interest at the Default Rate for the period from and including the due date thereof to but excluding the date the same is paid in full.

If any payment of principal or interest on this Note shall become due on a day which is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computing of interest in connection with such payment. In the event an installment, or the maturity date as set forth herein, is due on the 29th, 30th, or 31st day of the month, for each month which does not have a 29th, 30th, or 31st day, such installment, or the final payment, as applicable, shall be due on the last day of such month. Payments received on weekends or bank holidays will be credited as of the next Business Day. Any check, draft, money order or other instrument given in payment of all or any portion of this Note may be accepted by Lender and handled in collection in the customary manner, but the same shall not constitute payment or diminish any rights of Lender except to the extent that actual cash proceeds of such instrument are unconditionally received by Lender.

Unless otherwise agreed in writing, or otherwise required by Applicable Laws, interest on this Note will be calculated on the unpaid principal balance to the date each installment is paid and payments received will be applied in the following order of priority: (i) the payment or reimbursement of any expenses, costs, or obligations (other than the outstanding principal balance hereof and interest hereon) for which either Maker shall be obligated or Lender shall be entitled pursuant to the provisions of this Note, (ii) the payment of accrued but unpaid interest hereon, and (iii) the payment of principal. However, any Monthly Payments timely made by Maker shall be credited as of the date such Monthly Payment is due, and Lender shall not be required to ledger and compute reductions in interest for Monthly Payments made before such Monthly Payment is due.

Maker shall have the privilege to prepay at any time, and from time to time, all or any part of the principal amount of this Note, without notice, penalty or fee. Except as expressly provided herein to the contrary, all prepayments on this Note shall be applied in the following order of priority: (i) the payment of accrued but unpaid interest hereon, and (ii) the payment of all or any portion of the principal balance hereof then outstanding hereunder, in the inverse order of maturity.

Time is of the essence in the performance of this Note. Maker agrees that all past-due principal and past-due accrued interest under this Note shall bear interest from the date it is due until paid at the Maximum Lawful Rate.

4

CONFIDENTIAL DOCUMENTS

HAH001243

Upon the occurrence of an Event of Default, Lender may, at its option, after the expiration of the notice and right to cure period provided herein, (i) declare the outstanding principal balance of and accrued but unpaid interest on this Note at once due and payable, or (ii) foreclose all liens securing payment hereof. Upon the occurrence of an Event of Default, if this Note is placed in the hands of an attorney for collection (whether or not suit is filed), or if this Note is collected by suit or legal proceedings or through the probate court or bankruptcy proceedings, Maker agrees to pay an additional amount as attorney's fees as may be reasonable.

Except as otherwise provided herein, Maker waives presentment for payment, demand, protest, notice thereof and dishonor, notice of intent to accelerate, notice of acceleration, and diligence in collecting and consents that the time of payment may be extended from time to time without notice and without releasing Maker.

Until such time as all New Funds have been advanced hereunder, Lender shall not assign this Note without the prior written consent of Maker, which consent shall not be unreasonably withheld. Following the final advance of New Funds after completion of the Project, Lender shall have the right to assign this Note without necessity of Maker's consent.  In such event, the term "Lender" shall mean any permitted assignee of this Note.

This Note and its validity, enforcement and interpretation, shall be construed in accordance with Applicable Laws, without regard to any conflict of law rules or principles except as otherwise expressly set forth herein. It is expressly stipulated and agreed to be the intent of the Maker and the Lender at all times to comply strictly with Applicable Laws governing the maximum rate or amount of interest payable on the indebtedness evidenced by this Note. If Applicable Law is ever judicially interpreted so as to render usurious any amount (i) contracted for, charged, taken, reserved or received pursuant to this Note, (ii) contracted for, charged, taken, reserved or received by reason of the Lender's exercise of the option to accelerate the maturity of the Indebtedness, or (iii) the Maker will have paid or the Lender will have received by reason of any voluntary prepayment by the Maker of the Indebtedness, then it is the Maker's and the Lender's express intent that all amounts charged in excess of the Maximum Lawful Rate shall be automatically canceled, *ab initio*, and all amounts in excess of the Maximum Lawful Rate theretofore collected by the Lender shall be credited on the principal balance of the Indebtedness (or, if the Indebtedness have been or would thereby be paid in full, refunded to the Maker), and the provisions of this Note shall immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder and thereunder; provided, however, if this Note has been paid in full before the end of the stated term of this Note, then the Maker and the Lender agree that the Lender shall, with reasonable promptness after the Lender discovers or is advised by the Maker that interest was received in an amount in excess of the Maximum Lawful Rate, either refund such excess interest to the Maker and/or credit such excess interest against the Indebtedness then owing by the Maker to the Lender. The Maker hereby agrees that as a condition precedent to any claim seeking usury penalties against the Lender, the Maker will provide written notice to the Lender, advising the Lender in reasonable detail of the nature and amount of the violation, and the Lender shall have thirty (30) days after receipt of such notice in which to correct such usury violation, if any, by either refunding such excess interest to the Maker or crediting such excess interest against the Indebtedness then owing by the Maker to the Lender. All sums contracted for, charged, taken, reserved or received by the Lender for the use, forbearance or detention of any Indebtedness shall, to the extent permitted by applicable law, be amortized or spread, using the

5

CONFIDENTIAL DOCUMENTS                    HAH001244

actuarial method, throughout the stated term of this Note (including any and all renewal and extension periods) until payment in full so that the rate or amount of interest on account of this Note does not exceed the Maximum Lawful Rate from time to time in effect and applicable to this for so long as any Indebtedness is outstanding. In no event shall the provisions of Chapter 346 of the Texas Finance Code (which regulates certain revolving credit loan accounts and revolving triparty accounts) apply to this Note. Notwithstanding anything to the contrary contained herein, it is not the intention of the Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

To the extent that Lender is relying on Chapter 303 of the Texas Finance Code to determine the Maximum Lawful Rate payable on any Indebtedness, the Lender will utilize the weekly ceiling from time to time in effect as provided in such Chapter 303, as amended. Additionally, to the extent permitted by Applicable Laws now or hereafter in effect, the Lender may, at its option and from time to time, utilize any other method of establishing the Maximum Lawful Rate under such Chapter 303 or under other Applicable Law by giving notice, if required, to the Maker as provided by Applicable Law now or hereafter in effect.

In case any one or more of the provisions contained in this Note shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Note, and this Note shall be construed as if such invalid, illegal, or unenforceable provision had never been included in this Note.

No amendment, modification, or alteration of the terms of this Note shall be binding unless the same is in writing, dated subsequent to the date of this Note, and duly executed by the parties to this Note.

All notices sent to Maker shall be sent by hand delivery or by certified mail, return receipt requested to HFR Enterprises, Inc., Attn: Dakota Fontenot, 3414 Old Richmond Road, Rosenberg, Texas 77471 (with a copy to BoyarMiller, Attn: Christopher Barteau and Tiffany Melchers, 2925 Richmond Avenue, 14th Floor, Houston, Texas 77098), unless directed otherwise by Maker after notice to the Lender (or any other holder hereof) at the address set forth on Page 1 herein, or at such other address of the Lender (or any other holder hereof) specified by notice to Maker as described herein. Any notice required herein shall be sufficient if it provides at least 10 days of notice after mailing, unless otherwise required by law.

[Remainder of page intentionally left blank.]

6

CONFIDENTIAL DOCUMENTS                                    HAH001245

IN WITNESS WHEREOF, Maker has duly executed this Note as of the day and year first above written.

**MAKER:**

**HFR ENTERPRISES, INC.,**
a Texas corporation

By: _____
Name: Dakota Fontenot
Title: President

Address:
6710 Southwest Freeway
Houston, Texas 77074
Attention: Dakota Fontenot

THE STATE OF TEXAS            §
                             §
COUNTY OF HARRIS             §

This instrument was acknowledged before me on May 22, 2023, by Dakota Fontenot, President of HFR Enterprises, Inc., a Texas nonprofit corporation, for and on behalf of such corporation.



_____
NOTARY PUBLIC, STATE OF TEXAS

SIGNATURE PAGE TO
NOTE

CONFIDENTIAL DOCUMENTS                    HAH001246

# EXHIBIT E

C.A. 21-CPR-036521

| | | |
|---|---|---|
| ESTATE OF | § | IN COUNTY COURT AT LAW |
| DALLAS JOSEPH FONTENOT, JR., | § | |
| DECEASED | § | NO. FOUR (4) OF |
| | § | |
| | § | FORT BEND COUNTY, TEXAS |

No. 21-DCV-288736

| | | |
|---|---|---|
| IN RE | § | IN THE 240TH DISTRICT COURT |
| HOLLI ANN HARDIN TRUST | § | |
| NUMBER ONE | § | OF |
| | § | |
| | § | FORT BEND COUNTY, TEXAS |

## Assignment of Interest &
## Disclaimer of Further Interest

Pursuant to the Binding Mediation Settlement Agreement reached in the above-captioned cases, and which is attached hereto as Exhibit "A":

1. Holli Ann Fontenot acknowledges receipt of check number 1005 payable to Holli Ann Fontenot in the amount of $2,823,464.00, and which sum represents full satisfaction of eighty five percent (85%) of the total value of The Dakota Trust assets ($1,899,514.00) and twenty percent (20%) of the total value of the Holli Ann Hardin Trust No. 1 assets ($923,950.00).

2. Holli Ann Fontenot hereby assigns any and all beneficial interest she has in the Holli Ann Hardin Trust No. 1 to the Trustee for further administration and distribution by the Trustee.

3. Holli Ann Fontenot assigns any and all beneficial interest she has in The Dakota Trust to the Trustee for further administration and distribution by the Trustee.

4. Holli Ann Fontenot disclaims any right to any further interest in the Holli Ann Hardin Trust No. 1. Holli Ann Fontenot previously resigned as the Trustee of said Trust.

5. Holli Ann Fontenot disclaims any right to any further interest in The Dakota Trust. Holli Ann Fontenot hereby resigns as a fiduciary of said Trust.

[SIGNATURE ON THE FOLLOWING PAGE]

SIGNED AND EXECUTED ON ___18___ DAY OF JANUARY 2023.

HOLLI ANN FONTENOT

STATE OF TEXAS      §
                           §

COUNTY OF HARRIS      §

This instrument was acknowledged before me on this the 18 day of January 2023 by Holli Ann Fontenot.

Notary Public in and for
The State of Texas

NO. 21-CPR-036521

| | | |
|---|---|---|
| IN THE ESTATE OF | § § | IN THE COUNTY COURT AT LAW |
| DALLAS JOSEPH FONTENOT, JR., | § § | NUMBER FOUR (4) OF |
| DECEASED | § | FORT BEND COUNTY, TEXAS |

NO. 21-DCV-288736

| | | |
|---|---|---|
| IN RE: | § § | IN THE 240th DISTRICT COURT |
| | § | OF |
| HOLLI ANN HARDIN TRUST | § | |
| NUMBER ONE | § | FORT BEND COUNTY, TEXAS |

## BINDING MEDIATED SETTLEMENT AGREEMENT

The Parties – Dakota Fontenot, individually, in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in his capacity as next friend and virtual representative for S.F., a minor, Holli Ann Fontenot, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, Dallas Joseph Fontenot, III, individually, and in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One, Michelle Ann Fontenot, individually, in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in her capacity as next friend and virtual representative for A.E., a minor, and Ashley Fontenot Estrada, individually and in her capacity as a beneficiary of the Hollis Ann Hardin Trust Number One – hereto agree that all causes of action pending in cause number 21-CPR-036521 and cause number 21-DVC-288736, both of which are pending in Fort Bend County, Texas, and all related claims and/or controversies between them, whether asserted or not, known or unknown, actual or contingent, are hereby settled, in accordance with the terms of this Binding Mediated Settlement Agreement (hereinafter referred to as the "Settlement Agreement").

## A. DEFINITIONS

1. Whenever used in this Settlement Agreement, the following terms shall have and be construed to have the following meanings:

   i. "Settlement Agreement" shall mean and refer to this Binding Mediated Settlement Agreement.

   ii. "Dakota" shall mean and refer to Dakota Fontenot, individually, in his capacity as beneficiary of the Holli Ann Hardin Trust Number One, and in his capacity as next friend and virtual representative of S.F., a minor.

1

iii.    "Holli" shall mean and refer to Holli Ann Fontenot, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

iv.    "Joe" shall mean and refer Dallas Joseph Fontenot, III, individually and in his capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

v.    "Michelle" shall mean and refer to Michelle Ann Fontenot, individually, in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One, and in her capacity as next friend and virtual representative of A.E., a minor.

vi.    "Ashley" shall mean and refer to Ashley Fontenot Estrada, individually and in her capacity as a beneficiary of the Holli Ann Hardin Trust Number One.

vii.    "Trust" shall mean and refer to the Holli Ann Hardin Trust Number One.

viii.    "Estate" shall mean and refer to the Estate of Dallas Joseph Fontenot, Jr., whose administration is pending in cause number 21-CPR-036521, in the County Court at Law Number Four (4) of Fort Bend County, Texas.

ix.    "Parties" shall mean and refer to Dakota, Holli, Joe, Michelle, and Ashley, collectively, as described in paragraphs two (ii) through six (vi) above.

x.    "Claims" shall mean and include any and all causes of action, demands, debts, obligations, duties, liens, liabilities, and theories of liabilities of whatsoever kind and nature, whether based in contract or tort, whether arising in equity or under the common law, whether by statute or regulation, whether known or unknown, whether past or present, whether contingent or matured, whether for damages relief, injunctive relief, declaratory relief, equitable relief, or any other type of relief, whether for actual damages, personal injury damages, mental anguish, liquidated damages, punitive damages, exemplary damages, compensatory damages, consequential damages, incidental damages, pecuniary damages, costs, expenses, attorneys' fees, penalties, or fines that are (is), were (was), could be, or could have been asserted as of the Effective Date, regardless of whether actually asserted, whether by claim, counterclaim, cross-claim, motion, third-party claim regarding the Estate and Trust, including but not limited to, claims, whether asserted or not, known or unknown, actual or contingent.

xi.    "Effective Date" shall mean and refer to the date that the last Party to this Settlement Agreement executes the same.

xii.    In respect to any defined term herein, the singular shall include the plural, and the plural shall include the singular.

2

### B. TERMS, CONDITIONS, AND MUTUAL CONSIDERATION

1.      The Parties acknowledge that bona fide disputes and controversies exist between them, both as to liability and the amount thereof in damages, if any, and by reason of such disputes and controversies they desire to compromise and settle all Claims and causes of action of any kind whatsoever which the Parties have or may have arising out of the transactions or occurrences which have been brought or could have been brought regarding the Trust.

2.      **THE PARTIES AGREE AND ACKNOWLEDGE THAT UPON THE EXECUTION OF THIS SETTLEMENT AGREEMENT, THIS SETTLEMENT AGREEMENT SHALL BECOME BINDING AND IRREVOCABLE.**

3.      The Parties agree that the 2013 Last Will and Testament and 2017 First Codicil to the Last Will and Testament will be admitted to probate. The Parties agree that Holli will be appointed as the Independent Executor of the Estate and agree not to object to the same.

4.      All of the Estate's assets, including all associated bank accounts, shall be distributed to Holli, save and expect the following items:

- The following items are going to be distributed to Dakota:

  o   The 2017 F150 Truck
  o   The 2013 Toyota Sequoia
  o   All interest, including all associated bank accounts, in Entertainment Marketing and Management, LP
  o   The coin collection and gold located in the backpack at the Rosenburg Office

- The following items are going to be distributed to Joe:

  o   The 2008 Honda Ridgeline
  o   One-half (1/2) of the Decedent's Tiki Mug Collection

The Parties agree to execute all documents necessary to effectuate the conveyance of all property described above the individual recipients stated in paragraph four (4).

5.      From the Rosenburg office, Holli shall be entitled to obtain:

- The remaining $150,000 in non-earmarked cash located in the backpack;
- Any and all Playboy Magazines

6.      The Parties agree that all personal property belonging to Dakota, Joe, and/or Michelle that is currently located at 10402 W. Hidden Lake Lane, Richmond, Texas 77406 shall be distributed to Dakota, Joe, and/or Michelle as appropriate. Dakota, Joe and/or Michelle shall

be afforded the opportunity, within thirty (30) days of the Effective Date of this Settlement Agreement, to conduct a supervised walkthrough of their personal property located at 10402 W. Hidden Lake Lane, Richmond, Texas 77406. During that time, Dakota, Joe, and/or Michelle will take photographs of their personal property which they would like to obtain. A list and accompanying photographs will be delivered to counsel for Holli of those items within fourteen (14) days of the walkthrough being completed. Holli will have fourteen (14) days to object to the items which Dakota, Joe, and/or Michelle would like to obtain. If the parties cannot reach a resolution regarding the same, Russ Jones will mediate, at an hourly rate, the division of the disputed personal property. Upon the completion and approval of a final list of items, Dakota, Joe, and/or Michelle, at their expense, shall obtain and remove the items on the approved final list of items at a mutually agreeable date and time within fourteen (14) days of the approval of the final list of items.

7.      The attorney's fees for Holli, Dakota, Joe, Michelle, and/or Ashley may be paid from the assets of the Holli Ann Hardin Trust Number One in an amount no more than $200,000.00 per side. The Parties will present their fees to Linda Goehrs, in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, for payment. The Parties agree that they will not object to the payment of the fees of any other party.

8.      The real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183 shall be distributed to Holli. Dakota, Michelle, and Joe, with Dakota as authorized representative, shall retain a right of first refusal in the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183. If Holli decides to sell or otherwise transfer the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183, Holli shall notify Dakota, Michelle, and Joe in writing and provide an appraisal completed by a certified and licensed real estate appraiser. From the date of receipt of that notice, Dakota, Michelle, and/or Joe shall have 30 days to exercise their right to purchase the real property and improvements located at 271 Iron Duke Avenue, Las Vegas, Nevada 89183. If exercised, Dakota, Michelle, and/or Joe shall enter into a real estate contract to purchase the property with a proposed closing date sixty (60) days from the date of receipt of the notice of sale or transfer triggering the right of first refusal. Holli is not required to sell at the appraised value if she receives offers in excess of the appraised value. If Holli receives an offer greater than the appraised value, the right of first refusal will be triggered upon delivery of the great offer to Dakota as authorized representative. The right of refusal will not renew if it is not exercised against the greatest value delivered by Holli.

9.      With regard to the further administration of the Holli Ann Hardin Trust Number One:

- The Parties agree that the assets of the Holli Ann Hardin Trust Number One shall be appraised by certified and licensed business or real estate appraisers, as is appropriate for the particular asset. Russ Jones shall select the appraisers to complete the real estate and business appraisals. The costs of the appraisals shall be borne by the Holli Ann Hardin Trust Number One.

4

- The Parties agree that, once the values on the appraisals are obtained for all Holli Ann Hardin Trust Number One assets, Holli's interest will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One in an amount equal to the twenty percent (20%) of the total value of the assets. Such purchase will occur within ninety days (90) of the completion of the valuation of the assets of the Holli Ann Hardin Trust Number One.

- The Parties agree that during the appraisal period described above, Linda Goehrs, in her capacity as Temporary Successor Trustee and/or Dakota, shall execute the necessary documents to install Dakota as an Officer and/or Director of Ice Embassy, Inc., HRF Enterprises, Inc., and Entertainment Marketing and Management, LP.

- The Parties agree that Linda Goehrs shall remain Temporary Successor Trustee of the Holli Ann Hardin Trust Number One until the closing of a sale on Holli's interest in the Holli Ann Hardin Trust Number One. At the time that Holli's interest is purchased, Linda Goehrs will resign as Temporary Successor Trustee, and Dakota, Joe, Michelle, and Ashley shall select a Successor Trustee of the Trust.

- Holli agrees to execute an assignment of interest and disclaimer of further interest in the Holli Ann Hardin Trust Number One at the time that her interest is purchased in accordance with this Settlement Agreement.

- The Parties agree that Dakota and Holli shall remain employees of Entertainment Marketing and Management, LP, and/or the business, or businesses owned by the Holli Ann Hardin Trust Number One. Holli shall be removed from the payroll on the date that her interest is purchased pursuant to this Agreement. The compensation amount that Dakota and Holli have been receiving shall remain unchanged.

- The Parties agree that Dakota and Holli shall remain on the insurance paid for by Entertainment Marketing and Management, LP, and/or the business or businesses owned by the Holli Ann Hardin Trust Number One. Holli shall be removed from the insurance plan on the date that her interest is purchased pursuant to this Agreement.

- To the extent owned by the Trust, Linda Goehrs as Temporary Successor Trustee, shall gift the horses known as Coco and Rusty to Holli.

10. With regard to the further administration of the Dakota Trust:

- The Parties agree that the assets of the Dakota Trust shall be appraised by certified and licensed real estate appraisers. Russ Jones shall select the appraisers to complete the real estate appraisal. The cost of the appraisal shall be borne by the Dakota Trust.

5

- Upon completion of the appraisal, the total value of the assets will be compiled and Holli's interest will be purchased by Dakota, Joe, Michelle, and/or the business entities owned by the Holli Ann Hardin Trust Number One in an amount equal to eighty-five percent (85%) of the total value of the assets. Such purchase will occur within ninety days (90) of the completion of the valuation of the assets of the Dakota Trust.

- Holli agrees to execute an assignment of interest and disclaimer of further interest in the Dakota Trust at the time that her interest in purchased in accordance with this Settlement Agreement.

11.     Within seven (7) days of the Effective Date of this agreement, Dakota, Joe, Michelle, and/or Ashley agree to dismiss all pending pleas, pleadings, and/or motions, with prejudice regarding the Estate and/or Trust pending in cause number 21-CPR-036521 and cause number 21-DVC-288736, both of which are pending in Fort Bend County, Texas.

12.     Neither the Trust nor any entity owned, held, or possessed by the Holli Ann Hardin Trust Number One, the Dakota Trust, and/or the Estate have any claims against any of the Parties.

13.     The Parties agree to release Linda Goehrs, in her capacity as Temporary Successor Trustee, for making distributions according to this Settlement Agreement which contradict the terms of the Trust Agreement for the Holli Ann Hardin Trust Number One or the Dakota Trust.

## C. RELEASES AND DISCHARGE

1.     **Release of Claims by Dakota.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Dakota, on behalf of himself and all his heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Holli, Joe, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Dakota hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Dakota expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Holli, Joe, Michelle, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Dakota does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

2.     **Release of Claims by Holli.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Holli, on behalf of herself and all her heirs, successors,

6

executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Joe, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Holli hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Holli expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Michelle, Joe, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Holli does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

3.    **Release of Claims by Joe.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Joe, on behalf of himself and all his heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Michelle, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Joe hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Joe expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Michelle, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Joe does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

4.    **Release of Claims by Michelle.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Michelle, on behalf of herself and all her heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Joe, Ashley, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Michelle hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Michelle expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind

7

known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Joe, and Ashley. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Michelle does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

5.    **Release of Claims by Ashley.** For and in consideration of the mutual promises, covenants, and agreements stated herein, Ashley, on behalf of herself and all her heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns, does hereby release and acquit, and forever discharge, and shall be conclusively deemed to have released, acquitted, and forever discharged, Dakota, Holli, Joe, Michelle, and each of their heirs, successors, executors, administrators, predecessors, principles, agents, employees, attorneys, accountants, representatives, and assigns of and from any and all liability on or for any and all Claims, as defined in this Settlement Agreement. Ashley hereby acknowledges and agrees that the release and discharge expressed herein is a general release and shall be interpreted and enforced as a general release. Ashley expressly waives and assumes the risk of any and all Claims and rights of action, damages, and costs of every kind known or unknown. This release is intended to and does inure to the benefit of all heirs, successors, executors, administrators, predecessors, principals, agents, employees, attorneys, accountants, representatives, and assigns of Dakota, Holli, Joe, and Michelle. It is expressly understood and agreed by and between the Parties that, notwithstanding anything in this Settlement Agreement to the contrary, Claims shall not include, and Ashley does not release, any claim seeking the enforcement or performance of this Settlement Agreement and/or for breach of this Settlement Agreement.

## D. REPRESENTATIONS AND WARRANTIES

1.    **Representations and Warranties.** Each of the Parties hereto represents and warrants to the other that:

a.    They are adequately represented by competent counsel in connection with the execution and delivery of this Settlement Agreement and/or had an opportunity to retain counsel in connection with this Settlement Agreement;

b.    In executing this Settlement Agreement, they relied upon the Party's own judgment and any advice it received from its own attorneys;

c.    They were not induced to sign or execute this Settlement Agreement by promises, omissions, agreements, or representations not expressly stated in this Settlement Agreement;

d.    They freely and willingly executed this Settlement Agreement and expressly disclaims reliance upon any facts, promises, statements made or not made, undertakings, or representations made by any person or entity

8

prior to the Effective Date of this Settlement Agreement except as specifically enumerated herein;

e.  They consent that this Settlement Agreement was not procured, obtained, or induced by improper conduct or undue influence;

f.  After an opportunity to consult with an attorney concerning the matters made subject of this Settlement Agreement, and after reviewing this Settlement Agreement, they agree this Settlement Agreement is fair, reasonable, and supported by good, valuable, and adequate consideration; and

g.  They understand and agree to the terms and conditions of this Settlement Agreement, which contains the entire agreement between the Parties relating to the matters made the subject of this Settlement Agreement.

2.  **Capacity and Authority**. Each of the Parties hereto represents and warrants to the other that the person signing this Settlement Agreement in a representative capacity has the requisite authority and consent to execute this Settlement Agreement on behalf of the Party for whom he or she has executed this Settlement Agreement, and that this Settlement Agreement is binding upon the Party for whom he or she has executed this Settlement Agreement and upon such Party's successors and assigns.

3.  **Assignment of Claims**. Each of the Parties hereto represents and warrants to the other that it has not transferred, assigned, or otherwise conveyed, excepting any interest held by counsel, in whole or in part, its respective interest in the Claims at issue and that it is the owner and holder thereof. Each of the Parties further represents and warrants that, aside from any interest held by counsel, it is the only holder of the Claims being released and that no other person or entity owns, or has any interest in, any of the Claims being released. Despite any interest held by counsel, this Settlement Agreement applies to the entirety of each of the Parties' Claims.

4.  **Cooperation in Execution of Further Documents**. Each of the Parties expressly agrees to execute any other documents reasonably necessary to effectuate the terms, purpose, and intent of this Settlement Agreement.

### E. MISCELLANEOUS PROVISIONS

1.  **Invalidity**. In the event any one or more of the provisions of this Settlement Agreement shall, for any reason, be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Settlement Agreement.

2.  **Entire Agreement**. This Settlement Agreement reflects the final and complete agreement between the parties concerning the matters made subject of this Settlement Agreement and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the Parties. There are no unwritten oral agreements between the Parties. The Parties expressly

9

acknowledge that any rights, duties, or obligations, whether contractual or otherwise, owed by or between the Parties prior to the effective date of this Settlement Agreement are terminated as of the Effective Date of this Settlement Agreement and the only rights, duties, or obligations owed by or between the Parties from this point forward shall be those set forth in this Settlement Agreement.

3.     **Governing Law and Venue.** The validity, effect, and construction of this Settlement Agreement shall be governed by the laws of the State of Texas. Venue for any cause of action, controversy, or dispute regarding this Settlement Agreement or the subject matter hereof shall be proper only in the state courts of Fort Bend County, Texas.

4.     **Amendment.** This Settlement Agreement may not be amended, modified, waived, or terminated unless such is done in a writing signed by all the Parties.

5.     **Construction of Agreement.** This Settlement Agreement shall not be construed in favor of or against any Party on the basis that the Party did or did not author this Settlement Agreement or any attachment related to it. It is intended that this Settlement Agreement shall be comprehensive in nature and shall be construed liberally to affect its purposes.

6.     **Titles or Headings.** All titles or headings used in this Settlement Agreement are used only for the convenience of the Parties and shall not be construed to have any effect or meaning with respect to the other content of the Settlement Agreement, such other content being controlling as to the Settlement Agreement of the Parties.

7.     **Costs and Attorneys' Fees.** Each party shall bear its own costs and attorneys' fees in relation to the claims and the negotiation and preparation of this Settlement Agreement, subject to the attorney's fees provisions within this Settlement Agreement.

8.     **Waiver.** The failure of any of the Parties to enforce, at any time, any provision of this Settlement Agreement shall not be construed to be a waiver of such provision, nor in any way affect the validity of this Settlement Agreement or any part thereof or any right of any Party thereafter to enforce each and every provision. No waiver of any breach of this Settlement Agreement shall be held to constitute a waiver of any other breach.

9.     **Binding Agreement.** This Settlement Agreement is binding on the Parties hereto and not subject to revocation, repudiation, or withdrawal of consent, even if one or more of them shall become debtors in a bankruptcy proceeding. This binding effect is an integral part of this Agreement.

10.    **Execution of Agreement.** This Settlement Agreement may be executed in a number of identical counterparts, each of which shall be deemed an original for all purposes. A fax signature or a copy of an original signature shall constitute an original signature for purposes of this Settlement Agreement. This Settlement Agreement shall be valid only if fully executed by all Parties and/or their representatives as agreed to herein. If not fully executed by all Parties, this Settlement Agreement shall be null and void and of no effect.

10

11.     **Future Disputes.** In the event that there are future disputes, disagreements, and/or conflicts regarding the terms and/or implementation of any terms of this Settlement Agreement, the Parties agree to return to Russ Jones for mediation regarding the dispute. The Parties agree to return to mediation prior to filing any litigation regarding a breach of this settlement agreement or these terms. If a Party refuses to return to mediation, the remaining parties are permitted to file litigation without returning to mediation. Should further litigation be filed regarding a breach of the agreement, the prevailing party shall be entitled to an award of attorney's fees as determined by a jury or judge.

12.     **Indemnity.** Each party shall indemnify the other parties for all claims made by, through, or under the indemnifying party.

AGREED TO BY ALL PARTIES AS EVIDENCED BY THEIR SIGNATURE BELOW ON THIS THE 7th DAY OF JANUARY, 2022.

_____
Dakota Fontenot, in all capacities

_____
Holli Ann Fontenot, in all capacities

_____
Dallas Joseph Fontenot, III, in all capacities

_____
Michelle Ann Fontenot, in all capacities

_____
Ashley Fontenot Estrada, in all capacities

_____
Christopher Burt
*Counsel for Dakota Fontenot*

11

11.    **Future Disputes.** In the event that there are future disputes, disagreements, and/or conflicts regarding the terms and/or implementation of any terms of this Settlement Agreement, the Parties agree to return to Russ Jones for mediation regarding the dispute. The Parties agree to return to mediation prior to filing any litigation regarding a breach of this settlement agreement or these terms. If a Party refuses to return to mediation, the remaining parties are permitted to file litigation without returning to mediation. Should further litigation be filed regarding a breach of the agreement, the prevailing party shall be entitled to an award of attorney's fees as determined by a jury or judge.

12.    **Indemnity.** Each party shall indemnify the other parties for all claims made by, through, or under the indemnifying party.

AGREED TO BY ALL PARTIES AS EVIDENCED BY THEIR SIGNATURE BELOW ON THIS THE 7th DAY OF JANUARY, 2022.

_____
Dakota Fontenot, in all capacities

_____
Holli Ann Fontenot, in all capacities

## Dallas Joseph Fontenot III
_____
Dallas Joseph Fontenot, III, in all capacities

## Michelle Ann Fontenot
_____
Michelle Ann Fontenot, in all capacities

## Ashley Fontenot Estrada
_____
Ashley Fontenot Estrada, in all capacities

_____
Christopher Burt
*Counsel for Dakota Fontenot*

11

_____
Steven Mendel
*Counsel for Holli Ann Fontenot*


_____
Kenneth Sumner
*Counsel for Dallas Joseph Fontenot, III,
Michelle Ann Fontenot, and Ashley Estrada*

12

_____

Steven Mendel
*Counsel for Holli Ann Fontenot*

# Kenneth E. Sumner, Jr.
_____

Kenneth Sumner
*Counsel for Dallas Joseph Fontenot, III,*
*Michelle Ann Fontenot, and Ashley Estrada*

**Signature:** *Dallas Joseph Fontenot III*
Dallas Joseph Fontenot III (Jan 7, 2022 19:33 CST)

**Email:** djoef3@hotmail.com

**Signature:** _____
Ashley Fontenot Estrada (Jan 7, 2022 19:38 CST)

**Email:** ashleyafontenot@gmail.com

**Signature:** _____
Michelle Fontenot (Jan 7, 2022 19:36 CST)

**Email:** mannefontenot@gmail.com

**Signature:** *Kenneth C. Sumner, Jr*

**Email:** ksumner@romanosumner.com

12

# EXHIBIT F

**THE COLORADO BAR & GRILL CORPORATION**

**UNANIMOUS JOINT WRITTEN CONSENT OF THE
SOLE SHAREHOLDER AND SOLE DIRECTOR**

**IN LIEU OF A SPECIAL MEETING**

May 19, 2023

The undersigned, being the sole shareholder (the "*Shareholder*") and the sole member of the Board of Directors (the "*Board*") of **THE COLORADO BAR & GRILL CORPORATION**, a Texas corporation (the "*Corporation*"), in lieu of holding a special meeting of the Shareholder and the Board, the call and notice of each of which are hereby expressly waived, do hereby consent to the following resolutions:

**Loss or Destruction of Corporate Records**

**WHEREAS**, the Corporation was formed as a Texas Corporation by filing of Articles of Incorporation (the "*Articles*") with the Texas Secretary of State on June 7, 1994 (the "*Formation*");

**WHEREAS**, subsequent to the Formation, all corporate records of the Corporation were maintained by or on the behalf of Dallas Joseph Fontenot, Jr. ("*Mr. Fontenot*");

**WHEREAS**, Mr. Fontenot died on September 3, 2021, and since such date, no corporate records of the Corporation have been located after a diligent search by his heirs and authorized affiliates; and

**WHEREAS**, the Shareholder and the Board desire to create new corporate records to govern the affairs of the Corporation, effective as of the date first set forth above to, among other things, replace the original records of the Corporation which have been lost or misplaced, elect the sole member of the Board, elect officers, adopt new Bylaws, and adopt and reflect the issuance of new share certificates (collectively, the "*New Records*").

**RESOLVED**, that New Records shall be obtained and adopted to replace any records of the Corporation which may be in existence, as of the date first written above.

**Election of Directors**

**WHEREAS**, the Shareholder desires to reconstitute the Board of the Corporation and remove any members of the Board which may have been previously elected.

008402\00002\3480123.2 - 5/17/2023 1:55:00 PM

1

HAH 000169

**RESOLVED**, that the following named person be, and hereby is, elected to serve as a member of the Board, and to serve in such capacity until his respective successor has been duly elected and qualified, or until his earlier death, resignation or removal:

Dakota Fontenot

**FURTHER RESOLVED**, that any member of the Board not listed above is hereby removed from the Board.

### Election of Officers

**WHEREAS**, immediately following the reconstitution of the Board, the Board desires to reconstitute the officers of the Corporation and remove any officers which may have been previously elected.

**RESOLVED**, that the following named person be, and hereby is, elected to the offices set forth opposite his name, to serve in such capacity until his successor is duly elected and qualified or until his earlier death, resignation or removal:

Dakota Fontenot                    President and Secretary

**FURTHER RESOLVED**, that the officer is empowered to carry out the day-to-day business of the Corporation, subject to the direction and control of the Board.

**FURTHER RESOLVED**, that any officer of the Corporation not listed above is hereby removed from any such office they may have held with the Corporation.

### Corporate Records

**WHEREAS**, the corporate records of the Corporation, including its minute book cannot be located, and as such the Shareholder and the Board desire to create the New Records to replace the missing corporate records.

**RESOLVED**, that the Corporation shall recreate and maintain, as part of its corporate records, a minute book that shall include, but that shall not be limited to, records of the Corporation's Certificate of Formation and amendments thereto, its Bylaws and amendments thereto, minutes of all meetings of the Board, minutes of all meetings of the Shareholder, the time and the place of each such meeting, whether the meeting was regular or special, the manner in which the meeting was authorized, the notice given, the names of those present or represented at the meeting and the proceedings of each meeting; and

**FURTHER RESOLVED**, that the Secretary of the Corporation be, and hereby is, authorized and directed to procure such a replacement minute book and such other books and records as may be required by the Corporation.

2

HAH 000170

## Articles of Incorporation

**RESOLVED**, that a copy of the filed Articles bearing the file stamp of the Secretary of State of Texas be inserted into the replacement minute book of the Corporation.

## Amended and Restated Bylaws

**WHERAS**, consistent with the adoption of New Records, and immediately following the reconstitution of the Board, the Board and Shareholder deem it advisable and in the best interests of the Corporation to enter into those certain Amended and Restated Bylaws dated as of even date herewith (the "*Amended and Restated Bylaws*"), by which any Bylaws, amendments thereto, or amendments and restatements thereof, of the Corporation shall be amended and restated in their entirety.

**RESOLVED**, that the form of Amended and Restated Bylaws presented to the Board and Shareholder for review be, and hereby are, approved and adopted as the Amended and Restated Bylaws of the Corporation; and

**FURTHER RESOLVED**, that the President of the Corporation is directed to certify a copy of the Amended and Restated Bylaws, insert them into the minute book of the Corporation, and maintain them in the principal office of the Corporation, open for inspection by the Shareholder of the Corporation at all reasonable times during office hours.

## Qualification in Other Jurisdictions

**RESOLVED**, that the Corporation qualify to engage in business in any state of the United States or any foreign country in which the Board determines it to be necessary or appropriate for the Corporation to qualify to do business;

**FURTHER RESOLVED**, that the proper officers of the Corporation be, and hereby are, authorized and directed on behalf of the Corporation to make and file such certificates, reports or other instruments as may be required by the laws of such jurisdiction to be filed for that purpose; and

**FURTHER RESOLVED**, that the officers of the Corporation be, and each acting separately hereby is, authorized and directed to pay all fees and expenses incident to and necessary for the qualification of the Corporation to do business in any state or foreign country.

## Licenses and Tax Permits

**RESOLVED**, that the officers of the Corporation be, and each acting separately hereby is, authorized and directed to obtain, in the name of the Corporation, such licenses and tax permits as may be required by any applicable federal, state, county or municipal governmental statute, ordinance or regulation for the conduct of the business of the Corporation within any jurisdiction in which the Corporation shall have qualified to do business.

3

HAH 000171

## Banking Authority

**RESOLVED**, that the Secretary of the Corporation be, and hereby is, authorized and directed to select one or more financial institutions for the deposit of the Corporation's cash and securities, the deposit and collection of checks and drafts made payable to the order of the Corporation, issuance of letters of credit on behalf of the Corporation, extensions of credit, and other financial transactions on behalf of the Corporation, and to designate the names of the persons authorized to sign checks, drafts, borrowing requests and other instructions to such financial institutions on behalf of the Corporation;

**FURTHER RESOLVED**, that the Secretary of the Corporation be, and hereby is, authorized to open additional accounts with such additional financial institutions, close any accounts with financial institutions, change the names of the persons authorized to sign check, drafts, borrowing requests and other instructions on behalf of the Corporation as the Secretary deems to be necessary of convenient from time to time;

**FURTHER RESOLVED**, that the form of resolutions specified by any such financial institutions that are designated by the Secretary from time to time be, and hereby are, ratified and approved as the official resolutions of the Corporation and the persons designated from time to time by the Secretary as signatories on such accounts be, and hereby are, approved; and

**FURTHER RESOLVED**, that the Secretary of the Corporation be, and hereby is, authorized and directed to certify the adoption of the form of resolutions required by any such financial institutions from time to time designated by the Secretary and to certify the names and signatures of the persons designated by the Secretary from time to time as signatories on behalf of the Corporation.

## Adoption and Issuance of Share Certificates

**WHEREAS**, all certificates representing shares of stock in the Corporation have been lost or misplaced, and have not been recovered after a diligent search (collectively, the "*Lost Certificates*").

**WHEREAS**, the Corporation has received that certain Affidavit of Lost Stock Certificate of the Shareholder, and the Board and Shareholder believe it is in the best interest of the Corporation to reissue a certificate to the Shareholder, representing 1,000 shares of common stock (no par value) of the Corporation.

**RESOLVED**, that consistent with the adoption of the New Records, the form of share certificate attached hereto as **Exhibit A** be, and hereby is, approved and adopted as the form of share certificate representing the common stock (no par value per share) of the Corporation; and

**FURTHER RESOLVED**, that the certificates shall be consecutively numbered, beginning with the number 1; that the certificates shall bear all legends required by law to be placed on the Corporation's share certificates; and that the certificates shall only be issued in the manner and upon the conditions set forth in the Bylaws.

4

HAH 000172

RESOLVED, that the Corporation issue shares of its Common Stock, no par value per share, to the following persons and prepare or cause to be prepared, issued, and executed a certificate representing such shares in exchange for the considerations set forth below, the receipt of which is hereby acknowledged on behalf of the Corporation, which shares, when so issued, shall be validly issued, fully paid and non-assessable, with no personal liability attaching to the ownership thereof:

| Shareholder | Shares | Consideration |
|---|---|---|
| Holli Ann Hardin Trust Number One | 1,000 | $0.00 |

FURTHER RESOLVED, that the Corporation shall refuse to recognize any person other than the Shareholder as a shareholder of the Corporation, refuse to make any payment, transfer, registration, delivery or exchange called for by the Lost Certificates to any person other than the Shareholder, and refuse to take any other action pursuant to the request or demand of any person other than the Shareholder.

## General Authority

RESOLVED, that the officers of the Corporation be, and each acting separately hereby is, authorized and directed to do any and all acts and things and to execute and deliver and accept delivery of, in the name of and on behalf of the Corporation, any and all instruments, agreements, consents, certificates and other documents as in their opinion, or in the opinion of counsel to the Corporation, may be necessary or appropriate in order to carry out the purposes and intent of any of the foregoing resolutions;

FURTHER RESOLVED, that any act or acts of any of the officers of the Corporation which acts would have been authorized by the foregoing resolutions, except that such acts were taken prior to the adoption of such resolutions, be, and they hereby are, severally ratified, confirmed, approved and adopted in all respects as acts in the name and on behalf of the Corporation and

FURTHER RESOLVED, that the Secretary of the Corporation be, and hereby is, authorized and directed to certify the adoption of these resolutions.

*[Balance of Page Intentionally Blank. Signature Page Follows]*

5

HAH 000173

This Consent shall be effective as of the date hereof regardless of whether any signature occurs before, or after such date.  All actions taken in this Consent shall be deemed to be taken simultaneously in the location of the Corporation's principal office on the date of this Consent.

**EXECUTED** by the undersigned to be effective as of the date first set forth above.

**SHAREHOLDER**:

**HOLLI ANN HARDIN TRUST NUMBER ONE**

By: _____

Name: Linda Goehrs

Title: Trustee

**DIRECTOR**:

By: _____

Name: Dakota Fontenot

Signature Page
Unanimous Joint Written Consent of the Sole Shareholder and Sole Director
Of
The Colorado Bar & Grill Corporation

HAH 000174

## EXHIBIT A

SPECIMEN SHARE CERTIFICATE

See attached.

HAH 000175

# EXHIBIT G

## HFR ENTERPRISES, INC.

### UNANIMOUS JOINT WRITTEN CONSENT OF THE SOLE SHAREHOLDER AND SOLE DIRECTOR

### IN LIEU OF A SPECIAL MEETING

May 19, 2023

The undersigned, being the sole shareholder (the "*Shareholder*") and the sole member of the Board of Directors (the "*Board*") of **HFR ENTERPRISES, INC.**, a Texas corporation (the "*Corporation*"), in lieu of holding a special meeting of the Shareholder and the Board, the call and notice of each of which are hereby expressly waived, do hereby consent to the following resolutions:

**Loss or Destruction of Corporate Records**

WHEREAS, the Corporation was formed as a Texas Corporation by filing of Articles of Incorporation (the "*Articles*") with the Texas Secretary of State on April 28, 1988 (the "*Formation*");

WHEREAS, subsequent to the Formation, all corporate records of the Corporation were maintained by or on the behalf of Dallas Joseph Fontenot, Jr. ("*Mr. Fontenot*");

WHEREAS, Mr. Fontenot died on September 3, 2021, and since such date, no corporate records of the Corporation have been located after a diligent search by his heirs and authorized affiliates; and

WHEREAS, the Shareholder and the Board desire to create new corporate records to govern the affairs of the Corporation, effective as of the date first set forth above to, among other things, replace the original records of the Corporation which have been lost or misplaced, elect the sole member of the Board, elect officers, adopt new Bylaws, and adopt and reflect the issuance of new share certificates (collectively, the "*New Records*").

RESOLVED, that New Records shall be obtained and adopted to replace any records of the Corporation which may be in existence, as of the date first written above.

**Election of Directors**

WHEREAS, the Shareholder desires to reconstitute the Board of the Corporation and remove any members of the Board which may have been previously elected.

008402\00002\3535010.1 - 5/17/2023 1:51:36 PM

1

HAH 000155

RESOLVED, that the following named person be, and hereby is, elected to serve as a member of the Board, and to serve in such capacity until his respective successor has been duly elected and qualified, or until his earlier death, resignation or removal:

Dakota Fontenot

FURTHER RESOLVED, that any member of the Board not listed above is hereby removed from the Board.

## Election of Officers

WHEREAS, immediately following the reconstitution of the Board, the Board desires to reconstitute the officers of the Corporation and remove any officers which may have been previously elected.

RESOLVED, that the following named person be, and hereby is, elected to the offices set forth opposite his name, to serve in such capacity until his successor is duly elected and qualified or until his earlier death, resignation or removal:

Dakota Fontenot　　　　　　　　　President and Secretary

FURTHER RESOLVED, that the officer is empowered to carry out the day-to-day business of the Corporation, subject to the direction and control of the Board.

FURTHER RESOLVED, that any officer of the Corporation not listed above is hereby removed from any such office they may have held with the Corporation.

## Corporate Records

WHEREAS, the corporate records of the Corporation, including its minute book cannot be located, and as such the Shareholder and the Board desire to create the New Records to replace the missing corporate records.

RESOLVED, that the Corporation shall recreate and maintain, as part of its corporate records, a minute book that shall include, but that shall not be limited to, records of the Corporation's Certificate of Formation and amendments thereto, its Bylaws and amendments thereto, minutes of all meetings of the Board, minutes of all meetings of the Shareholder, the time and the place of each such meeting, whether the meeting was regular or special, the manner in which the meeting was authorized, the notice given, the names of those present or represented at the meeting and the proceedings of each meeting; and

FURTHER RESOLVED, that the Secretary of the Corporation be, and hereby is, authorized and directed to procure such a replacement minute book and such other books and records as may be required by the Corporation.

2

HAH 000156

## Articles of Incorporation

**RESOLVED**, that a copy of the filed Articles bearing the file stamp of the Secretary of State of Texas be inserted into the replacement minute book of the Corporation.

## Amended and Restated Bylaws

**WHERAS**, consistent with the adoption of New Records, and immediately following the reconstitution of the Board, the Board and Shareholder deem it advisable and in the best interests of the Corporation to enter into those certain Amended and Restated Bylaws dated as of even date herewith (the "*Amended and Restated Bylaws*"), by which any Bylaws, amendments thereto, or amendments and restatements thereof, of the Corporation shall be amended and restated in their entirety.

**RESOLVED**, that the form of Amended and Restated Bylaws presented to the Board and Shareholder for review be, and hereby are, approved and adopted as the Amended and Restated Bylaws of the Corporation; and

**FURTHER RESOLVED**, that the President of the Corporation is directed to certify a copy of the Amended and Restated Bylaws, insert them into the minute book of the Corporation, and maintain them in the principal office of the Corporation, open for inspection by the Shareholder of the Corporation at all reasonable times during office hours.

## Qualification in Other Jurisdictions

**RESOLVED**, that the Corporation qualify to engage in business in any state of the United States or any foreign country in which the Board determines it to be necessary or appropriate for the Corporation to qualify to do business;

**FURTHER RESOLVED**, that the proper officers of the Corporation be, and hereby are, authorized and directed on behalf of the Corporation to make and file such certificates, reports or other instruments as may be required by the laws of such jurisdiction to be filed for that purpose; and

**FURTHER RESOLVED**, that the officers of the Corporation be, and each acting separately hereby is, authorized and directed to pay all fees and expenses incident to and necessary for the qualification of the Corporation to do business in any state or foreign country.

## Licenses and Tax Permits

**RESOLVED**, that the officers of the Corporation be, and each acting separately hereby is, authorized and directed to obtain, in the name of the Corporation, such licenses and tax permits as may be required by any applicable federal, state, county or municipal governmental statute, ordinance or regulation for the conduct of the business of the Corporation within any jurisdiction in which the Corporation shall have qualified to do business.

3

HAH 000157

## Banking Authority

**RESOLVED**, that the Secretary of the Corporation be, and hereby is, authorized and directed to select one or more financial institutions for the deposit of the Corporation's cash and securities, the deposit and collection of checks and drafts made payable to the order of the Corporation, issuance of letters of credit on behalf of the Corporation, extensions of credit, and other financial transactions on behalf of the Corporation, and to designate the names of the persons authorized to sign checks, drafts, borrowing requests and other instructions to such financial institutions on behalf of the Corporation;

**FURTHER RESOLVED**, that the Secretary of the Corporation be, and hereby is, authorized to open additional accounts with such additional financial institutions, close any accounts with financial institutions, change the names of the persons authorized to sign check, drafts, borrowing requests and other instructions on behalf of the Corporation as the Secretary deems to be necessary of convenient from time to time;

**FURTHER RESOLVED**, that the form of resolutions specified by any such financial institutions that are designated by the Secretary from time to time be, and hereby are, ratified and approved as the official resolutions of the Corporation and the persons designated from time to time by the Secretary as signatories on such accounts be, and hereby are, approved; and

**FURTHER RESOLVED**, that the Secretary of the Corporation be, and hereby is, authorized and directed to certify the adoption of the form of resolutions required by any such financial institutions from time to time designated by the Secretary and to certify the names and signatures of the persons designated by the Secretary from time to time as signatories on behalf of the Corporation.

## Adoption and Issuance of Share Certificates

**WHEREAS**, all certificates representing shares of stock in the Corporation have been lost or misplaced, and have not been recovered after a diligent search (collectively, the "*Lost Certificates*").

**WHEREAS**, the Corporation has received that certain Affidavit of Lost Stock Certificate of the Shareholder, and the Board and Shareholder believe it is in the best interest of the Corporation to reissue a certificate to the Shareholder, representing 1,000 shares of common stock ($1.00 par value) of the Corporation.

**RESOLVED**, that consistent with the adoption of the New Records, the form of share certificate attached hereto as **Exhibit A** be, and hereby is, approved and adopted as the form of share certificate representing the common stock (no par value per share) of the Corporation; and

**FURTHER RESOLVED**, that the certificates shall be consecutively numbered, beginning with the number 1; that the certificates shall bear all legends required by law to be placed on the Corporation's share certificates; and that the certificates shall only be issued in the manner and upon the conditions set forth in the Bylaws.

HAH 000158

RESOLVED, that the Corporation issue shares of its Common Stock, no par value per share, to the following persons and prepare or cause to be prepared, issued, and executed a certificate representing such shares in exchange for the considerations set forth below, the receipt of which is hereby acknowledged on behalf of the Corporation, which shares, when so issued, shall be validly issued, fully paid and non-assessable, with no personal liability attaching to the ownership thereof:

| Shareholder | Shares | Consideration |
|---|---|---|
| Holli Ann Hardin Trust Number One | 1,000 | $0.00 |

FURTHER RESOLVED, that the Corporation shall refuse to recognize any person other than the Shareholder as a shareholder of the Corporation, refuse to make any payment, transfer, registration, delivery or exchange called for by the Lost Certificates to any person other than the Shareholder, and refuse to take any other action pursuant to the request or demand of any person other than the Shareholder.

### General Authority

RESOLVED, that the officers of the Corporation be, and each acting separately hereby is, authorized and directed to do any and all acts and things and to execute and deliver and accept delivery of, in the name of and on behalf of the Corporation, any and all instruments, agreements, consents, certificates and other documents as in their opinion, or in the opinion of counsel to the Corporation, may be necessary or appropriate in order to carry out the purposes and intent of any of the foregoing resolutions;

FURTHER RESOLVED, that any act or acts of any of the officers of the Corporation which acts would have been authorized by the foregoing resolutions, except that such acts were taken prior to the adoption of such resolutions, be, and they hereby are, severally ratified, confirmed, approved and adopted in all respects as acts in the name and on behalf of the Corporation and

FURTHER RESOLVED, that the Secretary of the Corporation be, and hereby is, authorized and directed to certify the adoption of these resolutions.

*[Balance of Page Intentionally Blank. Signature Page Follows]*

5

HAH 000159

This Consent shall be effective as of the date hereof regardless of whether any signature occurs before, or after such date.  All actions taken in this Consent shall be deemed to be taken simultaneously in the location of the Corporation's principal office on the date of this Consent.

**EXECUTED** by the undersigned to be effective as of the date first set forth above.

**SHAREHOLDER**:

**HOLLI ANN HARDIN TRUST NUMBER ONE**

By: _____

Name: Linda Goehrs

Title: Trustee

**DIRECTOR**:

By: _____

Name: Dakota Fontenot

Signature Page
Unanimous Joint Written Consent of the Sole Shareholder and Sole Director
Of
HFR Enterprises, Inc.

HAH 000160

**EXHIBIT A**

SPECIMEN SHARE CERTIFICATE

See attached.

HAH 000161

# EXHIBIT H

**ICE EMBASSY, INC.**

**UNANIMOUS JOINT WRITTEN CONSENT OF THE
SOLE SHAREHOLDER AND SOLE DIRECTOR**

**IN LIEU OF A SPECIAL MEETING**

May 19, 2023

The undersigned, being the sole shareholder (the "*Shareholder*") and the sole member of the Board of Directors (the "*Board*") of **ICE EMBASSY, INC.**, a Texas corporation (the "*Corporation*"), in lieu of holding a special meeting of the Shareholder and the Board, the call and notice of each of which are hereby expressly waived, do hereby consent to the following resolutions:

**Loss or Destruction of Corporate Records**

**WHEREAS**, the Corporation was formed as a Texas Corporation by filing of Articles of Incorporation (the "*Articles*") with the Texas Secretary of State on April 28, 1988 (the "*Formation*");

**WHEREAS**, subsequent to the Formation, all corporate records of the Corporation were maintained by or on the behalf of Dallas Joseph Fontenot, Jr. ("*Mr. Fontenot*");

**WHEREAS**, Mr. Fontenot died on September 3, 2021, and since such date, no corporate records of the Corporation have been located after a diligent search by his heirs and authorized affiliates; and

**WHEREAS**, the Shareholder and the Board desire to create new corporate records to govern the affairs of the Corporation, effective as of the date first set forth above to, among other things, replace the original records of the Corporation which have been lost or misplaced, elect the sole member of the Board, elect officers, adopt new Bylaws, and adopt and reflect the issuance of new share certificates (collectively, the "*New Records*").

**RESOLVED**, that New Records shall be obtained and adopted to replace any records of the Corporation which may be in existence, as of the date first written above.

**Election of Directors**

**WHEREAS**, the Shareholder desires to reconstitute the Board of the Corporation and remove any members of the Board which may have been previously elected.

008402\00002\3535052.1 - 5/17/2023 12:46:45 PM

1

HAH 000162

RESOLVED, that the following named person be, and hereby is, elected to serve as a member of the Board, and to serve in such capacity until his respective successor has been duly elected and qualified, or until his earlier death, resignation or removal:

Dakota Fontenot

FURTHER RESOLVED, that any member of the Board not listed above is hereby removed from the Board.

## Election of Officers

WHEREAS, immediately following the reconstitution of the Board, the Board desires to reconstitute the officers of the Corporation and remove any officers which may have been previously elected.

RESOLVED, that the following named person be, and hereby is, elected to the offices set forth opposite his name, to serve in such capacity until his successor is duly elected and qualified or until his earlier death, resignation or removal:

Dakota Fontenot                          President and Secretary

FURTHER RESOLVED, that the officer is empowered to carry out the day-to-day business of the Corporation, subject to the direction and control of the Board.

FURTHER RESOLVED, that any officer of the Corporation not listed above is hereby removed from any such office they may have held with the Corporation.

## Corporate Records

WHEREAS, the corporate records of the Corporation, including its minute book cannot be located, and as such the Shareholder and the Board desire to create the New Records to replace the missing corporate records.

RESOLVED, that the Corporation shall recreate and maintain, as part of its corporate records, a minute book that shall include, but that shall not be limited to, records of the Corporation's Certificate of Formation and amendments thereto, its Bylaws and amendments thereto, minutes of all meetings of the Board, minutes of all meetings of the Shareholder, the time and the place of each such meeting, whether the meeting was regular or special, the manner in which the meeting was authorized, the notice given, the names of those present or represented at the meeting and the proceedings of each meeting; and

FURTHER RESOLVED, that the Secretary of the Corporation be, and hereby is, authorized and directed to procure such a replacement minute book and such other books and records as may be required by the Corporation.

2

HAH 000163

## Articles of Incorporation

**RESOLVED**, that a copy of the filed Articles bearing the file stamp of the Secretary of State of Texas be inserted into the replacement minute book of the Corporation.

## Amended and Restated Bylaws

**WHERAS**, consistent with the adoption of New Records, and immediately following the reconstitution of the Board, the Board and Shareholder deem it advisable and in the best interests of the Corporation to enter into those certain Amended and Restated Bylaws dated as of even date herewith (the "*Amended and Restated Bylaws*"), by which any Bylaws, amendments thereto, or amendments and restatements thereof, of the Corporation shall be amended and restated in their entirety.

**RESOLVED**, that the form of Amended and Restated Bylaws presented to the Board and Shareholder for review be, and hereby are, approved and adopted as the Amended and Restated Bylaws of the Corporation; and

**FURTHER RESOLVED**, that the President of the Corporation is directed to certify a copy of the Amended and Restated Bylaws, insert them into the minute book of the Corporation, and maintain them in the principal office of the Corporation, open for inspection by the Shareholder of the Corporation at all reasonable times during office hours.

## Qualification in Other Jurisdictions

**RESOLVED**, that the Corporation qualify to engage in business in any state of the United States or any foreign country in which the Board determines it to be necessary or appropriate for the Corporation to qualify to do business;

**FURTHER RESOLVED**, that the proper officers of the Corporation be, and hereby are, authorized and directed on behalf of the Corporation to make and file such certificates, reports or other instruments as may be required by the laws of such jurisdiction to be filed for that purpose; and

**FURTHER RESOLVED**, that the officers of the Corporation be, and each acting separately hereby is, authorized and directed to pay all fees and expenses incident to and necessary for the qualification of the Corporation to do business in any state or foreign country.

## Licenses and Tax Permits

**RESOLVED**, that the officers of the Corporation be, and each acting separately hereby is, authorized and directed to obtain, in the name of the Corporation, such licenses and tax permits as may be required by any applicable federal, state, county or municipal governmental statute, ordinance or regulation for the conduct of the business of the Corporation within any jurisdiction in which the Corporation shall have qualified to do business.

3

HAH 000164

## Banking Authority

**RESOLVED**, that the Secretary of the Corporation be, and hereby is, authorized and directed to select one or more financial institutions for the deposit of the Corporation's cash and securities, the deposit and collection of checks and drafts made payable to the order of the Corporation, issuance of letters of credit on behalf of the Corporation, extensions of credit, and other financial transactions on behalf of the Corporation, and to designate the names of the persons authorized to sign checks, drafts, borrowing requests and other instructions to such financial institutions on behalf of the Corporation;

**FURTHER RESOLVED**, that the Secretary of the Corporation be, and hereby is, authorized to open additional accounts with such additional financial institutions, close any accounts with financial institutions, change the names of the persons authorized to sign check, drafts, borrowing requests and other instructions on behalf of the Corporation as the Secretary deems to be necessary of convenient from time to time;

**FURTHER RESOLVED**, that the form of resolutions specified by any such financial institutions that are designated by the Secretary from time to time be, and hereby are, ratified and approved as the official resolutions of the Corporation and the persons designated from time to time by the Secretary as signatories on such accounts be, and hereby are, approved; and

**FURTHER RESOLVED**, that the Secretary of the Corporation be, and hereby is, authorized and directed to certify the adoption of the form of resolutions required by any such financial institutions from time to time designated by the Secretary and to certify the names and signatures of the persons designated by the Secretary from time to time as signatories on behalf of the Corporation.

## Adoption and Issuance of Share Certificates

**WHEREAS**, all certificates representing shares of stock in the Corporation have been lost or misplaced, and have not been recovered after a diligent search (collectively, the "*Lost Certificates*").

**WHEREAS**, the Corporation has received that certain Affidavit of Lost Stock Certificate of the Shareholder, and the Board and Shareholder believe it is in the best interest of the Corporation to reissue a certificate to the Shareholder, representing 1,000 shares of common stock ($1.00 par value) of the Corporation.

**RESOLVED**, that consistent with the adoption of the New Records, the form of share certificate attached hereto as **Exhibit A** be, and hereby is, approved and adopted as the form of share certificate representing the common stock (no par value per share) of the Corporation; and

**FURTHER RESOLVED**, that the certificates shall be consecutively numbered, beginning with the number 1; that the certificates shall bear all legends required by law to be placed on the Corporation's share certificates; and that the certificates shall only be issued in the manner and upon the conditions set forth in the Bylaws.

4

HAH 000165

**RESOLVED**, that the Corporation issue shares of its Common Stock, no par value per share, to the following persons and prepare or cause to be prepared, issued, and executed a certificate representing such shares in exchange for the considerations set forth below, the receipt of which is hereby acknowledged on behalf of the Corporation, which shares, when so issued, shall be validly issued, fully paid and non-assessable, with no personal liability attaching to the ownership thereof:

| Shareholder | Shares | Consideration |
|---|---|---|
| Holli Ann Hardin Trust Number One | 1,000 | $0.00 |

**FURTHER RESOLVED**, that the Corporation shall refuse to recognize any person other than the Shareholder as a shareholder of the Corporation, refuse to make any payment, transfer, registration, delivery or exchange called for by the Lost Certificates to any person other than the Shareholder, and refuse to take any other action pursuant to the request or demand of any person other than the Shareholder.

**General Authority**

**RESOLVED**, that the officers of the Corporation be, and each acting separately hereby is, authorized and directed to do any and all acts and things and to execute and deliver and accept delivery of, in the name of and on behalf of the Corporation, any and all instruments, agreements, consents, certificates and other documents as in their opinion, or in the opinion of counsel to the Corporation, may be necessary or appropriate in order to carry out the purposes and intent of any of the foregoing resolutions;

**FURTHER RESOLVED**, that any act or acts of any of the officers of the Corporation which acts would have been authorized by the foregoing resolutions, except that such acts were taken prior to the adoption of such resolutions, be, and they hereby are, severally ratified, confirmed, approved and adopted in all respects as acts in the name and on behalf of the Corporation and

**FURTHER RESOLVED**, that the Secretary of the Corporation be, and hereby is, authorized and directed to certify the adoption of these resolutions.

*[Balance of Page Intentionally Blank. Signature Page Follows]*

5

HAH 000166

This Consent shall be effective as of the date hereof regardless of whether any signature occurs before, or after such date. All actions taken in this Consent shall be deemed to be taken simultaneously in the location of the Corporation's principal office on the date of this Consent.

**EXECUTED** by the undersigned to be effective as of the date first set forth above.

**SHAREHOLDER**:

**HOLLI ANN HARDIN TRUST NUMBER ONE**

By: _____

Name: Linda Goehrs

Title: Trustee

**DIRECTOR**:

By: _____

Name: Dakota Fontenot

Signature Page
Unanimous Joint Written Consent of the Sole Shareholder and Sole Director
Of
Ice Embassy, Inc.

HAH 000167

## EXHIBIT A

SPECIMEN SHARE CERTIFICATE

See attached.

HAH 000168

# EXHIBIT I

## MANAGEMENT AGREEMENT

THIS MANAGEMENT AGREEMENT (this "Agreement") is made effective January 1, 2024 (the "Effective Date"), between ENTERTAINMENT MARKETING & MANAGEMENT, LTD., a Texas limited partnership ("Manager"), and ICE EMBASSY, INC. d/b/a THE COLORADO BAR AND GRILL, a Texas corporation (the "Owner").

## RECITALS

A. The Owner leases space from HFR ENTERPRISES, INC., a Texas corporation ("HFR") where it operates a sexually oriented business, bar, and restaurant (the "Club") located at the municipal address: 6710 Southwest Fwy, Houston, Texas 77074.

B. The Owner's corporate records and contracts were previously maintained by or on behalf of Dallas Joseph Fontenot, Jr. ("Mr. Fontenot").

C. Mr. Fontenot died on September 3, 2021, and since such date, neither corporate records of the Owner, nor records of any contract or agreement relating to the management of the Club have been located after a diligent search by his heirs and authorized affiliates.

D. On or about the Effective Date, the Owner previously retained Manager to manage and operate the Club, which such relationship may have been memorialized pursuant to a written or oral agreement, which neither the Owner, nor the Manager have been able to locate (the "Original Agreement").

E. The Owner desires to continue to retain Manager to manage and operate the Club, and provide support services to the Owner, on the terms and conditions set forth in this Agreement. Any reference to the Owner throughout this Agreement shall mean and include any and all of the Owner's designated affiliates that may directly or indirectly control or own an interest in the Club.

F. Manager is experienced in bar operations and management and has the staff, expertise and capability to perform the terms of this Agreement.

G. The Owner and the Manager desire that this Agreement amend, supersede, and replace the Original Agreement, and further desire that their relationship be governed in accordance with the terms and provisions of this Agreement effective as of the Effective Date.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements contained in this Agreement and other good and valuable consideration not recited in this Agreement, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Engagement and Authorization.

1.01 Engagement As Manager. The Owner hereby engages Manager as its sole and exclusive agent to supervise, manage, direct and control the operations of the Club, in accordance with the terms

1

HAH 000193

and conditions hereof. Manager hereby accepts such engagement as the manager of the Club during the Term, as hereafter defined, of this Agreement. The parties acknowledge such engagement does not include alcoholic beverage operations at the Club.  In accordance with applicable law, Owner, as the holder of the TABC permit for the Club, maintains control over the purchase, sale, and service of alcoholic beverages at the Club.

1.02 Grant of Authority. The Owner hereby grants Manager the power and authority to take all actions and to do all things reasonably required to perform the obligations of the Manager under this Agreement.  For the avoidance of doubt, Manager shall not have the power and authority to (i) borrow any money or execute any promissory note, bill of exchange or other credit obligation, mortgage or encumbrance, or pledge the credit of the Owner without, in each case, the prior written consent of the Owner, (ii) file, prosecute, defend or settle any legal or regulatory proceedings involving the Owner or the Club without the Owner's prior written approval, or (iii) act on behalf of, or hold itself out as having authority to act on behalf of, the Owner in any manner which is beyond the scope of the terms of this Agreement. In the performance of this Agreement, Manager shall act as the agent of the Owner; the creation of this agency shall not in any manner relieve the Owner of its duties or obligations under contract or law.

2. Manager's Duties. During the Term, Manager shall provide the Owner with the following specific services (hereinafter collectively referred to as the "Services"), at the Club:

2.01 Club Management. Manager shall oversee the day-to-day management of the Club, which responsibilities shall include: (a) the hiring, training and supervising of all Club employees, as more particularly described below; ; (b) the maintenance of business files and records; (c) the performance of general administrative functions; and (d) the preparation of the Club's monthly activities, as more particularly described below. In addition, Manager shall manage, operate, and maintain the Club in such a manner that the Club is at all times in substantial compliance with: (i) all zoning and use restrictions, fire codes, building codes, and other requirements issued by any governmental authority; (ii) all licenses, permits and other authorizations required in the operation of the Club; (iii) any policy of insurance covering the Club; (iv) that certain Real Estate Lease between the Owner and HFR (the "Club Lease") and that certain Sublease between the Owner and HFR (the "Parking Lot Lease" and collectively with the Club Lease, the "Leases"), to avoid any default by the Owner thereunder; (v) the negotiation of inventory purchase contracts with vendors, including combining purchasing quantity of Manager and its franchisee and/or licensees with the purchasing quantity of the Owner, its affiliates and franchisee and/or licensees in order to obtain any vendor discounts, rebates or refunds; and (vi) all applicable laws and regulations. With the written consent of the Owner, Manager may in the name of itself, the Owner or both, take such appropriate action as necessary to challenge to protest the validity or application of any legal requirement, tax or other imposition against the Club. The Owner agrees to execute and deliver any documents which Manager and the Owner deem reasonably necessary and appropriate in connection with such action.

2.02 Reimbursement of Expenses

HAH 000194

Owner shall reimburse Manager for all expenses incurred by Manager in connection with this Agreement or otherwise incurred in connection with the Club. Such expenses shall be reimbursed on demand, subject to reconciliation on a monthly basis.

2.03 – 2.04 Intentionally Blank

2.05 Financial Reports.

(a) Manager shall maintain full and adequate records and books of account and such other records as might be appropriate to reflect the results of operation of the Club, and which shall reflect all revenues and expenditures and all other receipts and disbursements relating to each of the Club. All books and records will be kept in accordance with generally accepted accounting principles ("GAAP") and shall be the property of the Owner and the Owner will have access thereto at all reasonable times.

(b) Within fifteen (15) days after the end of each month, Manager shall prepare and furnish to the Owner the following information for the preceding calendar month for each of the Club:

(i) Financial Statements. An accrual basis balance sheet in reasonable detail, together with a reasonably detailed accrual basis profit and loss statement for such preceding calendar month next preceding and with a cumulative calendar year accrual basis profit and loss statement to date, and a statement of cash flows for each monthly and cumulative period for which a profit and loss statement is prepared;

(ii) Supporting Data. At the Owner's request, copies of the following: (a) all checks, bank statements, bank deposit slips and bank reconciliations; (b) detailed cash receipts and disbursement records; (c) copies of all invoices; (d) supporting documentation for payroll, payroll taxes and employee benefits; and (e) such other information as the Owner might reasonably request;

(iii) Other Reports. Such other reports and documents as might be reasonably requested by the Owner from time to time (including, without implied limitation, certificates of compliance and other instruments required in connection with any bond financing relating to the Club); and

(iv) Management Fee Invoice. An invoice for the Management Fee (defined below) for such preceding calendar month and any other preceding calendar month for which the Management Fee is outstanding, based on the Gross Revenues set forth in the applicable financial statements.

(c) Within forty-five (45) days after the end of each calendar year, Manager shall furnish to the Owner year-end financial statements for the Club (including a balance sheet, income statement and statement of cashflows) which statements shall be unaudited and shall be prepared in accordance with GAAP. The Owner may engage an independent certified public accounting firm to provide audited annual financial statements, which cost shall be an operating expense of the Club. Manager shall cooperate in all respects with such accountant in the preparation of such statements, including the delivery of any financial information generated by Manager pursuant to the terms of this Agreement and reasonably required by the Owner's accountant to prepare such audited financial statements.

3

HAH 000195

(d) The Owner, shall have the right and privilege of examining and inspecting the books and records (including audit rights) during customary business hours following reasonable advance notice to Manager. Upon the termination of this Agreement, all such books and records shall be turned over to the Owner to insure the orderly continuance of the operation of the Club. If an audit or inspection of the books reveals that the calculation of Gross Revenues was miscalculated by Manager such that the fees paid out of the operating funds of the Club by the Owner pursuant to this Agreement varied by five percent (5%) or more from the amount provided by Manager in the statements delivered pursuant to this Agreement, then Manager will reimburse the Owner for all inspection and audit costs (including, without limitation, reasonable travel, lodging, meals, salaries and other expenses of the inspecting or auditing personnel) in addition to any adjustment or reimbursement for fees owing pursuant to this Agreement.

2.06 Human Resources. Manager shall hire, train, supervise, and pay all of its own employees and other personnel ("Employees") necessary to fulfill its obligations hereunder. All Employees shall be the employees or independent contractors of Manager, not the Owner. Manager may discharge any Employee in its discretion and pursuant to applicable state and federal law. Manager shall cause Employees to be covered by workers' compensation insurance and such other insurance as is now or hereafter required by law. Manager shall maintain all personnel and payroll records and manage all Employee benefits programs, including, but not limited to, health insurance, dental insurance, short and long term disability plans, life insurance, workers' compensation, cafeteria plans, vacation plans, sick leave and employee policy manuals in accordance with this Agreement, may draw down from the Gross Revenues (defined herein), all costs and expenses incurred in connection with all on and offsite Employees, including, without limitation, wages, salaries, on-site staff, reasonable bonuses, contract labor, commissions, fringe benefits, employee benefits, recruitment costs, workers' compensation and unemployment insurance premiums, payroll taxes, vacation and sick leave (but excluding any such costs or expenses and overhead of any offsite personnel). In addition, Manager shall maintain businesslike relations with the customers of the Club and all customer complaints will be received, logged and resolved in a systematic fashion. Complaints of a serious nature will be reported to the Owner with appropriate recommendations from the Manager.

2.07 Accounting. Manager shall perform general accounting functions for the operation of the Club, including, without limitation: cash management and banking relations; budgeting, forecasting and financial statement reporting; the preparation and maintenance of records necessary to produce financial statements; the preparation of financial statements in accordance with this Agreement; the preparation, execution, and filing, punctually, when due all forms, reports, and returns required by law relating to the employment of Employees or to the management, operation, occupancy, maintenance or use of the Club, including without limitation any sales or use tax forms, reports, and income tax returns; audit support; and any other general accounting function as requested by the Owner. In addition, Manager shall pay punctually when due any sales, use, employment or other taxes relating to the operation of the Club.

2.08 Marketing. Manager will devise a strategy for and assist in the implementation, at the Owner's sole costs and expense, of a marketing program to advertise and promote the business of the Club. Manager may cause the Club to participate in such marketing plans, oral and written presentations,

HAH 000196

promotional materials, public relations, media relations and any other general marketing functions to promote the Club.

2.09 Point-of-Sale Management Information System. Manager shall operate, administer, maintain, repair and upgrade, at the Owner's expense, the existing point-of-sale management information system for tracking purchases and inventory of each of the Club. Manager shall provide to the Owner an automated, monthly point-of-sale report on the first day of each calendar month.

2.10 Manager Personnel. Owner understands and agrees that Manager may hire or contract with outside contractors for some of its responsibilities hereunder.

2.11 Deletion of Specified Services. Any time during the Term of this Agreement, upon prior written notice by the Owner to Manager, the Owner may delete any specified service from the Services to be provided to the Club.

2.12. Term. Unless sooner terminated as hereafter provided, this Agreement shall be effective for a period of one (1) year commencing on the Effective Date of this Agreement (the "Term"), which Term shall be automatically extended for additional periods of one (1) year each, unless on or before thirty (30) days prior to the expiration of the Term, as extended, either party provides written notice to the other party not to so extend the Term.

3.01 Events for Termination.

(a) The Owner may terminate this Agreement, at any time and for any reason by providing Manager at least thirty (30) days' prior written notice.

(b) In addition, the Owner, at its sole option, may terminate this Agreement if any of the following events of default occur:

(i) The filing of a voluntary petition in bankruptcy or insolvency or a petition for reorganization under any bankruptcy law by Manager;

(ii) The consent to any involuntary petition in bankruptcy or the failure to vacate, within ninety (90) days from the date of entry thereof, any order approving an involuntary petition by Manager;

(iii) The entering of an order, judgment or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating Manager as bankrupt or insolvent, or approving a petition seeking reorganization or appointing a receiver, trustee, or liquidator of all or a substantial part of such party's assets, and such order, judgment or decree continues unstayed and in effect for any period of ninety (90) days or more;

(iv) The appointment of a receiver for all or any substantial portion of the property of Manager;

(v) The failure of Manager to make any payment required to be made in accordance with the terms of this Agreement within ten (10) days after receipt of written notice from the Owner, specifying said default with reasonable specificity, when such payment is due and payable; or

5

HAH 000197

(vi) The failure of Manager to perform, keep or fulfill any of the material covenants, undertakings, obligations or conditions set forth in this Agreement (but excluding any default set forth in Section 3.01(b)(v)), and the continuance of such default for a period of thirty (30) days after written notice of said failure from the Owner; provided, however, if such default cannot be cured within such thirty (30) day period and Manager commences to cure such default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended so long as it shall require Manager in the exercise of due diligence to cure such default, but not to exceed 180 days; provided, further, however, in the event of a default of the type set forth in this Section 3.01(b)(vi) shall result in a default by the Owner under any financing or loan agreement, such shorter cure period (if any) with respect to such default as shall be provided for therein; provided further that the cure period for any breach of this Agreement that would result in criminal sanctions against the Owner must be cured within ten (10) days following written notice thereof from the Owner.

(c) Manager, at its sole option, may terminate this Agreement if any of the following events of default occur:

(i) The filing of a voluntary petition in bankruptcy or insolvency or a petition for reorganization under any bankruptcy law by the Owner;

(ii) The consent to any involuntary petition in bankruptcy or the failure to vacate, within ninety (90) days from the date of entry thereof, any order approving an involuntary petition by the Owner;

(iii) The entering of an order, judgment or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating the Owner as bankrupt or insolvent, or approving a petition seeking reorganization or appointing a receiver, trustee, or liquidator of all or a substantial part of such party's assets, and such order, judgment or decree continues unstayed and in effect for any period of ninety (90) days or more;

(iv) The appointment of a receiver for all or any substantial portion of the property of the Owner;

(v) The failure of the Owner to make any payment required to be made in accordance with the terms of this Agreement within ten (10) days after receipt of written notice from Manager, specifying said default with reasonable specificity, when such payment is due and payable; or

(vi) The failure of the Owner to perform, keep or fulfill any of the material covenants, undertakings, obligations or conditions set forth in this Agreement (but excluding any default set forth in Section 3.01(c)(v)), and the continuance of such default for a period of thirty (30) days after written notice of said failure from Manager; provided, however, if such default cannot be cured within such thirty (30) day period and the Owner commences to cure such default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended so long as it shall require the Owner in the exercise of due diligence to cure such default, but not to exceed 180 days; provided, further, however, that the cure period for any breach of this Agreement that would result in criminal sanctions against Manager must be cured within ten (10) days following written notice thereof from Manager.

6

HAH 000198

3.02 <u>Certain Obligations of Manager After Termination</u>. Upon termination of this Agreement, Manager shall: (i) deliver to the Owner all records, books, accounts, files, and other documentation (the "Records") pertaining to the management, maintenance, operation, marketing and use of the Club, including, without limitation, all records relative to the employees, suppliers, finances, and affairs of the Club; (ii) deliver and assign, transfer or otherwise convey to the Owner all contracts and all personal property relating to or used in the management, operation and maintenance of the Club, including, without limitation, all keys, combinations to locks and other security devices, documents, materials, operating supplies, furnishings and equipment, provided that any personal property owned by Manager may be retained by Manager; (iii) prepare and deliver to the Owner a full set of reports for the Club in accordance with Section 2.05, current to the date of termination; (iv) deliver all funds held by Manager on behalf of the Owner; and (v) render such assistance as the Owner might reasonably request to facilitate an orderly transition in the management and operation of the Club.

4. <u>Management Fee</u>. As compensation for all Services to be rendered by Manager during the Term of this Agreement, the Owner agrees to pay to Manager the following:

4.01 <u>Management Fee</u>. The Owner shall pay to Manager a management fee (the "Management Fee") for the Services in an amount equal to Seventeen Thousand Five Hundred and No/100 Dollars ($17,500.00) per month, with a true-up at the end of each calendar year, such that the aggregate annualized Management Fee is equal to ten percent (10%) of the Gross Revenues of the Club, for such calendar year. For the purposes of this Agreement, "Gross Revenues" means all revenues from the Club, except from the sale of alcoholic beverages, less any sales, use, employment or other taxes relating to the operation of the Club. The Management Fee shall be paid on a monthly basis within ten (10) days following the Owner's receipt of the applicable financial reports set forth in Section 2.05(b), but in no event earlier than the twentieth (20th) of the applicable month. In the event this Agreement is terminated during a calendar month, the Management Fee payable for the month in which such termination occurs will be prorated based upon a thirty (30) day month. Any short-fall of the Management Fee payment(s) shall carry over and shall be paid by Owner as soon as practicable.

5. <u>Insurance; Indemnification; Exculpation from Liability</u>.

5.01 <u>Insurance.</u>

(a) Manager, as an operating expense of the Club, shall obtain and maintain all the insurance policies and endorsements required under the Leases.

(b) Furthermore, Manager, at its sole cost and expense, shall obtain a commercial general liability insurance policy with amounts not less than $1,000,000 combined single limit for each occurrence and $2,000,000 for the aggregate of all occurrences within each policy year, as well as excess liability (umbrella) insurance with limit of at least $5,000,000 per occurrence, covering each of the following: bodily injury, death, or property damage liability per occurrence, personal and advertising injury, general aggregate, products and completed operations, and "all risk legal liability".

HAH 000199

(c) Owner, at is sole cost and expense, shall obtain a liquor liability insurance policy with amounts not less than $1,000,000 combined single limit for each occurrence and $2,000,000 for the aggregate of all occurrences within each policy year and shall list Manager as an additional insurance on the policy.

5.02 Indemnity.

(a) **MANAGER SHALL INDEMNIFY AND HOLD THE OWNER (AND THE OWNER'S AGENTS, SHAREHOLDERS, OFFICERS, DIRECTORS, AGENTS, PRINCIPALS AND EMPLOYEES) HARMLESS FROM AND AGAINST ALL CLAIMS, DEMANDS, DAMAGES, JUDGMENTS, COSTS, LOSSES, PENALTIES, FINES, LIENS, SUITS, AND EXPENSES AND LIABILITIES, INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND COSTS AND EXPENSES INCIDENT THERETO (COLLECTIVELY, "CLAIMS") WHICH ARE NOT COVERED BY INSURANCE PROCEEDS PAYABLE TO THE OWNER OR THE INDEMNIFIED PARTY THAT MAY BE INCURRED BY OR ASSERTED AGAINST ANY SUCH PARTY AND THAT ARISE FROM (A) THE FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE OF MANAGER, ITS AGENTS, PRINCIPALS, PARTNERS, MEMBERS, OFFICERS, DIRECTORS, AND EXECUTIVE AND KEY EMPLOYEES, INCLUDING, WITHOUT LIMITATION, IN THE SUPERVISION OR TRAINING OF EMPLOYEES AND OTHER EMPLOYMENT MATTERS; OR (B) PLACING, DISCHARGE, LEAKAGE, USE OR STORAGE, OF HAZARDOUS MATERIALS ON THE PREMISES OR IN THE HOTEL BY MANAGER OR ITS AGENTS, PRINCIPALS, PARTNERS, MEMBERS, OFFICERS, DIRECTORS, AND EMPLOYEES DURING THE TERM IN VIOLATION OF THE LEASES. THIS INDEMNITY EXPRESSLY COVERS AND INCLUDES CLAIMS ARISING FROM THE NEGLIGENCE (BUT NOT GROSS NEGLIGENCE) OF THE OWNER.**

(b) **EXCEPT WITH RESPECT TO MATTERS FOR WHICH MANAGER IS OBLIGATED TO PROVIDE INDEMNIFICATION PURSUANT TO SECTION 5.02(a) OR ARISING SOLELY OUT OF AN EVENT OF DEFAULT BY MANAGER UNDER THIS AGREEMENT, OWNER SHALL INDEMNIFY AND HOLD MANAGER AND THE MANAGER AFFILIATED ENTITIES (AND THEIR RESPECTIVE AGENTS, PRINCIPALS, PARTNERS, MEMBERS, OFFICERS, DIRECTORS, AND EMPLOYEES) HARMLESS FROM AND AGAINST ALL CLAIMS WHICH ARE NOT COVERED BY INSURANCE PROCEEDS PAYABLE TO MANAGER OR THE INDEMNIFIED PARTY THAT ARISE FROM OR IN CONNECTION WITH (A) THE OWNERSHIP AND OPERATION OF THE CLUB, (B) THE CONDITION OR USE OF THE CLUB, INCLUDING INJURY TO PERSONS OR PROPERTY OR BUSINESS, (C) THE FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE OF THE OWNER, OR (D) PLACING, DISCHARGE, LEAKAGE, USE OR STORAGE, OF HAZARDOUS MATERIALS IN THE CLUB BY THE OWNER DURING THE TERM, THE EXISTENCE OF HAZARDOUS MATERIALS IN, ON OR UNDER THE PREMISES BEFORE THE COMMENCEMENT OF THE TERM. MANAGER SHALL PROMPTLY PROVIDE THE OWNER WITH WRITTEN NOTICE OF ANY CLAIM OR SUIT BROUGHT AGAINST IT BY A THIRD PARTY WHICH MIGHT RESULT IN SUCH INDEMNIFICATION.**

8

HAH 000200

**THIS INDEMNITY EXPRESSLY COVERS AND INCLUDES CLAIMS ARISING FROM THE NEGLIGENCE (BUT NOT GROSS NEGLIGENCE) OF MANAGER.**

(c) Any party obligated to indemnify the other party under this Agreement (the "Indemnifying Party") shall have the right, by written notice to the other party, to assume the defense of any claim with respect to which the other party is entitled to indemnification hereunder. If the Indemnifying Party gives such written notice, (i) such defense shall be conducted by counsel selected by the Indemnifying Party and approved by the other party, such approval not to be unreasonably withheld or delayed (provided, however, that the other party's approval shall not be required with respect to counsel designated by the Indemnifying Party's insurer); (ii) so long as the Indemnifying Party is conducting such defense with reasonable diligence, the Indemnifying Party shall have the right to control said defense and shall not be required to pay the fees or disbursements of any counsel engaged by the other party for services rendered after the Indemnifying Party has given the written notice provided for above to the other party, except if there is a conflict of interest between the parties with respect to such claim or defense; and (iii) the Indemnifying Party shall have the right, without the consent of the other party, to settle such claim, but only provided that such settlement involves only the payment of money, the Indemnifying Party pays all amounts due in connection with or by reason of such settlement and, as part thereof, the other party is unconditionally released from all liability in respect of such claim. The other party shall have the right to participate in the defense of such claim being defended by the Indemnifying Party at the expense of the other party, but the Indemnifying Party shall have the right to control such defense (other than in the event of a conflict of interest between the parties with respect to such claim or defense). In no event shall (i) the other party settle any claim without the consent of the Indemnifying Party so long as the Indemnifying Party is conducting the defense thereof in accordance with this Agreement; or (ii) if a claim is covered by the Indemnifying Party's liability insurance, take or omit to take any action which would cause the insurer not to defend such claim or to disclaim liability in respect thereof.

(d) The provisions of this Section 5.02 shall survive the termination of this Agreement with respect to acts, omissions and occurrences arising during the Term and shall be binding on the successors and assigns of the Owner and Manager.

6. Miscellaneous Provisions.

6.01 Notices. All notices, requests, demands, and other communications required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given if delivered by hand, mailed by certified or registered mail with postage prepaid or by overnight mail, electronic mail transmission, or if sent by facsimile as follows:

| If to Manager, to: | Entertainment Marketing & Management, Ltd. |
| | 3414 Old Richmond Road |
| | Rosenberg, Texas 77471 |
| | Attn: Dakota Fontenot |
| | Email: dakotajamesfontenot@gmail.com |

| If to the Owner, to: | ICE Embassy, Inc. |

9

HAH 000201

3414 Old Richmond Road
Rosenberg, Texas 77471
Attn: Dakota Fontenot
Email: dakotajamesfontenot@gmail.com

In either case, with a copy to:    BoyarMiller
2925 Richmond Avenue, 14th Floor
Houston, Texas 77098
Attn: Tiffany Melchers
Email: tmelchers@boyarmiller.com

or to such other person or address as such party hereafter designates (by written notice to the other party).

6.02 Notices Concerning the Club. Upon the receipt by Manager of any notice pertaining to the Club not of a routine nature, including in any event, but not limited to, notices of any violation of any legal requirements, Manager shall immediately inform the Owner of such notice and shall deliver a copy of the notice to the Owner as expeditiously as possible.

6.03 Assignment. This Agreement and all of the provisions of this Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations shall be assigned by either of the parties without the prior written consent of the other party.

6.04 Governing Law. This Agreement and the legal relations among the parties shall be governed by and construed in accordance with the laws of the State of Texas.

6.05 Counterparts. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

6.06 Headings. The headings in this Agreement are inserted for convenience only and shall not affect the construction of this Agreement.

6.07 Entire Agreement; Modification. This Agreement embodies the entire agreement and understanding of the parties with respect to the subject matter contained in this Agreement. This Agreement supersedes all prior agreements and understandings between the parties with respect to the subject matter contained herein. This Agreement may not be amended or modified in any manner except by an instrument in writing signed by the parties

6.08 Severability. The provisions of this Agreement are severable and the invalidity of any one provision shall not affect the validity of any other provision.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

10

HAH 000202

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement effective as of the date first above written.

OWNER:

ICE EMBASSY, INC. d/b/a THE COLORADO BAR AND GRILL

By: _____
Name: Dakota Fontenot
Title: President

MANAGER:

ENTERTAINMENT MARKETING & MANAGEMENT, LTD.

By:    BFD GP, LLC, its general partner

By: _____
Name: Dakota Fontenot
Title: President

11

# EXHIBIT J

## CONSULTING AGREEMENT

This Consulting Agreement ("**Agreement**") is entered into between HFR Enterprises, Inc., a Texas corporation ("**HFR**") having offices at 3414 Old Richmond Road, Rosenberg, TX 77471, Ice Embassy, Inc. a Texas corporation ("**Ice**") having offices at 3414 Old Richmond Road, Rosenberg, TX 77471, and Gray Entertainment Inc, a Texas corporation having offices at 6111 Burning Tree Drive, Houston, Texas 77036 ("**Consultant**") (each a "**Party**" and, collectively, "**Parties**"), is made effective as of the 24th day of January 2025 ("**Effective Date**"). HFR and Ice shall be referred to herein collectively as the "**Company**." Obligations of HFR and Ice hereunder shall be joint and several. References herein to HFR and Ice shall include the Affiliates of each. "Affiliate" means a person, natural or legal, that (a) is owned by, controlled by or under the direction of, directly or indirectly, a Party, (b) owns or controls, directly or indirectly, a Party, (c) is under common control as a Party or (d) is a familial relative of a Party or an Affiliate; and includes any person that acquires any ownership interest in HFR, Ice, the assets of HFR, or the assets of Ice.

WHEREAS, Company is in the business of owning and operating a sexually oriented business ("SOB") in Harris County, Texas;

WHEREAS, Consultant works with persons owning, operating, and acquiring businesses similar to that of the Company;

WHEREAS, Company desires to engage Consultant to provide certain services in the area of Consultant's expertise, and Consultant is willing to provide such services to Company;

THEREFORE, in consideration of the mutual promises exchanged in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows

### SECTION 1:  CONSULTING DUTIES

**1.1**    **Term**. Company agrees to retain Consultant, and Consultant agrees to be retained by Company, beginning as of the Effective Date and continuing until HFR and Ice enters into the Purchase Agreement (defined below)("Term"). The Term is subject to the provisions in Section 3 of this Agreement.

**1.2**    **Duties and Responsibilities**. Consultant will assist with the sale of HFR and Ice and/or the sale of all or substantially all the assets of HFR and Ice. For purposes of clarity, "all or substantially all the assets" of each entity shall mean those assets used in connection with the SOB and may or may not include any realty that may be owned by HFR and/or Ice.

**1.3**    **Extent of Service**. Consultant shall, during the Term, devote such time to the business and affairs of Company as Consultant, in Consultant's sole discretion, deems appropriate. Notwithstanding the foregoing, it is understood that Consultant may have other business and personal interests that are not contrary to the interests of Company. For the avoidance of doubt, Company and Consultant agree that Consultant shall fulfill his obligation to devote reasonable business time under this Agreement, as such is determined in the sole and absolute discretion of

Consultant.

CONFIDENTIAL
HAH011840

## SECTION 2: COMPENSATION

**2.1     Purchase Agreement**. Company is currently negotiating the sale of HFR and Ice's stock, the real property and improvements HFR owns located at 6710 Southwest Freeway, Houston, Texas 77074 (the "Property"), and/or the assets of the foregoing through one or more purchase agreements (individually and collectively, the "Purchase Agreement").

**2.2     Compensation**. Consultant's compensation shall be one hundred fifty thousand dollars ($150,000) ("Compensation") if Purchase Agreement is with Colorado Rose, LLC, a Texas limited liability company, directly or indirectly, including its Affiliates (collectively, **"Colorado Rose"**). Company will each pay to Consultant the Compensation within four (4) business days of their respective actual receipt of any proceeds it receives from the Purchase Agreement provided, however the total amount paid to Consultant shall not exceed one hundred fifty thousand dollars ($150,000).

**2.3     Independent Contractor**. The relationship between Company and Consultant shall be an Independent Contractor/Contractor relationship. Nothing contained in this Agreement shall be regarded as creating any other kind of relationship between Consultant and Company, including but not limited to an employee/employer relationship or a relationship between joint ventures, partners, shareholders, or the like. Consultant shall be liable for his own debts, obligations, acts, and omissions, the payment of all applicable compensation, wages, pensions, workers' compensation, insurance benefits, and all required taxes, including but not limited to withholding, social security, and other taxes and benefits. Consultant shall not be subject to any Company policies solely applicable to Company or Company's employees, or be eligible for any benefit plan offered by Company.

## SECTION 3: TERMINATION PRIOR TO EXPIRATION OF TERM

**3.1     Termination by HFR**. If a Purchase Agreement with Colorado Rose is not executed within one (1) year of the Effective Date, this Agreement is null and void.

**3.2     Termination by Consultant**. Consultant may terminate this Agreement at any time upon written notice.

**3.3     Termination by Completion.** Upon closing of a purchase of HFR or Ice, and/or the assets of HFR or Ice by Colorado Rose, this agreement shall terminate subject to **Section 3.4.**

**3.4     Survival of Obligations**. Termination of the Consulting relationship does not terminate those obligations imposed by this Agreement which are continuing obligations, including, without limitation, Consultant's obligations under **Sections 4 and 5** and the Company's obligation to pay the Compensation under **Section 2.2**. Notwithstanding the foregoing, the Company's obligation to pay the Compensation is terminated in the event of termination under Section 3.1 and Section 3.2.

CONFIDENTIAL

HAH011841

## SECTION 4:  CONFIDENTIAL INFORMATION AND
## FIDUCIARY OBLIGATIONS

**Confidential Information**.  The Parties recognize and acknowledge that during the term of this Agreement in order for Consultant to perform the duties required under this Agreement, Company is obligated to provide some, but not all, of certain confidential information of Company, including, but not limited to, (i) software, devices, inventions, processes, compilations of information, records, source codes, object codes, and specifications, that are owned by Company and that are used in the operation of the business of Company, (ii) customer lists, financial, accounting, statistical, and personnel information concerning Company and their customers and (iii) lists of and the relationships that Company have with entities (all of the foregoing are collectively referred to hereinafter as the "Company Confidential Information").  Consultant acknowledges and agrees that Company Confidential Information constitutes valuable, special and unique property of Company.  Consultant further acknowledges that protection of such Company Confidential Information and trade secrets against unauthorized disclosure and use is of critical importance to Company in maintaining their competitive position.  Consultant hereby agrees that Consultant will not, at any time during term of this Agreement and for a period of five (5) years from the date of this Agreement, make any unauthorized disclosure of any Company Confidential Information or trade secrets of Company , or make any use thereof, except in the carrying out of Consultant's consulting responsibilities hereunder.  As a result of Consultant's services on behalf of Company , Consultant may also from time to time have access to, or knowledge of, confidential business information or trade secrets of third parties, such as customers, suppliers, partners, joint venturers, and the like, of Company.  Consultant also agrees to preserve and protect the confidentiality of such third-party confidential business information and trade secrets to the same extent, and on the same basis, as Company's Confidential Information and trade secrets.  Consultant acknowledges that money damages would not be a sufficient remedy for any breach of this Section by Consultant, and Company shall be entitled to enforce the provisions of this Section by terminating any payments then owing to Consultant under this Agreement and/or to specific performance and injunctive relief as remedies for such breach or any threatened breach.  Such remedies shall not be deemed the exclusive remedies for a breach of this Section but shall be in addition to all remedies available at law or in equity to Company, including the recovery of damages from Consultant and Consultant's agents involved in such breach.  In connection with any such equitable action, Consultant agrees that Company shall not be required to post a bond greater than One Hundred Dollars ($100).

Confidential Information shall not include information that is or becomes generally available to the public other than through Consultant's breach of this Agreement; or is communicated to Consultant by a third party that had no confidentiality obligations with respect to such information; or was known to Consultant prior to the effective date of this Agreement; or was created by Consultant without regard to the Company Confidential Information; or is part of Consultant's general knowledge.  Nothing herein shall be construed to prevent disclosure of Company Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation or order. Consultant agrees to provide written notice of any such order to an authorized officer of the Company within three (3) days of receiving such order, but in any event sufficiently in advance of making any disclosure to permit the Company to contest the order or seek

CONFIDENTIAL

HAH011842

confidentiality protections, as determined in the Company's sole discretion.

CONFIDENTIAL

HAH011843

## SECTION 5: OWNERSHIP AND PROTECTION OF INFORMATION; COPYRIGHTS

**5.1** <u>Ownership of Company Confidential Information</u>. All Company Confidential Information, including, but not limited to, customer and prospects lists, ideas, concepts, improvements, discoveries, and inventions, whether patentable or not, which are conceived, made, developed or acquired by Consultant, individually or in conjunction with others, during Consultant's retention by Company (whether during business hours or otherwise and whether on Company's premises or otherwise) which relate to Company's business, products, customers or services shall be disclosed to HFR and are and shall be the sole and exclusive property of Company. Moreover, all drawings, memoranda, notes, records, files, correspondence, manuals, models, specifications, computer programs, source code, object code, and all other writings or materials of any type embodying any of such information, ideas, concepts, improvements, discoveries, and inventions are and shall be the sole and exclusive property of Company .

**5.2** <u>Return of Company Confidential Information</u>. All written materials, records, and other documents made by, or coming into the possession of, Consultant during the Term which contain or disclose confidential business information or trade secrets of Company shall be and remain the property of Company, as the case may be. Upon termination of Consultant's services on behalf of Company, for any reason, Consultant promptly shall deliver the same and all copies thereof, to Company . Notwithstanding the foregoing, Confidential Information may be retained by the Consultant to the extent that retention of such Confidential Information is necessary to comply with the Consultant's reasonable internal document retention policies aimed at legal, corporate governance or regulatory compliance and any such retained Confidential Information shall remain subject to the disclosure and use restrictions set forth herein, notwithstanding any termination of this Agreement. The Consultant shall not be deemed to have retained or failed to return or destroy any Company Confidential Information if Company Confidential Information received or stored in digital format is deleted from local hard drives so long as no attempt is made to recover such Company Confidential Information from servers or back-up sources, provided that any such retained Company Confidential Information shall remain subject to the disclosure and use restrictions set forth herein, notwithstanding any termination of this Agreement.

## SECTION 6: MISCELLANEOUS

**6.1** <u>Choice of Law</u>. This Agreement shall be governed in all respects by the laws of the State of Texas, notwithstanding any conflict-of-law, rule or principle that might refer the construction of the Agreement to the laws of another State or country.

**6.2** <u>Choice of Venue and Service of Process</u>. The Company and Consultant are citizens of the State of Texas. Company's principal place of business is in Harris County, Texas. This Agreement was negotiated and signed in Harris County, Texas. This Agreement shall be performed in Harris County, Texas. Any litigation that may be brought by either Company or Consultant involving the enforcement of this Agreement or the rights, duties, or obligations of this Agreement shall be brought exclusively in the State or federal courts sitting in Harris County, Texas, or the next nearest county in Texas where such courts reside. In the event that service of process cannot be effected upon a party, each party hereby irrevocably appoints the Secretary of State for the State of Texas as its, his, or her agent for service of process to receive the summons and other pleadings in connection with any such litigation. In the event of an action based on the

CONFIDENTIAL
HAH011844

terms of this Agreement in which a Party incurs costs, including but not limited to attorneys' fees, to enforce or defend its rights under this Agreement, the prevailing Party in such action shall be entitled to recover from the other Party its costs and reasonable attorneys' fees incurred in such proceeding, including the investigation in connection therewith.

     **6.3**    **Non-Waiver**. No failure by either Party hereto at any time to give notice of any breach by the other Party of, or to require compliance with, any condition or provision of this Agreement shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time.

     **6.4**    **Severability: Headings**. It is a desire and intent of the parties that the terms, provisions, covenants, and remedies contained in this Agreement shall be enforceable to the fullest extent permitted by law. If any such term, provision, covenant, or remedy of this Agreement or the application thereof to any person, association, or entity or circumstances shall, to any extent, be construed to be invalid or unenforceable in whole or in part, then such term, provision, covenant, or remedy shall be construed in a manner so as to permit its enforceability under the applicable law to the fullest extent permitted by law. In any case, the remaining provisions of this Agreement or the application thereof to any person, association, or entity or circumstances other than those to which they have been held invalid or unenforceable, shall remain in full force and effect. Headings and other references are for the convenience of the Parties and shall in no way affect the construction, enforcement or interpretation of this Agreement.

     **6.5**    **Binding Effect and Non-Assignment**. This Agreement shall be binding upon and inure to the benefit of the Company and any other person, association, or entity which may hereafter acquire or succeed to all or substantially all of the business or assets of Company by any means whether direct or indirect, by purchase, merger, consolidation, or otherwise. Consultant's rights and obligations under Agreement hereof are personal and such rights, benefits, and obligations of Consultant shall not be voluntarily or involuntarily assigned, alienated, or transferred, whether by operation of law or otherwise.

     **6.6**    **Entire Agreement, Construction and Modification**. This Agreement constitutes the entire agreement of the Parties with regard to such subject matters, and contains all of the covenants, promises, representations, warranties, and agreements between the Parties with respect to such subject matters. Each Party to this Agreement acknowledges that no representation, inducement, promise, or agreement, oral or written, has been made by either Party with respect to such subject matters, which is not embodied herein, and that no agreement, statement, or promise relating to the Consulting of Consultant by Company that is not contained in this Agreement shall be valid or binding. This Agreement shall not be construed either more favorably for or strongly against Consultant or Company. Any modification of this Agreement will be effective only if it is in writing and signed by each party whose rights hereunder are affected thereby, provided that any such modification must be authorized or approved by the Directors of Company.

     **6.7**    **Counterparts**. Counterparts of this Agreement may be executed in one (1) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one (1) and the same instrument.

     **6.8**    **Representations of the Company**. Company has all requisite power and authority to enter into this Agreement. This Agreement, when duly executed and delivered in accordance

CONFIDENTIAL

HAH011845

with its terms, will constitute a valid and binding obligation of Company, enforceable in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, and other similar laws of general application relating to or affecting creditors' rights and to general equitable principles. Company owns all equitable interests in HFR and Ice, free and clear of any liens, claims, equities, charges, options, rights of first refusal, or encumbrances, and no other person or party has any right, title or claim on the equity of Company or the assets thereof. The execution, delivery, and performance of this Agreement by Company does not conflict with, violate, or constitute a breach of or a default under other outstanding agreements of which Company are a party that would have a materially adverse effect on their ability to complete the sale as contemplated herein, or result in the creation or imposition of any lien, claim, or encumbrance of any kind upon the interests of the Company and/or the assets of Company.

IN WITNESS WHEREOF, Company and Consultant have duly executed this Agreement in multiple originals to be effective on the date first stated above.

**HFR Enterprises, Inc.**

_____

Dakota Fontenot, President

**Ice Embassy, Inc.**

_____

Dakota Fontenot, President

**GRAY ENTERTAINMENT INC.**

_____

John Gray, President

CONFIDENTIAL

# EXHIBIT K

## CONSULTING AGREEMENT

This Consulting Agreement ("**Agreement**") is entered into between Ice Embassy, Inc., a Texas corporation ("**ICE**") having offices at 3414 Old Richmond Road, Rosenberg, TX 77471, and Tim Wilson, an individual residing in Waller County, Texas ("**Consultant**") (collectively, "**Parties**"), is made effective as of the 13th day of February 2025 ("**Effective Date**").

WHEREAS, ICE is in the business of running a sexually oriented business ("SOB") in Harris County, Texas;

WHEREAS, Consultant works with governmental entities in Harris County, Texas;

WHEREAS, ICE desires to engage Consultant to provide certain services in the area of Consultant's expertise and Consultant is willing to provide such services to ICE;

THEREFORE, in consideration of the mutual promises exchanged in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows

### SECTION 1: CONSULTING DUTIES

**1.1** **Term**. ICE agrees to retain Consultant, and Consultant agrees to be retained by ICE, beginning as of the Effective Date and continuing until ICE enters into the Purchase Agreement (defined below)("Term").

**1.2** **Duties and Responsibilities**. Consultant will assist with the sale of ICE.

**1.3** **Extent of Service**. Consultant shall, during the Term, devote reasonable business time to the business and affairs of ICE, but it is understood that Consultant may have other business and personal interests that are not contrary to the interests of ICE. For the avoidance of doubt, ICE and Consultant agree that Consultant shall fulfill his obligation to devote reasonable business time under this Agreement.

### SECTION 2: COMPENSATION

**2.1** **Purchase Agreement**. ICE is currently negotiating the sale of its stock, the real property and improvements HFR Enterprises Inc. ("HFR") owns, located at 6710 Southwest Freeway, Houston, Texas 77074 (the "Property"), and the sale of BFD LP, LLC ("LP"), and BFD GP, LLC's ("GP") stock. (collectively, "Purchase Agreement").

**2.2** **Compensation**. Consultant's compensation shall be $175,000.00 from the net proceeds of the Purchase Agreement ("Compensation"). ICE will pay Consultant the Compensation within four (4) days of ICE's actual receipt of any proceeds it receives from the Purchase Agreement.

**2.3** **Independent Contractor**. The relationship between ICE and Consultant shall be an Independent Contractor/Contractor relationship. Nothing contained in this Agreement shall be

1

HAH011847

regarded as creating any other kind of relationship between Consultant and ICE, including but not limited to an employee/employer relationship or a relationship between joint ventures, partners, shareholders, or the like. Consultant shall be liable for his own debts, obligations, acts, and omissions, the payment of all applicable compensation, wages, pensions, workers' compensation, insurance benefits, and all required taxes, including but not limited to withholding, social security, and other taxes and benefits. Consultant shall not be subject to any ICE policies solely applicable to ICE or ICE's employees, or be eligible for any benefit plan offered by ICE.

## SECTION 3: TERMINATION PRIOR TO EXPIRATION OF TERM

**3.1** **Termination by ICE**. If Consultant fails to perform his obligations in Section 1.2 of this Agreement before a Purchase Agreement for the sale of ICE can be executed, this Agreement is null and void.

**3.2** **Survival of Obligations**. Termination of the Consulting relationship does not terminate those obligations imposed by this Agreement, which are continuing obligations, including, without limitation, Consultant's obligations under **Sections 4, and 5.**

## SECTION 4: CONFIDENTIAL INFORMATION AND FIDUCIARY OBLIGATIONS

**Confidential Information**. The Parties recognize and acknowledge that during the term of this Agreement in order for Consultant to perform the duties required under this Agreement, ICE is obligated to provide some, but not all, of certain confidential information of ICE, including, but not limited to, (i) software, devices, inventions, processes, compilations of information, records, source codes, object codes, and specifications, that are owned by ICE and that are used in the operation of the business of ICE, (ii) customer lists, financial, accounting, statistical, and personnel information concerning ICE and its customers and (iii) lists of and the relationships that ICE have with entities (all of the foregoing are collectively referred to hereinafter as the "ICE Confidential Information"). Consultant acknowledges and agrees that ICE Confidential Information constitutes valuable, special and unique property of ICE. Consultant further acknowledges that protection of such ICE Confidential Information and trade secrets against unauthorized disclosure and use is of critical importance to ICE in maintaining their competitive position. Consultant hereby agrees that Consultant will not, at any time during term of this Agreement and for a period of five (5) years from the date of this Agreement, make any unauthorized disclosure of any ICE Confidential Information or trade secrets of ICE, or make any use thereof, except in the carrying out of Consultant's consulting responsibilities hereunder. As a result of Consultant's services on behalf of ICE, Consultant may also from time to time have access to, or knowledge of, confidential business information or trade secrets of third parties, such as customers, suppliers, partners, joint venturers, and the like, of ICE. Consultant also agrees to preserve and protect the confidentiality of such third-party confidential business information and trade secrets to the same extent, and on the same basis, as ICE's Confidential Information and trade secrets. Consultant acknowledges that money damages would not be a sufficient remedy for any breach of this Section by Consultant, and ICE shall be entitled to enforce the provisions of this Section by terminating any payments then owing to Consultant under this Agreement and/or to specific performance and injunctive relief as remedies for such breach or any threatened breach.

2

CONFIDENTIAL

HAH011848

Such remedies shall not be deemed the exclusive remedies for a breach of this Section but shall be in addition to all remedies available at law or in equity to ICE, including the recovery of damages from Consultant and Consultant's agents involved in such breach. In connection with any such equitable action, Consultant agrees that ICE shall not be required to post a bond greater than One Hundred Dollars ($100).

## SECTION 5: OWNERSHIP AND PROTECTION OF INFORMATION; COPYRIGHTS

5.1     **Ownership of ICE Confidential Information**. All ICE Confidential Information, including, but not limited to, customer and prospects lists, ideas, concepts, improvements, discoveries, and inventions, whether patentable or not, which are conceived, made, developed or acquired by Consultant, individually or in conjunction with others, during Consultant's retention by ICE (whether during business hours or otherwise and whether on ICE's premises or otherwise) which relate to ICE's business, products, customers or services shall be disclosed to ICE and are and shall be the sole and exclusive property of ICE. Moreover, all drawings, memoranda, notes, records, files, correspondence, manuals, models, specifications, computer programs, source code, object code, and all other writings or materials of any type embodying any of such information, ideas, concepts, improvements, discoveries, and inventions are and shall be the sole and exclusive property of ICE.

5.2     **Return of Confidential Information**. All written materials, records, and other documents made by, or coming into the possession of, Consultant during the period of Consultant's services on behalf of ICE which contain or disclose confidential business information or trade secrets of ICE shall be and remain the property of ICE, as the case may be. Upon termination of Consultant's services on behalf of ICE, for any reason, Consultant promptly shall deliver the same and all copies thereof, to ICE.

## SECTION 6: MISCELLANEOUS

6.1     **Choice of Law**. This Agreement shall be governed in all respects by the laws of the State of Texas, notwithstanding any conflict-of-law, rule or principle that might refer the construction of the Agreement to the laws of another State or country.

6.2     **Choice of Venue and Service of Process**. Each of ICE and Consultant is a citizen of the State of Texas. ICE's principal place of business is in Harris County, Texas. This Agreement was negotiated and signed in Harris County, Texas. This Agreement shall be performed in Harris County, Texas. Any litigation that may be brought by either ICE or Consultant involving the enforcement of this Agreement or the rights, duties, or obligations of this Agreement shall be brought exclusively in the State or federal courts sitting in Harris County, Texas, or the next nearest county in Texas where such courts reside. In the event that service of process cannot be effected upon a party, each party hereby irrevocably appoints the Secretary of State for the State of Texas as its, his, or her agent for service of process to receive the summons and other pleadings in connection with any such litigation.

3

CONFIDENTIAL

HAH011849

**6.3     Non-Waiver**. No failure by either party hereto at any time to give notice of any breach by the other party of, or to require compliance with, any condition or provision of this Agreement shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time.

**6.4     Severability; Headings**. It is a desire and intent of the parties that the terms, provisions, covenants, and remedies contained in this Agreement shall be enforceable to the fullest extent permitted by law. If any such term, provision, covenant, or remedy of this Agreement or the application thereof to any person, association, or entity or circumstances shall, to any extent, be construed to be invalid or unenforceable in whole or in part, then such term, provision, covenant, or remedy shall be construed in a manner so as to permit its enforceability under the applicable law to the fullest extent permitted by law. In any case, the remaining provisions of this Agreement or the application thereof to any person, association, or entity or circumstances other than those to which they have been held invalid or unenforceable, shall remain in full force and effect. Headings and other references are for the convenience of the parties and shall in no way affect the construction, enforcement or interpretation of this Agreement.

**6.5     Binding Effect and Non-Assignment**. This Agreement shall be binding upon and inure to the benefit of ICE and any other person, association, or entity which may hereafter acquire or succeed to all or substantially all of the business or assets of ICE by any means whether direct or indirect, by purchase, merger, consolidation, or otherwise. Consultant's rights and obligations under Agreement hereof are personal and such rights, benefits, and obligations of Consultant shall not be voluntarily or involuntarily assigned, alienated, or transferred, whether by operation of law or otherwise.

**6.6     Entire Agreement, Construction and Modification**. This Agreement constitutes the entire agreement of the parties with regard to such subject matters, and contains all of the covenants, promises, representations, warranties, and agreements between the parties with respect to such subject matters. Each party to this Agreement acknowledges that no representation, inducement, promise, or agreement, oral or written, has been made by either party with respect to such subject matters, which is not embodied herein, and that no agreement, statement, or promise relating to the Consulting of Consultant by ICE that is not contained in this Agreement shall be valid or binding. This Agreement shall not be construed either more favorably for or strongly against Consultant or ICE. Any modification of this Agreement will be effective only if it is in writing and signed by each party whose rights hereunder are affected thereby, provided that any such modification must be authorized or approved by the Directors of ICE.

**6.7     Counterparts**. Counterparts of this Agreement may be executed in one (1) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one (1) and the same instrument.

IN WITNESS WHEREOF, ICE and Consultant have duly executed this Agreement in multiple originals to be effective on the date first stated above.

4

CONFIDENTIAL

HAH011850

ICE:

Ice Embassy, Inc.

_____

Dakota Fontenot, President

CONSULTANT:

_____

Printed Name: Tim D Wilson Sr

CONFIDENTIAL    HAH011851

# EXHIBIT L

## STOCK PURCHASE AGREEMENT

This STOCK PURCHASE AGREEMENT is effective as of the "**Effective Date**" (as defined herein), by and among Colorado Rose, LLC, a Texas limited liability company ("**Purchaser**"), and Linda Goehrs, Trustee for the Holli Ann Hardin Trust Number One ("**Seller**"), who are joined herein by Ice Embassy, Inc., a Texas corporation ("**Ice Embassy**"). The Purchaser and Seller are joined herein by Dakota Fontenot, an individual resident of Texas ("**Fontenot**", and together with Seller and Ice Embassy, collectively the "**Seller Parties**") for the purposes herein expressed.

## RECITALS

A.    The Seller owns the Acquired Interests.

B.    The Seller desires to sell the Acquired Interests to Purchaser, and the Purchaser desires to purchase the Acquired Interests in accordance with the terms of this Agreement.

C.    Contemporaneously herewith, the Parties and/or their Affiliates or related parties are entering into the Parallel Agreements, and the Acquisition contemplated herein is conditioned upon the consummation of the transactions contemplated under the Parallel Agreements.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants, agreements, and conditions hereinafter set forth, and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE I
## PURCHASE AND SALE

Section 1.1    Agreement to Purchase and Sell. On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Seller will sell, transfer and deliver to the Purchaser, and the Purchaser will purchase and acquire from the Seller, all of the Acquired Interests, and by reason of such purchase shall acquire all assets of the Company, regardless of whether such assets are listed in the Company's books and records; provided, however, that Seller shall be allowed to transfer to itself at or prior to Closing the Excluded Assets listed in Schedule 1.1. At the Closing, Seller shall transfer, convey and assign to Purchaser the Acquired Interests free and clear of all Liens and encumbrances whatsoever. At Closing, Seller will deliver, transfer and assign the Acquired Interests to Purchaser by delivering stock certificates representing all of the capital stock of the Company duly endorsed or accompanied by stock powers duly executed in blank, with any required seals or stamps affixed thereto, and otherwise in proper form for transfer, as shall be necessary to vest in Purchaser, full, complete, good and marketable title to such Acquired Interests.

Section 1.2    Consideration. At Closing, Purchaser shall pay the Consideration (subject to any adjustments set forth herein) to Seller. Seller agrees to pay the Retained Liabilities at the Closing and Seller agrees to either (i) escrow funds with the Title Company in an amount equal to the Retained Liabilities and have the Title Company, as escrow agent, pay the Retained Liabilities via cashier's check or wire transfer at the Closing, or (ii) through reduction of the Consideration have pay the Retained Liabilities directly to the holders thereof via cashier's check or wire transfer at the Closing, with any remaining balance paid by Seller. Purchaser shall pay an amount equal to the Cash Consideration less the Retained Liabilities to Seller via cashier's check or wire transfer on the Closing Date.

Section 1.3    C Corporation Status. Seller represents and warrants to Purchaser that Ice Embassy is and has always been classified as a "C Corporation" for federal income tax purposes and no election has been made to classify Ice Embassy as an "S Corporation".

CONFIDENTIAL DOCUMENTS                                          HAH011515

CONFIDENTIAL DOCUMENTS

HAH011516

Section 1.4     Accounts Receivable and Bank Accounts. All Accounts Receivable existing as of the Effective Date are listed on Schedule 1.4A, which Schedule shall be updated immediately prior to Closing. The bank accounts and other deposit accounts of the Company are listed in Schedule 1.4B, which shall be updated immediately prior to Closing to reflect the then current cash balances of such accounts net of any uncleared checks/debits and any uncleared deposits/credits. At or prior to Closing, Seller shall obtain and provide all necessary signature cards and updates to same to reflect the designated officer of Purchaser as signatory on such accounts and to remove all parties affiliated with Seller from such accounts

Section 1.5     Parallel Agreements. The Parties understand and agree that simultaneous with the execution of this Agreement, the Parties and/or their Affiliates (and related parties) shall enter into the Parallel Agreements, and the Acquisition contemplated herein is conditioned upon the contemporaneous closing and consummation of the transactions contemplated under the Parallel Agreements.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller Parties hereby, jointly and severally, represent and warrant to the Purchaser that the statements, representations and warranties contained in this Article II are true and correct as of Effective Date and, shall continue to be true and correct as of the Closing Date. In addition, the Seller Parties hereby understand and confirm that the Purchaser is relying on the statements, representations and warranties set forth in this Article II in connection with Purchaser's execution and delivery of this Agreement and in completing the transactions contemplated by this Agreement and the Parallel Agreements.

Section 2.1     Organization. Ice Embassy is a corporation duly formed, validly existing, and in good standing under the laws of Texas and is not a reporting issuer (as such term is defined or used under U.S. securities laws). Ice Embassy has all requisite power and authority to own, lease and operate its assets and properties and to carry on its business as now being conducted, and is duly qualified or registered and in good standing as a domestic corporation to transact business under the laws of each jurisdiction where the character of its activities or the location of the properties owned or leased by it requires such qualification or registration. Ice Embassy does not have and has never had any subsidiaries.

Section 2.2     Authorization. Each of the Seller Parties has full power, capacity and authority to enter into, execute and deliver this Agreement and the Seller Ancillary Documents (to which it is a signatory), and to perform such Person's obligations under this Agreement and the Seller Ancillary Documents and to consummate the transactions contemplated hereby and thereby. The Seller Parties shall (and shall cause Ice Embassy to) duly execute and deliver, as applicable, this Agreement and the Seller Ancillary Documents as of the Closing Date, and (assuming each other parties' execution, delivery, and due authorization of same) constitute, or will constitute, as the case may be, legal, valid and binding agreements of the Seller Parties and Ice Embassy, as applicable, enforceable against each of them, as applicable, in accordance with their respective terms, subject to applicable bankruptcy, insolvency and other similar laws affecting the enforceability of creditors' rights generally, general equitable principles and the discretion of courts in granting equitable remedies.

Section 2.3     Capitalization.

(a)     Seller owns 100% of the Stock of Ice Embassy, which is comprised of 1,000shares of common stock, represented by share certificate number CS001, and Seller is the original and only shareholder of Ice Embassy.

(b)     Ice Embassy has never issued any securities or other equity interests to any Person other than to the Seller, and the Seller has been the sole shareholder of Ice Embassy since its formation. All of the issued and outstanding Stock of Ice Embassy is duly authorized, validly issued, fully paid, and non-assessable. As of the date hereof, all of the Acquired Interests, are held beneficially and of record by the

CONFIDENTIAL DOCUMENTS                                    HAH011517

CONFIDENTIAL DOCUMENTS

HAH011518

Seller free and clear of any Liens, except for restrictions imposed thereon by applicable securities laws, and none of the Acquired Interests were issued in violation of any purchase or call option, right of first refusal, subscription right, preemptive right or any similar rights. At the Closing upon payment of the Consideration, the Purchaser shall be vested with sole beneficial and record ownership of the Acquired Interests, free and clear of all Liens.

Section 2.4        Absence of Restrictions and Conflicts; Consents. The Seller Parties and Ice Embassy's execution, delivery and performance of this Agreement and the Seller Ancillary Documents, the consummation of the transactions contemplated under this Agreement and the Seller Ancillary Documents and the fulfillment of and compliance with the terms and conditions of this Agreement and the Seller Ancillary Documents, do not and will not (as the case may be), with the passing of time or the giving of notice or both, contravene, violate or conflict with, constitute a breach of or default under, result in the loss of any benefit under, permit the acceleration of any obligation under or create in any party the right to terminate, modify or cancel:  (a) any term or provision of the constituent, charter or organizational documents of Ice Embassy or any resolution adopted by the board of directors (or any committee thereof) or owner of Ice Embassy (all of which have been delivered to Seller), (b) any of the Contracts, the licenses or any other material contract, agreement, permit, franchise or license applicable to Ice Embassy or Seller, including but not limited to any documents necessary to run the business of Ice Embassy (all of which that are material to the operation of Ice Embassy or its Business have been or shall be disclosed by Seller to Purchaser prior to Closing), (c) any judgment, decree, order, injunction, award or ruling of any Governmental Entity or arbitration panel to which Ice Embassy or Seller is a party or by which any Company or Seller or any of their respective assets or properties are bound (all of which have been or shall be disclosed by Seller to Purchaser prior to Closing ) or (d) any Applicable Laws applicable to Ice Embassy or Seller.  No consent, permit, waiver, license, approval, order or authorization of, or registration, declaration or filing with, any Governmental Entity or public or regulatory unit, agency or authority is required with respect to Ice Embassy or the Seller Parties in connection with the execution, delivery or performance of this Agreement or the Seller Ancillary Documents or the consummation of the transactions contemplated hereby or thereby.

Section 2.5        Real and Personal Property.

(a)        Real Property. Ice Embassy does not currently own and has never owned any real property and does not hold any option to acquire any real property for use with respect to the Business.

(b)        Personal Property; Title, Condition and Related Matters. The books and records of Seller and Ice Embassy adequately identify all tangible Personal Property owned by Ice Embassy used in or relating to the Business and all leasehold interests in Personal Property used in this Business. Ice Embassy has good, marketable, and transferable title to or a legal, valid, and binding leasehold or license interest in the Personal Property as of the  Closing Date. The Personal Property is sufficient for Ice Embassy to continue conducting the Business after the Closing in substantially the same manner as conducted prior to the Closing and constitutes all of Ice Embassy's rights, property, and assets necessary to conduct the Business as currently conducted.

Section 2.6        Ice Embassy Financial Statements, Liabilities and Indebtedness.

(a)        Financial Statements. Attached hereto as Schedule 2.6 are the Financial Statements. The Financial Statements are true, complete, and prepared in accordance with generally accepted accounting principles (GAAP) and fairly present the Ice Embassy's financial condition as of the respective dates of such Financial Statements and the results of Ice Embassy operation of the Business for the periods indicated.

(b)        Undisclosed Liabilities. Ice Embassy does not have any liabilities or obligations, whether known or unknown, absolute, contingent or otherwise (and, to Seller's knowledge, there is no basis for any present or future proceeding against Ice Embassy giving rise to any liabilities or obligations), except

CONFIDENTIAL DOCUMENTS                                    HAH011519

CONFIDENTIAL DOCUMENTS                                    HAH011520

liabilities and obligations (i) that are expressly disclosed or specifically reserved against in the Financial Statements as of the Interim Balance Sheet Date, (ii) that have been incurred since such date pursuant to bona fide transactions entered into in the ordinary course of business consistent with reasonable past practice of Ice Embassy, and (iii) that are listed in the Schedules attached to this Agreement, and none of the liabilities described in (i), (ii) and (iii) are, or would reasonably be expected to be, individually or in the aggregate, material in amount or resulting from any claim based in tort or pursuant to a breach of contract.

(c)    *Indebtedness.* Ice Embassy does not have any Indebtedness not reflected on the Financial Statements and those listed in the Schedules attached to this Agreement, all of which shall be considered Closing Date Debt which shall be paid in full by Seller on or prior to Closing.

Section 2.7    Legal Proceedings and Potential Claims.

Except for the legal proceedings and potential claims listed in Schedule 2.7 attached to this Agreement, (a) there are no known Actions that are before, under the authority of or within the purview of any Governmental Entity or arbitrator of any kind pending or, to the Knowledge of the Seller, threatened against or by or relating to or involving Ice Embassy or the real or personal property (whether leased or owned) of Ice Embassy, (b) Ice Embassy has not, and none of its assets or operations has, been a party or subject to any Action during the five (5) years prior to the Closing Date, and (c) Ice Embassy is not subject to any settlement, consent decree, judgment, injunction, ruling, order or finding of any Governmental Entity or arbitrator.

Section 2.8    Compliance with Law. Ice Embassy is, and for the past three (3) years has been, in compliance in all material respects with all Applicable Laws.

Section 2.9    Tax Returns; Taxes.

(i)    all Tax Returns of Ice Embassy required to be filed through the Closing Date in accordance with any Applicable Law have been duly and timely filed;

(ii)    all such Tax Returns are true, complete, correct, were prepared in accordance with Applicable Law and generally accepted accounting principals, and accurately reflect the income, business, assets, operations, status, and other matters of Ice Embassy;

(iii)    all Taxes (whether or not shown on any Tax Return) that are due and payable on or prior to the Closing Date by Ice Embassy have been paid in full;

(iv)    the provisions for Taxes, if reflected in the Financial Statements, are sufficient to cover all liabilities for Taxes Ice Embassy owes for the periods covered by such Financial Statements ;

(v)    there are not now any extensions of time in effect with respect to the dates on which any Tax Returns of Ice Embassy were or are due to be filed;

(vi)    all deficiencies asserted as a result of any examination, audits, assessments, or reassessments of any Tax Returns of Ice Embassy have been paid in full or finally settled;

(vii)    no claims have been asserted and no proposals, deficiencies or assessments for any Taxes are being asserted or, to the Knowledge of the Seller, proposed or threatened against Ice Embassy and, to the Knowledge of the Seller, no audit, investigation, assessment or reassessment of any return or report of Taxes is currently underway, pending or threatened, and no Seller has received any written notice thereof;

(viii)    to the Knowledge of Seller, no claim has ever been made by an authority in a jurisdiction in which Ice Embassy does not file Tax Returns that it is or may be subject to taxation by that jurisdiction;

CONFIDENTIAL DOCUMENTS

HAH011521

CONFIDENTIAL DOCUMENTS

HAH011522

(ix)    Ice Embassy has complied with all Applicable Laws relating to the withholding of Taxes (including from employees of the Business for income Taxes and social security and other payroll Taxes) and has withheld and paid on a timely basis all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, manager, creditor, member, or other third party;

(x)    there are no Liens for Taxes (other than Liens for Taxes which are not yet due and payable) on any of the Acquired Interests or any of the assets of Ice Embassy;

(xi)    no Tax Authority has proposed any adjustment, assessment or reassessment, or change in accounting method of Ice Embassy, and Ice Embassy does not have an application pending with any Tax Authority requesting permission for any change in accounting method; and

(xii)    none of the assets of Ice Embassy are properly treated as owned by persons other than Ice Embassy for income Tax purposes.

Section 2.10    Insurance Policies. Ice Embassy has maintained all insurance required to be maintained pursuant to each material Company contract and the types and amounts of insurance that a reasonably prudent operator of the Business would maintain. Ice Embassy's current insurance policies are listed in Schedule 2.10 and such policies (a) are valid, outstanding, in full force and effect, and enforceable in accordance with their terms, (b) have not been subject to any lapse in coverage, and (c) are sufficient for compliance with all Applicable Laws. All premiums due on the Company insurance policies will be paid prior to Closing in accordance with the payment terms of each such insurance policy.

Section 2.11    Intellectual Property. Ice Embassy has good, marketable, and transferable title to or possesses adequate licenses, assignments, or other valid rights to use the Intellectual Property, free and clear of all Liens, and has paid all maintenance fees, renewals or expenses related to such Intellectual Property. The Intellectual Property is subsisting and is not invalid or unenforceable, in whole or in part.

Section 2.12    Licenses and Permits. Ice Embassy owns, holds or possesses all Licenses that are necessary to enable Ice Embassy to own, lease, and operate the Business and its assets and properties and to carry on its operations as presently conducted. All Licenses are valid, binding, and in full force and effect. Ice Embassy has taken all necessary action to maintain each of its Licenses, including the payment of all fees and charges with respect to the Licenses due or payable as of the Closing Date. No loss or expiration of any material License is pending or, to the Knowledge of Seller, would reasonably be expected or, to the Knowledge of the Seller, is threatened. Ice Embassy has fulfilled and performed its obligations under each of Licenses, and no event has occurred or condition or state of facts exists which constitutes or, after notice or lapse of time or both, would constitute a breach or default under any such Applicable Laws or which permits or, after notice or lapse of time or both, would permit revocation or termination of any License, or which might adversely affect the rights of Ice Embassy under any License.

Section 2.13    Employee Matters.

(a)    Except as set forth in Schedule 2.13, with respect to all employees of Ice Embassy and its Affiliate, EM&M:

(i)    there are no collective bargaining agreements, and no employee is represented by a union or other labor organization or collective bargaining entity;

(ii)    all employees are employed at will;

(iii)    as of the date of this Agreement, Ice Embassy and the Seller Parties have not received notice of any charge or complaint with respect to or concerning any employee before any Governmental Entity responsible for the prevention or redress of unlawful, discriminatory, or unsafe employment or labor practices;

---

CONFIDENTIAL DOCUMENTS                    HAH011523

(iv)    there have not been any investigations by a Governmental Entity responsible for the enforcement of applicable labor or employment laws, and, to the Knowledge of Seller, no such investigation has been threatened;

(v)    Ice Embassy and EM&M are in compliance with all applicable Laws relating to labor or employment matters;

(vi)    All current employees and all former employees who worked in the Business or who were employed by Ice Embassy or EM&M within the five (5) years prior to the Closing Date, were legally authorized to work in the United States. Ice Embassy has completed and retained the necessary employment verification paperwork under the Immigration Reform and Control Act of 1986 ("IRCA") for the employees hired prior to the Closing Date. Further, at all times prior to the Closing Date, Ice Embassy and EM&M were in compliance with both the employment verification provisions (including the paperwork and documentation requirements) and the anti-discrimination provisions of IRCA.

(viii)    (A) Ice Embassy and EM&M have each paid to their current and former employees and independent contractors all salaries, wages, wage premiums, overtime, bonuses, commissions, accrued unused paid time off, fees, and other compensation to which they are entitled under Applicable Laws, Contracts, or policies of Ice Embassy and EM&M, and they are not liable for any arrears of wages or any Taxes or penalties for failure to comply with any of the foregoing; and (B) each individual who provides or has provided services to Ice Embassy or EM&M is or has been, as applicable, properly classified as "exempt" or "non exempt" and as an employee or independent contractor, as applicable, for purposes of the Fair Labor Standards Act and all other applicable employment-related Laws.

(b)    Ice Embassy and EM&M have not implemented any plant closing or mass layoff without providing notice in accordance with the WARN Act in the past six years, and no such actions are currently contemplated, planned, or announced.

(c)    Ice Embassy and EM&M have not created, put into effect or maintained any benefit plan for the employees of Ice Embassy or EM&M (or any Affiliate entity) including but not limited to any welfare benefit plan or other plan subject to Employee Retirement Income Security Act of 1974 (ERISA),(or that is intended to qualify under Section 401(a) of the Internal Revenue Code.

Section 2.14    Brokers, Finders, and Investment Bankers. Seller has not employed any broker, finder, or investment banker or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, or finders' fees in connection with the transactions contemplated by this Agreement.

Section 2.15    Disclosure.

(a)    No representation, warranty or covenant made by Seller or Ice Embassy in this Agreement, the Schedules or the Exhibits attached to this Agreement, or the Seller Ancillary Documents contains an untrue statement of a material fact or omits to state a material fact required to be stated herein or therein or necessary to make the statements contained herein or therein, in light of the circumstances in which they were made, not misleading.

(b)    Prior to the execution of this Agreement, the Seller has delivered to the Purchaser true and complete copies of all security agreements and other instruments creating or imposing any Lien on the real or personal property of Ice Embassy and any other documents or instruments identified or referred to in the Schedules.

CONFIDENTIAL DOCUMENTS    HAH011525

CONFIDENTIAL DOCUMENTS

HAH011526

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to Seller that the statements contained in this Article III are true and correct as of the date of this Agreement and as of the Closing Date. In addition, the Purchaser hereby confirms that the Seller is relying on the representations and warranties set forth in this Article III in connection with their execution and delivery of this Agreement and in completing the transactions contemplated by this Agreement.

Section 3.1    Organization.  Purchaser is a limited liability company duly formed, validly existing, and in good standing under the laws of Texas and is not a reporting issuer (as such term is defined or used under U.S. securities laws).  The Purchaser has all requisite power and authority to own, lease and operate its assets and properties and to carry on its business as now being conducted, and is duly qualified or registered and in good standing as a foreign corporation to transact business under the laws of each jurisdiction where the character of its activities or the location of the properties it owns or leases requires such qualification or registration.

Section 3.2    Authorization.  The Purchaser has full power, capacity, and authority to enter into, execute, and deliver this Agreement (if a signatory hereto) and the Purchaser Ancillary Documents and to perform such Person's obligations under this Agreement and the Purchaser Ancillary Documents and to consummate the transactions contemplated hereby and thereby.  Purchaser will duly execute and deliver at the time of Closing this Agreement and the Purchaser Ancillary Documents, and (assuming the due authorization, execution and delivery thereof by each other party thereto) constitute, or will constitute, as the case may be, legal, valid and binding agreements of the Purchaser enforceable against it in accordance with their respective terms, subject to applicable bankruptcy, insolvency and other similar laws affecting the enforceability of creditors' rights generally, general equitable principles and the discretion of courts in granting equitable remedies.

Section 3.3    Absence of Restrictions and Conflicts; Consents.

(a)    Purchaser's execution, delivery and performance of this Agreement and the Purchaser Ancillary Documents, the consummation of the transactions contemplated in this Agreement and the Purchaser Ancillary Documents and the fulfillment of and compliance with the terms and conditions of this Agreement and the Purchaser Ancillary Documents, do not and will not (as the case may be), with the passing of time or the giving of notice or both, contravene, violate or conflict with, constitute a breach of or default under, result in the loss of any benefit under, permit the acceleration of any obligation under or create in any party the right to terminate, modify or cancel any judgment, decree, order, injunction, award or ruling of any Governmental Entity or arbitration panel to which the Purchaser are a party or by which the Purchaser or any of its respective assets or properties are bound or any Applicable Laws applicable to the Purchaser.

(b)    No consent, approval, order or authorization of, or registration, declaration or filing with, any Person (other than a Governmental Entity) is required by or with respect to the Purchaser in connection with the execution, delivery or performance of this Agreement or the Purchaser Ancillary Documents or the consummation of the transactions contemplated hereby or thereby other than any such consents, approvals, orders or authorization of, registrations, declarations or filings that have already been obtained or made by the Purchaser, as applicable.

Section 3.4    Brokers, Finders, and Investment Bankers.  Purchaser has not employed any broker, finder, or investment banker or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, or finders' fees in connection with the transactions contemplated in this Agreement.

CONFIDENTIAL DOCUMENTS                    HAH011527

CONFIDENTIAL DOCUMENTS HAH011528

## ARTICLE IV
## CERTAIN COVENANTS AND AGREEMENTS

Section 4.1    Reasonable Efforts; Further Assurances; Cooperation.  Subject to the other provisions of this Agreement, each of the Parties will use their reasonable, good faith efforts to perform their respective obligations in this Agreement and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable under Applicable Laws to obtain all required consents and regulatory approvals and to satisfy all conditions to their respective obligations under this Agreement and to cause the transactions contemplated in this Agreement to be effected on the Closing Date, in accordance with the terms of this Agreement, and will cooperate fully with each other and their respective Affiliates, officers, directors, employees, agents, counsel, accountants and other designees in connection with any steps required to be taken as a part of their respective obligations under this Agreement, including:

(a)    Each of the Parties will promptly make their respective filings and submissions and will take all actions necessary, proper, or advisable under Applicable Laws to obtain any required approval of any Governmental Entity with jurisdiction over the transactions contemplated by this Agreement. Each of the Parties will furnish all information required for any application or other filing to be made pursuant to any Applicable Law in connection with the transactions contemplated in this Agreement.

(b)    In the event any claim, action, suit, investigation or other proceeding by any Governmental Entity or other Person is commenced which questions the validity or legality of the Acquisition or any of the other transactions contemplated by this Agreement or seeks damages in connection therewith, the Parties agree to cooperate and use all reasonable commercial efforts to defend against such claim, action, suit, investigation or other proceeding and, if an injunction or other order is issued in any such action, suit or other proceeding, to use all reasonable efforts to have such injunction or other order lifted and to cooperate reasonably regarding any other impediment to the consummation of the transactions contemplated in this Agreement.

(c)    The Seller and Ice Embassy, as applicable, will give, and will cause their Affiliates to give, any notices to third parties and use all commercially reasonable efforts (in consultation with the Purchaser) necessary to obtain any third party consents (i) necessary, proper or advisable to consummate the transactions contemplated by this Agreement, (ii) disclosed or required to be disclosed in the Schedules to this Agreement, and (iii) required to avoid a breach of or default under any material Company contract in connection with the consummation of the transactions contemplated by this Agreement; provided, however, that this paragraph will not require the Seller to pay any money (other than customary fees and expenses), or agree to any material contract concession, waiver, indemnity, guaranty or amendment, as a condition of receiving a consent.

(d)    The Seller or the Purchaser, as the case may be, will give prompt notice to each other Party of any failure of such Party to comply in any material respect with or satisfy any covenant, condition, or agreement to be complied with or satisfied by such Party under this Agreement. Each Party acknowledges that each other Party does not and will not waive any rights it may have under this Agreement as a result of any such notifications and delivery of any notice pursuant to this Section 4.1(d) will not limit or otherwise affect the rights or remedies available hereunder to the recipient of such notice.

Section 4.2    Intentionally omitted.

Section 4.3    Tax Matters.

(a)    Tax Periods Ending on or Before the Closing Date. The Seller has prepared all prior Tax Returns of Ice Embassy with respect to any taxation period ending on or before the Closing Date. Such Tax Returns were prepared by treating items on such Tax Returns in a manner consistent with the past practice. The Seller will provide to Purchaser a copy of such Tax Return already filed when the Purchaser requests copies. The Seller has the ultimate responsibility for all taxes prior to the Closing Date.  No payment pursuant to this Section 4.3(a) shall excuse the Seller from their indemnification obligations. If

CONFIDENTIAL DOCUMENTS                              HAH011529

CONFIDENTIAL DOCUMENTS

HAH011530

the federal or applicable state and local income tax returns for Ice Embassy for the taxable year ending March 31, 2025 (the "2024 Tax Period") are not prepared and filed prior to the Closing Date, then Seller shall, at its sole cost and expense, be responsible for causing such returns (the "2024 Tax Returns") to be timely prepared by a tax professional or accounting firm customarily engaged by Ice Embassy for such matters, or another firm reasonably acceptable to Purchaser. Seller shall deliver complete drafts of the 2024 Tax Returns to Purchaser no later than sixty (60) days prior to the applicable filing deadline (including extensions) for such returns. Purchaser shall have thirty (30) days from receipt of the draft 2024 Tax Returns to review and provide comments to Seller. Seller shall, in good faith, consider all reasonable comments made by Purchaser and incorporate such comments to the extent required to ensure the 2024 Tax Returns are prepared in accordance with Applicable Laws and consistent with past practice, unless otherwise required by a change in law or fact. Upon resolution of any comments from Purchaser, Seller (with Purchaser's cooperation) shall file or cause to be filed the 2024 Tax Returns on or before the due date (including extensions) and shall provide Purchaser with a final copy of each filed return within five (5) business days after filing. Nothing in this Section shall limit or impair Purchaser's right to challenge or dispute the contents of any such return in connection with any audit, proceeding, or indemnification claim under this Agreement, including under Article VII (Indemnification).

(b)      Tax Periods Ending After the Closing Date. The Purchaser shall prepare or cause to be prepared and timely file or cause to be timely filed all other tax returns required for Ice Embassy. The Tax Returns will be prepared by treating items on such Tax Returns in a manner consistent with the past practice unless otherwise required by Applicable Law. For the avoidance of doubt, Purchaser shall be permitted to use the accrual method of accounting for the Tax Returns. For tax year 2025, Purchaser will provide to the Seller a draft of each such Tax Return (along with supporting workpapers and showing all tax elections) at least thirty (30) days prior to the due date for its filing and, in the case of a Tax Return due within thirty (30) days after the Closing Date, as soon as practical before the filing date. For tax year, 2025, within fifteen (15) days after receipt of the draft of each such Tax Return, or as soon as practical after the receipt of a Tax Return, the Seller will notify Purchaser of the existence of any objection, specifying in reasonable detail the nature and basis of such objection, to any items set forth on such draft Tax Return. Purchaser and Seller agree to consult and resolve in good faith any such objection, it being agreed that if an item is being treated in a manner consistent with past practice, such item will be rebuttably presumed to be reasonable and appropriate. If Purchaser desires to make any tax election in the Tax Return that is inconsistent with past practice of the prior Tax Returns and would be materially adverse to Seller's interests, Seller shall have the right to review and approve such elections. In addition, Purchaser agrees not to make a Section 338 or 336 election. There will be no allocation of purchase price among assets as only the Stock is being purchased, not the assets of Ice Embassy directly.

(c)      For purposes of determining the amount of any Taxes due for the Tax Return for which Seller shall have liability for the amount of Taxes attributable to the portion of the year ending on the Closing Date shall be:

(i)      in the case of Taxes that are either (A) based upon or related to income or receipts, or (B) imposed in connection with any sale or other transfer or assignment of property (real or personal, tangible or intangible), deemed equal to the amount that would be payable if the Tax period of Ice Embassy ended with (and included) the Closing Date; *provided* that exemptions, allowances or deductions that are calculated on an annual basis (including depreciation and amortization deductions) shall be allocated between the period ending on and including the Closing Date and the period beginning after the Closing Date in proportion to the number of days in each period; and

(ii)      in the case of Taxes that are imposed on a periodic basis with respect to the assets or capital of Ice Embassy, deemed to be the amount of such Taxes for the entire period (or, in the case of such Taxes determined on an arrears basis, the amount of such Taxes for the immediately preceding period), multiplied by a fraction the numerator of which is the number of calendar days

Stock Purchase Agreement – Ice Embassy

CONFIDENTIAL DOCUMENTS                                    HAH011531

CONFIDENTIAL DOCUMENTS

HAH011532

in the portion of the period ending on and including the Closing Date and the denominator of which is the number of calendar days in the entire period.

Section 4.4      Intentionally Omitted.

Section 4.5      Closing Adjustments. The Consideration payable by Purchaser at Closing may be adjusted so that is reduced by the estimated 2025 Tax Year liability of Ice Embassy apportioned to Seller under Section 4.3(b) of this Agreement.

## ARTICLE V
## SIMULTANEOUS CLOSING OF PARALLEL AGREEMENTS

The Parties agree that the transactions contemplated under this Agreement and the Parallel Agreements shall be closed and consummated as simultaneous closings, to be treated as having all occurred at the same time, and conditioned upon each of the such transactions being properly closed.

## ARTICLE VI
## CLOSING

Unless this Agreement shall have been terminated and the transactions contemplated herein shall have been abandoned pursuant to and subject to the satisfaction or waiver of the conditions set forth in Article V, the Closing will occur or about June 13, 2025 or in the alternative on such date as the Parties may agree. The Closing will take place via the electronic exchange of executed documents, or at such place or via such other method as the Parties may agree.

## ARTICLE VII
## INDEMNIFICATION

Section 7.1      Indemnification Obligations of the Seller.  Subject to the other terms of this Article VII, the Seller, each beneficiary of any trust that owns or controls Ice Embassy (each, a "Trust Beneficiary"), and each of the other Seller Parties and their Affiliates (collectively, the "Seller Related Parties") will jointly and severally indemnify, defend, and hold harmless the Purchaser Indemnified Parties from, against, and in respect of the Losses resulting from, arising out of, relating to, or in connection with:

(a)      any breach or inaccuracy of any representation or warranty made by any of the Seller Related Parties in this Agreement, in any of the Seller Ancillary Documents, or Parallel Agreements, or by Ice Embassy in the Company Ancillary Documents;

(b)      any breach of any covenant, agreement, or undertaking made by Ice Embassy, any of the Seller Related Parties (or their Affiliates) in this Agreement, any of the Seller Ancillary Documents, or Parallel Agreements or any breach, at or prior to Closing, of any covenant, agreement, or undertaking Ice Embassy made in connection with the transactions contemplated by this Agreement;

(c)      any fraud, intentional misrepresentation, willful misconduct, criminal act, bad faith, or gross negligence of any of the Seller Related Parties in connection with this Agreement, the Seller Ancillary Documents, or Parallel Agreements or any fraud, intentional misrepresentation, willful misconduct, criminal act, bad faith, or gross negligence at or prior to Closing, of Ice Embassy in connection with the transactions contemplated by this Agreement;

(d)      any Closing Date Debt;

(e)      any and all Taxes that Seller is responsible for under the terms of this Agreement;

(f)      any and all liabilities, indebtedness, obligations, and/or claim (whether known or unknown, contingent or otherwise) related to the ownership, operation, maintenance, leasing, use, or occupancy of the Business or Ice Embassy's assets for all periods prior to the Closing Date, including but not limited to

CONFIDENTIAL DOCUMENTS                                                    HAH011533

CONFIDENTIAL DOCUMENTS                                    HAH011534

Tax liabilities, contractual obligations, or tort claims, regardless of whether such liabilities are discovered before or after Closing; and

(g)    any other indemnifiable matter identified by Purchaser in Schedule 7.1(g).

Section 7.2    Indemnification Obligations of the Purchaser. Subject to the other terms of this Article VII, the Purchaser will indemnify, defend, and hold harmless the Seller Indemnified Parties from, against, and in respect of any and all Losses arising out of, relating to, or in connection with:

(a)    any breach or inaccuracy of any representation or warranty the Purchaser made in this Agreement, in any of the Purchaser Ancillary Documents, or Parallel Agreements on the execution date hereof and as of the Closing Date;

(b)    any breach of any covenant, agreement, or undertaking Purchaser made in this Agreement, in any of the Purchaser Ancillary Documents, or Parallel Agreements;

(c)    any fraud, intentional misrepresentation, willful misconduct, criminal act, or bad faith of the Purchaser in connection with this Agreement, the Purchaser Ancillary Documents, or Parallel Agreements; and

(d)    any liability of the Seller under personal guarantees executed for the benefit of Ice Embassy on or prior to the Closing Date, but solely to the extent related to the operation of Ice Embassy's business following the Closing and that is not otherwise a part of Purchaser Losses under this Agreement.

Section 7.3    Indemnification Procedure.

(a)    Promptly after and Indemnified Party's receipt of a third party's notice (including any Governmental Entity) of any Action with respect to which such Indemnified Party may be entitled to receive payment hereunder for any Purchaser Losses or any Seller Losses (as the case may be), such Indemnified Party will notify the Indemnifying Party, of any such Action; provided, however, that (x) the failure to so notify the Indemnifying Party will relieve the Indemnifying Party from liability under this Agreement with respect to such Action only if, and only to the extent that, such failure to notify the Indemnifying Party results in the Indemnifying Party's forfeiture of material rights and defenses otherwise available to the Indemnifying Party with respect to such Action and (y) no such notice shall be required with respect to any of the matters covered by Section 7.1(d). Unless (i) the Indemnified Party shall have received advice from its selected counsel that a conflict of interest exists that would make joint representation inappropriate, (ii) if the Seller are the Indemnifying Party, such Action seeks an injunction or other equitable relief against any Indemnified Party, (iii) upon request of the Indemnified Party at any time, the Indemnifying Party fails to provide reasonable assurance to the Indemnified Party of its financial capacity to defend and provide indemnification with respect to such Action or (iv) the Action involves any of the matters covered by Section 7.1(d), the Indemnifying Party will have the right, at its sole expense, to assume the defense of such Action, upon written notice delivered to the Indemnified Party within ten (10) days after receiving such notice and, with respect to each Action for which it has assumed the defense under this Section 7.3(a), to maintain the defense of such Action, in each case with counsel selected by the Indemnifying Party and reasonably satisfactory to the Indemnified Party; provided that the Indemnifying Party shall have acknowledged in writing to the Indemnified Party its unqualified obligation to fully indemnify the Indemnified Party pursuant to this Article VII with respect to each Action for which the Indemnifying Party has assumed the defense under this Section 7.3(a), and the Indemnifying Party agrees to its unqualified obligation to fully indemnify the Indemnified Party pursuant to Article VII with respect to each Action for which the Indemnifying Party maintains the defense. In the event, however, that (A) the Indemnifying Party declines or fails to (1) assume or maintain the defense of the Action, (2) provide reasonable assurance to the Indemnified Party of its financial capacity to defend and provide indemnification with respect to such Action or (3) employ counsel reasonably satisfactory to the Indemnified Party, in any case, on the terms provided above, or (B) the Indemnified Party shall have

CONFIDENTIAL DOCUMENTS                                                    HAH011535

received advice from its selected counsel that a conflict of interest exists that would make joint representation inappropriate, then such Indemnified Party may employ counsel to represent or defend it in any such Action and the Indemnifying Party will pay, after payments are first taken out of the Fee Agreement Proceeds, the reasonable fees and disbursements of such counsel as incurred; *provided, however*, that the Indemnifying Party will not be required to pay the fees and disbursements of more than one counsel for all Indemnified Parties in any jurisdiction in any single Action. The Indemnifying Party shall use its best efforts to maintain the defense of each Action for which it has assumed the defense under this Section 7.3(a) and of each Action related to the matters covered by Section 7.1(d) . In any Action with respect to which indemnification is being sought hereunder, the Indemnified Party or the Indemnifying Party, whichever is not assuming or maintaining the defense of such Action, will have the right to participate in such matter and to retain its own counsel at such Person's own expense, so long as, in the event the Indemnifying Party fails to assume or maintain the defense of any such Action, the Indemnifying Party either (x) acknowledges in writing to the Indemnified Party that it is, without qualification, obligated to fully indemnify the Indemnified Party pursuant to this Article VII with respect to such Action and pays the amounts, after giving credit for any Fee Agreement Proceeds received or credited to Ice Embassy after Closing but prior to such date, as may be required hereunder, including the reasonable fees and disbursements of the Indemnified Party's counsel as incurred, or (y) has complied with its obligations pursuant to the immediately preceding sentence, has disputed in writing its obligation to indemnify the Indemnified Party pursuant to this Article VII with respect to such Action and has demonstrated in writing a reasonable basis therefor; *provided* that, for the avoidance of doubt, the fees and expenses incurred by the Indemnified Party prior to the assumption of any Action by the Indemnifying Party shall be borne by the Indemnifying Party and the fees and expenses incurred by the Indemnified Party after the assumption of any Action by the Indemnifying Party shall be borne by the Indemnified Party to the extent that the Indemnifying Party has already properly assumed and maintained such defense. The Indemnifying Party or the Indemnified Party, as the case may be, will at all times use reasonable efforts to keep the Indemnified Party or the Indemnifying Party, as the case may be, reasonably and promptly apprised of the status of the defense of any Action the defense of which they are maintaining and to cooperate in good faith with each other with respect to the defense of any such Action; *provided, however*, that, in the event the Indemnifying Party fails to assume or maintain the defense of any such Action, the Indemnified Party will have no such obligations unless the Indemnifying Party either (x) acknowledges in writing to the Indemnified Party that it is, without qualification, obligated to fully indemnify the Indemnified Party pursuant to this Article VII with respect to such Action and pays the amounts required hereunder, including the reasonable fees and disbursements of the Indemnified Party's counsel as incurred, or (y) has complied with its obligations use its best efforts to maintain the defense of each Action for which it has assumed the defense under this Section 7.3(a) and of each Action related to the matters covered by **Error! Reference source not found.**, has disputed in writing its obligation to indemnify the Indemnified Party pursuant to this Article VII with respect to such Action and has demonstrated in writing a reasonable basis therefor.

(b)        No Indemnified Party may settle or compromise any claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party, unless: (i) the Indemnifying Party does not assume or fails to maintain the defense of such claim pursuant to Section 7.3(a), (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party from all liability arising out of such claim, or (iii) the amount of Fee Agreement Proceeds received by or credited to Ice Embassy prior to such date fully covers such settlement, compromise, or consent. An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise or consent (1) includes an unconditional release of each Indemnified Party (including its Affiliates) from all liability arising out of such claim, (2) does not contain any admission or statement suggesting any wrongdoing or liability on behalf of any Indemnified Party or any of its Affiliates, (3) does not contain any equitable order, judgment or term which in any manner adversely affects, restrains or interferes with the business of any

CONFIDENTIAL DOCUMENTS                HAH011536

CONFIDENTIAL DOCUMENTS

HAH011537

Indemnified Party or any Indemnified Party's Affiliates and (4) does not and will not result in any increase in Taxes of any Indemnified Party or any Indemnified Party's Affiliate, or adverse effect on Taxes of any Indemnified Party or any Indemnified Party's Affiliate, for any taxable period or portion thereof after the Closing Date.

(c)     A claim for indemnification by an Indemnified Party for any matter not involving an Action by a third party shall be asserted by written notice to the Indemnifying Party from whom indemnification is sought. Such notice will specify in reasonable detail the basis for such claim. As promptly as possible after the Indemnified Party has given such notice, such Indemnified Party and the appropriate Indemnifying Party will establish the merits and amount of such claim (by mutual agreement, litigation, arbitration or otherwise) and, within five (5) Business Days of the final determination of the merits and amount of such claim, the Indemnifying Party will pay, after giving credit for any Fee Agreement Proceeds received or credited to Ice Embassy after Closing but prior to such date, to the Indemnified Party immediately available funds in an amount equal to such claim as determined hereunder. If the Indemnified Party and the Indemnifying Party agree with respect to any of such claims, the Indemnified Party and the Indemnifying Party shall promptly prepare and sign, if applicable, an instruction to the Escrow Agent.

(d)     The General Representations of the Seller Parties shall survive Closing for the General Representation Survival Period.

(e)     Any representations and warranties set forth in this Agreement or any of the Seller Ancillary Documents pertaining to Taxes shall survive Closing for six (6) years after the Closing Date, and all Fundamental Representations and all covenants of the Seller Parties shall survive Closing for the appliable statute of limitations period.

(f)     No claim for a breach of any representation or warranty of Seller shall be actionable or payable unless written notice containing a description of the specific nature of such breach shall have been provided to Seller within the survival periods set forth in (d) and (e).

(g)     All amounts owing to Purchaser Indemnified Parties for Purchaser Losses may, after giving credit for any Fee Agreement Proceeds received or credited to Ice Embassy after Closing, be paid through application and delivery to Purchaser of Escrow Funds, being maintained by the Escrow Agent in accordance with the terms of the Real Estate Purchase Agreement, and upon Purchaser demand therefor Seller shall cause the delivery of all necessary instruments and written release to effectuate the release of Escrow Funds in the amount of Purchaser Losses to Purchaser.

## ARTICLE VIII
## MISCELLANEOUS PROVISIONS

Section 8.1     Notices. All notices, communications and deliveries under this Agreement will be made in writing signed by or on behalf of the Person making the same, will specify the Section under this Agreement pursuant to which it is given or being made, and will be delivered personally or by facsimile transmission or sent by registered or certified mail (return receipt requested) or by nationally recognized overnight courier (with evidence of delivery and postage and other fees prepaid) as follows:

If to the Purchaser:

Colorado Rose, LLC
c/o Zack Truesdell
1800 W Loop S, Ste. 1125
Houston, TX 77027
zack@theclegroup.com

With copies to:

ChristianAttar Law Firm
Ardalan Attar
1177 W Loop S, Ste. 1700
Houston, TX 77027
aattar@christianattarlaw.com

CONFIDENTIAL DOCUMENTS                                    HAH011538

If to the Seller:

Linda Goehrs, Trustee for
the Holli Ann Hardin Trust Number One
3414 Old Richmond Road
Rosenberg, TX 77471

With copies to:

Sean Greenwood
THE GREENWOOD LAW FIRM
1415 N. LOOP WEST, SUITE 1250
HOUSTON, TX 77008
Facsimile: 832-356-1589
sean@woodlaw.com

If to Fontenot:

Dakota Fontenot
2926 Fontana Dr
Houston, TX 77043
(713) 419-2966
dakotajamesfontenot@gmail.com

or to such other representative or at such other address or facsimile number of a Party as such Party may furnish to the other Parties in writing. Any such notice, communication or delivery will be deemed given or made (a) if personally delivered, when so delivered in person, (b) if given by facsimile, when transmitted, with written confirmation of transmission, (c) if given by nationally recognized overnight courier, one (1) Business Day after being sent by nationally recognized overnight courier, or (d) if given by registered or certified mail, upon the date of delivery as confirmed in writing.

Section 8.2    Schedules and Exhibits. The Schedules and Exhibits to this Agreement are hereby incorporated into this Agreement and are hereby made a part of this Agreement as if set out in full in this Agreement.

Section 8.3    Assignment; Successors in Interest. No assignment or transfer by any Party of its rights and obligations under this Agreement will be made except with the prior written consent of the other Parties to this Agreement. This Agreement will be binding upon and will inure to the benefit of the Parties and their successors and permitted assigns, and any reference to a Party will also be a reference to a successor or permitted assign.

Section 8.4    Number; Gender. Whenever the context so requires, the singular number will include the plural, and the plural will include the singular, and the gender of any pronoun will include the other genders.

Section 8.5    Captions. The titles, captions, and table of contents contained in this Agreement are inserted in this Agreement only as a matter of convenience and for reference and in no way define, limit, extend, or describe the scope of this Agreement or the intent of any provision of this Agreement. Unless otherwise specified to the contrary, all references to Articles and Sections are references to Articles and Sections of this Agreement, and all references to Schedules or Exhibits are references to Schedules and Exhibits, respectively, to this Agreement.

Section 8.6    Controlling Law; Amendment. This Agreement will be governed by, construed, and enforced in accordance with the internal laws of the State of Texas without reference to its choice of law rules. This Agreement may not be amended, modified, or supplemented except by written agreement executed and delivered by all of the Parties.

CONFIDENTIAL DOCUMENTS    HAH011539

CONFIDENTIAL DOCUMENTS

HAH011540

Section 8.7      Consent to Jurisdiction, Etc.; Waiver of Jury Trial. Each of the Parties hereby irrevocably consents and agrees to the exclusive personal jurisdiction of the courts of the State of Texas in Harris County, Texas, or the federal courts for the Southern District of Texas, for any Legal Dispute.

Section 8.8      Attorneys Fees. In the event of any Legal Dispute, the prevailing party shall be entitled to recover its reasonable attorneys' fees and costs from the non-prevailing party.

Section 8.9      Severability. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction will, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement, and any such prohibition or unenforceability in any jurisdiction will not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by Applicable Laws, the Parties waive any provision of Applicable Laws that renders any such provision prohibited or unenforceable in any respect.

Section 8.10     Counterparts. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one and the same instrument. Facsimile or scanned and emailed transmission of any signed original document or retransmission of any signed facsimile or scanned and emailed transmission will be deemed the same as delivery of an original. At the request of any Party, the Parties will confirm facsimile or scanned and emailed transmission by signing a duplicate original document.

Section 8.11     No Third-Party Beneficiaries. Except as provided in Article VII, nothing expressed or implied in this Agreement is intended, or will be construed, to confer upon or give any Person other than the Parties, the Purchaser Indemnified Parties and the Seller Indemnified Parties and their respective successors and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement, or result in such Person being deemed a third party beneficiary of this Agreement.

Section 8.12     Waiver. Any agreement on the part of a Party to any extension or waiver of any provision of this Agreement will be valid only if set forth in an instrument in writing signed on behalf of such Party. A waiver by a Party of the performance of any covenant, agreement, obligation, condition, representation, or warranty will not be construed as a waiver of any other covenant, agreement, obligation, condition, representation, or warranty. A waiver by any Party of the performance of any act will not constitute a waiver of the performance of any other act or an identical act required to be performed at a later time.

Section 8.13     Entire Agreement. This Agreement and the documents executed pursuant to this Agreement supersede all negotiations, agreements and understandings among the Parties with respect to the subject matter of this Agreement (including, for the avoidance of doubt, that certain letter of intent, dated August 16, 2021, by and between Purchaser and Seller) and constitute the entire agreement between the Parties with regards to the subject matter of this Agreement.

Section 8.14     Transaction Costs. Except as provided above or as otherwise expressly provided herein, (a) the Purchaser will pay their own fees, costs and expenses incurred in connection with this Agreement and the transactions contemplated by this Agreement, including the fees, costs and expenses of its financial advisors, accountants and counsel, and (b) the Seller will pay the fees, costs and expenses of the Seller and Ice Embassy incurred in connection with this Agreement and the transactions contemplated by this Agreement (including any such fees, costs or expenses incurred in connection with any pre-closing restructuring or transactions undertaken in contemplation of the completion of the transactions contemplated hereby), including the fees, costs and expenses of their financial advisors, accountants and counsel.

Section 8.15     Construction and Further Assurances. This Agreement has been freely and fairly negotiated among the Parties. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if the Parties jointly drafted the same, and no presumption or burden of proof will arise favoring or disfavoring any Party because of the authorship of any provision of this Agreement. Any

Stock Purchase Agreement – Ice Embassy

CONFIDENTIAL DOCUMENTS

HAH011541

reference to any law will be deemed also to refer to such law as amended, modified, succeeded, or supplemented from time to time and in effect at any given time, and all rules and regulations promulgated thereunder, unless the context requires otherwise. From time to time following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement. Without limiting the foregoing, Seller shall execute and deliver, or cause to be executed and delivered, to Purchaser such other instruments of conveyance and transfer as Purchaser may reasonably request or as may be otherwise necessary to more effectively convey and transfer to, and vest in, Purchaser and put Purchaser in possession of, the Acquired Interests and the assets of Ice Embassy.

# ARTICLE IX

## DEFINITIONS

The following defined terms have the meanings ascribed to such terms as used in this Agreement:

**Accounts Receivables** means all rights the Company has now or in the future to payments including, but not limited to, payment for goods and other property sold or leased or for services rendered, whether or not the Company has earned such payment by performance listed in Schedule 1.4.

**Acquired Interests** means the issued and outstanding capital stock of Ice Embassy.

**Acquisition** means the purchase and sale of all the Acquired Interests pursuant to the terms of the Agreement.

**Action or Actions** means individually or collectively, known actions, customer demands or allegations, complaints, suits, arbitrations, mediations, claims, audits, proceedings, assessments or reassessments of Taxes or charges, indictments or investigations, in each case of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

**Affiliates** mean any Person that directly or indirectly controls, or is under common control with, or is controlled by, another Person and, if such Person is an individual, any member of the immediate family (including parents, spouse, children and siblings) of such individual and any trust whose principal beneficiary is such individual or one or more members of such immediate family and any Person who is controlled by any such member or trust. As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise).

**Agreement** means this Stock Purchase Agreement.

**Applicable Laws** means all applicable federal, state, municipal, local and foreign laws (including the common and civil law and equity), statutes, rules, regulations, ordinances, codes, orders, decrees, injunctions, judgments and other legislative, administrative or judicial promulgations, including those relating to zoning, Taxes, immigration, environmental matters, labor and employment, security, privacy, data production and the safety and health of employees, of all Governmental Entities or arbitration panels

CONFIDENTIAL DOCUMENTS                                    HAH011542

CONFIDENTIAL DOCUMENTS

HAH011543

and contained in all published requirements, plans, notices, permits, licenses, authorizations, approvals, consents and demand letters issued, entered, promulgated or approved thereunder, in each case as amended and in effect from time to time.

.

**Business** means the business Ice Embassy currently conducts, including (without limitation) the ownership and operation of a restaurant, bar, sexually oriented business known as the "Colorado".

**Business Day** means any day except Saturday, Sunday, or any day on which banks are generally not open for business in Houston, Texas.

**Closing** means the consummation of and reference to the transactions contemplated under this Agreement.

**Closing Date** means the date on which the Closing occurs.

**Closing Date Debt** means an aggregate amount equal to the current and non-current portions of the indebtedness and all other long-term liabilities of Ice Embassy outstanding as of the Closing Date, including, obligations for borrowed money, obligations evidenced by loan agreements, notes, bonds or similar instruments, capital leases, amounts due to the Seller or their respective Affiliates, amounts drawn and unpaid under outstanding letters of credit, net obligations under any swap, derivative or similar transactions, obligations for deferred purchase price, deferred compensation or other deferred payments for which Ice Embassy is liable, accounts payable as of the Closing Date, prepayment fees and penalties related to the payoff of any of the foregoing as of the Closing, any guarantee (which, for purposes of this definition, shall include any obligation, contingent or otherwise, having the economic effect of guaranteeing any indebtedness or other obligation payable or performable by another Person in any manner, whether directly or indirectly) by Ice Embassy of any of the foregoing, and any outstanding obligations or liabilities of Ice Embassy pursuant to any shares of preferred stock or any other equity or equity-based interest or instrument, in each case, whether or not such items are included as indebtedness or liabilities in the Financial Statements pursuant to GAAP and, in each case, whether short-term or long-term.

**Consideration or Cash Consideration** means TWO HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($250,000.00).

**Contracts** means Ice Embassy's contracts listed on Schedule 2.4A.

**Company or Ice Embassy** means Ice Embassy, Inc., a Texas corporation.

**Company Ancillary Documents** means any certificate, agreement, document, or other instrument Ice Embassy executes and delivers in connection with the transactions contemplated in this Agreement.

**Effective Date** means the date all Parties have executed the Agreement.

**EM&M** means Entertainment Marketing & Management, Ltd., a Texas limited partnership.

**EM&M Agreement** means that certain agreement for the purchase of the partnership interests of EM&M, made by and among BFD GP, LLC, a Texas limited liability company, BFD LP, LLC, a Texas limited liability company and Fontenot, as seller parties therein, and Purchaser, as purchaser therein.

---

CONFIDENTIAL DOCUMENTS                                    HAH011544

**Excluded Assets** means the assets listed on Schedule 1.1.

**Fee Agreement Proceeds** means the monetary amount or compensation that Ice Embassy is entitled to receive as a result of a resolution, judgment, or settlement arising from litigation or disputes related to credit card fees Visa and Mastercard charged to Ice Embassy.

**Financial Statements** means Ice Embassy's (i) the balance sheets of Ice Embassy with respect to the Business as of March 31st of 2022, 2023 and 2024 and the related statements of income for each of the years then ended (collectively, "Annual Financial Statements"), and (ii) the balance sheet of Ice Embassy with respect to the Business as of April 30, 2025 ("Interim Balance Sheet Date") and the related statements of income for the one month then ended ("Interim Financial Statement", and together with the Annual Financial Statements, the "Financial Statements", which are attached hereto as Schedule 2.6.

**Fundamental Representations** means all statements, representations and warranties set forth in Article II other than General Representations.

**General Representations** means the representations and warranties contained in Sections 2.4, 2.10 and 2.12 of this Agreement.

**General Representations Survival Period** means the period beginning on the Closing Date and ending on the 60th day after the one (1) year anniversary of the Closing Date, which is the period in which Purchaser may present claims pertaining to any default, inaccuracy or breach of the General Representations set forth in Article II of this Agreement, which period shall continue for such period of time as needed to resolve by settlement, litigation or other proceeding such presented claims. .

**Governmental Entity or Governmental Entities** means, individually or collectively, any federal, state, municipal, local, or foreign government or any court, tribunal, administrative or regulatory agency or commission, or other governmental authority or agency, domestic or foreign.

**Indebtedness** means all such indebtedness, obligations, and liabilities collectively referred to under this Agreement. means with respect to Ice Embassy, as of any date, without duplication, (a) all obligations for borrowed money (or issued in substitution for or exchange of indebtedness for borrowed money), including all principal, interest, premiums, fees, expenses, overdrafts and penalties with respect thereto, whether short term or long term, and whether secured or unsecured, (b) all obligations evidenced by bonds, debentures, notes or similar instruments, (c) all obligations upon which interest charges are customarily paid (other than trade payables incurred in the ordinary course of business or any Taxes), (d) all obligations under conditional sale or other title retention agreements relating to property or assets purchased by Ice Embassy, (e) all guarantees, whether direct or indirect, of Indebtedness of others or Indebtedness of any other person or entity secured by any assets of Ice Embassy, and (f) all capital lease obligations.

**Indemnified Party** means the Party receiving indemnification.

**Indemnifying Party** means the Party providing the indemnification.

**Intellectual Property** means all registered and unregistered copyrights, trade names, trade secrets, trademarks, service marks (including logos), patents (or application therefor), know-how or other

CONFIDENTIAL DOCUMENTS                                          HAH011545

intellectual property or proprietary property rights that are material to the business of Ice Embassy or as to which Ice Embassy claims an ownership interest or as to which Ice Embassy is a licensee or licensor.

**Interim Balance Sheet Date** means April 30, 2025.

**Knowledge or Know** shall mean with respect to the Seller Parties (a) the actual or constructive knowledge of the Seller Parties, after due and reasonable inquiry with those employees, officers, directors, and representatives of Ice Embassy having responsibility for or who could reasonably be expected to be aware with respect to the matters at hand.

**Legal Dispute** means any action, suit, or proceeding arising in connection with any disagreement, dispute, controversy, or claim arising out of or relating to this Agreement or any related document.

**Licenses** means all notifications, licenses, permits, franchises, grants, easements, variances, exceptions, consents, orders, certificates (including certificates of occupancy with respect to all Leased Real Property, where applicable), approvals, exemptions, classifications, registrations and other similar documents and authorizations, including the date and expiration, and applications therefor.

**Liens**. Means all mortgages, liens (statutory or other), pledges, hypothecations, security interests, assignments, charges, claims, community property interests, title defects, conditions, covenants, options, equitable interests, rights of first refusal, restrictions of any kind, easements, and encumbrances of any nature whatsoever.

**Losses** means any and all claims, liabilities, obligations, losses, damages, costs, expenses, penalties, interest, awards, fines and judgments (in equity or at law) and damages whenever arising or incurred (including amounts paid in settlement, costs of investigation and reasonable attorneys' and consultants' fees and expenses).

**Parallel Agreements** means the Real Estate Purchase Agreement and the EM&M Agreement.

**Parties** means Purchaser and Seller.

**Person** means any individual, corporation, company, limited liability company, association, partnership, joint venture, trust, unincorporated organization, or government authority.

**Personal Property** means all of Ice Embassy's intangible and tangible personal property including (without limitation) all equipment, inventory, and other items of personal property, and all other assets useful or needed for the operations of the Business currently conducted by Ice Embassy.

**Purchaser** means Colorado Rose, LLC, a Texas limited liability company, its members, managers, officers, predecessors, successors, agents, and assigns.

**Purchaser Ancillary Documents** means any other certificate, agreement, document, or other instrument to be executed and delivered by Purchaser in connection with the transactions contemplated by this Agreement.

**Purchaser Indemnified Parties** means the Purchaser and Purchaser's Affiliates (including Ice Embassy from and after Closing), and each of their respective shareholders, officers, directors, members, employees,

CONFIDENTIAL DOCUMENTS                                   HAH011546

agents, and representatives and each of the heirs, executors, successors, and permitted assigns of any of the foregoing (in each case other than the Seller).

**Purchaser's Losses** means the Losses of the Purchaser Indemnified Parties described in Section 7.1 as to which the Purchaser Indemnified Parties are entitled to indemnification from the Seller Parties.

**Real Estate Purchase Agreement** means that certain agreement for the purchase of the real property and improvements located at 6710 Southwest Freeway, Houston, Texas 77074 used for the operation of the Business for a purchase price of Four Million Seven Hundred Fifty Thousand and No/100 Dollars ($4,750,000.00), of even date herewith, made by and between HFR Enterprises Inc., a Texas corporation, as seller therein, and CLE Group SKZ Real Estate, LLC, a Texas limited liability company, as purchaser therein.

**Retained Liabilities** means debt and/or liabilities set forth in Schedule 1.2B, attached hereto.

**Seller or Trust** means Linda Goehrs, Trustee for the Holli Ann Hardin Trust Number One.

**Seller Ancillary Documents** means any other certificate, agreement, document, or other instrument Seller or Ice Embassy executes and delivers in connection with the transactions contemplated under this Agreement.

**Seller Indemnified Parties** means the Seller and each of their respective shareholders, officers, directors, members, employees, agents, and representatives and each of the heirs, executors, successors, and permitted assigns of any of the foregoing.

**Seller Losses** means the losses of the Seller Indemnified Parties described in Section 7.2 as to which the Seller Indemnified Parties are entitled to indemnification.

**Stock** means all of the issued and outstanding shares of common stock of the Company.

**Tax Authority** means any Governmental Entity responsible for the imposition, assessment, or reassessment of any Taxes.

**Taxes** means all taxes, installments, assessments, charges, duties, fees, levies or other governmental charges, including income, franchise, margin, capital stock, real property, personal property, tangible, withholding, employment, payroll, social security, land transfer, employer, health, goods and services, harmonized sales, social contribution, employment insurance premium, unemployment compensation, disability, transfer, sales, use, service, license, excise, gross receipts, value-added (ad valorem), add-on or alternative minimum, environmental, severance, stamp, occupation, premium, unclaimed property, escheat and all other taxes of any kind for which a Person may have any liability imposed by any Governmental Entity, whether disputed or not, and any charges, fines, interest or penalties imposed by any Governmental Entity or any additional amounts attributable or imposed with respect to such amounts.

**Tax Return** means any report, return, information return, statement, form, election, slip, declaration, or other information required to be supplied to a Governmental Entity in connection with Taxes, including any estimated or amended returns and reports of any kind with respect to Taxes.

**Title Company** means Post Oak Title; by and through its escrow agent Zeeshan Jivani.

---

CONFIDENTIAL DOCUMENTS                                    HAH011547

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed, as of the date first above written.

**SELLER**
**Holi Ann Hardin Trust Number One**

*Linda Goehrs*
_____
Linda Goehrs, Trustee for the Holli Ann
Hardin Trust Number One

**PURCHASER**
**Colorado Rose, LLC**

By: _____
Printed Name: _Justin Zachariah Truesdell_
Title: _Manager_

**FONTENOT**

_____
Dakota Fontenot


**Ice Embassy, Inc.**

By: _____
Title: _Director/President_

CONFIDENTIAL DOCUMENTS                                    HAH011548

# EXHIBIT M

## PARTNERSHIP INTEREST PURCHASE AGREEMENT

THIS PARTNERSHIP INTEREST PURCHASE AGREEMENT (this "**Agreement**") is made and entered into as of June ___, 2025, by and among Colorado Rose, LLC a Texas limited liability company, with a principal place of business at 1800 West Loop S, Ste. 1125, Houston, TX 77027 ("**Buyer**"), BFD GP, LLC a Texas limited liability company with a principal place of business at 3414 Old Richmond Road, Rosenberg, TX 77471 ("**BFD GP**") and  BFD LP, LLC a Texas limited liability company with a principal place of business at 3414 Old Richmond Road, Rosenberg, TX 77471 ("**BFD LP**", and together with BFD GP, collectively, the "**Sellers**" and each individually a "**Seller**") and Entertainment Marketing & Management, Ltd., a Texas limited partnership with a principal place of business at 3414 Old Richmond Road, Rosenberg, TX 77471 ("**Company**"). The Buyer and Sellers are joined herein by Dakota Fontenot, an individual resident of Texas ("**Fontenot**, and together with the Sellers, collectively the "**Seller Parties**"). Buyer, Seller Parties, and the Company are hereinafter collectively referred to as the "**Parties**."

WHEREAS, BFD GP, LLC is the sole general partner holding all of the general partnership interests of the Company (the "**GP Interests**"), and BFD LP, LLC is the sole limited partner holding all of the limited partnership interests of the Company (the "**LP Interests**"), and together, Sellers own 100% of the issued and outstanding GP Interests and LP Interests in the Company (collectively, the "**Interests**");

WHEREAS, contemporaneously with this Agreement, the Parties and/or their affiliates or related parties are entering into that certain Stock Purchase Agreement (the "**SPA**") for the acquisition of stock in Ice Embassy, Inc., a Texas corporation ("**Ice Embassy**"), and that certain Purchase and Sale Agreement (the "**PSA**") for the acquisition of that certain real property located at 6710 Southwest Freeway, Houston, Texas 77074, as further described in the PSA (the "**Property**") from HFR Enterprises Inc., a Texas corporation ("**HFR**") (the SPA and PSA collectively referred to herein as the "**Parallel Agreements**");

WHEREAS, Fontenot owns 100% of the membership interests of the Sellers, and further, Fontenot and/or his affiliates own, possess, manage and control ICE Embassy and HFR through equity ownership and management (or services) agreements, and by which Fontenot will benefit from the closing of all transactions under this Agreement and the Parallel Agreements;

WHEREAS, the Parties desire to enter into this Agreement, pursuant to which the Buyer agrees to purchase from the Seller, and the Seller agrees to sell to the Buyer and assign to Buyer (and Buyer's designee, with respect to the LP Interests), all of the Interests, on the terms and subject to the conditions set forth in this Agreement; and

WHEREAS, the Seller and the Buyer desire to consummate the proposed transaction pursuant to the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

DF000502

# ARTICLE I

## PURCHASE AND SALE OF INTERESTS

1.1 <u>Purchase and Sale of Interests</u>. Upon the terms and subject to the conditions of this Agreement, at the Closing on the Closing Date, the Seller agrees to sell, assign, convey, transfer and deliver to the Buyer (and Buyer's designee, with respect to the LP Interests), and the Buyer and Buyer's designee agrees to acquire from the Seller all of the Interests, free and clear of all Liens (as defined below) (other than restrictions under the Securities Act and state securities Laws), excluding the assets listed in <u>Exhibit A</u>, attached hereto and incorporated herein by this reference ("**Excluded Assets**").

1.2 <u>Purchase Price</u>.

(a) Upon the terms and subject to the conditions of this Agreement, in consideration of the aforesaid sale, assignment, conveyance, transfer and delivery of the Interests, the purchase price payable by the Buyer to the Seller at the Closing (the "**Purchase Price**") shall be in the aggregate:  Two Million Seven Hundred Fifty Thousand and 00/100 ($2,750,000.00) Dollars, payable as follows:

(i) the Buyer shall pay the Seller One Million Five Hundred Thousand and 00/100 ($1,500,000.00) Dollars via wire transfer at Closing (the "**Closing Cash Payment**");

(ii) subject to Section 1.2(b), the Buyer shall pay the Sellers an aggregate sum of One Million Two Hundred Fifty Thousand and 00/100 ($1,250,000.00) Dollars ("**Installment Amount**"), pro-rata in accordance with each Seller's proportionate share of the Interests, via wire transfer, to be paid as follows:

(iii) One half of the Installment Amount ($625,000) shall be paid in quarterly installments, with the first installment being due and payable on October 1, 2025 and three successive installments being due and payable on the first day of the succeeding fiscal quarter thereafter (i.e., January 1, 2026, April 1, 2026, and July 1, 2026), and with the remaining one-half of the Installment Amount ($625,000) shall be paid in 12 monthly increments, with the first payment being due and payable on August 1, 2026, and with successive monthly payments being due on the first day of each month until the Installment Amount is paid in full.

The quarterly and monthly payments of the Installment Amount are collectively referred to herein as the "**Installment Payments**". As security for payment of the Installment Payments, Sellers shall be granted a subordinate lien covering the Property being purchased under the PSA, which will be provided under a second-priority lien deed of trust security interest in the Property. Buyer shall execute and deliver a deed of trust in favor of Sellers, in form and substance reasonably satisfactory to Sellers and Buyer.

(b) Notwithstanding anything to the contrary, Buyer shall be entitled to offset against any unpaid Installment Payments due to the Buyer Indemnified Parties for Buyer's Losses as set forth

DF000503

in Article VIII herein or under any of the Parallel Agreements. Any offset shall reduce the applicable Installment Payment(s) on a dollar-for-dollar basis.

1.3 [Reserved].

1.4 Excluded Assets License. As part of this Agreement, Buyer is granted a non-exclusive, revocable license to use Item No. 16 in the Excluded Assets ("**Twin Zebras**") while operating its business at the Property. This license shall remain in effect for as long as the Buyer continues to operate on the Property and desires to use the Twin Zebras. In the event that the Buyer ceases operations on the Property, no longer wishes to use the Twin Zebras, or is otherwise unable to continue using the Twin Zebras, the Buyer shall promptly return the Twin Zebras to Dakota Fontenot in their original condition, reasonable wear and tear excepted. The Seller Parties reserve the right to inspect the Twin Zebras upon their return to ensure compliance with this provision. This license is non-transferable and may not be assigned or sublicensed by the Buyer without the prior written consent of Sellers. The Seller Parties retain all ownership rights to the Twin Zebras and may revoke this license at their discretion with reasonable notice to the Buyer.

1.5 Removal of Excluded Assets. Sellers shall have thirty (30) days following the Closing Date to remove all Excluded Assets from the Property. Sellers shall coordinate and arrange mutually agreeable times with Buyer for the removal of such Excluded Assets, ensuring minimal disruption to Buyer's operation of its business at the Property. Sellers shall be responsible for any costs associated with the removal and shall leave the Property in a clean and orderly condition following removal of the Excluded Assets.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES OF SELLERS

2.　　Representations and Warranties of the Seller Parties. As an inducement to the Buyer to enter into this Agreement, each of the Seller Parties, jointly and severally, represent and warrant to the Buyer that as of the date of this Agreement and the Closing Date:

a.　　Title to Partnership Interests. The Sellers own, possess, and have good and marketable title to the Interests free and clear of all liens, leases, pledges, charges, encumbrances, equities, covenants, conditions, restrictions, or claims of every nature and kind whatsoever (the "**Liens**").

b.　　Legal Requirements. The Sellers have all requisite power, authority, and approvals to transfer ownership of the Interests. The Company and Sellers are in good standing with the State of Texas and has complied and will continue to comply with all applicable federal, state, or local statutes, laws, and regulations, if any, with respect to its transfer of the Interests.

c.　　Consents and Approvals. Other than in compliance with the provisions of applicable statutes and regulations, no notice to, filing with, or authorization, consent, or approval of any domestic or foreign public body or authority is necessary for the consummation of the transactions contemplated by this Agreement. The execution, delivery, performance and consummation of this Agreement does not and will

3

DF000504

not: (i) violate, conflict with or constitute a default or an event that, with notice or lapse of time or both, would be a default, breach or violation under any term or provision of any instrument, agreement, contract, commitment, license, promissory note, conditional sales contract, indenture, mortgage, deed of trust, lease or other agreement, instrument or arrangement to which the Company or Seller Parties are a party or by which the Sellers' Interests are bound; (ii) violate, conflict or constitute a breach of any statute, regulation or judicial or administrative order, award, judgment or decree to which the Seller Parties or the Company or to which the Sellers' Interests are bound or subject; or (iii) result in the creation or imposition of any adverse claim or interest, or any lien, encumbrance, charge, equity or restriction of any nature whatever, upon or affecting the Seller Parties, the Company, or Sellers' Interests. The sole member of the Sellers, Fontenot, has consented to the sale of the Sellers' Interests and this Agreement. The Sellers, being the sole partners of the Company have consented to the sale of the Sellers' Interests and this Agreement.

d.    Litigation. There is no: (i) action, suit or proceeding pending or threatened against the Sellers, Sellers' Interests, the Company, or Fontenot; or (ii) proceeding, investigation, charges, audit or inquiry threatened or pending before or by any federal, state, municipal or other governmental court, department, commission, board, bureau, agency or instrumentality which might result in an adverse effect on the Sellers, Sellers' Interests, the Company, or Fontenot.

e.    Taxes. There is no pending or known threatened claim against the Sellers, the Company, or Fontenot for payment of any taxes arising from the Sellers' ownership of the Interests or Fontenot's ownership of the membership interests in the Sellers. There is no pending or known threatened claim against the Company or Seller Parties for payment of taxes. Neither the Sellers, the Company, nor Fontenot has executed any waiver of any statute of limitations against assessments of taxes.

f.    Authority. The Sellers, the Company, and Fontenot  have taken all necessary action to authorize the execution, delivery, and performance of this Agreement and has adequate power, authority, and legal right to enter into, execute, deliver, and perform this Agreement and to consummate the transactions contemplated hereby. This Agreement is legal, valid, and binding with respect to the Sellers and is enforceable in accordance with its terms. On execution, delivery, and performance of this Agreement in accordance with its terms, the Buyer will own one hundred percent (100%) of the Sellers' Interests free of all claims, Liens, encumbrances, and liabilities, thereby owning one hundred percent (100%) of the Company free of all claims, Liens, encumbrances, and liabilities.

g.    Full Disclosure. This Agreement, any schedule referenced in or attached to this Agreement, any document furnished to the Buyer under this Agreement or any certification furnished to the Buyer under this Agreement does not contain any untrue statement of a material fact and does not omit to state a material fact necessary to make such statement, in the circumstances under which it was made, is not misleading. All of the representations, warranties and covenants in this Agreement: (i) are true and correct as of the date made; (ii) will be true and correct as of the Closing Date; and (iii) will survive

4

DF000505

and not be waived, discharged, released, modified, terminated or affected by any due diligence by the Buyer.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF BUYER

3.      Representations and Warranties of Buyer. As an inducement to the Sellers to enter into this Agreement, the Buyer represents and warrants to the Sellers that as of the date of this Agreement and the Closing Date:

a.      Legal Requirements. The Buyer has all requisite power, authority, and approvals to purchase ownership of the Interests. The Buyer is in good standing with the State of Texas and has complied and will continue to comply with all applicable federal, state, or local statutes, laws, and regulations, if any, with respect to its transfer of the Interests.

b.      Consents and Approvals. Other than in compliance with the provisions of applicable statutes and regulations, no notice to, filing with, or authorization, consent, or approval of any domestic or foreign public body or authority is necessary for the consummation of the transactions contemplated by this Agreement. The execution, delivery, performance and consummation of this Agreement does not and will not: (i) violate, conflict with or constitute a default or an event that, with notice or lapse of time or both, would be a default, breach or violation under any term or provision of any instrument, agreement, contract, commitment, license, promissory note, conditional sales contract, indenture, mortgage, deed of trust, lease or other agreement, instrument or arrangement to which the Buyer is a party; (ii) violate, conflict or constitute a breach of any statute, regulation or judicial or administrative order, award, judgment or decree to which the Buyer is bound or subject; or (iii) result in the creation or imposition of any adverse claim or interest, or any lien, encumbrance, charge, equity or restriction of any nature whatever, upon or affecting the Buyer. The members of the Buyer have consented to the purchase of the Sellers' Interests and this Agreement.

c.      Litigation. There is no: (i) action, suit or proceeding pending or threatened against the Buyer that would materially and adversely affect Buyer's ability to perform its material obligations under this Agreement; or (ii) proceeding, investigation, charges, audit or inquiry threatened or pending before or by any federal, state, municipal or other governmental court, department, commission, board, bureau, agency or instrumentality which might result in an materially adverse effect on the Buyer's ability to perform its material obligations under this Agreement.

d.      Taxes. There is no pending or known threatened claim against the Buyer for payment of any taxes. The Buyer has not executed any waiver of any statute of limitations against assessments of taxes.

5

e.    Authority. The Buyer has taken all necessary action to authorize the execution, delivery, and performance of this Agreement and has adequate power, authority, and legal right to enter into, execute, deliver, and perform this Agreement and to consummate the transactions contemplated hereby. This Agreement is legal, valid, and binding with respect to the Buyer and is enforceable in accordance with its terms. On execution, delivery, and performance of this Agreement in accordance with its terms, the Buyer will own one hundred percent (100%) of the Sellers' Interests free of all claims, Liens, encumbrances, and liabilities.

f.    Full Disclosure. This Agreement, any schedule referenced in or attached to this Agreement, any document furnished to the Sellers under this Agreement or any certification furnished to the Sellers under this Agreement does not contain any untrue statement of a material fact and does not omit to state a material fact necessary to make such statement, in the circumstances under which it was made, is not misleading. All of the representations, warranties and covenants in this Agreement: (i) are true and correct as of the date made; (ii) will be true and correct as of the Closing Date; and (iii) will survive and not be waived, discharged, released, modified, terminated or affected by any due diligence by the Sellers.

## ARTICLE IV

## CONDITIONS TO CLOSING

4.    Conditions to Closing. Prior to the Closing Date, the Buyer and Seller Parties will take all necessary steps to ensure the proper transfer of the Interests from the Sellers to the Buyer at closing in compliance with the operating agreement and other governing documents, if any, of the Company.

## ARTICLE V

## THE CLOSING

5.    The Closing. This Agreement will be consummated remotely by the exchange of the Buyer's Deliverables and Seller Parties' Deliverables (defined herein) by the Buyer and the Sellers on June __, 2025 (the "**Closing Date**").

## ARTICLE VI

## BUYER AND SELLER PARTIES DELIVERABLES

6.1    The Buyer's Deliverables. On the Closing Date, the Buyer will deliver or cause to be delivered to the Sellers the following items (all documents will be duly executed and acknowledged where required): (a) the Purchase Price less Installment Payments; (b) such corporate resolutions and other evidence of authority with respect to the Buyer as might be reasonably requested by the Sellers; (and (c) such additional documents as might be reasonably requested by the Sellers to consummate this Agreement.

6.2.    Seller Parties' Deliverables. On the Closing Date, the Seller Parties will deliver or cause to be delivered to the Buyer the following items (all documents will be duly executed and

6

DF000507

acknowledged where required): (a) assignments and conveyances acceptable to the Buyer necessary to convey to the Buyer (and Buyer's designee, with respect to the LP Interests) all of the Sellers' right, title and interest in and to all of the Interests; (b) written consent and/or approval of the transfer of the Interests to Buyer (and Buyer's designee, with respect to the LP Interests); (c) such corporate resolutions and other evidence of authority with respect to the Company as might be reasonable requested by the Buyer; and (d) Such additional documents as might be reasonably requested by the Buyer to consummate this Agreement.

**ARTICLE VII**
**DEFAULT**

7.    Default. If a Party fails to perform any obligation contained in this Agreement, the Party claiming default will serve written notice to the other party specifying the nature of such default and demanding performance. If such default has not been cured within ten (10) business days after receipt of such default notice, the non defaulting party will be entitled to exercise all remedies arising at law or in equity by reason of such default.

**ARTICLE VIII**
**INDEMNIFICATION**

8.1    Definitions.

a.    **"Buyer Indemnified Parties"** means Buyer, the purchaser entities under the Parallel Agreements, and each of their respective shareholders, officers, directors, members, employees, agents, and representatives and each of the heirs, executors, successors, and permitted assigns of any of the foregoing.

b.    **"Buyer's Losses"** means any and all claims, liabilities, obligations, losses, costs, expenses, penalties, interest, awards, fines and judgments (in equity or at law) and damages whenever arising or incurred (including amounts paid in settlement, costs of investigation and reasonable attorneys' and consultants' fees and expenses) of the Buyer Indemnified Parties described in Section 8.2, as to which the Buyer Indemnified Parties are entitled to indemnification.

c.    **"ERC Credit"** means the refundable tax credit Ice Embassy, Inc. may receive as provided under the Coronavirus Aid, Relief, and Economic Security Act, designed to encourage businesses to retain employees during the COVID-19 pandemic.

d.    **"Escrow Agreement"** has the meaning ascribed thereto in the PSA.

e.    **"Fee Agreement"** means the monetary amount or compensation that Ice Embassy, Inc. is entitled to receive as a result of a resolution, judgment, or settlement arising from litigation or disputes related to credit card fees Visa and Mastercard charged to Ice Embassy, Inc.

7

DF000508

f.      **"Indemnity Escrow Account"** has the meaning ascribed thereto in the PSA.

g.      **"Indemnity Escrow Amount"** has the meaning ascribed thereto in the PSA.

h.      **"Parallel Agreements"** shall mean any agreement between Buyer and Seller Parties, or any of Seller Parties' affiliated entities, including but not limited to agreements with or involving the Company, Ice Embassy, Inc., HFR Enterprises, or any of its subsidiaries.

8.2.    Indemnification by Seller Parties. Subject to the terms and conditions of this Agreement (including the limitations set forth in Section 8.3 below), the Seller Parties, and each of its and their affiliates, officers, agents, representatives, subsidiaries, owners, members, trustees, beneficiaries (including any individual beneficiaries of any trust that owns or controls any such entities) (collectively, the **"Seller Indemnifying Parties"**), jointly and severally agree to indemnify, defend, and hold harmless Buyer and the other Buyer Indemnified Parties from and against any and all Buyer's Losses arising out of, relating to, in connection with, or resulting from:

a.      any liability, obligation, or claim (whether known or unknown, contingent or otherwise) related to the Interests or the ownership, operation, maintenance, leasing, use, or occupancy of the Property or the business or assets of the Seller Indemnifying Parties occurring or relating to any period prior the Closing Date, regardless of when asserted, including but not limited to tax liabilities, contractual obligations, or tort claims, regardless of whether such liabilities are discovered before or after Closing and regardless of whether such liabilities are covered by insurance;

b.      any fraud, intentional misrepresentation, willful misconduct, criminal act, bad faith, or gross negligence of the Seller Indemnifying Parties in connection with this Agreement and the Parallel Agreements;

c.      any breach of or inaccuracy in any representation or warranty made by Seller Parties in this Agreement, in any Parallel Agreements, or in any certificate, document, or instrument delivered pursuant hereto; and

d.      any breach or non-fulfillment of any covenant or agreement of the Seller Parties contained in this Agreement, in any Parallel Agreements, or in any certificate, document, or instrument delivered pursuant hereto.

8.3.    Application of Funds for Losses. Any Buyer's Losses for which the Buyer Indemnified Parties are entitled to indemnification under this Article VIII may be satisfied by the following sources in the following order: (i) by applying any proceeds actually received by Buyer from the Fee Agreement to such Buyer's Losses; (ii) by withdrawing the applicable portion of the Indemnity Escrow Amount from the Indemnity Escrow Account in accordance with the Escrow Agreement; (iii) through a set-off against any amounts owed by any Buyer Indemnified Party to any Seller Indemnifying Party under this Agreement or any other Parallel Agreements, including

8

DF000509

the Installment Payments: or (iv) to the extent Buyer's Losses are not fully satisfied by the foregoing (i) – (iii), by direct payment from any of the Seller Indemnifying Parties without Buyer being required to first pursue recovery from any other Seller Indemnifying Party.

8.4.     Survival. The representations, warranties and covenants of the Parties made in this Agreement, including specifically Article II and Article III herein, shall survive the Closing of the transactions contemplated in this Agreement for the applicable statute of limitations period. Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the non-breaching Party to the breaching Party prior to the expiration date of the applicable statute of limitations period shall not thereafter be barred by the expiration of the relevant representation or warranty and such claims shall survive until finally resolved.

8.5.     No Waiver. The indemnification rights under this Article are in addition to, and not in lieu of, any other remedies available at law or in equity or pursuant to any other provision of this Agreement. Nothing in this Section shall limit Buyer's right to seek specific performance, injunctive relief, or other equitable remedies.

## ARTICLE IX

## TAXES

9.     2024 Tax Returns – Responsibility for Preparation. If the federal or applicable state and local income tax returns for the Company for the taxable year ending December 31, 2024 (the "**2024 Tax Period**") are not prepared and filed prior to the Closing Date, then Sellers shall, at its sole cost and expense, be responsible for causing such returns (the "**2024 Tax Returns**") to be timely prepared by a tax professional or accounting firm customarily engaged by the Company for such matters, or another firm reasonably acceptable to Buyer. Sellers shall deliver complete drafts of the 2024 Tax Returns to Buyer no later than sixty (60) days prior to the applicable filing deadline (including extensions) for such returns. Buyer shall have thirty (30) days from receipt of the draft 2024 Tax Returns to review and provide comments to Sellers. Sellers shall, in good faith, consider all reasonable comments made by Buyer and incorporate such comments to the extent required to ensure the 2024 Tax Returns are prepared in accordance with applicable law and consistent with past practice, unless otherwise required by a change in law or fact. Upon resolution of any comments from Buyer, Sellers shall file or cause to be filed the 2024 Tax Returns on or before the due date (including extensions) and shall provide Buyer with a final copy of each filed return within five (5) business days after filing. Nothing in this Section shall limit or impair Buyer's right to challenge or dispute the contents of any such return in connection with any audit, proceeding, or indemnification claim under this Agreement.

DF000510

# ARTICLE X

## MISCELLANEOUS

10.1.    Time. Time is of the essence for this Agreement.

10.2    Notices. Any notice, demand or communication required or permitted to be given by any provision of this Agreement will be in writing and will be deemed to have been given and received when delivered personally or by telefacsimile to the party designated to receive such notice, or on the date following the day sent by overnight courier, or on the third (3rd) day after the same is sent by certified mail, postage and charges prepaid, directed to the addresses first set forth above.

10.3.    Representations and Warranties. The respective representations and warranties of the Parties contained herein or in any certificates or other documents delivered prior to or at the Closing Date will not be deemed waived or otherwise affected by any investigation made by any party hereto. Each and every such representation and warranty will survive the Closing Date and will not be terminated or extinguished for a period of twelve (12) months after the Closing Date.

10.4.    Cooperation. Prior to and at all times following the termination of this Agreement the parties agree to execute and deliver, or cause to be executed and delivered, such documents and do, or cause to be done, such other acts and things as might reasonably be requested by any party to this Agreement to assure that the benefits of this Agreement are realized by the Parties.

10.5.    Headings. The paragraph headings contained in this Agreement are for reference purposes only and are not intended to affect in any way the meaning or interpretation of this Agreement.

10.6.    Entire Agreement. This Agreement, the Parallel Agreements, and any document executed in connection herewith on or after the date of this Agreement constitute the entire agreement between the Parties with respect to the subject matter hereof and there are no agreements, understandings, warranties or representations except as set forth herein or in the Parallel Agreements.

10.7.    Assignment. It is agreed that the Parties may not assign such party's rights nor delegate such party's duties under this Agreement without the express written consent of the other parties to this Agreement.

10.8.    Amendment. Neither this Agreement, nor any of the provisions hereof, can be changed, waived, discharged, or terminated, except by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge, or termination is sought.

10.9.    Severability. If any clause or provision of this Agreement is illegal, invalid, or unenforceable under any present or future law, the remainder of this Agreement will not be affected thereby. It is the intention of the Parties that if any such provision is held to be illegal, invalid, or unenforceable, there will be added in lieu thereof a provision as similar in terms to such provisions as is possible and to be legal, valid, and enforceable.

10

DF000511

10.10. <u>Governing Law; Consent to Jurisdiction</u>. This Agreement will be interpreted, construed, and enforced in accordance with the laws of the State of Texas, regardless of any applicable principles of conflicts of law. Each of the Parties hereby irrevocably consents and agrees to the exclusive personal jurisdiction of the courts of the State of Texas in Harris County, Texas or the federal courts for the Southern District of Texas, for any action, suit or proceeding arising in connection with any disagreement, dispute, controversy or claim arising out of or relating to this Agreement or any related document.

10.11. <u>Attorney Fees</u>. If any party institutes an action or proceeding against any other party relating to the provisions of this Agreement, the party to such action or proceeding that does not prevail will reimburse the prevailing party therein for the reasonable expenses of attorneys' fees and disbursements incurred by the prevailing party.

10.12. <u>Waiver</u>. Waiver of performance of any obligation or term contained in this Agreement by any party, or waiver by one party of the other's default hereunder will not operate as a waiver of performance of any other obligation or term of this Agreement or a future waiver of the same obligation or a waiver of any future default.

10.13. <u>Counterpart Execution</u>. This Agreement may be executed in counterparts, including by telefacsimile, each of which will be deemed an original document but all of which will constitute a single document. Also, for the purposes of this Agreement, a facsimile or electronic signature shall serve as an original.

[signature page follows]

11

DF000512

IN WITNESS WHEREOF, this Agreement has been executed by the parties effective the date first above written.

**Seller Parties**:

BFD GP, LLC

*[signature]*

Dakota Fontenot, Sole Member

BFD LP, LLC

*[signature]*

Dakota Fontenot, Sole Member

*[signature]*

Dakota Fontenot, individually
Address: 2926 Fontana Dr
Houston Tx 77043

**Buyer**:
Colorado Rose, LLC

*[signature]*

Name: Justin Zachariah Truesdell
Title: manager

**Company**:
Entertainment Marketing & Management, Ltd.

By: BFD GP, LLC
    Its General Partner

*[signature]*

Dakota Fontenot, Sole Member

Signature Page to Partnership Interest Purchase Agreement

DF000513

**EXHIBIT A**
**Sellers Excluded Assets**

*The Excluded Assets below are located at the real property and improvements at 6710 Southwest Freeway, Houston, Texas 77074.*

1.  Dallas Fontenot's desk and side table in manager's office.

2.  Lion taxidermy.

3.  Smartboard in conference room.



    a.

4.  Art on walls in conference room.



    a.



    b.

5.  Dakota Fontenot's Pool Table and pool table chairs, equipment, etc., in the shed.

6.  Memorabilia addressed to Dallas Fontenot (limited to 10 items)

DF000514

7. Playboy Memorabilia (limited to 5 items)

8. Bear in sports bar



a.

9. Frank Sinatra autographed portrait in sports bar



a.

10. Beaded native American moccasins next to sports bar and ATMs and framed fish hooks beneath



a.

11. Beaded native American necklaces next to entertainer's locker room and Bar 1 station area

DF000515

12. Gibson Les Paul guitar hanging on ceiling by canoe bar

a.

13. These Playboy memorabilia items

a.

b.

DF000516



c.

14. Other



a.



b.

DF000517

c.

15. Art on wall by Bar 2 and coffee bar

16. Twin Zebras taxidermy.

DF000518

FILED
09/26/2025 8:51:31 AM
Teneshia Hudspeth
County Clerk
Harris County, Texas
nelson.aguilar

# EXHIBIT N

## CAUSE NO. 537721

| | | |
|---|---|---|
| **LINDA GOEHRS, IN HER CAPACITY AS** § | **IN THE PROBATE COURT** |
| **TRUSTEE OF THE HOLLI ANN** § | |
| **HARDIN TRUST NUMBER ONE** § | |
| *Plaintiff,* § | |
| § | **NUMBER ONE (1)** |
| **v.** § | |
| § | |
| **DAKOTA FONTENOT** § | |
| *Defendant.* § | **HARRIS COUNTY, TEXAS** |

### TEMPORARY INJUNCTION

On this day, came on for consideration the Application for Temporary Injunction filed by Plaintiff LINDA GOEHRS ("Plaintiff"), in her capacity as Temporary Successor Trustee of the Holli Ann Hardin Trust Number One, against Defendant DAKOTA FONTENOT ("Defendant"). The Court, having considered the Application, evidence, and arguments of counsel, finds that the Application is well taken and should be in all things GRANTED.

It appears from the evidence that unless a Temporary Injunction is granted against Defendant that Plaintiff will suffer probable, imminent, and irreparable harm including but not limited to the loss of assets held in the Holli Ann Hardin Trust Number One, loss of information pertaining to such assets, and inability to recover such assets should Defendant attempt to avoid potential liability. Plaintiff has demonstrated a likelihood of success on the merits of this case and there is no adequate remedy at law for the damages threatened. Plaintiff has further demonstrated a probable right to the relief sought upon final hearing or trial hereof. A balancing of the equities strongly favors the granting of this Temporary Injunction to prevent the threatened harm, and the threatened injury to Plaintiff outweighs the threatened harm to Defendant by the

Copy from re:SearchTX

granting of this Temporary Injunction, which is limited in time and will not disserve the public interest.

The Court THEREFORE ORDERS as follows:

1. Defendant is enjoined from selling the real property located at 3414 Old Richmond Road, Rosenberg, Texas 77471;

IT IS FURTHER ORDERED, that this Temporary Injunction is binding upon Defendant and all officers, agents, services, employees, attorneys, and all other persons in active concert or participation with Defendant who receive notice of this Order.

IT IS FURTHER ORDERED, that the Clerk of the Court shall issue a Writ of Injunction pending final hearing and determination of this case enjoining all parties detailed in the preceding paragraph from the actions detailed herein.

IT IS FURTHER ORDERED, that prior to the issuance of the injunction, Plaintiff shall file with the Court a bond executed by Plaintiff in the sum of $5,000.00 payable to Defendant, approved and conditioned as required by law.

IT IS FURTHER ORDERED, that this Temporary Injunction shall be effective upon filing of the bond and shall remain intact and will not expire, until the conclusion of the trial on the merits.

All relief not expressly granted in is hereby DENIED.

Signed: 09/25/2025
3:56:23 PM

JUDGE PRESIDING

APPROVED AND ENTRY REQUESTED:



RUDOLPH M. CULP
State Bar No. 24043014
rudy@texsprobateattorney.com
COLLIN J. BULLARD
State Bar No. 24129570
collin@texasprobateattorney.com
BAILEY D. BOWE
State Bar No. 24142201
bailey@texasprobateattorney.com
*EFILE EMAIL: efile@texasprobateattorney.com*
**HOUSTON OFFICE:**
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
O: (713) 297-0700
F: (817) 383-5110
**ATTORNEYS FOR PLAINTIFF**

Copy from re:SearchTX

## DESIGNATION OF SUCCESSOR TRUSTEE
Dakota Trust

The undersigned Dallas Joseph Fontenot, Jr., Successor Trustee of Dakota Trust, a trust established by Trust Declaration of Holli Ann Fontenot dated November 9, 1994 ("Trust Declaration") does hereby declare as follows:

Article V, Section C of the Trust Declaration provides in part that:

> SUCCESSION. Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment will have the right to appoint a successor or successors to serve as Trustee in the event that person ceases to serve for any reason, and each Trustee may specify any conditions upon succession and service as may be permitted by law. For example, a successor may be required to furnish a fiduciary bond as a prerequisite or a successor's service may be conditioned upon another appointee's death, resignation, or inability to serve. Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment may also provide that one or more designated successors as Trustee will have the authority to appoint his, her, or its successor as Trustee. An appointment of successor Trustee must be in writing and must be acknowledged to be effective.

Pursuant to Article V, Section C of the Trust Declaration, Dallas Joseph Fontenot, Jr. appoints Dakota James Fontenot as successor Trustee, to serve immediately upon the death, disability, resignation, or disqualification of Dallas Joseph Fontenot, Jr.

Dallas Joseph Fontenot, Jr. appoints Frost Bank to serve as successor Trustee upon the death, disability, resignation, or disqualification of Dakota James Fontenot.

Each Trustee will have the right to appoint a successor or successors to serve as trustee of the Trust in the event that he ceases to serve for any reason, and such Trustee may specify any conditions upon succession and service as may be permitted by law.

The incapacity or disability of a trustee hereunder shall be (i) determined by a duly licensed physician representing that he or she is certified by a recognized medical board and is not related by blood or marriage to any trustee or beneficiary hereunder; and (ii) evidenced by a writing which is executed, witnessed, and acknowledged certifying that such a physician is familiar with the physical and mental condition of a person and has concluded that, by reason of accident, physical, or mental deterioration, or other similar cause, such person was, as of the date thereof, unable to give prudent, prompt, and intelligent consideration to financial matters. No judicial determination of incapacity

or disability shall be necessary. Any physician's certificate described above may be revoked by a similar certificate to the effect that such person is no longer incapacitated, which certificate must be executed either (i) by the originally certifying physician or (ii) by two other licensed, unrelated physicians. In the case of a revocation of a certificate of incapacity or disability of a trustee hereunder, such revocation shall cause such trustee to regain his or her appointment as trustee, and the then serving successor trustee shall be relieved of his or her duties.

This Designation of Successor Trustee shall be effective as of May 1, 2013 and shall revoke and replace all prior Designations of Successor Trustee.

_____
Dallas Joseph Fontenot, Jr., Trustee

STATE OF NEVADA
COUNTY OF ___Clark___
This document was acknowledged before me on the _7TH_ day of May, 2013 by Dallas Joseph Fontenot, Jr., Trustee.

MICHAEL J. MOORE
Notary Public State of Nevada
No. 08-7991-1
My Appt. Exp. September 11, 2016

_____
Notary Public, State of Nevada

## DESIGNATION OF SUCCESSOR TRUSTEE
Dakota Trust

The undersigned Dallas Joseph Fontenot, Jr., Successor Trustee of Dakota Trust, a trust established by Trust Declaration of Holli Ann Fontenot dated November 9, 1994 ("Trust Declaration") does hereby declare as follows:

Article V, Section C of the Trust Declaration provides in part that:

> SUCCESSION. Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment will have the right to appoint a successor or successors to serve as Trustee in the event that person ceases to serve for any reason, and each Trustee may specify any conditions upon succession and service as may be permitted by law. For example, a successor may be required to furnish a fiduciary bond as a prerequisite or a successor's service may be conditioned upon another appointee's death, resignation, or inability to serve. Except as set forth in Section V.B (the provisions of which shall control this section), each Trustee by original appointment may also provide that one or more designated successors as Trustee will have the authority to appoint his, her, or its successor as Trustee. An appointment of successor Trustee must be in writing and must be acknowledged to be effective.

Pursuant to Article V, Section C of the Trust Declaration, Dallas Joseph Fontenot, Jr. removes all prior appointments of appoints Dakota James Fontenot as successor Trustee and, instead, appoints Frost Bank to serve as successor Trustee upon the death, disability, resignation, or disqualification of Dallas Joseph Fontenot, Jr.

Each Successor Trustee will have the right to appoint a successor or successors to serve as trustee of the Trust in the event that he ceases to serve for any reason, and such Trustee may specify any conditions upon succession and service as may be permitted by law.

The incapacity or disability of a trustee hereunder shall be (i) determined by a duly licensed physician representing that he or she is certified by a recognized medical board and is not related by blood or marriage to any trustee or beneficiary hereunder; and (ii) evidenced by a writing which is executed, witnessed, and acknowledged certifying that such a physician is familiar with the physical and mental condition of a person and has concluded that, by reason of accident, physical, or mental deterioration, or other similar cause, such person was, as of the date thereof, unable to give prudent, prompt, and intelligent consideration to financial matters. No judicial determination of incapacity or disability shall be necessary. Any physician's certificate described above may be

000456

revoked by a similar certificate to the effect that such person is no longer incapacitated, which certificate must be executed either (i) by the originally certifying physician or (ii) by two other licensed, unrelated physicians. In the case of a revocation of a certificate of incapacity or disability of a trustee hereunder, such revocation shall cause such trustee to regain his or her appointment as trustee, and the then serving successor trustee shall be relieved of his or her duties.

This Designation of Successor Trustee shall be effective as of October 14, 2017 and shall revoke and replace all prior Designations of Successor Trustee.

_____
Dallas Joseph Fontenot, Jr., Trustee

STATE OF TEXAS
COUNTY OF Harris

This document was acknowledged before me on the 14th day of October, 2017 by Dallas Joseph Fontenot, Jr., Trustee.

_____
Notary Public, State of Texas

DIANNE N SKINNER
Notary ID # 126280969
My Commission Expires
November 11, 2019

000457

## RESOLUTIONS ADOPTED BY
## WRITTEN CONSENT OF SHAREHOLDER AND DIRECTOR OF
## VIVA LAS VEGAS PROPERTIES, INC.
(OCTOBER 14, 2017)

The undersigned, being the sole shareholder of Viva Las Vegas Properties, Inc., a corporation organized and existing under the laws of Texas, does by this writing consent to take the following actions and adopt the following resolutions:

RESOLVED that the following persons person is elected as the sole Director of Viva Las Vegas Properties, Inc., to serve at the discretion of the Shareholder from October 14, 2017 until such time as his successors are elected by the Shareholder and qualify:

Dallas Fontenot

The undersigned direct that this consent be filed with the minutes of the proceeding of the Shareholders of Viva Las Vegas Properties, Inc.

The undersigned, now being the sole director of Viva Las Vegas Properties, Inc., does by this writing consent to take the following actions and adopt the following resolutions:

RESOLVED that the following person is elected to the offices of Viva Las Vegas Properties, Inc. set forth below, to serve at the discretion of the director from October 14, 2017 until such time as his successors are elected by the Shareholder and qualify:

Dallas Fontenot        President
Dallas Fontenot        Secretary

ESOLVED that Dakota Fontenot is hereby removed from all offices and all positions as a Director of Viva Las Vegas Properties, Inc. from and after October 14, 2017.

The undersigned direct that this consent be filed with the minutes of the proceeding of the Directors of Viva Las Vegas Properties, Inc.

This consent is executed pursuant to the laws of Texas and the Bylaws of Viva Las Vegas Properties, Inc., which authorize the taking of action by the Shareholders and Directors by unanimous written consent without a meeting. This consent is intended to substitute for a special meeting of the Shareholders and Directors of Viva Las Vegas Properties, Inc. Only those persons named above shall serve as Directors until a subsequent election or appointment by the

000437

Shareholder of Viva Las Vegas Properties, Inc.  Only those persons named above shall serve as an officer until a subsequent election or appointment by the Director of Viva Las Vegas Properties, Inc.

Dated to be effective as of October 14, 2017.

Viva Las Vegas Properties, Inc., Shareholder

by:_____
Dallas Fontenot, President

_____
Dallas Fontenot, Director