REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
TRIAL COURT CAUSE NO. 537721

LINDA GOEHRS, IN HER CAPACITY ) IN THE PROBATE COURT
AS TRUSTEE OF THE HOLLI ANN    )
HARDIN TRUST NUMBER ONE,        )
Plaintiff                       ) NUMBER ONE (1) OF
                                )
v.                              )
                                )
DAKOTA FONTENOT,                )
Defendant                       ) HARRIS COUNTY, TEXAS

_____

**TEMPORARY INJUNCTION**

_____

On the 24th day of September, 2025, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Jerry Simoneaux, Judge Presiding, held in Houston, Harris County, Texas.

Proceedings reported by computerized stenotype machine.

EXHIBIT
5

**APPEARANCES**

Rudolph M. Culp
SBOT NO. 24043014
Bailey Bowe
SBOT NO. 24142201
Texas Probate Attorneys
24 Greenway Plaza, Suite 1825
Houston, Texas 77046
Telephone:  713-297-0700
E-mail:  rudy@texasprobateattorney.com
Attorneys for Linda Goehrs

Jeffrey Watters
SBOT NO. 2406695
John P. "Trey" Avant, III
SBOT NO. 24101471
Gray Reed & McGraw, LLP
1300 Post Oak Boulevard, Suite 2000
Houston, Texas 77056
Telephone:  713-986-7000
E-mail:  jwatters@grayreed.com
          tavant@grayreed.com
Attorney for Dakota Fontenot

Paul Beik
SBOT NO. 24054444
Beik Law
440 Louisiana, Suite 1800
Houston, Texas 77002
Telephone:  713-869-6975
E-mail:  paul@beiklaw.com
Attorney for Dakota Fontenot

Ryan Cantrell
SBOT NO. 24055259
Mariah Karigan
SBOT NO. 24123088
Chamberlain, Hrdlicka, White, Williams & Aughtry
1200 Smith Street, Suite 1400
Houston, Texas 77002
Telephone:  713-658-1818
E-mail:  ryan.cantrell@chamberlainlaw.com
          mariah.karigan@chamberlainlaw.com
Attorney for Michelle Fontenot and Joe Fontenot

**JOANNA GONZALES LAMBERT,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

*BY MR. CULP:*

Q.    Is it Ms. Lambert or it is Gonzales Lambert?

A.    Well, it's Gonzales Lambert.  Lambert is my divorced name, and Gonzales is my maiden name.

Q.    Is it okay if I just call you Ms. Lambert?

A.    That's fine, but you can say Joanna.

Q.    Can you please state your full name for the record?

A.    Joanna R. Gonzales Lambert.

Q.    And where are you currently employed?

A.    I'm currently employed with the Clay Group. The Clay Group is the group that purchased the club, Ice Embassy.

Q.    Okay.  And prior to where you're employed now, where did you work?

A.    I worked for EMM, which is the management company for Ice Embassy.

*Joanna Gonzales Lambert - September 24, 2025*   133
*Direct Examination by Mr. Culp*

Q.   Okay.  And maybe you can tell us how all those entities work together.

A.   My understanding of the entities is HFR owns the properties, EMM manages it and Ice Embassy is the club itself, the Colorado.

Q.   Okay.  And when you -- well, what are your -- when you were, I guess -- what were your responsibilities -- and we'll just call it The Colorado Club.  What were your responsibilities for The Colorado Club?

A.   I was to make sure that the books were up-to-date, keeping them up, renewing any permits that we needed.  Making sure that if Dakota or Madi at the time, when she was running, if they needed bills to be paid, I needed to pay those, Take care of them.  If I was not able to take care of them because of lack of funds, I would go to them, mention to them, and they would tell me, "Don't worry about it.  We'll take care of it later."

          And so that's how I dealt with stuff.

Q.   Okay.  And when you first were working at the club, who was running it?

A.   Frank Kent.

Q.   And what happened with Frank Kent?

A.   Frank Kent retired.  He retired in May.  I

cannot be specific.  It was '23 or '24.  My years are not that great.  So in July of 2024 I had a stroke there in the office in Rosenberg.  So I'm just not all together some days.

Q.    Okay.  And after Frank left, who took over running the club?

A.    Dakota did but Dakota took over right before Frank left, I'd say maybe three, four months.

Q.    And --

A.    So December of 2022, I think.

Q.    Okay.  And while Frank was running the club, what was the weekly amount of money that was coming to you?

A.    Wow.  The money that I would get when Frank was running the club, I got enough money to pay everything. I was able to keep up with SOB, the mixed beverage sales tax, the mixed beverage gross receipt tax, the sales and use tax, anything I had to pay, it was good, and payroll taxes.

The only thing I was having issues with was payroll.  I could cover majority of it but never all of it.  So I always had to borrow money for it.

Q.    Where were you borrowing money from?

A.    It would come from the Holli Ann Hardin Trust account.

Q.   Okay.  And how did that change when Dakota took over?

A.   When Dakota took over, we did not have enough money for everything.  So Madi then would change -- she changed our bar banks.  She lowered them.  She lowered our banks, and doing so we were able to function but not fully function.  We were always tight.  We never had enough money to pay our mixed beverage sales or gross receipt tax.  We got behind in that and our payroll taxes.

Q.   And you've been sitting in the courtroom today, correct?

A.   Yes, sir.

Q.   And so you heard the issue with SOB taxes?

A.   I heard a little bit, yes, sir.

Q.   And do you have any recollection of what happened with SOB taxes while Dakota was running the property?

A.   On that we did not have funds.  I would mention it to Dakota and Madi, "Hey, we need to pay this.  It's important.  If we don't pay this, we could get in trouble.  They'll freeze our accounts."

It came to the point where we were four months -- well, two quarters, three quarters behind in the SOB, and with the state comptroller for the mixed

beverage sales and liquor taxes, we were at one point about five to six months behind.  Every time we got a little money, I would try to sneak a payment in.  I got in trouble a few times for doing so.

They said, "No, I need you to hold the money.  I need it to go to something else right now.  Don't pay that."

Q.   And so there was an email that was shown earlier that -- where you were emailing both Dakota and Linda, and you called them "my bosses."

A.   Yes.

Q.   Do you recall that?

A.   Yes, sir.

Q.   Was all of the information always provided to Linda?

A.   I did for a while, and I stopped because Dakota told me to quit including Linda in all the emails.  That happened after I sent Linda a notice from the state comptroller stating that she would be responsible for payments that had not been made.

Q.   Okay.

A.   And that is one of the emails I sent to Dakota and her all together.

Q.   And did you follow those directions?

A.   I did because I was trying not to overstep.

Dakota -- Linda put Dakota in charge so I was trying to abide by it.

Q.   Okay.  Are you aware of -- the Richmond property that's an issue in this case, are you aware of that property?

A.   You're talking Rosenberg?

Q.   Rosenberg, I'm sorry.

A.   So there was four properties in Rosenberg. There was two off of Spur 529, and then there were two on Old Richmond Road.

Q.   Okay.  The ones on Old Richmond Road --

A.   The ones on Old Richmond Road, there was the building that I worked in, and then right next door to it there was -- I want to say it was 2 acres, but if I'm correct, those 2 acres have already been sold.

Q.   Right.  And how did you become aware that Dakota was selling those properties?

A.   Because I was going to pay taxes, and he said, "Don't.  I'm in the middle of selling that one.  It's almost about to close."

Q.   Did he ever tell you, or did you ever hear anything about what his plan was to do with the proceeds?

A.   No, it was none of my business to ask that.

Q.   Do you have any knowledge about any other

*Joanna Gonzales Lambert - September 24, 2025*   138
*Direct Examination by Mr. Culp*

property that he was trying to sell?

A.   Yes, he was trying to sell the ones off Spur 529 and the property there where I was working out of, off of Old Richmond Road.

Q.   Okay.  All right.  While you were at the club, working at the club under Dakota's direction, did you ever notice any misuse of funds?

A.   Yes.  I brought it to both Dakota and Madi's attention and asked about them because I had -- there are forms that I had to do -- money really.  So I would have to give 15,000 -- 10 to 15,000 out to them every week to do payouts to the girls, and the girls meaning entertainers, contract laborers.  I would give them that money, but when I would get the bags back, they were always short, and nobody could ever explain it -- I'm sorry.

Q.   Maybe take a step back and explain what the bags are and how that all transpires.  I'm not sure I understand.

A.   Okay.  So at the club, there are various POS stations.  POS stations where let's say a customer comes in, they make a payment.  The payment goes through that register.  Okay?

Q.   Okay.

A.   So everybody has -- there was two bars and then

the door and then the waitresses.  The waitresses were their own POS system.  I did not give waitresses banks, but the bars and the door girls always started off with a small bank.  That's if someone came in, they could at least give change back.

Q.   Okay.

A.   And that bank would grow as the day went on because even though they're giving change back, they're getting other denominations making the bank go higher.

Q.   Sure.

A.   Once they had all their banks, at the end of the week, I would get all the banks for the week, count it out, and then if there were any issues and shortages, I would make sure Madi and Dakota understood and knew what was going on.  For a while there, there was never any answers back on it and then --

Q.   Wait, wait, so when you say "any answers," does this mean you were bringing it to their attention?

A.   Oh, yes, sir.  I did it every week.

Q.   How much money are we talking about?

A.   Sometimes a few hundred.  A few times it was almost a thousand.  At one time it was short about $5,000.  And there was no recollection of where it went. I had copies, and I scanned them all in so that Madi could review them because she heard Dakota had access to

the Dropbox so they could see it.

Q.   Was any action ever taken in regards to these missing funds that you're aware of?

A.   I know that Madi would talk to the managers. She would have manager meetings, and my understanding is she would say she would discuss --

MR. AVANT:  Objection to hearsay.

THE COURT:  Sustained.

THE WITNESS:  Sorry.  I'm sorry.

THE COURT:  It's okay.

THE WITNESS:   It's okay.  He's just doing his job.  You keep on going.

A.   Okay --

THE COURT:  No, no, no, I mean -- now I've sustained it.  The attorney will ask another question.

THE WITNESS:  Okay.  I'm sorry.

THE COURT:  That's okay.  Don't worry about it.

Q    (BY MR. CULP) So were changes made -- so I'm trying to understand how -- what Dakota did differently that Frank didn't do that might have made a change that caused this to happen?

A.   On those cash out, tip out sheets, they're supposed to write where the funds go.  There were some written items on there that I always had questions on.

So I would confront Madi on it.  After a while she wouldn't discuss anything with me, so I went to Dakota, and when I asked Dakota about one specific item, he said, "Well" --

MR. AVANT:  Objection to the hearsay.

THE COURT:  Sustained.

THE WITNESS:  So I don't answer that?

THE COURT:  No, you stop there, and Mr. Culp will ask another question.

THE WITNESS:  Okay.

Q    (BY MR. CULP) So what -- tell me what changes were made to the system that caused this to happen.

A.   I could not tell you.  It's just the mishandling of money, in my opinion, but that's just my opinion.  My opinion does not matter.

Q.   So tell me what Frank did differently.

A.   Frank stayed on top of everything.  If any money was missing, Frank made people accountable for it. After that -- after Frank left, there was no accountability.

Q.   And did you talk to Dakota about these issues?

A.   No.  I spoke to Madi because Dakota had Madi in charge.

Q.   Okay.  And who is Madi?

A.   Madi is Madison Fontenot, Dakota's wife.

Q.   Okay.  And are there any other things that you noted while you were working there that you thought were improper use of funds of the company?

A.   Yes, I would -- Dakota would ask me to write something off, and I'd tell him that's -- I'm not supposed to do that, that's not a proper write-off.

MR. AVANT:  Objection to hearsay.

THE COURT:  Dakota is a party opponent, isn't he?

MR. AVANT:  Well, not for this witness.

THE COURT:  Excuse me?

MR. AVANT:  Not for this witness.  She's not a party.

THE COURT:  They're asking the questions.

MR. AVANT:  I think that extends to this particular witness, Your Honor.  And she also is talking about statements she made, which would also be hearsay.

THE COURT:  Statements she made would be hearsay outside of court --

MR. AVANT:  It's mixed in there.

MR. CULP:  Statements that who made, Madi?

THE WITNESS:  That I made --

THE COURT:  She made herself outside of court.  To that extent it's sustained.  And then I'll refresh my memory on party opponent exception.

*Joanna Gonzales Lambert - September 24, 2025*    143
*Direct Examination by Mr. Culp*

Q    (BY MR. CULP) Okay.  So what did Dakota say, tell you to do?

A.    He would tell me, "My father wrote it off.  I should be able to write it off."

I told him, "There are things that you cannot write off according to the IRS."

Q.    Okay.  And so what things was he asking you to write off?

A.    Some travel things, travel.  Some things were business, other things were not.  So if it was not business, I would tell him I was not able to.  He said, "It's travel, write it off as travel."  So I did so.

Q.    Okay.  And did you -- at some point you decided to resign from your employment; is that true?

A.    Yes, sir, I did.

Q.    Why did you decide to do that?

A.    Because I was becoming a person that was not good.  I was being rude and disrespectful to my bosses, and that was wrong.

Q.    Okay.

A.    So the best thing I could do was to remove myself from the situation because it was not right of me to be rude and disrespectful to them.

Q.    Okay.  And why were you being rude and disrespectful to your bosses?

Alexis Cook, CSR
Official Court Reporter, Probate Court No. 1

*Joanna Gonzales Lambert - September 24, 2025*   144
*Direct Examination by Mr. Culp*

A.   Well, I took things I guess you would say, personal by the way they would speak to me, and they were rude, and I took it personally.  So I, myself, felt it was best that I would remove myself from the situation.

Q.   And did you ultimately stay?

A.   Not to Dakota or Madi, no, sir.

Q.   Did you ultimately stay with the company?

A.   Yes, sir, I did.

Q.   And why is that?

A.   I -- probably about a month, a month and a half before the sale of the company, maybe more, I telephoned Ms. Linda and I told her I could not do this anymore, one, my health; and two, I'm becoming a person that I should not be.  I'm rude and disrespectful to my bosses, and that's not right.

Q.   But you ended up staying?

A.   She asked me to please hold on.

Q.   Okay.  And we talked earlier about the direction from Dakota to not provide information to Ms. Goehrs.  Do you recall that?

A.   Yes, sir.

Q.   Did you ever begin again to give information to Ms. Goehrs?

A.   Yes, I did.  Probably a few weeks after I spoke

to Ms. Linda, maybe three, I can't remember, she came to the office, and she started asking me for paperwork, and I told her, "Okay.  So" --

MR. AVANT:  Objection to the hearsay, to both Ms. Goehrs' statements and this witness' statements.

THE COURT:  I didn't hear her entire statement, but it didn't sound like it was being offered for the truth of the matter asserted, just simply that there was a response to a question.

Why don't you reask the question, and let's see if we can get clarification.

Q    (BY MR. CULP) So Ms. Goehrs came to the office and asked to look over paperwork?

A.    Yes.

Q.    Was there -- so at what point -- what my question was:  When and why did you start disclosing information to Ms. Goehrs as you hadn't done since Dakota had instructed you not to?

A.    Because Ms. Goehrs told me she was my boss before they were my boss.

Q.    Okay.  And is that the first time you had heard that?

A.    Yes.

Q.    And how far before the closing on the company,

the sale of the company was that?

A.   A month and a half.

Q.   Okay.

MR. CULP:  I pass the witness.

THE COURT:  Mr. Cantrell?

**CROSS-EXAMINATION**

BY MR. CANTRELL:

Q.   Ms. Lambert, just a couple follow-up questions. Did the club pay for personal credit card charges for Dakota and his wife?

A.   Yes.

Q.   Did the club pay for personal charges related to Dakota's law firm?

A.   Yes.

Q.   And did the club pay for personal expenditures for detailing cars and personal expenses for Dakota and Madi?

A.   Yes.

Q.   Did the club pay for liquor and food that Madi took or Madi and Dakota personally?

MR. AVANT:  Objection to the leading.

THE COURT:  Overruled.

Q   (BY MR. CANTRELL) Did the club pay for food that Madi and Dakota would then take home?

THE WITNESS:  I can answer that?

THE COURT: Yes.

A. Okay. I'm sorry. They would not take it home. They would consume it there at the club.

Q (BY MR. CANTRELL) Okay. So they drank on the club's dime, so to speak?

A. Yes.

Q. Okay. And did Dakota pay himself a salary?

A. Yes.

Q. What did his salary start at?

A. At first he was getting a salary of, I want to say, about 2,000 a week -- or every two weeks, I'm sorry. When we took his mother off of payroll, he instructed me to give his paycheck and his mother's paycheck combined, so I did so.

Q. So what did that go from? You said 2,000 every other week to then what?

A. Oh, wow. I can't remember what Holli's was, and I can't remember that unless I'm looking at the books. I cannot remember Holli's.

Q. Did he increase his own salary again?

A. Yes. When Frank Kent left, I was to give him his salary, his mother's salary and Frank Kent's, and his statement was because I was making $300,000 working for my father-in-law, I need to make that again.

Q. Is that when he then started paying himself out

of the club's funds, $300,000?

A.   No, he was paying -- getting a payroll check that way.

Q.   Okay.

A.   So it was 300 -- almost -- it was 250-some thousand a year he was getting.

Q.   Okay.  And was his wife also on payroll?

A.   Yes.  Ms. Madison did work though.  I have -- she did work to get her paycheck.

Q.   How much -- I take it by the implication that you don't believe Dakota did any work to justify the paycheck he received?

A.   Not the paycheck that he was getting, no, sir.

Q.   With Madi --

A.   She started making 70,000 a year, and when she gave a manager a raise, she took it out of her pay.  So she lowered her pay to give the manager the raise.

Q.   Did Dakota, other than the salary, other than his wife's salary, did Dakota in any way receive any sort of management fee on top of the salary?

A.   Yes, sir.  He did receive management fees out of Entertainment Marketing and Management.

Q.   Who paid the management fees?

A.   Entertainment -- well, it was -- some of the funds came from Ice.  I know at one time it came from

the Holli Ann Hardin Trust.

Q.   But all generated from club activity?

A.   I do not believe the one from the Holli Ann Hardin Trust was club activity but...

Q.   Okay.  All right.  How much was the management fee, if you remember?

A.   One was 100,000.  One was 50,000, and I think one was 300,000.

Q.   Okay.  Is this the same time frame we've been talking about from 2023 to 2025 when the club sold?

A.   Yes, sir.

Q.   Okay.  At the same time that Dakota was paying himself this salary that Dakota was using personal expenses for the company that Dakota was paying himself --

MR. AVANT:  Objection to the counsel testifying.

THE COURT:  Counsel has laid a foundation for this question already.

MR. AVANT:  Objection to the compound would be my next objection.

MR. CANTRELL:  It's not a compound question because I didn't get there.

THE COURT:  I don't believe it's compound because he's just simply laying a foundation for his

*Joann Gonzales Lambert - September 24, 2025*   150
*Cross-Examination by Mr. Cantrell*

question, and the foundation is based on evidence that's already come forward.  Overruled.

Q   (BY MR. CANTRELL) But for the money that left the club for those reasons -- let me ask it differently. Could you have covered the note if there were no salary or management fees or personal expenses being paid?

A.   Yes.

Q.   Okay.  And then the note, as I understood, fell behind by I think you said several months before anyone alerted Ms. Goehrs?

A.   Yes.

Q.   And at that point, had there already been threatened foreclosure proceedings?

A.   Yes.

Q.   Okay.

A.   We got served, I want to say, twice, maybe three times, and every time I would notify Dakota.

Q.   Okay.  And then were there back taxes that were owed and unpaid as well?

A.   Yes.

Q.   And what types of back taxes were owed and unpaid?

A.   The liquor mixed beverage and gross receipt tax and sales and use tax and the SOB tax and the payroll taxes.

Alexis Cook, CSR
Official Court Reporter, Probate Court No. 1

*Joann Gonzales Lambert - September 24, 2025*    151
*Cross-Examination by Mr. Avant*

Q.    Okay.  I think there was some discussion earlier about the comptroller.  Did the comptroller ever intervene and shut down any accounts?

A.    Yes, all Ice Embassy's accounts were frozen.

Q.    Okay.  By the comptroller due to what reason, if you know?

A.    Unpaid bills.

Q.    Okay.  And during the time that the bills were being unpaid, did Dakota and his wife continue to receive the compensation and funds that you've described previously?

A.    Yes.

STATE OF TEXAS

COUNTY OF HARRIS

     I, Alexis Cook, Official Court Reporter in and for Probate Court 1 of Harris County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

     I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

     WITNESS MY OFFICIAL HAND this 20th day of November, 2025.

                              /s/Alexis Cook
                              _____

                              Alexis Cook, CSR
                              Texas CSR 8489
                              Official Court Reporter
                              Probate Court 1
                              Harris County, Texas
                              201 Caroline, Suite 600
                              Houston, Texas 77002
                              Telephone:  832-927-1420
                              Expiration:  1/31/2027